UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANTHONY TELLIS and BRUCE | * | CIVIL ACTION NO._____ |
| CHARLES, on behalf of themselves | * | |
| and all other similarly situated prisoners | * | |
| at David Wade Correctional Center, | * | |
| | * | |
| PLAINTIFFS, | * | |
| | * | SECTION _____ |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, SECRETARY OF | * | JUDGE _____ |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS; | * | |
| JERRY GOODWIN, WARDEN OF | * | CLASS ACTION |
| DAVID WADE CORRECTIONAL | * | |
| CENTER; COL. LONNIE NAIL; | * | |
| DOCTOR GREGORY SEAL; ASSISTANT | * | |
| WARDEN DEBORAH DAUZAT; | * | |
| STEVE HAYDEN; AERIAL ROBINSON; | * | |
| JOHNIE ADKINS; and THE LOUISIANA | * | |
| DEPARTMENT OF PUBLIC SAFETY | * | |
| AND CORRECTIONS, | * | |
| | * | |
| DEFENDANTS. | * | |

## **COMPLAINT**

### **INTRODUCTION**

1.      Men at David Wade Correctional Center (hereinafter "DWCC") are being held in

extreme, abusive conditions.  They are held in prolonged solitary confinement or extended

lockdown for months and years, often unable to go outside for weeks on end.  There is no

external sensory stimulation—no television, no radio, and little human contact. Men held in these

conditions are allowed to place one phone call per month to someone in the outside world.

2.      These extreme conditions create mental illness, and exacerbate pre-existing

mental illness, causing psychotic decompensation and propensity for acts of self- harm. Some

1

people hear voices, or talk and scream to themselves. Some engage in cutting themselves and attempting suicide to escape the extreme conditions. Two men have sliced open their testicles and one attempted to cut off his ear. Another man climbed a barbed-wire fence and attempted suicide by diving off headfirst. Others bang their heads against the walls. The people confined at David Wade are at immediate risk of harm without this Court's intervention.

3.      Prisoners are placed in extended lockdown, either in a double bunk cell or a more restrictive solitary cell, without regard to whether they are already at risk for mental illness, decompensation, or self-harm.   Once on extended lockdown, people with mental illness decompensate and symptoms become more severe. Staff then respond to symptoms of mental illness by using restraint chains on people in cells, chaining people to wooden restraint chairs, using chemical spray on people in cells, issuing additional write-ups or criminal charges, taking away outdoor time, moving prisoners to more extreme isolation, and taking away all clothing, reading material, and mattresses as punishment.

4.      Virtually no mental health care is provided to prisoners on extended lockdown, aside from scattershot, poorly administered and inconsistent medication. What minimal contact prisoners at David Wade have with a psychiatrist at the prison occurs once every three to six months, lasts less than ten minutes and is supervised by a security officer in the room. If prisoners at David Wade request mental health care they are placed on "suicide watch" which means that they are stripped of clothing and belongings, and held in a solitary confinement cell on the disciplinary tier for weeks. Suicide watch is only provided on the disciplinary tiers. There is no lesser intervention provided and no otherwise functioning sick call or grievance system available to seek mental health care.

5.      Plaintiffs bring this action for injunctive and declaratory relief to remedy the destructive cycle imposed by Defendants in which prisoners suffer breakdowns due to untreated mental illness under harsh and brutal conditions, Defendants respond with punitive suicide watch instead of treatment, Defendants ignore the worsening symptoms of mental illness, and then Defendants punish those who speak out or act out due to lack of treatment.  This cycle continues until the prisoner is either totally unable to care for himself and has to be transferred out of the prison into an acute care facility or is released on to the street.  This lawsuit seeks to enjoin the failed systems that deprive prisoners of their rights to humane, civilized conditions of confinement.

6.      Plaintiffs Anthony Tellis and Bruce Charles, each an individual with a disability and prisoner of DWCC, bring this action under Title II of the Americans with Disabilities Act ("ADA), 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act (Section 504), 29 U.S.C. § 794, and 42 U.S.C. § 1983 to remedy violations of the Eighth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

7.      Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 12131 *et seq.*, and 29 U.S.C. § 794. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 1343, and § 2201.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because many of the events or omissions complained of occurred here, the Department of Public Safety and Corrections is headquartered here, and the Defendant Secretary resides here.

## PARTIES

### A.    DEFENDANTS

9.    Defendant James LeBlanc is the Secretary of the Louisiana Department of Public Safety and Corrections ("DPS&C"). Secretary LeBlanc is ultimately responsible for the control, oversight, and functioning of all programs and facilities within the DPS&C, including David Wade Correctional Center. He formulates, directs, and maintains all regulations of the DPS&C, and determines the DPS&C's policies regarding management, personnel, and total operations. This includes ultimate determination of facilities and conditions in which the DPS&C houses people with mental illness. Defendant LeBlanc directs the DPS&C's central office and field staff, which are charged with carrying out the work of the agency. He is responsible for protecting the constitutional and statutory rights of all persons held by the DPS&C, including at David Wade Correctional Center.  Defendant LeBlanc is the final policymaker with regard to the conditions at DWCC. He has implemented or supported the implementation of the policies that cause harm to Plaintiffs, and has failed to implement additional policies that would prevent harm to Plaintiffs. He has oversight authority over DWCC, which he has failed to exercise to prevent harm to Plaintiffs.  At all times relevant to this Complaint he was acting under color of law and in his official capacity.

10.    Defendant Jerry Goodwin is the Warden over David Wade Correctional Center. He is responsible for control over DWCC and makes all final staffing, budget, and administrative decisions that are not otherwise made by Defendant LeBlanc. He is responsible for the safety and care of all persons held at David Wade Correctional Center and is responsible for protecting and implementing prisoners' statutory and constitutional rights. He oversees disciplinary actions and decisions, housing decisions, and the supervision of and care for people with serious mental

illness. He personally sets and implements policies that cause the onset of mental illness, mental decompensation, and harm to Plaintiffs. He is sued in his official capacity.

11. Defendant Lonnie Nail is a Colonel at DWCC. Nail has final authority over operations of the "south side" of the facility, which houses the extended lockdown and solitary confinement populations at DWCC, including Plaintiffs and the proposed class members. Upon information and belief he answers only to Defendants Warden Goodwin and Secretary LeBlanc. He participates in and supervises disciplinary actions and decisions, staffing decisions, housing decisions, and supervision of and care for people with serious mental illness. He personally sets and implements policies that cause harm to Plaintiffs, including causing decompensation and the onset of mental illness. He is sued in his official capacity.

12. Defendant Doctor Gregory Seal, M.D. is a contract psychiatrist at DWCC. Defendant Seal fails to adequately treat and care for Plaintiffs and proposed class members. He implements treatment and non-treatment decisions that cause mental deterioration and harm to Plaintiffs and proposed class members. He is sued in his official capacity.

13. Defendant Assistant Warden Deborah Dauzat is the Mental Health Director at DWCC. She is a Licensed Clinical Social Worker and a Board Approved Clinical Supervisor. She participates in hiring of mental health staff. Defendant Dauzat fails to adequately supervise the mental health staff and oversee treatment planning. Defendant Dauzat fails to ensure that mental health services and programs are adequate to address the serious needs of Plaintiffs and proposed class members. She implements treatment and non-treatment decisions that cause mental deterioration and harm to Plaintiffs and proposed class members. She is sued in her official capacity.

14.     Defendant Steve Hayden is a Corrections Program Manager 2 at DWCC. He holds a Master's Degree in Industrial Psychology. Defendant Hayden fails to adequately treat and care for Plaintiffs and proposed class members, and provides clinical care without being licensed to do so. He implements treatment and non-treatment decisions that cause mental deterioration and harm to Plaintiffs and proposed class members. He is sued in his official capacity.

15.     Defendant Aerial Robinson is a Social Services Counselor 1 at DWCC. She implements treatment and non-treatment decisions that cause mental deterioration and harm to Plaintiffs and proposed class members. Defendant Robinson is a Licensed Clinical Social Worker. Defendant Robinson fails to adequately treat and care for Plaintiffs and proposed class members. She is sued in her official capacity.

16.     Defendant Johnie Adkins is employed by DWCC as a Social Services Counselor I. In that capacity, he conducts interviews with inmates on suicide watch, conducts PREA interviews following a sexual assault, and informs inmates of the passing of relatives. He fails to adequately treat and care for Plaintiffs and proposed class members. He provides clinical care without being licensed to do so, and his decisions cause harm to Plaintiffs and proposed class members. He is sued in his official capacity.

17.     The Department of Public Safety and Corrections ("DPS&C") is the administrative arm of the State of Louisiana responsible for administering the state's correctional facilities, including DWCC where Plaintiffs are incarcerated. The DPS&C is an instrumentality of the State of Louisiana. The DPS&C is responsible for each of the actions and inactions complained of herein. The DPS&C is a recipient of federal funding. The DPS&C as an entity is sued pursuant to the ADA and Section 504 of the Rehabilitation Act only.

6

### B.      PLAINTIFFS

18.     Plaintiff Anthony Tellis is a prisoner housed in extended lockdown at DWCC. Mr. Tellis first came into DWCC custody in 2008 and has been on extended lockdown since February 2016.  He was not diagnosed with a mental illness prior to being incarcerated, but has since developed mental illness.  Mr. Tellis is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9).  Mr. Tellis is being exposed to inhumane conditions in violation of the Eighth Amendment.  He is also being denied adequate mental health treatment and reasonable accommodations for his disabilities under the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973.  Mr. Tellis is a representative of the putative class and subclass.

