UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
BATON ROUGE DIVISION

| | | |
|---|---|---|
| ADVOCACY CENTER, | * | CIVIL ACTION NO. 3:17-468 |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| | * | SECTION JWD-EWD |
| | * | |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, SECRETARY OF | * | JUDGE deGRAVELLES |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS; | * | |
| JERRY GOODWIN, WARDEN OF | * | |
| DAVID WADE CORRECTION CENTER | * | |
| and LONNIE NAIL, | * | |
| | * | |
| DEFENDANTS. | * | MAGISTRATE JUDGE WILDER- |
| | * | DOOMES |

## SETTLEMENT AGREEMENT

### INTRODUCTION

The Plaintiff Advocacy Center (hereinafter, "AC") is the designated protection and advocacy system for individuals with disabilities in the state of Louisiana pursuant to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801 *et seq.*; the Developmental Disabilities Assistance and Bill of Rights Act ("PADD Act"), 42 U.S.C. §§ 15041-45; the Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C. § 794e. (hereinafter collectively referred to as the "P & A Acts"). Acting pursuant to this authority, Plaintiff requested records and sought access to David Wade Correctional Center (hereinafter, "DWCC") to investigate allegations of abuse and neglect of prisoners with disabilities, as defined by the P&A Acts and regulations, held in restrictive housing. Plaintiff brought this action against James M. LeBlanc, Secretary of the Louisiana Department of Public

F

Safety and Correction, Jerry Goodwin, Warden, David Wade Correctional Center, and Col. Lonnie Nail, (jointly referred to as "Defendants") pursuant to 42 U.S.C. §1983 to enforce its authority under the P & A Acts.

In order to foster a constructive working relationship between them, the parties have agreed, to the entry of this Settlement Agreement to settle all claims set forth in the Complaint. The parties enter into this agreement for the purpose of avoiding the risk and burden of litigation. Nothing in this agreement constitutes an admission by Defendants that they violated the rights of AC or any inmates, nor is it an admission that any prior or present policy, procedure, practice, event, circumstance, act or failure to act by Defendants, its officials, contractors, agents or employees violated any rights of AC, any constitutional rights of any inmates at DWCC, failed to meet applicable federal or constitutional standards, or otherwise fell short of any standard of care imposed by law. This Settlement Agreement does not resolve any claims against Defendants that individual prisoners may have for relief under state or federal law. The parties will address AC's claim for reasonable attorney's fees in a separate stipulation or other filing with the Court.

**It is, therefore, ORDERED, ADJUDGED, AND DECREED:**

1.      This Court has jurisdiction over the subject matter of Plaintiff's federal law claims against the Defendant and jurisdiction over the persons of the Defendants with respect to these claims.

## DEFINITIONS

2.      For the purposes of this Settlement Agreement, the definitions in the relevant federal statutes and regulations shall apply and will have the meanings given to them in those

statutes and regulations unless a contrary meaning is indicated by the text. As used in this Settlement Agreement, the terms defined below have the following meaning:

a.     "Actively aggressive" means that the prisoner is assaulting or credibly threatening to assault others, or the prisoner is actively harming him or herself.

b.     "AC" and "AC staff" means any officer, director, employee of AC, including law student interns, or duly authorized AC consultants, contractors, or other duly authorized agents of AC. AC must provide to the DWCC Administrator a list of AC staff that may visit the DWCC who must be approved in accordance with this agreement. DWCC's staff may search any packages, parcels, briefcases, handbags, or any other items that AC staff seeks to bring into the DWCC. For purposes of this agreement, no search shall include reading or otherwise reviewing any documents contained in any such item any packages, parcels, briefcases, handbags, or any other items that AC staff may bring into the DWCC.

c.     "Advocacy Client" means any prisoner who is determined by AC to have a mental illness, as that term is defined in 42 C.F.R. § 51.2 as an individual who has a significant Mental Illness or emotional impairment as determined by a Mental Health professional; or, has a developmental disability as that term is defined in 42 U.S.C. § 15002(8), or 29 U.S.C. § 705(9).

