UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| ANTHONY TELLIS, ET AL | CIVIL ACTION NO. 18-cv-0541 |
| VERSUS | JUDGE FOOTE |
| JAMES M. LEBLANC, ET AL | MAGISTRATE JUDGE HORNSBY |

## REPORT AND RECOMMENDATION

**Introduction**

The Advocacy Center, on behalf of inmates at the David Wade Correctional Center ("DWCC"), filed this putative class action to seek injunctive relief with respect to the mental health care afforded inmates who are held in extended lockdown on the south compound in buildings N-1 through N-4, which are solitary confinement and extended lockdown tiers. Several months before suit was filed, counsel for the Advocacy Center wrote DWCC and demanded that it place a litigation hold on relevant evidence, specifically including video footage from cameras located in the N tiers.

Discussions were held between the Advocacy Center and prison officials about how to preserve and transfer the recordings. In the midst of those discussions, Warden Jerry Goodwin elected to disconnect the tier cameras from hard drives that recorded the video, leaving the cameras as live view only. Before the court is the Advocacy Center's **Motion for Preliminary Injunction (Doc. 45)** that asks the court to order prison officials to restore the video storage capacity of the tier cameras and provide copies of all video to the

Advocacy Center. For the reasons that follow, it is recommended that the motion be denied.

**Scope of the Motion and Hearing**

The motion for preliminary injunction (Doc. 45) and memorandum in opposition (Doc. 49) set out the relevant facts in considerable detail and include supporting affidavits and other exhibits. The undersigned held a conference to discuss the motion. Counsel expressed general agreement that the principal issues—whether the court can and should order DWCC to reactivate recording of the tier cameras and provide the plaintiffs copies of the recordings—are primarily legal issues.

Plaintiffs stated that they would like to present witnesses and evidence relevant to potential remedies, such as the relative cost and burden of proposed technical solutions. They were afforded that opportunity when the court held an evidentiary hearing on June 28, 2018. The evidence received at the hearing was largely consistent with the earlier written submissions. A summary of the relevant facts are set forth below.

The court also discussed at the prehearing conference that any claim of spoliation and related remedies was not at issue in connection with the motion for prospective injunctive relief. It would be more appropriate to address such matters after motion practice and any required factual development that targets the spoliation issues. Minutes at Doc. 56, pg. 2.

**Relevant Facts**

DWCC is divided into two compounds: north and south. The south compound is comprised of five buildings designated as N-1 through N-4, and H-5. Buildings in N-1

through N-4 house offenders assigned to restrictive housing or maximum custody due to disciplinary issues or classification designations.

These housing units are often referred to as tiers. They are long hallways with cells along the side. There is a shower area, referred to by some of the witnesses as a shower cage, where restraints are removed after the inmate is inside the shower. There is also a lobby area, and officers control access and communications from a key room or control room.

Beginning in the mid-2000's, the prison installed video cameras to monitor the tiers in N-1 through N-4. The tier cameras were aimed down the hallways and did not capture video of the inside of cells (except for a few cells set aside for suicide watch). The cameras do not capture any audio. Warden Jerry Goodwin and other witnesses testified that the purpose of the cameras was to ensure that officers were making rounds at the appropriate times. The prison was not required by law or DOC policy to maintain the cameras. Warden Goodwin and other prison officials testified that rounds are now monitored by a card swipe system that requires an officer to swipe an identification card at the end of a tier to mark his presence at a certain time.

The tier cameras are motion activated and, until recently, recorded to hard drives in five-minute increments. Once the hard drives were filled, the cameras automatically began to overwrite existing footage with new video footage. It has often been said that the hard drives stored the last 30 days of footage, but that was a mere estimate that depended on how often the motion sensors activated to commence a five-minute recording. Witnesses testified that, beginning in February 2017, oscillating fans were installed in N-1 through

N-4, and their motion often triggered the sensors on the cameras. This resulted in the hard drives filling up much faster, so that they held only about 12 to 20 days of recordings.

The Advocacy Center is authorized by federal law to investigate abuse and neglect of people with disabilities, which disabilities include mental illness. The Center began investigating complaints of abuse and neglect of inmates with mental illness in solitary confinement and extended lockdown at DWCC. Counsel for the Advocacy Center sent a letter to the prison on July 7, 2017 that advised officials that it was their obligation to preserve documents and things for discovery in the dispute, even though a complaint had not yet been filed. The letter explained that a party who reasonably anticipates litigation must suspend its routine document destruction policy and place a litigation hold to ensure the preservation of relevant documents, lest it be charged with spoliation of evidence. The letter specifically asked the prison to preserve video footage from any cameras located in the N tiers, including but not limited to hallway cameras, from May 26, 2017 and all dates going forward. The letter asked that the prison discontinue all data destruction and backup tape recycling policies, and that officials preserve relevant hardware unless an exact replica of the file was made. Doc. 45, Exhibit A. This led to discussions between the Advocacy Center and state officials.

