# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| **ANTHONY TELLIS, ET AL.** | **CIVIL ACTION NO. 18-cv-0541** |
| **VERSUS** | **JUDGE ELIZABETH E. FOOTE** |
| **JAMES M. LEBLANC, ET AL.** | **MAGISTRATE JUDGE HORNSBY** |

## MEMORANDUM RULING

Before the Court is Defendants' appeal of the Magistrate Judge's order granting Plaintiffs' first motion to amend their complaint. [Record Document 157]. Because the Advocacy Center has associational standing and because good cause exists for the amendment, the Magistrate Judge's order granting leave to amend the complaint [Record Document 153] is **AFFIRMED**.[1]

## I.    Background

Anthony Tellis ("Tellis")[2] and Bruce Charles ("Charles") brought this suit on behalf of a class of all prisoners held in extended lockdown at David Wade Correctional Center ("DWCC") and a sub-class of prisoners with mental illness on the lockdown tiers. [Record Document 1 at 7–8]. The motion for class certification remains pending; a hearing is set for October 15, 2019. [Record Documents 2 and 141]. Tellis and Charles were represented by attorneys from the Advocacy Center, the protection and advocacy ("P&A") agency for the state of Louisiana. [Record Document 1 at 52]. P&A agencies such as the Advocacy Center

---

[1] Plaintiffs have filed a second motion to amend to add additional named plaintiffs. [Record Document 170]. As that amendment involves a different set of issues than the amendment to add the Advocacy Center, this ruling does not address the second motion to amend.

[2] Tellis has since been dismissed on Plaintiffs' voluntary motion. [Record Document 174].

have a statutory mandate to investigate conditions at facilities that treat individuals with mental illness. 42 U.S.C. §§ 10802(3), 10805(a)(1)(A). Following such investigations, P&A agencies have the authority to bring legal or administrative actions to protect those individuals' statutory and constitutional rights. *Id.* § 10805(a)(1)(B)–(C).

In the midst of protracted and contentious discovery, Plaintiffs moved to amend their complaint to add the Advocacy Center as a plaintiff. [Record Document 128]. The amended complaint names as Defendants a variety of officials at DWCC and at the Louisiana Department of Corrections who are responsible for the allegedly deficient mental health treatment provided at the prison. [Record Document 154 at 4–7].[3] Specifically, Plaintiffs contend that the conditions on the extended lockdown tiers at DWCC and the level of mental health care provided evince deliberate indifference to serious mental health needs. [*Id.* at 11–45]. According to Plaintiffs, Defendants provide inadequate screening, treatment, and medication for mental illnesses, maintain inadequate staffing levels, and misuse their suicide-watch procedures. [*Id.* at 11–24]. Plaintiffs seek injunctive and declaratory relief to remedy alleged violations of the First and Eighth Amendments, the Americans with Disabilities Act (the "ADA"), and § 504 of the Rehabilitation Act. [*Id.* at 53–54].

In an order addressing several pending motions, the Magistrate Judge granted the motion for leave to amend over Defendants' objections. [Record Documents 132 and 153 at 4–7]. Specifically, the Magistrate Judge found that the Advocacy Center satisfied the

---

[3] The named defendants are James LeBlanc (the Secretary of the Department of Public Safety and Corrections), Jerry Goodwin (DWCC's warden), Colonel Lonnie Nail, Dr. Gregory Seal, Assistant Warden Deborah Dauzat, Steve Hayden, Aerial Robinson, Johnie Adkins, and the Louisiana Department of Public Safety and Corrections. [Record Document 154 at 4–7].

requirements for associational standing under the test laid out in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), because remediating the systemic abuses alleged in the amended complaint would not require the participation of individual DWCC inmates:

> The sum and substance of the Amended Complaint is that DWCC's staff does not properly screen for or treat prisoners with mental health problems, and when a prisoner does request mental health care or speaks up for himself, the prisoner is punished by being placed on suicide watch and/or held in harsh and brutal conditions. The court agrees with Plaintiffs that this case presents exactly the sort of claims and remedies for which associational standing is appropriate.

[Record Document 153 at 7 (internal citation omitted)]. The Magistrate Judge also found that although the deadline for amending the complaint had passed, Defendants would suffer "little if any prejudice" from the amendment. [*Id.*].

