UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF BATON ROUGE

| | | |
|---|---|---|
| ANTHONY TELLIS and BRUCE CHARLES, on behalf of themselves and all other similarly situated prisoners at David Wade Correctional Center | * * * | |
| | * | CIVIL ACTION NO. 3:18-cv-00161 |
| VERSUS | * | |
| | * | JUDGE SHELLEY D. DICK |
| JAMES M. LEBLANC, SECRETARY OF THE | * | |
| LOUISIANA DEPARTMENT OF PUBLIC | *. | MAGISTRATE JUDGE |
| SAFETY AND CORRECTIONS, et al. | * | RICHARD L. BOURGEOIS, JR |
| | * | |

**************************************************************************

# EXPERT REPORT OF JOHN W. THOMPSON, JR., M.D.

EXHIBIT

7

# INDEX

A.  Purpose of Evaluation ................................................................................................1

B.  Qualifications of the Examiner ..................................................................................1

C.  Sources of Information ..............................................................................................2

D.  Background Information on DWCC ...........................................................................4

    1. Overview of DWCC Provision of Care ...............................................................4

    2. Mental Health Personnel at DWCC .....................................................................6

        a.  Warden Michelle Dauzet ..........................................................................6

        b.  Steve Hayden ............................................................................................6

        c.  James Burgos .............................................................................................7

        d.  Aerial Robinson ........................................................................................7

        e.  Dr. Gregory Seal .......................................................................................8

        f.  Other ..........................................................................................................9

    3.  Screening for Mental Health Issues .....................................................................9

    4.  DWCC Staff Training...........................................................................................13

    5.  Administrative Segregation at DWCC .................................................................13

    6.  Mental Health on Administrative Segregation ....................................................14

    7.  Suicide Prevention ...............................................................................................14

    8.  Programming ........................................................................................................17

E.  Legal Underpinnings .................................................................................................17

F.  Response to Plaintiffs' Experts' Opinions Regarding Whether Serious Mental Illness Develops or is Worsened by Administrative Segregation Procedures on the South Compound at DWCC .........................................................................18

1. Administrative Segregation background history and brief summary of research in the field ...................................................................................... 19

2. History of Purported Mental Illness Development or Worsening Theories ................ 21 in Administrative Segregation

G. Evaluation of Drs. Burns' and Haney's Criticism of Social Worker Hayden's Evaluation of Patients "At the Bars" on the South Compound. ............................................... 27

H. Response to Burns and Haney's Further Criticisms of Social Worker Hayden's Ability to Diagnose Individuals with Appropriate Psychiatric Diagnoses Because He Does Not Have the Qualifications to Diagnose ...................................................................... 28

I. Dr. Haney's Use of Instruments That Are Not Research Validated or Part of the DSM-Diagnostic Manual Criteria ............................................................................................ 29

J. Response to Particular Criticisms in Dr. Burns' Report, Also Covered in Dr. Haney's Report ...................................................................................................................................... 29

1. Screening .................................................................................................................. 30

2. Mental Health Rounds ............................................................................................. 31

3. Periodic Mental Health Assessments ...................................................................... 31

4. Treatment that is more than mere seclusion or close supervision ............................... 32

5. Participation by trained mental health professionals (in appropriate numbers) .......... 33

6. SMI Is Not Increasing at DWCC .............................................................................. 34

7. Training of Mental Health Staff ................................................................................ 36

8. Screening for Mental Health Issues .......................................................................... 38

9. Safeguards against psychotropic medications that are prescribed in dangerous amounts without adequate supervision or otherwise inappropriately administered as outline in Dr. Burns' report ................................................................. 39

10. Accurate, complete and confidential records ............................................................ 40

11. Suicide Prevention Program ..................................................................................... 40

12. Length of Stay decreases in Administrative Segregation in Louisiana .......................41

K.  Summary of Conclusions and Opinions ..................................................................42

ATTACHMENTS

1.  Offender evaluations

2.  Offender deposition summaries

3.  Summary of various claims and deposition summaries of DWCC employees, and others

4.  John W. Thompson, Jr., MD Curriculum Vitae with list of publications

5.  List of Cases – Expert testimony

6.  Sample A&I Reports

## A. **PURPOSE OF THE EVALUATION**

Pursuant to a lawsuit filed in the United States District Court for the Middle District of Louisiana entitled, Anthony Tellis, et al. v. James M. LeBlanc, et al., Messrs. Keith Fernandez, Connell Archey, and Randal Robert, of the firm of Butler Snow LLP, asked me to perform an evaluation and review of the following items, and evaluate individuals at David Wade Correctional Center ("DWCC").

Specifically, I was asked to undertake the following:

1. Review Department of Corrections and DWCC Policies and Procedures with regard to Administrative Segregation ("AS") and Mental Health;

2. Review the expert reports of Drs. Kathy Burns and Craig Haney and Dan Pacholke, in order to understand, evaluate, and potentially rebut their criticisms of the DWCC Facility.

3. Interview offenders, randomly selected, from the North and South compounds to determine if minimal constitutional standards were met with reference to their care.

4. Determine whether or not serious mental illness was created or worsened by restrictive housing in AS at DWCC.

5. Provide other relevant opinions to ultimately assist the Court in determining if the mental health care provided on the South at DWCC compound fell below a standard of deliberate indifference to the mental health needs of the offenders on the South compound.

## B. **QUALIFICATIONS OF THE EXAMINER.**

The qualifications of the examiner, John W. Thompson, Jr., M.D., are outlined in my Curriculum Vitae, which is attached to this report. I am board certified in Adult Psychiatry, with added qualifications in Forensic Psychiatry and Addiction Psychiatry by the American Board of Psychiatry and Neurology.

I am the Chairman of the Department of Psychiatry at Tulane University School of Medicine and the Chief of Staff at the Eastern Louisiana Mental Health System. I have been

evaluating and treating individuals with Severe Mental Illness for 30 years. I have supervised psychiatrists in the provision of care to Louisiana offenders at Elayn Hunt Correctional Center, Louisiana Correctional Institute for Women, and the Orleans Justice Center.

I am ultimately responsible for overseeing competency restoration inpatient services and outpatient services as well as evaluation and treatment of individuals adjudicated NGBRI (Not Guilty by Reason of Insanity) and retuning them safely to group homes and into the community. I am familiar with Joint Commission, NCCHC, and ACA standards for the treatment of mentally ill individuals in hospitals, jails, and prison environments. I have been appointed by Judges throughout the State of Louisiana to evaluate individuals for competency and sanity at the time of offense, and as such have performed evaluations in most jails in Louisiana, as well as most prison systems in Louisiana.

I regularly consult with experts and leaders in the field of correctional psychiatry to assist in improving the provision of care, jail and prison psychiatric staffing, and standards of care in various correctional environments.

My billing rate is $600 per hour for work related to this case.

## C. SOURCES OF INFORMATION

My opinions are based on various sources of information. I toured and inspected the facilities at DWCC including the South Compound which is the subject of this lawsuit. On April 29-30, 2019 and January 8, 2020, I (along with my mental health consulting staff – Dr. Vyas and Dr. Soong) conducted in person evaluations of a randomly sampled group of 51 offenders who are among the mental health patients located at DWCC. During these evaluations we met with the offenders, reviewed their mental health records, and prepared evaluations, including diagnoses as reflected in the reports which are attached to this report as Attachment 1. I also reviewed various

2

depositions of offenders, employees, and other witnesses in this case as reflected in the summaries (prepared under my direction) which are attached to this report as Attachments 2 and 3. I also reviewed various departmental and DWCC policies and procedures regarding AS and mental health. I interviewed and had discussions with Warden Goodwin and Warden Dauzat. Additionally, a detailed list of other source materials considered in connection with my opinions is set forth below.

1. Complaint
2. Interviews of Offenders taken at David Wade Correctional (*see* reports in Attachment 1)
3. Offenders Medical Records and Mental Health Records of Offenders
4. Deposition transcripts of Offenders (see summaries in Attachment 2)
5. Deposition transcripts of DWCC staff and others (see summaries in Attachment 3)
6. Defendants' Responses to First Request for Production of Documents
7. Defendants' Responses Second Request for Production of Documents
8. Defendants' Responses to Third Request for Production of Documents
9. Defendants' Fourth Production and Supplementation
10. Plaintiffs Response to Requests for Production
11. Louisiana Department of Corrections and David Wade Correctional Center Policies and Procedures.
12. References to materials used in developing opinions:
    a.  Estelle v. Gamble, 429 U.S. 97 (1976)
    b.  Ruiz v Estelle, 503 F.Supp.1265 (S.D.Tex 1980)
    c.  Farmer v Brennan, 511 U.S. 825 (1994)
    d.  One Year Longitudinal Study of the Psychological Effects of Administrative Segregation, National Institute of Justice, January 2011. https://www.ojp.gov/pdffiles1/nij/grants/232973.pdf
    e.  American Psychiatric Association Position Statement on Segregation of Prisoners with Mental Illness, American Psychiatric Association. 2012. http://www.psych.org/File%20Library/Learn/Archives/ps2012 _PrisonerSegregation.pdf.
    f.  Association of State Correctional Administrators' Restrictive Status Housing Policy Guidelines, August 9, 2013.
    g.  Society of Correctional Physicians. 2013. Position Statement, Restricted Housing of Mentally Ill Inmates.

       http://societyofcorrectionalphysicians.org/resources/position-
statements/restricted-housing-ofmentally-ill-inmates

h.    O'Keefe, ML, Klebe, KJ, Metzner, J, Dvoskin J, et al. A Longitudinal Study
of Administrative Segregation. J Am Acad Psychiatry Law, 41:49-60. 2013.

i.    World Health Organization, Prisons and Health 2014, Chapter 5 - Solitary
confinement as a prison health issue.

j.    The Nelson Mandela Rules, UN Standard Minimum Rules on the Treatment
of Prisons (2015 Rev)

k.    American Correctional Association, Restrictive Housing Performance Based
Standards (August, 2016), p. 46. https://www.asca.net/pdfdocs/8.pdf

l.    US Department of Justice, NCJ 250315 - Restrictive Housing in the U.S.
Issues, Challenges and Future Directions, Nov 2016.

m.    National Commission on Correctional Health Care, Position Statement:
Solitary Confinement (isolation), Journal of Correctional Health Care, 22,
257-263 (2016). http://www.ncchc.org/solitaryconfinement

n.    Quantitative Syntheses of the Effects of Administrative Segregation on
Inmates' Well-Being, Robert Morgan et al. Psychology, Public Policy and
Law, August 2016. http://safealternativestosegregation.org/wp-
content/uploads/legacy/files/morgan-et-al_effects-of-administrative-
segregation.pdf

o.    Reflections on Colorado's Administrative Segregation Study, Maureen
O'Keefe. National Institute of Justice, March 2017.

p.    The Psychological Effects of Solitary Confinement: A Systematic Critique,
Craig Haney Ph.D., J.D. Crime and Justice: A Review of Research, March
2018.

q.    The Safe Alternatives to Segregation Initiative: Findings and
Recommendations for the Louisiana Department of Public Safety and
Corrections, and Progress Toward Implementation. New York: Vera Institute
of Justice (2019).

r.    Association of Restrictive Housing During Incarceration With Mortality After
Release. Brinkley-Rubenstein, L., Sivaraman, J., Rosen, D., et al. *JAMA
NETWORK Open.* 2019:2(10):e1912516

s.    Time-In-Cell 2019: A Snapshot of Restrictive Housing, Correctional Leaders
Association, Arthur Liman Center for Public Policy and Law at Yale Law
School, September 2020.

## D. BACKGROUND INFORMATION ON DWCC.

### 1. Overview of DWCC Provision of Care.

DWCC is a maximum-security prison, which houses approximately 1,224 offenders.

DWCC consists of a North Compound and a South Compound. The North Compound houses

general population and to my knowledge is not at issue in this litigation. The South Compound

houses offenders in buildings designated as N Blocks and H Blocks. The H Blocks are used for

protective custody and are not at issue in the litigation. This litigation is focused on the N Blocks 1-4 on the South Compound where offenders are housed in AS.

The N blocks contain cells with open fronts and consist of four blocks, designated as N-l through N-4. Each block consists of four tiers, designated as A through D, and each tier consists of 16 cells. The cells have bars that open to a hallway with the shower area at one end of the hall and the door to the central control room at the other end of the hall. Most cells are double bunked. N-l is a medium security block for transitional housing. Offenders assigned to N-l are eligible for transfer to general population once a bed is available. N-l is equipped with televisions and offenders have additional time outside of their cells. Offenders housed in N-l eat in the chow hall outside of their cells and attend group classes. (N-1 was formerly an AS unit and was changed to medium security in 2018).

N2, A and B tiers house offenders placed in investigative, disciplinary, and preventative segregation and each tier has a capacity of 32 offenders for a total of 64. N2 C tier houses offenders in transitional segregation for offenders pending transfer. N2 D tier houses protective custody assigned to a custody status of Closed Custody/Restricted ("CCR"). CCR is for long-term offenders with protection concerns (either to protect other offenders or to protect staff) and/or significant security concerns. The capacity for N2 C is 24 offenders.

N3 and N4 are used to house offenders who are maximum custody and are assigned to restrictive housing typically for major offenses. Each of the four N3 A and D tiers have a capacity of 30 and the B and C tiers have a capacity of 32. The capacity of N4 A-C is 16 offenders each. N4D has a capacity of 30 offenders.

DOC has recently undertaken steps to limit the number of offenders in AS statewide. For instance, DOC closed Camp J at Angola that formerly housed offenders in AS. Because DWCC

has the facilities, offenders with a history of disciplinary offenses that cannot be appropriately housed elsewhere are transferred to DWCC when AS is or may be necessary. Even with this transition and movement of individuals to DWCC, the N-1, N2C, and N2D unit was closed to AS offenders, reducing the total capacity of potential AS from 384 to 266, reducing AS cells by at approximately 30.7%.

### 2. **Mental Health Personnel at DWCC**

DWCC provides mental health care to offenders through a team consisting of mental health professionals who serve under the supervision of Warden Michelle Dauzet. The credentials Warden Dauzet and the three mental health professionals are as follows:

#### a. **Warden Michelle Dauzet**

Warden Dauzet has a master's in social work and LCSW and is a board approved licensed clinical social worker. Warden Dauzet has been in the mental health field for over 21 years. She completed the required clinical supervision from Clay Williams, LCSW and obtained her license for clinical social worker certification in 2004. LCSW clinicians are required to obtain 20 hours of continuing education annually. Of the required continuing education, 10 are required to include diagnosis and treatment. Three hours of ethics are also required every two years. A board approved clinical social worker is required to complete 6.5 hours supervision workshop and maintain continuing education requirements annually. Ms. Dauzet has been certified in Critical Incident Stress Debriefing since 2004. Ms. Dauzet is also certified as a Prison Rape Elimination Act Auditor through the Department of Justice.

#### b. **Steve Hayden**

Mr. Hayden possesses a Master Industrial Class Organizational Psychology. This Graduate Degree Program focuses on Behavioral Science, with specific concentration on research and

gathering of statistical data. In the later phase of the master's level program, Mr. Hayden attended a supervised internship, which consisted of testing and collecting data on student pilots who were exhibiting elevation in mental health symptoms.

Mr. Hayden completed his post-graduate education in a two-year period, with weekly two-hour clinical supervision, meeting with a psychologist, Dr. Webb Sentell. The sessions consisted of review of cases, DSM-IV criteria reviews, testing results and evaluation of clinical impressions indicated by Mr. Hayden, upon completing client assessment. During this two-Year period, Mr. Hayden also met with a psychologist, Dr. Arian Ward, as his immediate site supervisor to review his findings related to clinical impressions of DSM-IV and testing results on cases that were not tested at Elayn Hunt Correctional Center ("EHCC").

### c.   James Burgos

James Burgos obtained a Master of Industrial Organizational Psychology: in 2006 and a Master of Counseling in 2017. In addition, Mr. Burgos received two years of Clinical Supervision from Dr. Ernie Cowger, Ph.D. from 2017 to 2019. The supervision sessions were centered on case consultation, DSM-5 criteria, good therapeutic dynamics, etc.   In addition to his licensed supervision, Mr. Burgos was also supervised by Dr. Susan Tucker, Ph.D. as his on-site direct supervisor. Mr. Burgos is a Licensed Professional Counselor, through the Louisiana Board of Licensed Professional Counselors. Mr. Burgos is required to receive 40 hours of continuing education for renewal of his license every other year. Of the required Continuing Education Classes, three hours must be ethics related and six hours must consist of diagnostic assessment and treatment. Mr. Burgos's license is current and compliant with all Board requirements.

### d.   Aerial Robinson

As of January of 2021, Ms. Robinson is a licensed clinical social worker with the Louisiana

Board of Social Work Examiners. Ms. Robinson passed the ASWB clinical exams and obtained her licensed clinical social worker certification. The requirements for obtaining this level of certification are completion of 5,760 hours of post-graduate social work practice, 90 hours of face-to-face supervision, and 3,840 hours of post-graduate social work experience under the supervision of a board-approved supervisor.

LCSW clinicians are required to obtain 20 hours of continuing education annually. Of the required continuing education, 10 are required to include diagnosis and treatment. Three hours of ethics are also required every two years. In January of 2021, Ms. Robinson became a licensed master clinical social worker. As an LMSW, she was still required to receive twenty hours of continuing education annually, but the diagnostic and treatment is not required for an LMSW.

Ms. Robinson has extensive experience in mental health settings. She was employed as a social worker for geriatric/psychiatric inpatients at Springhill Medical Center. During her employment, she received Board supervision from an LCSW, in addition to weekly consultation with a staff psychiatrist. Dr. Lionel Guilluame. Ms. Robinson also completed an internship at Steven Hoyle Intensive Substance Abuse Program, where she received on-site supervision from Dr. Susan Tucker, Ph.D. Upon completion of her master's program, Ms. Robinson successfully passed the ASWB Master Level Exam to obtain an LMSW. Ms. Robinson is a trained mental health first aid instructor for the DOC.

### e. Dr. Gregory Seal

Dr. Seal is a psychiatrist who provides mental health service to DWCC via a contract with the Louisiana Department of Corrections. Dr. Seal received his medical degree from LSU Medical Shreveport in 1988. He is board-certified in Psychiatry by the by the American Board of Psychiatry and Neurology. He served as a psychiatrist in the Air Force from 1988 to 1996 and

began working in private practice in 1996. He has worked as a psychiatrist for the Louisiana Department of Corrections since 2009. He has previously served as the coroner for mental health in Caddo Parish, Louisiana. He has also worked with Louisiana Clinical Research since 2004-2005 doing clinical trials for mental health medications. Dr. Seal also works with Assertive Community. Treatment teams treating very ill mental patients with intensive therapies.

Dr. Seal has been providing psychiatric services at DWCC since 2009. Dr. Seal's current contract with DWCC is for 18 hours per month. He generally is onsite at DWCC seeing patients one day every two weeks.

### f. Other

DWCC also has support from the community when necessary. Until recently, the mental health staff would coordinate with Dr. Susan Tucker, a psychologist. Dr. Tucker recently retired and DWCC is looking to find a replacement for her.

Finally, the medical staff at DWCC also assists with mental health needs when appropriate. During weekends, when presented with an emergent situation or in response to a threat of suicide, the medical staff will assist the mental health staff.

### 3. Screening for Mental Health Issues

Offenders housed at DWCC are screened and assessed for mental health issues at EHCC upon entering the DOC system prior to coming to DWCC. The evaluations at EHCC are extensive and include psychological testing of various types, including personality testing with the Personality Assessment Inventory ("PAI"). This is a widely used personality test that gives psychiatric diagnoses, co-efficient of fit for psychiatric diagnoses, as well as likely treatment compliance. In addition, IQ testing is performed at EHCC on every offender that comes through the DOC system. The screening process at EHCC results an assignment of DSM-5 Diagnosis

(According to LADOC policy, Serious Mental Illness is defined by DSM-5 diagnoses of 1) Schizophrenia and Schizophrenia spectrum disorders; 2) Bipolar Disorder; 3) Schizoaffective disorder; 4) Major Depressive Disorder; and Severe Anxiety Disorders.) by a medical professional authorized to make such diagnosis.

A Level of Care ("LOC") severity or length of functional impairment classification is assigned to offenders categorized as LOC-1 through LOC-5.  The LOC classifications are as follows:

*Level of Care 1.*  Level of Care 1 shall be assigned to offenders who have serious mental illness ("SMI") and significant disability (functional impairment or length of active symptoms) primarily due to their mental health condition. These offenders are housed in the special mental health housing units with a 24-hour medical and/or mental health presence. These offenders require ongoing intensive intervention/supervision are treated at other facilities. (For example: HSU at EHCC.)  In other facilities, such as LCIW and LSP, these offenders shall be admitted to the infirmary. These offender's benefit from assistance with activities of daily living (ADL) (i.e., medication brought to them).

*Level of Care 2.*  Level of Care 2 shall be assigned to offenders with a diagnosis of SMI, who have been in remission for less than six months or have displayed a pattern of instability. Medication adherence and program participation are considered. Offender should be capable of performing activities of daily living, less functional impairment. These offenders may be housed in the special mental health housing units/infirmaries or in general housing areas, at the discretion of the mental health care practitioner/provider/professional.

It is my understanding that there are no LOC-1 or 2 offenders housed at DWCC in any form of segregation or in the general population. Those identified as LOC-1 or 2 are diverted

before DWCC or they are moved to EHCC or other facilities from DWCC once identified.

*Level of Care 3.* Level of Care 3 shall be assigned to offenders with SMI, and who have been in remission or have been stable for a least six months. These offenders may live in the general housing areas at most LADOC correctional facilities. A SMI diagnosis is typically chronic in nature and the offender will most likely remain diagnosed with SMI for the remainder of the offender's life. If they are stable, functional (no to low functional impairment) and have no major problem with compliance, then they should be designated to LOC-3. (These offenders would not typically be considered for any other treatment in the community than they are receiving at DWCC. They would most likely remain outpatients at community mental health centers receiving the same types of medications they receive at DWCC.)

*Level of Care 4.* Level of Care 4 shall be assigned to offenders with any, diagnostic impression excluding severe mental illness (SMI) excluding addiction disorder diagnosis or those requiring mental health interventions within the last year. Mental health staff individualized contact shall occur at a minimum of every 180 days. These offenders may live in the general housing areas. (These individuals would also likely have outpatient community treatment with mediations at longer intervals than LOC-3.)

*Level of Care 5.* Level of Care 5 shall be assigned to offenders not prescribed any psychotropic medication or current mental health intervention for more than one year. Individualized contact by mental health staff shall be as needed. (La. DOC Health Care Policy No. HC-26, 12/15/2017 & DWCC Employee Policy: Memorandum #3-02-003, 2/13/2019.)

Therefore, the vast majority of individuals who enter DWCC already have a diagnosis by a psychologist who is capable of diagnosing mental illness and assigning an LOC or functional impairment to the offender outlined in the Assessment and Intervention Report ("A&I Report").

The offenders with the most serious illness, LOC-1 and 2, are not housed at DWCC. DWCC houses offenders assigned with LOC-3 through LOC-5.

In the rare instance that an offender arrives at DWCC without going through EHCC diagnostic screening (documented on the A & I report), Mr. Hayden administers the same testing as an offender would receive at EHCC. Mr. Hayden then sends the results to a psychologist, formerly Dr. Tucker, to make a diagnosis. Mr. Hayden can make additional screening impressions but does not make diagnoses per practice.

Offenders at DWCC have individualized mental health needs that run the gamut from no mental health issues to serious mental illnesses that require considerable broad treatment intervention.

A review of the LOC classifications readily demonstrates the diverse and individualized nature of the mental health issue of offenders. As previously discussed above, LOC classifications attempt to identify the severity or length of functional impairment of offenders within the DOC system. LOC-1 is assigned to offenders who have SMI and significant functional impairment. LOC-2 is assigned to offenders with SMI who have displayed a pattern of instability. LOC-3 have been in remission for 6 months, and LOC-4 to individuals with less than SMI. Thus, not all mentally ill offenders are alike and should not be treated as such.

My review of the medical records and interviews of offenders reflected the diverse nature of mental health diagnoses given by Dr. Seal. The medical records and interviews revealed different histories and risk profiles. Diagnoses ranged from Schizophrenia and schizophrenia spectrum disorders, to Bipolar, Schizoaffective, Major Depression, depression NOS and anxiety disorders. Each disorder requires different treatments and medication management.

### 4.  **DWCC Staff Training**

All DWCC staff are required to participate in annual training which includes mental health training. Part of that annual training is the Mental Health First Aid curriculum and suicide prevention training. This is clearly outlined in the multiple deposition testimonies the summaries of which are provided as an attachment to this report. Every staff member outlined their training and mental health training when asked.

### 5.  **Administrative Segregation at DWCC**

Offenders who commit disciplinary infractions are housed in AS in the N Blocks.   While in AS, offenders are kept in their cells from 22 to 23 hours per day. Offenders are allowed 10-to-15 minutes per day to shower and an hour of yard time in a fenced recreation area. Offenders are also allowed to have reading materials in their cells.

Offenders in AS have contact with others through the bars. Offenders receive meals in their cells. Pill-call officers administer pills three times a day after nursing places the medication in the pill cart.   Correctional officers make regular rounds in the tiers as outlined their deposition testimony.   Sick call is available daily for new or worsening symptoms. Visitation is available on weekends, and offenders are provided one phone call a month as well as emergency calls when appropriate.   Offenders are provided with access to their attorneys through visits and phone calls. A barber provides haircuts on Wednesdays in the central control room of each cell block. Offenders are removed from their cells to receive medical treatment or individualized psychiatric evaluation by Dr. Seal or the mental health professional.

Upon arriving at DWCC, offenders are assigned to housing commensurate with their custody level.  Maximum security offenders are housed in N2-N4.  Offenders with lower custody levels (or protection concerns) are housed in the areas designated for their particular custody level.

Offenders that are not maximum custody may be temporarily housed on the South Compound as they await a bed in the dormitories on the North Compound. When this occurs, they are generally housed on N-1 with other medium custody offenders. N-1 is not an AS unit.

Offenders accused of serious rules violations are moved to AS during the investigation and prior to their hearing on the violation. If found guilty of a serious rule violation, Offenders who are sentenced to disciplinary detention are assigned to N2-N4. Hearings typically occur within a week.

As of February 8, 2021, there were 234 offenders housed in South Compound AS cells. That number represents a steady decrease over time as a result of planned usage changes at DWCC and LADOC to decrease AS population.

### 6.  **Mental Health on Administrative Segregation**

As stated above, with few exceptions, offenders are screened at EHCC prior to arriving at DWCC. Offenders who arrive with medications are given sufficient medications to last until they are able to see Dr. Seal, unless medically contraindicated. Dr. Seal sees new offenders typically within 14 days of being assigned to DWCC. He confirms the mental health diagnosis and prescribes medications as appropriate and requests therapy if needed.

The total capacity on AS in N2A, N2B, N3 and N4 is 266.  As of February 22, 2021, 64 offenders in N2A, N2B, N3 and N4 were diagnosed with as LOC-3 or LOC-4.  Any offender in AS can request to see a mental health professional at any time. In addition, the mental health staff make rounds through the tiers. Correctional officers can refer an offender to mental health if the offender appears in need of services.

### 7.  **Suicide Prevention**

DWCC screens and assesses all offenders for suicide risk at all inter- and intra-system

transfers. (EPM #03-02-001(A).) This screening is conducted by a mental health professional or mental health trained employee. If an offender is found to have a "significant risk for suicide," the offender is observed until a Mental Health Management Order can be started.

A Mental Health Management Order ("MHMO") is completed on each new watch and discontinuation. The MHMO describes which techniques are to be used, which property items are permitted, and which property items are prohibited. These techniques, permissions or restrictions are made using the clinical judgment of the mental health or medical professional initiating the watch.

In terms of watching offenders with mental health concerns or indicators of suicidal tendencies, DWCC has three options available under its Mental Health Management Orders: 1) mental health observation; 2) standard suicide watch; and 3) extreme suicide watch. Offenders on suicide watch are usually placed in a camera cell to allow for remote observation, but the location of the offender is up to the clinical judgment of the mental health professional.

DWCC EPM #03-02-008 governs the usage of mental health observations ("MHO") at the facility. MHO's are utilized to follow an individual offender more closely who is experiencing an acute exacerbation of symptoms which is considered temporary by medical professionals. MHO is appropriate for offenders who are psychotic, in acute distress, noncompliant with psychotropic medication, or otherwise psychologically impaired to a significant degree, but not considered a high risk for suicidal behavior.

MHO's should be initiated by mental health professionals whenever possible. MHO may only be discontinued by a mental health professional or attending physician. While on MHO an offender is seen every 24 hours at a minimum by a mental health professional (or medical staff in the absence of a mental health professionals). A MHMO governs the conditions of the watch and

observations of the offender are documented by security staff. The property allowed an offender on MHO is governed by the clinician's judgment documented in the MHMO. Offenders on MHO must be observed at least every 30 minutes, but the frequency of the observation is governed by the clinician's judgment documented in the MHMO.

DWCC EPM #03-02-001 governs the usage of suicide watches at the facility. Standard suicide watch is initiated by mental health clinicians at DWCC. An offender placed on standard suicide watch is evaluated by mental health professionals (or other medical staff on the weekends) at a minimum of every 24 hours. The standard in-person observation for standard suicide watch that is included in the MHMO is every 30 minutes. On weekends, mental health staff are on call to assist medical staff as needed. The offender who is placed on watch has his activity during the observation logged on a suicide watch document. Standard suicide watch may only be discontinued or down-graded by a mental health professional or physician.

Extreme suicide watch is used for offenders who have committed a suicidal act. Extreme suicide watch can only be started with the authorization of a physician in consultation with a mental health professional. Extreme suicide watch can involve the usage of medical restraints. Once restraints are in place, observation must be made at least every 15 minutes unless more frequent observation is not specified in the MHMO. Following initiation, the offender on watch must be examined every two hours to document the presence or absence of swelling or discoloration of extremities, the adequacy of blood circulation, and any other risk to the offender's health. Medical staff must examine the offender at least every 12 hours. Release from restraint for toilet, sanitation, and nourishment functions shall occur every 2 hours at the most. During this break, direct observations is continuous.

When extreme suicide watch is no longer necessary, the offender is downgraded to a standard suicide watch for a length of time sufficient to assess the offender's stability. The downgrade or termination of a suicide watch must be made by a mental health professional or medical health professional in consultation with the Medical Director or designee. Once a suicide watch of MHMO has been discontinued, a follow-up contact with the offender by a mental health professional is conducted within 7 days at the latest.

All staff with responsibility for offender supervision is trained on an annual basis on suicide prevention and intervention.

### 8. **Programming**

Due to the dangerous nature of the offender population in AS, in-person group programming is not conducted for maximum-security offenders. Written materials are made available to any offender upon request. After receiving written materials, the offender can receive in person counseling regarding the materials with the metal health professional.

## E. **LEGAL UNDERPINNINGS**

The Eighth Amendment prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976). The plaintiff must prove objectively that he was exposed to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825,834, 114 S.Ct. 1970 (1994). Additionally, the plaintiff must show that jail officials acted or failed to act with deliberate indifference to that risk. *Id*. at 834, 114 S.Ct. 1970. The deliberate indifference standard is a subjective inquiry; the plaintiff must establish that the jail officials were actually aware of the risk, yet consciously disregarded it. *Id.* at 837, 839, 114 S.Ct. 1970.

17

**F.** **RESPONSE TO PLAINTIFFS' EXPERTS' OPINIONS REGARDING WHETHER SERIOUS MENTAL ILLNESS DEVELOPS OR IS WORSENED BY ADMINISTRATIVE SEGREGATION PROCEDURES ON THE SOUTH COMPOUND AT DWCC.**

Prior to opining about DWCC specifically, Dr. Haney spends the first forty-pages (40) of his expert report outlining his position on the development of mental health symptoms in isolated settings and worsening of mental illness in these setting. He frequently conflates terms such as solitary confinement and AS. Dr. Haney further delineates the various health agencies, mental health organizations, and accrediting bodies who support his views. Dr. Burns likely agrees with Dr. Haney's position on this issue. However, Dr. Burns does not go into great detail as to the basis for her opinions regarding the alleged harms of AS to mentally ill and non-mentally ill offenders.

Neither Dr. Haney nor Dr. Burns provide a specific set of longitudinal data from DWCC or any other LADOC facility that support their opinions regarding development or worsening of Mental Illness for individuals in AS in Louisiana. Instead, they support their opinions with other opinions, and cite poorly controlled studies and case reports.

They also rely on brief personal interviews with offenders at DWCC selected: i) at the bars on rounds; ii) provided by plaintiffs' attorneys; and iii) randomly selected by an undetermined methodology. All of individuals were housed at the South Compound and most were already classified by LADOC's classification system as LOC-3 and LOC-4. They did not assert in their reports that LOC-1 or LOC-2 offenders were present in AS settings at DWCC. They did not define Serious Mental Illness (SMI) in their reports either.

Only Dr. Burns wrote SMI in her assessment section of her report. This fact alone makes it extremely difficult for the trier of fact to determine what SMI means according to Dr. Burns or Dr. Haney, and how they determined if an offender had SMI or not. Nonetheless, Dr. Burns reported 13 individuals as SMI in her assessment section of the 34 she interviewed. Nearly all of

the patients designated as SMI (12) by Dr. Burns were already designated as SMI by the LOC

system and were being treated by Dr. Seal the psychiatrist at DWCC. Other offenders that she

indicated had "depression" or other symptoms were also being treated by Dr. Seal even though she

did not designate them as SMI. The only other offender identified by Dr. Burns as having SMI

was assessed by Dr. Seal (after conference with Mr. Hayden) to be using mental health for

secondary gain.

1. **Administrative Segregation background history and brief summary of research
   in the field.**

Use of AS, which has also been referred to as restrictive housing, protective custody,

solitary confinement (even when double bunked), etc., is a disciplinary technique that has been

used in correctional systems for hundreds of years. AS is not a mental health practice and is not

used by mental health professionals outside of corrections. It is a disciplinary procedure used to

control aberrant behavior by both mentally ill and non-mentally ill offenders. The widespread use

of this technique in North American prison systems has led to opinion papers, studies, and political

position statements on the subject and AS's alleged ills or reported correctional or disciplinary

benefits.

Most prison systems, both small and large, have a system of isolation for prisoners who do

not conform to jail or prison rules. Nationwide as many as 11% of prisoners are incarcerated in

some form of restrictive housing setting. Commonly referred to as AS, it is typically in separate

housing away from the general population or can be on a designated building or cell block. The

structure of the cells can vary widely, with most cells being similar to DWCC cells in Louisiana.

Other types of cells (not at DWCC) can be solid boxes of concrete and metal doors with little or

no light coming into the cell. Infractions such as physical violence, murder, failure to obey orders,

sexually inappropriate behavior and others, typically result in charges being brought by corrections

officers/officials. Infractions can be major or minor. This action is followed by a disciplinary hearing and potential sentencing to a cell, alone or with one other offender, for a period of time. The period of time is either preset or to be determined by the hearing committee.

While in AS, the offender is usually made to stay in his cell from 22 or more hours per day, having minimal contact with other offenders or the outside yard. The offender is allowed 10-to-15 minutes per day to shower, three to five times a week and an hour of yard time in a type of chain-link fenced cage or walking in line on the cellblock. Offenders are provided reading materials and radios, or access to television, in some prison systems. Some systems only provide reading materials similar to DWCC policies on N-2 to N-4 exclusive of Closed Cell Restriction.

Offenders with diagnosed mental disorders are frequently housed on AS units. This percentage varies widely depending on the definition of SMI used by each state. At DWCC this mentally ill population is typically classified at LOC-3 and LOC-4 by length of mental health treatment and functional impairment. (Offenders who are relatively stable on medications.) Offenders on these AS units may or may not have programming, group therapy, or anger management classes. In some settings these therapies are provided "at the bars," rather than removal to an off-the tier group therapy room.

AS can be used for multiple reasons including but not limited to: i) various forms of rule violations, major or minor; ii) punishment for aggressive behavior; iii) protection from other offenders; and/or, iv) closer observation, as a result to suicidal ideas, threats, gestures, or attempts to seriously harm self.

Timeframes in AS can vary depending on the type of violation or can be for a fixed amount of time. Usually, the scope of behaviors must improve prior to release back to the prison's "general population" ("GP"). This determination is made by a review board with higher-level supervisors

or the warden. Individuals who follow the rules in AS can be removed rapidly, and conversely, individuals who have difficulty conforming to the rules may stay in AS for long periods, sometimes years.

There are a number of mental health professionals and professional organizations, who support the theory that AS causes mental illness or worsens mental illness in clients designated with SMI. (See reference list Mandella Rules, NCCHC, APA 2012, Haney and other publications.) This SMI definition, in my opinion, likely refers to individuals classified as LOC-1 or 2 by LADOC who have SMI and significant functional or behavioral disability associated with SMI, but because there is no clear definition that is universally applied SMI could include anyone with any mental health history or syndrome if interpreted broadly. (And could include LOC3/4 offenders at DWCC).

### 2. History of Purported Mental Illness Development or Worsening Theories in Administrative Segregation.

Early studies in the 1950s and 60s began to look at the issue of sensory deprivation in other environments. These studies were conducted on students and volunteers who reported on symptoms experienced during periods of days to weeks in complete isolation. Some researchers, over time, extrapolated these studies into correctional settings and reasoned that the same symptoms should also appear in criminal justice settings where strict solitary confinement settings were a common practice. Security Housing Units ("SHU"), such as Pelican Bay in California, were denounced as causing mental illness or making mental illness worse. These units and cells were concrete and metal boxes much different in design and discipline than DWCC units, which have open bars and windows across from the bars. Dr. Haney has written extensively on the topic of solitary confinement and AS. He is a major proponent of the theories that SMI is created or worsened in these settings. However, there is little data to support the contention that Pelican Bay

SHU units are the same as DWCC units or that longitudinal data supports LOC-3 and 4 individuals at DWCC become LOC1 and 2 requiring movement to EHCC for increased Mental Health treatment. Deposition testimony by several direct care and correctional staff said these decompensations were rare.

Over time, terms such as "solitary confinement or being placed in the hole" in SHU units, were conflated with any form of AS where an offender is in a cell for twenty-two (22) hours a day and has limited contact with other offenders or the general population.

Due to poor research design in studies that support theories of development or worsening of Mental Illness while in AS, several researchers (who were proponents of the isolation syndromes) sought to develop a study to prove their hypothesis. The thesis was that the syndromes existed and an elaborate study design with controls should demonstrate that mental illness emerged or was worsened in AS environments.

The most well-controlled study, in the forensic psychiatric literature, is the Colorado Prison System Study supported by the National Institute of Justice and published in the Journal of the American Academy of Psychiatry and the Law in 2013.   This study used rigorous methods and controls to the extent that such controls are allowed in the correctional environment.  The authors theorized in advance that the study would demonstrate SMI was developed or worsened in AS environments.

Two authors, Dr. Jeffrey L. Metzner and Dr. Joel A. Dvoskin, were long-time proponents of these theories and were on the steering committee of the Colorado study. However, when the data was analyzed, the results did not demonstrate that AS was responsible for the development of mental illness or significantly worsened mental illness in  the Colorado prison environment. Essentially, the mental health symptoms of both the mentally ill and non-mentally ill populations,

accommodated in the new environment of AS. The environment did not appear to cause the development or substantially worsen Mental Illness. The blowback on the authors was quite intense.

This study and others have led thoughtful mental health researchers on both sides of the debate to step back and take notice. Some have sought to encourage continued study of the isolation syndrome either to validate it or to replicate/discredit the results of the Colorado Study. To date the issue is still an emotionally charged topic for both proponents of the isolation syndrome and sceptics of the non-controlled data in most studies. Further study in the form of Meta-Analysis was conducted by two groups and summarized in a publication by the Morgan, et al. group. This evaluation of two different meta-analysis data sets led the authors to conclude that the more rigorous the study design, the less likely long-term mental health effects of AS emerge from the data analyzed.

Dr. Haney and others have published or opined about the reported methodologic flaws of the Colorado Study. Despite his critique, Dr. Haney has not attempted to replicate the rigorous study approach at any prison or at DWCC which would support or refute the Colorado Study's findings. Instead, he states in his report, that the perfect study in corrections is impossible/impractical to complete due to a multitude of difficulties with study design in prison settings.

To be fair, the "perfect study" is very difficult to conduct in prison, but many believe that the Colorado study was the closest we have to such a study. In my opinion, the Morgan meta-analysis gives us an even more broad approach and includes multiple study sets. This study lays out the thought process for further study to either replicate the Colorado study in other environments or change the study design to address reported methodologic flaws of the Colorado

study. The authors continue to support, as do I, the rationale for decreasing AS in environments where it can be done safely. Abolition of AS practices are not likely to be effectively and safely administered in all prison populations. Offenders are more violent than the general population and a small subset of mentally ill are likely more violent as well.

While there are methodologic considerations with any study, the Colorado Study is the most well-designed study to date in-prison settings on the issues of mental illness in AS and clearly should not be ignored. Neither Drs. Haney nor Burns listed this study in their references. (It should be noted that Dr. Burns is an active member in the American Academy of Psychiatry and Law ("AAPL") and receives the Journal of the American Academy of Psychiatry and Law, in which the study was published. Surely, both doctors are aware of the study and meta-analyses that have followed the Colorado study.)

It is my opinion that experts who are opining about deliberate indifference to the mental health needs of individuals in DWCC, should rely on all of the literature, rather than only literature they have published or only literature that supports their theories. As such, I have included the Colorado Study and the most widely published Meta-Analysis on the subject of AS that can be applied to DWCC offenders. Both studies used Dr. Haney's publications in their bibliography and were well aware of his positions on AS and mental illness.

Dr. Haney references the North Carolina study on the association of restrictive housing with mortality after release. This study was published in October of 2019 and was reportedly the first study of this type. It is relatively new information that requires further study from other states to validate the data. The limitations of the study are clearly stated in the limitation section, including that is an observational study done retrospectively (looking back at data) which is notoriously flawed. There were additional confounds noted that were not able to be controlled for

including diagnoses of mental disorder, substance abuse, criminogenic risk, and the cause of the restrictive housing, all of which may increase risk for mortality which was the primary outcome measure. As such a cause and effect relationship between restrictive housing and mortality should be interpreted with caution. It is an interesting study that warrants further study and replication just as the Colorado Study invites further study. (Association of Restrictive Housing During Incarceration With Mortality After Release: Brinkley-Rubinstein, L., et al, Oct 4, 2019. JAMA Network Open. 2019, 2(10):e1912516.

After considering all the research and data available, it is my opinion that the research on whether AS causes or increases mental health illness is inconclusive.

In addition, AS has also not been proven to be therapeutic for mentally ill offenders or to reduce mental health symptoms substantially. Therefore, I cannot endorse it as a practice, except in cases of self-harm or harm to other offenders or to protect offenders from retaliation. From the Morgan Meta-Analysis, included in my bibliography, it appears that widespread use of AS does not typically support correctional goals of reducing either aggression or anger in the groups of offenders studied for mental health reasons. Other experts will likely opine about correctional goals of AS with regard to making the prison environment safe.

As such, it is my opinion that the LADOC, under the Direction of Secretaries James LeBlanc and Seth Smith, with guidance from the Vera Institute of Justice, is acting responsibly by moving in the direction of limiting use of long-term AS practices. They are decreasing overall numbers of individuals in AS, for minor and major offenses, and limiting the use for individuals designated by the department as SMI (LOC-1 to LOC-4) with active symptoms. Drs. Haney and Burns have reported on this process but mistakenly report that DWCC has done nothing towards moving in this direction, when in fact DWCC has reduced AS beds by approximately 30% and

25

LADOC eliminated Camp J at Angola. The Arthur Liman Center data would also support the fact that Louisiana has less beds for restrictive housing in most categories. This Survey also documents the percentage of individuals in restrictive housing with reported severe mental illness at 7.3% statewide. The Liman study is based on an inmate population of 14,269 offenders in 2019. The actual total DOC population, including DOC offenders housed in local jails, was 31,609 which would reduce the percentage by approximately one half.

It is my opinion that the Administration of DWCC is willing to move in the overall direction of the LADOC, especially if the pilot programs are proven to be effective and LADOC supports funding for staff, restrictive housing options and programming, necessary to implement reforms. In fact, the preliminary results appear to have been promising as LADOC has recently promulgated Department Regulation No. OP-C-1 (B-05-001) which incorporates changes to disciplinary rules and procedures and is applicable to offenders at DWCC. The Vera Institute of Justice praises these pilot programs and Louisiana's commitment to reducing AS cells. The Administration of DWCC have already reduced the number of AS beds from 384 to 266, eliminating the N-1 and N-2 C and D tiers as AS units. They have already changed the matrix model and adjusted practices as per LADOC recent directives. The N-1 unit has been modified in programing and functions as a pilot to this process.

Most importantly, if mental illness generation or worsening has not been proven by sound research methods either inside of DWCC or outside of DWCC, how could the administration at DWCC have objective evidence of SMI worsening in their institution that they have allegedly "subjectively" ignored? The Vera Institute Report data and praise of LADOC along with Arthur Liman Center Survey demonstrate that the state and DWCC have taken steps to decrease segregation and to divert or move LOC-1 and LOC-2 mentally ill offenders to the appropriate

treatment setting, despite the controversial nature of the data in these various publications and studies. Ultimately, the most vulnerable and severe mentally ill population (LOC-1 and LOC-2) were never or rarely housed at DWCC. Instead, they were appropriately diverted to EHCC or moved out when discovered.

## G. EVALUATION OF DRS. BURNS' AND HANEY'S CRITICISM OF SOCIAL WORKER HAYDEN'S EVALUATION OF PATIENTS "AT THE BARS" ON THE SOUTH COMPOUND.

Dr. Burns and Dr. Haney made specific negative comments regarding the qualifications of Mr. Steve Hayden. They questioned whether he is qualified to screen individuals and to make evaluations "at the bars," in the South Compound and to appropriately refer patients to DWCC's treating psychiatrist, Dr. Seal. Dr. Burns commented that Mr. Hayden was not qualified because he was an industrial psychologist and could not perform screening evaluations. Interestingly, Dr. Haney is apparently also unable to diagnose or treat mentally ill offenders in correctional settings. Per his CV, he does not appear qualified to diagnose or treat mentally ill offenders. Nor is he or Dr. Burns licensed to diagnose or treat individuals in the State of Louisiana.

In the above sections, I have review Mr. Hayden's qualifications, as well as the screening process that occurs at DWCC and in the Louisiana Department of Corrections, to ensure that SMI patients are diverted or referred appropriately to higher levels of care or to Dr. Seal if they are LOC-3 or LOC-4. Mr. Hayden is qualified to give impressions in my opinion and has extensive supervision in diagnosis although he does not diagnose in practice in his job at DWCC.

Nearly every offender that Dr. Burns identified as having SMI or Dr. Haney implied as SMI, had already been identified by Mr. Hayden, or other social workers, as having SMI. These offenders were referred to Dr. Seal and were being treated with appropriate medications. A review of Dr. Burns' evaluation process demonstrated that 92% of the individuals she identified as SMI

27

had already been identified by Mr. Hayden. These offenders were referred to Dr. Seal for medications and/or offered individual counseling, which appeared appropriate to the mental health symptoms she described and to the DSM-5 diagnostic manual as well as their level of classification. This fact alone, clearly demonstrates that Mr. Hayden's and LADOC/DWCC's assessment/screening and A & I report leads to appropriate referral to the psychiatrist and appropriate treatment with the most advanced medications available to psychiatrists.

**H. RESPONSE TO BURNS AND HANEY'S FURTHER CRITICISM OF SOCIAL WORKER HAYDEN'S ABILITY TO DIAGNOSE INDIVIDUALS WITH APPROPRIATE PSYCHIATRIC DIAGNOSES BECAUSE HE DOES NOT HAVE THE QUALIFICATIONS TO DIAGNOSE.**

There is no documentation in the records reviewed by me that indicates Mr. Hayden is diagnosing individuals or that there are offenders with diagnoses rendered by Mr. Hayden that are being treated without Dr. Seal's concurrence. As previously discussed, extensive screening is performed for every offender that enters into the Department of Corrections at EHCC during intake and documented in the A & I report. Screening is performed by individuals who are able to diagnose, i.e. clinical psychologists at EHCC, who perform standardized psychological testing in addition to evaluations. The documentation of these evaluations is readily available to the individuals at DWCC to review, including Mr. Haney and Dr. Seal. Furthermore, neither Dr. Burns nor Dr. Haney diagnosed any individual that they have seen for this particular litigation. Dr. Burns writes "SMI" in a section of her evaluation that is entitled, "Assessment," but never uses DSM-IV-TR or DSM-5 criteria to diagnose any of the individuals that she evaluated for this litigation. Additionally, Dr. Haney uses an instrument that virtually no psychiatrist or psychologist uses on a regular basis to diagnose clients or offenders. This instrument, yet to be named, has a variety of symptoms, which clearly do not delineate specific mental illnesses or SMI clients from non-

mentally ill individuals, nor does it give a functional impairment rating that equates with DSM or LOC used by LADOC to my knowledge.

In Dr. Haney's 100-plus page report, there is no psychiatric/psychological diagnosis of any of the individuals he evaluated, presumably because he is not qualified to diagnose mentally ill individuals. To criticize Mr. Hayden for not being capable of diagnosing mental illnesses, when he is in the same boat seems unwarranted.

## I.   DR. HANEY'S USE OF INSTRUMENTS THAT ARE NOT RESEARCH VALIDATED OR PART OF DSM-5 DIAGNOSTIC MANUAL CRITERIA.

As stated above, the instrument used by Dr. Haney which is unnamed in his report is rarely used by any psychiatrist or psychologist in the United States in order to diagnose severe mental illness or any mental disorder. It appears to be his own instrument or borrowed from other instruments. There is no research validation of this instrument documented in his report. It is likely, that if this instrument were used in a general population of offenders who had just been admitted to the correctional system, the scores would be elevated as well because of the anxiety that accompanies initial incarceration. The instrument used by Dr. Haney is not specific to mental illness, it simply reports mental health symptoms, not diagnoses consistent with SMI. In other words, it would not necessarily differentiate someone with mental illness, from an individual who might have stress from other reasons, i.e. stress from incarceration or stress of recent HIV diagnosis or Cancer diagnosis.

## J.   RESPONSE TO PARTICULAR CRITICIAMS IN DR BURNS' REPORT, ALSO COVERED IN DR. HANEY'S REPORT.

Dr. Burns' report addresses a number of topics of adequacy of evaluation and treatment at DWCC. Below is my response to those topics that she identifies as problematic:

1. **Screening**.

Both Dr. Burns and Dr. Haney appear to have ignored screening processes that occur prior to DWCC admission which occurs at EHCC and is documented in the A & I report for every offender that enters the DOC's system.  These evaluations at EHCC are extensive, performed by or supervised by a clinical psychologist, and include psychological testing of various types, including personality testing, and cognitive testing with standardized and well-recognized diagnostic instruments.  The PAI, a widely used personality inventory, which correlates psychiatric diagnoses, gives coefficients of fit for psychiatric diagnoses, as well as prognosticates treatment compliance.  IQ testing is performed on every offender at EHCC that comes through the DOC system.  Each offender is given an IQ range.  Therefore, individuals who enter DWCC already have a diagnosis by a qualified mental health professional, a psychologist, who is capable of diagnosing mental illness and assigning an LOC to the offender in question. Mr. Hayden has this data at his disposal on every offender except transfers from other institutions.   The EHCC evaluation is contained in a detailed A & I report on each offender.  In the unusual circumstance that an offender does not have an A & I report, Mr. Hayden gets them tested and the results are read by a qualified psychologist. DWCC mental health professionals do not diagnose offenders. The psychiatrist, Dr. Seal, is the only individual who issues a mental health diagnosis at DWCC. Each offender with mental illness, current psychotropic medications and/or concerns, will be referred to see the psychiatrist within fourteen (14) days per policy.  If the offender is on medications, these medications are continued by the general medical doctor, unless there is an indication that these medications may be harmful to the offender.

In Dr. Burns' report, she notes that Dr. Seal is the only person able to conduct a comprehensive mental health examination and formulate a "diagnosis by virtue of his training and

license." This fact is only partially true at DWCC, as the consulting psychologist can also diagnose after reviewing the testing performed by Mr. Hayden on those individuals not already tested at EHCC. Most offenders have already been diagnosed at EHCC by a qualified psychologist, as per the above description. This process of evaluation and screening is redundant and is actually a "best practice" rather than an inadequate one as described in the reports of Dr.'s Burns and Haney. I find the screening process to be appropriate and adequate.

## 2. **Mental Health Rounds.**

Anytime a mental health professional enters the cellblock area for rounds, it is documented in the Security Log. A mental health round is designed for the mental health clinician to be routinely available in the event the offender has a question or needs further assessment/intervention. A mental health round is not intended to be a therapeutic intervention, nor is it utilized in this manner at DWCC. This method affords the offender the opportunity to express the need to speak with a clinician privately, ask questions, or simply engage in casual conversations with the clinician. I find the process of mental health rounds at DWCC to be adequate and appropriate.

## 3. **Periodic Mental Health Assessments.**

DWCC is fully aware of the American Correctional Association ("ACA") language in the Fifth Edition regarding mental health and restrictive housing. However, DWCC is compliant with the current DOC regulation, HCP-27 and DWCC EMP#03-02-003, Mental Health Program. LADOC has recently promulgated Department Regulation No. OP-C-1 (B-05-001) to include the requirement for the 30-day assessment, as opposed to the prior 90-day assessment, consistent with the fifth edition of the ACA language. It is my understanding that DWCC plans to comply, implement, and adjust practice accordingly. DWCC is presently accredited by the ACA under the

Fourth Edition guidelines, is fully committed to remain accredited under the Fifth Edition. Assuming that DWCC makes the necessary changes to comply with the Fifth Edition, I find that its mental assessments are adequate and appropriate.

### 4.  **Treatment that is more than mere seclusion or close supervision.**

Group Therapy is not currently an option for maximum-security offenders per DWCC policy, EPM#03-02-005. However, any offender regardless of custody status has the opportunity to request treatment/self-help correspondence material. In addition to treatment group material, offenders may request any type of materials for specific circumstances, i.e. grief, anxiety, transgender issues, depression, substance abuse, etc. Once the offender is provided with the materials, he can request individual sessions to discuss the materials. This is frequently done in the cellblocks and only requires a written request by the offender.

Confidentiality and the limits of confidentiality are discussed with each offender upon initial intake. Every effort is made by the treatment staff to uphold confidentiality as much as the situation warrants. However, if an offender has a pattern of violence or poses a risk to staff, security staff will have to be in close proximity. This is common in any correctional center on multiple levels for both safety and logistical reasons. If an offender feels that he is not at liberty to discuss personal concern, he has the right to request an individual confidential session with the clinician, which can occur in the building.

With reference to treatment plans, DWCC treatment plans are similar for each offender, depending on the housing assignment and the custody status. This issue has been addressed during peer review with Blake LeBlanc, Mental Health Director for the DOC. I reviewed email correspondence between Warden Dauzat and Mr. Leblanc and it appears that DWCC is developing a template in coordination with the LADOC to provide more individualized treatment plans.

Clearly, treatment plans can and should be improved. Presently they appear to be cookie-cutter treatment plans in my opinion. However, I have reviewed hundreds to thousands of medical records in community hospital and long-term hospital settings. Treatment plans in most systems are not as specific as most surveying agencies would like them to be.

Dr. Burns' report indicates that there is no therapy/counseling provided to offenders in restrictive housing areas. This is not an accurate statement. Dr. Burns' report uses an example of an offender, "Literally dying," of cancer, experiencing anxiety and depression, but received no counseling. If this offender had requested counseling for his anxiety and depression, not only would he have received ongoing supportive counseling, but he would also be referred to a psychiatrist for further evaluation to determine the need for psychotropic intervention.

Each offender has the ability to request individual counseling and according to Warden Dauzat and Mr. Hayden many offenders in cellblock areas do this on a regular basis. The frequency, duration and intensity of the counseling is dependent on the clinical need despite Dr. Burns' speculations in her report that it does not exist.

**5. Participation by trained mental health professionals (in appropriate numbers).**

Dr. Burns' opined that a staffing ratio of 1:60 or 65 offenders on the mental health caseload would be acceptable, including all offenders in the cellblock housing units, both medium and maximum. Each clinician would have sixty-five (65) offenders assigned.

The mental health caseload assignments are as follows: (i) Steve Hayden on N3 and N4, (ii) James Burgos on N1, N2, H1, and H2, and (iii) Ariel Robinson on H2, H4 and H5. The total capacity on AS in N2A, N2B, N3 and N4 is 266. As of February 22, 2021, 64 offenders in N2A, N2B, N3 and N4 were assigned as LOC-3 or LOC-4. Considering that Steve Hayden is assigned N3 and N4, and James Burgos covers N2, the staffing ratio is appropriate on the South Compound.

Psychiatrist time is likely understaffed in my opinion as Dr. Seal is seeing 32 to 36 offenders per day and spending an average of 3 to 10 min with offenders per testimony. His notes are very brief and difficult to read. It is my opinion that a half time to three quarter time psychiatrist or psychiatric NP is needed to treat offenders and document more clearly rationale for medication changes and adjustments. These additional services could be offered through telemedicine procedures.

Dr. Burns' Expert Report on page 22 states that DWCC, EMP#03-02-003, mandates that, "An offender with SMI and other offenders on mental health caseloads, will receive out-of-cell treatment." This language is not in the policy that I reviewed. Although the aim is to provide service when conducting individual sessions, DWCC has not made a requirement, by policy, to provide out-of-cell treatment. As noted in multiple locations, Dr. Seal almost always provides out-of-cell treatment and social workers, as per Mrs. Robinson's deposition, offenders are provided out of cell treatment when requested.

### 6.   **SMI Is Not Increasing at DWCC**.

According to data in CAJUN, the percentage of SMI individuals diagnosed or recorded has remain relatively the same since 2017. This refutes the contentions by Dr. Haney and Dr. Burns that overall mental illness is created by AS. It also refutes that "nothing" has changed at DWCC since they first performed their initial evaluations, as clearly the total AS cellblock has reduced from 384 total offenders to 266 which is approximately a 30.7% reduction in overall AS beds. The N-1 unit has been designated as a transitional housing unit, is medium custody, and has increased privileges, including out-of-cell time, eating in the dining hall and attending group therapy sessions with other offenders. N2C and N2D have also transitioned and are no longer used as AS.

34

In Dr. Burns' report, she said that there were approximately 45% of individuals had SMI that she evaluated. Interestingly, from my assessment, all of the individuals evaluated by Dr. Burns, who were identified by her as SMI, thirteen (13) of thirty-four (34) (or 38% of the population) were on the mental health caseload and seen by Dr. Seal. Her evaluations were not randomly selected. Instead, the individuals selected for interview consisted primarily of individuals pre-selected, individuals selected by Dr. Burns and/or Dr. Haney, and individuals selected by the attorney. Her interviews included a smaller number of individuals randomly selected. Of the thirteen (13) individuals that Dr. Burns documents are SMI, twelve (12) of thirteen (13) were seen by Dr. Seal and treated with appropriate psychotropic medication. All of those individuals she identified as SMI were seen by one of the social workers and referred to Dr. Seal. This is important for two reasons. i) it demonstrates that the evaluation and screening process, has identified individuals on the South Compound that Dr. Burns identified as SMI and ii) these individuals are being evaluated by Dr. Seal and treated, either with counseling by the mental health professional and/or were referred to the psychiatrist for medication management.

We validated some of the numbers with our individual evaluations. We found similar percentages of SMI LOC 3 and 4 offenders in both the North and South Compounds ranging from 38% to 50% of the individuals evaluated by randomly picking from a group of offenders that were on the mental health case load. Virtually every offender with a mental health history was seen by Dr. Seal and prescribed medication and had also been seen by a DWCC mental health professional. Even others that were not SMI but had diagnoses ranging from Adjustment disorder to Depression NOS were also evaluated and in treatment.

In contrast to Dr. Burns' evaluation methods, Dr. Seal uses DSM-5, diagnoses. The medications he treats patients with are cutting edge psychotropic medications, commonly used by

psychiatrists in the community.  I did not see consistent evidence of excessive dosages of medications, outdated medications being used, engagement in polypharmacy, or his putting offenders in danger in the way he was prescribing medications.  Dr. Burns contention that he is routinely using excessive dosages of dangerous medications is simply inaccurate even when considered in the most favorable light to her opinions.  One patient I evaluated was on two antidepressants, which may seem like polypharmacy or excessive dosing, however the offender was fully aware of the risks and comfortable with the discussions he had with Dr. Seal regarding his medication and dosages.

### 7.  **Training of Mental Health Staff.**

All non-mental health staff at DWCC have completed the Mental Health First Aid Curriculum, in addition to annual Suicide Prevention Training.  This document can be provided, if requested and is confirmed in sworn deposition testimony.  Prior to employment, each employee is required to attend the Training Academy, which includes Suicide Prevention and Detection. With regard to mental health staff, my opinions on their training and experience is as follows:

#### a.  **Warden Michelle Dauzet**

Warden Dauzet is highly qualified to supervise DWCC's mental health staff considering her credentials including a master's in social work an LCSW and a BACS and her 21 years in the mental health field.  Her extensive training and experience detailed above are exemplary for her position.

#### b.  **Steve Hayden**

Much has been made of Mr. Hayden's lack of qualifications.  His Graduate Degree in Industrial Class Organizational Psychology Program focuses on Behavioral Science, with specific concentration on research, with gathering of statistical data.  In the later phase of the master's level

program Mr. Hayden attended, a supervised internship, which consisted of testing and collecting data on student pilots who were exhibiting elevation in mental illness, was conducted.

Mr. Hayden completed his post-graduate education in a two-year period, with weekly two-hour clinical supervision, meeting with a psychologist, Dr. Webb Sentell.  The sessions consisted of review of cases, DSM-4 criteria reviews, testing results and evaluation of clinical impressions indicated by Mr. Hayden, upon completing client assessment.  During this two-year period, Mr. Hayden also met with a psychologist, Dr. Arian Ward, as his immediate site supervisor to review his findings related to clinical impressions of DSM-IV-TR.

Since Mr. Hayden has been employed at DWCC, any psychological assessments he completes (for WRDC purposes), is forwarded to Dr. Susan Tucker, Ph.D. for review before it is approved.  Dr. Tucker has retired as of January 12, 2021(another individual will need to be assigned for this purpose).  As stated above, Mr. Hayden does not issue diagnoses in his capacity as a Correctional Program Manager.  He uses diagnoses that have already been made by qualified mental health professionals during the EHCC evaluation process, provides screening (which Mr. Hayden is clearly capable of providing) and refers those individuals to Dr. Seal for further diagnostic evaluation and, if needed, treatment.

Mr. Hayden's training and experience qualify him to provide the services that he is providing and to provide mental health impressions to others such as Dr. Seal for them to make mental health diagnoses.

### c.  James Burgos

James Burgos is qualified by training to provide the mental health service for which he is employed.  He obtained a Master of Industrial Organizational Psychology in 2006 and a Master of Counseling in 2017.  Mr. Burgos is a Licensed Professional Counselor, through the Louisiana

Board of Licensed Professional Counselors. Mr. Burgos's license is current and compliant with all Board requirements.

### d. Aerial Robinson

In January 2021, Ms. Robinson passed the ASWB clinical exams, obtained her licensed clinical social worker certification. Having been employed by DWCC for years, Ms. Robinson has extensive experience in mental health sittings. Her recent certifications allow Ms. Robinson to competently provide the mental services for which she is employed.

### e. Dr. Gregory Seal

Dr. Seal is board-certified by the by the American Board of Psychiatry and Neurology and has been providing psychiatric services at DWCC since 2009. Dr. Seal has extensive qualifications and experience to provide mental services to offenders at DWCC.

### 8. Screening for Mental Health Issues

Screening is adequate and appropriate. The evaluations at EHCC to offenders prior to arriving at DWCC are extensive and include psychological testing of various types, including personality testing with the Personality Assessment Inventory. This is a widely used personality test that gives psychiatric diagnoses, co-efficient of fit for psychiatric diagnoses, as well as likely treatment compliance. In addition, IQ testing is performed at EHCC on every offender that comes through the DOC system. The screening process at EHCC results in assignment of LOC classification to offenders of LOC-1 through LOC-5 as stated above in the A & I reports. In the rare instance where an offender arrives at DWCC without being screened by EHCC, Hayden administers the same tests and a medical professional thereafter assigns a diagnosis.

**9. Safeguards against psychotropic medications that are prescribed in dangerous amounts without adequate supervision or otherwise inappropriately administered as outline in Dr. Burns' report.**

Dr. Burns incorrectly states in her report that appointments with the psychiatrist occur infrequently based on policy minimums. There is no DWCC policies that indicate a period for psychiatric appointments. The follow-up appointments for psychiatric services are based upon the order from the DWCC psychiatrist who makes the determination, just as any psychiatrist determines follow up in the community. If an offender presents with a need for intervention prior to the scheduled appointment, he is added to the next available clinic.

Every pill call officer receives training in the administration of pills, in addition to on-site training from the South Compound RN supervisor regarding non-compliance data entry into the database. When the psychotropic medication is received from the South Compound, a sticker is placed on the pill card indicating that the medication is a designated psychotropic medication. This process ensures the continuity when the pill-call officer is documenting the non-compliant offenders with prescription psychotropic medication. The documentation process likely needs some tuning and improvement and the MAR process also likely needs some tuning and improvement, however, Dr. Burns' contention that there are large doses of psychiatric medications being administered and prescribed inappropriately is not accurate. Dr. Seal does not use excessive dosages of psychotropic medications from records I reviewed. Dr. Burns states in her report that appointments with the psychiatrist occur infrequently based on policy minimums. The follow-up appointments for psychiatric services are based upon the order from the DWCC psychiatrist who makes the determination. If an offender presents with a need for intervention prior to the scheduled appointment, he is added to the next available clinic.

**10. Accurate, complete and confidential records.**

Mental health records are kept in the medical section of the medical record. Both the mental health progress notes and the interview with the segregated officer have a section to detail information from the interview if necessary. Without viewing, the specific form stated in this report regarding the MSE and the offender refusing to speak, it is hard to understand what is being referenced by Dr. Burns. However, when the clinician is conducting segregation rounds, they begin first at the cell of the tier. It is a frequent occurrence that the clinician is able to observe and there is interaction with staff and other offenders during the process of the round prior to the interview. In addition, the clinician can accurately access an individual's status through said interactions despite the offender verbalizing his wish not to communicate with the clinician. In addition, prior to entering any tier for the rounds, the mental health clinician speaks with staff to inquire about any issues with any offender in a particular housing unit. There are multiple resources available to obtain information regarding an offender's status without a lengthy dialogue between clinician and the offender.

Dr. Seal is the assigned clinician for the unit. He is present during the consult. In 2019, DWCC implemented a change in practice with regards to the psychiatric clinic. Each clinic now completes a mental health progress note based on the psychiatric visit to include the assessment and plan as a result of Dr. Seal's evaluation. This augments Dr. Seal's limited documentation in his Progress Notes, which were so sharply criticized by Dr. Burns.

**11. Suicide Prevention Program.**

The Suicide Prevention Program that is in place is consistent with the DOC Regulations and Practice and DWCC Employee Policy Memorandum #03-02-001. The statement that offenders are not allowed phone calls or visits while on suicide watch is inaccurate. In the event

an offender requests to make a telephone call or anticipating a visit that the DWCC is aware of, arrangements are made to follow up to allow both telephone call or/or visit, unless stringent circumstances are present. Furthermore, if an offender requests to see mental health privately, while speaking to the clinician in the cell front, the clinician will arrange for a private session in the treatment/courtroom on the unit. On the weekend, after hours and holidays, medical staff serves as the treatment staff and will follow up with the offenders on suicide watch. Based on the recommendation from our Mental Health Peer Review, DWCC implemented a new form in December of 2020 for the nurses to utilize when seeing the offenders on suicide watch during weekends, holidays and after hours. The form will be kept in the mental health section of the medical records for easy accessibility.

The latter section of Dr. Burns' report outlines her opinion on the inadequacies of the mental health care at DWCC. It is important to point out that not all offenders' testimony regarding services in mental health are accurate, nor is every offender who has provided information deemed a credible source. A re-offender is afforded an opportunity to request additional treatment, consultation, counseling, etc. Moving segregated offenders from their cell for requested services is a routine practice. In addition to being seen privately upon request, the offenders are provided treatment materials and seen privately to discuss these. In my opinion, DWCC strives to provide the best medical and mental health treatment to all offenders given budgetary constraints and will likely continue to do so and keep current with all the DOC current regulations, many of which the Vera Institute praises.

### 12. Length of Stay decreases in Administrative Segregation in Louisiana.

The Liman Center Study, which Louisiana participated in, demonstrated significant reductions in AS from 2017 to 2019 in all areas of length of stay in restrictive settings. Table 27

and 28 of the report show the overall decreases in length of stay for 7 of 8 categories. (See Liman Center Study in references). This data along with the Vera Institute report of 2019 demonstrate that Louisiana is decreasing AS and restrictive housing statewide. Further, the Liman Center Study shows that LADOC's percentage of offenders assigned to AS is consistent or even below the national average.

**K. SUMMARY OF CONCLUSIONS AND OPINIONS:**

The opinions in this report are rendered to a reasonable degree of medical certainty given the materials provided and summarized in this report. Should additional information become available I will take it into consideration and amend my opinions as necessary.

1. There is insufficient documentation to support the opinions of Dr. Haney and Burns that Mental Illness is being generated or worsened by AS at DWCC.

2. AS use is decreasing in LADOC and DWCC as per the VERA institute and Arthur Liman Center surveys and reports.

3. Mentally ill patients are being identified appropriately both before and after DWCC with appropriate screening and evaluation procedures as well as appropriate supportive individual therapy and individualized medication management.

4. The Mental Health Professionals are clearly trained to make clinical impressions regarding mentally ill offenders and referring them to the psychiatrist Dr. Seal for medication management.

5. Medications are prescribed in appropriate dosages and being administered within policy guidelines by trained personnel. They are not being prescribed in an excessive manner by Dr. Seal or in a dangerous manner, in my opinion.

42

6.Medication administration is being supervised and quality assured by the RN nurse manager. (LPN's could improve this process and an could upgrade medication administration deliverables if they can be hired in this remote location.)

7.Pill officers are trained in the administration of medications. Documentation is inconsistent and could be improved with reference to delivery in a timely manner and by LPN nurses.

8.Suicide prevention is occurring at DWCC and is preventing suicidal behaviors by my assessment and LADOC data. Mental Health Observation could improve the process and the use of leather restraints with mentally ill offenders should be strongly encouraged rather than shackles and metal boxes. (If the suicide chair has not been used in two years as reported in deposition then it should be removed, and the policy abolished.) DWCC administrators have advised that they have no intention of using the chair in the future.

9.Treatment plans need to be improved so that they are more individualized and reflect the individualized care being provided.

10.Psychiatric time should be increased to help improve documentation and overall time spent with patients. This can be accomplished with telemedicine to any of the three medical schools who have forensic psychiatry programs. Use of forensic fellows for this purpose is a cost-effective way to improve psychiatric time and documentation, both of which need attention at DWCC.

11.The care and treatment of mentally ill offenders in AS on the South Compound is far from "deliberate indifference". The reductions in AS usage across LADOC and DWCC above do not constitute deliberate indifference in my opinion, however the ultimate decision is the Court's regarding the constitutionality of the care provided to mentally ill offenders in AS at DWCC. It

also must be emphasized that DWCC cares for LOC-3 and LOC-4 offenders only who are typically

stable. LOC-1 and LOC-2 are transferred to EHCC where specific mental health units are

designated for higher acuity offenders with significant functional impairments and are typically

not in AS environments. (LOC-1 AND LOC-2 are the typical clients who would receive treatment

for SMI outside of corrections and require multiple psychiatric admission for stabilization.)


Respectfully submitted,
John W. Thompson, Jr., MD
Professor and Chair,
Department of Psychiatry and Behavioral Sciences
Director, Division of Forensic Neuropsychiatry
Founding Director, Fellowship in Forensic Psychiatry
Tulane University School of Medicine

John W. Thompson, Jr. MD