UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself and all other similarly situated prisoners at David Wade Correctional Center, | * * * | CIVIL ACTION NO.: 5:18-CV-00541-EEF-MLH |
| | * * | JUDGE ELIZABETH E. FOOTE |
| and | * * | |
| The ADVOCACY CENTER, | * * | |
| PLAINTIFFS, | * * | USMJ MARK L. HORNSBY |
| VS. | * * | CLASS ACTION |
| JAMES M. LEBLANC, *et al.*, | * * | |
| DEFENDANTS. | * | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

I.     Introduction ...................................................................................................1

II.    Background ....................................................................................................2

III.   Legal Standards .............................................................................................3

IV.    Argument .......................................................................................................4
       A.     The Class and Sub-Class Satisfy Rule 23(a) Factors .........................4
              1.     Numerosity .............................................................................4
              2.     Commonality ...........................................................................6
              3.     Typicality ..............................................................................20
              4.     Adequacy ...............................................................................21
       B.     The Class and Sub-Class Satisfy the Requirements of Rule 23(b)(2). ................22
       C.     The Court Should Certify Class Counsel Under Rule 23(g). .............................25

V.     Conclusion ...................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Choate,*
    469 U.S. 287 (1985) ............................................................................................. 20

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds,*
    568 U.S. 455 (2013) ............................................................................................... 4

*Berger v. Compaq Computer Corp.,*
    257 F.3d 475 (5th Cir. 2001) ................................................................................ 22

*Brewer v. Wilkinson,*
    3 F.3d 816 (5th Cir. 1993) .................................................................................... 16

*Castano v. Am. Tobacco Co.,*
    84 F.3d 734 (5th Cir. 1996) .................................................................................... 3

*Cole v. Livingston,*
    2016 WL 3258345 (S.D. Tex. June 14, 2016) ................................ 14, 20, 21, 23

*Dockery v. Fischer,*
    253 F. Supp. 3d. 832 (S.D. Miss. 2015) ...................................................... *passim*

*Dunn v. Dunn,*
    318 F.R.D. 652 (M.D. Ala. 2016) ............................................... 17, 19, 20, 21

*Every v. Jindal,*
    413 F. App'x 725 (5th Cir. 2011) ......................................................................... 15

*Evon v. Law Offices of Sidney Mickell,*
    688 F.3d 1015 (9th Cir. 2012) .............................................................................. 13

*Gates v. Cook,*
    376 F.3d 323 (5th Cir. 2004) ............................................................................ 7, 14

*Hacker v. Cain,*
    2016 WL 3167176 (M.D. La. 2016) .................................................................... 18

*Hale v. King,*
    642 F.3d 492 (5th Cir. 2011) ............................................................................... 17

*Henderson v. Thomas,*
    289 F.R.D. 506 (M.D. Ala. 2012) ....................................................................... 20

*Jackson v. Danberg,*
    240 F.R.D. 145 (D. Del. 2007) .............................................................................. 5

*Jones v. Diamond*,
 519 F.2d 1090 (5th Cir. 1975) ............................................................5

*Jones v. Gusman*,
 296 F.R.D. 416 (E.D. La. 2013)................................................ 14, 22, 23

*Kemp v. Holder*,
 610 F.3d 231 (5th Cir. 2010) ....................................................... 16, 17

*Lewis v. Cain*,
 2021 WL 1219988 (*Lewis II*) ............................................... 19, 20, 22

*Lewis v. Cain*,
 324 F.R.D. 159 (E.D. La. 2018).................................................*passim*

*M.D. ex rel. Stukenberg v. Perry*,
 294 F.R.D. 7 (S.D. Tex. 2013) (*Stukenberg II*) ...............................21

*M.D. ex. rel. Stukenberg v. Perry*,
 675 F.3d 832 (5th Cir. 2012) (*Stukenberg I*) ...................... 3, 6, 23, 24

*Maldonado v. Ochsner Clinic Foundation*,
 493 F.3d 521 (5th Cir. 2007) .........................................................3

*McManus v. Fleetwood Enterprises, Inc.*,
 320 F.3d 545 (5th Cir. 2003) .........................................................4

*Mullen v. Treasure Chest Casino, LLC*,
 186 F.3d 620 (5th Cir. 1999) .........................................................5

*Pa. Dep't of Corr. v. Yeskey*,
 524 U.S. 206 (1998)....................................................................17

*Parsons v. Ryan*,
 754 F.3d 657 (9th Cir. 2014) .......................................................14

*Pierce v. District of Columbia*,
 128 F.Supp.3d 250 (D.D.C. 2015) .................................................18

*Postawko v. Missouri Dep't of Corr.*,
 910 F.3d 1030 (8th Cir. 2018) .....................................................14

*In re Rodriguez*,
 695 F.3d 360 (5th Cir. 2012) .......................................................23

*Ruiz v. Estelle*,
 503 F. Supp. 1265 (S.D. Tex. 1980), *aff'd in part*, 679 F.2d 1115 (5th Cir.
 1982).....................................................................................10

*Stirman v. Exxon Corp.*,
　280 F.3d 554 (5th Cir. 2002) ....................................................................22

*Taylor v. Principal Fin. Grp., LLC*,
　93 F.3d 155 (5th Cir. 2009) .....................................................................18

*Turner v. Safley*,
　482 U.S. 78 (1987) ..................................................................................14

*In re TWL Corp.*,
　712 F.3d 886 (5th Cir. 2013) .....................................................................4

*Valentine v. Collier*,
　2020 WL 3491999 (S.D. Tex. June 27, 2020)........................................ 14, 23, 25

*Wal-Mart v. Dukes*,
　564 U.S. 338,350-51 (2011) .............................................................*passim*

*Williams v. Mohawk Indus., Inc.*,
　568 F.3d 1350 (11th Cir. 2009) ...............................................................21

*Yates v. Collier*,
　868 F.3d 354 (5th Cir. 2017) ..............................................................14, 20, 23, 24

**STATUTES**

U.S. CONST. AMMEND. I...............................................................................14, 24

U.S. CONST. AMMEND. XVIII ...................................................................*passim*

42 U.S.C. § 12102........................................................................................17

29 U.S.C. § 794(a) ......................................................................................16

42 U.S.C. § 1983...........................................................................................1

42 U.S.C. § 12102(1) ..................................................................................16

42 U.S.C. § 12132 .......................................................................................16

Americans with Disabilities Act ............................................................*passim*

Rehabilitation Act ..................................................................................*passim*

**OTHER AUTHORITIES**

28 C.F.R. § 35.130(b) .............................................................................17, 18

28 C.F.R. § 36.105....................................................................................16

Federal Rule of Civil Procedure 23(b)(2) ........................................................... *passim*

Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84
    N.Y.U. L. Rev. 97, 132 (2009) ........................................................................ 6, 23

1 William B. Rubinstein, *Newberg on Class Actions* § 3:12 ...................................... 5

## I.     INTRODUCTION

Plaintiffs Bruce Charles, Carlton Turner, Larry Jones, and Ronald Brooks move to certify a class and sub-class under Federal Rule of Civil Procedure 23(b)(2). For claims under 42 U.S.C. § 1983 for violations of the Eighth and First Amendments to the United States Constitution, Plaintiffs propose a class of "all prisoners currently held, or who will in the future be held, in extended lockdown at DWCC [David Wade Correctional Center] in the N-1, N-2, N-3, and N-4 buildings." R. Doc. 316 ¶ 258. For claims brought under the Americans with Disabilities Act and the Rehabilitation Act, Plaintiffs propose a sub-class of "all prisoners with disabilities related to mental health, or who are perceived as having such disabilities, currently held, or who will in the future be held, in extended lockdown at DWCC in N-1, N-2, N-3, and N-4." *Id.* ¶ 259.

The Court should certify the class and sub-class. After extensive discovery, the evidence is clear that DWCC's policies and practices in their extended lockdown buildings subject *each prisoner* to a substantial risk of serious psychological harm. Prisoners are confined to cells for 23 hours a day or more, sometimes for *years* at a time. They are socially isolated and deprived of mental and physical stimulation. They are subjected to inhumane and demeaning discipline. Mental health care is administered by a handful of overworked and underqualified staff who deliver no treatment beyond inconsistently administered medications.

These conditions pose an unconstitutional risk of serious harm to *all* class members, but they are *especially* bad for prisoners with mental health disabilities. Solitary confinement exacerbates mental illness, but DWCC makes no effort to mitigate the differential impacts of extended lockdown on prisoners with mental health disabilities. DWCC policies also discriminate against sub-class members by providing inadequate mental health care and punishing prisoners for expressing mental health needs.

1

In support of their motion, Plaintiffs offer expert evidence from three towering names in the fields of correctional psychology and administration: Dr. Craig Haney, Ph.D., J.D., one of the country's leading scholars on the psychological impacts of solitary confinement; Dr. Kathryn A. Burns, M.D., M.P.H., a former Chief Psychiatrist for the Ohio Department of Rehabilitation and Correction; and Dan Pacholke, former Secretary of the Washington State Department of Corrections. Each expert personally visited the extended lockdown units at DWCC and interviewed individual prisoners. They reviewed a host of record evidence, including DWCC policies, deposition testimony, and prisoner records. They conclude that the conditions of confinement at DWCC put all prisoners at substantial risk of serious harm; that these risks are heightened for prisoners with mental illness; that these risks are exacerbated by grossly inadequate mental health care; that the conditions are far outside national norms; and that these risks are or should be obvious to Defendants and can persist only through their deliberate indifference.

Because Plaintiffs challenge the policies and practices of DWCC's extended lockdown units—policies that apply equally to *all* class and sub-class members—class certification is appropriate. The claims present common questions that must be resolved and remedied in common across the class. Cases such as this one, which can be resolved only with class-wide injunctive relief, are precisely the kind contemplated by Rule 23(b)(2).

## II.    BACKGROUND

Buildings N1-N4 in the South Compound of DWCC house prisoners in "extended lockdown." Trunell Dec. Ex. 3, Pacholke Rept. 4 (hereinafter, "Pacholke Rept.").[1] Prisoners on extended lockdown are placed in these units "for an indeterminate period of detention

---

[1] All exhibit citations within are to the exhibits attached to the declaration of Jonathan Trunnell. Alterations and internal citations in quoted material are omitted throughout.

characterized by 90-day classification reviews." Ex. 4, DWCC 010293. Prisoners may be placed on extended lockdown because they are suspected of or have been found guilty of a disciplinary infraction, but *all* prisoners transferred to DWCC spend at least 90 days in extended lockdown, regardless of disciplinary history. Ex. 1, Haney Rept. ¶ 62 (hereinafter, "Haney Rept."). Prisoners may also be kept in extended lockdown in Building N1 while they wait for a bed in general population. Haney Rept. ¶ 103; Pacholke Rept. 6.

Conditions in extended lockdown at DWCC are inhumane by any measure, and there is not enough space to detail each harmful and counter-indicated penal policy in this brief. *See generally* Haney Rept. ¶¶ 57-138; Burns Rept. 10-28; Pacholke Rept. 5-48. Individual facts relevant to the instant motion are cited throughout.

## III.   LEGAL STANDARDS

"To obtain class certification, parties must satisfy Rule 23(a)'s four threshold requirements, as well as the requirements of Rule 23(b)(1), (2), or (3). *Maldonado v. Ochsner Clinic Foundation*, 493 F.3d 521, 523 (5th Cir. 2007). Rule 23(a) requires that

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b)(2), under which Plaintiffs proceed, requires that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." In deciding to certify a class, "'a district court must conduct a rigorous analysis,'" requiring the Court to "'look beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *M.D. ex. rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012) (*Stukenberg I*) (quoting *Castano v. Am.*

*Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996) and *McManus v. Fleetwood Enterprises, Inc.*, 320 F.3d 545, 548 (5th Cir. 2003)).

"Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). Frequently the "'rigorous analysis'" required "will entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart v. Dukes*, 564 U.S. 338,350-51 (2011) at 351. Here, the main fact questions relevant to determination of class certification are: (1) Do the class and sub-class meet Rule23(a)(1)'s numerosity requirement? (2) Do Plaintiffs' claims depend on the existence of common policies, applied class- and sub-class-wide and remediable on a common basis by changing those policies, satisfying Rule 23(a)(2) commonality and Rule 23(b)(2)? (3) Are the named Plaintiffs' claims typical of the claims of the class and sub-class, and are they adequate representatives, satisfying Rule 23(a)(3)-(4)? Defendants' alleged penological justifications, the policies' impacts on particular class members, and the policies' ultimate legality need not and should not be resolved at this stage. *See Dockery v. Fischer*, 253 F. Supp. 3d 832, 848 (S.D. Miss. 2015) ("[C]lass certification does not require the plaintiffs to . . . prove that the policies they identified did, in fact, cause the harm they are alleging."). Nonetheless, below and in expert reports Plaintiffs offer a wealth of evidence to aid the Court in its analysis.

## IV. ARGUMENT

### A. The Class and Sub-Class Satisfy Rule 23(a) Factors.

#### 1. Numerosity

In assessing numerosity, the Court should consider not only the number of class members but also "geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *In re TWL Corp.*, 712

F.3d 886 (5th Cir. 2013). However, a class of 40 or more members is generally presumed to meet the numerosity requirement. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999); 1 William B. Rubinstein, *Newberg on Class Actions* § 3:12. Where a plaintiff "is seeking injunctive relief on behalf of future class members" as well as present members, even "[s]maller classes are less objectionable." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975); *accord Jackson v. Danberg*, 240 F.R.D. 145, 147 (D. Del. 2007) (certifying class of 16 death row prisoners due to fluctuating identities of class members).

Here, the class includes 366 presently incarcerated prisoners as of March 2020, who are held on extended lockdown in buildings N-1 through N-4, as well as an untold number of future prisoners. Ex. 5, DWCC 191356, at 440. It would be impractical to join all current class members and impossible to identify and join future members. Rule 23(a)(1) is satisfied.

Enumerating the sub-class is more difficult because of Defendants' inadequate mental health care. Though DWCC does not appear to track serious mental illness ("SMI") diagnoses in extended lockdown separately, a baseline calculation[2] suggests that at least 48 individuals with conceded SMI diagnoses are in extended lockdown today—more than enough to meet the standard 40-member numerosity requirement. Future sub-class members obviously extend to at least hundreds and likely thousands more.

Furthermore, DWCC's numbers are surely an undercount. Dr. Burns offered a "conservative estimate" of the mentally ill population of South Compound at 240-270 individuals. Ex. 2, Burns Rept. 22. Steve Hayden, the employee primarily in charge of mental health for the class, estimated that between 25 and 40 percent of prisoners on extended lockdown have a mental

---

[2] The prison's own reporting counted 159 prisoners with SMI diagnoses. Ex. 5, DWCC 191456, at 101-102; Ex. 6, DWCC 016261, at 266. Roughly 30 percent of the population of the prison resides in buildings N1-N4. Ex. 5, DWCC 191440, at 85. 159 x 0.3 = 47.7.

illness. Ex. 7, Hayden Dep. 36:20-38:7 (March 29, 2019). This implies a current sub-class population of 92-146. Finally, extended lockdown is itself pathogenic, and mental health diagnosis at DWCC inadequate, suggesting that lockdown creates additional cases that go undiagnosed. *See* Haney Rept. 10-32, 49; Burns Rept. 12. As with the class, it is impracticable to join all or even most members of the sub-class, especially given the presence of future prisoners in the class.

## 2.    Commonality

In the wake of *Dukes*, "a proposed class must prove that the claims of every class member 'depend upon a common contention that is capable of class-wide resolution,' meaning that the contention is 'of such a nature that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Stukenberg I*, 675 F.3d at 838 (quoting *Dukes*, 564 U.S. at 350). "What matters to class certification is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 at 350 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). Even a single common question "will suffice, provided it is critical to resolving the class members' claims." *Id.* at 849. This case presents several common questions, all of which are susceptible to resolution with common remedies that would create class-wide relief.

### a.    *Common Questions Are Central to the Class Claims.*

On behalf of the class, Plaintiffs primarily raise Eighth Amendment claims that DWCC's policies and practices unconstitutionally expose the class to a substantial risk of serious harm, and that Defendants are deliberately indifferent to those risks. R. Doc. 316 ¶¶ 290-94. "Prison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). "Further, mental health needs are

6

no less serious than physical needs." *Id.* The elements of an Eighth Amendment claim are met when a prison official "1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate." *Id.* at 333.

In pursuing such claims on a class basis, courts have required plaintiffs to "identify a unified common policy, practice, or course of conduct that is the source of their alleged injury." *Dockery*, 253. F. Supp. 3d at 846; *see also Lewis v. Cain*, 324 F.R.D. 159, 169 (E.D. La. 2018) ("*Lewis I*"). This policy "need not be formal or officially-adopted" but may instead be "identified on the basis of custom or consistent practice." *Dockery*, 253 F. Supp. 3d at 846-47. A plaintiff must also "connect[] the policy or practice to the alleged harm." *Id.* at 847. "Failure to act can also constitute a policy or practice." *Id.* at 848; *accord Lewis I*, 324 F.3d. at 169. Conditions of confinement may violate the Eighth Amendment in combination even when they would not do so alone, if they together deprive prisoners of an identifiable human need. *Gates*, 376 F.3d at 333.

The evidence shows that DWCC's policies and practices expose *each prisoner* on extended lockdown to a substantial risk of serious harm. By Defendants' own admissions, these policies govern the entire extended lockdown population of DWCC and apply consistently across the class.[3] Class members who have not *yet* been injured by these policies nonetheless bear a substantial *risk* of serious harm from them. The factual and legal questions of whether these policies create an unconstitutional risk of harm allow this claim to be resolved across the entire class. In particular:

_____

[3] Many are official DWCC policies applying by their terms to all prisoners on extended lockdown; these are cited in detail below. In deposition, DWCC staff often affirmed this. *See, e.g.*, Ex. 8, Goodwin Dep. 183:7-11 (phone policy); Ex. 9, Nail Dep. 123:3-124:5 (March 28, 2019) (pill policy); *id.* 154:18-155:13 (Disciplinary policies and procedures); *id.* 177:22-25 (strip policy); *id.* 188:10-13 (use of force policy); Ex. 10, Dauzat Dep. 8:4-9 (March 3, 2020) (mental health policies). *Cf. Lewis I*, 324 F.R.D. at 169 (certifying class where "policies and procedures regarding medical care apply across the board to all prisoners.").

(1)    Inhumane Conditions of Confinement Expose Class
       Members to a Substantial Risk of Serious Harm.

*Social Isolation.* Prisoners in extended lockdown are typically confined to their cells 23 hours per day on weekdays, and longer on weekends. Haney Rept. ¶ 64-65; Pacholke Rept. 8; Ex. 11, Offender Posted Policy (OPP) #35, DWCC 105259.  Individuals on "yard restriction" are confined to their cells nearly 24 hours per day on weekdays and may be permitted 50 minutes of yard time on the weekend. Haney Rept. ¶ 65; Pacholke Rept. 5, 27; Ex. 11, OPP #35, DWCC 105259. A ten-minute shower offered every day is included in this out-of-cell time. Pacholke Rept. 8; Ex. 11, OPP #35, DWCC 105259. Prisoners in Building N4 are single-celled and have almost no other human contact; prisoners in N1-N3 are double-celled, but must spend 23 hours each day in cramped, small cells with a single cellmate. Haney Rept. ¶ 64; *see id.* ¶ 20 ("Forced double-celling under these onerous conditions does not mitigate, and indeed may *exacerbate*, the psychological impact of this kind of confinement."). Prisoners in Buildings N2-N4 are denied any rehabilitative programming[4]; in N1, prisoners may attend "re-entry" class once per week and eat in a common area. Haney Rept. ¶ 67 & n.78. Prisoners are allowed one ten-minute phone each month but may not schedule their calls to be sure family members are available. *Id.* ¶ 66. Visitation is offered only on a non-contact, "first come" basis, so visitors cannot be sure they will be able to see their loved ones, a policy that isolates prisoners whose families must drive long distances. *Id.*

*Enforced Idleness.* During the 50 minutes per day they are allowed outside, class members are confined to empty cages scarcely larger than their cells, in which little meaningful physical activity can be accomplished. Haney Rept. ¶ 65 & App'x A, pic. 19. Aside from a single religious book, prisoners are allowed only three books and three magazines, and may not have radios, crafts,

---

[4] Ex. 11, OPP #35, DWCC 105259.

or televisions, though prisoners in N1 may watch a common television mounted on the wall of their tier. Haney Rept. ¶ 68, 103; Pacholke Rept. 8; Ex. 11, OPP #35, DWCC 105259. Illiterate prisoners have literally nothing with which they can occupy their minds. Haney Rept. ¶ 64. What few privileges and little property prisoners are allowed can be taken away at the arbitrary discretion of DWCC staff. *Id.* ¶¶ 69-71.

*Indefinite Exposure.* Prisoners are kept on extended lockdown indefinitely, subject only to perfunctory and meaningless classification reviews every 90 days, which prisoners may not attend. Pacholke Rept. 6, 20-24; Ex. 4, DWCC 010287, at 93. As one prisoner put it to Dr. Haney, "I don't know how to get out. They say 90 days review, but they just keep you here and don't say why." Haney Rept. ¶ 99. Though the United Nations' "Mandela Rules" characterize solitary confinement of more than 15 days as "torture," prisoners at DWCC often spend months and even years in these conditions. *Id.*  ¶¶ 95, 141.

Dr. Haney situates these conditions within a robust empirical and theoretical psychological literature on solitary confinement. *Id.* ¶¶ 11-15, 18-46, 63. That literature and Dr. Haney's report, demonstrate conclusively that conditions at DWCC present *every prisoner* on extended lockdown with a substantial risk of serious harm. *Id.* ¶¶ 15, 163. Extended lockdown predictably leads to a wide variety of severe psychological harms, including

> appetite and sleep disturbances, anxiety, panic, a sense of impending emotional breakdown, lethargy, hypersensitivity to stimuli, irritability, aggression, rage, loss of control, ruminations, paranoia, perceptual distortions, cognitive dysfunction, hallucinations, depression, self-mutilation, suicidal ideation and behavior, and social withdrawal.

*Id.* ¶ 32; *see also id.* ¶¶ 22-46 (discussing research on psychological harms from isolation generally and extended lockdown in particular); Burns Rept. 7-9. Pathologies developed in extended lockdown can "destabilize a person's sense of self" and persist "long after time in isolation has ended." *Id.* ¶¶ 37-40. "The *prevalence* of psychological symptoms . . . is often very high," and Dr.

Haney "found that almost all of the prisoners" whom he evaluated exhibited serious psychological symptoms. *Id.* ¶¶ 35-36. The extreme social isolation, enforced idleness, and deprivations of even basic comforts prisoners suffer in DWCC's extended lockdown predictably lead to severe harm. *All* class members are subjected to a substantial risk of serious harm from these policies.

(2)     DWCC's Mental Health Care Is Inadequate to Detect and Prevent Severe Psychological Harm to Prisoners.

DWCC staff lack the qualifications, abilities, time, and inclination to care for the mental health of class members, leading to serious harms (especially in combination with the psychological stressors of inhumane conditions). As detailed by Plaintiffs' experts, mental health care at DWCC fails to meet *any* of the criteria required for adequate mental health care as laid out in the landmark *Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980), *aff'd in part*, 679 F.2d 1115 (5th Cir. 1982). Burns Rept. 11-31; *see also* Haney Rept. ¶¶ 75-82; Pacholke Rept. 35-42.

Most mental health care services for the class are the responsibility of staff supervisor Steven Hayden, who is "poorly trained, unqualified and unlicensed," Burns Rept. 13, and lacks "any specialized training in psychiatry, clinical psychology, social work, or counseling," Haney Rept. ¶ 75. Mr. Hayden "conducts psychotherapy," despite lacking any training or professional license to do so. *Id.* He is also unqualified to diagnose mental illness. Burns Rept. 13. Another mental health staff person, James Burgos, "was unable to define mental illness, specified psychiatric symptoms, diagnoses considered serious mental illness, or extended lockdown in deposition." *Id.*13-14. Assistant Warden Deborah Dauzat, the only licensed clinical social worker at DWCC, "does not routinely go on rounds in the prison." Haney Rept. ¶ 75; Pacholke Rept. 38. *All* mental health staff at DWCC displayed ignorance of both the actual conditions at South Compound *and* the psychological effects of solitary confinement. *See* Haney Rept. ¶¶ 126-34.

Even if DWCC's mental health staff were qualified, they would be too few to provide adequate care. DWCC has only two counselors for the South Compound and one psychiatrist whose services at DWCC are limited to 16 hours per month for the 1,200 prisoners of *both* North and South Compounds. Burns Rept. 20-24. Though none of DWCC's mental health staff could specify their caseload, it is clear they are too high. *Id.* 20. Dr. Burns estimates the caseload of South Compound at 240-270 individuals and suggests an appropriate staffing ratio of 1 counselor for every 60-65 prisoners on the mental health caseload. *Id.* 23. The American Psychiatric Association recommends one full-time equivalent psychiatrist for every 150-200 prisoners receiving psychiatric medication, more than *ten times* the ratio provided at DWCC.[5] *Id.* 20, 23.

Predictably, DWCC's underqualified and insufficient mental health staff provide inadequate services. Screening and evaluation of mental illness is haphazard, brief, and performed by unqualified practitioners. *Id.* 12-15. The *only* mental health treatment available to prisoners on extended lockdown is medication (and that is inconsistently administered). *Id.* 16. Each prisoner with identified mental illness receives *the same* "individualized" treatment plan, which lacks actual treatments; no therapy or counseling is available. *Id.* at 17-19. Psychiatry appointments are five to ten minutes long. *Id.* Staff make no effort to ensure prisoners actually receive their prescribed medications, and do not keep accurate records. *Id.* 24-25. Finally, DWCC's approach to suicide prevention is to take away prisoners' property, clothing, mattress and bedding; no treatment is provided, no risk assessment is conducted, and no phone calls or visits are permitted. *Id.* 27-28.

These policies and practices expose every prisoner to a substantial risk of serious harm. In interviews with class members, Drs. Haney and Burns encountered a heartbreaking litany of

---

[5] DWCC's 0.1 full-time equivalent psychiatrist covers all 260 prisoners receiving medication. Ex. 5, at 101-102, DWCC 191456-57.

debilitating psychiatric symptoms. *See* Haney Rept. ¶¶ 83-120; Burns Rept. App'x D. In one set of Dr. Haney's interviews, "[a]ll of the individual interviewees reported suffering from numerous symptoms of psychological stress and trauma." Haney Rept. ¶ 91. In another, Dr. Haney noted that "half or more of the persons I interviewed reported possible hallucinations—hearing or seeing things they were not sure others heard or saw—or having at least occasional thoughts of hurting themselves or taking their own lives." *Id.* ¶ 97. "Many of them also reported that they had attempted suicide in the past and/or been placed on suicide watch for expressing suicidal thoughts." *Id.* In the words of one prisoner, "It is a zoo in our unit. We are treated like animals . . . . [There are] people in here who are mentally gone, and they ignore them." *Id.* ¶ 113. Another said the guards "spray us like animals, free people tell us we are worthless, [there's the] smell of people spreading or eating feces. This ain't no place for nobody." *Id.* ¶ 114.

As self-evident as it is that conditions in DWCC's extended lockdown are harmful, Secretary Pacholke makes clear that the units are "by far more restrictive and stark than the national norm," and "inconsistent with generally accepted penological practices." Pacholke Rept. 10. Indeed, many of DWCC's harsh policies and practices are *counterproductive* and "do not support the penological interests of safety and security within the prison." *Id.*

These policies and practices are consistent across *every class member*. Though there are differences in some practices across subsets of the class—for instance, prisoners in building N-1, who have slightly more out-of-cell time than others, and prisoners in building N-4, who are single-celled—*all* prisoners are subject to common conditions that expose them to a substantial risk of serious psychological harm. Haney Rept. ¶ 63; *accord id.* ¶¶ 15, 61. All are subject to unconstitutionally harmful policies of social isolation, enforced idleness, indefinite exposure, and inadequate mental health care. *Cf. Dockery*, 253 F. Supp. 3d at 849 ("'It is not necessary that

members of the proposed class share every fact in common.'") (quoting *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012)).

Because the policies are common to all class members, injunctive relief modifying those policies would provide class-wide relief. The injunction Plaintiffs seek speaks exclusively to policy and practice at DWCC; no individualized injunctive or monetary relief is sought. *See infra* at IV.B. The merits case succeeds or falls as to all class members equally. The common questions at issue are, as the *Dukes* court put it, "amenable to common *answers*." 564 U.S. at 350.

Because class-wide policies and practices are the foundation of Plaintiffs' claims, and because Plaintiffs seek only injunctive relief to address these policies, virtually every important issue in the case is a "common question" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. These include: (1) whether DWCC's policies of social isolation, enforced idleness, indefinite exposure, and inadequate mental health care substantially increased class members' risks of serious harm; (2) whether Defendants were deliberately indifferent to these risks; (3) whether confining prisoners to cells for nearly all of every day for indefinite durations unconstitutionally risks serious harm; (4) whether 50 minutes of "rec yard" time five days per week in a cage is constitutionally adequate; (5) whether and to what extent DWCC may constitutionally place prisoners on "yard restriction" to one 50-minute rec yard session per week; (6) whether DWCC's visitation and phone call policies unconstitutionally risk serious harm, alone or in combination with other policies;[6] (7) whether DWCC's policies as to programming, education, reading material, radio and television, and crafts are constitutionally adequate; (8) whether DWCC disciplinary

---

[6] Even challenged policies that may not violate the Constitution on their own may do so in combination with other policies. *See Gates*, 376 F.3d at 333. For brevity's sake we do not invoke this formula for every question to which it could be applied.

practices are unconstitutional; (9) whether DWCC's mental health staff is constitutionally adequate; (10) whether DWCC's mental health diagnosis, monitoring and recordkeeping are constitutionally adequate; (11) whether DWCC's punitive use of "suicide watch" is constitutional; and (12) what relief is required to ensure constitutional conditions of confinement for the class. Other common questions in the same vein abound. Anticipated affirmative defenses, such as whether DWCC's policies serve legitimate penological interests, are also common to the class. *See Turner v. Safley*, 482 U.S. 78, 90-91 (1987).

Courts in this circuit have consistently affirmed the existence of common questions in (b)(2) class cases concerning conditions of confinement. *See, e.g.*, *Yates v. Collier*, 868 F.3d 354, 362-66 (5th Cir. 2017); *Valentine v. Collier*, 2020 WL 3491999, at *10-11 (S.D. Tex. June 27, 2020); *Lewis I*, 324 F.R.D. at 168-76; *Cole v. Livingston*, 2016 WL 3258345, at *7-8 (S.D. Tex. June 14, 2016); *Dockery*, 253 F. Supp. 3d at 853-55; *Jones v. Gusman*, 296 F.R.D. 416, 465-66 (E.D. La. 2013); *accord, e.g.*, *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1038-39 (8th Cir. 2018); *Parsons v. Ryan*, 754 F.3d 657, 674-85 (9th Cir. 2014).

> (3)   DWCC's Handling Practices Regarding Legal Mail Violate the First Amendment and Its Own Policies

Plaintiffs' First Amendment claims also pose questions common to the class. DWCC has a consistent practice of opening legal mail from attorneys to prisoners and from prisoners to attorneys, outside of the presence of the prisoner, in violation of official policy.

Louisiana Department of Public Safety and Corrections (DPSC) policy states that "outgoing privileged correspondence may be posted sealed, and will not be opened and inspected without express authorization from the Warden." Ex. 12, PLA016960; *see also* Ex. 13, DWCC 105383; Ex. 14, Mathews Dep. 47:3-13. DWCC mailroom staff confirmed they know the ACLU and Advocacy Center addresses and recognize that they are proper recipients of privileged

correspondence. Ex. 14, Mathews Dep. 43:1-11. Despite this, outgoing privileged correspondence to the Advocacy Center continues to be opened by someone at DWCC after it is sealed by individual prisoners. Letters from South Compound prisoners frequently arrive at the office of counsel opened. Ex. 15, O'Brien Affidavit ¶ 4. Some envelopes are taped closed,[7] some are simply left cut open or ripped open. *See, e.g.*, Ex. 16 (pictures of mail received at DRLA).

DWCC policy states that incoming legal mail is to be opened in front of the individual prisoner and the prisoner must sign a receipt that the legal mail has been received. Ex. 17, DWCC 105829, at 34. Major Angela Matthews testified that DWCC mailroom staff do not open legal mail, and that contraband checks on legal mail are performed in front of the prisoner. Ex. 14, Matthews Dep. 39:1-6, 43:17-21. In spite of this testimony, prisoners insist that they routinely receive legal mail after it has already been opened and read by staff. See, e.g., Ex. 18, DWCC 110959, at 69; Ex. 19, DWCC 110975, at 83; Ex. 20, DWCC 111873.

"Prisoners retain free speech rights consistent 'with the legitimate penological objectives of the corrections system,' and restrictions on those rights cannot be greater than necessary to protect the correctional interests involved." *Every v. Jindal*, 413 F. App'x 725, 727 (5th Cir. 2011) (quoting *Brewer v. Wilkinson*, 3 F.3d 816, 821-22 (5th Cir. 1993)). DWCC's practices of opening outgoing legal mail and opening and reading incoming legal mail violate those rights and are not penologically necessary. The appropriate remedy is to enforce the official policies by court order. Whether each practice is constitutional and what remedy is required are common questions.

---

[7] Prisoners do not have access to tape. Ex. 8, Goodwin Dep. 68:2-4. Many prisoners write "sealed not taped" on their envelopes, but they arrive taped anyway. *See* Ex. 16.

b.      *Common Questions Are Central to the Sub-class Claims.*

On behalf of the sub-class, Plaintiffs press claims for violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA"). R. Doc. 316 ¶¶ 295-309. The ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A person with a disability is defined as "a person who has a physical or mental impairment that substantially limits one or more major life activity." 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105. Included are those with historical, but not present, impairments and those who are regarded as having an impairment regardless of actual disability. 42 U.S.C. § 12102(1)(B)-(C).

The RA states that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of his disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "[T]he ADA applies only to public entities, including private employers, whereas the RA prohibits discrimination in federally funded programs and activities. The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010).

To prevail on ADA claims, a plaintiff must prove "'(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).[8]

---

[8] In particular, the ADA recognizes a "methods of administration" claim that prohibits public entities from using, "criteria or methods of administration . . . .[t]have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3); *see Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016). These claims obviously implicate policies that apply across the sub-class. *See Dunn*, 318 F.R.D. at 664-66.

The RA has the same elements, except that the second element queries whether the program in question receives Federal financial assistance. *See Kemp*, 610 F.3d at 234. A mental health disability is a mental impairment that "substantially limits one or more major life activities," such that all class members have a qualified disability and satisfy the first element. 42 U.S.C. § 12102. State prisons are also "public entities" within the ADA's statutory definition. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998). The Louisiana Department of Public Safety and Corrections, a named Defendant, receives federal funds.[9] Thus, the ADA and RA claims turn on whether sub-class members were discriminated against because of their disabilities.

A number of DWCC policies and practices place prisoners with mental health disabilities at heightened and discriminatory risk of serious harm because of their disabilities:

> (1)  The Conditions of Confinement in Extended Lockdown Discriminatorily Exacerbate Mental Illness, and DWCC Makes No Modifications to Policy for Mentally Ill Prisoners.

*DWCC Policies Put Mentally Ill Prisoners Especially at Risk.* "[S]ome prisoners are especially vulnerable to the psychological pain and pressure of solitary confinement. Mentally ill prisoners are particularly at risk in these environments." Haney Rept. 47; *see also id.* ¶¶ 48-56. "Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain." *Id.* ¶ 48. Solitary confinement "undermine[s] prisoners'] sense of self or social identity and erod[es] their connection to a shared social reality." *Id.* ¶ 50. Many courts, corrections officials, and professional organizations have limited or eliminated solitary confinement for this reason, *see* Haney Rept. ¶¶ 52-55. At DWCC, however, prisoners are placed on extended lockdown with no thought to whether it will exacerbate existing mental illness. *See* Burns Rept. 14. DWCC's

---

[9] *See* Proposed Budget for the State of Louisiana for Fiscal Year 2020-2021 at p. 57, available at: https://www.doa.la.gov/media/ia5hbtb5/fy21_proposedbudget.pdf

policy of housing sub-class members in extended lockdown, which is common to all sub-class members, differentially and discriminatorily exacerbates those prisoners' mental illness.

*DWCC Fails to Identify and Make Reasonable Modification to Accommodate Prisoners' Mental Illness.* "A public entity shall make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7); *see Hacker v. Cain*, 2016 WL 3167176, at *11 (M.D. La. 2016). Prisons have an affirmative duty to identify and make reasonable modifications where they are "unquestionably aware of the disability by, for example, receiving reports from its own doctor that recommend one or more specific accommodations." *Hacker*, 2016 WL 3167176, at * 12 (citing *Taylor v. Principal Fin. Grp., LLC*, 93 F.3d 155, 165 (5th Cir. 2009)); *accord Pierce v. District of Columbia*, 128 F.Supp.3d 250, 272 (D.D.C. 2015).

Though prisoners' mental illness in many circumstances requires special care and accommodation, none is given at DWCC. Haney Rept. ¶ 78. Prisoners identified by Defendants as having SMI[10] are subject to the same conditions as every other prisoner on South Compound. *Id.* Individuals with SMI are routinely placed on extended lockdown for years at a time. *See, e.g.*, Haney Rept. ¶¶ 99-100. Defendants do not modify any existing mental health programming or counseling services to allow sub-class members to participate. Haney Rept. ¶¶ 78, 80; Burns Rept. 16-19; Pacholke Rept. 37-40. And they routinely use excessive force on prisoners with SMI, without regard to its impact on those prisoners. Haney Rept. ¶¶ 72-74, 87-89. *Cf. Lewis v. Cain*, 2021 WL 1219988 (*Lewis II*), at *55 (M.D. La. Mar. 31, 2021) ("A failure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force . . .

---

[10] The DPSC's definition of SMI is under-inclusive for ADA requirements because it is based on whether an individual has a particular diagnosis, rather than a functional impairment.

with respect to a disabled person."). DWCC's failure to identify and make reasonable modifications is an actionable omission common to the sub-class. *See Dunn*, 318 F.R.D. at 665.

><blockquote>(2)    DWCC's Systemically Inadequate Mental Health Care Discriminates Against Prisoners with Mental Illness.</blockquote>

The defects of DWCC's mental health care are detailed above and in Plaintiffs' experts' reports. *See generally* Burns Rept. 11-31; Haney Rept. ¶¶ 75-82; Pacholke Rept. 35-42. Especially relevant to prisoners with existing mental illness is DWCC's incapacity to diagnose and treat such conditions. These failures have the foreseeable effect of exacerbating underlying conditions. *See* Haney Rept. ¶¶ 75-82; Burns Rept. 11-28. Because all sub-class members are subjected to this inadequate standard of care, the failures of DWCC's mental health care system present sub-class-wide questions to be resolved in common with injunctive relief. *Cf. Lewis I*, 324 F.R.D. at 168-76 (certifying class with respect to prisoners' inadequate medical health care).

><blockquote>(3)    DWCC's Policy of Punishing Prisoners for Seeking Mental Health Care is Discriminatory.</blockquote>

"Prisoners who request mental health attention may be placed on 'suicide watch,'" where their property, clothes, and mattress are removed and they are forced to wear a paper gown. Haney Rept. ¶ 72. They may even be placed in a four-point restraint chair. *Id.* This punitive policy "may worsen rather than ameliorate a prisoner's emotional crisis" and also deters prisoners from seeking mental health care: "[P]risoners know that expressing a mental health concern to staff is likely to result in being subjected to the added deprivations and indignities of suicide watch." *Id.* ¶ 74; *accord* Burns Rept. 28. These punitive policies discriminate against people with mental illness, who often will seek care for their disabilities only to be punished for expressing their needs.

As with the Eighth Amendment claims, the policies challenged above are applied in common across the sub-class. In particular, common questions include: (1) whether DWCC's policies discriminate against prisoners with mental health disabilities; (2) whether the

discriminatory effect of these policies is because of prisoners' disabilities within the meaning of the statute;[11] (3) whether placement of prisoners with mental health disabilities on extended lockdown is discriminatory; (4) whether DWCC's failure to identify and make reasonable modifications to policies to accommodate prisoners' mental illness is discriminatory; (5) whether DWCC's inadequate mental health system is discriminatory; and (6) whether DWCC's punishment of prisoners who seek mental health care is discriminatory. The gravamen of these claims is that Plaintiffs challenge "the denial of a system that would have the effect of ensuring that they and their fellow prisoners were appropriately accommodated." *Dunn*, 318 F.R.D. at 663. These systemic claims are intrinsically common to the sub-class.

Courts routinely certify common questions with respect to prisoners' ADA and RA claims. In this circuit in just the past decade, *see Yates*, 868 F.3d at 366; *Lewis I*, 324 F.R.D. at 175-76; *Cole*, 2016 WL 3258345, at *8; *Dunn*, 318 F.R.D. at 663-66; *Henderson v. Thomas*, 289 F.R.D. 506, 511 (M.D. Ala. 2012). This Court should do the same.

### 3.   Typicality

Under Rule 23(a)(3), class representatives' claims must be "typical of the claims . . . of the class." "The commonality and typicality requirements of Rule 23(a) tend to merge," in that both measure "'whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Dukes*, 564 U.S. at 349 n.5 (quoting *Falcon*, 457 U.S. at 157 n.13 (1982)).

> Typicality requires a showing that the claims of the named plaintiffs are in fact those asserted as the common class claims. . . . Commonality requires showing that, in fact, all members of the proposed class share a common claim . . . . Typicality

---

[11] The statutes do not require discriminatory intent. *See Alexander v. Choate*, 469 U.S. 287, 295, (1985); *Lewis v. Cain*, 2021 WL 1219988, at *50 (M.D. La. Mar. 31, 2021) (*Lewis II*).

requires showing that, in fact, the proposed representatives have that claim. Often, once commonality is shown typicality will follow as a matter of course.

*M.D. ex rel. Stukenberg v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013) (*Stukenberg II*). Class representatives' claims must "'arise from the same event or pattern or practice and [be] based on the same legal theory' as the class claims; they need not be identical." *Dunn*, 318 F.R.D. at 666 (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009)); *accord Lewis I*, 324 F.R.D. at 169. "The analysis focuses on whether the named representative's claims are typical, not whether the representative is." *Cole*, 2016 WL 3258345, at *8.

Each named plaintiff was housed in extended lockdown at DWCC between 2016 and the Court's ruling on the standing in R. Doc. 315. Each has a history and diagnosis of serious mental illness. *See* Ex. 21, DWCC 104880 (Jones); Ex. 22, DWCC 083092 (Brooks); Ex. 23, DWCC 001350 (Turner); Ex. 24, DWCC 000780 (Charles). And each named plaintiff was subject to substantial risks of serious harm from the constellation of policies and practices governing South Compound.[12] Those policies applied equally to the named plaintiffs and to all class and sub-class members. The named Plaintiffs share the class's and sub-class's legal theories. Plaintiffs' claims are typical of the claims of the class. *Cf. Dockery*, 253 F. Supp. 3d at 855.

### 4.    Adequacy

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. To meet this test, "Plaintiffs must show that the representative parties will fairly and adequately protect the interests of the class." *Dockery*, 253 F. Sup. 3d at 855. The Court "must consider the 'zeal and competence

---

[12] Some named plaintiffs also suffered actual serious harm. For instance, Carlton Turner cut his wrists and scrotum and fractured both legs in attempts to end his own life. *See* Ex. 25, PLA011330, at 36; Ex. 26, DWCC 001327. Larry Jones was sprayed with chemical agent while begging for help on suicide watch. *See* Ex. 27, Jones Dep. 27:23-29:4.

of the representatives' counsel and the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of the absentees.'" *Stirman v. Exxon Corp.*, 280 F.3d 554, 563 (5th Cir. 2002) (quoting *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479 (5th Cir. 2001)).

The class representatives are members of the class and sub-class, were subject to the challenged policies and share the interests of the class and sub-class in remedying unconstitutional conditions of confinement; none has any conflict with the class or sub-class. In spite of their incarceration, their mental illness, and the outrageous conditions at DWCC, each has maintained close contact with their attorneys and fully participated in the conduct of the litigation. Each has testified in a deposition, in which each fended off the attacks and innuendos of defense counsel. They have each proved their adequacy as class representatives.

Counsel have vigorously pursued this litigation for more than three years, through hotly contested motion practice and extensive discovery largely conducted during a global pandemic. They are well qualified. *See generally* Dec. of Class Attys. Notably, attorneys from the Advocacy Center of Louisiana and the ACLU Foundation of Louisiana previously successfully litigated a similar class action through bench trial in the Middle District of Louisiana regarding the Louisiana State Penitentiary at Angola; in that case, Plaintiffs both certified a class and achieved a ruling at trial that the prison had violated the Eighth Amendment, the ADA, and the RA. *See Lewis II*, 2021 WL 1219988. Other class counsel was trial counsel in *Jones v. Gusman*, class litigation against the Orleans Parish jail that resulted in a consent decree. 296 F.R.D. 416, 465-66 (E.D. La. 2013). Counsel submit that they are capable of adequately advocating on behalf of the class.

B.     **The Class and Sub-Class Satisfy the Requirements of Rule 23(b)(2).**

Rule 23(b)(2) states that a class may be certified if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

22

corresponding declaratory relief is appropriate respecting the class as a whole." The Fifth Circuit interprets this language to require "(1) the 'class members must have been harmed in essentially the same way,' and (2) 'the injunctive relief sought must be specific.'" *Stukenberg I*, 675 F.3d at 845. The Rule "applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Dukes*, 564 U.S. at 360. "The key to the (b)(2) class is . . . that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Id.* (quoting Nagareda, 84 N.Y.U. L. Rev. at 132). In *Stukenberg I*, the Court noted that (b)(2) claims may "be based on an allegation that the State engages in a pattern or practice of agency action or inaction—including a failure to correct a structural deficiency within the agency, such as insufficient staffing." 675 F.3d at 847.

With respect to the first requirement, "'[I]nstead of requiring common issues, Rule 23(b)(2) requires common behavior by the defendant toward the class.'" *Yates*, 868 F.3d at 366 (quoting *In re Rodriguez*, 695 F.3d 360, 365 (5th Cir. 2012)). The Rule "looks to whether the *defendant's* conduct applies 'generally to the class.'" *Id.* at 367. In this case, as in *Yates* and a host of district court cases, "[a]ll inmates . . . are subject to the *same* policy . . . and all are (allegedly) harmed in essentially the *same* way—*i.e.*, by exposure to a substantial risk of serious harm." *Id.* at 368; *see also Valentine*, 2020 WL 3491999, at *13; *Cole*, 2016 WL 3258345, at *10; *Dockery*, 253 F. Supp. 3d at 851. In promulgating dangerous policies and practices with deliberate indifference to the welfare of its prisoners, DWCC has harmed the entire class and sub-class in the same way.

The Fifth Circuit also requires that "the injunctive relief sought must be specific." *Stukenberg I*, 675 F.3d at 845. "The specificity element requires plaintiffs to 'give content' to the injunctive relief they seek 'so that final injunctive relief may be crafted to describe in reasonable detail the acts required.'" *Yates*, 868 F.3d at 367 (quoting *Stukenberg I*, 675 F. 3d at 848). "Rule

23

23(b)(2) does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage; it requires only 'reasonable detail' as to the 'acts required." *Id.* at 368.

After extensive discovery, Plaintiffs can identify the contours of the injunctive relief required in more than adequate detail. Plaintiffs seek declarations that the policies and practices detailed above and in Plaintiffs' experts' reports violate the Eighth Amendment, the First Amendment, the ADA, and the RA; and the injunction sought will:

- Limit the use of solitary confinement to cases and durations which are absolutely necessary to protect the health and safety of others;

- Divert prisoners with mental health disabilities to secure treatment facilities;

- Require that prisoners who must be in solitary confinement be allowed adequate out of cell time per day, including a mix of recreational activities and structured programming opportunities;

- Require that prisoners be permitted access to rehabilitative programming, radio and television entertainment, regular and scheduled visitation and phone call privileges, and other quality-of-life minima;

- Eliminate barbaric and outdated correctional practices that strip people of their clothing, property, and mattress;

- Require that DWCC hire and train sufficient qualified mental health staff to conduct its mental health services so as to appropriately identify, prevent, and treat prisoners' mental health challenges;

- Require an overhaul of the system for documenting and providing mental health medications; and

- Prohibit punishing prisoners for seeking mental health care or manifesting symptoms of mental illness, and require suicide watch policies and practices that protect prisoners rather than punishing them, including the use of suicide prevention garments that cover the body and afford prisoners dignity and privacy, and use of suicide-resistant mattresses rather than bare concrete for sleeping.

Obviously, the above is not the precise language of the injunctive relief requested, and Plaintiffs reserve the right to add or subtract from their requests. But it is more than sufficient to allow the Court to determine whether the relief requested would provide relief on a class-wide basis. It would. *Compare Valentine*, 2020 WL 3491999, at *14; *Dockery*, 253 F. Supp. 3d at 855-56.

C.    **The Court Should Certify Class Counsel Under Rule 23(g).**

The Court must also appoint class counsel pursuant to Rule 23(g), considering

(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Disability Rights Louisiana and the ACLU Foundation of Louisiana respectfully submit that each of these considerations favors their appointment as class counsel. *See* Dec. of Class Attys.

## V.    CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion and certify the class under Rule 23.

Respectfully submitted this 7th day of May, 2021:

*/s/ Jonathan Trunnell*
Jonathan C. Trunnell, La. Bar No. 36956, T.A.
Melanie Bray, La. Bar No. 37049
Ronald K. Lospennato, La. Bar No. 32191
Emma Lee Douglas, La. Bar No. 39076
Disability Rights Louisiana
8325 Oak Street
New Orleans, LA 70118
504-708-1460
504-507-1956 (fax)
mbray@disabilityrightsla.org


*/s/ Bruce Hamilton*
Bruce Hamilton, La. Bar No. 33170
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
Facsimile:(504) 613-5611
bhamilton@laaclu.org


*/s/ Katie M. Schwartzmann*
Katie M. Schwartzmann, La. Bar No. 30295

*Cooperating Counsel for ACLU OF LA*
Tulane Law School
6329 Freret Street
New Orleans, La 70115
(504) 496-8566
kschwartzmann@tulane.edu

*/s/ Robert W. Cobbs*
Robert W. Cobbs (*pro hac vice* application pending)
Cohen Milstein Sellers & Toll, PLLC
1100 New York Ave. NW, Ste. 500
Washington, DC 20011
(202) 408-4600
rcobbs@cohenmilstein.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of May, 2021 a copy of the foregoing Motion was electronically filed with the clerk of Court using the CM/ECF system. Notice of this filing will be sent to counsel of record b operation of the Court's electronic filing system.

*/s/ Jonathan Trunnell*

26