UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself and all other similarly situated prisoners at David Wade Correctional Center | * * * * | JUDGE ELIZABETH E. FOOTE USMJ MARK L. HORNSBY |
| and | * * | |
| ADVOCACY CENTER, | * * | |
| PLAINTIFFS | * * | CIVIL ACTION NO. 5:18-cv-00541-EEF-MLF |
| VERSUS | * * | |
| JAMES M. LEBLANC, et al., | * * | |
| DEFENDANTS | * | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING EIGHTH AMENDMENT CLAIMS**

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW, LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

Randal J. Robert (#21840)
Connell L. Archey (#20086)
Keith J. Fernandez (#33124)
*Special Assistant Attorneys General*
Email: randy.robert@butlersnow.com
connell.archey@butlersnow.com
keith.fernandez@butlersnow.com

Counsel for Defendants

i

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................ii

I.   Factual Background .................................................................................................... 1

   A.   Defendants appropriately identify and diagnose mental illness ............................. 2

   B.   Defendants provide treatment for mental illness .................................................. 3

   C.   DWCC appropriately uses restrictive housing to deliver public safety, staff safety, and offender safety ............................................................................ 4

II.  Law and Argument ..................................................................................................... 7

   A.   Summary Judgment Standard ................................................................................ 7

   B.   The Plaintiffs cannot carry their burden of proving a violation of the Eighth Amendment ................................................................................................ 8

      1.   In order to prevail under the Eighth Amendment, the Plaintiffs must prove that the Defendants were deliberately indifferent to South Compound Offenders' serious mental health needs ........................ 8

      2.   Plaintiffs' Complaint for violations of the Eighth Amendment should be dismissed because they have failed to show that an objectively intolerable risk of harm exists ................................................ 10

      3.   The undisputed material facts show that Defendants are not subjectively deliberately indifferent to South Compound Offenders' serious mental health needs .................................................... 12

         a.   Defendants appropriately identify and diagnose mental illness ............................................................................................ 12

         b.   Defendants appropriately provide treatment for mental illness ............................................................................................ 14

            i.    Defendants manage medications appropriately ............... 14

            ii.   Mental health staff make regular rounds and assessments ...................................................................... 15

            iii.  Medication administration is sufficient ........................... 15

        iv.    Individual counseling and programming are available ........................................................... 16

        v.    DWCC fully complies with its obligation to prevent suicide ................................................. 17

    c.    DWCC appropriately uses restrictive housing to deliver public safety, staff safety, and offender safety ........................... 18

    d.    The evidence negates any suggestion that Defendants are subjectively indifferent to Plaintiffs' serious mental health needs................................................................................ 23

III.    Conclusion ...................................................................................................... 25

IV.    List of Attachments

Declaration:

1. Declaration of Warden Jerry Goodwin dated 6/18/21

Deposition excerpts:

2. Burgos, James taken on 12/9/19
3. Burns, Kathryn, M.D. taken on 3/24/21
4. Dauzat, Deborah Michelle taken on 2/21/19
5. Dauzat, Deborah Michelle taken on 3/3/20
6. Disability Rights entity deposition taken on 1/5/21
7. Goodwin, Warden Jerry taken on 3/6/20
8. Haney, Craig, Ph.D. taken on 4/5/21
9. Hayden, Steve taken on 3/29/19
10. Jimerson, Jesse taken on 1/13/20
11. LeBlanc, Sectary James taken on 8/10/20
12. Norris, Leigh Michelle taken on 3/27/19
13. Robinson, Aerial taken on 2/20/19
14. Seal, Gregory, M.D. taken on 3/4/20
15. Smith, Seth taken on 8/10/20

Policies and Regulations:

16. Disciplinary Matrix
17. EPM #02-04-008
18. EPM #03-02-001
19. EPM #03-02-003
20. EPM #04-01-017
21. HCP No. HC-27

22. HCP No. HC-28
23. HCP No. HC-37
24. Offender Policy 34
25. Reg. No. B-02-016
26. Reg. No. B-02-019
27. Reg. No. IS-B-4
28. Reg. No. OP-C-1

Other materials:

29. Chapter 6 of the NIJ White Paper titled Mental Health Effects of Restrictive Housing, Issues, Challenges, and Future Directions
30. Colorado Study, abstract, table of contents and executive summary
31. Liman Survey excerpts
32. Thompson, John, M.D. expert report dated 3/8/21
33. Upchurch, James R. expert report dated 3/5/21

## TABLE OF AUTHORITIES

**Constitution, Statutes and Rules**

Eighth Amendment to the United States Constitution......................................................en passim

Fed. R. Civ. P. 56(a) ............................................................................................................1, 7

**Cases**

*Anderson v. Dallas Cty. Texas*, 286 F. App'x 850 (5th Cir. 2008).............................................. 17

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382 (1997)................... 9

*Berry v. Brady*, 192 F.3d 504 (5th Cir. 1999)............................................................................. 19

*Brewster v. Dretke*, 587 F.3d 764 (5th Cir. 2009) ........................................................................ 8

*Cadena v. El Paso Cty.*, 946 F.3d 717 (5th Cir. 2020) ................................................................. 9

*Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019)..................................................................... 9, 12

*Cuellar v. Livingston*, 321 Fed. Appx. 373 (5th Cir. 2009)....................................................... 19

*Davis v. Scott*, 157 F.3d 1003 (5th Cir. 1998) ......................................................................... 16

*Dockery v. Hall*, 443 F. Supp. 3d 726 (S.D. Miss. 2019)........................................... 16, 21-23

*Domino v. Texas Dep't of Crim. Justice,* 239 F.3d 752 (5th Cir. 2001)......................................... 9

*Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976) .................................................................. 9

*Evans v. City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993) ....................................................... 17

*Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970 (1994)........................................... 9, 10, 12, 19

*Gage v. Canal Barge Co.*, 431 F. Supp. 3d 754 (M.D. La. 2020) ................................................. 8

*Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974)......................................................................... 18

*Gobert v. Caldwell*, 463 F.3d 339 (5th Cir. 2006)....................................................................... 10

*Hernandez v. Velasquez* 522 F.3d 556 (5th Cir. 2008)................................................................ 22

*International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257 (5th Cir. 1991)................................. 8

v

*LaVergne v. McDonald*, No. 19-709, 2020 WL 7090064 (M.D. La. 3/23/20) ........................... 18

*Little v. Liquid Air Corp.,* 37 F.3d 1069 (5th Cir.1994) ................................................ 8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S. Ct. 1348 (1986) ....................................................................................................................... 8

*Missouri v. Jenkins*, 495 U.S. 33, 110 S.Ct. 1651 (1990) ........................................... 10

*Newman v. State of Al.*, 559 F.2d 283 (5th Cir. 1977) ........................................... 16

*Novak v. Beto*, 453 F.2d 661 (5th Cir. 1971) ........................................................ 18, 19

*Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827 (1973) ....................................... 10

*Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392 (1981) ................................. 19, 22

*Shadrick v. Hopkins Cnty.,* 805 F.3d 724 (6th Cir. 2015) ...................................... 9

*Tasby v. Cain*, 2017 WL 4295441 (M.D. La. 9/12/17), *report and recommendation adopted* 2017 WL 4322413 (M.D. La. 9/28/17) ....................................... 18, 19

*Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020), *cert. denied*, 2020 WL 2497541 (5/14/20) ....................................................................................................... 9

*Wilson v. Seiter,* 501 U.S. 294, 111 S. Ct. 2321 (1991) ................................. 8, 16, 19

*Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378 (2006) ........................................... 10

**MAY IT PLEASE THE COURT:**

This memorandum is submitted on behalf of the Louisiana Department of Public Safety and Corrections ("DOC"); James M. Leblanc, in his official capacity as Secretary of the DOC; Jerry Goodwin, in his official capacity as Warden of David Wade Correctional Center ("DWCC"); Deborah Dauzat, in her official capacity as Assistant Warden of DWCC; and Lonnie Nail, Dr. Gregory Seal, Steve Hayden, Aerial Robinson, and Johnie Adkins (all in their official capacities as employees of DWCC (collectively the "Defendants") in support of their motion for summary judgment.

## I. FACTUAL BACKGROUND

The Plaintiffs have brought this suit alleging that Defendants are violating the Eighth Amendment with respect to their mental health care at DWCC. Specifically, they are claiming that: (i) Defendants are not identifying persons with mental illness; (ii) Defendants are not treating persons with mental illness; and (iii) that the conditions of confinement at DWCC cause mental illness and the exacerbation of pre-existing mental illness.

As the undisputed facts will show, the Defendants are not violating the Eighth Amendment and are appropriately identifying and managing mental illness of the offenders at DWCC. Defendants have a robust system that (i) identifies and diagnoses mental illness; (ii) treats mental illness with a psychiatrist and mental health staff; and (iii) appropriately uses restrictive housing to deliver safety to the public, DWCC staff, and the other offenders. For the reasons more fully set forth herein, Defendants are entitled to summary judgment dismissing Plaintiffs' Eighth Amendment claims.

1

A.   **DEFENDANTS APPROPRIATELY IDENTIFY AND DIAGNOSE MENTAL ILLNESS.**

Offenders received into the custody of DOC are screened, evaluated, and tested for mental health issues at Elayn Hunt Correctional Center ("EHCC").[1] These evaluations are extensive and include personality testing, IQ testing, and interviews. This screening process results in the assignment of a DSM-5 Diagnosis for those offenders with mental illness. The tests and diagnosis are reviewed by a psychiatrist or psychologist at EHCC. The findings are detailed in an Assessment & Intervention report for each offender.[2]

Upon an offender's arrival at DWCC and prior to housing being assigned by the initial classification board, the offender is again screened by mental health to ensure that the findings on site are congruent with the findings at EHCC.[3] The "intra-system" screening includes but is not limited to:

a.   Inquiry into whether the offender:
   - Has a present suicidal ideation;
   - Has a history of suicidal behavior;
   - Is presently prescribed psychotropic medication;
   - Has a current mental health complaint;
   - Is being treated for mental health problems;
   - Has a history of inpatient and/or outpatient psychiatric treatment;
   - Has a history of treatment for substance use; and/or
   - Has a detoxification need.

b.   Observation of:
   - General behavior;
   - General appearance;
   - Evidence of abuse and/or trauma; and/or
   - Current symptoms of psychosis, depression, anxiety and/or aggression.[4]

In the rare circumstance that an offender is not tested at EHCC prior to arrival and prior to housing being assigned by the initial classification board, the same battery of tests the

---

[1] Ex. 5, Dauzat dep. (03/03/2020), at p. 20–21; Ex. 32, Thompson rep., at p. 9.

[2] *See* Ex. 32, Thompson rep., at pp. 9–12.

[3] Ex. 9, Hayden dep., at p. 176, 182–85; Ex. 13, Robinson dep., at p. 238; Ex. 5, Dauzat dep. (03/03/2020), at p. 21.

[4] Ex. 22, Health Care Policy No. HCP37, §7(A)(3).

offender would receive at EHCC are administrated at DWCC and reviewed by a psychologist.[5]

If an offender is on medication upon arrival at DWCC, the medications come with the offender, and medications are continued by the general medical doctor unless there is an indication that these medications may be harmful to the offender.[6] Offenders with a mental health diagnosis are then scheduled to see DWCC's psychiatrist, Dr. Seal,[7] at the next available time.[8] Finally, DWCC provides offender orientation where it informs offenders of the various options available to them with regard to their mental health concerns.[9]

**B.      DEFENDANTS PROVIDE TREATMENT FOR MENTAL ILLNESS.**

Once identified and seen by Dr. Seal, offenders with mental illness are followed by a dedicated mental health staff that includes a master's level psychologist, two social workers, and licensed counselor.[10] A treatment plan is created for each offender.[11] Medication is the primary form of treatment for many mental disorders.[12] Dr. Seal performs the traditional role of a prison psychiatrist and manages medication.[13] Despite plaintiffs' pleading to the contrary, plaintiffs' experts have no criticisms of Dr. Seal's medication management of the offenders on the South Compound.[14]

Appropriate medications are prescribed and delivered to the offender—the primary form

---

[5] Ex. 9, Hayden dep., at p. 19.
[6] Ex. 12, Norris dep., at p. 17; Ex. 2, Burgos dep., at p. 235; Ex. 13, Robinson dep., at pp. 156–57.
[7] Dr. Seal obtained his medical license in 1990 and is a board-certified psychiatrist. He has provided services for DWCC and other DOC facilities for more than 10 years. Dr. Seal also has a clinical practice and participates in clinical research. See Ex. 14, Seal dep., at pp. 7–14.
[8] Ex. 4, Dauzat dep. (02/21/2019), at pp. 101–02; Ex. 9, Hayden dep. at p. 186–87.
[9] Ex. 13, Robinson dep., at p. 103.
[10] Ex. 32, Thompson rep., at pp. 6–9.
[11] Ex. 19, EPM #3-02-003, at pp. 7–8.
[12] Ex. 3, Burns dep., at p. 159.
[13] Ex. 14, Seal dep., at p. 19; Ex. 3, Burns dep., at p. 159 ("Traditionally the primary role of a psychiatrist working in correctional facilities has been psychotropic medication management.")
[14] Ex. 3, Burns dep., at p. 177.

of treatment for most disorders.[15] Medications are administered by pill call officers.[16]

There has been no backlog for either psychiatric time or mental health clinician time from the filing of this case through the present day.[17]

## C.   DWCC APPROPRIATELY USES RESTRICTIVE HOUSING TO DELIVER PUBLIC SAFETY, STAFF SAFETY, AND OFFENDER SAFETY.

The area of DWCC that is at issue in this case is the South Compound, which is comprised of four buildings designated as N-1 through N-4.[18] Offenders assigned to restrictive housing and/or maximum custody due to disciplinary issues are housed only in N2 A and B tiers, and N3–N4.[19] DWCC primarily uses three types of restrictive housing: 1) investigative segregation; 2) disciplinary segregation; and 3) preventative segregation.[20]

Offenders found guilty of major rules violations can be assigned to a restrictive housing status known as "disciplinary segregation."[21] A disciplinary matrix provides the range of sentences for offenders found guilty of rules violations.[22] After serving time in disciplinary segregation, if an offender's "continued presence in general population is a danger to the good order and discipline of the facility and/or whose presence poses a danger to himself, other offenders, staff, or the general public," he may be assigned to "preventative

---

[15] Ex. 3, Burns dep., at p. 177.

[16] Ex. 12, Norris dep., at p. 12.

[17] Ex. 1, Goodwin dec. at ¶ 4; Ex. 14, Seal dep., at pp. 138–41.

[18] Each building consists of 4 tiers designated as A–D.

[19] Ex. 1, Goodwin dec. at ¶ 2; Ex. 32, Upchurch rep., at pp. 11–12. N1 houses medium custody offenders. N2C houses transitional segregation offenders with additional privileges. N2D houses closed cell restriction ("CCR") offenders. CCR is for offenders that, because of their institutional history or seriousness of their crimes, require a high level of protective custody.

[20] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p.6. Reg. IS-B-4 became officially effective on March 7, 2021. Prior to that time, DWCC was operating under a substantially similar pilot regulation dated July 19, 2019, Ex. 25, DOC Dept. Reg, No. B-02-019. The experience of the department piloting Regulation B-02-019 produced Reg. IS-B-4.

[21] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 15.

[22] Ex. 28, DOC Dept. Reg. No. OP-C-1, is the current Disciplinary/Sanctions Matrix in effect at DWCC. Reg. OP-C-1 became officially effective on March 7, 2021. Prior to that time, DWCC was operating under a substantially similar pilot regulation piloted on or about July 19, 2019, the Draft Disciplinary/Sanctions Matrix, attached as Ex. 16. The experience of the department piloting Draft Disciplinary/Sanctions Matrix produced the Reg. OP-C-1. DWCC is currently apply the new disciplinary matrix. Ex. 15, Smith dep., at p. 110.

segregation"[23] until the offender modifies his behavior. The key to progressing out of a restrictive housing status is demonstrating that the offender is less of a threat to other offenders, the staff, and the public. An offender in preventative segregation is reviewed every 60-days by a multi-disciplinary review board that includes a mental health clinician.[24]

When an offender is placed in restrictive housing, he is afforded a phone call within 24-hours of that placement.[25] Offenders undergo a mental health appraisal within 7-days of assignment to restrictive housing.[26] Offenders in restrictive housing are given a minimum of two personal phone calls a month.[27] Offenders in restrictive housing have access to non-contact visitation by loved ones.[28] No offender in restrictive housing has been denied visitation because of his classification, a lack of space, or a backlog of any sort.[29]

Offenders housed in the South Compound may remain there for varying lengths of time depending on the individual circumstances of each particular offender. The duration of each offenders' stay in the South Compound is highly variable and depends on the nature of the disciplinary issue and/or the overall risk the offender presents to offenders housed in the general population, staff, and the public.[30]

While the plaintiffs continually claim that some individuals are housed in restrictive housing for "years,"[31] such duration is rare and reserved only for offenders who persist in violent conduct and refuse to adhere to the rules of DWCC. For instance, as of March 8, 2021, only 6 of 234 offenders had been in restrictive housing for "years."[32] The majority—

---

[23] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 17.
[24] Ex. 27, DOC Dept. Reg. No. IS-B-4, at pp. 3 & 17.
[25] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 13.
[26] Ex. 27, DOC Dept. Reg. No. IS-B-4, at 10.
[27] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 13.  Legal phone calls are not counted against this number.
[28] Ex. 17, DWCC EPM #02-04-008, at p. 8.
[29] Ex. 1, Goodwin dec. at ¶ 5.
[30] Ex. 7, Goodwin dep., at p. 160; Ex. 10, Jimerson dep., at pp. 151–54.
[31] *See, e.g.*, R. Doc. 397, at p. 7.
[32] Ex. 1, Goodwin dec. at ¶ 6; Ex. 32, Upchurch rep., at p. 13.

140 out of 234—had been in a restrictive housing status for less than 6 months.[33] Over the past five years, DOC has reviewed data of offenders held long term and sent teams to determine if the offender could be moved to less restrictive housing.[34] Plaintiffs' experts did not opine that DWCC is keeping offenders in restrictive housing for too long a period of time.[35]

Offenders with a mental health diagnosis defined by the DOC as a "Serious Mental Illness"[36] ("SMI") must be cleared by the mental health department before being placed in segregated housing.[37] A behavioral health assessment by a mental health provider is completed at least every 30 days for offenders with a "diagnosed behavioral health disorder and more frequently if clinically indicated."[38] As Defendants' expert, Dr. John Thompson, describes it, "these offenders would not typically be considered for any other treatment in the community than they are receiving at DWCC. They would most likely remain outpatients at community mental health centers receiving the same types of medications they receive at DWCC."[39]

Offenders in restrictive housing with no mental illness are reviewed at least every 60 days by a multidisciplinary board, including a mental health clinician, to move them to the least restrictive appropriate environment.[40] Offenders identified by DOC as having a diagnosed

---

[33] Ex. 33, Upchurch rep., at p. 13.
[34] Ex. 15, Smith dep., at p. 30.
[35] Ex. 3, Burns dep., at p. 213; Ex. 8, Haney dep., at p. 165; Ex. 30, Liman Survey, at pp. 9–14.
[36] According to LADOC policy, "Serious Mental Illness" is defined by DSM-5 diagnoses of 1) Major Depressive Disorder; 2) Schizophrenia; 3) Schizoaffective Disorder; 4) Bipolar Disorder; 5) Unspecified Schizophrenia Spectrum; or 6) Severe Anxiety Disorder. *See* Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 7.
[37] Ex. 27, DOC Dept. Reg. No. IS-B-4, at pp. 9–10; Ex. 7, Goodwin dep., at pp. 74–75.
[38] Ex. 27, DOC Dept. Reg. No. IS-B-4, p. 10.
[39] See Ex. 32, Thompson rep., at p. 11.
[40] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 17.

behavioral health disorder are reviewed every 30 days by a mental health professional to ensure these offenders are not decompensating in any way, and that the offender's housing is proper.[41]

Offenders in restrictive housing have access to mental health clinicians, Dr. Seal, mental health medications, and program materials such as anger management and parenting.[42] The mental health clinicians make rounds through the restrictive housing areas weekly and offenders can request to see the mental health staff if the offender needs assistance.[43] Offenders can also be referred to the mental health staff by any staff member—including the medical staff and the security staff—or other offenders.[44] In these cases, mental health is notified, and a clinician goes to meet with the offender.

## II. LAW AND ARGUMENT

The Plaintiffs seek relief under the Eighth Amendment. The Plaintiffs claim deficiencies in screening for mental illness, usage of restrictive housing, medication, and policies. The undisputed facts show that the Defendants are managing restrictive housing at DWCC in a reasonable manner and in compliance with the U.S. Constitution. As such, the Defendants are entitled to summary judgment dismissing the Plaintiffs' Eighth Amendment claims.

### A.   SUMMARY JUDGMENT STANDARD.

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the

---

[41] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 10.

[42] Ex. 4, Dauzat dep. (02/21/2019), at pp. 40 & 128.

[43] Ex. 9, Hayden dep., at pp. 249–51; Ex. 4, Dauzat dep. (2/21/2019), at pp. 40, 75; Ex. 2, Burgos dep., at p. 32–33. While the rounds are at least weekly by policy, the mental health staff will often be in these areas at other times and offenders can ask to speak with them when they are physically present.

[44] Ex. 4, Dauzat dep., 02/21/2019, at pp. 17 & 106; Ex. 9, Hayden dep., at p. 122.

material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587, 106 S. Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citations and internal quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec.*, 475 U.S. at 587. Further, in resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable [fact-finder] drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion. *International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257, 1263 (5th Cir. 1991). *Gage v. Canal Barge Co.*, 431 F. Supp. 3d 754, 759 (M.D. La. 2020).

## B.   THE PLAINTIFFS CANNOT CARRY THEIR BURDEN OF PROVING A VIOLATION OF THE EIGHTH AMENDMENT

The Plaintiffs have raised claims of deliberate indifference related to Defendants' mental health program that is carried out at DWCC's South Compound for those in restrictive housing. Plaintiffs allegations are system-wide in nature; thus, their claims are that the system fails.

### 1.   In order to prevail under the Eighth Amendment, the Plaintiffs must prove that the Defendants were deliberately indifferent to South Compound Offenders' serious mental health needs.

"Prison officials [may] violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs." *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009) (citing *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S. Ct. 2321, 2323 (1991)). "Deliberate

indifference is an 'extremely high' standard to meet." *Id.* at 770; *see also Domino v. Texas Dep't of Crim. Justice,* 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference 'is a stringent standard of fault, requiring proof that a municipal [or state] actor disregarded a known or obvious consequence of his [, her or its] action.'" *Shadrick v. Hopkins Cnty.,* 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382 (1997)). Only "unnecessary and wanton infliction of pain" is proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976). "Deliberate indifference is an extremely high standard to meet." *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020); *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020), *cert. denied*, 2020 WL 2497541 (5/14/20).

> The Fifth Circuit in *Valentine* explained that:

> To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." [*Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970 (1994).] To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970).

The Fifth Circuit in *Valentine* held that "after accounting for the protective measures TDCJ has taken, the Plaintiffs have not shown a 'substantial risk of serious harm' that amounts to 'cruel and unusual punishment.'" *Id.*

The Supreme Court has also held that in cases in which inmates seek injunctive relief to prevent substantial risks of serious injury from ripening into actual harm, the Eighth Amendment deliberate indifference standard "should be determined in light of the prison authorities current attitudes and conduct," i.e. "their attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 827. Further, a prisoner seeking injunctive relief on the grounds that there is "a contemporary violation of a nature likely to

9

continue," must show both the existence of a violation and produce evidence "from which it can be inferred that the [prison] officials were at the time suit was filed . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . during the remainder of the litigation and into the future." *Id.* As regards this showing, "inmates may rely on developments that postdate the pleadings and pretrial motions, [and] defendants may rely on such developments to establish that the inmate is not entitled to an injunction." *Id.*

Moreover, the Supreme Court has repeatedly warned that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" *Woodford v. Ngo*, 548 U.S. 81, 94, 126 S.Ct. 2378 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S.Ct. 1827 (1973)); *see also Missouri v. Jenkins*, 495 U.S. 33, 51, 110 S.Ct. 1651 (1990).

The Fifth Circuit has also held that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

## 2. Plaintiffs' Complaint for violations of the Eighth Amendment should be dismissed because they have failed to show that an objectively intolerable risk of harm exists.

Regarding the objective requirement of deliberate indifference, the plaintiffs cannot show an "objectively intolerable risk of harm." *Farmer*, 511 U.S. at 846. Plaintiffs' entire case is premised on a theory of harm that has not been scientifically proven. In fact, the only objective scientific studies on the subject are clearly contrary to the Plaintiffs' claims in this case.

Plaintiffs' expert, Craig Haney, Ph.D., has advocated for changes in restrictive housing and worked toward that end through litigation. However, his theories have not been proven

10

through the scientific method. In November of 2016, the National Institute of Justice ("NIJ") published an extensive paper titled, *Restrictive Housing in the U.S., Issues, Challenges, and Future Directions*.[45] The NIJ White Paper describes the state of the science on harm from restrictive housing as a "contentious" debate.[46]

Between 2011 and 2016, several large-scale studies were undertaken to study restrictive housing.[47] A team of researchers undertook a systematic longitudinal study[48] of restrictive housing in Colorado in order to prove the hypothesis that restrictive housing causes psychological harm.[49] The Colorado Study concluded that "[t]he results . . . were largely inconsistent with our hypotheses and the bulk of literature that indicates [administrative segregation] is extremely detrimental to inmates with and without mental illness."[50]

The Plaintiffs claim an objective risk of serious harm exists despite the only scientific studies on restrictive housing not supporting this hypothesis. Without an objective risk of serious harm, Plaintiffs' claims must fail. At this point, Plaintiffs' claims rest solely on Dr. Haney's belief that restrictive housing causes harm. Yet Dr. Haney has not undertaken any study to prove his hypothesis. Because Dr. Haney disagrees with the results of the only scientific studies on the subject, he instead chooses to ignore them altogether. What remains is a Dr. Haney's deeply held personal "commonsensical" theory which is wholly unsupported by scientific proof.[51]

Plaintiffs have not shown an objectively intolerable risk of harm exists.

---

[45] The NIJ report, referred to as a "White Paper," consists of ten chapters and is 400 pages in length. The entire NIJ White Paper is available at https://www.ojp.gov/pdffiles1/nij/250315.pdf Chapter 6 of the NIJ White Paper titled *Mental Health Effects of Restrictive Housing, Issues, Challenges, and Future Directions* is attached as Ex. 29 and is hereafter referred to as the NIJ White Paper.

[46] Ex. 29, NIJ White Paper, p. 199.

[47] Ex. 29, NIJ White Paper, at 204–05.

[48] A longitudinal study is a research design that involves repeated observations of the same variables over a period of time.

[49] The study shall be referred to as the "Colorado Study." The abstract, the table of contents and the executive summary of the Colorado Study can be found at Ex. 30. The entire Colorado Study consisting of 164 pages is available at https://www.ojp.gov/pdffiles1/nij/grants/232973.pdf.

[50] Ex. 30, Colorado Study, Abstract.

[51] For a more detailed treatment of the shortcomings of Dr. Haney's opinions, *see* R. Doc. 393, pp. 4–17.

### 3. The undisputed material facts show that Defendants are not subjectively deliberately indifferent to South Compound Offenders' serious mental health needs.

Even if the Plaintiffs could show an objective substantial risk of serious harm exists (which is denied), the Plaintiffs cannot show that the Defendants were "(1) 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837). To the contrary, the undisputed facts show that the Defendants are affirmatively identifying, diagnosing, and treating mental health while making appropriate and necessary use of restrictive housing.

#### a. Defendants appropriately identify and diagnose mental illness.

The Defendants identify and diagnose mental illness through multiple extensive multi-step screening and assignment of diagnoses and level of care classifications.

The Defendants screen offenders for mental illness at EHCC at the intake center when committed to DOC custody and again once offenders arrive at DWCC.[52] This extensive screening process, including personality testing, IQ testing and interviews, concludes with the assignment of a DSM-5 diagnosis and a level of care designation.[53] The Plaintiffs' expert, Dr. Burns, has no criticisms of the screening being performed at EHCC.[54]

Offenders undergo another screening process upon intra-system transfer into DWCC. The intra-system screening inquires into the offenders' suicide ideation and history, current psychotropic medications, current health complaints, current mental health problems, history of inpatient and outpatient psychiatric treatment, substance abuse history, and general observations

---

[52] Ex. 25, DOC Reg. No. B-02-016, at pp. 6–7; Ex. 22, DOC HCP No. HC-37, pp. 3–5; Ex. 20, EPM #04-01-017.
[53] Ex. 19, EPM 3-02-003, p. 3–8.
[54] Ex. 3, Burns dep., at p. 134. Indeed, Dr. Burns agreed that the screening at EHCC is "robust."

of behavior, appearance, and symptoms of psychosis, depression, anxiety and/or aggression.[55] Dr. Burns also testified that this screening can be performed by a correctional officer with appropriate training.[56] This intra-system screening at DWCC is generally performed by Steve Hayden.[57] Hayden has a master's in psychology and has worked at DWCC for ten years. Prior to being employed by DWCC, Hayden had experience with mental health testing and evaluations.[58] While Plaintiffs are critical of Hayden, there can be no serious question that if a correctional officer can be trained to perform this screening, then an individual with a master's in psychology and vast experience in the subject matter can perform this screening.

The robust screening identifies offenders with mental illness prior to placement at DWCC. The evaluations of both Defendants' expert, Dr. Thompson,[59] and Plaintiffs' expert, Dr. Burns, found that mental health issues were being properly identified both at EHCC and DWCC.[60]

After screening, if an offender is on medication, the medications are continued by the general medical doctor unless there is an indication that these medications may be harmful to the offender.[61]

After the intra-system intake screening into DWCC, offenders with mental illness see Dr/ Seal, a licensed psychiatrist. Dr. Seal provides appropriate diagnoses for each offender.[62] All experts in this case agree that the diagnoses and prescriptions for the offenders are appropriate.[63]

---

[55] Ex. 22, Health Care Policy No. HCP37, §7(A)(3).

[56] Ex. 3, Burns dep., at p. 141.

[57] Ex. 9, Hayden dep., at p. 176.

[58] Ex. 9, Hayden dep., at p. 15–18.

[59] Dr. Thompson is board certified in Adult Psychiatry with added qualifications in Forensic Psychiatry and Addiction Psychiatry by the American Board of Psychiatry and Neurology. He is the Chairman of the Department of Psychiatry at Tulane University School of Medicine and the Chief of Staff of the Eastern Louisiana Mental Health System.

[60] *See* Ex. 31, Dr. Thompson's report at p. 42; Ex. 3, Burns dep., at p. 134.

[61] Ex. 12, Norris dep., at p. 17; Ex. 2, Burgos dep., at p. 235; Ex. 13, Robinson dep., at pp. 156–57.

[62] Ex. 3, Burns dep., at p. 38.

[63] Ex. 31, Thompson rep. at p. 42; Ex. 3, Burns dep., at p. 38.

The plaintiffs' expert agrees that Defendants' LOC assignments are correct and reasonable.[64] The evidence establishes that the Defendants appropriately screen and diagnose offenders with mental health concerns. Even if the process is not perfect, it certainly meets standards that are far above the threshold of an Eighth Amendment violation.

### b.  Defendants appropriately provide treatment for mental illness.

After an offender has been appropriately diagnosed and assigned a level of care classification upon intake, the offender receives treatment.

### i.    Defendants manage medications appropriately.

Medication is the primary form of treatment for many mental disorders.[65] Dr. Seal performs the traditional role of a prison psychiatrist and manages medication.[66] Appropriate medications are prescribed and delivered to the offender—the primary form of treatment for most disorders.[67]

Once identified and seen by Dr. Seal, offenders with mental illness are followed by a dedicated mental health staff that includes a master's level psychologist and two social workers.[68] A treatment plan is created for each offender.[69] There has been no backlog for either psychiatric time or mental health clinician time from the filing of this case through the present day.[70] Despite plaintiffs' pleading to the contrary, plaintiffs' experts have no criticisms of Dr. Seal's medication management of the offenders on the South Compound.[71]

---

[64] Ex. 3, Burns dep., at pp. 40–42.

[65] Ex. 3, Burns dep., at p. 159.

[66] Ex. 3, Burns dep., at p. 159 ("Traditionally the primary role of a psychiatrist working in correctional facilities has been psychotropic medication management.")

[67] Ex. 3, Burns dep., at p. 177.

[68] Ex. 32, Thompson rep., at pp. 6–9.

[69] Ex. 19, EPM #3-02-003, at pp. 7–8.

[70] Ex. 1, Goodwin dec. at ¶ 4.

[71] Ex. 3, Burns dep., at p. 177.

14

### ii.   Mental health staff make regular rounds and assessments

The mental health clinicians make rounds at least weekly.[72] Plaintiffs' expert agrees that performing rounds on a weekly basis is appropriate.[73] In addition, offenders can request to see the mental health staff if the offender needs assistance.[74] Offenders can also be referred to the mental health staff by the medical staff, the security staff, or other offenders.[75] In these cases, mental health is notified, and a clinician goes to meet with the offender. At most, Plaintiffs can only complain about the level of documentation of the weekly rounds made by DWCC staff. This does not meet the stringent Eighth Amendment standards.

The DWCC mental health staff perform mental health assessments at least every 30 days for offenders with a "diagnosed behavioral health disorder and more frequently if clinically indicated."[76] Dr. Burns saw that these assessments were being performed.[77]

### iii.   Medication administration is sufficient

Medications are administered by pill call officers. Using correctional officers as pill call officers is appropriate.[78] There is no question that the formal training of the pill call officers is adequate.[79] Completion of medication administration records is difficult, and it is not unusual to see problems with medication administration records in correctional facilities.[80] Defendants acknowledge that the documentation may not be perfect, but any shortcomings certainly do not amount to an Eighth Amendment violation.

---

[72] Ex., 13, Robinson dep., at p. 160; Ex. 2, Burgos dep., at p.174; Ex. 9, Hayden dep., at p. 54–55.

[73] Ex. 3, Burns dep., at p. 149.

[74] Ex. 9, Hayden dep., at pp. 249–51; Ex. 4, Dauzat dep. (2/21/2019), at pp. 40, 75; Ex. 2, Burgos dep., at p. 32–33.

[75] Ex. 4, Dauzat dep. (02/21/2019), at p. 17 & 106; Ex. 9, Hayden dep., at p. 122.

[76] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 10.

[77] Ex. 3, Burns dep., at p. 155. The assessment used to be every 90 days. The assessments are now every 30 days consistent with the new ACA standard.

[78] Ex. 3, Burns dep., at p. 179.

[79] Ex. 3, Burns dep., at p. 179.

[80] Ex. 3, Burns dep., at p. 181.

### iv.    Individual counseling and programming are available

Individual counseling is provided by DWCC mental health staff to offenders housed in restrictive housing. Any offender who requests individual counseling, is provided that opportunity through cell front sessions, or, if needed, individual private sessions.[81] Offenders in restrictive housing have access to program materials such as anger management, substance abuse, sex offender treatment, and parenting.[82] These materials are provided to offenders in restrictive housing upon request.[83] If any follow-up, counseling, questions, or help is needed, the offender can speak to a clinician about the material. DOC's goal is to have the offender leave better than when they came to DOC.[84]

As the Fifth Circuit and a sister court in this circuit have noted, "[t]he Constitution . . . 'does not require that prisoners, as individuals or groups, be provided with any amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.'" *Dockery v. Hall*, 443 F. Supp. 3d 726, 748 (S.D. Miss. 2019) (*citing Newman v. State of Al.*, 559 F.2d 283, 291 (5th Cir. 1977)). Only "extreme deprivation" of one or more of the "minimal civilized measures of life's necessities" arise to a violation of the Eighth Amendment. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S. Ct. 2321, 2327 (1991)).

The *Dockery* court expressly held that expert opinions that offenders should "be given different types of mental health care and different types of medication, and that the security and mental health staff should interact with them in a different manner . . ." do not arise to the level necessary to violate the Eighth Amendment. *Dockery*, 443 F. Supp. 3d at 743.

---

[81] Ex. 2, Burgos dep., at p. 174; Ex. 4, Dauzat dep. (02/21/2019), at p. 39–41; Ex. 13, Robinson dep., at p. 126.
[82] Ex. 4, Dauzat dep. (02/21/2019), at p. 39–41; Ex. 9, Hayden dep., at pp. 126–27.
[83] Ex. 4, Dauzat dep., (02/21/2019), at p. 40–41.
[84] Ex. 15, Smith dep., p. 84.

### v.    DWCC fully complies with its obligation to prevent suicide.

Addressing the threat of suicide is an important part of providing mental health care. The Defendants have a duty to provide adequate protection against a prisoner's known suicidal impulses. *Anderson v. Dallas Cty. Texas*, 286 F. App'x 850, 857 (5th Cir. 2008); *Evans v. City of Marlin*, 986 F.2d 104, 107 (5th Cir. 1993). Defendants fully and appropriately comply with this obligation.

DWCC trains the correctional staff to identify suicide risk factors. Dr. Burns had no criticisms of that training.[85] Of course, as alluded to above, the Defendants track offenders with mental illness and make both medical and mental health rounds on the South Compound as addressed above.

If an offender is found expressing suicidal thoughts or taking suicidal actions, DWCC's mental health clinicians can order a suicide watch.[86] There is and needs to be a low threshold for initiating suicide watch.[87] It is better to err on the side of caution and initiate suicide watch rather than risk a completed suicide.[88] The mental health staff makes the decision to both initiate and terminate suicide watch.[89] Suicide watch at DWCC can either be "standard" or "extreme."[90] Offenders on suicide watch are seen for mental health concerns daily.[91]

DWCC does not have a problem with too many completed suicides.[92] In terms of the numbers, Plaintiffs' experts did not find that the number of suicide watches was disproportionate and found that the average length of a suicide watch at DWCC is consistent with the national

---

[85] Ex. 3, Burns dep., at p. 186.
[86] Ex. 4, Dauzat dep. (02/21/2019), at p. 65–66.
[87] Ex. 3, Burns dep., at p. 187.
[88] Ex. 3, Burns dep., at p. 187.
[89] Ex. 3, Burns dep., p. 189.
[90] Ex. 18, EPM #03-02-001. Dr. Burns' only criticism of extreme suicide watch was use of the steel restraints. Ex. 3, Burns dep., at p. 188.
[91] Ex. 3, Burns dep., at p. 189. Mental health staff see the offenders on suicide watch during the week. Nurses see offenders on suicide watch on the weekend.
[92] Ex. 3, Burns dep., at p. 200.

average.[93] Though the Plaintiffs have pleaded that Defendants use suicide watch as punishment, at Disability Rights' organizational deposition, it conceded that offenders were conflating the administrative option to prevent offenders from throwing substances on others or the tier—Offender Posted Policy 34—with suicide watch.[94]

Plaintiffs identified five persons as evidence for suicide watch being used as "targeted punishment"—Sean Francis, Larry Jones, Brian Covington, Joshua Musser, and Joshua Williams.[95] None of the five persons identified were punished with an inappropriate suicide watch.[96] The five persons ended up on a suicide watch at some point, but the Plaintiffs were unable to identify any facts supporting the allegation that the usage of suicide watch was inappropriate. Plaintiffs' cannot show that Defendants' suicide prevention policies or practices are violative of the Eighth Amendment.

### c.  DWCC appropriately uses restrictive housing to deliver public safety

The Fifth Circuit has held that solitary confinement/restrictive housing is not *per se* cruel and unusual punishment. *Novak v. Beto*, 453 F.2d 661, 665 (5th Cir. 1971); *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974); *LaVergne v. McDonald*, No. 19-709, 2020 WL 7090064 at *13 (M.D. La. 3/23/20).

The classification of inmates is a matter left to the broad general discretion of prison officials, and a failure to refer an inmate plaintiff for additional treatment, diagnostic testing or evaluation is a matter of professional medical judgment that the courts will not normally second-guess in the context of a claim of deliberate medical indifference. *Tasby v. Cain*, 2017 WL 4295441 at *9 (M.D. La. 9/12/17), *report and recommendation adopted* 2017 WL 4322413

---

[93] Ex. 3, Burns dep., at p. 202–03.

[94] Ex. 6, 3rd Disability Rights dep., at pp. 26–55. *See also* Ex. 24, Offender Posted Policy 34.

[95] R. Doc. 316 at ¶ 57.

[96] The five identified were either placed on Offender Posted Policy 34 for throwing items or had force used on them while on suicide watch. In one instance, Disability Rights claimed that Mr. Williams ended up on suicide watch because of other factors. Ex. 6, 3rd Disability Rights dep., at p. 50.

18

(M.D. La. 9/28/17); *Cuellar v. Livingston*, 321 Fed. Appx. 373, 374 (5th Cir. 2009) (upholding the dismissal of an inmate's claim as frivolous where he complained of a failure to refer him to a specialist, noting that "the question whether 'additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment,'").

Solitary confinement serves a legitimate purpose in the prison community as a deterrent and a punitive force. *Novak*, at 453 F.2d at 670. The Eighth Amendment imposes a duty upon prison officials to protect prisoners from violence at the hand of other prisoners. *Farmer*, 511 U.S. at 831-32; *see also Wilson*, 501 U.S. at 300, 303; *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981).

The Fifth Circuit also recognized the paramount concern of security in corrections, stating:

> It is beyond dispute, of course, that order must be maintained in the prisons. And when a prisoner continues to break prison rules even after losing such privileges as going to the movies and being assigned extra work, the authorities must have some harsher measure to induce compliance with prison regulations.

*Id.* It is undisputed that "prison officials are accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order. *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999); *Tasby*, 2017 WL 4295441, at *7.

Restrictive housing has been used for decades and is currently used in the overwhelming majority of prison systems in the country.[97] Dr. Burns agrees that it benefits general population offenders to remove offenders who are more severely anti-social from the general population.[98] The law and evidence overwhelming support the appropriate use of restrictive housing.

The Defendants use of restrictive housing is limited and appropriate. Restrictive housing in Louisiana is "limited to those circumstances which pose a direct threat to the safety of people

---

[97] Ex. 3, Burns dep. at p. 50–51.
[98] Ex. 3, Burns dep., at p. 55–57.

or a clear threat to the safe and secure operations of the facility."[99] The Defendants have also implemented a disciplinary matrix to help ensure consistency in discipline department-wide.[100] The disciplinary matrix provides sentencing parameters for offenders who are found guilty of rule violations, using factors like frequency and severity of the violation.[101] The Defendants screen offenders who are assigned to restrictive housing.[102] Mental health staff must clear an individual for placement in restrictive housing.[103]

Defendants take into account the mental health of offenders as they are assigned to restrictive housing. By policy, persons with mental illness may only be placed in segregated housing if 1) the offender is cleared by appropriate mental health staff and reviewed by a psychiatrist/psychologist at the earliest possible date; 2) the offender is not actively psychotic; and 3) less restrictive measures cannot assure the safety/security of the unit.[104] Dr. Burns agreed that this policy is appropriate.[105]

Once placed in restrictive housing, the mental health staff at DWCC follow-up with those individuals to make sure they are transitioning appropriately to the restrictive environment.[106] Mental health staff make weekly rounds in restrictive housing and provide one-on-one counseling.[107] Offenders can also request to see mental health staff themselves or be referred to mental health by any staff member or another offender.[108]

Louisiana's numbers of offenders in restrictive housing are well within the average across

---

[99] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 8.

[100] *See* Ex. 28.

[101] Ex. 28, DOC Dept. Reg. No. OP-C-1.

[102] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 8–9.

[103] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 9.

[104] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 8-9; Ex. 26, DOC Dept. Reg, No. B-02-019, at p. 6.

[105] Ex. 3, Burns dep., at pp. 100–04.

[106] Ex. 27, DOC Dept. Reg. No. IS-B-4, at p. 9–10.

[107] Ex., 13, Robinson dep., at p. 160; Ex. 2, Burgos dep., at p.174; Ex. 9, Hayden dep., at p. 54–55.

[108] Ex. 4, Dauzat dep., 02/21/2019, at pp. 17 & 106; Ex. 9, Hayden dep., at p. 122.

the country.[109] In fact, the Defendants have reduced their restrictive housing population from 19% in 2017 to roughly 4.8% in 2019.[110] The number of offenders in restrictive housing at DWCC has also decreased.[111] Finally, there is no evidence that Louisiana is keeping offenders in restrictive housing for longer periods of times than other facilities throughout the country.[112]

The very recent case of *Dockery* from the Southern District of Mississippi is instructive. In *Dockery*, the plaintiffs alleged that the East Mississippi Correctional Facility was keeping offenders with mental illness in restrictive housing and allowing them to "go days, and sometimes weeks, without being permitted any out-of-cell time." *Dockery*, 443 F. Supp. 3d at 733. The plaintiffs further alleged that there were "bright artificial lights around the clock" and a "vermin infestation." As in this case, Plaintiffs complained that placement in solitary confinement exacerbates symptoms of pre-existing mental illnesses and can increase the risk of suicide. *Id.* at 734.

In a striking similarity to the complaints in this case, the plaintiffs also alleged: (1) they receive little, if any, individual or group mental health treatment; (2) they are over-medicated with tranquilizing anti-psychotic medications; (3) the symptoms of their mental diseases are exacerbated by the conditions under which they are housed; and (4) they are subjected to disciplinary action if they attempt to seek help from the medical staff. The plaintiffs also made allegations of abuse and excessive force. *Id.* at 734.

As to mental health care, the court found:

> that Plaintiffs have failed to show that they, as members of a class or classes, are being denied constitutionally adequate medical care while housed at EMCF. While Plaintiffs and their expert witnesses have presented evidence to show that

---

[109] Ex. 30, Liman Survey, at pp. 9-10. See also Ex. 8, Haney dep., at pp. 40–41; Ex. 3, Burns dep., at pp. 80–81.
[110] Ex. 3, Burns dep., at pp. 80–81. The 4.8% number of offenders in restrictive housing is arguably 2.4% considering that DOC houses an equal number of offenders in local jails. Secretary LeBlanc testified that Louisiana was at the top of the list in reducing the use of restrictive housing. Ex. 11, LeBlanc dep., at p. 33.
[111] Ex. 3, Burns dep., at p. 82.
[112] Ex. 3, Burns dep, at p. 213; Ex. 8, Haney dep., at p. 165–166; Ex. 30, Liman Survey, at p. 12–14.

there have been times when the provision of medical care at EMCF was delayed or may not have been adequate, they have not shown that Defendants have acted with deliberate indifference to their medical needs on a class-wide basis. There is insufficient evidence that prisoners, as a class, are being refused treatment, having their medical problems ignored, or are intentionally being mistreated as is required to succeed on a Section 1983 claim.

*Id.* at 739–40.

As in this case, the plaintiffs alleged errors in medication administration records in support of class-wide claims of constitutional violations. The court found that to the extent the MARs reflect human error or poor record keeping, they do not amount to a violation of the Eighth Amendment. Further, the court noted that there was insufficient evidence that the class "suffered substantial harm as a result of the missed doses or delays. *Id.* at 740.

As to screening and treatment, the court found, on allegations very similar to the one's alleged here, that "challenges regarding the frequency, adequacy, and appropriateness of the mental health care being delivered at EMCF do not arise to level necessary to violate the Eighth Amendment." *Id.* at 743.

With regard to claims about use of restrictive housing and its purported harm on offenders, the court found as follows:

Kupers's testimony/opinion that a prisoner should not be held in solitary confinement for more than fifteen days does not create a benchmark for determining whether any constitutional rights have been violated. *See Rhodes*, 452 U.S. at 348, 101 S.Ct. 2392 (explaining that expert opinions regarding desirable prison conditions do not "suffice to establish contemporary standards of decency."). In addition, Plaintiffs have not shown that their being placed in solitary confinement was not justified, or that the conditions under which they are being confined are inhumane. Although Plaintiffs complain that they often do not get the five-hours-per-week recreation time, or the three showers-per-week as prescribed by EMCF policy, longer periods of continuous cell time have been found constitutional. *See e.g. Hernandez v. Velasquez* 522 F.3d 556, 561-62 (5th Cir. 2008)(finding that the denial of recreation time for a thirteen-month period had not violated the prisoner's constitutional rights).

*Id.* at 743.

Finally, as to use of force, the court found that the defendants had not acted with deliberate indifference as to risk of harm when force is used as the defendants had regular training and a review of all uses of force. *Id.* at 745.

In total, the court in *Dockery* dismissed all of the plaintiffs claims in favor of defendants in conditions that are described as much worse than the conditions in the instant case. The Defendants respectfully submit that this Honorable Court should reach the same conclusion as its sister court in *Dockery*.

### d. The evidence negates any suggestion that Defendants are subjectively indifferent to Plaintiffs' serious mental health needs.

The evidence overwhelming negates any argument that the Defendants are subjectively indifferent to the Plaintiffs' serious mental health needs.[113] DOC and DWCC are ACA accredited and use the ACA standards to develop its policies.[114] DOC reviews its policies annually and finished a complete review of its policies in 2020.[115]

The Defendants have taken and continue to take steps in the responsible use of restrictive housing and treatment of mental illness. Here are some of the measures the Defendants have undertaken to address the mental health needs of its offenders:

- DWCC has a contract psychiatrist and is increasing his time at the facility from 16 hours a month to 32[116]

- DWCC has retained a forensic psychologist to provide up to an additional 32 hours of clinical time a month at the facility.[117]

- DWCC employs a full-time mental health staff consisting of a masters' level psychologist, two masters' level social workers, and a licensed counselor.[118]

- The Defendants twice screen offenders for mental illness, once at intake at EHCC

---

[113] Ex. 1, Goodwin dec. at ¶¶ 12–14.
[114] Ex. 11, LeBlanc dep., at p. 25; Ex. 15, Smith dep., at p. 97. The ACA audits the DOC facilities every three years.
[115] Ex. 11, LeBlanc dep., at p. 25.
[116] Ex. 1, Goodwin dec. at ¶ 9.
[117] Ex. 1, Goodwin dec. at ¶ 10.
[118] Ex. 32, Thompson rep., at pp. 6-9

and a second time at the offenders' arrival at DWCC.[119]

- DWCC provides appropriate medication to offenders in restrictive housing.[120]

- DWCC provides individual counseling to offenders in restrictive housing.[121]

- The Defendants have reduced their usage of restrictive housing and promulgated new policies and practices, including DOC Reg. IS-B-4.[122]

- DWCC clears offenders with mental illnesses before housing them in restrictive housing.[123]

- DWCC follows up with offenders in restrictive housing to ensure they are adjusting appropriately.[124]

- DWCC offers multiple channels of access to its mental health staff, including weekly rounds, sick call, security referrals, correspondence with the mental health department, and other offender referrals.[125]

- The Defendants maintain and execute a reasonable suicide watch policy.[126]

- The Defendants fulfill their obligation to keep general populations offenders secure by removing offenders who are violent and refuse to follow the institutional rules.[127]

- DWCC provides offender orientation where it informs offenders of the various options available to them with regard to their mental health concerns.[128]

- DWCC has added two additional mental health positions—one for a master's level social worker and one for a licensed counselor—which it is currently trying to fill.[129]

- DWCC provides classification reviews to its offenders to ensure they are housed at the proper custody level based on the offenders' disciplinary history, security risk profile, and the seriousness of the offenders' institutional offenses.[130]

---

[119] Ex. 32, Thompson rep., at pp. 9–12.

[120] Ex. 3, Burns dep., at p. 177.

[121] Ex. 2, Burgos dep., at p. 174; Ex. 4, Dauzat dep. (02/21/2019), at p. 39–41; Ex. 13, Robinson dep., at p. 126.

[122] Ex. 11, LeBlanc dep., at pp. 32 & 33; Ex. 30, Liman Survey.

[123] Ex. 27, DOC Dept. Reg. No. IS-B-4, at pp. 9–10; Ex. 7, Goodwin dep., at pp. 74–75.

[124] *See, e.g.*, Ex. 27, DOC Dept. Reg. No. IS-B-4.

[125] Ex. 4, Dauzat dep. (02/21/2019), at pp. 17 & 106; Ex. 9, Hayden dep. at p. 122.

[126] *See supra*, Section (v) on pp. 17–19 herein.

[127] Ex. 3, Burns dep., at p. 55–57.

[128] Ex. 13, Robinson dep., at p. 103.

[129] Ex. 1, Goodwin dec. at ¶ 11.

[130] Ex. 10, Jimerson dep., at pp. 133 & 146.

Considering the extensive undertakings by the Defendants, there is no showing of subjective belief of serious harm.

## III. CONCLUSION

Defendants are entitled to summary judgment considering that there is neither an objective or subjective belief of serious harm. Considering the conditions of confinement and the treatment given to offenders at DWCC, the Defendants are entitled to summary judgment. As this summary judgment is on the merits, it moots the injunction request as it would negate the Plaintiffs' ability to demonstrate likelihood of success on the merits on its Eighth Amendment claims. The Defendants respectfully request that this Court grant the motion as prayed for.

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW, LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By: /s/ Randal J. Robert
      Randal J. Robert (#21840)
      Connell L. Archey (#20086)
      Keith J. Fernandez (#33124)
      *Special Assistant Attorneys General*
      Email: randy.robert@butlersnow.com
            connell.archey@butlersnow.com
            keith.fernandez@butlersnow.com

Counsel for Defendants

## CERTIFICATE OF SERVICE

    I hereby certify that on the 18th day of June 2021, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

_/s/ Randal J. Robert_____

Randal J. Robert

58751014.v1