UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself and all other similarly situated prisoners at David Wade Correctional Center, | * | CIVIL ACTION NO.: |
| | * | 5:18-CV-00541-EEF-MLH |
| | * | |
| | * | JUDGE ELIZABETH E. FOOTE |
| | * | |
| and | * | |
| | * | |
| The ADVOCACY CENTER, | * | |
| | * | USMJ MARK L. HORNSBY |
| PLAINTIFFS, | * | |
| | * | |
| VS. | * | CLASS ACTION |
| | * | |
| JAMES M. LEBLANC, *et al.*, | * | |
| | * | |
| DEFENDANTS. | * | |

**PLAINTIFFS' REPLY TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING EIGHTH AMENDMENT CLAIMS**

**TABLE OF CONTENTS**

**I.    SUMMARY JUDGMENT LEGAL STANDARD** ........................................................... 4

  **A.  Summary Judgment Standard** .................................................................................. 4

  **B.  Defendants' Motion is Reliant on Inadmissible Evidence** ............................................ 6

**II.   EIGHTH AMENDMENT LEGAL STANDARD** ........................................................... 12

  **A.  Subjective Deliberate Indifference** ............................................................................ 12

  **B.  Conditions at David Wade Pose a Substantial Risk of Serious Harm** ........................ 14

**III.  ARGUMENT** ................................................................................................................ 17

  **A.  Inadequate Mental Health Care Creates A Substantial Risk Of Serious Harm** ....... 18

    1.   Defendants do not appropriately identify or diagnose mental illness, creating a substantial risk of serious harm. ............................................................................................ 18

      a)   Intake screening creates a substantial risk of serious harm by failing to appropriately identify and diagnose mental illness ...................................................................... 18

      b)   Security staff do not play any role in identifying and diagnosing mental illness, creating a substantial risk of serious harm. ................................................................. 19

c)   Mental health staff create a substantial risk of serious harm by failing to appropriately identify and diagnose mental illness on an ongoing basis. ........................ 20

   (1)   *Mental health staff do not conduct regular or effective rounds to check on people, creating a substantial risk of serious harm.* ................................................... 21

   (2)   *The rounds that are conducted lack privacy, which results in a substantial risk of serious  harm.* ........................................................................................... 23

   (3)   *Mental health staff do not adequate evaluation of people's mental health, resulting in a substantial risk of serious harm.* .......................................................... 24

2.   Defendants do not appropriately provide treatment for mental illness, resulting in suffering and injury to the men at David Wade and creating a substantial risk of serious harm. ...................................................................................................................... 26

   a)   Mental health staffing is inadequate, creating a substantial risk of serious harm..... 26

   b)   Psychiatric staffing is inadequate, creating a substantial risk of serious harm. ........ 28

   c)   There are no mental health treatment plans, creating a substantial risk of serious harm. ..................................................................................................................... 29

   d)   No treatment or programming is available to individuals housed on extended lockdown other than medication, creating a substantial risk of serious harm. ................ 33

3.   Defendants' medication policies are extremely dangerous, creating a substantial risk of serious harm. ............................................................................................................ 41

   a)   Medication not continued upon arrival at DWCC creating a substantial risk of serious harm. .................................................................................................................. 41

   b)   Defendants' medication administration policies create a substantial risk of serious harm. ..................................................................................................................... 42

4.   David Wade does not respond to decompensation or mental health crisis, resulting in actual harm and creating a substantial risk of serious harm. .................................................. 51

5.   DWCC's suicide prevention policies create a substantial risk of serious harm. .......... 61

**B.   Inadequate Record Keeping At DWCC Creates A Substantial Risk Of Serious Harm** ............................................................................................................................ 66

**C.   The Brutal and Isolated Conditions of Confinement at David Wade Create a Substantial Risk of Serious Harm** ..................................................................................... 67

   1.   Defendants' Policy 34 creates a substantial risk of serious harm. ............................... 67

   2.   Defendants' excessive use of force and staff abuse of people with SMI creates a substantial risk of serious harm. ............................................................................................ 69

   3.   Defendants' prolonged use of solitary confinement poses a substantial risk of serious harm. ..................................................................................................................... 77

**IV.   CONCLUSION** .......................................................................................... 81

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 25 (1986) .................................................. 6

*Arkansas Right to Life State Political Action Committee v. Butler*, 983 F. Supp. 1209 at 1215 (W.D. Ark. 1997) .................................................................................................................. 5

*Bell v. Wolfish,* 441 U.S. 520, 539(1979). ........................................................................... 12

*Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005). ........................................ 9

*Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1263 (M.D. Ala. 2017) .................................. 10, 11, 17

*Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967) .......................................... 5

*Calhoun v. DeTella,* 319 F.3d 936, 940 (7th Cir. 2003) ....................................................... 14

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ........................................................... 5, 6

*Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) ................................................. 14

*Clorox v. Proctor & Gamble*, 228 F.3d 24, 31 (1st Cir. 2000) ............................................... 9

*Cope v. Cogdill*, 2021 WL 2767581, at *5 (5th Cir. July 2, 2021) ........................................ 6

*Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) ............................................................ 4

*Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994) .................................................... 12, 13, 14

*First Nat. Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 288 (1968) ................................. 6

*Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) ..................................................... passim

*Hacker v. Cain*, No. 3:14-00063-JWD-EWD, 2016 WL 3167176, at *10 (M.D. La. June 6, 2016) ...................................................................................................................................... 12

*Helling v. McKinney,* 509 U.S. 25, 33 (1993) ..................................................................... 14

*Hernandez v. Cremer*, 913 F.2d 230, 235 (5th Cir. 1990) .................................................. 10

*Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015) ................................................ 13

*Hope v. Pelzer*, 536 U.S. 730 (2002) .................................................................................. 12

*Hudson v. McMillian*, 503 U.S. 1, 4 (1992) ....................................................................... 17

*Hulsey v. State of Tex.*, 929 F.2d 168, 170 (5th Cir. 1991) .................................................. 4

*Hutto v. Finney,* 437 U.S. 678, 686–872 (1978) .................................................................. 16

*Jackson v. Cain*, 864 F.2d 1235, 1241 (5th Cir. 1989) ......................................................... 5

*K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013) ........................................................... 11

*Kennedy v. Silas Mason Co*., 334 U.S. 249, 256 (1948) ....................................................... 5

*Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000) ................................. 16

*Macklin v. Butler*, 553 F.2d 525, 529 (7th Cir. 1977). ......................................................... 9

*Madrid v. Gomez,* 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995) ...................................... 17

*McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012) ................................................... 4

*Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir. 1987) ......................................... 15, 16

*Muhammad v. Crews*, No. 4:14CV379-MW/GRJ, 2016 WL 3360501, at *6 n.5 (N.D. Fla. June 15, 2016) ....................................................................................................................... 11

*Murrell v. Bennett*, 615 F.2d 306, 311 (5th Cir.1980) ......................................................... 5

*Nat'l Ass'n of Bds. of Pharm. v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1308–09 (11th Cir. 2011) ................................................................................................... 11

*Orsi v. Kirkwood*, 999 F.2d 86, 91 (4th Cir. 1993) ............................................................. 10

*Partridge v. Two Unknown Police Officers of City of Houston, Texas*, 791 F.2d 1182, 1187 (5th Cir. 1986) ............................................................................................................... 12, 15

*Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ........................................................ 16

*Rhodes v. Chapman,* 452 U.S. 337, 347 (1981) ............................................................. 14, 15

Case 5:18-cv-00541-EEF-MLH   Document 419-2   Filed 07/13/21   Page 4 of 82 PageID #: 16356

*Ruiz v. Johnson,* 37 F.Supp.2d 855, 914 (S.D.Tex.1999),........................................................... 15

*Russell v. Lundergan–Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015)...................................... 11

*Triple Tee Golf, Inc. v. Nike, Inc.,* 485 U.S. 253, 261 (5th Cir. 2007) ..................................... 5, 6

*Whitley v. Albers,* 475 U.S. 312, 319 (1986) .............................................................................. 12

*Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007) ......................................... 15, 16

*Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977)................................................... 16

*Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015)............................................................ 12

*Wilson v. Seiter*, 501 U.S. 294, 305 (1991)................................................................................... 16

**Rules**

Rule 56(a)............................................................................................................................................ 8

Rule 56(c)..................................................................................................................................... 6, 9

**Treatises**

10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL
    PRACTICE AND PROCEDURE CIVIL § 2732 (3d. ed. 2007)................................................. 5

## FACTUAL BACKGROUND

Plaintiffs file this Reply to Defendants' Motion for Summary Judgment Regarding Eighth Amendment Claims. Plaintiffs incorporate the accompanying Statement of Disputed Material Facts. As outlined, Defendants' motion should be denied and this matter should proceed to trial.

## LAW AND ARGUMENT

### I.    SUMMARY JUDGMENT LEGAL STANDARD

#### A.    Summary Judgment Standard

Summary judgment is appropriate only if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hulsey v. State of Tex.*, 929 F.2d 168, 170 (5th Cir. 1991). The court construes "'all facts and inferences in the light most favorable to the nonmoving party.'" *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012) (quoting *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010)). Because summary judgment is a final adjudication on the merits, courts must employ this device cautiously. *Murrell v. Bennett*, 615 F.2d 306, 311 (5th Cir.1980); *see also Jackson v. Cain*, 864 F.2d 1235,

1241 (5th Cir. 1989); *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967). ("Summary judgment is a lethal weapon, and courts must . . . beware of overkill in its use.").

A "series of Supreme Court decisions" indicate that "summary judgment may not be appropriate in complicated and important litigation." 10B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE AND PROCEDURE CIVIL § 2732 (3d. ed. 2007), *see*, e.g., *Kennedy v. Silas Mason Co*., 334 U.S. 249, 256 (1948) (warning against using summary judgment "for deciding issues of far-flung import"). In particular,

> [c]ases premised on alleged violations of the constitutional or civil rights of plaintiffs frequently are unsuitable for summary judgment. As is true with other cases involving important public issues, courts may refuse to grant summary judgment in these actions because it is felt that a fuller record is necessary in order to be able to decide properly the issues involved. Further, the very nature of the claims involved often presents factual issues that require summary judgment to be denied.

10B WRIGHT & MILLER, supra, at § 2732.2. *See, e.g., Arkansas Right to Life State Political Action Committee v. Butler*, 983 F. Supp. 1209 at 1215 (W.D. Ark. 1997) (denying summary judgment in part because, "in cases premised on alleged violations of a person's constitutional rights, summary judgment may be inappropriate").

The movant always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007).

A non-movant need not carry the burden of proving their case. *First Nat. Bank of Ariz. v. Cities Serv. Co*., 391 U.S. 253, 288 (1968); *see Cope v. Cogdill*, 2021 WL 2767581, at *5 (5th Cir. July 2, 2021). Rather, a non-movant can defeat summary judgement by setting forth specific facts

showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 25 (1986); *see also Triple Tee Golf, Inc.*, 485 F.3d 253 at 261. Rule 56(c) requires that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth. *Anderson,* 477 U.S. at 248–49; *see Cope,* 2021 WL 2767581, at *2. Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves. *Celotex*, 477 U.S. at 324. However, a Rule 56 motion cannot be premised on facts that are inadmissible (Fed. R. Civ. Proc. 56(c)(2) and 56(c)(4)), as Defendants' is. As demonstrated by the enormous volume of evidence in support of Plaintiffs' position cited below, conditions at David Wade Correctional Center violate the Eighth Amendment to the Constitution.  Summary judgment is inappropriate and this case must proceed to trial.

### B.    Defendants' Motion is Reliant on Inadmissible Evidence

On October 27, 2020, this Court entered an Order granting in part the Plaintiffs' Motion in Limine to limit the evidence for trial in this matter as of March 15, 2020.[1] Plaintiffs filed that motion because otherwise discovery in this case would be never-ending and the parties could not proceed to an orderly trial. In its decision, the Court provided a method by which the Defendants could introduce evidence regarding changes to their policies or procedures through a motion to the Court, to be submitted by August 10, 2021.[2] As of the date of this filing, no such motion has been

---

[1] Rec. Doc. 378 ("Plaintiff's motion, Record Document 336, was GRANTED in part and DENIED in part. The Court will limit the evidence at trial to conditions as they existed prior to March 15, 2020. However, the Court will entertain a motion to introduce additional evidence, as outlined above." (The Court's procedure to admit additional evidence is outlined here in FN 2)).

[2] *Id*. ("Defendants shall file a motion to have the Court consider additional evidence at trial by August 10, 2021. This motion must be limited to evidence regarding changes to policies and procedures occurring after March 15, 2020. The motion should include updated expert reports, a list of evidence of changed policies and procedures Defendants wish to present, and the names of any witnesses Defendants would like to testify regarding these changes. Defendants shall describe the testimony they expect any witnesses to give at trial in sufficient detail for the Court to determine whether the evidence is relevant and worthwhile to justify an additional discovery period. If the motion is not sufficiently detailed, the Court may deny Defendants' request.").

submitted in this case. Instead Defendants' have asserted new policies and facts as "undisputed facts" in this motion for summary judgment.

Specifically, Defendants point to a number of developments at David Wade that were allegedly implemented March 2021, *one full year after the limit for evidence in this case*.[3] The assertions not only disregard this Court's Order but they have not been subject to discovery by Plaintiffs; these assertions were not included in deposition testimony by fact or expert witnesses and have not been the subject of cross-examination by Plaintiffs. Disputed statements relying completely on evidence outside of this Court's Scheduling Order include, most importantly, the assertion that David Wade has fully implemented a new disciplinary and classification policy promulgated by the Department of Corrections.[4] Specifically, the allegations of new facts presented as undisputed facts include:

> 16. The key to progressing out of a restrictive housing status is demonstrating that the offender is less of a threat to other offenders, the staff, and the public.
> 17. An offender in preventative segregation is reviewed every 60-days by a multidisciplinary review board that includes a mental health clinician.[5]
> 18. When an offender is placed in restrictive housing, he is afforded a phone call within 24-hours of that placement.[6]
> 19. Offenders undergo a mental health appraisal within 7-days of assignment to restrictive housing.[7]
> 20. Offenders in restrictive housing are given a minimum of two personal phone calls a month.

---

[3] *Id*; Rec. Doc. 414-1.

[4] *See* Rec. Doc. 414-1 referencing DOC Dept. Reg. No. IS-B-4; Rec. Doc. 414-3 Declaration of Warden Jerry Goodwin.

[5] Every deposition conducted by Plaintiffs on this point indicated that the classification review board reviews occurred every ninety days, and that was supported by the review board documents reviewed by Plaintiffs in discovery. The Board was comprised of the head of South Compound and a representative from Classification. It was not "multi-disciplinary" in nature and did not include any representative of the mental health department. *See* Exh. 1, Deposition of Lonnie Nail 156:11-13, 159:12-14, 159:23-160:4; Exh. 2, Deposition of Kayla Sherman 116:2-8; Exh. 3, Deposition of Rodney Long 101:18-21. ALL of the evidence made available to the Plaintiffs points to this fact as being flatly false.

[6] This provision is apparently contained in a written policy adopted March 2021, a full year after close of fact discovery in this matter. The policy actually in effect during discovery had no such provision.

[7] *Id.*

22. No offender in restrictive housing has been denied visitation because of his classification, a lack of space, or a backlog of any sort.[8]

24. As of March of 2021, the majority of offenders in restrictive housing -- 140 out of 234 -- had been in that status for less than 6 months.

25. Offenders with a mental health diagnosis defined by the DOC as a "Serious Mental Illness" ("SMI") must be cleared by the mental health department before being placed in segregated housing.

26. A behavioral health assessment by a mental health provider is completed at least every 30 days for offenders with a "diagnosed behavioral health disorder and more frequently if clinically indicated.

27. Offenders in restrictive housing with no mental illness are reviewed at least every 60 days by a multidisciplinary board, including a mental health clinician, to move them to the least restrictive appropriate environment.[9]

28. Offenders identified by DOC as having a diagnosed behavioral health disorder are reviewed every 30 days by a mental health professional to ensure these offenders are not decompensating in any way, and that the offender's housing is proper.

32. DWCC has added two additional mental health positions -- one for a master's level social worker and one for a licensed counselor -- which it is currently trying to fill.

The points made by Defendants in their statement of facts numbering 4-11, 13-20, 22-32 are also disputed.[10]

Although declarations by the moving party are admissible under Rule 56(a), the declaration of Warden Goodwin in the Defendants' motion presents evidence that has been explicitly excluded by the Court in this case. His declaration includes allegations of changed policies and conditions including some matters that are very important to the case: changed numbers of people housed on extended lockdown (paras. 2 and 6), and alleging increased psychiatrist, psychologist and mental health contracts (paras. 9 - 11) to provide care for patients. The presentation of significant new

---

[8] When Bruce Charles was on hunger strike and placed on standard suicide watch in extended lockdown, he was denied a visit from his aunt. Deposition of Bruce Charles 93:4-8. Further, visitation for the South Compound is on a first come, first serve basis therefore denial of visitation is always a possibility and the restriction of visiting privileges is not considered a disciplinary penalty, but recommendations to restrict may be made by classification. *See* Exh. 4, 2020-2-28, EPM 02-04-008 Offender Visiting.

[9] Rec. Doc. 414-1 p. 4-5; *See* fn. 5; moreover, there is in fact no "review board." Classification status is evaluated on the papers such that prisoners are never allowed to attend and simply receive a paper notifying them of the board's decision in the mail. There is no "live board," much less an interdisciplinary one; *Supra* at Fn. 5 *see e.g.* Exh. 5, Deposition of Shawn Francis 17.

[10] Rec. Doc. 414-1.

facts at this stage of the proceedings that fall outside of the scope of this Court's temporal order is a clear attempt at unfair surprise.

Fed. R. Civ. Pro. is clear that an affidavit "used to support… a motion must… set out facts that would be admissible in evidence…." Fed. R. Civ. Pro. 56(c)(4). A party may object "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. Pro. 56(c)(2). Plaintiffs so object, and ask this Court to exclude from consideration in this motion any facts or evidence developed after the Court's evidentiary cutoff date of March 15, 2020. Defendants' attempt to introduce new facts—and to present them as undisputed-- runs afoul of the Court's Order and also is an attempt to create an unfair advantage in this proceeding.

Although Plaintiffs have repeatedly asked, Defendants have flatly asserted that they have no ongoing obligation to supplement discovery in this matter. Rather, the majority of the discovery supplementation received by Plaintiffs has been the result of court intervention and orders for Defendants' production. Therefore, Plaintiffs have no written discovery in this matter dated later than November 2020. Deposition testimony only allowed Plaintiffs to traverse conditions at the prison up until March 2020. Summary judgment should not be granted where it may be the result of unfair surprise. *See Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005); *Clorox v. Proctor & Gamble*, 228 F.3d 24, 31 (1st Cir. 2000); *Macklin v. Butler*, 553 F.2d 525, 529 (7th Cir. 1977). In considering a motion for summary judgment, courts have a duty to "ensure . . . that neither side in a dispute [has] unfairly surprise[d] the other with evidence that the other has not had time to consider." *Orsi v. Kirkwood*, 999 F.2d 86, 91 (4th Cir. 1993).

Defendants are presenting conditions that have allegedly changed since the close of discovery in this matter as though these supposed changes are undisputed facts, rather than

litigating on the records in this matter. This is precisely why Plaintiffs sought the limiting order it did from the Court; with Defendants refusing to supplement discovery, and with the practical burdens on this Court of attempting to discern the truth based upon an already voluminous record, there is no possibility of an orderly trial unless facts are cabined by discovery. Defendants' current motion attempts to end-run the Court's order and the basic rules of Federal Civil Procedure and would signal a return to "trial by ambush."

Any possible prejudice to the Defendants in forcing them to go to trial on the record already established is easily outweighed by the burden on the Plaintiffs and the Court in never-ending discovery. Even assuming *arguendo* that Defendants have modified all of the relevant conditions at the prison (a point clearly contested by Plaintiffs) injunctive relief would still be appropriate based upon the substantial and recalcitrant record of rights' violations committed by the Defendants in this matter, and Plaintiffs deserve a trial on that issue.

> [V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, (1953). See *Defunis v. Odegaard*, 416 U.S. 312, 317–18, (1974). Denial of injunctive relief might leave the INS "free to return to [its] old ways." *W.T. Grant*, 345 U.S. at 632, 73 S.Ct. at 897. "It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption." *United States v. Oregon State Medical Societ*y, 343 U.S. 326, 333 (1952).

*Hernandez v. Cremer*, 913 F.2d 230, 235 (5th Cir. 1990), *see also Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1263 (M.D. Ala. 2017) (rejecting defendant's assertion during trial that they have begun to remedy the inadequacies, holding the Plaintiff's claims were not moot and therefore suitable for resolution by the court). "The Eleventh Circuit, along with the Fifth Circuit and the Sixth Circuit, has suggested that a threat of recurrence sufficient to render a claim not moot should also be sufficient for the ongoing-violation requirement." *Id.* at fn 92, *see Nat'l Ass'n of Bds. of Pharm. v.*

*Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1308–09 (11th Cir. 2011) (treating a dispute regarding whether the plaintiff alleged an ongoing violation as a mootness inquiry); *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013) (rejecting the contention that a non-moot claim did not meet the ongoing-violation requirement, because "[that] theory, if accepted, would work an end-run around the voluntary-cessation exception to mootness where a state actor is involved"); *Russell v. Lundergan–Grimes*, 784 F.3d 1037, 1047 (6th Cir. 2015) ("[A]t the point that a threatened injury becomes sufficiently imminent and particularized to confer Article III standing, that threat of enforcement also becomes sufficient to satisfy ... *Ex parte Young*."); *see also Muhammad v. Crews*, No. 4:14CV379-MW/GRJ, 2016 WL 3360501, at \*6 n.5 (N.D. Fla. June 15, 2016) (Walker, J.) (summarizing the case law)."

Plaintiffs ask this Court to find as "contested facts" the assertions of Defendants purporting changed conditions at David Wade. At the core of this case is Plaintiffs' contention that Defendants do not provide adequate mental health care, and that Defendants house men in conditions of extreme isolation and brutality, which operate together to create conditions posing a serious risk of harm to the men at David Wade. Through discovery, Plaintiffs have unearthed hundreds of documents and pages of testimony that confirm their initial allegations and that paint a clear picture of a prison being unconstitutionally operated by the Defendants, to the grave detriment of the people housed there. Plaintiffs believe that they will prevail at trial. But for the purposes of the instant motion, there are numerous points of material fact for which plentiful evidence favorable to the Plaintiffs exists, such that Defendants' motion for summary judgment should be denied. The Plaintiffs should be allowed to proceed to trial with their request for relief from this Court.

## II.     EIGHTH AMENDMENT LEGAL STANDARD

The conditions of confinement at David Wade Correctional Center violate the Eighth Amendment to Constitution. Although people are sent to prison as punishment, the prison environment itself may not be so brutal or unhealthy as to be in itself a punishment. *Bell v. Wolfish,* 441 U.S. 520, 539(1979). "[T]he unnecessary and wanton infliction of pain... constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hope v. Pelzer,* 536 U.S. 730 (2002), *citing Whitley v. Albers,* 475 U.S. 312, 319 (1986).

Plaintiffs asserting a claim of cruel and unusual conditions of confinement under the Eighth Amendment must prove that prison officials "1) show[ed] a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate." *Gates v. Cook*, 376 F.3d 323, 333 (5th Cir. 2004) (citing *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994)).

### A.     Subjective Deliberate Indifference

The subjective component of the deliberate indifference standard inquires into whether prison officials knew of a risk of harm. *Farmer*, 511 U.S. at 848. This requires a state of mind amounting to recklessness as used in criminal law. *Williams v. Hampton*, 797 F.3d 276, 281 (5th Cir. 2015) (en banc) (citing *Farmer*, 511 U.S. at 839–40); see also *Hacker v. Cain*, No. 3:14-00063-JWD-EWD, 2016 WL 3167176, at *10 (M.D. La. June 6, 2016) ("An intent to harm or animus towards a particular inmate is not itself required so long as such reckless disregard for his or her medical needs can be shown."). Mental health needs are no less serious than physical health needs in this context. *Partridge v. Two Unknown Police Officers of City of Houston, Texas*, 791 F.2d 1182, 1187 (5th Cir. 1986).

Systemic deficiencies in a prison's health-care system can provide the basis for a finding of deliberate indifference at an institutional level. See *Gates*, 376 F.3d at 333.  The fact that a risk

is obvious is sufficient evidence to allow a fact finder to conclude that prison officials knew of the risk. *Farmer*, 511 U.S. at 842; *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015); *Gates*, 376 F.3d at 333. Plaintiffs may also demonstrate knowledge through inference from circumstantial evidence. *Farmer*, 511 U.S. at 842. If there is proof of a problem that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Hinojosa*, 807 F.3d at 665 (quoting *Farmer*, 511 U.S. at 842-43) (internal quotation marks omitted). Finally, willful blindness to the risk posed to inmates is not a valid defense to a deliberate indifference claim. See *Farmer*, 511 U.S. at 843 n.8 (a prison official "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

Defendants do not identify the subjective deliberate indifference component as an uncontested material fact in this proceeding.[11] Neither do they dispute the Defendants' subjective knowledge of conditions or risk of harm in their supporting brief.[12] Instead, Defendants' motion is premised on an argument that the objective facts indicate that Defendants "are affirmatively identifying, diagnosing, and treating mental health while making appropriate and necessary use of restrictive housing."[13] Defendants' statement of uncontested fact and memoranda in support of their motion do not offer any argument as to the knowledge or lack thereof of the Defendants, and moves directly to a defense premised on the Defendants not having the requisite deliberate

---

[11] Rec. Doc. 414-1.
[12] Rec. Doc. 414-2.
[13] Rec. Doc. 414-2 at 12.

indifference because they did not operate unconstitutional conditions of confinement. Plaintiffs can demonstrate requisite subjective deliberate indifference on the part of the Defendants, based upon the jurisprudence outlined *supra*. Plaintiffs dispute that the conditions at David Wade do not pose a substantial risk of serious harm to the men housed there, and dispute Defendants' allegation that they "are affirmatively identifying, diagnosing, and treating mental health while making appropriate and necessary use of restrictive housing."[14]

### B.    Conditions at David Wade Pose a Substantial Risk of Serious Harm

To determine if prison conditions satisfy the Eighth Amendment's objective component "[t]he deprivation alleged must be, objectively, sufficiently serious.... [T]he inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834 (internal quotation marks and citations omitted). Additionally, the Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 33 (1993) (quotation marks omitted). Courts ask whether the conditions are contrary to "the evolving standards of decency that mark the progress of a maturing society," *Farmer,* 511 U.S. at 833–34, or whether the incarcerated person has been denied "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981). These standards are not static. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).

The Eighth Amendment not only protects against risk of harm to prisoners' physical health, but also protects mental health care as a basic human need of which incarcerated people cannot be deprived. *See, e.g., Calhoun v. DeTella,* 319 F.3d 936, 940 (7th Cir. 2003); *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir. 1987); *Gates*, 376 F.3d at 343, *citing Partridge,* 791 F.2d at 1187. "The same standards that protect against physical torture prohibit mental torture as well—

---

[14] Rec. Doc. 414-1.

including the mental torture of excessive deprivation." *Ruiz v. Johnson,* 37 F.Supp.2d 855, 914 (S.D.Tex.1999), *rev'd on other grounds,* 243 F.3d 941 (5th Cir.2001), *adhered to on remand,* 154 F. Supp. 2d 975 (S.D. Tex. 2001). The *Ruiz* court, finding that prisoners had been subjected to "a systemic pattern of extreme social isolation and reduced environmental stimulation," described the evolving standards of decency recognizing psychological pain as follows:

> In the past, courts faced with horrendous conditions of confinement have focused on the basic components of physical sustenance—food, shelter, and medical care. *See Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). More recently, in light of the maturation of our society's understanding of the very real psychological needs of human beings, courts have recognized the inhumanity of institutionally-imposed psychological pain and suffering. As the Third Circuit stated, "[t]he touchstone is the health of the inmate. While the prison administration may punish, it may not do so in a manner that threatens the physical and *mental health* of prisoners." *Young,* 960 F.2d at 364 (emphasis added).

*Ruiz*, 37 F. Supp. 2d at 914.

Like mental health care, social interaction and environmental stimulation are basic human needs.

> The failure to identify them [as such] would be inconsistent with jurisprudence recognizing mental health as worthy of Eighth Amendment protection, and the requirement  that Eighth Amendment protections  change to reflect 'evolving standards of decency that mark the progress of a maturing society.' . . . In *Ruiz,* the district court found that the defendants were "deliberately indifferent to a systemic pattern of extreme social isolation and reduced environmental stimulation," and social interaction and environmental stimulation have been identified as basic psychological human needs, either directly or indirectly, by other courts.

*Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007); *citing Ruiz,* 37 F. Supp. 2d at 855, *Rhodes,* 452 U.S. at 346.

The Eighth Amendment analysis is a very fact-based, institution-specific inquiry wholly dependent upon the combination of facts presented in a given case. "Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single,

identifiable human need . . . .". *Gates*, 376 F.3d at 333. Although certain conditions standing alone might not rise to the level of a constitutional violation, a combination of conditions having a "mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth or exercise—for example, a low cell temperature at night combined with a failure to issue blankets," may state a claim under the Eighth Amendment. *Wilkerson,* 639 F. Supp. 2d at 679; *citing Wilson v. Seiter*, 501 U.S. 294, 305 (1991). Similarly, both the Supreme Court and the Fifth Circuit have recognized that certain conditions that would pass constitutional scrutiny if imposed for a short period of time may be rendered unconstitutional if imposed for an extended period of time. *Wilkerson*, 639 F. Supp. 2d at 679, *citing Gates,* 376 F.3d at 333, *Hutto v. Finney,* 437 U.S. 678, 686–872 (1978), *see also Meriwether,* 821 F.2d at 416 ("[T]he duration of a prisoner's confinement in administrative segregation or under lockdown restrictions is certainly an important factor in evaluating whether the totality of the conditions of confinement constitute cruel and unusual punishment.").

In class actions challenging systemic health care deficiencies, a risk of harm to people's health needs may be shown by proving "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff," or by proving there are such "systemic and gross deficiencies in staffing, facilities, equipment, or procedures" such that the inmate population is effectively denied access to adequate medical care. *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted); *Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977); *Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000). The test is whether a cognizable <u>risk</u> of harm exists, not whether the consequences of that risk have manifested as harm; the goal of the courts is to prevent harm where such a risk exists. *See Gates*, 376 F.3d at 341 (emphasis added) (holding that an Eighth Amendment plaintiff did not have to prove that he was actually injured by

exposure to raw sewage, only that such exposure posed a serious health risk), *Hudson v. McMillian*, 503 U.S. 1, 4 (1992) (holding that excessive physical force against a prisoner can constitute cruel and unusual punishment even if the prisoner does not suffer serious injury).

The risk associated with placing people in lockdown conditions of the severity of those implemented at David Wade has been widely recognized as unconstitutional by courts.

> For these inmates, placing them in the SHU [restrictive housing] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly unreasonable.' Such inmates are not required to endure the horrific suffering of a serious mental illness or major exacerbation of an existing mental illness before obtaining relief. [. . .] A risk this grave—this shocking and indecent—simply has no place in civilized society.

*Madrid v. Gomez,* 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995) (internal citations omitted), *Braggs,* 257 F. Supp. 3d at 1192 (finding mental health programs offered in restrictive housing by the Alabama Department of Corrections unconstitutional under the Eighth Amendment). As outlined below, the conditions at David Wade are violative of the Eighth Amendment. At this stage of the proceedings the burden is on the Defendants to demonstrate that there are no genuine issues of material fact warranting trial in this matter, and that they therefore are entitled to judgment as a matter of law. There is overwhelming evidence of risk of harm and actual harm to the Plaintiffs in this case; the level of suffering that has been endured by the men at David Wade is horrifying. Summary judgment is inappropriate.

## III.    ARGUMENT

Conditions at DWCC pose a substantial risk of serious harm to people. The failure to provide adequate mental health diagnosis and treatment operates in tandem with stark and brutal conditions of confinement. Together, they operate to create a grave risk to the safety and lives of the men housed at David Wade.

**A.      Inadequate Mental Health Care Creates A Substantial Risk Of Serious Harm**

1.      Defendants do not appropriately identify or diagnose mental illness, creating a substantial risk of serious harm.

Identifying and responding to signs and symptoms of mental illness are crucial components of keeping people safe in prison.[15] Staff at David Wade fail to adequately screen for and respond to mental illness. Defendants fail to screen for mental illness at the initial intake when the person arrives on extended lockdown. Defendants also fail to take any subsequent steps to screen for mental illness as it emerges in people subject to the extreme conditions of extended lockdown for months and years on end.

a)      *Intake screening creates a substantial risk of serious harm by failing to appropriately identify and diagnose mental illness*

Defendants maintain that because individuals are put through a rigorous screening process at Elayn Hunt Correctional Center ("EHCC") that they are appropriately screened for mental health concerns prior to arrival at DWCC. However, although individuals who enter the Louisiana prison system are initially screened at EHCC, those same individuals are often transferred multiple times over the course of years before arriving at DWCC.[16] For this reason, it is still important that David Wade have a functioning screening system.

Defendants assert that when an individual is not provided the battery of initial testing at Elayn Hunt Correctional Center ("EHCC") those tests are administered at DWCC and reviewed by a psychologist.[17] Defendants reference Steve Hayden's deposition as a basis for this fact, but

---

[15] Exh. 18, Burns Report at p.30 (under treated and untreated symptoms of mental illness also result in increased instances of discipline which prolongs the time prisoners are held in extended lockdown); Exh. 29, Haney Report at p.78-79 (placing people with SMI in solitary is harmful to everyone, not just the individuals, including staff); Exh. 13, Pacholke Report at p.13-14 (practices at DWCC are inconsistent with industry standards for institutional safety).

[16] Examples include: Ronald Brooks, D'Angilo Rubin, Vincent Dotson, Steve Givens, Carlton Turner, Larry Jones; *See also* Exh. 118, Responsive document to RFP No. 25, list of all individuals transferred to DWCC from LSP.

[17] Rec. Doc. 414-1 - Defendants Material facts p.2 point 5.

Mr. Hayden's testimony does not state that a psychologist does any level of review of Mr. Hayden's paperwork. There is no evidence of a psychologist on staff or that a psychologist reviews any mental health paperwork.[18] Staff deposed in March 2020 replied with a clear "no" when asked if there were psychologists on staff.[19] In fact, the record clearly reflects that Steven Hayden conducts the intake screening.[20] The record is devoid of mention of a psychologist who reviews records at DWCC, and as such this is a contested fact.

> b)      *Security staff do not play any role in identifying and diagnosing mental illness, creating a substantial risk of serious harm.*

The security staff at DWCC have been clear in depositions that they are not qualified to identify signs and symptoms of mental illness. Assistant Warden and Chief of Security Jacob Baird testified that the mental health training provided to all staff at DWCC does not include how to identify signs and symptoms of mental illness.[21] Mr. Baird went on to state "that's Mental Health's job. It's not my job or any security's job."[22] Mr. Baird further stated that he has never observed any signs or symptoms of anyone he believes to have mental illness in the South Compound.[23] Sec. Pacholke opined that Baird's testimony indicated either the annual mental health training is grossly inadequate or Asst. Warden Baird was simply not paying attention.[24] Col. Nail similarly testified that he had never seen anyone on the South Compound who needed more acute mental health care than they were receiving at DWCC.[25] As such, he had never made a request to mental health for an individual to be transferred to another facility.[26] Rodney Long testified that he is not

---

[18] *See* Exh. 6, Deposition of Steve Hayden; Exh. 7, Deposition of Asst. Warden Dauzat; Exh. 8, Deposition of Ariel Robinson; Exh. 9, Deposition of Dr. Gregory Seal; Exh. 10, Deposition of James Burgos.
[19] Exh. 10, Deposition of Burgos 190:4-6; Exh. 6, Deposition of Hayden 154:5-7.
[20] Exh. 6, Deposition of Hayden 176:9-18.
[21] Exh. 12, Deposition of Chief of Security, Jacob Baird 57:2-4.
[22] Exh. 12, Deposition of Baird 57:6-7.
[23] Exh. 12, Deposition of Baird 63.
[24] Exh. 13, Pacholke Report at p.39.
[25] Exh. 1, Deposition of Nail 138:10-14.
[26] Exh. 1, Deposition of Nail 134:10-12.

qualified to say whether anyone with SMI is housed in segregation.[27]  When asked about staffing a restrictive housing unit, Sec. Pacholke noted that there is benefit when  mental health staff and the security staff communicate:

> They [a Psychologist] might come out and talk to the officers, how you doing today, who is causing you problems. And, you know, the officers may say stuff like, well, so and so is talking in there, but I can't make heads or tails on what he's doing or this guy hasn't showered in two months or, you know, this guy is making figurines out of what looks like feces, but the officers would begin to just learn the kind of indicators and behavioral cues that the population would demonstrate and it would give them a chance to intervene early on.[28]

Yet, at DWCC, because security staff is clear that it is not their role to recognize and respond to signs of mental illness, the onus falls entirely to the facility's inadequate mental health staff.[29]

> c)      *Mental health staff create a substantial risk of serious harm by failing to appropriately identify and diagnose mental illness on an ongoing basis.*

Because David Wade does not do robust mental health screening at intake, and because security staff is not trained to identify mental illness, if the line mental health staff does not properly identify needs, an individual goes undiagnosed and untreated. This can result in dangerous decompensation that creates a serious risk of harm to the individual.

There are only a couple of ways that the mental health of incarcerated individuals is evaluated at David Wade. First, every 90 days, every individual on extended lockdown is supposed

---

[27] Exh. 3, Deposition of Long 125:1-6.

[28] Exh. 95 Deposition of Pacholke 359:8-360:2.

[29] Exh. 14, Deposition of Lt. Col. Vincent Coleman 74:4 - 75:22 (Stating that he calls security staff if someone is acting unusual, but unable to identify what behaviors would constitute as unusual.), 85:2-23 (In speaking about Anthony Caro, stated that he is not a mental health practitioner, and therefore he does not know what behaviors might constitute as manifestations of a mental illness); 108:6-25 (After acknowledging that he has received mental health training Mr. Coleman said that he still did not know what signs and symptoms of mental health to look for when making a decision to put someone on strip cell status.); See also, Exh. 15, Deposition of Capt. Matthew Elmore 47:5-25 (Noting that nothing in policy requires security staff to report to mental health when behaviors change dramatically); 48:1-11 (Never referred Tyle Blanchard to Mental Health despite noting that he acted out); 48:14-49:3 (Never referred Jacoby Batiste to mental health despite noting that he acted out).

to be evaluated by a member of the staff using a form called "Interview with a Segregated Inmate."[30] Since September 2017 (after commencement of the Advocacy Center investigation of the facility) these forms have been completed on a March, June, September, December schedule. As such, the "interviews" are conducted of every person on extended lockdown approximately every 90 days.

Second, if an individual is on the mental health caseload, staff will complete a "mental health progress note" when there is contact with mental health staff, which theoretically should report on how an individual is doing and screen for decompensation issues. Staff ostensibly make "rounds" on the tiers to complete these forms and to check on people on suicide watch, which should allow them to identify individuals needing care. Defendants' own expert, Dr. Thompson, testified that screening before someone goes into segregation is a good idea to identify whether things have changed, and that the rescreening would be best completed by mental health staff.[31] These "ongoing screening" systems are broken. Because the systems do not work, and because they are functionally the only screening mechanisms available, mental health concerns go unidentified and untreated, to the great detriment of the men housed at DWCC.

> *(1)    Mental health staff do not conduct regular or effective rounds to check on people, creating a substantial risk of serious harm.*

The primary way that mental health staff other than Dr. Seal have contact with patients is through "rounds," which is a process whereby a member of the mental health staff is supposed walk onto the tiers and speak to individuals housed there. It is virtually impossible to ascertain when rounds are made and how long is spent with each patient because mental health staff do not adequately document mental health contacts. When mental health staff do rounds, they are not

---

[30] Exh. 16, LDPSC Health Care Policy No. HC-27 - Segregation.

documented in any consistent form, in dispute from Defendants' assertion in their statement of facts.[32] Plaintiffs dispute that rounds are regular, and particularly dispute the implication that rounds provide accessible mental health care.

Mr. Hayden testified that every person on the South Compound is seen every week, so he might be on a tier every day of the week because people are seen at different intervals for different reasons.[33] However, Mr. Hayden also testified that he only sees patients four days a week, Monday through Thursday.[34] Mr. Hayden testified that he does not document rounds.[35] Further, there are no documents created by mental health staff documenting that they have made rounds unless there is substantial contact with an individual that causes a progress note to be completed.[36] Nothing in the paperwork would indicate that an interaction was the result of the staff person being on the tier making rounds.[37] While there is a card swipe system on the tiers,[38] it is inconsistently used by mental health staff. Warden Dauzat testified that she "will swipe [her] card occasionally,"[39] Steve Hayden stated he "sometimes" swipes his card[40], and Ariel Robinson stated she "sometimes" swipes her card.[41] The security tier officers may inconsistently document when mental health staff enter and exit the tier, and the mental health staff are not documenting when they conduct rounds. Due to this breakdown of basic documentation, it is impossible to assess who visits the tiers and how often rounds are conducted. Plaintiffs report that they do not regularly see mental health staff

---

[32] Rec. Doc. 414-1 p.6 point 30.
[33] Exh. 6, Deposition of Hayden 58:1-7.
[34] Exh. 6, Deposition of Hayden 94:21-24.
[35] Exh. 6, Deposition of Hayden 60:25-61:6.
[36] Exh. 7, Deposition of Dauzat 24:10-18; Exh. 6, Deposition of Hayden.
[37] Exh. 6, Deposition of Hayden 250:24 - 251:7 (testifying that he does not document rounds or the majority of discussions that take place with people on South Compound).
[38] This is a system utilized in many prisons whereby staff swipes an electronic device upon entry onto or passage to the end of a particular housing unit. The swipe card system is capable of tracking employee presence on the tier, and, if used at both the front and back of the tier, can document how long a staff member spent on the tier. David Wade has such a system. Although policy requires staff to use it, they do not.
[39] Exh. 7, Deposition of Warden Dauzat 24:12.
[40] Exh. 6, Deposition of Hayden 58:25-59:2.
[41] Exh. 8, Deposition of Robinson 227:18-20.

on the tiers other than for the purpose of evaluating individuals who are on "suicide watch," or that staff presence on tiers is cursory.[42]

> (2)     *The rounds that are conducted lack privacy, which results in a substantial risk of serious  harm.*

Interactions during rounds lack privacy, and prisoners have no way to communicate confidentially with mental health staff. Class members testify that staff are so unprofessional that they will allow sensitive mental health disclosures to be weaponized against prisoners.

> It's this-- this environment I'm in is new to me because the administration far as mental health, they conduct their meetings at the bars[43] instead of, you know what I'm saying, in private -- you know what I'm saying? 'Cause I might want to tell you, you know, I'm gonna kill myself or I might want to tell you something that's really bothering me that you need to help me with, and I got other people next door to me listening to this here, they're gonna make fun of me when you leave, then I got to be antagonized with that. So therefore, you not doing-- or the social workers' not doing what they're supposed to do because I read that paperwork, as well, what they supposed to do and what they should not do in a cellblock setting. [44]

\*\*\*

> I might wanna say something very, you know what I'm saying, personal that other inmates feel, though, they want to use for later to, you know, antagonize me, or they call it bar fighting or to argue with me or to make jokes on me, you know what I'm saying? So -- so some of them things you might wanna just, you know what I'm saying, you feel like be personal about it, you know what I'm saying? You know, like you're my attorney…..So it's, you know, certain things that me and you might talk about that nobody else 'posed to hear, you know what I mean? For protection of me and you, you know."[45]

---

[42] Exh. 11, Deposition of Burns 133:1-4 (rounds are so infrequent that people's changing conditions are not identified); Exh. 18, Burns Report at p.14; Exh. 19, Excerpt of Deposition of Willie Dillon 65-67; Exh. 20, Deposition of Brennan Bellard 12:9-14 (no MH treatment other than Seal; does not see Steve Hayden on the tiers); *Id.* at 15:3-6 (has not seen Ariel Robinson making rounds); *Id.* at 19:5-25 (At other prisons, MH does rounds, check on people, talk alone/pull you out. "That don't really happen here… only time you see doc is for 3 minutes for meds); Exh. 21, Excerpt of Deposition of Kenneth Ratcliffe 24:17-24 (mental health make rounds on the tier once per month); *Id.* 25:1-6 (saw Ariel Robinson on the tier once); Exh. 22, Excerpt of Deposition of Damarcus Thomas 33 (staff do not make rounds on all tiers); Exh. 23, Excerpt of Deposition of Cody Doucet 44:3-4 ("The only time they come to see people is when people are on suicide watch.").

[43] "At the bars" is slang for "cell-front." It means standing at the bars at the front of one's cell.

[44] Exh. 19, Excerpt of Deposition of Willie Dillon at 36.

[45] Exh. 19, Excerpt of Deposition of Willie Dillon at 49. *See also*, Exh. 20, Excerpt of Deposition of Brennan Bellard 14:1-13 (Didn't raise other issues with social worker because visited at cellfront with cellie present, "don't feel very comfortable explaining …"); *Id.* at 20:1-25 (on how staff will allow confidential information shared in mental health

If people request confidential visits, they are denied.[46]

Defendant Hayden in particular is ineffective and alienating; people either feel unheard, or, if they do speak with him, find him not responsive to their needs.[47] He is often seen as dismissive and uncaring, or worse. Christopher Solomon testified that Steve Hayden was in the room when Mr. Solomon told Dr. Seal that his mother was addicted to crack. Hayden later called Solomon "crack baby" on tier, which led to various other taunting and name-calling by people who overheard.[48] "And that affects a lot of a person's mental health of being in those cells. Because if everyone on the tier is steady messing with you and you're in your cell by yourself, that's going to make you-- I mean, it makes you depressed."[49]

It seems commonsensical that people would not confide their serious mental health struggles in front of other people, much less in the challenging prison environment, in which even information has currency. The lack of privacy in rounds renders them an ineffective and unavailable means of accessing mental health services, at great risk of harm to the men housed at David Wade.

> (3)     _Mental health staff do not adequate evaluation of people's mental health, resulting in a substantial risk of serious harm._

In addition to infrequency of contact and lack of confidentiality, what contact does occur on the tiers is rote, as evidenced by the anemic documentation and response to signs of decompensation. Documentation indicates that staff often copy-paste prior forms, and the

---

consult to be used against an individual on the tier.); *See also*, Exh. 24, Excerpt of Deposition of Christopher Solomon 49:20-25, 50:1-4.
[46] Exh. 19, Excerpt of Deposition of Willie Dillon at 50.
[47] Exh. 19; Excerpt of Deposition of Willie Dillon Depo at 48; Exh. 25, Excerpt of Deposition of James White 18, 24-25; Exh. 22, Excerpt of Deposition of Thomas Demarcus 32.
[48] Exh. 24, Deposition of Christopher Solomon 50:11-25.
[49] Id.

documents are so cursory as to provide no insight into an individual patient's wellbeing. This means that any information that is actually gleaned from the infrequent and non-confidential rounds is never transmitted to colleagues, to Dr. Seal, to supervisors or to anyone else responsible for continuity in care.

Mental health staff rounds are documented by forms called "Interview with a Segregated Inmate" and "Mental Health Progress notes." These forms are completed with virtually no level of detail.[50] They are completed this way regardless of whether a particular prisoner is in mental health crisis. Indeed, there are dozens of these forms on which mental health staff (particularly Mr. Hayden) report that a prisoner refused to speak to them, but the staff did not escalate the matter for additional attention, schedule the person for more robust intervention, or otherwise seek to change the course of treatment.[51] These documents are literally the only forms in an individual's file that might note what is happening with a given prisoner from a mental health perspective. As mentioned, Dr. Seal sees patients every 90 days for a few minutes. If the forms do not contain any detail about how an individual is actually doing, there is no handoff of information on which Dr. Seal, any supervisor, the Department of Corrections or any other healthcare provider can ascertain a proper course of care.[52] No supervisory staff perform quality checks to assess whether these progress notes actually match the reality of the patient.[53]

This failure to meaningfully screen and monitor prisoners throughout their incarceration-- not just at intake-- results in a substantial risk of harm.

---

[50] *See* Exh. 26, Sampling of Segregation Interview forms with the same comment between September 2017 to December 2018; *See* Exh. 27, Sampling of Mental Health Progress Notes with limited notes and no detail.
[51] Exh. 28, Sampling of segregation interview forms with similar comments, refusals to speak.
[52] *Supra* III.a.1.(b).
[53] Exh. 7, Deposition of Dauzat 35:4-15.

2.    <u>Defendants do not appropriately provide treatment for mental illness, resulting in suffering and injury to the men at David Wade and creating a substantial risk of serious harm.</u>

Due to the dangerous screening and identification deficiencies, DWCC grossly under identifies individuals needing mental health intervention. Even once an individual is identified as having a mental health need, however, the Defendants fail to provide necessary and life-saving care.

a)    *Mental health staffing is inadequate, creating a substantial risk of serious harm.*

Defendants assert as an uncontested fact that individuals are followed by a "dedicated mental health staff that includes a master's level psychologist, two social workers, and licensed counselor."[54] Defendants cite to Dr. Thompson's report to substantiate this statement. However, there are no psychologists who provide services at DWCC -- according to the mental health staff who work at DWCC.[55] More importantly, Defendants' representation that all mental health staff catalogued on the roster provide services to the class of individuals who are Plaintiffs in this case is inaccurate based upon deposition testimony in this matter.

The only individuals actually licensed by the State of Louisiana to provide mental health "treatment" per se at David Wade are Dr. Seal (the contract psychiatrist), Warden Dauzat (a licensed clinical social worker and the Assistant Warden over Mental Health), and James Burgos, a licensed professional counselor.

Warden Dauzat does not herself provide direct treatment. Her job description includes overseeing and supervising the mental health department, serving as the Prison Rape Elimination Act coordinator,[56] supervising Warden Kayla Sherman and monitoring the functions of the

---

[54] Rec. Doc. 414-1 p.2 point 7.
[55] Exh. 6, Deposition of Hayden 31:7-9; 31:10-12; 31:15-17.
[56] Exh. 7, Deposition of Dauzat 10:23-25.

Classification and Education Departments.[57] By her own admission, Warden Dauzat provides direct care to patients only occasionally, delivering a death message or grief counseling or meeting with individuals in group therapy. She stated that she has occasionally met with individuals on suicide watch or mental health observation, but she could not recall the last time she had provided treatment to anyone.[58]

The mental health staffing for the buildings at issue in this litigation has shifted over this litigation. Initially mental health staffing was comprised only of two people[59] until January 2019, at which time Ariel Robinson stopped working on the South Compound,[60] and only Steve Hayden was providing mental health services to all 400 people on the South Compound. Subsequently, James Burgos was hired to supplement the work of Mr. Hayden, but his job duties were unknown even to his supervisors and close colleagues.[61] Even Mr. Burgos is unclear on who his caseload is and his responsibilities,[62] as are the Plaintiffs. It seems that Mr. Hayden and Mr. Burgos are the primary persons responsible for delivering services to all individuals housed on the South Compound which includes obligations to screen everyone to identify new or worsening signs of mental illness, conducting segregation interviews every 90 days to monitor new or worsening signs of mental illness, providing care to individuals who engage in self harm or threaten self-harm by placing them on suicide watches, amongst a litany of other duties. These duties are in addition to their obligations on the North Compound, which include providing group therapy at least once a

---

[57] Exh. 7, Deposition of Dauzat March 3, 2020 6:16-17; 7:6-7.
[58] Exh. 7, Deposition of Dauzat 14:10-17. See also, Exh. 24, Excerpt of Deposition of Christopher Solomon 24:25-25.
[59] Exh. 6, Deposition of Hayden 31:20-25; Exh. 8, Deposition of Robinson 13:20 - 14:2.
[60] Exh. 7, Deposition of Dauzat 83:3 - 84:7.
[61] Exh. 6, Deposition of Hayden 73:2-8 (stated he does not know definitively what Burgos' job entails); Exh. 7, Deposition of Dauzat 38:2-18 (stated she does not know Burgos' job duties) (despite being his direct supervisor); *Id.* 39:2-10 (intention for Burgos to work with sex offender program in general population on North Side).
[62] Exh. 10, Deposition of Burgos 14:23-24 (stated he works on both the North and South Compounds).

week and seeing other patients.[63] Defendants' representation to this Court that all individuals who are considered mental health staff at DWCC are available to individuals on the South Compound is a mischaracterization. In fact, Defendants' own expert identified staffing shortages.[64]

Defendants' assertion that there are social workers at DWCC was refuted by their own expert, Dr. John Thompson.[65] In sum, Defendants' characterization of the staffing level actually providing mental health services to the Plaintiffs is a contested fact, and it is material to whether constitutional care is being provided at David Wade. Summary judgment is inappropriate on this point.

> b)    *Psychiatric staffing is inadequate, creating a substantial risk of serious harm.*

There are only two ways an individual housed on extended lockdown at David Wade may be seen by mental health staff. One is to be placed on a visit list to see Dr. Seal, the prison's contract psychiatrist, the other is rounds.

Dr. Seal visits the prison every two weeks.[66] During each visit he is on-site for 5 hours, arriving around 9:00 am and leaving around 2:00 pm.[67] Each visit, he sees 32-36 patients.[68] His time is divided between the North Compound and the South Compound.[69] Tt best, on each visit he sees approximately 32-36 people for approximately 5-10 minutes each. The purpose of his visit is to evaluate medication needs and adjust medication.[70] Although Dr. Seal testified that he would

---

[63] Exh. 10, Deposition of Burgos 14:23-24; 18:21-23; 22:17-23; 99:14-16; 143:3-13 (sees patients on north compound; anger management psychotherapy group and sex offender group for north side; not available for extended lockdown); Exh. 6, Deposition of Hayden 40:2-4 (sees patients on the North side).
[64] Exh. 17, Deposition of Thompson 197:15 - 198:18.
[65] Exh. 17, Deposition of Thompson 213:19-24.
[66] Exh. 6, Deposition of Hayden 78:4-12; Exh. 8, Deposition of Robinson 39:18-19; Exh. 10, Deposition of Burgos 55:8-9.
[67] Exh. 9, Deposition of Gregory Seal 101:19-20, 116:11-15.
[68] Exh. 9, Deposition of Seal 103:20-21.
[69] Exh. 9, Deposition of Seal 104:6-9.
[70] Exh. 9, Deposition of Seal 19:15-18; 107:15-20.

meet with patients as long as necessary,[71] the practical limitations of the structure of his visits there means that he has 10 hours a month to see everyone on the mental health caseload at David Wade Correctional Center, a prison with a population of roughly 1,200.[72] This interaction, then, is necessarily fairly cursory and limited in scope.[73] For this reason much of the actual patient interaction and evaluation necessarily falls to line mental health staff.

Dr. Seal is the only licensed psychiatrist whose role is only to prescribe medications and provide a mental health diagnosis. Dr. Seal testified he is on campus at DWCC approximately 10 hours a month with the expectation he is providing psychiatric care to all individuals at DWCC, both the North and South Compounds.[74] Dr. Seal does not independently evaluate each individual nor does he check to make sure each individual is receiving medications he has prescribed,[75] instead relying upon Mr. Hayden and Mr. Burgos to provide him all the information he needs. This level of mental health care falls below the constitutional floor, creates a substantial risk of serious harm, and has resulted in catastrophic consequences for individual members of the class.

> c) *There are no mental health treatment plans, creating a substantial risk of serious harm.*

The basic underpinning of the provision of mental health is a plan of treatment, established by qualified professionals after evaluating the needs of a sick patient. At David Wade an individual course of treatment is memorialized as a "treatment plan." Policy promulgated by both the Louisiana Department of Public Safety & Corrections (LDPSC) and DWCC require that mental

---

[71] Exh. 9, Deposition of Seal 140:8-9.
[72] Exh. 17, Deposition of Thompson 173:2-5.
[73] Exh. 9, Deposition of Seal 107:15-20; Exh. 17, Deposition of Thompson 188:12-14 (Seal's progress notes need more detail and should lay out treatment plans); Exh. 11, Deposition of Burns 133:13-16; Exh. 29, Dr. Craig Haney Declaration p.76-77, para. 133; Exh. 20, Excerpt of Deposition of Brennan Bellard 18:2-4 (Seal "ain't really applying the psychiatry. He's just trying different meds to work.").
[74] Exh. 9, Deposition of Seal 104:6-9.
[75] Exh. 9, Deposition of Seal 58:21-25.

health treatment plans be individualized for all individuals with a level of care 1, 2, 3, or 4.[76] However, the treatment plans created for each individual housed on the South Compound are not individualized. Defendants advance as an undisputed fact that "a treatment plan is created for each offender."[77] This fact is disputed: every expert witness to this case agrees that the treatment plans at David Wade are dangerously inadequate because they are not "created for each offender." Rather, the facility implements the exact same treatment plan for every person housed there, regardless of their individual mental illness, disability, or level of need. This practice is dangerous because individual mental health needs are neither identified nor met.

DWCC mental health staff all testified at deposition that each of these treatment plans contains the same terms.[78] Short term goals are: maintain compliance with all institutional rules and regulations; maintain appropriate level of functioning, and increase insight in order to be moved to a less restrictive environment. Each of these treatment plans also contain the same long-term goals, which are: comply with medications prescribed and advise staff of any adverse effects; identify stressors that create behaviors warranting segregation; consistently display appropriate behavior in accordance with institutional regulations.[79] The plans are in no way tailored to meet the needs of individual patients. During depositions, Steve Hayden testified that the mental health staff at DWCC have been using this template for the nearly a decade that he has been employed at DWCC and he cannot recall who created it.[80] Dr. Craig Haney observed that "the "treatment plans" placed in the files of different prisoners at DWCC are virtually identical, unchanging, and pro

---

[76] Exh. 35, 2019-2-13 - EPM 03-02-003 - Mental Health Program at p.7-9.
[77] Rec. Doc. 414-1 p.3.
[78] Exh. 6, Deposition of Hayden 229:22-230:6; Exh. 7, Deposition of Dauzat 68:2-8; Exh. 8, Deposition of Robinson 202:10-17; 203:16-204:1.
[79] Exh 36, *in globo*, sampling of 153 treatment plans received in discovery, each with identical short- and long-term goals.
[80] See Exh. 6, Deposition of Hayden 242:2-6; Exh. 8, Deposition of Robinson 201:1-4 (when asked if treatment plans were ever updated, she did not understand).

forma, despite the fact that the prisoners have significantly different diagnoses."[81] "They virtually all consist of three generic short-term and long-term goals" and describe the same goals listed above.[82] Dr. Haney points out that it is inaccurate to call them "treatment plans" -- "there is no mention of actual mental health 'treatment' -- no counseling, individual or group; therapy, or treatment-related activities."[83] Dr. Haney also states "nor do the treatment plans mention any staff monitoring to detect adverse reactions to isolated confinement or worsening symptoms."[84]

Dr. Burns similarly observed that "DWCC mental health treatment plans are not individualized: all of them say literally the exact same thing and contain no mention of mental health interventions whatsoever."[85] Dr. Burns noted that "they do not reflect an individualized assessment by a qualified mental health professional, treatment interventions (type, frequency or provider) or progress toward goal attainment."[86] Dr. Burns testified that, in her expert opinion, a mental health treatment plan needs to be individualized, which means the short and long term goals need to be specifically tailored to the individual. Dr. Burns explained that individualized treatment plans are important "because it should deal with the individual and their particular situation and problem. Not that some people won't have similar problems, which is why these places have moved to conducting group treatment because it's more efficient from a staff perspective if you have four people that need anger management, for example, and that's listed on their four treatment plans."[87] Individualized treatment plans are "the standard of care for mental-health treatment, period, inside prisons and outside." Cookie-cutter treatment plans are just not acceptable.[88]

---

[81] Exh. 29, Dr. Craig Haney Report p.52 ¶80.
[82] Exh. 29, Dr. Craig Haney Report p.52 ¶80.
[83] Exh. 29, Dr. Craig Haney Report p.52 ¶80.
[84] Exh. 29, Dr. Craig Haney Report p.52 ¶80.
[85] Exh. 18, Dr. Katherine Burns Report p.17-18.
[86] Exh. 18, Dr. Katherine Burns Report p.18.
[87] Exh. 11, Deposition of Burns 165:7-14.
[88] Exh. 11, Deposition of Burns 167:24-168:1-6.

Even Dr. John Thompson, expert for the Defendants, testified that "if a treatment plan for everybody on a particular unit says the exact same thing, then it's not necessarily individualized."[89] Dr. Thompson described what an example of an individualized treatment plan would include, particularly focusing on the fact that "an individualized approach rather than a cookie cutter approach" would be necessary.[90] Dr. Thompson agreed that the treatment plans created and utilized at DWCC were not individualized. He testified that he had discussed the issue with Warden Dauzat to address the problem and develop individualized mental health treatment plans. However, despite the early identification of this issue David Wade has persisted in using the same, identical, non-individualized "treatment plans" since Plaintiffs filed this suit in February 2018; Plaintiffs have seen no evidence of any change to the treatment plans, despite the dangerous deficiencies having been pointed out to Defendants over three years ago.

As such, Plaintiffs vigorously dispute Defendants' assertion that treatment plans are created for every individual. The plans employed by David Wade do not meet a definition of a "treatment plan," according to every mental health expert in this case, and they are not individually created. The experts all agree that individualized mental health treatment plans are necessary to the safe treatment of patients, and that DWCC needs to change their policy, practice, and procedure to ensure that the plans provide for "treatment" and are individualized. The failure to provide individuals treatment plans creates a substantial risk of harm, because there is functionally no agreed upon course of treatment for a given individual with a serious mental illness or disability. Untreated mental illness creates a substantial risk of harm that the Eighth Amendment seeks to prevent.

---

[89] Exh. 17, Deposition of Thompson 191:3-5.
[90] Exh. 17, Deposition of Thompson 192:2-4.

Importantly, Warden Dauzat, the individual responsible for overseeing David Wade's mental health program, did not think the plans were in any way deficient. Warden Dauzat agreed that a mental health treatment plan "should be individualized to be effective."[91] But when deposed about the treatment plans provided at David Wade, Warden Dauzat defended the point that they *were* individualized, despite the fact that they clearly are rotely verbatim, and testified that whether or not they are considered individualized is a matter of opinion.[92] Warden Dauzat is responsible for the overall administration and supervision of the provision of mental health at David Wade.[93] She is the person to whom all other mental health staff report.[94] She not only approved of identical treatment plans for every individual regardless of diagnosis, she thought that *was* individualized treatment. Her testimony evidences why there is a disputed fact about the risk of harm created by the lack of treatment plans, and by the leadership of the mental health department at David Wade generally. If the warden over the department refuses to acknowledge a deficiency identified by every expert in this case, Court intervention is necessary, and summary judgments should not be granted.

> ### d) No treatment or programming is available to individuals housed on extended lockdown other than medication, creating a substantial risk of serious harm.

David Wade offers no mental health treatment to individuals housed in solitary confinement other than the scattershot and dangerous medication administration identified *supra*. There is no programming and there is no counseling.[95] This is a disputed fact, as Defendants

---

[91] Exh. 7, Deposition of Dauzat 69:20-22.
[92] Exh. 7, Deposition of Dauzat 69:23 - 70:2.
[93] Exh. 37, Deposition of Angie Huff 63:6-7.
[94] Exh. 6, Deposition of Hayden 62:16-17; Exh. 8, Deposition of Robinson 43:19-21; Exh. 10, Deposition of Burgos 45:1-2.
[95] Exh. 38, Excerpt of Deposition of Quentin Moran 31-32.

present that individual counseling is available and that written materials are available as programming.

Individuals housed on the South Compound are not eligible to participate in group therapy programming, per DWCC EPM# 03-02-005.[96] There is group therapy programming available for individuals housed on the North Compound.  However, Ariel Robinson testified that individuals who are receiving group therapy while housed on the North Compound are discontinued from group if they are transferred to extended lockdown on the South Compound.[97] Warden Dauzat testified that there is no group counseling available for individuals housed on the South Compound, including individuals housed in N1.[98] Steve Hayden likewise testified that group therapy is not available to individuals housed in segregation.[99] Group therapy is not available for individuals housed on the South Compound.[100]

In addition to not offering group therapy or group programming, individuals on extended lockdown are offered no out-of-cell programming whatsoever. Dr. Haney testified that "the mental health care, which the prisoners receive in those units, is inadequate. There isn't any provision made for group therapy or out-of-cell programming for those prisoners."[101] The provision of some congregate programming is crucial for people with mental illness. Dr. Haney stated "that's why it's so important to provide programming in restrictive housing, why it's so important to provide mentally ill prisoners with real therapy, not just medication, but group therapy, meaningful

---

[96] *See also* Exh. 39, Dr. John Thompson Report at 32.
[97] Exh. 8, Deposition of Robinson 165:12-16.
[98] Exh. 7, Deposition of Dauzat 15:17-22.
[99] Exh. 6, Deposition of Hayden 126:14-17.
[100] Exh. 8, Deposition of Robinson 164:9-25 (no group therapy and no GED program on South Compound); Exh. 40, Deposition of Haney 126:14 - 127:3 (no group therapy and no classroom settings); Exh. 7, Deposition of Dauzat 39:8-10 (sex offender group not available); *Id.* 80:11-20 (AA/NA and anger management programs not available).
[101] Exh. 40, Deposition of Haney 152:11-14.

individual contact, so that when they do get released they're not taking their psychiatric or mental health problems back into general population."[102]

Defendants' position seems to be that providing out-of-cell programming for the individuals on extended lockdown at David Wade is not possible from a security perspective. This is a disputed fact. Dr. Burns provided some insight into how other facilities provide group programming and therapy, explaining "they've made some modifications to furniture, for example, to be able to have a number of people out in group at the same time safely in restraints."[103] In fact, group therapy is beneficial from a staffing perspective; when you have multiple people with the same type of treatment in their plans "you could see them all at the same time as opposed to pulling them out and doing an individual session with each of them, so it really does help staffing."[104] Secretary Pacholke provided similar testimony. He noted that at WADOC he was involved with developing ways to pull people out of isolation and restrictive conditions to provide programming on a larger scale to address the issues that led to individuals cycling in and out of restrictive housing, and to allow them to return to general population.[105] Defendants have not taken any steps to implement or even consider modifications that would allow any out-of-cell programming to take place for individuals on the South Compound.

In addition to not offering any out-of-cell group therapy or programming, David Wade offers no out-of-cell individual programming or therapy at all. There is no question but that such therapy or programming would help prevent additional harm to the men struggling with mental illness on extended lockdown; Dr. Seal recognizes the importance of providing a combination of

---

[102] Exh. 40, Deposition of Haney 208:13-19.
[103] Exh. 11, Deposition of Burns 163:20-23.
[104] Exh. 11, Deposition of Burns 165:14-17.
[105] Exh. 13, Pacholke Report at p.12-13.

medications and psychotherapy as opposed to medication alone.[106] And yet Warden Dauzat testified that she cannot recall seeing a treatment plan that included receiving regularly scheduled individual counseling.[107] Indeed, for a brief period of time David Wade piloted a program that included a feature of individual meetings with staff to establish individual goals; it was called "transition treatment planning," or "TTP." TTP was a "program that was implemented to speak to the [individuals] that were...problematic [individuals] that weren't progressing past segregation."[108] The purpose was to help these individuals "move forward, to help figure out what the issues were, to try to talk to...them and get the gist of what was going on, what the hang-ups are, where the pitfalls are for them"[109] with the goal of helping people transition out of segregation.[110] One feature of that program was that participants "received individual counseling."[111] The program was intended to last either until the individuals refused to participate further or they transitioned out of segregation.[112] This implication is that individuals who were not part of the transition treatment plan program did not receive individual counseling. The treatment offered to individuals in the TTP was even described as being different from what is available to everyone generally, that people are "actually pulled into a courtroom and [mental health staff] would actually discuss their behavior in depth."[113] Despite reporting to be the only individuals providing treatment for this program, neither Hayden nor Robinson were able to identify the

---

[106] Exh. 9, Deposition of Seal 24:19-25:2.
[107] Exh. 7, Deposition of Dauzat 111:12-16; *See* Exh. 18, Burns Report at p.17-18 (DWCC treatment plans do not include treatment interventions such as individual therapy, group therapy, etc.).
[108] Exh. 6, Deposition of Hayden 231:12-17; Exh. 8, Deposition of Robinson 208:10-15 (purpose was to give people in segregation more treatment in order to be released or moved to a less restrictive environment).
[109] Exh. 6, Deposition of Hayden 231:18-23.
[110] Exh. 6, Deposition of Hayden 231:24 - 232:7.
[111] Exh. 7, Deposition of Dauzat 126:10-15.
[112] Exh. 6, Deposition of Hayden 233:11-14.
[113] Exh. 8, Deposition of Robinson 209:4-10.

eligibility criteria or explain how individuals were chosen to participate in TTP.[114] That program was discontinued, staff cited staffing shortages and not enough time as possible reasons.[115]

There is no authority or evidence for the assertion made by Defendants' that individual counseling is available to the men on extended lockdown; this is a disputed fact that Plaintiffs intend to disprove at trial. Warden Dauzat's testimony on the provision of individual counseling was very confusing; she asserted that passing an individual and asking how they are doing could constitute individual counseling.[116]

Despite Defendants' assertion that individual counseling is available, a number of individuals testified at deposition that individual counseling is not an available option despite their individual requests. For instance, Willie Dillon testified that he was only provided with medication, despite his requests to also receive individual counseling.[117] Theron Nelson additionally testified that individual counseling was not available to him and he suffers in his cell.[118] Brennan Bellard testified that the only mental health treatment available is medication, nothing else.[119] Quentin Moran testified that although he requested help, nothing was available-- there are no programming options on extended lockdown.[120] In the case of Willie Dillon, he knew he needed conversation therapy to feel better, "so that we can identify what's going on with me first because I don't know what's going on with me, but I know something is going on." "A class or something? Some information you could send me that I could read to tell me what I'm feeling

---

[114] Exh. 6, Deposition of Hayden 232:14-20; Exh. 8, Deposition of Robinson 209:22-24.
[115] Exh. 6, Deposition of Hayden 234:20-21; Exh. 8, Deposition of Robinson 209:25 - 210:6.
[116] Exh. 7, Deposition of Dauzat 128:13-25 (describing talk therapy as engaging your client in any type of casual conversation).
[117] Exh. 19, Excerpt of Deposition of Dillon 36-38
[118] Exh. 41, Excerpt of Deposition of Nelson 13-14.
[119] Exh. 20, Excerpt of Deposition of Bellard 12:9-14
[120] Exh. 30, Excerpt of Deposition of Quentin Moran 31-32.

to try to identify if I can—I'm telling you what I'm going through because I don't know what I'm going through." No materials were available.[121]

Mr. Dillon was transferred from David Wade to Elayn Hunt for a court trip for a period of 5 or 6 months. While at EHCC he was taken off of the medication that Dr. Seal had given him because he felt that doctor truly listened to him and gave him other options. Talking to the social worker at EHCC profoundly helped him. Then he was sent back to DWCC and again the only treatment available to him was medication.[122]

Likewise, Shawn Francis, who is diagnosed bipolar schizophrenic and reports hallucinations, reports that he needs something "to help (him) cope" with the cells-- like something to read or a radio to help his mind while he is housed in the lockdown cell.[123] Chris Solomon asked the mental health staff whether there is any type of treatment other than medication. Steve Hayden informed him that his only option was to see Dr. Seal. When he saw Dr. Seal, he asked if there was any treatment other than medication; Dr. Seal said no.[124] And after evaluating the mental health program at David Wade, Dr. Burns concluded that there is no treatment at David Wade other than medication.[125]

In sum, no group therapy or individual therapy is provided for people with mental illness on extended lockdown.[126] Any assertions by Defendants to the contrary are disputed. This therapy

---

[121]Exh. 19, Excerpt of Deposition of Willie Dillon 36-37.

[122] Exh. 19, Excerpt of Deposition of Willie Dillon 39-40.

[123] Exh. 5, Excerpt of Deposition of Shawn Francis 33-34.

[124] Exh. 24, Excerpt of Deposition of Christopher Solomon 53-54; *see also*, *Id*. at 52:7-25 (describing treatment that would help him).

[125] Exh. 18, Burns Report at p.3.

[126] Exh. 42, DWCC EPM# 03-02-005; *see also* Exh. 39, Thompson Report at 32; Exh. 8, Deposition of Robinson 165:12-16; Exh. 7, Deposition of Dauzat 15:17-22; Exh. 6, Deposition of Hayden 126:14-17.

is important to preventing further injury and to mitigating the psychological harm that stems from prolonged cell-confinement.[127]

Plaintiffs flatly reject the notion that David Wade prisoners are such high security risks that additional mental health care or therapy cannot be provided, as has been implied by the Defendants.  High security, maximum custody institutions are able to provide programming and care for people even in the most serious of carceral settings.[128]  Indeed, the very men housed at David Wade have been provided with programming-- including group therapy-- when housed in maximum security settings in other Louisiana prisons.[129]  Noel Dean, held for years at David Wade without programming, is now at Elayn Hunt and attending group programming in shackles, which he reports is really helping him.[130]  Cody Doucet, held for years at Wade in very deteriorated conditions, testified that at Elayn Hunt he was able to get help and speak with a social worker, and that he had more ready access to mental health staff to help him.[131] David Wade is out of sync with what happens even at other Louisiana DOC facilities,[132] and the Defendants have chosen not to bring it in line with practices used elsewhere.

Finally, Plaintiffs dispute whether Defendants provide any helpful in-cell materials to the men housed on extended lockdown. Plaintiffs propounded a discovery request for all correspondence course materials and curriculum available to individuals on extended lockdown.[133] Defendants produced only a packet titled "Understanding and Reducing Angry Feelings" which is self-described as "a collection of materials for leading counseling sessions."[134] There were no other

---

[127] Exh. 29, Haney Report at p. 29 para.41, p.44 para.64, p.46 para.67, p.62 para.102; Exh. 18, Burns Report p.10; Exh. 13, Pacholke Report at p.12.
[128] Exh. 11, Deposition of Burns 163:14 - 164:3; Exh. 13, Pacholke Report at p.12-13.
[129] Exh. 19, Excerpt of Deposition of Willie Dillon 52-53.
[130] Exh. 43, Excerpt of Deposition of Noel Dean 29.
[131] Exh. 23, Excerpt of Deposition of Cody Doucet 49-50.
[132] Exh. 19, Excerpt of Deposition of Willie Dillon, 68.
[133] Exh. 44, Plaintiffs' Eighth Set of Requests for Production no. 114.
[134] Exh. 45, Understanding and Reducing Angry Feelings packet

materials produced. Prisoners testified that they asked for programming or therapy and none were provided.[135] Exactly one prisoner has reported that he asked for written anger management materials and that he received them.[136] The mental health staff testified that they have rarely, if ever, provided an individual with any treatment materials or self-help materials.[137]  Mr. Burgos represented that individuals could request access to mental health materials in their cells,[138] although he had not actually provided any materials to anyone.[139]

Plaintiffs simply dispute that such materials are truly available, given the one document produced in discovery and the inconsistent testimony among staff about whether such materials are available. Additionally, the provision of written materials in cell is not a substitute for actual mental health care. Most of the men housed on extended lockdown have very limited education.[140] Providing these individuals with the ability to request written materials in-cell is not addressing mental health needs or mitigating any risk of harm to those individuals, even if the materials exist-- which Plaintiffs contest.

Because there is no programming or therapy available, medication is the only course of treatment offered at David Wade.

---

[135] Exh. 38, Excerpt of Deposition of Quentin Moran 32; Exh. 46, Excerpt of Deposition of John Booth 54 11--13.

[136] Exh. 19, Excerpt of Deposition of Willie Dillon at 46.

[137] Exh. 6, Deposition of Hayden 129:20-22; 13017-20 (provided sex offender materials to one person); Exh. 8, Deposition of Robinson 211:1 - 212:5 (only provided written materials to people in TTP as assignments).

[138] Exh. 10, Deposition of Burgos 143:14-25

[139] Exh. 10, Deposition of Burgos 146:11-15.

[140] Exh. 19, Excerpt of Deposition of Willie Dillon at 7 (6th grade education); Exh 5, Excerpt of Deposition of Shawn Francis at 7 (8th grade); Exh. 41, Excerpt of Deposition of Theron Nelson 7 (3rd grade); Exh. 25, Excerpt of Deposition of James White 7:2-3 (9th grade); Exh. 43, Excerpt of Deposition of Noel Dean 7 (6th grade); Exh. 47, Excerpt of Deposition of Leroy Kelly (12th grade); Exh. 48, Excerpt of Deposition of Jawaan Chevalier 8 (could not remember, only knew he was "special education"); Exh. 22, Excerpt of Deposition of Demarcus Thomas 8:12-13 (8th grade); Exh 49, Excerpt of Deposition of Jonathan Regan 6:19-7:7 (3rd grade, special education); Exh. 50, Excerpt of Deposition of Joshua Isaac 7:23-8:4 (10th grade); Exh. 51, Excerpt of Deposition of Mookie Matthews 7:12-15 (10th grade); Exh, 52, Excerpt of Deposition of D'Angilo Rubin 8:7-9 (11th grade); Ex. 53, Excerpt of Deposition of Tyronne Wells 10 (3rd grade); Exh. 54, Excerpt of Deposition of Willie Jones 6-7 (8th grade); Exh. 55, Excerpt of Deposition of Carlton Turner 8:6-9 (8th grade).

3.    <u>Defendants' medication policies are extremely dangerous, creating a substantial risk of serious harm.</u>

    *a)    Medication not continued upon arrival at DWCC creating a substantial risk of serious harm.*

Defendants assert that "medications come with the offender" when an individual is transferred to DWCC.[141] Plaintiffs have consistently contested this fact because medications are often interrupted when individuals are transferred to DWCC. Shawn Francis testified that he was taking Seroquel prior to his transfer to DWCC, but that medication did not come with him. He stated he was told by Dr. Seal that Seroquel is not administered at DWCC.[142] Theron Nelson reported the same.[143] James White testified that he was taken off his medication upon arrival at DWCC, he was told by Dr. Seal that it wasn't provided at DWCC.[144] White became so depressed that he dove off of his prison bunk head first into the concrete floor in a suicide attempt.[145] Jacoby Batiste testified that DWCC does not provide the medication he is supposed to be taking.[146] Demarcus Thomas was taken off his Remeron when he arrived at DWCC from EHCC; he was unaware that DWCC even had a psychiatrist on staff.[147] Travis McKee testified that when he arrived at DWCC from EHCC and was taken off his meds "cold turkey" he had a nervous breakdown as a result.[148] Brennan Bellard testified that at all the other prisons he has been at, there has been no issue receiving medications but at DWCC his medications were stopped.[149] Cody Doucet testified that he did not receive his medications for approximately two or three months at

---

[141] Rec. Doc. 414-1 p.2 point 6.
[142] Exh. 5, Excerpt of Deposition of Francis 31 (and reporting that without his medication, he hallucinates, gets mad and frustrated.)
[143] Exh. 41, Excerpt of Deposition of Nelson 36.
[144] Exh. 25, Excerpt of Deposition of White 18, 20
[145] Exh. 25, Excerpt of Deposition of White 18-20.
[146] Exh. 56, Excerpt of Deposition of Jacoby Batiste 19.
[147] Exh. 22, Excerpt of Deposition of Thomas 30-31.
[148] Exh. 57, Excerpt of Deposition of Travis McKee 18.
[149] Exh. 20, Excerpt of Deposition of Bellard 15:16-25.

DWCC.[150] Jonathan Regan testified that he was not provided with his medication upon intake at David Wade, which resulted in his becoming delusional, slamming his head into the bars, and being sent to suicide watch for 5 days.[151] This testimony is only some of the proof that shows a dangerous discontinuation of medication upon arrival at DWCC, and certainly creates a question of material fact regarding the risk of harm at David Wade such that summary judgment is inappropriate.

> b)    *Defendants' medication administration policies create a substantial risk of serious harm.*

Defendants present as an uncontested fact that "appropriate medications are prescribed and delivered to the offender."[152] In actuality, the medication administration at DWCC represents some of the worst treatment and record-keeping within the correctional system. The conditions created by DWCC's medication practices are incredibly dangerous to the men housed at David Wade. "The control, prescription, dispensation, and administration of medications are important aspects of any medical care delivery system." *Ruiz*, 503 F. Supp. at 1324. "[P]rescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment." *Id.* at 1339. Medication dispensation and recordkeeping at DWCC fall below the constitutional minimum standard of care. Medication administration records are so incomplete that it is impossible to reconstruct even the basic facts of whether medication pass occurred on extended lockdown on many days. Medication administration Officers responsible for medication administration were unable to remember basic aspects of their training, are not supervised by

---

[150] Exh. 23, Excerpt of Deposition of Doucet 37:9-13.
[151] Exh. 49, Excerpt of Deposition of Regan 13:21-14.
[152] Rec. Doc. 414-1 p.3 point 9.

anyone, and there is no mechanism which verifies whether the medication administration records are complete or accurate.

Medication is the only mental health treatment provided at David Wade.[153] "There is essentially no mental health treatment provided except psychotropic medication which is not consistently, or property administered, rendering it ineffective."[154] The way that medication is delivered in a prison can be a matter of life or death.[155] At David Wade, medication is administered by security staff.[156] Staff make rounds three times per day to deliver medication.[157] Staff testified that they understand the importance of record keeping and why it is so important for safety and treatment.[158]

The security staff involved in medication dispensation is responsible for recording that the person actually takes their pills[159] and reporting medication non-compliance to mental health staff.[160] Medication dispensation is required to be recorded in the eMAR system: the electronic database that records pill distribution.[161] When staff make rounds to deliver medication, they mark each delivery as taken, by indicating it with a checkmark which appears as their initials in the eMAR, an "R" if the individual actively refused the medication, or an "N" if the individual "did

---

[153] Exh. 18, Burns Report at p. 3; Exh. 38, Excerpt of Deposition of Moran 31.

[154] Exh. 18, Report of Dr. Burns at p. 3

[155] Exh. 58, Deposition of Paul Pitts 37:13-21; Exh. 59, Pill Pass Training, DWCC 033871 (Risks include seizures, fights, coma, rapes, and death); Exh. 18, Burns Report at p. 25.

[156] Exh. 1, Deposition of Nail 120:14 - 121:1

[157] Exh. 60, Deposition of Michelle Norris 12:4-6.

[158] Exh. 6, Deposition of Hayden 210:22-25; 211:10-13; Exh. 7, Deposition of Dauzat 86:22 - 87:4; Exh. 8, Deposition of Robinson 181:7-9; Exh. 9, Deposition of Seal 142:10-11; Exh. 10, Deposition of Burgos 114:9-22; Exh. 58, Deposition of Pitts 37:13-21; Exh. 59, Pill Pass Training, DWCC 033871 (Risks include seizures, fights, coma, rapes, and death); Exh. 18 Burns Report at p. 25.

[159] Exh. 1, Deposition of Nail 121:5-8; Exh. 59, Pill Pass Training, DWCC 033872

[160] Exh. 58, Deposition of Pitts 55:24 - 56:3

[161] Exh. 60, Deposition of Norris, 18:1-11

not request" the medication.[162] Staff testified that they accurately mark every medication administration -- they testified that their "pill pass" records are completely accurate.[163]

The medication administration practices are inconsistent depending on the staff member conducting the pill pass. There are functionally two staff responsible for pill distribution for people on extended lockdown at David Wade: Sgt. Scriber and Sgt. Pitts.[164] Due to the lack of training and supervision, Sgt. Scriber could not remember any training on whether to mark a missed dose as "N" or "R."[165] He could not remember his training on the eMAR system[166] or the importance of record-keeping.[167] Only one security staff member claimed to create any contemporaneous record of medication administration, which he would note on a sheet of paper and then transfer into the computer system later on in his shift.[168] It was not Sgt. Scriber's  practice to make a contemporaneous written record of who missed doses of their medications.[169] Sgt. Scriber would generally rely only on his memory, rather than any written records, to make the record of his pill pass.[170] Despite this, Sgt. Scriber never received a negative evaluation on his pill pass work.[171]

The training provided to "pill pass" officers specifically states that mental health staff are to be informed if a patient misses three doses.[172] The officers do not report the vast majority of missed doses to mental health staff because they testified that the system does not require them to make a report to mental health if they mark the medication as "not requested" ("N") rather than

---

[162] Exh. 58, Deposition of Pitts 49:11 - 54:22
[163] Exh. 61, Deposition of Erik Scriber 71:2-9.
[164] Exh. 1, Deposition of Nail 120:25 - 121:1
[165] Exh. 61, Deposition of Scriber 54:12-16.
[166] Exh. 61, Deposition of Scriber 17:18-24
[167] Exh. 61, Deposition of Scriber 17:24 - 18:2
[168] Exh. 58, Deposition of Pitts 49:20 - 50:17;
[169] Exh. 61, Deposition of Scriber 23:1-8,
[170] Exh. 61, Deposition of Scriber 12:1-8.
[171] Exh. 61, Deposition of Scriber 11:13-16
[172] Exh. 59, Pill Pass Training, DWCC 033852

"refused" ("R").[173] Similarly, the pill pass officers do not properly observe whether patients actually take medications after they are distributed, as shown by frequent use of prescription medication overdose as a means of self-harm.[174]

Sgt. Scriber could not recall any time any supervisor or nursing staff observed him during pill pass to ensure he was performing it correctly.[175] By contrast, Sgt. Pitts testified that his pill pass activities were supervised directly by nurses.[176] Nursing staff at DWCC testified that they do not review medication administration records to ensure accurate record-keeping.[177] When nursing staff do review MAR records, it is simply to confirm that the records exist, not their accuracy.[178] The colonel in charge of the security staff for extended lockdown testified that he did not even know if the staff were required to make records of the pill pass and stated that all supervisory responsibility was with the nursing department.[179] Mental health staff do not review the medication administration forms to evaluate whether someone has been taking medication.[180] Dr. Seal testified he does not review the eMARs to check on whether the medication he is prescribing reaches the patient,[181] despite the fact that he renews their prescriptions every 90 days. The staff produced for a 30(b)(6) deposition regarding the medication administration practices at DWCC testified that nobody is responsible for reviewing the MAR for accuracy.[182] Thus, there is no individual at David Wade whose responsibility it is to ensure that people are actually receiving or taking their

---

[173] Exh. 61, Deposition of Scriber 54:5-16; Exh. 58, Deposition of Pitts 55:34 - 56:6
[174] Exh. 62, *in globo*: Nov. 14, 2018 Mental Health Progress Note DWCC 100827-28; Jan. 1, 2018 Use of Force Review DWCC 004201-18; March 5, 2017 Use of Force Review DWCC 003025-29; Feb. 19, 2017 Use of Force DWCC 02897-907; Sept. 12, 2016 Use of Force Review DWCC 006546-64; Exh. 63, Excerpt of Deposition of Brian Covington 41:22-25.
[175] Exh. 61, Deposition of Scriber 15:10-19
[176] Exh. 58, Deposition of Pitts 12:12:5-11; 28:19 - 29:10
[177] Exh. 64, Deposition of Joel Williams, RN 36:4-8;
[178] Exh. 60, Deposition of Norris, 47:25 - 48:6.
[179] Exh. 1, Deposition of Nail 121:4-18.
[180] Exh. 6, Deposition of Hayden 103:11 - 104:12
[181] Exh. 9, Deposition of Seal 58:21-25.
[182] Exh. 60, Deposition of Norris 49:9-17

medication.  Not only do these inconsistencies demonstrate the lack of training and supervision, but they also create an obvious danger to the people who depend on medications to treat severe mental health conditions.

The eMAR records actually kept by Defendants indicate that people fail to receive medications for months at a time, show a pattern of missed doses marked "N" across the entire extended lockdown population, show records being edited, and mark people who are not even present at the institution as having received medications. Contrary to Defendants' characterization, the eMAR records have more than simple "imperfections" but rather dangerous and systematic problems with basic elements of record keeping. For example, in April of 2017, records show people receiving only a single dose of medication across the entire month.[183] The fact that so many people received no medication, and that each was not actively refusing but only "failing to request" the medication indicates that these records are dangerously unreliable. While April of 2017 stands as a particularly egregious and obvious example of poor record-keeping and the lack of oversight, the pattern of logging all people as "N" for days and weeks at a time is a common occurrence at DWCC.

The pattern of all patients on extended lockdown being marked as "N" not requesting their medications persists in an extreme form. Since the time this litigation was filed, there has been a consistent pattern of multiple people across all the extended lockdown buildings all missing their doses on the same pill passes in the eMAR records.

February 2018: medications only delivered on six of the 28 days of the month.[184]

March 2018: medications only delivered on 18 of the 31 days of the month.[185]

---

[183] Exh. 65, *in globo*, Medication Administration Records, DWCC 082285; DWCC 156906; DWCC 148509; DWCC 199430; DWCC 218423, DWCC 201746, DWCC 197159
[184] Exh. 66, MARs in globo DWCC 1989, 2006, 107921, 1082, 2094, 2261, 95089, 93783, 82268-82269, 97925
[185] Exh. 67, MARs in globo DWCC 107919, 114204, 2262-2263, 2084-2085

April 2018: medications only delivered on 14 of the 30 days of the month.[186]

May 2018: medications only delivered on 20 of the 31 days of the month.[187]

June 2018: medications only delivered on 18 of the 30 days of the month.[188]

July 2018: medications only delivered on 23 of the 31 days of the month.[189]

August 2018: medications only delivered on 19 of the 31 days of the month.[190]

September 2018: medications only delivered on 21 of the 30 days of the month.[191]

October 2018: medications only delivered on 22 of the 31 days of the month.[192]

November 2018: medications only delivered on 23 of the 30 days of the month.[193]

December 2018: medications only delivered on 20 of the 31 days of the month.[194]

January 2019: medications only delivered on 22 of the 31 days of the month.[195]

February 2019: medications only delivered on 18 of the 28 days of the month.[196]

March 2019: medications only delivered on 22 of the 31 days of the month.[197]

April 2019: medications only delivered on 21 of the 30 days of the month.[198]

May 2019: medications only delivered on 16 of the 31 days of the month.[199]

June 2019: medications only delivered on 24 of the 30 days of the month.[200]

---

[186] Exh. 68, MARs in globo DWCC 2086-2087, 2008, 2049, 107908, 1991, 2264, 2096
[187] Exh 69, MARs in globo DWCC 107918, 114320-114322, 2266-2267, 2088-2089, 114202.
[188] Exh. 70, MARs in globo DWCC 114317-114319, 114116-114117, 107916, 95583, 114246-114247, 114350, 114201
[189] Exh. 71, MARs in globo DWCC 114314-114316, 107915, 97928, 114114-114115, 14244-114245, 114349
[190] Exh. 72, MARs in globo DWCC 114200, 114242-114243, 107913-107914, 82258-82259, 114348, 114112-114113
[191] Exh. 73, MARs in globo DWCC 114240-114241, 107910, 97194, 114119, 114347, 114110-114111
[192] Exh. 74, MARs in globo DWCC 114108-114109, 95081, 114238-114239, 114148, 114346.
[193] Exh. 75, MARs in globo DWCC 114147, 107905, 114345, 114236-114237, 114107.
[194] Exh. 76, MARs in globo DWCC 114104-114106, 130949-130950, 114234-114235, 114146, 114344
[195] Exh. 77, MARs in globo DWCC 114102-114103, 114225, 114343, 114198
[196] Exh. 78, MARs in globo DWCC 114101, 130945-130946, 114144, 114197, 114342
[197] Exh. 79, MARs in globo DWCC 114224, 114196, 130926, 114341, 114099, 114143
[198] Exh. 80, MARs in globo DWCC 114142, 114097-114098, 114122-114223, 114340, 114195
[199] Exh. 81, MARs in globo DWCC 114095-114096, 114194, 114339, 114141, 114220-114221
[200] Exh. 82, MARs in globo DWCC 114094, 114260-114262, 114338, 114219, 114140.

This pattern, in which each person appears to miss their medications all on the same day, is a direct consequence of DWCC's failure to train, supervise, and monitor staff. Identifying this problem takes no great leap of forensic analysis. If any individual were exercising any level of oversight over the medication administration at David Wade blaring alarms should have gone off. The facility has been regularly ordering hundreds of pills from the Department of Corrections with absolutely no indication that the pills made it to the prisoners for whom they were intended.[201] The failure to recognize and ameliorate this obvious problem <u>for years</u> demonstrates the complete lack of oversight of medication administration at DWCC.

These medication records are also inconsistent with the pharmacy ordering records for individual patients. According to Carlton Turner's eMAR records, he received only six doses of Cogentin, five doses of Ripserdol, and one dose of Paxil between February and May in 2017.[202] However, the records of pharmacy orders during that same time period reflect DWCC staff reordering the Cogentin three times for a total of 180 doses,[203] three orders of Paxil for a total of 114 doses,[204] and three orders of Risperdol for a total of 192 doses, ostensibly for Mr. Turner.[205] This pattern repeats for Bruce Charles, his eMAR records show him receiving only one dose of Depakote between February and May of 2017,[206] but the medication was reordered twice during that time for a total of 90 doses.[207] Tyler Blanchard received seven doses of Wellbutrin between February and May of 2017,[208] but the medication was reordered three times for a total of 180

---

[201] Exh. 60, Deposition of Norris 25:16-24
[202] Exh. 83, MAR Turner DWCC 002244-48
[203] Exh. 83, MAR Turner DWCC 002310
[204] Exh. 83, MAR Turner DWCC 002313
[205] Exh. 83, MAR Turner DWCC 002313-14
[206] Exh. 84, MAR Charles DWCC 001994-97
[207] Exh. 84 MAR Charles DWCC 002278
[208] Exh. 85, MAR Blanchard DWCC 2035-38

doses.[209] Nurses are only supposed to reorder medication when the cart runs out.[210] The discrepancy between the eMAR records and the institution's medication orders raises only dangerous and disturbing possibilities, among them that medication actually provided to people on extended lockdown is not being recorded in the system or that powerful psychotropic medications are being diverted from the intended recipients in dangerously high volumes.

On March 20, 2017, Plaintiffs requested medication administration records for Bruce Charles under the Advocacy Center's P&A Access Authority.[211] Defendants provided medication administration records for Mr. Charles, including for the time period of February through March of 2017.[212] Those records, produced prior to the start of the lawsuit, do not match the records later produced by Defendants during discovery; the records produced following the filing of the lawsuit indicate Mr. Charles received not even a single dose of Depakote during that two month time period, however, the records provided before the filing of the lawsuit show Mr. Charles receiving 16 doses of Depakote in February 2017[213] and 7 doses in March 2017.[214] Tyler Blanchard follows a similar pattern: prior to the filing of the lawsuit, he received 17 doses of Wellbutrin in February 2017[215] and 15 doses in March 2018[216] but when those same documents were produced after the start of discovery they reflected that he received no doses in either month.[217] The modification of these records following the filing of the lawsuit calls into question the validity of any record kept by Defendants.

---

[209] Exh. 85, MAR Blanchard DWCC 002383
[210] Exh. 60, Deposition of Norris 26:19 - 27:10; 75:4-13
[211] Exh. 86, MAR Charles PLA016650
[212] Exh. 86, MAR Charles PLA012965-68
[213] Exh. 86, MAR Charles PLA012965
[214] Exh. 86, MAR Charles PLA012966
[215] Exh. 87, MAR Blanchard PLA012838
[216] Exh. 87, MAR Blanchard PLA012839
[217] Exh. 87, MAR Blanchard DWCC 002035-36

There are also records of medication administration being affirmatively recorded when the patient was not even at DWCC. Carlton Turner attempted suicide by jumping from the fence of the recreation cage on September 18, 2017, and was immediately taken to the hospital for surgery.[218] Mr. Turner was admitted to University Health Shreveport on September 18 and discharged on October 5, 2017.[219] However, Mr. Turner's eMARs show that he continued to receive medication from Sgts. Scriber and Warren while he was hospitalized and no longer physically present at DWCC.[220] This again raises the possibility that powerful psychotropic medications are being diverted from the intended patients by staff at DWCC, and certainly confirms that eMAR records are totally inaccurate.

These practices are obviously extremely dangerous, as they allow people to go unmedicated or improperly medicated without intervention. Patients can refuse doses, or be denied doses, or sleep through pill distribution, or collect their pills and attempt an overdose; there is simply no way of knowing based upon these records.

The obvious risks of these inadequate medication administration policies manifest as actual, life-threatening harm to individual class members. Matthew Carroll attempted to take his life using prescription medications.[221] Bruce Charles became suicidal and was placed on suicide watch on March 4, 2017,[222] and received a write-up for masturbating[223] during a period for which his mental health medication compliance is impossible to reconstruct. Joshua Musser was placed on extreme suicide watch with his hands and feet shackled when he returned from the hospital

---

[218] Exh. 88, MAR Turner DWCC 017440
[219] Exh. 88, Turner PLA 016971
[220] Exh. 88, MAR Turner DWCC 002253-2254
[221] Exh. 89, suicide attempts *in globo*, Jan. 16, 2018 Use of Force DWCC004201-18
[222] Exh. 89, suicide attempts *in globo*, Mar. 4, 2017 Mental Health Progress Note DWCC 000800-01.
[223] Exh. 89, suicide attempts *in globo*, Mar. 24, 2018 Disciplinary Report DWCC 000745

after he took a handful of pills.[224] On June 6, 2017, Musser would again attempt suicide by taking blood pressure medication and banging his head on the cell walls.[225]

In short, the one course of treatment actually "offered" at David Wade-- medication-- is not in fact provided. And worse, this information never reaches the licensed mental health provider-- Dr. Seal.  His entire course of treatment of patients is premised on medication administration.[226] He only sees patients for roughly 5 minutes at a time every 90 days, which is not enough time for meaningful therapy or to deeply evaluate someone.[227] He has to rely on medication as the main form of treatment.[228] Because that is not being delivered at DWCC, there is effectively no mental health treatment at the prison whatsoever.

        4.    <u>David Wade does not respond to decompensation or mental health crisis, resulting in actual harm and creating a substantial risk of serious harm.</u>

Staff at David Wade do not respond appropriately to even the most severe demonstrations of psychological decompensation or crisis, and this failure creates a substantial risk of serious harm for the men housed at Wade. Warden Dauzat testified that individual treatment plans are not updated following a sick call or any other decision that could change the treatment options for an individual, including crisis intervention.[229] Dr. Seal testified that not only does he not review an individual's treatment plan when they go onto suicide watch, he does not make any changes to it as a result of being on suicide watch.[230]

Treatment plans for individuals housed on the South Compound are updated annually, regardless of what happens to an individual throughout the course of the year.[231] And as previously

---

[224] Exh. 89, suicide attempts *in globo*, Mar. 5, 2017 Use of Force DWCC 003025-29
[225] Exh. 89, suicide attempts *in globo*, June 6, 2017 Use of Force DWCC 003308-15
[226] Exh. 9, Deposition of Seal 19:13-24.
[227] See Supra III.A.2.(b).
[228] Exh. 9, Deposition of Seal 47:6-8; 48:5-8; 51:7-9; 52:8-11.
[229] Exh. 7, Deposition of Dauzat 132:14-23.
[230] Exh. 9, Deposition of Seal 95:21 - 96:1.
[231] *See* Exh. 6, Deposition of Hayden 229:2-3.

noted, they are "updated" to include the exact same treatment plan that the individual had previously, because there is nothing individualized about them.[232] Therefore, the treatment plans (which should be the guiding document coordinating care between all staff) fails to reflect or adapt when an individual experiences a mental health crisis or has a suicide attempt that may result in the necessity for additional or different mental health treatment. But not only do treatment plans not change-- nothing about an individual's treatment changes in response to crisis.

Cody Doucet, who has a diagnosis of bipolar schizophrenia,[233] repeatedly "was made" to eat his feces and smeared feces over his body.[234] Mr. Doucet reports that he did not receive his medication for months[235] and his medical records substantiate that despite his very serious diagnosis and his bizarre and dangerous behavior, he did not receive medication for four months.[236] Mr. Doucet reports that he had multiple suicide attempts as a result.[237] David Wade did not change Mr. Doucet's treatment plan.[238] It did not change his medications.[239] Staff progress reports during this period reflect multiple suicide watches, both extreme and standard, in addition to numerous reports of self-harm.[240] Rodney Long with the Classification Department testified that Mr. Doucet was in preventative segregation because he was a danger to himself and indicated his mishandling of feces as a reason.[241] And although he was known by staff to be eating his own feces, Mr. Doucet was not moved to a more therapeutic environment than the disciplinary unit at David Wade.

---

[232] *See* Supra III.A.2.(c).
[233] Exh. 23, Excerpt of Deposition of Doucet 34:1-25.
[234] Exh. 23, Excerpt of Deposition of Doucet 14:29-23; 24:20-25.
[235] Exh. 23, Excerpt of Deposition of Doucet 37:9-13.
[236] Exh. 90, Doucet MARs for 03/19 and 07/19 (there were no MAR for April, May or June in records).
[237] Exh. 23, Excerpt of Deposition of Doucet 39:14-120; 41:1-7.
[238] Exh. 90, Treatment plans dated 11/1/2018 DWCC 150623 and 3/7/2019 DWCC 150578.
[239] *See* Exh. 90 Doucet MARs.
[240] Exh. 90, In globo records of SSW & ESW.
[241] Exh. 3, Deposition of Long 139:1-24.

D'Angelo Rubin arrived at David Wade in February 2019, having completed the diagnostic screening test at Hunt, and Hunt having ascertained that David Wade was the proper placement for him.[242] During the intake screen in December 2018, EHCC indicated that Mr. Rubin was diagnosed with schizophrenia and bipolar since he was 8 years old and indicated his medications were Seroquel and Zyprexa.[243] He was provided the same treatment plan as everyone else.[244] He was seen by the EHCC mental health staff on January 17, 2019 due to a report that he was only given Zyprexa and it is not working so he requested he be provided his Seroquel.[245] The notes indicate he reported sleep problems and flashbacks.[246] Mr. Rubin was transferred to DWCC and a Level of Care review completed around the time of his arrival indicated he was a Level of Care 3 with a diagnosis of Psychotic (not otherwise specified) ("NOS"),[247] despite the intake screen at EHCC listing a different diagnosis. There are limited records available from Mr. Rubin's time at DWCC, and the records that were available are incomplete and missing pages that would have included notes and impressions that would have provided insight into Mr. Rubin's interactions with staff.[248] On June 10, 2019 a segregation follow up interview form was completed which indicated that everything was within normal limits and Mr. Rubin reported no mental health issues.[249] In September 2019, he was transferred back to EHCC although his record does not indicate what the reason for transfer was. Through a very tortured deposition transcript, it became clear that Mr. Rubin was ultimately at DWCC for nine months. He is so decompensated during his

---

[242] Exh. 52, Deposition of Rubin, 10 5-22.
[243] Exh. 91, 2018-12-17 HRDC Mental Health Intake Screening DWCC 135692.
[244] Exh. 91, 2019-2-7 - Mental Health Treatment Plan DWCC 135697.
[245] Exh. 91, 2019-1-17 - Mental Health Individual Progress Notes DWCC 135716-17.
[246] *Id.*
[247] Exh. 91, 2019-2-4 - Mental Health Service Codes and Level of Care Review DWCC 135704.
[248] Exh. 91, Multiple Progress Notes missing second pages (seen 2/8/19 for medical referral DWCC 135695) (seen 3/4/19 for PREA Vulnerability Reassessment DWCC 135693) (seen 3/18/19 due to Mr. Rubin being held in segregation exceeding 30 days DWCC 135688) (seen 7/25/19 for psychiatric clinic DWCC 135685).
[249] Exh. 91, 2019-6-10 - Interview of Segregated Inmate DWCC 135686.

deposition that it is difficult to follow. At points, he suggested that opposing counsel was speaking Japanese.[250] Ultimately Mr. Rubin was so unable to participate that defense counsel canceled the deposition. It was never rescheduled.

Vincent Dotson served time at Angola and had no write-ups or confrontations with staff.[251] However, at David Wade in the harmful conditions of extended lockdown,[252] Dotson began to decompensate -- throwing items onto the tier "because the voices was getting to me, or something like that."[253] He got writeups and was maced for "racking the bars."[254] Mr. Dotson had no prior mental health diagnosis or medication.[255] On October 7, 2016, Capt. Huey saw Mr. Dotson banging his head against the cell bars.[256] Medical staff was summoned and, during treatment Mr. Dotson began to vomit glass.[257] Shortly after Mr. Dotson ceased vomiting, Capt. Huey heard Mr. Dotson make a loud crunching noise as he began again eating glass from a lightbulb.[258] Because Mr. Dotson ate the lightbulb on a Friday, he did not see mental health staff until the following Monday.[259] When Steve Hayden did talk to him, the notes from the encounter made no reference to eating the lightbulb, simply stating: "Offender reports conditional stress and conflict with fellow offenders. He denies any current S/I, H/I or MH concerns. Discontinue SSW."[260] After that, there was no mental health follow-up about this extreme act of self-harm and obvious manifestation of mental illness.[261]

---

[250] Exh. 52, Excerpts of Deposition of Rubin 14, 21-25.
[251] Exh. 34, Excerpt of Deposition of Dotson 11:16-24.
[252] Exh. 34, Excerpt of Deposition of Dotson 13:20-24.
[253] Exh. 34, Excerpt of Deposition of Dotson 12:22-13:5.
[254] Exh. 34, Excerpt of Deposition of Dotson 14:16-23; 15:1-15.
[255] Exh. 34, Excerpt of Deposition of Dotson 20:10-25.
[256] Exh. 92, Oct. 7, 2016 Use of Force Review DWCC 006698, *et seq.*
[257] *Id.*
[258] *Id.*
[259] Exh. 92, Oct. 10, 2016 Individual Progress Note DWCC134509-10.
[260] *Id.* (Translated: He denies any current S/I (suicidal ideation), H/I (homicidal ideation) or MH (mental health) concerns. Discontinue SSW (standard suicide watch)).
[261] Exh. 34, Excerpt of Deposition of Dotson 23:9-25.

Noel Dean arrived at DWCC from Louisiana State Penitentiary (LSP) on November 28, 2017 and was identified as Level of Care[262] 3F, denoting frequent mental health problems.[263] His DWCC intake file contains a mental health intake screening noting Level of Care 3 and SMI,[264] the same treatment plan as every other person on extended lockdown[265] and a level of care review form.[266] He received no mental health contact other than suicide watch rounds from November, 2017 until he was placed on extreme suicide watch in full restraints on January 10, 2018 for cutting his wrists with a razor blade.[267] On January 23, 2018, Noel Dean was placed on extreme suicide watch again.[268] That evening, while in his cell in full restraints, he was written up for threatening to bite his tongue to spit blood.[269] That same night, he was also sprayed with mace and written up for making too much noise.[270]

On April 1, 2018, Mr. Dean cut his wrist and was again placed on extreme suicide watch in full restraints.[271] The next day, Mr. Dean again cut his wrist and stated that he was suicidal.[272] While Mr. Dean was still on extreme suicide watch in full restraints, he attempted to commit suicide by hanging himself by the neck with those restraints.[273] The next day, Mr. Dean remained in the same restraints which he had used to attempt suicide with no additional supervision or mental health treatment.[274] He remained on extreme suicide watch in restraints for days.[275] On April 4,

---

[262] Level of Care is a system of categorizing the degree of acuity of mental illness, Level 1 reflects the most extreme needs, Level 5 reflects a determination that the individual has no mental illness.
[263] Exh. 30, Nov. 28, 2017 Initial Classification – DWCC 023633 – Noel Dean.
[264] Exh. 30, Nov. 28, 2018 Intake Screening – DWCC 090570 – Noel Dean.
[265] Exh. 30, Nov. 30, 2017 Mental Health Treatment Plan – DWCC 090562.
[266] Exh. 30, Level of Care Review – DWCC 085315.
[267] Exh. 30, Jan. 10, 2018 Unusual Occurrence Report – DWCC 004190-91.
[268] Exh. 30, Jan 23, 2018 Mental Health Management Order – DWCC 023612.
[269] Exh. 30, Jan. 23, 2018 Disciplinary Report – DWCC 023580.
[270] Exh. 30, Jan. 23, 2018 Disciplinary Report – DWCC 023584.
[271] Exh. 30, April 1, 2018 Unusual Occurrence Report – DWCC 023536.
[272] Exh. 30, April 2, 2018 Unusual Occurrence Report – DWCC 023535.
[273] Exh. 30, April 2, 2018 Unusual Occurrence Report – DWCC 023523.
[274] Exh. 30, April 3, 2018 Mental Health Management Order – DWCC 023518.
[275] Exh. 30, April 4, 2018 Mental Health Management Order – DWCC 023506.

2018, he was placed in the restraint chair for 12 hours after attempting to wrap his cuffs around the food tray to hang himself.[276] Mr. Dean was taken off of extreme suicide watch on April 5, 2018.[277]

On May 17, 2018, the classification review board voted to keep Mr. Dean in extended lockdown due to the "serious nature of past offenses" and "disciplinary reports received during current confinement" with no discussion of his repeated suicide watches, attempts to harm himself, or steps necessary to keep him in a maximum-security setting safely.[278] Mr. Dean's obvious and totally unaddressed mental health needs resulted in his continued deterioration. On July 4, 2018, he was placed on strip cell and food loaf following incidents where he is alleged to have thrown feces.[279] On July 5, 2018, he was again placed on extreme suicide watch in restraints.[280] Mr. Dean was taken off of Policy 34 strip cell status on August 12, 2018.[281] He was put back on strip cell status for throwing his feces on August 27, 2018[282] and taken off again September 25, 2018.[283] This pattern would repeat itself again on October 13, 2018.[284] At no point did mental health or security staff document any concern that the pattern of throwing his feces may reflect an unmet mental health need.

Despite the concerning behavior exhibited by Mr. Dean, on December 13, 2018, Defendant Hayden wrote of Mr. Dean that everything was "within normal limits" and that "No psychiatric

---

[276] Exh. 30, April 4, 2018 Mental Health Management Order – DWCC 023507.
[277] Exh. 30, April 5, 2018 Unusual Occurrence Report – DWCC 023501.
[278] Exh. 30, May 17, 2018 Classification Review Board – DWCC 023497.
[279] Exh. 30, July 4, 2018 Unusual Occurrence Report – DWCC 023464.
[280] Exh. 30, July 5, 2018 Unusual Occurrence Report –DWCC 023472.
[281] Exh. 30, August 12, 2018 Decision Form – DWCC 023440.
[282] Exh. 30, August 27, 2018 Decision Form – DWCC 023436.
[283] Exh. 30, Sept. 25 2018 Decision Form – DWCC 023427.
[284] Exh. 30, Oct. 13, 2018 Decision Form – DWCC 023415.

distress was noted."[285] Mr. Dean again engaged in self harm on Dec. 25, 2018.[286] On Dec. 28, 2018, he was placed on extreme suicide watch again.[287]

Torre Huber died at DWCC. When he was first processed into the Department's custody, he was diagnosed with major depressive disorder and borderline personality disorder and prescribed Zyprexa and Celexa.[288] At Elayn Hunt Correctional Center (EHCC) intake on February 26, 2015 he reported auditory hallucinations and a history of self-harm, including an attempted suicide by gunshot.[289] He arrived at DWCC on March 30, 2015, and received a mental health intake screening from Defendant Hayden who identified only major depressive disorder and listed his medication as Remeron.[290] During his initial visit with Dr. Seal, Mr. Huber reported auditory hallucinations and received a diagnosis of schizoaffective disorder, but Dr. Seal failed to diagnose him with   major depressive disorder.[291] After only approximately five months on extended lockdown, his condition deteriorated to the point where he experienced auditory and visual hallucinations of conversations with his deceased relatives.[292] His treatment plan remained the same as everyone else's and reflects no programming, mental health counselling, or any additional safety measures.

A month after the visit where Mr. Huber reported conversations with his deceased relatives, he was listed as a no-show for psychiatric clinic, a pattern which would repeat itself as his condition worsened.[293] Even where Dr. Seal's notes indicated that Mr. Huber was experiencing

---

[285] Exh. 30, Dec. 13, 2018 Interview of Segregated Inmate – DWCC 131006.
[286] Exh. 30, Dec. 25, 2018 Level of Care Review – DWCC 130997.
[287] Exh. 30, Dec. 28, 2018 Individual Progress Note – DWCC 130998-99.
[288] Exh. 31, Feb. 26 2015 Mental Health Progress Note (EHCC) – DWCC 012096.
[289] Exh. 31, Feb. 16, 2015 Mental Health Intake Screening – DWCC 012098-99.
[290] Exh. 31, March 30, 2015, Mental Health Intake Screening – DWCC 012078.
[291] Exh. 31, April 1, 2015 Mental Health Progress Note – DWCC 012076.
[292] Exh. 31, Sept. 3, 2015 Offender Progress Note – PLA 015369
[293] Exh. 31, Oct. 15, 2015 Mental Health Progress Note – DWCC 012053; Exh. 31, Jan 21, 2016 Mental Health Progress Note – DWCC 012049; Exh. 30, June 23, 2016 Mental Health Progress Note – DWCC 012035.

hallucinations, Defendant Hayden's notes from the same clinical encounters fail to reflect this fact; instead Defendant Hayden recommended that Mr. Huber's next visit occur in 4-6 months.[294] His treatment plan remained the same even as his symptoms escalated.[295] By September 2016, Mr. Huber's condition deteriorated to the point where he was severely disoriented and no longer responded to commands or answered questions.[296] Around this time, Dr. Seal indicated a suspected diagnosis of early onset dementia.[297] Mr. Huber's condition continued to deteriorate, with Ariel Robinson describing him as catatonic and "help-seeking."[298] The day after Ms. Robinson's visit, he was taken off mental health observation with no follow-up treatment steps, safety measures, or memory aids.[299] Mr. Huber did not see Dr. Seal again until February of 2017.[300] Around this time, after nearly two years on extended lockdown (for reasons that are completely unclear) Mr. Huber was returned to general population. Later that same year, Mr. Huber, a known dementia patient, returned to extended lockdown for a work offense.[301]

On July 3, 2018, Mr. Huber was taken from extended lockdown in N2 to the hospital non-responsive with a temperature of 105.1.[302] While at the hospital, DWCC was contacted for patient history which DWCC staff described as follows: "that patient does become confused at times and will be oriented one day and confused the next and this seems to be his baseline status."[303] Staff at the hospital suspected he was reacting to his medication, possibly combined with the heat. He was returned to the prison with no provision for assistance with any activities of daily living, no special

---

[294] Exh. 31, Feb. 4, 2016 Mental Health Progress Note – DWCC 012047; Exh. 31, Feb 4, 2016 Psychiatric Clinic Assessment – DWCC 012043.
[295] Exh. 31, Feb. 4, 2016 Mental Health Treatment Plan – PLA015356.
[296] Exh. 31, Sept. 15, 2016 Mental Health Progress Note – DWCC 012029-30.
[297] Exh. 31, Sept. 22, 2016 Mental Health Progress Note – DWCC 012018-20.
[298] Exh. 31, Sept. 26, 2016 Mental Health Progress Note – DWCC 012016-17.
[299] Exh. 31, Sept. 27, 2016 Mental Health Progress Note – DWCC 012015.
[300] Exh. 31, Feb. 2, 2017 Mental Health Progress Note – DWCC 012008.
[301] Exh. 31, Oct. 10, 2017 Disciplinary Report – PLA 014956.
[302] Exh. 31, July 3, 2018 Health Care Request Form – PLA 015243.
[303] Exh. 31, July 3, 2018 Physician Discharge Summary – PLA 015030.

supervision as a result of his memory issues, and no additional precautions for his safety. Shortly thereafter, he stopped eating and drinking.[304] By that time, he no longer spoke much and what speech he had was largely incomprehensible.[305] He had only hot water to drink between meals[306] despite temperatures being in the 90s[307] and despite his being on psychotropics and despite the hospital having indicated that he still had an altered mental state on discharge.[308] On July 22, 2018, Torre Huber was found dead in his cell by his cellmate in the early morning.[309]

GB was transferred to DWCC after intake at EHCC around November 2, 2015[310] and received a mental health intake screen at DWCC on November 10, 2015.[311] His intake stated he was Level of Care 4 with a diagnosis of ADHD[312] which was inexplicably changed to a Level of Care 5h on June 29, 2016.[313] Over the course of the next year and a half, GB's behavior became increasingly bizarre and he was placed on multiple suicide watches as a means to deal with his behavior.[314] Despite the numerous reports of bizarre behaviors, inability to communicate, and refusals to leave his cell, there was no intervention by Dr. Seal or direct mental health staff other than cursory progress notes.[315] Vincent Dotson had been on the same tier with GB for approximately 9 months[316] and he testified that GB was in a strip cell and food loaf the whole time he was there.[317] Around June 5, 2017, GB was transferred to EHCC for mental health treatment.[318]

---

[304] Exh. 32, Excerpt of Deposition of Joshua McDowell 31:1-7.
[305] Exh. 32, Excerpt of Deposition of Joshua McDowell 31:13-19.
[306] Exh. 32, Excerpt of Deposition of Joshua McDowell 12:12-16.
[307] Exh. 32, Excerpt of Deposition of Joshua McDowell 35:25.
[308] Exh. 31, July 11, 2018 Discharge Summary DWCC – 015286.
[309] Exh. 31, July 24, 2018 Medical Summary Report – DWCC 103827.
[310] Exh. 33 2015-11-2 - Mental Health Service Codes and LOC Review.
[311] Exh. 33 2015-11-10 - Mental Health Intake Screening - Bonner, Gerald.
[312] Exh. 33 2015-11-2 - Mental Health Service Codes and LOC Review - Bonner, Gerald.
[313] Exh. 33 2016-6-29 - Mental Health Service Codes and LOC Review - Bonner, Gerald.
[314] Exh. 33, in globo suicide watch notes and progress notes
[315] Exh. 33, in globo progress notes, psch call out refusal notes
[316] Exh. 34, Excerpt of Deposition of Dotson 18:16-21.
[317] Exh. 34, Excerpt of Deposition of Dotson 17:13-23.
[318] Exh. 33, 2017-6-5 - Notification of Transfer - Bonner, Gerald.

On intake at EHCC, he was diagnosed with schizophrenia and his level of care was changed to a level 1 resulting from his inability to communicate or care for himself.[319] GB's development of schizophrenia while at DWCC went unnoticed by the mental health staff who are responsible for identifying mental illness. Consequently, GB received no treatment for nearly a year and a half.

Carlton Tuner was seen by Dr. Seal on April 20, 2017, during which Dr. Seal noted Mr. Turner reported doing well.[320] A level of care review completed May 16, 2017 indicated Mr. Turner to be a Level of Care 3 with a diagnosis of Major Depressive Disorder.[321] On August 29, 2017, Mr. Turner was found in his cell with blood on the floor, having cut his wrists while voicing suicidal ideation.[322] As a result, he was placed on suicide watch in alternative restraints.[323] He was seen by Steve Hayden on August 30[324] and 31[325], 2017, at which time he was discontinued from suicide watch. He was seen by Mr. Hayden again on September 4, 2017, who reports Mr. Turner was taking all medications as prescribed and working as intended with no current mental health concerns.[326] However, just 2 weeks later on September 18, 2017, Mr. Turner climbed to the top of the 12-foot exercise pen and jumped off, in a reported suicide attempt.[327] As a result, he fractured both legs and required multiple surgeries to save his legs. From April 20, 2017, Mr. Turner was not seen by Dr. Seal again until November 9, 2017.[328] In 4 months, Mr. Turner had 2 suicide attempts and was not seen once by the only psychiatrist at DWCC, nor is there an indication in the records that a referral was made by Mr. Hayden.

---

[319] Exh. 33, 2017-6-6 - Psychiatric Progress Notes, Hunt - Bonner, Gerald.
[320] Exh. 93, *in globo* 2017-4-20 - Progress Note - Turner, Carlton.
[321] Exh. 93, *in globo* 2017-05-16 MH Level of Care Review - Turner, Carlton.
[322] Exh. 93, *in globo* 2017-8-29- Use of Force- Turner, Carlton.
[323] Exh. 93, *in globo* 2017-8-29 - MH Progress Note - Turner, Carlton.
[324] Exh. 93, *in globo* 2017-8-30 - MH Progress Note - Turner, Carlton.
[325] Exh. 93, *in globo* 2017-8-31 - MH Progress Note - Turner, Carlton.
[326] Exh. 93, *in globo* 2017-9-4 - MH Progress Note - Turner, Carlton.
[327] Exh. 93, *in globo* 2017-9-18 - Unusual Occurrence Report - Turner, Carlton.
[328] Exh. 93, *in globo* 2017-11-9 - Progress Note - Turner, Carlton.

Thomas Demarcus reports that upon presenting as suicidal he was placed on suicide watch for a week but was never brought to see Dr. Seal -- ever -- despite Dr. Seal being the only licensed treatment provider at the time.[329]

Defendants' failure to respond meaningfully to crisis situations results in a substantial risk of harm for the men incarcerated at David Wade. This is a material fact bearing on whether Defendants provide adequate mental health care and whether an Eighth Amendment violation exists in this case, rendering trial necessary and summary judgment improper.

The only response at David Wade to a mental health crisis is suicide watch.[330] Because the conditions on suicide watch are so punitive, there is a disincentive to report mental health needs, for fear of being placed on suicide watch.

5.    DWCC's suicide prevention policies create a substantial risk of serious harm.

The policies and practices maintained at David Wade regarding suicide prevention create a substantial risk of harm to the men housed there, sufficient to create a disputed material fact as to prisoner safety and make a grant of summary judgment inapposite.

When an individual presents as suicidal or poses a risk of self-harm the facility responds by placing that individual on "suicide watch." This is also true even if the individual is not suicidal, but rather only needs intervention and mental health care.[331] David Wade does not have a mental health unit or even a suicide watch unit; anyone in the entire facility that is in mental health crisis or that is suicidal is sent to extended lockdown.[332] For example, when Travis McKee had a nervous

---

[329] Exh. 22, Excerpt of Deposition of Thomas 22.
[330] Exh. 50, Excerpt of Deposition of Joshua Isaac 15:14-2 ("they don't give us no type of mental health treatment. The moment we ask to speak to a psychiatrist we are put on suicide watch.") *Id.*, 22:6-18.
[331] Exh. 5, Excerpt of Deposition of Francis 37; Exh. 51, Excerpt of Deposition of Matthews 20:8-9 ("Any time you request mental health you automatically go on suicide watch at David Wade.")
[332] Exh. 6, Deposition of Hayden 13-16; Exh. 10, Deposition of Burgos 109:23-110:6; Exh. 1, Deposition of Nail 54:16-18; Exh. 7, Deposition of Dauzat 74:1-3; *See also* Exh. 29, Report of Haney p.43, para. 63.

breakdown while housed on protective custody, he was sent to extended lockdown for suicide watch-- not to any therapeutic setting.[333]

The extended lockdown buildings are built and staffed with the purpose and policies of being a punitive setting; they are designed to punish and respond to prisoner misconduct. Suicide watch at David Wade, then, is provided in the most punitive setting available within the DOC system: stripped cells on the disciplinary units. This gives rise to the reasonable belief by people held on extended lockdown that they are being punished for having mental health needs.[334]

DWCC has two levels of suicide watch, standard and extreme. The standard suicide watch involves the individual being placed into a "camera cell," which are only located on the extended lockdown units of David Wade. The individual can be observed by a staff member housed outside of the tier via camera, although that person is not responsible for documenting their observations.[335] That staff member is also simultaneously responsible for monitoring the door to the building, monitoring the doors to all 4 tiers, logging who enters and exits the building and the tiers, checking in and out leg irons and cuffs, and, ostensibly, monitoring the "sound" being pulled from all 64 cells in the building.[336] There is simply no way for this individual to meaningfully provide "suicide watch" over an individual at risk of self-harm, in addition to all of the other tasks she is completing. In fact, Sec. Pacholke the need for extensive staff involvement during suicide watch to ensure the safety of a suicidal prisoner.[337] David Wade strips every person on suicide watch of all belongings and clothing-- they do not provide meaningful staff supervision of a

---

[333] Exh. 57, Excerpt of Deposition of McKee 10.
[334] *See* Exh. 18, Burns report p. 28.
[335] Exh. 8, Deposition of Robinson 111:4-15.
[336] Exh. 94, Deposition of Warden Jerry Goodwin 107:3- 109:7 (Explaining that the Key room officer is responsible for monitoring the audio on all four tiers, and the suicide watch cell cameras); Exh. 15, Deposition of Elmore 80:1-10 (noting that the listening device is in the Key room and that it is the only listening device); Exh. 3, Deposition of Long (Explaining that the Key Room Officer is responsible for monitoring all of the tiers).
[337] Exh 96, Deposition of Sec. Dan Pacholke 96:6 – 97:4.

suicidal person. In lieu of staff observation of and interaction with a person, Defendants take draconian measures to attempt to limit self-harm.

While Defendants' policy states the mental health staff can determine what clothing and property an individual may have, the default is to remove all property and place the individual in a blue paper gown.[338] This includes removal of a mattress and forcing suicidal individuals to sleep on bare concrete for days on end.[339] This also requires removal of all books and papers. Because there are no televisions or radios on the tier, this means that a suicidal person is held-- naked except for a paper gown-- in a cell with absolutely no stimuli-- nothing to read, look at or listen to, and no one to talk to-- barefoot on bare concrete-- completely alone with only their thoughts. It is difficult to conjure a less therapeutic environment.

Extreme suicide watch encompasses all the aspects of standard suicide watch (naked/barefoot, paper gown, no books, papers or other stimuli, no mattress, no direct staff observation) and includes an extra level of restraint or restriction. Individuals on extreme suicide watch may be placed in 4-point restraints in their cell, placed into the restraint chair, or placed in a helmet depending on the individual's actions and attempts at self-harm.[340] Warden Dauzat described it as "extreme suicide watch would indicate that there is a level of restraint that is not present in a standard suicide watch."[341] Staff only periodically monitor the person who is in restraints.[342]

Dr. Burns testified that, in her experience, other facilities do not use the system of standard and extreme suicide watch.[343] Defense expert Dr. Thompson referred to extreme suicide watch as

---

[338] Exh. 6, Deposition of Hayden 137:3-8; Exh. XX, Deposition of Robinson 109:10 - 110:3.
[339] See Exh 22, Excerpt of Deposition of Thomas 22.
[340] See Exh. 7, Deposition of Dauzat 134:11-15; Exh. 6, Deposition of Hayden 138:2-12, 138:15-17
[341] Exh. 7, Deposition of Dauzat 134:4-6.
[342] Exh. 49, Excerpt of Deposition of Regan 24:1-25 (on extreme suicide watch he was held shackled for three days before seeing anyone from mental health.)
[343] Exh. 11, Deposition of Burns 187:19-23.

"draconian"[344] and suggested that maybe there could be a "medi-duty" or some other level between standard and extreme suicide watch.[345] At the outset of this litigation David Wade utilized a restraint chair as a form of restraint for people on extreme suicide watch. Indeed, one individual died immediately following a period of time in the chair with evidence of significant trauma to his head and neck[346] and froth built up in his airways.[347] Defendants represent that they have ceased reliance upon the restraint chair, as was the recommendation of both the Defense and Plaintiff experts in this matter.[348] Steve Hayden testified that mental health staff can downgrade patients from extreme suicide watch to standard suicide watch without medical oversight,[349] which raises the question of why such a status can be implemented without a rigorous evaluation by qualified medical professionals. Despite Defendants' protestations, DWCC's current policy still allows use of the restraint chair.[350]

In addition to being deprived of all stimuli with nothing to look at or listen to, individuals who are on suicide watch are subjected to extreme conditions, such as extreme cold temperatures during the winter months. The cells are concrete walls and floors, which can become extremely cold during the winter months. Individuals are not provided with a mattress or blankets, leaving them to sit on a cold metal bunk or cold concrete slab with only a paper gown to cover themselves.[351]  Dr. Haney testified that "prisoners complained about even being sprayed (with

---

[344] Exh. 17, Deposition of Thompson 235:7-8.
[345] Exh. 17, Deposition of Thompson 239:4-8.
[346] Exh. 96, Death Report for Robert Baltimore, DWCC 015091-109 at 015101-02
[347] *Id.*  at DWCC 015105
[348] Exh. 17, Deposition of Thompson 69:2-3 ("Dr. John Thompson, expert for Defendants, stated that "I don't think you should put someone in a restraint chair." He went on to explain that "it'd be my recommendation to start seriously looking at whether or not your facility really needs a restraint chair. There are other ways to do it without having to use that particular item."); Exh. 40, Deposition of Haney 171:16-19.
[349] Exh. 6, Deposition of Hayden 148:10-14.
[350] Exh. 117, Deposition of Dauzat 25:20 – 26:3.
[351] Exh. 22, Excerpt of Deposition of Thomas 22; Exh. 41, Excerpt of Deposition of Nelson 28-30 (no mattress, paper gown). *See also*, *Infra* IV.B.

chemical agents) while they were on suicide watch."[352] Dr. Burns testified that other facilities "put people on suicide watch in a more therapeutic environment such as an infirmary watch cell as opposed to staying in segregation."[353] And the prisoners testified that the harsh conditions on suicide watch are a deterrent to identifying oneself as suicidal-- no one wants to be put in a paper gown and housed on cold bare concrete, without access to even a mattress to sleep on, for weeks.[354] These brutal conditions lead to underreporting of needs for assistance, which poses a greater risk of completed suicide or untreated mental deterioration.

The brutal conditions of suicide watch also lead prisoners to increased incidence of self-harm; staff do not stay on site with suicidal prisoners to prevent harm:[355]

> I'm like, "Excuse me, I've been in here this long, I haven't been on my medication." So they finally bring me a sick call. I tell 'em that -- I'm-I'm-I'm-I'm really feeling to the point where people say I'm feeling like I wanted to harm myself. So, Steve [Hayden] came and said, "Alright, just take all his stuff." Wasn't worrying about medication, wasn't worrying about none of that. Take all my belongings, left me in the cell with no camera, no nothing. Double-bunk cell. So, I'm in this. It's the holiday time, I'm feeling real depressed. So I really had felt – at that time I really felt like I really wanted to harm myself. So I climbed on the rack and jumped off, and I lost consciousness when they woke me back up.[356]

Mr. White dove off the top rack of the bunks head first in an attempt to kill himself on suicide watch.[357] And in a separate incident, he cut his wrists while on suicide watch with a piece of metal he found in cell, resulting in his being put on extreme suicide watch.[358]

Noel Dean once was on suicide watch for six months. Because there is no yard or recreation while on suicide watch, he did not go outside for six months.

A: cut—cut—cut—yeah every day. Every time I think about it, being depressed. Well, if I was gon' die, I was gon' die by my hands, not them."
Q: So you were cutting yourself?

---

[352] Exh. 40, Deposition of Haney 184:25-185:1.
[353] Exh. 11, Deposition of Burns 188:21-189:3.
[354] Exh. 19, Excerpt of Deposition of Dillon at 44. ("Please don't put me in a gown.")
[355] Exh. 25, Excerpt of Deposition of White 24-25.
[356] Exh. 25, Excerpt of Deposition of White 19-20.
[357] Exh. 25, Excerpt of Deposition of White 25-26.
[358] Exh. 25, Excerpt of Deposition of White 31-32

A: Yes sir.
Q: Okay. And how many times did you cut yourself?
A: Sometimes two or three times a day.
Q: what were you cutting yourself with if you were on strip cell?
A: You got iron in the cell. You can take any kinda piece of metal and make a little shim." [359]

Mr. Dean goes on to discuss being put in restraints and trying to kill himself in restraints. The punitive conditions of suicide watch at David Wade drive prisoners to greater self-harm, and staff are not present to prevent it. The suicide watch policies and practices create a substantial risk of harm to the men incarcerated at David Wade, such that summary judgment cannot be granted and this matter should proceed to trial.

### B.   Inadequate Record Keeping At DWCC Creates A Substantial Risk Of Serious Harm

As noted elsewhere in this pleading, DWCC consistently fails to properly document the activities, treatment or contacts with mental health staff.[360] But it bears mentioning that the deficient record-keeping is so troublesome that it creates its own risk of harm to the men housed at David Wade. The documentation completed by the psychiatrist Dr. Gregory Seal was found to be insufficient as it is nearly impossible to read or interpret.[361] Dr. Burns testified that when an individual is on suicide watch, "the nurses on the weekends did not provide documentation of those cell-side visits."[362] Additionally, Dr. Thompson opined that one of the areas that DWCC "performed really poorly in, it's documentation."[363] There is no dispute that DWCC's practices around documentation are deficient and require change. The below-standard record keeping practices create a substantial risk of serious harm to the men housed at David Wade, because even if all of the substantive deficiencies in care were remedied tomorrow, no medical or mental health

---

[359] Exh. 43, Excerpt of Deposition of Dean, 24- 25.
[360] *See, Supra*, III.A.1-5
[361] *See* Exh. 7, Deposition of Dauzat; Exh. 17, Deposition of Thompson.
[362] Exh. 11, Deposition of Burns 189:19-25.
[363] Exh. 17, Deposition of Thompson 168:13.

providers could work together or with security staff to provide care. The record-keeping, supervisory and communication systems are so anemic that staff could not coordinate care even if more robust care were offered.

### C.   The Brutal and Isolated Conditions of Confinement at David Wade Create a Substantial Risk of Serious Harm

Operating in tandem with the mental health systemic failures outlined above, DWCC's security-side practices pertaining to conditions of confinement, force and prolonged isolation function to exacerbate the risk of harm to people housed there, in violation of the Eighth Amendment. All individuals who arrive at DWCC are placed in segregation on extended lockdown upon arrival,[364] including people with serious mental illnesses. The brutal conditions in these punitive housing units create a serious risk of harm such that conditions at the facility violate the Eighth Amendment.

### 1.   Defendants' Policy 34 creates a substantial risk of serious harm.

David Wade maintains an institution-specific disciplinary policy called "Offender Posted Policy 34."[365] The policy on its face provides that an individual may be subjected to solitary confinement with no clothing other than a paper gown, and no property, recreation, mattress or bedding for a period of up to thirty (30) days for certain enumerated offenses.[366] Mental health staff are not consulted prior to an individual being placed on this status,[367] and the policy is often applied to people with serious mental illness.[368] These conditions mirror those of suicide watch, with the end result that the same conditions intended to prevent an individual from engaging in

---

[364] Exh. 10, Deposition of Burgos 195:9-12.
[365] Exh. 97, Offender Posted Policy No. 34.
[366] Id.
[367] Exh. 6, Deposition of Hayden 155:21-23; Exh. 7, Deposition of Dauzat 160:19-24; Exh. 8, Deposition of Robinson 229:11-16; Exh. 1, Deposition of Nail 178:1-3.
[368] Exh. 25, Excerpt of Deposition of White 9.

suicidal behavior are also used to punish individuals for disciplinary behaviors.[369] This policy, and subsequent conditions, are imposed by security staff without any appearance before the disciplinary board,[370] and therefore with no due process. Although ostensibly limited to certain enumerated offenses, the status can be and is imposed for much more minor transgressions.[371] These punishing conditions may be imposed for 30 days at a time before a brief break wherein the individual is permitted to have clothing and bedding for a few days[372] prior to being placed back on strip cell, again with no due process protections.

Individuals with serious mental illness may have a harder time conforming to rules such as modulating speech or other erratic behaviors. Allowing staff to punish people in the most draconian conditions imaginable without passing such disciplinary actions through any mental health review, or even a formal disciplinary board that could theoretically account for a person's mental health needs, creates a very high risk of harm to all people, and particularly people with mental illness. Dr. Haney opined that Policy 34 is "an even worse form of punishment that can be administered at the complete discretion of the DWCC correctional staff" in "response to anything a staff member perceives as a rule violation."[373] Dr. Haney noted that "this additional punishment is imposed without affording the prisoner any procedural safeguards or due process protections (such as a hearing)."[374] Col. Nail testified that the list of individuals eligible for punishment with

---

[369] See Exh. 18, Burns Report at p.28.
[370] Exh. 97, 2013-11-08 OPP 034 Maximum Custody Housing - General, strip cell status at DWCC 105253-105256.
[371] Exh. 98, *in globo,* May 14, 2018 Use of Force DWCC 004658-62 (Alvin Ball and Joshua Martin placed on DOPPS 34 for hollering and racking bars); Dec. 31, 2017 Decision Form DWCC 0120979 (refusing to pass back a dinner tray); Mar. 31, 2018 Decision Form DWCC 120890 (broken light fixture in cell); June 11, 2015 (policy 34 applied to Torre Huber who turned out to have early onset dementia); July 7, 2017 Disciplinary Report DWCC 028417 (attempting to flush paper gown); Aug. 6, 2017 Use of Force DWCC 003611-18 (spitting on his own dinner tray); Jan. 27, 2018 Use of Force DWCC 004157-62 (throwing a book); May 22, 2017 Use of Force DWCC 005886-94 (pulling away while being handcuffed)
[372] Exh. 1, Deposition of Nail 178:1-3
[373] Exh. 29, Haney Declaration at p. 47, para.70.
[374] Exh. 29, Haney Declaration at p.47, para. 71.

68

Policy 34 was kept on a rolodex on his desk.[375] Sec Pacholke testified that he agrees with the Defendant's expert, Mr. Upchurch that Policy 34 is inconsistent with the ACA standards as well as accepted correctional practices.[376] He went on to testify that Policy 34 is akin to torture noting, "I think strip cell status is torture.· I think taking all property out of a cell and leave people with a paper covering that breaks about their knees in the middle of the night is equivalent to sleep deprivation."[377] Because this system of severe punishment operates completely outside of the sphere of mental health review and any formal disciplinary proceedings but applies to people with serious mental illness, it places all individuals at David Wade at risk for the development or worsening of mental health symptoms.

2. Defendants' excessive use of force and staff abuse of people with SMI creates a substantial risk of serious harm.

The men housed on the South Compound at DWCC are subject to conditions that alone and in combination with one another create a substantial risk of serious harm. Described below are (1) use of force policies that employ chemical and physical restraint with very few (if any) attempts at de-escalation; (2) write ups, force, and extrajudicial punishment used on men who are in extreme mental health crisis; (3) physical and social isolation; and (4) a severely curtailed to communicate with loved ones. These conditions individually create a risk of harm and when combined that risk only escalates to exceed the threshold of an Eighth Amendment claim and send this case to trial.

People at David Wade are subjected to excessive use of chemical agents.[378] Chemical agents are often used for refusal to come to the bars.[379] Chemical agents are used for people talking

---

[375] Exh. 1, Deposition of Nail 46:20 - 49:19.
[376] Exh. 95, Deposition of Sec. Pacholke 350:1-13
[377] Id. at 285: 3-8
[378] Exh. 19, Excerpt of Deposition of Dillon, 10.
[379] Exh. 19, Excerpt of Deposition of Dillon, 56.

too loudly,[380] including people asking loudly for medicine, or clapping.[381] However, "racking the bars" (making noise) is often the only way to get staff to come on the tier to assist or answer questions.[382] The abusive use of chemical agents is part of the culture set by the highest levels of administration at David Wade, sending a message to staff that it is permissible to use chemicals excessively against the most mentally ill people held there.[383] Staff will use chemical agents without activating body cameras, to avoid documentation.[384] Chemical agents are used against people on suicide watch who are housed in paper gowns.[385] Larry Jones, a named Plaintiff in this matter, was sprayed with chemical agents for requesting mental health help and requesting to be taken off of suicide watch.[386]

People housed on extended lockdown also receive write-ups and are sprayed for attempting suicide. On April 10, 2017, John Booth wrapped a jumpsuit around his neck after declaring himself suicidal.[387] Mr. Booth did not comply with an order to remove the jumpsuit and so Sgt. Wallace sprayed him and gave him a write-up for aggravated defiance.[388] Damian Clark cut his wrist and wrote in blood on his cell walls.[389] Mr. Clark was taken from his cell, became argumentative, and then was sprayed with chemical agent and given a write-up for aggravated defiance.[390] Brad Rison

---

[380] Exh. 14, Deposition of Coleman 129:2-7
[381] Exh. 19, Excerpt of Deposition of Willie Dillon 57; Exh. 22, Excerpt of Deposition of Thomas 23-24; Exh. 63, Excerpt of Deposition of Covington 13:11-24.
[382] Exh. 5, Excerpt of Deposition of Francis 41; Exh. 54, Excerpt of Deposition of Jones 31; Exh 14, Deposition of Coleman 133: 9-19.
[383] Exh. 24, Excerpt of Deposition of Solomon 37:2-40:1 (Col. Nail v. Cody Doucet).
[384] Exh. 5, Excerpt of Deposition of Francis 10; Exh. 23, Excerpt of Deposition of Doucet 47:22-25; 48:5-16.
[385] Exh. 25, Excerpt of Deposition of White 33-34; Exh. 1, Deposition of Nail 188:19-13; Exh 15, Deposition of Elmore 74:9-17 (Noting that the policy regarding the use of spray does not change when a prisoner is on suicide watch).
[386] Exh. 99, *in globo,* May 14, 2018 Use of Force Review DWCC 004839-50 (Plaintiff sprayed for yelling while requesting to be taken off suicide watch)
[387] Exh. 99, *in globo,* April 10, 2017 Use of Force DWCC 003265-81
[388] Exh. 99, *in globo, Id.* at DWCC 003281
[389] Exh. 99, *in globo,* June 6, 2017 Use of Force DWCC 003316-32
[390] Exh. 99, *in globo, Id.* at DWCC 003332

declared himself suicidal and retrieved a sheet from his laundry bag.[391] He was sprayed and given a write-up for aggravated disobedience.[392] On March 16, 2018, Alvin Ball tied a sheet around his neck and declared himself suicidal.[393] Mr. Ball was sprayed and issued a write-up for causing a disturbance.[394] Chris Solomon, a U.S. Army veteran,[395] was sprayed and issued a write-up because he "refused" to stop talking to himself or banging his head on the cell bars.[396] Using spray and issuing disciplinary sanctions to a person for disobeying an order not to attempt suicide reflects barbaric and unacceptable attitudes towards mental illness.

People are intentionally exposed to extreme cold temperatures to punish them when they are on suicide watch.[397] Windows are opened during freezing temperatures while people are housed naked- without shoes- in only paper gowns.[398] Prisoners call it "bluesing" and describe it as torture.[399] Staff intentionally expose severely mentally ill people to freezing temperatures as retaliation for talking loudly.[400] People naked on suicide watch are laughed at for asking for a mattress in the cold.[401] "You cold? You still cold?"[402]

Staff are indifferent to the mental health needs of prisoners.[403] People who seek mental health care are made fun of, mocked or retaliated against.[404] Prisoners who help other prisoners

---

[391] Exh. 99, *in globo*, July 8, 2017 Use of Force DWCC 003466-70
[392] Exh. 99, *in globo, Id* at DWCC 003470
[393] Exh. 99, *in globo*, Mar. 6 2018 Use of Force DWCC 004486-517
[394] Exh. 99, *in globo, Id.* at DWCC 004512
[395] Exh. 24, Excerpt of Deposition of Solomon 7:21-25
[396] Exh. 99, *in globo*, July 8, 2019 Disciplinary Write-up DWCC 179279
[397] Exh. 25, Excerpt of Deposition of White 9.
[398] Exh. 19, Excerpt of Deposition of Dillon 70-72; Exh. 43, Excerpt of Deposition of Dean 34; Exh. 22, Excerpt of Deposition of Thomas 25-26; Exh. 32, Excerpt of Deposition of McDowell 27-29; Exh. 63, Excerpt of Deposition of Covington 12:17-22.
[399] Exh. 50, Excerpt of Deposition of Joshua Isaac 17:20-18.
[400] Exh. 100, Excerpt of Deposition of Dameion Brumfield 17-18.
[401] Exh. 25, Excerpt of Deposition of White 9.
[402] Exh. 25, Excerpt of Deposition of White 29-33.
[403] Exh. 19, Excerpt of Deposition of Dillon, 10
[404] Exh. 25, Excerpt of Deposition of White 9; Exh. 19, Excerpt of Deposition of Dillon 10

file requests for help are retaliated against.[405] Christopher Solomon reports one time when he was on suicide watch, "chained up with no mattress, stuck on a rock."[406] When he asked to see mental health, Major Coleman mocked him. "He was like, 'Ain't nothing wrong with you. You ain't talking to no mental health.' And he told me, 'You ain't crazy. You crazy? Let me see you run your head in the bars.' And I ran my head into the bars. And he sprayed me. And then he called Mental Health." [407]

The staff's complete indifference to suffering is a very common thread in Plaintiffs' experiences. One man explains,

> "Ain't nothing wrong with you. There ain't nothing wrong with you. There's nothing wrong with you." This dude just finished slinging sh—feces out his cell and you're talking about "he's fine"? You serious? I live around these guys. All night I hear screaming and they crying for help, but here's the administration they're like, "oh they're okay, they're alright over here." [408]

Multiple people substantiate this attitude of indifference among staff.

> Some of them will just ignore it. They told me if I'm having a problem they ain't gonna move me out the cell until they see me hurt myself or if I -- gotta get into it with my celly. Or sometimes tell 'em -- I let 'em know that I'm having mental health problems, and they'll be like, "We -- we – we ain't worrying about you. You ain't hanging yourself. You ain't trying to cut yourself or anything like that." And I'm letting them know that I -- I'm having mental health issues and all that. And they're not trying to hear what I'm saying. They're telling me to go ahead and kill myself or either cut myself or show 'em that I'm serious. Or letting 'em know that I'm trying to get out the cell to have some -- some "me time" because I'm going through some mental health things. They just ignore it.[409]

Thomas Demarcus reported that when he told one staff member he was suicidal; staff response was just "don't do it on my shift."[410]

[405] Exh. 100, Excerpt of Deposition of Brumfield 19-22.
[406] Exh. 24, Excerpt of Deposition of Solomon, 26:11-13.
[407] Exh. 24, Excerpt of Deposition of Solomon 27:1-11.
[408] Exh. 19, Excerpt of Deposition of Dillon at 10-11.
[409] Exh. 48, Excerpt of Deposition of Chevalier 20.
[410] Exh. 22, Excerpt of Deposition of Thomas 21.

Prisoners recount staff forcing a very mentally ill man (who often "played with" his feces) to bark like a dog for food.[411]  Staff behavior is cruel, and it can also be lethal.[412] Staff mocked this litigation and the men participating in it, as well as counsel.[413]

People housed on extended lockdown at David Wade are confined to their cells for 23 hours per day. Although policy provides that they can go outside for one hour per day,[414] most men on extended lockdown are on "yard restriction" and can only go outside one hour per week. Even that is often not provided.[415] Thus as a practical matter the only out-of-cell time many individuals get daily is their opportunity to shower. Although policy provides that a shower should be provided daily, people are not always allowed to shower.[416] Staff dislike having to transport prisoners on the tier for showers, so they pressure people to "give up" their showers. Individuals will forfeit showers to staff in exchange for other privileges (like extra food, or just to curry staff favor).[417] Staff leave windows open in the winter to make it cold on the tier such that people do not want to shower.[418]  When people are denied recreation and shower, they are confined 24 hours per day in a small cell, often alone but sometimes with a cellmate.

---

[411] Exh. 100, Excerpt of Deposition of Brumfield 14-15; 75-76; Exh. 101, Excerpt of Deposition of Edward Polk 24:7-24.

[412]  Exh. 100, Excerpt of Deposition of Brumfield 80-81 (Terrance Goodeau asked to see mental health, was disregarded before killing himself.)

[413] Exh. 25, Excerpt of Deposition of White at 10; Exh. 19, Excerpt of Deposition of Dillon at 64-66; Exh. 48, Excerpt of Deposition of Chevalier 33; Exh. 22, Excerpt of Deposition of Thomas 34-36; Exh. 32, Excerpt of Deposition of McDowell 14; Exh. 54, Excerpt of Deposition of Jones 40.

[414] Exh. 102, Offender Posted Policy #035.

[415] Exh. 38, Excerpt of Deposition of Quentin Moran 24.

[416] Exh. 51, Excerpt of Deposition of Mookie Matthews 17:5--17; Exh. 49, Excerpt of Deposition of Regan 25:13-24 (been denied showers many times); Exh. 100, Excerpt of Deposition of Brumfield 75.

[417] Exh. 19, Excerpt of Deposition of Dillon 10, 58-61; Exh. 20, Excerpt of Deposition of Bellard 34:2-21; Exh. 49, Excerpt of Deposition of Regan 26:1-30 (some staff will barter food for forfeiting shower). Exh. 103, Excerpt of Deposition of Kenneth Webster 63:7--25 (staff use food to bribe you out of your shower) and 64:1--11 (he sold his shower because he did not have enough food).

[418] Exh. 32, Excerpt of Deposition of McDowell 10; Exh. 54, Excerpt of Deposition of Jones 12.

Although policy provides men on extended lockdown one phone call per month[419], which serves as a singular lifeline to the outside world for many people, those calls are afforded only sporadically and are sometimes denied.[420] Conditions are constantly noisy, staff are often belligerent and rude, heat precautions are not followed, men are only allowed limited items to occupy their minds including at most 3 books and one religious text.[421]  In this culture, weaker or more vulnerable prisoners are often abused or overlooked to a point of extreme deterioration.[422]

People are placed in lockdown, and therefore made to suffer under the conditions described above, for extended periods of time without penological justification. Joshua McDowell spent six months on extended lockdown for falling asleep in school in general population.[423] Willie Dillon was housed at DWCC for the last several years, on lockdown, except for five or six months when he went to Elayn Hunt for some court matters. While at Elayn Hunt he participated in therapy that was very helpful to him.[424] While at Elayn Hunt he worked as an inmate social worker,[425] functioning as a "diffuser" to try to talk to prisoners who were upset to calm them down.  Mr. Dillon had no write-ups while at Hunt.[426] Then was sent right back to lockdown at DWCC, where he was left to live in the most punitive conditions possible, despite having clearly demonstrated that he is capable of being successful in less restrictive environments.

---

[419] Exh. 102, Offender Posted Policy #035.
[420] Exh. 38, Excerpt of Deposition of Moran 26; Exh. 51, Excerpt of Deposition of Matthews 16:8-25.
[421] Exh 104, Offender Posted Policy # 036
[422] Exh. 20, Excerpt of Deposition of Bellard 39:1-12-40; 40:13-24 (discusses abuse of Cody Doucet, potential rape of Cody Doucet.); Exh. 50, Excerpt of Deposition of Isaac 29:23-30 (noting that prisoner A.J. only gets to shower every month or two; 30:18-31:8 noting that A.J. flies a spaceship inside of his cell.); Exhibit 21, Excerpt of Deposition of Ratcliffe 22:12-23 (observing the deterioration of two men on lockdown who did not get to shower, would hit the wall and talk to themselves-- without staff intervention.)
[423] Exh. 32, Excerpt of Deposition of McDowell 18-19.
[424] Exh. 19, Excerpt of Deposition of Willie Dillon 39-40.
[425] Exh. 19, Excerpt of Deposition of Dillon 20-21.
[426] Exh. 19, Excerpt of Deposition of Dillon 23.

Mr. Dillon was sent to David Wade because of a fight he had at Angola in November 2017. Mr. Dillon's classification status was reviewed by 4 classification review boards over a period of 19 or 20 months with no write-ups and he was still held in solitary. He had no write-ups at David Wade and yet his status was not changed. He went to Elayn Hunt and had no write-ups there, and was remanded back to DWCC with again no writeups. Mr. Dillon was not released from lockdown. Ultimately, as happens to most people, he received another wrote-up-- in June 2019.[427]

People go for many months at a time without a write-up, but nonetheless remain on extended lockdown. In September 2019, Ronald Brooks, a named plaintiff in this matter, had been on extended lockdown without a write-up since March 2019.[428] That same month, Carlton Turner remained on extended lockdown despite not having received a write-up since October 2018.[429] Others, including Andre Evans, Brandon Jackson, Willie Hayes, Laron Brown, Frederick Sheppard, Freddie Williams, Christopher Taylor, John Cunningham, Clyde Anderson, Jeremy Coleman, and Azarius Heard had similarly all been without write-ups since March 2019, but nonetheless remained on lockdown. Frankie Adams, Benjamin Watkins, Jeremey Perot, Dontrevel Mitchell, Lawrence Brue, Matthew Mobley, and Tywaski King hadn't had a write-up since February 2019, but still remained on lockdown.[430] Still other people hadn't had a write-up in that calendar year: Joshua Mosely and Gregory Kelley since November 2018, Michael Couch and Juvonte Turner since December 2018, Raymond Broussard since October 2018, Xavier Heard since May 2018, Darius Dowell since September 2018, James Oscar since October 2018, Raymond LeBlanc since July 2018, and Jerrod Johnson since March 2018.[431]

---

[427] Exh. 19, Excerpt of Deposition of Willie Dillon 69.
[428] Exh. 105, Sept. 2019 Continuous Confinement Report DWCC 195947-54 at 195951.
[429] *Id.* at 195954
[430] *Id.* at 195947-54
[431] *Id.*

This pattern continues into 2020. For example, Jose Castro hadn't had a write-up for more than a year before arriving at DWCC and being placed on extended lockdown, he never got a new write-up but remained on extended lockdown for more than three months.[432] Matthew Carroll, Drayfus Bob, Justin Craft, James Doyle, Timothy Hill, and Brandon Allwell also remained on extended lockdown despite having gone for more than four months without a write-up.[433] Gregory Kelley, Raymond LeBlanc, and Jerrod Johnson each remained on extended lockdown in January of 2020 despite their most recent write-ups having been in 2018.[434] These examples demonstrate that simple compliance with institutional rules does not protect an individual from a lengthy stay in solitary confinement.

Shawn Francis has been on extended lockdown at David Wade for over four years. He does have an extensive disciplinary history, but twice he has gone six month stretches with no write-ups, only to be kept on extended lockdown due to his prior history.[435] This makes people lose hope and go insane, because they feel like they can never get out. If one follows the rules for 180 days and still is not released to try general population-- hope is lost. Likewise, Jawaan Chevalier (who also has an extensive disciplinary history) does not feel he has any chance of leaving extended lockdown, explaining that he has gone months without disciplinary infractions and is not moved.[436] Theron Nelson (who has a very long disciplinary history as well) says "They don't give us a chance to prove that we could be, you know, more better than we are. … They don't ever give us a chance to prove that we did change."[437] People get stuck in extended lockdown in the brutal conditions expounded upon herein. The staff culture, lack of treatment and stark conditions create a cycle of

---

[432] Exh. 106, January 2020 Continuous Confinement Logs DWCC 195977
[433] *Id.* at DWCC 195981-82
[434] *Id.* at DWCC 195982
[435] Exh. 5, Excerpt of Deposition of Francis 41-42.
[436] Exh. 48, Excerpt of Deposition of Chevalier 29.
[437] Exh. 41, Excerpt of Deposition of Nelson 15.

discipline and punishment that many people struggle to escape from. These conditions cause a serious risk of harm to all people, and particularly people with serious mental illness, who may need interventions to assist them with being safe and successful in the David Wade environment.

### 3.    Defendants' prolonged use of solitary confinement poses a substantial risk of serious harm.

Individuals who are held in restrictive housing for prolonged periods of time are at risk for worsening mental health symptoms or development of new symptoms.[438] As chronicled *supra* III.A., individuals are placed in prolonged lockdown without regard to the effect on their mental health. Staff were able to recall only occasional transfers to a more therapeutic setting.[439] Incident reports from Wade chronicle people swallowing razors,[440] self-mutilation of the face,[441] slicing open scrotums,[442] attempting to slice off ear,[443] writing on the walls in blood,[444] head-banging,[445] eating a lightbulb[446] while no additional mental health services are made available at this facility. The conditions at David Wade exacerbate and cause mental illness.[447]

Shawn Francis has been on extended lockdown for more than four years. He is a person that is diagnosed with bipolar schizophrenia. He has been unable to secure his release from lockdown. Mr. Francis reports that after living so long on extended lockdown he can only be in a

---

[438] Exh. 29, Haney Declaration at p.6, 8, 34.

[439] Exh. 6, Deposition of Hayden 168:14-18; 170:7-24 (two people transferred in past 6 months);

[440] Exh. 107, *in globo,* Feb. 29 2016 Use of Force Review DWCC 005418-36 (incident involving Jesse Sullivan); Feb 29 2016 Use of Force DWCC 005437-57 (incident involving Joshua Musser); July 5, 2016 Use of Force DWCC 006112-25; Aug. 29, 2017 Use of Force DWCC 003627-37

[441] Exh. 107, *in globo,* August 12, 2016 Use of Force DWCC 006475-96

[442] Exh. 107, *in globo,* April 30, 2016 Use of Force DWCC 005729-59 (Joshua Musser); Aug. 12 2016 Unusual Occurrence Report DWCC 013935 (Carlton Turner)

[443] Exh. 108, 2016-8-11- Use of Force- Musser, Joshua

[444] Exh. 109, *in globo,* 2016-8-6- Use of Force- Greenup, Levi; Exh. XX 2017-6-6- Use of Force- Clark, Damian; Exh. XX 2019-5-22 - Unusual Occurence Report - Sullivan, J.

[445] Exh. 110, *in globo,* Sept. 10, 2018 Use of Force DWCC 103446; July 8, 2019 Disciplinary Write-up DWCC 179279 (also issued a disciplinary report for aggravated disobedience)

[446] *Supra* III(A)(4).

[447] Exh. 38, Excerpt of Deposition of Moran 27 (developed clinical depression); Exh. 57, Excerpt of Deposition of McKee 22 (prior to conditions at DWCC only was diagnosed with clinical depression, now has another dx).

cell by himself. Being around other people is very hard for him and he is paranoid, thinking that other people are going to harm him.[448] With the exception of 3 months, Theron Nelson has been on extended lockdown at David Wade for almost ten years. Mr. Nelson is a person with a disability and a serious mental illness. He struggled to communicate in his deposition, explaining "These cells done made me messed up in the mind that I can't communicate with people."[449]  Mr. Nelson explains what it's like to be locked in a cell, and also locked in one's own mind with a serious mental illness in lockdown-- a torture that most of us cannot even imagine.

> I done went through my going -- having -- was hearing voices, ramming my head on the locker box, beat my head on the wall. That's why I got this permanent mark right here on my head. Try to cut myself. Try to hang myself multiple times. They had to cut me down. I go through my, you know, my mental stages. And you know, sometimes I just – the cells -- the walls close in on me, to where I go to hearing things. And just do the -- do whatever the voice tell me to do. Stuff like that.[450]

Joshua Isaac, who has been locked down for two years,[451] testified that he feels boxed in, trapped, catches himself having conversations with himself. He believes he would function better in general population. [452]

Tyroderick Foster was incarcerated at David Wade from 2015 through 2018. He spent the entire three and a half years on extended lockdown.[453] He is diagnosed with paranoid-schizophrenia and bi-polar disorder.[454] While at David Wade, Mr. Foster received only medication; "I need better treatment--counseling. And get us more better on call mental health staff who know-- if we do have a problem, they can be on hand to where we can call 'em and we can speak to 'em."[455]  After more than three years of being housed in the conditions outlined above, Mr. Foster

---

[448] Exh. 5, Excerpt of Deposition of Francis 42-43.
[449] Exh. 41, Excerpt of Deposition of Nelson 12.
[450] Exh. 41, Excerpt of Deposition of Nelson 27-28.
[451] Exh. 50, Excerpt of Deposition of Isaac 11:1-4.
[452] Exh. 50, Excerpt of Deposition of Isaac 24:8-25:5.
[453] Exh. 111, Excerpt of Deposition of Tyroderick Foster 10:3-19.
[454] Exh. 111, Excerpt of Deposition of Foster 14:2-3.
[455] Exh. 111, Excerpt of Deposition of Foster 27:17-21.

was released back into his community. He did not receive any re-entry programs or transitional services-- he was released straight from solitary confinement back to the streets.[456] Upon release, he had a very hard time communicating with people and figuring out how to talk to his family.[457] Mr. Foster was rearrested and is back at David Wade, on extended lockdown.

Every person that arrives at David Wade is housed on extended lockdown for a substantial period of time.[458] Dr. Haney reported that "most of the men [he interviewed] reported being confined in extended lockdown/solitary confinement at DWCC for a period of years, not months."[459] The risk of individuals with mental illness being housed in restrictive housing was even recognized by Defendants' expert, Dr. John Thompson.[460] When considering whether an individual should be housed in restrictive housing, Dr. Thompson stated "as psychiatrists we have to interface with that in a way that informs the folks that are gonna put people in those administrative segregation situations" and considering "what kind of mental illness does this guy have and is he gonna do okay or worse and how much time would be reasonable for them to be in there to fix whatever disciplinary issue there is, but also be aware that they have issues and those issues could get worse."[461] Dr. Thompson additionally opined that policies and procedures "should have some caveats for the mentally ill folks so that we're not just putting them into the same bucket as everybody else and not giving them the same program that everybody else is having.[462]

---

[456] Exh. 111, Excerpt of Deposition of Foster 28:1-13.
[457] Exh. 111, Excerpt of Deposition of Foster 28:18-23.
[458] Exh. 32, Excerpt of Deposition of McDowell 18; Exh. 3, Deposition of Long 59:7-60:21; Exh. 1, Deposition of Nail 54:5-15; Exh. 112, Deposition of James Jimmerson 91:23-95:18 (explaining that a person transferred into DWCC would only go directly to the North Compound under extraordinary circumstances such as needing to be placed in the infirmary).
[459] Exh. 29, Haney Declaration at p.58 para.95.
[460] Exh. 17, Deposition of Dr. Thompson 266:16 - 267:2.
[461] Exh. 17, Deposition of Thompson 67:5-14.
[462] Exh. 17, Deposition of Thompson 200:2-6.

Defendants assert that individuals are not housed in restrictive housing at David Wade for prolonged period of time.[463] Plaintiffs dispute this allegation, and such an assertion is belied by Defendants' own documents. As a prerequisite for accreditation by the American Correctional Association (ACA) David Wade is required to maintain "continuous confinement logs" showing the length of time individuals are held in cell confinement.[464]   David Wade also is required to submit those reports monthly to the Department of Corrections, in the form of CO-5 reports.[465] Plaintiffs requested all of these documents in discovery.[466] Despite the fact that the documents are required for accreditation, and the fact that Defendants have to submit the reports regularly to their supervisors, Defendants had a difficult time locating them and some ultimately could not be found.[467] It is noteworthy that forms intended to serve as a backstop or institutional check on the over-detention of people in segregated housing could not be located, because presumably neither Warden Goodwin nor Secretary LeBlanc can exercise review over the propriety of prolonged detention if they do not have the records-- which means that people will languish in extended lockdown with no supervisory review.

The documents that were obtained by Plaintiffs indicate that Defendants' representations to the Court about the truncated lengths of stay on extended lockdown are inaccurate. Specific examples include: according to the April 2019 continuous confinement report produced by DWCC Jamine Felton spent 4 years, 8 months and 26 days in extended lockdown;[468] the September 2019 the report shows Carlton Turner as having been in extended Lockdown for 2 years, 9 months, and

---

[463] Rec. Doc. 414-1, point 24.
[464] Exh 94, Deposition of Warden Goodwin 154:10-22
[465] Id. at 69:15-72:16
[466] See Exh 44 - Plaintiffs' Eighth Set of Requests for Production, Nos. 108, 109, and 113.
[467] Exh. 113, 2019-7-8 - Defendants_ Responses to Plaintiffs_ Eighth Set of Discovery; Exh. 114, 2020-8-6 - Email with agenda items for meet and confer; Exh. 114, 2020-8-12 - Follow up after Meet and Confer re. RFP 113; Subsequently, Defendants produced some continuous confinement reports on December 16, 2019 and Plaintiffs' have not received a supplement since then.
[468] See Exh 115, April 2019 Continuous Confinement report

14 days and Jeremy Ricard having been there for 3 years, 3 months and 19 days.[469] As of March 2020 John Booth had spent 3 years, 2 months and 14 days on extended lockdown.[470] This list is not exhaustive, yet clearly demonstrates that the men at DWCC are subjected to periods of time on lockdown in excess of years.

This prolonged period of time on lockdown in the punitive and harsh conditions outlined herein and without access to a functioning mental health care system operate independently and in combination to create a substantial risk of harm to the men at David Wade.

## IV.   CONCLUSION

The conditions of confinement at David Wade violate the Eighth Amendment. The Plaintiffs have clearly raised serious disputes as to material facts that tend to show that the conditions at David Wade violate the rights of the men housed there. Plaintiffs certainly have shown adequate facts to be entitled to a trial on the merits in this matter, and to overcome Defendant's assertion that there are not material facts in dispute.  Accordingly, Defendants' motion should be denied, and this matter should proceed to trial, to allow for relief for the men housed at David Wade who have been hoping for Court intervention for over three years.


Respectfully submitted,


/s/ Melanie Bray
Melanie Bray, La. Bar No. 37049
Jonathan C. Trunnell, La. Bar No. 36956
Emma Lee Douglas, La. Bar No. 39076
Ronald K. Lospennato, La. Bar No. 32191
Disability Rights Louisiana
Formerly known as The Advocacy Center
8325 Oak Street

---

[469] See Exh 116, September 2019 Continuous Confinement Report.
[470] See Exh 117, March 2020 Continuous Confinement Report.

New Orleans, LA 70118
504-208-4151
504-507-1956 (fax)
mbray@disabilityrightsla.org


Katie M. Schwartzmann, La. Bar No. 30295
Cooperating Counsel for ACLU-F LA
6329 Freret Street
New Orleans, La 70115
(504) 496-8566
kschwartzmann@tulane.edu