UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


ANTHONY TELLIS, et al.,                    )
                                           )
Plaintiffs                                 )
                                           )
                                           )
versus                                     )          CASE NO.  5:18-CV-00541-EEF-MLH
                                           )
                                           )
JAMES M LeBLANC, et al.                     )
                                           )
Defendants                                 )


REPORT OF MENTAL HEALTH EXPERT
January 11, 2021

Kathryn A Burns MD, MPH

**Assignment**

I have been retained by counsel for plaintiffs in *Tellis v LeBlanc* to provide expert psychiatric consultation regarding the effects of extended lockdown at the David Wade Correctional Center (DWCC) on inmates confined there, and particularly the effects on those inmates with serious mental illness.  Within the field of corrections, extended lockdown has also been called segregation, administrative segregation, solitary confinement and most recently, restrictive housing.  Placements in extended lockdown are generally related to punishment for not following prison rules, safety concerns (such as known or suspected gang members), or protection from other prisoners for a variety of reasons.  At DWCC, housing units N4, N3 and portions of N2 on the South compound house prisoners in extended lockdown. I have also been asked to assess the adequacy of the mental health treatment provided to prisoners in extended lockdown.

**Summary of Key Findings**

There were severe deficiencies in the elements examined that are necessary for a functioning system to provide mental health care to prisoners with serious mental illness.

- Screening for prisoners with mental illness at admission to extended lockdown is inadequate and performed by staff that are not trained or qualified to recognize signs and symptoms of mental illness leading to delays in referral to the psychiatrist for evaluation and delays in accessing higher levels of care when necessary.

- Psychiatric evaluations and follow-up appointments are not comprehensive, not conducted in a confidential setting, and are not documented legibly or comprehensively.

- There is essentially no mental health treatment provided except psychotropic medication which is not consistently, or property administered, rendering it ineffective.

- Mental health staffing is woefully inadequate:  there are too few staff and they are not appropriately trained to recognize signs and symptoms of mental illness, authorized to formulate diagnoses and are unqualified by virtue of education and training to provide mental health treatment.

- The suicide prevention program provides no treatment and places prisoners under punitive conditions that serve to increase isolation and worsen depressive symptoms.

- Medical and mental health records are poorly organized and provide little or inaccurate descriptions of prisoners' conditions.

All prisoners in extended lock down are exposed to the risk of developing serious mental consequences and persons with serious mental illness are particularly vulnerable to the harmful effects of segregation.  These consequences include psychological pain and suffering, serious self-injury and death by suicide.  The severe deficiencies in the mental health care provided at DWCC do nothing to address or ameliorate these risks and in some instances, serve to increase the risk of harm by failing to treat symptoms of mental illness leading to behaviors that punished with prolonged stays in extended lockdown.

**Expert Qualifications**

I am a Psychiatric Medical Doctor licensed in the state of Ohio.  I also have a master's degree in Public Health.  I am Board Certified by the American Board of Psychiatry and Neurology in General Psychiatry and Forensic Psychiatry.  I am a Distinguished Life Fellow of the American Psychiatric Association.  I have a clinical faculty teaching appointment at the Ohio State University.

I served as the Chief Psychiatrist for the Ohio Department of Rehabilitation and Correction from May 1995 to August 1999 and also from July 2013 until my retirement from public service July 31, 2018.  I have provided direct psychiatric care to patients in jails, prisons and state hospitals in addition to holding clinical administrative posts in state and county agencies.  I am a Certified Correctional Health Professional.  I have written correctional mental health policies and procedures and developed staffing plans for correctional mental health services.  I have written and been published in journals and peer reviewed textbooks on topic pertaining to correctional mental health care.

I have served as both a consulting and testifying expert witness in legal cases involving correctional mental health care.  I have conducted assessments of the adequacy of mental health care in individual correctional facilities as well as state systems including Massachusetts, Pennsylvania, Indiana, Illinois, Ohio, Alabama, and Delaware.  I have also been a monitoring expert in correctional litigation cases including *Coleman v Brown* (California), *Disability Rights Network of Pennsylvania v Wetzel* (Pennsylvania), *Disability Law Center v Massachusetts Department of Correction* (Massachusetts), *Graves v Arpaio* (Maricopa County, Arizona) and *Carty v Mapp* (US Virgin Islands).

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

4

A copy of my current curriculum vitae, which includes a list of all publications authored and a list of all cases in which I have testified at trial or deposition during the past four years is attached to this report as Appendix A.

**Compensation**

My rate of compensation for this case is $400 per hour for all work, including deposition and testimony at trial.  Travel time is compensated at $100 per hour.

**Facts and Data Considered in Forming Opinions**

My opinions in these matters are based on a number of sources, including my direct experience interviewing and evaluating inmates housed in extended lockdown/solitary confinement as well as on-going review of the scientific literature and professional standards promulgated by the American Correctional Association and principles and position statements adopted by the Association of State Correctional Administrators and the National Commission on Correctional Health Care and the American Psychiatric Association, among others.

I reviewed multiple state and local policies including, but not limited to those pertaining to Reception and Evaluation Intake Screening Medical, Mental Health Screens and Appraisals; Reception and Orientation Process; Suicide Prevention and Post Suicide Management; Mental Health Observation; Mental Health Program; Health Care Policy HC-27: Segregation; Use of Restraints/Offender Control; DWCC Offender Posted Policy #034 Maximum Custody Housing – General.  I reviewed prisoners' medical and mental health records and deposition testimony of

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

5

DWCC staff and prisoners.  Appendix B contains a complete list of the documents I considered in preparation of this report.

I visited DWCC August 27-29, 2018.  I reviewed portions of medical records primarily pertaining to the time period corresponding to a prisoner's time in extended lockdown for 15 prisoners prior to the August site visit and current medical records of inmates individually interviewed during the site visit.  I also toured representative restrictive housing/segregation units in Buildings N1, N2, N3 and N4 on August 27, 2018.  During this tour, I spoke to prisoners briefly at cell front in housing units N1A, N1B, N2C, N3D, N4B and N4C.  I was able to directly observe the environmental conditions of inmates on extended lockdown status, suicide watch and punitive "strip cell status."[1]

I interviewed 22 inmates individually in an interview room outside of the cellblocks;  five of whom were selected by plaintiffs' counsel, eight were selected based on cell front interview and nine were selected randomly from a list of inmates in extended lockdown for greater than 90 days which was provided by defendants.  Appendix C contains a list of inmates interviewed and a number assigned for purposes of this report in which they will be referred to by number rather than name.

I re-visited DWCC October 23-25, 2019 and toured extended lockdown housing units on the South compound and the "transition units" (N1), stopping to speak briefly with more than fifty prisoners in their cells and observing the conditions of the housing units.  I also toured the outdoor recreation areas, the dining hall and the room used for inmate visits with the

---

[1] Strip cell status is an additional type of punishment imposed on a prisoner for certain types of behaviors, actions or verbalizations discussed more fully later in this report.

psychiatrist.  I privately interviewed 13 prisoners individually on October 24 and 25: eight selected from cell front interviews during the tour, two were chosen because I had reviewed their medical records (and I had interviewed one of them during the prior visit) and three were randomly selected from the roster of inmates in extended lockdown for 90 days or longer provided by the defendants.  Appendix C also contains these prisoner names and a number assignment.

**Effects of Extended Lockdown - General**

There has been a documented increase in the use of segregation or solitary confinement, now known as restricted housing, in correctional facilities across the United States over the last several decades.  Such placements are generally related to punishment for not following rules or safety concerns, such as known or suspected gang members or protection from other prisoners for a variety of reasons.[2] At DWCC, this placement is known as extended lockdown.

It has also been observed and documented that inmates with serious mental illness are over-represented in segregation or extended lockdown housing units in part due to difficulty conforming to institutional rules specifically because of their mental illness and their stay is prolonged because their mental condition worsens when maintained in extended lockdown precluding their release.[3] The harmful effects of solitary confinement on prisoner health and

---

[2] Association of State Correctional Administrators' Restrictive Status Housing Policy Guidelines, August 9, 2013.
[3] US Department of Justice, NCJ 250315 - Restrictive Housing in the U.S. Issues, Challenges and Future Directions, Nov 2016

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

welfare have been recognized by researchers and scholars as well as the United States National Institute of Justice, the World Health Organization, United Nations and other international bodies.  These harmful effects are due to the conditions of confinement in extended lockdown that involve the absence of meaningful social interaction, enforced idleness and lack of environmental stimulation and the restrictive and oppressive security measures.[4]  These harmful effects may be experienced by any and all inmates housed under extended lockdown but are particularly malignant for prisoners with serious mental illness.

The World Health Organization listed the following effects of solitary confinement on prisoner physical health:  gastrointestinal and genitourinary problems, diaphoresis (sweats), insomnia, deterioration of eyesight, profound fatigue, heart palpitations, migraines, back and joint pains, weight loss, diarrhea and aggravation of pre-existing medical problems.  Mental health problems, even for those with no prior history of mental illness include: anxiety, depression, anger, diminished impulse control, paranoia, visual and auditory hallucinations, cognitive disturbances, obsessive thoughts, paranoia, hypersensitivity to stimuli, posttraumatic stress disorder, self-harm, suicide and psychosis.  Prisoners with pre-existing mental illness are at particularly high risk of worsening symptoms.

The harmful effects of extended lockdown have long been recognized by scholars and have been increasingly recognized by courts, the health professions and as noted, within the corrections profession itself.[5] In fact, in recognition of the harmful effects of extended

---

[4] World Health Organization, Prisons and Health 2014, Chapter 5 - Solitary confinement as a prison health issue.

[5] National Commission on Correctional Health Care Position Statement, Solitary Confinement (Isolation) Adopted April 2016; American Psychiatric Association Position Statement on

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

8

restrictive housing on prisoners with serious mental illness, the American Correctional

Association (ACA), which accredits prisons, including those in Louisiana, has adopted additional

standards calling for prisoners to be screened prior to placement in segregation, monitored

frequently by medical and mental health staff conducting rounds in restrictive housing units

and have mental health assessments at intervals of 30-90 days. In addition, the newly revised

standards adopted in August 2018[6], specifically exclude individuals diagnosed with serious

mental illness from placement in extended restrictive housing unless there is an immediate and

present danger to others or the safety of the institution. If placed, "there must be an active

individualized treatment plan that includes weekly monitoring by mental health staff,

treatment as necessary and steps to facilitate the transition back into general population."[7] All

of these standards are for the express purpose of identifying prisoners experiencing mental

health difficulty or worsening symptoms of mental illness in order to remove them from

lockdown and provide them with treatment.  DWCC does not perform these functions as

intended and holds prisoners in segregation/restrictive housing for prolonged periods of time,

including prisoners with pre-existing serious mental illness and others experiencing harmful

psychological effects of lock-down.

---

Segregation of Prisoners with Mental Illness, Approved by the Board of Trustees, December 2012; Association of State Correctional Administrators' Restrictive Status Housing Policy Guidelines, August 9, 2013.

[6] The standards were developed in 2017 and adopted in August 2018.  The effective date is October 1, 2020.

[7] ACA Performance-Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition, March 2020; Standard 5-ACI-4B-30.

**Effects of Extended Lockdown - DWCC**

The conditions observed in extended lockdown at DWCC during the site visits, reflected in the records reviewed and reported by prisoners housed there include all of the conditions known to have harmful effects on prisoners including being locked inside a cell for 22 or more hours per day, the absence of meaningful social interaction, enforced idleness and lack of environmental stimulation and restrictive and oppressive security measures.  Prisoners in extended lockdown have extremely limited out of cell time, no access to programming, limited property with no access to television or radios and essentially no mental health monitoring or mental health treatment.  There are no measures to exclude inmates with serious mental illness from placement in extended lockdown or remove them when serious symptoms emerge or worsen.  While in lockdown, symptoms of mental illness are not treated but often lead to disciplinary action which results in prolonging the time spent in extended lockdown status, further worsening symptoms.  The cycle repeats itself over and over.

Every prisoner housed in extended lockdown at DWCC is subjected to these same policies and practices.  There are no exceptions.  All prisoners are exposed to these harmful conditions and many suffer serious mental consequences.  During the site visit, of the 34 inmates interviewed with open-ended questions, 28 reported or displayed symptoms of anxiety, depression, self-injury, poor impulse control, auditory hallucinations and/or sleep disturbances.  Some had histories of suicide attempts and having multiple watch placements. At least 13 were likely seriously mentally ill; and two were clearly intellectually impaired to the point of possible mild to moderate mental retardation.  Brief synopses of interviews and record reviews are appended to this report as Appendix D.

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

10

**Mental health care in extended lockdown at DWCC**

I've organized this portion of the report of my assessment of the adequacy of mental health care provided to prisoners confined in extended lockdown around the six criteria for constitutionally adequate psychiatric care that were originally articulated in *Ruiz v Estelle* (1980)[8] because they form a useful framework for the discussion.

The criteria are:

- Systematic screening and evaluation

- Treatment that is more than mere seclusion or close supervision

- Participation by trained mental health professionals (in appropriate numbers)

- Safeguards against psychotropic medications that are prescribed in dangerous amounts, without adequate supervision or otherwise inappropriately administered

- Accurate, complete and confidential records

- Suicide prevention program

While described separately in the sections that follow, the criteria are actually linked and intertwined with one another.  For example, screening, evaluation and treatment cannot occur without adequate numbers of trained staff and must be recorded in accurate and complete records to serve as the basis for individualized treatment planning.

---

[8] Ruiz v Estelle, 503 F.Supp.1265 (S.D.Tex 1980), *aff'd in part, rev'd in part*, 679 F.2d 115 (5th Cir. 1982), *amended in part, vacated in part*, 688 F. 2d 266 (5th Cir. 1982)

<u>Systematic screening and evaluation</u>

Screening is a systematic and standardized process in which prisoners are asked a series of questions about their mental health history, treatment and current symptoms; their responses and the screener's observations of functioning and any obvious impairments are documented.  A positive screen leads to further evaluation.  At DWCC, the further evaluation must be conducted by the psychiatrist, Dr. Gregory Seal, because he is the only person able conduct a comprehensive mental health examination and formulate a diagnosis by virtue of his training and licensure.  None of the other mental health staff at DWCC are appropriately trained and licensed to conduct a comprehensive examination or formulate diagnoses.

At DWCC, there are three places in which there is an opportunity for screening for the presence or worsening of prisoners' mental health conditions[9]:

- During intake at DWCC when a prisoner is received in transfer from another prison to DWCC and placed in extended lockdown (transfer intake screening);

- During mental health rounds in extended lockdown; and

- Periodic mental status examinations of inmates in segregation as required by policy (and credentialing bodies)

---

[9] There are other points at which individuals may be assessed by mental health staff such as upon staff referral or submission of a self-referral (health care request) but these are made on behalf of or by an individual as opposed to being a systematic process applied to all similarly situated inmates.

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

*Transfer screening*:

All offenders receive an intra-system intake screening upon arrival at DWCC per institutional policy #04-01-017:  Reception and Evaluation Intake Screening Medical, Mental Health Screens and Appraisals.[10]  The mental health intra-system screening consists of inquiry into current mental health treatment, thoughts of suicide and history of suicidal behavior and prior inpatient and outpatient psychiatric treatment; as well as observations of general appearance and behavior and current symptoms.  The vast majority of these screenings are conducted by Steve Hayden, a mental health staff person.[11] Mr. Hayden testified that he reviewed information recorded in Cajun, the correctional database program, before meeting with the transferred prisoner, but doesn't review the paper medical record which contains the detailed clinical documentation.  Mr. Hayden has a master's degree in organizational psychology which does not permit him to diagnose mental illness.[12] He does not conduct any sort of risk assessment regarding suicide risk, even when prisoners arrive on suicide watch from another prison and has a limited understanding of psychiatric illnesses and symptoms.  Mr. Hayden is poorly trained, unqualified and unlicensed and lacks the credentials to perform a diagnostic assessment.   Mr. Burgos, the other mental health staff person that currently shares responsibility for mental health treatment of inmates in extended lockdown, has been trained to do these transfer screenings by Mr. Hayden.  Mr. Burgos was unable to define mental illness, specified psychiatric symptoms, diagnoses considered serious mental illness or extended

---

[10] EPM #04-01-017, Mental Health intra-system screening at DWCC 106064-106065
[11] Hayden March 29, 2019 deposition 176: 9-10
[12] Hayden March 29, 2019 deposition 112:19 "I can't diagnose mental illness."

lockdown in deposition.  He also acknowledged that he cannot formulate diagnoses.[13]  He is similarly unqualified to conduct these screenings.

DWCC has no policy to prevent placement of prisoners with serious mental illness in restrictive housing or to prevent retaining them there for extended periods of time.  The purpose of the intra-institutional transfer screening appears to be simply to schedule prisoners received with prescription medications with Dr. Seal, the psychiatrist.

*Mental health rounds*:

Mental health rounds are another type of screening process to identify persons experiencing or exhibiting signs of mental illness and/or difficulty coping in the segregation environment.  Rounds consist of a mental health staff person visiting every housing unit at least weekly, announcing their presence and stopping briefly at every cell and speaking with every inmate to inquire about how they are doing, see if they have any mental health concerns and enable the staff person to observe the inmate's cell, personal hygiene, and general mental condition.  Rounds are not treatment or mental health evaluation - they are a means of regular surveillance for anyone experiencing problems or requesting assistance.  Persons that are identified during rounds as being in need of further assessment or evaluation, are scheduled for an out-of-cell, confidential mental health appointment at an interval determined by the urgency of the situation.

There is no documentation that mental health rounds are routinely conducted at regular intervals at DWCC in the files reviewed.  Prisoners consistently report that if mental health staff

---

[13] Burgos deposition pages 16-18

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

do rounds, it is infrequent, irregular and the staff do not stop to speak with every inmate. Inmates reported that the most predictable time that mental health staff are seen is when one of them enters a housing unit to do a cell front interview of a person on watch. These infrequent and brief, brisk, undocumented strolls through the housing units cannot be considered rounds and serve no purpose whatsoever.  Mr. Hayden and Mr. Burgos are assigned to do these rounds.  Neither appears to understand how to do it properly or the purpose rounds are intended to serve.

*Periodic mental health assessments*:

As noted earlier, the ACA also requires prisoners in extended lockdown undergo mental health evaluations at regular intervals; currently, the standard requires an assessment after 30 days or confinement and at 90-day intervals thereafter.  This is another means of surveillance for signs of mental decompensation when prisoners are maintained in extended lockdown. These are referred to as "Segregation interviews" at DWCC.  I have reviewed hundreds of these assessment interviews in the course of my document reviews and found them to be extremely cursory and lacking any description of the prisoner's actual condition or thought processes. Further, such interviews are most often conducted at cell front which affords no privacy or confidentiality from corrections staff or other inmates, making them essentially meaningless. The majority of inmates I interviewed individually and spoke with at cell front, were unaware that there was a 90-day segregation interview or that they had participated in it, though the paperwork exists at 90-day intervals in their medical records.  The segregation interviews are

also assigned to Mr. Hayden and Mr. Burgos; both poorly trained in the task and unqualified given their lack of knowledge regarding signs and symptoms of mental illness.

Treatment that is more than mere seclusion or close supervision

Medical record documentation and prisoner interviews demonstrate that virtually no mental health treatment is provided to prisoners in extended lockdown.  The only thing provided is psychotropic medication if it is prescribed by the psychiatrist, but even then, it is inconsistently administered by security staff.  (This is described in the section on medication *infra*.) In addition, psychiatric appointments are brief, not conducted in a confidential location and infrequent with months and months in-between appointments.  Mental health staff and security staff are present when prisoners are seen by the psychiatrist.[14]

Rounds are not treatment.  Cell front contacts, whether done as "Interview of Segregated Inmate", a "progress note" or assessment while on suicide watch are NOT mental health treatment.  The overwhelming majority of interviews, progress notes and suicide watch visits are conducted at the cell front, in the presence of the other prisoners on the housing unit as well any passing security staff.  There is no confidentiality whatsoever.  Confidentiality is a vitally important component of all health care and particularly mental health care to assure patients that personal information is held in confidence and shared only with health care providers and not with other inmates or custody staff.  If confidentiality is not present, it profoundly limits the type of information that a person will publicly disclose so that the

---

[14] Hayden March 29, 2019 deposition 221: 19-22

information is not used against them or to tease, ostracize, or criticize them and discourages all other prisoners to disclose private information publicly as well.  It also impacts the formation of trust in the relationship between the prisoner and mental health staff person, just as it would in the outside free world.  In a prison setting, the requirement for confidentiality may be satisfied by ensuring sound privacy while permitting security staff visual monitoring of the interaction for safety.

The State of Louisiana Dept of Public Safety and Corrections Health Care Policy No. HC-36, dated 15 December 2017[15] defines a Treatment Plan as "A written assessment of individualized needs, required services and interventions, including short-term and long-term goals, measurable outcomes, and the roles of healthcare and non-healthcare personnel for the purpose of providing necessary treatment and services in accordance with a patient's identified needs and problem areas."  The DWCC Employee Policy Memorandum #03-02-003 describing the Mental Health Program is consistent with the Department's Policy requiring individualized treatment plans and states that "the treatment plan shall include the long-term goals, short-term objectives, housing assignments, methods of treatment, identification of the mental health and other personnel involved in the care and supervision of the offender."[16]

In spite of policy and procedure mandates, DWCC mental health treatment plans are not individualized:  all of them say literally the exact same thing and contain no mention of mental

---

[15] DWCC 105171-105180 (exhibits in deposition Angie Huff)

[16] Employee Policy Memorandum #03-02-003, DWCC 106468-106478

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

17

health interventions whatsoever.  Assistant Warden Dauzat and Mr. Hayden acknowledged this in sworn deposition testimony.[17]

Every treatment plan contains the same long-term treatment goals:

1. Maintain compliance with all institutional rules and regulations.

2. Maintain appropriate Level of Functioning.

3. Increase Insight in order to be moved to a less restrictive environment.

Every treatment plan contains the same short-term objectives:

- Comply with medications prescribed and advise staff of any adverse effects.

- Identify stressors that create behaviors warranting segregation.

- Consistently display appropriate behavior in accordance to [sic] institutional regulations.

Further, all of the goals and objectives indicate they are "on-going" irrespective of how many times the identical plan is repeated, signed and placed in the record.  They do not reflect an individualized assessment by a qualified mental health professional, treatment interventions (type, frequency or provider) or progress toward goal attainment.  Although the form contains instruction that there be at least one objective for each goal and there is a key for treatment interventions that includes Individual Therapy, Group Therapy, Medication, Self-referral, Support Group and "Other", none of these treatment modalities is actually provided or tied to any of the "Long-Term Treatment Goals."

---

[17] Dauzat deposition February 21, 2019 70:1-2; Hayden deposition March 29, 2019 229:18-23.

Review of 52 prisoner records document that contacts with mental health staff are primarily limited to the cell front segregation interviews, cell front checks during suicide watch and visits to the psychiatrist during which mental health staff and uniformed correctional staff are also present.  The psychiatrist visit is conducted out of cell in the courtroom just off the main lobby of the housing unit.  The prisoner is not invited to take a seat during the visit but must remain standing.  The psychiatric appointments are brief (5-10 minutes) and occur infrequently (twice a year), even when medication changes or dose adjustments are made. There is no counseling, even in cases of obvious need. For example, prisoner #20's cell mate died of complications from heat in their cell and was discovered by prisoner #20, an obviously upsetting event and yet, he received no debriefing of the event, mental health support or counseling.  Prisoner #12 is literally dying from gastric cancer with metastasis to the liver and has asked for help to deal with his anxiety and panic attacks but receives no mental health support or counseling.  There is no group treatment available to prisoners on the South compound.[18]  There is no crisis prevention or mental health crisis intervention except to initiate a suicide watch, the conditions of which are punitive rather than therapeutic.  There is no follow-up from watch placement except one additional cell front visit within a week of watch discontinuation.  Prisoners are seen at the minimum frequency set by policy.  There are no changes to the frequency, duration, location or type of mental health contact in response to clinical need.

---

[18] Dauzat February 21, 2019 deposition 15:17-20

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

19

The records themselves document this abject lack of treatment and the prisoners are well aware of it based on their experience with mental health treatment in the civilian world as well as at other institutions within DOC.  This lack of treatment leads to exacerbation of symptoms, increased frequency of mental health crises, an elevated risk of suicide and self-harm as well as an increased potential for assaultive behavior towards others and behavior which results in additional disciplinary write-ups.

Participation by trained mental health professionals (in appropriate numbers)

Correctional mental health staffing ratios are based upon a number of factors including, but not limited to the inmate population (number of inmates, security level of inmates, male, female, juvenile); the level of care provided (inpatient, residential, outpatient, crisis care) and the number of inmates on the mental health caseload.  The ratio is generally expressed in terms of the number of inmates on the mental health caseload per 1.0 full time equivalent (FTE) of a particular type of mental health professional.   For example, the American Psychiatric Association recommends one FTE psychiatrist for every 150-200 seriously mentally ill inmates receiving psychotropic medication in a correctional outpatient setting.[19]   If treating prisoners in high security settings, the lower end of the ratio (1:150) is most appropriate because it takes longer to see high security inmates that require restraints, pat downs, searches and security escort to and from appointments than it does in a lower security setting in which inmates can walk over to the clinic without escort and wait in a waiting room.  In other words, fewer high

---

[19] Psychiatric Services in Correctional Facilities, Third Edition, 2016

security or lockdown prisoner can be seen in a given day than the number of lower security prisoners that can be seen in a day.

There are two mental health counselors, Mr. Hayden and Mr. Burgos, for inmates on the South compound which includes housing units N1 through N4, but both of them also have responsibility for other inmates and programs on the North Compound.  Assistant Warden Dauzat who supervises the mental health program (in addition to some other duties) testified in deposition that all of the inmates residing on the South compound are part of the mental health staff's caseload.[20]  Mr. Hayden testified that he believed his caseload on the South compound was approximately 90[21] and that perhaps 25% of the inmates in N2, N3 and N4 had mental illness.[22]  Mr. Burgos could not describe how many or who was on the mental health caseload.

Mr. Hayden and Mr. Burgos work on both the North and South compounds.  On the North compound, they conduct sex offender groups, substance abuse groups and re-entry classes.[23] Duties on the South compound include rounds, segregation interviews, suicide watch assessments and "follow-ups for the guys on mental medicines."[24]  Many of these follow-ups appear to occur during psychiatric visits which are scheduled and attended by Mr. Haden and Mr. Burgos as they do a mental health progress note contemporaneous with the psychiatrist's

---

[20] Dauzat deposition February 21, 2019 84:3,4
[21] Hayden deposition March 29, 2019 89:25
[22] Hayden deposition March 29, 2019 37:1,2
[23] Hayden deposition March 29, 2019 19:15-25
[24] Hayden deposition March 29, 2019 19:24,25

appointment and progress note.  Neither Mr. Hayden nor Mr. Burgos was able to estimate the proportion of his time spent on either compound.

The lack of clarity with respect to the size of the mental health caseload and the proportion of time spent providing contacts to the prisoners on the South compound adds a degree of complication in determining a prisoner to mental health staff ratio.   In addition, according to the Mental Health Program Employee Policy Memorandum (EPM #03-02-003) prisoners with serious mental illness and other prisoners on the mental health caseload must receive individualized, out-of-cell treatment: individual counseling, psychosocial interventions, crisis intervention, suicide risk assessment, treatment planning, and quarterly out-of-cell assessments .  Using the Department's published population report,[25] DWCC capacity is 1224 and 1222 inmates were physically present on 12/31/19; 48% of the population, approximately 600 prisoners, were reported as being maximum custody.  Warden Dauzat would consider all of 600 maximum security inmates on the mental health caseload but most commonly, only the persons with a mental health diagnosis are considered as being on the mental health caseload in correctional and other healthcare settings.  Since there are no practices to exclude inmates with serious mental illness from placement or continued stay in extended lockdown, a conservative estimate of persons with mental illness is 40-45% on the South compound at DWCC, or 240-270 individuals.

It is impossible for Mr. Hayden and Mr. Burgos, splitting time between the North and South compounds, to cover 240-270 prisoners.  It would not be possible for two full-time

---

[25] Accessed 4/30/20 on-line at doc.louisiana.gov

mental health professionals to provide out-of-cell mental health treatment to 240-270 individuals, in addition to regular rounds and segregation interviews to all of the inmates in extended lockdown.  Separate from concerns about Mr. Hayden's and Mr. Burgos' qualifications, the staffing ratio is simply inadequate.  If operations at DWCC do not change and inmates with mental illness and serious mental illness continue to be over-represented in extended lockdown, a more reasonable number of mental health professionals to cover the South compound is 4.0 FTEs or a staffing ratio of 1 mental health counselor to 60-65 inmates on the mental health caseload.[26]

The psychiatric staffing is woefully inadequate.  The psychiatrist, Dr. Seal, also covers both the North and South compounds, all 1224 inmates.  His contract is to provide psychiatric services 16 hours per month, or 0.1 FTE.  Further, Dr. Seal is the only mental health staff person at DWCC qualified and permitted by licensure to actually conduct comprehensive evaluations and formulate diagnoses.   There is insufficient psychiatric time to see patients regularly and in response to clinical need.  Dr. Seal is not consulted when inmates are placed or maintained on suicide watch; he is not routinely consulted or asked to evaluate inmates that are decompensating; he is only on-site one day every other week.  Consequently, it takes longer to get an appointment and longer to get medication prescribed or adjusted --- the only treatment that is available at DWCC.  Clinical studies have demonstrated that the longer it takes to receive

---

[26] To preserve continuity of care, some correctional facilities assign prisoners to counselors by means other than a housing assignment since inmates move frequently.  For example, prisoners with DOC numbers ending with a 0,1 or 2 could be assigned to counselor A; prisoners with numbers ending with 3, 4 and 5 could be assigned to counselor B, and so on.  This permits a counselor to continue to follow and provide care to the same group of patients throughout the South compound regardless of cell reassignments, including during suicide watches.

treatment, the longer it takes to respond to treatment prolonging suffering, increasing the risk of harm to self and others, and the less robust the response to treatment whenever it is finally provided; the overall effect is prolonged suffering and risking harm, including death by suicide.[27]  Nominally, the South Compound requires at least 1 FTE psychiatrist to provide minimally adequate care, evaluate prisoners in confidential space, participate in treatment team meetings, assess prisoners in crisis and according to clinical need rather than policy minimums.

<u>Safeguards against psychotropic medications that are prescribed in dangerous amounts, without adequate supervision or otherwise inappropriately administered</u>

As noted, appointments with the psychiatrist occur infrequently based on policy minimums rather than clinical need and are not conducted in a confidential setting.  Health care requests to see the psychiatrist cannot be accommodated due to the number of prisoners prescribed medications and the extremely limited psychiatric hours available.  Consequently, prisoners try to precipitate a sooner psychiatric follow-up appointment by refusing medication in hopes that mental health staff will schedule an appointment with the psychiatrist due to medication "noncompliance."   Follow-up appointments after starting medication or making dose adjustments do not happen for months, delaying the identification of side effects or prolonging symptoms if the medication is ineffective.

Prescribed psychotropic medication is distributed by poorly or untrained correctional staff who make no effort to ensure every inmate that is prescribed medication actually receives

---

[27] Biswas J, Drogin EY, Gutheil TG. "Treatment Delayed is Treatment Denied" J Am Acad Psychiatry Law 46:447-53, 2018.

it.  This is apparent in a review of the Medication Administration Records (MAR) which reflect missing doses for periods of days or weeks.[28]  Prisoners describe the medication pass as requiring you to be ready with your open hand sticking out of your cell when the officer walks down the range to drop medications into your hand.  If you are not at the door or your hand is not outside the bars, you do not receive your medication.  The officer will not wait or return to your cell.  There is no effort on the part of security to ensure that medication is ingested.  The prisoner reports were very consistent across housing unit location, time and as compared to their experiences in other institutions.  Their reports were credible.

Proper medication administration requires ensuring that the right drug is administered at the right time in the right dose to the right person, and the process is documented on the MAR contemporaneously with the administration.  None of these requirements is met in the medication administration process at DWCC; medications are inappropriately administered; documentation is untimely and inaccurate, and the entire process is inadequately supervised. Consequently, prisoners do not routinely and regularly receive the psychotropic medication(s) prescribed to them and experience on-going and worsening symptoms, prolonging suffering, increasing the risk of death by suicide as well as the behaviors that result in being punished with additional disciplinary reports and preventing release from lockdown.

---

[28] Medication administration record exhibits in depositions of medication administration officers, Paul Pitts and Erik Scriber

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

<u>Accurate, complete and confidential records</u>

The medical and mental health records are kept separate from other types of institutional records and access is limited to treatment staff.  Mental health progress notes and segregation interviews are standardized forms containing checkboxes for various aspects of a mental status examination.  They are cursory, contain no description of symptoms, assessment of symptom reduction or worsening, or assessment of progress toward goal attainment. They also contain inaccurate information.  For example, prisoner #18 routinely does not speak to mental health counselors when they stand at his cell for the segregation interviews, and the documentation by the counselor clearly states that he does not speak and yet, the interview form then further documents that #18's "Sensorium, Orientation, Speech, Affect, Mood, Thought Flow, Ideation, Judgment, Insight and Interpersonal" are all within normal limits. These items can only be assessed verbally through questions and answers - but the inmate does not speak to the counselor.  The items have not been assessed; they cannot be documented as normal. [29]   The information cannot be relied upon as accurate or complete so the point of doing segregation interviews is completely lost; false information is provided and no information about the prisoner can be gleaned from reviewing these so-called interviews.

Dr. Seal's progress notes are brief, handwritten and mostly illegible.[30]  The psychiatric notes do not contain assessments of mental status, suicidal and violence potential or recommendations for treatment, except psychotropic medication.

---

[29] DWCC 130943, 130937, 130933 (Segregation interview forms)
[30] DWCC 158377 (#1), DWCC 146540, 146588 (#14), DWCC 159798 (#10), DWCC 184778, 184783 (#19)

In sum, although the records themselves are confidential in the sense that they are kept separate from other types of records, the records reviewed were incomplete, cursory and at times, inaccurate or apparently fabricated.

Suicide prevention program

DWCC Employee Policy Memorandum #01-02-110 dated March 18, 2019 contains the procedures related to Suicide Prevention and Post Suicide Management.[31]  There are two levels of mental health management: standard and extreme.  On standard suicide watch (SSW), The suicidal prisoner's property and clothing are removed, and he is moved to an empty cell inside the segregation unit that contains a closed-circuit camera that permits security staff outside the housing unit to view the inmate on a monitor.

On extreme suicide watch (ESW), the prisoner is held under the same conditions as above but, he is also placed in steel restraints, including handcuffs, and a "black box" (a sort of black square shaped handcuff cover that further restricts arm movement) although he could also be put into a restraint chair, immobilizing him completely.  ESW requires the authorization of a physician in the medical department at DWCC.  The inmate is seen at the cell front as above and eventually stepped down to SSW before being released from watch status.

On either type of watch, no actual mental health treatment is provided; no suicide risk assessment is conducted; the prisoner's so-called treatment plan is not updated; no more frequent or intensive treatment interventions are provided.  No phone calls or visits are permitted – interventions that could assist the prisoner and lead to timelier crisis resolution.

---

[31] DWCC 106008-106017

*Tellis v LeBlanc*
Mental Health Report
January 11, 2021

27

The psychiatrist is not notified or involved in any way to assess the inmate, consider changes to medication or recommend transfer to a higher level of care. The inmate is seen daily for a matter of minutes at the cell front, not in private, by a mental health staff person during the week.[32] These are documented as progress notes in the medical record.  On weekends, a medical nurse stops at the cell front.  The medical nurse weekend assessments are not documented.

Neither of these types of watches has any positive impact on mental health or depression.  The conditions on either type of watch are punitive and designed in such a way as to discourage others from reporting suicidal thoughts.  In fact, the nearly exact same conditions (single cell, no clothing, paper gown, no property, no recreation, no mattress or bedding) are used by custody staff when prisoners are placed in "strip cell status" as punishment for certain types of behavior or spoken language.  The prisoner may often receive a disciplinary write-up and sanction for the behavior in addition to the 30-day "strip cell" placement, which is at the discretion of the shift supervisor.[33] Mental health staff are not consulted regarding strip cell placement and do not stop by regularly to check on the prisoner's condition.[34]

---

[32] Hayden deposition 151:13
[33] 2013-11-08 OP 034 Maximum Custody Housing - General, strip cell status at DWCC 105253-105256
[34] Hayden deposition 155:15

**Conclusions & Opinions**

None of the six criteria established in *Ruiz* as necessary for adequate mental health care is met: Screening is conducted by staff that are not trained to recognize signs and symptoms of serious mental illness at the front door and thereafter, very brief, non-confidential cell front visits at 90-day intervals are conducted by these same staff. Rounds through the locked down units are infrequent and cursory. Psychiatric evaluations are not comprehensive and similarly conducted in a setting that is not confidential. If psychotropic medication is prescribed and the officers assigned to administer it do so appropriately, then it is the only treatment provided to prisoners housed in extended lockdown, but often, it is not administered appropriately, rendering it ineffective. Psychotropic medications are not consistently or properly administered and there is inadequate supervision of the process. There is no other treatment: there is no counseling, there are no opportunities to participate in any sort of structured programming or activities. Mental health staffing levels are woefully inadequate, and counselors do not have the proper education or training in the recognition of signs and symptoms of psychiatric illness or the basic tenets of mental health treatment. Records are cursory at best and do not accurately portray a prisoner's condition and illegible at worst. The suicide prevention program maintains prisoners under punitive conditions with no treatment while on suicide watch and no additional or changed treatment interventions following watch cessation. The responses to prisoners in crisis are harmful and appear intended to discourage other prisoners from seeking mental health care.

As a consequence of these profound deficiencies in the surveillance for and treatment of mental illness, all prisoners in extended lock down at DWCC are exposed to the risk of developing serious mental consequences including psychiatric illness, psychological suffering and including serious self-harm and death by suicide.  Persons with serious mental illness are particularly vulnerable to the harmful effects of segregation from the absence of meaningful social interaction, enforced idleness, lack of environmental stimulation and restrictive and oppressive security measures, including during "strip cell" placement, recreation restriction and suicide watch - a procedure ostensibly to reduce harm but causes more psychological and physical distress, isolation and no mental health treatment.  Prisoners with serious mental illness suffer unnecessarily from treatable symptoms, exacerbation of symptoms and are not identified promptly so as to be removed from those conditions or even scheduled to see the psychiatrist promptly, the only person on staff with the qualifications to diagnose mental illness and order the only type of treatment that is available.  Under treated and untreated symptoms of mental illness also result in increased instances of discipline which prolongs the time prisoners are held in extended lockdown.

The policies and procedures of DWCC's extended lockdown are applied equally to all prisoners housed there and include:

- Failure to pre-screen and divert inmates with serious mental illness from extended lockdown;

- Lack of adequate surveillance and removal when symptoms of mental illness through meaningful rounds and periodic mental health assessments;

- Failure to provide mental health treatment – no counseling, group therapy or support; treatment requires more than just medication, particularly when that medication is not distributed or administered appropriately or as directed by the physician;

- Failure to respond appropriately to suicidal and seriously mentally ill inmates: increasing their isolation, removing clothing, bedding, property and denying opportunities for recreation, phone calls and visits, providing no treatment whatsoever including failure to refer to the psychiatrist and offering no private counseling sessions or support.

I have based my analysis and opinions on the information available to me at the time this report was written.  In the event additional information becomes available through the discovery process, I reserve the right to file a supplemental report and/or revise my opinions after consideration of the additional information.

Respectfully submitted,

Kathryn A Burns MD, MPH
January 11, 2021