UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself and all other similarly situated prisoners at David Wade Correctional Center, | * * * | CIVIL ACTION NO.: 5:18-CV-00541-EEF-MLH |
| | * * | JUDGE ELIZABETH E. FOOTE |
| and | * * | |
| The ADVOCACY CENTER, | * * | |
| PLAINTIFFS, | * * | USMJ MARK L. HORNSBY |
| VS. | * * | CLASS ACTION |
| JAMES M. LEBLANC, *et al.*, | * * | |
| DEFENDANTS. | * | |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT**

TABLE OF CONTENTS

INTRODUCTION ............................................................................................................4

LAW AND ARGUMENT.................................................................................................5

    **I.**    **Class Members are Routinely Harmed by Defendants' Systematic Violation of the ADA and RA** ...................................................................................................**5**

        *a.*   *Brian Covington* ................................................................................................5

        *b.*   *Decedent TH*......................................................................................................7

        *c.*   *Noel Dean* .........................................................................................................9

        *d.*   *Corey Adams* ..................................................................................................12

    **II.**   **Defendants Have Violated the Affirmative Duties Imposed Under the Americans with Disabilities Act and Rehabilitation Act** ....................................................**17**

        *a.*   *The ADA and RA Impose the Affirmative Duty to Evaluate and Accommodate People with Disabilities* .........................................................................................18

b.    Equal Treatment Violates the ADA Requirements of Appropriate Setting and Reasonable Accommodation..................................................................................................20

III.    **Plaintiffs' Claims Under the ADA and RA are Supported by the Record.** ...........21

a.    *Defendants Fail to Individually Identify People with Disabilities.* .............................22

i.    Defendants' Definition of Serious Mental Illness is Under-Inclusive....................22

ii.    Defendants Exclude People with Chronic Mental Illness from the Definition of Serious Mental Illness .................................................................................................23

b.    *Defendants provide no affirmative modifications even for people identified as having serious mental illness.* ................................................................................................25

i.    Defendants Violate the ADA by Setting an Overly Restrictive Criteria for Reasonable Accommodations.........................................................................................26

ii.    Defendants Violate the ADA by Ignoring Open and Obvious Disabilities. .............28

c.    *DWCC Fails to Provide a Process for Requesting Reasonable Accommodations* .......29

d.    *DWCC uses brutal methods of discipline against people with mental illness for behaviors related to their disability.* ..................................................................................32

e.    *Defendants Discriminate Against People with Known Disabilities by Disregarding Appropriate Housing Assignments* ......................................................................................34

IV.    **Plaintiffs Adequately Plead Violation of the Americans with Disabilities Act and the Rehabilitation Act** ..................................................................................................37

a.    *DWCC fails in its affirmative duty to identify people with disabilities* .......................38

b.    *DWCC Makes No Reasonable Accommodations for Individuals with Known Disabilities.* 38

c.    *DWCC Fails to Track and Act upon Requests for Reasonable Accommodation* ..........40

d.    *DWCC Fails to Provide Reasonable Accommodations in its Use of Force and Discipline* 41

e.    *DWCC Disregards Recommendations from Mental Health Staff that individuals with Mental Illness be Placed in General Population.* ............................................................41

CONCLUSION.............................................................................................................42

## TABLE OF AUTHORITIES

**CASES**

*Alexander v. Choate*, <u>469 U.S. 287, 301</u> (1985)................................................................................ 4

*Armstrong v. Newsom*, No. 94-cv-02307 CW, <u>2021 WL 933106</u>, at *3 (N.D. Cal. Mar. 11, 2021)............................33

*Badalamenti v. Louisiana Dep't of Wildlife & Fisheries*, <u>439 F. Supp. 3d 801, 808</u> (E.D. La. 2020) ..........................20

*Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015)..................................................................18

*Brooklyn Cntr for Independence of the Disabled v. Bloomberg*, 980F. Supp.2d 588, 640 (S.D.N.Y. 2013) .............18

*Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).....................................................................21

*Cadena v. El Paso Cty.*, 946 F.3d 717, 723 (5th Cir. 2020) .......................................................17, 35

*Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016)...............................................................22, 29

*E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1048 (10th Cir. 2011) ..............................................41

*Kemp v. Holder*, 610 F.3d 231, 236 (5th Cir. 2010)........................................................................24

*Levy v. Louisiana Dep't of Pub. Safety & Corr.*, 371 F. Supp. 3d 274, 285 (M.D. La. 2019) ....................25

*Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *55 (M.D. La. Mar. 31, 2021) ...................33

*McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004)...................................................20

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)...........................................17, 21

*Pierce v. District of Columbia*, 128 F.Supp.3d 250, 272 (D.D.C. 2015) ...............................18, 23, 35

*Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998) .................20

*Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir.1999) ..................................................41

*Williamson v. Larpenter* No. CV 19-254, 2019 WL 3719761, at *14 (E.D. La. July 15, 2019) ................28

*Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir.2002) ................................................41

## STATUTES

42 U.S.C. § 12101(a)(5)..........................................................................................................29

42 U.S.C. § 12101(b)(1)............................................................................................................4

42 U.S.C. § 12101(b)(2)............................................................................................................4

42 U.S.C. § 12102(1)(B)..........................................................................................................23

42 U.S.C.A. § 12102(4)(E)(i)....................................................................................................24

## OTHER AUTHORITIES

Department of Justice Commentary to 28 C.F.R. § 35.152.............................................................21

## RULES

Fed. R. Civ. P. 12(h)(2)...................................................................................................39

**REGULATIONS**

28 C.F.R. § 35.106...........................................................................................................29

28 C.F.R. § 35.130(b)(3)..................................................................................................22

28 C.F.R. § 35.130(b)(7)....................................................................................................4

28 C.F.R. § 35.152(b)(2)..................................................................................................19

28 C.F.R. § 35.163...........................................................................................................29

## INTRODUCTION

Defendants' Motion for Summary Judgment on Plaintiffs' claims brought under the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act should be denied.

The purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1) (2012), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). Public entities must make "reasonable accommodations" to enable people with disabilities to participate in activities and receive services, such that they have "meaningful access." *Alexander v. Choate*, 469 U.S. 287, 301 (1985). The ADA requires an entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Defendants have violated the ADA by failing to make any reasonable accommodations for individuals with disabilities related to mental illness.

The factual record in this case supports the allegations that Defendants have violated the ADA, and so Defendants' Motion for Summary Judgment should be denied. First, Defendants misrepresent contested facts as undisputed and misconstrue the legal significance of the facts. Second, the record shows that Defendants make no effort to identify people with mental illness disabilities to proactively provide them with accommodations. Third, the record shows that Defendants knew of individuals with open and obvious disabilities, but did nothing to provide accommodations to those individuals. Finally, the record also shows that individuals have made requests for reasonable accommodation based on mental health disabilities, but that Defendants have ignored each such request.

## LAW AND ARGUMENT

**I.      Class Members are Routinely Harmed by Defendants' Systematic Violation of the ADA and RA**

At its core, this is a case about how human beings are treated in the custody of the state. The individual harms that befall people due to Defendants' violation of the ADA and RA are serious. Even individuals who have not yet been personally harmed, or harmed to the most severe degree, remain at unacceptable and known risk of serious harm. Plaintiffs herein present the stories of three people whose mistreatment particularly illustrate the harms and the danger of Defendants' policies of failing to identify people with disabilities at DWCC and provide them reasonable accommodations.

*a.   Brian Covington*

Defendants diagnosed Brian Covington with autism spectrum disorder and schizophrenia[1] yet held him on extended lockdown at DWCC from October 2016 to September 2018. His mental

---

[1] Exh. A, Deposition of Gregory Seal 54:4-8; Exh. B at p. 39, August 1, 2018 Psychiatric Clinic Note – DWCC 132394.

health conditions meet the ADA's definition of disability due to the interference with sensing, social relationships, and caring for one's self. When he arrived at DWCC, he received a mental health intake screening which noted that he was currently in treatment for schizophrenia, receiving Haldol and Depakote, and had been in treatment at an in-patient facility.[2] He was recommended for housing in general population, received no mental health referral, and the only instructions were to "follow up per policy."[3] Despite actual knowledge of his autism and schizophrenia diagnosis and the recommendation by mental health staff that he be sent to general population, he was sent to extended lockdown. There, he endured multiple suicide watches,[4] confinement to the restraint chair,[5] multiple uses of mace,[6] prolonged periods of strip cell confinement under Policy 34,[7] and sexual attacks.[8] He received the same treatment plan as everyone else.[9] All of these events are evident from Defendants' own records. Simply put, DWCC noted in its record that Mr. Covington had multiple, severe mental illnesses, categorized him as having serious mental illness (SMI), neglected to make reasonable modifications to the conditions of his confinement to accommodate his disability, and then sent him to extended lockdown where staff watched with complete indifference as he suffered.

---

[2] Exh. B at p. 1, Oct. 3, 2016 Mental Health Intake – DWCC 132468.
[3] *Id.*
[4] Exh. B at p. 3, Jan. 3, 2017, Brian Covington Suicide Watch Order – DWCC 132449; Exh. B at p. 4, March 11, 2017 Suicide Watch Order – DWCC 132236; Exh. B at p. 7, July 11, 2017 Individual Progress Note (Suicide Watch Order Missing) – DWCC 132426-27; Exh. B at p. 40, August 31, 2018 Suicide Watch Order – DWCC 132389.
[5] Exh. B at p. 41, Sept. 9, 2018 Mental Health Management Order – DWCC 132364.
[6] Exh. B at pp. 5-25 May 25, 2017, Brian Covington Review of Use of Force – DWCC 005831; Exh. B at pp 28-38, Dec. 17, 2017, Brian Covington Review of Use of Force – DWCC 004052.
[7] Exh. B at p. 25, May 25, 2017, Policy 34 Authorization – DWCC 005851; Exh. B at p. 38, Dec. 16, 2017, Brian Covington Policy 34 Authorization – DWCC 004076.
[8] Exh. C, Deposition of Brian Covington 15:24 – 16:16.
[9] Exh. B at p. 2, Oct. 6, 2016 Treatment Plan – DWCC 132457.

    *b.  Decedent TH.*

Another individual, ███████, died at DWCC in part due to the facility's failure to provide any accommodation to him based on his schizophrenia and dementia. When he was first processed into the Department's custody, he was diagnosed with major depressive disorder and borderline personality disorder and prescribed Zyprexa and Celexa.[10] At Elayn Hunt Correctional Center (EHCC) intake on February 26, 2015 he reported auditory hallucinations and a history of self-harm, including an attempted suicide by gunshot.[11] These conditions clearly meet the definition for a disability under the ADA and RA due to the interference with major life activities including sensing and self-preservation. He arrived at DWCC on March 30, 2015, and received a mental health intake screening from Defendant Hayden who identified only major depressive disorder and listed his medication as Remeron.[12] During his initial visit with Dr. Seal, Mr. ███████ reported auditory hallucinations and received a diagnosis of schizoaffective disorder, but Dr. Seal failed to diagnose him with  major depressive disorder.[13] After only approximately five months on extended lockdown, his condition deteriorated to the point where he experienced auditory and visual hallucinations of conversations with his deceased relatives.[14] His treatment plan remained the same as everyone else's and reflects no programming, mental health counselling, or any additional safety measures.

A month after the visit where Mr. ███████ reported conversations with his deceased relatives, he was listed as a no-show for psychiatric clinic, a pattern which would repeat itself as his condition worsened.[15] Even where Dr. Seal's notes indicated that Mr. ███████ was experiencing

---

[10] Exh. D at p. 3, Feb. 26 2015 Mental Health Progress Note (EHCC) – DWCC 012096.
[11] Exh. D at pp. 1-2, Feb. 16, 2015 Mental Health Intake Screening – DWCC 012098-99.
[12] Exh. D at p. 4, March 30, 2015, Mental Health Intake Screening – DWCC 012078.
[13] Exh. D at p. 5, April 1, 2015 Mental Health Progress Note – DWCC 012076.
[14] Exh. D at p. 6, Sept. 3, 2015 Mental Health Progress Note – DWCC 012055.
[15] Exh. D at p. 8, Oct. 15, 2015 Mental Health Progress Note – DWCC 012053; Exh. D at p. 9,  Jan 21, 2016 Mental Health Progress Note – DWCC 012049; Exh. D at p. 12, June 23, 2016 Mental Health Progress Note – DWCC 012035.

hallucinations, Defendant Hayden's notes from the same clinical encounters fail to reflect this fact; instead Defendant Hayden recommended that Mr. ██████'s next visit occur in 4-6 months.[16] His treatment plan remained the same even as his symptoms escalated.[17] By September 2016, Mr. ██████'s condition deteriorated to the point where he was severely disoriented and no longer responded to commands or answered questions.[18] Around this time, Dr. Seal indicated a suspected diagnosis of early onset dementia.[19] His condition continued to deteriorate, with Robinson describing him as catatonic and "help-seeking."[20] The day after Robinson's visit, he was taken off mental health observation with no follow-up treatment steps, safety measures, or memory aids.[21] Mr. ██████ did not see Dr. Seal again until February of 2017.[22] Around this time, after nearly two years on extended lockdown (for reasons that are completely unclear) Mr. ██████ was returned to general population. Later that same year, Mr. ██████, a known dementia patient, returned to extended lockdown for a work offense.[23]

On July 3, 2018, Mr. ██████ was taken from extended lockdown in N2 to the hospital non-responsive with a temperature of 105.1.[24] While at the hospital, DWCC was contacted for patient history which DWCC staff described as follows: "that patient does become confused at times and will be oriented one day and confused the next and this seems to be his baseline status."[25] Staff at the hospital suspected he was reacting to his medication, possibly combined with the heat. He was returned to the prison with no provision for assistance with any activities of daily living, no special

---

[16] Exh. D at p. 10, Feb. 4, 2016 Mental Health Progress Note – DWCC 012047; Exh. D at p. 11, Feb 4, 2016 Psychiatric Clinic Assessment – DWCC 012043.
[17] Exh. D at p. 7, Feb. 4, 2016 Mental Health Treatment Plan – DWCC 012042.
[18] Exh. D at pp. 13-14, Sept. 15, 2016 Mental Health Progress Note – DWCC 012029-30.
[19] Exh. D at pp. 15-17, Sept. 22, 2016 Mental Health Progress Note –  DWCC 012018-20.
[20] Exh. D at pp. 18-19, Sept. 26, 2016 Mental Health Progress Note – DWCC 012016-17.
[21] Exh. D a pp. 20-21, Sept. 27, 2016 Mental Health Progress Note – DWCC 012015.
[22] Exh. D at pp. 22, Feb. 2, 2017 Mental Health Progress Note – DWCC 012008.
[23] Exh. D at pp. 23, Oct. 10, 2017 Disciplinary Report – PLA 014956.
[24] Exh. D at pp. 24, July 3, 2018 Health Care Request Form – PLA 015243.
[25] Exh. D at pp. 25-27, July 3, 2018 Physician Discharge Summary – PLA 015030.

supervision as a result of his memory issues, and no additional precautions for his safety. Shortly thereafter, he stopped eating and drinking.[26] By that time, he no longer spoke much and what speech he had was largely incomprehensible.[27] He had only hot water to drink between meals[28] despite temperatures being in the 90s[29] and despite his being on psychotropics and despite the hospital having indicated that he still had an altered mental state on discharge.[30] On July 22, 2018, ████ ████ was found dead in his cell by his cellmate in the early morning.[31]

c.  *Noel Dean*

Noel Dean arrived at DWCC from Louisiana State Penitentiary (LSP) on November 28, 2017 and was identified as Level of Care[32] 3F, denoting frequent mental health problems.[33] His DWCC intake file contains a mental health intake screening noting Level of Care 3 and SMI,[34] the same treatment plan as every other person on extended lockdown[35] and a level of care review form.[36]  He received no mental health contact other than suicide watch rounds from November, 2017 until he was placed on extreme suicide watch in full restraints on January 10, 2018 for cutting his wrists with a razor blade.[37] On January 23, 2018, Noel Dean was placed on extreme suicide watch again.[38] That evening, while in his cell in full restraints, he was written up for threatening

---

[26] Exh. E, Deposition of Joshua McDowell 31:1-7.
[27] Exh. E, Deposition of Joshua McDowell 31:13-19.
[28] Exh. E, Deposition of Joshua McDowell 12:12-16.
[29] Exh. E, Deposition of Joshua McDowell 35:25.
[30] Exh. D at p. 25, July 11, 2018 Discharge Summary DWCC – 015286
[31] Exh. D at p. 28, July 24, 2018 Medical Summary Report – DWCC 103827
[32] Level of Care is a system of categorizing the degree of acuity of mental illness, Level 1 reflects the most extreme needs, Level 5 reflects a determination that the individual has no mental illness.
[33] Exh. F at p. 1, Nov. 28, 2017 Initial Classification – DWCC 023633.
[34] Exh. F at p. 2, Nov. 28, 2017 Intake Screening – DWCC 090569.
[35] Exh. F at p. 3, Nov. 30, 2017 Mental Health Treatment Plan – DWCC 090562.
[36] Exh. F at p. 4, Nov. 28, 2017 Level of Care Review – DWCC 085315.
[37] Exh. F at p. 5, Jan. 10, 2018 Unusual Occurrence Report – DWCC 023624.
[38] Exh. F at p. 6, Jan 23, 2018 Mental Health Management Order – DWCC 023612.

to bite his tongue to spit blood.[39] That same night, he was also sprayed with mace and written up for making too much noise.[40]

On April 1, 2018, Mr. Dean cut his wrist and was again placed on extreme suicide watch in full restraints.[41] The next day, Mr. Dean again cut his wrist and stated that he was suicidal.[42] While Mr. Dean was still on extreme suicide watch in full restraints, he attempted to commit suicide by hanging himself by the neck with those restraints.[43] The next day, Mr. Dean remained in the same restraints which he had used to attempt suicide with no additional supervision or mental health treatment.[44] He remained on extreme suicide watch in restraints for days.[45] On April 4, 2018, he was placed in the restraint chair for 12 hours after attempting to wrap his cuffs around the food tray to hang himself.[46] Mr. Dean was taken off of extreme suicide watch on April 5, 2018.[47]

While Mr. Dean's disability and mental health needs were open and obvious, Mr. Dean wrote an ARP to follow-up on the April 4, 2018 incidents, stating:

> I inmate Noel Dean was on extreme suicide watch, at which time I was allowed to remove the security leg iron restraints and hung myself. However, since that date I have only been constantly crying and thinking of ways to harm myself, without any follow-up evaluations. The condition of confinement housed here in (DWCC) extended lockdown is only worsing my mental conditions, which I have been diagnosed with major depression for over 30 years, these cells are closing in on my and my eye sight is getting worser, the (DWCC) administration is denying me adequate mental/medical care, and beep was activated.[48]

---

[39] Exh. F at p. 7, Jan. 23, 2018 Disciplinary Report – DWCC 023580.
[40] Exh. F at p. 8, Jan. 23, 2018 Disciplinary Report – DWCC 023584.
[41] Exh. F at p. 9, April 1, 2018 Unusual Occurrence Report – DWCC 023536.
[42] Exh. F at p. 10-11, April 2, 2018 Unusual Occurrence Report – DWCC 023535.
[43] Exh. F at pp. 12, April 2, 2018 Unusual Occurrence Report – DWCC 023523.
[44] Exh. F at p. 13, April 3, 2018 Mental Health Management Order – DWCC 023518.
[45] Exh. F at p. 14, April 4, 2018 Mental Health Management Order – DWCC 023506.
[46] Exh. F at p. 15, April 4, 2018 Mental Health Management Order – DWCC 023507.
[47] Exh. F at p. 16, April 5, 2018 Unusual Occurrence Report – DWCC 023501.
[48] Exh. F at p. 29, Administrative Remedy Procedure (ARP) DWCC-2018-0408 – DWCC 111663.

This ARP was not construed as a request for accommodations for his disability and resulted in no additional actions or assessments undertaken by mental health staff at DWCC.

On May 17, 2018, the classification review board voted to keep Mr. Dean in extended lockdown due to the "serious nature of past offenses" and "disciplinary reports received during current confinement" with no discussion of his repeated suicide watches, attempts to harm himself, or steps necessary to keep him in a maximum-security setting safely.[49] Mr. Dean's obvious and totally unaddressed mental health needs resulted in his continued deterioration. On July 4, 2018, he was placed on strip cell and food loaf following incidents where he is alleged to have thrown feces.[50] On July 5, 2018, he was again placed on extreme suicide watch in restraints.[51] Mr. Dean was taken off of Policy 34 strip cell status on August 12, 2018.[52] He was put back on strip cell status for throwing his feces on August 27, 2018[53] and taken off again September 25, 2018.[54] This pattern would repeat itself again on October 13, 2018.[55] At no point did mental health or security staff document any concern that the pattern of throwing his feces may reflect an unmet mental health need.

Despite the concerning behavior exhibited by Mr. Dean, on December 13, 2018, Defendant Hayden wrote of Mr. Dean that everything was "within normal limits" and that "No psychiatric distress was noted."[56] Mr. Dean again engaged in self harm on Dec. 25, 2018.[57] On Dec. 28, 2018, he was placed on extreme suicide watch again.[58] Mr. Dean's condition was an open and obvious

---

[49] Exh. F at p. 17, May 17, 2018 Classification Review Board – DWCC 023497.
[50] Exh. F at p. 18, July 4, 2018 Unusual Occurrence Report – DWCC 023464.
[51] Exh. F at pp. 19-20, July 6, 2018 Unusual Occurrence Report –DWCC 023472.
[52] Exh. F at p. 21, August 12, 2018 Decision Form – DWCC 023440.
[53] Exh. F at p. 22, August 27, 2018 Decision Form – DWCC 023436.
[54] Exh. F at p. 23, Sept. 25 2018 Decision Form – DWCC 023427.
[55] Exh. F at p. 24, Oct. 13, 2018 Decision Form – DWCC 023415.
[56] Exh. F at p. 25, Dec. 13, 2018 Interview of Segregated Inmate – DWCC 131006.
[57] Exh. F at p. 26, Dec. 25, 2018 Level of Care Review – DWCC 130997.
[58] Exh. F at p. 27-28, Dec. 28, 2018 Individual Progress Note – DWCC 130998-99.

disability impacting his ability to care for himself and clearly posed a significant risk to his personal safety. Despite having filed an ARP requesting help with his disability, he received no reasonable accommodations nor were any such accommodations apparently even considered by Defendants. While his lack of medical and mental health care is actionable under the Eighth Amendment, the conditions of his confinement, their role in exacerbating his disability, and the prolonged use of solitary confinement are also actionable under the ADA and RA.

Mr. Dean was transferred to EHCC on November 28 of 2019, after two years continuously being housed on extended lockdown.[59] Once there, he began to attend group therapy to help him with his depression.[60] Mr. Dean's time at EHCC demonstrates that it is possible to provide Mr. Dean, and people with similar disabilities, with actual mental health treatment. EHCC was able to provide those services with no change to his diagnostic needs or security level. DWCC's failure to provide needed care for people with mental illness is not motivated by legitimate penological concerns that make such therapy impossible, but rather by deliberate indifference and failure to provide accommodations as required by law.

d. *Corey Adams*

Corey Adams arrived at DWCC on November 28, 2017, the same day as Noel Dean, also as a transfer from LSP. There was no notation in his initial classification paperwork that he had any mental health level of care needs, but there was a reference to an incident from October 3, 2017 indicating he had cut his wrist.[61] In actuality, Corey Adams had psychosis due to a traumatic brain injury.[62] At LSP, he had been on suicide watch no fewer than 24 times in the past year,

---

[59] Exh. G, Deposition of Noel Dean 29:25 - 30:1.
[60] *Id.* 28:23 - 29:5.
[61] Exh. H at p. 37, Nov. 28, 2017 Initial Classification– DWCC 020085.
[62] Exh. H at pp. 1-2, Oct. 31, 2016 Psychiatric Notes – DWCC 078616.

12

including several uses of extreme suicide watch, suicide watches lasting longer than a month, and one suicide watch during the week before he was transferred to DWCC.[63]

His DWCC intake medical screening reflected his traumatic brain injury, psychosis, and paranoid personality disorder, a suicide attempt in the previous week, and his history of inpatient and outpatient mental health treatment.[64] That document assigned Mr. Adams to general population and set a follow-up with medical staff in six months as his only referral.[65] Mr. Adams' then-current psychotropic medications were Wellbutrin, Zyprexa, Haldol, and Benadryl.[66] That same document designated Mr. Adams as a person with SMI, changed his Level of Care to 3F and recommended that he be assigned to general population.[67] However, Mr. Adams was not sent to general population, he was instead placed on extended lockdown, as is every person that arrives at David Wade. Mr. Adams received the same treatment plan as everyone else on extended lockdown, despite his traumatic brain injury and extensive history of self-harm.[68]

---

[63] Exh. H pp. 3-36, Nov. 28, 2016 Mental Health Management Order – DWCC 079440; Dec. 5, 2016 Mental Health Management Order – DWCC 079432; Dec. 15, 2016 Mental Health Management Order – DWCC 079423; Dec. 19, 2016 Mental Health Management Order – DWCC 079417; Dec. 29, 2016 Mental Health Management Order – DWCC 079404; Jan 20, 2017 Mental Health Management Order – DWCC 079387 (Extreme Suicide Watch); Jan. 28, 2017 Mental Health Management Order – DWCC 079366; Feb. 4, 2017 Mental Health Management Order – DWCC 079359; Feb. 10, 2017 Mental Health Management Order – DWCC 079344; Feb. 14, 2017 Mental Health Management Order – DWCC 079334; Feb. 17, 2017 Mental Health Management Order – DWCC 079328; Feb. 20, 2017 Mental Health Management Order DWCC 079314 (Upgraded to ESW in Feb. 23, 2017 Mental Health Management Order DWCC 079300, Discontinued March 24, 2017 Mental Health Management Order DWCC 0729203); April 6, 2017 Mental Health Management Order – DWCC 079200 (Discontinued per April 20, 2017 Mental Health Management Order – DWCC 079165); April 26, 2017 Mental Health Management Order – DWCC 079161 (Discontinued per June 14, 2017 Mental Health Management Order – DWCC 080263); June 28, 2017 Mental Health Management Order – DWCC 080259; Sept. 14, 2017 Mental Health Management Order – DWCC 080350; Sept. 28, 2017 Mental Health Management Order – DWCC 080340; Oct. 6, 2017 Mental Health Management Order – DWCC 080324; Nov. 5, 2017 Mental Health Management Order – DWCC 080313; Nov. 21, 2017 Mental Health Management Order – DWCC 081257.
[64] Exh. H at p. 38, Nov. 28, 2017 Intra-Institutional Health Screening – DWCC 080662.
[65] Id.
[66] Exh. H at p. 39, Nov. 28, 2018 Mental Health Intake – DWCC 081253.
[67] Id.
[68] Exh. H at p. 40, Jan. 11, 2018 Treatment Plan – DWCC 081244.

Mr. Adams first requested mental health help in writing on January 29, 2018, stating he was having claustrophobic attacks.[69] He requested help with claustrophobia again on February 6, 2018.[70] On February 11, 2018, his Wellbutrin prescription ran out.[71] His electronic Medication Administration Record (eMAR) entries from February until April 2018 are missing and it is impossible to verify whether his prescription actually ran out. On February 26, 2018, he was transferred back to EHCC on a court trip. While at EHCC, he made repeated suicide attempts and was placed on extreme suicide watch three times.[72] At EHCC, he received disciplinary write-ups and punishments for smearing feces over his body,[73] refusing to come to the bars to be restrained,[74] cutting his wrists,[75] and placing a razor blade in his penis.[76] He returned to DWCC on April 23, 2018, while still on suicide watch from cuts to his wrist two days prior.[77] He was again recommended for general population[78] but placed on extended lockdown,[79] despite having been classified as medium security in February, 2018.[80] The classification review board recommended that he remain on extended lockdown based on the disciplinary reports he received for self-injurious conduct while at EHCC.[81] Assigning an individual to extended lockdown based on write-ups for self-harm is manifestly counterproductive and construes a disability as a disciplinary problem.

---

[69] Exh. H at p. 41, Jan. 29, 2018 Health Care Request – DWCC 080839
[70] Exh. H. at p. 42, Feb. 6, 2018 Health Care Request – DWCC 080846
[71] Exh. H at p. 43, Feb. 16, 2018 Health Care Request – DWCC 080845
[72] Exh. H at pp. 45-46, Mar. 1, 2018 Mental Health Management Order – DWCC 081221; Exh. H at p 47, Mar. 6, 2018 Mental Health Management Order – DWCC 081204; Exh. H at pp. 48-50, Mar. 15, 2018 Mental Health Management Order – DWCC 081163.
[73] Exh. H at p. 51, Apr. 4, 2018 Disciplinary Report – DWCC 020015.
[74] Exh. H at p. 52, Apr.2, 2018 Disciplinary Report – DWCC 020016; Exh. H at p. 53, Apr. 4, 2018 Disciplinary Report – DWCC 020010.
[75] Exh. H at p. 54, Mar. 19, 2018 Disciplinary Report – DWCC 020044.
[76] Exh. H at p. 55, Mar. 19, 2018 Disciplinary Report – DWCC 020045.
[77] Exh. H at pp. 56-57, Apr. 25, 2018 Individual Progress Note – DWCC 081054.
[78] Exh. H at p. 58, Apr. 23, 2018 Intra-Institutional Health Screening – DWCC 080649.
[79] Exh. H at p. 59, Apr. 23, 2018 Initial Classification Board – DWCC 020026.
[80] Exh. H at p. 44, Feb. 22, 2018 Classification Review Board – DWCC 020079.
[81] Exh. H at p. 60, May 17, 2018 Classification Review Board – DWCC 020021

Mr. Adams continued requesting mental health care upon his return to DWCC. On May 24, 2018, he wrote to request therapy for "claustrophobia with extreme panic attack and reinstatement of Wellbutrin medicine for major depression disorder."[82] He requested help again on June 6, 2018[83] and again on June 14, 2018.[84] On June 14, 2018, he was seen by Defendant Robinson who reported a subjective complaint of "depression and extreme anxiety" but noted that "offender exhibits no physical symptoms of anxiety" and took no further action.[85] He requested mental health help again on June 21, 2018,[86] and July 2, 2018.[87] On July 5, 2018, Dr. Seal noted his continued psychosis as well as depression and paranoia, changing only the dosage on his medication but otherwise taking no steps.[88] A week later on July 13, 2018, Corey Adams wrote "Mental health emergency want to cut myself with box in cell can't take this no longer. Help", asking to be placed on standard suicide watch.[89] After being placed on standard suicide watch, he cut his wrist and was placed on extreme suicide watch in four point restraints.[90] Mental health staff did not come to see him until Monday, July 16, 2018.[91] On July 17, 2018, he cut his wrist again, telling the staff that "he was claustrophobic,"[92] and was placed on extreme suicide watch again in alternative restraints.[93] *The next day*, his level of care was reviewed and was listed as 4, consistent with only an Axis II personality disorder, and listed no SMI or diagnosis of psychosis.[94] Looking at his level of care assessments, Mr. Adams' condition would seem to be improving since his

---

[82] Exh. H at p. 61, May 24, 2018 Health Care Request Form – DWCC 080785.
[83] Exh. H at p. 62, June 6, 2018 Health Care Request Form – DWCC 080790.
[84] Exh. H at p. 63, June 14, 2018 Health Care Request Form – DWCC 080789.
[85] Exh. H at p. 64, June 14, 2018 Interview of Segregated Inmate – DWCC 081043.
[86] Exh. H at p. 65, June 21, 2018 Health Care Request Form – DWCC 080784.
[87] Exh. H at p. 66, July 2, 2018 Health Care Request Form – DWCC 080780.
[88] Exh. H at p. 67, July 5, 2018 Progress Note – DWCC 081040.
[89] Exh. H at p. 68, July 13, 2018 Health Care Request Form – DWCC 080779.
[90] Exh. H at pp. 69-75, July 13, 2018 Unusual Occurrence Report – DWCC 005155.
[91] Exh. H at pp. 76-77, July 16, 2018 Progress Note – DWCC 081027-28.
[92] Exh. H at pp. 78-83, July 17, 2018 Unusual Occurrence Report – DWCC 005191.
[93] Exh. H at p. 84-85, July 17, 2018 Progress Note – DWCC 081022-23.
[94] Exh. H at p. 86, July 18, 2018 Level of Care Review – DWCC 081021.

arrival at DWCC, but the opposite was clearly the case. His pattern of self-injury, prior diagnosis of psychosis, traumatic brain injury, and repeated requests for mental health help are all inconsistent with his designation as Level of Care 4 without SMI.

Mr. Adams engaged in self-harm again on July 23, 2018, and was again placed on extreme suicide watch.[95] He was taken off suicide watch on July 25, 2018.[96] The next day, he wrote the following: "ADA request(s) for accommodations: 1) adequate medical care for chronic arthritis and severe pain in my neck, back, and hip, 2) adequate mental health care therapy and one on one counseling for my serious mental illnesses and chronic claustrophobia with extreme panic attacks (frequent)."[97] He made this request for reasonable accommodations specifically referencing the ADA almost a year before DWCC would assert that it had received no requests for reasonable accommodations related to mental health and before the ADA Coordinator Angie Huff would deny knowledge of any requests for reasonable accommodations based on mental health. No documentation exists of the ADA Coordinator taking any follow-up actions based on this request.

He went back on to suicide watch the next day, writing "I can't take it. I will hurt myself if I'm not protected from myself."[98] He injured himself with a razor again while on standard suicide watch on July 30, 2018 and was placed back on extreme suicide watch.[99] This time, his Level of Care was upgraded to Level 3 and his paperwork reflected his diagnosis and SMI.[100] Still, nothing would change based on this pattern of clear deterioration and the Defendants' acknowledgement of his mental illness. He followed up on his request for a reasonable accommodation with an ARP, numbered as ARP DWCC-2018-0617, written in the third person explaining that "seeing a lot of

---

[95] Exh. H at pp. 87-89, July 23, 2018 Progress Note – DWCC 081009.
[96] Exh. H at p. 90, July 25, 2018 Mental Health Management Order – DWCC 081004.
[97] Exh. H at p. 91, July 26, 2018 Health Care Request Form – DWCC 080774.
[98] Exh. H at p. 92, July 27, 2018 Health Care Request Form DWCC 080999
[99] Exh. H at pp. 93-99, July 30, 2018 Unusual Occurrence Report DWCC 005231
[100] Exh. H at p. 100-01, July 30, 2018 Level of Care Review DWCC 080986

his blood and the pain when he cuts himself makes him feel better" and reiterated his request for individualized counselling and mental health programming.[101] Despite these requests, he would receive no additional treatment or accommodations for his disability and the pattern of self-harm and extreme suicide watch would repeat over[102] and over[103] and over[104] and over[105] again.

## II.     Defendants Have Violated the Affirmative Duties Imposed Under the Americans with Disabilities Act and Rehabilitation Act

The Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act both outlaw discrimination against people with disabilities by public entities. Prisons are public entities and as such may not exclude individuals with disabilities from participation in or deny them the benefits of their services, programs, or activities. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998). "The remedies, procedures, and rights available under the Rehabilitation Act parallel those available under the ADA. Thus, jurisprudence interpreting either section is applicable to both." *Cadena v. El Paso Cty.*, 946 F.3d 717, 723 (5th Cir. 2020) (internal citations and quotations omitted). The prima facie case under Title II and the Rehabilitation Act require that the plaintiff show:

> (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Cadena*, 946 F.3d at 723 (5th Cir. 2020). "In addition to their respective prohibitions of disability-based discrimination, both the ADA and the Rehabilitation Act impose upon public entities an

---

[101] Exh. H at p. 107, ARP DWCC-2018-0617 DWCC 112192
[102] Exh. H at p. 102, August 17, 2018 Unusual Occurrence Report DWCC 080958
[103] Exh. H at pp. 103-04, August 21, 2018 Unusual Occurrence Report DWCC 019944
[104] Exh. H at p. 105, August 27, 2018 Unusual Occurrence Report DWCC 080929
[105] Exh. H at p. 106, September 12, 2018 Unusual Occurrence Report DWCC 08

affirmative obligation to make reasonable accommodations for disabled individuals." *Id., citing Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). "For this type of claim, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Id.*

      a. *The ADA and RA Impose the Affirmative Duty to Evaluate and Accommodate People with Disabilities*

"The ADA seeks to prevent not only intentional discrimination against people with disabilities but also – indeed primarily – discrimination that results from 'thoughtlessness and indifference,' that is, from 'benign neglect.'" *Brooklyn Cntr for Independence of the Disabled v. Bloomberg*, 980F. Supp.2d 588, 640 (S.D.N.Y. 2013) (quoting, H.R.Rep. No. 101–485(II), at 29 (1990)). "[P]rison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody and to provide the accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation and without relying solely on the assumptions of prison officials regarding that individual's needs." *Pierce v. District of Columbia*, 128 F.Supp.3d 250, 272 (D.D.C. 2015). DWCC undertakes no such assessments of the needs of people with mental illness to be able to participate in the programs and services available in the DPS&C. People at DWCC in extreme, obvious, and well-documented need for mental health services and therapeutic settings are unable to access those services, even as they are available to others in DPS&C custody.

      The gravamen of Plaintiffs' complaint is that people with mental illness at DWCC are abandoned without care in the extreme conditions of extended lockdown. Defendants make no

individualized determination as to whether the individual is safe in those conditions. Despite the strong evidence and consensus that those conditions are not merely intrinsically dangerous[106] but especially so for people with disabilities,[107] Defendants take no special caution whatsoever. Defendants make no alterations to their usual conditions of confinement that prohibit individual participation in group therapy and all other out of cell programming, that deprive prisoners of their access to yard and recreation, and that maintain quiet through the use of chemical spray.[108]

Under the ADA, "[p]ublic entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152(b)(2). At David Wade, people with disabilities are housed in extended lockdown for no penological purpose whatsoever-- simply because the facility is out of medium-custody beds.[109] The Department's own policy provides for this, and makes no exception for people with disabilities, because, as Defendants' brief explains repeatedly, "everyone is treated the same." That runs directly afoul of 28 C.F.R. § 35.152(b)(2). Additionally, people are kept on extended lockdown long beyond the time when they are a threat to anyone else or to the security of the facility; men languish months and years on extended lockdown, despite known and obvious disabilities.

---

[106] Exh I, Report of Dr. Haney, pp. 10 - 32, Section IV. The Adverse Psychological Effects of Social Isolation and Solitary Confinement

[107] Exh, I, Report of Dr. Haney, pp. 32 - 38, Section V. The Exacerbating Effects of Isolation on Mental Illness

[108] Exh. J at pp. 1-5, June 25, 2018 Use of Force Review DWCC 004925-29 (Individual sprayed while screaming "I am not suicidal" and refusing to give up clothing.); Exh. J at pp. 6-17, May 14, 2018 Use of Force Review DWCC 004839-50 (Plaintiff sprayed for yelling while requesting to be taken off suicide watch); Exh. J at pp. 18-29, May 14, 2018 Use of Force Review DWCC 004815-26 (Individual sprayed for yelling and racking bars after Plaintiff was sprayed); Exh. J at pp. 30-34, May 14, 2018 Use of Force Review DWCC 004658-62 (Two additional people, one of whom was on suicide watch, sprayed for yelling and racking bars due to upset at use of force against people on suicide watch that day. Both placed on strip cell status for making noise); Exh. J at pp. 35-38, Feb. 23, 2018 Use of Force Review DWCC 017818-21 (Tyler Blanchard sprayed for yelling that he was afraid of security.); Exh. J at pp. 39-51, Jan. 23, 2018 Use of Force Review DWCC 004230-42 (Noel Dean sprayed for yelling while in full restraints on extreme suicide watch, given rule violation.)

[109] Exh. K, Deposition of Long 60:1-25.

b.  *Equal Treatment Violates the ADA Requirements of Appropriate Setting and Reasonable Accommodation*

Defendants argue that by treating all people the same, regardless of whether they have a disability, discrimination is impossible. In fact, Defendants' argument that all people are treated identically, regardless of their disability, is an admission of a violation of the ADA. Defendants stipulate that "the Plaintiffs and offenders with disabilities are treated the same as the non-disabled offenders housed in the South Compound." R. Doc. 413-2 at p. 12. Defendants' argument fundamentally misunderstands the affirmative obligation to provide reasonable accommodations to people with disabilities. "The purpose of the ADA's reasonable accommodation requirement is to guard against the facade of 'equal treatment' when particular accommodations are necessary to level the playing field." *Badalamenti v. Louisiana Dep't of Wildlife & Fisheries*, 439 F. Supp. 3d 801, 808 (E.D. La. 2020) *citing McGary v. City of Portland,* 386 F.3d 1259, 1267 (9th Cir. 2004). "[A] person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation." *Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998).

David Wade deploys the setting of extended lockdown without any regard to whether it is "the most integrated setting appropriate to needs of the individual." The determination of whether a specific prison facility is an appropriate setting for an individual should be based on the treatment needs of that individual:

> The Department wishes to emphasize that detention and correctional facilities are unique facilities under Title II. Inmates cannot leave the facilities and must have their needs met by the corrections system, including needs relating to a disability. If the detention and correctional facilities fail to accommodate prisoners with disabilities, these individuals have little recourse, particularly when the need is great (*e.g.*, an accessible toilet; adequate catheters; or a shower chair). It is essential that corrections systems fulfill their nondiscrimination and program access obligations by adequately addressing the needs of prisoners with disabilities, which

> include, but are not limited to, **proper medication and medical treatment**, accessible toilet and shower facilities, devices such as a bed transfer or a shower chair, and assistance with hygiene methods for prisoners with physical disabilities.

Department of Justice Commentary to 28 C.F.R. § 35.152 (Effective March 15, 2011, emphasis added). The Supreme Court recognizes a broad interpretation of the ADA's coverage, "Modern prisons provide inmates with many recreational "activities," medical "services," and educational and vocational "programs," all of which at least theoretically "benefit" the prisoners (and any of which disabled prisoners could be "excluded from participation in")." *Yeskey*, 524 U.S. at 210. Defendants incorrectly argue that the ADA does not allow analysis of whether a setting is appropriate to the treatment needs of a person with a disability; their argument is based on case law predating both these regulations and *Yeskey*. Rec. Doc. 413-2 at p. 7, *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

## III.    Plaintiffs' Claims Under the ADA and RA are Supported by the Record.

Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by excluding people with disabilities from the benefits, services, programs, and activities by reason of their disabilities: (1) DWCC fails in its affirmative duty to identify people with disabilities; (2) where DWCC does identify a person with a disability, DWCC does not make any reasonable modifications or accommodations for people with mental illness; (3) DWCC fails to track and act upon requests for reasonable accommodation made by people held on extended lockdown; (4) DWCC fails to make any reasonable accommodations to the disciplinary or use of force practices as they are applied to people with disabilities; and (5) DWCC disregards recommendations from its own mental health staff that individuals with mental illness be placed in general population.

a. *Defendants Fail to Individually Identify People with Disabilities.*

The Louisiana Department of Public Safety and Corrections does not track individuals with mental health disabilities according to the ADA's definition of disability. The ADA makes it unlawful for a public entity to "directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3). "[E]mploying no system or an inadequate system for identifying and tracking prisoners with disabilities" is a viable class-wide claim for an unlawful method of administration. *Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020). DWCC fails on two levels, first by using an under-inclusive definition of disability and second by removing people from the categorization of people having a mental health disability when that person stabilizes.

i. Defendants' Definition of Serious Mental Illness is Under-Inclusive

The DPSC tracks people with mental illness based only on its internal level of care system and an internal definition of "serious mental illness" or "SMI," which is based only on diagnosis rather than functional impairment.[110] The six enumerated conditions are: major depressive disorder, schizophrenia, schizoaffective disorder, bipolar disorder, unspecified schizophrenia spectrum, and severe anxiety disorder. By limiting the definition of SMI to only a list of six specific diagnoses and failing to independently track disability, Defendants under-identify people with

---

[110] Exh. L, Deposition of Dr. Burns at 115:6 - 120:8; Exh. M, Deposition of Dr. Thompson at 252:4-18.

disabilities by excluding people with mental illness whose symptoms cause a functional impairment but whose diagnosis is not included on the limited list of six SMI diagnoses. This is inadequate.

The ADA requires an individualized inquiry into the person's functional limitations. *Pierce*, 128 F.Supp.3d at 272. Making determinations based on stereotypes of people with certain diagnoses fails to satisfy this requirement. *Id.* The DPSC's policies that only recognize some diagnoses as serious disregards the potential for other diagnoses to inflict functional limitations that amount to disability is such a stereotype. By adopting an unlawfully narrow definition of disability, Defendants have inflicted severe harm and placed all people with mental health disabilities in danger. Defendants have an obligation to identify and provide reasonable accommodations to people with functional impairments, even when they lack the ability to request an accommodation for themselves. Defendants' faulty approximation of diagnosis for mental health disability is enshrined in policy, and there is no question that it violates the ADA.

        ii.   Defendants Exclude People with Chronic Mental Illness from the Definition of Serious Mental Illness

In addition to the failure to individualize the assessment into the functional impairment, the DPSC also fails to make accommodations based on a record of a disability. People with a record of serious mental illness in remission remain people with disabilities within the definition of the ADA. 42 U.S.C. § 12102(1)(B). Pursuant to Defendants' policy, people whose symptoms are stable and managed with medication are categorized under the level of care system as 5H and lose the SMI designation. For instance, Plaintiff Bruce Charles was categorized as "Bipolar in Remission" and lost his designation as SMI even though he remained at level of care 3.[111] People

---

[111] Exh. N, Nov. 2, 2018 - Level of Care Review, Charles, Bruce DWCC 113023

with serious mental illnesses remain at risk, even if the condition is temporarily controlled by medication. The risk to people with a record of mental health disabilities is addressed by Dr. Burns, who discussed at length the consensus of the ACA, National Commission on Correctional Healthcare, and American Psychiatric Association that such people should still be tracked and not be placed into restrictive housing, even while in remission.

"The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures" 42 U.S.C.A. § 12102(4)(E)(i). Mitigating measures include "medication" and "learned behavioral or adaptive neurological modifications." 42 U.S.C.A. § 12102(4)(E)(i). The Fifth Circuit explains:

> The ADAAA went on to explicitly overrule "the requirement enunciated by the Supreme Court in *Sutton* ... and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures," sec. 2(b)(3), and amended the ADA to mandate that the "determination of whether an impairment substantially limits a major life activity ... be made without regard to the ameliorative effects of mitigating measures such as-... implantable hearing devices," ADAAA, sec. 4(a), § (4)(E)(I).

*Kemp v. Holder*, 610 F.3d 231, 236 (5th Cir. 2010). When a person has a mental illness that rises to the level of disability, even managed by medication or a level of behavioral adaptation, that mental illness remains a disability. Defendants' practices for identifying individuals with mental illness linger more than a decade behind Congress's 2008 ADA Amendments Act that directly reversed the standard in *Sutton,* which deprived individuals of the protections of the ADA while their conditions were managed and in remission.

Defendants' definition of disability is fundamentally under-inclusive. Identifying people with disabilities only by diagnosis, rather than functional impairment, violates the ADA. Paradoxically, Defendants do not even maintain the SMI flag in the records of people like Bruce Charles, who have an enumerated SMI diagnosis, if their condition enters a period of remission.

People with serious mental illness should not be kept for prolonged periods of time in restrictive housing, and while there must receive an individualized treatment plan focused on preparing the person for transfer to a less restrictive setting.[112] Defendants violate the ADA by failing to identify people with disabilities, and thereby failing to take proactive measures to safely house and keep those individuals in the least restrictive setting appropriate to their needs.

        b.   *Defendants provide no affirmative modifications even for people identified as having serious mental illness.*

"[I]t is axiomatic that the ADA and RA do not require a plaintiff to specifically request a certain accommodation in order to prevail on a claim of disability discrimination." *Levy v. Louisiana Dep't of Pub. Safety & Corr.*, 371 F. Supp. 3d 274, 285 (M.D. La. 2019). Defendants' own expert estimates that 40% of the population on extended lockdown meets the Defendants' under-inclusive definition of SMI limited only to enumerated diagnoses.[113] Though many prisoners require special care and accommodation, no modifications are made for people with serious mental illness on extended lockdown. Prisoners who Defendants document as having SMI are subject to the same harmful conditions of confinement as every other prisoner on extended lockdown at DWCC, even though they might be particularly vulnerable to harm.[114] Psychotherapy, programming, and a higher level of care necessary for individuals with a mental health disability who are maximum security are unavailable at DWCC,[115] although such services are available at other DOC facilities such as EHCC.[116] The DPSC and practices at DWCC render inmates with mental health disabilities on extended lockdown unable to access needed mental health care for

---

[112] Exh. L, Deposition of Dr. Burns, 88:12-23.
[113] Exh. M, Deposition of Dr. Thompson, 134:20-25
[114] Exh. I, Report of Dr. Haney, pp. 32 - 38, Section V. The Exacerbating Effects of Isolation on Mental Illness.
[115] Exh. Z, Report of Dr. Burns at p. 3.
[116] Exh. M, Report of Dr. Thompson at pp. 10-11.

which they are qualified recipients. That care is reasonable, practical, and available at other institutions.

i.   Defendants Violate the ADA by Setting an Overly Restrictive Criteria for Reasonable Accommodations

Dr. Seal testified that he recommends people for transfer out of DWCC , albeit rarely, but only if they meet a three-part test: the individual must "have a mental illness, usually a psychotic mental illness, and they are showing dangerous behavior to themselves or others, which might be alleviated by treatment by they are refusing said treatment."[117] He could not recall a single incident of transferring a patient away from David Wade because that person would benefit from more intensive treatment.[118] This very narrow and specific set of criteria followed by Dr. Seal to transfer an individual to a facility with more robust mental health treatment options prevents people with disabilities, even those who have been identified as having SMI by the Defendants, from being able to access the care they need while in a maximum-security setting. The patient's inability to access care is simply due to their symptom cluster not meeting the requirements for reassignment from DWCC imposed by Dr. Seal. It is not driven by any specific mental health needs, or individualized evaluation of security concerns.

Similarly, Defendants also fail to limit the duration of confinement on extended lockdown for individuals who have been documented as having SMI, or people with functional impairment. Defendants' own expert agrees, testifying "you could say that's a consensus of mental health experts, that they should not be held in these conditions for long periods of time."[119] The record is replete with examples of individuals with SMI (Defendants' proxy for disability) who have been housed in the dangerous conditions of extended lockdown for years. Defendants do not modify

---

[117] Exh. A, Deposition of Dr. Seal, p. 40:18-22.
[118] Exh. A, Deposition of Dr. Seal, 92:9-16.
[119] Exh. M, Deposition of Dr. Thompson 266:16 - 267:2.

any existing mental health programming or counseling services to allow people with mental health disabilities on extended lockdown to participate. Brian Covington has autism and schizoaffective disorder, which caused a pattern of self-harm and suicide watch.[120] ███ ███ had early onset dementia and schizoaffective disorder, which impaired his memory and his ability to communicate his needs. DWCC responded to these needs with medication and suicide watch, not treatment, not therapy, not programming, and not movement to treatment settings where such things might be available.[121] Noel Dean has a record of repeated suicide attempts and significant mental health needs, including an ARP which should have triggered some level of intervention from a disability and mental health perspective, but he languished on extended lockdown for two years without treatment.[122] Corey Adams has a traumatic brain injury and psychosis, both of which impair his ability to care for himself and resulted in a pattern of self-harm and extreme suicide watch.[123]

To return to the elements of the *prima* facie case for discrimination under the ADA, these are individuals with disabilities who have been excluded from access to care and services for which they qualify on the basis of their disability. The individuals identified above are individuals with disabilities. These individuals are qualified to receive the mental health care and services available from the DPS&C, even as they remain classified as maximum security, as evinced by the fact that EHCC does not wait for the individuals to be downgraded to medium security before providing access to care and services, and, further, as evidenced by the fact that other Departments of Corrections provide accommodations in maximum security settings.[124] DWCC regularly documents the mental health conditions of people, classifies them as seriously mentally ill, and

---

[120] See discussion Supra, Part I.a
[121] See discussion Supra, Part I.b
[122] See discussion Supra, Part I.c
[123] See discussion Supra, Part I.d
[124] Exh. O, Report of Dr. Thompson at pp. 10-11.

then fails to take any steps whatsoever to accommodate those individuals' need for services or accommodation. This indifference to the needs of people with mental health disabilities violates the ADA and RA.

> ii.    Defendants Violate the ADA by Ignoring Open and Obvious Disabilities.

The ADA does not permit an institution to ignore the open and obvious needs of a person with a disability simply because they have not requested a reasonable accommodation. *Pierce*, 128 F.Supp.3d at 272. Just as the ADA requires prisons to affirmatively provide modifications to people who have visual, hearing, or mobility disabilities, it also requires that the prison affirmatively intervene to provide reasonable modifications to its program for people with known functional limitations arising from known mental health disabilities such as autism, dementia, and hallucinations. The affirmative obligation to provide reasonable accommodations to individuals with disabilities exists to prevent exactly the type of harm cataloged above.

Defendants' reliance on *Williamson v. Larpenter* No. CV 19-254, 2019 WL 3719761, at *14 (E.D. La. July 15, 2019), *report and recommendation adopted*, No. CV 19-254, 2019 WL 3718135 (E.D. La. Aug. 7, 2019), is misplaced because, unlike the facts in this case, those Defendants do in fact offer mental health services and counselling to people, including those in maximum-security custody. The fact that Defendants do not offer those services to people placed on extended lockdown at DWCC is exactly the problem. The Department may not knowingly accept people with severe disabilities and intentionally place them in a far-flung, extremely harsh setting known to cause harm to people with disabilities without services or accomodation. Allowing the Defendants to avoid their obligations under the ADA simply by creating settings which offer no programming or other reasonable accommodations to people with mental illness would go against the very purpose of the ADA, to remedy "various forms of discrimination,

including outright intentional exclusion, [. . .] overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities" 42 U.S.C. § 12101(a)(5).

> ### c.   DWCC Fails to Provide a Process for Requesting Reasonable Accommodations

"[E]mploying no system or an inadequate system for prisoners to request accommodations and submit grievances regarding non-accommodation" is an unlawful method of administration under the ADA. *Dunn*, 318 F.R.D. at 665. Public entities are required to maintain a process for requesting reasonable accommodations. 28 C.F.R. § 35.163; *see also* 28 C.F.R. § 35.106. When asked to admit or deny that "[n]o requests for a reasonable accommodation related to mental illness has been granted for a prisoner on extended lockdown in the last five years" Defendants replied that "It is admitted that DWCC has not received a request related to mental illness."[125] Defendants' own expert estimated that approximately 40% of the population on extended lockdown had SMI, even by the Department's under-inclusive definition.[126] The absence of even a single documented request for a mental health accommodation over a five-year period from that population is strong evidence that prisoners at DWCC are not able to use the reasonable accommodation process, that such requests are not tracked, and that no such process exists. DWCC has failed to satisfy its affirmative obligation under the ADA to implement a process for allowing individuals to affirmatively request reasonable accommodations.

DWCC's ADA coordinator, Assistant Warden Angie Huff, could not remember granting a single request for reasonable accommodations based on a mental health disability in her 32 years

---

[125] Exh. P, Responses to Plaintiffs' Requests for Admission dated May 3, 2019, p.38 no. 157.
[126] Exh. M, Deposition of Dr. Thompson, 134:20-25

of employment at David Wade, 15 of which have been in her current position as Deputy Warden.[127] Warden Huff testified that any time a person requests a reasonable accommodation, she is required to interview that person.[128] The ADA requires that accomodation be identified as such based on their substance. However, at David Wade, a request for accommodation must be accompanied by magic language; directly contrary to federal law.[129] The ADA coordinator at DWCC identified necessary records that are supposed to be kept when a person requests a reasonable accommodation.[130] Those records are, in fact, non-existent at the facility.  After testifying that she had never received a request for an accomodation related to mental illness, the ADA coordinator was presented with two such requests that had been filed with her office, using the specific language David Wade requires. Warden Huff was unable to say whether or not any others existed.[131]

Despite the fact that reasonable accommodations are not tracked, much less granted, individuals continued making requests. Bruce Charles filed an ARP requesting accommodations for his ADHD bipolar disorder in the form of being allowed to participate in mental health programs and classes or transfer to a facility capable of meeting his needs for treatment.[132] Ronald Brooks also filed an ARP requesting reasonable accommodations, particularly mental health care stating "I go to mental zones of madness where I have horrific visions and insights. I'm losing my family and friends and have no one to talk to. These conditions are driving me mad. I fear my health is deteriorating and need mental health care."[133] Corey Adams requested the following: "ADA request(s) for accommodations: 1) adequate medical care for chronic arthritis and severe

---

[127] Exh. Q, Deposition of Warden Huff at 45:2-8; 7:2-13.
[128] Exh. Q, Deposition of Warden Huff at 40:10-13.
[129] *Id.* at 41:20 - 42:4.
[130] *Id.* at 42:12-22.
[131] Exh. Q, Deposition of Warden Huff, 133:1-13
[132] Exh. R at p. 1, ARP DWCC-2017-0192 DWCC 000178
[133] Exh. R at pp. 2-4, ARP DWCC-2019-0348 DWCC 112864

pain in my neck, back, and hip, 2) adequate mental health care therapy and one on one counseling for my serious mental illnesses and chronic claustrophobia with extreme panic attacks (frequent)."[134] Shawn Francis also filed an ARP requesting reasonable accommodations for heat precautions related to his mental illness.[135] Anthony Montecino filed a similar request for reasonable accommodations for his mental illness, which noted his diagnosis as bipolar.[136] Noel Dean also filed an emergency request for reasonable accommodations for his mental illness while on suicide watch.[137] None of these requests were granted.

Colonel Lonnie Nail, the longtime unit manager for the extended lockdown unit at DWCC, did not know if there was a process for requesting a reasonable accommodation.[138] Assistant Warden Dauzat, who oversees the  mental health program at DWCC, testified that she does not know of any form to use for requesting a reasonable accommodation and does not train her staff nor is aware of any staff training regarding the reasonable accommodation process.[139] This ignorance of the basic process for providing such accommodations reflects an absolute state of failure in DWCC's compliance with the requirements of the ADA and RA. Col. Nail testified that he never received any directives to implement any reasonable accommodations.[140] Warden Dauzat testified she also has not seen a request or responded to a request that had been made for a reasonable accommodation.[141] This has the "effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii). This is all despite the fact that all parties agree that

---

[134] Exh. R at p. 5, July 26, 2018 Health Care Request Form DWCC 080774
[135] Exh. R at p. 6, ARP DWCC-2018-0497, DWCC 111829
[136] Exh. R. at p. 7, Letter to Warden Huff, DWCC 028947
[137] *Supra*, § I.c
[138] Exh. S, Deposition of Nail 142:16-24 (May 6, 2019)
[139] Exh. T, Deposition of Dauzat 92:18 - 93:9.
[140] Exh. S, Deposition of Nail 143:3-19 (May 6, 2019)
[141] Exh. T, Deposition of Dauzat 92:7-12.

hundreds of people on extended lockdown have a serious mental illness under Wade's own definition. There can be no clearer evidence of systemic and class-wide violation of the ADA and RA.

        *d. DWCC uses brutal methods of discipline against people with mental illness for behaviors related to their disability.*

Defendants' own experts assess that approximately 40% of the population on extended lockdown at DWCC has a condition which fits their own definition of SMI.[142] Despite this high prevalence of acute mental health conditions, the security staff at DWCC have repeatedly stated that the use of chemical agents is justified against people simply for making too much noise.[143] When people engage in behaviors linked to mental illness such as flooding their own cell or throwing their own feces, the staff are able to take away that person's clothing, mattress, and property for a month without a hearing or appeal.[144]

Noel Dean[145] is an example of a person with an obvious disability whose mental decompensation was treated as a disciplinary issue and punished with strip cell status. Similarly, Larry Jones and the other men who were sprayed for making noise while on suicide watch are examples of a use of force policy and practice that fails to provide accommodation in the form of mental health response and de-escalation.[146] As one prisoner describes it: "They put me in a strip

---

[142] Exh M, Deposition of Dr. Thompson, 134:20-25
[143] See Fn 108; Exh. J at pp. 1-5, June 25, 2018 Use of Force Review DWCC 004925-29 (Individual sprayed while screaming "I am not suicidal" and refusing to give up clothing.); Exh. J at pp. 6-17, May 14, 2018 Use of Force Review DWCC 004839-50 (Plaintiff sprayed for yelling while requesting to be taken off suicide watch); Exh. J at pp. 18-29, May 14, 2018 Use of Force Review DWCC 004815-26 (Individual sprayed for yelling and racking bars after Plaintiff was sprayed); Exh. J at pp. 30-34, May 14, 2018 Use of Force Review DWCC 004658-62 (Two additional people, one of whom was on suicide watch, sprayed for yelling and racking bars due to upset at use of force against people on suicide watch that day. Both placed on strip cell status for making noise; Exh. J at pp. 35-38, Feb. 23, 2018 Use of Force Review DWCC 017818-21 (Tyler Blanchard sprayed for yelling that he was afraid of security.); Exh. J at pp. 39-51, Jan. 23, 2018 Use of Force Review DWCC 004230-42 (Noel Dean sprayed for yelling while in full restraints on extreme suicide watch, given rule violation.)
[144] Exh. U, Report of Sec. Pacholke at pp. 31-35
[145] *Supra*, I(d)
[146] See Fn 108, 143.

cell, for 30 days. No property, no clothes, no nothing. [They] take your mattress at 5 AM, maybe get it back at 10 PM… I'm losing it. No phone calls, no mail, no writing material, no reading, no nothing. Not even my slippers."[147] Warden Baird, the prison's chief of security, did not even know if there was a requirement to consult with mental health before placing somebody on strip cell status.[148]

The obligation to provide accommodations applies to the discipline of disabled inmates, as well: "A failure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person. A failure to provide a reasonable accommodation, or discrimination by reason of disability, constitutes a violation of the ADA[.]'" *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *55 (M.D. La. Mar. 31, 2021). "When applied in the prison context, it follows that the second element of a § 12132 claim can be satisfied where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person." *Id.* citing *Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 933106, at *3 (N.D. Cal. Mar. 11, 2021). The court in *Lewis* found that the "hands off approach to discipline" by the ADA coordinator and medical staff at LSP violated the ADA. *Id.*

Based upon his review of body camera footage, Sec. Dan Pacholke concluded "there are no attempts to de-escalate, just supervisors ordering prisoners to comply, additional supervisors giving an order to comply, and then the deployment of force."[149] Sec. Pacholke's report documents numerous uses of force against individuals requesting mental health help.[150] The use of extreme force against people with mental illness during crisis is commonplace at DWCC: "[They] put me

---

[147] Exh. I, Report of Dr. Haney at p. 63
[148] Exh. V, Deposition of Baird 84:16-23
[149] Exh. W, Report of Sec. Pacholke at p. 43.
[150] Exh. W, Report of Sec. Pacholke at p. 44.

in a cell with a camera, in a gown. I was upset. They sprayed me, left, went to get another can of spray, and emptied it on me. I said, 'I'm on suicide watch.' The officer who was spraying me said, 'oh, you wanted to die?' and then he sprayed the other whole cannister on me [while] I'm in a suicide gown."[151]

The same "hands off approach to discipline" which violated the ADA in *Lewis* is also in effect at DWCC. Hayden has never been consulted by classification about the initial decision of whether to keep a person on extended lockdown based on mental illness.[152] Col. Nail testified that he never once involved mental health staff in the disciplinary board's decision to impose a sanction based on a write-up.[153] Sanctions such as the loss of yard and phone restriction can be counter-productive:

> Prisoners are punished, sometimes by retaliatory staff, for relatively minor infractions, and at no time is the root cause of negative behaviors addressed. Under current practice, sanctioning includes long terms of privilege removal, taking away things like telephone, recreation, and visits that help prisoners cope. Prisoners in extended lockdown have few privileges to begin with, so by taking away what they do have for extended periods of time, prisoners are left with nothing to occupy their time and their minds, which in my experience leads to more unwanted behavior.[154]

The psychological consequences of taking away privileges, such as the minimal outside recreation offered at DWCC or monthly telephone call can also be severe.[155] DWCC has intransigently refused to act on its obligation under the ADA to provide accommodations to people with disabilities even as part of the use of force or disciplinary sanctioning process.

e.  *Defendants Discriminate Against People with Known Disabilities by Disregarding Appropriate Housing Assignments*

---

[151] Exh I, Report of Haney at pp. 55-56.
[152] Exh. X, Deposition of Hayden 35:16-23 (class)
[153] Exh. S, Deposition of Nail 156:11-13.
[154] Exh. W, Report of Sec. Pacholke at p. 25
[155] Exh. I, Report of Dr. Haney at p. 53, 58-60

People who Defendants subjectively know to have mental illness disabilities are placed in restrictive housing upon arrival at DWCC for prolonged periods of time, even where counter-indicated by the person's mental health intake assessment. This violates the ADA's affirmative obligation to provide reasonable accommodations to prisoners who are subjectively known to require accommodations. *See*, *Pierce*, 128 F.Supp.3d at 272.

A prima facie case for discrimination under the ADA requires that the person have a disability, and that (1) a person with a disability (2) be denied a benefit or excluded from a program or service (3) due to their disability. *Cadena*, 946 F.3d at 723. People held on extended lockdown have documented mental illness that rises to the Department's own definition of SMI. These people with disabilities are denied the benefit of the housing assignment recommended by staff in general population where counseling and group therapy are available. People with disabilities are denied this benefit due to Defendants' failure to provide the reasonable accommodation of housing the person in either the recommended general population or treatment setting.  Simply put, even when Defendants' own mental health staff document on intake that an individual with mental illness could properly be housed in general population, that recommendation does not result in the person actually receiving an appropriate housing location.

Dr. Haney's expert declaration documents the extensive literature and scientific support for the proposition that extended lockdown is uniquely harmful for people with pre-existing mental illness. He states:

> Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the benign and socially supportive atmosphere that mental health clinicians seek to create within therapeutic environments. Not surprisingly, mentally ill prisoners generally deteriorate and decompensate when they are placed in isolation units.[156]

---

[156] Exh. I, Report of Dr. Haney at p. 33.

There is no question that this practice is commonplace at DWCC. For example, Anthony Caro's intake assessment noted that he had a history of suicidal behavior and cleared him for general population.[157] Plaintiff Larry Jones' intake screening also notes that he has a history of depression with inpatient and outpatient treatment as well as multiple suicide attempts before and during incarceration; he is cleared for general population with a mental health referral.[158] Jamine Felton's intake assessment noted a history of suicidal behavior and bipolar disorder, and he was cleared for general population as well.[159] ███████ had a documented history of schizophrenia and was cleared for general population.[160] ███████ was also documented as having a history of suicidal behavior, and was cleared for placement in general population.[161] Corey Adams' intake screening documented his pattern of cutting himself and his psychotic disorder, clearing him for placement in general population with a mental health referral.[162] None of these documents had even the slightest impact on the housing assignments for these people-- they were sent to extended lockdown and solitary confinement. It is precisely because they were treated the same and sent to extended lockdown with no accommodations for their documented mental illness or pattern of suicidal behavior-- that these people were discriminated against.

To be clear, Plaintiffs continue to allege that DWCC's mental health staff under-identifies people with disabilities at the screening stage. However, even where DWCC staff document that the person has a history of self-harm or mental illness, and where staff clear the person for general population, those assessments are roundly ignored. Individuals with pre-existing mental illness are sent to extended lockdown where they decompensate, and they are unable to get out.

---

[157] Exh. Y at p. 1, Nov. 14, 2016 Mental Health Intake Screening DWCC 000637
[158] Exh. Y at p. 2, Nov. 28, 2017 Mental Health Intake Screening (Bates Unclear)
[159] Exh. Y at p. 3, July 27, 2015 Mental Health Intake Screening DWCC 011266
[160] Exh. Y at p. 4, Feb 1, 2017 Mental Health Intake Screening DWCC 133575
[161] Exh. Y at p. 5, Dec. 5, 2017 Mental Health Intake Screening DWCC093895
[162] Exh. Y at p. 6, Dec. 5. 2017 Mental Health Intake Screening DWCC 081253

IV.     **Plaintiffs Adequately Plead Violation of the Americans with Disabilities Act and the Rehabilitation Act**

As cataloged extensively herein, Plaintiffs have identified evidence demonstrating violations of the ADA and the RA including facts about the institution generally and the lives of specific individuals incarcerated there which violated those laws. Defendants' motion for summary judgment reads partially as a motion to dismiss on the pleadings, as it parses the paragraphs of Plaintiffs' Complaint and argues that Plaintiffs have not pled a claim. Fed. R. Civ. P. 12(h)(2) limits the time for bringing a motion for failure to state a claim to trial, a motion under Rule 12(c), or when a responsive pleading would be allowed. Defendants do not address any reason why a motion to dismiss should be permitted at this point in time. Because the motion is styled as a motion for summary judgment, Plaintiffs respond with the extensive evidence above. However, in an abundance of caution, Plaintiffs also seek to respond to Defendants arguments about their pleadings.

Defendants' argument is fatally flawed because it ignores allegations about conduct at the facility which are highlighted in the individual stories, and then claims that it is conclusory to draw the conclusion that the facts alleged and wrongs described in the complaint violate the ADA, when the ADA and RA violations are a *prima facia* case.

Plaintiffs' allegations show the following five violations of the ADA and RA: (1) DWCC fails in its affirmative duty to identify people with disabilities; (2) where DWCC does identify a person with a disability, DWCC does not make any reasonable modifications or accommodations for people with mental illness; (3) DWCC fails to track and act upon requests for reasonable accommodation made by people held on extended lockdown; (4) DWCC fails to make any reasonable accommodations to the disciplinary or use of force practices as they are applied to

people with disabilities; and (5) DWCC fails to divert people with documented mental illness from extended lockdown at intake.

### a. DWCC fails in its affirmative duty to identify people with disabilities

Plaintiffs describe in detail the lack of screening for mental illness, and the individual harm this causes. Relevant sections of the Complaint include:

> 71. Prisoners known to the Defendants to have serious mental illnesses, including extensive histories of suicidal ideation and behavior, are routinely placed on extended lockdown at DWCC.
> 72. Placement on extended lockdown further exposes a prisoner with serious mental illness to significant risk of self-harm. Defendants' screening mechanisms disregard the information available in the prisoners' mental health records.
> 73. Likewise, when a prisoner is placed on extended lockdown for a disciplinary reason, Defendants do not conduct any review of records to identify whether the prisoner has a mental health diagnosis that would require treatment or care inconsistent with the extreme isolation of solitary confinement or extended lockdown.
> [. . .]
> 74. The absence of observation and monitoring of individuals on extended lockdown means that psychiatric decompensation goes unnoticed, as does the onset of new symptoms.

As explained more fully *Supra* at III(a), the ADA imposes the affirmative duty to conduct an individualized assessment in order to determine whether the individual has a disability. DWCC conducts no such inquiries for any of the people described in the complaint. What limited assessment people do receive applies definitions inconsistent with the ADA and fails to account for chronic mental illness.

### b. DWCC Makes No Reasonable Accommodations for Individuals with Known Disabilities.

Under the ADA, a prison system has an affirmative obligation to provide reasonable accommodations to individuals with known disabilities. DWCC has no system in place to provide reasonable accommodations even to individuals who have a documented history of mental illness or who are exhibiting open and obvious signs thereof.

77. Signs and symptoms of serious mental illness remain unidentified or untreated and prisoners experiencing crisis manifestations of mental illness are not detected before the person is a significant risk to himself or others. Each of the named class representatives have been harmed by the absence of ongoing screening for mental illness while on extended lockdown because they have not been assessed for changes to their condition despite new and worsening symptoms.

[. . .]

78. Defendants do not respond to evidence of mental health crisis with any system of assessments, diagnostics, counseling, or treatment.

79. Defendants do not conduct screenings or make mental health resources available to prisoners with a pattern of suicidal ideation, even in the face of repeated mental health crises.

80. Upon release from suicide watch, Defendants' policy only calls for one follow-up interview, to be conducted one week after the prisoner is taken off suicide watch. The follow-up interview uses the same format as the "Segregation Interview" and does not call for any further mental health evaluations or services.

81. Other manifestations of illness that fall short of self-harm or suicidal ideation are treated as disciplinary violations and produce no mental health treatment or follow-up. Defendants respond to yelling, cursing, refusing to move, and other behavior potentially diagnostic of untreated mental illness as a disciplinary matter rather than a mental health symptom.

82. The failure of DWCC's system of intake, diagnosis, and routine evaluation exposes all prisoners to the real risk that a mental illness will be left undiagnosed and untreated.

Each of the individuals whose stories appear in the named complaint has a mental illness which rises to the level of a disability, as defined by the ADA. Defendants' initial knowledge of Bruce Charles' mental illness is documented in the complaint,[163] indicating that Defendants were aware of his bipolar disorder and nonetheless held him in extended lockdown, wherein he suffered a predictable deterioration with multiple incidents of suicide watch and other indicia of worsening mental illness.[164] Carlton Turner's documented history of mental illness was known to Defendants,[165] and he suffered a similar predictable decompensation and extreme self-harm when subjected to extended lockdown.[166] Larry Jones has a documented history of depression and was

---

[163] Rec. Doc. 316 paragraphs 124-132
[164] Rec. Doc. 316 paragraphs 133-154
[165] Rec. Doc. 316 paragraphs 155-162
[166] Rec. Doc. 316 paragraphs 163-182

nonetheless sprayed for failure to maintain quiet while on suicide watch.[167] Ronald Brooks was also held on extended lockdown for nearly a year despite a documented history of depression with psychotic features.[168] DWCC never made any reasonable accommodations for the named Plaintiffs in the form of exclusion from long term placement on extended lockdown, allowing people to participate in treatment or programming offered by the Department, or taking even basic measures to ameliorate the harshest aspects of solitary confinement.

### c.  *DWCC Fails to Track and Act upon Requests for Reasonable Accommodation*

Plaintiffs repeatedly alleged that DWCC fails to make reasonable accommodations.[169] Plaintiffs alleged that each and every one of the named Plaintiffs were deprived of reasonable accommodations for their disabilities.[170] Bruce Charles filed an ARP requesting accommodations for his ADHD bipolar disorder in the form of being allowed to participate in mental health programs and classes or transfer to a facility capable of meeting his needs for treatment.[171] Ronald Brooks also filed an ARP requesting reasonable accommodations, particularly mental health care stating "I got to mental zones of madness where I have horrific visions and insights. I'm losing my family and friends and have no one to talk to. These conditions are driving me mad. I fear my health is deteriorating and need mental health care."[172] Carlton Turner also filed a request for mental health reasonable accommodations in the form of an ARP.[173] Requests for reasonable accommodations do not have to be in writing or include the words "reasonable accommodation" but need to connect a request for assistance to the person's disability. *E.E.O.C. v. C.R. England,*

---

[167] Rec. Doc. 316 paragraphs 184-199
[168] Rec. Doc. 316 paragraphs 200-209
[169] Rec. Doc. 316 paragraphs 299, 304, 307
[170] Rec. Doc. 316 paragraphs 28-31.
[171] Exh. R at p. 1, ARP - 0192 DWCC 000178
[172] Exh. R at p. 2, ARP DWCC-2019-0348 DWCC 112864
[173] Exh R at pp. 8-9, ARP DWCC-2016-1157 DWCC 019266-67

*Inc.*, 644 F.3d 1028, 1048 (10th Cir. 2011), *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir.2002), *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir.1999).

### d. *DWCC Fails to Provide Reasonable Accommodations in its Use of Force and Discipline*

Plaintiffs allege that DWCC uses excessive force against people with disabilities on extended lockdown.[174] "Once on extended lockdown, people with mental illness decompensate and symptoms become more severe. Staff then respond to symptoms of mental illness by using restraint chains on people in cells, chaining people to wooden restraint chairs, using chemical spray on people in cells, issuing additional write-ups or criminal charges, taking away outdoor time, moving prisoners to more extreme isolation, and taking away all clothing, reading material, and mattresses as punishment."[175] This is illustrated particularly vividly by Mr. Jones being sprayed for requesting to be taken off of suicide watch.[176]

### e. *DWCC Disregards Recommendations from Mental Health Staff that individuals with Mental Illness be Placed in General Population.*

Plaintiffs allege that mental health staff are not adequate for the purposes of screening people at intake.[177] Even where Defendants successfully identify mental illness, they do not have a role in the process that allows them to redirect or exclude people from solitary confinement based on mental illness or history of self-harm. "All prisoners who are transferred to DWCC are housed in lockdown for a period of time prior to being moved to general population. The lockdown units also are used for any prisoner in general population who is suicidal or attempts suicide."[178] Even

---

[174] Rec. Doc. 316 paragraph 249
[175] Rec. Doc. 316 paragraph 3
[176] Rec. Doc. 316 paragraph 184-99.
[177] Rec. Doc. 316 Paragraph 67-73
[178] Rec. Doc. 316 paragraph 40

where mental health staff clear prisoners to be placed in general population, those recommendations are ignored.

## CONCLUSION

Defendants' admission that everybody is treated exactly the same, regardless of whether they have a disability, is exactly the problem. The Department of Public Safety and Corrections may not simply exclude people with disabilities from needed programming by transferring them to institutions where such programming is unavailable. There is no justice in a system that equally deprives people with disabling mental illness and people without disabilities of treatment. There is wide agreement that people with mental illness must be housed in a setting with available treatment and that the oppressive conditions of extended lockdown worsen the symptoms of people with mental illness. Defendants ignore their own staff's recommendations for housing assignments based on mental illness, ignore the known and obvious symptoms of mental illness, ignore requests for reasonable accommodation when they are made, and treat everyone with equally ruthless force regardless of their disability. The record supports these allegations and triable questions of fact abound. For these reasons, Defendants' Motion for Summary Judgment should be denied.

Respectfully submitted this 9th day of July, 2021,

*/s/ Jonathan C. Trunnell*
Jonathan C. Trunnell, La. Bar No. 36956, T.A.
Melanie Bray, La. Bar No. 37049
Ronald K. Lospennato, La. Bar No. 32191
Emma Lee Douglas, La. Bar No. 39076
Disability Rights Louisiana
*Formerly known as The Advocacy Center*
8325 Oak Street
New Orleans, LA 70118
504-708-1460
504-507-1956 (fax)
jtrunnell@advocacyla.org

_/s/ Katie M. Schwartzmann_
Katie M. Schwartzmann, La. Bar No. 30295
_Cooperating Counsel for ACLU-F LA_
Tulane Law School
6329 Freret Street
New Orleans, La 70115
(504) 496-8566
kschwartzmann@tulane.edu