UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself | * | JUDGE ELIZABETH E. FOOTE |
| and all other similarly situated prisoners at | * | USMJ MARK L. HORNSBY |
| David Wade Correctional Center | * | |
| | * | |
| and | * | |
| | * | |
| ADVOCACY CENTER, | * | |
| | * | |
| PLAINTIFFS | * | CIVIL ACTION NO. |
| | * | 5:18-cv-00541-EEF-MLF |
| VERSUS | * | |
| | * | |
| JAMES M. LEBLANC, et al., | * | |
| | * | |
| DEFENDANTS | * | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING EIGHTH AMENDMENT CLAIMS

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW, LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

Randal J. Robert (#21840)
Connell L. Archey (#20086)
Keith J. Fernandez (#33124)
*Special Assistant Attorneys General*
Email: randy.robert@butlersnow.com
         connell.archey@butlersnow.com
         keith.fernandez@butlersnow.com

Counsel for Defendants

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................... iii

I.      Plaintiffs' Opposition Fails to Address the Objective Risk of Harm Element ....................................................................................................................... 2

II.     Defendants appropriately identify and diagnose mental illness ........................................ 4

III.    Screening identifies offenders with SMI, assigns an appropriate diagnosis and LOC ..................................................................................................................................... 4

IV.     Security staff are well trained on mental health issues and Plaintiffs rely on demonstrably flawed and self-serving accounts ...................................................... 5

V.      Health Staff Identify and Diagnose Mental Illness Mental ............................................... 7

VI.     Staffing levels are sufficient ............................................................................................. 8

VII.    Mental health evaluations are performed ......................................................................... 8

VIII.   DWCC has treatment plans ............................................................................................... 9

IX.     Individual counseling and programming are available .................................................... 9

X.      Medication policies are adequate .................................................................................. 11

XI.     Plaintiffs' argument that Defendants do not respond to decompensation is unsupported ........................................................................................................... 16

XII.    DWCC fully complies with its obligation to prevent suicide ..................................... 17

XIII.   Offender Posted Policy 34 Does Not Create a Substantial Risk of Serious Harm ..................................................................................................................... 18

XIV.    Defendants Do Not Use Excessive Force and Plaintiffs' Claims Are Not Appropriate for Class Determination ................................................................... 20

XV.     Conclusion ...................................................................................................................... 22

## TABLE OF AUTHORITIES

**Constitution, Statutes and Rules**

Eighth Amendment to the United States Constitution.....................................................*en passim*

Fed.Civ.R. 30(b)6 ..........................................................................................................12, 13, 21

**Cases**

*Arkansas v. Hartford Cas. Ins. Co.*, No. 3:10-CV-322-HTW-LRA, 2014 WL 12321183, at *9 (S.D. Miss. Mar. 23, 2014) ...................................................................... 13

*Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 117 S.Ct. 1382 (1997)....................2

*Bell v. Wolfish*, 441 U.S. 520, 561 (1979) ................................................................................ 11

*Block v. Rutherford*, 468 U.S. 576, 584–85 (1894) ....................................................................10

*Brewster v. Dretke*, 587 F.3d 764 (5ᵗʰ Cir. 2009) ..........................................................................2

*Bone v. Walker,* 2010 WL 375320 (C.D.Ill.2010) ........................................................................19

*Cadena v. El Paso Cty.*, 946 F.3d 717 (5ᵗʰ Cir. 2020) ...................................................................3

*Carter v. Wilkinson*, Civ. A. No. 1:06–cv–02150, 2010 WL 5125499, at *2 (W.D.La. Dec.9, 2010) ........................................................................................................................ 19

*Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019)............................................................................3

*Davis v. Scott*, 157 F.3d 1003 (5ᵗʰ Cir. 1998) .......................................................................... 10

*Demerson v. Woodford,* 2009 WL 498199 (E.D.Cal.2009) .........................................................19

*Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) .......................................................... 21

*Dockery v. Hall*, 443 F. Supp. 3d 726 (S.D. Miss. 2019)....................................... 7, 9, 11, 12

*Doe v. Bailey*, No. CIV.A. H-14-2985, 2015 WL 5737666, at *4 (S.D. Tex. Sept. 30, 2015 ...................................................................................................................................... 21

*Domino v. Texas Dep't of Crim. Justice,* 239 F.3d 752 (5ᵗʰ Cir. 2001).........................................2

*Duncan v. Levenhagen,* 2000 WL 557009, *2 (7th Cir.2000) ....................................................19

*Dunkley v. Tate,* 2007 WL 2900169 (W.D.Va.2007) ..................................................................20

*Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285 (1976) ........................................................ 3

*Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970 (1994) .......................................................... 3

*James v. LeBlanc*, No. 09-CV-1592, 2011 WL 6842516, at *8 (W.D. La. Nov. 16, 2011), *report and recommendation adopted,* No. 09-CV-1592, 2011 WL 6842512 (W.D. La. Dec. 29, 2011) .................................................. 19

*Johnson v. Big Lots Stores, Inc.*, No. CIV.A. 04-3201, 2008 WL 6928161, at *2 (E.D. La. May 2, 2008) .................................................................................. 12

*Lewis v. Casey*, 518 U.S. 343 (1996) ........................................................................ 10

*Lloyd v. Briley*, 2007 WL 917385 (M.D.Ill.2007) ........................................................ 20

*Newman v. State of Al.*, 559 F.2d 283 (5ᵗʰ Cir. 1977) ............................................. 10

*Peterson v. Michael*, 42,315 (La. App. 2 Cir. 6/20/07), 960 So. 2d 1260, 1264 .......................... 19

*Prison Just. League v. Bailey*, 697 F. App'x 362 (5ᵗʰ Cir. 2017) ................................. 21

*Roberts v. Vannoy*, No. 16-CV-600-JWD-EWD, 2017 WL 2256962, at *2 (M.D. La. 2017) ........................................................................... 10, 11

*Seltzer–Bey v. Delo*, 66 F.3d 961 (8th Cir.1995) ....................................................... 19

*Shadrick v. Hopkins Cnty.*, 805 F.3d 724 (6ᵗʰ Cir. 2015) .............................................. 2

*Valentine v. Collier*, 956 F.3d 797 (5ᵗʰ Cir. 2020), *cert. denied*, 2020 WL 2497541 (5/14/20) ................................................................................... 3

*Wilkins v. Gaddy*, 559 U.S. 34, 130 S.Ct. 1175, 1177–79, 175 L.Ed.2d 995 (2010) ................. 20

*Wilkinson v. Austin*, 545 U.S. 209, 224, 125 S. Ct. 2384, 2395 (2005) ........................ 3

*Wilson v. Seiter,* 501 U.S. 294, 111 S. Ct. 2321 (1991) ............................................2, 10

**MAY IT PLEASE THE COURT:**

This reply memorandum is submitted on behalf of the Louisiana Department of Public Safety and Corrections ("DOC"); James M. Leblanc, in his official capacity as Secretary of the DOC; Jerry Goodwin, in his official capacity as Warden of David Wade Correctional Center ("DWCC"); Deborah Dauzat, in her official capacity as Assistant Warden of DWCC; and Lonnie Nail, Dr. Gregory Seal, Steve Hayden, Aerial Robinson, and Johnie Adkins (all in their official capacities as employees of DWCC (collectively the "Defendants") in support of their motion for summary judgment. For the reasons set forth in the briefing and supporting exhibits, the Defendants are entitled to summary judgment.

The Plaintiffs have failed to show a genuine issue of material fact regarding both the objective and subjective risk of harm prongs. Without either of these, the Plaintiffs cannot succeed on an Eighth Amendment claim. The undisputed fact that Plaintiffs' expert Dr. Haney's hypothesis has not been proven by scientific studies, either globally or at DWCC, defeats Plaintiffs' contention that restrictive housing as used at DWCC creates mental illness in those without prior mental illness and exacerbates mental illness in those with preexisting mental illness. Since this theory is not proven, it also defeats any subjective risk of serious harm.

Because the Plaintiffs cannot demonstrate their theory scientifically, they instead focus on incomplete anecdotes with self-serving slants that are not supported by the documentation. For instance, as detailed herein, the Plaintiffs ignore cause and effect consistently throughout their opposition. No mention is made of the serious disciplinary violations that putative class members committed that got them assigned to maximum custody. The antecedent for assignment to this custody status informs classification decisions going forward. As is the case around the country, custody decisions at DWCC are

1

made by classification professionals based on the seriousness of past offenses and disciplinary conduct.  The goals of classification—and corrections for that matter—is to promote the safety of the public, the staff, and the other offenders.

Plaintiffs also make unsupported arguments that Defendants do not adequately screen offenders, do not adequately identify mental illness and do not adequately treat offenders with mental illness. As discussed in both Defendants original memorandum and below, Defendants do provide adequate overall care to offenders in all of these areas.  Plaintiffs arguments are not supported by the facts or the law.  Moreover, as discussed below, Plaintiffs arguments are not supported in many cases by their own experts.

Further, in some cases, the Plaintiffs rely on misstatements of fact from putative class members that do not comport with the reality of why offenders were placed in restrictive housing.  Finally, the Plaintiffs focus on their descriptions of incidents from 3–5 years ago that do not reflect current conditions as required.  As a result, the Plaintiffs' have failed to create a genuine issue of material fact as to their Eighth Amendment claims.

## I.   **Plaintiffs' Opposition Fails to Address the Objective Risk of Harm Element**

"Prison officials [may] violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs." *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009) (citing *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S. Ct. 2321, 2323 (1991)). "Deliberate indifference is an 'extremely high' standard to meet." *Id.* at 770; *see also Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference 'is a stringent standard of fault, requiring proof that a municipal [or state] actor disregarded a known or obvious consequence of his [, her or its] action.'" *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382 (1997)). Only "unnecessary and wanton infliction of pain" is proscribed by the Eighth

Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976). "Deliberate indifference is an extremely high standard to meet." *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020); *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020), *cert. denied*, 2020 WL 2497541 (5/14/20).

> The Fifth Circuit in *Valentine* explained that:
>
> To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." [*Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970 (1994).] To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970).

The Fifth Circuit in *Valentine* held that "after accounting for the protective measures TDCJ has taken, the Plaintiffs have not shown a 'substantial risk of serious harm' that amounts to 'cruel and unusual punishment.'" *Id.*

Plaintiffs ignore the Defendants' arguments that Dr. Haney's opinions are not based upon the scientific method and are contrary to the science. Plaintiffs then make the astounding representation that the risk of placing people in lockdown conditions has been widely recognized as unconstitutional by the court.[1] That statement is not true. To the contrary, the United States Supreme Court has acknowledged that "harsh conditions [of administrative segregation] may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners." *Wilkinson v. Austin*, 545 U.S. 209, 224, 125 S. Ct. 2384, 2395 (2005).

Thus, considering the objective scientific evidence represented by the Colorado study, the two meta-analyses, and the NIJ White Paper, there is no genuine issue demonstrating an objective risk of harm caused by the use of restrictive housing.

---

[1] R. Doc. 428, p. 17.

3

## II.    Defendants appropriately identify and diagnose mental illness.

Plaintiffs argue that Defendants do not identify and diagnose mental illness despite contrary testimony from their own experts.[2] Dr. Burns testified that Dr. Seal appropriately diagnoses offenders and that the LOC assigned to offenders is appropriate.[3] Plaintiffs' lawyers' argument, made consistently without support, should be rejected. For example, Plaintiffs' lawyers state that "DWCC grossly under identifies individuals needing mental health intervention."[4]  Not only is that statement made without support, Dr. Burns directly contradicts that assertion.  Since Dr. Burns directly contradicts and refutes Plaintiffs' arguments, Plaintiffs' arguments that Defendants do not identify and diagnose mental illness are without merit.

## III.    Screening identifies offenders with SMI, assigns an appropriate diagnosis and LOC

Plaintiffs admit that the screening that takes place at EHCC rigorous and robust.[5] Additionally, when an offender is transferred directly to DWCC without going through EHCC (which does not happen often), DWCC administers the same screening process used by EHCC which is reviewed by an outside psychologist.  Dr. Tucker was performing this function until she retired in January of 2020.[6]

After the intake screening, offenders undergo a second screening upon intra-system transfer into DWCC. The intra-system screening at DWCC determines whether the offender has suicidal ideations, his psychiatric history, current psychotropic medications, current health complaints, current mental health problems, history of inpatient and outpatient psychiatric treatment, substance abuse history, and general observations of behavior, appearance, and

---

[2] R. Doc. 428, pp. 18–25.
[3] *See* Ex. 31, Dr. Thompson's report at p. 42 (previously filed at R.Doc. 414-33); Pls. Ex. 11, Burns dep., at pp. 38–40 & 13 (previously filed at R. Doc 418-6).
[4] R. Doc. 428, p. 26.
[5] R. Doc. 428, p. 18; Ex. 3, Burns dep., at p. 134 (previously filed at R. Doc 414-5). Indeed, Dr. Burns agreed that the screening at EHCC is "robust."
[6] The duties will now be performed by the facility's psychologist, Dr. Wood.

symptoms of psychosis, depression, anxiety and/or aggression.[7] This intra-system screening at DWCC is generally performed by Steve Hayden.[8] Considering that Hayden has a master's in psychology and has worked at DWCC for ten years, it appears that Plaintiffs' no longer assert that Hayden is unable to perform the screening.[9]

Plaintiffs instead now argue that a psychologist does not review Hayden's paperwork.[10] The Plaintiffs simply claim that Hayden testified that a psychologist was not on staff. This testimony was true, given that Dr. Tucker was an outside provider.  However, as noted above, Hayden's screening documents are reviewed by a psychologist.  Moreover, after the intra-system intake screening into DWCC, offenders with mental illness see Dr. Seal, a licensed psychiatrist, or a medical doctor if Dr. Seal is unavailable.[11]

The bottom line is that the screening process at both EHCC and DWCC identifies mental health issues, assigns an appropriate LOC, and results in appropriate mental health diagnoses.[12] The screening process certainly meets standards that are far above the threshold of an Eighth Amendment violation.

## IV.    Security staff are well trained on mental health issues and Plaintiffs rely on demonstrably flawed and self-serving accounts.

DWCC provides extensive mental-health first aid training for all staff.  DWCC provides an eight-hour training session which is repeated annually. Plaintiffs' expert, Dr. Burns was not critical of that training at all.[13]   Plaintiffs' arguments relating to staff training rely on

---

[7] Ex. 22, Health Care Policy No. HCP37, §7(A)(3) (previously filed at R. Doc 414-24). Dr. Burns agreed that screening for these concerns is appropriate. Ex., 3, Burns dep., at 136 (previously filed at R. Doc 414-5).
[8] Ex. 9, Hayden dep., at p. 176 (previously filed at R. Doc 414-11).
[9] In fact, Plaintiffs' own expert has opined that this type of screening can be performed by a correctional officer who is appropriately trained. Ex. 3, Burns dep., at p. 141 (previously filed at R. Doc 414-5).
[10] R. Doc. 428, p. 19.
[11] Ex. 3, Burns dep., at pp. 141–42 (previously filed at R. Doc 414-5).
[12] See Ex. 31, Dr. Thompson's report at p. 42 (previously filed at R. Doc 414-33).; Ex. 3, Burns dep., at pp. 38 & 134 (previously filed at R. Doc 414-5).
[13] Ex. 3, Burns dep., at pp. 186–87 (previously filed at R. Doc 414-5).

mischaracterizing staff-member's answers at depositions when asked if they identified signs and symptoms of mental illness, rather than identifying persons that need contact with the mental health department because of how they are acting.[14]

While the Plaintiffs claim that persons with mental illness are being "abused" or "overlooked",[15] the documentation shows that the men in restrictive housing are followed by mental health and have frequent contacts with those staff members.

Plaintiffs' deposition testimony does not provide the true story. For instance, Joshua McDowell testified, and Plaintiffs cite in their brief, that he was "locked up" for sleeping in class. The records, however, show that, rather than being locked up for sleeping in class, McDowell lost 6 weeks of canteen for that incident.[16] A year later, McDowell was, in fact, placed in restrictive housing for attempting to smuggle smokeless tobacco into the facility.[17] McDowell's records also show that he was placed in maximum custody for an aggravated sex offense on July 13, 2018.[18]

On March 13, 2019, Ronald Brooks was caught with contraband.[19] On March 15, 2019, DWCC investigators concluded that Brooks was soliciting offenders to join his organization that has taken credit for prison strikes.[20] Brooks was reassigned from medium custody to maximum custody. Brooks was seen by mental health on staff April 3, 22, and 24, 2019.[21] As Brooks continued to report difficulty adjusting to restrictive housing, Mr. Burgos referred him to Dr. Seal who evaluated him and prescribed Zyprexa.

---

[14] *See, e.g.*, Pls. Ex. 12, Baird dep., p. 57 (previously filed at R. Doc. 418-24).
[15] R. Doc. 428, at 74.
[16] Ex. 34, Offender Records *in globo*, DWCC 028621 (attached hereto).
[17] Ex. 34, DWCC 028622.
[18] Ex. 34, DWCC 028624
[19] Ex. 34, DWCC 114471.
[20] Ex. 34, DWCC 114469.
[21] Ex. 34, DWCC 114491–96.

**V.**    **Mental Health Staff Identify and Diagnose Mental Illness**

Plaintiffs acknowledge that mental health staff completes an "Interview with a Segregated Inmate" form every 90 days (now every 60 days).[22] In addition, mental health staff complete mental health progress notes for offenders.[23]

The mental health clinicians make rounds at least weekly.[24] Plaintiffs complain that the documentation is not adequate. The fact remains that the mental health staff do make rounds at least weekly.

Plaintiffs then complain that the weekly rounds lack privacy.[25] Any offender who requests individual counseling, is provided that opportunity through cell front sessions, or, if needed, individual private sessions.[26] Moreover, there is no constitutional requirement that weekly rounds must be conducted in private sessions. *See*, *Dockery v. Hall*, 443 F. Supp. 3d 726 (S.D. Miss. 2019). Plaintiffs finally assert that the mental health staff do not make adequate evaluations of offender's mental health.[27] Again, Plaintiffs' lawyers' arguments lack support from their own experts. As acknowledged by Dr. Burns, Dr. Seal appropriately diagnoses offenders and that the LOC assigned to offenders is appropriate.[28]

---

[22] R. Doc. 428, p. 21.

[23] R. Doc. 428, p. 21.

[24] Ex., 13, Robinson dep., at p. 160 (previously filed at R. Doc 414-15).; Ex. 2, Burgos dep., at p.174 (previously filed at R. Doc 414-4).; Ex. 9, Hayden dep., at p. 54–55 (previously filed at R. Doc 414-11).

[25] R. Doc. 428, p. 23.

[26] Ex. 2, Burgos dep., at p. 174 (previously filed at R. Doc 414-4).; Ex. 4, Dauzat dep. (02/21/2019), at p. 39–41 (previously filed at R. Doc 414-6).; Ex. 13, Robinson dep., at p. 126 (previously filed at R. Doc 414-15).

[27] R. Doc. 428, p. 24.

[28] *See* Ex. 31, Dr. Thompson's report at p. 42 (previously filed at R. Doc 414-33).; Ex. 3, Burns dep., at pp. 38 & 134 (previously filed at R. Doc 414-5).

## VI.    Staffing levels are sufficient

Plaintiffs argue, without expert support, that the mental health staff levels are inadequate.[29]  The mental health staff staffing levels are easily within constitutional limitations. Dr. Burns' opined that one mental health counselor for 60 to 65 inmates is appropriate.[30]  When presented with the actual numbers that the ratio was in that range, she conceded that the situation had improved significantly.[31] Dr. Thompson opined directly that the staffing ratios are appropriate.[32]

Plaintiffs argue that the psychiatric staffing in inadequate.[33] That allegation does not rise to a constitutional violation. The traditional role of a psychiatrist working in a correctional facility is psychotropic medication management.[34] Since Dr. Burns has no criticisms of Dr. Seal's medication management, there is no constitutional issue with Dr. Seal's role at DWCC.

The real proof that the staffing levels are appropriate is two-fold.  One, the diagnoses and LOC are appropriate, and, two, there is no backlog of services.[35]

## VII.   Mental health evaluations are performed

Plaintiffs complain of the documentation generated by the mental health staff.[36] Plaintiffs actually note that the mental health staff generate documentation of their encounters through "Interview with a Segregated Inmate" and "Mental Health Progress notes." Plaintiffs' lawyers criticize the documentation, again with no expert opinion whatsoever. Plaintiffs' primary complaint appears to be that these forms lack the level of

---

[29] R. Doc. P. 26.
[30] Ex. 3, Burns dep. at p. 170 (previously filed at R. Doc 414-5).
[31] Ex. 3, Burns dep. at p. 171 (previously filed at R. Doc 414-5).
[32] Ex. 31, Thompson rep. at p. 33 (previously filed at R. Doc 414-33).
[33] R. Doc. 428, p. 28.
[34] Ex. 3, Burns dep. at p. 159 (previously filed at R. Doc 414-5).
[35] Ex. 1, Goodwin dec. at ¶ 4 (previously filed at R. Doc 414-3).
[36] R. Doc. 428 pp. 24–25.

detail that the Plaintiffs' think is appropriate.  This argument is made without any support that forms completed "with virtually no level of detail" is an Eighth Amendment violation. Plaintiffs have no case law or even expert opinion to support such claims.

### VIII.   DWCC has treatment plans

A treatment plan is created for each offender.[37] There is no dispute, however, that until recently, the treatment plans were similar.  DWCC has been recently implementing new individualized treatment plans.   However, a deficiency as to treatment plans is not a constitutional violation. *See*, *Dockery v. Hall*, 443 F. Supp. 3d 726, 748 (S.D. Miss. 2019).

### IX.   Individual counseling and programming are available.

Plaintiffs argue that no treatment or programming is available on the South Compound.[38] That assertion is not true.  Individual counseling is provided by DWCC mental health staff to offenders housed in restrictive housing. Any offender who requests individual counseling, is provided that opportunity through cell front sessions, or, if needed, individual private sessions.[39] Offenders in restrictive housing have access to program materials such as anger management, substance abuse, sex offender treatment, and parenting.[40] These materials are provided to offenders in restrictive housing upon request.[41] If any follow-up, counseling, questions, or help is needed, the offender can speak to a clinician about the material. DOC's goal is to have the offender leave better than when they came to DOC.[42]

Plaintiffs made no effort to distinguish the caselaw that failure to provide programming is not a constitutional violation. *Dockery v. Hall*, 443 F. Supp. 3d 726, 748

---

[37] Ex. 19, EPM #3-02-003, at pp. 7–8 (previously filed at R. Doc 414-21).
[38] R. Doc. 428 pp.33–40.
[39] Ex. 2, Burgos dep., at p. 174 (previously filed at R. Doc 414-4).; Ex. 4, Dauzat dep. (02/21/2019), at p. 39–41 (previously filed at R. Doc 414-6).; Ex. 13, Robinson dep., at p. 126 (previously filed at R. Doc 414-15).
[40] Ex. 4, Dauzat dep. (02/21/2019), at p. 39–41 (previously filed at R. Doc 414-6).; Pls. Ex. 6, Hayden dep., at pp. 126–27 (previously filed at R. Doc 418-26).
[41] Ex. 4, Dauzat dep., (02/21/2019), at p. 40–41 (previously filed at R. Doc 414-6).
[42] Ex. 15, Smith dep., p. 84 (previously filed at R. Doc 414-17).

(S.D. Miss. 2019) (*citing Newman v. State of Al.*, 559 F.2d 283, 291 (5th Cir. 1977)). Only "extreme deprivation" of one or more of the "minimal civilized measures of life's necessities" arise to a violation of the Eighth Amendment. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S. Ct. 2321, 2327 (1991)). The undisputed individual counseling and written programming provided by DWCC clearly meets the constitutional standards set forth in the relevant case law.

Plaintiffs state that they "flatly reject the notion that David Wade prisoners are such high security risks that additional mental health care or therapy cannot be provided."[43] Respectfully, the determination of the risk presented by offenders is left to the discretion of the state officials charged with making the determination to keep the public, staff, and other offenders safe. The offenders at DWCC are high risk and have engaged in acts of violence.

Indeed, a former named plaintiff, Anthony Tellis, placed a pad lock in a pillow case and beat another offender to death upon being placed into general housing.[44] While it is easy for Plaintiffs' lawyers to argue that the risk is not great, the officials charged with keeping the public safe know better and do not have the luxury of not being responsible if the wrong decision is made from a security perspective.

The United States Supreme Court has stated that prison administrators are to be accorded "wide-ranging deference in their adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain internal security." *Block v. Rutherford*, 468 U.S. 576, 584–85 (1894); *Roberts v. Vannoy*, No. 16-CV-600-JWD-EWD, 2017 WL 2256962, at *2 (M.D. La. 2017). As a result, federal district courts should not allow themselves to become "enmeshed in the minutiae of prison operations." *Lewis*

---

[43] R. Doc. 428, p. 39.
[44] Ex. 34, DWCC 013499–500

*v. Casey*, 518 U.S. 343 (1996) (citing *Bell v. Wolfish*, 441 U.S. 520, 561 (1979)); *Roberts v. Vannoy*, No. 16-CV-600-JWD-EWD, 2017 WL 2256962, at *2 (M.D. La. 2017).

## X.    Medication policies are adequate.

The Plaintiffs continue to assert that offenders are transferred to DWCC without medication. These allegations now rely on self-serving testimony from offenders that clearly contradicts the documentary record. Plaintiffs argue that medications are not continued upon arrival at DWCC.[45] After screening, if an offender is on medication, the medications are continued by the general medical doctor unless there is an indication that these medications may be harmful to the offender.[46] Even Dr. Burns agreed that medications are continued upon arrival at DWCC.[47]

Plaintiffs' lawyers argue that medication management creates a significant risk of serious harm.[48] Once again, Plaintiffs' expert does not support the argument. Dr. Burns acknowledged that it was not unusual to see problems with Medication Administration Records ("MARs").[49]

While the Plaintiffs criticize DWCC's electronic medical administration records, they ignore the failsafe that exists within the packaging of offender's medication at DWCC. Each medication is packaged in a "blister pack" for 30- or 60-day supplies, depending on the medicine.[50] The blister packs are numbered by day and the pill call officer and unit nurse can see how many days of doses are left.[51] Medications are reordered when there are about 10 days

---

[45] R. Doc. 428, p. 41.
[46] Ex. 12, Norris dep., at p. 17 (previously filed at R. Doc 414-14).; Ex. 2, Burgos dep., at p. 235 (previously filed at R. Doc 414-4).; Ex. 13, Robinson dep., at pp. 156–57 (previously filed at R. Doc 414-15).
[47] Ex. 3, Burns dep., at p. 142 (previously filed at R. Doc 414-5).
[48] R. Doc. 428, pp. 42–51.
[49] Ex. 3, Burns dep. at p. 181 (previously filed at R. Doc 414-5).
[50] Pls. Ex. 60, Norris dep., p. 27 (previously filed at R. Doc 423-4).
[51] Pls. Ex. 60, Norris dep., p. 27 (previously filed at R. Doc 423-4).

of doses left[52]. The nurse on the night shift goes through each pill card to see what needs to be reordered.[53] Dr. Burns agreed that the use of blister packs is another procedure for ensuring the medications are administered correctly.[54]

Further, if offenders are having issues getting their medicine, they can notify security, fill out a sick call form, write a letter to mental health, file a grievance, or discuss the issue while mental health clinicians are making their rounds.[55]

The court in *Dockery* found that to the extent the MARs reflect human error or poor record keeping, they do not amount to a violation of the Eighth Amendment. *Dockery*, 443 F. Supp. 3d at 740. Further, the court noted that there was insufficient evidence that the class "suffered substantial harm as a result of the missed doses or delays." *Id.* Plaintiffs made no effort to distinguish *Dockery*. Further, the Plaintiffs have produced absolutely no evidence that the purported class has suffered any harm as a result of missed doses or delays in this case.

In January of 2021 when the Advocacy Center was asked what offenders were not getting needed medication, they identified only Ron Brooks, Cody Doucet, Brennan Bellard, Travis McGee, and Corey Pittman.[56]   Now, after failing to provide a complete answer, at their deposition, they cite Bruce Charles, Tyler Blanchard, and Carlton Turner.   Plaintiffs are bound by their answers at the deposition. *Johnson v. Big Lots Stores, Inc.*, No. CIV.A. 04-3201, 2008 WL 6928161, at *2 (E.D. La. May 2, 2008) ("Moreover, statements by corporate designees under Rule 30(b)(6) are binding on a corporate party because the corporation, by making the designation, 'represents that the employee has authority to speak on behalf of the corporation.'");

---

[52] Ex. 12, Norris dep., p. 27 (previously filed at R. Doc 414-14).
[53] Ex. 12, Norris dep., p. 26 (previously filed at R. Doc 414-14).
[54] Ex. 3, Burns dep. at p. 181 (previously filed at R. Doc 414-5).
[55] Pls. Ex. 60, Norris dep., p. 69 (previously filed at R. Doc 423-4).
[56] Ex. 6, 3rd Advocacy Center dep., p. 57 (previously filed at R. Doc 414-8).

*Arkansas v. Hartford Cas. Ins. Co.*, No. 3:10-CV-322-HTW-LRA, 2014 WL 12321183, at *9 (S.D. Miss. Mar. 23, 2014) ("Plaintiff is bound by its Rule 30(b)(6) deposition testimony . . .").

The records clearly show the following:  Shawn Francis arrived at DWCC on November 24, 2014 and had his medications, Zyprexa and Wellbutrin, continued by Dr. Hearn, DWCC's medical doctor.[57]   Francis was scheduled to see Dr. Seal on December 11, 2014.  After evaluation, Dr. Seal discontinued his Zyprexa and increased his Wellbutrin.  Francis was followed by Dr. Seal thereafter on January 7, 2015[58] and October 6, 2016[59] and his medications remained the same.

The Plaintiffs raise Shawn Francis as an example that people are kept on extended lockdown despite their disciplinary history.[60]  Francis was convicted of armed robbery.  Francis has a history of claiming he is suicidal when he is mad at security.[61]   Francis has spat on security.[62]  He has cursed at nursing staff.[63]  He defies security with the intention of escalating the situation to throw liquid on them.[64]  Francis has thrown feces inside and in front of another offenders' cell.[65]  These incidents are merely a brief sampling of the dangerous behaviors Francis engages in that have resulted in institutional discipline.

Theron Nelson arrived at DWCC on October 1, 2012 with no mental health medications prescribed at that time.  He was seen by Dr. Seal on October 4, 2012, and he did not prescribe medication at that time.  On November 7, 2013, Dr. Seal saw Nelson and prescribed him

---

[57] Ex. 34, DWCC 153099, 152477.
[58] Ex. 34, DWCC 153105.
[59] Ex. 34, DWCC 153059.
[60] R. Doc. 428, p. 76.
[61] Ex. 34, DWCC 153026–27, DWCC 152993–94.
[62] Ex. 34, DWCC 003847, 176358.
[63] Ex. 34, DWCC 135275–76.
[64] Ex. 34, DWCC 135485.
[65] Ex. 34, DWCC 176418.

Risperidone (Risperdal) and Trazadone.[66] Nelson has been treated by mental health since 2013 and is currently prescribed Remeron and Depakote.[67]

Nelson is yet another offender the Plaintiffs have identified as a person who is kept in restrictive housing despite their record.[68] In 2017, Nelson had monthly sessions with Steve Hayden.[69]

James White arrived at DWCC on November 28, 2017 with no prescribed mental health medications and a Level of Care 5. He saw Dr. Seal in January of 2018 where he was prescribed Fluphenazine (Prolixin), Benztropine (Cogentin), and Sertraline (Zoloft).[70] He is currently a Level of Care 3 and lives in general population with prescriptions of Effexor and Remeron.[71]

Jacoby Batiste arrived at DWCC on August 28, 2017 with prescriptions for Paxil and Benadryl. Batiste reported at intake that he was taking Risperdal, but his records did match his self-report. Batiste was transferred back to EHCC on September 5, 2017. Batiste was transferred back to DWCC on September 11, 2017[72] and saw Dr. Seal on the 21st.[73] On October 5, 2017, Batiste had his medications discontinued by Dr. Seal for noncompliance.[74] On September 6, 2018, Batiste was diagnosed at EHCC as malingering for sedating psychiatric medication.[75] Dr. Seal restarted Risperidone on November 3, 2018.[76] Batiste was released from custody in July of 2020.

---

[66] Ex. 36, Supplemental Offender Prescription Records (attached herto).
[67] Ex. 36.
[68] R. Doc. 428, p. 76.
[69] Ex. 34, DWCC 103959–60.
[70] Ex. 34, DWCC 113326–27; See also, Ex. 36.
[71] Ex. 36.
[72] Ex. 34, DWCC 146002.
[73] Ex. 34, DWCC 146049.
[74] Ex. 34, DWCC 146048.
[75] Ex. 34, DWCC 146599.
[76] Ex. 34, DWCC 146231, 113200.

Demarcus Thomas arrived at DWCC on <u>August 31, 2015</u> with a prescription of Trazadone and Imipramine (Tofanil).[77] His medications were continued by Dr. Hearn until he was seen by Dr. Seal on September 3, 2015.[78] Dr. Seal noted that Thomas did not have a mental health diagnosis and that he was being treated by medical for chronic pain and a sleep disorder. After complaining about anxiety in 2020 he was started on Buspirone (Buspar) by Dr. Seal and followed by the mental health staff.[79]

Travis McKee arrived at DWCC on February 8, 2016 with prescriptions for Quetiapine (Seroquel) and Citalopram (Celexa).[80] McKee was seen by Dr. Seal on February 16, 2016 who ordered his Seroquel tapered down over a period of 3 weeks and then discontinued.[81] Thereafter, he continued the Celexa and started Mirtazapine (Remeron).[82]

Brennan Bellard arrived at DWCC on March 27, 2019 with a prescription for Amitriptyline (Elavil) that was continued until he could see Dr. Seal.[83] He saw Dr. Seal on April 4, 2019 who discontinued Elavil and ordered Divalproex sodium (Depakote) and Trazadone.[84] Depakote was discontinued in May of 2019 due to elevated levels and Olanzapine (Zyprexa) was ordered.[85] Bellard is now housed in general population at DWCC.

The pertinent part of Cody Doucet's record is as follows. He arrived at DWCC on October 15, 2018 with a prescription for Divalproex sodium (Depakote) after an attempted escape from work release in Baton Rouge.[86] Dr. Hearn continued his medications on October 17,

---

[77] Ex. 36. Supplemental Offender Prescription Records.
[78] Ex. 36.
[79] Ex. 36.
[80] Ex. 36.
[81] Ex. 36.
[82] Ex. 36.
[83] Ex. 34, DWCC 113200; Ex. 36.
[84] Ex. 34, DWCC 113200; Ex. 36.
[85] Ex. 34, DWCC 113200; Ex. 36.
[86] Ex. 34, DWCC 175766.

2018 and reordered them on October 27, 2018.[87]  He was transferred back to EHCC to attend

court on his attempted escape charge.[88]  He returned to DWCC on March 4, 2019.  On March 29,

2019, Aerial Robinson ordered a standard suicide watch for Doucet after he cut his wrist with a

paper clip in an attempt to get a transfer.[89]  On March 12, 2019, Dr. Seal changed his medication

to Citalopram (Celexa).[90]  On August 12, 2019, Doucet was transferred to Hunt to attend court

related to his escape attempt.  He saw Dr. Seal on September 5, 2019 where he continued him on

Prozac and added Trazadone.  Doucet claims that he did not receive his medicine for 2 months,

however, the records show that he did receive those medications.

    Not only does the record documentation wholly refute Plaintiffs' self-serving statements,

but more importantly, Plaintiffs have failed to show any actual harm that resulted in connection

with medication distribution in this case. The bottom line is that Plaintiffs self-serving statements

are not supported by the record documentation and do not create a genuine issue of material fact

in this case.

## XI.     Plaintiffs' argument that Defendants do not respond to decompensation is unsupported

    Plaintiffs' lawyers argue that Defendants do not respond appropriately to

decompensation.[91]  In one particularly egregious insinuation, the Plaintiffs note that Torre

Huber died at DWCC prior to launching into his alleged mental health issues at the

facility.[92]  The record is clear, however, that Torre Huber died of hypertensive atherosclerotic

cardiovascular disease while at DWCC—not related to his mental health treatment.[93]

---

[87] Ex. 34, DWCC 113221.
[88] Ex. 34, DWCC 175794.
[89] Ex. 34, DWCC 175947.
[90] Ex. 34, DWCC 113221.
[91] R. Doc. 428 pp. 51–61.
[92] See R. Doc. 428 pp. 57–59.
[93] Ex. 34, DWCC 103836–43.

16

Beyond the issue with Mr. Huber, Plaintiffs' section contains zero cites to any expert to support their argument. Indeed, the testimony by Dr. Burns is that Dr. Seal properly diagnoses offenders and manages their medication. Without expert support, this whole section should be rejected.

**XII.   DWCC fully complies with its obligation to prevent suicide.**

Plaintiffs' arguments as to suicide watch are disingenuous and lack candor considering the testimony of their own expert, Dr. Burns. Contrary to Plaintiffs' lawyers' arguments, Dr. Burns had few criticisms of DWCC's use of suicide watch.

DWCC trains the correctional staff to identify suicide risk factors. Dr. Burns had no criticisms of that training.[94] If an offender is found expressing suicidal thoughts or taking suicidal actions, DWCC's mental health clinicians can order a suicide watch.[95] There is and needs to be a low threshold for initiating suicide watch.[96] It is better to err on the side of caution and initiate suicide watch rather than risk a completed suicide.[97] The mental health staff makes the decision to both initiate and terminate suicide watch.[98] The mental health staff makes the decision as to what property the offender can retain while on suicide watch.[99]

Suicide watch at DWCC can either be "standard" or "extreme."[100] Contrary to Plaintiffs' lawyers' arguments, extreme suicide watch is used in other facilities. Dr. Burns' only criticism of extreme suicide watch was the use of steel restraints.[101] Offenders on suicide watch are seen for

---

[94] Ex. 3, Burns dep., at p. 186 (previously filed at R. Doc 414-5).
[95] Ex. 4, Dauzat dep. (02/21/2019), at p. 65–66 (previously filed at R. Doc 414-6).
[96] Ex. 3, Burns dep., at p. 187 (previously filed at R. Doc 414-5).
[97] Ex. 3, Burns dep., at p. 187 (previously filed at R. Doc 414-5).
[98] Ex. 3, Burns dep., at p. 189 (previously filed at R. Doc 414-5).
[99] Ex. 3, Burns dep., at p. 189 (previously filed at R. Doc 414-5).
[100] Ex. 18, EPM #03-02-001 (previously filed at R. Doc 414-20).
[101] Ex. 3, Burns dep. at p. 188 (previously filed at R. Doc 414-5).

mental health concerns daily.[102] These facts are undisputed.

DWCC does not have a problem with too many completed suicides.[103] In terms of the numbers, Plaintiffs' experts did not find that the number of suicide watches was disproportionate and found that the average length of a suicide watch at DWCC is consistent with the national average.[104] Though the Plaintiffs have pleaded that Defendants use suicide watch as punishment, at Disability Rights' organizational deposition, it conceded that offenders were conflating the administrative option to prevent offenders from throwing substances on others or the tier— Offender Posted Policy 34—with suicide watch.[105] Again, these facts are undisputed.

Plaintiffs' lawyers argue that DWCC does not have a mental health unit or a suicide watch unit.  There is no constitutional requirement that DWCC have a mental health unit or a suicide watch unit. To the contrary, Dr. Burns acknowledged that other facilities use segregation for suicide watch.[106]

The proof that DWCC's suicide watch is constitutional is that the experts agree it does not overuse suicide watch and does not have a problem with too many completed suicides. Plaintiffs' cannot show that Defendants' suicide prevention policies or practices violate the Eighth Amendment.

### XIII.   Offender Posted Policy 34 Does Not Create a Substantial Risk of Serious Harm.

Offender Posted Policy 34 ("Policy 34") is an administrative remedy available for offenders who throw items on others or on the tier.  An offender may be placed on strip cell status if the offender engages in any of the following behaviors: 1) throws human waste

---

[102] Ex. 3, Burns dep., at p. 189 (previously filed at R. Doc 414-5). Mental health staff see the offenders on suicide watch during the week. Nurses see offenders on suicide watch on the weekend.
[103] Ex. 3, Burns dep., at p. 200 (previously filed at R. Doc 414-5).
[104] Ex. 3, Burns dep., at p. 202–03 (previously filed at R. Doc 414-5).
[105] Ex. 6, 3rd Disability Rights dep., at pp. 26–55 (previously filed at R. Doc 414-8). *See also* Ex. 24, Offender Posted Policy 34 (previously filed at R. Doc 414-26).
[106] Ex. 3, Burns dep., at p. 189 (previously filed at R. Doc 414-5).

anywhere; 2) spits; 3) stores weapons, human feces of urine inside the cell; 4) throwing items at any person on the tier; 5) uses items to barricade their cell; 6) making threats against another while in immediate possession of an item that may be used as a weapon; 7) flooding of a cell; 8) committing an act of violence against another person; or 9) participation in a major disturbance. All of these prohibited behaviors directly bear on the safety, security, and discipline of the facility. Policy 34 can only be instituted by a shift supervisor or above and the shift supervisor must review each offender every 4 hours.

A first offense results in this status for one day.[107] Offenders who persist in these behaviors after being placed on Policy 34 or who have a documented pattern of behavior prohibited by Policy 34 may be placed in this status for up to 30-days.[108] Policy 34 has been challenged numerous times in both state and federal courts and has been upheld.

In *Peterson v. Michael*, 42,315 (La. App. 2 Cir. 6/20/07), 960 So. 2d 1260, 1264, the court held:

> Furthermore, like the trial court, we conclude that Peterson failed to establish any constitutional violation or illegality as to the posted policy. At the time of the hearing, Peterson was no longer on strip cell tier, and counsel for the defendants agreed that he could not be placed back on it without a new infraction. There was no basis for the granting of injunctive relief in Peterson's favor and consequently we reverse and vacate the injunction.

In *James v. LeBlanc*, No. 09-CV-1592, 2011 WL 6842516, at *8 (W.D. La. Nov. 16, 2011), *report and recommendation adopted*, No. 09-CV-1592, 2011 WL 6842512 (W.D. La. Dec. 29, 2011), the court held:

---

[107] Ex. 24, Policy 34(S)(2)(g) (previously filed at R. Doc 414-26).

[108] As of May 2021, offenders who persist in prohibited behaviors while on Policy 34 or offenders with a documented pattern of behavior can be assigned to this status for seven (7) days. Offenders are reviewed for release back to regular assignment at least every 7 days by the Unit Manager and a Classification Officer. Recommendations to release or not release from this status must be approved by the Warden or Designee. Continued violent behavior, as outlined in Policy 34, may result in the offender remaining in this status.

Courts have rejected similar claims that confinement to a strip cell generated due process claims. *See e.g., Duncan v. Levenhagen,* 2000 WL 557009, *2 (7th Cir.2000) (placement in strip cell without food for 10 to 12 hours did not impose an atypical and significant hardship); *Seltzer–Bey v. Delo,* 66 F.3d 961 (8th Cir.1995) (strip cell for two days without clothing, bedding, or running water, with a concrete floor, a concrete slab for a bed, and cold air blowing; procedural due process claim dismissed); *Bone v. Walker,* 2010 WL 375320 (C.D.Ill.2010) (strip cell for eight days, without a mattress or clothing for 24 hours, was not atypical or a significant hardship); *Demerson v. Woodford,* 2009 WL 498199 (E.D.Cal.2009) (three days in strip cell did not give rise to due process claim); *Dunkley v. Tate,* 2007 WL 2900169 (W.D.Va.2007) (three days in strip cell without clothing or personal property, with only a smock and mattress, did not present due process claim); and *Lloyd v. Briley,* 2007 WL 917385 (M.D.Ill.2007) (strip cell with no sheets, toilet paper, or personal property for 13 days did not give rise to procedural due process claim). Plaintiff's procedural due process claim should be dismissed.

Policy 34 has been tested in the legal crucible across the country and has not been found to amount to a constitutional violation. The Plaintiffs do not cite a single case holding otherwise. Their arguments should be rejected.

## XIV.   Defendants Do Not Use Excessive Force and Plaintiffs' Claims Are Not Appropriate for Class Determination

Plaintiffs attempt to make a case about mental health treatment into a class claim for use of excessive force. The Plaintiffs cite offenders Willie Dillon, Demarkus Thomas, Brian Covington, Chris Solomon, Shawn Francis, Cody Doucet, Alvin Ball, James White, Joshua Isaac, and Dameion Brumfield, none of which are named plaintiffs in this case.

While Defendants unequivocally deny any allegations of excessive force, class actions are not an appropriate vehicle for a challenge to uses of force.   Excessive force in the prison context requires the evaluation of the nature and amount of force used, the extent of the injury suffered, and whether the force was used to keep order or for a malicious purpose, among other things. See *Wilkins v. Gaddy,* 559 U.S. 34, 130 S.Ct. 1175, 1177–79, 175 L.Ed.2d

995 (2010) (rejecting the notion that significant physical injury is a necessary element of an Eighth Amendment excessive force claim but noting that the extent of the injury suffered is "one factor" suggesting whether the use of force could plausibly have been thought necessary in a particular situation).

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (discussing Fourth Amendment excessive force claims); see also *Carter v. Wilkinson*, Civ. A. No. 1:06–cv–02150, 2010 WL 5125499, at *2 (W.D.La. Dec.9, 2010) (quoting *Deville* and discussing Eighth Amendment excessive force claims). Because excessive force claims require individualized, fact-based details of particular situations, participation of the individual members who were allegedly subjected to the harm is necessary for the proper adjudication of each claim. See *Doe v. Bailey*, No. CIV.A. H-14-2985, 2015 WL 5737666, at *4 (S.D. Tex. Sept. 30, 2015), *aff'd sub nom. Prison Just. League v. Bailey*, 697 F. App'x 362 (5th Cir. 2017). Anecdotes without context do not meet the standard of showing that excessive force was used.

The Plaintiffs also raise unsubstantiated allegations of using cold temperatures to "punish" people on suicide watch.[109]  At their 30(b)(6) depositions, the Advocacy Center reported that windows were left open once, on January 2, 2018.[110]  When asked who opened the windows, the Advocacy Center could not identify a single person.[111]  A review of the logs for January 2, 2018 shows that the temperatures in the buildings around this time were as follows: N1 70 degrees[112] N2 - 69 degrees,[113]    N3 - 70 degrees,[114]   N4 - 70 degrees.[115]  These

---

[109] R. Doc. 428, p. 71.
[110] Ex. 35, Supplemental Testimony of the Advocacy Center, 3rd Advocacy Center dep., pp. 168–70 (attached hereto).
[111] Ex. 35, 3rd Advocacy Center dep., p. 170.
[112] Ex. 34, DWCC 037916 & 042476

temperatures were reported despite shift changes.  There is no documentary evidence supporting the Advocacy Center's allegation of punishing using cold temperatures.

## XV.   **Conclusion**

Defendants are entitled to summary judgment.  The undisputed facts show that Defendants identify offenders with mental health issues and provide mental health care to offenders at DWCC.  The Defendants respectfully request that this Court grant this motion dismissing the Plaintiffs' claims under the Eighth Amendment.

Respectfully Submitted:
**JEFF LANDRY,
ATTORNEY GENERAL**

BUTLER SNOW, LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By: /s/ Randal J. Robert
    Randal J. Robert (#21840)
    Connell L. Archey (#20086)
    Keith J. Fernandez (#33124)
    *Special Assistant Attorneys General*
    Email: randy.robert@butlersnow.com
        connell.archey@butlersnow.com
        keith.fernandez@butlersnow.com

Counsel for Defendants

### **CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of July 2021, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

    /s/ Randal J. Robert
    Randal J. Robert

---

[113] Ex. 34, DWCC 052683
[114] Ex. 34, DWCC 062887 & 062890.
[115] Ex. 34, DWCC 068571