UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself and all other similarly situated prisoners at David Wade Correctional Center, | * <br> * <br> * <br> * <br> * | CIVIL ACTION NO.: <br> 5:18-CV-00541-EEF-MLH <br><br> JUDGE ELIZABETH E. FOOTE |
| and | * <br> * | |
| The ADVOCACY CENTER, | * <br> * | USMJ MARK L. HORNSBY |
| PLAINTIFFS, | * <br> * | |
| VS. | * <br> * | CLASS ACTION |
| JAMES M. LEBLANC, *et al.*, | * <br> * <br> * | |
| DEFENDANTS. | * | |

**TABLE OF CONTENTS**

**I.    DEFENDANTS' ARGUMENTS ARE NOT SUPPORTED BY THE LAW**....................2

    *a.    David Wade's "strip cell" punishment is an unconstitutional practice* .............................................2

    *b.    Conditions of confinement may establish an Eighth Amendment violation in combination where an individual condition may not do so alone* ....................................................................................4

**II.    DEFENDANTS' REPRESENTATIONS OF FACTS AS UNDISPUTED ARE NOT SUPPORTED BY THE RECORD**...................................................................................6

    *a.    Disputed facts regarding isolation*................................................................................6

    *b.    Disputed facts regarding the identification and diagnosis of mental illness*........................7

    *c.    Disputed fact regarding screening*...............................................................................8

    *d.    Disputed facts regarding staffing levels* ......................................................................9

    *e.    Disputed facts regarding mental health evaluations*....................................................10

    *f.    Disputed facts regarding treatment plans* ..................................................................10

    *g.    Disputed facts regarding mental health treatment* ......................................................10

    *h.    Disputed facts regarding medication polices*..............................................................12

    *i.    Disputed facts regarding response to decompensation*..................................................14

    *j.    Disputed facts regarding suicide watch* .....................................................................15

**III.    CONCLUSION**..............................................................................................16

## TABLE OF AUTHORITIES

**Cases**

*Dockery v. Hall,* 443 F.Supp. 3d 726 (S.D. Miss. 2019)..................................................... 4, 13

*Farmer v. Brennan*, 511 U.S. 825 (1994)..................................................................................4

*Flynn v. Doyle*, 630 F. Supp. 2d 987 (E.D. Wis. 2009)......................................................14

*Gates v. Cook,* 376 F.3d 323 (5th Cir. 2004).........................................................................4

*Hutto v. Finney,* 437 U.S. 678 (1978)......................................................................................4

*Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016) ...............................................................4, 5

*James v. LeBlanc,* No. 09-CV-1592, 2011 WL 6842516 (W.D. La. Nov. 16, 2011) ...............3

*Meriwether v. Faulkner*, 821 F.2d 408 (7th Cir. 1987)........................................................4

*Peterson v. Michael*, 960 So. 2d 1260 (La. App. 2 Cir. 6/20/07) .................................2, 3

*Ruiz v. Estelle*, 503 F.Supp. 1265 (5th Cir. 1980)..............................................................14

*Wilkerson v. Stalder,* 639 F. Supp. 2d 654 (M.D. La. 2007)................................................4

*Wilson v. Seiter,* 501 U.S. 294 (1991).....................................................................................4

**Statutes**

Federal Rule of Civil Procedure 56(c)(1) & (2)...................................................................6

## PLAINTIFFS' SURREPLY TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT REGARDING EIGHTH AMENDMENT CLAIMS

Plaintiffs file this sur-reply to Defendants' Motion for Summary Judgment Regarding Eighth Amendment Claims to address misstatements made by Defendants in their Reply Memorandum, Rec. Doc. 434.

## I.    DEFENDANTS' ARGUMENTS ARE NOT SUPPORTED BY THE LAW

### a.    *David Wade's "strip cell" punishment is an unconstitutional practice*

Defendants' Reply purports to provide jurisprudential support for David Wade's Offender Posted Policy 34. Defendants cite to two cases, neither of which are applicable to the Plaintiffs' current claims under the Eighth Amendment. These decade-old cases are procedurally and factually distinguishable from the current case at bar.

*Peterson v. Michael*, 960 So. 2d 1260, 1264 (La. App. 2 Cir. 6/20/07), was primarily focused on the issue of whether the policy governing strip cell required promulgation under the Administrative

Procedure Act. The court held that the plaintiff's claims were moot because he was no longer on strip cell: "At the time of the hearing, Peterson was no longer on strip cell tier, and counsel for the defendants agreed that he could not be placed back on it without a new infraction." *Id.* at 1264. This is a state court decision primarily about administrative procedure and standing for injunctive relief -- it simply cannot be cited for the proposition that the practices at David Wade at issue in this litigation comport with the Eighth Amendment.

The second case Defendants point to is *James v. LeBlanc*, which was a challenge brought by a person who had spent 24-hours on strip cell status. No. 09-CV-1592, 2011 WL 6842516, at *2-3 (W.D. La. Nov. 16, 2011). In that case, the court stated "[t]he length of confinement should be considered in deciding whether the confinement meets constitutional standards." *Id.* at *7. The court found that 24-hour placement on strip cell status did not violate the Constitution because of the brief period of time of the deprivation. *Id.* at *7. Unlike the facts before the court in *James*, members of the putative class have been placed on strip cell repeatedly for 30 days at a time.[1] Defendants also point to a string citation in *James* which analyzes strip cell status from a due process perspective, rather than on conditions of confinement.[2] None of those cases are analogous to the challenge now before this Court.

From these two cases, Defendants infer that "Policy 34 has been tested in the legal crucible across the country."[3] Not only are the cases cited inadequate proof of Defendant's contention, but the policy has not even held up within the crucible of Defendants' own expert witnesses. Mr. Upchurch acknowledged that "keeping an inmate in the status of deprivation for a month or more is inconsistent with recent asserted acceptable practices in the corrections field."[4] Defendants' own

---

[1] *See,* e.g. Rec. Doc. 428 at 56.
[2] Rec. Doc. 434 at 19-20.
[3] Rec. Doc. 434 at 20.
[4] Exh. 119 – Report by James Upchurch at p. 22.

expert also states that it is inconsistent with the ACA standards to allow the use of strip-cell as a

punitive measure.[5]  Secretary Pacholke states the matter more clearly: "strip cell status is torture."[6]

The constitutionality of conditions implemented pursuant to Rule 34 is in dispute. Plaintiffs are

entitled to a trial on the facts.

   b.  *Conditions of confinement may establish an Eighth Amendment violation in combination where an individual condition may not do so alone*

Defendants' Reply attempts to break Plaintiffs' case into pieces and test whether each

condition of confinement, taken in isolation, would violate the Constitution. That is not the law, and

for good reason-- the conditions of confinement at David Wade do not exist or operate independent

of one another. Defendants' Reply repeatedly cites to *Dockery* for the proposition that an individual

deficiency is not a constitutional violation: treatment plans,[7] programming,[8] weekly mental health

rounds in private,[9] and medical administration records.[10] Defendants disregard the jurisprudence cited

in the Plaintiffs' prior briefing explaining that each risk of harm does not itself need to rise to the level

of a constitutional violation.[11] Discrete risks, either alone or when combined together, can create a

substantial risk of harm violative of the Eighth Amendment.[12]

   "The question under the Eighth Amendment is whether prison officials, acting with deliberate

indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future

health,' and it does not matter whether the risk comes from a single source or multiple sources….'"

---

[5] Exh. 119 – Report by James Upchurch at p. 21; Exh. 120 - Deposition of James Upchurch 194:24 – 195:8.
[6] Rec. Doc. 428 at 69.
[7] Rec. Doc. 434 at 9.
[8] Rec. Doc. 434 at 9.
[9] *Id.* at 7.
[10] *Id.* at 12.
[11] *See* Rec. Doc. 428 at 15-16 (Citing: *Gates v. Cook,* 376 F.3d 323, 333 (5th Cir. 2004*); Wilkerson v. Stalder,* 639 F. Supp. 2d 654, 678 - 9 (M.D. La. 2007)*, citing Wilson v. Seiter,* 501 U.S. 294, 305 (1991*); Hutto v. Finney,* 437 U.S. 678, 686–872 (1978); *Meriwether v. Faulkner*, 821 F.2d 408, 413 (7th Cir. 1987).
[12] Further context is that the Court in *Dockery* was ruling at the remedy phase on the discrete issues left in the case after the defendants had hired a new operations manager for the prison and acquired a new contracted health care provider, which is clearly a different factual posture than the instant litigation. 443 F.Supp. 3d 726, 734.

*Hyatt v. Thomas*, <u>843 F.3d 172, 179</u> (5th Cir. 2016), quoting *Farmer v. Brennan*, <u>511 U.S. 825, 843</u> (1994).

In *Hyatt,* the plaintiff alleged an Eighth Amendment violation because of the jail's inadequate response to his risk of suicide. Hyatt stated to jail staff that he was feeling "very depressed," the jail officials knew he had a history of depression, that he recently attempted suicide, and that his wife thought he was suicidal. *Id.* at 178. The combination of these factors led the court to hold that there was a substantial risk of harm to Hyatt despite the fact that the jail officials did not know that Hyatt had the means to kill himself in his cell.[13]

In the instant case, the Plaintiffs live in conditions that create a substantial risk of harm because individuals with and without severe mental illness are housed in brutal and isolated conditions of confinement in which they are afforded no mental health treatment other than haphazard medication. There is a lack of human stimulation, no meaningful programming, no group therapy or individual counseling, a lack of access to mental health professionals, inadequate screening and identification of mental health crises and deterioration, no individualized treatment plans, very little time out of cell, miserable conditions when in-cell, and an inability to speak to loved ones, *inter alia*, all of which operate together to create the overall conditions of confinement at David Wade.[14] Dr. Burns explains the importance of evaluating all factors of confinement: "while described separately in the sections that follow, the criteria are actually linked and intertwined with one another. For example, screening, evaluation and treatment cannot occur without adequate umbers of trained staff and must be recorded in accurate and complete records to serve as the basis for individualized treatment planning."[15] The Plaintiffs are entitled to a trial on the facts to determine if these conditions, working in combination with one another, rise to a violation of the Constitution. Defendants' attempts to compartmentalize the individual conditions into discrete claims is not supported by the jurisprudence or the reality of

---

[13] *See also* FN 10 *infra.*
[14] *See* Rec. <u>Doc. 428</u>, specifically, sections III(A) at p. 18, III(B) at p. 66, III(C) at p. 67.
[15] Rec. <u>Doc. 420-7</u>, Exh. 18 – Report by Dr. Kathryn Burns at 11.

how prisons function: the conditions, working together, have a cumulative impact on the human beings that live there.

## II.   DEFENDANTS' REPRESENTATIONS OF FACTS AS UNDISPUTED ARE NOT SUPPORTED BY THE RECORD

Defendants' Reply attempts to characterize Plaintiffs' assertions as "unsupported arguments." Plaintiffs submitted a substantial opposition to this motion in Rec. Doc. 428. This sur-reply will endeavor to only address inaccurate factual assertions in the Reply not previously briefed, and only point the Court back to Plaintiffs' original briefing where necessary.

### a.   *Disputed facts regarding isolation*

Defendants argue that "Dr. Haney's opinions are not based upon the scientific method and are contrary to science."[16] Defendants then affirmatively attempt to reply upon "the objective scientific evidence represented by the Colorado study and the two meta-analysis, and the NIJ White Paper" to demonstrate that there is no objective risk of harm caused by restrictive housing.[17]

Although a motion for summary judgment need not be supported by admissible evidence, neither can it rely upon facts that are inadmissible in the proceeding.[18] The reports cited by Defendants are hearsay, and there is no witness that Defendants could call at trial that could offer a proper foundation to allow for the admission of the opinions contained in those reports. This Court cannot grant summary judgment to the Defendants on the basis of reports that are not even admissible before this Court, much less where there is an expert (Dr. Haney) that is prepared to testify in this proceeding that based upon his investigation of the facts of this proceeding (which is admissible), he holds opinions directly contrary to the allegations in those reports. At a minimum, Plaintiffs have provided

---

[16] Rec. Doc. 434 at 3.
[17] *Id.*
[18] Federal Rule of Civil Procedure 56(c)(1) & (2); *See* Rec. Doc. 428 at 6-11, briefing this issue more extensively.

sufficient supporting evidence and testimony to prove that there is a genuine issue of material fact as to the harmfulness of cell confinement, such that Plaintiffs are entitled to trial on the merits.

     b.   *Disputed facts regarding the identification and diagnosis of mental illness*

In their Reply, Defendants represent to the Court that "Dr. Burns testified that Dr. Seal appropriately diagnoses offenders and that the LOC assigned to offenders is appropriate." And, without citation, that Dr. Burns "directly contradicts and refutes Plaintiffs' arguments" that David Wade under identifies individuals needing mental health intervention.[19]

Dr. Burns' testimony does not support Defendants' position. While she testified that Dr. Seal's <u>diagnoses</u> were, in general, appropriate and adequate,[20] Plaintiffs' claim that there is a failure to identify and diagnose mental illness at David Wade is not premised on Dr. Seal's diagnoses. It is premised on inadequate screening (both on intake and regularly by security and mental health staff), failure of mental health staff to conduct regular and effective rounds, lack of privacy in communications with mental health staff, and inadequate evaluation of mental health by staff.[21] Dr. Burns observed that David Wade did not properly identify and diagnose people.[22]

Additionally, Defendants' representation that "Dr. Burns testified that the Level of Care assigned to offenders is appropriate" is a misrepresentation. In fact, she testified that she found that many of the individuals she spoke with could have benefited from a higher level of care.[23] She explicitly refused to agree that level of care classifications are appropriate,[24] she found that people were not properly in the right level of care, and testified that while she recognizes there is a "working [level of

---

[19] Rec. <u>Doc. 434 at 4</u>.
[20] Rec. <u>Doc. 420</u> - Exh. 11, Dr. Kathryn Burns deposition 38:18-22.
[21] *See* Rec. <u>Doc. 428 at 18-26</u>.
[22] Rec. <u>Doc. 420</u> Exh. 11 Dr. Kathryn Burns deposition 135:4-136:7 (intra-institution screening must be a thorough evaluation); 137:4-138:2 (Mr. Hayden, who performs the screenings, doesn't have the right kind of credentials to do this work); 145:3 – 147:22 (short staffing means that people are not seen even if they are identified as needing more treatment upon intake).
[23] Rec. <u>Doc. 420</u> - Exh. 11, Dr. Kathryn Burns deposition 40:1-7.
[24] Rec. <u>Doc. 420</u> - Exh. 11, Dr. Kathryn Burns deposition 40:8-15.

care] classification system" she "would not agree that everyone was in the right place."[25] Although Dr. Burns testified that she developed "no overall opinion" that the level-of-care system was being operated inappropriately, she also opined that "there are too few staff and they are not appropriately trained to recognize signs and symptoms of mental illness, authorized to formulate diagnoses and are unqualified by virtue of education and training to provide mental health treatment."[26]  It is simply inaccurate for Defendants to assert that Dr. Burns found that the levels of care assigned to offenders were appropriate, and yet Defendants repeat this statement again at section V of their reply.[27]  This is a distortion of Dr. Burns' testimony.

> c.  *Disputed fact regarding screening*

Defendants have mischaracterized both the testimony and arguments regarding the types of screening conducted at DWCC. Dr. Burns testified that there are different types of screening conducted at DWCC, namely the intra-system intake and the intake screening.[28] Plaintiffs have not stated, explicitly or by implication, that they "no longer assert that Hayden is unable to perform the screening" as is alleged in Defendants' reply.[29] Defendants' assertions—with no documentation to substantiate them-- do not overcome the multitude of factually supported arguments in Plaintiffs' opposition memorandum.[30] Dr. Burns testified that Mr. Hayden is not an appropriate person to conduct screenings.[31] Plaintiffs continue to assert that Hayden is not qualified to conduct screenings and adopt the extensive arguments provided in their opposition.[32]

---

[25] Rec. Doc. 420 - Exh. 11, Dr. Kathryn Burns deposition 41:8-18.
[26] Rec. Doc. 420-7, Exh. 18 – Report by Dr. Kathryn Burns at 3.
[27] Rec. Doc. 434 at 11.
[28] Rec. Doc. 420-7, Exh. 18 – Report by Dr. Kathryn Burns at 13; Rec. Doc. 420 - Exh. 11, Dr. Kathryn Burns deposition 136:10 – 139:17.
[29] Rec. Doc. 434 at 5.
[30] *See* Rec. Doc. 428.
[31] Rec. Doc. 420 - Exh. 11, Dr. Kathryn Burns deposition 137:4-13; 139:5-17; 141:1-5.
[32] Rec. Doc. 428, specifically p. 18-19, 24-25, 54-61.

Contrary to Defendants' assertion, there is no evidence that a psychologist has ever conducted a review of Steve Hayden's work, and neither has there been a psychologist on staff.[33] Defendants do not cite to anything in the record that substantiates an assertion that Dr. Tucker performed any function. In footnote 6 of their Reply the Defendants allege—for the first time—that a Dr. Wood will be performing a review of the mental health screens conducted by DWCC when a prisoner is transferred directly to the prison.[34]  Defendants' footnote reference to a person named Dr. Wood is not tethered to any piece of evidence. Plaintiffs have never before heard mention of Dr. Wood. Defendants continue their attempts to offer inadmissible evidence to support their Motion for Summary Judgement, seeking yet again to rely on a piece of information that is new and unexamined by the Plaintiffs. Unsubstantiated new factual allegations cannot be used to support a dismissal of this case through summary judgment.[35] The Plaintiffs are entitled to a trial on the facts in this case.

    d.   *Disputed facts regarding staffing levels*

Defendants again distort Dr. Burns' testimony with regard to staffing levels, advising this Court that "when presented with actual numbers that the ratio was in that range, she conceded the situation had improved significantly."[36] This is inaccurate. Dr. Burns testified that the staffing ratios were inadequate.[37] When counsel presented her with new numbers she had never seen before, she said she would have to look at those, because the numbers being advanced were different from those that she saw in the paperwork and on her visit.[38] Plaintiffs' counsel rightly objected to form, because there was absolutely no foundation for the numbers being presented to Dr. Burns.[39] Defendants now offer

---

[33] Rec. Doc. 428 at 19. Defendants' now assert that the intake screenings of prisoners who are transferred into DWCC from an institution other than Elayn Hunt are reviewed by a psychiatrist. There is no evidence of this. It is not an appropriate basis for granting a motion for summary judgement on the issue, as discussed in Sec. II *infra.*
[34] Rec. Doc. 434 at 4.
[35] *See* Rec. Doc. 428 at 6.
[36] Rec. Doc. 434 at 8.
[37] Rec. Doc. 420-7, Exh. 18 – Report by Dr. Kathryn Burns at 20-24.
[38] Rec. Doc. 420 - Exh. 11, Dr. Kathryn Burns deposition at 170-171.
[39] *Id.* at 170.

this exchange to this Court and state that "she conceded that the situation had improved significantly." Dr. Burns made no such concession.

       e.    *Disputed facts regarding mental health evaluations*

Defendants assert in their Reply that Plaintiffs criticize mental health evaluation documentation "with no expert documentation whatsoever."[40] This is false. Plaintiffs' experts all found serious and dangerous deficiencies with the documentation created by mental health staff. Plaintiffs refer back their arguments made in their opposition memorandum.[41]

       f.    *Disputed facts regarding treatment plans*

Plaintiffs note that every treatment plan for every person in David Wade is identical. Defendants assert that David Wade has begun individualizing treatment plans. There is no record citation provided for this assertion.[42] This assertion is inadmissible for the same reason the other unsubstantiated new assertions are inadmissible.[43]

       g.    *Disputed facts regarding mental health treatment*

Plaintiffs thoroughly outlined Defendants' failure to provide mental health treatment in their opposition memorandum.[44] Inexplicably, Defendants' Reply persists in representing that there is "undisputed individual counseling and written programming."[45] This is not undisputed. There are significant disputes of material fact as to what is actually provided, and as to what safely can be provided—but this has already been thoroughly briefed.[46]

---

[40] Rec. Doc. 434 at 8.
[41] Rec. Doc. 428 at 21-22; 24-25.
[42] Rec. Doc. 434 at 9.
[43] Rec. Doc. 428 at 6.
[44] Rec. Doc. 428 at 33-40.
[45] Rec. Doc. 434 at 14.
[46] *See* Rec. Doc. 428 at 33-40.

In their Reply, Defendants seemingly now assert that they cannot provide any additional care beyond that already provided, because the men who are housed at David Wade are too dangerous.[47] As evidence for this, Defendants offer the Court the example of Anthony Tellis, who Defendants represent "placed a pad lock in a pillow case and beat another offender to death upon being placed in general housing."

This event is tragic. Mr. Tellis beat a man up with a lock in a pillow case on February 12, 2016. The man later died on February 20, 2016, while still hospitalized, from complications from pneumonia.[48] The characterization that Mr. Tellis "beat a man to death" is clearly intended to inflame this Court. But the more serious problem is that Defendants inform this Court that Tellis beat the man "*upon being placed into general housing.*"

Anthony Tellis transferred to DWCC on August 10, 2015[49] and was placed in administrative segregation, as is the practice for all individuals when they arrive at DWCC. But Tellis had been living in general population at DWCC very successfully for about six months at the time of the assault.[50] Tellis had not had any disciplinary infractions for approximately 2 years prior to this tragic incident and indeed was awarded an "honor card;" he was housed in the honor dorm at the time of the assault.[51] Defendants skewed retelling of this awful event is an attempt to make the incident representative of something it was not, or make it mean something about the character and security risk posed by all of the men who are housed on extended lockdown. Yes, prisons are dangerous and security officials have to protect both prisoners and staff. But Plaintiffs' experts have opined on the possibilities for providing safe and effective counseling and group therapy to individuals housed in restrictive

---

[47] Rec. Doc. 434 at 14.
[48] Exh. 121 – Autopsy findings for K. Cotton.
[49] Exh. 122– Tellis Housing Records (Transfer into DWCC on 8/10/2015 PLA014167; Letter requesting honor card with timeline of housing at DWCC PLA014193; Notice of removal from honor program PLA014172).
[50] *Id.*
[51] *Id.*

housing.[52] The tragic incident with Anthony Tellis simply does not stand for the proposition that the men now held on extended lockdown cannot safely be provided with mental healthcare, and the way that it is presented to the Court in Defendants' brief is misleading.

  b. *Disputed facts regarding medication polices*

  This topic was explored exhaustively in Plaintiff's opposition memorandum which will not be rehashed here. However, Defendants' Reply represents to this Court that "Even Dr. Burns agreed that medications are continued upon arrival at DWCC."[53] This is yet another distortion of Dr. Burns' testimony. She testified to no such thing, and the citation provided by Defendants does not contain any testimony to that effect. The section of the transcript provided was her discussion of the role of physicians in intake and their ability to continue medications, not any opinion on whether medications generally were continued or not.[54] Further, while Dr. Burns stated that it is not unusual to see problems with Medication Administration Records ("MARs"), this statement was a generality and not made in reference to DWCC itself. In fact, Dr. Burns did not provide any testimony that supports the assertions Defendants are attempting to make. Plaintiffs refer back to the extensive discussion regarding this topic in their opposition memorandum.[55]

  Defendants also attach a new exhibit to their Reply.[56] This exhibit was never provided to Plaintiffs in discovery and contains no identifying Bates number. This document apparently only contains a list of refills of prescriptions authorized by Dr. Seal, but has not been authenticated by him or any other witness. Plaintiffs therefore object to the admissibility of this document on both foundation and relevance. This document does not show the previous prescriptions of the patients listed, does not document when or whether the medications prescribed were actually furnished to

---

[52] Rec. Doc. 428 at 33-40.
[53] Rec. Doc. 434 at 11.
[54] Rec. Doc. 420 - Exh. 11, Dr. Kathryn Burns deposition at 141-142.
[55] Rec. Doc. 428 at 41-51.
[56] Rec. Doc. 434-3.

patients, and does not indicate whether Dr. Seal or a nurse ordered the refill, and there is no ability for Plaintiffs to examine the authenticity or veracity of the document. This is especially troubling due to the pattern of medication re-ordering at DWCC that does not correspond to the doses of medication documented as furnished to patients.[57]

Defendants' Reply also raises new legal argument based on citation to *Dockery*.[58] In the remedial phase of *Dockery*, the court held that there was no longer evidence of a class-wide medication administration problem for two reasons: first, there was an intermittent pattern of individuals missing medications or receiving doses late, and second, people who missed three or more doses were automatically seen by staff to determine the reason for non-compliance. 443 F.Supp.3d at 740. These facts are different from *Dockery* because Defendants' pattern of either failing to provide medications is systematic and class-wide, and the Defendants do not have a functioning system for checking on people who miss doses.[59] Defendants do not point to any eMARs showing that individuals did, in fact, receive their medication during the days when Plaintiffs' brief showed that no pills were administered. The failure to document the administration of medications to any people on lockdown for days at a time does not reflect mere individual negligence as contemplated in *Dockery*, it reflects a systemic breakdown of supervision, training, and accountability.

Failure to provide or document medication administration creates an objectively serious risk of injury that is recognized by the federal courts:

> Without a written record of the disposition of every dose of medication, pharmacotherapy unravels. Medication Administration Records are a critical component of a patient's medical chart and the importance of their proper completion flows from the medical axiom that without documentation, there is no way to demonstrate that care was given. Correct documentation of doses is vital to determining patient compliance with medication regimens, assessing clinical effectiveness, assessing the need to modify treatment plans, and preventing accidental overdoses and similar errors.

---

[57] Rec. Doc. 428 at p. 48.

[58] Rec. Doc. 434 at 12.

[59] Defendants' brief does not dispute that for missed doses marked "N" there is no follow-up by mental health staff.

*Flynn v. Doyle*, 630 F. Supp. 2d 987, 991 (E.D. Wis. 2009) (granting preliminary injunction in Eighth Amendment class action), *see Ruiz v. Estelle*, 503 F.Supp. 1265, 1324 (5th Cir. 1980). Defendants argue that no harm has occurred, but this is directly contradicted by testimony by staff that pill pass documentation is a literal life-or-death matter.[60]

Finally, Defendants' contention that Plaintiffs are limited only to the responses provided during the 30(b)(6) deposition is not only inaccurate but it also misrepresents the responses provided at the deposition. When asked who has been deprived of needed medications, the response provided was that "at least some of the people that I have where this was an issue in one form or another was Ron Brooks, Cody Doucet, Brennan Bellard, Travis McGee and Corey Pittman. Again, we're continuing to look at the records so there may be many more of these but those are some people that, based on my review of the depositions".[61] It was made clear that the information provided during the deposition was the information identified at that time and not an exhaustive list. Contrary to Defendants' assertion, Plaintiffs are supplementing the responses provided at the deposition with information that was learned through the additional review of the records received, not disavowing them. Defendants assertion should be rejected.

Plaintiffs additionally disagree with the characterizations of individual circumstances made by Defendants in their Reply. However, those points are better left to be made at trial on the merits. For the purposes of the instant motion, Plaintiffs have provided sufficient evidence to show a genuine issue of material fact and are entitled to trial on the merits.

  i.   *Disputed facts regarding response to decompensation*

Contrary to Defendants' assertion, Plaintiffs provided substantial support that Defendants do not respond to prisoners' mental decompensation.[62] Defendants willfully overlooked the detailed

---

[60] Rec. Doc. 428 at pp. 42-43
[61] Rec. Doc. 414-8 – 30(b)(6) Deposition of Ronald Lospennato 57:15-25.
[62] Rec. Doc. 434-1 at 20.

examples, supported by individual records, that demonstrate Defendants' failures to respond to peoples' decompensation. Plaintiffs refer back to Cody Doucet, D'Angelo Rubin, Vincent Dotson, Noel Dean, Torre Huber, GB, Carlton Turner, and Demarcus Thomas.[63] Dr. Burns opined that one of the failures of DWCC's mental health system is that Dr. Seal "is not routinely consulted or asked to evaluate inmates that are decompensating; he is only on-site one day every other week."[64] Moreover, Plaintiffs attached voluminous examples showing staff failing to intervene despite obvious crisis; the expert witnesses opined extensively about treatment plans remaining the same and mental health forms being rote and unhelpful.[65]  Plaintiffs have provided a wealth of support for this point and refer back to the opposition memorandum rather than rehash this topic.[66] Because Defendants have failed to provide any support as to why there is no disputed fact as to Defendants' failure to respond to decompensation, Plaintiffs are entitled to trial on the merits.

> j.    *Disputed facts regarding suicide watch*

Defendants tell this Court that "Despite Plaintiffs' allegations, Dr. Burns had few criticisms of DWCC's use of suicide watch."[67] This is flatly false. Dr. Burns criticized the policies and practices governing suicide watch at DWCC noting: the lack of treatment, lack of a risk assessment, lack of updates to a treatment plan, lack of psychiatrist involvement, lack of confidentiality during visits, lack of mental health visits on weekends, and extremely austere conditions.[68] Dr. Burns characterized the use of extreme suicide watch as being inconsistent with other correctional facilities.[69] She not only discussed extensively these issues at deposition,[70] going beyond Defendants' assertion that she only

---

[63] Rec. Doc. 428 at 52-61.
[64] Rec. Doc. 420-7, Exh. 18 – Report by Dr. Kathryn Burns at 23.
[65] Rec. Doc. 428 at 51-61.
[66] Rec. Doc. 428 at 51-61.
[67] Rec. Doc. 434 at 17.
[68] Rec. Doc. 420-7, Exh. 18 – Report by Dr. Kathryn Burns at 27-28.
[69] Rec. Doc. 420 - Exh. 11, Dr. Kathryn Burns deposition 187:19-23.
[70] Rec. Doc. 420 - Exh. 11, Dr. Kathryn Burns deposition 185-204.

opined on the use of steel restraints,[71] Dr. Burns, in fact, discusses both the policies and practices regarding suicide watch at DWCC at length.[72]

While Dr. Burns does acknowledge that other facilities use segregation for suicide watch, her response to the question was "sadly there are"[73] which indicates not a confirmation that this practice is acceptable but instead an indication that other facilities are also not handling suicide watches correctly. The assertion that people are seen on suicide watch daily is a disputed fact. The mere fact that mental health staff are available during the week and medical staff are available on weekends does not in and of itself equate to people on suicide watch actually being seen every day. Plaintiffs correct these specific misstatements of Dr. Burns' testimony made by Defendants and refer back to the opposition memorandum for the full discussion on suicide watch and his harmfulness at DWCC.[74]

## III.   CONCLUSION

The Plaintiffs continue to show serious disputes as to material facts. Defendants' Reply brief contained mischaracterizations of both fact and law that Plaintiffs could not leave unanswered. For the reasons cited herein and in Plaintiffs' prior briefing on the matter the Court should deny Defendants' motion for summary judgement.

Respectfully submitted this 28th day of July, 2021,

<div style="margin-left:auto">

/s/ Melanie Bray

Jonathan C. Trunnell, La. Bar No. 36956
Melanie Bray, La. Bar No. 37049
Ronald K. Lospennato, La. Bar No. 32191
Emma Lee Douglas, La. Bar No. 39076
Disability Rights Louisiana
8325 Oak Street
New Orleans, LA 70118
504-208-4151
504-272-2531   (fax)

</div>

---

[71] Rec. Doc. 434 at 17.
[72] Rec. Doc. 420 - Exh. 11, Dr. Kathryn Burns deposition 187:19 – 188:20.
[73] Rec. Doc. 420 - Exh. 11, Dr. Kathryn Burns deposition 189:4-6.
[74] Rec. Doc. 428 at 61-66.

mbray@disabilityrightsla.org

*/s/ Katie M. Schwartzmann*
Katie M. Schwartzmann, La. Bar No. 30295
*Cooperating Counsel for ACLU-F LA*
Tulane Law School
6329 Freret Street
New Orleans, La 70115
(504) 496-8566
kschwartzmann@tulane.edu

17