## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

ANTHONY TELLIS, ET AL.                          CIVIL ACTION NO. 18-541

VERSUS                                          JUDGE ELIZABETH E. FOOTE

JAMES M. LEBLANC, ET AL.                        MAGISTRATE JUDGE HORNSBY

### MEMORANDUM RULING

This is a suit for injunctive relief, not money damages. Before the Court is a motion for class certification, filed by Plaintiffs Bruce Charles, Carlton Turner, Larry Jones, and Ronald Brooks (collectively, "Named Plaintiffs").[1] Record Documents 2 and 397. Plaintiffs seek certification of a class consisting of "all prisoners who are or will be subjected to extended lockdown at David Wade Correctional Center" and a subclass consisting of "all individuals on extended lockdown at David Wade Correctional Center who have or are perceived as having a qualifying disability related to mental health, as defined within the Americans with Disabilities Act." Record Document 2-1 at 3. Defendants oppose certification of both classes. Record Document 131. After a lengthy discovery period, both parties have filed supplemental briefing on the issue of class certification, and the motion is now ripe for review. Record Documents 397, 407, and 412. For the reasons stated herein, Plaintiffs' motion [Record Document 2] is **GRANTED**.

### I.       Background

David Wade Correctional Center ("DWCC") is prison located in Claiborne Parish, Louisiana. The facility is divided into two compounds—the North Compound and the South Compound. Record

---

[1] The Advocacy Center, now known as Disability Rights Louisiana, is also a Plaintiff in this matter but is not a party to the motion for class certification. Record Documents 157, 178, and 316.

1

Document 397-4 at 5. The South Compound, which is at issue in this case, has five buildings—N-1 through N-5. *Id.* As of March 2020, buildings N-1 through N-4 housed inmates on extended lockdown.[2] *Id.* Inmates in buildings N-1 through N-3 are generally housed in cells holding two people while inmates in building N-4 are in single cells. *Id.*

This suit was filed by several inmates at DWCC seeking to challenge the conditions of confinement for inmates on extended lockdown at DWCC and to challenge the mental health care provided to inmates on extended lockdown. Record Document 316. Plaintiffs allege that DWCC's policies and practices are a violation of the Eighth Amendment, the First Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"). They seek certification of two classes. First, a class comprised of all prisoners who are or will be subjected to extended lockdown at DWCC that will pursue the Eighth Amendment and First Amendment claims. Second, a subclass of all individuals on extended lockdown at DWCC who have or are perceived as having a qualifying disability related to mental health, as defined within the Americans with Disabilities Act that will pursue the ADA and RA claims.

## II.    Class Certification

### A.    General Requirements

Federal Rule of Civil Procedure 23 governs certification of class actions in federal court. Under this rule, the party seeking certification of a class has the burden of demonstrating that the prerequisites of Rule 23(a) are met and that the class is of a type listed in Rule 23(b). *Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 545–46 (5th Cir. 2020) (citing *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 350 (2011));

---

[2] As discussed in more detail below, Defendants have presented evidence that, as of March 2021, it is no longer the case that all inmates in buildings N-1 through N-4 are housed in extended lockdown conditions. For the reasons expressed below, the Court considers the evidence as of March 2020.

*M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 837 (5th Cir. 2012). Rule 23(a) contains the following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)(1)–(4). In this case, Plaintiffs seek certification as a class and subclass pursuant to Rule 23(b)(2) which permits litigants to proceed as a class when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

District courts have broad discretion in determining whether to certify a class, though it must "rigorously analyze" the prerequisites for class certification contained in Rule 23 before doing so. *Prantil v. Arkema Inc.*, 986 F.3d 570, 574 (5th Cir. 2021) (quoting *Spence v. Glock, G.m.b.H.*, 227 F.3d 308, 310 (5th Cir. 2000)). This analysis requires "the district court to go beyond the pleadings to determine whether the requirements of Rule 23 have been met: 'a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.'" *Id.* (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir. 2007)). A court cannot "merely 'review a complaint and ask whether, taking the facts as the party seeking the class presents them, the case *seems* suitable for class treatment.'" *Chavez*, 957 F.3d at 546 (quoting *Spano v. Boeing Co.*, 633 F.3d 574, 583 (7th Cir. 2011)) (emphasis in original).

## B.    Numerosity

Rule 23(a) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). To meet this requirement, plaintiffs "must ordinarily demonstrate some

3

evidence or reasonable estimate of the number of purported class members." *Ibe v. Jones*, 836 F.3d 516, 528 (5th Cir. 2016) (quoting *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981)).

The number of members in a proposed class alone, however, is not determinative of whether joinder of all members is practicable. *Id.* Factors such as "geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim" are relevant considerations. *Id.* (quoting *Zeidman*, 651 F.2d at 1038). "[S]maller classes are less objectionable where . . . the plaintiff is seeking injunctive relief on behalf of future class members as well as past and present members." *Haab v. City of Bossier City*, No. 16-CV-1663, 2018 WL 1220570, at *4 (W.D. La. Mar. 8, 2018) (quoting *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975)). The fluid nature of a class, like that in prison litigation cases, may also counsel "in favor of certification of all present and future members." *Lewis v. Cain*, 324 F.R.D. 159, 168 (M.D. La. 2018).

### 1.     The Class

Plaintiffs argue that they have satisfied the numerosity requirements for the class of inmates who are currently or will in the future be subjected to extended lockdown in buildings N-1 through N-4 at DWCC because, as of March 2020, there were 366 inmates housed in these buildings and because it is impossible to identify and join individuals who will be housed there in the future. Record Document 397 at 11. Defendants raise two main arguments in opposition. Record Document 407 at 11–13. First, they argue that it is inadequate for Plaintiffs to present evidence of the number of inmates housed in buildings N-1 through N-4 as of March 2020; they maintain that the Court must consider the present conditions. *Id.* at 11. Second, they note the differences between the conditions on individual tiers within buildings N-1 through N-4 and contend that these differences render Plaintiffs' proposed class and subclass overbroad. *Id.* at 12.

As an initial matter, the Court will consider the evidence as of March 2020 for purposes of class certification. Per the Court's order in effect at the time the parties filed their supplemental briefing regarding class certification, discovery closed in March 2020. Record Document 378. Thus, evidence concerning conditions at DWCC in March 2020 was the most up-to-date information available to Plaintiffs when they supplemented their motion for class certification. *See Dunn v. Dunn*, 318 F.R.D. 652, 661–62 (M.D. Ala. 2016) (basing a numerosity finding in September 2016 on data from March 2015 because that was "the date of the most recent records available to plaintiffs").

The Court turns next to assessing whether the putative class satisfies the numerosity requirement. Plaintiffs have presented evidence that in March 2020, there were 366 individuals housed in extended lockdown in buildings N-1 through N-4. Record Document 397-6 at 86. While geographically compact, 366 individuals is sufficiently numerous that joinder of each party would be impracticable, especially given that the class includes those who may be housed on extended lockdown in buildings N-1 through N-4 in the future and, as this Court has previously addressed at length, the class is a fluid population. Record Document 315.

Defendants do not dispute the accuracy of Plaintiffs' calculations of the number of inmates held in buildings N-1 through N-4 and instead present evidence that all of those housed in buildings N-1 through N-4 are not *currently* being held under extended lockdown conditions. Record Document 407 at 11–12. To support this, they cite to an expert report issued by James Upchurch. *Id.* This report, dated March 5, 2021, describes the "*current* manner in which N-1 through N-4 tiers are being used." Record Document 407-6 at 11 (emphasis added). He states that building N-1 is *currently* being used to house 128 medium custody offenders.[3] *Id.* The report does not state whether building N-1 was being

---

[3] At present, building N-1 is not holding 128 inmates because two tiers within the building are only being filled to fifty percent of their capacity due to Covid-19 precautions. Record Document 407-6 at 11. With the precautions, the building is holding 96 inmates.

used to house offenders in medium capacity in March 2020, and thus, the Court cannot conclude from this evidence that Plaintiffs' calculations are incorrect. The Court, therefore, finds that the putative class has satisfied the numerosity requirement.

### 2.  The Subclass

Plaintiffs were not able to provide the same concrete numbers regarding members of the subclass of individuals on extended lockdown who have or are perceived as having a qualifying disability related to mental health housed in extended lockdown in buildings N-1 through N-4. Record Document 397 at 11. However, they estimate that approximately forty-eight inmates on extended lockdown have a serious mental illness ("SMI") actually diagnosed by DWCC officials.[4] *Id.* Plaintiffs also provided estimates of how many inmates they believe to be a member of the subclass, even if they are not diagnosed as having an SMI by DWCC. First, they cite an estimate from their expert, Dr. Kathryn Burns, that between 240 and 270 inmates on DWCC's South Compound have a mental illness.[5] Record Documents 397 at 11 and 397-3 at 23. Second, they cite a DWCC mental health care provider's estimate that between twenty-five and forty percent of inmates in extended lockdown have a mental illness. Record Documents 397 at 11 and 397-8 at 8–9. From this, they conclude that the subclass is likely between 92 and 146 inmates. Record Document 397 at 12.

Defendants argue that Plaintiffs' "crude" formula regarding the population with an SMI as diagnosed by DWCC is insufficient. Record Document at 12. They also argue once again that the

---

[4] Plaintiffs reached this estimate using data provided by DWCC regarding the number of inmates in its facility as a whole diagnosed with an SMI and the percentage of the overall DWCC population housed in buildings N-1 through N-4. Record Document 397 at 11. They reason that because there are 159 inmates with an SMI diagnoses at DWCC and approximately thirty percent of inmates are housed in buildings N-1 through N-4, approximately forty-eight inmates in buildings N-1 through N-4 have an SMI diagnosis. *Id.*

[5] The South Compound at DWCC include building N-5 in addition to buildings N-1 through N-4.

population included in Plaintiffs' estimates are not similarly situated. *Id.* For example, they note that Plaintiffs' estimates include inmates with a diagnosed SMI that are stable. *Id.*

The Court is satisfied that Plaintiffs' estimates are sufficient to satisfy the numerosity requirement for the subclass. All estimates of the class are greater than forty, which the Fifth Circuit has previously implied is sufficiently numerous. *Abboud v. Agentra, LLC*, No. 3:19-CV-00120-X, 2020 WL 5526557, at *3 (N.D. Tex. Sept. 14, 2020) (citing *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999)). Like the class, the subclass includes future members and the population is fluid, which makes joinder impracticable. The Court, therefore, finds that the putative subclass has satisfied the numerosity requirement.

## C.   Commonality

Rule 23(a) next requires that the party seeking class certification show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To establish commonality, plaintiffs must present more than "questions that are common to the class 'because any competently crafted class complaint literally raises common questions.'" *Lewis*, 324 F.R.D. at 169 (quoting *Wal-Mart Stores, Inc.*, 564 U.S. at 350). Plaintiffs must instead "demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The Fifth Circuit has explained that this means that "class members must raise at least one contention that is central to the validity of each class member's claims[, b]ut this contention need not relate specifically to the damages component of the class members' claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014). Thus, "[e]ven an instance of injurious conduct, which would usually relate more directly to the defendant's liability than to the claimant's damages, may constitute 'the same injury.'" *Id.* In sum, the "principal requirement of *Wal-Mart* is merely a single common contention that enables the class action 'to generate common *answers* apt to drive the resolution of the litigation.'" *Id.*

at 811 (quoting *Perry*, 675 F.3d at 840) (emphasis in original). Stated differently, putative class plaintiffs must identify a common contention that is "of such a nature . . . that determination of its truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke." *Lewis*, 324 F.R.D. at 169 (quoting *Wal-Mart*, 564 U.S. at 350). In order to determine whether the commonality standard is met, a court's analysis may require "some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351.

> ### 1.    The Class

Plaintiffs are pursuing Eighth Amendment and First Amendment claims on behalf of the class. The putative class in this matter seeks injunctive relief, not money damages. As to the Eighth Amendment, the putative class alleges that DWCC's policies and practices unconstitutionally expose it to a substantial risk of serious harm. Record Document 316 ¶s 290–94. It claims that DWCC violates the putative class's First Amendment rights through its practice of opening legal mail from prisoners to attorneys and from attorneys to prisoners outside the presence of the prisoner. *Id.* ¶s 310–11. The Court will address each constitutional claim individually.

The Eighth Amendment provides that "[p]rison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates." *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). "Mental health needs are no less serious than physical needs." *Id.* The elements of an Eighth Amendment claim are met when a prison official "1) shows a subjective deliberate indifference to 2) conditions posing a substantial risk of serious harm to the inmate." *Id.* at 333. In a class context, plaintiffs must "identify a unified common policy, practice, or course of conduct that is the source of their alleged injury." *Dockery v. Fischer*, 253 F. Supp. 3d 832, 846 (N.D. Miss. 2016). This policy "need not be formal or officially-adopted" but may instead be "identified on the basis of custom

or consistent practice." *Id.* at 846–47. "Failure to act can also constitute a policy or practice." *Id.* at 848. A plaintiff must also "connect[] the policy or practice to the alleged harm." *Id.* at 847.

Here, Plaintiffs have sorted their Eighth Amendment claims into two broad categories. First, that the conditions of confinement for inmates on extended lockdown are inhumane and expose the class to a serious risk of harm. Record Document 397 at 14. Second, that DWCC's mental health care is inadequate to detect and prevent severe psychological harm to inmates housed in extended lockdown. *Id.* at 16.

The Court turns first to policies related to the conditions of confinement. Plaintiffs allege that inmates in extended lockdown are exposed to a substantial risk of harm by policies causing or related to social isolation, enforced idleness, and indefinite exposure to extended lockdown conditions. Record Document 397 at 14–16. They cite to evidence demonstrating that inmates on extended lockdown are usually confined to their cell for twenty-three hours per day; that those on "yard restriction" are confined to their cell for nearly twenty-four hours per day, except for fifty minutes of "yard time" per weekend; that inmates in buildings N-2 through N-4 are denied all rehabilitative programming while inmates in building N-1 are permitted to attend one "re-entry" class per week and eat in a common area; and that phone calls are limited to ten minutes per month. Record Documents 397 at 14, 397-2 at 45–47, 397-3 at 5, 8, and 27, and 397-12 at 2. Plaintiffs cite evidence that, during the limited times putative class members are allowed outside, they are confined in cages that are too small to allow for meaningful physical activity; that putative class members are permitted one religious book, three books or magazines, and no radios, crafts, or televisions, except for inmates in building N-1 who share a common television. Record Documents 397 at 14–15, 397-2 at 46, 47, and 63, and 397-12 at 2. Finally, they cite evidence that putative class members on extended lockdown are kept housed on extended

lockdown indefinitely, with only "perfunctory" reviews every ninety days. Record Documents 397 at 15, 397-4 at 6, and 397-5 at 8.

Plaintiffs presented opinions from two experts, Dr. Craig Haney and Dr. Kathryn Burns, that the aforementioned conditions present every member of the putative class with a substantial risk of harm including:

> appetite and sleep disturbances, anxiety, panic, a sense of impending emotional breakdown, lethargy, hypersensitivity to stimuli, irritability, aggression, rage, loss of control, ruminations, paranoia, perceptual distortions, cognitive dysfunction, hallucinations, depression, self-mutilation, suicidal ideation and behavior, and social withdrawal.

Record Documents 397 at 15, 397-2 at 8–33, 95, and 397-3 at 8–11.

Next, the Court turns to the second category of Eighth Amendment claims identified by Plaintiffs—the mental health care provided to inmates on extended lockdown. Plaintiffs present expert opinions from Dr. Burns, Dr. Haney, and Dan Pacholke outlining why they believe DWCC's mental health care fails to meet the criteria required for mental health care as stated in *Ruiz v. Estelle*, 503 F. Supp. 1265 (S.D. Tex. 1980), *aff'd in part, rev'd in part*, 679 F.2d 1115 (5th Cir. 1982). Record Documents 397 at 16, 397-2 at 50–54, 397-3 at 12–32, and 397-4 at 36–43. The *Ruiz* criteria are: systematic screening and evaluation; treatment that is more than mere seclusion or close supervision; participation by trained mental health professionals in appropriate numbers; safeguards against psychotropic medications that are prescribed in dangerous amounts, without adequate supervision or otherwise inappropriately administered; accurate, complete and confidential records; and a suicide prevention program. *Ruiz*, 503 F. Supp. at 1339.

Plaintiffs present evidence that, among other things: the DWCC staff member with the most responsibility for the mental health care provided to the putative class is "poorly trained, unqualified, and unlicensed"; this staff member "conducts psychotherapy" despite lacking training or a license to

do so; the only licensed clinical social worker employed at the facility "does not routinely go on rounds in the prison"; all staff providing mental health care on extended lockdown lack knowledge of the conditions under which inmates on extended lockdown actually live and as to the psychological effects of solitary confinement; there are only two counselors for all of the South Compound; there is one psychiatrist who works only sixteen hours per month serving all inmates at DWCC; screening and evaluation for mental illness is inconsistent, brief, and performed by unqualified individuals; the only mental health treatment provided to inmates on extended lockdown is medication, which is not always consistently administered; medication administration records are not accurate; each inmate with an identified mental health treatment plan has an identical "individualized" treatment plan; and DWCC's suicide prevention approach is to deprive the prisoner of his property, clothing, mattress, and bedding, without providing treatment or conducting a risk assessment. Record Documents 397 at 15–16, 397-2 at 50, 73–79, 397-3 at 14, 13–29, and 397-4 at 39.

Plaintiffs also cite evidence related to the alleged substantial risk of harm provided by the aforementioned inadequacies in the system. For example, Drs. Burns and Haney reported after interviews with inmates on extended lockdown that many were suffering from psychiatric symptoms; that in one set of interviews Dr. Haney discovered that at least half of the interviewees reported possible hallucinations; and that many reported attempting suicide in the past or had been placed on suicide watch for expressing such thoughts. Record Documents 397 at 17–18, 397-2 at 54–71, and 397-3 at 48–98. They presented opinion evidence from expert Dan Pacholke that DWCC's extended lockdown conditions are "far more restrictive and stark than the national norm," are "inconsistent with generally accepted penological practices," and "do not support the penological interests of safety and security within the prison." Record Document 397-4 at 11.

Based on the above, Plaintiffs identified the following questions that are common to the class as a whole:

> (1) whether DWCC's policies of social isolation, enforced idleness, indefinite exposure [to extended lockdown], and inadequate mental health care substantially increased class members' risks of serious harm; (2) whether Defendants were deliberately indifferent to these risks; (3) whether confining prisoners to cells for nearly all of every day for indefinite durations unconstitutionally risks serious harm; (4) whether 50 minutes of 'rec yard' time five days per week in a cage is constitutionally adequate; (5) whether and to what extent DWCC may constitutionally place prisoners on 'yard restriction' to one 50-minute rec yard session per week; (6) whether DWCC's visitation and phone call policies unconstitutionally risk serious harm, alone or in combination with other policies; (7) whether DWCC's policies as to programming, education, reading material, radio and television, and crafts are constitutionally adequate; (8) whether DWCC disciplinary practices are unconstitutional; (9) whether DWCC's mental health staff is constitutionally adequate; (10) whether DWCC's mental health diagnosis, monitoring and recordkeeping are constitutionally adequate; (11) whether DWCC's punitive use of 'suicide watch' is constitutional; and (12) what relief is required to ensure constitutional conditions of confinement for the class.

Record Document 397 at 19–20 (footnote omitted).

Plaintiffs also seek to raise a First Amendment claim on behalf of the class. "Prisoners retain free speech rights consistent 'with the legitimate penological objectives of the corrections system,' and restrictions on those rights cannot be greater than necessary to protect the correctional interests involved." *Every v. Jindal*, 413 F. App'x 725, 727 (5th Cir. 2011) (quoting *Brewer v. Wilkinson*, 3 F.3d 816, 821–22 (5th Cir. 1993)). Plaintiffs allege that DWCC has a practice, in violation of its stated policy, of opening legal mail sent from attorneys to prisoners and from prisoners to attorneys. Record Document 397 at 20. They support this contention by citing to official policies stating that "outgoing privileged correspondence may be posted sealed, and will not be opened and inspected without express authorization from the Warden." Record Documents 397 at 20 and 397-13 at 9. They presented evidence that staff is aware of this policy and aware that the organizations involved in the instant suit are proper recipients of privileged correspondence. Record Documents 397 at 20 and 397-15 at 14–15. Despite this, Plaintiffs cite to evidence that mail sent by prisoners at DWCC to Disability Rights has

been opened before reaching that prisoner numerous times. Record Documents 397 at 21 and 397-16 at 2. They point to DWCC policies requiring that incoming legal mail be opened in front of the prisoner and that the prisoner sign a receipt that the mail has been received and contrast that with testimony from prisoners that they routinely receive mail that has already been opened outside their presence. Record Documents 397 at 21, 397-19 at 2, and 397-20 at 10. Plaintiffs contend that this demonstrates two common questions: 1) whether DWCC's policies related to mail are constitutional and 2) the appropriate remedy for any violations. Record Document 397 at 21. Defendants do not offer any specific argument against commonality as to Plaintiffs' First Amendment claim. *See* Record Documents 131 at 12–14 and 407 at 13–19. Considering the lack of argument by Defendants and the evidence produced by Plaintiffs, the Court finds that Plaintiffs have satisfied the commonality requirement as to their First Amendment claim.

Defendants raise several arguments against commonality as to Plaintiffs' Eighth Amendment claims. They point to Dr. John Thompson's expert report explaining that inmates at DWCC have individualized mental health needs requiring different treatments and interventions, to testimony from Plaintiffs' expert Dr. Burns acknowledging that each inmate has different mental health needs, and to Disability Rights Louisiana's deposition testimony admitting that each inmate's mental health needs must be considered individually to argue that claims related to mental health are not common because of their individualized nature. Record Documents 407 at 15–16, 407-1 at 16, and 407-8 at 216–17.[6] Defendants contend that there can be no finding of a common question in this case because there is no "scientific proof that Plaintiffs' hypothesis is actually true—that restrictive housing causes mental

---

[6] Defendants excerpted the relevant portion of Dr. Burns's deposition testimony in their brief and direct the Court to Record Document 397-3. *See* Record Document 407 at 16, n.31. Record Document 397-3 is Dr. Burns's expert report, not her deposition testimony, and the Court did not independently locate Dr. Burns's deposition testimony in the record.

illness in those without it and exacerbates mental illness in those with it." Record Document 407 at 16. Finally, Defendants aver that the alleged injuries of the class are not the same and that the "answers to these alleged harms are also not subject to uniform resolution." *Id.* at 18. For example, they note that "[r]epeatedly violent offenders who create security concerns present a different penological case than the offender who has had one major violation that has placed him in restrictive housing and is released after serving the time for his infraction." *Id.* at 18–19.

The Court concludes that the putative class has also satisfied the commonality requirement as to its Eighth Amendment claims. As summarized by another court, "in order to prove commonality, Plaintiffs must establish that there is a policy or practice on the part of the defendants that is the source of the putative class members[’] alleged injuries, and also that the claims arising out of those injuries depends on common questions of law and fact." *Dockery*, 253 F. Supp. 3d at 853. Plaintiffs have done so. As outlined above, Plaintiffs have shown that there are numerous policies and practices in place on extended lockdown at DWCC that are the alleged source of the putative class's injuries. For example, they have established via expert testimony that exposing inmates to social isolation, forced idleness, and an indefinite time period being held in extended lockdown poses a substantial risk of serious harm. Further, they have shown that the claims of the putative class will arise out of common questions of law and fact. For example, whether the policies that Plaintiffs describe as social isolation, forced idleness, and indefinite time on extended lockdown in fact do create a substantial risk of serious harm to inmates' mental health and, if so, whether DWCC staff was aware of and deliberately indifferent to this risk both arise from common facts and common questions of law.

The Court will briefly address why it is not persuaded by the arguments Defendants raise in opposition to commonality. Contrary to Defendants' assertion, differences in the individual mental health needs are immaterial to this case because Plaintiffs seek to challenge the overall systems and

14

policies in place. They do not contend that the treatment provided to an individual prisoner has exposed him to a substantial risk of harm, but rather, that all inmates are exposed to a substantial risk of harm due to the policies and practices in place on extended lockdown at DWCC. Other courts have reached a similar conclusion. *See, e.g.*, *Dockery*, 253 F. Supp. 3d at 854; *Braggs v. Dunn*, 317 F.R.D. 634, 656–57 (M.D. Ala. 2016).

Defendants' argument that commonality is not satisfied because prisoners face different injuries and have different resolutions is unpersuasive. As other courts have held when faced with arguments regarding the dissimilarity of injuries in the prisoner litigation context, "Plaintiffs need only show that Defendants' actions 'were ineffective to reduce the risk of serious harm to a constitutionally permissible level for *any* inmate.'" *Valentine v. Collier*, No. 4:20-CV-1115, 2020 WL 3491999, at *10 (S.D. Tex. June 27, 2020) (quoting *Yates v. Collier*, 868 F.3d 354, 363 (5th Cir. 2017)) (emphasis in original). Like in *Lewis*, Defendants' argument "fail[s] to negate the injury at the center of the [putative class's] claims: the exposure to an unreasonable risk of serious harm." *Lewis*, 324 F.R.D. at 170–71. While inmates will likely have different exposure to that risk of serious harm, it does not destroy commonality. *Id.*

Finally, the alleged lack of scientific proof regarding Plaintiffs' hypothesis that restrictive housing causes or exacerbates mental illness does not lead to a conclusion that there are no common questions. In fact, the opposite is true. The hypothesis as framed by Defendants is the core common question for resolution at the center of this case. If Defendants and their experts are vindicated in their position that Plaintiffs cannot establish that the conditions on extended lockdown at DWCC pose a substantial risk of causing or exacerbating mental illness, then the entire putative class's claims are defeated. This is therefore the exact type of common contention that will generate a common answer likely to resolve the claims of the putative class at once. *In re Deepwater Horizon*, 739 F.3d at 811. The putative class has satisfied the commonality requirement.

2. **The Subclass**

Plaintiffs seek to pursue claims that DWCC has violated the ADA and RA on behalf of the putative subclass. Record Document 316 ¶s 295–309. Again, Plaintiffs request injunctive relief, not money damages. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. It defines a person with a disability as "a person who has a physical or mental impairment that substantially limits one or more major life activity." 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105. This includes individuals with historical, but not present, impairments and those who are regarded as having an impairment regardless of actual disability. 42 U.S.C. § 12102(1)(B)–(C).

The RA states that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of his disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). It defines disability in the same way as the ADA. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). "The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Id.* (citations omitted).

To prevail on ADA claims, a plaintiff must prove "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). The elements of a claim under the RA are the same, except that the entity in question must be one which receives federal financial assistance. *See Kemp*, 610 F.3d at 234. Particularly relevant to this case, the ADA recognizes a "methods of administration" claim that prohibits public entities from using "criteria or methods of

16

administration . . . [that] have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3); *see Dunn*, 318 F.R.D. at 664.

Plaintiffs have established, and Defendants do not dispute, that the ADA and RA apply to DWCC. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209–10 (1998); Proposed Budget for the State of Louisiana for Fiscal Year 2020-2021 at 57, https://www.doa.la.gov/media/ia5hbtb5/fy21_proposedbudget.pdf. Whether the putative subclass has established that it has in common a mental disability as defined by the ADA and RA and whether the putative subclass was discriminated against because of their disabilities is in dispute. Record Documents 393 at 23 and 507 at 26–27.

Plaintiffs maintain that the putative subclass has satisfied the first element of their claim because "[a] mental health disability is a mental impairment that 'substantially limits one or more major life activities.'" Record Document 397 at 23 (quoting 42 U.S.C. § 12102). Defendants argue that this is insufficient because Plaintiffs have failed to "identify which life activity or activities are limited by their proposed class, or how the class is represented by these named plaintiffs." Record Document 407 at 26. In response, Plaintiffs presented evidence regarding the diagnosed SMI of each Named Plaintiff and how these diagnoses interfere with major life activities. Record Document 412 at 11. They explain:

> Larry Jones has been diagnosed with major depressive disorder, requiring medication. R. Doc. 397-22. Ronald Brooks has been diagnosed with depressive episodes with psychotic features and PTSD, and requires medication to prevent hallucinations. R. Doc. 397-23. Carlton Turner has been diagnosed with major depressive disorder and harmed himself in 2010. R. Doc. 397-24. Bruce Charles has been diagnosed with bipolar disorder and harmed himself in 2016. R. Doc. 397-25. These diagnoses are all acknowledged by Defendants as serious mental illness, and squarely meet the standards for disability under the ADA.

*Id.*

The Court finds that this is sufficient to satisfy the first element of the putative subclass's claim. Plaintiffs have adequately alleged that the Named Plaintiffs have a disability as defined by the ADA

and the subclass is defined in such a way that it only includes those who likewise have qualifying disabilities under the ADA.

The remaining issue is whether Plaintiffs have presented evidence raising common questions of fact or law regarding whether the putative subclass has been discriminated against because of its disability. Plaintiffs attempt to satisfy this requirement by identifying policies and practices which they allege "place prisoners with mental health disabilities at heightened and discriminatory risk of serious harm because of their disabilities." Record Document 397 at 23. They cite Dr. Haney's expert opinion that mentally ill prisoners are especially vulnerable to the conditions of extended lockdown because they are "generally more sensitive and reactive to psychological stressors and emotional pain." Record Documents 397 at 23 and 397-2 at 33–34. Dr. Haney explains that, for this reason, many corrections officials have limited the use of solitary confinement for those with mental illness. Record Document 397-2 at 36.

At DWCC, however, inmates with diagnosed SMI are subject to the same conditions as all other inmates on the South Compound. *Id.* at 52. That DWCC does not limit the use of extended lockdown for these inmates or consider these inmates' mental health when placing them on extended lockdown, Plaintiffs allege, is a failure to make a reasonable accommodation as required by 28 C.F.R. § 35.130(b)(7). Record Document 397 at 24. Plaintiffs presented evidence that DWCC fails to make reasonable accommodations in other ways as well. These include failing to modify existing mental health programming or counseling services to allow subclass members to participate and using excessive force on inmates with a diagnosed SMI without regard to its impact on that inmate. Record Documents 397 at 24, 397-2 at 49–57, 397-3 at 19–20, and 393-4 at 38–40.

Plaintiffs next contend that the aforementioned inadequacies of the mental health care system at DWCC applies to the subclass, particularly because for these inmates, the alleged inability to diagnose

18

and treat mental illness exacerbates the underlying mental illness. Record Document 397 at 25. They also present evidence that DWCC has a policy of punishing those who seek mental health care and argue that this is discriminatory toward the putative subclass because it is those who already have mental illness who will most often seek care for that condition and be "punished for expressing their needs." *Id.*

Based on the above, Plaintiffs have identified numerous common questions relative to the subclass:

> (1) whether DWCC's policies discriminate against prisoners with mental health disabilities; (2) whether the discriminatory effect of these policies is because of prisoners' disabilities within the meaning of the statute; (3) whether placement of prisoners with mental health disabilities on extended lockdown is discriminatory; (4) whether DWCC's failure to identify and make reasonable modifications to policies to accommodate prisoners' mental illness is discriminatory; (5) whether DWCC's inadequate mental health system is discriminatory; and (6) whether DWCC's punishment of prisoners who seek mental health care is discriminatory.

Record Document 397 at 25.

Defendants argue that Plaintiffs have failed to show that there are common questions as to the subclass because Plaintiffs have not alleged that they have been discriminated against because of their disability. Record Document 407 at 27. For example, they note that Plaintiffs allege that all inmates in the South Compound are treated the same and do not allege that disabled inmates are treated differently because of their disability. *Id.* These arguments are not persuasive and seem to fundamentally misunderstand the claims of the putative subclass—it is DWCC's failure to treat inmates with mental illness in a way that accommodates the mental illness that Plaintiffs allege is discriminatory. *See also Yates*, 868 F.3d at 366 (finding no error in a district court certifying a class to pursue ADA claims based on the alleged failure to provide reasonable accommodations to inmates with disabilities that could make them more susceptible to heat than other inmates).

The Court finds that Plaintiffs have met the commonality requirement for the putative subclass. As listed above, there are numerous common questions of fact and law and the resolution of those questions will be determinative of the claims of the subclass as a whole. For example, if it is shown that it is not discriminatory for DWCC not to modify its policies to accommodate prisoners' mental illness, it will resolve all Plaintiffs' claims at once. The putative subclass has therefore satisfied the commonality requirement of Rule 23(a).

### D.    Typicality

The third prerequisite contained in Rule 23(a) is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Other courts have described the typicality requirement as "commonality addressed from the perspective of the named plaintiffs. Commonality requires showing that, in fact, all members of the proposed class share a common claim. . . . Typicality requires showing that, in fact, the proposed representatives have that claim." *Lewis*, 324 F.R.D. at 169 (quoting *M.D. v. Perry*, 294 F.R.D. 7, 29 (S.D. Tex. 2013)). This does not require a showing that all claims are identical, however. *Id.* Instead, the class representative's claims must "'arise from the same event or pattern or practice and [be] based on the same legal theory' as the class claims." *Dunn*, 318 F.R.D. at 666 (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009)). Typicality is not as concerned with the "strengths of the named and unnamed plaintiffs' cases" as it is with the "similarity of legal and remedial theories behind their claims." *Ward v. Hellerstedt*, 753 F. App'x 236, 247 (5th Cir. 2018) (citing *Ibe*, 836 F.3d at 528–29).

Plaintiffs seek injunctive relief, not money damages. Plaintiffs assert that each Named Plaintiff satisfies the typicality requirement to represent both the class and the subclass because each was housed in extended lockdown at DWCC between 2016 and the Court's ruling regarding standing in this matter and because each named Plaintiff has a diagnosed SMI. Record Document 397 at 27. They, therefore,

20

reason that each Named Plaintiff was subject to the substantial risks of serious harm from the policies in place for inmates on extended lockdown, that these policies applied equally to the Named Plaintiffs as to the class and subclass as a whole, and that the Named Plaintiffs and the class and subclass share the same legal theories.

Defendants argue that Plaintiffs have failed to carry their burden because none of the Named Plaintiffs remain at DWCC.[7] Record Document 407 at 21. They further argue that the Named Plaintiffs have failed to show that their claims are typical of the class at large because they have not shown that the time spent in restrictive housing was typical, that their level of care was typical, or that their injuries were typical. *Id.* at 22. Finally, they contend that the Named Plaintiffs' claims are not typical of the subclass because they have not shown that they have a qualifying disability under the ADA.[8] *Id.*

The Named Plaintiffs have satisfied the typicality requirement as to the class and subclass. The fact that the men are no longer at DWCC does not mean that their claims are atypical of the inmates who remain incarcerated there. Their claims still arise from the same events and policies as the class and subclass and are premised on the same legal theories. That they are no longer at DWCC relates more to whether the men have standing, an issue which this Court has already addressed in Record Document 315, and to the adequacy of their representation, which the Court will address below.

Each of the Named Plaintiffs' claims are typical to that of the class and subclass in that they were inmates housed on extended lockdown at DWCC and subjected to the policies and practices now at issue. Any differences identified by Defendants between the Named Plaintiffs and the class and subclass are immaterial because the claims of each putative class and subclass member arise from the same policies and practices and are based on the same legal theories, not the facts as applied to a

---

[7] Bruce Charles has been released from custody, Carlton Turner is now housed at Louisiana State Penitentiary, and Larry Jones and Ronald Brooks are housed at Elayn Hunt Correctional Center.

[8] The Court has previously addressed this issue and thus does not address it again here.

particular inmate. The claims thus have the same characteristics, and the Named Plaintiffs meet the typicality requirement for the class and subclass. *Dockery*, 253 F. Supp. 3d at 855.

### E.      Adequacy

Rule 23(a)'s final prerequisite is the requirement that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). A key function of the adequacy inquiry is to "uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc., v. Windsor*, 521 U.S. 591, 625 (1997). The Fifth Circuit has held that:

> Adequacy encompasses three separate but related inquiries (1) 'the zeal and competence of the representative[s'] counsel'; (2) 'the [willingness] and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees'; and (3) the risk of 'conflicts of interest between the named plaintiffs and the class they seek to represent.'

*Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017) (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 130 (5th Cir. 2005)).

Defendants argue that the Named Plaintiffs have failed to satisfy the adequacy requirement because they are no longer housed at DWCC. Record Document 407 at 21. They aver that the Named Plaintiffs' claims will conflict with the "desires of offenders housed in general population at DWCC." *Id.* Defendants suggest that, because the putative class and subclass seek to include offenders who may in the future be housed in extended lockdown, the class must also take into account the interests of those offenders currently housed in general population at DWCC. *Id.* at 21–22.  They note that putative class counsel works for Disability Rights, who is also a Named Plaintiff in this matter and stands to benefit financially from this matter while the putative class and subclass do not. *Id.* at 22.

The Named Plaintiffs satisfy the adequacy requirement. The Named Plaintiffs' counsel has zealously and competently represented the Named Plaintiffs in this matter, as evidenced by the "volume and thoroughness of the pleadings" filed to date. *Dockery*, 253 F. Supp. 3d at 855. While it is true that

several lawyers enrolled to represent the Named Plaintiffs work for and also represent Disability Rights Louisiana, this is not a hindrance in their ability to effectively represent the putative class and subclass. In fact, it is not uncommon for lawyers from organizations with associational standing to represent both the organization and the plaintiffs in the same litigation. *Cunningham v. Fed. Bureau of Prisons*, 222 F. Supp. 3d 959, 960 (D. Colo. 2015); *Braggs*, 317 F.R.D. at 639; *Indiana Prot. & Advoc. Servs. Comm'n v. Indiana Dep't of Corr.*, No. 1:08- CV-01317, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012).

The Court has also been presented with no evidence to contradict Plaintiffs' counsel's assertion that the Named Plaintiffs in this matter remain committed to taking an active role in the litigation and to protecting the interests of absentees. Record Document 397 at 28. Counsel reports that even after being moved from DWCC, the Named Plaintiffs have "maintained close contact with their attorneys and fully participated in the conduct of the litigation." *Id.*

Finally, the Court does not find that there is a conflict of interest between the Named Plaintiffs and the class they seek to represent. Defendants seemingly base their conflict argument on the theory that, because the putative class and subclass include inmates who may in the future be held in extended lockdown, the class and subclass include some inmates currently housed in general population at DWCC. From this, they reason that it is a conflict of interest for those currently housed in extended lockdown to represent the interests of those in general population who may in the future be housed in extended lockdown because the class and subclass seek to change policies "that have clearly worked at [DWCC], to the benefit of the general population offenders." Record Document 407 at 22. This logic is flawed. If the inmates currently in general population are members of the class or subclass, it is because they will in the future be removed from general population and housed in extended lockdown. Therefore, their interests as a member of the class or subclass is not in the conditions of general population, but rather in the policies and procedures they would be subjected to while housed in

extended lockdown. Further, the Court does not find that the constitutionally adequate treatment of one prisoner is a conflict with another prisoner.

In sum, the Named Plaintiffs in this matter have satisfied the adequacy requirement of Rule 23(a). Having concluded that Plaintiffs have satisfied the prerequisites of Rule 23(a) for both the class and subclass, the Court now turns to whether Plaintiffs have met the requirements of Rule 23(b).

### F.      Rule 23(b)(2)

Plaintiffs seek certification as a Rule 23(b)(2) class. A Rule 23(b)(2) class is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This analysis is focused on whether there are common behaviors by a defendant toward a class and not focused on whether there are common issues to be determined. *Yates*, 868 F.3d at 366. The Fifth Circuit has interpreted this language to have two requirements. First, the "class members must have been harmed in essentially the same way." *Perry*, 675 F.3d at 845 (quoting *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007)). Second, "the injunctive relief sought must be specific." *Id.* (quoting *Maldonado*, 394 F.3d at 524). Supreme Court precedent holds that a Rule 23(b)(2) class is only appropriate "when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.* (quoting *Wal-Mart*, 564 U.S. at 360).

Plaintiffs argue that they have satisfied the requirements of Rule 23(b)(2) as to the class and subclass because they seek a declaration that the policies and practices detailed above violate the Eighth Amendment, First Amendment, ADA, and RA. Record Document 397 at 30. They identify the following as the contents of injunctive relief sought by the class and subclass:

- Limit the use of solitary confinement to cases and durations which are absolutely necessary to protect the health and safety of others;

- Divert prisoners with mental health disabilities to secure treatment facilities;

- Require that prisoners who must be in solitary confinement be allowed adequate out of cell time per day, including a mix of recreational activities and structured programming opportunities;

- Require that prisoners be permitted access to rehabilitative programming, radio and television entertainment, regular and scheduled visitation and phone call privileges, and other quality-of-life minima;

- Eliminate barbaric and outdated correctional practices that strip people of their clothing, property, and mattress;

- Require that DWCC hire and train sufficient qualified mental health staff to conduct its mental health services so as to appropriately identify, prevent, and treat prisoners' mental health challenges;

- Require an overhaul of the system for documenting and providing mental health medications; and

- Prohibit punishing prisoners for seeking mental health care or manifesting symptoms of mental illness, and require suicide watch policies and practices that protect prisoners rather than punishing them, including the use of suicide prevention garments that cover the body and afford prisoners dignity and privacy, and use of suicide-resistant mattresses rather than bare concrete for sleeping.

*Id.*

Defendants contend that Plaintiffs have failed to satisfy Rule 23(b)(2) because the class members have not been harmed in essentially the same way. Record Document 407 at 24. They note that the injunctive relief "does not even consider putative class members not currently in restrictive housing." *Id.* They argue that Plaintiffs' outline of injunctive relief sought is impermissibly vague. *Id.* For example, Plaintiffs seek to require DWCC to have "qualified mental health staff" to "appropriately identify, prevent, and treat" inmates. *Id.* at 24–25.

Plaintiffs have satisfied the requirement that they be harmed in essentially the same way. Like other prisoner litigation cases, Plaintiffs seek to challenge policies and procedures that are broadly

25

applicable to the class and subclass. *Ward*, 753 F. App'x at 249 ("[T]his court has found purported class members to have been 'harmed in essentially the same way' where they have each been subject to the same allegedly wrongful *policy*, despite variations in the degree of damages suffered by each.") (citing *Yates*, 868 F.3d at 367–68); *Braggs*, 317 F.R.D. at 667 ("The Supreme Court has approved of system-wide relief in prison cases involving 'systemwide violation[s]' resulting from 'systemwide deficiencies.'") (quoting *Brown v. Plata*, 563 U.S. 493, 532 (2011)). Because the putative class and subclass seek to challenge policies, "any injunction ordered by the Court would provide relief to each member of the class" and subclass. *Dockery*, 253 F. Supp. 3d at 855.

Plaintiffs have also satisfied the specificity requirement. The specificity requirement "does not require that every jot and tittle of injunctive relief be spelled out at the class certification stage; it requires only 'reasonable detail' as to the 'acts required.'" *Yates*, 868 F.3d at 368 (quoting *Perry*, 675 F.3d at 848). Plaintiffs "must be able to explain 'how a court could define or enforce meaningful injunctive relief.'" *Ward*, 753 F. App'x at 249 (quoting *Maldonado*, 493 F.3d at 525). The Fifth Circuit has previously opined that "to comply with Rule 23(b)(2), Plaintiffs will, at minimum, have to describe in some kind of detail from what actions or inactions Defendant should be restrained. A general request that Defendant be restrained from violating Plaintiffs' Fourteenth Amendment protections is insufficient." *Id.* Here, Plaintiffs have identified numerous policies that they seek to change in reasonable detail to show how the Court could define or enforce meaningful injunctive relief. While they have not fully spelled out the precise injunctive relief they seek, they have provided the core of the relief they seek. The precise details of each element of injunctive relief will be determined at trial and after taking into account the current policies and practices in place at DWCC.

The Court, therefore, concludes that Plaintiffs have established the requirements to certify a class under Rule 23(b)(2). Because Plaintiffs have met the requirements of Rule 23(a) and Rule 23(b)(2),

the Court certifies Plaintiffs' class of all prisoners who are or will be subjected to extended lockdown at David Wade Correctional Center and a subclass consisting of all individuals on extended lockdown at David Wade Correctional Center who have or are perceived as having a qualifying disability related to mental health, as defined within the Americans with Disabilities Act.

### G.      Class Counsel

Rule 23(g) requires a court that certifies a class to appoint class counsel. In appointing class counsel, a court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
>
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
>
> (iii) counsel's knowledge of the applicable law; and
>
> (iv) the resources that counsel will commit to representing the class.

Fed R. Civ. P. 23(g)(1)(A). A court may also consider "any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

In this case, all factors favor appointing Plaintiffs' current counsel as class counsel. Counsel has already devoted significant time and effort to investigating and pursuing potential claims in this matter, they are experienced in handling litigation of this type, have knowledge of the applicable law through their prior litigation experience, and have demonstrated that they will dedicate sufficient resources to representing the class. Record Document 397-29. Accordingly, the Court appoints the counsel for the Named Plaintiffs as class counsel.

## III.   Conclusion

For the reasons stated herein, Plaintiffs' motion to certify a class and subclass [Record Document 2] is **GRANTED**. The Court certifies a class of all prisoners who are or will be subjected

to extended lockdown at David Wade Correctional Center and a subclass consisting of all individuals

on extended lockdown at David Wade Correctional Center who have or are perceived as having a

qualifying disability related to mental health, as defined within the Americans with Disabilities Act.

     **THUS DONE AND SIGNED** this _20th____ day of September, 2021.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE