UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself and all other similarly situated prisoners at David Wade Correctional Center, | * * * * | CIVIL ACTION NO.: 5:18-CV-00541-EEF-MLH |
| | * | JUDGE ELIZABETH E. FOOTE |
| and | * * | |
| The ADVOCACY CENTER, | * * | USMJ MARK L. HORNSBY |
| PLAINTIFFS, | * * | |
| VS. | * * | CLASS ACTION |
| JAMES M. LEBLANC, *et al.*, | * * | |
| DEFENDANTS. | * | |

**Plaintiffs' Memorandum of Law in Support of Establish a Negative Presumption Based on the Spoliation of Evidence By Defendants at David Wade Correctional Center or, in the Alternative, Motion *in Limine***

Introduction ........................................................................................................................ 2
Procedural History ............................................................................................................. 2
Law and Argument ............................................................................................................ 3
   I.   The Spoliated Evidence ............................................................................................ 4
       a.   Defendants Deleted Relevant Video Evidence .................................................. 4
       b.   Defendants' Prevented Future Tier Video Recordings ..................................... 5
   II.   The Sanctions of Adverse Inference or, in the Alternative, Preclusion of Evidence by Motion *in Limine* are Appropriate .................................................................... 10
       a.   Plaintiffs Suffered Prejudice from the Spoliation of Evidence ....................... 11
       b.   Fairness of the Fact-Dispositive Sanction ....................................................... 12
       c.   Relatedness of the Sanction to the Spoliated Evidence .................................. 13
       d.   Deterrent Effect of the Sanction ...................................................................... 14
Conclusion ........................................................................................................................ 15

Cases

*Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1151 (N.D. Cal. 2012) ........................10
*Chilcutt v. United States*, 4 F.3d 1313, 1321 (5th Cir. 1993) ................................................. 10, 11
Condrey v. SunTrust Bank of Georgia, 431 F.3d 191, 203 (5th Cir. 2005) ................................10
*Gen. Atomic Co. v. Exxon Nuclear Co.*, 90 F.R.D. 290, 308-09 (S.D. Cal. 1981) .......................11
*Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir.1996) ...............................................11
*Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 205 (E.D.N.Y. 2010) .............................................11
*Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1155 (7th Cir.1998) ...................................10
*Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010) ..........14
*Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1300 (M.D. Fla. 2009) .........................12
*Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) .......................................................11

Rules

Fed. R. Civ. P 37(e) .................................................................................................................. 3, 10

## Introduction

Plaintiffs respectfully submit the following memorandum in support of Plaintiffs' motion to establish a negative presumption based on Defendants' destruction of evidence regarding the frequency of medication administration (also known as pill pass) and mental health staff rounds at DWCC, as well as a negative presumption regarding the use of extreme cold temperature in the winter time as punishment. In the alternative, Plaintiffs seek a Motion *in Limine* to limit rebuttal testimony alleging that Defendants have engaged in pill pass or mental health rounds not reflected in DWCC's log books.

## Procedural History

Plaintiffs previously moved for a preliminary injunction requiring Defendants to restore the recording functions of the camera system monitoring the tiers in N1 through N4. Rec. Doc. 45. Although injunctive relief requiring Defendants to restore the recording capabilities was denied, this Court held that "this ruling should not be taken to imply that specific footage that has not been or will not be recorded or that has been destroyed may not be the appropriate subject of a spoliation motion." Rec. Doc. 126 at p. 7. In that ruling, the Court further held

> The only issue is that the data created by the cameras is evanescent. This, what is being asked of Defendants is not to create data but rather to preserve data that would otherwise vanish.

Rec. Doc. 126 at p. 4. Plaintiffs bring the instant motion seeking the Court's intervention based on Defendants' failure to preserve data that has now vanished.

## Law and Argument

At issue are spoliation problems stemming from video that Defendants attempted to delete and failed to preserve during the pendency of this litigation. The consequences for spoliation of electronic records are dictated by Fed. R. Civ. P 37(e), which states:

> If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
>     (A) presume that the lost information was unfavorable to the party [. . .]

Plaintiffs' investigation, including expert reports, has been completed and the impact of the spoliated information is now clear, along with the limitations on Plaintiffs ability to "restore or replace [the information] through additional discovery." The destruction of video evidence prejudicially deprives Plaintiffs and this Court of a clear picture of the actual medication administration, mental health tier rounds, and retaliatory security practices in place at DWCC. The remaining electronic evidence and the circumstances surrounding the spoliation supports a finding that Defendants acted with intent to deprive Plaintiffs of the information's use in the litigation.

Plaintiffs seek an order which establishes a negative presumption regarding the content of the spoliated material, holding as established the following: (1) that Defendants were subjectively

3

aware that the practices for medication administration and mental health staff rounds on N1-N4 at DWCC posed a serious risk of harm to individuals housed there, (2) that Defendants inadequately supervised pill call staff to detect or remedy problems with medication administration, (3) that Defendants inadequately supervised mental health staff to ensure regular tier rounds occurred, (4) that DWCC has a pattern and practice of failing to follow its own internal policies related to medication administration and mental health tier rounds on N1-N4, and (5) that the tier video which Defendants have not preserved contained material adverse to Defendants regarding the use of extreme cold as punishment.

In the alternative, Plaintiffs seek a Motion *in Limine* which limits Defendants' ability to rebut DWCC's own tier logs. Specifically, Plaintiffs ask the Court to hold that Defendants may not attempt to introduce testimony with the goal of demonstrating that medication administration and mental health rounds in fact took place more often than is reflected in DWCC's tier logs, or that Defendants actually provided medications to patients that are not reflected in their electronic medication administration records ("eMARS").

**I.    The Spoliated Evidence**

    *a. Defendants Deleted Relevant Video Evidence*

Prior to November of 2017, DWCC had a video camera system in place which recorded activities in the hallway on each tier in N1 through N4. R. Doc. 93 at p.3. While this system was operational and recording, it created a contemporaneous and independently verifiable record of who was on the tier, when, and what that person was doing. After the system was deactivated, Plaintiffs and Defendants arranged for a visit to DWCC for Plaintiffs' staff to copy the relevant hard drives from N1-N4. *Id.* at 4.

Upon analysis by Plaintiffs' expert Michael Harvey, he observed large amounts of video data had been moved into the "recycle bin" of the hard drive on November 9, 2017, at 2:24pm.[1] The deletion occurred between the deactivation of the recording system and Plaintiffs imaging the drives. This pattern of deletion did not match how the software operated on any of the other drives from N1-N4. Furthermore, this pattern of deletion's use of the "recycle bin" feature in the Windows operating system is consistent only with user deletion, not the automatic operation of a program.[2] Based on this information, Plaintiffs' expert concludes that a user intervened to delete the data on the afternoon of November 8, 2017.[3]

The video data which Plaintiffs were able to recover from the attempted deletion is relevant for what it does not show – officers performing medication administration, or pill pass. From the recovered footage from N3A on September 12, 2017, no morning pill pass takes place. No other hard drive has video records from this date and no other tier cameras on N3 were preserved. On this date, pill pass only occurs twice, once at approximately 9:40am[4] and again at approximately 2:15pm,[5] rather than the three pill passes required at DWCC. According to policy at DWCC, "The pill officers will pass out the pills in three pill calls. 6:00 a.m., 12:00, and 4:00. And they go down each tier to each cell."[6] Tier logs do not show any further medication passes that day.[7]

b. *Defendants' Prevented Future Tier Video Recordings*

Defendants' decision to discontinue recording the video footage from the tier cameras prevented Plaintiffs from obtaining evidence regarding activities that are reported to occur on the

---

[1] Exh. A - Harvey Expert Report at p. 4.
[2] *Id.* at p. 5.
[3] *Id.*
[4] Exh. B - Event20170912094615001.mp4
[5] Exh. C - Event20170912143623001.mp4
[6] Exh. D - 30(b)(6) Deposition of Michelle Norris regarding Pill Pass, at 13:5-7.
[7] Exh. E - N3 Tier Log Book, pp 55-59, DWCC 057564-68

5

tiers through the process of discovery. The recordings from the tier cameras would have provided valuable insight to Plaintiffs and the Court regarding who is present on the tiers and with what frequency. The recordings would have also provided a factual account of when staff opened windows on the tiers in the winter months when it was cold outside, subjecting individuals who were in paper gowns to extremely cold temperatures. Since the tier cameras were stationary on the walls and provided a 24/7 perspective of the tiers, the recordings could have also provided a more complete picture of uses of force on the tiers or other unusual occurrences.

### 1. *Spoliation of Video Evidence of Mental Health Staff Conducing Rounds.*

Throughout the course of discovery, Plaintiffs deposed the mental health staff at DWCC and inquired about mental health rounds and the accompanying documentation. Mr. Hayden testified that he does not document rounds.[8] There are no documents created by mental health staff specifically documenting that they have made rounds.[9] The mental health staff, including Hayden, Dauzat, and Robinson, testified that while there is a card swipe system they rarely, if at all, use it as policy requires.[10] The matter of whether and how frequently mental health staff are on the tiers has been a point of contention through this case. While the mental health staff claim that they are present on the tiers weekly, testimony and accounts from prisoners suggests that mental health staff are rarely present on the tiers, and when they are it is typically only when someone is on suicide watch.

The video footage from the tier cameras would have definitively shown when mental health staff were on the tiers, the duration of time they spent on the tiers, and how many individuals they spoke to. The video footage would have provided an objective answer to how frequently mental

---

[8] *See,* Exh. F - Deposition of Hayden 60:25 – 61:6.
[9] *See,* Exh. G - Deposition of Dauzat 24:10-18.
[10] *See,* Exh. F - Deposition of Hayden 58:25 – 59:2; Exh. G - Deposition of Dauzat 24:12; Exh. H - Deposition of Robinson 227:18-20.

health staff are making rounds and how much time they spend speaking with people cell-front. Due to Defendants' failure to maintain adequate records of when mental health staff conduct rounds, and Defendants' admitted failure to consistently and properly utilize the card swipe system, there is no other source of evidence to definitively prove whether mental health staff are conducting regular rounds.

Class members have repeatedly described the failure of mental health staff to make their appointed rounds.[11] The only record which might tend to reflect the times at which mental health staff performed rounds are the tier logs. From January 26, 2018 until February 28, 2018, the tier logs for N4's A and B tiers show mental health rounds occurring only once.[12] Other mentions of mental health staff being present on the tier either do not have an activity listed[13] or describe an activity other than rounds, such as a callout.[14] Plaintiffs seek an adverse inference that mental health staff are not conducting regular rounds, or, in the alternative, a motion *in limine* limiting Defendants from introducing testimony that rounds are conducted any more often than they are specifically described in the log books.

### 2. *Spoliation of Video Evidence of Pill Pass*

Tier video is also the only means of independently and directly establishing that pill pass took place on a given date and time. Even without video evidence, Defendants' self-reporting in the log books casts grave doubts over the institution's eMARs. The log book entries from N4's A and B tiers only show that pill pass occurred a total of 20 times between January 26, 2018 and

---

[11] E.g. Exh. I - Deposition of Shawn Francis at 37:12-14 (mental health only makes rounds for suicide watch); Exh. J - Deposition of Willie Jones at 10:14-15 and 22:23-24 (only saw Hayden three times between September 2019 and his deposition on Dec. 5, 2019)
[12] Exh K - N4 A&B Tier Log (Ariel Robinson performs rounds on February 26, 2018 at 2:06pm) at DWCC 068914.
[13] Exh. L - N4 A&B Tier Log (Steve Hayden on February 15 2018 at 9:06am) at DWCC 068846.
[14] Exh. M - N4 A&B Tier Log (Aeriel Robinson on February 16, 2018 at 2:10pm) at DWCC 068853; Exh. N - N4 A&B Tier Log (February 22, 2018 Robinson and Seal for clinic) at DWCC 068888.

February 28, 2018.[15] Every tier is supposed to be visited by pill pass officers three times per day.[16] During that 33-day period, there should have been 99 pill passes on each tier. Defendants' own log book shows them missing 79 pill passes during that time frame. There are thirteen days during that time period on which there is no mention of pill pass whatsoever in the log book, January 26, 27, and 31, and February 1, 4, 6, 9, 10, 11, 14, 15, 18, 19, 20, 21, and 28. Without the video records, Plaintiffs are unable to directly impeach witnesses based on the presence or absence of video showing pill pass taking place.

It is necessary to verify when pill pass took place because of contradictory evidence of the same. Contrary to the log book discussed above, the eMARs from this time period show patients passively refusing medications, with nothing to reflect any irregularities in the process for pill pass.[17] On February 4th, 14th, and 18th, the log book does not indicate that pill pass took place, but the eMAR records on this date indicate that individuals on those tiers received medications.[18] Furthermore, on dates where no pill pass is indicated in the log book, patients are marked as having "not requested" their medications as though the medications had been offered. Due to Defendants' failure to preserve the information from the tier cameras, the parties and the Court are left with a tangle of self-contradictory records that make it all but impossible to deduce whether pill pass took place on a given day or whether medications marked as delivered were actually furnished to the patient.

---

[15] Exh. O - N4 A&B Tier Log. The only dates and times pill pass is recorded are: Jan. 28, 2018 at 2:07pm, DWCC 068740; Jan 29, 2018 at 2:50pm, DWCC 068746; Jan. 30, 2018 at 2:25pm DWCC 068752; Feb. 2, 2018 at 2:09pm DWCC 068770; Feb. 3, 2018 at 2:40, DWCC 068776; Feb. 5, 2018 at 737am, DWCC 068788 and 2:13pm DWCC 068789; Feb. 7, 2018 at 7:20am, DWCC 068800; Feb. 8, 2018 at 1:30pm DWCC 068807; Feb. 12, 2018 at 240pm DWCC 068830; Feb. 13, 2018 at 2:10pm DWCC 068836; Feb. 16, 2018 at 2:15, DWCC 068853; Feb. 17, 2018 at 2:20pm, DWCC 068859; Feb. 22, 2018 at 7:15am, DWCC 068887; Feb. 23, 2018 at 7:11am, DWCC 068894; Feb. 24, 2018 at 7:15am, DWCC 068901, and 2:12pm, DWCC 068903; Feb. 25, 2018 at 7:06am, DWCC 068907; Feb. 26, 2018 at 2:42pm, DWCC 068914; and Feb. 27, 2018 at 2:09pm, DWCC 068920.
[16] Exh. D - 30(b)(6) Deposition Re. Pill Pass, at 13:5-7.
[17] Exh. P - A.T. eMAR for February 2018.
[18] *Id.*

Defendants must not be allowed to benefit from their failure to maintain the only record which could objectively prove what actually took place. Defendants failed to preserve the video evidence that would have permitted direct observation of the time and date of each pill pass. Due to the spoliation of this evidence, Plaintiffs request either that a negative presumption be entered regarding the content of the deleted video that rounds are not occurring regularly or, in the alternative, a motion *in limine* limiting Defendants from introducing testimony that pill pass is conducted any more often than it is specifically described in the log book.

### 3. *Spoliation of Evidence of Freezing Temperatures as Punishment*

Defendants' intentional decision to cease recording of the tier camera video footage has resulted in the destruction of evidence of "bluesing[19]" on the tiers. Plaintiffs and class members have testified to the practice by DWCC staff of opening windows on the tiers in the winter months when it was cold outside to subject individuals who were clothed only in a paper gown to extremely cold temperatures.[20] Plaintiffs and class members have stated that they believe staff engage in this practice as a means of punishment or retaliation. Staff have denied engaging in this practice. There is no paperwork generated as a result of this activity and the only existing evidence on this point is the testimony of the prisoners who have been subjected to this condition or who have observed this practice.

The video footage from the tier cameras would have provided an objective account of whether staff were intentionally opening the windows on the tiers during the winter months when the weather reached exceedingly cold temperatures. Defendants' intentional disconnection of the

---

[19] The practice of subjecting men in paper gowns to extreme temperatures in the winter is one example of "bluesing", which is more broadly defined by prisoners as acts of retaliation by staff. *See* Exh. Q - Deposition of Bruce Charles 130:15-24.

[20] E.g., Exh. R - Deposition of Quinten Moran, 24:20-24; Exh. S - Deposition of Corey Pittman, 36:25 – 37:2; Exh. T - Deposition of Frederick Ross, 44:11-21; Exh. U - Deposition of James White, 9:3-15; *see also* Rec. Doc. 428 at p. 71.

recording capabilities deprived Plaintiffs and this Court from evidence that is not available in any other capacity. Plaintiffs seek an adverse inference that staff at DWCC engage in the practice of "bluesing", which in this context refers to the practice of opening the windows during the winter months.

> II. **The Sanctions of Adverse Inference or, in the Alternative, Preclusion of Evidence by Motion *in Limine* are Appropriate**

Fed. R. Civ. P. 37(e)(2) allows courts to impose the penalty of a negative inference if it is determined that the spoliator "acted with the intent to deprive another party of the information's use in the litigation." Even without such a finding of intent to authorize a negative inference from the spoliated information, the district court has wide latitude under the Fed. R. Civ. P. 37(e) to "order measures no greater than necessary to cure the prejudice." The Fifth Circuit's analysis of fact-dispositive sanctions looks to the "fairness and substantial relationship between the sanction and the claim—along with a third—that the sanction meet the Rule 37 goals of punishing the party which has obstructed discovery and deterring others who would otherwise be inclined to pursue similar behavior—should guide our review." *Chilcutt v. United States*, 4 F.3d 1313, 1321 (5th Cir. 1993) (internal citations omitted). While this view predates the 2015 revisions to Fed. R. Civ. P. 37 which codified the rule for spoliation of evidence, the case is nonetheless a helpful standard for guiding the Court's exercise of its discretion. *Cf, Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005) (requiring a showing of bad faith prior to the 2015 amendments), *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015) ("Bad faith, in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence."); *Mathis v. John Morden Buick, Inc.,* 136 F.3d 1153, 1155 (7th Cir.1998) (discussion of bad faith requirement).

District courts routinely impose adverse inferences and deem facts admitted, and preclude evidence based on similar patterns of spoliation. *See, Apple Inc. v. Samsung Elecs. Co.*, 881 F.

10

Case 5:18-cv-00541-EEF-MLH   Document 473-1   Filed 11/19/21   Page 11 of 16 PageID #: 23366

Supp. 2d 1132, 1151 (N.D. Cal. 2012) (imposed adverse inference); *Linde v. Arab Bank, PLC*, 269 F.R.D. 186, 205 (E.D.N.Y. 2010) (precluding evidence, deeming facts admitted, and giving an adverse inference instruction); and *Gen. Atomic Co. v. Exxon Nuclear Co.*, 90 F.R.D. 290, 308-09 (S.D. Cal. 1981) (designating facts presumed and precluding evidence). The federal rule authorizes sanctions up to and including case dispositive sanctions and the three factors of fairness, relation to the information, and deterrence, all favor the fact dispositive sanctions described above.

Plaintiffs will follow the formula proposed by the Fifth Circuit's prior holding in *Chilcutt*, analyzing the (1) prejudice of the lost information, (2) the fairness of the sanction, (3) the relationship between the proposed sanction and the spoliated evidence, and (4) the deterrent effect of the sanction.

### a. Plaintiffs Suffered Prejudice from the Spoliation of Evidence

The Eighth Amendment draws a key line of distinction between the policies and procedures at a prison as opposed to the actual practices on the ground. *See, Shepherd v. Dallas Cty.*, 591 F.3d 445, 452 (5th Cir. 2009) *quoting Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir.1996) (en banc) (In some cases, a condition may reflect an unstated or de facto policy, as evidenced by a pattern of acts or omissions "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.") As alluded to above, in this case the Defendants' own records regarding their medication administration practices are in stark contrast to their established policies. Defendants' tier records show stark differences between the mental health staff's recorded presence on the tiers and the weekly rounds called for in policy. Additionally, the use of extreme cold as a punishment is not sanctioned by any written policy at the institution, but it is a consistent fixture in the testimony of people imprisoned on extended lockdown. Each of these distinct threads shares the same problem that without video

11

recording of the tiers, Defendants are free to claim that they perform three medication passes per day, make mental health rounds weekly, and do not use cold as a punishment.

The truth-seeking function of the federal courts and due process depends on the availability of hard evidence and objective facts to establish sound conclusions. By deleting evidence and failing to preserve video, Defendants seek to reduce key allegations about the conditions on extended lockdown into a contest of their-word-against-ours rather than a measured finding of objectively supported fact. This harms not only the Plaintiffs but also the process as a whole.

### b. *Fairness of the Fact-Dispositive Sanction*

Plaintiffs seek to remedy the prejudice caused by Defendants destroying tier video footage at DWCC. The circumstances surrounding the deletion of video supports the conclusion that Defendants acted to delete the video with the intention to conceal evidence of systemic misconduct. The video system and the hard drives were, at all relevant times, in the physical custody of the Defendants and kept within the confines of DWCC, a maximum-security prison. Further, Defendants acted to prevent the continued recordation of the tier camera video with the intention of concealing evidence that staff do not follow policy regarding regular mental health rounds and that staff engage in acts of retaliation against prisoners through "bluesing".

In *Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1300 (M.D. Fla. 2009), the district court found that a party had deliberately destroyed evidence based on the party's "motive and the opportunity" as well as testimony from an expert that the deletion was likely caused by the user. In this case, the Defendants and Defendants' employees are the only individuals with motive or opportunity to delete video evidence. Additionally, the contention that a user deleted the video data is supported by Plaintiffs' expert witness, Michael Harvey.

The remedy of an adverse inference sought by Plaintiffs addresses the problems created by Defendants' deletion of video showing deviation from medication administration policies as well as the intentional deprivation of continuing tier camera footage showing the lack of mental health rounds and acts of retaliation by staff. The finding that Defendants attempted to conceal evidence allows the district court to fairly infer that Defendants had knowledge that their staff were engaging in activities that were objectively dangerous. Furthermore, the spoliation of evidence shows the abject failure of the supervisory systems in place at DWCC and the DPS&C to detect missed pill passes, failure of mental health staff to conduct regular rounds on the tiers, or actions by staff that fall outside a penological interest. Lastly, deletion of video, failure to preserve video, and the shambles of Defendants' records all strongly indicate that DWCC staff and administration have a pattern and practice of disregarding policies and procedures, making such a negative inference imminently fair and related to the lost material.

In the alternative, the remedy of a Motion *in Limine* precluding the presentation of evidence arguing that Defendants conducted pill pass and mental health rounds more often than is reflected in their own log books and eMARs would be fair. Defendants must bear the burden of their own failure to preserve video evidence. Video evidence would have allowed Defendants to show that they perform pill pass, make rounds, and generally manage the tiers in accordance with their own policy. In the absence of those records, Plaintiffs are left only with Defendants' self-reported data. Basic fairness requires that Defendants be precluded from attempting to extrinsically demonstrate that they performed pill pass and rounds more often than their own tier logs reflect.

    c. *Relatedness of the Sanction to the Spoliated Evidence*

The argument around fairness of the sanction is necessarily intertwined with the analysis of the relationship between the evidence lost and the spoliation. The video evidence showing only

two pill passes was recovered for only one tier, N3A. From the deletion of the other tier cameras on that day, this Court may fairly infer that this violation was widespread. Defendants' intentional actions to dismantle the recording systems in place that captured the tier camera footage immediately following a preservation request by Plaintiffs strongly suggests that Defendants were aware of the problems surrounding DWCC staff failing to follow policy and procedure. Plaintiffs have endeavored to tailor the sanction as closely to the spoliation as possible.

The spoliation of video evidence has significantly prejudiced Plaintiffs by depriving Plaintiffs of an objective record with which to impeach or cross-examine Defendants. "Prejudice can range along a continuum from an inability to prove claims or defenses to little or no impact on the presentation of proof. A court's response to the loss of evidence depends on both the degree of culpability and the extent of prejudice." *Rimkus Consulting Grp., Inc. v. Cammarata,* 688 F. Supp. 2d 598, 613 (S.D. Tex. 2010). Here, the contradiction between Defendants' assertion that they regularly perform rounds and pill pass sits near the heart of the case. The loss of the only objective indicator of Defendants' actual presence or absence on the tiers inflicts great harm by constraining Plaintiffs' examination to only self-reported tier logs.

### d. *Deterrent Effect of the Sanction*

Defendants' conduct in both dismantling the recording system for the tier camera video but also the intentional deletion of previously recorded video undermines the basic truth-seeking function of the federal judiciary. The problematic practices at DWCC will require a solution. A finding that the prison has acted with subjective knowledge of a grave risk, failed to maintain adequate supervision, and violated its own policies reflects a robust response proportional to the problem.

In the alternative, a sanction precluding Defendants from attempting to rebut their own tier logs with evidence of further pill passes or mental health rounds may help to deter future misconduct though a finding that such actions fall within the ambit of Rule 37(e). Allowing Defendants to delete video without a serious consequence, such as this fact dispositive sanction, would promote further misconduct in the future.

## Conclusion

Plaintiffs respectfully request that the Court grant an adverse inference based on the spoliation of evidence by Defendants. Plaintiffs request that the court derive adverse inference regarding the practices and supervisory accountability for medication administration at DWCC, the lack of oversight and failure to conduct regular mental health rounds, and the intentional actions by staff that serve to punish or retaliate. In the alternative, Plaintiffs seek a Motion *in Limine* precluding Defendants from attempting to rebut their own tier logs by showing that they made unrecorded pill passes or mental health rounds.

Respectfully submitted this 19th day of November, 2021.

COUNSEL FOR PLAINTIFFS:

*Jonathan C. Trunnell*
Melanie Bray, La. Bar No. 37049
Jonathan C. Trunnell, La. Bar No. 36956
Ronald K. Lospennato, La. Bar No. 32191
Emma Lee Douglas, La. Bar No. 39076
Disability Rights Louisiana
*Formerly known as The Advocacy Center*
8325 Oak Street
New Orleans, LA 70118
504-708-1460
504-507-1956 (fax)
jtrunnell@disabilityrightsla.org

/s/ Katie M. Schwartzmann
Katie M. Schwartzmann, La. Bar No. 30295
*Cooperating Counsel for ACLU-F LA*

15

Tulane Law School
6329 Freret Street
New Orleans, La 70115
(504) 496-8566
kschwartzmann@tulane.edu

*/s/ Megan Snider*
Megan E. Snider, La. Bar No. 33382
Nora Ahmed\*, N.Y. Bar. No. 5092374
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
msnider@laaclu.org
nahmed@laaclu.org