UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself | * | CIVIL ACTION NO.: |
| and all other similarly situated prisoners | * | 5:18-CV-00541-EEF-MLH |
| at David Wade Correctional Center, | * | |
| | * | JUDGE ELIZABETH E. FOOTE |
| | * | |
| and | * | |
| The ADVOCACY CENTER, | * | |
| | * | USMJ MARK L. HORNSBY |
| PLAINTIFFS, | * | |
| | * | |
| VS. | * | CLASS ACTION |
| | * | |
| JAMES M. LEBLANC, *et al.*, | * | |
| | * | |
| DEFENDANTS. | * | |

**PLAINTIFFS' PRETRIAL SUMMARY OF CLAIMS AND EVIDENCE**

## **Table of Contents**

A.     THE NATURE OF THE ACTION .................................................................................... 6

B.   PARTIES ........................................................................................................................ 6

C.   CLAIMS AND EVIDENCE ........................................................................................... 7

I.     DEFENDANTS VIOLATE THE EIGHTH AMENDMENT TO THE CONSTITUTION BY SUBJECTING THE CLASS TO A SUBSTANTIAL RISK OF SERIOUS HARM ............................. 8

    A.     The Defendants' failure to provide adequate mental health care creates a substantial risk of harm. 11

    B.     Defendants do not appropriately provide treatment for mental illness, resulting in suffering and injury to the men at DWCC and creating a substantial risk of serious harm. ..................................... 13

    C.     Defendants' medication management practices are inadequate and create a substantial risk of serious harm. ........................................................................................................................ 15

    D.     Defendants' suicide watch policies create a substantial risk of serious harm. .......................... 17

    E.     Inadequate record keeping at DWCC creates a substantial risk of serious harm. .................... 19

    F.     Defendants' mental health staffing is inadequate such that it creates a substantial risk of serious harm. 21

    G.     Defendants security practices create a substantial risk of serious harm. .................................. 21

    H.     The stark conditions of confinement at DWCC create a substantial risk of serious harm. ....... 23

II.     DEFENDANTS HAVE SUBJECTIVE KNOWLEDGE OF THEIR POLICIES AND PRACTICES, THEIR DEFICIENCIES, AND THE SERIOUS RISK OF HARM .............................. 26

III.     DEFENDANTS VIOLATE THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT. .................................................................................. 27

    A.     DWCC fails in the affirmative duty to identify people with disabilities. ................................. 27

      i)     Defendants' definition of disability is under-inclusive. ................................................. 28

      ii)     Defendants fail to identify and track people with chronic mental health disabilities. .......... 29

    B.     Defendants provide no affirmative modifications for people identified as having serious mental illness. .............................................................................................................................. 30

      i)     DWCC houses people known to have mental health disabilities. .......................................... 30

      ii)     Defendants fail to provide treatment and an appropriate setting at DWCC that are available at defendants' other facilities. ..................................................................................... 31

      iii)     DWCC discriminates against people with disabilities by restricting access to necessary care in an appropriate setting based on disability. ....................................................................... 31

    C.     DWCC fails to provide a process for requesting reasonable accommodations. ........................ 33

    D.     DWCC applies brutal discipline against people with mental illness for behaviors related to their disability. ............................................................................................................................ 34

IV.     DEFENDANTS' CONDUCT VIOLATES THE FIRST AMENDMENT TO THE CONSTITUTION.................................................................................................................... 35

    A.     Protecting the sanctity of legal mail is of particular significance in this case. .......................... 35

    B.     The First Amendment legal framework. ..................................................................... 37

    C.     Defendants systematically interfered with mail sent by prisoners to their counsel in violation of the First Amendment to the Constitution. (Outgoing Mail). ................................................................ 38

    D.     Defendants interfered with Plaintiffs' First Amendment rights by systematically censoring mail sent by attorneys to prisoners at DWCC. (Incoming Mail). ................................................................ 40

    E.     Defendants otherwise attempted to interfere with communication with counsel. ...................... 42

## Table of Authorities

**Cases**

*Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 933106, at *3 (N.D. Cal. Mar. 11, 2021) ........ 34

*Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1192 (M.D. Ala. 2017) ......................................................... 11

*Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir. 1993) .................................................................... 38

*Brooklyn Cntr for Independence of the Disabled v. Bloomberg*, 980F. Supp.2d 588, 640 (S.D.N.Y. 2013)
.................................................................................................................................................... 28

*Burt v. Carlson*, 752 F. Supp. 346, 348 (C.D.Cal. 1990) ................................................................ 37

*Burton v. Foltz*, 599 F.Supp. 114, 117 (E.D.Mich. 1984) ............................................................... 37

*Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003) .................................................................... 8

*Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004). ............................................................ 8

*Davidson v. Scully*, 694 F.2d 50, 53 (2d Cir. 1982) ...................................................................... 39

*Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) ........................................................................ 37

*Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000) .................................................................... 38

*Dunn v. Dunn*, 318 F.R.D. 652, 665 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn,* No.
2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020). .................................................. 33

*Every v. Jindal*, 413 Fed.Appx. 725, 727 (5th Cir. 2011) .......................................................... 38, 39

*Ex parte Hull*, 312 U.S. 546, 549 (1941) .................................................................................... 35

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994). ........................................................................ 8, 26

*Faulkner v. McLocklin*, 727 F. Supp. 486, 489–92 (N.D.Ind. 1989)............................................... 37

*Gates v. Cook*, 376 F.3d 323, 343 (5th Cir. 2004) ............................................................... 8, 9, 10

*Guyer v. Beard*, 907 F.2d 1424, 1428–29 (3d Cir. 1990) ............................................................... 38

*Hayes v. Idaho Correctional Center*, 849 F.3d 1204, 1213 (9th Cir. 2017) ....................................... 40

*Helling v. McKinney,* 509 U.S. 25, 33 (1993). .............................................................................. 8

*Hinderliter v. Hungerford*, 814 F. Supp. 66, 68 (D.Kan. 1993) ...................................................... 37

*Hudson v. McMillian*, 503 U.S. 1, 4 (1992) ................................................................................. 10

*Hutto v. Finney,* 437 U.S. 678, 686–872 (1978)........................................................................... 10

*Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 131 (1977)............................................... 42

*Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002) .................................................................. 40

*Kemp v. Holder*, 610 F.3d 231, 236 (5th Cir. 2010) ..................................................................... 29

*Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000) .............................................. 10

*Lemon v. Dugger*, 931 F.2d 1465, 1467–68 (11th Cir. 1991) ......................................................... 37

*Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *55 (M.D. La. Mar. 31, 2021) ...................... 34

*Madrid v. Gomez,* 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995)................................................... 11

*Mawby v. Ambroyer*, 568 F.Supp. 245, 249–50 (E.D.Mich. 1983) .................................................. 39

*McChriston v. Duckworth*, 610 F. Supp. 791, 795–96 (N.D.Ind. 1985) ........................................... 38

*Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir. 1987) .................................................... 8, 10

*Merriweather v. Zamora*, 569 F.3d 307, 316–17 (6th Cir. 2009) .................................................... 37

*Mitchell v. Peoples*, 10 F.4th 1226,  1230–31 (11th Cir. 2021)............................................ 37, 38, 40

*Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182, 1187 (5th Cir. 1986). ............... 8

*Pell v. Procunier*, 417 U.S. 817, 828 (1974)............................................................................... 41

*Pierce v. District of Columbia*, 128 F.Supp.3d 250, 272 (D.D.C. 2015). ..................................... 28, 30

*Proudfoot v. Williams*, 803 F.Supp. 1048, 1052 (E.D.Pa. 1992) ........................................................ 37

*Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ........................................................................ 10

*Reneer v. Sewell*, 975 F.2d 258, 260 (6th Cir. 1992) ........................................................................ 37

*Rhodes v. Chapman,* 452 U.S. 337, 347 (1981)............................................................................... 8, 9

*Royse v. Superior Court of State of Washington*, 779 F.2d 573, 574–75 (9th Cir. 1985)....................... 37

*Ruiz v. Johnson,* 37 F.Supp.2d 855, 914 (S.D.Tex.1999), *rev'd on other grounds,* 243 F.3d 941 (5th
    Cir.2001), *adhered to on remand,* 154 F. Supp. 2d 975 (S.D. Tex. 2001).................................... 8, 9

*Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003) ........................................................................ 37

*Smith v. Shimp*, 562 F.2d 423, 424 (7th Cir. 1977)........................................................................... 39

*Stone-El v. Fairman*, 785 F. Supp. 711, 715 (N.D.Ill. 1991) ............................................................. 38

*Thornburgh v. Abbott*, 490 U.S. 401, 411–13 (1989)........................................................................ 39

*Turner v. Safley*, 482 U.S. 78, 90 (1987) ................................................................................... 41, 42

*U.S. v. DeFonte*, 441 F.3d 92, 95–96 (2d Cir. 2006) ........................................................................ 37

*Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007).................................................. 9, 10

*Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977) ......................................................... 10

*Williams v. Price*, 25 F. Supp. 2d 623, 629 – 30 (W.D.Pa. 1998)...................................................... 38

*Wilson v. Blankenship*, 163 F.3d 1284, 1290–91 (11th Cir. 1998.................................................... 38

*Wilson v. Seiter*, 501 U.S. 294, 305 (1991)........................................................................................ 9

*Witherow v. Paff*, 52 F.3d 264, 265–66 (7th Cir. 1995); *Royse*, 779 F.2d at 574–75 ........................... 39

*Wolff v. McDonnell*, 418 U.S. 539, 577 (1974) .......................................................................... 37, 40

*Young v. Keohane*, 809 F.Supp. 1185, 1197 (M.D.Pa. 1992)............................................................. 37

## Statutes

29 U.S.C. § 794................................................................................................................................ 6

42 U.S.C. § 12131 ........................................................................................................................... 6

42 U.S.C. §1983................................................................................................................................ 6

## Regulations

28 C.F.R. § 35.106 .......................................................................................................................... 33

28 C.F.R. § 35.130 .......................................................................................................................... 33

28 C.F.R. § 35.152(b)(2) ................................................................................................................. 31

28 C.F.R. § 35.163 .......................................................................................................................... 33

## A.  THE NATURE OF THE ACTION

1.   This is an action for injunctive and declaratory relief to remedy the constitutionally inadequate conditions of confinement and mental health care at David Wade Correctional Center in Homer, Louisiana as well as unconstitutional interference with legal communications.

## B.  PARTIES

2.   The parties and their legal relationships are as follows:

### PLAINTIFFS

3.   Plaintiff ADVOCACY CENTER is a private, federally-funded, non-profit corporation, designated by Louisiana to serve as the State's protection and advocacy system for persons with mental illness;

4.   Plaintiff BRUCE CHARLES was a prisoner housed in extended lockdown at DWCC at the time of filing;

5.   Plaintiff CARLTON TURNER was a prisoner housed in extended lockdown at DWCC at the time of filing;

6.   Plaintiff LARRY JONES was a prisoner housed in extended lockdown at DWCC at the time of filing;

7.   Plaintiff RONALD BROOKS was a prisoner housed in extended lockdown at DWCC at the time of filing;

8.   Plaintiffs bring this action under 42 U.S.C. §1983, for violations of the First and Eighth Amendments to the United States Constitution on behalf of all prisoners currently held, or who will in the future be held, in extended lockdown at DWCC in the N-1, N-2, N-3, and N-4 buildings;

9.     Plaintiffs also bring this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*.; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.

DEFENDANTS

10.     Defendant James LeBlanc in his official capacity as the Secretary of the Louisiana Department of Public Safety and Corrections ("DPS&C"); and,

11.     Defendant Jerry Goodwin in his official capacity as the Warden over David Wade Correctional Center; and,

12.     Defendant Lonnie Nail in his official capacity as a Colonel overseeing the South Compound at DWCC; and,

13.     Defendant Doctor Gregory Seal, M.D. in his official capacity as a contract psychiatrist at DWCC; and,

14.     Defendant Assistant Warden Deborah Dauzat in her official capacity as the Mental Health Director at DWCC; and,

15.     Defendant Steve Hayden in his official capacity as a Corrections Program Manager at DWCC; and,

16.     Defendant Aerial Robinson in her official capacity as a Social Services Counselor at DWCC; and,

17.     Defendant Johnie Adkins in his capacity as a Social Services Counselor at DWCC; and,

18.     The Department of Public Safety and Corrections ("DPS&C") pursuant to the ADA and Section 504 of the Rehabilitation Act only.

C.   CLAIMS AND EVIDENCE

I. **DEFENDANTS VIOLATE THE EIGHTH AMENDMENT TO THE CONSTITUTION BY SUBJECTING THE CLASS TO A SUBSTANTIAL RISK OF SERIOUS HARM**

19.     To determine if prison conditions satisfy the Eighth Amendment's objective component "[t]he deprivation alleged must be, objectively, sufficiently serious.... [T]he inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).

20.     Additionally, the Eighth Amendment requires that "inmates are furnished with the basic human needs, one of which is reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 33 (1993).

21.     Courts ask whether the conditions are contrary to "the evolving standards of decency that mark the progress of a maturing society," *Farmer,* 511 U.S. at 833–34, or whether the incarcerated person has been denied "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981).

22.     These standards are not static. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).

23.     The Eighth Amendment not only protects against risk of harm to prisoners' physical health, but also protects mental health care as a basic human need of which incarcerated people cannot be deprived. *See, e.g., Calhoun v. DeTella,* 319 F.3d 936, 940 (7th Cir. 2003); *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir. 1987); *Gates v. Cook,* 376 F.3d 323, 343 (5th Cir. 2004), *citing Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182, 1187 (5th Cir. 1986).

24.     "The same standards that protect against physical torture prohibit mental torture as well— including the mental torture of excessive deprivation." *Ruiz v. Johnson,* 37 F.Supp.2d 855, 914 (S.D.Tex.1999), *rev'd on other grounds,* 243 F.3d 941 (5th Cir.2001), *adhered to on remand,* 154 F. Supp. 2d 975 (S.D. Tex. 2001).

25.     The *Ruiz* court, finding that prisoners had been subjected to "a systemic pattern of extreme social isolation and reduced environmental stimulation," described the evolving standards of decency recognizing psychological pain as follows:

> In the past, courts faced with horrendous conditions of confinement have focused on the basic components of physical sustenance—food, shelter, and medical care. *See Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). More recently, in light of the maturation of our society's understanding of the very real psychological needs of human beings, courts have recognized the inhumanity of institutionally-imposed psychological pain and suffering. As the Third Circuit stated, "[t]he touchstone is the health of the inmate. While the prison administration may punish, it may not do so in a manner that threatens the physical and *mental health* of prisoners." *Young,* 960 F.2d at 364 (emphasis added).

> *Ruiz,* 37 F. Supp. 2d at 914.

26.     Like mental health care, social interaction and environmental stimulation are basic human needs. *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007); *citing Ruiz,* 37 F. Supp. 2d at 855, *Rhodes,* 452 U.S. at 346.

27.     "Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .". *Gates*, 376 F.3d at 333.

28.     Although certain conditions standing alone might not rise to the level of a constitutional violation, a combination of conditions having a "mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth or exercise—for example, a low cell temperature at night combined with a failure to issue blankets," may state a claim under the Eighth Amendment. *Wilkerson,* 639 F. Supp. 2d at 679; *citing Wilson v. Seiter*, 501 U.S. 294, 305 (1991).

29.     Both the Supreme Court and the Fifth Circuit have recognized that certain conditions that would pass constitutional scrutiny if imposed for a short period of time may be rendered unconstitutional if imposed for an extended period of time. *Wilkerson*, 639 F. Supp. 2d at 679, *citing Gates,* 376 F.3d at 333, *Hutto v. Finney,* 437 U.S. 678, 686–872 (1978), *see also Meriwether,* 821 F.2d at 416 ("[T]he duration of a prisoner's confinement in administrative segregation or under lockdown restrictions is certainly an important factor in evaluating whether the totality of the conditions of confinement constitute cruel and unusual punishment.").

30.     In class actions challenging systemic health care deficiencies, a risk of harm to people's health needs may be shown by proving "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff," or by proving there are such "systemic and gross deficiencies in staffing, facilities, equipment, or procedures" such that the inmate population is effectively denied access to adequate medical care. *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted); *Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977); *Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000).

31.     The test is whether a cognizable <u>risk</u> of harm exists, not whether the consequences of that risk have manifested as harm; the goal of the courts is to prevent harm where such a risk exists. *See Gates*, 376 F.3d at 341 (emphasis added) (holding that an Eighth Amendment plaintiff did not have to prove that he was actually injured by exposure to raw sewage, only that such exposure posed a serious health risk), *Hudson v. McMillian*, 503 U.S. 1, 4 (1992) (holding that excessive physical force against a prisoner can constitute cruel and unusual punishment even if the prisoner does not suffer serious injury).

32.     The risk associated with placing people in lockdown conditions of the severity of those implemented at David Wade has been widely recognized as unconstitutional by courts. *Madrid v.*

*Gomez,* 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995) (internal citations omitted), *Braggs v. Dunn,* 257 F. Supp. 3d 1171, 1192 (M.D. Ala. 2017) (finding mental health programs offered in restrictive housing by the Alabama Department of Corrections unconstitutional under the Eighth Amendment).

### A. The Defendants' failure to provide adequate mental health care creates a substantial risk of harm.

33.     Defendants' failure to appropriately identify or diagnose mental illness, inadequate medication administration practices, harsh conditions of confinement, substandard suicide watch conditions, and security practices all combine to create a substantial risk of serious harm.

34.     It is anticipated that classification and security staff will provide testimony that all people who are transferred to DWCC are housed in lockdown for a period of time prior to being moved to general population.

35.     Plaintiffs will show through the testimony and medical and mental health records of prisoners at DWCC that individuals housed on extended lockdown at DWCC have disabilities due to mental illness, which interfere with their major life activities as defined by the Americans with Disabilities Act.

36.     Staff at DWCC are expected to testify that the intake screenings performed by the Defendants are inadequate, and are not reviewed by a licensed mental health care professional.

37.     Plaintiffs' also will enter into evidence the intake screenings performed by staff at DWCC.

38.     Prisoner records show that the Defendants rely heavily on information that is gathered at EHCC's reception and diagnostic center (HRDC), even if a prisoner has not been transferred directly from EHCC, and even if their initial assessment was done some time ago.

39.     Defendants and staff of the named Defendants are expected to testify that when an individual is placed on extended lockdown for a disciplinary reason, Defendants do not conduct a

review of records to identify whether the person has a mental health diagnosis that would require treatment or care inconsistent with the extreme isolation of solitary confinement or extended lockdown.

40.     Documentary evidence will show that if screening mechanisms are conducted before placement on extended lockdown, Defendants disregard the information available in the individual's mental health records.

41.     Defendants' mental health intake screenings themselves, and testimony from the staff, will show that their intake procedures are inadequate to detect major changes in a person's mental health, which is especially dangerous when the person's HRDC intake screening is old.

42.     This results in mental health intake screenings failing protect people with mental illness from the harmful effects of placement on extended lockdown.

43.     Documentary evidence and testimony will show that people known to the Defendants to have serious mental illnesses (SMI), including extensive histories of suicidal ideation and behavior, are routinely placed on extended lockdown at DWCC.

44.     The absence of observation and monitoring of individuals on extended lockdown means that psychiatric decompensation goes unnoticed, as does the onset of new symptoms. This is evidenced by extensive indications of decompensation in prisoners' medical and mental health records, their master prison records, and their anticipated testimony.

45.     Plaintiffs' experts will testify that Defendants fail to identify people with serious mental illness and consistently understate the severity of mental illness where it is identified.

46.     Plaintiffs' experts will testify and documentary evidence will show that even when an individual with mental illness is identified, every person receives the same treatment plan, which does not actually provide for treatment.

47.     Plaintiffs' experts will testify that Defendants do not provide appropriate treatment for those suffering from mental illness. This results in a substantial risk of serious harm in the form of increased suffering, injury and the possibility of lethality for the Plaintiff class members.

48.     The expert testimony of the Plaintiffs will show that medication management, on its own, is not adequate mental health care. The failure to supplement medication management with other forms of mental health care creates a substantial risk of harm to patients.

49.     Plaintiffs' experts will testify that in order to meet adequate care, in addition to offering medication and medication management, a mental health program must also contain treatment options such as group counseling, individual counseling, and programming to assist patients in managing the symptoms of mental illness.

### B.  Defendants do not appropriately provide treatment for mental illness, resulting in suffering and injury to the men at DWCC and creating a substantial risk of serious harm.

50.     Testimony will show that people on extended lockdown receive virtually no treatment for mental illness.

51.     Policy documents and testimony will show that there is no individual counseling, group therapy, or support group available for people on extended lockdown, regardless of an individual's diagnosis or response to medication.

52.     Testimony and documentary evidence will show that people on lockdown in DWCC only have contact with a contracting psychiatrist, Defendant Seal, every three months, and that:

53.     People are unable to otherwise request visits with Defendant Seal.

54.     Visits with the psychiatrist last approximately 3-5 minutes according to testimony.

55.     A security officer is present in the room at every psychiatrist visit, and thus, if the patient wants to seek mental health care related to treatment by security staff, there is no confidentiality or privacy.

56.     Visits with the psychiatrist lack indicia of either diagnostic or psychotherapeutic purpose due to their short duration, infrequency, and lack of confidentiality.

57.     Defendant Seal is expected to testify that he never prescribes counseling, group therapy, or any intervention other than medication management.

58.     Defendant Seal is retained by DWCC only to provide medication management visits to people.

59.     Experts will testify that the mental health staffing at DWCC is inadequate to provide a minimum of care.

60.     In the event that a person does not receive a prescription for any medication from Defendant Seal, that individual receives no mental health treatment or plan whatsoever.

61.     The Defendants' treatment plan template indicates that a mechanism for achievement should be coded beside each short-term goal, identifying how Defendants will help the individual to achieve each identified goal. No treatment method codes are ever displayed and there is never any narrative explanation of a treatment method.

62.     The plans themselves show that they are also completely devoid of any required actions on the part of DWCC to provide any monitoring, counseling, or therapy, regardless of any patient's medical history, diagnosis, or circumstances.

63.     The treatment methods in the treatment plans for everyone on extended lockdown are absent. Each form cryptically states: "Treatment Methods: on-going."

64.     Defendants' treatment plans will show that Defendant Steve Hayden signed all mental health treatment plans for the named Plaintiffs identifying himself as a "therapist."

65.     Mr. Hayden is not licensed by the State of Louisiana to provide mental health care in any capacity.

### C. Defendants' medication management practices are inadequate and create a substantial risk of serious harm.

66.     The Plaintiffs will present testimony and documentary evidence showing that only medication management is provided for individuals who are prescribed medicine and on the mental health case load.

67.     In addition, the Plaintiffs will show through the records of the Defendants, the testimony of the experts, DWCC staff, and Plaintiff class members that the system for medication distribution at DWCC is insufficient and leaves class members at serious risk of harm.

68.     Some Plaintiff class members are deprived of their medication when they arrive at DWCC and their medication is discontinued. Testimony from the staff at DWCC and Plaintiff class members will show that some class members who arrive at David Wade are taken off of mental health medication that has long been a part of their treatment plan.

69.     Documentary evidence and testimony from Plaintiff class members and staff at DWCC will show that other Plaintiff class members are deprived of their medication because of the improper medication administration practices at David Wade.

70.     This deprivation includes instances of Defendants discontinuing the medications that were being prescribed and administered in the facilities where the individuals were confined immediately prior to the transfer.

71.     As a result of the discontinuation of medication upon arrival to DWCC, a person often waits weeks without necessary medication, until he meets with Defendant Seal, receives a new prescription, and is integrated into the medication distribution rotation.

72.     Documentary evidence will show that individuals who refuse medications are diagnosed as "in remission" despite a lack of review by a psychiatrist to determine whether the change in diagnosis is appropriate.

73.     Through testimony of the staff that administers medication and the Medication Administration Records (MARs) Plaintiffs will show gaping holes in the distribution of medication to Plaintiff class members.

74.     Plaintiffs' experts will testify that these days and sometimes weeks without mental health medication can cause the Plaintiff class members' mental illnesses to worsen and for them to decompensate.

75.     The failure to provide even the bare minimum of mental health treatment in the form of medication leaves class members unnecessarily cycling on and off psychotropic medications, and doing so without any safety net of other care or counseling.

76.     The evidence will show that pill call officers who administer medications to prisoners on extended lockdown are security staff who have received training to pass out medications.

77.     Defendant Seal's clinical notes are often inconsistent with the medication distribution notes, as will be demonstrated through testimony and documentary evidence.

78.     Testimony will show that missed doses of medication do not prompt any notification to a psychiatrist or medical staff, despite possible mental and physical side effects of suddenly discontinuing psychotropic medications.

79.    Medication distribution documentation improperly and inconsistently note instances of refused medication, including psychotropic medication.

80.    Documentary evidence will show that medications are marked as having been administered to people who are not physically present in the facility.

81.    Medication administration documentation for the quantity of medication administered does not match the medication refill ordering information.

82.    Medication administration records show no doses administered for days at a time across the extended lockdown tiers.

83.    Plaintiffs' experts will testify that Defendants' medication administration and record keeping reflects a breakdown in supervision, training, and accountability in the handling of medications. This failure places the patients on extended lockdown at risk.

84.    Extensive testimony from Plaintiff class members, Plaintiffs' experts, and documentary evidence will show that Defendants do not respond to decompensation or mental health crisis, creating a substantial risk of serious harm.

### D. Defendants' suicide watch policies create a substantial risk of serious harm.

85.    When the lack of mental health treatment causes some class members to decompensate, display self-injurious behavior, or to become suicidal the only remedy provided by Defendants are the stark conditions of suicide watch.

86.    Testimony from Plaintiff class members and Plaintiff experts will explain that if a person on lockdown requests mental health care, he will usually be placed on suicide watch.

87.    Defendants' own policies will show that the two forms of suicide watch at David Wade each include a stripped-down cell in which class members are left with no mattress, no clothing except for a paper gown, and no personal items for 24 hours a day.

88.     During a person's time on suicide watch there is no additional mental health counseling provided. Plaintiffs will show that the only mental health follow up provided for class members is performed 7 days after they are released from suicide watch.

89.     Testimony and documentary evidence will show that DWCC staff sometimes restrain individuals in a restraint chair, used for extreme suicide watch for days at a time, and often use the chair rather than providing actual mental health care.

90.     Plaintiff class member testimony and prisoner records will show DWCC staff engage in targeted punishment of suicidal people.

91.     Per their own policy Defendants refuse to allow people on suicide watch to visit with relatives or use the telephone to access any source of outside emotional support.

92.     Testimony from DWCC staff members will show that although the facility possesses suicide resistant mattresses, those mattresses are often not given to people on suicide watch, who must stand and sleep on the concrete without clothing and shoes.

93.      In the winter, the cells can be extremely cold.

94.     The testimony will show that staff open windows near the suicide watch cells to make conditions even colder.

95.     When on suicide watch individuals do not have shoes or mattresses, so people must stand barefoot on concrete in a small paper gown.

96.     Plaintiff experts will opine that the conditions and practices regarding suicide watch work together to deter people from reporting mental health emergencies, create a substantial risk of harm and deprive people of life's basic necessities.

97.     In concert with the lack of general mental health screening and treatment by qualified staff, Defendants use isolation and suicide watch as a response to any urgent request for mental health services, even if the request does not express suicidal ideation or threats of self-harm.

98.     Staff testimony, Plaintiff class member testimony, and documentary evidence will demonstrate that staff visits to people being held on suicide watch are purely to determine whether the individual remains a threat to himself.

99.     The conversations between staff and an individual on suicide watch are at cell-front, short and do not include any attempt to ascertain whether the individual is suffering from worsening mental illness or is experiencing a crisis manifestation of a chronic mental illness.

100.    When a person is on suicide watch the underlying mental illness causing the self-harm risk is not addressed, because of the complete lack of other mental health treatment and screening.

101.    As evidenced by the Defendants' own records, the lack of mental health care at DWCC often results in people returning to suicide watch multiple times.

102.    Plaintiffs' experts will testify that the harsh conditions of suicide watch and lack of treatment trigger psychiatric deterioration and decompensation of individuals.

103.    The testimony will show that if a person refuses suicide watch and requests other care, he may face a disciplinary charge of malingering.

104.    Plaintiffs' experts will testify that the stark conditions of suicide watch create a substantial risk of serious harm.

105.    Plaintiffs' experts will testify that the conditions of suicide watch at David Wade do not meet a penological interest.

### E.  Inadequate record keeping at DWCC creates a substantial risk of serious harm.

106.    The record-keeping practices at DWCC are unreliable and dangerous, as evidenced by the records themselves. Diagnoses shift without explanation and Defendants discontinue or alter drug regimens with little or no paper trail.

107.    The documentation of segregation interviews show that they are cursory and diagnostically unhelpful.

108.    The documentation produced as a result of a routine segregation interview will nearly universally indicate that the individual is "within normal limits" in all areas, even for people with serious mental health diagnoses, which indicates a failure to conduct a comprehensive segregation interview.

109.    The documentation will show that these interviews typcially note that the individual engaged in minimal conversation, which indicates a failure to conduct a comprehensive segregation interview.

110.    Even when patients have requested mental health care or are presently on suicide watch, segregation interviews fail to document these concerns.

111.    These records do not include adequate detail to understand the status of the patient.

112.    This results in the signs and symptoms of serious mental illness remaining unidentified or untreated and people experiencing crisis manifestations of mental illness are not detected before the person is a significant risk to himself or others.

113.    The testimony will show that Defendants do not conduct screenings or make mental health resources available to people with a pattern of suicidal ideation, even in the face of repeated mental health crises.

114.    Documentary evidence and testimony will show that manifestations of illness that fall short of self-harm or suicidal ideation are treated as disciplinary violations and produce no mental health treatment or follow-up.

115.    Mental health staff at DWCC frequently make decisions that are inconsistent with individual health concerns that are clearly apparent in their own records.

### F. Defendants' mental health staffing is inadequate such that it creates a substantial risk of serious harm.

116.    Defendants' own records show that Defendant Steve Hayden is not licensed to provide mental health care, yet he makes most day-to-day decisions about care.

117.    The evidence and testimony will show that when Defendant Hayden does walk-through the extended lockdown facilities, he does not provide any counseling services or individualized care.

118.    The documentary evidence will show that Asst. Warden Dauzat authorizes care and treatment for individuals on extended lockdown without having ever seen her putative patients.

119.    Dr. Seal's contract, his testimony and his treatment records will show that he is present at the prison for an anemic number of hours to treat the number of Plaintiff class members held in extended lockdown.

### G. Defendants security practices create a substantial risk of serious harm.

120.    Defendants' own policies will show that they employ disciplinary practices that are outside the formal structures of discipline for the prison.

121.    One such example is Policy 34, which is independent of any formal disciplinary sentence.

122.    Policy 34, according to the text of the policy, is deployed at staff discretion with no due process protections or hearings. The absence of any procedural safeguards allows a staff member

who becomes upset with an individual to simply put the individual on Policy 34 without any showing that the person has violated any institutional rules.

123.    On Policy 34, according to the policy itself, people are not allowed a mattress outside of the hours of 9pm to 5am.

124.    Testimony will show that mattresses are frequently not returned timely or at all.

125.    Testimony and documentary evidence will also show that people will be housed on Policy 34 Strip Cell for thirty days or more, at the whim of the ranking correctional officers.

126.    The foregoing evidence shows that Policy 34 status is strictly punitive.

127.    The text of Policy 34 shows that is not imposed through DWCC's disciplinary process. It is imposed directly by staff.

128.    Policy 34 is devoid of language that would subject a decision made under the policy to appeals or other processes associated with other disciplinary sanctions.

129.    Policies from the prison and testimony show that prior to the adoption of the pilot disciplinary matrix in December 2019, DWCC would impose a disciplinary penalty called "isolation" in which a person is not allowed a jumpsuit, mattress, or other personal property. This penalty was imposed in 10-day increments.

130.    Classification documents and DWCC policy show that the classification of "extended lockdown" at DWCC is imposed until the person is reclassified as medium custody and recommended for movement to general population by the classification review board.

131.    A person whose custody status is being reviewed by the classification review board is not present for the classification review board meeting, as will be shown via prison policies and testimony.

132.   Testimony and documentary evidence will show that people held in preventative segregation are housed in the same conditions as are people held on disciplinary segregation.

133.   The same evidence shows that people held in preventative segregation are afforded the same privileges as are people held on disciplinary segregation.

134.   Per DWCC policy people held in preventative segregation are housed in their cell for 23 hours per day.

135.   Also, per DWCC policy, people held in preventative segregation are held in preventative segregation until they are reclassified as medium custody by the classification board.

136.   DWCC policy and records confirm that there is no maximum time limit on a person's placement in extended lockdown.

137.   The same evidence shows that there is no maximum time limit for which a person can be held in preventative segregation.

138.   Testimony from DWCC staff, Plaintiff class members, and the prisons own policies make it clear that all people on extended lockdown are held in the same conditions of confinement.

139.   All people on extended lockdown are held in the same conditions, regardless of individual mental health disabilities.

140.   The evidence will show that Defendants respond to yelling, cursing, refusing to move, and other behavior potentially diagnostic of untreated mental illness as a disciplinary matter rather than a mental health symptom.

### H. The stark conditions of confinement at DWCC create a substantial risk of serious harm.

141.   Prison documents and anticipated testimony from prison staff will show that there is no designated mental health unit or tier at David Wade Correctional Center.

142.     Policy dictates that, and testimony will confirm that people on extended lockdown are allowed one ten-minute phone call per month.

143.     The one 10-minute phone call per month for individuals on extended lockdown is not at a regularly scheduled time and thus there is no way to plan for a family member to be available for the phone call.

144.     Anticipated testimony will explain how staff may refuse an individual's phone call without giving any reason.

145.     Anticipated testimony will describe how staff will often refuse to allow a person to make a phone call as retaliation against the individual requesting the call.

146.     The restrictive nature of the housing arrangements on extended lockdown mean that individuals on extended lockdown are unable to make attorney phone calls without first getting permission from a security officer.

147.     Per prison policy, there are no televisions on the tiers in the N2, N3 or N4 buildings and prisoners are not permitted access to radios or other music or sound producing devices on the tiers in the N2, N3, or N4 buildings.

148.     People who are not literate or who have become incapable of reading due to mental illness have nothing to occupy their minds on extended lockdown.

149.     Plaintiffs' Expert will testify that this lack of mental stimulation creates a substantial risk of serious harm for Plaintiff class members.

150.     Additionally, prisoners housed in the N2, N3, or N4 buildings are permitted very limited access to the canteen/commissary.

151.     Testimony and master prison records will show that many people are on yard restriction for months or years on end.

152.     Testimony will show that staff barter additional food in exchange for people waiving their shower time, do not wake people who are sleeping for their showers, or simply ignore people and record the shower as having been waived.

153.     Interactions between individuals on the tiers are forbidden by the written policy of DWCC, and they may receive a disciplinary write-up for attempting to communicate with one another.

154.     The culmination of these policies and the method of implementation means that people on extended lockdown, especially those in solitary confinement, are allowed very little human contact.

155.     According to prison records, most of the individuals serving disciplinary time on the lockdown units have been diagnosed with one or more mental illnesses.

156.     The testimony will show that due to the lack of human contact and uncontrolled mental illness, many individuals will scream, laugh, and talk to themselves. Others rock in place or deteriorate to more severe manifestations of their conditions, such as smearing blood or feces.

157.     Plaintiffs' experts will testify that individuals who suffer a major psychiatric episode frequently lose the ability to take care of themselves for the duration of such an episode.

158.     When a person in extended lockdown is unable to care for himself, he may go weeks or months without a shower.

159.     According to the anticipated testimony of Plaintiffs' experts, the extreme isolation, deprivation of stimuli, severe punishments, and acts of torture all work to create a significant risk of harm to the mental health of the people housed at DWCC.

160.     Plaintiffs' experts will ultimately testify that the conditions of confinement at DWCC can cause mental illness. The conditions of solitary confinement and extended lockdown at DWCC are

not merely abusive or psychologically painful, they cause the onset or major deterioration of Plaintiffs' mental illnesses.

## II. DEFENDANTS HAVE SUBJECTIVE KNOWLEDGE OF THEIR POLICIES AND PRACTICES, THEIR DEFICIENCIES, AND THE SERIOUS RISK OF HARM

161.   The Defendants' own documents and anticipated testimony will demonstrate Defendants' knowledge of the risk of harm.

162.   The obviousness of the risks involved in keeping people with mental illness confined in extreme and austere conditions is also evidence of Defendants' subjective knowledge. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842.

163.   The testimony will show that the DPS&C approved the use on Policy 34 on people confined at DWCC.

164.   The testimony and documentary evidence will show that there is a culture of cover-up and excessive force at David Wade, including excessive use of chemical agents and force on people with serious mental illness.

165.   The evidence will show that Defendants do not require or make adequate reporting and do not enforce disciplinary policies; from the highest levels of the Department down to the prison unit level, there is a culture of no accountability.

166.   In sum, this culture is established and tolerated by each of the named Defendants to this litigation.

167.   The testimony and evidence will show that people reporting serious mental illness for themselves or others are threatened and receive serious disciplinary punishment, including Policy 34 and isolation.

168.    Testimony will show Defendants have warned several class members that their continued participation in the investigation of mental health conditions at DWCC would lead to retaliation. See also, First Amendment claim, below.

169.    The testimony will show that Defendants have offered promises of putting in a "good word" toward a transfer to another facility in exchange for individual cooperation to cease participating in the investigation. See also, First Amendment claim, below.

170.    The record clearly shows that two individuals have chosen to withdraw as Plaintiffs in this litigation. See also, First Amendment claim, below.

### III.    DEFENDANTS VIOLATE THE AMERICANS WITH DISABILITIES ACT AND SECTION 504 OF THE REHABILITATION ACT.

171.    Defendants violate the ADA and RA in the following ways: (1) DWCC fails in its affirmative duty to identify people with disabilities; (2) where DWCC does identify a person with a disability, DWCC does not make any reasonable modifications or accommodations for people with mental illness; (3) DWCC fails to track and act upon requests for reasonable accommodation made by people held on extended lockdown; (4) DWCC fails to make any reasonable accommodations to the disciplinary or use of force practices as they are applied to people with disabilities.

### *A. DWCC fails in the affirmative duty to identify people with disabilities.*

172.    DWCC has an affirmative duty to identify people with disabilities. "The term 'disability' means, with respect to an individual (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102.

173.    The analysis of whether an impairment substantially limits one or more major life activities necessarily requires an assessment of that individual's level of functioning.

174.    "The ADA seeks to prevent not only intentional discrimination against people with disabilities but also – indeed primarily – discrimination that results from 'thoughtlessness and indifference,' that is, from 'benign neglect.'" *Brooklyn Cntr for Independence of the Disabled v. Bloomberg*, 980F. Supp.2d 588, 640 (S.D.N.Y. 2013) (quoting, H.R.Rep. No. 101–485(II), at 29 (1990)).

175.    "[P]rison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody and to provide the accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation and without relying solely on the assumptions of prison officials regarding that individual's needs." *Pierce v. District of Columbia*, 128 F.Supp.3d 250, 272 (D.D.C. 2015).

176.    DWCC violates this affirmative duty in two ways: first, through an under-inclusive definition of disability and, second, by failing to identify and track people with chronic mental health disabilities.

*i)   Defendants' definition of disability is under-inclusive.*

177.    The ADA defines disability on the basis of functional impairment, not stereotypes based on diagnosis. *Pierce*, 128 F.Supp.3d at 272.

178.    The documentary evidence will show that DPSC tracks people with mental illness based only on its internal level of care system and an internal definition of "serious mental illness" or "SMI," which is based solely on diagnosis rather than functional impairment.

179.    Per DPS&C policy, the six enumerated conditions are: major depressive disorder, schizophrenia, schizoaffective disorder, bipolar disorder, unspecified schizophrenia spectrum, and severe anxiety disorder.

180.     Plaintiffs' experts will testify that by limiting the definition of SMI to only a list of six specific diagnoses and failing to independently track disability, Defendants under-identify people with disabilities by excluding people with mental illness whose symptoms cause a functional impairment but whose diagnosis is not included on the limited list of six SMI diagnoses.

181.     The Defendants have enshrined this under-inclusive definition in Department of Public Safety and Corrections policy, including the restrictive housing classification program implemented as of March 2020.

*ii)   Defendants fail to identify and track people with chronic mental health disabilities.*

182.     "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C.A. § 12102(4)(D) (West).

183.     "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 42 U.S.C.A. § 12102(4)(E)(i).

184.     Mitigating measures include "medication" and "learned behavioral or adaptive neurological modifications." 42 U.S.C.A. § 12102(4)(E)(i); *Kemp v. Holder*, 610 F.3d 231, 236 (5th Cir. 2010).

185.     Defendants remove the SMI tag from the mental health files for individuals who enter temporary remission in their mental illness according to testimony and documentary evidence.

186.     Expert testimony will show that it is the consensus of the ACA, National Commission on Correctional Healthcare, and American Psychiatric Association that people with mental health conditions, even in remission, should still be tracked and not be placed into restrictive housing, even while in remission.

**B. Defendants provide no affirmative modifications for people identified as having serious mental illness.**

187.    The documentary evidence and testimony will show that prisoners who are documented as having SMI are subject to the same harmful conditions of confinement as every other prisoner on extended lockdown at DWCC.

188.    The three elements of this prima facie case are that (1) individuals with disabilities (2) who are qualified participants in a program or service (3) are denied access to that program or service by virtue of their disability.

189.    Testimony and records will show that individuals with a mental health disability often have specific, disability related needs and vulnerabilities.

190.    Defendants fail to provide reasonable accommodations due to DWCC's failure to provide treatment and a setting appropriate to the needs of the individual according to testimony and documentary evidence.

    i)    *DWCC houses people known to have mental health disabilities.*

191.    The ADA does not permit an institution to ignore the open and obvious needs of a person with a disability simply because they have not requested a reasonable accommodation. *Pierce*, 128 F.Supp.3d at 272.

192.    The documentary evidence and testimony will show that even the people who Defendants identify as having SMI receive no reasonable modifications to the conditions at DWCC.

193.    The evidence will show that people at DWCC have serious needs, the Department is aware of those needs, and yet DWCC fails to offer reasonable accommodations to people who are experiencing psychotic episodes, suffering from dementia, or engaging in patterns of serious self-harm or suicide attempts.

ii) *Defendants fail to provide treatment and an appropriate setting at DWCC that are available at defendants' other facilities.*

194.   The prima facie case for disability discrimination requires that a person with a disability who is otherwise qualified to participate in a program may not be denied participation in that program due to disability.

195.   Under the ADA, "[p]ublic entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152(b)(2).

196.   Testimony and documentary evidence will show that the DPS&C and practices at DWCC render people with mental health disabilities on extended lockdown unable to access needed mental health care for which they are qualified recipients.

197.   The documentary evidence and testimony will show that services such as psychotherapy or other programming which provides the higher level of care necessary for individuals who are classified as maximum security with a mental health disability are unavailable at DWCC. That care is reasonable, practical, and available at other DPS&C institutions, such as EHCC.

198.   Because patients who are classified as maximum security may access that mental health care at EHCC, those patients are qualified participants in an existing DPS&C program. Testimony and documentary evidence will show that DWCC's refusal to allow individuals with disabilities access to that needed level of mental health care is discriminatory.

iii) *DWCC discriminates against people with disabilities by restricting access to necessary care in an appropriate setting based on disability.*

199.    DWCC itself not only bars maximum-custody people from most treatment, but also discriminates on the basis of disability when deciding whether to send a person to a different prison where treatment is available according to testimony and documentary evidence.

200.    It is anticipated that Dr. Seal will testify that he rarely recommends people for transfer out of DWCC, and then only if they meet his specific criteria.

201.    This testimony will show that the very narrow and specific set of criteria followed by Dr. Seal prevents people with disabilities, even those who have been identified as having SMI by the Defendants, from being able to access the care they need while in a maximum-security setting.

202.    The evidence will show that a decision to transfer individuals to EHCC is not driven by any specific mental health needs, or individualized evaluation of security concerns. This inconsistent practice deprives people with disabilities of access to care without and adequately individualized assessment of the person's needs.

203.    Plaintiffs' experts will testify that in addition to failing to provide needed care, Defendants expose people with disabilities to unique risks by keeping them in restrictive housing indefinitely.

204.    The evidence will show that Defendants fail to limit the duration of confinement on extended lockdown for individuals who have been documented as having SMI, or people with functional impairment.

205.    Plaintiffs' experts will testify at length regarding the dangers of this practice.

206.    Dr. Haney's testimony is expected to mirror his expert declaration which documents the extensive literature and scientific support for the proposition that extended lockdown is uniquely harmful for people with pre-existing mental illness.

207.     Plaintiffs experts will testify that the highly restrictive environment on extended lockdown at DWCC prevents people with mental illness from being able to access needed care and exposes people with mental illness to significant dangers.

208.     Plaintiffs' experts will testify that those dangers are manifested as repeated acts of serious self-harm, suicide attempts, mental deterioration, and serious behavioral problems.

### C. DWCC fails to provide a process for requesting reasonable accommodations.

*209.*     "[E]mploying no system or an inadequate system for prisoners to request accommodations and submit grievances regarding non-accommodation" is an unlawful method of administration under the ADA. *Dunn v. Dunn,* 318 F.R.D. 652, 665 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn,* No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020).

210.     Public entities are required to maintain a process for requesting reasonable accommodations. 28 C.F.R. § 35.163; *see also* 28 C.F.R. § 35.106.

211.     The failure to track these requests for reasonable accommodations, and failure to train, supervise, and set policies for their staff to track requests for reasonable accommodation, has had the "effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(ii).

212.     Testimony from DWCC employees is expected to show that DWCC has not received a request for a reasonable accommodation related to mental illness for a prisoner on extended lockdown in the past five years.

213.     The documentary evidence will show that Defendants received several requests for reasonable accommodations related to mental illness in the relevant period of this lawsuit, including formal ARPs.

214.   Testimony is expected to show a lack of knowledge regarding a process for people to request reasonable accommodations.

### D. DWCC applies brutal discipline against people with mental illness for behaviors related to their disability.

215.   The obligation to provide accommodations also applies to the discipline of disabled prisoners: "A failure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person. A failure to provide a reasonable accommodation, or discrimination by reason of disability, constitutes a violation of the ADA[.]'" *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *55 (M.D. La. Mar. 31, 2021).

216.   "When applied in the prison context, it follows that the second element of a § 12132 claim can be satisfied where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person." *Id.* citing *Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 933106, at *3 (N.D. Cal. Mar. 11, 2021).

217.   The court in *Lewis* found that the "hands off approach to discipline" by the ADA coordinator and medical staff at LSP violated the ADA. *Id.*

218.   The documentary evidence and testimony are expected to show that Defendants frequently employ force which is inappropriate to the circumstances, especially in situations involving prisoners with mental illness.

219.   The documentary evidence and testimony are expected to show that the use of mace on people who are making noise is endemic. DWCC and the Department both maintain regulations with the goal of preventing the overuse of force on people with mental illness, but those policies are no practical barrier to the use of force at DWCC.

220.   Testimony is expected to show that Defendants maintain a pattern and practice of using unrestricted force even where there are objective indicators that a person is in need of mental health assistance, such as a direct request for mental health, being on suicide watch, or responding to hallucinatory stimuli.

221.   Plaintiffs' expert Sec. Dan Pacholke will testify that in addition to the brutal use of force, DWCC also employs counterproductive sanctions against people with disabilities.

222.   Dr. Haney will testify as to the role of forced idleness, social isolation, and sensory deprivation in worsening mental health symptoms for people in solitary confinement.

## IV.   DEFENDANTS' CONDUCT VIOLATES THE FIRST AMENDMENT TO THE CONSTITUTION.

223.   It is long established that prisoners have a right to unobstructed and confidential communication with courts and attorneys. *Ex parte Hull*, 312 U.S. 546, 549 (1941).

224.   Unfettered communication between lawyers and their clients is indispensable to the fair operation of our system of justice.

### A.   *Protecting the sanctity of legal mail is of particular significance in this case.*

225.   Undersigned counsel were retained to challenge the conditions of confinement at David Wade Correctional Center.

226.   David Wade is a maximum-security prison located in a very rural part of Louisiana, physically situated in a national forest.

227.   All parties and physical evidence in this proceeding are within the exclusive control of the Defendants.

228.   Because of the remote location of David Wade, attorneys wishing to communicate with men housed there largely rely upon written legal correspondence.

229.    Although opening and reading any attorney's mail is a serious constitutional problem, the unique facts of this case raise a particularly odious specter of interference with the conduct of the litigation.  Evidence will show Defendant prison administrators surveilled Plaintiff prisoner correspondence with counsel engaged to sue the prison, for ongoing conditions at the prison.

230.    Prison litigation is unique in that the plaintiffs are in a uniquely vulnerable position vis a vis the defendants.  Defendant prison administrators control every aspect of Plaintiffs' lives: whether they eat, how much they eat, whether they shower, whether they are allowed outside, what temperatures they are held in, whether they have access to reading material, whether they receive medication, whether they sleep and every other basic human need.

231.    If prisoners know their correspondence with counsel about prison conditions is being monitored or read:

    a.  It deters many prisoners from writing to counsel at all, for fear that in communicating with Class counsel they will be less favored, manifesting as fewer privileges or more punishment.

    b.  It forces writers to self-censor or limit disclosures, also for fear of retaliation.

    c.  It allows the named Defendants in the proceeding to know which class members are communicating with counsel, when, and about what.

232.    Defendants have the ability to exert all manner of influence—directly and indirectly—over those members of the class.

233.    The Court does not need an expert witness to understand the risk inherent in these facts. The potential for complete disruption of the attorney-client relationship is common sense and self-evident.

234.    The identities of the parties and subject matter of this case militate toward a most rigorous scrutiny of interference with legal mail.

235.    The interference with legal mail made conduct of this litigation extraordinarily onerous. It resulted in multiple class members being intimidated into withdrawal from the litigation, exponentially compounding the burden on class members, counsel, and the Court.

### B. The First Amendment legal framework.

236.    Prisoners have a right of privacy in their legal communications. This right applies to prison visits, telephone calls, and mail by counsel.

237.    "Privileged" mail is entitled to greater confidentiality and freedom from censorship than general correspondence.

238.    Privileged mail may not be read in the ordinary course of a prison's routine or practice, except in the case of an emergency. *Reneer v. Sewell*, 975 F.2d 258, 260 (6th Cir. 1992); *Lemon v. Dugger*, 931 F.2d 1465, 1467–68 (11th Cir. 1991); *Proudfoot v. Williams*, 803 F.Supp. 1048, 1052 (E.D.Pa. 1992); *U.S. v. DeFonte*, 441 F.3d 92, 95–96 (2d Cir. 2006).  Instead, prison officials must obtain a warrant to conduct such act. *Burton v. Foltz*, 599 F.Supp. 114, 117 (E.D.Mich. 1984).

*239.*    Most courts have held that privileged legal correspondence may not be opened by prison officials outside the prisoner's presence. *Wolff v. McDonnell*, 418 U.S. 539, 577 (1974); *Merriweather v. Zamora*, 569 F.3d 307, 316–17 (6th Cir. 2009); *Mitchell v. Peoples*, 10 F.4th 1226, 1230–31 (11th Cir. 2021); *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003); *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003); *Royse v. Superior Court of State of Washington*, 779 F.2d 573, 574–75 (9th Cir. 1985); *Hinderliter v. Hungerford*, 814 F. Supp. 66, 68 (D.Kan. 1993); *Young v. Keohane*, 809 F.Supp. 1185, 1197 (M.D.Pa. 1992); *Burt v. Carlson*, 752 F. Supp. 346, 348 (C.D.Cal. 1990); *Faulkner v. McLocklin*, 727 F. Supp. 486, 489–92 (N.D.Ind. 1989);

*McChriston v. Duckworth*, 610 F. Supp. 791, 795–96 (N.D.Ind. 1985); *Guyer v. Beard*, 907 F.2d 1424, 1428–29 (3d Cir. 1990); *Stone-El v. Fairman*, 785 F. Supp. 711, 715 (N.D.Ill. 1991).

240.    The interference with or invasion of privacy of legal mail potentially violates two rights – a prisoner's First Amendment right to free speech and the right of access to the courts. *Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir. 1993).

241.    Plaintiffs herein do not bring an access-to-courts claim, because Plaintiffs were ultimately able to pursue this litigation; Defendants actions created significant burden and delay, but did not ultimately thwart litigation.

242.    Rather, Plaintiffs bring a First Amendment claim based upon the right to communicate with lawyers. *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000); *Williams v. Price*, 25 F. Supp. 2d 623, 629 – 30 (W.D.Pa. 1998).

243.    "Protection of an inmate's freedom to engage in protected communications is a constitutional end in itself." *Mitchell*, 10 F.4th at 1230; *quoting Wilson v. Blankenship*, 163 F.3d 1284, 1290–91 (11th Cir. 1998).

244.    A free speech claim upholds the right to be free from unjustified governmental interference with communication. *Brewer*, 3 F.3d at 820.

245.    Both the Supreme Court and the Fifth Circuit have recognized this right. "Prisoners retain free speech rights consistent 'with the legitimate penological objectives of the corrections system,' and restrictions on those rights cannot be greater than necessary to protect the correctional interests involved." *Every v. Jindal*, 413 Fed.Appx. 725, 727 (5th Cir. 2011); *quoting Brewer*, 3 F.3d at 821–22.

### C.    *Defendants systematically interfered with mail sent by prisoners to their counsel in violation of the First Amendment to the Constitution. (Outgoing Mail).*

246. Outgoing privileged mail may generally be sent unopened. *Davidson v. Scully*, 694 F.2d 50, 53 (2d Cir. 1982); *Smith v. Shimp*, 562 F.2d 423, 424 (7th Cir. 1977); *Mawby v. Ambroyer*, 568 F.Supp. 245, 249–50 (E.D.Mich. 1983); *Witherow v. Paff*, 52 F.3d 264, 265–66 (7th Cir. 1995); *Royse*, 779 F.2d at 574–75.

247. A prisoner has a right to be free from unlawful interference with his mail, including outgoing legal mail. *Every*, 413 Fed.Appx. at 726.

248. Documentary evidence and testimony will show that Defendants interfered with that right by opening Plaintiffs' outgoing legal mail to counsel.

249. Staff at DWCC are expected to testify to the mail handling and security procedures in place at DWCC, which evidence a violation of Plaintiffs' rights.

250. Through testimony of Plaintiffs' witnesses and exhibits, Plaintiffs also will show that some outgoing legal mail was received at Disability Rights Louisiana only after having been previously opened, or was not received by Disability Rights Louisiana at all.

251. Unlike incoming mail, outgoing mail from prisoners does not pose a threat to prison order and security. In fact, the Court acknowledged that "the implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott*, 490 U.S. 401, 411–13 (1989).

252. Defendant's opening of outgoing legal mail is subjected to heightened legal scrutiny.

253. To hold otherwise would threaten lawyers' ability to competently represent people who are incarcerated.

254. Plaintiffs will show through the DWCC and DPS&C mail handling policies that there is no substantial or legitimate penological or government interest served by opening outgoing legal mail.

255.    There is no substantial or legitimate penological or government interest served by opening clearly marked mail addressed to the office of lawyers that prison officials know to be suing them.

256.    If any government interest does exist, Defendants' opening of Plaintiffs' legal mail clearly addressed to counsel does not further any such interest.

### D. Defendants interfered with Plaintiffs' First Amendment rights by systematically censoring mail sent by attorneys to prisoners at DWCC. (Incoming Mail).

257.    Prison officials may not censor clearly-marked legal mail. *Wolff*, 418 U.S. at 574–77.

258.    Censorship's effect on free speech "need not be great in order to be actionable." *Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002).

259.    It is established that such censorship "sufficiently chills, inhibits, or interferes with [the inmate's] ability to speak, protest, and complain openly to his attorney so as to infringe his right to free speech." *Mitchell*, 10 F.4th at 1241.

260.    "When a prisoner receives confidential legal mail that has been opened and re-sealed, he may understandably be wary of engaging in future communication about privileged matters." *Hayes v. Idaho Correctional Center*, 849 F.3d 1204, 1213 (9th Cir. 2017).

261.    Documentary evidence and testimony will show that Defendants in this matter have clearly interfered with prisoners' incoming legal mail at DWCC.

262.    Defendant's opening of incoming legal mail is subjected to heightened legal scrutiny.

263.    To hold otherwise would threaten lawyers' ability to competently represent people who are incarcerated.

264.    There is no substantial or legitimate penological or government interest served by opening incoming legal mail outside of the presence of the recipient. The Court's own reasoning, jurisprudence, and both DWCC and DPS&C policies will confirm this principle.

265.     Such evidence will also show there is no substantial or legitimate penological or government interest served by opening clearly marked mail addressed from the office of lawyers that prison officials know to be suing them, much less doing so outside of the presence of the intended recipient.

266.     If any government interest does exist, Defendants' opening of counsel's legal mail clearly addressed to Class members does not further any such interest.

267.     Established legitimate penological interests include "security, good order, or discipline of the institution." *Thornburgh*, 490 U.S. at 416.

268.     While inspecting incoming mail for safety reasons—such as checking for contraband—is a valid penological interest, DWCC's practice of opening legal mail from attorneys suing the prison about ongoing conditions and outside of the presence of the recipient violates prisoners' First Amendment rights.

269.     Any regulation restricting prisoner's First Amendment rights must be neutral in its enforcement, not discriminatory to the content of the expression. *Turner v. Safley*, 482 U.S. 78, 90 (1987); *citing Pell v. Procunier*, 417 U.S. 817, 828 (1974).

270.     Because of who the parties to the mail at issue are, the nature of these proceedings, the testimony from Plaintiffs and the fact that Defendants were acting in violation of their own mail policies in opening both outgoing and incoming mail, this Court can surmise that Plaintiffs' mail was targeted for surveillance because of the content of their speech and involvement in this litigation.

271.     Such a selection based upon the content of their First Amendment activity triggers strict scrutiny analysis.  Defendants cannot pass strict scrutiny analysis on these facts.

272.    Plaintiffs and staff of the named Defendants are expected to testify that without access to privileged legal mail, Plaintiffs had no alternative avenues for confidentially communicating with counsel.

273.    When prisons restrict expression through a valid and justified speech restriction (which Plaintiffs' dispute is present here), they must retain other avenues for prisoner expression. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 131 (1977), *Turner*, 482 U.S. at 89. No such avenues at DWCC exist.

### E.  Defendants otherwise attempted to interfere with communication with counsel.

274.    Plaintiffs also plan to enter into evidence testimony and exhibits to show prisoners were punished for bringing documents to attorney-client visits.

275.    Staff seized counsel's contact information from Plaintiffs and otherwise interfered with and refused counsel the ability to provide written materials to prisoners in violation of the First Amendment of the Constitution. This will be demonstrated through Plaintiff testimony, Defendant's testimony, as well as documentary evidence.


Respectfully submitted this 30th day of December, 2021.

COUNSEL FOR PLAINTIFFS:

*/s/ Emma Lee Douglas*_____
Melanie Bray, La. Bar No. 37049
Jonathan C. Trunnell, La. Bar No. 36956
Ronald K. Lospennato, La. Bar No. 32191
Emma Lee Douglas, La. Bar No. 39076
Disability Rights Louisiana
*Formerly known as The Advocacy Center*
8325 Oak Street
New Orleans, LA 70118
504-708-1460

504-507-1956 (fax)
mbray@disabilityrightsla.org


*/s/ Katie M. Schwartzmann*
Katie M. Schwartzmann, La. Bar No. 30295
*Cooperating Counsel for ACLU-F LA*
Tulane Law School
6329 Freret Street
New Orleans, La 70115
(504) 496-8566
kschwartzmann@tulane.edu


*/s/ Megan Snider*
Megan E. Snider, La. Bar No. 33382
Nora Ahmed*, N.Y. Bar. No. 5092374
ACLU Foundation of Louisiana
P.O. Box 56157
New Orleans, Louisiana 70156
Telephone: (504) 522-0628
msnider@laaclu.org
nahmed@laaclu.org


*Appearing Pro Hac Vice*