UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself and all other similarly situated prisoners at David Wade Correctional Center, | * * * | CIVIL ACTION NO.: 5:18-CV-00541-EEF-MLH |
| | * | |
| | * | JUDGE ELIZABETH E. FOOTE |
| | * | |
| and | * | |
| | * | |
| The ADVOCACY CENTER, | * | |
| | * | USMJ MARK L. HORNSBY |
| PLAINTIFFS, | * | |
| | * | |
| VS. | * | CLASS ACTION |
| | * | |
| JAMES M. LEBLANC, *et al.*, | * | |
| | * | |
| DEFENDANTS. | * | |

**<u>DEFENDANTS' SUMMARY OF DEFENSES AND EVIDENCE</u>**

NOW INTO COURT, through undersigned counsel, come Defendants, the Louisiana Department of Public Safety and Corrections; James M. Leblanc, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; Jerry Goodwin, in his official capacity as Warden of David Wade Correctional Center; Deborah Dauzat, in her official capacity as Assistant Warden of David Wade Correctional Center; and Lonnie Nail, Dr. Gregory Seal, Steve Hayden, Aerial Robinson, and Johnie Adkins (all in their official capacities as employees of the David Wade Correctional Center) (collectively the "Defendants"), who respectfully submit this summary of defenses and evidence to be offered at trial.

## <u>TABLE OF CONTENTS</u>

Table of Authorities…………………………………………………………………………3

I. Defendants are not in violation of the Eighth Amendment's very high bar prohibiting cruel and unusual punishment…..……………………………………………………………………5

    Defense 1 – Plaintiffs cannot carry the high burden of establishing a violation of the Eighth Amendment…………………………………………………………………………..5

    Defense 2 – Restrictive Housing does not present an objectively intolerable unreasonable risk of harm………………………………………………7

    Defense 3 – Restrictive Housing is a necessary penological practice and is not *per se* cruel and unusual punishment…………………………………………………………..8

    Defense 4 – Restrictive Housing at DWCC is necessary, consistent with practices of prisons throughout the country, and is not cruel and unusual punishment……………10

    Defense 5 – Offenders are screened and assessed for mental health illnesses before being assigned to restrictive housing……………………………………………13

    Defense 6 – Offenders housed in restrictive housing receive constitutionally adequate mental healthcare……………………………………………………………16

    Defense 7 – DWCC's use of suicide watch is appropriate…………………………..21

    Defense 8 – Offenders are manipulative and act out; such behavior is a disciplinary issue, not a mental health issue…………………………………………23

    Defense 9 – DWCC's Security Practices, specifically use of force, are appropriate……...29

    Defense 10 – Two identified deficiencies do not rise to the level of deliberate indifference or cruel and unusual punishment………………………………………30

    Defense 11 – Defendants are not subjectively deliberately indifferent to South Compound Offenders' serious mental health needs………………………………32

II.    Plaintiffs fail to state a claim for violation of the ADA or the RA………………………...33

III.    Plaintiffs' First Amendment claims fail…………………………………………..37

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Atkins v. Cty. of Orange*, 251 F. Supp. 2d 1225 (S.D.N.Y. 2003)…………………………………35

*Berry v. Brady*, 192 F.3d 504 (5th Cir. 1999)……………………………………………………..9

*Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397 (1997)………………………..5

*Brewster v. Dretke*, 587 F.3d 764 (5th Cir. 2009)……………………………………………5, 7

*Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996)……………………………………………...34, 34

*Cadena v. El Paso Cty.*, 946 F.3d 717 (5th Cir. 2020)………………………………………………5

*Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019)……………………………………………………6

*Cuellar v. Livingston*, 321 F. App'x 373 (5th Cir. 2009)………………………………………………9

*Davis v. Scott*, 157 F.3d 1003 (5th Cir. 1998)……………………………………………………6

*Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021)……………………………………………………6, 7

*Dockery v. Hall*, 443 F. Supp. 3d 726 (S.D. Miss. 2019)……………………………..7, 21, 31

*Domino v. Tex. Dep't of Crim. Justice,* 239 F.3d 752 (5th Cir. 2001)………………………….5

*Estelle v. Gamble*, 429 U.S. 97 (1976)……………………………………………………………5

*Farmer v. Brennan*, 511 U.S. 825 (1994)………………………………………………5, 6, 8

*Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974)……………………………………………………8

*Goodman v. Johnson*, 524 F. App'x 887 (4th Cir. 2013)………………………………………34

*Hale v. King*, 642 F.3d 492 (5th Cir. 2011)………………………………………………………33

*Irby v. Sumnicht*, 683 F. Supp. 2d 913 (W.D. Wis. 2010)…………………………………...36

*Kokinda v. Pa. Dep't of Corr.*, 779 F. App'x 944 (3d Cir. 2019)…………………………………34

*LaVergne v. McDonald*, No. 19-709, 2020 WL 7090064 (M.D. La. Mar. 23, 2020)……………8

*Lee v. State, Dep't of Corr. Servs.*, No. 97-7112, 1999 WL 673339 (S.D.N.Y. Aug. 30, 1999)………………………………………………………………………34, 35

62639725.v1

*Maccharulo v. N.Y. Dep't of Corr. Servs.*, No. 08-301, 2010 WL 2899751 (S.D.N.Y July 21, 2010)……………………………………………………………………...34, 35

*Mo. v. Jenkins*, 495 U.S. 33 (1990)…………………………………………………..9

*Newman v. State of Al.*, 559 F.2d 283 (5th Cir. 1977)………………………………7, 21

*Novak v. Beto*, 453 F.2d 661 (5th Cir. 1971)…………………………………………...8, 9

*O'Guinn v. Nev. Dep't of Corr.*, 468 F. App'x 651 (9th Cir. 2012)………………………35

*Preiser v. Rodriguez*, 411 U.S. 475 (1973)…………………………………………...9

*Rhodes v. Chapman*, 452 U.S. 337 (1981)……………………………………………8

*Shadrick v. Hopkins Cty.*, 805 F.3d 724 (6th Cir. 2015)…………………………………5

*Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011 (9th Cir. 2010)………………………………35

*Smith v. Harris Cty., Tex.*, 956 F.3d 311 (5th Cir. 2020)………………………………34, 35

*Tasby v. Cain*, No. 16-0277, 2017 WL 4295441 (M.D. La. Sept. 12, 2017), *report and recommendation adopted,* 2017 WL 4322413 (M.D. La. Sept. 28, 2017)……………….....9

*Valentine v. Collier*, 956 F.3d 797 (5th Cir. 2020), *cert. denied*, 140 S. Ct. 1598 (2020)………….5

*Wilkinson v. Austin*, 545 U.S. 209 (2005)………………………………………………35, 36

*Williamson v. Larpenter*, No. 19-254, 2019 WL 3719761 (E.D. La. July 15, 2019)………..34, 36

*Wilson v. Seiter,* 501 U.S. 294 (1991)……………………………………………...5, 6, 7, 8

*Woodford v. Ngo*, 548 U.S. 81 (2006)………………………………………………...9

## STATUTES

42 U.S.C. 12101(b)(1)……………………………………………………………33

42 U.S.C. 12132…………………………………………………………………34

I.   **DEFENDANTS ARE NOT IN VIOLATION OF THE EIGHTH AMENDMENT'S VERY HIGH BAR PROHIBITING CRUEL AND UNUSUAL PUNISHMENT.**

**DEFENSE 1: Plaintiffs cannot carry the high burden of establishing a violation of the Eighth Amendment.**

1.   "Prison officials [may] violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs . . . ." *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)).  "Deliberate indifference is an 'extremely high' standard to meet." *Id.* at 770; *see also Domino v. Tex. Dep't of Crim. Justice,* 239 F.3d 752, 756 (5th Cir. 2001).

2.   "Deliberate indifference 'is a stringent standard of fault, requiring proof that a municipal [or state] actor disregarded a known or obvious consequence of his [, her, or its] action.'" *Shadrick v. Hopkins Cty.,* 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 410 (1997)).

3.   Only "unnecessary and wanton infliction of pain" is proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).  "Deliberate indifference is an extremely high standard to meet." *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020); *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020), *cert. denied*, 140 S. Ct. 1598 (2020).

4.   "Deliberate indifference is an 'extremely high' standard to meet." *Brewster*, 587 F.3d at 769 (citing *Wilson,* 501 U.S. at 297); *see also Domino,* 239 F.3d at 756; *Cadena*, 946 F.3d at 728; *Valentine*, 956 F.3d at 801.

5.   The Fifth Circuit in *Valentine* explained that: To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." [*Farmer v. Brennan*, 511 U.S. 825, 846 (1994).]  To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious

harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." 956 F.3d at 801 (quoting *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837)).

6.      The Supreme Court has also held that in cases in which inmates seek injunctive relief to prevent substantial risks of serious injury from ripening into actual harm, the Eighth Amendment deliberate indifference standard "should be determined in light of the prison authorities' current attitudes and conduct," i.e. "their attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 827.

7.      Further, a prisoner seeking injunctive relief on the grounds that there is "a contemporary violation of a nature likely to continue," must show both the existence of a violation and produce evidence "from which it can be inferred that the [prison] officials were at the time suit was filed . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . during the remainder of the litigation and into the future." *Farmer*, 511 U.S. at 846.[1]

8.      Only "extreme deprivation" of one or more of the "minimal civilized measures of life's necessities" arise to a violation of the Eighth Amendment. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (quoting *Wilson*, 501 U.S. at 304).

9.      "Overall conditions" do not rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.  In *Dockery v. Cain*, 7 F.4th 375, 378 (5th Cir. 2021), the plaintiffs argued that the district court erred by considering the challenged conditions in isolation instead of in combination.  The Fifth Circuit found that the

---

[1] Defendants maintain their objection that they should be allowed to present evidence of current conditions, including policy changes and hiring additional staff.  The Supreme Court in *Farmer* clearly instructed in a suit for an injunction that "prisoner[s] may rely on developments that postdate the pleadings and pretrial motions, as [defendants] may rely on such developments to show that the prisoner is not entitled to an injunction." 511 U.S. at 827.

62639725.v1

argument was foreclosed by *Wilson* (501 U.S. at 305), which explained, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.*

10.     "Prison officials [may] violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs . . . ." *Brewster*, 587 F.3d at 769 (citing *Wilson,* 501 U.S. at 297).

11.     As the Fifth Circuit and a sister court in this circuit have noted, "[t]he Constitution . . . 'does not require that prisoners, as individuals or groups, be provided with any amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.'" *Dockery v. Hall*, 443 F. Supp. 3d 726, 748 (S.D. Miss. 2019) (citing *Newman v. State of Al.*, 559 F.2d 283, 291 (5th Cir. 1977)).

12.     Evidence of Plaintiffs' failure to carry their high burden of proof will consist of all evidence at trial.

**DEFENSE 2 – Restrictive Housing does not present an objectively intolerable unreasonable risk of harm.**

13.     Defendants' expert, Dr. Thompson will testify that the issue of whether restrictive housing causes or contributes to mental illness is unsettled.  He will testify regarding what is known as the Colorado Study.  The Colorado Study was undertaken with the goal of proving the hypothesis that restrictive housing causes or aggravates mental illness.  At the end of the one-year study, to the surprise of the researchers, offenders in restrictive housing actually showed slightly less mental illness.  The Colorado Study actually refuted the very premise sought to be proven.

14.     Dr. Thompson will further testify regarding two meta-analyses undertaken.  A meta-analysis surveys and summarizes the literature.  As with the Colorado Study, the meta-analyses also failed to prove the hypothesis that restrictive housing causes or aggravates mental

illness.

15.    Dr. Thompson will further explain the error of the thinking of Plaintiffs' expert, Dr. Craig Haney.  Dr. Haney conflates anecdotal and small-scale studies and draws conclusions therefrom that cannot be supported.  In this area of science, it is important to compare similar studies.  One study that addresses isolation on individuals with serious mental illness that would qualify as a LOC 1 or a LOC 2 under DPS&C's guidelines has little relevance to what is happening at DWCC.  Further, a study of very draconian conditions, as in prisoner of war camps, have no relevance to conditions at a modern prison such as DWCC.

16.    There is no objective risk of serious harm from housing offenders who either have no mental illness or whose mental illness is stable or in remission in an open bar cell in a modern prison setting.

17.    Without an objective risk of serious harm, Plaintiffs' claims must fail.

**DEFENSE 3 – Restrictive Housing is a necessary penological practice and is not *per se* cruel and unusual punishment.**

18.    The Fifth Circuit has held that solitary confinement/restrictive housing is not *per se* cruel and unusual punishment. *Novak v. Beto*, 453 F.2d 661, 665 (5th Cir. 1971); *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974); *LaVergne v. McDonald*, No. 19-709, 2020 WL 7090064, at *13 (M.D. La. Mar. 23, 2020).

19.    Solitary confinement serves a legitimate purpose in the prison community as a deterrent and a punitive force. *Novak*, 453 F.2d at 670.  The Eighth Amendment imposes a duty upon prison officials to protect prisoners from violence at the hand of other prisoners. *Farmer*, 511 U.S. at 831-32; *see also Wilson*, 501 U.S. at 303; *Rhodes v. Chapman*, 452 U.S. 337, 347-48 (1981).

62639725.v1

20.     The Fifth Circuit also recognized the paramount concern of security in corrections, stating:

> It is beyond dispute, of course, that order must be maintained in the prisons. And when a prisoner continues to break prison rules even after losing such privileges as going to the movies and being assigned extra work, the authorities must have some harsher measure to induce compliance with prison regulations.

*Novak*, 453 F.2d at 670.

21.     Prison officials are accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order. *See Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999); *Tasby v. Cain*, No. 16-0277, 2017 WL 4295441, at *7 (M.D. La. Sept. 12, 2017), *report and recommendation adopted,* 2017 WL 4322413 (M.D. La. Sept. 28, 2017).

22.     The classification of inmates is a matter left to the broad general discretion of prison officials, and a failure to refer an inmate plaintiff for additional treatment, diagnostic testing, or evaluation is a matter of professional medical judgment that the courts will not normally second-guess in the context of a claim of deliberate medical indifference. *Tasby*, 2017 WL 4295441, at *9; *Cuellar v. Livingston*, 321 F. App'x 373, 374 (5th Cir. 2009) (upholding the dismissal of an inmate's claim as frivolous where he complained of a failure to refer him to a specialist, noting that "the question whether 'additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment'").

23.     The Supreme Court has repeatedly warned that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" *Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973)); *see also Mo. v. Jenkins*, 495 U.S. 33, 51 (1990).

62639725.v1

24.     Evidence to support this defense will be presented throughout the trial, including by Defendants' security expert, John Upchurch, Secretary James M. Le Blanc, Assistant Secretary Seth Smith, and DWCC security officers.  Plaintiffs really do not contest this point as their own expert, Dr. Haney, concedes the need for restrictive housing, as he must.

**Defense 4 – Restrictive Housing at DWCC is necessary, consistent with practices of prisons throughout the country, and is not cruel and unusual punishment.**

25.     DWCC is a maximum custody facility accredited by the American Correctional Association.  It is an extremely well-run facility, is clean, and is well maintained.

26.     DWCC is divided into two compounds: the North Compound and the South Compound. The North Compound houses offenders in a general population in a dorm type setting. The South Compound has cells with open bars that houses offenders in a restrictive housing setting.

27.     Offenders housed in tiers A, B, and C of N2 and in buildings N3-N4 are classified as maximum custody.   Offenders housed in N2 D tier are closed cell restriction ("CCR"). Offenders housed in N1 are classified as medium custody.

28.     Restrictive housing is primarily used to house offenders who have committed multiple violent offenses outside and/or inside of prison.  Restrictive housing is a disciplinary procedure used to control aberrant behavior by both mentally ill and non-mentally ill offenders.

29.     Offenders in restrictive housing at DWCC are dangerous and violent men.  Indeed, offenders with a history of disciplinary offenses that cannot be appropriately housed elsewhere can be transferred to DWCC.

30.     Defendants will show evidence of injury that can occur when violent offenders are removed from restrictive housing.  Plaintiffs do not address or consider the adverse impacts of

moving violent offenders who cannot abide by prison rules from restrictive housing to general population.

31.     Prisons throughout the country utilize restrictive housing.  DPS&C's use of restrictive housing is consistent with prisons throughout the country, including both the percentage of offenders housed in restrictive housing and the length of time that offenders remain in restrictive housing.

32.     Defendants will show evidence through the Liman Survey and testimony of experts that as of 2019, 4.8% of offenders held in DPS&C were in restrictive housing.[2]  According to the Liman Survey and testimony of experts, that percentage is consistent with other states in the country.

33.     Offenders housed in the South Compound may remain there for varying lengths of time depending on the individual circumstances of each particular offender.  The duration of each offender's stay in the South Compound is highly variable and depends on the nature of the disciplinary issue and/or the overall risk the offender presents to offenders housed in the general population, staff, and the public.  The key to progressing out of a restrictive housing status is demonstrating that the offender is less of a threat to other offenders, the staff, and the public.

34.     Offenders regularly progress from restrictive housing on the South Compound to the general population housing on the North Compound at DWCC.

---

[2] The 4.8% number is calculated based on the offenders held directly by DPS&C.  DPS&C contracts with and houses offenders in local jails and prisons.  When the offenders housed in local jails and prisons is considered, the actual percentage of offenders housed in restrictive housing is reduced to about half that amount.

62639725.v1

35.     Defendants will show evidence through the Liman Survey and testimony of experts that as of 2019, the length of time that DPS&C holds offenders in restrictive housing is consistent with other states in the country.

36.     Defendants will produce evidence that offenders are not isolated in restricted housing.

37.     Cells in restrictive housing are open front cells that face concrete walls and windows which open to the outdoors.

38.     A typical day for an offender in restrictive housing is approximately as follows in part:

   a.   0500–0515 sick call slips
   b.   0600 Pill call
   c.   0600 Breakfast is delivered
   d.   1030 Lunch is delivered
   e.   1115 major count/Begin Feeding/Pill call
   f.   Afternoon recreation time
   g.   1600 Major count
   h.   1600 Pill call
   i.   1700 Dinner
   j.   1800 Shift change
   k.   Shower
   l.   2230 Lights out

39.     Offenders have regular and constant contact with others.  They can and do speak to other offenders in adjacent cells in conversational tones.  They recreate in chain link enclosed recreation areas where they can converse with other offenders in the adjacent/nearby enclosures. Thirty-minute security checks are required by security staff in N1–N4.  Managers and supervisors visit the tiers on a regular basis.  Offenders are also permitted to interact with staff if they wish during their presence on the tiers.  In addition to all of the routine items listed above, there is clothing exchange, mail call, and library book exchange.  Haircuts and shaves are available in the

12

common area on a regular basis.  Offenders have call outs for medical, dental, vision, and mental health care.

40.     Many offenders are double bunked, and DWCC screens the offenders for compatibility when selecting cellmates.

41.     Weekend non-contact visitation is available.

42.     Offenders are given one phone call per month, and calls to attorneys are not limited in number or duration.

43.     Offenders are out of their cells for many reasons.  Offenders have daily recreation. Showers are offered daily.  Indeed, offenders are required to take a shower at least once every 3 days.  Call outs for medical, dental, vision, and mental health care occur.

44.     Any suggestion that the offenders are "isolated" is false.

45.     Many offenders prefer restricted housing to general population because of the challenges of living in an open bay dorm in prison.

**DEFENSE 5 – Offenders are screened and assessed for mental health illnesses before being assigned to restrictive housing.**

46.     Offenders sentenced to the DPS&C are typically initially assessed at Elayn Hunt Correctional Center ("EHCC") at the Hunt Reception and Diagnostic Center ("HRDC") before being assigned to a specific DPS&C facility for housing.

47.     The EHCC assessment is extensive and consists of personality testing, IQ testing, interviews, and results in a DSM-5 diagnosis of prisoners with mental illness.  The findings are detailed in an Assessment & Intervention Report for each offender.

48.     EHCC conducts an extensive screening process that assigns a DSM-5 diagnosis, where appropriate, and a level of care designation for offenders.

62639725.v1

49.     DPS&C assigns the following level of care designations to offenders:

a.      LOC 1 – shall be assigned to offenders who have significant disability primarily due to their mental health condition.  These offenders are housed in the special mental health housing units with a 24 hours medical and/or mental health presence.  These offenders require ongoing intensive intervention/supervision.  Housed at EHCC or HSU.

b.      LOC 2 – shall be assigned to offenders with a diagnosis of SMI AND who have been in remission for less than six months, or have displayed a pattern of instability, may not have ability to follow directions or dysfunctional due to mental health illness.  Medication adherence and program participation are considered.  Offender should be capable of performing activities of daily living satisfactorily.

c.      LOC 3 – shall be assigned to offenders with SMI and who have been in remission or have been stable for at least six months.  These offenders may live in the general housing areas.  A SMI diagnosis is typically chronic in nature and the offender will most likely remain diagnosed with SMI for the remainder of the offender's life.  If they are stable, functional, and have no major problem with compliance, then they should be designated as LOC 3.

d.      LOC 4 – shall be assigned to offenders with any Axis I diagnosis excluding severe mental illness (SMI) and excluding addiction disorder diagnosis or those requiring mental health interventions within the last year.

e.      LOC 5 – not prescribed any psychotropic medication or current MH intervention for more than one year.

50.     Offenders with a designation of LOC 1 and LOC 2 are not housed at DWCC.  Accordingly, all offenders in restrictive housing on the South Compound either have no serious

mental illness or are in remission or are stable.  This fact cannot be overstated and is essential to a proper understanding of the case.

51.     If an offender is placed by DPS&C at DWCC, DWCC staff then perform an intra-system mental health screening on intake at DWCC.

52.     The DWCC intra-system mental health intake screening is designed to be a more limited assessment than that performed at the HRDC.

53.     The "intra-system" screening includes:

a.     Inquiry into whether the offender:
- Has a present suicidal ideation;
- Has a history of suicidal behavior;
- Is presently prescribed psychotropic medication;
- Has a current mental health complaint;
- Is being treated for mental health problems;
- Has a history of inpatient and/or outpatient psychiatric treatment;
- Has a history of treatment for substance use; and/or
- Has a detoxification need.

b.     Observation of:
- General behavior;
- General appearance;
- Evidence of abuse and/or trauma; and/or
- Current symptoms of psychosis, depression, anxiety, and/or aggression.[3]

54.     New intake offenders with a mental health diagnosis are scheduled to see DWCC's psychiatrist, Dr. Seal, at the next available time.

55.     DWCC provides offenders with an orientation which informs offenders of the various options available to address mental health concerns.

56.     In the rare circumstance that an offender is not tested at EHCC prior to arrival and prior to housing being assigned by the initial classification board, the same battery of tests

---

[3] Ex. 22, Health Care Policy No. HCP37, §7(A)(3).

the offender would receive at EHCC are administrated at DWCC and reviewed by a psychologist.

57.     The screening process identifies offenders with serious mental illness.

58.     The entirety of the DWCC MH staff will testify to the screening process that takes place to identify offenders with serious mental illness.

**DEFENSE 6 – Offenders housed in restrictive housing receive adequate mental health.**

59.     As the mental health care in the South Compound at DWCC is considered, it is important to remember that offenders who have a LOC 1 or LOC 2 classification are not housed there.  All offenders in the South Compound either have no serious mental illness, are in remission, or are stable.

60.     The mental health staff at DWCC as of March 15, 2020, consisted of the following:

a.     Warden Michelle Dauzat has a master's degree in social work and is a board approved Licensed Clinical Social Worker.  Warden Dauzat has been in the mental health field for over 21 years and has worked at DWCC since January 6, 2003.  Warden Michelle Dauzat is responsible for overseeing and supervising the mental health program and mental health staff at DWCC.

b.     Steve Hayden possesses a master's degree in Industrial Class Organizational Psychology and has been employed at DWCC since January 3, 2005.

c.     As of March 2020, Aerial Robinson is a Licensed Master Social Worker employed as a Social Service Counselor 2 at DWCC.  She was originally hired as a Social Service Counselor on September 20, 2016 and promoted to her current position on October 12, 2017.

62639725.v1

      d.      James Burgos obtained a Master of Industrial Organizational Psychology in 2006 and a Master of Counseling in 2017.  Mr. Burgos is a Licensed Professional Counselor, through the Louisiana Board of Licensed Professional Counselors.

      e.      Johnie Adkins was previously a Social Service Counselor 1 at DWCC. Though previously employed as a counselor, at all times from the date of the filing of this lawsuit, Mr. Adkins has served as a chaplain for DWCC.  Johnie Adkins, is the holder of a Master's of Divinity; Master's of Religious Education; Master's of Theology; and Doctorate of Theology.[4]

      f.      Gregory Seal, M.D. has been contracted as a Psychiatrist at DWCC since 2009.  Dr. Seal received his medical degree from LSU Medical Shreveport in 1988 and is board certified.  Dr. Seal is not an employee of DPS&C.  Dr. Seal provides services for offenders held at DWCC both in general population and restrictive housing.  Dr. Seal's contract, as of March 2020, was to provide services at DWCC for 18 hours a month.

      g.      The medical staff at DWCC assists with mental health needs when appropriate.  During weekends, when presented with an emergent situation or in response to a threat of suicide, the medical staff will assist the mental health staff.

61.      Based on demographic data across the country, it is a fact that a certain percentage of offenders in restrictive housing will have a history of mental illness.

62.      The ratio of mental health staff to offenders on the South Compound at DWCC is adequate.  The opinion of Dr. Kathryn Burns stating that the ratio was inadequate was based on an incorrect census (too high) and did not include Mr. Burgos who had recently been hired.

63.      Dr. Seal regularly sees offenders housed on the South Compound during his scheduled visits to DWCC.  Dr. Seal sees every offender on the mental health case load at least

---

[4] Mr. Adkins stopped providing mental health services in the first part of 2016.  He should never have been named as a defendant in this suit for injunctive relief.

every 90 days.  Dr. Seal determines the need and frequency of follow-up visits at each scheduled appointment, which may be sooner that 90 days.

64.     If an offender presents with a need for intervention prior to the scheduled appointment, Dr. Seal will see him at his next available date.

65.     Dr. Seal stays at DWCC until he has seen all of the patients scheduled for the day.

65.     Dr. Seal's diagnoses of the offenders are appropriate and accurate.  Importantly, this is an uncontested fact.  Dr. Burns, Plaintiffs' expert psychiatrist, had no criticisms of Dr. Seals' diagnoses.

66.     Medication is the primary form of treatment for mental disorders of offenders located in restrictive housing.

67.     Dr. Seal performs the traditional role of a prison psychiatrist and the management of medications.  Again, Dr. Burns agrees with this statement, which was in an article that she published.

68.     Dr. Seal's conduct in his role of management of medication is appropriate.  Dr. Burns has no criticisms of either the type or amount of medications administered by Dr. Seal.

69.     There has never been a mental health backlog at DWCC from 2017 to March 2020.

70.     Once identified and seen by Dr. Seal, offenders with mental illness are followed by a dedicated mental health staff that includes a master's level psychologist, two social workers, and licensed counselor.

71.     Every offender presented to the Court will have numerous contacts with mental health staff.

72.     A treatment plan is created for each offender.[5]

---

[5] The weakness of the treatment plans is addressed below.

73.    Mental Health staff at DWCC perform weekly rounds on the South Compound and counsel mental health offenders during those rounds.

74.    An offender can request mental health through numerous avenues, including the sick call process, declaring an emergency, and through a correctional officer.   Indeed, any correctional officer or other employee at DWCC can request mental health assistance for an offender at any time.

75.    Group Programming is available to offenders on N1 and N2-D.

76.    Although group therapy is not afforded in other restrictive housing areas due to security concerns, mental health staff do provide individualized counseling to mental health offenders in restrictive housing.  Additionally, written materials relating to group therapy sessions are made available to offenders on N2–N4.

77.    Mental health progress notes and segregation interviews are completed using standardized forms containing checkboxes for various aspects of a mental status examination.

78.    DWCC mental health staff create written records of interviews with offenders, progress notes, and assessments after interactions with offenders.

79.    If it is determined that an offender is in need of a higher level of care, DWCC will transfer the offender to EHCC.

80.    Plaintiffs' expert witnesses did not opine that the level of care designation of the offenders is incorrect.

81.    The percentage of offenders with serious mental illness at DWCC has remained relatively the same since 2017.

82.    Because correctional officers play an important role in identifying mental illness, all DWCC staff are required to participate in annual training which includes mental health training.

Part of that annual training is the Mental Health First Aid curriculum and suicide prevention training.

83.     If an offender is on medication upon arrival at DWCC, the medications come with the offender, and medications are continued by the general medical doctor unless there is an indication that these medications may be harmful to the offender.

84.     Offenders who arrive at DWCC with a mental health diagnosis are scheduled to see Dr. Seal, at the next available time, within 14 days at the most.

85.     Dr. Seal prescribes appropriate psychotropic medications in appropriate dosages.

86.     All mental health medications are monitored and distributed using "blister packs" which are specifically numbered and are monitored by nursing staff at DWCC.

87.     Medications are administered by pill call officers.  Pill call officers are provided specific training on administering medications.

88.     Weaknesses in the mediation administration records ("MARs") are addressed below.

89.     Mental health observations ("MHO") are utilized to follow an individual offender more closely who is experiencing an acute exacerbation of symptoms which is considered temporary by medical professionals.  MHO is appropriate for offenders who are psychotic, in acute distress, noncompliant with psychotropic medication, or otherwise psychologically impaired to a significant degree, but not considered a high risk for suicidal behavior.

90.     An offender on MHO is seen daily by mental health or medical staff.

91.     DWCC through its dedicated mental health staff provides adequate mental health care to the offenders on restrictive housing.

92.     Plaintiffs' complaints in large part are that there are additional things that could be done, such as group therapy.  But the law is clear that "[t]he Constitution . . . 'does not require that prisoners, as individuals or groups, be provided with any amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.'" *Dockery v. Hall*, 443 F. Supp. 3d at 748 (citing *Newman*, 559 F.2d at 291).

**DEFENSE 7 – DWCC's use of suicide watch is appropriate.**

93.     DWCC has two types of suicide watch, standard and extreme.  The mental health staff at DWCC places an offender on suicide watch if there is a question of suicide because it is better to err on the side of caution and institute a suicide watch when in doubt as opposed to taking no action and allowing an offender to commit suicide.

94.     Mental health staff completes a mental health management order ("MHMO") on each new suicide watch.  With the clinical judgment of the mental health staff, the MHMO describes the techniques to be used, which property items are permitted, and which property is prohibited.  Removing an offender's property while on suicide watch is an appropriate procedure designed to reduce the risk of completed suicide while an offender is on suicide watch.

95.     DWCC will present evidence of offenders using property such as gowns and mattresses to attempt suicide or make suicidal gestures.

96.     Placing an offender in a room with a camera for monitoring is an appropriate procedure to reduce the risk of suicide while a prisoner is on suicide watch.

97.     An offender on suicide watch is seen and evaluated daily; mental health staff sees prisoners on suicide watch daily on Monday through Friday; nursing staff sees offenders on the weekends.

98.     Offenders on standard suicide watch receive in-person observation at least every thirty minutes, preferably every fifteen minutes, and also randomly between intervals.

99.     The standard in-person observation for extreme suicide watch is every fifteen minutes and randomly between intervals.

100.    Extreme suicide watches can only be utilized by DWCC's mental health staff with the concurrence of a medical doctor.

101.    Offenders on suicide watch are also monitored by the key room officer through the use of the in-cell cameras.

102.    Restraints used on extreme suicide watch may be: (1) four-point restraints, (2) placing an offender in a restraint chair, or (3) use of a helmet to prevent head banging.

103.    The use of the restraint chair is infrequent and limited to only the time deemed necessary by the mental health staff with the concurrence of a medical doctor.

104.    The mental health staff at DWCC decides when to end a suicide watch.

105.    Upon termination of suicide watch, mental health staff contacts and evaluates the offender within seven days.

106.    DWCC does not overuse suicide watch.  The average number of standard suicide watches per month is 9.59, and the average number of extreme suicide watches per month is 2.16. Dr. Burns, Plaintiffs' psychiatrist, did not find that DWCC overuses suicide watch.

107.    DWCC does not keep offenders on suicide watch for too long a period of time.  The average time on standard suicide watch is 3.48 days.  Dr. Burns found that to be appropriate.

108. DWCC does not have a problem with too many completed suicides.  DWCC's use of suicide watch does not create a substantial risk of harm.  Indeed, to the contrary, DWCC's use of suicide watch is appropriate and working as intended.

**DEFENSE 8 – Offenders are manipulative and act out; such behavior is a disciplinary issue, not a mental health issue.**

109.     Training materials for officers at DWCC, although addressing female security officers, captures the problem and provides that:

> An offender has 24-hours to think of ways to manipulate officers. Offenders have nothing but time to observe, time to hear, and profit from everything they know about an officer and his job. Offenders are predators, they watch the female employees, they target female employees, the offenders identify weak links, and set up employees to gain confidence.

Basic Security Academy: Offender Manipulation (D31, p. 31).

110.     Dr. Thompson, Defendants' expert psychiatrist, will testify to offenders engaging in manipulative behavior and that such manipulative behavior is a security issue, not a mental health issue.

111.     The records in this case are replete with specific examples of offenders engaging in manipulative behavior.  Offenders will claim suicidal ideation to be placed on suicide watch for many reasons other than being suicidal.

112.     Offenders will claim to be suicidal in order to secure a different cell assignment. DWCC employees will provide testimony as to this practice.  In addition, on 05/21/18, as to Charles, "When questioned about S/I, offender stated, 'I didn't want to be by the shower and make security work.'" (D63, pp. 110-111). *See* Exhibit D78 generally.  On 05/10/18, Jones "states that he needs to be placed into the chair to, 'make these bit** mo** f***ing officers work.'  He further reports that he is homicidal/suicidal and plans to inform his lawyers if I do not comply with his wishes."  (D70, pp. 60-61). *See* Exhibit D78.

113.     Offenders will claim to be suicidal in order to be transferred to an institution of their choice.  This is an improper and manipulative use of suicide watch.  Offender records provide the following examples:

- 05/22/18, Charles admitted that he had been attempting suicide to attempt to get shipped to EHCC. (D63, pp. 113-114).
- 08/30/18, Adams stated that "he plans to eat lunch and be placed on ESW until he is given a transfer." (D64, p.293).  There are numerous other records of Adams invoking suicide for placement at DWCC and elsewhere.
- 03/29/19, Doucet "told Colonel Nail, I ain't playing move me back to Hunts." (D71, p. 31).  There are many other records of Doucet threatening suicide for placement.
- 05/28/19, Sullivan "reports A/I and refuses to be removed from SSW until he is given a transfer to the institution of his choice." (D68, pp. 73-74).

*See* Exhibit D78.

114.    Offenders will claim to be suicidal in order to make security work or to get back at security:

- 08/06/17, Charles reported that he was angry with security staff and made false claims of S/I in order to make them 'work.'" (D63, pp. 16-17).
- 05/15/18, Charles placed a gown around his neck.  "When questioned about gesture, offender stated, "I'm still getting back at security." (D64, pp. 88-89).
- 05/15/18, Charles, "when questioned about SI, offender stated, 'I'm not suicidal! I'm just messing with security.'" (D63, pp. 91-92).
- 10/11/18, Jones "reports that he was given a false RVR and now he is going to make security staff work.  He further reports S/I." (D70, p. 82).

*See* Exhibit D78.

115.    Offenders refer to claiming suicide ideation in order to make security work as "playing" with security.  Just a few examples of such actions are:

- 09/06/18, Adams, when questioned about SI, Adams stated "I'm tired of playing. I'm not suicidal." (D64, pp. 300-301).
- 09/12/18, When asked about suicide ideation, Adams stated "This is how this sh** works, you M*** F***kers want to play games with me and F*** with me, I play games with you and F*** with you.  I'm M*** F***king suicidal." (D64, pp. 310-311).
- 12/14/18, Caro stated, "I'm done playing with y'all. You know I wasn't going to kill myself." (D75, pp. 195-196).

*See* Exhibit D78.

116.    In a most disturbing turn of events, offenders have taken actions in order to further their legal claims, such as in this lawsuit.  Examples of such actions include:

- 05/03/18, Charles "reports that after speaking with his lawyer it was decided that he not [take] any medication unless he can be placed on his choice (Wellbutrin). He denies any S/I, H/I, or other MH concerns. He was encouraged to continue taking his medications as prescribed." (D63, pp. 81-82).
- 09/20/18, Adams reported that "he is in an upbeat mood due to the fact he and his lawyers have successfully sued LSP and about to 'shut them down' and are in the process of doing the same to DWCC. When asked if he had any S/I he replied, 'Yeah, I'm f***king suicidal'" (D64, pp. 321-322).
- 12/13/18, Caro reported "This ain't nothing against you, but I got them lawyers working for me and need to stay of in here a little bit longer." (D75, p. 194).

117.    Indeed, there is some evidence of offenders taking action as directed by their lawyers:

- 09/24/19 and 10/02/19, Solomon told Steve Hayden that his lawyers told him not to speak with Hayden because he was not licensed.[6] (D69, pp. 113 & 119). "My lawyers already told me that I don't have to have shit to do with you." (D69, p. 119).
- 05/10/18, Jones demanded the restraint chair and threatened to inform his lawyers if Hayden did not comply.[7] (D70, pp. 60-61).

118.    In addition, a review of the files of specific offenders' records undercut Plaintiffs' claims.

119.    Plaintiffs have submitted a two-hour video of Anthony Caro being sprayed. Plaintiffs argue that Caro was decompensating and that DWCC responded by spraying him with chemicals. The record does not support that claim at all.

---

[6] The 09/24/19 note is particularly troublesome. It reads:

> When offender Solomon was seen in regards to his sick call he stated, "I ain't fixing to talk to you're a**. My lawyers already told me that I don't have to have sh** to do with you. Trot you a** back down and get that bit** Dauzat. After she talks to me she can show me that pretty little pus*** of hers. On second thought just tell that bit** to come and show me her pus***. She is too stupid to talk to since she is the one who hired your a**.

(D69, p. 113).

[7] A suspicious interaction occurred with Charles on 07/18/17 when he demanded that he be placed in restraints. Ms. Robinson, the mental health worker, explained that there was no reason for restraints. Charles then cut himself to make her place him in restraints. (D63, pp. 46-47).

120.     Professionals at EHCC, not DWCC, diagnosed Caro as malingering. (D75, pp. 15, 19 & 22).  After being transferred to DWCC, Caro threatened suicide numerous times. (D75, pp. 35 – 60 and 75-93).  On 04/03/18, Caro stated that:

> he has no need for mental health medications and only agreed to take them to assist with his being transferred.  He further states that he will be no problems for staff if he is transferred as he was promised.

(D75, pp. 96-97).  Dr. Seal nevertheless referred Caro to EHCC for evaluation.  On 05/09/18, EHCC diagnosed Caro as malingering for transfer. (D75, p.105).  Caro was sent back to DWCC. On 06/26/18, Caro stated that:

> Offender reports that he only agreed to take medication due to Col. Nail promising to transfer him if he did.  He further reports that he will not take any medication and is giving the Col. 1 week to transfer him before "he goes the f*** off."

(D75, pp. 113-114).  As promised, on 07/09/18, Caro went off.  He snatched his hands away from correctional officers with the cuffs on two occasions.  Cell extraction teams had to retrieve him from the cell when he would not comply as the Colonel and Hayden tried to persuade him to comply. (D75, pp. 115-144).  The video is evidence of a preplanned deliberate bad act, not mental health decompensation.  Caro knew exactly what he was doing and why he was doing it.

121.     Adams is another offender that the Plaintiffs contend support their claims.  Again, the records say otherwise.  Adams' behavior at LSP (Angola) and EHCC prior to coming to DWCC was identical to his behavior at DWCC.

122.     Adams was housed at LSP (Angola) in 2017.  While at LSP, there were 16 separate instances of Adams cutting himself, three instances of him hitting his head or hands against the bars, and he smeared feces on himself. (*See* D64, pp. 9-45).  He was transferred to DWCC from 11/28/17 through 02/26/18.  He was stable during that period of time and made the classification board to be eligible for medium custody. (D64, p. 55).

62639725.v1

123.    On 02/26/17, Adams was transferred to EHCC. (D64, p. 56).   EHCC diagnosed Adams as malingering for placement. (D64, pp. 57, 62, 90, 96, 127).   Adams was at EHCC for 56 days, 02/26/18 through 04/22/18. (D64, pp. 56-166).   During 56 days at EHCC, Adams cut himself 8 times.   In fact, on 03/14/18, Adams threatened to cut himself, stating, "F** it, I am going to cut my self cause I did not get double portions." (D64, p.92).   Then, five days later on 03/19/18, he actually did cut himself because he did not get double portions. (D64, p.104).   During his 56 days at EHCC, Adams banged his head against the wall three times and smeared feces on himself.   In one of his last encounters with mental health while at EHCC, Adams was asked on 04/16/18 why he went off/on suicide watch so much.   He responded "because of his legal work." (D64, p. 160).

124.    On 04/23/18, Adams was transferred back to DWCC. (D64, p. 167).   The records produced in the litigation go through 09/25/18.   During the 150 days from 04/23/18 through 09/25/18, Adams cut himself 10 times, exactly like he did at LSP and EHCC.

125.    Adams received much mental health care at EHCC and at DWCC.   During his 56 day stay at EHCC, there are 71 records of mental health contact.   During the 150 days at DWCC, there are 78 records of contact with mental health staff.

126.    Adams was clearly being manipulative.   On 08/07/18, Adams told Hayden that he had retained lawyers from the Advocacy Center and that he would see them in court. (D64, pp. 241-243).   On 08/17/18, Adams threatened to act out if he did not get specific medications he wanted, i.e., "I want Wellbutrin.  I've tried asking.  Now you will see." (D64, p. 262).   He would go on suicide watch to play with security.   On 09/06/18, he stated, "I tired of playing.  I'm not suicidal." (D64, p. 301).   On 09/12/18, he stated, "This is how this sh** works, you Mo*** F****ers want to play games with me and f*** with me, I play games with you and f*** with you.

I'm mo\*\*\* f\*\*\*ing suicidal."(D64, p. 311).  The record clearly shows that Adams was a bad actor, not an offender with a serious mental illness.

127.    Charles is another offender who acted out and did not have a serious mental illness. Prior to 05/22/18, Charles was a combative and difficult offender.  He was on numerous suicide watches during that period of time.  However, on 05/22/18, everything changed.  Charles stated at the time that:

> he has never taken MH meds and never will.  He was attempting to be shipped to EHCC but now wants to do the small amount of time he has left and get out of prison.

(D63, p. 114).  In line with that confession, on 05/31/18, Dr. Seal discontinued Depakote because he was not taking it. (D63, p. 115).  A mental health progress note dated 06/19/18 stated that Charles was "doing well since removal of his mental health medications." (D63, p. 122).  On 11/02/18, Charles' LOC changed from LOC 3 to LOC 5. (D63, p.130).  On 07/30/19, Charles was reassigned to medium custody. (D63, p. 137).  Over the next several months, Charles completed 14 re-entry courses. (D63, pp. 138-140).  He was released on 11/06/19.

128.    Charles' records show that he was a bad actor, not an offender with serious mental illness.

129.    In many respects, the Court will have to make a credibility determination as to whom to believe.  The testimony of offenders who are convicted criminals and known manipulators must be weighed against the testimony of the DWCC staff who are charged with the difficult and thankless job of maintaining the prison.  Testimony of DWCC staff is supported by records generated contemporaneously over time.  The evidence clearly weighs in favor of the Defendants and against the Plaintiffs.

62639725.v1

**DEFENSE 9 – DWCC's security practices, specifically use of force, are appropriate.**

130.    It should go without saying that security concerns in a prison are of paramount importance – the security concerns are magnified in a maximum-security prison housing offenders who are violent both before entering prison and while in prison.

131.    Correctional officers on the South Compound can use chemical spray to obtain compliance from offenders who refuse to comply with the officers' commands.

132.    Correctional officers turn on their body cameras when the use of chemical spray or other use of force is anticipated.  The body camera videos show that the correctional officers repeatedly advise the offender that chemical spray will be used if the offender persists in not complying with orders.

133.    Use of Force incidents at DWCC are reviewed by the Unit Manager who oversees the South Compound.  Either Col. Lonnie Nail or Col. Tyrone Mays were the unit managers for the South Compound at all times relevant to this trial.

134.    Use of Force incidents are required to be reported by DWCC to DPS&C in the monthly C-05 report.  The C-05 report shows that DWCC averages 9.08 uses of spray per month.

135.    Offenders who throw items on the tier, at staff members, or at other offenders can be placed on Policy 34, which restricts their property to prevent recurrence of these types of incidents.

136.    An offender who engages in behavior prohibited by Policy 34 can be placed on that status for 24 hours the first time he engages in that behavior.

137.    As of March 2020, an offender who engaged in a pattern of behavior prohibited by Policy 34 may be placed on that status for 30 days.[8]

---

[8] This is an example of a policy change that the Defendants contend should be considered at this time.  Policy 34 now provides a seven-day review period.

138.     Correctional officers do not barter with offenders for privileges such as showers. Suggestions otherwise are categorically denied.

139.     Correctional officers do not open windows in the winter time to punish offenders or make conditions more uncomfortable for offenders.  This is a myth known as "bluesing" that is spread among offenders.

140.     The Department of Corrections is charged with staff, offender, and public safety.

141.     It is a necessary and commonly accepted practice in correctional systems to separate a portion of the offender population securely and more restrictively from the general population.

142.     Segregated, restrictive housing serves as a punitive sanction for violent and/or disruptive misconduct by offenders.

143.     Longer-term restrictive housing for offenders with a pattern of continued serious violent and disruptive conduct serves as an incapacitation function, keeping the staff, other offenders, and the public safe and secure.

**DEFENSE 10 – Two identified deficiencies to not rise to the level of deliberate indifference or cruel and unusual punishment.**

144.     Defendants recognize two issues identified by the Plaintiffs pertaining to the Medication Administration Records (MARs) and Treatment Plans.

145.     As to the MARs, Plaintiffs have argued that the MARs at DWCC are inaccurate.

146.     In response, Defendants acknowledge a problem with the MARs.  That said, Defendants are confident that offenders have received their medications.  All mental health medications are monitored and distributed using "blister packs" which are specifically numbered and are monitored by nursing staff at DWCC.  This procedure operates to ensure that offenders receive their medications.

147.    Certain of the psychotropic medications prescribed by Dr. Seal require monitoring of blood levels of the offenders.  The blood tests operate as another indication that the medications are being delivered.

148.    Offenders are not required to take medications.  Indeed, there are numerous records showing that offenders were non-compliant and DWCC mental health staff encouraging compliance with medications.

150.    Plaintiffs' experts will testify that MARs are difficult to complete and that many prisons have difficulty effectively completing MARs.

151.    Recognizing the problem with the MARs, DWCC assigned new officers as pill call officers and reemphasized the training for those officers.

152.    While the MARs need to be and should be accurate, considering the evidence that medications were delivered, this is not a constitutional violation.  The court in *Dockery v. Hall*, 443 F. Supp. 3d at 740, addressed problems with MARs in that case and held that:

> To the extent the missed doses or untimely administration of medications evidenced on the MARs reflect human error or poor record keeping, they do not amount to constitutional violations.

153.    The second area identified by the Plaintiffs as problematic is treatment plans at DWCC.

154.    Defendants agree that the treatment plans needed to be more rigorous and were in the process of developing new treatment plans going forward.[9]

155.    The Court in *Dockery v. Hall* also addressed treatment plans in that case and held that the fact that plaintiffs wanted different treatment plans did not establish a constitutional violation.  Again, that holding should apply here. 443 F. Supp. 3d at 742.

---

[9] The new treatment plans are currently in place and operating.

62639725.v1

**Defense 11 – Defendants are not subjectively deliberately indifferent to South Compound Offenders' serious mental health needs.**

156.    None of the defendants are being subjectively indifferent to prisoners' serious mental health needs.

157.    Secretary Le Blanc has worked with the Vera Institute in good faith to address alleged concerns regarding restrictive housing and has made adjustments throughout DPS&C accordingly.

158.    DPS&C closed Camp J at the Louisiana State Penitentiary ("LSP"), a restrictive housing facility, which has resulted in the transfer of certain prisoners from LSP to DWCC.

159.    The bottom line is that DPS&C has decreased its reliance on restrictive housing dramatically over the last several years.  In 2017, 19% of the offender population in DPS&C was in restrictive housing; by 2019, the percentage of offenders held in restrictive housing had decreased to 4.8%, a percentage consistent with other states in the country.

160.    Warden Goodwin has relied upon the advice and counsel of mental health professionals as to the appropriate means to provide mental health care to offenders on the South Compound.

161.    DWCC has reduced the number of offenders in restrictive housing.  DWCC does not keep prisoners on restrictive housing for longer periods than other prisons around the country.

162.    Colonel Nail and Colonel Mays have overseen security of the South Compound while complying with directives from superiors and relying upon mental health professionals as to the appropriate means to provide mental health care to prisoners on the South Compound.

163.    Dr. Seal has provided treatment and appropriate medication management to prisoners on the South Compound as shown by the fact that Dr. Burns is not critical of Dr. Seal's diagnoses or medication management of prisoners.

164.    Warden Dauzat has supervised and overseen mental health care to prisoners following the guidance from established DOC policies and Dr. Seal.

165.    Defendants Mr. Hayden, Ms. Robinson (and Mr. Burgos) have provided mental health care to prisoners in compliance with policies directed by superiors and under the guidance of Dr. Seal.

166.    Defendant Adkins no longer provides mental health care at DWCC.

167.    Dr. Thompson, chief of psychiatry at Tulane University, has opined that the mental health care provided by DWCC is more than adequate.

168.    Weaknesses identified through the litigation have been addressed.  DWCC has expanded its mental health staff.  The MARs and Treatment Plans were addressed above.  In addition, DPS&C implemented new policies which were in the final pilot stage as of 3/15/20.

## II.    PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF THE ADA OR THE RA.

169.    A plaintiff states a claim for relief under Title II of the ADA if he alleges: (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

170.    The purpose of the ADA as specifically stated by Congress is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. 12101(b)(1).

171.    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

62639725.v1

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. 12132.

172.    The RA is interpreted the same as the ADA with certain exceptions not applicable here. *Smith v. Harris Cty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020).

173.    The ADA is not meant to be an "end run" around Eighth Amendment cases. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

174.    The ADA proscribes discrimination against disabled individuals.  The Eastern District of Louisiana in *Williamson v. Larpenter*, No. 19-254, 2019 WL 3719761, at *14 (E.D. La. July 15, 2019) held that: "the ADA is a discrimination statute.  The fact that a person has a qualifying disability is not alone sufficient to state a cognizable ADA claim.  Instead, the person with a disability must also establish causation, i.e., that he was discriminated against in the provision of benefits, services or programs by reason of his disability." (emphasis in original). *See also Kokinda v. Pa. Dep't of Corr.*, 779 F. App'x 944, 950 (3d Cir. 2019) (claim was dismissed because plaintiff failed to "assert that he was excluded from a program or service on account of or because of his disability as required"); *Goodman v. Johnson*, 524 F. App'x 887, 890 (4th Cir. 2013) (ADA claim dismissed because plaintiff "failed to allege facts indicating that, due to his disability, he has been deprived of benefits for which he was otherwise qualified"); *Bryant*, 84 F.3d at 249 (failure to attend to a disabled person's needs is not a violation of the ADA where no discrimination is alleged and the disabled person is not treated worse because he was disabled.); *Maccharulo v. N.Y. Dep't of Corr. Servs.*, No. 08-301, 2010 WL 2899751, at *3 (S.D.N.Y July 21, 2010) ("Therefore, when there is no allegation of 'disparate treatment,' . . . between disabled and non-disabled individuals, the plaintiff has not stated a claim under the ADA or the Rehabilitation Act."); *Lee v. State, Dep't of Corr. Servs.*, No. 97-7112, 1999 WL 673339, at *14

(S.D.N.Y. Aug. 30, 1999) (plaintiff's allegations suffered from a fundamental defect in that they failed to state that the offender was excluded from any prison service or program because of his disability).

175.    Neither the ADA nor the RA applies to claims regarding the quality of mental health services. *Smith*, 956 F.3d 318 n.1 ("[T]he ADA does not typically provide a remedy for negligent medical treatment."); *Atkins v. Cty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003); *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *Bryant*, 84 F.3d at 249 (the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners" where no discrimination is alleged).

176.    Similarly, a claim that challenges the adequacy or the substance of services that are provided to a disabled individual is not a valid claim under either the ADA or the RA. *Maccharulo*, 2010 WL 2899751, at *3; *Atkins*, 251 F. Supp. 3d at 1232.

177.    Disciplinary action taken as a result of misconduct is not discrimination based upon a disability as to mental health. *See O'Guinn v. Nev. Dep't of Corr.*, 468 F. App'x 651, 654 (9th Cir. 2012) (claim rejected because O'Guinn failed to produce evidence showing that his disciplinary action was on account of his disability—rather than on account of his misconduct).

178.    "[H]arsh conditions [of administrative segregation] may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners." *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).

179.    If the entity <u>does not provide</u> the program, service or activity as a general matter, then the entity has no duty under Title II to provide an accommodation for disabled persons.  This makes sense because the goal of the ADA is to provide <u>equal access</u> to individuals with disabilities

to opportunities and benefits, <u>not to provide privileges withheld from everyone else</u>. *Williamson*, 2019 WL 3719761, at *15 (quoting *Irby v. Sumnicht*, 683 F. Supp. 2d 913, 917 (W.D. Wis. 2010)) (emphasis in original) (In *Williamson*, the offender asserted that the "defendants discriminated against him by denying him access to therapy, group programs, and regular trips to a mental health facility."  The court addressed the ADA claims specifically by noting that the jail did not provide any of the services to <u>any</u> of the inmates at the jail.  The court then noted that, the plaintiff "was not treated differently from other inmates.").

180.    The mere fact that conditions may be harsh is not an allegation of discrimination. *Wilkinson*, 545 U.S. at 224.  "[R]outine discomfort is part of the penalty that convicted prisoners pay for having committed crimes." *Williamson*, 2019 WL 3719761, at *11.

181.    Prior to March 2020, Deputy Warden Angie Huff was the ADA liaison at DWCC.

182.    Heat precaution duty statuses for offenders on certain psychotropic medication are ordered by medical or mental health staff, and heat advisories are determined by temperature and declared facility-wide by DWCC's control center.

183.    During a heat advisory at DWCC, offenders on the South Compound are provided ice throughout the day, afforded additional showers, provided wet towels, and the jumpsuit policy is relaxed.

184. The tiers of buildings N1-N4 have oscillating fans and windows that can be opened when the weather is hot.

185.    DWCC staff receive training on the ADA which includes how to identify and meet offender needs related to their disabilities.

186.    Plaintiffs' underlying assumption appears to be that all offenders on the South Compound are entitled to accommodations.  That assumption is false.  Recall that DWCC does

not house offenders classified as LOC 1 or LOC 2 and that many offenders in restrictive housing do not have a mental illness.  Thus, there is no blanket across the board need for accommodations under the ADA due to mental health in the South Compound.

187.    Defendants are aware of no request for accommodation due to mental health that has not been addressed.

188.    Most ADA accommodations at DWCC are handled informally based on staff observation or offender's inquiry without the offender having to file a request for accommodation.

189.    Disciplinary action taken as a result of misconduct is not discrimination based upon a mental health disability.

190.    Discipline against offenders with mental illness is allowed in a prison setting.

191.    Restrictive housing is necessary and appropriate for offenders with mental illness if they pose a danger to the public, prison officials, and/or other offenders.

192.    Group therapy and/or group programs are not available to any offender in restrictive housing at DWCC, including offenders with or without a disability.   Individual study and counseling are permitted.

193.    Offenders in disciplinary segregation, both with or without a disability, have access to programs through written materials and individual counseling.

194.    All offenders in restrictive housing are treated the same with regard to the types of mental health treatment available to them.

## III.    **PLAINTIFFS' FIRST AMENDMENT CLAIMS FAIL.**

195.    Defendants categorically deny all allegations pertaining to the First Amendment and/or alleged interference with the attorney-client relationship between Plaintiffs and counsel. Defendants demand strict proof of any such allegations.

62639725.v1

196.    Defendants deny interfering with legal mail in any respect.

197.    Major Angela Matthews with the DWCC mail room will testify regarding the mail room procedures.

198.    Outgoing legal mail is gathered by passing locked boxes marked "US Mail" on the tiers in the South Compound.

199.    DWCC mail officers are the only individuals with keys to the South Compound mail boxes.

200.    DWCC mail officers retrieve outgoing legal mail from the locked mail boxes located on the South Compound on a daily basis.

201.    DWCC mail officers do not open or inspect outgoing sealed legal mail.

202.    DWCC mail officers stamp legal mail envelopes "not responsible for contents" since the mail is not inspected.

203.    DWCC mail officers then personally deliver the mail to the United States Postal Service office located on Homer, Louisiana.

204.    DWCC mail officers are the only employees allowed in the mail room.

198.    Incoming legal mail is retrieved by DWCC mail officers from the Post Office in Homer and delivered to the DWCC mail room.

199.    Incoming legal mail is not opened or inspected by DWCC mail officers.

200.    The incoming legal mail is sorted and delivered to the ranking officer on each South Compound tier for delivery to inmate recipients on N1 – N4.

201.    The ranking officer on each tier delivers the sealed mail to the inmate recipient and has the recipient sign a receipt for the mail.

62639725.v1

202.    The inmate recipient is then required to open the mail in front of the ranking officer to confirm that it does not include contraband.

203.    The inmate recipient maintains control of the mail, and it is not read by the ranking officer.

204.    The signed delivery receipt is then returned to the DWCC mail officers.

205.    Any complaints about the condition of mail received by the Advocacy Center is not the fault of DWCC.  DWCC maintains sound policies on the handling of mail, and they comply with those policies.

200.    Finally, Defendants have made no efforts whatsoever to persuade offenders to not be a part of the litigation.  To the contrary, Defendants and their attorneys have complied with the Court's orders regarding contact with offenders.

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 383-4703
Facsimile: (225) 343-0630

By: /s/ Randal J. Robert
         Randal J. Robert (#21840)
         Connell L. Archey (#20086)
         Keith J. Fernandez (#33124)
         Madaline G. King (#38301)
         *Special Assistant Attorneys General*
         Email:  Randy.Robert@butlersnow.com
                    Connell.Archey@butlersnow.com
                    Keith.Fernandez@butlersnow.com
                    Madaline.King@butlersnow.com
Counsel for Defendants

62639725.v1

<u>**CERTIFICATE OF SERVICE**</u>

 I hereby certify that on the 5th day of January, 2022, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

   /s/ Randal J. Robert   
Randal J. Robert

62639725.v1