1                UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF LOUISIANA
2                    SHREVEPORT DIVISION

3   _____
    ANTHONY TELLIS ET AL            )
4                                   ) CIVIL ACTION
    VERSUS                          ) NO. 5:18-CV-00541
5
    JAMES M. LEBLANC ET AL
6   _____

7

8                BENCH TRIAL - VOLUME IV
                    JANUARY 13, 2022
9
        OFFICIAL TRANSCRIPT OF REMOTE PROCEEDINGS
10        BEFORE THE HONORABLE ELIZABETH E. FOOTE
                UNITED STATES DISTRICT JUDGE
11

12

13  APPEARANCES:

14
    FOR THE PLAINTIFFS, ADVOCACY CENTER OF LOUISIANA,
15  BRUCE CHARLES, CARLTON TURNER, ET AL.:
        Melanie Bray
16      Jonathan C. Trunnel
        Emma Lee Douglas
17      DISABILITY RIGHTS LOUISIANA
        FORMERLY KNOWN AS THE ADVOCACY CENTER
18      8325 Oak Street
        New Orleans, Louisiana 70118
19
        Katherine Murphy Schwartzmann
20      TULANE LAW CLINIC
        6329 Freret Street
21      New Orleans, Louisiana 70118

22      Kyle Potts
        Elizabeth Roussel
23      ADAMS & REESE
        701 Poydras Street, Suite 4500
24      New Orleans, Louisiana 70139

25

```
 1   (Appearances for the Plaintiffs Cont'd)

 2        Nishi Kumar
          Jamila Johnson
 3        Rebecca Ramaswamy
          Samatha Bosalavage
 4        PROMISE OF JUSTICE INSTITUTE
          1024 Elysian Fields Avenue
 5        New Orleans, Louisiana 70117

 6

 7   APPEARANCES FOR THE DEFENDANTS JAMES M. LEBLANC, JERRY
     GOODWIN, LOUISIANA DEPARTMENT OF PUBLIC SAFETY &
 8   CORRECTIONS, LONNIE NAIL, GREGORY SEAL, DEBORAH
     DAUZAT, AERIAL ROBINSON, JOHNNIE ATKINS, AND STEVE
 9   HAYDEN:
          Randal J. Robert
10        Connell L. Archey
          Keith J. Fernandez
11        Madaline G. King
          BUTLER SNOW LLP
12        445 North Boulevard, Suite 300
          Post Office Box 2997
13        Baton Rouge, Louisiana 70821-2997

14
     FOR THE DEFENDANT LOUISIANA DEPARTMENT OF PUBLIC
15   SAFETY AND CORRECTIONS:
          Jonathan Ray Vining
16        General Counsel
          Louisiana Department of Public Safety &
17        Corrections
          Baton Rouge, Louisiana 70804
18

19
                         REPORTED BY:
20                       Jodi D. Terry, RPR
                         Federal Official Court Reporter
21                       300 Fannin Street, Room 4209
                         Shreveport, Louisiana 71101
22                       (318) 934-4756

23        produced by mechanical stenography, transcript
     produced by computer.
24

25
```

```
1        (Court called to order at 9:03 a.m.)
2              THE COURT:  All right.  Good morning,
3    everyone.  We are resuming the plaintiffs' case in
4    chief.
5              I see Ms. Bray is present.  It looks like we
6    have Mr. Robert present for the defendants.  There we
7    are.  A little bit closer please, Ms. Guilhas.
8              And we have a witness present.
9              Let's go ahead, then, and --
10             MS. BRAY:  Your Honor, before we get
11   started, we have one thing we wanted to ask and verify
12   with the Court.  We wanted to know if the Court has
13   received the updated binder with the joint exhibits
14   yet.
15             THE COURT:  They have not made their way up
16   to my office.
17             MR. ROBERT:  They were sent FedEx., I
18   believe they were delivered.  Ms. King is checking
19   right now.  But we were checking and it was en route
20   yesterday and was supposed to get there yesterday
21   afternoon.
22             THE COURT:  All right.  And, Ms. Keifer, if
23   you would ask someone in the clerk's office to check
24   the mail room.  All I know is that they have not made
25   it up to the fourth floor.
```

 1              MS. BRAY:  Okay, just so I know in terms of

 2     referencing the exhibits this morning so that the

 3     Court is able to find them in whatever binder that is

 4     there.

 5              THE COURT:  Are you using them with this

 6     witness?

 7              MS. BRAY:  Yes, Your Honor.

 8              THE COURT:  Miss Keifer, if you could check

 9     on that.

10              In the meantime, were we able to get the

11     stipulations together?

12              MS. BRAY:  We put them together and we sent

13     them over to defendants for their review.

14              MR. ROBERT:  Your Honor, we are sure it's

15     going to be fine.  We just haven't had a chance to

16     look at it.  We'll look, if it's all right with you

17     we'll look at it this weekend, and by Tuesday we'll be

18     ready to roll, if that is okay.

19              THE COURT:  All right.  And we just need

20     your electronic signature on it, and we'll file it

21     into the record on Tuesday morning.

22              Mr. Schimpf, if you will remind me of that

23     Tuesday morning to do that first thing.

24              And the exhibits, were we successful in

25     agreeing on a list of exhibits to give to Miss Keifer

 1  for yesterday?

 2          MS. BRAY:  Yes, I believe that e-mail has

 3  already gone out.

 4          THE COURT:  Very good.  Going out you mean

 5  to Miss --

 6          MS. BRAY:  To Miss Keifer, yes.

 7          THE COURT:  Very good.  Very good.  Well,

 8  that will certainly make the minutes more accurate and

 9  complete, with the cooperation of counsel.  All right.

10          MS. BRAY:  Your Honor, we also were able to

11  determine some time designations for the depositions

12  in lieu of live testimony.

13          THE COURT:  Oh, fabulous.  Tell me about

14  that.

15          MS. BRAY:  So for Mr. Demarcus Thomas, we

16  have, it comes out as 51.36 minutes, I think we can

17  round.

18          THE COURT:  All right.  So 52 minutes for

19  the plaintiff.  And this is Mr. Thomas's deposition?

20          MS. BRAY:  Correct.

21          And we have 45.8 minutes for defendant

22  designations.

23          THE COURT:  Miss Bray, you know, we haven't

24  had any trouble with your microphone till this

25  morning.  We're losing the second half of what you are

```
 1   saying.
 2            MS. BRAY:  Oh, no.
 3            THE COURT:  So on Mr. Thomas.
 4            MR. ROBERT:  Your Honor, may I just, may I
 5   just?
 6            MS. KEIFER:  Judge, I'm not losing her.
 7            Jodi, can you hear her?
 8            (Off-the-record discussion was held.)
 9            MR. ROBERT:  Your Honor, may I just chime in
10   one second, please?
11            THE COURT:  She wasn't finished speaking,
12   Mr. Robert, but go ahead.
13            MR. ROBERT:  Well, I don't mean to interrupt
14   her., I just -- they made that calculation, it hasn't
15   been shared with us yet so it hasn't been confirmed by
16   us yet, so we would like to do that before we -- you
17   know, the judge -- before it's determined in stone
18   here.  It hasn't been shared with us yet.
19            THE COURT:  Okay.  All right.  Is that
20   right, Miss Bray?
21            MS. BRAY:  We are happy to send an e-mail to
22   defendants with these calculations before we share
23   with the Court, yes, Your Honor.
24            THE COURT:  That would be good.  The idea
25   is for you all to agree upon a time.  And how did you
```

1  come up with your time, Miss Bray, just so we know?

2          MS. BRAY:  The minute a page direction.

3          THE COURT:  Did you all try reading it?  I

4  wondered about that.

5          MS. BRAY:  We did not.  We did not.

6          MR. ROBERT:  We have no problem with the

7  minute a page.  If you suggest that works, that works

8  for us as well.  We just want to make sure that it is

9  calculated correctly, and then we'll be good to go.

10         THE COURT:  Let me just say that when I said

11 a minute a page, that was based on a dim recollection

12 from many years ago, so I would not take that to the

13 bank.  That was not a direction from the Court.

14         MS. BRAY:  We did look it up and check, and

15 that is the standard is a minute a page is what we

16 were able to find as well.

17         THE COURT:  All right, very good.  All

18 right.  So Mr. Robert's team is going to check that

19 out, and again, on Tuesday morning he is going to let

20 us know is what is -- what is acceptable in terms of

21 allocation.

22         So let's talk, then, a little bit about what

23 dep -- while we're waiting on confirmation as to the

24 receipt of the joint exhibits.

25         I note our witness is present.  Does anyone

1  have any objection to us talking about these things in

2  front of the witness?

3          MS. BRAY:  We have no objection, Your Honor.

4          THE COURT:  All right.  So let's go ahead,

5  then, and if the plaintiffs would make their formal

6  offer of what exhibit -- of what depositions they are

7  going to offer.

8          And just to be clear, Mr. Brooks has -- we

9  played Mr. Brooks' deposition, correct?

10          MS. BRAY:  Correct, Your Honor.

11          THE COURT:  All right.  And I will get a

12  copy., I have an extra copy of that.  Thank you all.;

13  I will get that to the court reporter for her

14  assistance.

15          MS. BRAY:  Yes, Your Honor.

16          THE COURT:  Miss Keifer, do we need to offer

17  it?  We need to offer it.

18          MS. KEIFER:  Can I tell you my plan?

19          THE COURT:  Yes, ma'am, tell me your plan.

20          MS. KEIFER:  Okay.  As far as on my witness

21  list, like beside Mr. Brooks' name, it says by video.

22  So as the transcripts are entered, I am going to

23  attach to the witness list the written transcripts

24  and/or the video; like whether they submitted it on a

25  DVD, jump drive, whatever they do.  I am attaching

1    that to my witness list.

2              THE COURT:  Thank you.  And I have that,

3    Miss Keifer, upstairs, so I do have that.  I have a CD

4    and I have a transcript.

5              You know, Miss Keifer's job is to make sure

6    that your record is preserved that all of the exhibits

7    are in a format that the Court can review after we

8    finish with the testimony, and also for the Court of

9    Appeal.  So that is why we're very persnickety about

10   all of this.  So Brooks is okay.

11             The next one is Mr. Thomas.  And that is

12   going to be offered with the excerpts; is that right?

13             MS. BRAY:  Yes, Your Honor.

14             THE COURT:  And I have different copies of

15   that.

16             All right.  Then -- so would you at this

17   time like to offer, then, the deposi -- the redacted,

18   or we should say edited; the edited deposition

19   transcript of Demarcus Thomas?

20             MS. BRAY:  Yes, Your Honor, we move to enter

21   the edited deposition Demarcus Thomas in lieu of live

22   testimony.

23             THE COURT:  And how would you designate that

24   as an exhibit?

25             MS. BRAY:  Well, it was jointly edited so it

 1  could be a joint exhibit.  And I do believe --

 2          MR. ROBERT:  23, I believe, Melanie.

 3          THE COURT:  Okay.  It is not a joint

 4  exhibit.  Not to put too fine a line on it, I don't

 5  know if it is going to matter, but it is not a joint

 6  exhibit.  It is the plaintiff's offering testimony as

 7  part of their case in chief.  So it is not -- how,

 8  Miss Keifer -- would you prefer that they put it at

 9  the end of their exhibit list or do you give

10  depositions a separate number, Miss Keifer?

11          MS. KEIFER:  Judge, if they have it on their

12  witness list -- I mean, on their exhibit list.  I am

13  sorry.  If they have it on their exhibit list, then it

14  will electronically be in there as an exhibit ,but I

15  am also going to do it with my witness list as a --

16          THE COURT:  I don't think, it is not listed

17  on your exhibit list, is it, ma'am?

18          MS. BRAY:  No, Your Honor.

19          THE COURT:  Okay.  All right, so let's,

20  let's, could you please come up with a designation,

21  then, for it on your exhibit list.  And I know what

22  you are thinking, Miss Bray, is you don't know what

23  the next entry would be.

24          MS. BRAY:  Actually, I do.  It could be

25  designated as P-YYY-1.

```
 1              THE COURT:  P-YY-1.

 2              MS. BRAY:  Triple Y.

 3              THE COURT:  Triple Y-1.  So that would be

 4    the deposition of Demarcus Thomas.  And the parties

 5    have agreed that his testimony will be by deposition

 6    and in lieu of live testimony.  So that is admitted.

 7    But it is your exhibit.  And the only remaining issue

 8    with Mr. Thomas is how much time is allocated to it.

 9              The next thing is I do have the -- as I

10    indicated previously, I have the edited version of a

11    deposition of Bruce Fuller and one of Johnny Atkins.

12              Are these being offered by the plaintiff,

13    Miss Bray?

14              MS. BRAY:  Yes, Your Honor.

15              THE COURT:  All right.  So have you -- and

16    you have listed these people on your witness list?

17              MS. BRAY:  Yes, Your Honor.

18              THE COURT:  All right.  And is there

19    objection, Mr. Robert, to the deposition testimony of

20    these witnesses being entered in lieu of their live

21    testimony?

22              MR. ROBERT:  No, Your Honor.  They were

23    jointly agreed to.

24              THE COURT:  All right.  And these are not by

25    video, they are just by written, or are they going to
```

814

1   be by video too, Miss Bray?

2           MS. BRAY:  They were only written.  There

3   was no video associated.

4           THE COURT:  Okay.  All right.  So we need to

5   decide, then, on these as well, and the Court will --

6   so over the weekend the Court will read these three

7   deposition transcripts as well.

8           So let me -- Miss Bray?

9           MS. BRAY:  Would you like me to designate

10  exhibit identifiers for each of those as well?

11          THE COURT:  Please.  That was the next

12  thing.

13          MS. BRAY:  Excellent.  So for Mr. Bruce

14  Fuller, we will designate his deposition transcript as

15  P-YYY-2.

16          And then for Mr. Johnny Atkins, we can do

17  P-YYY-3.

18          THE COURT:  All right.  The Court would

19  second those filings, then, at this time, and I will

20  read them and be familiar with them.

21          MS. BRAY:  Do we also need to designate for

22  Mr. Brooks?

23          THE COURT:  Miss Keifer says no.

24          MS. BRAY:  Okay.

25          MS. KEIFER:  Well, that -- I mean that is up

1  to you all, Judge.

2          THE COURT:  Oh, okay.  All right.  Well,

3  let's go ahead, then, and we'll designate Mr. Brooks

4  as P-YYY-4.

5          MS. BRAY:  Yes.

6          THE COURT:  Very good.

7          MS. BRAY:  Thank you.

8          MS. KEIFER:  And, Judge, I just have one

9  more quick question, to interrupt you all, I am sorry.

10  If a deposition transcript is read into the record by

11  an attorney or whoever, Miss Terry wants to know if

12  you want every word taken down on that?

13          THE COURT:  I don't think we're going to do

14  that.  I think I will simply -- for the ones that are

15  not video and the Court will have had the advantage of

16  seeing the witness, I will just simply go ahead and

17  read those depositions.  And that will be a good way

18  for us to pick up on our time as well.  So I will

19  simply read those outside of the scope of our

20  hearings.  If that is acceptable to everyone?

21          MS. BRAY:  Yes, Your Honor.

22          THE COURT:  Is that --  all right, very

23  good.

24          MR. ROBERT:  Yes.

25          THE COURT:  So Miss Terry won't have to

1  worry about that.  And I will get that notebook and
2  those copies to Miss Terry today.
3          All right.  Is there any information,
4  Mr. Robert, as to the whereabouts of the joint
5  exhibits?
6          MR. ROBERT:  It is delayed by FedEx, pending
7  delivery in Shreveport.  It is in Shreveport, Your
8  Honor.  But we did send it for overnight, but it is
9  just apparently difficult right now with FedEx trying
10 to get things delivered timely.
11         MS. BRAY:  Your Honor, we'll do our best.
12 We will try and make sure that what we are entering as
13 the joint exhibits, we're going to use the
14 designations that were in the joint pretrial order as
15 the binder will be when it arrives, and we will direct
16 the Court to where those exhibits hopefully are
17 actually located in the binder that you have.
18         THE COURT:  Okay.  All right.  I am looking
19 for the joint exhibits.
20         Okay.  Well, then, we'll do our best with
21 that.  Of course you will be showing them on the
22 screen as well.
23         MS. BRAY:  And, I am sorry.  Miss Keifer, so
24 there -- I don't know; Corey Adams has popped up, and
25 it appears that he is joining.  He is early.  They're

817

1  working on actually disconnecting him.  So if you

2  wouldn't mind moving him for now, please.

3            MS. KEIFER:  In the waiting room?

4            MR. BRAY:  Yes, please.  Thank you.

5            THE COURT:  Corey Adams was on ,like ,at

6  7:30 this morning or something.  On my -- on my

7  computer it showed that he was joined.

8            MS. KEIFER:  I didn't know this until now.

9            THE COURT:  It pops up in my inbox.

10           Okay.  Are we ready now, Miss Bray, to

11  proceed?

12           MS. BRAY:  We are.  I am actually going to

13  turn it over to Miss Roussel.

14           THE COURT:  To Miss Roussel.

15           All right, very good.  All right.

16           Miss Keifer, would you please swear our

17  witness?

18           (The witness was duly sworn.)

19           THE COURT:  Very good.  All right, please

20  proceed.

21                 MICHELLE NORRIS,

22        having been called as a witness, having

23        been duly sworn, testified as follows:

24                 CROSS-EXAMINATION

25  BY MS. ROUSSEL:

818

1  Q.   Good morning, Miss Norris.  We haven't met before

2  today.  My name is Liz Roussel.  It is nice to meet

3  you.

4  A.   Good morning.

5  Q.   Miss Norris, my understanding is that you

6  currently work at David Wade Correctional Center; is

7  that correct?

8  A.   Yes, ma'am.

9  Q.   And you have worked there --

10         THE COURT:  Miss Roussel, I don't know this

11  witness's name.  I am reading Michelle Norris; is that

12  correct?

13         THE WITNESS:  Yes, ma'am.

14         THE COURT:  Very good.  All right, please

15  proceed.

16         MS. ROUSSEL:  Thank you, Your Honor.

17  BY MS. ROUSSEL:

18  Q.   Miss Norris, you have worked at David Wade since

19  June of 2013; is that correct?

20  A.   Yes, ma'am.

21  Q.   And you obtained your associate's degree from

22  Louisiana Tech in nursing prior to that, right?

23  A.   Yes, ma'am.

24  Q.   You are a registered nurse?

25  A.   Yes, ma'am.

1  Q.   When you started working at David Wade you were

2  an RN supervisor A; is that right?

3  A.   Yes, ma'am.

4  Q.   And at some point thereafter you were promoted to

5  an RN supervisor B?

6  A.   Yes, ma'am.

7  Q.   Is that the position that you hold today?

8  A.   No, ma'am.

9  Q.   What position do you hold today?

10  A.   I'm the Director of Nursing.

11  Q.   And so that would have been a promotion from the

12  RN supervisor B position?

13  A.   Yes, ma'am.

14  Q.   And when did that occur?

15  A.   2020.

16  Q.   I want to ask you some questions about the

17  responsibilities you had as an RN supervisor B and

18  what the responsibilities of an RN supervisor A are as

19  well.

20           So when you were working as an RN

21  supervisor B, one of your responsibilities was to

22  supervise the RN supervisor As.  Is that correct?

23  A.   Yes, ma'am.

24  Q.   And those are in -- supervisor As are generally

25  responsible for working the floor, right?

1    A.   Yes, ma'am.  I mean I have LPNs also that work

2    the floor.

3    Q.   Okay.  And working the floor refers to doing sick

4    call and tending to the patients that are in the

5    infirmary; is that right?

6    A.   Sick call in terms of the infirmary.  It's also

7    sick call on the south side.  Yes, ma'am ,we have a

8    supervisor on that side also.

9    Q.   Okay.  And just to be clear, there is an

10   infirmary on the north side and there is also an

11   infirmary on the south side, right?

12   A.   Yes, ma'am.

13   Q.   But the RN supervisor As would be -- one of their

14   job responsibilities would be tending to the patients

15   in those infirmaries regardless of whether they are on

16   the north or the south side, right?

17   A.   I have a supervisor on south side separately from

18   the supervisor on north side, yes.

19   Q.   Thank you.  How long were you the RN

20   supervisor B?

21   A.   I would have to look back exactly.  I do believe

22   I was -- I really do not know exact years.

23   Q.   Okay.  When you were in that role, you were

24   responsible primarily for infection control and

25   quality assurance; is that right?

821

1    A.    Yes, ma'am.

2    Q.    And with respect to quality assurance, you were

3    responsible for making sure that David Wade's

4    infirmary on the north side was operating in

5    compliance with the ACA rules; is that right?

6    A.    Yes, ma'am.

7    Q.    And ACA refers to the American Correctional

8    Association.    Correct?

9    A.    Yes, ma'am.

10   Q.    That's sort of an accrediting entity for your

11   facility?

12   A.    Yes, ma'am.

13   Q.    The quality assurance part of your job when you

14   were a supervisor RN B did not require you to go to

15   the south compound; is that right?

16   A.    Yes, ma'am.

17   Q.    Is it fair to say that when you worked as the RN

18   supervisor B you spent most of your time in the north

19   compound?

20   A.    Yes, ma'am.

21   Q.    One task that you were expected to perform as it

22   related to quality assurance was to do chart checks;

23   is that right?

24   A.    Yes, ma'am.

25   Q.    And in that regard, according to the ACA rules,

822

1   what you were required to do was review ten patient

2   charts every three months, right?

3   A.   Yes, ma'am.

4   Q.   And to do that you would pull ten charts at

5   random, right?

6   A.   Yes, ma'am.

7   Q.   And so there was no process for determining

8   whether the charts you pulled would be for individuals

9   who were on the north compound or the south compound?

10  A.   Correct.

11  Q.   You just selected those charts at random?

12  A.   Yes, ma'am.

13  Q.   And when you would do a chart check, one of the

14  things you would do was to review the chart to make

15  sure that there was a medication administration record

16  present in the chart, right?

17  A.   Yes, ma'am.

18  Q.   But that was the extent of your review of the

19  medication administration record; isn't that true?

20  A.   Yes, ma'am.

21  Q.   In other words, as long as that document was

22  present in the chart, then your task as it related to

23  quality assurance was complete?

24  A.   Yes, ma'am.

25  Q.   All right.  I want to move on and ask you some

1  questions concerning just the process for receiving

2  medications at David Wade.

3          As an RN supervisor B, and I guess as the

4  Director of Nursing now, you are familiar with how

5  medication is received at the facility and how it is

6  distributed to the prisoners, right?

7  A.   Yes, ma'am.

8  Q.   One way that medication is received at David Wade

9  is by delivery to the facility when a prisoner is

10  first transferred there for incarceration, right?

11  A.   Yes, ma'am.

12  Q.   And when that happens, the medication actually

13  arrives in the same vehicle that brings that prisoner

14  to David Wade, right?

15  A.   Yes, ma'am.

16  Q.   And the officers who are transporting that

17  prisoner bring that medication and any other related

18  documentation into the infirmary, right?

19  A.   Yes, ma'am.

20  Q.   And at that point the nurses, whether it is a

21  registered nurse or an LPN, whoever is there, they

22  would handle intake of that medicine into the

23  facility; is that right?

24  A.   Yes, ma'am.

25  Q.   And they determine where that prisoner is going

1    to be housed at the facility so that they can place

2    the medication that they received onto a cart to be

3    sure that it is delivered to the right tier; is that

4    right?

5    A.    We do not determine where the house -- where the

6    prisoners are housed.

7    Q.    Okay.  So the nurses, though, they make -- they

8    go through a process when they intake that medicine to

9    put the medicine on a cart; is that right?

10   A.    Yes, ma'am.

11   Q.    Okay.  That is where the medication is stored

12   until it can be delivered to the prisoners?

13   A.    Yes, ma'am.

14   Q.    Another way that medication is received at David

15   Wade is by transportation from the pharmacy at Hunt,

16   right?

17   A.    Yes, ma'am.

18   Q.    Because David Wade does not have its own

19   pharmacy; isn't that correct?

20   A.    Correct.

21   Q.    All right.  So when medication is received from

22   Hunt, the same process is followed.  A nurse in the

23   infirmary would check in the medication, and then

24   place it on a cart for distribution to the prisoners,

25   right?

1    A.    Yes, ma'am.

2    Q.    Now, on the south compound, medication that the

3    nurses place on the cart is distributed to the

4    prisoners by pill call officers; isn't that true?

5    A.    Yes, ma'am.

6    Q.    And there -- it's my understanding there are two

7    pill call officers on the south side, right?

8    A.    Yes, ma'am.

9    Q.    And they work seven days on and seven days off,

10   right?

11   A.    No, ma'am, they no longer work that.  They work a

12   regular shift.

13   Q.    I'm sorry, I couldn't -- I couldn't understand

14   you.

15   A.    They work a regular security shift.

16            THE COURT:  Let's -- let's redirect her,

17   Miss Roussel, to the appropriate time frame.

18            MS. ROUSSEL:  I will, Your Honor.  And I

19   apologize, I was just having difficulty understanding

20   her response.

21            THE COURT:  Yes.  Miss Norris, if you, let's

22   see, maybe try backing off a little bit, back up a

23   little bit, let's see.

24            Talk a little bit, answer that question

25   again.

1           THE WITNESS:  We did have seven on --
2   officers that did seven on, seven off.  Now they work
3   a security shift.
4           THE COURT:  Okay.  This sounds a little bit
5   better that way, Miss Norris.
6           So, Miss Roussel, if you would, please,
7   then, as I said, direct her to the time frame so the
8   Court knows when we're talking about.
9           MS. ROUSSEL:  Yes, Your Honor, I will do
10  that.
11  BY MS. ROUSSEL:
12  Q.   So back in around January of 2019, the pill call
13  officers worked seven days on and seven days off; is
14  that right?
15  A.   Yes, ma'am.
16  Q.   Do you recall when the change was made to the
17  shifts that they work?
18  A.   No, ma'am, I do not.  You would have to get with
19  security.
20  Q.   Okay.  Do you know whether prior to March of 2020
21  they were working seven days on and seven days off?
22  A.   No, ma'am, I do not remember when they switched
23  over.
24  Q.   Okay.  In that time that they worked 7 days on, 7
25  days off, they were working 12-hour shifts per day,

827

1   right?

2   A.   Yes, ma'am.

3   Q.   So one of them would work 7 days straight 12-hour

4   shifts, and then the other one would work the next

5   7-day 12-hour shifts?

6   A.   Yes, ma'am.

7   Q.   In the four buildings on the south side there are

8   three pill calls each day; is that right?

9   A.   Yes, ma'am.

10  Q.   Okay, and that has been the case for years; is

11  that right?

12  A.   As long as I have been here, yes, ma'am.

13  Q.   Okay.  And those pill calls occur at 6 a.m.,

14  noon, and 4 p.m.; is that right?

15  A.   Yes, ma'am.

16  Q.   There is no particular sequence that the pill

17  call officers are required to go in when they

18  distribute the medication to the prisoners, right?

19  A.   No, ma'am.

20  Q.   They are just expected to visit each cell on each

21  tier of each building three times a day, right?

22        Now, all of the mental health medications the

23  pill call officers distribute at David Wade are kept

24  on pill carts; is that correct?

25  A.   Yes, ma'am.

1  Q.   And a pill cart is just a blister pack that has

2  either a 30-day or a 60-day supply of medicine in it,

3  right?

4  A.   Yes, ma'am.

5  Q.   All right.  I want to focus a little bit now

6  specifically on the medication distribution procedure

7  that is followed and that was followed prior to March

8  of 2020, okay?

9  A.   Yes.

10 Q.   David Wade has a post order that describes how

11 pill call officers are supposed to go about issuing

12 medications to prisoners, right?

13 A.   I'm sorry, I did not understand.  I did not hear

14 you, I am sorry.

15 Q.   No problem, I'm happy to repeat the question.

16       David Wade has a post order that describes

17 how pill call officers are supposed to go about

18 distributing medication to prisoners, right?

19 A.   Yes, ma'am.

20 Q.   All right.  And you are familiar with that

21 document?

22 A.   Yes, ma'am.

23 Q.   Let me go ahead and show you a copy of that

24 document.

25       MS. ROUSSEL:  Your Honor, I believe it is in

1  your binder.

2            Can Miss Keifer share this document?

3            Sorry, Your Honor, I am getting assistance

4  over here from Miss Bray.

5            For the record, Your Honor, the document

6  that we are referring to is marked as Exhibit J-13 but

7  it ought to be in the binder you have as J-12.

8  BY MS. ROUSSEL:

9  Q.   Miss Norris, are you able to see the document

10 that we put on the screen?

11 A.   Yes, ma'am.

12 Q.   Okay.  Is this the post order procedure at David

13 Wade that describes how pill call officers are

14 supposed to go about issuing medications to prisoners?

15 A.   Yes, ma'am.

16           MS. ROUSSEL:  Your Honor, I would like to

17 offer, file, and introduce this document as, well,

18 it's Joint Exhibit 13?

19           THE COURT:  Without objection, it is

20 admitted.

21 BY MS. ROUSSEL:

22 Q.   I would like to focus your attention to the

23 bottom of this first page, Miss Norris, which

24 describes a step-by-step process that the pill call

25 officers are supposed to follow when distributing

830

1  medication, right?

2  A.    Yes, ma'am.

3  Q.    All right.  So the first thing they do is take

4  the medication from the cart where the nurses have

5  placed it, right?

6  A.    They take the cart.

7  Q.    Excuse me, that is what I meant.  They take the

8  cart with the medication the nurses have placed upon

9  it?

10  A.    Yes, ma'am.

11  Q.    All right.  And you said earlier that the nurses

12  don't determine where the prisoners are located, it's

13  the pill call officers who then sort this medication

14  by tier to make sure it is going to the right place?

15  A.    No, ma'am.

16  Q.    Okay.  So when it says they sort the medication

17  by tier, what is that referring to?

18  A.    The nurses -- the nurses place the medications on

19  the cart, and we sort out the medications for each

20  tier.

21  Q.    Okay.  So the nurses do that part?

22  A.    Yes, ma'am, for the most part the nurses do it.

23  If an offender moves from C to D, the pill officers

24  can move that medication over but the nurses at

25  nighttime verify that is where the offender goes.

1  Q.   Okay.  And so then after that the pill call

2  officers are supposed to take the pill cart to the

3  proper building and the proper tier for distribution,

4  right?

5  A.   The pill call cart's on each building.  They have

6  their own cart for each tier, each block.

7  Q.   Okay.  And so the pill call officers, when they

8  pass by and visit each of the cells on each of the

9  tiers, they are required to verify the offender by

10  their name, their Department of Corrections number,

11  and their ID card before they can distribute

12  medication to them, right?

13  A.   Yes, ma'am.

14  Q.   And they are also supposed to verify the time the

15  medication is supposed to be given, right?

16  A.   Yes, ma'am.

17  Q.   And then they are supposed to request that the

18  prisoners get water or some sort of liquid to take the

19  medication, right?

20  A.   Yes, ma'am.

21  Q.   Now, after that there is a specific process they

22  are supposed to follow for actually providing the

23  medicine to the prisoners, right?

24  A.   Yes, ma'am.

25  Q.   They are supposed to actually punch the medicine

1    out of the blister pack and place it into a pill call

2    cup, right?

3    A.    Yes, ma'am.

4    Q.    That is what is given to the prisoners so that

5    they can take the medication with the water or liquid

6    that they have been asked to get right?

7    A.    Yes, ma'am.

8    Q.    All right.  And at that point they are supposed

9    to visually observe the offender taking the medication

10   in their presence?

11   A.    Yes, ma'am.

12   Q.    And the next part describes sort of a more

13   specific process of that, a visual oral cavity search

14   which requires the prisoner to open their mouth, raise

15   their tongue so they can be sure that they actually

16   swallowed the medication that they were provided,

17   right?

18   A.    Yes, ma'am.

19   Q.    And after they do that, they go to the next cell

20   and repeat this process with any prisoner who is

21   scheduled to receive medication, right?

22   A.    Yes, ma'am.

23   Q.    All right, and this policy goes to discuss that

24   this process is supposed to be documented, and

25   particularly if there is any refusal or if any

1  prisoners don't request their medication, that is

2  supposed to be documented, right?

3  A.   Yes, ma'am.

4  Q.   And I want to come back and ask you some more

5  questions about that, but before I do I want to ask

6  you about another policy that relates to the way the

7  pill call officers are supposed to go about

8  distributing medicine.

9        There is also a policy at David Wade that

10  addresses pill call that applies to all of the staff.

11  Are you familiar with that policy?

12  A.   Yes, ma'am.

13  Q.   Okay.  Let me go ahead and show it to you.

14        MS. ROUSSEL:  It is going to be marked, Your

15  Honor, in the binder that is coming to you as

16  Exhibit J-9.  And that is the same exhibit it should

17  have, Your Honor, in the binder that you have

18  presently.

19  BY MS. ROUSSEL:

20  Q.   Miss Norris, do you recognize the document that

21  we have marked as J-9?

22  A.   Yes, ma'am.

23  Q.   This is the pill call policy that -- or the

24  policy that addresses pill call that applies to all

25  staff at David Wade, right?

834

1  A.   Yes, ma'am.

2  Q.   All right, I want to direct your attention to the

3  second page of this document.  Under the section that

4  pertains to psychotropic medications.  The first

5  sentence here states that it is important that

6  offenders who have a history of unstable behavior

7  receive their medication on a regular and continual

8  basis, right?

9  A.   Yes, ma'am.

10  Q.   And that is something that all staff understand

11  and are made aware of at David Wade, right?

12  A.   Yes, ma'am.

13  Q.   Looking at this document, if you go to the next

14  page, the third page, again we're still under the

15  section concerning psychotropic medication.  It says

16  there at the last sentence that in all cases direct

17  observation therapy will be used to ensure that all

18  psychotropic medications are taken properly.  Do you

19  see that?

20  A.   Yes, ma'am.

21  Q.   The reference there to direct observation

22  therapy, that is the same thing we were just looking

23  at on the prior exhibit concerning the pill pass

24  officers being supposed to take steps to make sure

25  that the patients have actually swallowed the oral

835

1  medication; is that right?

2  A.   Yes, ma'am.

3  Q.   All right.  A moment ago I told you I wanted to

4  sort of come back and talk a little bit about

5  instances where prisoners either refuse to take

6  medication or it is not requested.

7          So if a prisoner says he will not take

8  medication, that is considered a refusal; is that

9  right?

10  A.   Yes, ma'am.

11  Q.   If a prisoner is asleep in their cell at the time

12  of pill call and does not wake up to accept

13  medication, that sometimes also is reported as a

14  refusal; is that right?

15  A.   I do not report that as a refusal.

16  Q.   Okay.

17  A.   No, ma'am.

18  Q.   Okay.  Would that be recorded as not requested?

19  A.   Yes, ma'am, that would be reported as not

20  requested.

21  Q.   Not requested.

22          And if a prisoner does not come to the bars

23  of their cell when the pill call officer passes by,

24  that could also be reported as not requested?

25  A.   That is what I would report it as is not

1  requested.

2  Q.   Okay.  And, likewise, if a prisoner does not

3  respond to the pill call officer when he passes, would

4  that be something you would report as the prisoner not

5  requesting the medication?

6  A.   That is what I would report it as is not

7  requested.

8  Q.   And you are making a clarification here about

9  what you would do.  Is it your understanding that what

10  you would do is different than what others would do?

11  A.   This is what I would do, yes, ma'am.

12  Q.   Okay.  So you can't speak to what others would

13  do?

14  A.   Yes, ma'am.

15  Q.   The pill call officers are required to record

16  whether a patient has refused to take the mental

17  health medication that they are distributing, right?

18  A.   Yes, ma'am.

19  Q.   And they are also required to document whether a

20  patient does not request the medication when they

21  pass; is that right?

22  A.   Yes.

23  Q.   Is it true that they normally record that on a

24  notepad when they are going through the tiers?

25  A.   That is what I would do, yes, ma'am.

1  Q.   Okay.  Do you know what the pill pass officers

2  actually do?

3  A.   No, ma'am.  You would have to ask them.

4  Q.   Okay.  Whether they record anything on a notepad

5  or not when they are walking through the tiers, they

6  are required after they complete the walk-through of

7  the tiers to complete a medication administration

8  record that documents whether the medication was

9  refused or not requested, right?

10  A.   Yes, ma'am.

11  Q.   And when a patient refuses medication, that is

12  supposed to be designated by the letter R in the

13  medication administration record, right?

14  A.   Yes, ma'am.

15  Q.   And when a patient does not request medication,

16  that is supposed to be reported with the letter N in

17  the medication administration record, right?

18  A.   Yes, ma'am.  I'm sorry.

19  Q.   That's okay, I just wasn't sure if I -- I

20  couldn't hear you.

21        Now, before January of 2019 when a patient

22  refused their medication, an e-mail would be sent to

23  every warden, to mental health, and to the head nurse

24  that made them aware of that; isn't that correct?

25  A.   Yes, ma'am.

1           THE COURT:  Ask the question again, Miss

2    Roussel.

3           MS. ROUSSEL:  Sure, Your Honor.

4    BY MS. ROUSSEL:

5    Q.   Before January of 2019, when a patient refused

6    their medication, an e-mail would be sent to every

7    warden, mental health, and the head nurse making them

8    aware of that, correct?

9    A.   Yes, ma'am, I believe.

10   Q.   Would a patient who did not request their

11   medication also be included on that e-mail?

12   A.   No, ma'am.

13   Q.   But in January of 2019 David Wade started

14   maintaining a database, an electronic database, to

15   reflect when mental health medications were refused,

16   right?

17   A.   Yes, ma'am.

18   Q.   Would that database also indicate when

19   medications were not requested?

20   A.   I do believe it does.  I do believe it documents

21   that when they did not take their medication.

22   Q.   Whether it was refused or not requested?

23   A.   Yes, ma'am.

24   Q.   Now, after January of 2019, when this database

25   started to be used, e-mails were no longer sent to the

1    wardens, the head nurse, and mental health to make

2    them aware that patients had refused or not requested

3    medication, right?

4    A.    I do not know the exact date that that e-mail was

5    stopped.

6    Q.    Okay.  Did it correspond with the time that the

7    database - that you all started to use the electronic

8    database?

9    A.    Again, I don't remember the time that the e-mails

10   were stopped, when we stopped using the e-mails.

11   Q.    Okay.  But you know at some point there was a

12   point when you stopped sending e-mails to the wardens

13   and folks in mental health and to the head nurse to

14   make them aware that patients had stopped -- had

15   refused or had not requested the medication, right?

16   A.    Yes, ma'am.

17   Q.    And once that happened, that information about

18   refusals and medication not being requested was

19   recorded only in the electronic, the E-MAR, in that

20   database; is that right?

21   A.    On both, yes, ma'am.

22   Q.    Okay.  There were no other records that reflected

23   when patients were not receiving their mental health

24   medication, right?

25   A.    Correct.

840

```
 1            THE COURT:  May I stop you right here, Miss
 2   Roussel?  She referred to both of them.  Can-- I --
 3   there was some confusion earlier in the testimony from
 4   what the Court heard.
 5            Is the MAR the database or is there a
 6   database and then a separate electronic MAR?
 7            THE WITNESS:  Are you addressing me, ma'am?
 8            MS. ROUSSEL:  Well, I am happy to ask the
 9   question again, Your Honor, and clarify that.
10   BY MS. ROUSSEL:
11   Q.   There is -- there is an electronic MAR that gets
12   created, right?
13   A.   Yes, ma'am, that we -- that the officers and the
14   nurses document on, yes.
15   Q.   Okay.  And in addition there is a database that
16   reflects when medication has been refused by the
17   prisoners, right?
18   A.   The mental health medications, yes, ma'am.
19   Q.   Yes.  And so after you discontinued using e-mails
20   to notify individuals about medication being refused
21   or not requested, the only place that information was
22   recorded was in the E-MAR or in the mental health
23   refusal database; is that right?
24   A.   And the mental health database.
25   Q.   Got it.  Sorry.  That is helpful.
```

1          MS. ROUSSEL:  So, Your Honor, I will make

2     sure that is clear.

3     BY MS. ROUSSEL:

4     Q.   So after you stopped using the e-mails as a

5     method to notify people about refusals and medication

6     not being requested, there were two places where that

7     was recorded; in the E-MARs and in the mental health

8     refusal database?

9     A.   Correct.

10    Q.   All right.  Those were the only places that that

11    information was recorded?

12    A.   Yes, ma'am.

13    Q.   Now, the pill call officers are the ones who are

14    responsible for entering the information into the

15    database concerning refusals and medication not being

16    requested, and on the E-MARs; is that right?

17    A.   On the nor -- on the south compound, yes.  I have

18    nurses on the north that pass out medications also.

19    Q.   Okay.  And the only people at David Wade who have

20    access to these E-MARs and this mental health refusal

21    database are the pill call officers and the nurses; is

22    that right?

23    A.   The wardens also have access.

24    Q.   Okay.  Which wardens have access to that?

25    A.   I don't have -- I don't know all of the wardens

1  that would have access to it but some of the wardens

2  do have access to that.

3  Q.   So do you know whether all of the wardens have

4  access to that or just some of the wardens?

5  A.   No, ma'am, I do not know who has access to it.

6  Q.   Okay.  Do you know if Warden Dauzat has access to

7  that?

8  A.   No, ma'am, I -- I don't believe she does but you

9  would have to ask her.

10  Q.   Okay.  For an individual to access the mental

11  health refusal database, they have to use a password

12  that unique to them; is that right?

13  A.   Yes, ma'am.

14  Q.   And as you sit here today, it is your

15  understanding that the pill call officers have a

16  password to access the database, right?

17  A.   Yes, ma'am.

18  Q.   And so do the nurses, right?

19  A.   Yes, ma'am.

20  Q.   And you think maybe some of the wardens do but

21  you're not sure who?

22  A.   Yes, ma'am.

23  Q.   To be clear, before March of 2020, did any of the

24  wardens have access to the database?

25  A.   You would have to ask them.

843

1   Q.   After the pill call officer creates the E-MAR and

2   puts the information into the database concerning

3   medication being refused or not requested, they have

4   no further duties with respect to reporting that

5   information to anyone else; is that right?

6   A.   I am sorry?  Can you --

7   Q.   I'll repeat the question.

8            After a pill call officer on the south side

9   completes the E-MAR and puts the information into the

10  electronic database about whether a prisoner has

11  refused medication or not requested it, they have no

12  further responsibility as it relates to reporting that

13  information to anyone, right?

14  A.   That would be up to the pill officers.

15  Q.   Okay.  But to your knowledge, they don't have any

16  further responsibility; isn't that right?

17  A.   To my knowledge.

18  Q.   Isn't it true that when a nurse or a pill call

19  officer logs into this electronic system to make a

20  record that a patient refused medication or didn't

21  request it, they would not see whether the patient had

22  refused medication or not requested it the day before

23  or in the days prior?

24  A.   Correct.

25  Q.   In other words, if they wanted to see that kind

1    of information they would have to generate some form

2    of a report; isn't that true?

3    A.    On the E-MAR?

4    Q.    On the E-MAR or out of the database?

5    A.    On the E-MAR, you would have to print a MAR.  You

6    have to print the MAR to see if they refused the day

7    before.

8    Q.    Okay.  And it is not common practice at David

9    Wade to print out the patients' E-MARs to check to see

10    if they had refused medication in the prior days;

11    isn't that true?

12    A.    No, ma'am, we do not print them out daily, no,

13    ma'am.

14    Q.    We discussed earlier that nurses are responsible

15    for accepting medication when it is delivered to David

16    Wade, right?

17    A.    Yes, ma'am.

18    Q.    And for placing it on the cart so it can be

19    distributed by the pill call officers, right?

20    A.    Yes, ma'am.

21    Q.    If the nurses see that the number of pills in a

22    blister pack is getting low, they also have some

23    responsibility for refilling that medication, right?

24    A.    Yes, ma'am.

25    Q.    All right.  All right, and the way they determine

845

1  that it is time to refill a medication is just by

2  visually looking at these blister packs to see how

3  many pills are left, right?

4  A.   Yes, ma'am.

5  Q.   There is no other sort of process for tracking

6  that medication, right?

7  A.   Correct.

8  Q.   The nurses also have responsibility for

9  administering certain medications that need to be

10  administered through injection, right?

11  A.   Yes, ma'am.

12  Q.   But on the south compound they are not

13  responsible for distributing the pills to the

14  prisoners, right?

15  A.   Correct.

16  Q.   Isn't it true that there is no one on the medical

17  staff at David Wade who is responsible for monitoring

18  or supervising the pill call officers to ensure that

19  they are complying with the written medication

20  distribution policies that we looked at a few moments

21  ago?

22  A.   We do not monitor them, no, ma'am, nursing does

23  not monitor them.

24  Q.   Isn't it true that there also isn't anyone at

25  David Wade who is responsible for ensuring that the

1  information is being accurately reported in the

2  E-MARs?

3  A.    The nursing documents to the mental health the

4  E-MARs, and the pill officers, yes, ma'am.

5            I am not understanding.

6  Q.    My question is more of a back to sort of quality

7  control, quality assurance.  Isn't it true that it is

8  no one's responsibility at David Wade to look back and

9  monitor to make sure that information is being input

10 correctly into the E-MARs?

11 A.    We do not go behind each pill officer, no, ma'am,

12 we do not.

13 Q.    Are you familiar with the heat pathology policy

14 in the Department of Public Safety and Corrections?

15 A.    Yes, ma'am.

16 Q.    That is a policy that applies statewide, right?

17 A.    Yes, ma'am.

18 Q.    Let me go ahead and show you a document that we

19 have marked as Exhibit J-11.

20            MS. ROUSSEL:  And, Your Honor, this should

21 be J-11 in your binder as well.

22 BY MS. ROUSSEL:

23 Q.    Miss Norris, do you recognize the document we

24 have marked as J-11?

25 A.    Yes, ma'am.

1  Q.   This is the Department of Public Safety and

2  Corrections heat pathology policy, right?

3  A.   Yes, ma'am.

4  Q.   All right.  And if you look down to the fifth

5  paragraph.

6        MS. ROUSSEL:  Your Honor, I would like to go

7  ahead and offer, file, and introduce Exhibit J-11?

8        THE COURT:  It is admitted.

9  BY MS. ROUSSEL:

10  Q.  If you look at the fifth paragraph, this policy

11  states that every facility within the Department of

12  Public Safety and Corrections should have a mechanism

13  to identify offenders who are more vulnerable to heat

14  and to enforce provisions to reduce heat pathology

15  among them, right?

16  A.   Yes, ma'am.

17  Q.   In other words, every institution is supposed to

18  have its own heat pathology policy, right?

19  A.   Yes, ma'am.

20  Q.   And the purpose of this policy is to protect

21  people who might be especially sensitive to heat in

22  certain cases because of the medication that is being

23  administered to them; is that right?

24  A.   Yes, ma'am.

25  Q.   Are you familiar with the heat pathology policy

848

1  that is specific to David Wade?

2  A.   Yes, ma'am.

3  Q.   I am going to go ahead and show you a document

4  that we have marked as Exhibit J-8.

5           MS. ROUSSEL:  Your Honor, this one should

6  appear in your binder as J-10.

7  BY MS. ROUSSEL:

8  Q.   Miss Norris, do you recognize the document we

9  have marked as Exhibit J-8?

10  A.   Yes, ma'am.

11           MS. ROUSSEL:  Your Honor, I would like to

12  offer, file, and introduce Exhibit J-8.

13           THE COURT:  It is accepted.

14  BY MS. ROUSSEL:

15  Q.   Miss Norris,this is the heat pathology policy

16  that is specific to David Wade, right?

17  A.   Yes, ma'am.

18  Q.   And this policy applies to all security staff,

19  medical staff, and mental health staff; is that right?

20  A.   Yes, ma'am.

21  Q.   This policy requires that individuals be educated

22  on the possible heat pathology response that may be

23  required, right?

24  A.   Yes, ma'am.

25  Q.   If you look at the second page and carrying over

849

1  to the third page under subpart D-3, this policy
2  triggers a heat alert when the apparent temperature
3  which takes into account the heat index exceeds 88
4  degrees Fahrenheit, right?
5  A.   Yes, ma'am, I believe that is the temperature.
6  Q.   And when a heat alert issues, there are certain
7  steps that must be taken, right?
8  A.   Yes, ma'am.
9  Q.   And those steps are identified here.  They
10  include making sure there is increased fluids and ice
11  available, right?
12  A.   Yes, ma'am.
13  Q.   And provision for additional showers or providing
14  additional cold, wet towels?
15  A.   Yes, ma'am.
16  Q.   And also making sure that ventilation is
17  increased as much as that is possible, right?
18  A.   Yes, ma'am.
19  Q.   And all of these steps that are supposed to be
20  taken in the event of a heat alert are supposed to be
21  documented, correct?
22  A.   Yes, ma'am.
23          MS. ROUSSEL:  Your Honor, I believe that is
24  all of the questions I have for this witness.
25          THE COURT:  All right.  Will the defendants

1  be taking this witness at this time on direct or will
2  they be deferring her to their case in chief?
3            MR. ROBERT:  Your Honor, we will proceed.
4  It will be brief, but.  We'll go ahead and take her
5  now.
6            THE COURT:  All right.  And to be clear, if
7  you do take her now, you are precluded from calling
8  her in your case.
9            MR. ROBERT:  We understand, thank you.
10           THE COURT:  All right.  Please proceed,
11  then, Mr. Robert.
12                    DIRECT EXAMINATION
13  BY MR. ROBERT:
14  Q.  Good morning, Nurse Norris.
15  A.  Good morning.
16  Q.  I just have a few questions for you.
17           Miss Roussel asked you whether or not the
18  Exhibit J-8 that we just looked at, the DWCC heat
19  pathology, whether it said it required individuals to
20  be educated on heat pathology; is that correct?
21  A.  Yes, sir.
22  Q.  And is education provided at DWCC on heat
23  pathology?
24  A.  Yes, sir.
25  Q.  Okay, what type of education is provided?

851

1   A.   We -- with the offenders that are on certain
2   medications, we encourage them to notify their key
3   room or anything if they are having any kind of issues
4   with the heat.  We do give them signs and symptoms of
5   the heat pathology.  That is about what we do, sir.
6   Q.   And would --
7           THE COURT:  I'm sorry, Miss Norris, Miss
8   Norris, my mind skipped a beat.  You educate the
9   prisoners or the staff?
10          THE WITNESS:  The staff, ma'am.  I am sorry.
11  BY MR. ROBERT:
12  Q.   And in what form does that education take?
13  A.   We do it in -- a lot of times we do it in our
14  training, in our February training.
15  Q.   And is that February training, is that annual, or
16  is it?
17  A.   Yearly, yes, sir.
18  Q.   Yearly, okay.
19  A.   They also get it whenever they are new hires.
20  Q.   Now, are you aware of heat alerts ever being
21  declared at David Wade during the time you have been
22  there?
23  A.   Yes, sir.
24  Q.   Okay.  And who is responsible when a heat alert
25  is declared to make sure that there is fluids and ice

852

1    and things like that; is it you?

2    A.    No, sir; the major.

3    Q.    Okay.  So the major on the compound would -- in a

4    particular tier would be responsible for that,

5    correct?

6    A.    Yes, sir.

7    Q.    And when a heat alert is declared, how -- how

8    would the major or how would you be notified of a heat

9    alert?

10   A.    The patrol center will announce heat alert.

11   Q.    Okay.  So it is announced over a loud speaker?

12   A.    Yes, sir.

13   Q.    Is it done in writing or is it just announced

14   over the loud speaker?

15   A.    It is announced over the loud speaker, and each

16   department writes it down into their books.  Yes, sir.

17   Q.    All right.  We talked a good bit about the MAR,

18   or you talked with Miss Roussel a good bit about the

19   MARs records.  I would like to talk to you about some

20   other things.

21          In addition to the MARs records, are there

22   any safeguards in place to make sure that offenders

23   are getting their medications?

24   A.    Yes, sir.  My nurses make one round each day,

25   besides for each time they have to go down the tiers,

1  they go down to each tier, at the very end, they come

2  back out.  If any offender feels like they have not

3  got their medication, they can talk to the nurse at

4  that time.  We also have emergency sick call they can

5  make.  We have routine sick call they can make if they

6  are not getting their medications.  Security also

7  makes routinely rounds on each tier, and if any

8  offender feels like they have not got their

9  medication, they can talk with several people to

10  notify us that their medications have not been given

11  or they have not received it.

12  Q.   Okay.  What significance, if any, are the blister

13  packs that are used to distribute the medication?

14  A.   The blister packs help us keep up with the

15  medications that they have.  If they have a 30-day and

16  they get down to 15 or less, we try to reorder the

17  medication at that time.  So that helps us -- instead

18  of a bottle, that helps us be able to reorder this

19  medication every night.

20  Q.   And does anyone on the nursing staff check the

21  pill supply on a regular basis?

22  A.   Yes, sir, we have a system on each side.  We have

23  a system that, we will say, like, on N, to give you

24  that example, they do that one on a Monday and a

25  Wednesday and then a Friday.  And then the next tiers

854

1  we have it signed to which -- every tier that you

2  would reorder the medication for each night.  You

3  could not reorder all of the medicines at one time.

4  Q.    Who would be the person that would monitor the

5  pill supply and the pill cards, do you know?

6  A.    The nurses monitor those each night, yes, sir.

7  Q.    Okay.  Are there any medications that require

8  blood draws or something to make sure that the

9  prisoners are actually taking the medication?

10  A.    Yes, sir, I have several medications that would

11  request blood draw.  Haloperidol or lithium, they have

12  to have levels, yes, sir.

13        And on the medical part you have several

14  medicines that have to have blood draw.

15  Q.    Okay.  Would the nursing staff be the ones that

16  are responsible for doing the blood draws?

17  A.    Yes, sir, we draw blood on anybody that needs --

18  any medication that needs levels, those bloods are

19  drawn every six months.

20  Q.    Okay.  And you notified that -- you have a list

21  of people who are on those medications and so the

22  nursing staff can do that?

23  A.    Yes, sir, we do.

24  Q.    Okay.  You talked about sick calls, that the

25  offenders if they're not getting their medicine can

1  make sick calls.  Are there different types of sick
2  calls that they can make?
3  A.   Yes, sir.  We have regular sick call, which is
4  Monday through Friday, they can put one of those in,
5  but they also can do an emergency sick call anytime, 7
6  days a week, 24 hours a day.
7  Q.   And what is the difference between the two as far
8  as being seen or having somebody come out there to
9  talk to them?
10  A.   All sick calls, a nurse sees the offender on
11  every sick call, whether a sick call or it is routine
12  or if it is an emergency, yes, sir.  Routine sick
13  call, that is done Monday through Friday in the
14  morning time, and then the emergencies is 24/7.
15  Q.   So emergency would typically be used if it was at
16  on the -- at night or on the weekend; is that correct?
17  A.   Yes, sir; weekend, holidays, yes, sir.
18  Q.   Okay.  Let me ask you something.  The inmates,
19  are they -- do they get any training on heat
20  pathology?
21  A.   I do not know if they get individual on heat
22  pathology or not.  That would be a mental health.
23  Q.   Okay.  But you don't do it?
24  A.   No, sir.
25  Q.   All right.  Are you personally aware of any

856

1    nursing staff ever getting a sick call or ever being

2    told by an offender that they were not getting their

3    medication?

4    A.   Well, yes, sir, I'm sure that, I mean I have seen

5    a sick call that offenders place that they have not

6    got their medication, and we will research that; we

7    will make sure the medication is on the card, we will

8    make sure it has been reordered, and we will talk to

9    the offender.

10   Q.   And how -- is that a responsibility that you have

11   or is it every -- every -- each nurse does it

12   individually depending on who -- who the offender

13   speaks to?  Just tell me how that works.

14   A.   It is whenever they put their sick call in, it's

15   the nurse that takes the sick call.  They will

16   research that and get back with the offender, yes,

17   sir.

18   Q.   Okay.

19           MR. ROBERT:  Thank you, Nurse Norris.

20           THE COURT:  I have a question.

21           When he asked you about the safeguards to

22   make sure that the prisoners were getting their

23   medication regularly, you indicated that a nurse walks

24   down the tier once a day and a prisoner can talk to

25   her.  And I am asking you if this is what you said.

1  They can call -- the guards are there, they can tell

2  the guards, or they can do a sick call, either

3  emergency or routine.

4          So it is up to the prisoner, then, to let

5  the staff know that they have not gotten their

6  medication?

7          THE WITNESS:  Yes, ma'am.  I mean yes,

8  ma'am, that would be the main thing is if they feel

9  they haven't gotten their medication, there are

10 several ways they can let us know.

11         They can also write me a letter and let me

12 know they have not got their medication.

13         THE COURT:  But that's the safeguard that is

14 in place is the presence of the staff on the tier.

15         THE WITNESS:  Yes, ma'am.

16         THE COURT:  Thank you, ma'am.

17         THE WITNESS:  Yes, ma'am.

18         THE COURT:  Miss Roussel?

19         MS. ROUSSEL:  Thank you, your Honor.

20                  REDIRECT EXAMINATION

21 BY MS. ROUSSEL:

22 Q.   I just have few follow-up questions, Miss Norris.

23 I want to direct you back to Exhibit J-8.

24         So, Miss Norris, Exhibit J-8 is the policy

25 that we were talking about that addressed heat

858

1    pathology, which states that it is applicable to all

2    security staff, medical staff, and mental health

3    staff, right?

4    A.    Yes, ma'am.

5    Q.    Okay.  And if you look down under procedure, it

6    says that offenders prescribed psychiatric medications

7    and those offenders with chronic medication conditions

8    identified by the health care practitioner as

9    susceptible to heat will be educated, monitored, and

10   evaluated for potential adverse reactions concerning

11   heat or photosensitivity related pathology.

12          As I under the testimony you gave a moment

13   ago, you said that medical does not educate, to your

14   knowledge, the offenders about heat pathology; is that

15   right?

16   A.    We do hand out -- I am sorry.  We do hand out a

17   duty status, and it will have on there the heat

18   pathology, and we do -- write those out and hand those

19   out to the offenders, I am sorry.

20   Q.    Okay, I am sorry, you said, what did you refer to

21   that as?

22   A.    A duty status.

23   Q.    A duty status.  And what is that?

24   A.    I would have to go back to get the exact wording

25   of the duty status.  I don't have one in front of me.

859

1   But it is a form that we fill out and we do give to

2   each offender that is on the heat pathology.

3   Q.   All right.  And is that the extent of what

4   medical does as it relates to educating the offenders?

5   A.   Yes, ma'am.

6   Q.   We also -- I asked you earlier whether there was

7   anyone who supervised the pill call officers to make

8   sure that they were complying with the policies for

9   distribution of medication, and you said not in

10  medical, right?

11  A.   That would be security.  They are under security.

12  Q.   And that's what I was going to clarify.  Each

13  pill call officer is supervised by their colonel in

14  security; is that right?

15  A.   Yes, ma'am.

16  Q.   And so is it -- is it correct for me to

17  understand that to the extent that someone is supposed

18  to ensure that they are complying with those policies

19  it would be their corporal?

20  A.   Through security, yes, ma'am.

21  Q.   Okay.  I had also asked you previously whether

22  there was anyone who was responsible for verifying

23  that information is entered correctly on the E-MAR.

24  Do you remember that?

25  A.   Yes, ma'am.

860

Q.   Okay.  Isn't it true that there is no one at
David Wade with that responsibility?

A.   I am responsible for the nurses, yes, ma'am.

Q.   So is your testimony that you are responsible for
making sure that the nurses complete the E-MARs
correctly?

A.   We train the nurses, yes, ma'am.  We do not train
the pill officers.

Q.   Okay.  And isn't it true that there is no one who
is responsible for ensuring that the pill officers are
completing the E-MARs correctly?

A.   I do not know that.

Q.   Do you recall giving a deposition in this case?

A.   A very long time ago, yes, ma'am.

Q.   Okay, and I realize it was a long time; but at
that time you did your best to answer the questions
truthfully and give complete and accurate testimony,
right?

A.   Yes, ma'am.

Q.   And, in fact, at that time you testified on
behalf of David Wade, the institution, not just based
on your own personal knowledge, right?

A.   It's my knowledge then as it is now, yes, ma'am.

Q.   Okay, but you were giving a corporate deposition,
right?

1  A.    Yes, ma'am.

2  Q.    Okay.  And that -- I want to go ahead and show

3  you that deposition.  You gave that on March 27th,

4  2019; does that sound right?

5  A.    Yes, ma'am.

6  Q.    Okay.  And I just want to direct you to page,

7  give me a moment, I am getting some assistance here,

8  page 49 of that deposition.  And actually if we back

9  up it might be easier to get the context beginning at

10 the bottom of page 48.  I asked, or you were asked, to

11 be clear, was that you don't know whether anyone has

12 the job of checking to make sure that the information

13 in the MARs is accurate, or there is no such person,

14 right?

15          And then there was an objection and a

16 clarification.

17          Okay, you need -- you're asking if the MARs

18 match up with the physician's orders, is that what you

19 are asking for?

20          And then this was the question that was

21 presented to you.  The MARs match up with the

22 physician's orders, that the MARs contained correct

23 data about pill distribution, all of the things that

24 are in the MARs.  Is there anyone whose job it is to

25 make sure that that information is reported

862

1    accurately?

2            And at that time your answer was no, sir.

3            Did I read that correctly?

4            I'm sorry, I couldn't hear.  Did I read that

5    correctly?

6    A.   I'm reading that, and it is moving, I am sorry.

7    Q.   Okay.  So did I -- did I read that correctly?

8    A.   I mean we do not have someone that is going

9    through each MAR, I do -- we do not in medical.

10   Q.   Okay.  But at the time you gave this testimony

11   you were speaking on behalf of David Wade, the

12   facility, right?

13   A.   I was speaking for myself, yes, ma'am.

14   Q.   Thank you.  Do you recall that you were

15   designated to give a corporate deposition, ma'am?

16   A.   Yes, ma'am.

17   Q.   Thank you.

18           MS. ROUSSEL:  Your Honor, I believe that is

19   all of the questions I have for this witness.

20           THE COURT:  Mr. Robert?

21           MR. ROBERT:  Judge, you're going to give me

22   another opportunity?  I did not realize I got another

23   opportunity, but I don't have any other questions.

24           THE COURT:  Yes, sir, I am.

25           MR. ROBERT:  Okay.  I don't have any further

1  questions.  Thank you.

2         THE COURT:  Very good.  And of course when

3  you get that second opportunity, sir, it is -- it is

4  limited, of course, to the scope of her -- of her

5  examination.  So, just to be clear.

6         All right.  That is it, then.

7         May this witness be released, Miss Roussel?

8         MS. ROUSSEL:  Yes, Your Honor.

9         THE COURT:  Thank you.  Please call your

10  next witness.

11         MS. ROUSSEL:  All right, Your Honor, we are

12  going to change counsel again, and I am going to allow

13  my partner, Kyle Potts, to do so.

14         THE COURT:  Thank you.

15         MS. KEIFER:  Judge, do I need to admit Corey

16  Adams?

17         THE COURT:  Let's see what Mr. Potts says.

18         Mr. Potts, are we calling Mr. Adams?

19         Mr. Potts, are we calling Mr. Adams?

20         MR. POTTS:  Your Honor, we are not calling

21  Mr. Adams, we're calling Mr. Paul Pitts.

22         THE COURT:  All right.  So poor Mr. Adams

23  has to stay in the waiting room.

24         MS. KEIFER:  And do we know where Mr. Pitts

25  is?  Is he anywhere near Miss Norris was?

864

```
 1              THE COURT:  Mr. Potts, where is your
 2  witness?
 3              MR. POTTS:  Your Honor, my understanding is
 4  that he is at David Wade.
 5              MR. ARCHEY:  He is, Your Honor, I think they
 6  are just in the process of switching out Miss Norris
 7  and getting him.  I think he is lined up and ready to
 8  go.
 9              THE COURT:  Thank you very much.
10              MR. ARCHEY:  There he is.
11              THE COURT:  All right, good morning, sir.
12  We're going to ask you to raise your right hand and be
13  sworn.
14              (The witness was duly sworn.)
15                      PAUL PITTS,
16         having been called as a witness, having
17         been duly sworn, testified as follows:
18                   CROSS-EXAMINATION
19  BY MR. PITTS:
20  Q.  Mr. Pitts, good morning.  My name is Kyle Potts.
21  Could you state your name for the record, please?
22  A.   Kyle Pitts.
23  Q.   Mr. Pitts, where do you work?
24  A.   David Wade Correctional Center.
25  Q.   When did you start working at David Wade?
```

1    A.    It was November.

2            THE COURT:  This November, sir?

3            THE WITNESS:  Yes, ma'am.

4    BY MR. POTTS:

5    Q.    Okay.  So you have just started back with David

6    Wade as of November '21?

7    A.    Yes, sir.

8    Q.    What is your position there?

9    A.    I'm in transportation right now.  Trip officer.

10   Q.    A trip officer?

11   A.    Yes, sir.

12   Q.    So does that mean you take prisoners out of the

13   prison, take them to court or a hospital, wherever

14   they need to go?

15   A.    Yes, sir.

16   Q.    All right.  You were last employed with David

17   Wade sometime in December of 2019; is that correct?

18   A.    November.

19   Q.    November of 2019.  Do you recall when you started

20   at David Wade, before you left the first time?

21   A.    I think it was November of 2014, I am thinking.

22   Q.    So you were with David Wade for approximately

23   five and a half years at the time you left in November

24   of 2019?

25   A.    Yes, sir.

1    Q.    Okay.  And at that time you were a security

2    officer; is that right?

3    A.    Yes, sir.

4    Q.    I am sorry?

5    A.    Yes, sir.

6    Q.    Okay.  And you were also what has been called a

7    pills pass officer?

8    A.    Yes, sir, a pill call officer.

9    Q.    Okay.  During that a five and half years from

10    2014 until you left in November of 2019, you were

11    performing pill pass in 2017, 2018, and 2019, correct?

12    A.    I think I did it -- I think so.

13    Q.    And during that period of time you only worked in

14    the south compound?

15    A.    Correct.

16    Q.    And the south compound is what we've been talking

17    about, the N1 through N4 buildings?

18    A.    Yes, sir.

19    Q.    Is that right?

20    A.    Yes, sir.

21    Q.    Okay.  Who provided you with training in

22    connection with being a security officer?

23    A.    It was a nurse.

24    Q.    For security?

25    A.    Oh, for -- for security?  Who was it I talked to

1  back then.  It was --

2  Q.    Mr. Pitts, is there anybody in the room with you?

3  A.    No, sir.

4  Q.    Okay.  So who provided you with your training for

5  security?

6  A.    It was -- I went through the academy; I think it

7  was Miss Lisa Wells was with academy director.

8  Q.    Okay.  And your duties and responsibilities as a

9  security officer were to walk the tiers, walk with

10  prisoners from their cells to wherever you needed to

11  take them; is that right?

12  A.    Yes, sir.

13  Q.    As a security officer, did you ever man the tier

14  to monitor who was coming on or off a tier?

15  A.    Yes, sir.

16  Q.    I am sorry?

17  A.    Yes, sir.

18  Q.    You might need to move a little closer,

19  Mr. Pitts.

20        So you've sat at the desk to monitor the

21  tiers and check on who comes in and out of tiers?

22  A.    Yes, sir.

23  Q.    And you would sign or fill out the tier logs in

24  connection with the activities on the particular tier

25  you were dealing with?

868

1  A.    Yes, sir.

2  Q.    Okay.  And that is common at David Wade, and

3  where you were in the south compound, is to keep

4  accurate tier logs, correct?

5  A.    Correct.

6  Q.    It is very important that documentation be

7  correct and accurate, isn't it?

8  A.    Yes, sir.

9  Q.    Okay.  And you understand from yourself having

10 operated on the tiers and filled out tier logs that it

11 is important to write down everything that happens on

12 a tier; isn't that right?

13 A.    Right.

14 Q.    Okay.  So again, you said that you had done pill

15 pass starting in 2017 through the time you left in

16 November 2019.  Where did you get your training to be

17 a pill pass officer?

18 A.    I got training by a nurse.

19 Q.    Do you recall a particular nurse's name?

20 A.    Jeffrey.

21 Q.    How much time did you spend getting trained as a

22 pill pass officer?

23 A.    Like a day, two days.

24 Q.    So you're talking about over the course of 8 to

25 16 hours you were trained on pill pass?

1  A.   Yes, sir.

2  Q.   So that entire time there wasn't any other topic

3  covered officer than pill pass?

4  A.   We went over the policy about the pill pass.

5  Q.   I am sorry?

6  A.   We went over the policy about the pill pass.

7  Q.   I am not -- could you say that one more time?

8  A.   The policy.

9          THE COURT:  Went over the policy of the pill

10 pass.

11 BY MR. POTTS:

12 Q.   Understood.  Okay.  Other than the policy, did

13 you review or were you given anything else in

14 connection with pill pass?

15 A.   Hands-on training.

16 Q.   Okay.  Anything else?

17 A.   No, sir.

18 Q.   Now, you mentioned that you were -- you were in

19 this class for, you know, it sounds like maybe a day

20 or more.  And you were provided with a David Wade

21 policy regarding pill pass; is that correct?

22 A.   Yes, sir.

23 Q.   You were -- in connection with that training you

24 all went through a PowerPoint presentation regarding

25 medication handling; is that correct?

1  A.    Correct.

2  Q.    And this first slide that you are seeing, you are

3  familiar with this PowerPoint presentation?

4  A.    Yes, sir.

5  Q.    How many times have you seen this PowerPoint

6  presentation?

7  A.    I have seen it a couple of times.

8  Q.    Okay.  So not only did you get it on your initial

9  training but at some point it was reviewed with you

10  again?

11  A.    Yes, sir.

12  Q.    Okay.

13          MR. POTTS:  Your Honor, at this time, it is

14  in Volume 32, and I would offer and introduce P-QQQ-3.

15          THE COURT:  Hearing no objection, it is

16  admitted.

17  BY MR. POTTS:

18  Q.    All right, sir, if we could go to page 6.  We're

19  going to need you to turn your head sideways to read

20  this.  Kidding, of course.

21          You see this slide called medication

22  compliance?

23  A.    Yes, sir.

24  Q.    And you have seen this before.

25  A.    Yes, sir.

1  Q.   Correct?

2           Under that first sub bullet point, it says

3  appropriate documentation is to be entered on MAR,

4  E-MAR, for all refused medications.  Did I read that

5  correctly?

6  A.   Yes, sir.

7  Q.   Okay.  Second bullet point says no medication is

8  to be returned to pharmacy related to refusal of

9  medication prior to discontinued stop date.  Did I

10 read that correct?

11 A.   Yes, sir.

12 Q.   Okay.  Additional documentation related to

13 noncompliance is to be adhered to based on facility

14 directives, policy, and procedures for all

15 medications.  Did I read that correctly?

16 A.   Yes.

17 Q.   Okay.  So you understood through your training

18 the importance of recognizing and noting

19 noncompliance with medications; is that correct?

20 A.   Correct.

21 Q.   All right.  So when we go to page 7 of this same

22 exhibit, it talks about medication compliance, and you

23 will see a large bullet point there that says

24 medication noncompliance, a smaller bullet point that

25 says three consecutive missed days, all doses.

872

1              You understood that noncompliance meant

2    missing those three consecutive missed days, correct?

3    A.   Correct.

4    Q.   All right.  And then we go to psychiatric

5    medication noncompliance, it says three consecutive

6    missed doses and/or an obvious pattern of missed

7    doses.  Did I read that correctly?

8    A.   Yes, sir.

9    Q.   So you understood that for psychiatric medication

10   noncompliance that it wasn't days, it was doses that

11   was the issue.

12              I read that correct?

13   A.   Yes, sir, you did.

14   Q.   Okay.  And you understood that policy of

15   noncompliance that it was three consecutive missed

16   doses, correct?

17   A.   Correct.

18   Q.   If we can go to page 8 of the same exhibit.

19              This slide is titled administering

20   medication, correct?

21   A.   Correct.

22   Q.   And you have seen this slide before?

23   A.   Yes, sir.

24   Q.   And this slide tells you to abide by the six Rs,

25   correct?

1  A.    Right.

2  Q.    And it's the right offender, the right dose, the

3  right route, the right time, the right medication, and

4  right documentation, correct?

5  A.    Correct.

6  Q.    So in your training you received this

7  information.  Did you in your duties as a pill pass

8  officer abide by the six Rs?

9  A.    Yes, sir, I did.

10  Q.    At every -- at every time?

11  A.    Every time.

12  Q.    All right.  Page 13 of the same exhibit.

13         You've seen this, this is titled

14  prescriptions?

15  A.    Yes, sir.

16  Q.    First bullet point says prescription meds along

17  with an inventory sheet are sent to an offender's

18  housing area.  Did I read that correctly?

19  A.    Yes, sir.

20  Q.    Have you seen an inventory sheet?

21  A.    No, sir.

22  Q.    Never saw one during your time at David Wade?

23  A.    No, sir.

24  Q.    Okay.  The second bullet point says pill call

25  staff must check to be sure all meds on the sheet are

874

1  received.  But you never saw that sheet, correct?

2  A.    Correct.

3  Q.    Third bullet point says if meds are not received,

4  pill room staff must contact the pharmacy promptly.

5  You really didn't deal with that one, did you?

6  A.    No, sir.

7  Q.    Okay.  Next bullet point, all medications are

8  given in accordance with directions on prescription

9  label and documented on the E-MAR.  Did I read that

10 correctly?

11 A.    Yes, sir, you did.

12 Q.    If an offender doesn't take his/her meds, it must

13 be documented.  Did I read that correctly?

14 A.    Yes, sir.

15 Q.    And when an offender did not take his meds, did

16 you document it correctly?

17 A.    Yes, sir.

18 Q.    As a pill officer you did that at all times?

19 A.    Yes, sir.

20 Q.    I am sorry?

21 A.    Yes, sir.

22 Q.    Okay.

23 A.    You do that three or more times a day; morning,

24 noon, and evening.

25 Q.    And as I understand, Mr. Pitts, there is a

1   morning, noon, and evening pill call; that is correct?

2   A.   Yes, sir.

3   Q.   The morning occurs around 6 a.m., right?

4   A.   Yes, sir.

5   Q.   The second, or afternoon, pill call is around

6   noon?

7   A.   Yes, sir, around noon.

8   Q.   And then the evening pill call is around

9   five-ish?

10   A.   About -- yes, sir, about four thirty, five, yes,

11   sir.

12   Q.   Okay.  So when you were at work, and as I

13   understand it, you worked seven days on, seven days

14   off, right?

15   A.   Correct.

16   Q.   And on that seven days on, you are the -- you are

17   the pill officer for the south compounds?

18   A.   Yes, sir.

19   Q.   So during your seven days, every day you would do

20   pill call in the morning, at noon, and the evening; is

21   that correct?

22   A.   Yes, sir.

23   Q.   And you do that pill call at those three times in

24   every building; N1, N2, N3, and N4.  Is that correct?

25   A.   Correct.

876

1    Q.    Did you also have responsibility for an H

2    building?

3    A.    Yes, sir, in the mornings and noons.

4    Q.    So that was two additional pill call rounds for

5    you?

6    A.    Yes, sir.

7    Q.    Okay.  And every day that you were at David Wade

8    from 2017 to the time you left in November 2019, your

9    job was to do pill call those three or two times a day

10   at the N buildings or H?

11   A.    Yes, sir.

12   Q.    Okay.  While you were on duty those seven days,

13   nobody else had pill call duty?

14   A.    No, sir.

15   Q.    The seven days when you were not there, obviously

16   there is another David Wade employee that would do

17   pill call; is that right?

18   A.    Yes, sir.

19   Q.    All right.  When we go to page 14 of the same

20   PowerPoint presentation, it says prescriptions, we

21   have a large bullet point that says E-MARs.  And that

22   stands for Electronic Medication Administration

23   Records; is that right?

24   A.    Yes, sir.

25   Q.    So you know what an E-MAR is?

877

1    A.    Yes, sir.

2    Q.    And on that E-MAR, with the next bullet point

3    contains -- contain offenders' current prescriptions;

4    is that right?

5    A.    Yes, sir.

6    Q.    Next bullet point, the E-MARs used to document

7    when administered by trained pill officers or medical

8    staff; is that right?

9    A.    Yes, sir.

10   Q.    So the only thing you'd use to document the

11   handing out of medicine to prisoners is the E-MAR?

12   A.    Yes, sir.

13   Q.    The next bullet point, medical pharmacy will make

14   all medication changes to the E-MARs.  Again that was

15   not your job, right?

16   A.    Correct.

17   Q.    Okay.  If anyone medication are discontinued,

18   there will be a stop order.  And that just means they

19   are not supposed to give out medication or stop it

20   without a stop order.

21   A.    Yes, sir.

22   Q.    Is that right?

23   A.    That's right.

24   Q.    Okay.  If we could go to page 20, please.

25           Page 20 of the same PowerPoint presentation,

1  Mr. Pitts.  And give us a second here so you don't

2  have to turn your neck.

3              Prescription refills, this is where we're

4  talking about all extra blister packages with a

5  duplicate prescription number will be stored in a pill

6  box.  Did I read that correctly?

7  A.   Yes, sir.

8  Q.   All right.  So these pills that are prescribed to

9  the prisoners --

10             MR. POTTS:  I'm sorry, Judge are you?

11             THE COURT:  I am reading it.  All extra

12  blister packages with duplicate prescription number

13  will be stored in a refill box.

14             I don't know what is meant by duplicate

15  prescription number.

16             MR. POTTS:  Judge --

17  BY MR. POTTS:

18  Q.   Mr. Pitts, let me ask you first.  All of the

19  medication you are dispensing comes in what is called

20  a blister package, correct?

21  A.   Yes, sir, correct.

22  Q.   And that will contain 30 to 60 doses of the

23  medication, right?

24  A.   Yes, sir.

25  Q.   And we're going to get -- we're going to go in a

1    little more detail about the actual pill call process,

2    but in connection with the blister pack, you pop the

3    medicine out of the blister pack, correct?

4    A.   Correct.

5    Q.   Okay.  So there are times based on this, I am

6    assuming, that there are extra blister packages for a

7    prisoner for the same medication but you haven't quite

8    finished the blister pack on the cart, correct?

9    A.   Correct.

10   Q.   And so you keep that in a refill box?

11   A.   Yes, sir.

12   Q.   Where is the refill box?

13   A.   It will be on the bottom of the cart or up in

14   medical.

15   Q.   I am sorry, or what was that second part?

16   A.   It would be on the pill cart on the bottom or it

17   would be in the medical.

18   Q.   Okay.  And so if there was additional or multiple

19   duplicate blister packages, you would see that in the

20   refill box?

21   A.   Yes, sir.

22   Q.   If we could go to page 27 of that same

23   presentation.

24           Mr. Pitts, you were trained to verify that

25   the offenders take and swallow the medication,

880

1  correct?

2  A.   Yes, sir.

3  Q.   And you were trained to have the offender open

4  his or her mouth and raise their tongue while you look

5  in the mouth after providing them with the medication,

6  correct?

7  A.   Correct.

8  Q.   And you may also require them to pull their lips

9  or cheeks away from teeth and gums for observation.

10  You would do that, correct?

11  A.   Yes, sir.

12  Q.   Would you do that after every time you provided a

13  prisoner with a medication?

14  A.   Yes, sir, every time.

15  Q.   So you would make sure that they -- that they

16  were actually taking the medicine, correct?

17  A.   Correct.

18  Q.   And that was important for you.  That is an

19  important part of your job to make sure that they take

20  that medicine?

21  A.   Yes, sir.

22  Q.   Okay.  You're also to check the offender's hands

23  to ensure he/she is not palming the medication; is

24  that accurate?

25  A.   Yes, sir.

881

1  Q.   And you would do that?

2  A.   Yes, sir.

3  Q.   Okay.  Let's go to the last page of the

4  presentation, page 31.  The last page that I have.

5  And we have this large title here, avoid mistakes,

6  correct?

7  A.   Yes, sir.

8  Q.   And this directs always record the results of

9  pill call on the E-MAR making note of any reason the

10  medication was not issued or taken, correct?

11  A.   Correct.

12  Q.   Second bullet point.  If you are in doubt about

13  whether an offender should receive a dose of

14  medication, do not give it to him or her until you can

15  resolve the problem with medical staff.  Did I read

16  that correctly?

17  A.   Yes, sir.

18  Q.   Did you ever have the occasion to have an issue

19  where you held on to medication until you spoke with

20  medical staff?

21  A.   Yes; when I see the ending date of it and it's

22  still on the cart the next day, I used to hold it and

23  just go check and just make sure.

24  Q.   So what you are referring to is on the E-MAR when

25  it says the last date of dosage, when you see that,

1  that is when you get in touch with medical staff about

2  the ongoing -- about the ongoing or providing that

3  medication on a continuous basis to the prisoner; is

4  that right?

5  A.   Right.

6  Q.   That is the only time you would get with medical

7  staff?

8  A.   Yes, sir.

9         MR. POTTS:  Yes, I am done.  Yeah, I am done

10  with that.  Thank you.

11  BY MR. POTTS:

12  Q.   Mr. Pitts, I want to refer you to what has

13  already previously been identified and introduced as

14  Exhibit J-13.

15         Are you familiar with this document, sir?

16  A.   Yes, sir.

17  Q.   All right.  So this is the post orders for pill

18  call officers, correct?

19  A.   Correct.

20         MR. POTTS:  And, Your Honor, this is also

21  J-13 in her binder?  Or is it J-12?

22         This one may be J-12 in your binder, Judge.

23         THE COURT:  All right.

24  BY MR. POTTS:

25  Q.   So, Mr. Pitts, this was obviously a policy that

1    was in effect May of 2017 while you were employed at

2    David Wade and continued through the time you left in

3    November of 2019, correct?

4    A.    Correct.

5    Q.    All right.  Under procedures it provides the --

6    obviously the different steps you need to take in

7    connection with doing your job as a pill call officer,

8    correct?

9    A.    Yes, sir.

10   Q.    I'm sorry?

11   A.    Yes, sir.

12   Q.    And you abided by all of these steps and wanted

13   to make sure you did everything properly, correct?

14   A.    Correct.

15   Q.    All right.  So you would retrieve the medication

16   cart from the key room; is that correct?

17   A.    Right.

18   Q.    So first tell us what is the key room?

19   A.    The key room is the, like a block control center

20   to open the doors.

21   Q.    And that is where the pill cart is maintained?

22   A.    Yes, sir.

23   Q.    Or stored?

24   A.    Stored, yes, sir, in the key room.

25   Q.    Okay.  And is it one cart per building?

884

1  A.   Yes, sir.

2  Q.   So each building has its own key room?

3  A.   Yes, sir.

4  Q.   All right.  Could you describe the cart a little

5  bit in terms of, we talked earlier about the refill

6  box underneath it.  What does the top of this cart

7  look like so that you're able to identify and hand out

8  the right prescriptions to the right prisoners?

9  A.    Well, so the cart has like five drawers on it,

10  and the top part is flat.  You put out the pills in a

11  little rack, the blister packs, and you just -- I

12  usually set them on top of the cart by each tier.  You

13  got eight tiers, A tier, B tier, C tier, and D tier.

14  All of them separate.  I just get out the A tier pill

15  blisters and go down the tier.

16  Q.   And so is there actually any sorting or any

17  medication that sits on top of the cart or do you

18  actually have to pull it out of one the drawers?

19  A.   I pull it out of one of -- one of the drawers.

20  Q.   And does each drawer pertain to a different level

21  of the tier or to a different tier?

22  A.   Yes, sir.

23  Q.   So the top drawer would be for tier A?

24  A.   Yes, sir.

25  Q.   And then the next one would for B?

885

1    A.    Yes, sir.

2    Q.    And then C and D below that?

3    A.    Yes, sir.

4    Q.    Okay.  So what you would do is you would pull

5    out, for going down tier A pull out the top drawer and

6    pull out the medications that needed to go down to the

7    1 through 16 cells, right?

8    A.    Yes.

9    Q.    Okay.  When you -- you know, I think we've

10   already talked about from the key room to the tier,

11   you transport the cart, obviously; and then when you

12   get to the cell you have to have verified the offender

13   by name, DOC number, and ID card, correct?

14   A.    Correct.

15   Q.    And then you verify the medication by offender

16   name, DOC number, ID card, and the time that the

17   medications are given, correct?

18   A.    Correct.

19   Q.    And then you ask them, obviously, to have

20   something to wash the medicine down with, correct?

21   A.    Yes, sir.

22   Q.    And then, as we have already gone over, letter G

23   from the PowerPoint presentation is you give them the

24   medication and then you take all the steps to make

25   sure they took it, correct?

886

1    A.    Correct.

2    Q.    And then you go on down the tier?

3    A.    Yes, sir.

4    Q.    And then letter K says each medication

5    administered or delivered, as well as not requested by

6    an offender, be documented in the MAR by the end of

7    the scheduled pill call; is that correct?

8    A.    Correct.

9    Q.    And that is something you would do?

10   A.    Yes, sir.

11   Q.    So what we can gather from that PowerPoint

12   presentation and that policy is that accuracy and

13   proper documentation are absolutely important, aren't

14   they, Mr. Pitts?

15   A.    Yes, sir.

16   Q.    When you proceed with your pill call during your

17   seven days on, do you have a list of prisoners in each

18   building on each tier that you need to give medication

19   to?

20   A.    Yes, sir.

21   Q.    Okay.  Where does that list come from?

22   A.    You mean a list of every offender?

23   Q.    What -- what list do you have in terms of

24   providing medication to those that are prescribed

25   medication, what do you go by to hand out the

1  medication?  Do you have a list, do you go by memory,

2  what do you do?

3  A.  I do you have a list of every offender on that

4  tier and which one's taking meds.

5  Q.  How is that list generated?

6  A.  I think by medical.

7  Q.  Okay.  What was your practice in terms of having

8  the list and making sure that you're checking off who

9  does and who does not take their medication?

10  A.  I have a little notebook, a little notepad with

11  me, and whoever's in it, I would just write their name

12  down and know -- and put the name by who I know didn't

13  take it.  And who I know took it.

14  Q.  Are you provided in an e-mail or some document

15  the a list of prisoners that need to be provided

16  medication?

17  A.  Yes, sir, they have -- yes, sir, they have a

18  paper.

19  Q.  Where is that paper?  Or who provides it?  Who

20  provides that paper?

21  A.  I think medical did.

22  Q.  Okay.  Do you create your own list of names and

23  write out the medications for those that you are

24  dispensing medication to?

25  A.  I write out the names of them.

888

```
 1   Q.   Okay.  So you would keep your own list; is that
 2   right?
 3   A.   Yes, sir.
 4   Q.   All right.
 5   A.   After you do something, you remember who does not
 6   take the meds.
 7            THE COURT:  It's a list of people who are
 8   not taking the meds, it's not just a whole complete
 9   list again; is that right, Mr. Pitts?
10            THE WITNESS:  Yes, ma'am.
11            THE COURT:  Okay.  All right.  I am not sure
12   what you mean by medical.  Who is medical that is
13   generating that list?
14            THE WITNESS:  Like the nurses.
15            THE COURT:  Okay.  And that is, like, on
16   your pill cart when you take it out of the key room?
17            THE WITNESS:  Sometimes.
18            THE COURT:  How do you get that list?
19            THE WITNESS:  They have -- I just look on
20   the desk and get it off the desk, like in the -- like
21   in the pharmacy, where the medical be.
22            THE COURT:  I thought you got it out of the
23   key room.
24            THE WITNESS:  No, ma'am.
25            THE COURT:  I thought you --
```

889

```
 1              THE WITNESS:  The cart be in the key room.
 2  But the medical --
 3              THE COURT:  The list.
 4              THE WITNESS:  Yes, sir.  Yes, ma'am.
 5              THE COURT:  The list is with the nurses.
 6              THE WITNESS:  Yes, ma'am.
 7              THE COURT:  Okay.  Thank you, sir.
 8              Please proceed, sir.
 9              MR. POTTS:  Thank you, Judge.
10              THE COURT:  Mr. Potts.
11              Before you go on, Mr. Potts.
12              Mr. Pitts, does the cart just stay in the
13  key room all the time, or?
14              THE WITNESS:  Yes, ma'am.  The cart is
15  locked up.  You gotta have a key to get in the cart.
16              THE COURT:  So it doesn't go back to the
17  nurses every day?
18              THE WITNESS:  No, ma'am.
19              THE COURT:  All right.  Thank you.
20              All right, Mr. Potts.
21              MR. POTTS:  Thank you, Judge.
22  BY MR. POTTS:
23  Q.  So, Mr. Pitts, when you would enter a tier there
24  would be someone at the tier to let you in that
25  maintained the tier log, correct?
```

1  A.   Yes, sir.

2  Q.   And they would mark you down when you entered the

3  tier to do the pill call, correct?

4  A.   Yes, sir.

5  Q.   All right.  And there would be logs for -- there

6  would be one set of logs for A and B, another set of

7  logs for C and D, correct?

8  A.   Yes, sir.

9  Q.   So when you do pill call morning, noon, and

10  night, there will be roughly 8 to 10, well, even more;

11  there will be over 20 entries for you in various pill

12  logs for distributing pills every day, correct?

13  A.   Yes, sir.

14  Q.   Okay.  And that's because you are going into four

15  buildings that have four tiers and you are doing it

16  three times a day.  Correct?

17  A.   Correct.

18  Q.   All right.  The way you track who takes the

19  medication or who doesn't take the medication is by

20  entering data into the E-MAR system, correct?

21  A.   Yes, sir.

22  Q.   Do you enter data at the end of each pill call

23  when you're done with the building?  When do you enter

24  your data?

25  A.   When I finish every block.

1  Q.   So when you complete N1, you will enter -- well,

2  let's say you do pill call for the morning at N1.  You

3  would then enter the data in the E-MAR system and then

4  go on to N2; is that right?

5  A.   No, sir.  I go N1, I do all of N, go back and.

6  Q.   I apologize.  I misunderstood.  So you would do

7  morning pill call for N1 through 4 and then enter the

8  information into E-MAR?

9  A.   Yes, sir.

10  Q.   Is that correct?

11  A.   Yes, sir.

12  Q.   Okay.  And then is that the same process you

13  would do for the after -- or for the noon and the

14  evening pill call?

15  A.   Yes, sir.

16  Q.   So you would be entering data into E-MAR three

17  times a day?

18  A.   Yes, sir.

19  Q.   In accessing E-MAR, you have a unique log-in and

20  pass code, correct?

21  A.   Yes, sir.

22  Q.   Would anybody else have your log-in and pass

23  code?

24  A.   No, sir.

25  Q.   So when it's logged in under your name and your

1  pass word and data is entered, that is you doing it,

2  correct?

3  A.   Yes, sir.  Correct.

4  Q.   So when you go for the morning pill call for the

5  entire block, you're -- you're working off a list of

6  who did and did not -- you checked off who did or did

7  not take medicine?

8  A.   Yes, sir.

9  Q.   Okay.  What do you do with that piece of paper

10 after you enter the data?

11 A.   I tear it up and just throw it away.

12 Q.   You just tear that piece of paper up and put in

13 the trash?

14 A.   Yes, sir.

15 Q.   Ask okay.  Is there any reason why you don't

16 maintain those?

17 A.   Because I have been -- I wrote it down myself,

18 and it was already on the E-MAR, so.

19 Q.   So you fill it into the E-MAR, then; is that

20 accurate?

21 A.   Yes, sir.

22         MR. POTTS:  I am sorry, Judge?

23         THE COURT:  That was the question, right.

24 So the E-MAR is not automatic; you have to enter

25 something for every prisoner as to the time they took

893

1  the medicine and the fact that they took the medicine

2  or that they refused the medicine; is that right?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  Okay.  So you make an entry for

5  each prisoner, and I may be saying the same thing

6  again.  But you make an entry for every prisoner who

7  is taking medication?

8          THE WITNESS:  Yes, ma'am.

9          THE COURT:  All right.  And what was the

10 times that you worked, what was the 12-hour shift that

11 you worked, from what time to what time?

12         THE WITNESS:  Five to five.

13         THE COURT:  How did you complete the evening

14 shift?

15         THE WITNESS:  Complete, like?

16         THE COURT:  Well, if you were starting to

17 pass out the meds at four thirty, the evening meds.

18         THE WITNESS:  Yes, ma'am.

19         THE COURT:  Did you have time, then,

20 between --

21         THE WITNESS:  Yes, ma'am.

22         THE COURT:  Okay.  Thank you sir.

23         MR. POTTS:  Thank you, Judge.

24 BY MR. POTTS:

25 Q.   Mr. Pitts, how long does it take you in N1 to

1    complete a pill call?

2    A.    I'd probably say about 20, 25 minutes.  It just

3    depends on, like, how many offenders that take meds in

4    the evening.

5    Q.    So it could take you anywhere from 20, 25

6    minutes, even 30 minutes, correct?

7    A.    Yes, sir.

8    Q.    Okay.  So let's just, I'm not going to be great

9    at math.  If you got N1, N2, N3, and N4, just to make

10   it easy let's say 30 minutes; morning, afternoon,

11   night, comes up to about 7 and half hours of pill

12   call?

13   A.    Yes, sir.

14   Q.    So you spend a great majority of your day doing

15   pill pass?

16   A.    Yes, sir.

17   Q.    Okay.  And so then, because it's that much time

18   you spend doing pill pass, it's even more important

19   that the report accurately reflect when you are on a

20   tier and what medications you are handing out,

21   correct?

22   A.    Correct.

23   Q.    All right.  And that doesn't even include the

24   time you spent in H, does it?

25   A.    No, sir.

1   Q.   When you go to the E-MAR to fill in the data, if

2   you are going to note that someone took the

3   medication, that is noted by your initials, correct?

4   A.   Yes, sir.

5   Q.   All right.  If someone just tells you I

6   absolutely do not want to take this medicine, how do

7   you note that?

8   A.   R.

9   Q.   That's an R.

10          If someone doesn't get out of bed or they

11  just don't acknowledge you, how do you note that?

12  A.   An N.

13  Q.   And what does in mean?

14  A.   N means, what does N mean?  I forgot.

15  Q.   Does N mean not requested?

16  A.   Yes, sir.

17  Q.   Okay.  Would you say a vast majority of your time

18  when you do pill call that you filled in the letter N?

19  A.   On some of them.

20  Q.   Okay.  Who supervises you on pill call?

21  A.   Supervise?  Like the captain made sure I was in

22  that block doing pill call at a certain time, like my

23  time I was supposed to be down doing pills.

24  Q.   Okay.  So does anybody else supervise you in

25  connection with that other than somebody making sure

896

1  you are on time?

2  A.   No, sir.

3  Q.   When you would enter a -- you know, we're talking

4  about May 2017, 2018, into 2019.  Would you would

5  enter an R into the E-MAR, did you have any further

6  responsibilities to report to anybody?

7  A.   No, sir.

8  Q.   If you entered an N, did you have any

9  responsibilities to report to anybody?

10  A.   No, sir.

11  Q.   So once you entered the data into your system,

12  the E-MAR system, your duties responsibilities were

13  done?

14  A.   Yes, sir.

15  Q.   Okay.

16        THE COURT:  Mr. Pitts, how would you report

17  the -- there were three doses in a row that were

18  missed?

19        THE WITNESS:  It be -- it would be on the

20  E-MAR.

21        THE COURT:  So it's on the E-MAR, but you

22  would not report that anybody, someone would have to

23  look at the E-MAR to see that.

24        THE WITNESS:  The E-MAR supposed to being

25  checked every day.  Once you put in --

```
 1              THE COURT:  Supposed to be checked every
 2    day.  And who was checking every day?
 3              THE WITNESS:  I don't know.  I usually just
 4    put it in; I'm guessing medical did.  I just put it
 5    in, and.
 6              THE COURT:  Okay.
 7              MR. POTTS:  Judge, would this be good time
 8    for a short break?
 9              THE COURT:  I guess so.  Let's come back --
10    let's come back at eleven fifteen and then we'll go
11    probably to about twelve fifteen to twelve thirty for
12    lunch.
13              Thank you very much.
14              MR. POTTS:  Thank you, Judge.
15              (Recess taken)
16              THE COURT:  All right, Mr. Potts, we have
17    finished with our break, we are continuing with your
18    examination of Mr. Pitts.
19              MR. POTTS:  Thank you, Your Honor.
20    BY MR. POTTS:
21    Q.   Mr. Pitts, a little while ago we were going
22    through the PowerPoint presentation in connection with
23    the pill call duties?  You recall that, correct.
24    A.   Yes, sir.
25    Q.   Were you handed any written materials in
```

898

```
 1   connection with that PowerPoint presentation?
 2   A.   No, sir.
 3   Q.   You don't recall getting any orientation
 4   materials?
 5   A.   Orien -- yes, sir, I got the PowerPoint.
 6   Q.   Okay, the PowerPoint.  Let me-.
 7           MR. POTTS:  Your Honor, I am looking at
 8   Volume 32, P-QQQ2.  Which is on page 2.
 9   BY MR. POTTS:
10           THE COURT:  All right.
11   BY MR. POTTS:
12   Q.   Mr. Pitts, do you recognize this document?
13           Can you see it okay?
14   A.   I can see it okay, I was looking.
15           I think it was in the PowerPoint.
16   Q.   So the same information here is what is in the
17   PowerPoint?
18   A.   Yes, sir.
19   Q.   Okay.  Were you handed this set of materials in
20   connection with your training?
21   A.   With the PowerPoint?
22   Q.   Yes, sir.
23   A.   I am thinking so.  I don't recall.  It has been
24   so long ago.
25   Q.   Okay.  But is this the training that gave you the
```

899

1  PowerPoint?

2  A.    I think so.

3  Q.    Okay.  Let me show you a couple more pages of

4  this to see if it might -- maybe go to page 1.

5            All right, do you see the length of

6  instructions there, Mr. Pitts, it says 1.5 hours?

7  A.    Yes, sir.

8  Q.    Okay.  I mean do you remember spending that much

9  time with the PowerPoint?

10  A.    We had the whole class on the PowerPoint.  They

11  were training on the PowerPoint.

12            MR. POTTS:  Your Honor, I am going to move

13  to enter P-QQQ2, offer to introduce and evidence it

14  into evidence?

15            THE COURT:  It is admitted.

16            MR. ARCHEY:  Your Honor, we don't have any

17  objection to the admission of the document, it's

18  obviously our document, but to the extent that he

19  wants to question this witness, this witness has, I

20  think, testified that he is not familiar with it.  So

21  that is my only objection.

22  BY MR. POTTS:

23  Q.    Mr. Pitts, let me direct you to page 2.  Page 2.

24  And in the middle there you see the medication

25  noncompliance, psychiatric medication

1    noncompliance?  Those are the same things that were on

2    the PowerPoint, correct?

3    A.    Yes.

4    Q.    Is that right?

5    A.    I think so.  I am not familiar with this right

6    here.

7    Q.    Let me ask you about that second full paragraph

8    up there that talks about medication compliance.  It

9    says offenders with a mental illness are often likely

10   to be in noncompliant with medication.  This could

11   result in deterioration of their mental status and

12   present correctional officers many avoidable

13   challenges.  During periods of noncompliance these

14   offenders are more likely attempt to harm them

15   themselves or others.  Also, they are more likely be

16   seen as behavior problems, as the medication helps

17   them to control some odd or bizarre behaviors.  In

18   order to keep offenders at their highest level of

19   functioning to avoid security risk, noncompliance with

20   psychiatric medication is to be reported in a timely

21   manner.

22           Do you agree with that?

23           MR. ARCHEY:  Your Honor, I have an

24   objection.  I just want to object to the fact that

25   this witness has now said at least two times that he

1    is not familiar with the document.  We have been told

2    during our questioning that we're not to show

3    documents to witnesses who have not seen the document

4    before and use them in our examination, so I just want

5    to lodge that objection.

6              THE COURT:  The problem with yours was that

7    you did not have the foundation for the records.  That

8    was the difficulty.

9              If this is a policy -- we have not heard

10   what the question yet is.  Whether he is aware of this

11   policy, whether anybody told him about this policy, we

12   have not heard what that question is.  So the Court's

13   is not allowing you to go into documents was because

14   there was not the proper foundation for it.

15             I really would encourage everybody to get

16   together and see if we could have that foundation

17   established.  But anyway.

18             I am going to allow the question.  Because

19   we have not heard the question yet.

20             You have read this to us, sir.  What is the

21   question?

22   BY MR. POTTS:

23   Q.   Mr. Pitts, you heard me read that paragraph out

24   loud, correct?

25   A.   Correct.

902

1    Q.   Did I read it accurately?

2    A.   Yes, you did.

3    Q.   Do you agree with what is contained, what is

4    contained in that paragraph in connection with your

5    pill call officer duties?

6    A.   Do I agree to it?

7    Q.   Do you agree with what's contained in that

8    paragraph in connection with your duties as a pill

9    call officer?

10   A.   Yeah, I agree to it.

11   Q.   Okay.  Thank you.

12          Mr. Pitts, I had asked you earlier about if

13   you were aware of the tier log system at David Wade,

14   particularly with the south compound, correct?

15   A.   Correct.

16   Q.   Okay.  And you're aware that when you are sitting

17   there at that desk duty, you are to note everyone that

18   comes on and off the tier, and whoever sitting there

19   at desk duty needs to know who is coming on and off

20   the tier, correct?

21   A.   Correct.

22   Q.   All right.

23          MR. POTTS:  Your Honor, I am going to be

24   looking at PPP-16 Volume 31 beginning at page 337?

25          THE COURT:  Please continue, sir.

903

```
 1              MR. POTTS:  Thank you, Judge.
 2   BY MR. POTTS:
 3   Q.   Mr. Pitts, do you recognize the front of this log
 4   book?
 5   A.   Yeah, it's a DWCC log book.
 6              THE COURT:  Mr. Pitts, again, now you are
 7   leaning back.  You need to come forward so we can hear
 8   you better.
 9              THE WITNESS:  Okay.
10   BY MR. POTTS:
11   Q.   Okay, so you recognize this as a David Wade
12   Correctional Center log book, correct?
13   A.   Correct.
14   Q.   All right.  And this is one that you have signed,
15   that where you've logged people and where people have
16   logged you in, correct?
17   A.   Correct.
18   Q.   This is a custody record that is kept at David
19   Wade Correctional to note who is on and off tier,
20   correct?
21   A.   Correct.
22              MR. POTTS:  Judge, at this time I would
23   offer and introduce into evidence P-PPP-16, the David
24   Wade Correctional log book for N4 A, B for a start
25   date of January 15 to February 28, 2018.
```

904

1         THE COURT:  Sir, I show it starting January
2  the 25th?
3         MR. POTTS:  Yes, Your Honor.
4         THE COURT:  All right, so it is January the
5  25th through February the 28th.  I show that as being
6  some 400 pages, is that?
7         MR. POTTS:  Yes, Your Honor.  That is
8  correct.
9         THE COURT:  Let's go through the pages, and
10  then the Court will decide what pages to admit, sir.
11         MR. POTTS:  Sounds good.  Thank you, Judge.
12  BY MR. POTTS:
13  Q.  Mr. Pitts, let me refer you first to the date of
14  January 29, 2018.
15         THE COURT:  I show that as page 359?
16         MR. POTTS:  Yes, Your Honor.
17  BY MR. POTTS:
18  Q.  Now, Mr. Pitts, this first page obviously deals
19  with, you know, right after midnight on the 29th
20  through that early morning.  This is not your shift,
21  correct?
22  A.   Correct.
23  Q.  Okay.  So if we go to the next page, to 360, will
24  you take a look at that page for me and see where it
25  is entered that you are doing morning pill call?

1          Do you see anything there that is showing
2     you doing morning pill call?
3     A.   No, sir, I don't.
4     Q.   Okay.  If we go to page 691 -- well, let me stop,
5     let me stop here in the middle.  Is there anything
6     showing you--
7          THE COURT:  The Court -- excuse me, the
8     Court has a question.
9          MR. POTTS:  Yes, Judge.
10         THE COURT:  When I look at the January 29th
11    entry that you're saying was his shift beginning at
12    6 a.m., how do I know that this is Mr. Pitts?
13         MR. POTTS:  I'm going to get there in two
14    more questions, Judge, if that is okay.
15         THE COURT:  All right.
16         MR. POTTS:  Or, let me -- let me go ahead do
17    that now.  Let me go to page 690 -- I'm sorry, 362?
18         THE COURT:  362, okay.
19         MR. POTTS:  All right, page 361 at 14:50.
20    BY MR. POTTS:
21    Q.   At 14:50, Mr. Pitts, can you tell us what that
22    says?
23    A.   A victim pill call.
24    Q.   Okay.  So on this date of January 29th, the logs
25    show you doing a pill call for the evening at 14:50,

1  correct?

2  A.   Correct.

3  Q.   But it does not show entries for you doing a

4  morning or an evening pill call, correct?

5  A.   Correct.

6  Q.   Okay.  So you were not on tier the morning or

7  afternoon for N4 A and B, correct?

8            THE COURT:  Mr. Potts, I am still --

9  Mr. Potts, I am still not sure what I am looking at.

10  This is a log book.  Who -- who makes these entries?

11  And I see it is signed by an officer.  I don't know, I

12  am in the dark.

13            MR. POTTS:  Okay, Judge.

14            THE COURT:  As to who is making this record?

15  BY MR. POTTS:

16  Q.   Mr. Pitts, again, as I asked you before, you are

17  familiar with the person that sits at the desk and

18  fills in the tier log, correct?

19  A.   Yeah.

20  Q.   And you have done that yourself, correct?

21  A.   Correct.

22  Q.   Anthony Robinson, the officer's signature at the

23  bottom of 361, he was the security officer that was

24  monitoring N4 A and B about on January 29th, correct?

25  A.   That what the log book says.

1  Q.    Do you know Anthony Robinson?

2  A.    No, I don't.

3  Q.    You have no idea who Anthony Robinson is?

4  A.    I probably seen his face here and there at work

5  but I don't know him personally.

6  Q.    Okay.  When you would go onto tier N4 A and B,

7  there would be somebody there logging you in, correct?

8  A.    There is supposed to be somebody logging me in

9  when I go on a tier.

10  Q.    Okay.  And so on this day it was David Wade

11  Correctional Officer Anthony Robinson.

12          MR. ARCHEY:  Your Honor, is there a question

13  there?

14          MR. POTTS:  I am asking him if that is

15  correct.

16          THE WITNESS:  Is what correct?

17  BY MR. POTTS:

18  Q.    That on January 29th, 2018, the David Wade

19  Correctional Officer for N4 A and B who was monitoring

20  and logging people in was Anthony Robinson, correct?

21  A.    Correct.

22  Q.    Okay.  And completing the log book is part of

23  your job, correct?

24          I am sorry, part of-.  Completing that log

25  book is part of the key officer's job, correct?

1   A.   Correct.

2   Q.   Okay.  And these are tier log records that are

3   maintained at David Wade for the purposes of noting

4   who comes in an out of tier, correct?

5   A.   Correct.

6   Q.   All right.  And on page 361 this log notes at

7   14:50 Sergeant Pitts in conducting pill call, correct?

8   A.   Correct.

9   Q.   All right.  Are there entries that day showing

10  you doing the morning or afternoon pill call?

11  A.   Well, in the morning they be feeding and

12  everything else so you might be coming in --

13           THE COURT:  Yeah, this is the wrong witness

14  for this, sir.  This is not made by him.  It is to

15  reflect his activities, allegedly, but I am having

16  difficulty.  You really lack a foundation with this

17  witness.  He has not any personal knowledge of what

18  is -- he did not make this log.

19           MR. POTTS:  Judge, it is a business record

20  of DWCC.

21           THE COURT:  I think it kind of --

22           MR. POTTS:  I -- Judge, I'm sorry, I did not

23  mean to interrupt you.

24           THE COURT:  Go ahead.

25           MR. POTTS:  With Zoom it is difficult.

1            It may be a business record but I think you
2    make a good point that the gentleman is not the person
3    who filled out this log and he can't attest to the
4    accuracy of it in any way, shape, or form.  So I just,
5    I don't -- I disagree with what you said, Judge.
6    Thank you.
7            THE COURT:  I am -- I think you -- I am not
8    saying this is not admissible.  I am not saying that
9    we would not amount it at some point.  I just think
10   this is the wrong witness to question about -- about
11   this document at this time, Mr. Potts.  And it may
12   well be a business record that you get in, you know,
13   another way.  You have demonstrated to the Court the
14   relevance of that document as far as the MAR is
15   concerned, and, but I just think you need to move on
16   with this witness since he -- he did not create this
17   document.
18           MR. POTTS:  Thank you, Your Honor.
19           THE COURT:  And would not have had any
20   reason to review it, any control over it, et cetera.
21           MR. POTTS:  All right.
22           THE COURT:  Miss Keifer, the record will
23   show that this was offered into evidence but that it
24   is pending acceptance by the Court.
25   BY MR. POTTS:

1  Q.   Mr. Pitts, in connection with your duties as pill
2  officer, we went over earlier about when you would
3  with complete each morning, afternoon, evening pill
4  call that you would enter data into the E-MAR system,
5  correct?
6  A.   Yes, sir.
7  Q.   You got to speak up for me, please, I am sorry.
8  A.   Yes, sir.
9  Q.   Okay.  And in connection with entering that data,
10  if they took it, it would be your initials, correct?
11  A.   Correct.
12  Q.   And if it was refused it would be an R, correct?
13  A.   Correct.
14  Q.   And N is for not requested?
15  A.   Yes, sir.
16  Q.   Okay.  And in entering into the E-MAR system, it
17  then notes and calculates how many doses the person
18  received over a month period of time, correct?
19  A.   Correct.
20  Q.   Okay.  And you're familiar with the fact that the
21  E-MAR keeps count?
22  A.   Yes, sir.
23  Q.   Okay.
24          MR. POTTS:  Judge, at this time I am going
25  to show an E-MAR with a redacted name?

```
 1           THE COURT:  Mr. Potts, could you please go
 2   back over those -- I was looking at the exhibit.
 3   Could you please go back over those last questions
 4   with regard to the E-MAR?
 5           MR. POTTS:  Certainly, Judge.  You want me
 6   to go again, Your Honor, for him entering the
 7   information into the system?
 8           THE COURT:  Yes, it was the last question
 9   when you said that it keeps track.  I was not -- I
10   must have missed something; it keeps track of what?
11           MR. POTTS:  Sure.
12   BY MR. POTTS:
13   Q.   So again, Mr. Pitts, once you get done with a
14   block, you know, whether it's morning, afternoon,
15   evening, you enter information regarding the pill call
16   into the system, correct?
17   A.   Correct.
18   Q.   And what will be entered in the boxes is either
19   your initials for the fact that they took it or an R
20   for refusal or an N for not requested, correct?
21   A.   Correct.
22   Q.   Okay.  And then that E-MAR for the month period
23   of time, it tracks the dosage, or the -- I am sorry,
24   the number of pills that the prisoner took, correct?
25   A.   Correct.
```

1  Q.   Okay.

2          MR. POTTS:  So again, Your Honor, at this

3  time I am going to show Mr. Pitts an E-MAR that is

4  PL-120 Volume 11?  I am sorry, PL-123 Volume 11 at

5  page 133 where we have redacted the prisoner's name.

6          THE COURT:  And give me the number again,

7  please, sir?

8          MR. POTTS:  Yes, Your Honor, Volume 11,

9  PL-123, page 133.

10          THE COURT:  All right.  Please proceed.

11  BY MR. POTTS:

12  Q.   Mr. Pitts, are you familiar with this E-MAR page?

13  A.   Yes, sir.

14  Q.   Okay.  And this shows -- could you scroll up a

15  little bit?  Can we see the bottom?  Yeah.

16          So this is going to show location, name, and

17  then over on the right-hand side there is a legend,

18  correct, that has your name, Paul Pitts, on it?

19  A.   Can you slide it over to the left?

20          MR. ARCHEY:  Your Honor, I just want to

21  lodge an objection to this document.  The unit

22  indicates that it's H-5B, which is not part of this

23  lawsuit.

24          MR. POTTS:  I think we may have a wrong

25  number, hold on one second, Judge.

913

```
 1              THE COURT:  The page I am looking at says
 2   N-4A.
 3              Is it Benadryl, Wellbutrin, and Haldol?
 4              MR. POTTS:  Yes, Your Honor.
 5              THE COURT:  Yeah, it is N4 A.
 6              MR. POTTS:  There we go.  There we go.
 7   BY MR. POTTS:
 8   Q.   Okay.  So again, Mr. Pitts, at the bottom right
 9   you see the legend that has your name on it, correct?
10   A.   Correct.
11   Q.   And that is on there because you are one of the
12   pill pass officers, correct?
13   A.   Correct.
14   Q.   Okay.  And if we go back up to the top, in the
15   middle where you see Wellbutrin, there is a reference
16   to O/D, correct?
17   A.   Correct.
18   Q.   And it gives the date of 8/29/2017, correct?
19   A.   Correct.
20   Q.   And again, this is an E-MAR that you are familiar
21   with, correct?
22   A.   Correct.
23   Q.   All right.
24              MR. POTTS:  Your Honor, I would offer and
25   introduce PL-123 into evidence.
```

1              THE COURT:  And that is just that single

2  page?

3              MR. POTTS:  Yes, Your Honor.

4              THE COURT:  I am not seeing the O/D that you

5  talked about.

6              MR. POTTS:  Your Honor, at Wellbutrin, when

7  you look down by RX, prescription, right above the bar

8  code?

9              THE COURT:  Oh, yes, okay.

10             And what does O/D stand for?

11             MR. POTTS:  That's what I was asking

12  Mr. Pitts.

13             THE WITNESS:  O/D?  O/D mean -- O/D means

14  the day that it started.

15             And that was 2017, and I wasn't put in pill

16  call until -- I started pill call in 2018, not '17.

17             THE COURT:  Well, but, sir, this is the

18  record that just shows you the date it started.  This

19  record is for when, do we know?

20             MR. POTTS:  Your Honor, I believe it's for

21  October 2017.

22             THE COURT:  Yes, sir, see at the top,

23  Mr. Pitts?

24             THE WITNESS:  Yes, ma'am.

25             THE COURT:  You were working pill call in

1  October of 2017?

2        THE WITNESS:  No, ma'am, I started pill call

3  in '18.

4        THE COURT:  Okay.  What does it say down

5  here when it says PPI, Paul Pitts?

6        THE WITNESS:  That's my -- that must have

7  been when I started it, and ended in 2018.

8        THE COURT:  Okay.  Does PPI mean that you're

9  the -- the-- all right, show him those little -- the

10 names of the people, please.

11       What does that mean, LH3 with Joe Hill, DW7,

12 Demarcus Warren, and then PPI, Paul Pitts?

13       THE WITNESS:  Yes, ma'am.

14       THE COURT:  And then N?  Oh, no, that's it.

15       So what does PPI mean, Mr. Pitts?

16       THE WITNESS:  Them are my -- them are my

17 initials for the meds, when I pass them out.

18       THE COURT:  So this does show that you were

19 working pill cart in October of 2017?

20       Does --

21       THE WITNESS:  Yes, it says.

22       THE COURT:  I mean, we're -- you know, if

23 it's the wrong page, it's the wrong page, sir.  So

24 don't feel -- so what we're asking you is does this

25 record show that you were working pill call based on

1  what these letters are, et cetera, for the month of

2  October in 2017?

3           THE WITNESS:  Yes, ma'am, it does.

4           THE COURT:  Okay.  All right.

5           All right, you can proceed, Mr. Potts.

6           MR. POTTS:  Thank you, Your Honor.

7  BY MR. POTTS:

8  Q.   So, Mr. Pitts, I was asking, the O/D date for

9  Wellbutrin of 8/2917, that is when the prescription

10  started, correct?

11  A.   That is the order date.

12  Q.   Okay.  And the date it ends is 2/24/18?

13  A.   Correct.

14  Q.   Okay.

15  A.   These continue.

16  Q.   And for Haldol, it is a start date of 8/2917,

17  correct?

18  A.   Correct.

19  Q.   And an end date of 2/24/2017, correct?

20  A.   Correct.

21  Q.   When we go to the column that says time, what we

22  have in there are two entries for each medication,

23  OOO1 and OOO4.  The OOO1 stands for morning pill call,

24  correct?

25  A.   Correct.

1  Q.   The OOOO4 is for evening pill call, correct?

2  A.   Correct.

3  Q.   Okay.  So when we look across, for example, to

4  October 29th for Wellbutrin, your initials or your

5  identification, PPI, is there, correct?

6  A.   Correct.

7  Q.   And that means that you logged in and used your

8  user name to make that entry, correct?

9  A.   Correct.

10  Q.   Okay.  So you were in fact doing pill pass at

11  this time, correct?

12  A.   Correct.

13  Q.   All right.  And you understand again, in looking

14  at the entries for these medications, whether the

15  person took or didn't take the medication, correct?

16  A.   Correct.

17  Q.   Okay.  So for this individual for Wellbutrin, out

18  of 62 doses how many did he take?

19  A.   I count 8.  No, 14.

20  Q.   Okay.  Do you see the total there at the end?

21  A.   Yes, sir.

22  Q.   Okay.  So it shows 14 out of 62, correct?

23  A.   Correct.

24  Q.   All right.  So --

25         THE COURT:  That is what you meant by the

918

 1  total, it shows the total, when I asked earlier.

 2          MR. POTTS:  Correct, Judge.

 3          THE COURT:  Okay.

 4  BY MR. POTTS:

 5  Q.   And when we look down at Haldol, it's the same

 6  thing, correct, 14 out of 62?

 7  A.   Correct.

 8  Q.   All right.  So by entering the letter N of not

 9  requested, that indicates that this individual didn't

10  take a vast majority of the medication, correct?

11  A.   Correct.

12  Q.   Okay.  When -- when you were delivering, based on

13  your entry for N of October 29th, did you report the

14  nonuse?

15  A.   Yes.

16  Q.   You did?

17  A.   The N.

18  Q.   I am sorry?

19  A.   Yes, sir, for N, not requested.

20  Q.   Okay.  But the way you report it is by entering

21  it in on E-MAR; you do nothing else, correct?

22  A.   Correct.

23  Q.   Okay.

24          MR. POTTS:  Make sure my numbers are right.

25          Your Honor, I believe it is in the same

919

volume PL-124.

      THE COURT:  I have a question before we move on.

      Mr. Pitts, when you enter the N, there is no way to know who on enters the N; is that right?

      THE WITNESS:  Yes, ma'am.

      THE COURT:  So we can just guess that's you for the seven-day period because that is when they were doing the seven-day periods?

      THE WITNESS:  Yes, ma'am.

      THE COURT:  And, for example, on that day, the 29th, when this inmate does take in the morning, then there's an N at night.  So I guess we can presume it was you that entered it at that time?

      THE WITNESS:  Sometimes they only take them -- yes, ma'am.  But sometimes they only take them one time a day.

      THE COURT:  Well, but it says he is supposed to take it two times a day, right?

      THE WITNESS:  I don't know, can we go back to the E-MAR?

      MR. POTTS:  Go back to the screen.

      THE COURT:  So my question to you is the fact that there is two entries, one that says OOO1 and OOO4 for the Wellbutrin and for the Haldol, that

920

 1  indicates that he is supposed to be taking it twice a

 2  day?

 3           THE WITNESS:  Yes, ma'am.

 4           THE COURT:  Okay.  Okay.  And did anybody

 5  train you on what is a psychotropic or a medication

 6  for a mental health need?

 7           THE WITNESS:  Yes, ma'am, we have a sheet,

 8  we have a sheet with mental health patients on there.

 9           THE COURT:  Okay.  Okay.  But, so it is by

10  patient and not by drug?

11           THE WITNESS:  Yes, ma'am.

12           THE COURT:  All right.  Thank you, sir.

13           You can continue, Mr. Potts.

14           MR. POTTS:  Thank You, Judge.

15           All right.  Your Honor, I believe this is

16  PL-124 at page 134 of 974.

17           MR. ARCHEY:  Your Honor, I just want to note

18  there's a name -- there's a name on this document; is

19  this somebody we have a release for?

20           MR. POTTS:  That is correct.

21           MR. ARCHEY:  Okay, I won't interrupt again,

22  I just --

23           MR. POTTS:  No, I appreciate it.

24  BY MR. POTTS:

25  Q.  So again, Mr. Pitts, you recognize this E-MAR

1    form, correct?

2    A.    Correct.

3    Q.    And your name is in the legend down at the bottom

4    right-hand corner, correct?

5    A.    Correct.

6    Q.    And this is for unit N1 A, correct?

7    A.    Yes, sir.

8    Q.    And what we show on here for this individual is

9    that there were two pills for him to take in the

10   morning and one in the evening, correct?

11   A.    Correct.

12   Q.    Okay.  And the one in the evening, the Remeron,

13   can you tell how many doses of that he got that month?

14   A.    I really can't tell, there's a black spot over

15   it.

16   Q.    Okay.  Are you able to count the initials?

17   A.    Seven.

18   Q.    Seven.  Okay.  And I believe -- yeah, for some

19   reason there's a hole punch there but I do believe it

20   is 7 out of 31 doses, correct?

21   A.    Correct.

22   Q.    Okay.  If you look at the top of this E-MAR, the

23   date of October 24, we see your initial there,

24   correct?

25   A.    Correct.

1    Q.   Okay.  And then if we go on over to the 29th we

2    see your initial, correct?

3    A.   Correct.

4    Q.   Okay.  So you were -- we can tell from this that

5    you were doing pill call from October 24th to

6    October 29th, correct?

7    A.   Correct.

8    Q.   And if we go down to the Remeron from

9    October  24th to October 29th, you administered it to

10   this individual one time, correct?

11   A.   Correct.

12   Q.   And you are saying again that based on your

13   training and the courses you went through and the

14   PowerPoint you went through that your reporting of the

15   missing of the dose is done when you enter the letter

16   N into the system, correct?

17   A.   Correct.

18   Q.   And hold on one second.

19         And the date that you did give him that

20   medication was on October 27th, correct?

21   A.   Correct.

22         MR. POTTS:  Your Honor, I don't -- if I

23   failed to do so, I offer and introduce into evidence

24   PL-124?

25         THE COURT:  It is -- it is admitted.

1          MR. POTTS:  Now we're going to PL-122.

2  BY MR. POTTS:

3  Q.   Mr. Pitts, again this is an E-MAR for

4  October 2107, correct?

5  A.   Correct.

6  Q.   Down in the bottom right-hand corner we see again

7  your legend there, PPI, correct?

8  A.   Correct.

9  Q.   For this individual who is housed in N3 C we see

10  there is a prescription for Remeron, correct?

11  A.   Correct.

12          MR. POTTS:  Your Honor, I would offer and

13  introduce PL-122 into evidence?

14          THE COURT:  It is admitted.

15  BY MR. POTTS:

16  Q.   Mr. Pitts, from the last E-MAR we looked at, we

17  know that you were doing pill call on October 24th to

18  29th, correct?

19  A.   Correct.

20  Q.   And for this individual, for an evening pill call

21  you provided him with one dose of Remeron on

22  October 27th, correct?

23  A.   Correct.

24  Q.   And that was the same night on our previous

25  exhibit that you also provided Remeron, correct?

924

1   A.    Correct.

2   Q.    And so can you tell us how many doses did this

3   individual get of the Remeron for the month of

4   October?

5   A.    Eight.

6   Q.    Out of how many prescribed?

7   A.    Thirty-one.

8   Q.    And again, you didn't report this to any per --

9   the missed doses you didn't report to anybody, you

10  simply entered the letter N, and that was the end of

11  your responsibility?

12  A.    Yes, sir.  Like I said earlier, when you put the

13  N in the computer, it goes to the medical, and then

14  the nursing check.

15  Q.    Can you say that last part again, I am sorry?

16  A.    I said once I put it in the E-MAR, that is all I

17  do is put in the E-MAR, and the nursing will check it.

18          MR. POTTS:  Your Honor, we are now looking

19  at, in the same volume, PL-14.

20          THE COURT:  All right, please proceed.

21          MR. POTTS:  We're pulling it up right now,

22  Judge.

23  BY MR. POTTS:

24  Q.    All right, Mr. Pitts, again, you recognize this

25  E-MAR, correct?

925

1    A.    Correct.

2    Q.    Your name is down in the legend there for this

3    October 2017 E-MAR, correct?

4    A.    Correct.

5    Q.    Okay.  At the bottom of this there is a

6    prescription for Effexor XR with an order date of

7    7/15/2017 through 2/10/2018, correct?

8    A.    Correct.

9    Q.    Okay.  And this is a pill call for a gentleman in

10   1-C for the morning, correct?

11   A.    Correct.

12   Q.    And as we look over the days, it appears again,

13   from what we have established you working on

14   October 24th through the 29th, we see your initials

15   for distribution of the medication on October 24th and

16   27th, correct?

17   A.    Correct.

18   Q.    But we see Ns for 25,26, and 27, correct?

19   A.    Correct.

20   Q.    Okay.  Then it appears that there is a new order

21   for Effexor, if you look at the second prescription

22   down from the top, with the order date of 10/28/17 and

23   extending into April 2018, correct?

24   A.    Correct.

25   Q.    And so that is a continuation of the Effexor for

926

```
 1  this individual, correct?
 2  A.    Correct.
 3  Q.    And on the 28th it's entered N, correct?
 4  A.    On the Effexor?
 5  Q.    I am sorry?  On Effexor.  On Effexor.
 6        Correct?
 7  A.    Correct.
 8  Q.    And then it is -- your initials are there for the
 9  27th and then an N for the 30 and 31st, correct?
10  A.    Correct.
11  Q.    So out of the 32 doses of Effexor, am I correct
12  that he received 9 of those doses?
13  A.    On the Effexor?
14  Q.    Yes, sir.  If we add the bottom column of Effexor
15  with the second row down?
16  A.    Yes, sir, I see that.
17  Q.    Okay.  So he got 9 doses out of 32, correct?
18  A.    Correct.
19  Q.    And then in connection with that missed
20  medication, again, all you do to inform is press the
21  letter or enter the letter N into the E-MAR, correct?
22  A.    Correct.
23        MR. POTTS:  And, Your Honor, I offer and
24  introduce into evidence PL-14?
25        THE COURT:  It will be admitted.
```

927

1           Mr. Potts, is the Court going to -- do you
2    have an expert or a summary chart or anything that is
3    going to summarize the rest of these medical
4    administration records for the Court?
5           MR. POTTS:  Yes, Judge.  I was trying to lay
6    a foundation on some of the admissible documents, and
7    due to the volume, voluminous E-MARs, we do have
8    summary charts to share with the Court.
9           THE COURT:  Okay.  Because I get the
10   relevance of this now.
11          MR. POTTS:  And that is what we're doing.
12          THE COURT:  Okay.  All right.
13          MR. POTTS:  Judge, I could enter -- I would
14   like to enter one more exhibit, and then that would be
15   a great time to break.
16          THE COURT:  Well, we've got -- we have to
17   offer him to the defendants as well.
18          MR. POTTS:  Oh, no, I'm just -- I'm just
19   giving you a little forward, that's all, I apologize.
20          Judge, we're looking at PL-15.
21          THE COURT:  Which is the next page?
22          MR. POTTS:  Yes, Your Honor.
23          THE COURT:  All right.
24   BY MR. POTTS:
25   Q.   All right, again, Mr. Pitts, you recognize this

```
 1  E-MAR?
 2  A.   Yes, sir.
 3  Q.   And that is your legend for your initials down in
 4  the bottom right-hand corner, correct?
 5  A.   Correct.
 6  Q.   For this individual in N1 C you are making two
 7  pill calls a day, correct?
 8  A.   Correct.
 9  Q.   For both Prolixin and Cogentin, correct?
10  A.   Correct.
11  Q.   And again if we look for this period of time of
12  October 24th through the 29th, we can see your
13  initials there for the days of the 24th and 27th,
14  correct?
15  A.   Correct.
16  Q.   Okay.  But on the 25th, 26th, and 28th, it is not
17  requested, correct?
18  A.   Correct.
19  Q.   And when we look at the N tally for both of these
20  medications, we show that 13 out of 56 doses were
21  provided, correct?
22  A.   Correct.
23          MR. POTTS:  Your Honor, we would offer and
24  introduce into evidence PL-15?
25          THE COURT:  It is admitted.
```

BY MR. POTTS:

Q.   And again, Mr. Pitts, in connection with your
duties and responsibilities, your way of reporting
noncompliance is by putting the letter N into the
E-MAR; is that correct?

A.   Correct.

Q.   All right.

THE COURT:  Mr. Pitts, what happens to the
medicine when they refuse it?  So you put it in the
little pill cup and either the guy doesn't come to the
bar or whatever; what happens to that medicine?

THE WITNESS:  He just -- I don't pop it out
until I get there to the cell.  I don't prepop them, I
pop them out as I go.

THE COURT:  Okay.  So it remains in the
blister pack if it is refused.

THE WITNESS:  Yes, ma'am.

THE COURT:  Okay.  Thank you.

MR. POTTS:  Your Honor, would you like for
us to keep going or do you want to -- this is a
natural breaking point, just in case.

THE COURT:  I think we need to keep going a
little bit, we just had a break.

MR. POTTS:  No, that is fine.

Your Honor, this is the summary that was

1  prepared pursuant to FRA1006.  When you -- when we

2  look at the bottom of the document, the P-L-14,

3  P-L-15, P-L-122, and P-L-124 I believe is what we have

4  gone over.  At the Court's pleasure we can --

5          THE COURT:  Do I have copy of this?

6          MR. POTTS:  You do, Your Honor.  It is not

7  marked.  Yeah, it is not marked but it is in its own

8  binder, the demonstrative MARs.

9          THE COURT:  And  how are you attempting to

10  get this into evidence at this time?

11         MR. POTTS:  Your Honor, we presented

12  Mr. Pitts with several E-MARS, and there are obviously

13  many, many more we can go through.  This is a summary

14  chart prepared in accordance with FRA1006, and I

15  believe that we can admit this pursuant to that rule.

16         THE COURT:  All right, I have the right

17  binder.

18         And I have what I believe to be the right

19  page.

20         MR. POTTS:  For October --

21         THE COURT:  October 17th.

22         MR. POTTS:  Correct.

23         THE COURT:  I see.

24         Is there any objection by the defendant to

25  the introduction of this -- of this summary document?

931

 1              MR. ARCHEY:  No, Your Honor.

 2              THE COURT:  All right.  And are all of

 3    the -- I thought we had to redact -- oh, you have

 4    redacted them up there.  Okay.  And the copy that you

 5    will have for Miss Keifer will be redacted as well; is

 6    that correct?

 7              MR. POTTS:  Yes, Your Honor.

 8              THE COURT:  Okay.

 9              MR. POTTS:  Yes.

10              THE COURT:  All right.  All right, so this,

11    then, is admitted for that -- for October of 2017.

12    And it purports to reflect a summary of these -- of

13    medical administration in these areas, with these

14    patients.

15              MR. POTTS:  Your Honor, I am kind of going

16    from the top of my head.  I believe these summaries

17    are prepared from, are they October 2017 -- from

18    January 2017 through June of 2019.  So we have

19    summaries --

20              THE COURT:  Are you offering all of those at

21    this time or just this October page?

22              MR. POTTS:  Well, I am starting with this

23    but if defendants have no objection, you know, we can

24    certainly go through the E-MARS and establish each

25    one.

932

```
 1              MR. ARCHEY:  Your Honor, that is not
 2    necessary.  We don't object.  You know, it is not --
 3              THE COURT:  Okay.  So.  So to be clear, the
 4    plaintiffs are offering the summaries for all of
 5    P-L, which is the medical administrative records, and
 6    they are -- to get the record straight, Mr. Potts,
 7    they are from January of 2017 until June of 2019; is
 8    that correct?
 9              MR. POTTS:  That is correct.
10              THE COURT:  All right.  They are admitted,
11    then, without objection.
12              MR. POTTS:  Your Honor, we'll identify these
13    as P-ZZZ.
14              THE COURT:  They are so admitted.
15              MR. POTTS:  Thank you.
16              THE COURT:  ZZ1.  All right.
17              Mr. Potts, are you finished?
18              MR. POTTS:  No, Your Honor, I have a little
19    bit more.
20              Your Honor, I am going to pull up the May
21    2019 summary that has now been entered.
22    BY MR. POTTS:
23    Q.   Mr. Pitts, can you see that okay?
24    A.   Yes, sir.
25              MR. ARCHEY:  Your Honor, I do want to object
```

1    to this questioning.  Because I had no problem with it
2    coming into evidence but I don't think it is
3    appropriate for him to be questioned on a summary that
4    he's never seen before, he did not prepare, has no
5    involvement with directly.
6            THE COURT:  The objection will be considered
7    by the Court once the Court hears the question.
8    BY MR. POTTS:
9    Q.   Mr. Pitts, do you see under the date of May 21
10   your designated initials?
11   A.   Yes.
12   Q.   And then do you see over to May 26th your
13   designated initials?
14   A.   I do.
15   Q.   Okay.  Who is ES3?
16   A.   I think that's Erik Scriber.
17   Q.   Okay.  So he would have been working the opposite
18   seven-day shift from you?
19   A.   Correct.
20   Q.   So we at least can tell that you were doing pill
21   call May 21 through 26, correct?
22   A.   Correct.
23   Q.   All right.
24   A.   May I --
25   Q.   Go ahead?

934

1    A.    I took a vacation in May, I'm thinking, so this

2    could have been from a vacation day with the Ns or

3    something, and somebody else did the pill call.

4    Q.    Say that one more time?

5    A.    I'm saying that I see where I did pill call back,

6    but I was sick back in May, so.

7    Q.    So does that mean nobody did pill call?

8    A.    When I don't do it somebody else is supposed to

9    do it.

10   Q.    Do you know if that happened while you were out

11   sick?

12   A.    I don't know.

13            THE COURT:  I think you better go back to

14   the original document, then, sir.

15            MR. POTTS:  Your Honor, we're going to go to

16   P-L409.  And it will have a redacted name.

17            P-L409 is going to be in Volume 12, Judge.

18   At page 826.

19            THE COURT:  All right, keep going.

20            MR. POTTS:  Thank you, Judge.

21   BY MR. POTTS:

22   Q.    Mr. Pitts, do you recognize this E-MAR?

23   A.    Yes.

24   Q.    Down at the bottom right corner again those are

25   your initials, correct?

935

```
 1   A.    Correct.
 2   Q.    At the bottom we see this is an individual in
 3   N2 C, correct?
 4   A.    Correct.
 5   Q.    All right.  And at the top we see a medication
 6   for Wellbutrin, correct?
 7   A.    Correct.
 8   Q.    And this is an active medication for the month of
 9   May, correct?
10   A.    Correct.
11   Q.    And it is to be given to this individual in the
12   morning and evening pill call, correct?
13   A.    Correct.
14   Q.    From May 2nd until the morning of May 6th, this
15   AMR shows that he did not get this medication,
16   correct?
17   A.    Correct.
18   Q.    It shows that you gave him a dose on the morning
19   of May 6th, correct?
20   A.    Correct.
21   Q.    Then from May 7th through the 12th there is no
22   Wellbutrin provided, correct?
23   A.    Correct.
24   Q.    And then we see Mr. Scriber has obviously come on
25   duty, correct?
```

936

```
 1   A.   Correct.
 2   Q.   And then from the 20th to the 26th, over that
 3   seven-day period, over that seven-day period you
 4   provided three doses of Wellbutrin, correct?
 5   A.   Correct.
 6   Q.   And then at the end you see the total dispensed,
 7   correct?
 8   A.   Correct.
 9   Q.   And it was 27 out of 62, correct?
10   A.   Correct.
11   Q.   And, again, the way you report noncompliance is
12   by putting N into the system, correct?
13   A.   Correct.
14   Q.   And now what you're saying also is that during
15   these spaces of Ns from May 7th to 12th and May 22 to
16   25 that you may have been out?
17   A.   Yes.
18   Q.   And you don't know if pill call was conducted on
19   those days?
20   A.   I don't know.  I wasn't here.
21   Q.   But you don't know whether you were at the
22   facility or not on -- on those days?
23   A.   I doesn't recall, I know I took a vacation in
24   May.  I don't really know what day it was.
25   Q.   Yeah, but N means they didn't receive medication,
```

937

1  correct?

2  A.    Not requested, that means they -- yes.

3  Q.    That means they didn't take the pill, correct?

4  A.    Correct.

5  Q.    Okay.

6           THE COURT:  And, Mr. Pitts, this is May of

7  2019.  Just to focus you on that date.  And you think

8  you took vacation days in May of 2019?

9           THE WITNESS:  I think.  I am not for sure.

10  I Know I took a vacation somewhere around that time.

11          THE COURT:  Okay.

12          MR. POTTS:  So when we go back to -- let's

13  go back to the summary chart.

14  BY MR. POTTS:

15  Q.   So, Mr. Pitts, in connection with the AMR, it

16  shows that you gave him Wellbutrin on May 21st.  And

17  in this chart do you see where your initials are

18  located under May 21?

19  A.    Yes.

20  Q.    Okay.  So this report was contained in the AMR of

21  you dispensing Wellbutrin to this individual on

22  May 21?

23          MR. ARCHEY:  Your Honor, I just got to renew

24  my objection on this.  I mean, it has been admitted.

25  We're not objecting to it.  He is asking this witness

1   to confirm the correctness of a chart that this

2   witness did not prepare, that the attorneys actually

3   prepared.  I don't understand the purpose of it.

4          THE COURT:  Well, certainly your objection

5   is well-founded that he did not prepare this.  With

6   the refreshing of his recollection, that is why I sent

7   him back to the original document, sir.  But with the

8   refreshing of his memory, he is asking him if this

9   correctly shows his participation in pill call for

10  that month, basically.  And so I am going to allow it.

11  You may be right, he may be spending some time he

12  doesn't need to spend.

13         MR. POTTS:  And, Your Honor, in connection

14  with that, we're offering and introducing PL-409 into

15  evidence.

16         THE COURT:  It is admitted.

17         MR. POTTS:  Thank you.

18         Your Honor, could I have one minute to

19  confer?

20         THE COURT:  Please.

21         MR. POTTS:  Judge, just one point for

22  clar -- when we entered and you accepted the summaries

23  into evidence, were the underlying E-MARs also

24  admitted into evidence?

25         THE COURT:  We can in fact admit the

1  underlying documents, if that is what you are choosing

2  to do.  And the -- I -- with the caveat that the Court

3  is not going to go through those page by page but will

4  rely on those that have been identified in testimony

5  individually and will rely on the summary chart.  So

6  to that extent.

7        MR. POTTS:  Thank you, Your Honor.

8  BY MR. POTTS:

9  Q.   Mr. Pitts, the entry and designation of N means

10  the prisoner did not take the pill, correct?

11  A.   Correct.

12        MR. POTTS:  That's all the questions I have,

13  Judge.

14        THE COURT:  All right.  Thank you.

15        Now, Mr. Robert, are you the -- we taking

16  this witness, and do you wish to take this witness now

17  or defer the case -- this witness to your case in

18  chief?

19        MR. ROBERT:  Your Honor, I will be the one

20  taking the witness, I do wish to take him now, and I

21  think it won't be very long with my questioning, so.

22        THE COURT:  Oh, okay, very good.

23        MR. ROBERT:  As far as our break is

24  concerned, I think I can finish up in a very

25  reasonable period of time.

```
 1              THE COURT:  Okay.  Well, let's go, then,
 2    we'll see.
 3                    DIRECT EXAMINATION
 4    BY MR. ROBERT:
 5    Q.   All right, Mr. Pitts, you indicated earlier that
 6    you are no longer doing pill call, correct?
 7    A.   Correct.
 8    Q.   When was the last time you did pill call?
 9    A.   Back like November 2019.
10    Q.   Okay.  And so you left the David Wade and went on
11    to another career for a while and then you came back,
12    correct?
13    A.   Correct.
14    Q.   And since you have been back you are not -- you
15    have not done any work on pill call or anything like
16    that, correct?
17    A.   Correct.
18    Q.   Okay.  You indicated in your direct testimony
19    that the pill carts that are located in the various
20    tiers are locked, correct?
21    A.   Correct.
22    Q.   Who has keys to that pill cart?
23    A.   Medical.
24    Q.   Okay.  Do you have a key to it?
25    A.   No.
```

```
 1    Q.    Okay.
 2    A.    When I was doing pill call yes, but not now, no.
 3    Q.    Okay.  So you go --
 4              THE COURT:  Mr. Robert, the Court doesn't
 5    under.  Is the cart itself locked or was it locked in
 6    the key room location?
 7              MR. ROBERT:  Okay.  I will follow up.
 8    BY MR. ROBERT:
 9    Q.    The cart itself; is it locked?  Does it have a
10    lock on it?
11    A.    Yes, sir.
12    Q.    Okay.  So you have to unlock each drawer or
13    whatever on the cart in order to get the pills out,
14    correct?
15    A.    Correct.
16    Q.    And you get the key from medical before you go
17    and unlock it?
18    A.    No, sir, I get the key from the control center.
19    Q.    Okay.  And where is the key located in the
20    control center?
21    A.    Locked up in the control center.
22    Q.    Okay.  Does anybody else have access to that
23    besides the pill call officers and medical?
24    A.    No.
25    Q.    We talked about making three pill passes per day,
```

1  correct?

2  A.    Correct.

3  Q.    There is a morning, there is a noon, and then

4  there is an evening.  Is that what you testified to?

5  A.    Yes, sir.

6  Q.    And does the amount of pills that you have to

7  pass on these different pill calls, does that vary?

8  A.    Does it what now?

9  Q.    Does it vary, from -- from call to call?  Do you

10  always pass pills to the same people at the same --

11  you know, three times a day, or does it vary?

12  A.    It varies.

13  Q.    Well, explain that to me; how does it vary?

14  A.    In most -- you have most of your pill calls be in

15  the morning.  In the evening you probably have a

16  couple.  In the Evening you probably have a few.  You

17  just --

18  Q.    Okay.

19  A.    It's not the same one every day, like regular

20  pill calls.

21  Q.    So do you necessarily have to go to every tier in

22  every unit three times a day to make pill call?

23  A.    No, sir.

24  Q.    Okay.  So there may be some areas, let's say N3,

25  tier 8, you might not have anybody at noon that you

943

1  got to go deliver to; is that correct?

2  A.   Correct.

3  Q.   And, you know, N4 tier C, you might not have

4  anybody to deliver to in there in the evening,

5  correct?

6  A.   Correct.

7  Q.   Okay.  So when you make pill call, it doesn't

8  necessarily mean you've got to go in every building on

9  every tier, it all depends on who needs to get the

10  medicine and when they need to get it, right?

11  A.   Right.

12  Q.   Okay.  Let me ask you, while you were working at

13  David Wade, did you ever just skip a pill pass, just

14  not go?

15  A.   No, sir, never.

16  Q.   Okay.  And I'm going to ask you that for the

17  morning.  Did you ever skip a morning pill pass?

18  A.   No, sir.

19  Q.   Did you ever skip a noon pill pass?

20  A.   No, sir.

21  Q.   Did you ever skip an evening pill pass?

22  A.   No, sir.

23  Q.   And did you have somebody making sure -- on the

24  tiers making sure that you were doing your job and

25  making pill rounds?

944

```
 1  A.   Yes, sir.

 2  Q.   And who was that?

 3  A.   The captain and the key lady made sure, key room

 4  officer.

 5  Q.   Okay.

 6          THE COURT:  I'm sorry, sir, you said the

 7  captain and who?

 8          THE WITNESS:  The -- key room officer.

 9          THE COURT:  Key room officer.

10  BY MR. ROBERT:

11  Q.   Have you ever intentionally withheld medicine

12  from an offender.

13  A.   No, sir.

14  Q.   Have you ever diverted any medication for your

15  own use?

16  A.   No, sir.

17  Q.   Have you ever given an offender's medication to

18  any other staff member at David Wade?

19  A.   No, sir.

20  Q.   Have you ever destroyed any offender's

21  medication?

22  A.   No, sir.

23          MR. ROBERT:  Anything else?

24          Your Honor, I think that is all I have for

25  this witness.
```

1          THE COURT:  All right.  Mr. Potts?

2          MR. POTTS:  Judge, just a couple.

3                RECROSS-EXAMINATION

4    BY MR. POTTS:

5    Q.   Mr. Pitts, you were asked about who supervises

6    you and make sure that, you know, you conduct pill

7    call.  Can you remind me of who those people were

8    again?

9    A.   The captains.

10   Q.   Okay.  What do they do to make sure you're doing

11   your pill call?

12   A.   They make sure, they call me on the radio and ask

13   me am I in so-and-so block doing pill calls.

14   Q.   Do they ever check the tier logs?

15   A.   Yes.

16   Q.   So in connection with overseeing whether or not

17   you do pill call, the people that supervise you will

18   review the tier logs to make sure that you are making

19   the pill call at the appropriate time to the

20   appropriate people, correct?

21   A.   Correct.

22          MR. POTTS:  Thank you, Judge.

23          THE COURT:  Okay.  Anything further,

24   Mr. Robert?

25          MR. ROBERT:  No, Your Honor.  We're good.

```
 1              THE COURT:  All right.  Very good.  May this
 2    witness be released?
 3              MR. POTTS:  Yes, Judge, as long as --
 4    sequestered.
 5              THE COURT:  Oh, he's to remain sequestered?
 6              MR. POTTS:  Because we have another pill
 7    call officer coming next.
 8              They are both at David Wade.
 9              MR. ARCHEY:  I don't have a problem with
10    that.  I would ask you, Your Honor, if you would give
11    him an instruction on as far as being sequestered not
12    to talk with the other pill call officer or anybody
13    else until he is released.
14              THE COURT:  Yes, sir.
15              So what we're saying, sir, is that please
16    don't talk, you are ordered by the Court, sir, not to
17    talk to anyone else about this case until such time
18    about what your testimony was, what questions who
19    asked you, whether or not Mr. Potts was polite or not
20    polite, anything about your testimony to any of the
21    other witnesses or officers at David Wade until such
22    time as this case is over.  All right?
23              MR. POTTS:  Thank you, Judge.
24              THE COURT:  All right.  And thank you, sir,
25    for coming today and testifying.
```

947

 1              MR. POTTS:  Thank you, Judge.  Thank you,

 2    Mr. Pitts.

 3              THE COURT:  And now we are at a good time

 4    for lunch.  It is twelve thirty, and we'll back at one

 5    thirty.  Thank you all very much.

 6              (Recess taken)

 7              THE COURT:  We are resuming now with the

 8    plaintiffs' case in chief.  The Court apologizes for

 9    being a few minutes late.

10              Mr. Potts, are you up?

11              MR. POTTS:  Yes, Your Honor.

12              MR. ARCHEY:  May I interrupt?  I think we

13    may have our first COVID complication, and I wanted to

14    discuss that with you, if I may?

15              THE COURT:  Okay.

16              MR. ROBERT:  Mr. Scriber was literally

17    sitting in the room waiting to testify when he

18    received notice from his doctor that he is COVID

19    positive.  And he is there, and I don't know if the

20    Court wanted to continue with him.  He is there, if

21    you want to continue with him, or, I mean, I believe

22    the rules would be that he should leave and go home,

23    but, you know, I just wanted to let the Court know

24    that and tell us how, you know, how you want us to

25    proceed?

948

1                 THE COURT:  And who is this witness,

2    Mr. Robert?

3                 MR. ROBERT:  He is the other pill call

4    officer, Your Honor.  Or he was.  He hasn't been in

5    the job for awhile, but he was.  Similar to Mr. Pitts.

6                 THE COURT:  Let's -- you know, the Court

7    is -- we're going to be doing this a long time, and

8    the Court has indicated that I have no objection to

9    taking witnesses out of order in this matter.

10                Mr. Potts, what is your opinion on this?

11                MR. POTTS:  Your Honor, obviously, we would

12   like to get the testimony, but I am not going to --

13   you know, if there is a departmental policy, I can't

14   really speak to that.

15                And then, you know, the other issue we're

16   going to have, Judge, is then trying to reallocate the

17   bullpen.  To get the next witness.

18                MR. ARCHEY:  Okay.  We are going to have to

19   have some time to disinfect that room because

20   everybody is testifying in that one room.  Once he

21   leaves, we're going to need some time to do that.  I

22   know Mr. Adams is not -- he is at Angola.  That would

23   give us some time to disinfect that room, if, in fact,

24   he was here, available this morning, if, in fact, he

25   is available.

949

```
 1            THE COURT:  Mr. Potts?
 2            MR. POTTS:  Yeah, Your Honor, it goes to the
 3   timing.  It goes to the hours, you know, I kind of,
 4   you know, roughly think we have an hour and a half for
 5   Mr. Scriber.
 6            MS. BRAY:  I am sorry, Your Honor.  Can we
 7   get Mr. Adams in to testify?
 8            MS. KEIFER:  Let me see if he is in the
 9   waiting room.  No, there is nobody in the waiting
10   room.
11            MS. BRAY:  Yeah, my understanding was they
12   were going to have him ready at 2:45, so we're making
13   some calls right now.
14            THE COURT:  All right.  Well, certainly the
15   Court will allow Mr. Scriber to go home, and we will
16   allow the plaintiff to call him at another date and,
17   hopefully, the man will not be too ill and in a week
18   or so they can call him at that time.  Okay?
19            So now in the meantime, in the meantime,
20   Mr. Potts, so will someone please let him know,
21   Mr. Robert?
22            MR. ROBERT:  Yes, Your Honor, we'll take
23   care of that.
24            THE COURT:  All right.  Like right now.
25            MR. ROBERT:  Yes, we're doing it as we
```

1  speak.

2          THE COURT:  All right.  Mr. Potts?

3          MR. POTTS:  We're checking on Mr. Adams

4  right now, Judge.

5          THE COURT:  All right.  We'll just stand at

6  ease for a second and see what the result of that is

7  or whether we have to take a little bit longer break.

8  Thank you.

9          MS. BRAY:  They are getting him to the

10 computer now.

11         THE COURT:  Very good.  Miss Keifer, if you

12 could just keep an eye out for the waiting room.  Not

13 too far away.  Thank you.

14         (Briefly off the record.)

15         THE COURT:  All right.  Good afternoon.

16         MR. COREY ADAMS:  Good afternoon, Your

17 Honor.

18         THE COURT:  Yes, sir.

19         MS. JAMILA JOHNSON:  Okay, Mr. Adams, can

20 you hear us?

21         THE WITNESS:  Yes, ma'am.

22         MS. JOHNSON:  The Court is going to swear

23 you in.

24         MS. KEIFER:  Raise your right hand, please.

25         (The witness was duly sworn.)

```
 1                        COREY ADAMS,
 2             having been called as a witness, having
 3             been duly sworn, testified as follows:
 4                     DIRECT-EXAMINATION
 5   BY MS. JOHNSON:
 6   Q.   Good afternoon, Mr. Adams.  Can you say your full
 7   name for the Court?
 8   A.   Corey Marquis Adams.
 9   Q.   And where you are testifying from today?
10   A.   Louisiana State Penitentiary.
11   Q.   How old are you?
12   A.   45.
13   Q.   And how long have you been in the Department of
14   Corrections on this conviction?
15   A.   A little over 20 years.
16   Q.   I would like to ask you some questions about your
17   childhood before going to prison.  What is the highest
18   grade you completed in school?
19   A.   The sixth or the seventh grade.
20   Q.   Were you in any special education classes?
21   A.   Yeah, from kindergarten all throughout.
22   Q.   What disability led you to be in these special
23   education classes?
24   A.   Slow learning and behavior disorder.
25   Q.   Who did you live with when you were growing up?
```

952

1    A.    With my biological parents until I was like 12

2    years old, then I was given away to foster care, and I

3    stayed --

4    Q.    Oh, go ahead.

5    A.    I stayed in foster care --

6             THE COURT:  Can you hear me?

7             THE WITNESS:  Yes, ma'am.  And I stayed in

8    foster care from 12 to almost when I was 18 years old.

9    BY MS. JOHNSON:

10   Q.    What conditions, if any, do you have that impact

11   your memory?

12   A.    Traumatic brain injury.

13   Q.    How did you get that traumatic brain injury?

14   A.    Well, October 1998, about 20 pe -- 20 dudes

15   that --that attacked me with some fence pipes, iron

16   fence pipes, bricks, and aluminum bats.

17   Q.    What were your injuries after that attack?

18            MS. KEIFER:  Everybody, Miss Johnson,

19   Mr. Adams, hold up for just a second.  Everybody just

20   pause for a moment.

21            THE COURT:  Miss Keifer, I may have solved

22   the problem myself.

23            Can everyone hear me?

24            MS. KEIFER:  Yes, ma'am.

25            THE COURT:  Very good, okay.  I solved the

953

1    problem.

2           All right.  All right, we are here now

3    continuing with the plaintiffs' case in chief, and we

4    have Mr. Adams who is going to testify.

5           Let's see, Miss Johnson, will you be

6    handling him; is that right?

7           MS. JOHNSON:  I will, Your Honor.

8           THE COURT:  Okay.  All right.  At this time,

9    then, Mr. Adams, we're going to ask you to raise your

10   right hand and be sworn.

11          MS. KEIFER:  Judge, even though your screen

12   was off, I did swear him; so is that okay?

13          THE COURT:  Oh, very good.

14          MS. JOHNSON:  We'll start -- we'll start

15   from the top again.

16          THE COURT:  All right.  Oh, yes, please,

17   because I did not hear anything.

18          All right.  So, Miss Johnson, if you would

19   please ask the witness to identify himself and we'll

20   go from there.

21   BY MS. JOHNSON:

22   Q.   Mr. Adams, can you tell us your name?

23   A.   Corey Marquis Adams.

24   Q.   And where are you testifying from today?

25   A.   Louisiana State Penitentiary.

954

1  Q.   How old are you?

2  A.   45.

3  Q.   And how long have you been in the Department of

4  Corrections on this conviction?

5  A.   A little over 20 years.

6  Q.   We're going to talk a little bit about your

7  childhood.  What was the highest grade you completed

8  in school?

9  A.   The sixth or the seventh grade.

10 Q.   Were you in any special education classes?

11 A.   Yes, ma'am, like from kindergarten up to the

12 sixth or seventh grade.

13 Q.   What led you to be in special education classes?

14 A.   Slow learner and behavior disorder.

15 Q.   Who did you live with when you were growing up?

16 A.   I was staying with my biological parents up to

17 the age of 12 years old, and at the age of 12 my

18 parents then gave me away to foster care, and I stayed

19 in foster care from 12 to almost 18 years old.

20 Q.   Where did you live when you were in foster care?

21 A.   Foster homes, a lot, around Louisiana; group

22 homes, reform schools, detention centers, mental --

23 mental health hospitals and mental health

24 institutions.

25 Q.   When you were -- which mental health institutions

955

1   were you in during that time?

2   A.   I was in Greenwald -- MeadowWoods first, I stayed

3   in there about two months, then I was at Greenwald

4   Springs Mental Institution.

5   Q.   Do you have any conditions that impact your

6   memory?

7   A.   Yes, ma'am, a traumatic brain injury.

8   Q.   How did you receive that traumatic brain injury?

9   A.   About -- a group of dudes, guys, about 20, at the

10  least, had attacked me with some iron fence pipes,

11  bricks, and aluminum bats.

12  Q.   What were the injuries you sustained after that

13  incident?

14        How were you injured?

15  A.   Well, I had to have a -- I had to have a brain --

16  when I woke up in the hospital, because I was

17  unconscious after the incident.  I woke up at Alaska

18  General Medical Center, the doctor told me I had to

19  have -- sign some papers for -- to have brain surgery;

20  if I don't I would die.  So I signed the papers.  And

21  they had -- they did the surgery, and I know that they

22  had to remove some -- I had a cracked skull, they had

23  to remove some blood clots out of my brain and put a

24  plate in my head, and I had 67 staples from that.  And

25  I set in ICU for two weeks because I couldn't -- I

956

1  couldn't -- I couldn't remember anything.  I couldn't
2  use my left -- I couldn't use my left side of my body,
3  and I couldn't -- I couldn't talk or walk.  I was in a
4  wheelchair.
5  Q.   When did this injury occur?
6  A.   October of 1990.
7  Q.   And how does this injury continue to impact you?
8  A.   Well, it's hard for me to remember things, short
9  term and long term, concentrate on things, keep
10 forward, get focused; it interrupt my speech and
11 communication, I can't communicate like I used to and
12 stuff, and I just been having a lot of problems from
13 the injury and stuff.
14 Q.   If you're having trouble remembering a word, will
15 you let us know we'll give you some more time?
16 A.   Yes, ma'am.
17 Q.   And if you can't remember something, will you let
18 us know that you can't remember?
19 A.   Yes, ma'am, if I can remember that.
20 Q.   Okay.  What prisons have you been in since your
21 conviction?
22 A.   I have been in Laborde Correctional Center, David
23 Wade Correctional Center, Elayn Hunts Correctional
24 Center, Avoyelles Correctional Center, and Louisiana
25 State Penitentiary.

957

1         I can't hear you.

2   Q.    How many times were you incarcerated at David

3   Wade?

4   A.    Twice.

5   Q.    When did you go to David Wade the first time?

6   A.    2011, from the flood when we was evacuated from

7   Louisiana State Penitentiary.

8   Q.    How long were you there then?

9   A.    Two months.

10  Q.    And when was the second time you went to David

11  Wade?

12  A.    November 2017.

13  Q.    And how long were you there that time?

14  A.    Until March 2019.

15  Q.    Was there a period of time that you were at Elayn

16  Hunt in the middle your time at David Wade?

17  A.    Yes, ma'am, on a court order.

18  Q.    And how long were you at Elayn Hunt?

19  A.    From like February 22nd I think till like April

20  23rd of --

21  Q.    Of which year?

22  A.    2018.

23  Q.    Okay.  Let's discuss your mental health.  What

24  mental health care did you receive before you went to

25  jail?

958

1   A.   Oh, I was -- well, I was getting -- when I was at
2   Greenwald Springs and MeadowWoods mental hospitals I
3   was getting inpatient mental health treatment, when I
4   was there, getting counseling and stuff like that.
5   And I was on medications and stuff.  And I was an in
6   and outpatient at Dr. Henry Joseph Tyler Mental Health
7   Center, Lafayette, Louisiana, when -- while I was in
8   foster care and throughout my life until I been
9   incarcerated on this charge.
10  Q.   Do you know what mental health diagnoses you had
11  before you went to jail?
12  A.   No, ma'am, but I know I was diagnosed with stuff.
13  I don't know.
14  Q.   Why do you think you don't know your diagnoses?
15  A.   I was never told.
16  Q.   Who was treating you for mental -- sorry.  What
17  was your understanding of your mental health diagnosis
18  during the time you were at David Wade?
19  A.   I really never understood, 'cause nobody ever
20  told -- talked to me about it anything or about my
21  mental health diagnosis or anything.
22  Q.   Do you -- what were your understandings of what
23  conditions you were being treated for?
24  A.   Oh, I know what that was, now I went through some
25  court, like some documents I had while I was at David

1  Wade and I think, yeah, through some documents and

2  stuff I had at David Wade I had learned that I had

3  antisocial personality disorder, and I think that was

4  it while I was over there.  But while I was at -- went

5  through some affidavits that I have from former

6  medical, mental health, medical director at the

7  Louisiana State Penitentiary, and they asked a

8  affidavit by Dr. Jason Collins, he said that I had

9  been diagnosed with significant chronic mental

10  illnesses which is post -- post traumatic -- post

11  traumatic psychosis, bipolar disorder, schizophrenia,

12  paranoia, and major -- major depressive disorder,

13  disorder, and, through which the former medical

14  doctor, director at Louisiana State Penitentiary now,

15  Dr. Randy Lavisphere, he filed similar affidavits in

16  the court records at the United States Middle District

17  Court.  And a Dr. Hal McMurrell, referring to the same

18  diagnosis.

19          And there was some more paperwork that I

20  had, that I have, the former psychiatrist at Louisiana

21  State Penitentiary, had diagnosed me with an impulse

22  control disorder.

23  Q.    Do you remember any mental health assessments you

24  may have received when you were transferred to David

25  Wade in 2017?

960

A.    No, ma'am.

Q.    Where did you live at David Wade in 2017?

A.    On extended lock-down in the cells, the whole --
the whole time.

Q.    Were you ever allowed into general population?

A.    No, ma'am.

Q.    What did your cells at David Wade look like?

A.    They were small.  I couldn't lay across the
floor, it was that small, I couldn't -- couldn't lay
flat on my back across the floor.

        There is a -- there's not an iron bed, it is
a concrete stump which you sleep on.  And the cells,
you can't -- it's like chicken wire, like the front
part of the cells, it's not bars.  You can't stick
your hands out the cells or nothing, or your arms out
the cells.

        There is only one tray light on the door
which is at a very low level, which you get handcuffs
at.  And the cell lights stay on all day, like from
five thirty every morning, weekend included; five
thirty in the morning till five thirty in the
afternoon every day.

        You can't have radios.  You can't have --
there is no televisions to watch.  Just offensive
cells; a stink, a stink for lint, dirt; lint, dirt and

1  trash, where you can't -- it's so packed with that you

2  can't even look, see through the vents, and you

3  breathing that in all day every day; and like it

4  depend what unit you on, the windows, when you look

5  outside, you can't see nothing but the brick building

6  across from you.  You can't see the sky.  Nothing else

7  to look at.

8            In every unit you have this big brick thing

9  that -- big thing that -- big concrete slab that

10  extends over each window that comes down to at least

11  half of the window and on the sides, where you

12  can't -- your vision outside and out the window is

13  very limited.

14  Q.   What could you have with you in the cells?

15  A.   Just -- just your legal work.  And -- and that

16  was limited.  You had a limited amount of legal work.

17  And legal work, and the most you could have is three

18  books.  Public -- any publication that's classified a

19  book, newspapers' classified as book, magazine is

20  classified a book.

21  Q.   What do the cells sound like?

22  A.   It was mostly be quiet because if you -- if you

23  made a loud amount of noise, you will be subjected to

24  excessive force.  Some type of excessive force.  Or

25  you going to be punished some kind of way, and it is

962

1    mostly excessive force.  Physical, and.
2            The most you'd hear, I'd hear, is like
3    complaining, a lot of complaining about the -- hearing
4    what people going through, the conditions at David
5    Wade being in the cells, how it's torment.  Not only
6    me but others also, you know, how it was getting the
7    best of them and the conditions getting the best of
8    them, and you'd just hear a lot of complaining.  It's
9    sad, it's misery, pain.
10   Q.    What did the cells smell like?
11   A.    Stale, old, musty; like feces and urine.
12   Q.    You talked about the vents earlier.  What was the
13   air circulation like in the cells?
14   A.    Nothing.
15   Q.    What was a typical in the cells like for you?
16   A.    Always miserable, boring, nothing to do.  So I'd
17   pace the floor back and forth majority of the time
18   until I just can't think of nothing else but want to
19   hurt myself, kill myself, get out of there, I just --
20   just wanted -- rather be dead than have to just look
21   to that; and then especially I was there, I didn't
22   know how long I was going to be there so that -- that
23   didn't help.
24   Q.    How many hours a day were you locked in the
25   cells?

1    A.    The majority.  Most of the time 24 hours a day.

2    Because I wouldn't -- I would still skip showers.

3    And, But sometimes average time would be like 23 hours

4    and 45 minutes a day.  Not including the 15-minute

5    shower, if I take a 15-minute shower.

6    Q.    Why would you skip showers?

7    A.    Because I have a back -- I had a bad -- I had a

8    bad back injury and neck injury, at the low level

9    where you have to stick your hand through the tray

10   slot to get handcuffs, to put restraints on your

11   hands.  Every time I bent down to that lower level, it

12   would put a strain on my back and my neck, and it

13   would aggravate the injury and cause me --

14            THE COURT REPORTER:  Are we frozen?  I can't

15   hear.

16            (Recess taken)

17            THE COURT:  Mr. Adams, would you please -- I

18   think the question was didn't you go for a shower, and

19   the court reporter has read back to us what your

20   response was.  So would you go over that a little bit

21   with us again because that is where her machine froze

22   up and she did not hear the rest of the testimony.  So

23   if you could please repeat for us what you said, and

24   then, Miss Johnson, if you have another question as

25   well, you can ask that question again.

964

1          So, is that okay with you, Mr. Adams?

2          THE WITNESS:  Yes, ma'am.

3          THE COURT:  All right.  So the question is

4    why didn't you go for the shower.  And tell us about

5    that.

6          THE WITNESS:  The reason why I would skip

7    showers is because the tray slot level is low on the

8    door, on all of doors, and you have -- I have to bend

9    down to a really lower level to stick my hands outside

10   the -- through the tray slot so I can be restrained,

11   so the handcuffs could be placed on my wrist.

12   BY MS. JOHNSON:

13   Q.   Mr. Adams, what would happen after the restraints

14   were put your wrists through the tray slot?

15   A.   I would have to go in the middle of the cell and

16   get on my knees and face the wall, the opposite

17   direction, face the wall, so the officers -- and the

18   officers would come in they would put body restraints

19   around my waist and connect it to my hand restraints,

20   and then put the leg, leg shackle restraints on.  And

21   from there you have to -- every inmate has to go

22   through that, they have to get up from that position

23   there, you got to stand up.  And every time I'd go to

24   kneel in that position and try to stand up from that

25   position, from that kneeling position, that would

1    aggravate my neck and back injuries and put a strain

2    on it and cause me additional pain.

3              And from there you could not have -- when I

4    would be walking to the shower, the shower have the

5    same low level -- low level slot where you have to

6    bend down to and stick your arm to be unrestrained and

7    to be back restrained, when you come -- when you --

8    when you about to exit the shower.

9              And you have to do the same thing when you

10   go back in the cell; go to the middle of the floor,

11   face the wall, get on your knees, bend down and get on

12   your knees for them to remove the restraints, the leg

13   restraints and the waist high restraints.  And when

14   they leave my cell, when the officers leave my cell,

15   the cell is closed, then I'm -- them I'm allowed to

16   get up, stand up out of that kneeling position, go to

17   the tray slot on the cell door, bend down to the lower

18   level again, stick my arms out the tray slide to get

19   the hand shackles, hand iron -- hand iron removed from

20   my hands, and that will be it.

21             But the bending, constant bending, getting

22   on my knees, standing up from the kneeling position

23   and kneeling, I mean, to be able to stick my arm

24   through the tray slot by the cell and the slot of the

25   shower all aggravate my back and my neck injury and

966

1  cause he make a whole lot of pain, and that's why I

2  wasn't showering every day.

3  Q.  You weren't showering every day.  How often were

4  you showering?

5  A.  It was sometime twice a week.

6  Q.  What did it feel like to be in extended

7  lock-down?

8  A.  It just, it felt miserable for me.  It felt

9  miserable.  Like nothing was -- like that was the end

10  of my life.  It was just miserable.  Nothing to do,

11  always bored, all the time.

12        And in the summertime when the lights would

13  be -- the lights would be on throughout the day all

14  day, started from beginning, all throughout the day,

15  it just take a whole lot from you.  It exhaust you.

16        Especially with that -- that heat.  I'm in

17  the cell constantly sweating, and then you have, what,

18  four, four or five little fans about this big on each

19  tier, and they rotate and go like this (indicating).

20  In some of the cell --

21  BY MS. JOHNSON:

22  Q.  Can you -- can you describe what you were just

23  doing with your fingers?

24  A.  It would rotate, it would go -- it would go like

25  this.

1            And some -- some cells, some -- the fans are
2    so spaced out, some cells don't even get no air at
3    all.  And it ain't doing nothing but blowing a bunch
4    of hot air anyway.
5    Q.   What was going through your mind during that time
6    period when you were in extended lock-down?
7    A.   Might as well cut an artery in my wrist.  It
8    just -- bleed, bleed to death in the cell, starve to
9    death, starve myself to death, but I even heard cases
10   where that ain't really -- they even let dudes and
11   inmates starve and starve, so bad to where a lot of
12   them wind up eating because they was just letting them
13   starve, starve themselves.  And a lot of them had to
14   eat, some would, the ones that was strong enough to go
15   through with it.  And they winded up getting
16   transferred to Elayn Hunt Correctional Center in real
17   bad condition.  And me, all -- all I think about, I'm
18   a cutter.  And I --
19   Q.   What does it mean, what does it mean to be a
20   cutter?
21   A.   I cut myself.  My whole body is cut up.  I have
22   marks all over my whole body, and I -- and I beat my
23   head against the walls, too.
24   Q.   When did you first start harming yourself?
25   A.   I've been doing that since I was out in society

1  before my incarceration.  I used to cut myself, bang

2  my head against walls; hit my head, myself in the head

3  with bottles, and stuff like that.

4          Go into a lot of stuff, like the head

5  injury, go into a lot of stuff that I know I can't

6  win.  But I just still go into it and I wind up

7  getting hurt, just like with the brain injury.

8  Q.   What does it feel like to harm yourself?

9  A.   It's a relief.  It's a relief.  It made me feel a

10 little better.  And the worser, the more severe I hurt

11 myself is the better I feel.  It make me feel a whole

12 lot better.  And the feeling don't last that long,

13 especially if I'm still, still going through the

14 situation or condition.  But it -- it help.  It help.

15 It help.  It help.  It help relieve some of the pain.

16 Q.   What -- can you describe when you get the feeling

17 that you want to hurt yourself?

18 A.   I get that feeling when I'm frustrated.  I get

19 that feeling when I'm -- when I was stuck in

20 claustrophobia at David Wade I was getting that

21 feeling.  When I'm depressed I get that feeling.  And

22 just going through something mentally, I just got the

23 feeling.

24 Q.   While you were at David Wade, did you request

25 help to stop feeling this way?

1  A.   Yes, ma'am, I did it in -- in -- through sick
2  call, health care request forms.  And I tried to get
3  help talking to the social workers; the warden, Miss
4  Dauzat; the worker Steve Hayden, Miss Robinson, Aerial
5  Robinson; Dr. Seals, the psychiatrist; and through
6  ARPs.
7  Q.   Mr. Adams, is there someone else in the room with
8  you right now?
9  A.   No, ma'am, but they're on the outside.
10 Q.   Can you still hear us okay?
11 A.   Yes, ma'am.
12 Q.   Are you still comfortable talking right now?
13 A.   Yes, ma'am.
14 Q.   All right.  What did David Wade do in response to
15 your requests for help to stop cutting yourself?
16 A.   It's kind of borderline.
17       MS. JOHNSON:  Your Honor, would you mind if
18 we just asked Mr. Adams to see if they can maybe step
19 a few feet back?
20       THE COURT:  No, I -- we might have some
21 diffi -- I think they've stopped.  Let's try again
22 with the question, Miss Johnson.  Mr. Adams is not
23 going to have a lot of control over his situation that
24 he is in.
25       MS. JOHNSON:  We've been in this room a lot.

970

1    They usually could just step a few feet back.  They're

2    just standing by the door.  So if they are really loud

3    they usually just.

4    BY MS. JOHNSON:

5    Q.   Mr. Adams?

6    A.   Yes, ma'am.

7    Q.   I think the question was, what sort of help did

8    you get when you asked for help to stop harming

9    yourselves?

10    A.   I didn't -- I didn't get any help.

11            The most I'd get, I wouldn't get any help.

12    I'd get ridiculed for trying to get help.  That is the

13    most -- I would never get no help.

14    Q.   Let's talk about, you said ridiculed.  Can you

15    explain to me what would happen?

16    A.   Well, especially a lot of it came from social

17    workers, Steve Hayden, 'cause that's mostly who I

18    dealt with most of the time.  That's who normally came

19    when I want to harm myself or stuff.  And he would

20    always have something sarcastic to say like, oh, man,

21    why you didn't cut right here, oh, you wasn't really

22    trying to kill yourself.  Oh, you got to do it better

23    than that; what you looking for, some attention?

24            And then he told me on a few occasions man,

25    you need to just kill yourself and do us all a favor

1    and just get it over with.  Like they didn't want to

2    put up with us anymore and do all the paperwork.

3    Q.   How did it feel when you would have those sorts

4    of interactions with the mental health social worker

5    at David Wade?

6    A.   Discouraged, hopeless, helpless.  And like, just

7    wanted to get it over with and kill myself, like he

8    said.

9    Q.   Have you ever complained to anyone about

10   Mr. Hayden's response to your self-harm?

11   A.   Yes, ma'am.

12   Q.   What did you do?

13   A.   I complained about it in sick calls.  I

14   complained to -- complained -- complained about it to

15   Mrs. Trunnell and Miss Schwartzmann.  I complained

16   about it in ARPs.

17   Q.   What is an ARP?

18   A.   A grievance -- a grievance letter request.

19   Q.   Why do people file ARPs?

20   A.   Well, just to -- to bring -- to -- to notify the

21   officials of a problem or a condition, anything,

22   something that's is gone on, and to request a remedy.

23   Q.   And you -- did you testify that you have filed

24   ARPs?

25   A.   Yes, ma'am.

972

1    Q.    Do he recall filing an ARP on or around May 17th

2    of 2019?

3    A.    I've filed a whole lot, and because of the brain

4    injury it is hard for me to remember.

5    Q.    Would you mind if I showed you the ARP?

6    A.    Yes, ma'am.  I wouldn't mind.

7    Q.    Mr. Adams, are you able to see this on your

8    screen?

9    A.    No.  It went to the window thing, but it went

10   to --

11            MS. JOHNSON:  Your Honor, this happens

12   sometimes on this computer.  Mr. Adams needs to

13   request someone to press a button.

14            THE COURT:  Mr. Adams, could you get the

15   guard, then, please, sir, to do that?

16            THE WITNESS:  Yes, ma'am.

17            THE COURT:  Officer?

18            AN OFFICER:  Yes, ma'am.

19            THE COURT:  We're trying to get that so that

20   he can see the exhibit.

21            AN OFFICER:  I can hear you all, I can't see

22   anything.  Hold on.

23            THE COURT:  We can see you.

24            AN OFFICER:  Oh, you can?

25            THE COURT:  We can see your head.

973

```
 1              AN OFFICER:  I can hear you all, I have no
 2    picture or nothing.  Let me see.
 3              Okay.  Here we go on.
 4              Here we go.
 5              THE COURT:  All right.  Well, wait; don't go
 6    away, sir.  Don't go away.
 7              THE OFFICER:  I'll be right here.
 8              THE COURT:  No, sir.  What we're trying to
 9    do is see the exhibit.  We need your attention to
10    this, sir.  All right, we need to see this exhibit.
11              Miss Johnson, can you assist with how that
12    would be done on that computer since you seem to be
13    familiar with it?
14    BY MS. JOHNSON:
15    Q.   So, Mr. Adams, can you see it right now?
16    A.   Yes, ma'am.
17    Q.   All right.
18              MS. JOHNSON:  So we're just going to have to
19    go through anything that is going to be screen sharing
20    right now, and I'm not going to stop screen sharing in
21    between because then he'll have to come back again.
22              THE COURT:  Okay.
23    BY MS. JOHNSON:
24    Q.   All right.  Can you see what has been previously
25    marked as PE-113 page 3?
```

974

```
 1  A.    Yes, ma'am.
 2  Q.    Do you recognize this document?
 3  A.    Yes, ma'am.
 4  Q.    What is this document, or how do you recognize
 5  it?
 6  A.    It is the ARP that I filed in my handwriting.
 7  Q.    All right.  Do you see a date on this document?
 8  A.    No, ma'am, because I got an ongoing, it's an
 9  ongoing problem.
10  Q.    Oh, yeah.  Does it say May -- rejected May 17th,
11  2018, here?
12  A.    Oh, yes, ma'am.
13  Q.    And do you see received May 17th, 2018 here?
14  A.    Yes, ma'am.
15  Q.    All right.  Do you recall why you filed this ARP?
16  A.    I really could --
17            THE COURT:  Can you read it, sir?
18            THE WITNESS:  Yeah, I can read.  Hold up.  I
19  can read some of it.  Some of it's off the screen.
20            MS. JOHNSON:  Oh, that's going to be a
21  problem.
22            THE COURT:  Can you not blow it up?
23            MS. JOHNSON:  I think if it gets bigger that
24  might be more of a problem.  I think I actually have
25  to make it a little smaller.
```

975

BY MS. JOHNSON:

Q.   Is that better?

A.   Yeah, I can see it now.

Q.   Okay.

A    I can't -- I can't make where the guy that
stamped it.  I could try to make it out.

On February 22nd, 2018, classification
review board, reassign from extended lock-down to
super max to medium.  On February 26th, 2018 I was
transferred to David Wade -- hold on, from David Wade
to Elayn Hunt Correctional Center for --

Q.   Let's stop for a second, Mr. Adams.  Do you
remember this document, this ARP?

A.   Yes, ma'am.

Q.   All right.

MS. JOHNSON:  I would like to offer PE-113
page 3 into evidence?

THE COURT:  It is admitted.  Can you tell me
the volume?

MS. JOHNSON:  It would be volume 7.

BY MS. JOHNSON:

Q.   And then there's a second page as well.
Mr. Adams.  Is this your signature?

A.        Yes, ma'am.

MR. ARCHEY:  Your Honor, if I may?  I assume

976

1  this is, as before, with the other ARPs, there is no

2  issue limited to that purpose?

3            THE COURT:  That is correct.  And your --

4  your objection is noted in writing for the record.

5  It's in the Monday minutes.  Thank you.

6            MS. JOHNSON:  Your Honor, I can't remember

7  if Mr. Adams was able to identify his signature before

8  the objection.

9  BY MS. JOHNSON:

10  Q.   Mr. Adams, is this your signature on page 4?

11  A.   Yes, it is.

12  Q.   And then on page 5 is this an attachment to your

13  ARP?

14  A.   Yes, ma'am.

15            MS. JOHNSON:  All right, then I would also

16  like to offer pages PE-113.4 and .5 into evidence.

17            THE COURT:  All right, I'm just getting

18  there.

19            All right.  Thank you, they are admitted.

20  BY MS. JOHNSON:

21  Q       Mr. Adams, do you remember talking about

22  claustrophobia in this ARP?

23  A.   Yes, ma'am.

24  Q.   Can you tell me a little bit about your

25  understanding of your issues with claustrophobia?

977

1  A.   Well, it -- I have these rule bad attacks.  I

2  break out into a real bad -- a real bad sweat each

3  time, each attack, and real bad panic, like I am

4  shortness of breath, I can't hardly get -- get my

5  breath each time, like the wall's closing in.

6          And I mean, man, it gets so bad.  It gets so

7  bad, it -- it just make me -- it make me want to stick

8  my head in the toilet and kill myself or some kind

9  of -- I just have to -- when I'm on -- having a panic

10  attack, I just have to get out -- out of the cell and

11  get some air some kind way, and there is none to get,

12  there is no way to get out of the cell, and I just

13  have through it.

14          And the majority of the time, thanks be to

15  God, He get me through.  All I could lean on and think

16  about that help -- really helped me get me through is

17  Him, and God getting me through each time.

18          If it don't make me harm -- if I don't beat

19  and harm myself.  It is bad, though.

20  Q.   I am showing you what has been admitted as

21  PE-113.3 again, which is I believe the first page of

22  the ARP.  Do you recall having raised concerns about

23  chemical agent spray in this ARP?

24  A.   I don't really remember.  I don't really

25  remember, like I said, because of the brain injury,

1  but I know I filed that ARP and, you know, I -- I

2  filed a lot of ARPs about the condition I was on,

3  because of the things I was going through trying to

4  get help.

5  Q.   Did you had issues with the chemical agent spray?

6  A.   Yes, ma'am, I still do.  Every time they -- every

7  time chemical agent is sprayed around me, it feel like

8  I'm -- like I'm about to die, each time.

9  Q.   We're only going to be able to talk about David

10 Wade during -- during the time that we're focused on

11 in this lawsuit?

12 A.   Okay.

13 Q.   So thinking about those times, what would happen

14 when chemical agents were sprayed while you were in

15 extended lock-down?

16 A.   I would have to grab -- I would have to wet a

17 towel and hurry up and put it on my face or something

18 to keep me from inhaling the chemical agent, because

19 that is how I be affected, the way that the chemical

20 agent was affecting me at David Wade, making me want

21 to myself harm myself, from him harming me, from not

22 being able to breathe, stuff like that, gasping for

23 breath.  And at David Wade chemical agent was sprayed

24 a whole lot.  A whole lot.  And then every time it was

25 sprayed, it was it excessive amounts.  And no med --

979

1  no -- no prisoner's medical background or conditions

2  was being considered on anything like that.  You say

3  anything about the chemical agents getting sprayed,

4  you -- you probably, majority of the time you will get

5  sprayed.  So you got to just keep your mouth shut and

6  just go through it.

7  Q.   In your ARPs did you ever request individual or

8  group therapy?

9  A.   Yes, ma'am.

10 Q.   Why were you requesting individual and group

11 therapy?

12 A.   Because I needed help from the conditions that I

13 had gone through and the things that I was going

14 through.  I needed help.

15 Q.   What sort of mental health treatment did you

16 receive at David Wade?  Did you ever get therapy?

17 A.   No, ma'am.  The only thing I ever got was

18 medication.

19 Q.   They can't take down these exhibits, I'm going to

20 move maybe a little quicker through them.  Do you

21 recall submitting an ARP on or about around July 5th

22 of 2018?

23 A.   I don't actually remember.  But like I said, I

24 filed so many, I'm trying to --

25 Q.   Let me show you what has been marked as PEE-123

1    of the same volume.  And we're going to go to pages 1

2    through 4.  And I'm going to slowly scroll through

3    this.  You let me know if you can't see it, okay?

4    A.    Okay.  I remember that ARP right there.

5    Q.    You do remember it?

6    A.    Yes, ma'am.

7    Q.    How do you know it is yours?

8    A.    It is my handwriting, I wrote it, and I know why,

9    I remember why I wrote it, and the short version using

10   the form because my other -- my normal ARPs that I

11   filed, they always get rejected on the ground that it

12   be contained in multiple complaints.  So I tried to

13   shorten it up and try to put some of the same facts

14   and trying to shorten it up by using the short form,

15   the regular form.

16   Q.    And did -- we've gone through pages 1 through 4

17   here?  Do you recognize the whole document?

18   A.    Yes, ma'am.

19   Q.    All right.

20          MS. JOHNSON:  I would like to offer into

21   evidence PE-123 pages 1 through 4.

22          THE COURT:  I am having a great deal of

23   difficulty, Miss Johnson, reading one page, OO3.

24          MS. JOHNSON:  Is it really light on your

25   copy?

```
 1                THE COURT:  Yes.
 2                MS. JOHNSON:  So that page is essentially a
 3    duplicate of the page from his earlier ARP.
 4                THE COURT:  I got you, I see that.
 5                MS. JOHNSON:  Because he submitted it.  But
 6    we can try to get a better print copy to --
 7                THE COURT:  No, I can read it, thank you.
 8                MS. JOHNSON:  -- get to the Court.
 9                THE COURT:  Yeah, I see that it is a copy.
10    Thank you.
11                And so was the next page, the OO4.  Yes,
12    thank you.
13                MS. JOHNSON:  I still have an offer to
14    admit.  Are they admitted?
15                THE COURT:  The Court will admit them.
16                MS. JOHNSON:  Thank you.
17                We're going to look at another ARP, which
18    has been previously marked as PE-132.  And we're going
19    to look at page 3.
20    BY MS. JOHNSON:
21    Q.   Do you recognize this document?
22    A.   Yes, ma'am.
23    Q.   What is this document?
24    A.   An ARP I filed.
25    Q.   And how do you know?
```

982

1   A.   It's my handwriting.  And I filed it.

2   Q.   Is this your -- is this your signature?

3   A.   Yes, ma'am.

4   Q.   Do you remember roughly when you filed this ARP?

5   A.   Oh, when I came back from -- from off the

6   corridor.

7   Q.   When you came from Elayn Hunt?

8   A.   Yes, ma'am.

9   Q.   All right.

10  A.   When they stopped my Wellbutrin, my depression

11  medication.

12          MS. JOHNSON:  Your Honor, I would like to

13  introduce PE-132 page 3?

14          THE COURT:  It is admitted.

15          Thank you, Your Honor.

16  BY MS. JOHNSON:

17  Q.   Now I am going to show you what has been marked

18  previously as PE-134 page 3.  Do you recognize this

19  document?

20  A.   Yes, ma'am.

21  Q.   How do you recognize this document?

22  A.   This is my handwriting, my signature.

23  Q.   What is this document?

24  A.   An ARP I filed.

25  Q.   Do you recall the issues in this ARP?

983

1    A.   Not necessarily, not -- not -- not all -- all of

2    it, 'cause like I said, I have a brain injury.  I

3    can't remember a whole bunch of short- and long-term

4    things, but I -- this is -- this is an ARP that I

5    filed.

6              MS. JOHNSON:  I would like to offer and

7    introduce PE-134 page 3.?

8              THE COURT:  All right.  Let me see, it is

9    admitted.

10   BY MS. JOHNSON:

11   Q.   I am now showing you what has been previously

12   marked as PE-133.  Page 29.  Do you recognize this

13   document?

14   A.   Yes, ma'am.

15   Q.   How do you recognize it?

16   A.   It's an ARP that I filed, my handwriting, my

17   signature.

18             MS. JOHNSON:  Your Honor, I would like to

19   introduce PE-133 page 29.

20             THE COURT:  It is admitted.

21   BY MS. JOHNSON:

22   Q.   Now I am showing you what has previously been

23   marked as PE-140.  Page 2.  Do you recognize this

24   document?

25   A.   Yes, ma'am.

984

1   Q.    What is it?

2   A.    An ARP I filed dealing with my mail being -- my

3   legal mail being tampered with.

4   Q.    Can you describe for me what the issue was with

5   your legal mail?

6   A.    Every time I'd send legal mail out through -- I'd

7   try to send legal mail out, sometimes the letters, the

8   legal mail, would get to Mr. Trunnell, Mr. Jonathan

9   Trunnell, and I would get responses that -- from

10  Mr. Trunnell that whenever I send legal mail to them

11  to make sure that I sealed it, seal my envelopes, and

12  not use any tape.

13          And I let him know that -- I wrote him and

14  let him know that they don't give us tape to use.

15  They don't give us no tape, we don't have access to

16  any tape.  I always seal all of my letters, especially

17  legal mail.  So I knew my -- my legal mail was being

18  tampered with and read, inspected, or whatever before

19  being sent out that -- that -- that Mr. Trunnell was

20  getting.

21          MS. JOHNSON:  I would like to offer and

22  introduce PE-140 page 2 into the record.

23          THE COURT:  It is admitted.  It is admitted.

24  BY MS. JOHNSON:

25  Q.    Last ARP, Mr. Adams, I promise.  I am showing you

1  what has been marked, previously marked, as PE-143

2  page 4.  Do you recognize this document?

3  A.   Yes, ma'am.

4  Q.   How do you recognize it?

5  A.   It is my handwriting and signature, and I

6  remember complaining about my medications most times

7  not being refilled timely and I would have to wait.

8  Q.   And you mentioned medication not being provided

9  timely.  Can you describe that for us?

10 A.   Well, a lot of times my medication, if not, it

11 just definitely being stopped, because I have to have

12 that problem too.  For no reason, without notice or

13 anything.  Most time it was -- it would be delivered

14 discontinued or it would be I wouldn't receive my

15 medication.  It wouldn't be refilled in time.  And I

16 would -- it would cause me to have problems and go

17 through whatever problem that I already was having.  I

18 was just trying to get -- trying to get something done

19 about it.

20        MS. JOHNSON:  I would like to introduce

21 PE-143 page 4 into the record.

22        THE COURT:  All right, it is admitted.

23 BY MS. JOHNSON:

24 Q.   Mr. Adams, I am going to stop screen sharing.

25 And can you tell me if you can still see us?

986

1    A.    Yes, ma'am.

2    Q.    All right.  One moment here.

3            Mr. Adams, what were the results are your

4    ARPs?

5    A.    They would always get rejected.  That's why I

6    used the -- tried to use the short form but that --

7    that got rejected.  Always rejected.

8    Q.    You described receiving medication while at David

9    Wade.  Who would you meet with to get that medication?

10   A.    Well, for my psychotropic mental health

11   medications Dr. Seal.

12   Q.    And where would you meet with Dr. Seal?

13   A.    In a private little room where they normally hold

14   disciplinary court.

15   Q.    Who would be in the room with you and Dr. Seal?

16   A.    It would be me, Dr. Seal, most times Steve

17   Hayden, and always a rank in correctional security

18   officer, always; and sometimes they would either have

19   a ranking current supervisor, correction officers, and

20   a sergeant that is regular unit.

21   Q.    How did correctional officers being in the room

22   impact what you were willing to say to Dr. Seal?

23   A.    It made me real uncomfortable because, like, a

24   lot of problems and issues that I was having, that I

25   would like to talk about, it would be with some of the

987

1    correction officers.  And a lot of them, they have

2    this thing about it is us against them, meaning it is

3    the security, the security, it's the prison officials

4    against the inmates.  And a lot of times, so what that

5    mean, anything you share dealing with any correction

6    officer, they -- the superior officer or the ranking

7    officer would go right back and let -- let that

8    correction officer know.  So you have to watch what

9    you say.  And that would prevent me, I wouldn't -- I

10   wouldn't say much.  Especially if I was going through

11   something with one of the officers.

12   Q.    We talked earlier a bit about your self-harm?

13   A.    Yes, ma'am.

14   Q.    When you were in David Wade Correctional Center,

15   how often would you harm yourself?

16   A.    At least, at least once a week, if I wasn't on

17   extreme watch already.  On suicide extreme.

18   Q.    Could you describe for me what extreme watch?

19   A.    Well, a standard suicide watch, you have standard

20   and extreme suicide watch.  Standard suicide watch is

21   where you just have a paper -- a paper gown on, a

22   paper top gown.  That is it.  You can't have anything

23   in your cell.  You can't have socks.  You can't have

24   sweaters.  Noth -- anything but just that gown.  You

25   can't have your legal work, which is always you can in

988

1  your cell; you can't have your three books.  And most
2  of the times if you are on extreme -- if I am on
3  extreme watch or standard suicide watch, I was not
4  getting a mattress neither.  So if I was on the
5  standard suicide watch, I would be in a cell while I
6  am on standard suicide watch, in a paper gown, without
7  a mattress, nothing else in the cell.
8            And on extreme suicide watch at David Wade
9  you put -- I was put in full body restraints,
10 handcuffs, which is handcuffs, leg iron shackles, a
11 body chain, like, I don't know if you all can see
12 this; a body chain like this, a waist chain.  And at
13 David Wade you have a black box.  You have the
14 handcuffs on with a black box.  I don't have a black
15 box to show you.  But you have the black -- you have
16 the black box on, right in between, which restricts
17 you, and you can't move.  And you'll be connected to
18 the waist chain like this.  So you be like -- I'd be
19 like this with a black box.  And I have shackles on.
20 I am like that the whole time on extreme watch,
21 anytime I am on extreme watch.  So I would have to
22 sleep, lay, and sit on the concrete stump, bed, or
23 floor.  And that's what I was doing.  Like that.
24 Q.   I know you can't be exact about the number of
25 times you were on extreme suicide watch and suicide

1  watch, but how often do you think that that was how

2  you were spending your time in extended lock-down?

3  A.   Well, I know I would be on extreme watch like

4  just sometimes for more than 24 hours.  And almost at

5  least every 2 weeks I was on extreme watch.  At least.

6  Q.   How often would you see correctional officers

7  checking in on you, when you were on standard suicide

8  watch?

9  A.   Sometime -- the policy says that they are

10  supposed to make every 15 minutes intervals and check

11  on you, supposed to be every 15 minutes, whether you

12  on standard suicide watch or extreme suicide watch.

13  They supposed to come check on you every 15 minutes.

14  And sometime they come in like, it's every 15 minutes

15  and also off and on in between the 15 minutes, so.

16  But most time if they were doing it just every 15

17  minutes, sometime they would come on like

18  eight o'clock, ten o'clock.  Highly irregular to do

19  every 30 minutes.  They violate their policy.  That

20  was their policy.

21  Q.   Now, Mr. Adams, do you know what the term bluesing

22  means?

23  A.   Yeah, like to make a person suffer.

24  Literally.

25  Q.   Did you ever undergo bluesing while on suicide

```
 1   watch or extreme suicide watch?
 2   A.   Yes, ma'am.  Yes, ma'am, a whole lot.  Like the
 3   mattress.  They literally did not providing me a
 4   mattress while I am on standard suicide watch, extreme
 5   suicide watch.  That is like bluesing because any
 6   other institution I have been, when I was on standard
 7   suicide watch and extreme suicide watch, I always had
 8   a mattress.  I was always provided a mattress.  Mental
 9   health social workers, they would always put in an
10   order for me to have a mattress.  Okay.  And the
11   bruising thing.  Like not only those like inmates that
12   is on strip -- I mean on suicide watch, mental health
13   suicide watch or extreme watch, will be bluesed, but
14   they had this thing at David Wade as a strip cell,
15   which is like being the same thing like that being on
16   standard suicide watch.  And the officers, ranking
17   officers, officers unit working the tiers, and this
18   would give -- they would tell me, they would tell us
19   that we got orders from Colonel O'Dell, Warden
20   Goodwin, and other mental health social workers and
21   other wardens that -- that he -- to cut -- to cut the
22   heating systems off, which they would do a whole lot.
23   They it cut the heating system off in the middle of
24   the winter while it is freezing cold on the tiers
25   and -- and outside.  They would deliberately cut the
```

991

1   heating system off and -- and put the fans on on the

2   tier.  And that's bruise.

3          The floors and the concrete are already

4   cold.  You have to suffer additional cold weather; the

5   windows -- 'cause they would open the windows on the

6   tier so you could freeze.

7   Q.   There's a siren going by, just give me one second

8   here.

9          Mr. Adams, were you trying to kill yourself

10  every time you engaged in self-harm?

11  A.   Not every time but a lot of times.

12  Q.   I want to go back to how social workers would

13  respond to an incident.  So when you harmed yourself,

14  did the -- did David Wade always know each time you

15  harmed yourself?

16  A.   Yes, ma'am.  I got punished one time by Steve

17  Hayden for harming myself.

18          I was in a front cell, on N-4 on a C tier.

19  I was in the first cell, in a camera cell.  And I

20  had -- I had tried -- I had tried to kill myself.  I

21  was trying to cut the artery in my wrist.  Steve

22  Hayden pulled me out and was talking about I should

23  have killed myself and stuff like that.  I could tell

24  that he was mad that I got him to come to the unit, he

25  has to take time and deal with me again.

1            And so he said I am going to fix you.  What

2   I am going to do?  Since you want to keep cutting

3   yourself, I am going to put you in the last cell on

4   that tier.  And, which would take me from -- it would

5   make -- I would be at the back of the tier, and if I

6   needed to -- needed some help or I wanted to call the

7   sergeant or stuff like that it would make it real hard

8   because I am way in the last cell.  And now I am in a

9   cell where there is not a window across from the cell.

10  The fan is far from that cell.  It is hard.  I can't

11  see out of the cell, look out of the cell and see

12  outside or anything like that, and, which really

13  caused me to make me want to hurt myself even more so.

14  When he put me in the cell, just, those conditions.

15  And as a result of that it started bothering me.  And

16  I am trying to cut my -- the artery in my wrist again.

17            I got the scars right here.

18  Q.   Mr. Adams, do you know what the term malingering

19  means?

20  A.   Yes, ma'am.

21  Q.   Has anyone ever told you you were malingering at

22  David Wade or any other facility?

23  A.   No, ma'am.  And that malingering, you get written

24  up for that.  That's a rule violation.  I never been

25  written up for that rule violation before.

1            MS. JOHNSON:  All right, Mr. Adams, I think
2   that is my last question for you.
3            THE COURT:  All right.  For the defense?
4                 CROSS-EXAMINATION
5   BY MR. ARCHEY:
6   Q.   Good afternoon, Mr. Adams.
7   A.   Okay, Good afternoon.
8   Q.   Okay.  You were convicted of second degree murder
9   in 2003, correct?
10  A.   Yes, sir.
11  Q.   And you were --
12  A    2000.
13           THE COURT:  I'm sorry?
14           THE WITNESS:  2000.
15  Q.   Correct?
16  A.   Yes, sir.
17  Q.   Okay.  And you were sentenced to life in prison,
18  correct?
19  A.   Yes, sir.
20  Q.   You've had many disciplinary write-ups since you
21  have been incarcerated, correct?
22  A.   Yes, sir.
23  Q.   Okay.  I want to talk about the one year before
24  you went into David Wade, while you were at Louisiana
25  State Penitentiary Angola.  Can we focus in on there?

994

1    Can we do that?

2    A.   Okay.

3    Q.   You went to David Wade in November of 2017,

4    correct?

5    A.   Correct.

6    Q.   So I want to talk about 2017 while you were at

7    LSP Angola, okay?

8         You cut yourself there, too, didn't you?

9    A.   I been -- I been on cutting myself since I was in

10   society.

11   Q.   You cut yourself 16 times during 2017 alone while

12   you were at LSP, correct?

13   A.   I don't remember.

14   Q    Okay.  If the record shows that, would you have

15   any reason to disagree with that?

16   A.   If -- if -- if that's what it says, that's what

17   it is, I guess.

18   Q.   Okay.  That sounds something like it could have

19   happened, right?

20   A.   Yeah.  I cut myself a lot.

21   Q.   Okay.  While you were LSP you were found with a

22   torn mattress around your neck trying to hang

23   yourself, correct?

24   A.   I don't remember.

25   Q.   Okay.  If we got a record that shows that --

1    A.    Okay.

2    Q.    -- you would agree with that because of your

3    memory issues; is that fair?

4    A.    Well, I know I also -- I guess so, but I know

5    they also falsify paperwork and records, so I would

6    not know if it is correct or not.

7    Q.    All right.  But you have already told us and the

8    Court you have got some memory issues issue, correct?

9    A.    Yes.  Yes, sir.

10   Q.    Okay.  Now, in addition you rammed your head into

11   the bars on three different occasions while you were

12   at LSP during this 2017 time frame, correct?

13   A.    Okay, if that is what it says.

14   Q.    Okay.  And you got into altercations with the

15   correctional officers while you were at LSP, got into

16   fights with them, right?

17   A.    I ain't never had a physical fight.

18   Q.    The record shows six altercations with

19   correctional officers during LSP during 2017.  Do you

20   remember any of that?

21             THE COURT:  Can you clarify?  Can you

22   clarify as to whether they are physical or not?  That

23   is the distinction the witness was making.

24   BY MR. ARCHEY:

25   Q.    Do you remember altercations with security guards

996

1  while at LSP at least six different times?  Let me

2  start there.

3          THE COURT:  Okay answered -- he answered the

4  question, sir, that he does not remember any physical

5  altercations, any fights.  That's what he said, so.

6  BY MR. ARCHEY:

7  Q.  You were actually written up with a formal charge

8  for an assault on a staff on March 22, 2017, while at

9  LSP, correct?

10  A.  I don't -- I don't -- I don't recall.

11  Q.  That is when you were found with cell phones,

12  illegal drugs, and you were intoxicated.

13  A.  That is --

14          MS. JOHNSON:  Objection.

15  BY MR. ARCHEY:

16  Q.  Was that a no?

17  A.  I never been -- I never been found with a cell

18  phone or any drugs.

19  BY MR. ARCHEY:

20  Q.  You don't remember that?

21          MS. JOHNSON:  Mr. Adams, I'm just objection.

22          THE COURT:  So, Mr. Archey, remember that

23  the way you are phrasing the question is not whether

24  or not he has been written up but -- I'm sorry, is

25  there something going on in your office,

997

1    Mr. Fernandez, I need to know about?

2        Let me -- you're phrasing the question, sir,

3    such that you're asking did he do these things.  And

4    of course the objection is sustained.  You just need

5    to ask were you written up for these things, as per

6    the Court's written ruling in the motion in limine.

7    BY MR. ARCHEY:

8    Q.   Mr. Adams, you were written up for an assault on

9    staff on March 22, 2017, correct?

10   A.   I don't recall, no.

11   Q.   You were also written up at that same time for

12   cell phones, illegal drugs, and being intoxicated.

13   You remember that?

14   A.   I don't remember that because, but I never had a

15   cell phone or drugs.

16   Q.   You were written up on July 14th, 2017, for

17   resisting an officer during disciplinary court.  Do

18   you remember that?

19   A.   No, sir.

20   Q.   On August 1, 2017, you actually came out of your

21   restraints, you were written up for coming out of your

22   restraints and exiting your cell.  Do you remember

23   that?

24   A.   No, sir.

25   Q.   Okay.  Now, you came to David Wade the first time

998

1  on November 28th, 2017, correct?

2  A.   I think it was the 20th.

3  Q.   On February 22,2018, three months later you made

4  the classification board and were assigned to medium

5  custody at David Wade.  Do you know that?

6  A.   I remember -- I remember receiving the papers.

7  Q.   Okay.  And at that time you were actually

8  transferred to Elayn Hunt, correct?

9  A.   Yes, sir.

10 Q.   That three months that you were in David Wade,

11 there are no instances of you either cutting yourself

12 or no write-ups -- nothing in your records for those

13 three months; true?

14 A.   Yeah, I guess, if that's what it says.

15 Q.   Okay.  And you saw Dr. Seal during that

16 three-month period of time, correct?

17 A.   I am not too sure because I wasn't seeing him as

18 often at all.

19 Q.   Okay.  And again, with -- we're talking about a

20 while back, and your memory.  If the record shows you

21 saw Dr. Seal and Miss Aerial Robinson, would you have

22 any reason to believe that would be incorrect?

23 A.   No, I guess not.

24 Q.   All right.  So you go to Elayn Hunt, and -- on

25 February 26th of 2018, correct?

1  A.   Yes, sir.

2  Q.   All right.  While you were at Elayn Hunt, you cut

3  yourself regularly, correct?

4  A.   Yes, sir.

5  Q.   You actually cut yourself 8 times in Elayn Hunt

6  over 56 days; you familiar with that?

7  A.   Not really but I remember cutting myself.

8  Q.   Okay.  One time you said you were going to cut

9  yourself if you did not get double portions.

10         MS. JOHNSON:  Objection.

11         THE COURT:  Again, the objection is

12  sustained Mr. Adams.  The objection is sustained.

13         MS. JOHNSON:  Your Honor, there's sort of a

14  second objection to that sort of thing which is that

15  Mr. Adams also is not a class member is not a party.

16  His statements out of court are not admissible.

17         THE COURT:  Well, I am going to -- I am

18  going to allow what is in the ARPs for -- but it is

19  simply -- but, Mr. -- Mr. Adams, we don't want you

20  having to say what you did or you didn't do.  He is

21  simply asking you if you remember being written up for

22  these things.

23         And the Court would direct him for the third

24  time to please just phrase your question in that

25  manner, okay?

1000

```
 1              MR. ARCHEY:  Your Honor, what I am trying to
 2   do now is not a write-up.  It is a statement by this
 3   witness.  And I am asking if he made the statement.
 4              MS. JOHNSON:  Your Honor, he's not a party.
 5              THE COURT:  He is not a party.  But you
 6   can --
 7              MR. ARCHEY:  Your Honor, they claimed him as
 8   a witness.
 9              THE COURT:  They claimed him as a witness?
10              MR. ARCHEY:  I mean, I am sorry.  I am
11   sorry, as their client.  And for them to sit here now
12   and say he's not a party is kind of stunning.
13              THE COURT:  Oh, that's -- all right.  Hold
14   on.
15              So what you're asking, the question was did
16   he cut himself 8 times in 56 days, and you said did
17   you say that you were going to cut yourself if you
18   didn't get double portions.  Is that the question on
19   the table?
20              MR. ARCHEY:  That is the question on the
21   table, Your Honor.
22   A.  No, sir.
23              THE COURT:  Well, there you go for.
24              MR. ARCHEY:  May I proceed?
25   BY MR. ARCHEY:
```

1  Q.   Mr. Adams, five days later you actually did cut

2  yourself because you did not get those double

3  portions; isn't that true?

4          THE WITNESS:  Mr. -- Mr.  Was he written up

5  for that?

6          MR. ARCHEY:  No, Your Honor.  This is just

7  what happened.  It is part of the, you know, reasons

8  for suicide watch, part of what is going on.  I am

9  really kind of at a loss why I can't ask these

10  questions.

11          THE COURT:  Okay.  Well, okay.  Mr. Archey,

12  here again, let's -- let's modulate, modulate our

13  attitude so that we're all talking about this in a way

14  that the Court can address it.

15          You can ask him if he did certain things

16  that are not crimes.  But if the things that you are

17  saying that he was written up for, I am not -- I don't

18  know whether you're going with malinger, you're going

19  with manipulation, but you can ask him if he did -- I

20  will allow you to ask him if he did cut himself five

21  days after.  But he said he didn't make the threat, so

22  you are kind of at a loss there.

23          MR. ARCHEY:  Well, Your Honor, if I may

24  respond.  I have records.  And you're not allowing us

25  to show him the records.  This is the only time we get

1   to question this witness, and you're preventing us

2   from showing the records because you've said we've

3   laid no foundation.  We can't lay a foundation because

4   it is not our case yet and we can't get the witnesses

5   here to lay the foundation.

6            THE COURT:  And you couldn't answer the

7   simple questions I had in order to lay the foundation.

8   When I asked those questions.  So I will ask, I

9   will -- don't argue with me about this.  I said that

10  you could ask him the question if he did in fact cut

11  himself five days later.  But I was saying to you that

12  you are in a predicament here because you asked did

13  you say you would cut yourself if you didn't get

14  double portions.  He said no.  You then say and so

15  five days later you cut yourself because you didn't

16  get the double portions.  So why don't you just ask

17  him if five days later he cut himself.

18           MR. ARCHEY:  I will move on.

19           THE COURT:  I am allowing you to ask him

20  what he did.

21           I am simply trying to explain to you the

22  reasoning behind what the Court is saying in order

23  that we can avoid having these discussions again.  So

24  I will allow you to ask him what he did if those

25  actions do not constitute a violation of the policy of

1003

1    the institution or a crime.

2              MR. ARCHEY:  I'm trying to comply, Your

3    Honor.

4    BY MR. ARCHEY:

5    Q.   In addition to cutting yourself at least eight

6    times while you were at Elayn Hunt, you also banged

7    your head against of the cell three different times,

8    correct.

9    A.   I know I banged my head, I remember that.

10   Q.   Okay.  You smeared feces on yourself while you

11   were at Elayn Hunt, correct?

12   A.   I don't remember doing that.

13   Q.   You told the mental health worker at Elayn Hunt

14   that you went on and suicide so much because of your

15   legal work, correct?

16   A.   I don't remember that.

17             MS. JOHNSON:  Objection, Your Honor.

18             THE COURT:  What is the objection, Miss

19   Johnson?

20             MS. JOHNSON:  Again, he is not a party to

21   this.  It's an out-of-court statement.

22             THE COURT:  Can you ask -- so the issue is

23   can you ask anyone if they made a statement at a

24   different time.  It's a declarative witness's prior

25   statement.

1004

```
 1              I am going to -- all right.  The reason that
 2    I am going to allow it is, Miss Johnson, did you --
 3    have you claimed attorney/client privilege with
 4    Mr. Adams for purposes of this litigation?
 5              MS. JOHNSON:  Your Honor, at one point in
 6    time Mr. Adams was in David Wade, at which point in
 7    time he would have been a class member.  We have
 8    talked to him in prep for this.  But for purposes of
 9    being a party he is not any different than another
10    witness.  And when a witness makes an out-of-court
11    statement when they are not a party, that is not
12    enough to be able to bring it in just because they
13    have been marked as a witness.  That is why I believe
14    that his out-of-court statements, unless there is
15    another exception out there for the statement in
16    particular, is far from the position of being
17    considered to be hearsay and not an exception under
18    801 statute.
19              THE COURT:  Yes, it is 801-D.
20              So the class members are those who are at
21    David Wade now.  All right.
22              Mr. Archey, I am going to allow you to go
23    ahead and put it in.  I am going to tell you that I am
24    not sure of the relevance that you have with this but
25    you can go ahead and put it in.  I am not -- I am not
```

1   real sure it is admissible, but because I am not sure

2   I am going to allow you to do this this time because

3   we probably won't get our hands on this witness again.

4           MR. ARCHEY:  Thank you, Your Honor.

5   BY MR. ARCHEY:

6   Q.   Mr. Adams, you reported that you went on and off

7   suicide so much, quote, because of your legal work,

8   closed quotes, true?

9   A.   Not true.

10  Q.   Okay.  You saw mental health regularly while you

11  were at Elayn Hunt, true?

12  A.   Yes.

13  Q.   And Elayn Hunt did, their psychiatrist and

14  psychologist did formal assessments of you, correct?

15  A.   I don't remember.

16  Q.   You remember them diagnosing you with malingering

17  for placement at least five different times?

18  A.   No, sir.

19  Q.   When you came to back to David Wade, that was on

20  April 23, 2018, correct?

21          THE COURT:  Mr. Adams?

22          THE WITNESS:  Excuse me, mind kind of drifts

23  off.

24          THE COURT:  I had you say earlier that do

25  you remember that -- when you went back to -- I had

1006

1   that at the very beginning of your testimony.  You

2   were in Elayn Hunt from February the 22nd to April the

3   23rd of 2018.  Does that sound about right?

4           THE WITNESS:  Yes, ma'am.

5           THE COURT:  Okay.  Mr. Archey.

6           MR. ARCHEY:  Thank you.

7   BY MR. ARCHEY:

8   Q.   Now, when you got back to David Wade, over the

9   next 150 days, that's how far our records go, you cut

10  yourself 10 times just like you had done at LSP and

11  just like you had done at Elayn Hunt, correct?

12  A.   I don't -- I don't recall how many times.

13  Q.   Okay.  When you got to David Wade, you saw mental

14  health three days in a row when you first arrived; is

15  that true?

16  A.   I don't remember that.

17  Q.   Okay.  You saw Dr. Seal the third day when you

18  got to David Wade, and he represcribed medications for

19  you, correct?

20  A.   I don't remember that.

21  Q.   During the 150 days that you were at David Wade

22  that we have record for, how many times do you think

23  you saw mental health?

24  A.   I don't -- I don't really remember because I know

25  they were make -- they would make a tier round like

1007

1  probably once every two weeks.  I don't -- I don't

2  know.

3  Q.   Sir, there are 78 record of contact between

4  mental health and you over those 150 days.  Are you

5  aware of that?

6  A.   No, sir.

7  Q.   During the time you were at David Wade you would

8  talk about playing with security, going on suicide

9  watch to play with security, right?

10           MS. JOHNSON:  Objection, Your Honor.

11           THE COURT:  Yeah.  That's -- isn't that a

12  rule violation.

13           MR. ARCHEY:  Your Honor, what I am asking

14  about are not -- is not anything that was written up.

15  I, mean these are not things that were written up,

16  these are things in the mental health records that are

17  being reported.  So no, there is no write-up.

18           THE COURT:  Okay.  You are going to be able

19  to get those in evidence in other ways, Mr. Archey,

20  and the Court will have those in front of it.

21           MR. ARCHEY:  All right.

22  BY MR. ARCHEY:

23  Q.   So after being diagnosed as a malingerer Elayn

24  Hunt, your behavior at David Wade was exactly the same

25  as it had been at both Elayn Hunt and LSP, correct?

1008

1   A.   No, sir.

2          MR. ARCHEY:  Your Honor, those are my

3   questions.  Thank you.

4          THE COURT:  All right.  Miss Johnson,

5   anything further for Mr. Adams?

6          MS. JOHNSON:  Your Honor, no redirect.

7          THE COURT:  All right.

8          Mr. Adams, we thank you for coming here

9   today and testifying.  And you can let the guards know

10  that you are now released from this matter and are

11  free to leave the room.

12         THE WITNESS:  Okay, thank you.  You all have

13  a good day.

14         THE COURT:  Thank you, Mr. Adams.

15         All right, Miss Johnson, call your next

16  witness.

17         MS. JOHNSON:  It's not going to be me next.

18  Let's see if the plaintiff main room comes back on

19  here.

20         MS. BRAY:  Yes, Your Honor, our next witness

21  is going to be Joshua McDowell.  And he is at David

22  Wade, and I believe that we are in the process of

23  retrieving him to get him onto a video call.  And I

24  think.

25         THE COURT:  And who is Mr. McDowell?

 1              MS. BRAY:  He is a -- he is a class member.

 2         He is right there.

 3              And I will pass this off now to

 4    Mr. Trunnell.

 5              THE COURT:  All right, Mr. McDowell, at this

 6    time we're going to ask you to raise your right hand

 7    and be sworn.

 8              (The witness was duly sworn.)

 9              THE COURT:  All right.  Mr. McDowell, we

10    are -- you are being called as a witness here.

11    Mr. Trunnell, you will be taking this witness; is that

12    correct?

13              MR. TRUNNELL:  Yes, Your Honor.

14              THE COURT:  You can proceed, then.

15                    JOSHUA MCDOWELL,

16         having been called as a witness, having

17         been duly sworn, testified as follows:

18                    DIRECT EXAMINATION

19    BY MR. TRUNNELL:

20    Q.   All right.  Good afternoon Mr. McDowell.  Can you

21    state your full name, please?

22    A.   Joshua Shane McDowell.

23    Q.   Where are you currently housed?

24    A.   David Wade Correctional Center in Homer,

25    Louisiana.

1   Q.   How long have you been at David Wade?

2   A.   Since 2014.

3   Q.   Have you ever been -- sorry.  Go ahead, sir.

4   A.   Roughly about seven years almost.

5   Q.   Have you ever been on extended lock-down during

6   your time at David Wade?

7   A.   Yes, I have.

8   Q.   Did you witness any acts of violence by staff

9   while you were on extended lock-down?

10   A.   One in particular.  I guy came in, was acting up,

11   and they had him in a restraint chair, and they was

12   spraying him with a big can of pepper spray.  And he

13   was restrained, I mean he was hollering because of it

14   being pepper spray, and they continuously was spraying

15   him.

16   Q.   Do you recall when that was?

17   A.   It was like 2017, 2016.  I am not for sure when

18   it was.

19   Q.   Okay.  I'd like to talk to you a little bit about

20   the overall conditions on extended lock-down.

21   A.   Okay.

22   Q.   What is the temperature like on the tiers during

23   the wintertime?

24   A.   Wintertime, man, it really -- really, to me, I in

25   my words, I would say is inhumane because, I mean, you

1  can be in the cells and you lay in bed, and you can

2  see the, I guess you would say stain line, you know

3  when it's real cold out, you blow air, you can see the

4  smoke, so.  And sometimes it gets that cold inside the

5  cell.  And you are not allowed to get up until the

6  blankets or nothing till after four o'clock Monday

7  through Friday, so it is pretty cold.

8  Q.   Did the staff ever open the windows on the tiers

9  when it was that cold?

10 A.   Yeah, they did, a lot of times; especially

11 whenever inmates was bugging them about, you know,

12 maybe toilet paper or soap or Tylenol and stuff like

13 that, they did not want to be bothered.  They didn't

14 want to come down the tier.  And later on the inmates

15 would keep at them, making noise, trying to get them

16 back down there, and they'd come down tier and ease

17 the windows open, they'd leave them open.  Sometimes

18 they stayed open for two or three days before we got

19 somebody that would be willing to close them for us

20 back there.

21 Q.   What was it like on the tiers when the windows

22 were open during the wintertime like that?

23 A.   Oh, just really it was miserable.  I mean, it is

24 like you hope -- I don't know.  For me, my body hurt.

25 You know, when you get so cold your body just hurts,

1  you ache.  That is the way it was whenever I was on

2  the cell when that happened on the tier.  My body, my

3  whole body, just ached.

4  Q.   Were you allowed to use blankets to keep warm?

5  A.   Not during -- not through Monday through Friday

6  you couldn't use none until after 4:00 p.m.

7  Q.   Did your time on extended lock-down include the

8  summer of 2018?

9  A.   Yes, sir, it did.

10 Q.   Approximately how long were you on extended

11 lock-down during the summer of 2018?

12 A.   I would say about seven -- six, seven, about six,

13 seven months.

14 Q.   What were the conditions like on extended

15 lock-down that summer?

16 A.   In the cell?

17 Q.   Yes, sir, in the cell.

18 A.   Well, pretty rough.  You had -- it was so hot at

19 times, we -- us on the tier, me and myself included,

20 we had to put on our boxer and put water on the floor

21 to lay down and cool off because of how hot it was.

22 And it is just unbe -- you can't even feel the fans.

23 They only got a couple fans on the tier and you can't

24 really even -- you can't really feel them.  Every now

25 and then you might feel a breeze but it's so hot.  The

1    winders were open, they still blowing the hot air

2    coming from outside inside, making it even hotter, so

3    it is really -- it is hot.

4    Q.   How did that feel on your body?

5    A.   Constant sweat, like, all day, all night.  I

6    rubbed my face so much my face was red and raw.  And I

7    complained about it and tried to get ice packs and

8    stuff, and I couldn't; I couldn't get no cooperation

9    with it, but.  Yeah, I sweated constantly, all night

10   long.  You sweat.  In your sleep you sweat.  You wake

11   up with sweat dripping down your face and your neck.

12   Q.   Earlier you asked me to be specific about the

13   conditions in your cell.  What was it like on the yard

14   at that time?

15   A.   As far as us going on the rec yard?

16   Q.   Yes.

17   A.   Well, most of the time they would come back there

18   and be, I guess you could say be too lazy to take us

19   out.  And a lot of times they'd come back there and

20   try to get us to sell our -- sell our yard and stuff.

21   And whenever we did go out, we would go out in the

22   cages and -- this little -- like little dog cages they

23   got, and it is on a concrete slab out in the middle of

24   the, you know, the field.  And we would have to sit

25   out there.  It would be a hundred and something

1014

1  degrees and we couldn't come in, you know.  It is just

2  -- most of the time a lot of us didn't even go out in

3  the summertime.

4  Q.    What did you mean by sell your rec time?

5  A.    The what?

6  Q.    What did you the mean when you said the guards

7  would want you to sell your rec time?

8  A.    They would offer you extra food, extra food

9  trays, you know.  Like certain days we got fried

10  chicken or fried fish or something good, they would

11  offer an extra tray.  And they would be like well,

12  I'll give you an extra tray if you don't -- if you

13  want to refuse your shower.  That way they didn't have

14  to pull you out for your shower.

15  Q.    Did you have any issues with the plumbing in your

16  cell that summer?

17  A.    Yes, sir, I did.  The sink stayed -- the hot

18  water button on the sink stayed stuck, and you

19  couldn't unstick it so the sink filled up with hot,

20  steaming hot water.  And you couldn't hardly even put

21  your hand under it, much less drink any of it.  And a

22  lot of times in the morning time you wake up, the sink

23  would be -- the water in the sink would be brown and

24  the water in the toilet would be brown.  And we didn't

25  know what it was but they would come in and turn it

1    off say they had to flush the pipes and stuff because

2    they had a busted pipe, and it liable would be off all

3    day.  And other than that, when they turned it back

4    on, they still never fixed the sinks and stuff.  It

5    was still hot -- nothing but hot, hot water.

6    Q.   Did you have a cellmate at that time?

7    A.   Yes, sir, I did.  I had a -- I'm glad you asked;

8    I had Mr. Torre Huber.  He passed away in my cell on

9    July the 22nd, 2018.

10   Q.   Did you talk with Mr. Huber while he you shared a

11   cell?

12   A.   Very, very little.  He -- he didn't say too much.

13   He was real, I guess you would say, I could say he was

14   strange, because I never been around people like he

15   was.  He didn't really talk.  He mumbled, he murmured,

16   you know, just like spoke under his breath.  And then

17   when he did speak he spoke -- he spoke real low and

18   you couldn't hardly understand; you had to really be

19   listening to what he saying to understand it.

20   Q.   Did you notice anything unusual about the way

21   Torre walked?

22   A.   The way he walked?

23   Q.   Yes, sir.

24   A.   Yeah; he always walked with his head down,

25   constantly.  When he got up he'd walk with his head

1016

1    down.  If he sat on his bed, he has his head down just

2    looking at the floor.  If he got up, he would walk,

3    have his hands in from of him, just walk the floor.

4            He never really looked up, he never looked

5    at nobody, you never called eye contact with him.  His

6    eyes were always down.

7    Q.   Did you notice anything unusual about the way

8    Torre would act in the cell?

9    A.   Yeah.  A couple occasions he -- I slept on the

10   floor.  Of course he had the bottom bunk 'cause he was

11   a little older.  And -- and he was in bad shape, he

12   took a lot of medications.

13           And it was hot.  I slept on the floor so I

14   can fell that little breeze that comes through the

15   cell right there.  And he woke me up one night and,

16   pulling my blanket out from under my head which I used

17   for a pillow.  And I looked up at him and I said,

18   Torre, what are you doing?

19           And he said I am looking for my ice cream.

20           I said, Torre, you ain't got no ice cream

21   under there.  I said lay down.  I talked to him, I

22   talked to him, like, 'cause that's the way he acted,

23   you know.

24           And again he woke me up one night pulling on

25   my jumpsuit, my pants leg on my jumpsuit.  And I

1017

1    looked up at him and I asked him, I said what, Torre?

2              And he just smiled at me and laid back down,

3    didn't say a word.

4              And another time he opened my locker up.

5    And he was going through my locker.  And I am asleep

6    at this time.  I take sleeping medication.  I sleep a

7    lot.  And, but he had -- I asked him, I said what are

8    you doing?  He said I am looking for my marijuana.

9    I said there is no marijuana in there, Torre.  And he

10   said oh, okay.  And he would sit down and just be

11   quiet, he never would say a word.

12   Q.   Did you take any of these actions as him trying

13   to antagonize you?

14   A.   No.  Really, from being in there with him, the

15   few days I was in there, I understand that he -- there

16   was something wrong with him.  So I kind of accepted

17   the way he was.  You know, I tried to help him as much

18   as possible.  I tried to get the captain along with

19   him, I tried to get him to help me.  He brought some

20   ice and water down there for us, but we couldn't get

21   nothing done.

22   Q.   During the time you and Torre were celled

23   together, did he go to the shower?

24   A.   He went to the shower one time, I think, in 11

25   days.  And when he got in the shower, he had his

1  boxers on; nothing but his boxers.  He stood under the

2  water, had his head up under the shower, facing down

3  like this, and stood there for about a minute and a

4  half.  He turned around, got out of the shower, and

5  walked to the cell.  And this was the night before he

6  had passed.  And he walked back to the cell with his

7  boxers on, soaking wet, and got in the bed.  And he

8  laid down, and that is -- that is the way that I found

9  him the next morning.  He was laid down in a fetal

10  position facing the wall.

11  Q.   What was the heat like in your cell at this time

12  in particular?

13  A.   This time of the month or this time of the

14  morning?

15  Q.   Let's say in the 11 days leading up to Mr. Huber

16  passing, the time when you were living together.

17  A.   It was easily in the hundreds.

18  Q.   What did that feel like?

19  A.   Miserable.  It is really, it's hard to explain

20  how it felt unless you're actually, you know, going

21  through it.  But, like I said, we had to get water on

22  the floor and get in our boxers, or get a towel and

23  get water out of the toilet and just put it on our

24  chest and our back and stuff to try to cool us off a

25  little bit.  That is how hot it was.  They even took

1  the temp -- the thermometer down 'cause we kept asking

2  how hot it was, they didn't want us to see.

3  Q.    Do you know who took the thermometers down?

4  A.    I couldn't tell you that.  I don't know.

5  Q.    Did Torre eat?

6  A.    He never really ate hardly anything, the whole

7  time we was in the cell together.  He would nibble on

8  stuff, and then every once in a while he maybe would

9  swallow it, but a lot of times he would take one or

10  two little bites, chew it up, and he would spit it

11  out.  He had food on the side of the bed on the floor,

12  after every chow, and that would be from where he just

13  either picked it up, bit it, or picked it up and spit

14  it.  That is how it got on the floor.  He would throw

15  it on the floor.

16  He'd take a bite, throw it on the floor; he would chew

17  it, and then spit it on the floor.

18  Q.    Did you clean that up?

19  A.    I have a couple of times.

20  Q.    Did Torre drink?

21  A.    Torre -- well, again, Torre was -- we was both

22  trying to find ways to get us something, get us some

23  water.  The only time we got anything to drink was

24  during chow but we only got a little glass, but that

25  was Kool-Aid, and I don't drink it.  Me personally, I

1  still don't drink it.  But Torre, he did something

2  that I wouldn't have thought of.  He had an orange

3  Croc, a shower shoe.  And he was putting hot water out

4  of the sink in that Croc and setting them up there on

5  the top of the bunk for a while and letting them cool

6  down, letting the water cool down, and he would get

7  the Croc and drink the water out of the Croc.

8  Q.    Did Torre do anything that made him appear sick?

9  A.    He tried; he always went to the toilet, he would

10  dry heave, like he was trying to throw up, but nothing

11  was coming out.  That was because he wasn't eating

12  anything.

13  Q.    Did he still go to the bathroom?

14  A.    I've never seen him use the bathroom.  He would

15  stand there and try, like, you know, like sometimes

16  you think you got to go and you try and you can't.

17  But he never used the bathroom while we was in the

18  cell together.

19            THE COURT:  Mr. McDowell?

20            THE WITNESS:  Yes, ma'am.

21            THE COURT:  Mr. McDowell, are you talking

22  about he never urinated or he never defecated?

23            THE WITNESS:  Neither one.  I never seen

24  him.  Like I said, unless he was asleep, I mean unless

25  I was asleep he did it.  But other than that, I never

1021

1   saw him do it.

2   BY MR. TRUNNELL:

3   Q.   Did you bring the conditions in your cell to

4   staff's attention?

5   A.   I told the Captain Long about it.  I asked him if

6   he was -- if he couldn't help him out or something, at

7   least move one of us out of the cell, because I

8   couldn't be in there around me like that.  I mean, I

9   don't like seeing people like that.  I just can't, I

10  don't like it.  And, but he never did anything for us.

11  Until Torre passed.  Then they moved me out of the

12  cell.

13  Q.   When you said you did not like to see him like

14  that, did you think he was suffering at that time?

15  A.   Being there in there with him, he was, but I

16  didn't know what was wrong because he wouldn't talk to

17  me.

18  Q.   Did you bring Torre's bizarre behavior to staff's

19  attention?

20  A.   Yes, sir, I did.  I told them about it, when I

21  was in the shower, I told Captain Long and Captain

22  White and Captain Cole that how he -- when I was in

23  the shower he would take my paperwork, my legal work,

24  my mail, out of my bunks and when I'd come back to the

25  cell he would have it neatly organized in little piles

1022

1    all over the cell.  And I told Captain White about

2    that.

3              You know, I've been down awhile, and I don't

4    like -- that is my privacy, you know, but.  Still

5    never no good.

6    Q.    What is your last memory of Torre alive?

7    A.    Pulling my pants leg on my jumper.  And I feel

8    like, I really feel like he was wanting me -- wanting

9    something when he did that.  You know, after the fact

10   that he had passed, I really -- I felt like he was

11   needing my help or wanting something, and that is what

12   hurts me, that is what makes me feel so bad about it,

13   because I feel like I should have got up talked to him

14   or something.  I feel like there's something I could

15   have did.  That is the last thing that I -- that is

16   the last I remember of him.

17   Q.    When did you realize Torre had passed?

18   A.    Like I said, I sleep on the floor in front of the

19   fan, in front of the cell, so I can feel the little

20   air.  And it was pancake and oatmeal morning, I will

21   never forget it, and orange juice.  And I got up from

22   them kicking the bars hollering chow, and I grabbed

23   mine and Torre' tray, like I had been every morning.

24   And when I grabbed that tray, I walked over and I

25   said, Torre, I said here is breakfast.  And I called

1  his name twice and he didn't say nothing so I put the

2  trays on the top bunk.  And I reached down there I

3  touched him, and I said, Torre, it's chow time.  And

4  he didn't -- he didn't move, didn't respond or

5  nothing, and I realized that he was kind of cold.  And

6  I got to looking and his body was pink, like

7  pinkish-purplish looking.  And I felt of him again,

8  and it was kind of -- his body was kind of hard, so it

9  dawned me.  I didn't want to believe it, but it dawned

10  on me.

11            So I went to the bars and I started

12  hollering man to come -- I started hollering for the

13  officer to come back.  I told him man, my cellee is

14  dead, my cellee is dead.  And he didn't want to

15  believe me.  They finished passing out chow before he

16  even come back to the cell, after I was hollering that

17  my cellee was dead.  And everybody on the tier heard

18  me hollering please, for someone to come back there.

19  Q.   Between the time you realized Torre was dead and

20  the time you were removed from the cell, how much time

21  was that, how much time passed?

22  A.   Well, whenever the officers finally come to the

23  cell door, he told me to put my hands through the bars

24  and stand at the bars.  And probably about, if I

25  remember correctly, it wasn't real, real long but it

1   was too long.  I would say about 10, 15 minutes.

2   Because he should have hit his beeper right then to

3   notify them to come down there.

4           Whenever they got there, it still took 30

5   minutes before they took me out of the cell.  They all

6   bundled up right there, questioning me and asking me

7   what I -- what did you do to him?  What did you do to

8   him?  I didn't do nothing to him.

9           That the first thing they asked, what did

10  you do to him.

11  Q.   Has that experience affected you emotionally?

12  A.   A lot, it still does.  It's something that --

13  Q.   How?

14  A.   It is something that I think about whole time.  I

15  mean I woke up, I woke up to it.  I woke out of my

16  sleep to it.  I talked to mental health about it and

17  they put me on Remeron, which that -- that never

18  helps.  They put everybody on Remeron.  They think

19  Remeron and certain medications just solves all of the

20  problems.  But, yeah, I wake up even thinking about

21  it, sweating.  I can see him like it was, you know,

22  like it was yesterday.  I can see him laying in that

23  fetal position like it was yesterday.

24  Q.   Did you ever receive any individualized

25  counseling from David Wade in the aftermath of this?

1  A.   No, sir, I haven't.  I never -- I never have

2  talked to anybody.  They -- I want to say it was Steve

3  Hayden that came down the tier one day, and he asked

4  me, he said you all right?  You need to talk to

5  anybody?  I said no, I am good, and.  But other than

6  that take nobody has ever had to talk to me or

7  anything.

8  Q.   Has any staff of David Wade Correctional Center

9  asked you about this case?

10  A.   Yes, they have.  Since you said that.  I remember

11  about a month ago, whenever you called up here and I

12  guess talked to the -- whoever -- however you do it,

13  whenever you schedule that you wanted to speak to me,

14  telling me that you wanted to speak to me or whatever,

15  setting up a video, this thing right here.  Well,

16  anyway, I had knew the day before because Colonel

17  Tyrone had called me to his office.  And he asked me,

18  he said, he said what have you got going on with this

19  advocacy center people?

20        I said not much, just some things that

21  happened back in the cell blocks when I was back

22  there.

23        And he said, oh okay.

24        And then the other day, the last time that

25  you come up, that you come up here, I had told you

1  about it, I had told you about it; he called me to his

2  office that morning, about nine, nine thirty, ten

3  o'clock.  He called me to his office that morning, and

4  he tried to -- the first thing he asked me, he said

5  you sure -- you sure are deep in with them lawyers up

6  there with The Advocacy Center.

7            I said well, I guess you could say that.

8            And he said well, anyway, he said, the

9  reason I called you up here is to ask you if you had

10  wrote to Warden Goodwin about having a visit with your

11  brother before he leaves.  You know, my brother, he

12  gets released from the south side on February the

13  12th, next month.

14            And I said told him no, I haven't wrote --

15  wrote him.  But yeah, he asked me then, well, you know

16  trying to -- he said something then about it.  I felt

17  like he was trying to dig for information from me.

18  Q.   Have you ever spoken with Colonel Coleman about

19  this case?

20  A.   I have never spoke to Colonel Coleman about this

21  case, but when I was in lock-down, on the south side,

22  and I had a -- lawyers come up, you and Miss Katie.

23  On my way back after the -- after our -- after our

24  visit, we was setting outside N2, and it was like

25  eight of us, inmates; and he told me, he looked at me,

1  he said -- it was him and Captain Huey.  Captain

2  Huey's not a captain anymore, he works maintenance

3  here.  And, but it was them two.  And he said next

4  time you see that pretty white girl, tell her she can

5  suck my thing.  And he looked over at Captain Huey,

6  and he said, I'm not going to say a thing about it.

7          He asked, he asked what do you think.  He

8  said what do you, Captain Huey.  He said that's right.

9  Q.   Has any staff at David Wade threatened you for

10 participation in this case?

11 A.   Have they ever threatened me?

12 Q.   Yes, sir.

13 A.   They have not really threatened me, but I know

14 I've had people -- I've had officers make little

15 gestures about it, like Eddie Kennedy, Sergeant Eddie

16 Kennedy, he's a lieutenant now.  And he come through

17 here awhile back and he said -- he asked me if I was

18 still talking to them lawyers.

19          And I said yeah, I am still talking to them.

20          He said hmm, he said, well, I'll see you

21 pretty soon.

22          That's all he has ever said.  That's the

23 only thing anybody's ever said.  That is why I have

24 always been scared about retaliation stuff, because I

25 know how they, and that has been my biggest thing

1028

1  about doing all this right here.

2  Q.   What is your current housing assignment at David

3  Wade?

4  A.   Well, after seven years I just got moved to honor

5  dorm, H4-3.

6  Q.   What does mean to be living in the honor dorm?

7  A.   To me it means a lot.  It just shows that I have

8  improved on how -- how I live, improved.  I showed

9  that I am improving myself.  It's a lot better.  I am

10  around a lot of older people that is in wheelchairs

11  and stuff so I can help them.  That is -- what I love

12  to do.

13  Q.   Earlier you mentioned a visit with your brother.

14  Do you have any kin at David Wade Correctional Center?

15  A.   Yes, sir, I have got my -- my brother, Martin

16  McDowell, he is on N2 B tier, cell 14, on the south

17  side.

18  Q.   Do you know how long is left on his sentence?

19  A.   His discharge date is next month, on February the

20  12th.

21        MR. TRUNNELL:  All right, Your Honor.  No

22  further questions.

23        THE COURT:  All right.

24        Is that Mr. Robert, you'll be taking --

25        MR. ROBERT:  Yes, ma'am.

1    CROSS-EXAMINATION

2  BY MR. ROBERT:

3  Q.   Good afternoon, Mr. McDowell.

4  A.   How are you doing?

5  Q.   Good to see you again.  Just a few follow-ups

6  with you.  You were convicted of second degree murder

7  in 2014; is that correct?

8  A.   Attempted second degree murder, yes, sir.

9  Q.   Okay.  And you were sentenced to 29 years and 5

10  months?

11  A.   Yes, sir, I was.

12  Q.   Okay.  And you would have arrived at David Wade

13  around December of 2014; is that correct?

14  A.   Yes, sir, I did.

15  Q.   Okay.  Before you were at David Wade you were at

16  Catahoula?  Is that correct?

17  A.   I left Catahoula; when I was at Hunt's got

18  processed to come here, and then before that I was at

19  Catahoula, sir.

20  Q.   Right.  I skipped the Hunt, but I am going to get

21  to that in a second.

22         You were at Catahoula, and you had had some

23  physical altercations with other inmates while you

24  were at Catahoula?

25         MR. ROBERT:  I know, Judge, but I am just

1030

1  saying what he told me in his deposition.  I don't

2  have a write-up for that.  My apologies.

3           THE COURT:  It is still a crime.

4  It's still -- Mr. McDowell.

5           It's still a crime.

6           MR. ROBERT:  Okay.  If you don't want me to

7  ask about it, that is fine.

8  BY MR. ROBERT:

9  Q.   After you Catahoula you went to Hunt for testing;

10 is that correct?

11 A.   Yes, sir, I did.

12 Q.   Okay.  And when you were at Hunt you were

13 diagnosed was it with depression?

14 A.   Yes, sir.

15 Q.   Okay.  And you got on medication when you were at

16 Hunt, correct?

17 A.   Yes, sir.

18 Q.   And that was the first time you had been on

19 medication since you had been incarcerated, correct?

20 A.   Actually I got put on medication in Jonesboro for

21 diabetes.

22 Q.   Okay.

23 A.   Blood pressure.

24 Q.   Mental health medication, I am sorry, for your

25 depression.

1    A.    Yes, sir.

2    Q.    Okay.  And you continued with mental health

3    medication once you came to David Wade in 2014,

4    correct?

5    A.    Yes, sir, I did.

6    Q.    Okay.  And you have not had any fights or

7    anything since you have been at David Wade, right

8    A.    I got jumped on but I -- not a fight.

9    Q.    Okay.  And, like I said, you continued your

10   medication at David Wade, you sought Dr. Seal early

11   on; is that correct?

12   A.    Yes, sir.

13   Q.    Okay.  And actually you saw Dr. Seal regularly

14   during the time you had been David Wade, haven't you?

15   A.    Yes, sir.

16   Q.    In fact I have got you saw him 13 times between

17   January of 2015 and August of 2018.  Would you think

18   that is an accurate figure?

19   A.    Well, they got to -- he's got to follow up to do

20   my blood test results to make sure my medication is

21   working properly, I got the right amount in my

22   bloodstream.

23   Q.    Okay.  And --

24            THE COURT:  Mr. Robert, Mr. Robert, did you

25   say 13 times?

1    MR. ROBERT:  Yes, Your Honor, 13 times.

2  BY MR. ROBERT:

3  Q.   About how often were you seeing him since you

4  have been there.  I said 13 times.  Do you have a

5  regular, is it every 30 days, is it every 6 months, or

6  can you tell me?

7  A.   Usually about every 6 months.

8  Q.   Okay.  And the depression meds have been working

9  for you, right?

10  A.   For the most part, yes, sir.

11  Q.   Okay.  And you got out of -- you spent -- early

12  on you spent some time in segregated housing, correct?

13  A.   Yes, sir.

14  Q.   And then there was a period you were released to

15  general population, correct?

16  A.   Yes, sir.

17  Q.   And then you had some rule violations and you

18  went back to -- to segregated housing for about

19  another six months, correct?

20  A.   Yes, sir.

21  Q.   Okay.  But then in January of 20192 you were

22  released back to general population, correct?

23  A.   Yes, sir.

24  Q.   And you have been in general population since

25  that time, right?

1033

1    A.    Yes, sir, I have.

2    Q.    You have never seen the south compound again

3    since January 2019, right?

4    A.    No, sir, I haven't.

5    Q.    And you have stayed out of trouble, you haven't

6    had any violations, you have been doing well at David

7    Wade, correct?

8    A.    Yes, sir, I have.

9    Q.    And you have been bettering yourself and taking

10   advantage of programs that are available to you at

11   David Wade, haven't you?

12   A.    Yes, sir I have.

13   Q.    In fact, you got your GED about a month before I

14   took your deposition at the end of 2019, didn't you?

15   A.    It was in '20.  Yes, sir.

16   Q.    Okay.  And you got that while you were at David

17   Wade, correct?

18   A.    Yes, sir, I did.

19   Q.    And I believe you told me that the formal

20   schooling that you had was about sixth or seventh

21   grade before you got that GED; is that correct?

22   A.    Yes, sir, it was low.

23   Q.    Okay.  And since your deposition, as you

24   testified today, things have even gotten better for

25   you at David Wade, you are in the honor dorm now,

1  correct?

2  A.   Yes, sir.

3  Q.   And you have been involved in this litigation

4  since it started, haven't you?

5  A.   Yes.

6  Q.   And nobody has sent you back to the south

7  compound for anything since you got out in January of

8  2019, correct?

9  A.   No, sir, because I stayed by myself.

10  Q.   Okay.  I just want a few follow-ups on Mr. Torre

11  Huber.  I understand that that was a difficult 11 days

12  for you.  And I just want to clarify that you were

13  only cellmates with him for 11 days; is that right?

14  A.   Yes, sir.

15  Q.   And I think you indicated that there was hot

16  water in the cell, correct?

17  A.   Yes, sir.

18  Q.   When we talked to you in your deposition, I had

19  made a note that you -- that Captain Malone actually

20  came and fixed the water during the time that you were

21  in the cell with Mr. Huber.

22  A.   He come to --

23  Q.   Is that correct?

24  A.   He come to the back of the pipe chase and fixed

25  it but it popped back out 'cause Mr. Huber was messing

1   with it.

2   Q.   But he did, for at least a little period of time

3   he fixed it, correct?

4   A.   About an hour, yes, sir.

5   Q.   Okay, and then Mr. Huber did something that

6   messed it up again; is that correct?

7   A.   Yes, sir.  Trying to get some water.

8   Q.   Okay.  And you do get -- at a very minimum you

9   get something cool to drink three times a day,

10  correct?

11  A.   Sometimes it is cool, not all the time.  Ice is

12  usually melted.  It sits out in the lobby and melts by

13  the time it gets to us.

14  Q.   Okay, but it's not hot.

15  A.   It is not hot.

16  Q.   Okay.  And when we talked in your deposition, I

17  think you mentioned to me something about Mr. Huber

18  taking, during those 11 days he took pills fairly

19  regularly, he got pills three times a day, correct?

20  A.   Yes, sir, it was two or times a day he took big

21  handfuls of medication.

22  Q.   Okay.  And he was receiving that medication

23  during the time that you were with?

24  A.   Yes, sir.

25           MR. ROBERT:  Your Honor, I think that is all

1   I have.

2          THE COURT:  All right.  Mr. Trunnell, any

3   redirect?

4          MR. TRUNNELL:  Just a few, Your Honor.

5                  REDIRECT EXAMINATION

6   BY MR. ROBERT:

7   Q.   During the 11 -- we talked a little bit about the

8   frequency of mental health care, the frequency with

9   which you saw them.  During the 11 days when you were

10  housed with Mr. Huber, did you have any contact with

11  mental health staff at that time?

12  A.   I never seen any of them.

13  Q.   Did they make any rounds during that time?

14  A.   Not that I seen.  Not until after, after he had

15  died, and I seen Steve come through, Steve Hayden come

16  through one time and hit the block.  That is the first

17  time I ever seen it.  I didn't see him no more after

18  that.

19  Q.   Did anyone from mental health come by to see if

20  you were having a reaction to your medications in the

21  heat?

22  A.   No.

23  Q.   Did anyone, from mental health or not, come by to

24  check and see if you were having any kind of

25  reactions?

1037

A.   No.

          MR. TRUNNELL:  I believe that is all, Your
Honor.  Thank you.

          THE COURT:  All right.  Thank you very much.

          We thank you, Mr. McDowell.

          MR. ARCHEY:  Your Honor, I do -- no, my
apologies, I don't get to do it on this one.  I'm
sorry.  I am sorry, I was jumping the gun.

          THE COURT:  Okay.  All right.  Thank you,
thank you, Mr. McDowell, for coming to testify.

          We have a request for a short break.

          Mr. Trunnell, do you all have another
witness ready to go this afternoon?

          MR. TRUNNELL:  Yes.

          THE COURT:  Very good.  You are free to go,
and we'll take quick comfort break and come back at 25
to five.  Thank you all.

          (Recess taken)

          MS. DOUGLAS:  Good evening, Your Honor,
we're back.

          THE COURT:  All right.  And that is Miss
Roussel?

          MS. DOUGLAS:  No.  This is Miss Douglas.

          THE COURT:  Okay, sorry.

          MS. DOUGLAS:  No problem.

1    THE COURT:  All right.  So, Miss Douglas, if
2  you would please call your next witness.
3    MS. DOUGLAS:  Thank you, Your Honor.
4  Plaintiffs call Assistant Warden Jacob Baird.
5    THE COURT:  I'm sorry, what is his name?
6    MS. DOUGLAS:  Jacob Baird.
7    THE COURT:  How do you spell that?
8    MS. DOUGLAS:  His last name, it's Jacob with
9  a C, and Baird is B-A-I-R-D.
10    THE COURT:  Thank you.  All right?  All
11  right.  Mr. Baird, if you would please raise your
12  right hand and be sworn.
13    (The witness was duly sworn.)
14    JACOB BAIRD,
15    having been called as a witness, having
16    been duly sworn, testified as follows:
17    CROSS-EXAMINATION
18  BY MS. DOUGLAS:
19  Q.   Good evening, Assistant Warden Baird.  Am I
20  saying your last name correctly, sir?
21  A.   Absolutely, yes, ma'am.
22  Q.   Okay.  Great.  Just want to make sure I got that
23  right.
24    Can you please state your full name for the
25  record?

1  A.    Jacob Brian Baird.

2  Q.    Thank you.  And you're the assistant warden,

3  chief of security at David Wade Correctional Center,

4  correct?

5  A.    Not currently, no, ma'am.

6          THE COURT:  I am sorry, what did you say,

7  sir?

8          THE WITNESS:  Not currently.  I am the

9  deputy warden.

10  BY MS. DOUGLAS:

11  Q.    Deputy warden.

12  A.    Yes.

13  Q.    Prior to March of 2020 were you the assistant

14  warden?

15  A.    From December to March, or January to March, I

16  can't recall, of 2020.

17  Q.    So January 2020 to March 2020; is that correct?

18  A.    Yes, ma'am.

19  Q.    Okay.

20          THE COURT:  And what was your position then?

21          THE WITNESS:  I was assistant warden then.

22          THE COURT:  All right, and assistant warden

23  for security?

24          THE WITNESS:  Yes, ma'am.

25          THE COURT:  All right.  And what was your

1040

1    position before that?  I am stealing Miss Douglas's

2    thunder.  What did you do before that?

3             THE WITNESS:  I was field colonel.  Field

4    operations?

5             THE COURT:  All right.  Please proceed, Miss

6    Douglas.  I was trying to make sure he was going to be

7    relevant.

8             MS. DOUGLAS:  Yes, of course, Your Honor.

9    BY MS. DOUGLAS:

10   Q.   And before -- when you were a field colonel, you

11   began as a field colonel in 2017; is that correct?

12   A.   Yes, ma'am.

13   Q.   And as assistant warden one of your primary

14   responsibilities is for staff and inmate safety,

15   correct?

16   A.   Yes, ma'am.

17   Q.   And the colonels reported to you in that

18   position.

19   A.   Yes, ma'am.

20   Q.   Right?

21   A.   Yes, ma'am.

22   Q.   While you were working that position, you worked

23   Monday through Friday from eight to four?

24   A.   Correct.

25   Q.   And in that position you reviewed all of the

1  daily paperwork from the shift prior; is that right?

2  A.   Yes, ma'am.

3  Q.   I am sorry, sir, I did not understand you.

4  A.   Yes, ma'am.

5  Q.   And that daily paperwork included unusual

6  incident -- unusual occurrence reports, sorry, often

7  called UORs?

8  A.   That is correct.

9  Q.   And as part of your job duties, again we're

10  talking about when you were the assistant warden, you

11  also make rounds on the south compounds?

12  A.   Yes, ma'am.

13  Q.   Is and that includes the units N1 through N4?

14  A.   Correct.

15  Q.   And when you are making your rounds, part of what

16  you're doing during that time is making sure that the

17  staff is doing their jobs; is that correct?

18  A.   That is correct, yes, ma'am.

19  Q.   And when you were the assistant warden, you

20  reported directly to Warden Goodwin, right?

21  A.   Yes, ma'am.

22  Q.   And both you and Warden Goodwin received the

23  daily paperwork that we just talked about a second

24  ago, right?

25  A.   Correct.

1042

1   Q.   And sometimes you would speak with Warden Goodwin

2   about a particular UOR if something was incorrect or

3   inaccurate in it?

4   A.   I don't believe I stated that in my deposition.

5   I think --

6   Q.   Okay.

7   A.   -- we had the same paperwork --

8          THE COURT:  That is not the -- I'm sorry,

9   Mr. Baird, to interrupt you.  It is not -- she -- it

10  is not about what you said in your deposition unless

11  she refers you to your deposition.  We just want you

12  to answer the question.

13         THE WITNESS:  Yes, ma'am.

14         THE COURT:  And the question was that

15  sometimes you would bring some of the unusual

16  occurrence reports to Warden Goodwin's attention; is

17  that correct.

18         THE WITNESS:  In somewhat fashion, yes,

19  ma'am.  But after the fact, if I already spoke to

20  whoever wrote the report or the colonel over that

21  unit.

22  BY MS. DOUGLAS:

23  Q.   So you would bring it to Warden Goodwin's

24  attention after you spoke to whoever wrote the report

25  or the colonel; is that correct?

1    A.    Yes, ma'am.

2    Q.    And often you were reviewing the completeness of

3    the report, the grammar in them, the way they were

4    filled out?

5    A.    Yes, ma'am.

6    Q.    Other than these instances, you and Warden

7    Goodwin don't talk about the daily paperwork that you

8    all both receive; is that correct?

9    A.    No, ma'am.

10   Q.    And when you were in the position of assistant

11   warden, you supervised Colonel Mays on the south

12   compound, right?

13   A.    Yes, ma'am.

14   Q.    And you have monthly meetings with Colonel Mays

15   in that supervisory role?

16   A.    Well, we have monthly meetings with all security

17   staff, which is our monthly staff meeting.

18   Q.    Okay, and at those meetings both you and Colonel

19   Mays were present?

20   A.    Yes, ma'am.

21   Q.    And Warden Goodwin was there as well, correct?

22   A.    Yes, ma'am.

23   Q.    But you don't have any other meetings one-on-one

24   with Colonel Mays, correct?

25   A.    Not -- no, ma'am, not necessarily meetings but we

1044

1  talk.

2  Q.   You talk?

3  A.   We wouldn't technically say it was a meeting.

4  Q.   Okay.  So you have conversations and you speak

5  with one another but you don't have a scheduled

6  meeting; is that correct?

7  A.   Yes, ma'am.

8  Q.   Okay.  Some of this daily paperwork that we have

9  been talking about, your supervisees, the people who

10  you oversee, they send you a roll call, shift reports,

11  and the UORS.  Is anything else included in that?

12  A.   Let me think.  We're sent a list of shakedowns;

13  also if they have done a fire drill UOR for that

14  quarter.  Just any paperwork that they would do on a

15  daily basis.

16          THE COURT:  But the question is, what is the

17  daily -- what is the paperwork that -- that you are

18  reviewing.

19          THE WITNESS:  That consisted of all of it,

20  right there.

21  BY MS. DOUGLAS:

22  Q.   So just to be clear, I listed roll call, which is

23  who was on shift that day; is that correct?

24  A.   Yes, ma'am.  Where they were, they're present,

25  and what drop they were.

1045

1    Q.    And then shift reports, which is something that

2    is compiled at the end the shift; is that right?

3    A.    Yes, ma'am, it is what went on during the shift,

4    they conducted inspections, ground inspections,

5    building inspections; shakedowns in each unit.

6    Q.    And then the UORs that we already talked about,

7    right?

8    A.    Yes, ma'am.  That's the only UOR.

9    Q.    Okay.  And then you also mentioned shakedowns and

10   fire drills.  Are those different or were they --

11   would they be included in the shift reports you just

12   told me about?

13   A.    They are separate.

14   Q.    They are separate.  So that is another set of

15   documents?

16   A.    Well, the fire drill being a UOR and the

17   shakedowns is on a separate form.

18   Q.    Okay.  Thank you for clarifying that for us.

19          So in addition to this daily paperwork that

20   you would receive from the colonels, you would expect

21   Colonel Mays to report to you any emergencies that

22   happen during a shift, correct?

23   A.    Yes, ma'am.

24   Q.    How would Colonel Mays report this information to

25   you?

1046

1    A.    Verbally.

2    Q.    Verbally when he saw you or verbally over the

3    telephone?

4    A.    Well, if he saw me or he could call me, either

5    way.

6    Q.    Okay.  And you require that the people who you

7    supervise keep accurate records, right?

8    A.    Yes, ma'am.

9    Q.    And you check to make sure those records are

10   accurate, right?

11   A.    I don't; no, ma'am.

12   Q.    You do not check to make sure that the records

13   are accurate?

14   A.    I have delegated people in those areas that is

15   their responsibility.  It's the colonels and then the

16   shift major takes care of the people under him.

17   Q.    Okay.  So you expect your colonels and your shift

18   majors to make sure that the records are accurate?

19   A.    Yes, ma'am.

20   Q.    And who makes sure that the colonels' records are

21   accurate?

22   A.    That would be me.

23   Q.    Is that you?

24   A.    Yes.

25   Q.    So you make sure that the colonel's accurate -- I

1047

1  am sorry, I apologize.  I did not mean to speak over

2  you.  Go ahead, sir.

3  A.   It's kind of like a military chain of command.

4  Each -- you report to the -- it's just like the

5  military; so the sergeant reports to the lieutenant,

6  the lieutenant reports up.  Everybody reports up.

7  Q.   So according to that system you could make sure

8  that the colonels' records were accurate, correct?

9  A.   Yes, ma'am.

10  Q.   Okay.

11          THE COURT:  I'm having a hard time

12  distinguishing what are the colonels' records?

13          THE WITNESS:  His daily paperwork.  Whatever

14  he --

15          THE COURT:  What does he generate daily that

16  you review for accuracy?

17          THE WITNESS:  Let's say if he done a review

18  of use of force, then I would check behind him and

19  make sure everything was accurate on that.

20          THE COURT:  How about the emergencies, are

21  they -- where would they be recorded?

22          THE WITNESS:  Well, the shift, whoever --

23  let's say the emergency happened on that shift, that

24  shift would report it.  That paperwork would go to the

25  colonel, the colonel would review it and make sure

1  policy and procedure was followed, and manage and see

2  if it was a clear and precise report and make sure

3  there was no information left out someone else who

4  read it, who didn't work here, so like if it went to

5  court, could read it and understand it without

6  question.

7          THE COURT:  But you don't review the

8  paperwork for the emergencies that?

9          THE WITNESS:  I -- I look at them, yes,

10  ma'am.  But if -- the emergency happened on the shift.

11  The shift major's responsible for that paperwork.

12  That paperwork is reviewed by him, and anybody under

13  him, he signs off on that paperwork.  Then the major's

14  paperwork -- go ahead, Judge.

15          THE COURT:  I was going to say, is an

16  emergency considered a UO, an unusual occurrence?  I

17  am just not clear on what encompasses that and who

18  creates that.

19          THE WITNESS:  If it's an unusual occurrence

20  report, it's an emergency situation and it goes on

21  that report.  But whatever shift worked and it

22  happened on, their -- their people, their staff,

23  actually work during that, they either witnessed it or

24  after the fact, and then they filed the reports.  So

25  the sergeant will file a report, the lieutenant or the

1  caption captain responsible for checking that

2  paperwork to make sure it's accurate, clear, and

3  precise; and then the major would check the captains

4  and the sergeants, and then the colonel would check

5  the whole package of theirs and make sure everything

6  was clear, precise, and understandable.

7           THE COURT:  All right.  Does -- is an

8  emergency a type of event that would end up on a UOR?

9           THE WITNESS:  Yes, ma'am.

10          THE COURT:  Okay.

11          All right, Miss Douglas, please continue.

12          MS. DOUGLAS:  Thank you, Your Honor.

13 BY MS. DOUGLAS:

14 Q.   So speaking of UORs, what eventS would generate a

15 UOR?

16 A.   Referring to anything outside of normal

17 activities?

18          THE COURT:  Well, what is the criteria for

19 what get -- that's kind of what I was getting is what

20 is the criteria for a UOR?

21          MS. DOUGLAS:  Thank you, Your Honor.

22          THE WITNESS:  Anything unusual that would

23 happen out of the scope of daily activity.

24          Say like, let's say you had an escape or you

25 had an unscheduled trip.  I mean there is just

1050

```
1  numerous emergencies that could go on there or
2  something that just happens on a daily -- not on daily
3  basis but outside the scope of a daily basis routine.
4  BY MS. DOUGLAS:
5  Q.   So would an unplanned use of force generate an
6  unusual occurrence report?
7  A.   Yes, ma'am.
8  Q.   Would a planned use of force generate an unusual
9  occurrence report?
10 A.   Yes, ma'am, absolutely.
11 Q.   Would a transfer between cells for prisoner
12 generate an unusual occurrence report?
13 A.   Not necessarily, no.
14 Q.   Not necessarily.
15 A.   No.
16 Q.   If it was planned would it generate an unusual
17 occurrence or report?
18 A.   A planned transfer from -- if you planned to move
19 an inmate from a different cell to another cell?
20 Q.   Correct.
21 A.   You would document that in your log book, I mean
22 I don't see the cause for that to be a UOR.
23 Q.   Okay.
24        THE COURT:  We're not -- let me -- Mr. -- we
25 are not second-guessing your judgment here.
```

1051

```
 1              THE WITNESS:  Yes, ma'am.
 2              THE COURT:  We're asking simply for the
 3    criteria.  Is the criteria written down somewhere,
 4    Mr. Baird?
 5              THE WITNESS:  It is -- on each UOR you have
 6    a cat A, cat B, cat C.
 7              THE COURT:  Is it written down somewhere as
 8    to what constitutes an unusual occurrence?
 9              THE WITNESS:  Yes, ma'am.
10              THE COURT:  Okay.
11              THE WITNESS:  In the -- it's in the unusual
12    occurrence report policy.
13              THE COURT:  Okay.
14    BY MS. DOUGLAS:
15    Q.   So, Mr. Baird, you are saying that the
16    requirements for an unusual occurrence report are
17    written on the form that you fill out when there is an
18    unusual occurrence?
19    A.   Yes, ma'am, anything outside of the normal scope
20    of duty.
21    Q.   Okay.  So if someone went on suicide watch, would
22    that generate an unusual occurrence report?
23    A.   Yes, ma'am.
24    Q.   And if somebody was placed in alternative
25    restraints --
```

1  A.   Yes, ma'am.

2  Q.   -- on suicide watch, would that generate an

3  unusual occurrence report?

4  A.   Yes, ma'am.

5  Q.   So if somebody was on suicide watch at the start

6  of a shift and then partway through a shift they were

7  put into alternative restraints, would that generate a

8  new unusual occurrence report?

9  A.   So you're saying if they started like on a

10  standard suicide watch with no restraints?

11  Q.   Correct.

12  A.   Yes, ma'am.

13  Q.   Okay.  Thank you.

14        THE COURT:  So yes, yes, it would -- yes,

15  the use of restraints or the addition of restraints

16  would trigger a UOR?

17        THE WITNESS:  Yes, ma'am.

18  BY MS. DOUGLAS:

19  Q.   Okay, so we started this conversation by talking

20  about accurate record keeping.

21  A.   Yes, ma'am.

22  Q.   And you said that it is -- you said you that

23  figured out who checks whoms records, and so it is an

24  important part of your job and the job of the people

25  that you supervise that records are accurate; is that

1053

1    correct?

2    A.    Yes, ma'am.

3    Q.    There is annual training conducted at David Wade,

4    correct?

5    A.    Yes, ma'am, it is.

6    Q.    And the training materials that you use for those

7    training -- for those trainings come from the

8    Department of Public Safety and Corrections, right?

9    A.    Yes, ma'am.

10   Q.    And at that annual training you receive training

11   in deescalation techniques, right?

12   A.    I believe we just started that.  I am not really

13   sure.  Not too long ago.

14   Q.    Can you tell me what you mean by not too long

15   ago?

16   A.    A couple years, maybe.

17   Q.    Okay.  So prior to March of 2020 was there

18   training on deescalation techniques at these annual

19   trainings?

20   A.    Honestly, I honestly can't answer that.  I am not

21   sure.

22   Q.    Okay.  So if I -- if I showed you your deposition

23   to refresh your recollection of what you had said

24   before, would that -- would that help you remember?

25   A.    Yes, ma'am, it might.

1054

1   Q.   Okay.  Give me one second.  My technical support
2   is pulling it up for you right now.
3         Okay.  So can you read -- can you see the
4   screen, sir?
5   A.   Yes, ma'am.
6   Q.   Okay.  And do you see the question that starts at
7   line 24, that says apart from that training do you
8   training on deescalation?
9         And then on the next page, your answer says
10  in use of force yes, ma'am, we discuss it, yes, ma'am.
11  A.   Okay.
12  Q.   Does that help remind you whether or not you
13  received deescalation training prior to March of 2020?
14  A.   I would have to say yes.  I mean, if I answered
15  yes then, I am assuming that was correct.
16        I mean, I don't not sure.
17  Q.   Okay.
18        THE COURT:  Miss Douglas, I am not satisfied
19  with this.  When -- you have not given us the date of
20  the deposition or anything like that.  When was the
21  deposition?
22        MS. DOUGLAS:  Thank you, Your Honor.  The
23  deposition was taken on February 5th of 2020 by my
24  colleague, Miss Bray.
25        THE COURT:  Very good.  And so the man said

1  he had deescalation training, so we know he had it,

2  then, before March of 2020.  Okay.

3          But, Miss Douglas, you know, when you do

4  that, that present, give the date, then ask him, and

5  the question is, is that your testimony.

6          MS. DOUGLAS:  Thank you, Your Honor.

7          THE COURT:  Mr. Baird, that was, in fact,

8  your testimony in February of 2020.

9          THE WITNESS:  Yes, ma'am.

10         THE COURT:  All right.  Very good.

11         Please keep going, Ms. Douglas.

12 BY MS. DOUGLAS:

13 Q.   And you receive use of force training during your

14 annual trainings; is that correct?

15 A.   Yes, ma'am.

16 Q.   And you receive mental health training as part of

17 your annual trainings, correct?

18 A.   Yes, ma'am.

19 Q.   But this training does not include, the -- and

20 when I say this training I mean the training on mental

21 health, does not include how to identify the signs and

22 symptoms of mental illness, right?

23 A.   Completely not my area no, ma'am.

24 Q.   The mental health training does provide you with

25 information about when you need to refer someone to

1056

1 mental health, though, right?

2 A.   When they request, yes, ma'am.

3 Q.   And have you ever --

4          THE COURT:  When they request; I am sorry

5 when they request, meaning the inmate?

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  Okay.

8 BY MS. DOUGLAS:

9 Q.   You have never referred someone to mental health?

10 A.   Me personally, no.

11 Q.   Are you familiar with the policy governing

12 classification sentencing and service at David Wade?

13 Sometimes this is referred to as the pilot program.

14 A.   Vaguely, yes, ma'am, but some of it, yes.

15 Q.   I would like to show you a document previously

16 marked as P-JJJ-42.

17          MS. DOUGLAS:  Which, your Honor, you can

18 find at Volume 29 at page 224.

19          THE COURT:  Has this previously been

20 admitted?

21          MS. DOUGLAS:  Not yet, Your Honor.

22          THE COURT:  Okay.  And give me the citation

23 again, please.

24          MS. DOUGLAS:  It is Volume 29 page 224, a

25 document previously marked as P-JJJ-42.

1057

```
 1              THE COURT:  All right, please continue.
 2   BY MS. DOUGLAS:
 3   Q.   Are you familiar with this policy, Mr. Baird?
 4   A.   It's not my area but, yeah, I am familiar with
 5   it.
 6   Q.   And this is -- policy is the one that was piloted
 7   at David Wade Correctional System, correct?
 8   A.   Yes, ma'am.
 9   Q.   And this policy was in effect as of March 2020,
10   correct?
11   A.   Yeah.  I thought was March '21.
12              THE COURT:  Dated the 19th, July the 13th or
13   something of 2000 and, I can't read the date; 2019.
14              THE WITNESS:  I am not really sure but I
15   thought that wasn't signed off on until March of '21.
16   BY MS. DOUGLAS:
17   Q.   So, Mr. Baird, are you familiar that there was a
18   version of this policy that was piloted specifically
19   at David Wade Correctional Center?
20   A.   Yes, ma'am.
21   Q.   And then later the Department of Public Safety
22   and Corrections adopted this policy in a broader
23   sense?
24   A.   Yes, ma'am.
25   Q.   And that, the broader adoption of this policy on
```

 1   the departmental level was significantly -- was in

 2   March of 2021.  Is that your recollection?

 3   A.   Yes, ma'am.

 4   Q.   So this pol -- do you recognize this policy as

 5   the policy that was piloted at David Wade Correctional

 6   Center?

 7   A.   Looking at your front page, I'm not looking at

 8   the rest of it.

 9   Q.   We can scroll through it.

10   A.   Okay.

11          All right.

12          Yes, ma'am.

13          Okay.  I gotcha.

14   Q.   And do you recognize this policy as the policy

15   that was piloted at David Wade Correctional Center?

16   A.   Yes, ma'am.

17   Q.   And was this the policy that was in effect as of

18   March 2020, correct?

19   A.   Yes.

20          MS. DOUGLAS:  Your Honor, I would like to

21   file, offer, and introduce what has been previously

22   marked as P-JJJ-42.

23          THE COURT:  It is admitted.

24   BY MS. DOUGLAS:

25   Q.   And, Assistant Warden Baird, this policy created

1 some changings in the housing unit designations,
2 right?
3 A.   Yes, ma'am.
4 Q.   And according to this policy David Wade no longer
5 uses the housing designation extended lock-down,
6 correct?
7 A.   Correct.
8 Q.   Now, according to this policy, there are four
9 different designations; investigative, disciplinary,
10 preventative, and transitional, correct?
11 A.   Yes, ma'am.
12 Q.   Okay.  Let's walk through them one by one.
13 Investigative segregation is used before a prisoner
14 goes to disciplinary court for a rule violation,
15 correct?
16 A.   Right.
17 Q.   And according to the policy, they stated there no
18 longer that 72 hours, correct?
19 A.   Or they have a hearing, yes, ma'am.
20 Q.   I am sorry, sir, what did you say?
21 A.   Or they have a hearing, yes, ma'am.
22 Q.   Okay.
23          THE COURT:  Wait, I don't understand what
24 that means, 72 hours?
25          THE WITNESS:  They have 72 hours --

1060

1    THE COURT:  To have a hearing.

2    THE WITNESS:  A disciplinary hearing, yes,

3  ma'am.

4    THE COURT:  When does the 72 hours start?

5    THE WITNESS:  When they're -- as soon as

6  they're locked up at unless it's a holiday or the

7  weekend.

8    THE COURT:  Okay.

9    MS. DOUGLAS:  I think I can have some --

10   THE COURT:  Go ahead, Miss Douglas.  I am

11 not understanding.

12 BY MS. DOUGLAS:

13 Q.   So, Mr. Baird, the process would be that a

14 prisoner receives a write-up that needs to be

15 investigated first, correct?  So that would be the

16 first step of this process, that's how they get into

17 investigatory segregation?

18 A.   Right.

19 Q.   And then unless it's a holiday or a weekend they

20 are moved into investigatory segregation, and they

21 stay there for no more than 72 hours before they see

22 the board; is that right?

23 A.   An offender commits a rule violation.

24 Q.   Okay.

25 A.   Supervisor deems it necessary if they can be

1    placed in investigative seg.  If it is during the week

2    the unit manager reviews that form that he fills out

3    and says, yeah, this is -- he can good to

4    investigative seg, or he may change that and say no,

5    he can stay in the same housing area.

6    Q.    Okay.  And if the unit manager says the prisoner

7    can good to investigative seg?

8    A.    They -- they go to investigative seg then.

9    Q.    Okay.  And once they are in investigative seg,

10   then no more than 72 hours later they would go before

11   the disciplinary board, correct?

12   A.    Yes, ma'am.

13   Q.    I am sorry, sir.  We need you to answer verbally.

14   A.    Yes, ma'am.

15   Q.    Okay.  Then they would go before the disciplinary

16   board, correct?

17   A.    Yes, ma'am.

18   Q.    And the disciplinary board makes a decision about

19   whether or not the person has committed a rule

20   violation; correct?

21   A.    They hold a hearing to decide the sanctions for

22   his disciplinary report.

23   Q.    Okay.  So the disciplinary board in determining

24   those sanctions, they refer to a disciplinary matrix;

25   is that correct?

 1   A.   That is true.  Yes, ma'am.

 2   Q.   All right.  And are you familiar with that

 3   distinguish matrix?

 4   A.   Yes, sir.

 5   Q.   That disciplinary matrix would have been attached

 6   to the document we just looked at which we were

 7   calling the pilot policy, correct?

 8   A.   Right.

 9   Q.   So I am going to show you a document in one

10   second.

11   A.   All right.

12   Q.   So is this document the disciplinary matrix that

13   would have been attached to the David Wade pilot, what

14   we've been calling the David Wade pilot project?

15   A.   Yes, ma'am.

16            MS. DOUGLAS:  Your Honor, I would like to

17   file, offer, and introduce what has been previously

18   marked as Exhibit D-2, disciplinary matrix.

19            THE COURT:  When I look at D-2, I see the

20   chemical agent log.  Is it D, as in dog?

21            MS. DOUGLAS:  Yes.  So, I am sorry, I think

22   we're missing each other, Your Honor.  It is one of

23   defendants' exhibits, so it is not P-D-2, it is just

24   D-2.

25            THE COURT:  Well, I have misplaced that

1063

 1  volume.  Let me just see it, then.  I can't see it,

 2  Miss Douglas.

 3            Okay.

 4            MS. DOUGLAS:  How is that, Your Honor?

 5            THE COURT:  Well, can you scroll it down,

 6  please a little bit more?

 7            MS. DOUGLAS:  Yes, of course.

 8            THE COURT:  Okay.  All right.  And there is

 9  another page?

10            MS. DOUGLAS:  There are several other pages,

11  Your Honor.

12            THE COURT:  Okay.

13            MS. DOUGLAS:  There are 28 of them.

14            THE COURT:  Okay.  All right, so you are

15  offering that as a defendants' exhibit?

16            MS. DOUGLAS:  Yes, Your Honor.

17            THE COURT:  All right.  Well, I guess we'll

18  admit it, then.

19            MS. DOUGLAS:  Thank you, Your Honor.

20  BY MS. DOUGLAS:

21  Q.  So this disciplinary matrix which is in the pol --

22  which is the policy in effect as of March 2020

23  determines the sanction for a specific rule violation,

24  correct?

25  A.  Yes, ma'am.

1  Q.   And the disciplinary board does not have any

2  discretion in determining a different sanction for a

3  specific rule violation contained in the matrix,

4  correct?

5  A.   You broke up for just a second.

6  Q.   Oh, I am so sorry.  You the disciplinary board

7  does not have any discretion in determining the

8  sanction for a specific rule violation, correct?

9  A.   No, ma'am.

10  Q.   So after somebody completes their disciplinary

11  sentence their classification change to preventative

12  segregation according to the policy in effect in March

13  of 2020, correct?

14  A.   Can you repeat that again?

15  Q.   So after somebody completes the sanction that is

16  determined by the disciplinary board, their

17  classification changes to preventative segregation,

18  correct?

19  A.   I don't believe, not -- no, not necessarily,

20  ma'am.

21  Q.   So your testimony today is that their -- their

22  classification does not necessarily change from

23  disciplinary to preventative at the end of their

24  sanction?

25  A.   No, ma'am.

1    Q.   Okay.  And do you remember giving a deposition in
2    this matter on February 5th?
3    A.   Yes.
4    Q.   Of 2020?
5    A.   Yes, ma'am.
6    Q.   And during that deposition you were asked
7    questions and you answered them truthfully under oath,
8    right?
9    A.   The best of my ability, yes.
10   Q.   I would like to show you a portion of that
11   deposition.  Okay.
12            So you and Miss Bray were having a
13   conversation about the different types of housing
14   classification, much like we are today.  And you
15   started by saying well, let me see if I can break it
16   down.  Miss Bray said okay.  Then starting on line
17   number 1, do you see that?
18   A.   Yes, ma'am.
19   Q.   Page 34 line number 1 you answered by saying
20   investigative segregation is when we place somebody
21   under investigation for a rule violation.  Then they
22   go to court and they're disciplinary segregation.
23   Then they get their sanctions there, and then they go
24   to preventative.  Then from there they go to
25   transitional, where they are allotted more privileges

1066

1  to I guess reward them for their good behavior in

2  order to return back to general population.

3          Did I read that correctly, sir?

4  A.  Yes, you did.

5  Q.  Okay.  And then Miss Bray goes on and says, okay.

6  So just that I make sure that I got the order right,

7  investigative, and then disciplinary, and then

8  preventative, and then transitional.  And you

9  responded to that question saying yes, ma'am.

10          Did I read that correctly?

11  A.  Yes, ma'am.

12  Q.  Okay.  So when a person moves from disciplinary

13  segregation to preventative segregation, they do not

14  necessarily move cells, do they?

15  A.  If they do what again now?

16  Q.  They do not move cells, do they?

17  A.  From where?

18  Q.  So when they move from disciplinary segregation

19  to preventative segregation, they do not move cells,

20  do they?

21  A.  Not necessarily, no, ma'am.

22  Q.  And are you familiar with the policy that governs

23  the conditions on what used to be called extended

24  lock-down, which is tiers N1 through N4?

25  A.  Am I familiar with the extended lock-down we used

 1 | to do, is that what you are asking me?
 2 | Q.   Yes.
 3 | A.   Well, I actually want to state this for the
 4 | record.  I got a pretty poor memory, and remembering
 5 | all of this new stuff, during these two years of
 6 | pandemic and having to go through this and remember
 7 | every little detail is -- is difficult for me, to say
 8 | the least, but you reflect back on the way we used to
 9 | do things to compare them to the way we do them now?
10 | No, ma'am.
11 | Q.   So let me try and ask a different question.  Are
12 | you familiar with the policy that governed the
13 | conditions that -- the conditions on tiers N1 through
14 | N4 that was current in March of 2020?
15 | A.   Was I -- was familiar with the pilot program
16 | then, is that what you are asking me?
17 | Q.   Let me show you a document, Assistant Warden.
18 | A.   Okay.
19 |         THE COURT:  Mr. -- Miss -- wait.  You're
20 | telling me you can't tell me what the terms and
21 | conditions of extended lock-down were prior to the
22 | institution of the pilot program, Warden?
23 |         THE WITNESS:  Judge, I was in the a position
24 | of assistant warden for three months when I got this
25 | deposition.  I have been a field colonel for most of

1  my career.

2          THE COURT:  As a field colonel, would you be

3  familiar with the policies that extend to what was

4  known as extended lock-down?

5          THE WITNESS:  I am pretty I was then, but to

6  reflect back and remember then, you know, I didn't

7  deal with that, I was a field colonel, I was in

8  general operations.  I conducted business outside of

9  the fence.

10         THE COURT:  All right, Miss Douglas, I'll

11  let you see what you can do with this witness.

12         MS. DOUGLAS:  Thank you, Your Honor.

13         So I pulled up and shared here what has been

14  marked previously as Exhibit J-16 which is in the

15  Court's binder as J-18.

16  BY MS. DOUGLAS:

17  Q.  Assistant Warden Baird, do you recognize this?

18  A.  Is that the old policy or, I mean, that's not the

19  new policy, correct?  That is the old policy for

20  extended lock-down?

21  Q.  The question is, do you recognize this policy?

22  A.  Not -- no, ma'am.

23  Q.  Okay.  So let's move up to talking about

24  preventative segregation.  So Colonel Mays and the

25  classification department make the decision to put

1069

1  someone on preventative segregation, correct?

2  A.   Correct.

3  Q.   And you supervise Colonel Mays, correct?

4  A.   Yes, ma'am.

5  Q.   There is no maximum amount of time that a person

6  can be on preventative segregation, is there?

7  A.   There's a review board.

8       They look at their record.

9  Q.   I am sorry, sir, that -- that wasn't the

10  question.  Is there a maximum amount -- there is no

11  maximum amount of time a person can be on preventative

12  segregation, correct?

13  A.   Not that I am aware of, no, ma'am.

14  Q.   Transitional segregation is -- I am sorry, sir.

15  Transitional segregation is for people who have been

16  moved off of preventive segregation and are awaiting a

17  move back to medium custody, correct?

18  A.   They're in medium custody in transitional

19  already.

20          They're awaiting a bed or a transfer.

21  Q.   They're awaiting a bed or a transfer?

22  A.   Yes, ma'am.

23  Q.   And did you just say that they are classified as

24  medical custody in transitional segregation?

25  A.   Yes, ma'am.

1   Q.   So we've been talking about the policy that was

2   current in March of 2020 and the disciplinary matrix

3   associated with it.  You and other staff at David Wade

4   were trained on that new matrix, correct?

5   A.   Yes, ma'am.

6   Q.   And that training meeting included Mr. Seth Smith

7   and Secretary LeBlanc, correct?

8   A.   That is true.

9   Q.   And at that training session Mr. Smith and

10  Secretary LeBlanc talked about how the department was

11  implementing this new policy department-wide including

12  in David Wade, correct?

13  A.   Yes, ma'am.

14  Q.   And they said they were in full support of this

15  new policy and the disciplinary matrix associated with

16  it?

17  A.   Absolutely.

18  Q.   I'm going to talk a little bit about the tiers

19  now.  So on the tiers there are fans and heaters but

20  no air-conditioning, correct?

21  A.   Yes, ma'am.  You are correct.

22  Q.   And the temperature on the tiers is monitored

23  with hand-held thermometers, correct?

24  A.   They can be, but the overall temperature is

25  monitored through the control center.  So if they want

 1  to issue a heat index or a heat alert.  The average

 2  temperature outside of 88 degrees then triggers heat a

 3  alert.  But they do monitor the temperature.

 4  Q.   So --

 5          THE COURT:  The question is the temperature

 6  on the tiers is --

 7          THE WITNESS:  Yes, ma'am.

 8          THE COURT:  The temperatures on the tiers is

 9  determined with a hand-held thermometer.

10          THE WITNESS:  Well, they have posted

11  thermometers too, yes, ma'am.

12          THE COURT:  On the wall?

13          THE WITNESS:  Yes, ma'am.

14  BY MS. DOUGLAS:

15  Q.   Okay, so the temperature on the tier is monitored

16  by hand-held thermometers and thermometers attached to

17  the wall inside of the tier?

18  A.   I believe it's in the lobby.

19  Q.   Okay.

20          THE COURT:  Well, the lobby's

21  air-conditioned.

22          THE WITNESS:  Ma'am?  The lobby's not --

23          THE COURT:  Isn't the lobby air-con --

24          THE WITNESS:  No, ma'am.

25          THE COURT:  But that is not the tier, is it?

1    THE WITNESS:  They can -- the can take it
2  and place it on the tier, yes, ma'am.  It's -- it's
3  not affixed to the wall, it's hanging on the wall.
4    THE COURT:  So they could pick it up and
5  move it.
6    THE WITNESS:  Yes, ma'am.
7    THE COURT:  Go ahead, Miss Douglas.
8    MS. DOUGLAS:  Thank you, Your Honor.
9  BY MS. DOUGLAS:
10  Q.   The temperature on the -- on the tier recorded in
11  the log book, correct?
12  A.   Yes, ma'am.
13  Q.   Was that a yes, sir?
14  A.   Yes, ma'am.  I'm sorry.
15  Q.   And there were some people who were on heat duty
16  status; is that correct?
17  A.   Yes, ma'am; heat pathology, yes, ma'am.
18  Q.   And heat duty status, what you just called heat
19  pathology, means that there are special concerns about
20  exposure of those people to heat, right?
21  A.   Yes, ma'am.
22  Q.   And when a heat advisory is announced, prisoners
23  are supposed to be provided with ice, water, and brown
24  paper towels for wetting themselves, as well as extra
25  showers, right?

1   A.   Extra showers are for the north compound, yes,

2   ma'am.

3   Q.   So on the south compound when a heat advisory is

4   announced, prisoners are supposed to be provided with

5   ice, water, and brown paper towels for wetting

6   themselves, right?

7   A.   Brown paper towels are for people who might be

8   currently on suicide, but the other heat pathology

9   people are offered towels, heat pathology towels.

10  Q.   Okay.  When these additional measures are taken,

11  they are documented in the log book, correct?

12  A.   Yes, ma'am.

13  Q.   Aside from the February training that includes

14  the mental health portion for identifying the signs

15  and symptoms of mental illness, there is no other

16  training provided to security staff on how to work

17  with people who have mental illness, right?

18  A.   Not that I am aware of, no.

19  Q.   And staff on the south compound do not have any

20  particularized training regarding working with people

21  who are exposed to prolonged segregation, right?

22  A.   That is correct.

23  Q.   Is there a policy at David Wade regarding

24  alternative restraints?

25  A.   Yes, ma'am.

```
1   Q.   Are you familiar with that policy?

2   A.   Yes, ma'am.

3   Q.   I would like to show a document previously marked

4   as J-2.

5           MS. DOUGLAS:  And it's still J-2 in your --

6   the binders you have in front of you, Your Honor.

7   BY MS. DOUGLAS:

8   Q.   Can you see that, Mr. Baird?

9   A.   Yes, ma'am.

10  Q.   You recognize it?

11  A.   Yes, ma'am.

12  Q.   And you're familiar with it?

13  A.   Yes, ma'am.

14          MS. DOUGLAS:  Your Honor, I would like to

15  offer exhibit previously marked as J-2 in EPM, or

16  Employee Policy Memo, number 2-1-30, use of

17  restraints.

18          THE COURT  Have we not previously admitted

19  this, Miss Douglas?

20          MS. DOUGLAS:  No, Your Honor.

21          THE COURT:  Okay.  Well, it is admitted, as

22  a joint exhibit.

23  BY MS. DOUGLAS:

24  Q.   Alternative restraints are handcuffs, a belly

25  chain, and leg shackles, correct?
```

1  A.   Yes, ma'am.

2  Q.   Can a person be put in -- a person can be put in

3  alternative restraints for a security reason, correct?

4        I'm sorry, sir?

5  A.   Yes, ma'am.

6        THE COURT:  Yeah, Mr. Baird, you really need

7  to answer out loud.  And I am looking down and I am

8  reading and I don't know what you are saying, so --

9        THE WITNESS:  It's loud in here.  I don't

10 know why it's not coming through too good.

11        THE COURT:  We found with some of the other

12 witnesses that if you don't lean back but just lean a

13 little back away from the microphone it seems to work

14 a little bit better.

15        THE WITNESS:  I'll just wait for a question,

16 Judge.

17        THE COURT:  No, sir, what I am trying to

18 tell you is that the last part of what you say gets

19 swallowed up for some reason.  So if you just like

20 maybe straighten up a little bit the sound's a little

21 bit better.  There seems to be a sweet spot for that

22 microphone.

23        THE WITNESS:  Yes, ma'am.

24        THE COURT:  Okay.

25 BY MS. DOUGLAS:

1  Q.   And in your role as assistant warden, you would

2  be notified if someone was put in alternative

3  restraints, correct?

4  A.   Developing on if I was the duty officer.  If I

5  was duty officer that weekend and it happened on a

6  weekend and/or after hours at night, then I would be

7  notified, yes, ma'am.

8           THE COURT:  No, okay.  In your job as

9  assistant warden that you would not get -- I thought

10  the restraints was a UOR and you got the UOR.

11          THE WITNESS:  Yes, ma'am.  I don't receive

12  that paperwork until the next day.

13          THE COURT:  Okay.

14  BY MS. DOUGLAS:

15  Q.   You would be notified, correct?

16  A.   Yes, ma'am.

17  Q.   And the people who would notify you would be the

18  shift supervisor and possibly mental health, correct?

19  A.   The shift supervisor.  Mental health don't report

20  to me.

21  Q.   Okay.  And when you were the colonel over field

22  operations, you were called to help with cell

23  extractions, correct?

24  A.   Yes.

25  Q.   And when a cell extraction happens, it's usually

1077

1  because a person refuses to come out or come to the
2  bars to be restrained, correct?
3  A.   Yes, ma'am.
4  Q.   Is there --
5          THE COURT:  I am going to -- may I stop you,
6  Miss Douglas.  I am having -- I have no idea what it
7  means for you to be the colonel in charge of field
8  operations.  You said you were outside of the bars.
9          THE WITNESS:  I was over on --
10          THE COURT:  Did you --
11          THE WITNESS:  Go ahead, Judge.
12          THE COURT:  Tell me.
13          THE WITNESS:  I was over all outside.  We
14  have work details of trustees.  That was my function,
15  to serve as the supervisor over the field unit which
16  all outside work crews.  Anything concerning outside
17  the fence, prison enterprise, trustee crews, things of
18  that nature; I had the tactical unit, the K9 unit.
19          I was over all that.
20          THE COURT:  But you still would be called in
21  for cell extraction?
22          THE WITNESS:  Well, my tactic -- my tactical
23  unit would, yes, ma'am.
24          THE COURT:  So what was the nature of your
25  tactical unit, if it's -- if it's -- yeah.  When you

1078

1  were the colonel.

2          THE WITNESS:  We would have to perform cell

3  extractions if they did not have enough people to do

4  that, then we would go do that for them.

5          THE COURT:  And in your duties as the

6  colonel for field operations, you did not have

7  familiarity with the policies and procedure that were

8  in effective on what was called extended lock-down at

9  that time?

10          THE WITNESS:  I mean, I had no effect over

11  that.  That was out of my area.

12          THE COURT:  Okay.  All right.

13          All right, Miss Douglas.

14  BY MS. DOUGLAS:

15  Q    Is there a policy at David Wade governing the

16  use of force?

17  A.   Yes, ma'am.

18  Q.   And are you familiar with that policy?

19  A.   Yes, ma'am.

20  Q.   I would like to show you a document that has been

21  previously labeled as J-1.

22          MS. DOUGLAS:  Which is still J-1 in your

23  binders, Your Honor.

24  BY MS. DOUGLAS:

25  Q.   Do you recognize this document, sir?

1    A.    Yes, ma'am.

2    Q.    What is this document, sir?

3    A.    It is a force policy.

4    Q.    And you were responsible for understanding the

5    guidelines that are in this document, correct?

6    A.    Yes, ma'am.

7              MS. DOUGLAS:  Your Honor, I would like to

8    offer what has been previously marked as Exhibit J-1,

9    Employee Policy Memorandum policy number 21-005, use

10   of force.

11             THE COURT:  It is admitted.

12   BY MS. DOUGLAS:

13   Q.    Assistant Warden Baird, you're responsible for

14   making sure that the people who you supervise follow

15   these guidelines when there is a use of force,

16   correct?

17   A.    Yes, ma'am.

18   Q.    And you provided the training on uses of force at

19   the annual training in February of 2019, correct?

20   A.    Yes, ma'am.

21   Q.    The security team at David Wade also uses

22   chemical agents on prisoners, correct?

23   A.    That is true.

24   Q.    And this policy that we're looking at right now

25   is the policy that governs the use of chemical agents,

1080

1  correct?

2  A.    Yes, ma'am.

3  Q.    And you yourself have been trained in the use of

4  force, correct?

5  A.    Yes, ma'am.

6  Q.    And at that training you were trained on when to

7  use chemical agents, correct?

8  A.    Yes, ma'am.

9  Q.    And you were trained on how to use chemical

10  agents, right?

11  A.    Right.

12  Q.    And you were trained on the effects of chemical

13  agents at that training, too, right?

14  A.    Yes, ma'am.

15  Q.    And as part of training on chemical agents, part

16  of that training was to experience the chemical agent

17  yourself, right?

18  A.    Exactly.

19  Q.    The two chemical agents that are used at David

20  Wade are Bantum and, I'm going to mess up the

21  pronunciation, Sabre Red?

22  A.    That correct, yes.

23  Q.    There is not much difference in the efficacy of

24  those two different chemicals agents, correct?

25  A.    No, ma'am.

1081

1    Q.    David Wade also uses capture shields, right?

2    A.    Yes, ma'am.

3    Q.    And a capture shield is a Plexiglas shield that

4    covers from about the shoulder to the hips of the

5    person holding it; is that right?

6    A.    Could be just a little bit longer than that.

7    Q.    Okay.

8    A.    I'm not too sure.

9    Q.    Below a person's hips, not necessarily to their

10   knees; is that correct?

11   A.    Somewhere in between there, yes.

12   Q.    Right.  And there are two different types of

13   capture shields, correct, one electronic and one not,

14   right?

15   A.    Right.

16   Q.    And the electronic one is the only one that David

17   Wade had during the time period we're talking about

18   which is prior to March of 2020?

19   A.    Yes, ma'am.

20   Q.    And the electronic one delivers a shock, right?

21   A.    Not really -- I don't know, I probably wouldn't

22   say it's a shock, maybe a shock, but it's a muscular

23   disruption.

24   Q.    Okay.  And when you were trained on the

25   electronic capture shield, did you also experience the

1  effects of the electronic capture shield?

2  A.   Yes, ma'am.

3  Q.   All of the chemical agents are kept in the

4  armory; is that correct?

5  A.   Our -- our mass supply is, yes.  Our armory

6  distributes that, from the armory.

7          So if somebody on the south compound needs a

8  chemical agent, say like the captain ran out, then we

9  would supply those individuals.

10  Q.   Okay.  And so on the south compound chemical

11  agents are kept in a foot locker in a room on N-4,

12  right?

13  A.   Stored in the foot locker, yes, ma'am, and

14  inventoried every day.

15  Q.   And there is a log completed by staff when they

16  remove a can of chemical agent, right?

17  A.   Yes, ma'am.

18  Q.   And part of completing that log is weighing that,

19  right?

20  A.   You weigh it at the beginning of shift, end of

21  shift, and after each use.

22  Q.   Thank you.  So let's talk about a planned use of

23  force.  A planned use of force is one that is used in

24  a nonemergency situation, right?

25  A.   Yes, ma'am.

1  Q.   With a planned use of force the officer is
2  supposed to give the prisoner two orders to do what he
3  is asking, first, correct?
4  A.   Yes, ma'am.
5  Q.   And then the officer is supposed to notify the
6  captain?
7  A.   Right.
8  Q.   And the captain is supposed to come and give the
9  prisoner an order, right?
10  A.   Yes, ma'am.
11  Q.   And then the captain is supposed to notify the
12  major if the prisoner has not complied yet?
13  A.   Yes, ma'am.
14  Q.   Then the major is supposed to come and give the
15  order and tell the prisoner that if they don't obey
16  the order the officer will use chemical agents, right?
17  A.   Well, that is the policy, yes, ma'am, but
18  officers give more than that number of commands, more
19  than that number of opportunities for that offender to
20  desist his activity.
21  Q.   How many more, sir?
22  A.   As many as they -- I mean, the use of force
23  chemical agent is the -- is the last, it is the most
24  minimal amount of force we can use to control a
25  situation, to remove an inmate from a cell.  Not

1084

1  everybody just wants to come and spray somebody.  But

2  they are given several opportunities and several

3  commands to stop doing what they are doing or come to

4  the bars to be restrained.  And they don't just follow

5  four orders.  This -- I teach people to be

6  transparent.  Be loud and verbal, so, you know, when

7  we are recording that people can look at that and say

8  that guy had several chances and opportunities to stop

9  doing what he was doing and follow commands.

10             Just because it says four, I promise you,

11  there are more than four given.

12  Q.   So any more than four given is at the discretion

13  of the security officers, correct?

14  A.   If there is more than four given that is at the

15  discretion of the security officer?

16  Q.   I am saying, I am asking if -- if there is more

17  than four given, as you just told me about, that any

18  more over four is at the discretion of the security

19  officers, they choose how many more; is that right?

20  A.   I would give as many as I -- I would want to give

21  to not have to do what I have to do.  To not do that.

22             THE COURT:  All right, Mr. Baird, the

23  question is, there is minimum of four.  But if they

24  give more than that, that is at their own discretion.

25             THE WITNESS:  Yes, ma'am.

```
 1              THE COURT:  That's the answer.  Okay.
 2   BY MS. DOUGLAS:
 3   Q.   Okay.  So after all of the things we just
 4   discussed happen, the officers are allowed to use
 5   chemical agents, correct?
 6   A.   Yes, ma'am.
 7   Q.   And the officers are supposed to record on body
 8   cameras the entire incident, correct?
 9   A.   Yes, ma'am.
10   Q.   And the only time that it is appropriate to use
11   chemical agents on a person who is trying self-harm is
12   when they are using a weapon, right?
13   A.   They're trying to harm themself yes, ma'am.  I
14   mean you're not going to stand there and let them keep
15   trying to kill theirself or cut his wrist.
16   Q.   And if a person has tied a sheet around their
17   neck in an attempt to kill themselves, this is not
18   considered a weapon; is that correct?
19   A.   No, ma'am.  No, ma'am, I wouldn't spray somebody
20   for doing that, no, ma'am.
21              THE COURT:  It's not -- the question's
22   not -- and the question is not what you would do.  But
23   what is the policy of the --
24              THE WITNESS:  Yes, ma'am.  We would not do
25   that.
```

1086

BY MS. DOUGLAS:

Q.   So that is not considered a weapon, that is what
you just said, correct?

A.   Right.

Q.   The only ranks that are trained to use chemical
agents are lieutenants, captains, majors, lieutenant
colonels, and colonels, correct?

A.   Yes, ma'am.

            MS. DOUGLAS:  Your Honor, may I take a very
brief break to consult my notes?

            THE COURT:  Are you saying that you're
almost finished?

            MS. DOUGLAS:  Yes, Your Honor.

            THE COURT:  Okay.  Well, then, in that event
you may.

            MS. DOUGLAS:  Thank you, Your Honor.

            (Recess taken)

            MS. DOUGLAS:  We're back, Your Honor.

            THE COURT:  All right.

            MS. DOUGLAS:  And, Your Honor, we tender
this witness for cross-examination.

            THE COURT:  Okay.  At this time, then, are
you going to take this witness, sir, or are you going
to defer to your case in chief?

            MR. FERNANDEZ:  Your Honor, I can take him

1  now.  I think I can finish reasonably quickly.

2          THE COURT:  All right.  If you take him now,

3  then you're precluded from calling him again.  Do you

4  understand?

5          MR. FERNANDEZ:  Your Honor, I understand

6  that.  Thank you.

7          THE COURT:  Okay.  All right, Mr. Fernandez,

8  it's twenty to six.  My goal would be to be out of

9  here by six.  You think that is a possibility?

10          MR. FERNANDEZ:  Yes, ma'am, I do.

11          THE COURT:  Okay, Mr. Fernandez, good.  Go.

12                  DIRECT EXAMINATION

13  BY MR. FERNANDEZ:

14  Q.   Good afternoon, Warden Baird, thank you for

15  staying with us here.

16          What were your duties as the field colonel?

17  A.   Overseeing all outside field crews and field

18  teams; K9s, tac team, trustees crews.

19  Q.   Okay.  You were not in charge of classification

20  as a field colonel, were you?

21  A.   No, sir.

22  Q.   Did you sit on the south compound's disciplinary

23  board as a field colonel?

24  A.   I believe I did, yes, sir.

25  Q.   Okay.  Did you sit on the north compound's

1  disciplinary board?

2  A.   No, sir.

3  Q.   When -- when would you sit on the south

4  compound's disciplinary board?

5  A.   Well, we had a rotational -- weekly rotation of

6  who did DB court that week.

7  Q.   Okay.  Who was your members?

8  A.   Oh, man, back then?  Wow.  I don't remember who

9  it was back then.

10  Q.   But it was you and one other person; is that

11  fair?

12  A.   Yes, sir.

13  Q.   Was it someone from classification?

14  A.   It was somebody from nonsecurity.

15  Q.   Okay.  Were you ever in charge of changing

16  someone's custody status from disciplinary segregation

17  to preventative segregation when you were the field

18  colonel?

19  A.   No, sir.

20  Q.   Were you in charge of changing that

21  classification as the warden over security?

22  A.   No, sir.

23  Q.   Were you in charge of doing that as the warden

24  chief of operations?

25  A.   No, sir.

1  Q.   Okay.  There is a warden over classification, is

2  there not?

3  A.   Yes, sir.

4  Q.   And who was that as of March of 2020?

5  A.   Wow.  Warden Sherman has it now.  I -- or, yeah,

6  I don't know -- prior to her was Warden Huff?

7  Q.   Okay.

8  A.   I could be incorrect in that but I believe it was

9  Warden Huff before Sherman.

10 Q.   I think that is succession is correct.

11           Were you in charge of, when you were a field

12 colonel, of training people on use of force?

13 A.   Yes, sir.

14 Q.   Did you train your people on when they could use

15 force in a -- in a time where life was at risk?

16 A.   Yes, sir.

17 Q.   What are they trained to do if someone's life is

18 at risk, what kind of force are they allowed to use?

19 A.   Depending on what environment, what setting are

20 you talking about?

21 Q.   Okay, let's talk about in the segregated housing

22 units.

23 A.   Okay.  So just like we discussed earlier, if

24 someone trying to commit suicide and they had a razor

25 blade, I wouldn't open the cell and go in because they

1  have a weapon.  I have to do something before that, I

2  have to use the minimum amount of force possible to

3  make the offender drop the razor, or whatever he had

4  that might be sharp and cutting himself because it

5  could be a ploy to get me come in the cell, and then

6  cut me.

7  Q.   Okay.  When you were the chief of security, what

8  were your duties then?

9  A.   Monitor the safe and secure functions of the

10 institution; make sure policy and procedure was

11 followed; duty officer, DB court chairman; 24-hour on

12 call for the institution, 24-hour on call for tac

13 team, chase team, firearms instructor.

14           THE COURT:  I am so confused.  When were you

15 chief of security, Mr. Baird?

16           THE WITNESS:  For three months, ma'am.

17           THE COURT:  Oh, that is that three-month

18 period.  Okay.  And that is when you were the

19 assistant warden versus now you are the deputy warden.

20           THE WITNESS:  Yes, ma'am.

21           THE COURT:  Versus being the field colonel.

22 I got it.  Okay.

23 BY MR. FERNANDEZ:

24 Q.   And when you were the cheer of security, warden

25 over security, who was in charge of the segregated

1091

1    housing units at that time?

2    A.    Colonel Mays.

3    Q.    Okay.  And he would report to you?

4    A.    Yes, sir.

5    Q.    And I think you testified about this when you

6    were called on cross earlier.  You would review what

7    Colonel Mays would do in terms of his review; is that

8    right?

9    A.    Yes, sir.

10   Q.    Okay, so what are you looking for when Colonel

11   Mays submits paperwork to you?

12   A.    To make sure his paperwork is correct, policy and

13   procedure was followed, it's accurate, clear, and

14   precise, and anyone who reads it can understand it.

15   Q.    And what if an investigation needs to be done

16   based on the paperwork, who handled investigations at

17   the facility at the time you were the warden over

18   security?

19   A.    There is an investigator on the north compound

20   and one on the south compound.

21   Q.    Okay, and who was it over the segregated housing

22   unit at that time?

23   A.    Colonel Coleman.

24   Q.    Okay.  And so would it be fair to say if you

25   needed something investigated based on your paperwork

1092

1  review, that would go to Colonel Coleman to do?

2  A.   Yes, sir.

3  Q.   Okay.

4         THE COURT:  All right, but the question,

5  Mr. Baird, did you refer them to Colonel Coleman or

6  did he do that based on an independent review?

7         THE WITNESS:  I would refer it or Colonel

8  Mays could refer it to him.  Either one.

9  BY MR. FERNANDEZ:

10  Q.   What about Warden Goodwin, could he refer

11  it?

12  A.   Absolutely.

13  Q.   What about Other warden level staff, could they

14  refer incidents?

15  A.   Yes, sir.

16         MR. FERNANDEZ:  That is all of the questions

17  I have.  Thank you.

18         THE COURT:  All right.  Miss Douglas?

19         MS. DOUGLAS:  Very briefly.

20                RECROSS-EXAMINATION

21  BY MS. DOUGLAS:

22  Q.   So you just told Mr. Fernandez that as the chief

23  of security one of your main job duties was to make

24  sure that policy and procedure were followed.  You

25  would need to be familiar with the policies governing

1093

```
 1  the south compound to properly do that job, correct?
 2  A.   Yes, ma'am.
 3  Q.   And you would need to be familiar with the
 4  policies governing the south compound to properly
 5  supervise Colonel Mays, correct?
 6  A.   Can I -- yes, ma'am, but can I add a little to
 7  that?  Just because I can't --
 8            THE COURT:  Yes, sir.
 9            THE WITNESS:  Ma'am?
10            THE COURT:  Yes, sir.  Yes, sir, you may
11  explain your answer.
12            THE WITNESS:  Just because I can't quote the
13  policy does not mean I can't go and refer to the
14  policy and read it, because that is what it is there
15  for.  I don't have a spectacular memory.  If I need to
16  know something, I need to check something, I can
17  always refer become to my policy and department
18  regulations.
19            THE COURT:  But you said you were not
20  familiar with the -- with the lock-down policy at all?
21            THE WITNESS:  I don't --
22            THE COURT:  The one in effect.
23            THE WITNESS:  Well, she asked about the
24  extended lock-down policy that was way before what
25  we're doing now.
```

1    THE COURT:  Okay.  All right.

2    Miss Douglas?

3    MS. DOUGLAS:  That's all from us.  Thank

4  you, Your Honor.

5    THE WITNESS:  Can I -- can I say something,

6  Judge, before we get off?  Am I permitted to do that?

7    THE COURT:  All right, Mr. Baird, I am going

8  to let you do that, only because this is a judge

9  trial.

10    THE WITNESS:  Well, I just want to say that,

11  you know, I stand behind this facility 100 percent.  I

12  back the people that work here.  We run a safe and

13  secure environment for people to come and work here,

14  and if nobody's been watching the news, it is hard to

15  get employees.  This career field is an essential,

16  essential job, because during the pandemic we can't

17  shut down, we have to still function.  I got people

18  working numerous days of overtime, I am working, other

19  wardens are coming to work corporals are doing the

20  work.  We run the -- I promise you, Judge, attorneys,

21  whoever is listening; this is the most safest,

22  securest in the state of Louisiana.  And I say that

23  with a hundred percent of my heart.

24    And that's I got, Judge.

25    THE COURT:  Thank you, Mr. Baird.

1095

```
1              All right, is there anything further,
2    Mr. Fernandez?
3              MR. FERNANDEZ:  No, Your Honor.
4              Thank you, Warden Baird, for your time
5    today.
6              THE WITNESS:  Yes, sir, thank you.
7              THE COURT:  Very good.  Very good.  All
8    right.  And this witness, then, is released.  We would
9    ask you, however, not to talk about the content of
10   your -- of examination with anyone until this matter
11   is over.  And that includes any of your supervisors or
12   any of the people that work for you.
13             THE WITNESS:  Yes, ma'am.
14             THE COURT:  And we would ask you not to do
15   that until this matter is over.
16             All right, everyone.  We then -- in just a
17   second I am going to adjourn us until Tuesday morning
18   at 9 a.m.
19             Miss Douglas, do you know what you are going
20   to be ready to go with at that time?
21             MS. DOUGLAS:  Your Honor, Plaintiffs will
22   begin with the testimony of Dr. Seal on Tuesday
23   morning and then move to the testimony of Dr. Burns.
24             THE COURT:  All right, and that has all been
25   arranged with -- with defendants' counsel to have
```

 1  Dr. Seal ready and able?

 2          Mr. Archey's saying yes.

 3          MS. DOUGLAS:  We notified -- we notified

 4  them, yes, Your Honor.

 5          THE COURT:  All right.  Very good.  And

 6  where is Dr. Burns located?

 7          MS. DOUGLAS:  Dr. Burns is in Ohio, Your

 8  Honor.  She'll be Zooming in.

 9          THE COURT:  All right.  Very good.  All

10  right, everyone.  Don't forget to agree upon the

11  exhibits.  We had a large number of them today.  Don't

12  forget to do that.  Defendants are going to look at

13  the designations on the depositions to see how many

14  minutes would be allocated to each side from their --

15  from their -- their total.  So that should give us a

16  little more time.

17          Yes, sir.  Mr. -- Mr. -- I wouldn't want you

18  to think I was tired.  Mr. Robert.

19          MR. ROBERT:  Your Honor, I just wanted to

20  note that we did get confirmation from FedEx that the

21  new joint exhibit book was delivered at 10:59 a.m.

22  this morning.  So if you have not received it yet

23  FedEx says that you got it, it must be somewhere in

24  the building.

25          THE COURT:  All right.  It maybe well in the

1  mail room, although we had alerted the mail room to

2  let us know immediately.  But we have -- I have not

3  seen it.  It was all right, the -- the attorney who

4  was handling that portion, including Miss Douglas, was

5  facile enough with the two numbers that it assisted

6  the Court.  So it did not -- it was no -- no harm to

7  the Court's understanding and being able to follow a

8  along today with the testimony.

9             MS. KEIFER:  And, Judge, I know that Amy

10  went to the mail room at least twice.  So other than

11  that I don't know.

12             MR. ROBERT:  All I can tell you is what

13  FedEx is reporting.  You now, I can send it again, if

14  that becomes necessary, I mean we're happy to do it.

15             THE COURT:  We'll see -- we'll see what

16  happens.  We'll see what happens.  But we did send the

17  deputy clerk of court to the mail room, so.

18             MR. ARCHEY:  Your Honor, would it possible

19  to get a time check from Miss Keifer before we

20  adjourn?

21             THE COURT:  Yes.  And you can always just

22  e-mail her on that, on that as well.  You know, she is

23  very available, she has to do her math, we won't keep

24  everyone any longer to do that.  But you can just

25  e-mail her or she can e-mail you all with the amount

1098

1    of time.  And if you let me know, Miss Keifer, how

2    many hours of testimony we got in today total, just

3    the total daily for both sides.

4            All right?

5            All right, if nothing else, then, we are

6    adjourned until Tuesday morning.  Thank you very much.

7            (Court adjourned for the evening.)

8                        - - - - -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL REPORTER

2

3

4        I, JODI D. TERRY, RPR, Federal Official Court

5    Reporter, in and for the United States District Court

6    for the Western District of Louisiana, DO HEREBY

7    CERTIFY that pursuant to Section 753, Title 28, United

8    States Code, that the foregoing is a true and correct

9    transcript of the stenographically reported

10   proceedings held in the above-entitled matter and that

11   the transcript page format is in conformance with the

12   regulations of the Judicial Conference of the United

13   States.

14

15

16

17                    /s/ Jodi D. Terry

18                JODI D. TERRY, RPR,
                  Official U.S. Court Reporter
19

20

21

22

23

24

25