19.     Plaintiff Bruce Charles is a prisoner housed in extended lockdown at DWCC.  Mr. Charles has been in DWCC custody since June 2016 and has been housed on extended lockdown since then.  He was diagnosed with bipolar disorder prior to his incarceration and that diagnosis was recognized during his placement at the Dixon, Hunt, and Allen state correctional facilities prior to his transfer to DWCC.  Mr. Charles is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9).  Mr. Charles is being exposed to inhumane conditions in violation of the Eighth Amendment.  He is also being denied adequate mental health treatment and reasonable accommodations for his disabilities under the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973.  Mr. Charles is a representative of the putative class as well as the subclass.

20.     Plaintiffs bring this action under 42 U.S.C. §1983, for violations of the First and Eighth Amendments to the United States Constitution on behalf of all prisoners currently held, or

who will in the future be held, in extended lockdown at DWCC in the N-1, N-2, N-3, and N-4 buildings.

21.     Plaintiffs also bring this action under the ADA and Section 504 on behalf of a sub-class consisting of all individuals on extended lockdown at David Wade Correctional Center who have or are perceived as having a qualifying disability related to mental health, as defined within the Americans with Disabilities Act. This sub-class includes all individuals who develop such a mental illness during the duration of time they are incarcerated in extended lockdown. On behalf of the sub-class, Plaintiffs advance claims pursuant to the First and Eighth Amendments as well as the ADA and Section 504.

## FACTUAL ALLEGATIONS

### A.  The Physical Plant of Lockdown Units at David Wade Correctional Center

22.     David Wade Correctional Center is divided into two compounds: the North Compound and the South Compound. The South Compound is comprised of five buildings, N-1 through N-5.

23.     The abuses complained of herein occur at the South Compound of the prison, buildings N-1 through N-4, which are solitary confinement and extended lockdown tiers.[1]

24.     For the purposes of the litigation, extended lockdown refers to the confinement in a cell for 23 to 24 hours per day. Solitary confinement refers to the subset of extended lockdown in which a single prisoner is confined alone in a cell with no regular social interaction for 23 to 24 hours per day.

---

[1] N-5 is not subject of this litigation as it houses high-profile prisoners in different conditions than the other buildings.

25.     Each lockdown building has four linear tiers: A, B, C, and D. The tiers each have 16 cells. These cells may used as double-man cells, except in the N-4 building, which is the solitary confinement building.

26.     Of the 16 cells on each tier in N-4, the first two cells are reserved for individuals who are on suicide watch. There is a camera in each of those cells, as well as in all cells on the N-4 C tier.

27.     The buildings are not consistently climate controlled. There is no air conditioning. Fans were installed approximately a year ago. In the summer the cells are very hot, and in the winter they are cold.

**B.  Conditions in the David Wade Lockdown Units are Brutal and Inhumane.**

28.     All prisoners who are transferred to DWCC are housed in lockdown for a period of time prior to being moved to general population. The lockdown units also are used for any prisoner in general population who is suicidal or attempts suicide. Finally, the units are used for the disciplinary population: prisoners who have committed a rule violation in general population may be administratively sentenced to serve time in the lockdown buildings.

29.     On extended lockdown, individuals are allowed outside for fifty-five minutes per day Monday through Friday, unless they are on "yard restriction." If on yard restriction, one is allowed outside for fifty-five minutes on Saturdays and Sundays. Many people are on yard restriction for months or years on end.  Mr. Charles has been on yard restriction for nearly two years.

30.     People on extended lockdown get one ten-minute phone call per month. That phone call is not at a regularly scheduled time and thus there is no way to plan for a family member to be available for the phone call. Staff may refuse a prisoner's phone call without

giving any reason.  Staff will often refuse the call as retaliation against the individual requesting the call.  Individuals on extended lockdown are unable to make attorney phone calls.

31.     Extended lockdown prisoners are not brought for a shower every day. Staff barter additional food in exchange for prisoners waiving their shower time, do not wake sleeping prisoners for their showers, or simply ignore the prisoner and record the shower as having been waived.

32.     Prisoners on extended lockdown are allowed three books. There is no radio, television, educational program, self-help program, or any other external stimuli on the tier. Prisoners who are not literate or who have become incapable of reading due to mental illness have nothing to occupy their minds on extended lockdown.

33.     Prisoners cannot see one another as the cells face concrete walls and the outer windows.

34.     Interactions between prisoners are forbidden by the written policy of DWCC, and they may receive a disciplinary write-up for attempting to communicate with one another.

35.     Prisoners on extended lockdown, especially those in solitary confinement, are allowed very little human contact.

36.     Most of the individuals serving disciplinary time on the lockdown units have been diagnosed with one or more mental illnesses. Due to the lack of human contact and uncontrolled mental illness, many will scream, laugh, and talk to themselves. Others rock in place or deteriorate to more severe manifestations of their conditions, such as smearing blood or feces. Some are unable to communicate at all.

37.     Prisoners who suffer a major psychiatric episode frequently lose the ability to take care of themselves for the duration of such an episode. When a prisoner in extended lockdown is unable to care for himself, he may go weeks or months without a shower.

38.     Defendants maintain a policy styled "Offender Posted Policy 34(S)," hereinafter "Policy 34," or "strip cell." This policy permits staff to strip a prisoner of all belongings, including his mattress, in response to a perceived rule violation.

39.     Policy 34 is independent of any formal disciplinary sentence. It is deployed at staff discretion with no due process protections or hearings. The absence of any procedural safeguards means that a staff member who becomes upset with a prisoner may simply put the prisoner on Policy 34 without any showing that the prisoner has violated any institutional rules.

40.     On Policy 34, prisoners are not allowed a mattress outside of the hours of 9pm to 5am. Although the policy calls for mattresses to be returned at 9pm, they are frequently not returned timely or at all. Prisoners will be housed this way for thirty days or more, at the whim of the ranking correctional officers. This status is strictly punitive.

41.     If a prisoner on lockdown requests mental health care, he will usually be placed on suicide watch.

42.     DWCC has two categories of suicide watch, standard and extreme.

43.     Prisoners on standard suicide watch are clothed only in a short paper gown.  The prisoner has no access to any property, including mattresses, letters, or books. He can only stand or sit in his cell on the concrete in a short paper gown.

44.     On extreme suicide watch, the suicidal prisoner is housed in a paper gown without access to property, but is additionally placed in restraints while in a cell alone.  Those restraints may be: (1) four-point restraints, which consist of both hands being cuffed with the chain for the

cuffs connected to a box to prevent movement or tampering, a belly chain connected to the handcuff chain, and shackles on the ankles, (2) chaining a person to a restraint chair, which attaches each limb to the chair, or (3) the restraint chair with a helmet to prevent spitting and head banging. DWCC staff sometimes restrain prisoners in this chair for days at a time, and often use the chair rather than providing actual mental health care.

45. DWCC staff engage in targeted punishment of suicidal prisoners. Defendants refuse to allow prisoners on suicide watch to visit with relatives or use the telephone to access any source of outside emotional support. Although the facility possesses suicide resistant mattresses, those mattresses are often not given to prisoners on suicide watch, who must stand and sleep on the concrete.

46. In the winter, prisoners' cells can be extremely cold. Prisoners uniformly report that sometimes staff open windows near the suicide watch cells to make conditions even colder. Because they do not have shoes or mattresses people must stand barefoot on concrete in a small paper gown.

47. Eleven independent prisoners' accounts confirmed that windows were left open late December of 2017 and early January of 2018, including January 2, 2018, when temperatures in Homer, Louisiana reached a low of 14 degrees Fahrenheit. The use of extreme cold to punish behavior on the tier is not a single isolated incident and occurs so frequently that prisoners have a word for it, "bluesing" or "getting bluesed."

48. When a prisoner in extended lockdown decides to self-report a mental health need, one must prepare to spend days and likely weeks without clothing, on a concrete floor, without a mattress, and without access to any property. Individuals are held in these conditions

for days or weeks at a time, irrespective of the actual risk of harm, whether other treatment methods would be effective, and even once the threat of self-harm has subsided.

49.     These conditions function as a deterrent to requesting any mental health care at all. Confining Plaintiffs to suicide watch as a general response to mental health concerns significantly chills willingness to report signs and symptoms of mental illness to staff.

50.     The extreme isolation, deprivation of stimuli, severe punishments, and acts of torture all work to create a significant risk of harm to the mental health of the people housed at DWCC.

**C. Defendants Fail to Provide Adequate Mental Health Care and Are Deliberately Indifferent to Prisoners' Mental Health Needs.**

51.     Defendants fail to provide any meaningful access to mental health care to the prisoners on extended lockdown. *First*, Defendants fail to identify prisoners with serious mental illness and consistently understate the severity of mental illness where it is identified. *Second,* even when an individual with mental illness is identified, every prisoner receives the same treatment plan that calls for nothing except medication management. *Third,* when the inadequate treatment causes a prisoner to decompensate, the only means Defendants employ to stabilize a patient is to simply place the prisoner on suicide watch. *Fourth,* Defendants' failure to adequately staff the mental health program at the prison contributes to each of these problems.

52.     Each of these failed policies put prisoners at severe risk of mental illness and physical harm. As outlined in Part C of this Complaint, these policies have caused actual harm to each named Plaintiff and to others housed at DWCC. Defendants act with deliberate indifference to these risks.

      **a.**    ***Defendants' Inadequate Mental Health Screening Places Prisoners at Risk of Serious Harm.***

53.     Mental health screening at DWCC is a failure at every juncture, including during intake, regular screening, and in response to crisis and suicide watch. Where screenings do occur, the inadequacy of the process results in under-diagnoses of serious mental illness.

54.     Defendants' failure to identify prisoners with serious mental illness exposes prisoners to significant risks of mental and physical harm and deprives prisoners of the opportunity to receive needed treatment.

        i.     <u>Defendants Place Prisoners on Extended Lockdown Without Adequate Screening.</u>

55.     Proper mental health screening is critical to the safety of prisoners.

56.     Prisoners sentenced to the DPS&C are often initially assessed at Elayn Hunt Correctional Center ("EHCC") before being assigned to a specific DPS&C facility for housing. EHCC has reception and diagnostic capacities, has a psychiatrist on staff, and has a special housing unit for individuals with severe mental health needs.

57.     If a prisoner is placed by DPS&C at DWCC, David Wade staff then perform a mental health screening. Inexplicably, these assessments do not take into account the person's initial DPS&C evaluation or their DPS&C records. These screenings are cursory, unhelpful, and produce results that are plainly contrary to facts already in the DPS&C's own records.

58.     The mental health screening is typically performed by Steve Hayden, who is not a psychiatrist, psychologist, social worker, or counselor.

59.     Prisoners known to the Defendants to have serious mental illnesses, including extensive histories of suicidal ideation and behavior, are routinely placed on extended lockdown at DWCC.

60.     Placement on extended lockdown further exposes a prisoner with serious mental illness to significant risk of self-harm. Defendants' screening mechanisms disregard the information available in the prisoners' mental health records.

61.     Likewise, when a prisoner is placed on extended lockdown for a disciplinary reason, Defendants do not conduct any review of records to identify whether the prisoner has a mental health diagnosis that would require treatment or care inconsistent with the extreme isolation of solitary confinement or extended lockdown.

                    ii.     Defendants Fail to Conduct Regular Screening for Mental Illness
                            in Extended Lockdown.

62.     The absence of observation and monitoring of individuals on extended lockdown means that psychiatric decompensation goes unnoticed, as does the onset of new symptoms.

63.     Staff at DWCC conduct segregation interviews for prisoners in extended lockdown approximately every 90 days. These interviews are conducted primarily by Defendant Hayden and Defendant Robinson.

64.     The segregation interviews that are conducted are cursory and diagnostically unhelpful.  The documentation produced as a result of a routine segregation interview will nearly universally indicate that the prisoner is "within normal limits" in all areas, even for prisoners with serious mental health diagnoses. Interviews also usually indicate that the prisoner engaged in minimal conversation.

65.     Signs and symptoms of serious mental illness remain unidentified or untreated and prisoners experiencing crisis manifestations of mental illness are not detected before the person is a significant risk to himself or others. Plaintiffs Charles and Tellis have been harmed by the absence of ongoing screening for mental illness while on extended lockdown because they have not been assessed for changes to their condition despite new and worsening symptoms.

iii.   Defendants Do Not Conduct Mental Health Screening in Response
to Mental Health Crisis Situations.

66.     Defendants do not respond to evidence of mental health crisis with any system of

assessments, diagnostics, counseling, or treatment.

67.     Defendants do not conduct screenings or make mental health resources available

to prisoners with a pattern of suicidal ideation, even in the face of repeated mental health crises.

68.     Upon release from suicide watch, Defendants' policy only calls for one follow-up

interview, to be conducted one week after the prisoner is taken off suicide watch. The follow-up

interview uses the same format as the "Segregation Interview" and does not call for any further

mental health evaluations or services.

69.     Other manifestations of illness that fall short of self-harm or suicidal ideation are

treated as disciplinary violations and produce no mental health treatment or follow-up.

Defendants respond to yelling, cursing, refusing to move, and other behavior potentially

diagnostic of untreated mental illness as a disciplinary matter rather than a mental health

symptom.

70.     The failure of DWCC's system of intake, diagnosis, and routine evaluation

exposes all prisoners to the real risk that a mental illness will be left undiagnosed and untreated.

**b.     *Defendants Provide Inadequate Mental Health Treatment to Prisoners on
Extended Lockdown.***

71.     Prisoners on extended lockdown receive virtually no treatment for mental illness.

There is no counseling, group therapy, or support group, regardless of an individual's diagnosis

or response to medication.

72.     Prisoners on lockdown in DWCC only have contact with a contracting

psychiatrist, Defendant Seal, every three months.  These visits last approximately 3-5 minutes.

16

A security officer is present in the room at every visit, and thus, if the patient wants to seek mental health care related to treatment by security staff, there is no confidentiality or privacy. These visits lack indicia of either diagnostic or psychotherapeutic purpose due to their short duration, infrequency, and lack of confidentiality. Defendant Seal's signature does not appear on any treatment plans. Defendant Seal never prescribes counseling, group therapy, or any intervention whatsoever other than medication.

73.     Defendant Seal is retained by DWCC to provide these medication management visits to prisoners.  Defendant Seal provides no other mental health services to prisoners in solitary or lockdown.

74.     In the event that a prisoner does not receive a prescription for any medication from Defendant Seal, that individual receives no mental health treatment plan whatsoever.

75.     Treatment for many mental health conditions requires more than just medication. The chemical elements of treatment cannot replace therapy and counseling services to assist patients in coping with their mental illnesses.

76.     All treatment plans for prisoners in solitary or extended lockdown at DWCC are substantively identical.

77.     This generalized treatment plan that Defendants use to treat all Plaintiffs has no value. The treatment plan is the same regardless of diagnosis, treatment history, medication regimen, and all other individual circumstances.

78.     The long-term treatment goals in the treatment plans for everyone on extended lockdown are: "Long term treatment goals: 1. Maintain compliance with all institutional rules and regulations. 2. Maintain appropriate level of functioning. 3. Increase insight in order to be moved to a less restrictive environment. Date Met: on-going."

17

79.     The short-term objectives in the treatment plans for everyone on extended lockdown are: "Short Term Objectives: Comply with medications prescribed and advise staff of any adverse effects, Identify stressors that create behaviors warranting segregation, Consistently display appropriate behavior in accordance to institutional regulations."

80.     The treatment methods in the treatment plans for everyone on extended lockdown are absent. Each form cryptically states: "Treatment Methods: on-going."

81.     The plans are also completely devoid of any required actions on the part of DWCC to provide any monitoring, counseling, or therapy, regardless of any patient's medical history, diagnosis, or circumstances.

82.     The Defendants' treatment plan template indicates that a mechanism for achievement should be coded beside each short-term goal, identifying how Defendants will help the individual to achieve each identified goal. No treatment method codes are ever displayed and there is never any narrative explanation of a treatment method.

83.     Defendant Steve Hayden signed mental health treatment plans for both named Plaintiffs identifying himself as a "therapist." Mr. Hayden is in fact not licensed by the State of Louisiana to provide mental health care in any capacity.

84.     The mental health treatment forms are also signed as "Reviewed by Michele Dauzat, Assist. Warden, LCSW." Assistant Warden Dauzat did not have any contact with the Plaintiffs in the formulation of their treatment plans. She almost never interacts with patients on the lockdown units at DWCC, yet she approves their treatment plans. These plans are non-individualized and do not reflect any individual assessment by a qualified psychological professional.

85.     Plaintiff Anthony Tellis received a mental health treatment plan exactly as described above on April 22, 2016, September 22, 2016, and January 5, 2017.

86.     Plaintiff Bruce Charles received a mental health treatment plan exactly as described above on June 9, 2016.

87.     Mental health care at DWCC consists exclusively of haphazard medication and relegation to restrictive conditions of confinement. When a prisoner has a crisis manifestation of a mental illness there are no interventions available other than suicide watch. The cursory treatment plans reflect the complete absence of any other interventions.

   *c.*     ***Defendants Deprive Prisoners of Needed Medications.***

88.     Upon transfer to DWCC, Defendants do not continue the medications that were being prescribed and administered in the facilities where the prisoners were confined immediately prior to the transfer.  As a result, a prisoner often waits weeks without necessary medication, until he meets with Defendant Seal, receives a new prescription, and is integrated into the medication distribution rotation.

89.     Interruptions to mental health medications can trigger behavioral problems or cause additional symptoms in the patient's underlying mental health condition.

90.     Individuals who refuse medications are diagnosed as "in remission" despite a lack of review by a psychiatrist to determine whether the change in medication is appropriate.

91.     The record-keeping practices at DWCC are unreliable and dangerous.  Diagnoses shift without explanation.  Defendants discontinue or alter drug regimens with little paper trail.

92.     Defendant Seal's clinical notes often indicate that a prisoner has stopped taking the prescribed medication of their own accord. However, Defendant Seal's clinical notes are

often inconsistent with the medication distribution notes, which do not contain documentation of refused medication.

93.     When prisoners do refuse psychotropic medications, such refusal is rarely properly documented. Refusal does not prompt any notification to a psychiatrist or actual medical staff, despite possible mental and physical side effects of suddenly discontinuing psychotropic medications.

94.     This failure to document is despite the fact that "comply with medications prescribed" is a goal on all generic treatment plans for prisoners in extended lockdown.

95.     Mental health staff at DWCC frequently make decisions that are inconsistent with individual health concerns that are clearly apparent in their own records. For example, there is no process for identifying which prisoners are on medication regimens that cannot safely be terminated without a step-down process.

### d.      *Defendants Utilize Suicide Watch and Isolation as Substitutes for Necessary Mental Health Treatment*

96.     There is no mental health treatment unit at David Wade Correctional Center.

97.     Due to the lack of general mental health screening and treatment by qualified staff, Defendants use isolation and suicide watch as a response to any urgent request for mental health services, even if the request does not express suicidal ideation or threats of self-harm.

98.     Defendants' notes from cell-front visits indicate that staff visits to people being held on suicide watch are purely to determine whether the individual remains a threat to himself. The conversations are short and do not include any attempt to ascertain whether the individual is suffering from worsening mental illness or is experiencing a crisis manifestation of a chronic mental illness.

99.     The underlying mental illness causing the self-harm risk is not addressed, due to the complete lack of other mental health treatment and screening.  This often results in prisoners returning to suicide watch multiple times.

100.     The harsh conditions of suicide watch and lack of treatment trigger psychiatric deterioration and decompensation of prisoners.  People become trapped in a cycle of suicidal thoughts and self-harm, deterioration in the harsh conditions of suicide watch, and new behavioral incidents caused by untreated mental illness. This results in additional disciplinary and self-harm actions. This cycle goes on ad infinitum. It prevents people from ever regaining their mental stability or leaving the disciplinary unit at the prison.

101.     Once they request urgent or crisis mental health care, prisoners are usually forced onto suicide watch as the only available intervention. If the prisoner refuses suicide watch and requests other care, he may face a disciplinary charge of malingering.  The result is that many people will remain quiet and silently suffer as mental health symptoms worsen to avoid choosing between the harsh conditions on suicide watch or a disciplinary charge.

102.     The putative Class members all face a risk of being subjected to the Defendants' punitive, non-therapeutic policies and practices pertaining to suicide watch.   Given the prevalence of under-diagnosed and untreated serious mental illness at DWCC, every prisoner housed on the South Compound is at significant risk of being trapped in an ever-deepening cycle of untreated mental illness, crisis manifestations of the chronic mental illness, escalating crises, and housing on suicide watch.

###### *e.     Defendants Maintain Inadequate Mental Health Staffing*

103.     Mental health services at DWCC are abysmally inadequate. There is one contract psychiatrist, Defendant Seal.   He only sees patients every ninety days—in the presence of

security staff-- for medication management. Prisoners are unable to otherwise request visits with him.

104.    Unlicensed DWCC staff make mental health treatment and housing decisions based upon cursory, uninformed, or limited interaction with prisoners.

105.    Defendant Steve Hayden is unqualified and unlicensed to provide mental health care yet he makes most day-to-day decisions about care.  When he does walk-through the extended lockdown facilities, he does not provide any counseling services.

106.    Assistant Warden Michelle Dauzat is responsible for the mental health program at DWCC.  Warden Dauzat does not regularly meet with prisoners in extended lockdown. However, she signs off on paperwork for individuals on extended lockdown without having ever seen her putative patients.

**D.  Defendants' Lack of Mental Health Care Results in Serious Harm.**

107.    The failure to provide mental health care has substantially injured people incarcerated at DWCC. They have unnecessarily suffered from the treatable symptoms of mental illness, the exacerbation of symptoms of mental illness, increased instances of discipline and non-conforming behavior, the development of new mental illnesses, the increased need for treatment, and the diminished chance of successfully treating the mental illness in the future. The abysmal care causes serious and potentially irreversible harm to many of the men housed at DWCC.

108.    All prisoners on extended lockdown are subjected to the risk that a mental illness will develop and that Defendants will leave it untreated.

109.    It is well established that solitary confinement and extended cell confinement can have devastating effects on the mental well-being of a person.  The conditions of solitary

confinement and extended lockdown at DWCC are not merely abusive or psychologically painful, they cause the onset or major deterioration of Plaintiffs' mental illnesses.

   *a.*   ***Defendants' Policies and Practices Harmed and Continue to Harm the Named Plaintiffs.***

   110.   The Defendants' policies and practices for screening, treatment, and medication of mental illnesses on extended lockdown have harmed, and continue to harm, Anthony Tellis and Bruce Charles, the named Plaintiffs to this case.

   111.   These same policies and practices inflict the same harm on other members of the putative class and sub-class.

   i.   Plaintiff Anthony Tellis

   112.   Plaintiff Anthony Tellis was processed into the DPS&C on October 1, 2008. Mr. Tellis was administered a Personality Assessment Inventory at Forcht-Wade Correctional Center. This test indicated that "[t]his inmate's clinical scale elevation profile suggests that the inmate is experiencing mild to moderate psychiatric distress and impairment.  This distress appears to be manifested in anxiety, character pathology, paranoia, and psychotic symptoms."

   113.   The DPS&C transferred Mr. Tellis to David Wade Correctional Center for housing. Defendants LeBlanc and Goodwin maintain a policy requiring that every individual arriving at DWCC be housed in one of the extended lockdown units for a period of 90 days before they are eligible to be moved into general population at the prison.  Some individuals are not transferred into general population and remain on extended lockdown.

   114.    On October 6, 2008 Mr. Tellis received his intake screening at David Wade Correctional Center.  That screening indicated no mental health diagnosis or history. It showed

no mental illness and categorized him as Level of Care[2] (hereinafter "LOC") 5 which indicates that he has no mental healthcare needs. This screening is directly contrary to the assessment conducted five days earlier.

115.    On October 21, 2008, after two weeks in solitary confinement, Anthony Tellis composed a letter to the mental health department at DWCC.  In this letter he stated, "I need help mentally coping with [the] situation at hand" and "I'm being treated like an [sic] death row prisoner for no apparent reason."  He stated that "This matter is causing depression [. . .]."

116.    Two days later, on October 23, 2008, program manager and layperson Defendant Hayden entered a note in Mr. Tellis' file stating that all of Mr. Tellis' findings are within normal limits. He noted that Mr. Tellis requested to be moved from extended lockdown.  The form contains no reference to mental health treatment. It only states that Mr. Tellis will be referred to classification and there will be follow-up per policy.

117.    Defendant Hayden is not qualified to assess whether an individual needs mental health care or whether an individual's mental state is within normal limits. Defendant Hayden's lay opinion effectively ended DWCC's early inquiry into Mr. Tellis's mental state in 2008. Anthony Tellis never received any further evaluation or follow-up from a licensed mental health professional.

118.    Nearly three months later, on January 13, 2009, Mr. Tellis received a visit from Steve Hayden. During that visit, Hayden noted that Mr. Tellis made no mental health complaints. Mr. Tellis did not raise any mental health concerns at that time because he was afraid Hayden would keep him in extended lockdown longer if he raised the mental health issues again. This

---

[2] The DPS&C categorizes prisoners into five LOC groups, with LOC 1 for the individuals with the most serious mental health needs and LOC 5 for individuals with no significant mental health needs.

fear was rooted in the fact that DWCC has no mental health unit and that individuals with mental illness are often kept indefinitely in extended lockdown.

119.    Mr. Tellis had no disciplinary record at that time and was only being held in extended lockdown pending initial his classification for housing in the general population. Mr. Tellis received another follow up segregation interview on March 4, 2009 before being released into the general population.

120.    On December 15, 2009, Mr. Tellis again requested mental health services for addiction, anger management, and parenting in writing. In general population, Mr. Tellis received anger management and family group counseling, but no individual counseling.

121.    On February 12, 2016, Mr. Tellis assaulted another prisoner. The other prisoner died from pneumonia following injuries from that fight. Mr. Tellis was placed on strip cell subsequent to that altercation.

122.    On February 18, 2016, Defendant Seal met with Mr. Tellis. In a meeting that lasted less than ten minutes, he received no diagnosis.

123.    On April 21, 2016, Mr. Tellis was diagnosed with "mood disorder, not otherwise specified" and prescribed Celexa, a selective serotonin reuptake inhibitor used to treat depression.

124.    On November 3, 2016, Mr. Tellis was placed on suicide watch. His existing mental health problems had reached a crisis. He remained on suicide watch for approximately 24 hours.

125.    Mr. Tellis has remained on extended lockdown since February 2016.

126.    Mr. Tellis currently complains of auditory and visual hallucinations.

127.    Mr. Tellis' situation demonstrates that Defendants do not follow-up on initial diagnostic screenings, and do not provide any counseling or therapy in extended lockdown regardless of circumstances, and the severe psychological consequences of prolonged solitary confinement and lockdown.

ii.    Plaintiff Bruce Charles

128.    Plaintiff Bruce Charles was processed into DPS&C custody on February 20, 2013.

129.    On June 2, 2016, he arrived in extended lockdown at DWCC on transfer from Allen Correctional Center.

130.    On June 6, 2016, Mr. Charles received cursory and contradictory intake and review screenings.

131.    First, on June 6, 2016, Defendant Hayden completed a "Mental Health Intake Screening" for Mr. Charles. Hayden marked that his mood, affect, and thought process were within normal limits. He noted that Mr. Charles denied any current symptoms, suicidal ideation, treatment, or psychotropic medications. He wrote that "prior treatment" was "none."

132.    The DOC records for Mr. Charles prior to this date show, conversely, that Mr. Charles reported a diagnosis of Bipolar Disorder dating back to 2001, has been prescribed psychotropic medications since the age of 12, was prescribed Depakote while incarcerated, had treatment plans citing mood instability and depressed mood, and had been placed on mental health observation several times.

133.    Also on June 6, 2016, Defendant Hayden completed a "Level of Care Review" for Mr. Charles. Under "Axis I diagnosis" he circled "none indicated." Under "Diagnosis" in the "Severe Mental Illness" section, he checked "Bipolar Disorder" and entered a diagnosis date of

December 10, 2013. He assigned Mr. Charles to LOC 5h. LOC 5 indicates no current mental illness, and the modifier "h" indicates a history of mental illness.

134.    On June 9, 2016, Mr. Charles saw Defendant Seal for the first time in psychiatric clinic. Defendant Seal noted that Mr. Charles was not currently receiving medication, but previously received Valproic acid, Seroquel, Zyprexa, and Risperdal. Mr. Charles reported that he was struggling with sleep. Seal noted Mr. Charles' mood to be fair, and his affect to be flattened. Seal diagnosed Mr. Charles as having Bipolar I and prescribed Depakote, with the medication level to be checked in two weeks.

135.    The clinic assessment form documents that Mr. Charles would be scheduled for his next psychiatric clinic in 4-6 months.

136.    On the same day, June 9, 2016, another Level of Care Review form was filled out, reassigning Mr. Charles from LOC 5 to LOC 3. Under Defendants' policies, Mr. Charles would not anticipate another encounter with mental health staff for the next 30 days at least, despite the fact that he was starting a potent psychotropic medication.

137.    On June 12, 2016, within three days of the Level of Care Review, Mr. Charles was placed on extreme suicide watch after he tied a sheet around his neck in an attempt to hang himself.

138.    Defendant Assistant Warden Dauzat documented the attempted hanging in a "Progress Note" but did not enter information for any of the 17 indicators of mental status. Mr. Charles was placed on extreme suicide watch following the attempt, and was downgraded to standard suicide watch the next day.

139.    On June 14, 2016, Steve Hayden completed a "Progress Note" while visiting Mr. Charles on suicide watch. Hayden marked that his affect and mood were angry, his thought

content was suicidal, his judgment was poor, his attitude was demanding, his behavior was aggressive, and he had suicidal ideations. Hayden noted that Mr. Charles had a plan to harm himself and begin a hunger strike.

140.    On the same day, June 14, 2016, Defendant Adkins also completed a "Progress Note" while visiting Mr. Charles. Adkins marked that his mood was normal, his affect was mood congruent, his thought content was normal, his thought process was logical, his judgment was normal, his attitude was cooperative, his behavior was normal, and he showed no significant risk of suicide. Defendant Adkins noted that Mr. Charles appeared in good spirits, and did not complain or try to persuade.

141.    On June 14, 2016, two days after Defendant Dauzat wrote a note documenting Mr. Charles' suicide attempt, Defendant Dauzat signed his intake screening. This intake screening showed his level of care as 5h, no Axis I diagnosis, no suicidal ideation, no symptoms, no history of treatment, and no current treatment. Her signature follows the statements "The initial screening data have been reviewed, and needs for additional screening or assessment/consultation, if any, are documented in Section C", and "Plan: Follow up per policy". There are no additional notes following this statement of review. Mr. Charles was still on suicide watch when that document was signed.

142.    On June 17, 2016, Defendant Hayden completed notes stating that Mr. Charles still had suicidal ideations and threatened self-harm. On June 17, 2016, Defendant Adkins completed a note stating that Mr. Charles had clear thinking and felt better, and that "other than the heat, all was well".

143.    There is no documentation that Mr. Charles had any encounters with mental health staff on June 18 or June 19, while he remained on suicide watch.

28

144.    On June 20, 2016, Defendant Hayden noted that Mr. Charles had no suicidal ideations or plans to self-harm, and released him from suicide watch. None of the documents created during this period record any diagnostic batteries, inventories, assessments, or instances of staff talking with Mr. Charles about psychosocial factors, support systems, his adjustment to medication, his adjustment to a new environment, coping mechanisms, recognizing risk factors, or treatment options.

145.    Two weeks later, on July 4, 2016, Mr. Charles again reported suicidal ideations and was again placed on suicide watch. There is no documentation that Mr. Charles was seen on July 5. On July 6, 2016, Mr. Charles tied a sheet around his neck to attempt suicide. He was again placed on suicide watch, and remained on watch until July 11, 2016. He received a segregation interview on July 28. He was not seen again by mental health until October 10.

146.    This tangle of self-contradictory progress notes, bungled intake process, and suicide watch is the clearly foreseeable result of Defendants' policies and lack of planning and available mental health resources.

147.    This pattern has continued since Mr. Charles arrived in extended cell confinement at DWCC with diagnosis of bipolar disorder.  He has since been on suicide watch five times, stripped belongings and mattress, clothed only in a short paper gown. He is not directly observed during this time period. Twice, Mr. Charles has been placed on "extreme suicide watch" for attempted suicide, meaning he was chained and clothed only in a paper gown in his cell without access to any stimuli or people.  The duration of Mr. Charles' confinement in extended lockdown has caused his health to deteriorate such that he consistently presents a danger to himself.

148.    Mr. Charles is currently categorized as LOC 3 by the DPS&C.

149.    The DPS&C defines LOC 3 as follows: "LOC 3 shall be assigned to offenders with SMI ("serious mental illness") and who have been in remission or have been stable for at least six months. These offenders may live in the general housing areas. A SMI diagnosis is typically chronic in nature and the offender will most likely remain diagnosed with SMI for the remainder of the offender's life. If they are stable, functional and have no major problem with compliance then they should be designated as LOC 3."

150.    Mr. Charles' condition routinely manifests as self-injurious or suicidal thoughts and actions. Because of the lack of screening and treatment, he is simply maintained on extended lockdown or suicide watch until the crisis manifestations of the chronic mental illness passes and he temporarily recompensates.

151.    Mr. Charles' diagnoses and behaviors are mismatched with his classification as LOC 3. His chronic mental illness has manifested repeatedly as suicidal behavior.

152.    Mr. Charles started Depakote, a trade name for valproic acid, in June of 2016. In March of 2017, Defendant Seal noted that he was "still only sporadically compliant", determined by VPA levels in his system. Charles has no medication refusal forms in his record from this time, and was never written up for having excess medication during shakedowns. If the Depakote was not refused, not in his system, and not in his cell, it stands to reason that the medication was not correctly dosed or delivered. There is no attempt by the Defendants to reconcile this serious medication discrepancy.

153.    Mr. Charles reported suicidal ideations on April 12, 2017.  He was seen by the nurse on duty and told that because no mental health staff were available at the time, he would be transferred to suicide watch. Mr. Charles did not want to move to suicide watch due to the harsh conditions. Staff informed him that if he refused suicide watch, he would receive a prison

disciplinary charge of malingering. Mr. Charles chose to accept a malingering charge and received a disciplinary action rather than being transferred indefinitely to suicide watch.

154.   On May 26, 2017, Mr. Charles again became suicidal due to deaths in his family. He was transferred to suicide watch. The prison stripped him of his clothes, gave him a paper gown and took away all of his possessions.  He received no mental health services to help him to cope with his loss or deal with the symptoms of his mental illness during that difficult time.

155.   In June of 2017, Mr. Charles learned that another of his brothers had just died. In protest against the absence of mental health services available to help him cope with his recent losses, Mr. Charles went on hunger strike on July 7, 2017. Defendants placed Mr. Charles on suicide watch due to his hunger strike. His family tried to visit him during this time and was denied.

156.   Mr. Charles' existing mental illness was greatly exacerbated due to Defendants' use of extreme isolation from family support and the absence of mental health staff to help deal with his loss.

157.   Mr. Charles has frequently been placed on suicide watch since his arrival at DWCC. No additional mental health diagnostics or screenings have been given to him despite his reoccurring suicidal ideations.

158.   This series of events clearly illustrates several of Defendants' problematic policies and practices: (1) repeated use of suicide watch does not trigger any alarm bells that a prisoner's mental health condition is not being effectively treated, (2) prisoners so dangerously unstable that they require suicide watch are still considered to be sufficiently "in remission or stable" for the purposes of level of care classification, (3) prisoners with known serious and chronic mental illnesses are placed in extended lockdown, (4) even as evidence of a serious mental illness

mounts, there is no process for reconsidering whether extended lockdown is an appropriate setting for treatment, and (5) Defendants apply the same schedule for mental health visits to all prisoners regardless of individual needs.

>   **b.    Defendants' Policies and Practices Harmed and Continue to Harm the Class Members.**

159.    The named Plaintiffs seek to represent the hundreds of men at risk of serious harm through Defendants' policies. As illustrated by the following examples, the experiences of the men at DWCC sadly follow the common experiences of Mr. Tellis and Mr. Charles, and those systemic failures alleged in this Complaint.

>   i.    <u>Matthew Carroll</u>

160.    Matthew Carroll has a history of mental health diagnoses and medication reaching back to age eight. While at Elayn Hunt Correctional Center, Mr. Carroll attempted suicide by swallowing a razor blade. On August 17, 2015, Mr. Carroll was transferred from EHCC to DWCC. Despite the record of those facts available to Defendants upon his arrival at DWCC, he received no mental health medication for one month following his transfer to DWCC.

161.    Mr. Carroll received a diagnosis of Depression NOS ("Not Otherwise Specified") upon his arrival at DWCC despite having received a diagnosis of intermittent explosive disorder and antisocial personality disorder on July 23, 2015 at EHCC.  Additionally, there are a number of notes documented while he was at EHCC that indicate psychotic features to his mental illness that are not indicated in the documentation while he has been at DWCC.

162.    Mr. Carroll has a documented history of suicidal ideation and attempts since his incarceration, even prior to arriving at DWCC.  Upon his arrival at DWCC, he was placed on extended lockdown and has not left.  Mr. Carroll continues to go through cycles of suicidal

ideation and attempts while on extended lockdown resulting from a lack of treatment and adequate response to requests for help and intervention for a mental health crisis.

163.    Mr. Carroll made a suicide attempt on September 22, 2017 in plain view of staff on the tier by swallowing a handful of pills.   The staff ignored Mr. Carroll and did not immediately intervene to prevent the attempt or to provide immediate medical treatment until after the shift change, between fifteen minutes and half an hour later.

164.    Following that attempt, Mr. Carroll was moved to EHCC for reasons unrelated to his mental health. He was returned to DWCC shortly thereafter without any additional treatment planning or diagnostics.

165.    Following his return to DWCC, Mr. Carroll again attempted suicide by overdose on or around January 16, 2018 and spent several days on suicide watch.

166.    Mr. Carroll was placed on suicide watch following his attempt but was not provided with any therapy or assessments and did not speak with Defendant Seal. Mr. Carroll is categorized as LOC 4, indicating mental illness that is not serious.   Since his arrival at DWCC his diagnosis has been Depression NOS.   This diagnosis and level of care classification is not consistent with his history of mental health treatment since the age of 8 or his persistent suicidal ideation and behavior.

ii.    Prisoner AA

167.    Prisoner AA is a man with significant mental illness who was held in extended lockdown and solitary confinement for an extended period at DWCC. During that period of time, his mental illness deteriorated significantly.

168.    Prisoner AA wrote a sick call on February 17, 2016. He was not on DWCC's mental health caseload at that time, despite having reported a history of major depression, and

being documented as being disoriented, talking to himself, showing bizarre behavior, and having an inappropriate affect. The sick call requested help for depression, "heart hurting," and trauma to head when he thinks or speaks too loud.

169.    The responder wrote that Prisoner AA was referred to mental health. No mental health assessment or treatment occurred.

170.    On September 27, 2016, Prisoner AA filled out another sick call using incomplete sentences, including "Mental, Mind, Brain, Depression. Feeling like my Brain getting strip out head…No Sleep only eyes close…need medication for Depression Direct head attack". The responder's assessment was "no suicidal thoughts expressed" and notified mental health.

171.    He was seen a month later, on October 28, 2016, when Defendant Aerial Robinson reported "rapid speech and bizarre thought content", and ordered a psychological consultation. On October 31, 2016, Prisoner AA had a segregation interview, the only form of mental health monitoring for prisoners without a diagnosis, and Steve Hayden wrote that he was "doing well" and denied any mental health concerns.

172.    Prisoner AA was seen by Defendant Seal on November 17, 2016, where he reported depression, and requested Cannabis and Ultram, then Wellbutrin. Seal noted that Prisoner AA "didn't want me to use my medical judgment", he was irritable, with a circumstantial thought process, but Defendant Seal made no diagnosis of any underlying mental health condition. Prisoner AA was reaffirmed as LOC 5 in December 2016.

173.    On January 3, 2017, Prisoner AA wrote another sick call with illogical language, including "head inside out need brain scan…having out space problem Aliens!" The responder noted that he complained of space aliens invading his body, and referred to mental health. No mental health treatment or evaluation was given.

174.    Prisoner AA wrote a similar sick call on January 5, 2017, noting "trauma to whole Brain having problems Body Reality missing". The responder noted "no medical issues" and notified mental health. No mental health treatment was given.

175.    Prisoner AA was seen for a compulsory segregation interview on January 25, 2017 by Steve Hayden. Hayden noted that Prisoner AA participated in casual conversation and reported no mental health concerns.

176.    Prisoner AA wrote a nonsensical sick call on March 8, 2017, and the responder wrote "unable to determine any specific medical problem" and determined "No tx [treatment] needed".

177.    On April 20, 2017, nurse Michelle Norris emailed Steve Hayden to request mental health contact because "Offender has rambling speech, flight of ideas." Hayden responded seven days later, stating that Prisoner AA had already been seen by Defendant Seal and "is seen per policy by mental health". As a LOC 5, Prisoner AA would only receive a segregation interview every 90 days, per policy.

178.    On April 21, 2017, Prisoner AA wrote another sick call that was still nonsensical and nearly illegible. The responder noted rambling speech and that Prisoner AA moved all extremities with extreme difficulty, and that he had last seen mental health on November 17, 2016. The responder again referred to mental health. A different writer added a note "make sure and reviews these sick call requests". No mental health treatment was given.

179.    On May 12, 2017, Prisoner AA wrote yet another rambling sick call with references to the bible and the FBI. The responder noted multiple random complaints, and no treatment needed. Hayden again documented a segregation interview, according the note,

Prisoner AA allegedly participated in conversation and had no complaints, with no apparent "acute distress."

180. Prisoner AA's level of care was reviewed on May 25, 2017, and changed from 5 to 5h. Another segregation interview was completed by Aerial Robinson on May 26, 2017, who found that Prisoner AA was delusional with rapid, pressured speech, and had a preoccupation with conspiracy theories. She referred for psych consult and would "follow up per policy."

181. Prisoner AA, still without any mental health treatment, wrote another illogical sick call on June 14, 2017. The responder noted rambling speech and difficulty moving limbs, but also noted that he had already been referred to mental health on April 20, 2017.

182. On August 24, 2017, months after staff documented their concerns about Prisoner AA's mental status, Defendant Seal saw him again at clinic. Defendant Seal noted that staff reported that he seemed manic, talked about "the government," and worked on blank sheets of paper as if he were writing on them. Prisoner AA again asked for Wellbutrin and Ultram, and refused other medication because "he's worried 'they will make me crazy.'"

183. Seal recorded that Prisoner AA was hyper-verbal, tangential, and having auditory hallucinations, and diagnosed him with Bipolar I.

184. Prisoner AA's pleas for help resulted only in Defendants' creation of inadequate, self-contradictory reports, often made by staff unlicensed to provide mental health observations and assessments. These reporting problems result in his severe mental illness being ignored and underdiagnosed, left to further destabilize and fall deeper into paranoia and delusions.

185. Months dragged on and more than a year passed, with sick calls and notes indicating progressively worse deterioration in expressive ability and clarity of thought. Each sick call and clinical visit should have led to the obvious conclusion that Prisoner AA suffers

from severe mental illness. Defendants did not transfer Prisoner AA to EHCC for mental health evaluation and treatment until late 2017.

### iii.   Carlton Turner

186.   Carlton Turner has a diagnosis of Bipolar Disorder. In January and June of 2016, Defendant Seal had diagnosed Mr. Turner with only Major Depression, although he was prescribed both an antipsychotic and an antidepressant. On August 12, 2016, around 8:30AM, staff found Mr. Turner sitting on the floor bleeding due to having cut his own scrotum. He was treated in the infirmary, and visited by Defendant Assistant Warden Dauzat, who noted that he refused to converse. He was ordered into the restraint chair on Extreme Suicide Watch.

187.   After 10 hours, Mr. Turner was downgraded to alternative restraints by verbal order, after nursing reported that he was calm and not attempting to remove stitches. He remained in a camera cell, with continued orders to be checked every 15 minutes and at random. Lieutenant Gary Carter recorded on a suicide watch log that he checked on Mr. Turner at 10:10AM, and Mr. Turner was laying on his bunk. Lt. Carter completed an unusual incident report stating that, at 10:25AM, he was passing out cups and sporks for mealtime, when he observed Mr. Turner, who was bleeding from his right wrist with a puddle of blood on the floor.

188.   Upon receiving a call from nursing that Mr. Turner had cut himself, Defendant Dauzat again verbally ordered him into the restraint chair. Mr. Turner was again downgraded to alternative restraints after 10 hours in the restraint chair, because he had conversed with nursing staff and hadn't expressed a current intent to harm himself. The following morning, Mr. Turner remained on Extreme Suicide Watch with 15-minute observations. Lieutenant Gary Carter logged that he checked on Turner at 6:21AM, and Mr. Turner was sleeping.

189.    Carter completed another Unusual Occurrence Report documenting that, four minutes later, at 6:25AM, Carter had been passing out cups and sporks when he observed Mr. Turner with arms outstretched and blood dripping from his left wrist. Medical was called after Mr. Turner was escorted to the lobby in full restraints, and he was treated. Defendant Dauzat was then called, and for a third time she verbally ordered Mr. Turner, now with wounds on both wrists and his genitals, to be strapped to a chair.

190.    At evening shift change 12 hours later, Defendant Dauzat documented that, with verbal concurrence by a staff physician, Dr. Fuller, due to his self-harm and lack of communication with staff, he would be left in the restraint chair, while mental health staff went home for the night. The following morning, while Mr. Turner was allowed a break from the chair and lay in his cell in other restraints, he repeatedly hit his head against the bunk, causing a bloody wound. He refused to converse when visited by Defendant Hayden. This was the first time mental health staff attempted to see or speak with him in three days, after he had spent over 40 hours with his limbs strapped to a chair and intentionally injured himself four times.

191.    Mr. Turner was placed in a helmet and returned to the restraint chair. Hayden again visited at 11:15AM, but Mr. Turner still refused conversation. Hayden observed "no outward aggression or attempts at self-injury", although Mr. Turner was fully immobilized. He was again downgraded to alternative restraints.

192.    Hayden visited again later, and alleged that Mr. Turner then reported that his self-harm was due to believing that he had been given a write-up, but had discovered that he had not received a write-up, and didn't plan to harm himself. He was downgraded to Standard Suicide Watch, and released the next day.

193.    Mr. Turner's escalating suicide attempts did not prompt any mental health treatment, counseling, or assessment. None of these events triggered any actual diagnostics. Satisfied with the explanation that Mr. Turner was upset over a write-up, Defendants ignored the obvious evidence that underlying mental illness caused Mr. Turner to mutilate his genitals and cut his wrists.

194.    On September 23, 2017, Mr. Turner attempted suicide on by making a 12-foot jump over barbed wire and onto concrete. He documented clearly in writing that his plan to commit suicide was due to insufficient mental health treatment, an inability to be transferred to a facility with adequate mental health treatment, and retaliation for speaking with attorneys. He received a disciplinary write-up for "general disobedience" as a result of the incident.

195.    While in the hospital, the psychiatric sections of his plan of care, for a span of only three weeks, included 7 goals and 27 modes of intervention. He was seen daily by a licensed psychiatrist and his medication was constantly monitored. The only change to his mental health care that followed him back to DWCC was a change in his medication to lithium.

196.    Mr. Turner has now been returned to extended lockdown. He continues to require multiple surgeries and faces the possibility of amputation of his leg due to injuries sustained in his most recent suicide attempt.

### iv.    Terrence Goudeau

197.    Terrence Goudeau, an individual with serious mental illnesses held on extended lockdown, frequently requested mental health evaluation and treatment from Defendants.  He never received any such treatment.  He hanged himself in June 2016.  The death of Goudeau illustrates the serious harm that may come from the deliberate indifference of staff at DWCC to serious mental illness.

h.     Tyler Blanchard

198.    Tyler Blanchard is a man who reports a history of Bipolar, PTSD, and OCD. His only diagnosis given by Defendant Seal is Depression. Shortly before 1:00AM on September 16, 2016, an officer making rounds noticed that Mr. Blanchard was bleeding from his left forearm. The captain was notified, and Mr. Blanchard was placed in full restraints and escorted to the lobby, where a nurse cleaned his wounds.

199.    Defendant Assistant Warden Dauzat was contacted by the nurse, and verbally authorized Extreme Suicide Watch with verbal concurrence from staff physician Dr. Fuller. Defendant Dauzat never saw or spoke to Mr. Blanchard, or offered any type of treatment. Mr. Blanchard was then returned to an observation cell while in full restraints. At about 2:45AM, the same officer again noticed Mr. Blanchard bleeding from his arm. Mr. Blanchard was supposed to be on 24-hr camera observation, but no one saw or prevented him from attempting suicide.

200.    Mr. Blanchard was again brought to the lobby in restraints to have his wounds cleaned. Defendant Dauzat was again called, and she directed that Mr. Blanchard be strapped to the restraint chair, again without seeing him, speaking to him, or offering any type of mental health treatment to a man who attempted suicide twice in a span of two hours. At 4:03AM, the same officer, while making rounds, noticed that Mr. Blanchard was banging his head against the wall. While still on 24-hour camera observation for two consecutive suicide attempts, no other staff noticed his active self-harm.

201.    Mr. Blanchard was then wheeled to the lobby, still strapped to the restraint chair, where a helmet was placed on his head at the authorization of Defendant Dauzat, and he was returned to the cell. Mr. Blanchard was still not given any therapeutic intervention despite doing everything within his ability to harm himself.

40

202.    Later that day, Defendant Adkins, acting as chaplain, visited Mr. Blanchard. During that visit, Adkins noted that Mr. Blanchard, who had each of his limbs strapped to a chair, able to move only his neck, and had been kept there for several hours, was "not readily talkative". After 12 hours immobilized in the restraint chair, Mr. Blanchard was released by a nurse, and downgraded to Standard Suicide Watch.

203.    Because it was the weekend, Mr. Blanchard did not see a mental health staff member for another three days. For the three subsequent days, Mr. Blanchard reported thoughts of self-harm and suicide, without any therapeutic intervention. On the fourth day, he did not report such thoughts, and was released. Mr. Blanchard spent 32 days on suicide watch during 2016, and cut himself 5 times.

204.    He received no counseling or treatment other than Wellbutrin.

205.    Mr. Blanchard reports that he cuts himself to relieve pain and stress, because there is no other treatment provided. Mr. Blanchard reports that he continues to harm himself, often by punching his cell walls until his hands become injured. Defendants' only response to this behavior is to threaten him with chemical restraints unless he stops the behavior.

206.    Mr. Blanchard states that he would like therapy or counseling to understand why he hurts himself and how to avoid handling his feelings that way. Developing that type of insight into his behavioral problems is not achievable only through medication and medication management.

207.    Following this incident, Defendants made no changes to Mr. Blanchard's mental health care treatment plan, and provided no counseling or other interventions. Mr. Blanchard remains on extended lockdown at DWCC.

208.    Defendants are deliberately indifferent to the risks of harm to which they subjected Mr. Tellis, Mr. Charles, Mr. Carroll, Mr. Turner, Prisoner AA, and Mr. Blanchard.

**E.  Defendants Respond Brutally to Symptoms of Mental Illness, Requests for Mental Health Treatment, and Attempts to Redress Grievances**

209.    There is a culture of cover-up and excessive force at David Wade, including excessive use of chemical agents and force on prisoners with serious mental illness. This culture is established and tolerated by each of the named Defendants to this litigation.

210.    Prisoners reporting serious mental illness for themselves or others are threatened and receive serious disciplinary punishment, including Policy 34 and isolation.

211.    Defendants have warned Mr. Charles and several putative Class members that their continued participation in the investigation of mental health conditions at DWCC would lead to retaliation. Defendants have offered promises of putting in a "good word" toward a transfer to another facility in exchange for individual cooperation to cease participating in the investigation.

212.    A significant portion of individuals that undersigned counsel has met with over the course of responding to complaints about conditions at DWCC have intentionally been moved out of the prison. This includes many individuals with significant mental illness who were moved to acute care units elsewhere in the DPS&C.

**F.  Defendants Systematically Deny Plaintiffs Delivery of Mail to and from Counsel.**

213.    Defendants interfere with counsels' ability to collect facts and discern legally relevant conditions at DWCC by intentionally denying prisoners the ability to send letters to the Advocacy Center and MacArthur Justice Center.

214.    The volume of correspondence that prisoners have sent to the Advocacy Center and MacArthur Justice Center but which never arrived demonstrates a clear pattern of

interference directed at deliberately and systematically preventing correspondence between Plaintiffs and their counsel.

215.    There is no legitimate penological interest in destroying or misplacing mail to counsel.

216.    Plaintiffs' correspondence with counsel in this case is related to non-frivolous claims under the Constitution and federal law.

217.    Defendants additionally have a policy of seizing documents and disciplining prisoners who bring legal documents to attorney visits if that document has another prisoner's name on it. This practice intimidates potential witnesses, invades the attorney client privilege, and interferes with peoples' access to information and the courts by prejudicing their ability to communicate with counsel.

## CLASS ACTION ALLEGATIONS

### PLAINTIFF CLASS AND SUB-CLASS DEFINED

218.    Plaintiffs bring this action under 42 U.S.C. §1983, for violations of the First and Eighth Amendments to the United States Constitution on behalf of all prisoners currently held, or who will in the future be held, in extended lockdown at DWCC in the N-1, N-2, N-3, and N-4 buildings.

219.    Plaintiffs also bring this action under the ADA and Section 504 on behalf of a sub-class of all prisoners with disabilities related to mental health, or who are perceived as having such disabilities, currently held, or who will in the future be held, in extended lockdown at DWCC in N-1, N-2, N-3, and N-4.

A.      **The Class Satisfies the Elements of Fed. R. Civ. P. 23**

1.      **Numerosity**

220.    The members of the class are too numerous and fluid to be joined as individual parties to this litigation.

221.    The South Compound is comprised of five buildings, N-1 through N-5. Buildings N-1 through N-4 are "extended lockdown" units subject to this litigation. In each of the buildings there are four tiers.  On each tier are 16 cells, some of which are individual cells and some of which are doubled.  In each of the four buildings, there are 64 cells.  At a maximum, if each cell on a building houses double cells there are 128 individuals in the building.  At a given time, there could be upwards of 500 individuals being housed in the South Compound.

222.    According to a report issued in 2017 by the Department of Justice's Bureau of Justice Statistics, 37% of prison inmates have a mental health diagnosis.[3] That same report indicated that during any given 30-day period, approximately 14% of prison inmates are experiencing "serious psychological distress" according to the criteria of the study's methodology.[4]

223.    The number of individuals housed on lockdown at DWCC with mental illness is significantly higher than these national statistics because of the practices of the Defendants, outlined above, which utilize the extended lockdown compound as a substitute mental health unit that in turn creates and exacerbates mental illness.

224.    Joinder of the individuals in this Class is impracticable because prisoners are routinely transferred in and out of DWCC as well as transferred between general population and

---

[3] Department of Justice, Bureau of Justice Statistics, Indicators of Mental Health Problems Reported by Prisoners and Jail Inmates, 2011-12 (2017) http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5946 (last visited December 4, 2017)

[4] *Id*.

44

extended lockdown.   Regardless of the duration of time an individual may be housed on extended lockdown before transferring out, he is still forced to endure the inhumane and unlawful conditions cultivated by the Defendants.

225.    This Class also contains future members.

226.    The sheer number of affected individuals, the fluidity of the Class members, and the fact that the proposed Class contains future members all militate toward a finding of numerosity.

### 2.    Commonality

227.    The violations of the Eighth Amendment, ADA, and Section 504 alleged herein are caused by the policies and systemic practices of the Defendants.

228.    Each prisoner held in extended lockdown is harmed by the brutal and inhumane conditions inflicted on prisoners in extended lockdown. Every individual housed in DWCC's lockdown units is subjected to the Defendants' deliberate indifference to unconstitutional conditions of confinement and is exposed to the risk of serious mental illness or self-harm.

229.    Each individual on extended lockdown, and especially those in solitary confinement, is placed at extreme risk of developing a mental illness due to Defendants' policies, practices and procedures.

230.    Each claim shares a common core of fact and law: First, there is the factual question of Defendants' implementation of the policies and practices as described herein. The questions of fact and law as to whether those policies create an objective risk of serious harm are also shared across the entire Class, regardless of whether each individual Class member exposed to the risk developed symptoms. And, finally, the entire Class shares the common question of

whether Defendants' subjective intent in carrying out these policies was deliberately indifferent to the risks.

### 3.    Typicality

231.    Bruce Charles and Anthony Tellis are both typical members of the Class.

232.    Plaintiffs reallege the facts above to show that they have all been failed by Defendants' system of care, subjected to brutal conditions, and suffered grievous harm.

233.    The inadequacies of initial screening have harmed Plaintiffs Charles and Tellis. Plaintiffs Tellis and Charles were both exposed to significant risks due to failure to identify significant mental illness. Defendants placed Mr. Tellis extended lockdown without any mental health services despite indicators of mental illness from his intake at EHCC. Paragraphs 114-119.  Mr. Charles was categorized as having no significant mental illness despite having a diagnosis of bipolar disorder and being on suicide watch at the time of his evaluation. Paragraphs 128-37.

234.    Requests for mental health treatment and reports of mental health crisis by both named Plaintiffs were met with little to no response. Paragraphs 115 and 153.

235.    Following placement on suicide watch, neither named Plaintiff received any additional screenings, diagnostics, or other mental health care as a result of their heightened risk of self-harm.

236.    Like all prisoners on extended lockdown at DWCC, named Plaintiffs are not provided access to counseling, group therapy, or support groups. Any communications with Defendant Seal are not confidential and do not promote communication of issues relating to mental illness.   Plaintiffs are not provided with individualized treatment plans and goals.

Plaintiffs Tellis and Charles receive the same treatment plan with the same generalized goals that are not tailored to address issues relating to mental illness. Paragraphs 78-84.

237.    The named Plaintiffs are subjected to suicide watch and extreme suicide watch simply because it is Defendants' only available response to any mental health issue or crisis. Paragraphs 124 and 153.

238.    The named Plaintiffs are frequently deprived of medications used to treat symptoms of mental illness or are provided medications that are ineffective at treating the symptoms.  Mr. Charles was not provided with medications when he arrived at DWCC until at least after June 9, 2016. After having been deprived of his medication for one week, Mr. Charles attempted suicide three days after restarting his medication. Paragraph 128-37.

239.    Each individual class representative advances the same legal theories, claims, and evidence.

240.    Each individual class representative is seeking the same relief from this Court.

### 4.    Adequacy

241.    Named Plaintiffs Charles and Tellis are both capable of representing the interests of absentee class members.

242.    There is no conflict of interest between Plaintiffs and Class members and the representatives have common interests with the unnamed members.  All claims of named and unnamed members rest upon the policies, procedures, and practices of Defendants as a whole, and as such apply to all individuals housed in extended lockdown.

243.    Class counsel are all members in good standing with the Louisiana Bar and Middle District of Louisiana. Counsel is experienced in the conduct of class action litigation and prison litigation.

244.    Class counsel has been conducting an investigation into conditions at DWCC for some time.   Counsel successfully litigated against the officials of the DPS&C to address counsel's access to the prisoners and facilities at DWCC in furtherance of that investigation and have worked with the DPS&C and Defendants to address issues under that settlement agreement.

245.    Counsel from the Advocacy Center is empowered under federal law and recognized by the state of Louisiana as the state's Protection and Advocacy group for individuals with disabilities, including mental illness. The Advocacy Center's statutory mandate is to protect the human and civil rights of people with disabilities.

**B.      The Sub-Class Satisfies the Elements of Fed. R. Civ. P. 23**

246.    Each named Plaintiff is a representative of the class as well as the sub-class.

247.    Each named Plaintiff is a person with a disability, and therefore a member of the Sub-Class.

248.    The claims for the violation of the ADA and Section 504, like the claims for the violation of the Eighth Amendment, are based on the allegation that Defendants have been violating the law by following their policies and practices.

249.    The request for certification of the sub-class is otherwise identical to the request for certification of the Class.

**CLAIMS FOR RELIEF**

**A.      Violations of the Eighth Amendment (Cruel and Unusual Punishment)**

250.    By their policies and practices described herein, Defendants deprive Plaintiffs of their constitutional right to be free from cruel and unusual punishment, protected by the Eighth Amendment to the Constitution.

251.    The practices outlined above subject Plaintiffs to a substantial risk of serious harm and injury.

252.    Defendants are aware of the risks of harm and are deliberately indifferent to those risks.

253.    Housing prisoners in these conditions does not serve any legitimate penological need.

254.    Defendants deprive Plaintiffs of basic human needs and violate present day concepts of human dignity.

### B.    Violations of the Americans with Disabilities Act

255.    Plaintiffs bring their claims for the violation of the ADA on behalf of the sub-class of individuals in extended lockdown who have mental illness.

256.    Plaintiffs have disabilities due to mental illness, which interfere with their major life activities.

257.    Plaintiffs' needs qualify them to receive mental health care, including therapy and counseling.

258.    Plaintiffs reallege and incorporate all allegations above herein.

259.    The Defendants knowingly and consistently discriminate against prisoners with mental disabilities by failing to provide them with reasonable accommodation for their disabilities and punishing them for behavior that is a product of their disabilities.

260.    Defendants have further knowingly discriminated against persons with disabilities as the result of Defendants' methods of administration of their solitary confinement, extended lockdown, and mental health programs.

261.     By placing prisoners with mental illness in extended lockdown, Defendants have denied prisoners with mental illness the benefits of the facility's services, programs, and activities, including education, programming, recreation, exercise, and mental health treatment and services, thus discriminating against persons on the basis of their disability.

262.     Discrimination against prisoners with mental illness occurs particularly because prisoners do not receive mental health services sufficient to counteract the effects that extended lockdown and other forms of punishment have on mentally ill prisoners, which is more severe than the impact it has on prisoners who are not mentally ill.

263.     The Defendants discriminate against prisoners with serious mental illness on the basis of their disabilities. The Defendants routinely warehouse prisoners with serious mental illness in solitary confinement, and disproportionately place prisoners with serious mental illness in extended lockdown and especially solitary confinement.

264.     By placing prisoners with serious mental illness in extended lockdown and imposing behavior management plans and other forms of punishment, the Defendants (a) failed to furnish reasonable accommodation to prisoners with disabilities, (b) punish prisoners with serious mental illnesses for disability-related conduct; and (c) deprive prisoners with mental illness of access to adequate mental health care.

## C.     Violation of Section 504 of the Rehabilitation Act of 1973

265.     Plaintiffs reallege and incorporate all allegations above herein.

266.     Plaintiffs qualify as individuals with disabilities as defined in Section 504 of the Rehabilitation Act of 1973. They have mental impairments that substantially limit one or more major life activity, including but not limited to thinking, concentrating, interacting with others,

and controlling their behavior. They have records of having such impairment or are regarded as having such an impairment.

267.    The Defendants discriminate against prisoners with disabilities by failing to provide reasonable accommodation for their disabilities.

268.    Defendants discriminate against prisoners with disabilities solely on the basis of their disabilities in violation of Section 504.

269.    In placing prisoners with serious mental illness in extended lockdown the Defendants have deprived prisoners with mental illness from the benefits of the facility's services, programs, and activities, including education, programming, recreation, exercise, and mental health services, thus discriminating against them on the basis of their disabilities.

**D.    Violation of the First Amendment**

270.    Defendants have taken extraordinary steps to interfere with counsel's investigation of conditions at DWCC by systematically interfering with mail sent by prisoners to their counsel, by punishing prisoners for bringing documents to attorney-client visits, and by refusing counsel the ability to provide written materials prisoners.

271.    Defendants' interference with Plaintiffs' communication with counsel and retaliation based on the content of privileged documents violates the First Amendment.

**PRAYER FOR RELIEF**

272.    Plaintiffs request this court grant them the following relief:

A.    Declare that this suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(2);

B.    Adjudge and declare that the acts, omissions, policies, and practices of Defendants, their agents, employees, officials, and all persons acting in concert with them under

color of state law or otherwise described herein have violated the rights of prisoner Plaintiffs and the class they represent under the Eighth Amendment's prohibition on cruel and unusual punishment and those rights protected by the Americans with Disabilities Act and the Rehabilitation Act;

C.    Enter injunctive relief enjoining Defendants and their agents from subjecting Plaintiffs to the illegal and unconstitutional conditions, acts, omissions, policies and practices set forth above;

D.    Award Plaintiffs the costs of this suit, and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988 and other applicable law;

E.    Retain jurisdiction of this case until all Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continued to comply in the future absent continuing jurisdiction; and

F.    Award such other and further relief as the Court deems just and proper.


Respectfully submitted this 20th day of February, 2018,


*/s/ Jonathan C. Trunnell*
Jonathan C. Trunnell, La. Bar No. 36956, T.A.
Sarah H. Voigt, La. Bar No. 18483
Melanie Bray, La. Bar No. 37049
Ronald K. Lospennato, La. Bar No. 32191
Advocacy Center
8325 Oak Street
New Orleans, LA 70118
504-708-1460
504-507-1956 (fax)
jtrunnell@advocacyla.org


*/s/ Katie M. Schwartzmann*
Katie M. Schwartzmann, La. Bar No. 30295

Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Avenue
New Orleans, La 70119
p. (504) 620-2259
katie.schwartzmann@macarthurjustice.org