d.     "Attorney Room" means the secure visiting area provided for visits between a prisoner and his or her attorney, and where passage of paper between prisoners and the attorney is permitted. The Attorney Room shall be at a location that minimizes the possibility of intrusion by other prisoners and DWCC staff and affords a reasonable expectation that communications between AC staff and the prisoner are confidential.

e.    "Complaints" or "Reports" of abuse or neglect or other rights violations shall include, but not be limited to, informal written or oral communications, such as telephone calls (including anonymous calls), as well as media reports.

f.    "Computation of Time." In computing any period of time prescribed or allowed under this Settlement Agreement, any notice or request given after 4:00 P.M. shall be considered as having been received at 9:00 am the following business day. A business day shall not include weekends or federal and state holidays. In computing the time for a response, weekends or federal and state holidays shall not be included.

g.    "Facility" means DWCC.

h.    "DWCC" means all, or any part, of the David Wade Correction Center located at 670 Bell Hill Road, Homer, LA 71040.

i.    "DWCC Administrator" means the Warden of DWCC and his or her designee.

j.    "Medical and Mental Health Units" means any dorm, cell, pad, or unit that is used for medical examination, treatment, convalescent care, or as an infirmary.

k.    "Probable cause" means reasonable grounds for belief that a prisoner has been, or may be subject to abuse or neglect. The individual making such determination may base the decision on reasonable inferences drawn from his or her own experience or training regarding similar incidents, conditions or problems that are usually associated with abuse or neglect.

l.    "Prisoner" means any person who has been placed into custody of DWCC.

m.    "Records" shall be construed as broadly as possible and shall mean all written or graphic materials, of any kind or nature, in the possession, custody or control of the defendants or known by the defendants to exist Records include without limitation, papers, emails, books, accounts, drawings, graphs, charts, photographs, electronic or videotape recordings, computer disks, or tapes or other forms of computer memory storage and other data compilations from which

information can be obtained and translated, if necessary, into reasonably usable form, and any drafts and non-identical copies thereof.

       n.      "Reasonable unaccompanied access" means access which reasonably accommodates AC staff to effectively monitor, conduct abuse and neglect investigations, and to conduct private interviews with prisoners and also equally takes into account the security needs of DWCC. A correctional officer will remain on the tier but be removed far enough to allow confidential conversations. This access includes what is contained in this Settlement Agreement.

       o.      "Tier" means any unit where prisoners at the DWCC reside.

       p.      "Unavailable" or "unavailability," as applied to a person, means that the person is not physically present at DWCC or is otherwise detained in a meeting or other event at the date and time access to the prisoner is sought, and will not be physically present or available at DWCC, at any time during the course of the same date. "Unavailable" or "unavailability," as applied to a record or other things, means that the record or other things is not physically present at DWCC, or is being utilized by staff at the date and time access to the record or other thing is sought, and cannot be retrieved or made available, at any time during the course of the same date.

### GENERAL ACCESS PROCEDURES

3.      AC may access DWCC, prisoners, prisoner records, DWCC records, and DWCC staff in the manner set in this Settlement Agreement. All parties recognize that in accessing DWCC, its prisoners, or its staff, safety and security are paramount.

       a.      Prior to being approved to visit DWCC, an attorney's credentials shall be verified by providing a copy of his or her bar card. Prior to non-lawyer AC staff members being approved to visit, an affidavit must be submitted by the employing attorney,

including name, social security number, birth date, length of time employed by AC, which shall be verified.

b.  AC acknowledges that they assume the risk by entering and accessing otherwise restricted areas at a maximum security correctional center such as DWCC.

c.  Subsequent to the approval of the agreement, all AC staff must engage in a seminar or training, directed to the operations, safety concerns, and obligations of DOC, DWCC and their employees, in order to inform AC staff about the operation of the facilities and all potential security risks involved.

4.  AC will always announce their arrival on DWCC premises and will provide sufficient identification of the AC staff visiting the DWCC to ensure that the AC staff making the visit is on the list of authorized AC staff previously screened.

5.  When providing advance notice, AC shall notify DWCC of the reason for the desired visit, i.e., whether the visit is to investigate incidents of alleged abuse or neglect of individuals with mental illness or disabilities, to meet with Advocacy Client or potential client who has requested assistance, to monitor the facility, or to provide education, training, or information to persons with mental illness or disabilities. If the visit is to investigate incidents of alleged abuse or neglect of individuals with mental illness or disabilities, AC staff will indicate whether such incidents were reported to AC or whether AC has probable cause to believe such incidents occurred.

6.  In announcing or providing notice of visits, AC shall to the extent possible identify all prisoners, DWCC personnel, and records, or a reasonable description thereof, that AC wants to interview or access, in order to facilitate the location of the individuals or records and to ensure that the request for access does not interfere with DWCC performing its lawful functions. Nothing

in this agreement, however, shall be construed to prohibit AC staff from requesting to speak to prisoners, DWCC personnel, and having access to records during the course of an investigatory or monitoring visit to DWCC.

### Access Related to an Abuse or Neglect Investigation

7.     AC may access DWCC, prisoners, prisoner records, DWCC records, and DWCC staff to investigate alleged incidents of abuse or neglect of prisoners whom it determines qualifies as an "Advocacy Client" if such incidents are reported to them, or if AC has probable cause to believe that an incident of abuse or neglect has occurred, or if AC determines that there is or may be imminent danger of abuse or neglect of an individual with a disability.

8.     AC will attempt to enter the facility between the hours of 8 am and 4 pm. Although advance notice of visits by AC is not required in cases where abuse or neglect investigations are being conducted, AC, in its sole discretion, may attempt to give notice to the DWCC Administrator or his designee prior to entering the DWCC on weekdays, between the hours of 8 a.m. and 4 p.m. by contacting the DWCC Administrator by telephone. AC will provide 24-hour advance notice of its intent to enter the facility at any time outside of regular business hours by contacting the DWCC Administrator or his designee by telephone. However, AC understands that failure to provide advance notice may result in the persons, records, or things sought to be investigated may be unavailable.

9.     AC may notify DWCC when it initially determines that probable cause to believe that an act of abuse or neglect exists. When notifying DWCC of its determination of probable cause, AC is not required to disclose information that would violate any attorney-client privilege which may exist or violate statutory rules governing confidentiality.

### Access Not Related to an Investigation

10.    AC may also access DWCC in the manner set out below, to provide legal representation, information, education and training regarding AC and its services and programs; to monitor compliance with respect to the rights, safety and care of prisoners; and to interview prisoners and DWCC staff, with their permission. In such cases, AC will provide 24-hour advance notice of its intent to visit the facility by contacting the DWCC Administrator or his designee by telephone or email.  Such visits will occur Monday through Friday between the hours of 8 am and 4 pm.

### AC Staff Identification

11.    AC staff will identify themselves upon arrival at the DWCC to a designated DWCC staff member by showing a Bar Card, a valid driver's license from the staff's state of residence, valid state photo identification card from the staff's state of residence, a valid military photo identification card (active duty only) or a valid passport. All AC staff is subject to search in accordance with Department regulations and DWCC directives. DWCC staff may then notify any other personnel, as their supervisors have directed them.

a.    DWCC may deny access to any person who does not present the proper identification as provided herein and has not been placed on the list previously provided by AC.

b.    AC will, upon arrival and prior to access, sign in a log maintained by DWCC for this purpose. The log will identify the AC staff, in general terms disclose the purpose of the visit, and/or the general basis for any investigation.

12.    DWCC reserves the right to refuse entry to any individual who appears to pose a security risk or who has interfered with the operation of DWCC, interfered with DWCC programs, failed to honor the privacy interests of prisoners and/or DWCC staff, failed to honor a request by

a prisoner or DWCC staff to not give or to terminate an interview, or who has violated the standards or policies of DWCC.

     a.     If access to any AC Staff is denied, the DWCC Administrator or DWCC will provide a written explanation of the grounds for the decision to deny access as soon as practical after the request is made, but no later than 5pm on the day before the date of the scheduled visit, if 24 hours' notice or more has been given, per paragraph 10 to the person requesting access and the AC point person or her designee.

     b.     The DWCC Administrator shall ensure that all relevant DWCC staff are aware of AC's access privileges to DWCC.

## CAMERA OR OTHER MONITORING EQUIPMENT

     13.     Photographic, Laptop Computers, or other monitoring equipment may not be brought into DWCC without notice to the DWCC Administrator or his designee. If AC staff wishes to utilize such equipment in any portions of DWCC facilities, AC will request advance permission to do so of the DWCC Administrator. Permission will not be withheld unless such equipment could reasonably compromise DWCC security and the DWCC administrator or his designee immediately explains in writing why such equipment compromises security.

     14.     Whenever the taking of a photograph may show an individual's face or other personally identifiable characteristics, AC will be responsible to the extent required by law for obtaining permission from any prisoner, DWCC staff, or other person in order to photograph them.

## AC REASONABLE ACCESS TO PRISONERS AND STAFF

     15.     AC staff will abide by this Settlement Agreement as well as all security and safety policies and all procedures of the DWCC. AC staff will not interfere with the operation of DWCC

or with the completion of responsibilities of DWCC staff. AC's access is always subject to and may be limited as provided herein by security concerns.

16.    While on DWCC premises, AC staff shall have reasonably unaccompanied access as follows:

a.    AC staff may interview any prisoner, employee, or other person who AC may reasonably believe to have knowledge of information pertinent to the purpose of the visit, when AC is conducting a monitoring visit or an investigation of an incident of alleged abuse or neglect of individuals with mental illness or disabilities if such incidents were either reported to AC or if AC has probable cause to believe such incidents occurred. These interviews will be requested in advance by the AC staff unless an exigent circumstance exists. The interviews will be conducted in the Attorney Visitation Room or comparable area which will afford confidentiality. The maximum security offenders will remain restrained during these visits. Documents and papers may be exchanged during the course of these interviews.

b.    If AC staff desires to speak with prisoners in the Tiers through their cell doors, DWCC personnel must be present on the Tier. In order to ensure that AC's presence does not interfere with DWCC's lawful operation of its function, AC staff's time on Tiers will be limited to ten minutes, unless a longer period of time is approved by DWCC. The passing of papers or other items will not be permitted through the cell bars. When AC seeks to exchange materials with inmates it will do so pursuant to Paragraph 16 and Paragraph 24. If AC seeks to speak to a prisoner in a cell while on the tier, AC does so at his or her own risk. AC hereby agrees that they will not sue or seek compensation for any injury arising out of this assumption of the risk. Conversations on the tiers in no way limits the right of AC to speak privately to prisoners in an attorney-room.

      c.      If a prisoner to whom AC desires to speak is located within a medical unit, AC can speak to or interview such prisoner in a manner that ensures that the communication is confidential, unless the prisoner is a danger to himself or others or whose medical condition forecloses such communication. However, AC shall not interfere with regularly scheduled medical appointments or programs.

      d.      With respect to DWCC employees, AC may speak to any DWCC employee who it reasonably believes may have knowledge pertinent to the purpose of the visit. However, AC may not interfere with any employee's performance of their job, nor can AC demand that DWCC employees, not otherwise scheduled to be at the facility, come to the facility solely for the purpose of being interviewed by AC. Any DWCC employee has the right to refuse to talk to AC.

      d.      AC may have controlled accompanied access within the camera viewing area if it is necessary to an investigation. Camera footage may be subject to limits as required by the Prison Rape Elimination Act of 2003 (hereinafter "PREA"). As the camera footage is maintained on desktop computers, DWCC staff must access the footage and control of the desktop computer will not be given to AC.

      17.      Subject to the terms of this Settlement Agreement, AC staff will conduct its investigations, DWCC monitoring and communications, as well as all other advocacy activities in a manner that:

      a.      does not interfere with DWCC programs;

      b.      honors the privacy interests of prisoners and DWCC staff;

      c.      honors a request by a prisoner or DWCC staff made on his or her own behalf to not give or to terminate an interview; and

d.     does not violate standards or policies of the Louisiana Department of Corrections or any DWCC policies;

e.     complies with PADD, PAIMI; and

f.     complies with PREA.

**In-Person Communication with Persons on DWCC Premises**

18.     While on DWCC premises, subject to the restrictions set out in this Settlement Agreement, AC staff shall have the ability to speak with prisoners, DWCC staff, or any other person on DWCC property for the purposes of investigating a complaint or report of abuse or neglect or for general monitoring. Nothing in this Settlement Agreement requires prisoners, DWCC staff, or any other person on DWCC property to speak with AC staff. AC Staff will not represent in any manner that they have any authority granted by DWCC to compel any person to speak to them.

19.     As necessary to facilitate scheduling or to locate the prisoner, DWCC staff may request, and AC staff shall disclose, the name of a particular prisoner that AC wants to visit and the general purpose of the visit. Nothing herein shall be construed as prohibiting AC staff during the course of a monitoring visit or investigation of neglect and abuse from talking to or meeting with other prisoners whose names have not been disclosed pursuant to this provision of this paragraph. However, AC understands that if it fails disclose such information in advance, it is possible that the person will be unavailable.

20.     AC staff will not be denied reasonable unaccompanied access to any prisoner they are authorized by law to access, unless at the time AC staff seeks access to the prisoner:

a.      The prisoner in question is engaged in a "medical session" or is in scheduled programming. AC staff will either wait until the session is completed, or reschedule the visit to a time mutually agreeable to the parties.

b.      The prisoner in question is actively aggressive while in seclusion or restraint. AC staff will then either (i) wait until the prisoner's aggressive behavior has stopped and be permitted to communicate with the prisoner while DWCC staff remain in viewing distance, and DWCC staff will afford the prisoner requiring restraint and/or seclusion with as much privacy as practicable, given the circumstances of each case, (ii) wait until the prisoner's aggressive behavior has stopped and be permitted to meet with the prisoner out of seclusion or restraint while DWCC staff remain in viewing distance, or (iii) will reschedule the visit to a time mutually agreeable to the parties.

c.      The access would involve a substantial risk of physical harm to AC staff, the prisoner or DWCC staff.  In this event, the DWCC Administrator shall so inform AC staff and shall explain the circumstances and any security or supervision concerns. AC staff will reschedule the visit to a time mutually agreeable to the parties.

d.      No prisoner is required to talk to AC staff and may decline to do so at any time.  If the prisoner decides that he does not wish to talk with AC staff prior to a scheduled interview, the prisoner shall communicate this in writing to DWCC, in accordance with DWCC policies. AC staff shall be provided the opportunity to review the prisoner's written communication regarding the visit. If during the interview the prisoner seeks to terminate the interview, AC staff will honor a prisoner's request immediately with no requirement to put the request to terminate the interview in writing..

e.      DWCC is experiencing a situation that justifies the DWCC Administrator to lock down DWCC.

f.      The prisoner is unavailable as defined above.

g.      DWCC is experiencing an emergency situation, where the safety of the prisoners, DWCC personnel, community, or AC staff is at issue. AC will reschedule a time to visit once the emergency situation no longer exists.

21.     If unaccompanied access to any prisoner is denied due to the circumstances listed in the preceding numbered paragraph, DWCC shall permit prisoners to request an appointment with AC staff and a meeting shall be set as soon as practical thereafter. If necessary, the prisoner shall be excused without penalty from any work duties in order to meet with AC staff. The meeting should be scheduled to minimize any disruption of scheduled program activities. The communications between AC and the prisoner shall be deemed confidential.

### Communication with Staff

22.     AC staff may also meet privately with the DWCC Administrator to advise him or her of the nature of an investigation and to request an interview with a DWCC staff member. DWCC shall make every reasonable effort to allow for the availability of its staff for investigation-related interviews.

a.      Interviews will be arranged at times so as not to interfere with the DWCC staff's work responsibilities.

b.      Nothing in this Settlement Agreement requires DWCC staff to speak with AC staff.

c.      DWCC shall permit its staff to talk openly with AC staff without fear of retaliation concerning prisoner issues, concerns, and problems including, but not limited to investigations of alleged incidents of abuse or neglect of prisoners unless, consistent with the terms of this Settlement Agreement, such matter is the subject of an impending or on-going Department of

Corrections investigation, criminal investigation, criminal prosecution or the subject of actual or threatened civil litigation.

        d.      DWCC staff may have the DWCC Administrator, or a legal representative of DWCC, accompany them in interviews with AC if DWCC staff so desires.

### Phone and Mail

        23.     DWCC may impose reasonable time and place restrictions on telephone communications between prisoners and AC staff. However, communications between prisoners and AC staff will be treated as a legal call. Either the prisoner or AC must designate any telephone calls as a legal call, in order for the call to be treated as confidential.

        24.     DWCC or DWCC staff will be treat AC mail as legal communications between AC and prisoners, so long as such all mail is identified as addressed to or coming from AC, unless it falls within an exception as set forth in the Department regulation.

## ACCESS TO RECORDS

### On-site Review of Medical and Mental Health Records and Copies

25.     AC shall have the authority to review the records of a prisoner when:

a.      a prisoner is the client of AC if such prisoner or his guardian, conservator, or other legal representative has authorized AC to have such access;

b.      a prisoner, who by reason of mental or physical condition, is unable to authorize AC to have such access; does not have a legal guardian, conservator, or other legal representative, or whose representative is the State, and with respect to whom either a complaint was received by AC or AC has probable cause to believe was subject to abuse or neglect; or

c.      a prisoner with a mental illness or disability who has a legal guardian, conservator, or other legal representative about whom either a complaint was received by AC or AC has probable cause to believe was subject to abuse or neglect, where such representative was contacted by AC to offer assistance to resolve the situation, but the representative failed or refused to act on behalf of the prisoner.

26.     If AC has authority pursuant to the P&A Acts to access a prisoner's records, AC shall notify DWCC of the general facts to support its request for records and provide a copy of an authorization, if applicable.

27.     AC staff shall be able to visually view the medical and mental health records of any prisoner for whom it is authorized by the P&A Acts to access as soon as practicable after the request is received by DWCC.

a.      Copies of the medical and mental health records for prisoners currently in DWCC or who have been released from DWCC will be made available to AC within three (3)

business days.  AC will work with the Department on a case-by-case basis to establish reasonable deadlines for voluminous requests.

      b.     AC staff will have access to review records in conformity with applicable state or federal law or regulations. Under no circumstances will AC staff be allowed to remove the record from the room in which AC staff is designated to remain while reviewing the record, remove the original record or any part thereof from the control of DWCC, or add or make changes to the record.

      c.     Any problems concerning the handling of DWCC records by AC staff should be reported to the DWCC Administrator and AC contact person as soon as the problem is discovered.

      28.     AC will not release or disclose to a third party any prisoner record or any information gathered as a result of an investigation of a complaint or report without, as needed, the authorization of the prisoner, or his or her parent, or attorney, or a court order from a court having jurisdiction over the prisoner, or in accordance with appropriate regulatory procedures as set forth in 42 C.F.R. § 51.45 and § 51.46.

      29.     AC and the Department will establish a protocol for requesting and transferring video recordings of the tiers presently in possession of the state's consolidated information technology service in the Division of Administration's Office of Information Technology.

      30.     AC will maintain the confidentiality of all records to the same extent as required of DWCC, pursuant to all state law and regulations regarding the disclosure of prisoner records, and in accordance with appropriate laws of the United States and the regulatory procedures as set forth in 42 C.F.R. § 51.45 and § 51.46.

### Copies of Records

### Non-Medical and Non-Mental Health Records of Prisoners Currently in DWCC

31.     AC will be provided with copies of records for prisoners currently in DWCC or who have been released from DWCC within three (3) business days.  AC will work with the Department on a case-by-case basis to establish reasonable deadlines for voluminous requests or when the records are not on premises controlled by DWCC.

32.     DWCC may charge a reasonable rate for copying any documents. For purpose of this Settlement Agreement, the rate charged for copying documents shall be equal to the rate charged under Louisiana's Public Records law. However, DWCC shall not delay sending requested records because a fee has not been paid. DWCC shall provide the AC staff requesting the records with an invoice with the production of the requested documents which shall be paid within 30 days.  If payment is not timely made to a prior request for copies, DWCC retains the right to demand payment prior to the release of a subsequent request for production.

### Curator or Guardian Contact Information.

33.     Upon identification of a prisoner about whom AC has received a complaint or has probable cause to suspect abuse or neglect, DWCC shall provide AC with the identity of the sentencing court or jurisdiction and any attorney of record, upon request. The information shall be provided as soon as practicable following AC's request.

**Form of Written Authorization for Access to a Prisoner's Records**

34.    To access records, AC may use its own form or DWCC's form, or a written statement of authorization made by the prisoner or, when applicable, legal guardian or curator. It is AC's responsibility to maintain valid authorization for release of records. Objection to the fact that such authorization may not be on a form used by DWCC shall not delay processing the requested information.

## MISCELLANEOUS PROVISIONS

35.    Nothing in this Agreement shall prohibit AC Staff from using normal channels to meet or communicate with inmate clients in accordance with DWCC policy. Specifically, where AC Staff is listed on an inmate's attorney list that attorney shall be permitted to schedule a visit with the inmate following standard procedures. Further, AC Staff shall be permitted to submit an executed release form and receive records concerning the identified inmate without going through DWCC's point of contact.  Whenever possible, AC will inform DWCC when AC agrees to provide legal representation to an individual inmate.

36.    The effective date of this Settlement Agreement is the date of the last signature on the Settlement Agreement.

37.    Failure by a party to enforce any provision of this Settlement Agreement will not be construed as a waiver of the party's right to enforce other provisions of the Settlement Agreement.

38.    This Settlement Agreement will not be modified, amended, or supplemented except by a writing executed by counsel for all parties. The parties acknowledge that the need to modify this Settlement Agreement may arise from time to time. In the event that such modifications are needed, the parties will meet to mutually agree upon the necessary changes. Any changes to the

Settlement Agreement mutually agreed to by the parties will be made a part of a letter agreement signed by counsel for the parties and filed with the court in this case.

39.     This Settlement Agreement is binding on the parties, including all principals, agents, administrators, representatives, successors, or assigns. Each party has a duty to inform any such principals, agents, administrators, representatives, successors, or assigns of its obligations under this Settlement Agreement to the extent permitted by law.

40.     The parties expressly acknowledge and agree that this Settlement Agreement may be executed in a number of identical counterparts, each of which shall be deemed an original for all purposes.

41.     Points of contact will be mutually selected by the parties to address concerns related to the implementation of this agreement. The points of contact designated by Defendants shall have the authority to investigate and correct any non-compliance with this agreement.

42.     The designated points of contact for the Plaintiff will be AC staff listed in this Agreement, or any others subsequently designated in writing by those individuals.

43.  The designated point of contact for the Defendants will be Warden Jerry Goodwin or any designation made in writing by Warden Goodwin.

## DISPUTE RESOLUTION MECHANISM

43.     This Settlement Agreement is intended to allow the AC to effectively carry out the provisions of the P&A Acts and equally take into account the security needs of DWCC. Therefore, in the event of any ambiguity in this Settlement Agreement or any conflict between this Settlement Agreement and federal law, federal law shall control.

44.     If the parties cannot agree on whether there has been compliance with the terms of this Agreement or the P&A Acts, or as to any dispute, claim, question, or disagreement arising out

of or relating to this Agreement, or the breach thereof, or with the proper remedy for non-compliance, the parties shall utilize the following procedures, in the order listed below in this paragraph:

    a.    An individual selected as a point of contact will provide written notice to the other party regarding any dispute, claim, question, or disagreement arising out of or relating to this Agreement.

    b.    The designated contact persons shall provide a response to the other party within a five (5) business day period unless it is clearly not feasible to do so due to holidays and/or other events outside of the control of the designated contact individual.

    c.    The parties shall first use their best efforts to settle any disputes that arise through good faith consultation and negotiation with each other, recognizing their mutual interests, and attempt to reach a just and equitable solution satisfactory to all parties. This period shall be ten (10) calendar days, beginning from the date written notice is received identifying the dispute.

    d.    The United States District Court for the Middle District of Louisiana shall retain jurisdiction to enforce the terms of this Settlement Agreement.

    e.    If the parties are unable to reach a solution through negotiation, then either Party shall have the right to seek enforcement of the terms of the Agreement in the United States District Court for the Middle District of Louisiana.

**ATTORNEY FEES**

    45.    Either party has the right to seek attorney fees and costs in any action to enforce this Settlement Agreement consistent with law regarding the award of attorney's fees under 42 U.S.C. § 1988.

[SIGNATURES ON NEXT PAGE]

FOR THE PLAINTIFFS:

Ronald K. Lospennato, Bar No. 32191
Advocacy Center
8325 Oak Street
New Orleans, LA 70118
504-208-4679
504-335-2890
rlospennato@advocacyla.org

Jonathan Trunnell, La. Bar No. 36956
Advocacy Center
8325 Oak Street
New Orleans, LA 70118
504-708-1460
504-507-1956 (fax)
jtrunnell@advocacyla.org

FOR THE DEFENDANTS:

Jerry Goodwin, Regional Warden, David Wade
Correctional Center

James M. LeBlanc, Secretary, Department Of
Public Safety and Corrections

Susan Wall Griffin, La. Bar No. 22402
504 Mayflower Street
Baton Rouge, LA 70802
Telephone: (225)342-6743
Facsimile: (225)342-3278

FOR THE PLAINTIFFS:

Ronald K. Lospennato, Bar No. 32191
Advocacy Center
8325 Oak Street
New Orleans, LA 70118
504-208-4679
504-335-2890
rlospennato @ advocacyla.org

Jonathan Trunnell, La. Bar No. 36956
Advocacy Center
8325 Oak Street
New Orleans, LA 70118
504-708-1460
504-507-1956 (fax)
jtrunnell @ advocacyla.org

FOR THE DEFENDANTS:

Jerry Goodwin, Regional Warden, David Wade
Correctional Center

James M. LeBlanc, Secretary, Department Of
Public Safety and Corrections

Susan Wall Griffin, La. Bar No. 22402
504 Mayflower Street
Baton Rouge, LA 70802
Telephone: (225)342-6743
Facsimile: (225)342-3278

Entered this 10th day of August, 2017.

UNITED STATES DISTRICT JUDGE

23 of 23
Page 22 of 22