There was also a disagreement about the ability of Advocacy Center attorneys to access DWCC and its prisoners. That dispute led to a lawsuit in the Middle District of Louisiana and, later, a settlement agreement. The agreement provided that the Advocacy Center and the DOC would establish a protocol for requesting and transferring tier video recordings that were then in possession of the State's consolidated information technology

service in the Division of Administration's Office of Information Technology. The agreement was based on the Advocacy Center's belief that the IT office held the video recordings from the DWCC tiers at issue. It was eventually learned that the tier cameras recorded only to local hard drives at DWCC and were not backed up or otherwise transmitted to the IT office.

Additional discussions were had about how the Advocacy Center might obtain copies of the tier recordings. Prison officials expressed concerns about the time and effort involved in sending the information to the Advocacy Center lawyers. The Center proposed to send hard drives to the prison that could be programmed to regularly back up the video recordings. Warden Goodwin requested time to consider the proposal. When the parties met again, Warden Goodwin said that he had decided to disconnect the tier cameras from the hard drives that stored video. The only cameras in the area that would continue to record to a hard drive were those in the suicide cells. Tier cameras would provide live feed only, and Goodwin said he had put his decision into effect a few days earlier.

Warden Goodwin testified at the hearing that the DOC began, in mid-2017, to require body cameras or portable cameras be used to record planned use of force incidents. DWCC received body cameras sometime during 2017, although witnesses varied in their recollection of when those body cameras arrived. The body cameras are small, clip-on devices that record in high definition and capture audio. All supervisors (meaning captains and majors) wear a body camera during their entire shift. The officers are able to activate and deactivate the cameras with a press of a button. The recordings are downloaded to a hard drive and stored at the end of a shift.

Warden Goodwin testified at the hearing that his decision to cease storing video from the tier cameras had nothing to do with this lawsuit. He said it was based on the fact that tier camera recordings were no longer required to monitor whether officers conducted their rounds on schedule. As for use of force incidents, he said that he believed the new body cameras were much better suited for reviewing the incidents.

Warden Goodwin said that he initially thought he would move the tier cameras to other parts of the prison, such as general population, where there was more traffic and greater need for surveillance. He then got a grant to buy more cameras, which allowed him to place new cameras in the dorms and keep the tier cameras as live feeds. The tier cameras are still in place, but they are now live-feed only with no storage.

The court heard testimony from inmates Tyler Blanchard and Jeremy Ricard. Both men were behavioral problems at other facilities, and each testified that he is bipolar and schizophrenic. They were transferred to DWCC, which is among three state prisons designed to house the most troublesome inmates. Both men have lengthy histories of disciplinary write-ups. Blanchard and Ricard each testified about separate incidents at DWCC where chemical spray was applied to them. Both incidents were recorded by body cameras (after the tier cameras were disabled from recording).

The court watched video from the body cameras of both incidents, and it heard testimony from the officers and inmates who were involved. It is not necessary to explore the details of the incidents. The main points to be taken from the evidence are that the body cameras do a good job of capturing high-definition video in the direction in which the cameras are pointed. Other advantages of the body cameras are that they record audio

and record events that happen inside cells, where witnesses testified most use of force incidents occur. The tier cameras show only a fixed view of the hallway outside the cells, and they do not capture audio.

Plaintiffs pointed out that recordings from the tier cameras could provide important context to understand what was happening inside the cells. For example, time-stamps from the two recording systems could provide information such as how long an officer was inside a cell before he activated his body camera. The tier recordings could also reflect matters such as the allegations of the inmate witnesses that inmates had their heads smashed against the wall or were dragged down the hall, incidents that are not necessarily captured by the body camera recording because of the close proximity of the camera and the direction in which it is pointing. The tier recordings would arguably provide better or additional evidence of such incidents.

Michael Harvey is a consultant who has worked with the Advocacy Center in its efforts to secure copies of recordings from DWCC. He visited the prison and made copies of the drives that were available before they were disabled. The drives for cameras on N-1 and N-2 had significant errors, which made it very time consuming to recover the data. Several thousand videos on the N-3 drive were found in a recycle bin. Plaintiffs suggested that this demonstrated that DWCC's backup system was not reliable, so the Advocacy Center needs to install its own reliable system to capture the recordings.

Mr. Harvey said that it took him about 40 hours to copy six hard drives. The 40 hours was not all hands-on time, and it included delay due to a computer timing out during the process. The defense argued that this showed the difficulty of constantly making

backups for the Plaintiffs as requested, but Mr. Harvey said that the process he used was a "world of difference" from what was proposed for the copying system at issue on this motion. Defense counsel questioned Mr. Harvey about whether the Advocacy Center's proposal included the means for DWCC to store a copy for itself. Mr. Harvey said DWCC would need to purchase drives, and he estimated that about 96 terabytes would cover the time at issue. He conceded that the proposal did not provide for the expense of data recovery or other issues if there were technical problems. He said his usual charge for such work is $120 per hour, but he is charging only $60 per hour in this case. There was other testimony that such consultants charge about $150 per hour.

Jacob Trupiano is an IT professional who works for the Division of Administration and is primarily stationed at DWCC. He testified that he bought the last tier cameras in 2014, and they are models 600TDL. He testified that the storage required would be much greater than estimated by Mr. Harvey. He estimated that about 12 terabytes would be used every two weeks or so. The prison would have to purchase hard drives to store video if it wanted to keep a copy of what it gave to the Advocacy Center. Mr. Trupiano testified that, contrary to what Mr. Harvey suggested, the camera system they have could not simultaneously record video from one camera to two different hard drives (which would simultaneously make a copy for the prison and for the Advocacy Center). Staff would have to copy the hard drives like Mr. Harvey did before, and they would need a third hard drive to record from the cameras during that copying process.

**Analysis**

An initial issue is what law governs the request for relief. In Humble Oil & Refining Company v. Harang, 262 F. Supp. 39 (E.D. La. 1966), Judge Rubin addressed a request for a preliminary injunction to prevent a party from destroying records that the plaintiff sought in discovery. The court analyzed the request under the traditional factors relevant to whether a preliminary injunction should issue. Under current law, a party seeking a preliminary injunction must show (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury absent an injunction, (3) that the threatened injury would exceed any harm that would flow from the injunction, and (4) that the injunction would not undermine the public interest. Walgreen Co. v. Hood, 275 F.3d 475, 477 (5th Cir. 2001).

Some district courts within this circuit have followed that approach. See, e.g., Madden v. Wyeth, 2003 WL 21443404 (N.D. Tex. 2003); Hunter v. Sterling, 2009 WL 4348660 (M.D. La. 2009). But other courts have criticized the approach, nothing that motions for preservation of documents and similar discovery orders have become widely used in the place of injunctions since the time of Humble Oil. The four-prong test that typically applies to requests for injunctive relief does not necessarily fit well with a request for a preservation order, given that proof of probability of success in litigation and consideration of the public interest are not consistent with or relevant to such requests. Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp., 220 F.R.D. 429 (W.D. Penn. 2004).

Capricorn suggested three factors be used when deciding a motion to preserve documents or other things: (1) the level of the concern the court has for the continuing existence and maintenance of the integrity of the evidence in the absence of an order directing preservation; (2) any irreparable harm likely to result to the parties seeking the preservation of evidence absent the order; and (3) the capability of a party or other person to maintain the evidence sought to be preserved, including the financial and other burdens created by ordering preservation. Capricorn Power, 220 F.R.D. at 433-34.

This case presents a new twist so it does not fit easily under either approach. Plaintiffs are not merely asking that the court order prison officials to *preserve* evidence that it has in its possession or is routinely generating. Plaintiffs are asking that the court order prison officials to *create* evidence—recordings—that are no longer being made at the prison. It is a rather extraordinary request that a defendant be ordered to continually record its actions on a going-forward basis, make copies of those recordings, and share them with its opponent in litigation. Plaintiffs have argued why the recordings would be helpful to monitor interactions between inmates and officers, and they urge that the burden on the Defendants would not be great, but they have not cited any decision where a court has ordered or upheld the granting of similar relief.

The scope of the litigation must be kept in mind. Plaintiffs' complaint asks for certification of a class of all prisoners who are or will be subjected to extended lockdown at DWCC, and a subclass of all individuals on extended lockdown at DWCC who have or are perceived as having a qualifying disability related to mental health. The complaint asks for injunctive relief with respect to the health care afforded such persons. The matters at

issue include the adequacy of mental health staffing, screening, and treatment. The claims are based primarily on the Eighth Amendment, the Americans with Disabilities Act, and Section 504 of the Rehabilitation Act.

Thus, the case has a particular scope and focus. It is not a general forum to litigate all perceived wrongs committed at DWCC on the tiers after the complaint was filed. Yet much of the argument by Plaintiffs appears to justify their request for recordings based on the ability of the recordings to help establish individual incidents/claims of excessive force or retaliation, more than relevance to the adequacy of mental health care at the prison. There is some overlap among the issues, but access to tier recordings after suit was filed will be of limited benefit in proving the central elements of the claims presented in the complaint.

As stated above, the issue now before the court is not spoliation, which is not yet ripe for decision. The issue is also not Warden Goodwin's credibility about the reason he stopped recording with the tier cameras soon after the claims at issue were presented. That assessment will be for the finder of fact at trial. The only issues are whether the court can and should issue an injunction that requires DWCC officials to resume recording with the tier cameras and share those recordings with the Advocacy Center attorneys. The relief requested is extraordinary, and Plaintiffs have cited no decision in which similar relief has been granted. The tier recordings would appear to be of limited relevance to the central issues presented in the complaint, and similar and often better HD video (with audio) recordings of particular incidents are available via the body camera system now in place.

Considering these and the other factors discussed above, the undersigned finds that Plaintiffs are not entitled to the relief they request in this motion for preliminary injunction.

Accordingly,

**IT IS RECOMMENDED** that Plaintiffs' **Motion for Preliminary Injunction (Doc. 45)** be **denied**.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 23rd day of August, 2018.

Mark L. Hornsby
U.S. Magistrate Judge