On appeal, Defendants essentially reiterate the objections they made to the motion for leave to amend. [Record Documents 132 and 157-2]. Defendants argue that adding the Advocacy Center as a party is an improper attempt to evade the requirements for class certification, that the Advocacy Center lacks associational standing, and that the Magistrate Judge failed to apply the proper legal standard when evaluating whether there was good cause to amend. [Record Document 157-2 at 2–9]. Plaintiffs maintain that class certification requirements do not apply to an organization seeking associational standing, that the Advocacy Center has associational standing as a consequence of its P&A authority, and that the discovery completed to date remains relevant after the amendment. [Record Document 166 at 2–8].

Although Defendants had the opportunity to file a reply brief, [Record Document 159 at 1], they elected not to do so. As a result, this matter is ripe for adjudication.

## II.    Standard of Review

Under the Federal Magistrate Act, a magistrate judge may issue binding rulings on non-dispositive matters. 28 U.S.C. § 636(b)(1)(A). A party that objects to such a ruling may appeal to the district judge who "must . . . modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). A clear error standard applies to a magistrate judge's findings of fact, while legal conclusions are reviewed de novo. *See Spillers v. Chevron USA Inc.*, No. 11-2163, 2013 WL 869387, at *3 (W.D. La. Mar. 6, 2013) (citing *Choate v. State Farm Lloyds*, No. 03-2111, 2005 WL 1109432, at *1 (N.D. Tex. May 5, 2005)). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). Hence, reversal of a factual finding is improper whenever the "magistrate judge's 'account of the evidence is plausible in light of the record viewed in its entirety.'" *Smith v. Smith*, 154 F.R.D. 661, 665 (N.D. Tex. 1994) (quoting *Resolution Tr. Corp. v. Sands*, 151 F.R.D. 616, 619 (N.D. Tex. 1993)).

## III.    Law and Analysis

### A.    Relationship of Amendment to Class Certification

Defendants correctly note that a court must "conduct a rigorous analysis of the [R]ule 23 prerequisites before certifying a class." *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) (citing *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982); *Applewhite v. Reichhold Chems.*, 67 F.3d 571, 573 (5th Cir. 1995)). This Court has every intention of doing so. However, the Magistrate Judge was not tasked with certifying a class; rather, he was to evaluate whether leave should be granted to add the Advocacy Center as an associational

plaintiff. Although Defendants maintain that the showing required for class certification under Rule 23 should apply to an amendment seeking to add an associational plaintiff, [Record Document 157 at 9], this contention is contrary to well-established law.

The Supreme Court has roundly rejected the equation of Rule 23 and associational standing because such a view "fails to recognize the special features . . . that distinguish suits by associations on behalf of their members from class actions." *UAW v. Brock*, 477 U.S. 274, 289 (1986). Following similar reasoning, the Fifth Circuit has observed that the associational standing inquiry is "[a]n altogether separate question" from class certification. *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1214 (5th Cir. 1991), *rev'd en banc on other grounds*, 959 F.2d 1283 (5th Cir. 1992); *see also Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1166 n.5 (M.D. Ala. 2016) ("[C]lass certification under Rule 23 and associational standing are evaluated on two different rubrics . . . ." (quoting *Bhd. of Maint. of Way Emps. v. Ind. Harbor Belt R.R. Co.*, 20 F. Supp. 3d 686, 691 (N.D. Ind. 2014))). In fact, it is perfectly possible for a court to find Rule 23 unsatisfied and yet find that an organization representing members of the proposed class has associational standing. *See S.S. ex rel. S.Y. v. City of Springfield*, 332 F. Supp. 3d 367, 375 (D. Mass. 2018) (noting that while a denial of certification "raise[s] substantive questions regarding the viability of the claims brought by [the associational plaintiffs], [it] do[es] not, and should not, have a direct bearing on the threshold issue of standing"). In the absence of any contrary authority identified by Defendants, this Court rejects their argument that the Magistrate Judge's grant of leave to amend to add an associational plaintiff violated Rule 23.

### B.     Associational Standing

#### 1.     The Requirements for Associational Standing

*Hunt* imposes three requirements an association must meet to have standing to sue on its members' behalf: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. at 343. The first two prongs of this test are mandated by Article III, while the third prong is prudential. *United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 555–57 (1996). As a "rule of judicial self-governance," a prudential limitation on standing may be abrogated by statute. *Warth v. Seldin*, 422 U.S. 490, 509 (1975).

#### 2.     The Constitutional Requirements

Defendants assert that only the third prong of the *Hunt* test is at issue in this case. [Record Document 157-2 at 3]. Nevertheless, because constitutional standing is a component of a federal court's subject matter jurisdiction, this Court must assure itself that the constitutional requirements for associational standing have been met. *See Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 301 F.3d 329, 331–32 (5th Cir. 2002) (citing *SEC v. Forex Asset Mgmt., LLC*, 242 F.3d 325, 328 (5th Cir. 2001)). For at least one member of an association to have standing to sue as an individual, the three familiar requirements must be satisfied: "(1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Friends of the Earth v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Charles's case illustrates that the individuals with mental illness whom the Advocacy Center represents have standing in their own right. [Record Document 154 at 28–34]. The amended complaint alleges that his pre-existing bipolar disorder was "greatly exacerbated" by policies and procedures that resulted in inconsistent administration of medication, extreme isolation, and the absence of regular mental health support. [*Id.*]. Altering policies to provide more frequent and extended interactions with mental health staff and to limit the use of isolation would provide redress. Thus, the requirement that there be some person with standing is met.

However, the Fifth Circuit also requires that the person with standing be a "member" of the association. *Ass'n for Retarded Citizens of Dall. v. Dall. Cty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994). P&A agencies advocate on behalf of individuals with mental illness, who are statutorily defined as "clients" of those agencies rather than as "members." *See* 42 U.S.C. § 10805(a)(4)(A), (a)(9), (c)(1)(B). Without extensive analysis, the Fifth Circuit held that a Texas P&A agency representing individuals with intellectual disabilities lacked associational standing because "most of its 'clients'— handicapped and disabled people—are unable to participate in and guide the organization's efforts." *Ass'n for Retarded Citizens of Dall.*, 19 F.3d at 244. However, as the Magistrate Judge noted, that decision was based on a different source of authority for a P&A agency, one designed to protect individuals with intellectual disabilities rather that individuals with mental illness. [Record Document 153 at 6]. Individuals with mental illness and their family members do have a role in directing the actions of P&A agencies through designated seats on the advisory council of each P&A agency. [*Id.*]. DWCC prisoners do not currently sit on the advisory council, but there is no statutory requirement that a representative of every sub-

group of individuals with mental illness serve on that council. Furthermore, although an individual represented by the Advocacy Center must have a "significant mental illness or emotional impairment," 42 U.S.C. § 10802(4)(A), such illness or impairment should not be confused with a disability that renders a person incapable of assisting an organization advocating on his or her behalf. Hence, even though the statute describes individuals with mental illness as "clients" of P&A agencies, this Court finds that a P&A agency in its role as an advocate for individuals with mental illness is a membership association for purposes of the *Hunt* test.

There can be no dispute regarding *Hunt*'s second prong. Congress funded P&A agencies to protect the constitutional and statutory rights of individuals with mental illness. 42 U.S.C. § 10801(b). As this lawsuit seeks to remedy alleged violations of the Constitution, the ADA, and § 504 for DWCC prisoners with mental illness, [Record Document 154 at 3, 53–54], this suit is indisputably "germane" to the Advocacy Center's purpose. And so, this Court concludes that the Advocacy Center meets both constitutional requirements for associational standing.

### 3. The Prudential Requirement

*Hunt* demands that an associational plaintiff demonstrate that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." 432 U.S. at 343. The Supreme Court concluded that Congress can abrogate this element by granting an organization the right to sue on behalf of its members. *United Food*, 517 U.S. at 558. The act setting out the requirements for state P&A agencies mandates that they "have the authority to . . . pursue administrative, <u>legal</u>, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or

treatment in the State." 42 U.S.C. § 10805(a)(1)(B) (emphasis added). Although the Fifth Circuit has not addressed this issue, persuasive authority has consistently held that this provision abrogated the third prong of the *Hunt* test. *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1112–13 (9th Cir. 2003); *Cmty. Legal Aid Soc'y, Inc. v. Coupe*, No. CV 15-688-GMS, 2016 WL 1055741, at *2 (D. Del. Mar. 16, 2016); *Dunn*, 219 F. Supp. 3d at 1171; *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corr.*, 642 F. Supp. 2d 872, 878 (S.D. Ind. 2009); *Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 307 (E.D.N.Y. 2008); *Univ. Legal Servs., Inc. v. St. Elizabeths Hosp.*, No. CIV. 105CV00585TFH, 2005 WL 3275915, at *5 (D.D.C. July 22, 2005); *Unzueta v. Schalansky*, No. 99-4162-RDR, 2002 WL 1334854, at *3 (D. Kan. May 23, 2002); *Risinger v. Concannon*, 117 F. Supp. 2d 61, 69–70 (D. Me. 2000). In line with this persuasive authority, this Court holds that Congress has abrogated the prudential prong of the *Hunt* test for P&A agencies by authorizing them to take legal action to protect individuals with mental illness.

Even if this Court were to find that Congress had not abrogated *Hunt*'s third prong, the Court would still find it satisfied in this case. Two considerations inform this determination: the relief requested and the evidence required to obtain that relief. When an associational plaintiff seeks only declaratory and injunctive relief, the participation of individual members is not required. *See Pennell v. City of San Jose*, 485 U.S. 1, 7 n.3 (1988) (holding that *Hunt*'s third prong is satisfied when an association raises a facial challenge to an ordinance); *Equal Rights Ctr. v. Abercrombie & Fitch Co.*, 767 F. Supp. 2d 510, 525 (D. Md. 2010) ("ERC seeks declaratory and injunctive relief under the ADA, which is precisely 'the type of relief for which associational standing was originally recognized.'" (quoting *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 187 (4th Cir. 2007)), *on reconsideration in part on other*

*grounds* (Jan. 31, 2011). Applying this principle, courts have had little difficulty finding that suits by P&A agencies satisfy the prudential element. *See, e.g., Univ. Legal Servs.*, 2005 WL 3275915, at *5 (finding the third prong met when the associational plaintiff sought "injunctive remedies that would bring institution-wide relief for its constituents"). Similarly, even if the relief requested would require a defendant to provide individualized evaluations, so long as the court is not required to oversee or rule upon the merits of those individual cases, the individuals are not required to participate in the litigation. *Dunn*, 219 F. Supp. 3d at 1172 (citing *Joseph S.*, 561 F. Supp. 2d at 308–09); *see also UAW*, 477 U.S. at 288 (allowing associational standing even though "the unique facts of each UAW member's claim will have to be considered by the proper state authorities before any member will be able to receive the benefits allegedly due him . . .").

The amended complaint seeks only declaratory and injunctive relief to benefit all the inmates in extended lockdown at DWCC. [Record Document 154 at 53–54]. While final relief in this matter may include an order from this Court requiring more frequent or extensive screening and treatment of prisoners, it is Defendants and not this Court that will conduct that screening and make medical determinations regarding appropriate care. Because this Court will not manage the individualized aspects of that process, any individualized benefits that accrue to DWCC inmates with mental illness will be a result of this litigation but will not be a part of this litigation.

The nature of the evidence to be presented at trial also supports this Court's conclusion. The need to offer evidence of harm to individual association members in order to establish a pattern of systemic deficiencies does not defeat a finding that *Hunt*'s third prong is satisfied. *See Univ. Legal Servs.*, 2005 WL 3275915, at *5 ("The mere need to show

individualized harm to the patients is not enough to offend *Hunt*'s third prong without a clear need for their direct participation in the litigation itself."). Notably, being required to sit for depositions or testify at trial does not constitute indispensable participation in the litigation. *See Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 601–02 (7th Cir. 1993) (referencing *Hosp. Council of W. Penn. v. City of Pittsburgh*, 949 F.2d 83 (3d Cir. 1991)). Instead, the proper inquiry is whether the association's "claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010). Where evidence provided by some association members will establish "a discrete pattern of conduct . . . to have applied equally against a large number of association members[,] . . . [p]roving the illegality of the pattern . . . [will] require[] some evidence from members, but once proved as to some, the violations would be proved as to all." *Id.* (citing *Retired Chi. Police Ass'n*, 7 F.3d 584; *Hosp. Council of W. Penn.*, 949 F.2d 83). In cases alleging systemic denials of health care, the "critical evidence" consists of expert testimony buttressed by medical and other records as well as fact testimony of those defendants responsible for setting and enforcing the relevant policies. *Dunn*, 219 F. Supp. 3d at 1172 (citing *Univ. Legal Servs.*, 2005 WL 3275915, at *5). Here, the most relevant information regarding Defendants' policies will be contained in just such sources. The participation of individual DWCC inmates will be limited to demonstrating that those policies cause harm and will likely be unnecessary to establish what the policies actually are. Because the members of the proposed class do not seek individualized relief, the fact that they may have suffered somewhat different types or degrees of harm as a result of DWCC's uniform policies and procedures does not affect the question of associational standing.

In support of their contention that the Advocacy Center lacks associational standing, Defendants direct the Court to an unpublished Fifth Circuit decision: *Prison Justice League v. Bailey*. 697 F. App'x 362 (5th Cir. 2017) (per curiam). In *Prison Justice League*, the associational plaintiff alleged that guards in a prison medical unit regularly used excessive force and retaliated against prisoners who filed grievances. *Id.* at 363. The Fifth Circuit held that the Prison Justice League lacked standing because excessive-force and retaliation claims in the prison context are "necessarily fact-intensive." *Id.* at 364 (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)). Nevertheless, the court went on to observe:

> While acknowledging that satisfying the third associational standing prong is difficult given the fact-intensive nature of such claims, we do not mean to imply that these difficulties are insurmountable. For example, where the complaint sufficiently alleges that officers are uniform in their intent or coordinated in their methods, an association may be able to prove its excessive force or retaliation claim without "fact-intensive-individual inquiry." Furthermore, where an association plausibly alleges that inmates fear retaliation from officers if they were to be named in a complaint, that association's standing claim is necessarily bolstered.

*Id.* (internal citation omitted). After observing that the Prison Justice League had not made such allegations, the Fifth Circuit affirmed the dismissal of the group for lack of standing. *Id.*

Several significant features distinguish the present litigation from that brought by the Prison Justice League. As an initial matter, the Advocacy Center has a statutory mandate to intervene to protect the interests of individuals with mental illness, including prisoners. 42 U.S.C. §§ 10801(b), 10805(a). The Prison Justice League, a membership organization representing incarcerated inmates, had no such source of authority. 697 F. App'x at 362. Moreover, despite Defendants' efforts to present this case as one that primarily concerns excessive force and retaliation, [Record Documents 132 at 3–5 and 157-2 at 3–5], Plaintiffs have alleged, as the Magistrate Judge correctly found, "that the entire system of care at

DWCC is broken or missing, not that care in individual instances has fallen beneath the constitutional floor," [Record Document 153 at 6].

Although Plaintiffs have alleged that "there is a culture of cover-up and excessive force at" DWCC, [Record Document 154 at 44], they have also alleged precisely the sort of uniform and coordinated policies or procedures that the Fifth Circuit found lacking in *Prison Justice League*. For instance, Plaintiffs allege that policies such as yard restriction, phone call limitations, shower restrictions, restrictions on personal materials, and prohibitions on cell-to-cell interactions contribute to mental decompensation in DWCC inmates. [*Id.* at 12–13]. They allege that "Policy 34," which strips all materials from an inmate's cell, and the procedures for using suicide watch both violate inmates' rights. [*Id.* at 13–15]. More generally, they allege that harm results from the small number of mental health staff and the length of time that passes between an inmate's meetings with that staff. [*Id.* at 15–24]. They also allege that every inmate at DWCC receives a substantially identical treatment plan regardless of his specific needs. [*Id.* at 20–21].

These alleged policies, which Defendants ostensibly apply uniformly to all members of the proposed class, distinguish this case from *Prison Justice League*. In light of these critical differences, this Court concludes that, even if Congress did not abrogate the third *Hunt* element for suits by P&A agencies, that element is satisfied here. Therefore, this Court affirms the Magistrate Judge's finding that the Advocacy Center has associational standing.

## C.     <u>Good Cause for Amendment</u>

Under Rule 15(a) of the Federal Rules of Civil Procedure, a court should "freely" grant leave to amend "when justice so requires." Fed. R. Civ. P. 15(a). However, once a scheduling order is in place, a request to amend a pleading after the deadline for amendment

has passed is controlled by the more restrictive standard of Rule 16(b)(4). *Filgueira v. U.S. Bank Nat'l Ass'n*, 734 F.3d 420, 422 (5th Cir. 2013) (citing *Fahim v. Marriot Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008)). Under that rule, leave may be granted "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The four factors relevant to good cause are: '(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice.'" *EEOC v. Serv. Temps Inc.*, 679 F.3d 323, 334 (5th Cir. 2012) (quoting *Fahim*, 551 F.3d at 348).

Defendants argue that because the deadline to amend pleadings passed five and a half months before Plaintiffs filed their motion, they were required to show good cause for the delay and have not done so. [Record Document 157-2 at 7–8]. Plaintiffs emphasize the lack of prejudice to Defendants and the fact that the amendment will enable the parties to begin their work on the merits. [Record Document 166 at 5–7].

A brief procedural history of this litigation will illuminate the background to the Magistrate Judge's order. Tellis and Charles originally filed suit in the Middle District of Louisiana on February 20, 2018. [Record Document 1]. After the matter was transferred to this Court, the Magistrate Judge issued a scheduling order, which set the deadline for amending pleadings for June 15, 2018—a mere two weeks after the scheduling conference. [Record Document 56 at 1]. The Court's intention was that the parties would commence discovery immediately, focusing primarily but not exclusively on certification-related issues. [*Id.* at 2]. In order to ensure that the litigation did not become excessively drawn out, the Court set the class certification hearing for December 2018. [*Id.* at 3]. Discovery commenced but soon became bogged down by a parade of disputes: Plaintiffs' access to recordings from

security cameras, [Record Documents 45, 49, 50, 53, 77, 83, 85, 92, 93, and 126], defense counsel's ability to accompany Plaintiffs' counsel and their experts during a walk-through of the extended lockdown tiers, [Record Documents 86, 87, 88, 89, 90, 91, 94, and 95], and Plaintiffs' counsel's access to inmates' medical records, [Record Documents 97, 98, 99, and 100]. Further complications arose as both parties requested this Court's intervention to obtain access to various groups of prisoners. [Record Documents 139, 142, 145, 147, 155, 156, 162, 163, 164, and 165]. As of this writing, three motions to compel remain pending. [Record Documents 112, 133, and 144].

These ongoing discovery disputes forced the Court to delay the class certification hearing by ten months.[4] [Record Document 127]. The effect was to create a year-long discovery period, which is quite lengthy for issues related solely to class certification, particularly where, as here, the identity of every member of the proposed class is known or easily ascertainable and all the relevant records are in Defendant's possession. On November 30, 2018, two weeks after this Court reset the class certification deadlines, Plaintiffs filed their motion to amend. [Record Document 128]. Defendants opposed the amendment as untimely. [Record Document 132 at 7]. The Magistrate Judge rejected Defendants' timeliness argument, finding that "[w]hile significant work has been done by the parties, much more work remains. The court perceives little if any prejudice to Defendants in allowing the amendment at this time." [Record Document 153 at 7].

Although Defendants maintain that Plaintiffs provided no explanation for their late request to amend, [Record Document 157-2 at 7], this is a misrepresentation of Plaintiffs'

---

[4] The delay was the product of Plaintiffs' motion to extend discovery, which was in turn based on Defendants' alleged failure to provide complete discovery responses. [Record Documents 105 and 107].

motion, which explains their justification in some detail, [Record Document 128-1 at 3–4]. Plaintiffs pointed out that the contentious nature of the discovery process had already delayed class certification significantly and suggested that with the addition of the Advocacy Center as a party, "the parties could streamline the litigation by stipulating to or dismissing elements of the complaint related to class certification." [*Id.* at 3]. They also highlighted the possibility that an appeal from a class certification decision may produce even further delay. [*Id.* at 4]. Given the parties' oppositional attitudes (as demonstrated by the discovery disputes catalogued above), this Court believes that such an appeal is a distinct possibility.

Plaintiffs' concern is ongoing harm to inmates with mental illness incarcerated at DWCC and their belief that delay compounds that harm. At the commencement of litigation, Plaintiffs could not have anticipated the combativeness of the parties' discovery disputes and the extent of the resulting delay. Plaintiffs made their request to amend soon after the Court reset the deadlines related to class certification—that is, at the point when it became clear that proceeding solely on behalf of the class of DWCC inmates in extended lockdown would not produce a speedy resolution of the disputes at the heart of this litigation. By allowing the amendment, this Court is now in a position to place the parties on a schedule that will move them towards the merits irrespective of the progress of class certification.

This amendment is important. This Court has a duty to ensure a "just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. While the Court respects counsel's right to zealous advocacy, at many points in this litigation that advocacy has outweighed the significance of the specific issue at hand. As the ongoing discovery disputes escalate, both parties have adopted increasingly rigid and inflexible

positions on nearly every issue. Allowing that process of ossification to continue uninterrupted while the parties prepare for the class certification hearing and this Court prepares its ruling would interfere with this Court's fundamental duty to ensure that justice is done in a timely fashion. Conversely, affirming the Magistrate Judge's grant of leave to amend assists this Court by enabling discovery and motion practice on the merits to commence immediately. Hence, the amendment is important.

Turning now to prejudice, the Court notes that it must defer to the Magistrate Judge's factual finding that Defendants will suffer no prejudice from the amendment. [Record Document 153 at 7]. Even if it were to review the matter de novo, this Court would concur in that finding. As the Advocacy Center's only role in this litigation is to represent the inmates' interests, the addition of the Advocacy Center neither introduces new claims nor alters any substantive issues in this case. As a result, discovery of facts about the Advocacy Center will be neither relevant to any issues in this case nor necessary to resolve them. Moreover, the current scheduling order sets only deadlines related to the motion for class certification; these deadlines are unaffected by the addition of the Advocacy Center as an associational plaintiff. [Record Documents 127 and 141]. As merits discovery and dispositive motions have yet to be scheduled, there are no deadlines that would need to be continued. To the extent that Defendants feel that the addition of the Advocacy Center as a party will increase the complexity of merits discovery, that issue can be addressed when a schedule is set for the next phase of this litigation.

Defendants also maintain that adding the Advocacy Center will somehow render irrelevant the class-based discovery they have conducted. [Record Document 157-2 at 8]. In a joint notice to the Court, the parties indicated that Plaintiffs no longer intend to dismiss

their class claims. Hence, in the present posture, the Court must proceed with the class certification process barring some further action by the parties.[5] As a result, no work in preparation for the hearing on class certification has been wasted. In the event that the parties resolve class certification issues without the need for additional briefing or a hearing, the underlying factual discovery (i.e., the mental health status of DWCC inmates, the conditions in which they are housed, and the policies and procedures affecting the treatment available to them) will remain relevant at the merits stage of this litigation.

Hence, this Court finds that all four factors support a finding of good cause for Plaintiffs' late motion to add the Advocacy Center as a plaintiff. Because the requirements of Rule 16(b)(4) are satisfied, this Court must freely grant leave to amend if justice so requires. Fed. R. Civ. P. 15(a). Justice requires that this litigation continue to proceed towards an ultimate resolution on the merits. Because adding the Advocacy Center as a plaintiff will promote that process, the Magistrate Judge's order granting Plaintiff's motion for leave to amend is affirmed.

## IV.    <u>Observations</u>

As it did in its previous memorandum ruling, [Record Document 165 at 11–13], the Court will offer the parties some additional direction. Although these insights should not necessarily be taken as binding, the Court believes that guidance is necessary in light of the parties' fractious behavior.

---

[5] In the joint notice, Defendants argued that adding the Advocacy Center as a party mooted the motion to certify a class. In light of the Supreme Court's acknowledgment that associational standing and Rule 23 are distinct, *see UAW*, 477 U.S. at 289–90, Defendants' argument lacks merit.

P&A agencies have a right to "have access to facilities in the State providing care or treatment." 42 U.S.C. § 10805(a)(3). The Court anticipates that the Advocacy Center may attempt to use this authority to uncover evidence to use in this litigation. To resolve a dispute in the Middle District of Louisiana about the Advocacy Center's P&A access, DWCC and the Advocacy Center entered into a settlement agreement, which establishes procedures for the Advocacy Center's access to the prison and to inmates' records. [Record Document 45-8]. Defendants maintain that the settlement agreement "defined the Advocacy Center's access to DWCC for matters not in litigation" and hence that the access provisions outlined in the agreement cannot be used to investigate any claims involved in this suit. [Record Documents 132 at 1 and 157-2 at 1 n.1].

Although both parties have referenced this contention in multiple filings, neither party has sought an express ruling on the continued viability of the settlement agreement. This Court will not rule in the abstract but will observe that the settlement agreement resolved only the question of the Advocacy Center's <u>access</u> to the prison. The agreement did not address any substantive issues regarding the <u>treatment</u> of inmates with mental illness. It seems unlikely that litigation—brought pursuant to statutory authority and which seeks to remedy conditions discovered while exercising a statutory right of access—renders inoperative an agreement enforcing that access. It also seems that the Advocacy Center's use of information discovered through the exercise of its right of access is a separate issue from whether the Advocacy Center continues to have that access. Moreover, since this litigation involves all of the mental health care being provided to any inmate in extended lockdown, Defendants' position would effectively deprive the Advocacy Center of the ability to exercise the full scope of its investigatory authority guaranteed by statute.

When moving to amend, Plaintiffs asserted:

> This amendment would allow the Court and the parties to reach the substance of this litigation without requiring the time and expense of class certification. If this Court permits the amendment of the complaint to add the Advocacy Center as a party, the parties could streamline the litigation by stipulating to or dismissing elements of the complaint related to class certification.

[Record Document 128-1 at 3]. They further suggested that the amendment would "eliminat[e] the burden of a cumbersome, time consuming, and expensive class certification process." [*Id.* at 5]. The Court interpreted these representations to mean that if leave to amend were granted, the class claim would either be entirely dismissed or entirely stipulated to, thereby obviating the need for any further consideration of class certification.

When granting Plaintiffs' motion, the Court ordered the parties to meet and confer to determine if the amendment affected the status of any pending motions. [Record Document 153 at 7]. In a joint notice, the parties reported that the amendment resolved no outstanding issues. In that notice, Plaintiffs clarified that their memorandum in support of their motion to amend was not intended to suggest that they would abandon their attempt to certify a class. Rather, they apparently believed that the amendment would have enabled the parties to reach some sort of agreement on many or all of the Rule 23 elements. Plaintiffs' failure to clearly articulate their vision for the future progress of this litigation confused Defendants and this Court. Going forward, the Court encourages both parties to be as explicit and forthright as possible about their plans to move this litigation forward. Given the complexity of this litigation, the number of people affected, and the importance of the issues at stake, hiding the ball from the Court or relying on procedural manipulation to achieve substantive results is unacceptable.

The Court also strongly advises the parties to avoid excessive hyperbole in their representations to the Court. For instance, Defendants insist that they "still do not know the nature of the Plaintiffs['] specific claims." [Record Document 167-1 at 3]. The Court finds this contention utterly baffling. The extremely detailed complaint catalogues a number of areas in which DWCC policies and procedures are allegedly deficient. [Record Document 154 at 11–24]. To the extent that Defendants claim that they lack full information about specific inmates, the Court reminds Defendants that they are in possession of all of the records relating to the mental health treatment of the men in extended lockdown. In fact, it appears that Plaintiffs' evidence is drawn from Defendants' own records. Finally, as this Court has repeatedly emphasized, the central issues in the case are Defendants' policies not the mental health status of any particular inmate (whether a named plaintiff or not).

## V.    <u>Next Steps</u>

The Court will issue a separate order setting a telephone status conference. The purpose of this conference will be to determine the most appropriate way to proceed. In light of the addition of the Advocacy Center as a party representing all the inmates with mental illness on extended lockdown, this Court will eventually have to rule on the merits of this case, whether at summary judgment or following a trial. Hence, merits discovery can begin with regard to those inmates and the issues affecting them regardless of the outcome of class certification. The Court will ask the parties to select between two options:

(1) Proceed with the class certification hearing as scheduled.

(2) Defer class certification to coincide with dispositive motions.

**In either option, discovery on the merits will begin immediately.** While it seemed appropriate at the start of this litigation to concentrate discovery on class-related

issues, the delays attending that process have made it necessary to move the parties into a merits phase while the motion for class certification remains pending. Given that the Court must resolve factual disputes in order to determine whether the elements necessary for class certification are met, the Court intends to conduct an evidentiary hearing on class certification unless the parties are able to stipulate to facts sufficient to allow the Court to resolve the legal questions on briefing alone.

The Court notes that Plaintiffs have filed a second motion to amend to add additional named Plaintiffs; this motion is pending before the Magistrate Judge. [Record Document 169]. Nothing in the instant ruling should be taken as suggesting any position on the merits of that motion. While the proposed amendment, if granted, might affect the parties' readiness to proceed with the class certification hearing in October, the proposed amendment has no effect on the merits claims in this case. Thus, merits discovery may begin while the Court considers Plaintiffs' second motion.

## VI.  Conclusion

In light of the foregoing, **IT IS ORDERED** that the ruling of the Magistrate Judge granting Plaintiffs' motion to amend the complaint to add the Advocacy Center as a party [Record Document 153] is **AFFIRMED**.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this the 3rd day of April _____, 2019.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE