UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself | * | CIVIL ACTION NO.: |
| and all other similarly situated offenders | * | 5:18-CV-00541-EEF-MLH |
| at David Wade Correctional Center, | * | |
| | * | JUDGE ELIZABETH E. FOOTE |
| | * | |
| and | * | |
| | * | |
| The ADVOCACY CENTER, | * | |
| | * | USMJ MARK L. HORNSBY |
| PLAINTIFFS, | * | |
| | * | |
| VS. | * | CLASS ACTION |
| | * | |
| JAMES M. LEBLANC, *et al.*, | * | |
| | * | |
| DEFENDANTS. | * | |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

NOW INTO COURT, through undersigned counsel, come Defendants, the Louisiana Department of Public Safety and Corrections; James M. Leblanc, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; Jerry Goodwin, in his official capacity as Warden of David Wade Correctional Center; Deborah Dauzat, in her official capacity as Assistant Warden of David Wade Correctional Center; and Lonnie Nail, Dr. Gregory Seal, Steve Hayden, Aerial Robinson, and Johnie Adkins (all in their official capacities as employees of the David Wade Correctional Center) (collectively the "Defendants"), who respectfully submit Proposed Findings of Fact and Conclusions of Law as follows:

**INDEX**

I.      Nature of the Action

II.     Parties

III.    Defendants' Proposed Findings of Fact re: Alleged Violation of the Eighth Amendment

        A.     Description of DWCC facilities at issue in this case
        B.     Use of restrictive housing in general
        C.     Use of restrictive housing at DWCC
        D.     Mental health screening and intake
        E.     Mental health staff at DWCC
        F.     Mental health care and treatment provided to offenders in restrictive housing at DWCC
        G.     Medication management at DWCC
        H.     Mental health observation and suicide watch
        I.     Use of force at DWCC
        J.     Offenders engage in manipulation or secondary gain
        K.     There is no credible evidence that offenders deteriorate or decompensate while in restrictive housing
        L.     Restrictive housing does not present an objectively intolerable risk of harm
        M.     Plaintiffs' evidence did not prove their case
        N.     Defendants were not subjectively indifferent to the offenders' serious mental health needs

IV.     Defendants' Proposed Conclusions of Law re: Eighth Amendment - Defendants are not deliberately indifferent to South Compound Offenders' serious mental health needs and have not violated the Eighth Amendment

V.      Defendants' Proposed Findings of Fact re: ADA

VI.     Defendants' Proposed Conclusions of Law re: ADA

VII.    Defendants' Proposed Findings of Fact re: First Amendment

VIII.   Defendants' Proposed Conclusion of Law re: First Amendment

IX.     Conclusion

## I.  <u>NATURE OF THE ACTION</u>

1.      This is a class action brought by Plaintiffs under 42 U.S.C. §1983, for violations of the First and Eighth Amendments to the United States Constitution on behalf of all offenders currently held, or who will in the future be held, in extended lockdown at DWCC in the N1, N2, N3, and N4 buildings. This action also includes claims by Plaintiffs pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*.; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.

## II.  <u>PARTIES</u>

2.      Plaintiffs in this action are Disability Rights Louisiana f/k/a the Advocacy Center, a private, federally-funded, non-profit corporation. Plaintiffs' class representatives include Bruce Charles, Carlton Turner, Larry Jones and Ronald Brooks, all offenders in extended lockdown at David Wade Correctional Center ("DWCC") at the time of filing.

3.      Defendants are James LeBlanc in his official capacity as the Secretary of the Louisiana Department of Public Safety and Corrections; Jerry Goodwin in his official capacity as the Warden over DWCC;  Vincent Coleman in his official capacity as a Colonel overseeing the South Compound at DWCC[1]; Doctor Gregory Seal, M.D. in his official capacity as a contract psychiatrist at DWCC; Assistant Warden Deborah Dauzat in her official capacity as the Deputy Warden at DWCC; Steve Hayden in his official capacity as a Corrections Program Manager at DWCC;  Aerial Robinson in her official capacity as a Social Services Counselor at DWCC; Johnie Adkins in his capacity as a Social Services Counselor at DWCC; and the Louisiana Department of Public Safety and Corrections ("DPS&C") pursuant to the ADA and Section 504 of the Rehabilitation Act only.

---

[1] Colonel Coleman was substituted during trial as the current office holder in an official capacity suit.

### III.  PROPOSED FINDINGS OF FACT RE: EIGHTH AMENDMENT

### Defendants are not deliberately indifferent to South Compound Offenders' serious mental health needs and have not violated the Eighth Amendment as a matter of fact.

#### A.  Description of DWCC facilities at issue in this case

4.      DWCC is a maximum custody facility accredited by the American Correctional Association ("ACA"). (R. Doc. 524, Stipulation ¶ 26; Exs. D-42 - proffer, D-43)

5.      DWCC is fully Prison Rape Elimination Act ("PREA") compliant. (Upchurch Tr. at 3213)

6.      DWCC is divided into two compounds: The North Compound and the South Compound. Five buildings, N1 through N5, comprise the South Compound, although only buildings N1-N4 are at issue for this case. (R. Doc. 524, Stipulation ¶ 28)

7.      Each restrictive housing building has four linear tiers, A, B, C, and D. The tiers each have 16 cells. (R. Doc. 524, Stipulation ¶ 29)

8.      Of the 16 cells on each tier in N-2 through N-4, the first two cells are camera cells for offenders who are on suicide watch. There is a camera in each of those cells, as well as in all cells on the N4 C tier. (R. Doc. 524, Stipulation ¶ 30)

9.      These cells may be used as double-man cells, except for cells reserved for camera observation on each tier, and except for all cells in the N-4 building, which are designated as single-person cells. (R. Doc. 524, Stipulation ¶ 31)

10.     Offenders housed in tiers A, B, and C of N2 and in buildings N3-N4 are classified as maximum custody.  (R. Doc. 524, Stipulation ¶ 32; Goodwin Tr. at 4218-4219)

11.     Offenders housed in N2D tier are closed cell restriction ("CCR"). (R. Doc. 524, Stipulation ¶ 33; Goodwin Tr. at 4213)

12.     Offenders housed in N1 are classified as medium custody. (R. Doc. 524, Stipulation ¶ 34; Goodwin Tr. at 4206)

13.     DWCC is a clean, well-run, and organized prison. (Upchurch Tr. at 3224-3227)

14.     DWCC operates its own water supply that is inspected and regulated by the Department of Health and Hospitals. (Goodwin Tr. at 4236-4237)

15.     The DWCC water system provides water to the entire prison, including administration buildings, as well as to persons who live on the property outside of the actual prison. (Goodwin Tr. at 4241-4242)

16.     On November 26, 2019, the Department of Health reported that there was no deficiency in the sanitation of the water and no bacteria in its sample. (Goodwin Tr. at 4240; Ex. D-44)

B.  **Use of restrictive housing in general**

17.     Restrictive housing is primarily used to house offenders who have committed violent offenses or offenses which jeopardize the stability of the facility. (Upchurch Tr. at 3201-3205; Goodwin Tr. at 4220-4221; Smith Tr. at 2543-2544)

18.     The use of restrictive housing is a necessary and appropriate prison practice to ensure the safety of the public, staff, and other offenders. (Upchurch Tr. at 3261; Burns Tr. at 1454; Haney Tr. at 3015; Pacholke Tr. at 2787, 2789)

19.     Restrictive housing is a disciplinary procedure used to control aberrant behavior by offenders. (Upchurch Tr. at 3201; Pacholke Tr. at 2787)

20.     Restrictive housing is necessary because there must be a way to separate offenders who represent a risk of harm to other offenders, to the institution or to the staff.  (Burns Tr. at 1454; Haney Tr. at 3016; Pacholke Tr. at 2790)  Offenders who cannot conform to the prison rules

5

and expectations end up in restrictive housing—a kind of a prison within a prison.  (Burns Tr. at 1454; Upchurch Tr. at 3201-3204; Smith Tr. at 2543-2544)  Some offenders who represent a risk to general population such as gang members need to be in restrictive housing.  (Burns Tr. at 1456)  Some offenders' dangerous behavior necessitates the usage of confinement in a cell. (Smith Tr. at 2542-2543)

21.     The use of restrictive housing benefits the general population of a prison. (Upchurch Tr. at 3208)  If a prison system refuses to appropriately use restrictive housing to segregate dangerous offenders, the prison system subjects the offenders to predation and violence. (Upchurch Tr. at 3207-3208.)  Failure to segregate offenders appropriately in a prison system poses a risk of serious harm to general population offenders. (Upchurch Tr. at 3208-3212)

22.     Prisons throughout the country utilize restrictive housing. (Burns Tr. at 1454; Haney Tr. at 3015-3016)  Plaintiffs' own experts confirmed this fact.  Dr. Burns testified that every prison system in the country uses restrictive housing, and Dr. Haney testified that 98% of the prisons in the country use restrictive housing. (Burns Tr. at 1454; Haney Tr. at 3015-3016)

23.     Prior to this litigation, DPS&C voluntarily agreed in good faith to participate in a program offered by the Vera Institute to reduce reliance on restrictive housing. (Sec. Le Blanc Tr. at 2574; Chief Smith at 2495-2499 and 2540)

24.     In 2017, the percentage of offenders held in restrictive housing by DPS&C was 19.0%, the highest in the country.  (Haney Tr. at 3048-3049)

25.     Since 2016, DPS&C closed Camp J at Louisiana State Penitentiary ("LSP"). (Thompson Tr. at 4066-4067)  In fact, the percentage of offenders held in restrictive housing by

DPS&C decreased from 19.0% in 2017, the highest in the nation, to 4.8% in 2019, below the national average of 5%, 11th in the country.  (Haney Tr. at 3048-3049)

26.     DPS&C has reduced its reliance on restrictive housing. DPS&C's use of restrictive housing is now consistent with other prison systems throughout the country.

27.     Secretary Le Blanc continues in good faith to work to improve Louisiana's prison system while maintaining public safety through DPS&C. (Sec. Le Blanc Tr. at 2574; Smith Tr. at 2536-2542)

**C.  Use of restrictive housing at DWCC**

28.     The area of DWCC that is at issue in this case is the South Compound, which is comprised of four buildings designated as N1 through N4. (Goodwin Tr. at 4206)

29.     N1 is not a restrictive housing unit. (Upchurch Tr. at 3230; Burns Tr. at 1471-1472; Goodwin Tr. at 4206-4207; Nail Tr. at 3114)

30.     Offenders assigned to restrictive housing and/or maximum custody due to disciplinary issues are housed only in N2 A, B, and C tiers, and N3-N4. (R. Doc. 524, Stipulation ¶ 32; Nail Tr. at 3113-3114)

31.     DWCC primarily uses three types of restrictive housing: 1) investigative segregation; 2) disciplinary segregation; and 3) preventative segregation. (Goodwin Tr. at 4223-4224 & 4392)

32.     Offenders found guilty of major rules violations can be assigned to a restrictive housing status known as "disciplinary segregation." (Ex. D-2)

33.     A disciplinary matrix provides the range of sentences for offenders found guilty of rules violations. (Ex. D-2)

34.     After serving time in disciplinary segregation, if an offender's "continued presence in general population is a danger to the good order and discipline of the institution and/or whose presence poses a danger to himself, other offenders, staff and the general public," he may be assigned to "preventative segregation" until the offender modifies his behavior. (Ex. P-JJJ-42 at 4; Goodwin Tr. at 4409)

35.     The key to progressing out of a restrictive housing status is demonstrating that the offender is less of a threat to other offenders, the staff, and the public. (Upchurch Tr. at 3212; Goodwin Tr. at 4409)

36.     The duration of each offenders' stay in the South Compound is highly variable and depends on the nature of the disciplinary issue and/or the overall risk the offender presents to offenders housed in the general population, staff, and the public. (Goodwin Tr. at 4303-4304, 4409)

37.     Offenders regularly progress from restrictive housing on the South Compound to the general population housing on the North Compound at DWCC. (Burns Tr. at 1471; Haney Tr. at 3025)

38.     There is no evidence that DWCC is keeping offenders in restrictive housing for too long a period of time. Dr. Burns said nothing in her report and testified that she did not independently assess whether DWCC was keeping offenders in restrictive housing for too long a period of time.  (Burns Tr. at 1457-1458)  Similarly, Dr. Haney did not address whether Louisiana is keeping offenders on restrictive housing for too long a period of time.  (Haney Tr. at 3025-3027)

39.     Notwithstanding transfers from other prisons in the state, such as due to closure of Camp J at LSP, the number of offenders in maximum custody on the South Compound at DWCC has been reduced from 344 as of January of 2017 to 228 as of March of 2020. (Ex. J-21 at1-2, 9)

8

40.     An offender in preventative segregation is reviewed at least every 90-days by a multi-disciplinary review board. (Goodwin Tr. 4304, 4412)

41.     Offenders in restrictive housing have access to non-contact visitation by loved ones. (Goodwin Tr. 4313)

42.     The Plaintiffs have not offered any evidence that an offender in restrictive housing has been denied visitation because of his classification, a lack of space, being on a suicide watch, or a backlog of any sort.

43.     Offenders in restrictive housing are allowed outside for fifty minutes per day Monday through Friday. (R. Doc. 524, Stipulation ¶ 35)

44.     Offenders in disciplinary and preventative segregation are allowed at least one ten-minute phone call per month plus attorney phone calls. (R. Doc. 524, Stipulation ¶ 37)

45.     Offenders in restrictive housing are allowed three books as well as additional religious and educational materials. (R. Doc. 524, Stipulation ¶ 38; Ex. P-JJJ-13; Turner Tr. at 51)

46.     Offenders in N1 and N2D are allowed access to televisions and radios. (R. Doc. 524, Stipulation ¶¶ 38 & 40)

47.     Offenders are not permitted access to radios or other music or sound producing devices on the tiers in the N2 A, B, and C, N3, or N4 buildings. (R. Doc. 524, Stipulation ¶ 42)

48.     Cells in restrictive housing are open front cells that face concrete walls and windows which open to the outdoors. (R. Doc. 524, Stipulation ¶ 43.)

49.     Offenders on N1 are allowed to use the yard for recreation, are provided a phone call on a weekly basis, and eat in a cafeteria setting out of their cells. (R. Doc. 524, Stipulation ¶ 45)  Offenders on N1 have two hours of recreation out of their cells.  (Goodwin Tr. at 4207-4208)

50.     A typical day for an offender in restrictive housing is approximately as follows in

part:

    a.  0500-0515 sick call slips
    b.  0600 Pill call
    c.  0600 Breakfast is delivered
    d.  1030 Lunch is delivered
    e.  1115 major count/Begin Feeding/Pill call
    f.  Afternoon recreation time
    g.  1600 Major count
    h.  1600 Pill call
    i.  1700 Dinner
    j.  1800 Shift change
    k.  Shower
    l.  2230 Lights out

(R. Doc. 524, Stipulation ¶ 46)

51.     Offenders are not isolated in restricted housing.  Cells in restrictive housing are

open front cells that face concrete walls and windows which open to the outdoors.  (Burns Tr. at

1467-1468)  Offenders talk to offenders in the cell next to them and to the offenders behind them

(through the pipe chase).  (Thompson Tr. at 4035-4037; Upchurch Tr. 3235-3237; Burns Tr. at

1468) Brumfield testified that he could see offenders adjacent to him and see down the tier.  He

further testified that he could pretty much hear everything going on in the tier, including others'

conversations.  (Brumfield Tr. at 155)

52.     Offenders have regular and constant contact with others.  They can and do speak to

other offenders in adjacent cells in conversational tones. (Upchurch Tr. at 3236; Thompson Tr. at

4035-4037)  They recreate in chain link enclosed recreation areas where they can converse with

other offenders in the adjacent/nearby enclosures.  (Thompson Tr. at 4036)  Thirty-minute security

checks are required by security staff in N1-N4.  Managers and supervisors visit the tiers on a

regular basis.  Offenders are also permitted to interact with staff if they wish during their presence

on the tiers.  In addition to all of the routine items listed above, there is clothing exchange, mail

call, and library book exchange.  Haircuts and shaves are available in the common area on a regular basis. (Burns Tr. at 1469-1470)  Offenders have call outs for medical, dental, vision, and mental health care.  Inmate counsel substitute visit weekly.  Weekend non-contact visitation is available. Offenders are given one phone call per month, and calls to attorneys are not limited in number or duration. (Burns Tr. at 1468-1471)

53.     Many offenders are double bunked, and DWCC screens the offenders for compatibility when selecting cellmates.  (Thompson Tr. at 4146; Burns Tr. at 1471; Goodwin Tr. at 4213, 4216, 4220-4221, 4363)

54.     Records show clear evidence that offenders interact with one another.  For example, Cody Doucet stated that "he was instructed to act out by fellow offenders in an attempt to be transferred to EHCC."  (Ex. D-71, p. 54)

55.     The evidence refutes any suggestion that the offenders are "isolated" or that the conditions are "solitary confinement."

56.     Showers are offered daily. Indeed, offenders are required to take a shower at least once every three days. (Thompson Tr. at 4036; Goodwin Tr. at 4215; Upchurch Tr. at 3551-3552; Ex. P-JJJ-13, p. 3.)

57.     Living in an open bay dorm in general population presents problems for offenders such as being preyed upon by other offenders, gang membership, and the like.  Because of the problems with living in general population, some offenders prefer being in restricted housing to general population.  (Upchurch Tr. at 3238-3239; Burns Tr. at 1466)

58.     Thirty-minute security checks are required by security staff in N1-N4; 15 minutes rounds are preferred.  (Goodwin Tr. at 4382-4383)

59.     Mental health staff make weekly rounds. (Hayden Tr. at 322-323)

60.     Managers and supervisors visit the tiers on a regular basis. (Goodwin Tr. at 4243; Nail Tr. at 3117)

61.     Calls to attorneys are not limited in number or duration. (Burns Tr. at 1470)

62.     Weekend non-contact visits are available. (Turner Tr. at 109-110; Hayden Tr. at 434; Burns Tr. at 1470)

63.     The classification review board reviews the custody status of each offender in maximum security at least every 90 days. (R. Doc. 524, Stipulation ¶ 84)

64.     DWCC has introduced numerous mitigation strategies in its restrictive housing units. (Upchurch Tr. at 3230-3231)

65.     DWCC does not take mattresses of offenders on disciplinary segregation. (Upchurch Tr. at 3231-3233)

66.     DWCC no longer uses the status of disciplinary detention/isolation. (Upchurch Tr. at 3231-3232)

67.     The Key Room Officer is responsible for documenting all movement in and out of the unit and on and off of the tiers. (Goodwin Tr. at 4378-4379; Nail Tr. at 3112-3113; Ex. P-JJJ-23 at 2)

**D.  Mental health screening and intake**

68.     DPS&C Health Care Policy No. HC-36 provides that a mental health screening and assessment should be completed upon intake into the DPS&C system.  (Ex. D-14 at 3)

69.     Offenders sentenced to the DPS&C are typically initially assessed at Elayn Hunt Correctional Center ("EHCC") at the Hunt Reception and Diagnostic Center ("HRDC") before being assigned to a specific DPS&C facility for housing. (R. Doc. 524, Stipulation ¶ 86; Hayden Tr. at 3555)

70.     The EHCC assessment is extensive and consists of personality testing, IQ testing, and interviews and results in a DSM-5 diagnosis of offenders with mental illness.  The findings are detailed in an Assessment & Intervention Report for each offender. (R. Doc. 524, Stipulation ¶ 89)

71.     EHCC conducts an extensive screening process that assigns a DSM-5 diagnosis, where appropriate, and a level of care designation for offenders. (R. Doc. 524, Stipulation ¶ 90)

72.     The assessment process at EHCC assigns offenders a mental health Level of Care designation as defined by EPM 03-02-003 III (B) of 5 (least severe indicating no mental illness) to 1 (the most severe indicating the need for a 24-hour medical and/or mental health presence). (R. Doc. 524, Stipulation ¶¶ 90 and 94)

73.     The Assessment & Intervention forms are current, generally less than 90 days old when an offender is transferred to DWCC.  (Dauzat Tr. at 3312-3313; Burns Tr. at 1474; Ex. D-7 at 2)  The following evidence confirms that the Assessment & Intervention forms are current:

| Offender | Date of A&I | Date of Intake |
|---|---|---|
| Dillon, Willie | 10/31/18 (Ex. D-61 at 43-46) 02/15/19 (Ex. D-61 at 52-55) [Amended A&I] | 03/04/19 (Ex. D-61 at 60) |
| Adams, Corey | 03/13/18 (Ex. D-64 at 87-90) | 04/23/18 (Ex. D-64 at 167) |
| McDowell, Joshua | 12/02/14 (Ex. D-65 at 13-17) | 12/22/14 (Ex. D-65 at 23) |
| Bonner, Gerald | 10/22/15 (Ex. D-73 at 10-13) | 11/02/15 (Ex. D-73 at 15) |
| Huber, Torre | 03/02/15 (Ex. D-74 at 11-14) | 03/30/15 (Ex. D-74 at 16) |

74.     If an offender is placed by DPS&C at DWCC after reception at EHCC, DWCC staff then perform an intra-system mental health screening on intake at DWCC. (R. Doc. 524, Stipulation ¶ 96; Burns Tr. at 1483)

75.     The DWCC intra-system mental health intake screening is designed to be a more limited assessment than that performed at the HRDC. (R. Doc. 524, Stipulation ¶ 97)

13

76.     The intra-system mental health screening at DWCC is typically performed by Steve Hayden. (R. Doc. 524, Stipulation ¶ 98; Hayden Tr. at 3557)  The mental health staff at DWCC talk with the mental health staff at EHCC if there are any specific concerns regarding an offender being transferred to DWCC.  (Hayden Tr. at 3556)  The intake screening is performed when offender arrives at DWCC, as soon as he gets off the bus.  (Hayden Tr. at 3557)

77.     The "intra-system" screening includes:

a.      Inquiry into whether the offender:
- Has a present suicidal ideation;
- Has a history of suicidal behavior;
- Is presently prescribed psychotropic medication;
- Has a current mental health complaint;
- Is being treated for mental health problems;
- Has a history of inpatient and/or outpatient psychiatric treatment;
- Has a history of treatment for substance use; and/or
- Has a detoxification need.

b.      Observation of:
- General behavior;
- General appearance;
- Evidence of abuse and/or trauma; and/or
- Current symptoms of psychosis, depression, anxiety and/or aggression.[2]

(Ex. J-5 at 1-2)

78.     Usually prior to the screening, the mental health staff person, usually Hayden, retrieves information on an offender being transferred to DWCC from the CAJUN database. (Hayden Tr. at 3559)  That information is usually typed in the top of an HC Form 37-A. (Hayden Tr. at 3559)

79.     The mental health staff person, usually Hayden, interviews the offender after he gets off the bus. (Hayden Tr. at 3560-3561)  Hayden completes a HC Form 37-A as he interviews

---

[2] Ex. D-15 at 3-4.

14

the offender.  (Hayden Tr. at 3558-3560)  Hayden assesses current complaints/symptoms, current suicidal ideation/behavior, and prior suicidal ideation/behavior.  (Hayden Tr. at 3560-3561)  If there is a discrepancy between what the offender tells Hayden and what is noted on CAJUN database, Hayden will look at the mental health records that accompany the offender.  (Hayden Tr. at 3563. Exhibits D-59 at 19 and D-64 at 167 are examples of completed HC-37-A forms, intra-system intake screening forms.)

80.     DWCC's intra-system screening is consistent with intra-system screening at other facilities.  (Thompson Tr. at 4010)

81.     DPS&C has a working level of care system for mental health.  (Burns Tr. at 1475) DPS&C assigns the following level of care designations to offenders:

a.     LOC 1 - shall be assigned to offenders who have significant disability primarily due to their mental health condition.  These offenders are housed in the special mental health housing units with a 24 hours medical and/or mental health presence.  These offenders require ongoing intensive intervention/supervision.  Housed at EHCC or LSP.

b.     LOC 2 - shall be assigned to offenders with a diagnosis of SMI AND who have been in remission for less than six months, or have displayed a pattern of instability, may not have ability to follow directions or dysfunctional due to mental health illness.  Medication adherence and program participation are considered.  Offender should be capable of performing activities of daily living satisfactorily.

c.     LOC 3 - shall be assigned to offenders with SMI and who have been in remission or have been stable for at least six months.  These offenders may live in the general housing areas.  A SMI diagnosis is typically chronic in nature and the offender will most likely

15

remain diagnosed with SMI for the remainder of the offender's life.  If they are stable, functional, and have no major problem with compliance, then they should be designated as LOC 3.

   d. LOC 4 - shall be assigned to offenders with any Axis I diagnosis excluding severe mental illness (SMI) and excluding addiction disorder diagnosis or those requiring mental health interventions within the last year.

   e. LOC 5 - shall be assigned to offenders who are not prescribed any psychotropic medication or current MH intervention for more than one year.

(Ex. J-7 at 5-7; Ex. D-14 at 6-8; Burns Tr. at 1475-1476)

  82. An offender classified as an LOC 1 is the equivalent of a person outside of prison who is in a hospital for in-patient treatment.  (Burns Tr. at 1476-1477).  An offender classified as an LOC 2 is the equivalent of a person outside the prison who is in some form of residential treatment.  (Burns Tr. at 1477)

  83. Offenders with a designation of LOC 1 and LOC 2 are not housed at DWCC. (R. Doc. 524, Stipulation ¶ 95; Thompson Tr. at 4002)

  84. An offender classified as an LOC 3 has a serious mental illness that is either in remission or is stable.  A serious mental illness can go into remission.  (Burns Tr. at 1477) Stable does not mean that there are no symptoms whatsoever; instead, stable means that an offender is able to function despite having some symptoms.  (Burns Tr. at 1477)  Dr. Seal further explained that stable means unchanging.  (Seal Tr. at 3858)

  85. Offenders housed at DWCC classified as LOC 3 and LOC 4 are the equivalent of outpatient individuals outside of prison.  (Thompson Tr. at 4003; Burns Tr. at 1478)

  86. Offenders housed at DWCC classified as LOC 5 have no present mental health diagnosis.  (Burns Tr. at 1476)

87.     The mental health staff has the authority to change the LOC classification on an offender, if appropriate, based upon the offender's situation.  (Dauzat Tr. at 3381)

88.     DWCC is doing a good job of identifying offenders with serious mental illness. (Thompson Tr. at 4004-4010 and 4086; Burns Tr. at 1479-1480)

89.     Accordingly, all offenders in restrictive housing on the South Compound either have no serious mental illness or are in remission or are stable.  This fact cannot be overstated and is essential to a proper understanding of the case.

90.     Offenders typically arrive at DWCC with medications from the sending institution. (P-YYY-1 at 77-78)  If an offender does not have medication for some reason, a medical doctor will order the medications, unless contraindicated, until the offender can see Dr. Seal. (Burns Tr. at 1494; Hayden Tr. at 3603-3604)

91.     If an offender has psychotropic medications upon arrival at DWCC, those medications are continued until the offender can see Dr. Seal.  (Hayden Tr. at 3603-3604)

92.     DWCC is not considered a reception center.  (Dauzat Tr. at 3346; Ex. J-5 at 1)  In the unusual instance when an offender arrives at DWCC without an Assessment & Intervention form from EHCC, Hayden administers the same testing at DWCC and has a psychologist, Dr. Susan Tucker at that time, sign off on the Assessment & Intervention form.  (Dauzat Tr. at 3346-3347; Hayden Tr. at 3595-3597;   Exhibit D-69 at 12-14 is an example of an Assessment & Intervention form completed at DWCC for Chris Solomon.)

93.     During the intra-screening intake process, offenders with a mental health diagnosis or who are on psychotropic medications are scheduled to see DWCC's psychiatrist, Dr. Seal, within 14 days.  (R. Doc. 524, Stipulation ¶ 100; Burns Tr. at 1495; Dauzat Tr. at 3345)

94.    DWCC provides offenders with an orientation which informs offenders of the various options available to address mental health concerns.  (R. Doc. 524, Stip. 99; Ex. D-36 at pp. 36-69 where the specific section on mental health is located at 64-65)  Offenders can request mental health services through sick call, farm mail, informing an officer, declaring an emergency, or during mental health rounds. (Ex. D-36 at p. 64; Burns Tr. at 1508)  In addition, correctional officers can and do refer offenders to mental health.  (Burns Tr. at 1508)

### E.  **Mental health staff at DWCC**

95.    Warden Michelle Dauzat has a master's degree in social work and is a board approved Licensed Clinical Social Worker. Warden Dauzat has been in the mental health field for over 21 years and has worked at DWCC since January 6, 2003.  (R. Doc. 524, Stipulation ¶ 47; Dauzat Tr. at 3304-3306) Warden Michelle Dauzat is responsible for overseeing and supervising the mental health program and mental health staff at DWCC. (R. Doc. 524, Stipulation ¶ 54; Dauzat Tr. at 3306-3307)

96.    Steve Hayden possesses a master's degree in Industrial Class Organizational Psychology and has been employed at DWCC since January 3, 2005.  (R. Doc. 524, Stipulation ¶ 48; Hayden Tr. at 3546) His work experience prior to coming to DWCC included working for the Department of Health and Hospitals doing psychometric testing and evaluations.  (Hayden Tr. at 3547) He earned an international certification from the Council on Quality and Leadership as an international interviewer and accreditation auditor.  (Hayden Tr. at 3548) After going to work for DWCC, he trained under Dr. Jennifer Crowder, Dr. Susan Tucker, and Warden Michelle Dauzat. (Hayden Tr. at 3549)  He further holds a certificate as a certified sex offender group leader and a certified case manager from the Louisiana Supreme Court drug court office.  (Hayden Tr. at 3549) In addition to working for DWCC, he has performed work as a qualified intellectual disability

18

professional performing psychometric testing and psychological evaluations for individuals with intellectual disabilities.  (Hayden Tr. at 3549-3550)  Hayden works a full-time 40-hour week on a Monday through Thursday 7:00 am to 5:30 pm schedule and is on-call 24 hours. (Hayden Tr. at 3551-3552)

97.     As of March 2020, Aerial Robinson had a master's degree in social work and was working toward obtaining her certification as a Licensed Master Social Worker.  (Robinson Tr. at 3451-3454)  She was originally hired as a Social Service Counselor on September 20, 2016 and promoted to her current position as a Social Service Counselor 2 on October 12, 2017. (R. Doc. 524, Stipulation ¶ 49; Robinson Tr. at 3451)  Robinson works 8:00 am to 4:30 pm Monday through Friday and is on-call 24-hours.   (Robinson Tr. at 3454-3455)

98.     James Burgos obtained a Master of Industrial Organizational Psychology in 2006 and a Master of Counseling in 2017. (R. Doc. 524, Stipulation ¶ 50; Burgos Tr. at 3778)  Mr. Burgos is a Licensed Professional Counselor through the Louisiana Board of Licensed Professional Counselors.  (R. Doc. 524, Stipulation ¶ 50; Burgos Tr. at 3778)  Prior to going to work for DWCC in early 2019, Burgos was a counselor at the Steve Hoyle substance abuse program within the Department of Corrections in Bossier Parish and prior to that was a parole officer for eleven years.  (Burgos Tr. at 3780)  Prior thereto, Burgos retired after 22 years in the United States Air Force.  (Burgos Tr. at 3781)  Burgos works 8:00 am to 4:30 pm Monday through Friday and is on-call one out of every three weeks.  (Burgos Tr. at 3782-3783)

99.     Johnie Adkins was hired on June 23, 2014 and was employed as a Social Service Counselor 1 at DWCC. Though previously employed as a counselor, Adkins now serves as a chaplain for DWCC.  Adkins is the holder of a Master's of Divinity; Master's of Religious Education; Master's of Theology; and Doctorate of Theology. (R. Doc. 524, Stipulation ¶ 51, 63)

100.     Gregory Seal, M.D. is contracted as a Psychiatrist at DWCC. His contract start date was July 1, 2009. Dr. Seal received his medical degree from LSU Medical Shreveport in 1988 and is board certified.  (R. Doc. 524, Stipulation ¶ 52; Seal Tr. at 3844)  Dr. Seal has maintained a private practice in psychiatry and has been associated with multiple hospitals since he left the military in 1996.  (Seal Tr. at 3844-3846)  He also served as the lead investigator for Louisiana Clinical Research, a private company doing research on psychiatric medications. (Seal Tr. at 3846)  Dr. Seal has worked with Assertive Community Treatment teams over the years.  (Seal Tr. at 3847)  An ACT team is a model to treat the most severely mentally ill in the community.  (Seal Tr. at 3847)  Dr. Seal also served as the Deputy Coroner for mental health for Caddo Parish.  (Seal Tr. at 3848)

101.     Dr. Seal is not an employee of the Department of Public Safety and Corrections. Dr. Seal provides services for offenders held at DWCC both in general population and restrictive housing. Dr. Seal's contract, as of March 2020, was to provide services at DWCC for 18 hours a month. The medical staff at DWCC assists with mental health needs when appropriate.  (R. Doc. 524, Stipulation ¶¶ 66-67, 69; Seal Tr. at 3855-3856 - proffer)

102.     The ratio of mental health staff to offenders on the South Compound at DWCC is adequate.  (Thompson Tr. at 4069-4071 and 4077-4078)  Dr. Burns opined that one mental health staff member would be needed for every 60 to 65 persons on the mental health caseload.  Dr. Burns' testimony, using correct numbers, confirms that two full-time staff on the South Compound was adequate.  (Burns Tr. at 1503-1506)  Considering that DWCC has two mental health staff, Hayden and Burgos, assigned primarily to the South Compound with a mental health caseload of approximately 90, the ratio is adequate.  (Thompson Tr. at 4071 and 4077-4078)

103.    During weekends, when presented with an emergent situation or in response to a threat of suicide, the medical staff will assist the mental health staff. (Dauzat Tr. at 3376)

**F.  Mental health care and treatment provided to offenders in restrictive housing at DWCC**

104.    Based on demographic data across the country, it is a fact that a certain percentage of offenders in restrictive housing will have a history of mental illness.

105.    Current policy provides that an offender must be assessed by health care personnel upon being transferred to restrictive housing.  (Dauzat Tr. at 3318-3319; Ex. D-12 at 1)  Medical personnel advise mental health staff if any mental health issues are identified; such notifications happen frequently.  (Dauzat Tr. at 3320)

106.    Further, a mental health professional personally interviews and prepares a written report on any offender in restrictive housing more than 30 days.  If an offender remains in restrictive housing longer, a mental health assessment by a mental health professional is made at least every three months.  (Dauzat Tr. at 3321; Ex. D-12, at 2)

107.    As of March of 2020, DPS&C enacted a pilot policy that was in the process of being implemented.  (Ex. P-JJJ-42)  That pilot policy provides that offenders with serious mental illness are not placed in segregated housing unless (a) cleared by appropriate Mental Health staff and reviewed by a psychiatrist/psychologist at earliest possible date, (b) not actively psychotic, and (c) less restrictive measures cannot assure safety/security of the unit.  (Ex. P-JJJ-42 at 6)

108.    DPS&C policy provides that there has to be procedures for non-mental health staff to refer an offender for mental health services at any point during an offender's incarceration.  (Ex. D-14 at 3)

109.     Hayden is primarily responsible for buildings N3 and N4 on the South Compound, and Burgos is primarily responsible for buildings N1 and N2 on the South Compound.  (Dauzat Tr. at 3354; Burgos Tr. at 3782)

110.     Hayden is on the tiers in the South Compound daily.  His goal is to get to know the offenders so that he can address any issues.  (Hayden Tr. at 3604) When he is on the tiers, Hayden will stop if anyone wants to talk to him.  (Hayden Tr. at 3606)  Most conversations while on the tiers do not result in a mental health progress note because nothing of importance is discussed. (Hayden Tr. at 3607)

111.     Burgos would counsel approximately ten offenders in an average month as of March of 2020.  (Burgos Tr. at 3784)  These counseling sessions take place in private in the courtroom, and 9 out of 10 times, the correctional officer is not present.  (Burgos Tr. at 3787)

112.     Robinson is primarily responsible for the North Compound, general population, of DWCC.  (Robinson Tr. at 3455)  Although her primary responsibilities are on the North Compound, Robinson is available and will assist on the restrictive housing, South Compound, when necessary.  (Robinson Tr. at 3455-3456)  Robinson testified to how she would try to understand what issues the offender may be having and come up with a solution.  (Robinson Tr. at 3462)  The same as Hayden, Robinson gets to the know the offender and even their families. (Robinson Tr. at 3463)

113.     Dr. Seal is of the opinion that Hayden, Burgos, and Robinson all do a good job at DWCC.  (Seal Tr. at 3855-3856 - proffer)  Dr. Seal found that Hayden was helpful, that he wanted to help the offenders, and that the information that Hayden gleaned from the offenders assisted Dr. Seal.  (Seal Tr. at 3855 - proffer)  Dr. Seal found that Burgos was doing a good job, was showing care for offenders, and was wanting to help offenders when and where he could.  (Seal Tr. at 3856

- proffer)  Dr. Seal found that Robinson does a very good job and is able to glean helpful information for him.  (Seal Tr. at 3855-3856)

114.    Dr. Thompson, Defendants' expert psychiatrist, similarly opined that Warden Dauzat, Hayden, Burgos, and Robinson are all qualified and do good work at DWCC. (Thompson Tr. at 3981-3983 and 3990-3993)  Specifically, in response to attacks on Hayden, Dr. Thompson was clear that Hayden is qualified to perform intake, create mental health progress notes, make decisions about removing offenders from suicide watch, and provide clinical counseling. (Thompson Tr. at 3983-3988 and 3991)

115.    The correctional officers on the tiers are trained to recognize mental health problems.  All DWCC staff are required to participate in mental health first aid training upon hire and then every three years thereafter.  (Ex. D-27; Robinson Tr. at 3516-3517)  The mental health first aid training was given to every DWCC employee in 2019.  (Robinson Tr. at 3517)  In addition, DWCC provides mental health training for correctional officers every February.  (Robinson Tr. at 3523-3524)  The training is effective as correctional officers will frequently call mental health to convey concerns regarding an offender.  (Robinson Tr. at 3526)

116.    Dr. Thompson found DWCC's training to be well done.  He emphasized that it was important for the training to be provided when an employee is hired and then annually, which DWCC does.  (Thompson Tr. at 4016)  He also wants that training to be performed by a mental health person, exactly as occurs (Robinson performs the training at DWCC).  (Thompson Tr. at 4016)  The most important part of the training is that employees are told to call mental health if they cannot figure a situation out.  (Thompson Tr. at 4017)  DWCC does exactly that.  (Ex. D-33 at 29)

117.    The correctional officer is the first line of information and will call mental health staff if a correctional officer believes that an offender needs to be seen by mental health.  (Burgos Tr. at 3786)

118.    The mental health staff routinely counsel offenders in a private setting outside their cells.  (Dauzat Tr. at 3329)  There are at least two to three such counseling sessions in a week. (Dauzat Tr. at 3329-3334)

119.    The mental health staff consisting of Hayden, Burgos, Robinson, and Warden Dauzat as a backup are on call after hours and on weekends.  (Dauzat Tr. at 3338)

120.    As of March of 2020, Dr. Seal would come to DWCC twice a month, every other Thursday.  (Seal Tr. at 3852)  Dr. Seal has enough time to see everyone that he needs to see.  (Seal Tr. at 3853)  Plaintiffs presented no evidence that Dr. Seal was unable to see anyone that needed to be seen.  Further, Dr. Seal is available by telephone to DWCC staff in between his visits.  (Seal Tr. at 3853)

121.    A member of the mental health staff is present when Dr. Seal sees offenders.  A majority of the time, the visits are confidential, without security present.  (Hayden Tr. at 3607-3608; Dauzat Tr. at 3373-3374)  Hayden testified that he is present with Dr. Seal to be able to update the database and to assist in providing information on the offender to Dr. Seal.  (Hayden Tr. at 3610)

122.    The mental health staff professional can follow up on Dr. Seal's directives and convey information to Dr. Seal as necessary.  (Dauzat Tr. at 3374)

123.    DPS&C has a department regulation that governs confidentiality of offenders' health records and information regarding an offender's health status.  (Ex. D-10)  There are limits to the confidentiality, i.e., (1) if an offender had a threat of violence against a specific victim, (2)

24

if there is any mention of child abuse, elder abuse or abuse of a disabled person, (3) if there is a threat to security of the institution, (4) there is any type of intent to escape, and (5) when required by law.  (Ex. D-10 at 2-3; Dauzat Tr. at 3317)  The limits of confidentiality are explained to the offender.  (Dauzat Tr. at 3317; Robinson Tr. at 3458)  The limits of confidentiality are presented to the offender on a form.  (Robinson Tr. at 3460-3461; Ex. D-65 at 77)

124.    Dr. Seal is doing the traditional job of a psychiatrist in a prison, i.e., medication management.  (Thompson Tr. at 4086)  There is no dispute that Dr. Seal is doing an outstanding job at DWCC.  Plaintiffs' own expert, Dr. Burns, acknowledged that Dr. Seal's diagnoses of the offenders are correct and that his medication management is appropriate.  (Burns Tr. at 1507)  Dr. Thompson concurred that Dr. Seal is diagnosing and prescribing appropriately.  (Thompson Tr. at 3993-3995)   The record shows that Dr. Seal adjusts medications in response to offenders' complaints and input. See, for example, treatment provided to Jesse Sullivan.  (Ex. D-68 at 108; Seal Tr. at 3902)

125.    Medication is the primary form of treatment for mental disorders of offenders located in restrictive housing.  (R. Doc. 524, Stipulation ¶ 129) Since medication is the primary form of treatment for many mental disorders, it is highly significant that Dr. Seal's medication management is appropriate.

126.    Although Dr. Burns opined that psychiatric staffing was inadequate, she could not identify any deficiencies in Dr. Seal's care.  (Burns Tr. at 1506)

127.    Dr. Seal determines when he needs to see a patient again.  (Seal Tr. at 3858)  Dr. Seal sees every LOC 3 offender on the mental health case load at least every 90 days and every LOC 4 offender at least every 180 days. (Ex. D-14, pp. 7-8)   Dr. Seal determines the need and

frequency of follow-up visits at each scheduled appointment, which may be sooner the maximum time period provided by HC-36 [Ex. D-14].  (Burns Tr. at 1507)

128.    If an offender presents with a need for intervention prior to the scheduled appointment, Dr. Seal will see him at his next available date.  (R. Doc. 524, Stipulation ¶ 52)

129.    Once identified and seen by Dr. Seal, offenders with mental illness are followed by a dedicated mental health staff that includes a master's level psychologist, two social workers, and licensed counselor. (R. Doc. 524, Stipulation ¶¶ 47-50)

130.    Mental health sees every offender who requests mental health care.  (Burns Tr. at 1509)

131.    A treatment plan is created for each offender.

132.    Mental Health staff at DWCC perform weekly rounds on the South Compound and counsel mental health offenders during those rounds.  (Dauzat Tr. at 3354-3355; Thompson Tr. at 4044-4047)  Weekly mental health rounds are sufficient.  (Burns Tr. at 1509)  Carlton Turner confirmed that mental health would make rounds about once a week.  (Turner Tr. at 91)  Mental health rounds provide access to mental health care.  (Dauzat Tr. at 3355-3356)  The important part of mental health rounds is to develop a relationship with the offenders.  (Thompson Tr. at 4046-4047)

133.    An offender can request mental health through the sick call process.  Joel Williams, R.N., testified that if an offender requested mental health treatment through a sick call request, Williams would see the offender and then refer him to mental health.  (Williams Tr. at 3811-3812) Further, as part of the sick call procedure, Williams and other RNs perform tier walks which allow offenders to talk to the nurse about any concerns that they may have.  (Williams Tr. at 3813-3816)

During the tier walks, Williams would take action if he identified an offender with a mental health concern.  (Williams Tr. at 3817)

134.    An offender can obtain mental health assistance through an emergency sick call as well.  (Dauzat Tr. at 3375)  A nurse will initially evaluate an offender who makes an emergency sick call.  Mental health will then respond and evaluate the offender.  (Dauzat Tr. at 3375)

135.    A mental health referral is a request for mental health services through anyone other than the mental health staff.  (Dauzat Tr. at 3376)  Any correctional officer or other employee at DWCC can request mental health assistance for an offender.  (Dauzat Tr. at 3324)

136.    Group Programming is available to offenders on N1.  The re-entry classes are four days a week for two and half hours and are conducted in the chapel.  (Goodwin Tr. at 4208-4211)

137.    Although group therapy is not afforded in other restrictive housing areas due to security concerns, mental health staff do provide individualized counseling to mental health offenders in restrictive housing.  Additionally, written materials relating to group therapy sessions are made available to offenders on N2-N4.  (Dauzat Tr. at 3328-3329; Burgos Tr. at 3796) Willie Dillon specifically testified that Robinson provided him with materials for anger management. (Dillon Tr. at 289)

138.    Counseling with offenders can be conducted in a private setting in the room identified as the treatment room or the courtroom.  (Robinson Tr. 3457-3458)  Sometimes a correctional officer is present; sometimes the correctional officer is not present.  (Robinson Tr. at 3457-3458)

139.    Mental health progress notes and segregation interviews are completed using standardized forms containing checkboxes for various aspects of a mental status examination.  The purpose of the segregated interviews is to check in with the offender every 90 days after an

27

offender has been in restrictive housing for more than 30 days to make sure that the offender is functioning okay within the environment.  (Dauzat Tr. at 3356-3357)  A segregated interview is performed on all offenders, not just those on the mental health case load.  (Dauzat Tr. at 3356)

140.    Mental health staff perform level of care reviews annually and as needed to ensure the coding is accurate. (Dauzat Tr. at 3358-3359)

141.    DWCC mental health staff see offenders classified as LOC 3 at least every 90 days and offenders classified as LOC 4 as least every 180 days, per policy.  (Dauzat Tr. at 3359-3360)

142.    DWCC can transfer offenders to EHCC for a mental health re-evaluation.  (Dauzat Tr. at 3339)  For example, DWCC transferred Anthony Caro to EHCC for an evaluation.  (Ex. D-75 at 101)  EHCC assessed Caro, diagnosed him as malingering for placement, and transferred him back to DWCC.  (Ex. D-75 at 103-106, 108)

143.    DWCC will transfer offenders in need of a higher level of mental health care to EHCC.  (Dauzat Tr. 3314-3315; Ex. D-7 at 4)  DWCC has never been denied a request to transfer an offender who DWCC thought was an LOC 1 or an LOC 2.  (Dauzat Tr. at 3385)  DWCC has no reason to continue to house an offender classified as an LOC 2 because DWCC does not have the resources to treat the offender; EHCC offers the higher level of care for such offenders. (Dauzat Tr. at 3385-3386)

144.    Plaintiffs' expert witnesses did not opine that the level of care designation of the offenders is incorrect.

145.    The percentage of offenders with serious mental illness at DWCC has remained relatively the same since 2017. (Thompson Tr. at 4081-4082)

**G.  <u>Medication management at DWCC</u>**

28

146.     Offenders typically arrive at DWCC with medications from the sending institution. If an offender does not have medication for some reason, a medical doctor will order the medications, unless contraindicated, until the offender can see Dr. Seal. (Burns Tr. at 1494; Hayden Tr. at 3603-3604)

147.     If an offender has psychotropic medications upon arrival at DWCC, those medications are continued until the offender can see Dr. Seal.  (Hayden Tr. at 3603-3604)

148.     During the intra-screening intake process, offenders with a mental health diagnosis or who are on psychotropic medications are scheduled to see DWCC's psychiatrist, Dr. Seal, within 14 days.  (R. Doc. 524, Stipulation ¶ 100; Burns Tr. at 1495; Dauzat Tr. at 3345)

149.     Dr. Seal prescribes appropriate psychotropic medications in appropriate dosages. (Burns Tr. at 1507)

150.     Medications are distributed using "blister packs" which are specifically numbered and are monitored by nursing staff at DWCC.  (Norris Tr. at 828, 830)

151.     Medications are administered by pill call officers.  It is not uncommon for prisons to use correctional officers as pill call officers.  (Burns Tr. at 1512)  It is an acceptable practice to use correctional officers as pill call officers with appropriate training, oversight and supervision. (Burns Tr. at 1512)

152.     Pill call officers are provided specific training on administering medications. (Exs. P-QQQ-1, P-QQQ-2, P-QQQ-3)

153.     When psychotropic medications are received, a sticker is placed on the pill card indicating that the medication is psychotropic.  This process ensures continuity in medication administration.  (R. Doc. 524, Stipulation ¶ 81)

154.    The formal training that DWCC provides to its pill call officers is good.  (Burns Tr. at 1513)

155.    It is not unusual to see problems with MARs in prisons.  (Burns Tr. at 1514)

156.    Regardless of any problems with the MARs, all offenders testified that they were receiving their medications from pill call officers.  (Burns Tr. at 1514-1515; Turner Tr. at 89; Brumfield Tr. at 191; Moran Tr. at 233; Dillon Tr. at 292)

157.    Joel Williams, RN, testified that he will investigate if an offender tells him that he did not receive his medications.  (Williams Tr. at 3818)

158.    There are mental health progress notes where offenders were counseled for noncompliance with medications.  (Burns Tr. at 1515)

159.    DWCC and DPS&C maintain policies to address potential risks associated with heat for offenders on certain psychotropic medications.  These policies provide offenders with additional showers, water, towels, and ice and DWCC relaxes its jumpsuit policy to help keep offenders cool. (Ex. J-11A; Goodwin Tr. at 4246-4248, 4252; Huff Tr. at 2018)

160.    DWCC physicians assign offenders whose medication puts them at risk to excessive heat a "heat duty status."  (Goodwin Tr. 4248; Huff Tr. at 2018, 2025; Mays Tr. at 2169)

**H. <u>Mental health observation and suicide watch</u>**

161.    Mental health observations ("MHO") are utilized to follow an individual offender more closely who is experiencing an acute exacerbation of symptoms which is considered temporary by medical professionals and is not expressing any suicidal intent or ideation.  (Ex. J-4; Dauzat Tr. at 3394) MHO is appropriate for offenders who are psychotic, in acute distress, noncompliant with psychotropic medication, or otherwise psychologically impaired to a

significant degree, but not considered a high risk for suicidal behavior. (Ex. J-4 at 1; R. Doc. 524, Stipulation ¶ 109)

162.    An offender on MHO is monitored in person every 15 minutes and random and by video by the officer in the key room.  (Dauzat Tr. at 3394)  An offender on MHO is seen daily by mental health or medical staff. (Hayden Tr. at 3622)  The offender will then see Dr. Seal at his next available time.  (Hayden Tr. at 3622)

163.    Suicide watch is a precautionary measure for the safety of the offender and the staff. (Dauzat Tr. at 3387)

164.    Correctional officers are trained annually to identify suicide risk factors.  (Ex. D-34; Robinson Tr. at 3528)  Dr. Burns has no criticisms of that training. (Burns Tr. at 1515)

165.    DWCC has two categories of suicide watch, standard and extreme.  Standard suicide watch is utilized if an offender expresses some intent or ideation to harm himself.  (Dauzat Tr. at 3388; Robinson Tr. at 3461)  Extreme suicide watch is for an offender who engages in some type of self-harm.  (Dauzat Tr. at 3392)

166.    Mental health staff completes a mental health management order ("MHMO") on each new suicide watch.  (Dauzat Tr. at 3388)  Within the clinical judgment of the mental health staff, the MHMO describes the techniques to be used, which property items are permitted, and which property is prohibited. (Ex. J-10 at 3-8; Dauzat Tr. at 3388-3389)

167.    Removing an offender's property while on suicide watch is an appropriate procedure designed to reduce the risk of a completed suicide while an offender is on suicide watch because offenders can and do use property such as gowns and mattresses to attempt suicide or make suicidal gestures. (Burns Tr. at 1349). Testimony of offenders and exhibits show examples

of offenders using such property to make a gesture or attempt suicide.  (Turner Tr. at 59; Ex. D-63 at 9, 103; Ex. P-VVV-39 at 3)

168.    Offenders on suicide watch are typically monitored by officers in person at 15 minutes intervals and randomly.  (Dauzat Tr. at 3391)  In addition, the officer in the key room has a camera for monitoring an offender on suicide watch.  (Dauzat Tr. at 3391)

169.    Offenders on standard suicide watch receive in-person observation at least every fifteen minutes, and randomly between intervals.  (Ex. J-10 at 6)

170.    An offender on suicide watch is seen and evaluated daily; mental health staff sees offenders on suicide watch daily on Monday through Friday; nursing staff sees offenders on the weekends. (Dauzat Tr. at 3391; Burns Tr. at 1516)

171.    Extreme suicide watch incorporates some level of restraint based on the actions of the offender.  (Dauzat Tr. at 3392) Extreme suicide watches can only be utilized by DWCC's mental health staff with the concurrence of a medical doctor.  (Ex. J-10 at 8)

172.    Restraints used on extreme suicide watch, by policy, may be: (1) four-point restraints, (2) placing an offender in a restraint chair, or (3) use of a helmet to prevent head banging.  (R. Doc. 524, Stipulation ¶ 108)

173.    Nurses check on offenders on extreme suicide watch every two hours.  (Williams Tr. at 3821, 3825)  Mental health sees offenders on extreme suicide watch every twelve hours.  (Dauzat Tr. at 3393)

174.    The use of the restraint chair is infrequent and limited to only the time deemed necessary by the mental health staff.  In fact, James Burgos who started at DWCC in early 2019 had never even seen the restraint chair.  (Burgos Tr. at 3794)

175.    The mental health staff at DWCC decides when to end a suicide watch. (Thompson Tr. at 4053-4054; Burns Tr. at 1516)

176.    The length of time that offenders at DWCC remain on suicide watch is consistent with the national average.  (Burns Tr. at 1518)

177.    Upon termination of suicide watch, mental health staff contacts and evaluates the offender within seven days.  (Burns Tr. at 1520; Hayden Tr. at 3628)

178.    Suicide watches, suicide attempts, suicidal gestures, and completed suicides must be reported by DWCC to the Department of Corrections in a monthly report called a C-05 report. (Dauzat Tr. at 3429-3430)   The medical director makes the determination of whether an act qualifies as a suicide attempt.  (Dauzat Tr. at 3430)

179.    DPS&C recognizes three categories of self-harm.   One is non-suicidal self-injurious behavior which refers to the intentional destruction of one's own body tissue without suicidal intent.   Common examples include cutting, burning, scratching, and banging or hitting. Two, is a suicide gesture which is a self-injurious behavior that would not have resulted in death and/or a permanent incapacitating physical disability if not intervention occurred. Three is a suicide attempt which is a self-injurious behavior that could have resulted in death and/or a permanent incapacitating physical disability if no intervention occurred.  (Ex. J-10 at 2-3)  Warden Dauzat explained the differences in detail.  (Dauzat Tr. at 3431-3435)

180.    The number of suicide watches at DWCC is not higher than it should be; stated differently, DWCC does not have a problem with overuse of suicide watch.  (Thompson Tr. at 4049 and 4054-4055; Burns Tr. at 1517-1518)

181.    From January of 2019 through February of 2020, the total number of standard suicide watches was 97, or 6.93 per month and that the total number of extreme suicide watches was 26 or 1.86 per month.  A chart with the numbers and citations follows:

|  | SSW | ESW | Cite |
|---|---|---|---|
| 1/2019 | 2 | 0 | Ex. J-19 at 95-96 |
| 2/2019 | 8 | 0 | Ex. J-19 at 98-99 |
| 3/2019 | 9 | 1 | Ex. J-19 at 101-102 |
| 4/2019 | 7 | 4 | Ex. J-19 at 104-105 |
| 5/2019 | 8 | 3 | Ex. J-19 at 107-108 |
| 6/2019 | 7 | 0 | Ex. J-19 at 110-111 |
| 7/2019 | 12 | 4 | Ex. J-19 at 113-114 |
| 8/2019 | 8 | 0 | Ex. J-19 at 116-117 |
| 9/2019 | 8 | 1 | Ex. J-19 at 119-120 |
| 10/2019 | 3 | 9 | Ex. J-19 at 122-123 |
| 11/2019 | 7 | 1 | Ex. J-19 at 125-126 |
| 12/2019 | 3 | 0 | Ex. J-19 at 128-129 |
| 1/2020 | 3 | 0 | Ex. J-19 at 130-131 |
| 2/2020 | 12 | 3 | Ex. J-19 at 133-134 |
| Total of 14 Months | 97 | 26 | |
| Average Per Month | 6.9286 | 1.8571 | |

182.    The time that DWCC keeps offenders on suicide watch is consistent with the national average.  (Burns Tr. at 1518)

183.    A review committee at DPS&C headquarters level reviews every suicide attempt, i.e., an instance where an offender engaged in self-injurious behavior that could have resulted in death and/or a permanent incapacitating physical disability if no intervention occurred.  (Dauzat Tr. at 3435-3437)  Noel Dean was the only suicide attempt at DWCC during the relevant period, and his case was presented to the committee.  (Dauzat Tr. at 3439-3442)

184.    Plaintiffs introduced a video of DWCC correctional officers responding to Dean's suicide attempt.  The video begins with an officer running down the tier to get to Dean's cell. Upon arrival at the cell, the officer finds another officer holding Dean by the legs so that he cannot harm himself further.  The officers then remove Dean from the hanging position and lay him on

the floor.  The officers call for medical and begin to care for Dean while waiting on medical.  Other likely more senior officers arrive at the scene. A nurse arrives and checks on Dean.  All of this takes place at beginning at 11:53 at night.[3]  (Ex. P-WWW-17)  The video shows an excellent response to a serious situation.

185.    DWCC does not have a problem with too many completed suicides.  (Burns Tr. at 1516-1517)

186.    DWCC does not use suicide watch as punishment.  (Dauzat Tr. at 3391; Williams Tr. at 3823; Robinson Tr. at 3462)  Dr. Thompson, Defendants' expert psychiatrist, agreed that DWCC does not use suicide watch as punishment.  (Thompson Tr. at 4050)

187.    DWCC's use of suicide watch does not create a substantial risk of harm.  Indeed, to the contrary, DWCC's use of suicide watch is appropriate and working as intended.

**I.  Use of force at DWCC**

188.    Correctional officers on the South Compound can use chemical spray to obtain compliance from offenders who refuse to comply with the officers' commands. (Ex. J-1 at 7; Goodwin Tr. at 4346)

189.    Correctional officers turn on their body cameras when the use of chemical spray or other use of force is anticipated.  The body camera videos (see, e.g., Exs. P-CCCC-1, P-WWW-17) show that the correctional officers repeatedly advise the offenders that chemical spray will be used if the offender persists in not complying with orders. (Nail Tr. at 3141-3142)

190.    DWCC does not overuse chemical spray.  From 2018 through February of 2020, DWCC averaged using spray 8.5 times a month. A chart with the numbers and citations follows:

---

[3] It is assumed that Plaintiffs will attempt to make much of the restraint chair.  While the restraint chair is seen on the tier, the video does not show that Dean was actually placed into the restraint chair.  Further, even if the restraint chair was used, say in the manner of a wheel chair to get him to the infirmary, there is no indication or testimony that such use would be improper.

| | Spray | Cite |
|---|---|---|
| 1/2018 | 3 | Ex. J-19 at 47 |
| 2/2018 | 6 | Ex. J-19 at 52 |
| 3/2018 | 5 | Ex. J-19 at 55 |
| 4/2018 | 10 | Ex. J-19 at 60 |
| 5/2018 | -- | -- |
| 6/2018 | 13 | Ex. J-19 at 68 |
| 7/2018 | 4 | Ex. J-19 at 74 |
| 8/2018 | 8 | Ex. J-19 at 79 |
| 9/2018 | 10 | Ex. J-19 at 82 |
| 10/2018 | 10 | Ex. J-19 at 85 |
| 11/2018 | 15 | Ex. J-19 at 88 |
| 12/2018 | 6 | Ex. J-19 at 91 |
| Total: | 90 | |

| | Spray | SSW |
|---|---|---|
| 1/2019 | 9 | Ex. J-19 at 94 |
| 2/2019 | 5 | Ex. J-19 at 97 |
| 3/2019 | 11 | Ex. J-19 at 100 |
| 4/2019 | 6 | Ex. J-19 at 103 |
| 5/2019 | 11 | Ex. J-19 at 106 |
| 6/2019 | 5 | Ex. J-19 at 109 |
| 7/2019 | 12 | Ex. J-19 at 112 |
| 8/2019 | 6 | Ex. J-19 at 115 |
| 9/2019 | 7 | Ex. J-19 at 118 |
| 10/2019 | 10 | Ex. J-19 at 121 |
| 11/2019 | 12 | Ex. J-19 at 124 |
| 12/2019 | 8 | Ex. J-19 at 127 |
| 1/2020 | -- | -- |
| 2/2020 | 12 | Ex. J-19 at 132 |
| Total: | 114 | |

90 sprays for 2018 plus 114 sprays for 2019 through February of 2020 equals a total of 204 sprays. 204 divided by the 24 reported months between January of 2019 and February of 2020 equals an average of 8.5 uses of spray per month.

191.    Use of Force incidents at DWCC are reviewed by the Unit Manager. (Nail Tr. at 3139; Mays Tr. at 2132)

192.    The unit manager is the colonel who oversees the South Compound. (Nail Tr. at 3111; Mays Tr. at 2132)

193.    Either Colonel Lonnie Nail or Colonel Tyrone Mays were the unit managers for the South Compound at all times relevant to this trial. (Nail Tr. at 3111; Mays Tr. at 2126-2127)

194.    Use of Force incidents are required to be reported by DWCC to DPS&C in the monthly C-05 report. (R. Doc. 524, Stipulation ¶ 123)

195.    Offenders who throw items on the tier, at staff members, or at other offenders can be placed on Policy 34, which restricts their property to prevent recurrence of these types of incidents. (R. Doc. 524, Stipulation ¶ 159; Nail Tr. at 3145-3147)

36

196.    An offender who engages in behavior prohibited by Policy 34 can be placed on that status for 24 hours the first time he engages in that behavior. (R. Doc. 524, Stipulation ¶ 159; Nail Tr. at 3145-3147)

197.    As of March 2020, an offender who engaged in a pattern of behavior prohibited by Policy 34 may be placed on that status for 30 days. (Nail Tr. at 3145-3147)

198.    Correctional officers do not barter with offenders for privileges such as showers or food. (Nail Tr. at 3149-3150)

199.    Correctional officers do not open windows in the winter time to punish offenders or make conditions more uncomfortable for offenders. (Nail Tr. at 3150-3152)

**J.   <u>Offenders engage in manipulation or secondary gain</u>**

200.    Many offenders are disciplinary problems, not mental health problems. Determining the difference between the two can be challenging.  DWCC's mental health training for correctional officers captures the essence of the problem as follows:



(Ex. D-33 at 29)

201.    Training materials for officers at DWCC, although addressing female security officers, further warns of how offenders who are bad attempt to manipulate officers and the system:

> An offender has 24-hours to think of ways how to manipulate officers. Offenders have nothing but time to observe, time to hear, and profit from everything they know about you and your job. Offenders are predators, they watch the female employees, they target female employees, the offenders identify weak links, and set up employees to gain confidence.

(Ex. D-31 at 31)

202.    The records in this case are replete with specific examples of offenders engaging in manipulative behavior.  Offenders will claim suicidal ideation to be placed on suicide watch for many reasons other than being suicidal.  The following specific examples prove the point.

203.    Bruce Charles is the named plaintiff.  His record shows that he was "bad" and that he acted out, but that he did not have a serious mental illness.

204.    On 03/06/17, while on suicide watch, Charles stated that he was angry with security and made false claims of suicide ideation in order to make them "work."  (D-63 at 17; Hayden Tr. at 3626)  Hayden took Charles off of suicide watch at that time.  (D-63 at 18; Hayden Tr. at 3627)  Three days later, on 03/09/17, within seven days of discontinuing suicide watch, Hayden followed up with Charles after being discontinued on suicide watch as per policy.  (Ex. D-63, pp. 20-21; Hayden Tr. at 3628-3629)

205.    Charles filed an ARP regarding restrictive housing and mental health care.  Hayden prepared the response, dated 04/03/17.  (Ex. P-E-24 at 5)  Hayden's response to Charles was:

> Your request for administrative remedy in which you contend your housing in solitary confinement has exacerbated your mental health condition has been reviewed. Upon your arrival at DWCC, you were initial classified to maximum custody extended lockdown. This is based upon a comprehensive review by a multi-disciplinary team of your complete record including but not limited to conduct, criminal history, adjustment concerns, etc. This assignment is an administrative decision. Consistent with this custody, your privileges and possessions are restrictive. This is done to promote and ensure staff and offender safety as well as

38

uniformity and structure. Consistent with this status, you are reviewed at a minimum of every 90 days for a less restrictive status. Mental health staff serve a function within the totality of your case management. The mental health department provides access to mental health clinical services 5 days a week and after hour services for emergency treatment. Offenders who are assigned to maximum custody are seen on a routine basis per the current classification designation in addition to the designated mental health level of care. There are numerous self-help opportunities available to the restrictive housing population. The services include but are not limited to chaplaincy services, library services, mental health counseling services, psychoeducational correspondence, addiction literature, etc. DWCC classification department, in conjunction with Unit management, evaluate each maximum custody offender to determine if a referral to the Transition Treatment Program is warranted based current need and level of functioning. Psychiatric services in addition to crisis management are also offered to all offenders at DWCC. You are also monitored and seen by mental health due to continuous confinement and your MH level of care. All clinical services are provided in accordance with DOC Regulations. Upon your reassignment to general population it is recommended that you write MH via farm mail and be placed on the waiting list for self-help groups.

(Ex. P-E-24 at 5; Hayden Tr. at 3631-3635)  Despite being advised of these services, there are no records indicating Charles requested any of the available services.

206.    Hayden's ARP response dated 04/03/17 attached mental health progress notes indicating that Charles was seen 25 times between 06/12/16 and 03/09/17.  (Ex. P-E-24 at 13-62)

207.    On 5/26/17, Robinson saw Charles for a mental health evaluation after he declared an emergency.  (Ex. D-63 at 27-28)  Charles stated that his grandmother was sick, and his brother had just committed suicide.  He expressed suicide ideation, so Robinson began standard suicide watch. (Ex. D-63 at 28)

208.    On 05/30/17, Hayden saw Charles while he was on suicide watch.  Hayden discontinued suicide watch since Charles denied any current suicide ideation.  (Ex. D-63 at 30-32) On 06/05/17, Hayden followed up with Charles after being discontinued from suicide watch.  (Ex. D-63 at 33-34)

209.    On 06/09/17 and 06/18/17, Charles refused to accept mental health medications.

(Ex. D-63 at 35, 37; Hayden Tr. at 3656-3658)

210.    On 07/06/17, Robinson saw Charles and noted that Charles discussed:

several incidents, which have occurred in his family.  Offender reports the suicide of his brother, grandfather killed three family members, and his grandmother is currently ill.  When questioned about coping he states, "I'm doing good. I just take it day by day."

(Ex. D-63 at 39-40; Robinson Tr. at 3468-3469)

211.    On 07/14/17, Robinson saw Charles after he missed his ninth consecutive meal.

(Ex. D-63 at 41-42)

212.    On 07/15/17, Charles refused psychotropic medications.  (Ex. D-63 at 44; Hayden Tr. at 3658-3659)

213.    On 07/18/17, Robinson saw Charles while on standard suicide watch. When Robinson questioned Charles about suicide ideation, he responded, "Put me in restraints." Robinson explained there was no reason for an order of restraints.  Charles then revealed a piece of plastic and began to attempt to cut his wrist.  At that point, Robinson placed Charles on extreme suicide watch.  (Ex. D-63 at 46-47; Robinson Tr. at 3471)  This incident was captured on an UOR as well.  (Ex. D-63 at 48)

214.    On 07/18/17, Hayden received a beeper call at approximately 9:00 pm at which time he downgraded Charles from extreme suicide watch to standard suicide watch.  (Ex. D-63 at 50-51; Hayden Tr. at 3661-3662)  A utilization of medical/mental health restraints after incident review was completed.  (Ex. D-63 at 52; Hayden Tr. at 3659-3661)

215.    On 08/04/17, Robinson counseled Charles about recent write-ups, family concerns, and short- and long-term goals.  (Ex. D-63 at 64-65; Robinson Tr. at 3474)

216.     On 08/10/17, Dr. Seal saw Charles.  Dr. Seal noted that Charles' mood was "euthymic," i.e., normal, neither depressed nor manic.  Dr. Seal diagnosed Charles as a Bipolar I. (Ex. D-63 at 66; Seal Tr. at 3859-3860)

217.     On 10/24/17, Robinson saw Charles who reported several new disciplinary write ups.  Robinson discussed the incidents and made goals pertaining to behavior improvement and discussed family concerns.  (Ex. D-63 at 67-68; Robinson Tr. at 3475)

218.     On 01/11/18, Dr. Seal saw Charles.  Charles reported that he was non-compliant with valproic acid, i.e., Depakote.  Charles' VPA level was 16, consistent with not taking Depakote.  (Seal Tr. at 3862-3863)  Dr. Charles diagnosed bipolar I and encouraged Charles to restart Depakote.  (Ex. D-63 at 71; Seal Tr. at 3863-3864)

219.     On 02/08/18, Robinson saw Charles and noted:

Offender reports noncompliance with medication. Offender states he is stressed. Offender discussed losing two brothers in 2017, being worried about grandmother's health, and the distance from his family. Offender agreed to restart his medication, and also made two short term goals. Offender verbally consented for writer to contact his aunt, Stacy [phone number listed]. Denies SI/HI.

(Ex. D-63 at 72-73; Robinson Tr. at 3476-3477)  This is an example of where Robinson would call a family member for an offender.

220.     On 03/28/18, Robinson saw Charles while he was on suicide watch.  She noted the following:

Offender is calm and cooperative. Offender denies SI/HI. Offender expressed being worried about family. Discussed coping skills and being compliant with medications. Writer will attempt to contact family. Discontinue SSW and RTQ.

(Ex. D-63 at 78-79; Robinson Tr. at 3477-3478)

221.     On 05/03/18, Hayden saw Robinson due to medication non-compliance and noted the following:

41

> Offender reports that after speaking with his lawyer it was decided that he not any medication unless he can be placed on the medication of his choice. (Wellbutrin) He denies any S/I, H/l, or other MH concerns. He was encouraged to continue taking his medications as prescribed.

(Ex. D-63 at 81-82; Hayden Tr. at 3664-3665) Dr. Seal testified as to how Wellbutrin is a drug of abuse in prisons.  Offenders crush Wellbutrin and snort it which gives them a little high like cocaine.  (Seal Tr. at 3871-3872; Thompson Tr. at 3994)

222.    On 05/16/18, Hayden saw Charles due to medication noncompliance and noted:

> Offender states that he has 14 months left in prison and has no need for mental health medications and never did. Nor has he ever actually taken any medications prescribed to him. He was urged to take all medications as prescribed and informed of the importance of his compliance.

(Ex. D-63 at 98-99; Hayden Tr. at 3665-3666)

223.    On 05/21/18, Robinson saw Charles while he was on suicide watch and reported the following:

> Offender denies SI. When questioned about SI, offender states, "I didn't want to be by the showers and making security work."  Discontinue SSW and RTQ.

(Ex. D-63 at 110-111; Robinson Tr. at 3485-3486)

224.    On 05/22/18, Hayden saw Charles for medication noncompliance and noted the following:

> he has never taken any mental health medications prescribed to him and never will. He further reports that he was attempting to be shipped to EHCC but now wants to do the small amount of time he has left and get out of prison.

(D-63 at 113-114; Hayden Tr. at 3666-3667)

225.    On 05/31/18, Dr. Seal discontinued Depakote because he was not taking it. (D-63 at 115; Seal Tr. at 3864-3865)

226.    On 06/19/18, Robinson saw Charles for a mental health follow up and noted the following:

> Seen offender for MH F/U. Offender is calm and cooperative. When questioned about mood, Offender replied, "I'm doing good." Offender was excited due to receiving a letter from aunt. Discussed family dynamics and possible discharge plans. Also, discussed anger management. Denies SI/HI.

(Ex. D-63 at 119-120; Robinson Tr. at 3487)  Hayden similarly noted on 06/19/18, that Charles was "doing well since removal of his mental health medications . . . ." (D-63 at 121-122; Hayden Tr. at 3671-3672)

227.    On 09/17/18, Robinson saw Charles for LOC and noted that:

> Seen offender for MH F/U. Offender is calm and cooperative. When questioned about mood, Offender replied, "I'm doing good." Offender was excited due to receiving a letter from aunt. Discussed family dynamics and possible discharge plans. Also, discussed anger management Denies SI/HI. Denies any mental health concerns at this time.

(Ex. D-63 at 123-124; Robinson Tr. at 3488)

228.    On 11/01/18, Dr. Seal saw Charles and noted that Charles refused medications and that his bipolar I diagnosis was in remission.  (Ex. D-63 at 127; Seal Tr. at 3867)  The fact that Charles was doing well, not getting any more write ups and was not taking medication made Dr. Seal question the diagnosis of bipolar I.  (Seal Tr. at 3867-3868)  Charles' LOC changed from LOC 3 to LOC 5 at that time. (D-63 at 130)

229.    On 07/30/19, Charles was reassigned to medium custody. (D-63 at 137; Hayden Tr. at 3672-3673)

230.    Over the next several months, Charles completed 14 re-entry courses. (D-63 at 138-140)  These classes were held on Monday, Wednesday and Friday.  (Hayden Tr. at 3674)

231.    On 11/06/19, Charles was released from DPS&C custody.  (Ex. D-63 at 141; Hayden Tr. at 3674)

232.    Charles' records show that he consistently acted out and was a bad actor with no mental illness.  Once he decided he wanted to do his time and get out, he had no issues and was

43

not taking any medications.  Although Charles is the lead plaintiff in this case, he did not testify.

Charles' records completely undermine the plaintiffs' claims in this case.

233.    Corey Adams is a case of an offender that was "bad" and "manipulative."

234.    Adams was convicted of second-degree murder and sentenced to life in prison.

(Adams Tr. at 993)  He has had many disciplinary write ups in prison as well.  (Adams Tr. at 993)

235.    Adams would cut himself before he was in prison.  (Adams Tr. at 994)  While at

LSP, prior to coming to DWCC, Adams cut himself 16 times during 2017.  (Adams Tr. at 994)

236.    On 11/28/17, Adams was initially transferred to DWCC.  (Ex. D-64 at 47)  He saw

Dr. Seal on 01/11/18 who diagnosed psychosis NOS and prescribed medications.  (Ex. D-64 at 52;

Seal Tr. at 3868-3870)  On 02/22/18, Adams was reclassified as medium security.  (Adams Tr. at

998)  He was thereafter transferred to EHCC.  (Adams Tr. at 998)  During these three months at

DWCC, Adams had no instances of cutting himself.  (Adams Tr. at 998)

237.    On 03/13/18, EHCC performed an assessment & intervention which included a

diagnose of malingering for placement and anti-social personality disorder.  (Ex. D-64 at 86-90;

Seal Tr. at 3873-3874)  Dr. Seal explained that a person with an anti-social personal disorder is

someone who has a lack of concern for anyone except one's self and that the person is out to get

what they can get for themselves no matter who suffers because of what they do.  (Seal Tr. at 3874)

238.    During the 56 days Adams was housed at EHCC, Adams cut himself eight times.

(Adams Tr. at 999)

239.    On 04/23/18, Adams was transferred back to DWCC.  (Hayden Tr. at 3696-3697)

Mental health staff saw Adams on 04/23/18, 04/24/18, and 04/25/18.  (Ex. D-64 at 169-170, 173-

176)

240.     On 04/26/18, three days after arriving at DWCC, Dr. Seal saw Adams.  Dr. Seal diagnosed Adams as psychosis NOS and ignored the malingering diagnosis from EHCC.  (Ex. D-64 at 177; Seal Tr. at 3874)

241.     On 07/02/18, Adams reported wanting to be prescribed Wellbutrin.  (Ex. D-64 at 187)  As alluded to above, Wellbutrin is a drug of abuse in prison that can be snorted.   (Seal Tr. at 3871-3872)

242.     On 07/05/18, Adams saw Dr. Seal who continued the same medications, without adding Wellbutrin.  (Ex. D-64 at 188; Seal Tr. at 3876-3877)

243.     On 08/17/18, Adams threatened to act out if he did not get specific medications he wanted, i.e., "I want Wellbutrin.  I've tried asking.  Now you will see." (D-64 at 261-262)

244.     Adams was at LSP and then EHCC prior to being transferred to DWCC.  At EHCC prior to being transferred to DWCC, Adams engaged in the exact same behavior that was thereafter occurred at DWCC.  (Burns Tr. at 4469)  The treatment provided by EHCC was more intensive than treatment available at DWCC.  (Burns Tr. at 4470)  EHCC accomplished none of the goals for Adams.  (Burns Tr. at 4472)  EHCC diagnosed Adams as a malingerer.  (Burns Tr. at 4469-4470)  Mental health staff saw Adams 78 times over 150 days while he was at DWCC.  (Burns Tr. at 4470-4471; Hayden Tr. at 3711-3712) His behavior at DWCC thereafter was exactly the same as his behavior at EHCC.  (Burns Tr. at 4469, 4472)

245.     The record shows that Adams was a "bad" offender diagnosed as both a malingerer and an anti-social personality disorder who acted the same at EHCC as he did at DWCC. There is no indication that anything about restrictive housing at DWCC caused Adams' problems.

246.     We next address Anthony J. Caro III.  He was transferred to DWCC on 11/14/16. (Ex. D-75 at 25; Hayden Tr. at 3677-3678)  He was an LOC 5 upon transfer to DWCC because he never had a history of mental health concerns.  (Ex. D-75 at 26; Hayden Tr. at 3678)

247.     On 07/13/17, Dr. Seal saw Caro for the first time.  (Ex. D-75 at 61)  Because Caro was noncooperative, Dr. Seal did not have enough information to assess or treat Caro at that time. (Seal Tr. at 3916)

248.     On 09/07/17, Dr. Seal saw Caro and again did not have enough information to assess or treat Caro due to him being uncooperative.  (Ex. D-75 at 63; Seal Tr. at 3917-3918)  Caro refused medications that Dr. Seal offered.  (Seal Tr. at 3919)

249.     On 11/09/17, Dr. Seal saw Caro and still did not have enough information to assess or treat Caro due to him being uncooperative.  (Ex. D-75 at 71; Seal Tr. at 3920-3921)

250.     On 03/22/18, Dr. Seal saw Caro and was able to diagnose him with psychosis NOS and prescribed medications.  (Ex. D-75 at 94; Seal Tr. at 3922-3923)

251.     On 04/03/18, Hayden saw Caro for medication noncompliance and noted that:

Offender states that he has no need for mental health medications and only agreed to take them to assist with his being transferred.  He further states that he will be no problems for staff if he is transferred as he was promised.

(D-75 at 96-97)

252.     On 04/23/18, Hayden saw Caro due to noncompliance with medications and noted:

Offender states that he has no need for MH medications and only agreed to be seen in psychiatric clinic to help in his chances for a transfer. He denies any S/I, H/l, or other MH concerns. He was urged to take all medications prescribed to him until he could be evaluated by Dr. Seal. Schedule for next psychiatric clinic and follow up per policy.

(Ex. D-75 at 98-99; Hayden Tr. at 3682)

253.    On 04/26/18, three days later, Dr. Seal saw Caro who refused to take medications. Dr. Seal encouraged Caro to take medications.  (Ex. D-75 at 100; Seal Tr. at 3923-3924; Hayden Tr. at 3683)

254.    On 05/01/18, Caro was transferred to EHCC, not because of his illness, but because of his behavior and for refusing treatment.  (Ex. D-75 at 101; Seal Tr. at 3925; Hayden Tr. at 3684-3685)

255.    On 05/09/18, EHCC performed an assessment & intervention on Caro which diagnosed him as malingering for transfer.  (Ex. D-75 at 103-106; Hayden Tr. at 3687-3688)

256.    On 05/14/18, Caro was transferred back to DWCC where the diagnosis of malingering for placement was noted.  (Ex. D-75 at 108; Hayden Tr. at 3686-3687)

257.    On 05/31/18, Dr. Seal saw Caro who noted that Caro was diagnosed with malingering, psychosis, and anti-social personality disorder.  (Ex. D-75 at 109; Seal Tr. at 3927)

258.    On 06/26/18, Hayden saw Caro due to medication noncompliance and noted that:

Offender reports that he only agreed to take medication due to Col. Nail promising to transfer him if he did.  He further reports that he will not take any medication and is giving the Col. 1 week to transfer him before "he goes the f*** off."

(D-75 at 113-114; Hayden Tr. 3690)

259.    As promised, on 07/09/18, Caro went off on security.  (Ex. D-75 at 116) An offender who says that he is giving the colonel one more week before he goes off, and then goes off is acting pursuant to a plan - a plan is not a decompensation event.  (Seal Tr. at 3929)  Hayden visited with Caro during his incident for 30 minutes or more.  (Ex. D-75 at 145-146; Hayden Tr. at 3692)

260.    On 12/13/18, Hayden saw Caro while he was on suicide watch and noted:

> Offender reports that he is doing well and stated, "This ain't nothing against you, but I got them lawyers working for me and need to stay of in here a little bit longer." When asked if he had any S/I he replied, "Yep."  Continue SSW.

(Ex. D-75 at 193-194; Hayden Tr. at 3694-3695)  This document is relevant as it shows that Caro, like many other offenders, is using suicide watch and threats pertaining to mental health as a pretext.

261.    On 12/14/18, Hayden saw Caro while he was on suicide watch and noted:

> Offender is calm and cooperative.  Offender denies suicidal and homicidal ideations.  When questioned about suicidal ideations, offender stated, "I'm done playing with y'all. You know I wasn't going to kill myself."  Discontinue SSW and RTQ.

(Ex. D-75 at 195-196)

262.    On 02/07/19, Dr. Seal saw Caro and diagnosed him as psychosis NOS.  (Ex. D-75 at 200; Seal Tr. at 3930-3931)

263.    Caro's records show him to be a manipulative offender throughout.

264.    Christopher Solomon is another manipulative offender.

265.    Solomon was convicted for armed robbery and sentenced to ten years in prison. (Solomon Tr. at 631)  Solomon had 37 disciplinary write ups between 2015 and December of 2019. (Solomon Tr. at 631-632)  In fact, there was a drastic uptick in the number of disciplinary write ups in 2019 when he received 26 of the 37 total.  (Solomon Tr. at 632)

266.    On 06/07/16, prior to coming to DWCC, Solomon hand wrote a note in which he expressed his displeasure with security at being written up for a sex offense.  He expressly stated:

> I'm going to keep throwing shit and break windows, break lights spit on people, fight all your trustees.  Fair warning I did 10 months in Afghanistan  I don't give a f*** bout this lock down Yall can send me to Angola camp J and Im still going to do me.  Yall going to have to kill me before the week over.
>
> The games begins.

(Ex. D-69 at 6-7; Solomon Tr. at 632-636)

267.     On 01/03/18, Solomon was transferred to DWCC from a local parish prison.  (Ex. D-69 at 8; Hayden Tr. at 3595)   He was transferred to DWCC for medical care after he broke in jaw in an altercation with another offender.  (Solomon Tr. at 637)

268.     Because Solomon was transferred from a parish facility, DWCC performed the assessment & intervention on Solomon.  Solomon was an LOC 5 with no mental health history.  (Ex. D-69 at 12; Hayden Tr. at 3596-3597)

269.     On 06/28/18, Solomon was written up for aggravated disobedience; his sentence was suspended.  (Ex. D-69 at 15; Solomon Tr. at 639)

270.     On 07/15/18, Solomon received a disciplinary write up for getting into a fight with another offender.  (Ex. D-69 at 16; Solomon Tr. at 640)  Solomon was transferred to restrictive housing because of this disciplinary write up.  (Solomon Tr. at 640)

271.     On 02/04/19, Solomon was transferred to EHCC.  (Ex. D-69 at 29)   EHCC performed an assessment & intervention on Solomon, and he was classified as LOC 5H, no current mental health issues.  (Ex. D-69 at 30-33)

272.     On 03/11/19, Solomon transferred back to DWCC.  (Ex. D-69 at 35; Hayden Tr. at 3599-3600)

273.     On 09/24/19, a request for mental health services completed by Hayden for Solomon provides:

> When offender Solomon was seen in regards to his sick call he stated, "I ain't fixing to talk to your ass. My lawyers already told me that I don't have to have shit to do with you. Trot your ass back down and get that bitch Dauzat. After she talks to me she can show me that pretty little pussy of hers. On second thought just tell that bitch to come and show me her pussy. She is too stupid to talk to since she is the one who hired your ass."

(Ex. D-69 at 113; Hayden Tr. at 3742-3743)

274.    On 09/25/19, a disciplinary report provides that Solomon told Hayden that,

"I ain't fixing to talk to your ass. My lawyers already told me that l don't have to
have shit to do with you. Trot your ass back down and get that bitch Dauzat.  After
she talks to me she can show me that pretty little pussy of hers. On second thought
just tell that bitch to come and show me her pussy. She is too stupid to talk to since
she is the one who hired your ass." I then exited the tier while offender Solomon
continued to curse and make threats.

(Ex. D-69 at 114; Solomon Tr. at 659)

275.    On 10/02/19, a request for mental health services completed by Hayden for

Solomon provides, "Offender reports that he was advised not to speak with me due to my not being

licensed by the state and he will only speak with Warden Dauzat."  (Ex. D-69 at 119; Hayden Tr.

at 3743-3744)

276.    Solomon's record clearly shows an offender who is "bad," not one who is "mad."

277.    On 04/03/19, Hayden saw Cody Doucet and noted that:

Offender reports that he was instructed to act out by fellow offenders in an attempt
to be transferred to EHCC. He denies any S/I, H/I, or other MH concerns. Continue
SSW until seen by Dr. Seal.

(Ex. D71, pp. 53-54; Hayden Tr. at 3745-3746)  This record shows that the offenders conspired

with each other to manipulate and act out.

278.    Offenders refer to claiming suicide ideation in order to make security work as

"playing" with security.  Just a few examples of such actions are:

- "The games begin" by Solomon, addressed above.  (Ex. D-69 at 7; Solomon Tr. at 632-636)
- "I'm tired of playing. I'm not suicidal" by Adams. (Ex. D-64 at 301)
- When asked about suicide ideation, Adams stated "This is how this sh** works, you mother f***kers want to play games with me and f*** with me, I play games with you and f*** with you.  I'm mother f***king suicidal." (Ex. D-64 at 311)
-  "I'm done playing with yall. You know I wasn't going to kill myself." by Caro. (Ex. D-75 at 196)

279.     Even though there is clear and obvious evidence that offenders malinger and/or take actions for secondary gain, the DWCC mental health staff never uses the term malingering without a diagnosis from EHCC first.  (Burns Tr. at 1480)  Aerial Robinson was clear that DWCC does not use the word "malinger." (Robinson Tr. at 3509) Instead, the DWCC mental health staff treats what is in front of them at the time.  So, if an offender says they are suicidal because they want a tier change, then they are suicidal. Whether they get the tier change or not is not the concern. (Robinson Tr. at 3509)  Hayden similarly testified that:

> All I can go with is what the offender tells me.  If he tells me he's suicidal I take him as suicidal.  But the actions that go along with it very much appeared to be a secondary gain scenario.  But we go with what he tells us and we treat him accordingly.  If he says that he is, you know, suicidal, then we take all precautions while he is suicidal.

(Hayden Tr. at 3709)  Finally, Robinson testified similarly that she does not document every time that she believes an offender is malingering.  Instead, she treats every expression as face value and reacts accordingly.   (Robinson Tr. at 3509)   Dr. Thompson, Defendants' expert psychiatrist, testified that:

> So what I would worry about is if there were times when he was saying, oh, this guy is malingering so I am not going to put him on suicide watch because he is obviously faking.  And that doesn't appear to be occurring.  What happens is that they -- they err on the side of caution when they put people on suicide watch, and I think they err on the side of caution when they are taking people off suicide watch.

(Thompson Tr. at 3986)  Dr. Thompson further explained that DWCC listens to offenders and places them on suicide watch if there is a suspicion of the need, all without having too many suicide watches.  (Thompson Tr. at 4049-4050)

280.     DWCC treating offenders and their complaints at face value when presented with what is clear evidence of malingering and secondary gain (even backed by diagnoses at EHCC) is

the very opposite of deliberate indifference.  The DWCC mental health staff is to be commended for the manner in which they respond to what is clear evidence of malingering and secondary gain.

**K.  There is no credible evidence that offenders deteriorate or decompensate while in restrictive housing**

281.    One of plaintiffs' primary allegations is that offenders in restrictive housing suffer and get worse, i.e., that they decompensate and deteriorate while in restrictive housing.  The record disproves these allegations.

282.    Plaintiffs presented no evidence that serious mental illness is increasing at DWCC. To the contrary, Dr. Thompson specifically found that serious mental illness was not increasing at DWCC.  (Thompson Tr. at 4081-4082)

283.    It is undisputed that an offender in general population can deteriorate.  (Haney Tr. at 3027)

284.    As discussed in detail above, Bruce Charles, the named plaintiff, stopped taking his psychotropic medications and got better while in restrictive housing.  (Haney Tr. 3066-3067) Charles is exactly the opposite of what Plaintiffs contend.

285.    Carlton Turner is an offender who got better while in restrictive housing—again, the exact opposite of what is alleged by plaintiffs.

286.    On 02/05/15, Dr. Seal saw Turner and diagnosed him with major depressive disorder; he increased his medications in response.  (Ex. D-66 at 18; Seal Tr. at 3880-3881)

287.    On 06/01/15, Hayden saw Turner while Turner was in general population on the North South.  Hayden noted the following:

> He then stated, "I saw Warden Dauzat walk in, can you call her to see me?" I asked if his question was anything that I could answer for him and he replied, "No, I really need to speak to her one on one." I then directed him to write her a letter detailing his concerns and she will place him on a call out if warranted or speak to building

security staff and they will contact her to determine if she is able to see him. He stated, "Let me think on it" and exited the building.

(Ex. D-66 at 21-22)  Hayden recalled that there was a problem with Turner writing explicit letters to Warden Dauzat.

288.    On 06/10/15, Hayden saw Turner again and noted that:

> Offender reports that he has been watching Warden Dauzat and knows that she should be in soon and requests that I catch her coming in to see if she will see him in her office. I reminded him of our prior conversation and reiterated that he should send her a letter detailing his concerns or ask the MH buildings security staff to call her when he comes for a walk in and she will see him if she is available. He replied, "With me getting wrote up for writing her that sexual letter saying what I'm going to do to her they ain't gonna let me get in the office with her by myself. But if you ask her and catch her off guard I might." I further explained to offender the proper process to take to speak with Warden Dauzat and he will be followed up with per policy.

(Ex. D-66 at 19-20; Hayden Tr. at 3726-3727)

289.    On 08/15/16, Turner was on extreme suicide watch.  Hayden saw Turner every two hours for his mandated breaks.  (Ex. D-66 at 67-70; Hayden Tr. 3728-3730)  During the first break, Turner began to bang his head on his bunk and refused to speak with Hayden.  Hayden continued extreme suicide watch and added a protective helmet.  (Ex. D-66 at 68; Hayden Tr. at 3728)  Later that same day, Hayden saw Turner again and noted:

> Offender reports that his anger and attempts at self harm were due to his false assumption that he had received an RVR. He states that now he has discovered that he did not receive a RVR and requests to be removed from ESW. He denies any further acts of self harm or any current S/I, H/l, or MH concerns. Downgrade from ESW to SSW.

(Ex. D-66 at 71-72; Hayden Tr. at 3731)

290.    On 10/13/16, Robinson saw Turner at his request after he recently moved to general population on the North Compound and was having some mood swings (particularly anger mood

swings).  Robinson discussed anger triggers and coping skills with Turner who indicated that he felt better after the session.  (Ex. D-66 at 78-79; Robinson Tr. at 3510-3511)

291.    On 11/17/16, Robinson gave Turner a disciplinary write up because of derogatory sexual remarks toward a correctional officer.  (Ex. D-66 at 80-85; Robinson Tr. at 3512-3516)

292.    On 11/17/16, Dr. Seal saw Turner while he was in general population on the North Compound.  Turner indicated that the medications were keeping him from getting depressed, although he was still with anxiety.  Dr. Seal increased his medications.  (Ex. D-66 at 87; Seal Tr. at 3882-3883)

293.    On 01/25/17, Turner lunged from his chair at a correctional officer while at the infirmary on call out for a medical visit.  Hayden was called to check on Turner after the incident. (Ex. D-66 at 94; Hayden Tr. at 3735-3736)

294.    On 04/20/17, Dr. Seal saw Turner.  Everything looked good, so Dr. Seal continued the medications.  (Ex. D-66 at 96; Seal Tr. at 3883-3885)

295.    On 09/21/17, Dr. Seal was unable to see Turner because he was at University Hospital.  (Ex. D-66 at 115; Seal Tr. at 3884)

296.    In November of 2017, Turner climbed the fence in the recreation area and jumped trying to reach the adjacent roof.  He missed, fell to the ground and broke both legs.  Colonel Nail responded immediately to the incident.  Turner told Colonel Nail that he was trying to jump to the ledge of the adjacent building.  (Nail Tr. at 3152-3153)

297.    On 11/09/17, Dr. Seal saw Turner and noted that he had an escape attempt where he broke both legs.  Dr. Seal noted that LSU had started Turner on lithium which was keeping his thoughts together.  Dr. Seal continued the lithium and changed his diagnosed to bipolar I because the lithium was working.  (Ex. D-66 at 120; Seal Tr. at 3886-3887)

298.     On 01/08/18, Hayden saw Turner for an LOC follow up and noted that his current medication regimen was working as needed and that he was taking the medications as prescribed. (Ex. D-66 at 122-123; Hayden Tr. at 3737)

299.     On 04/09/18, Hayden saw Turner for an LOC follow up and again noted that his current medication regimen was working as needed and that he was taking the medications as prescribed.  (Ex. D-66 at 124-125; Hayden Tr. at 3737-3738)

300.     On 04/12/18, Dr. Seal was unable to see Turner because he was in the hospital. (Ex. D-66 at 126; Seal Tr. at 3887)

301.     On 04/28/18, Dr. Seal saw Turner.  Dr. Seal noted that the lithium was keeping his thoughts straight and that Turner was pleased with the lithium.  Dr. Seal had Turner's blood level of lithium checked; although the level was on the lower end, Dr. Seal did not change the dosage because Turner was doing well clinically. Dr. Seal ordered Turner's blood to be checked again. (Ex. D-66 at 127; Seal Tr. at 3888-3890)

302.     On 07/05/18, Hayden saw Turner for an LOC follow up and noted that Turner was taking all prescribed medications and that they were working as intended.  (Ex. D-66 at 131-132; Hayden Tr. at 3738)

303.     On 10/04/18, Dr. Seal saw Turner who was doing well.  The medications were continued.  (Ex. D-66 at 135; Seal Tr. at 3891)

304.     On 02/04/19, Hayden saw Turner for an LOC follow up and noted that Turner was taking all mental health medications as prescribed and that they were working as intended.  (Ex. D-66 at 137-138; Hayden Tr. at 3739)

305.     On 03/07/19, Dr. Seal was unable to see Turner because he was in the hospital. (Ex. D-66 at 139; Seal Tr. at 3892)

306.     On 03/21/19, Dr. Seal saw Turner and noted that Turner's mood continued to be stable on lithium with no side effects.  Dr. Seal addressed Turner's blood levels based upon testing results.  (Ex. D-66 at 141; Seal Tr. at 3892-3893)

307.     The record shows that Turner actually stabilized and improved while in restrictive housing, contrary to the Plaintiffs' base allegation in this case.

308.     We next address Jesse Sullivan.  On 02/02/17, Dr. Seal saw Sullivan and diagnosed him with mood disorder not otherwise specified.  Dr. Seal opted to increase two of his medications at that time.  (Ex. D-68 at 19; Seal Tr. at 3894-3895)

309.     On either 07/13/17 or 09/13/17, Dr. Seal saw Sullivan who presented very similar to before.  Dr. Seal increased the Effexor medication.  (Ex. D-66 at 23; Seal Tr. at 3895-3896)

310.     On 12/21/17, Dr. Seal saw Sullivan.  Sullivan reported that his mood was fair but that he would get cranky in the afternoon.  Dr. Seal split the Effexor doses into two doses to address Sullivan's complaint about afternoon crankiness.  (Ex. D-66 at 27; Seal Tr. at 3896-3897)

311.     On 03/08/18, Dr. Seal saw Sullivan.  Sullivan reported no improvement in his afternoon mood.  Dr. Seal increased his Effexor to respond to his afternoon mood complaints.  (Ex. D-66 at 30; Seal Tr. 3897-3898)

312.     On 05/24/18, Dr. Seal saw Sullivan.  Sullivan's mood was good, but he was now experiencing stomach pains for the last two to three days.  Dr. Seal decreased Effexor in order to reduce the stomach side effects.  Sullivan wanted Wellbutrin, the drug that is abused in prison; Dr. Seal declined.  (Ex. D-66 at 32; Seal Tr. at 3898-3899)

313.     On 10/11/18, Dr. Seal saw Sullivan.  Sullivan was requesting to increase Effexor because it did not cause his stomach problems.  Dr. Seal increased Effexor for Sullivan.  (Ex. D-66 at 34; Seal Tr. at 3900)

314.    On 03/21/19, Dr. Seal saw Sullivan.  Sullivan was doing well.  Dr. Seal continued the medications as prescribed.  (Ex. D-66 at 43; Seal Tr. at 3901)

315.    On 08/15/19, Dr. Seal saw Sullivan.  Again, Sullivan was doing well, and Dr. Seal continued the medications as prescribed.  (Ex. D-66 at 108; Seal Tr. at 3902)

316.    Sullivan's records show that Dr. Seal was responsive to his complaints and adjusted his medications until they worked appropriately for him.  There is no indication whatsoever that Sullivan experienced any problems or deterioration from being housing in restrictive housing.

317.    Even though the Defendants produced hundreds of body camera videos, Plaintiffs introduced no video whatsoever of any purported decompensation event.

**L.  <u>Restrictive housing does not present an objectively intolerable risk of harm</u>**

318.    The issue of whether restrictive housing causes or contributes to mental illness is unsettled.  All three experts, Dr. Thompson for the defendants and Dr. Burns and Dr. Haney for the plaintiffs testified to what is known as the Colorado Study.  (Thompson Tr. at 4059-4065, 4081, 4142-4147; Burns Tr. at 1458-1463; Haney Tr. at 3037-3038)  The Colorado Study was a longitudinal study of the entire Colorado system undertaken with the goal of proving the hypothesis that restrictive housing causes or aggravates mental illness.  (Thompson Tr. at 4059-4060; Burns Tr. at 1458; Haney Tr. at 3037)  At the end of the one-year study, to the surprise of the researchers, mental illness of offenders in restrictive housing did not get worse.  (Thompson Tr. at 4060; Burns Tr. at 1462; Haney Tr. at 3037-3038)  The Colorado Study actually refuted the very premise sought to be proven.

319.    The Colorado Study was peer reviewed prior to being published.  (Thompson Tr. at 4143; Haney Tr. at 3038)  The peer review process means that the study went to three or four other experts in the field and a statistician prior to publication.  (Thompson Tr. at 4143)  Dr.

Thompson and Dr. Burns testified that the Colorado Study is an authoritative study in the field. (Thompson Tr. at 4059-4064; Burns Tr. at 1460)

320.    In addition to the Colorado Study, two meta-analyses were undertaken in 2016 summarizing the literature on whether restrictive housing causes or aggravates mental illness. (Thompson Tr. at 4060-4063; Haney Tr. at 3038-3043)  A meta-analysis surveys and summarizes the literature.  As with the Colorado Study, the meta-analyses also failed to prove the hypothesis that restrictive housing causes or aggravates mental illness.  Instead, the meta-analysis by Gendreau and Lebreque concluded that, contrary to some scholarly discourses, evidence to date suggest that administrative segregation does not produce dramatic negative psychological effects unless extreme conditions apply.  (Haney Tr. at 3039)  The meta-analysis performed separately by Dr. Morgan "did not support the popular contention that administrative segregation is responsible for producing lasting emotional damage."  (Haney Tr. at 3042)  Dr. Morgan further concluded in his meta-analysis study that restrictive housing "may not produce any more of an iatrogenic effect than routine incarceration."   (Haney Tr. at 3043) The meta-analysis studied a lot of different prisons and conditions and confirmed the results of the Colorado study.  (Thompson Tr. at 4060-4061)

321.    In 2016, the National Institute of Justice ("NIJ") published a research paper on restrictive housing which includes a chapter entitled, "Restrictive Housing in the U.S., Issues, Challenges, and Future Directions" (referred to as the NIJ White Paper).  (Burns Tr. at 1463)  The NIJ is the research, development, and evaluation agency of the United States Department of Justice; its mission is advance scientific research, development, and evaluation to enhance the administration of justice and public safety.  (Haney Tr. at 3029)

322.    The NIJ White Paper states that there are two points of view and no consensus on

whether restrictive housing causes mental illness or harm.  (Burns Tr. at 1464)  The NIJ White Paper further states that there is surprisingly little empirical evidence that demonstrates an exacerbation of psychiatric symptoms in restrictive housing with a mental illness diagnosis and there are very few areas where the data on whether restrictive housing causes harm is clear and compelling.  (Haney Tr. at 3030-3031)  Even Dr. Haney, plaintiffs' expert, agreed that there are a limited number of studies that directly address the issue of whether restrictive housing causes mental illness because, in his words, "it is so clearly commonsensical."  (Haney Tr. at 3031-3036)

323.    Dr. Thompson explained in a very balanced and cogent manner that the research does not support the proposition that restrictive housing causes or makes mental illness worse.  Dr. Thompson related how researchers studied the issue for a year in the Colorado study.  After a year, the researchers found that offenders tended to accommodate to the restrictive housing environment.  (Thompson Tr. at 4059-4060)  The results of the Colorado study were not what the researchers expected to see; in fact, the researchers were astonished by the results.  (Thompson Tr. at 4060, 4142)

324.    The Colorado study caused a backlash and the issue is a highly charged and controversial issue for some in the field.  (Thompson Tr. at 4060-4062)

325.    Dr. Haney used an instrument that asked offenders to endorse certain complaints.  Dr. Thompson explained that approach has not been has not been research validated.  (Thompson Tr. at 4081)  Neither Dr. Haney nor Dr. Burns performed a longitudinal study of the individuals at DWCC.  (Thompson Tr. at 4085)  Without such a study, neither has a basis to say that the number of mentally ill is increasing at DWCC.  (Thompson Tr. at 4085)

326.    The bottom line is that with control groups and standardized instruments, studies do not show big changes in the number of mentally ill people in restrictive housing; there is not a

lot of worsening of mental health symptoms, regardless of DSM diagnosis.  (Thompson Tr. at 4061)  It simply is not true, based upon the research data, that offenders in restrictive housing get worse as a group because offenders accommodate to the environment.  (Thompson Tr. at 4141-4144, 4159)

327.    Dr. Burns, Plaintiffs' own expert, testified that, "I am not saying that it was extended lock-down that caused [offenders] to develop [mental illness]."  She further explained that "[t]here is a lot of biological information and other things that - social information.  We don't really know who will get a mental illness and who won't get a mental illness."  (Burns Tr. at 1465)

328.    Plaintiffs' own experts agree that restrictive housing is a necessary correctional practice which is commonly used in the United States.  (Burns Tr. at 1454; Haney Tr. at 3015) Indeed, Dr. Burns testified that every prison system in the country uses restrictive housing, and Dr. Haney testified that 98% of the prisons in the country use restrictive housing. (Burns Tr. at 1454; Haney Tr. at 3015-3016)  A practice that is utilized in 98% of the prisons in the country cannot present an objectively intolerable risk of harm.

329.    Based upon the science and testimony above, there is no objective risk of serious harm from housing offenders who either have no mental illness or whose mental illness is stable or in remission in restrictive housing in a modern prison setting.

330.    Without an objective risk of serious harm, Plaintiffs' claims must fail.

M. **Plaintiff's evidence did not prove their case**

331.    Plaintiffs' evidence simply did not rise to the very high standard of proving that the Defendants were deliberately indifferent and that the conditions at DWCC are cruel and unusual.

332.    Testimony by the offenders consisted of evidence that is demonstratively false and otherwise fantastical and incredible.  Offenders testified to being sprayed with chemical spray at

least 30 times per week.  (Dillon Tr. at 277)  This testimony is refuted by the records.  Instead of there being over 120 uses of spray in a month, on average, there were only 8.5 uses of spray a month.  (Ex. J-19)

333.    Further, the offenders' testified that the cells were unsanitary and smelled of feces. This testimony was not supported by any other evidence.  Plaintiffs' experts did not testify to the cells being dirty and smelling.  The Plaintiffs offered no photographs of any such conditions.  The Plaintiffs did not elicit testimony from other witnesses of any such conditions.  To the contrary, Warden Goodwin testified to the sanitation process.   (Goodwin Tr. at 4232-4235) Further, sanitation is a condition considered as part of the ACA accreditation process.  (Ex. D-42 at 32 - proffer)  The offenders' testimony as to sanitation is simply not credible.

334.    Finally, it is almost not worth mentioning, but one offender testified that Hayden made an unidentified offender bark like a dog.  Hayden, of course, denied any such conduct. (Hayden Tr. at 3604-3605)  Respectfully, this testimony is a figment of the offender's imagination based upon stories from Iraq and Abu Grab.  If such truly shocking behavior was taking place, there would be more witnesses to it.  The fantastical testimony has no credibility at all.

335.    Both Dr. Burns and Dr. Haney had to acknowledge that restrictive housing is a necessary and common correctional practice utilized in 98% of the prisons in the country.  (Burns Tr. at 1454; Haney Tr. at 3015-3016)  There simply has to be a way to discipline offenders who fail to comply with prison standards and address aberrant behavior. (Burns Tr. at 1454; Haney Tr. at 3016)  Failure to utilize restrictive housing would have a negative impact on general population at DWCC and elsewhere. Dr. Haney and Dr. Burns further agreed that DWCC does not keep offenders in restrictive housing for too long a period of time.  (Burns Tr. at 1456-1458; Haney Tr. at 3025-3027)

61

336.    Plaintiffs' psychiatrist expert, Dr. Burns, actually supports the Defendants' case.  Dr. Burns established that DPS&C properly identified offenders with serious mental illness and that only offenders whose serious mental illness is stable or in remission (LOC 3 and LOC 4) are housed in restrictive housing.  (Burns Tr. at 1478-1480)  She further established that Dr. Seal's diagnoses of the offenders are correct and that his medication management is appropriate. (Burns Tr. at 1507)

337.    Respectfully, while there is always room for improvement (and improvements have been and are being made), the record does not show that the Defendants are deliberately indifferent to the Plaintiffs' serious medical needs or that restrictive housing at DWCC is cruel and unusual or below the constitutional standard.

**N.  <u>Defendants were not subjectively indifferent to the offenders' serious mental health needs</u>**

338.    None of the defendants are being subjectively indifferent to offenders' serious mental health needs. There is substantial, if not overwhelming evidence, that the Defendants are not being deliberately indifferent to the Plaintiffs' serious mental health needs.

339.    Sectary Le Blanc and the Department of Corrections have worked with the Vera Institute in good faith to address alleged concerns regarding administrative lockdown and has adjusted accordingly. (Le Blanc Tr. at 2574; Smith Tr. at 2495-2496, 2535-2539, 2540-2541)

340.    The Louisiana Department of Public Safety and Corrections uses ACA standards and department regulations and policies to ensure that its facilities comply with the U.S. Constitution and applicable law. (Le Blanc Tr. at 2561)

341.    The entire Department of Corrections, including probation and parole, are ACA accredited. (Le Blanc Tr. at 2581)

342.    Warden Goodwin has relied upon the advice and counsel of mental health professionals as to the appropriate means to provide mental health care to offenders on the South Compound.

343.    Colonel Nail and Colonel Mays have overseen security of the South Compound while complying with directives from superiors and relying upon mental health professionals as to the appropriate means to provide mental health care to offenders on the South Compound.

344.    Dr. Seal has provided treatment and appropriate medication management to offenders on the South Compound as shown by the fact that Dr. Burns is not critical of Dr. Seal's diagnoses or medication management of offenders.

345.    Warden Dauzat has supervised and overseen mental health care to offenders following the guidance from superiors and Dr. Seal.

346.    Defendants Hayden and Robinson have provided mental health care to offenders in compliance with policies directed by superiors and under the guidance of Dr. Seal.

347.    Defendant Adkins no longer provides mental health care at DWCC. (R. Doc. 524, Stipulation ¶ 99)

348.    DWCC is an ACA accredited institution.  (Goodwin Tr. at 4191; Ex. D-43)  The ACA reviews security and mental health provided in restrictive housing as part of the accreditation process.  (Goodwin Tr. at 4193-4194) ACA accreditation is evidence which negates subjective intent.  (Upchurch Tr. at 3221-3223)

349.    DPS&C has reduced its reliance on restrictive housing.  Since 2016, DPS&C closed Camp J at LSP.  (Thompson Tr. at 4066-4067)  In fact, the percentage of offenders held in restrictive housing by DPS&S decreased from 19.0% in 2017, the highest in the nation, to 4.8% in 2019, below the national average of 5%, 11th in the country.  (Haney Tr. at 3408-

3049)  This drastic reduction in the percentage of offenders housed in restrictive housing at DPS&C negates subjective intent.

350.    Indeed, it is the goal of DPS&C to eliminate restrictive housing altogether, meaning getting offenders out of their cells two hours or more a day.  (Smith Tr. at 2542-2543)  Such intent negates subjective intent.

351.    The number of offenders in maximum custody on the South Compound has been reduced from 344 as of January of 2017 to 228 as of March of 2020. (Ex. J-21)  The reduction in the number of offenders in maximum custody at DWCC negates subjective intent.

352.    DWCC trains all of its employees on mental health first aid, provides mental health training to correctional officers, and provides suicide recognition and prevention training to all employees.  (Exs. D-27, D-33, D-34)  This training negates subjective intent.

353.    DPS&C screens offenders upon intake, usually at EHCC.  That screening is robust and results in a diagnosis and a LOC classification.  Offenders who are classified as LOC 1 and LOC 2 are not housed at DWCC. (R. Doc. 524, Stipulation ¶ 95; Thompson Tr. at 4001-4002)  The screening and the LOC classification negates subjective intent.

354.    DWCC's psychiatrist, Dr. Seal, makes appropriate diagnoses and prescribes appropriate medications.  (Burns Tr. at 1507; Thompson Tr. at 3993-3995)  Having appropriate diagnoses and prescribing appropriate medications negates subjective intent.

355.    DWCC mental health staff sees every offender who requests mental health care.  (Burns Tr. at 1509)  Seeing offenders who request mental health care negates subjective intent.

356.    Mental Health staff at DWCC perform weekly rounds on the South Compound and counsel mental health offenders during those rounds.  (Dauzat Tr. at 3354-3355; Thompson Tr. at 4044-4047)  Performing weekly mental health rounds negates subjective intent.

357.    A segregated interview is performed on all offenders, not just those on the mental health case load, every 90 days after an offender has been in restrictive housing for more than 30 days to make sure that the offender is functioning okay within the environment.  (Dauzat Tr. at 3356-3357)  Performing segregated interviews negates subjective intent.

358.    Mental health staff perform LOC reviews annually and as needed to ensure the coding is accurate. (Dauzat Tr. at 3358-3359)  Performing LOC reviews negates subjective intent.

359.    DWCC mental health staff see offenders classified as LOC 3 at least every 90 days and offenders classified as LOC 4 as least every 180 days, per policy.  (Dauzat Tr. at 3359-3360)  Mental health seeing offenders consistent with their LOC classification negates subjective intent.

360.    Even though there is clear and obvious evidence that offenders malinger and/or take actions for secondary gain, the DWCC mental health staff never uses the term malingering without a diagnosis from EHCC first.  (Burns Tr. at 1480; Robinson Tr. at 3509) Instead, the DWCC mental health staff treats what is in front of them at the time.  (Robinson Tr. at 3509)  DWCC's policy of treating offenders' complaint without regard to malingering negates subjective intent.

361.    DWCC will transfer offenders in need of a higher level of mental health care to EHCC.  (Dauzat Tr. 3314-3315; Ex. D-7 at 4-5)  Transferring offenders in need of a higher level of mental health care from DWCC to EHCC negates subjective intent.

362.    Serious mental illness was not increasing at DWCC.  (Thompson Tr. at 4081-4082)  The fact that serious mental illness was not increasing at DWCC negates subjective intent.

363.    Suicide watch is a precautionary measure for the safety of the offender and the staff.  (Dauzat Tr. at 3387)  Erring on the side of caution and placing offenders on suicide watch when in doubt negates subjective intent.

364.     Mental health staff decides when to start and end suicide watch and what property the offender can have while on suicide watch.  (Ex. J-10 at 4; Dauzat Tr. at 3388-3389)  Having mental health in charge of suicide watch negates subjective intent.

365.     Offenders on suicide watch are typically monitored by officers in person at 15 minutes intervals and randomly.  (Dauzat Tr. at 3390-3391)  In addition, the officer in the key room has a camera for monitoring an offender on suicide watch.  (Dauzat Tr. at 3391)  Monitoring offenders while they are on suicide watch negates subjective intent.

366.     An offender on suicide watch is seen and evaluated daily.  (Dauzat Tr. at 3391; Burns Tr. at 1516)  Daily monitoring of offenders on suicide watch negates subjective intent.

367.     The length of time that offenders at DWCC remain on suicide watch is consistent with the national average.  (Burns Tr. at 1518)  Keeping offenders on suicide watch no longer than typical negates subjective intent.

368.     Upon termination of suicide watch, mental health staff contacts and evaluates the offender within seven days.  (Burns Tr. at 1520; Hayden Tr. at 3628)  Following up with offenders after suicide watch ends negates subjective intent.

369.     The number of suicide watches at DWCC is not higher than it should be. (Thompson Tr. at 4049, 4054-4055; Burns Tr. at 1517-1518)     Not overusing suicide watch negates subjective intent.

370.     A review committee at DPS&C headquarters level reviews every suicide attempt, i.e., an instance where an offender engaged in self-injurious behavior that could have resulted in death and/or a permanent incapacitating physical disability if no intervention occurred.  (Dauzat Tr. at 3435-3437)  A committee review of suicide attempts negates subjective intent.

371.   DWCC does not have a problem with too many completed suicides.  (Burns Tr. at 1516-1517) Not having too many completed suicides negates subjective intent.

372.   Correctional officers turn on their body cameras when the use of chemical spray or other use of force is anticipated.  (Nail Tr. at 3141-3142)  The use of body cameras negates subjective intent.

373.   DWCC does not overuse chemical spray.  From 2018 through February of 2020, DWCC averaged using spray 8.5 times a month.  Not overusing chemical spray negates subjective intent.

374.   DPS&C was in the process of implementing new policies during the relevant period of time.  (Exs. P-JJJ-42, D-2)  Implementing new policies negates subjective intent.

375.   Secretary Le Blanc explicitly represented to the Court the DPS&C is looking to improve mental health care. (Le Blanc Tr. at 4436-4439)

376.   As to security and the conditions of confinement, this is an area where the greatest deference should be given to the state officials.  Secretary Le Blanc succinctly captured the nature of the problem and why deference is owed to the public officials when he stated:

> you have to be real careful how you do these things.  And I have always -- my concern is for the public safety, for staff safety, and the population safety.  That is my biggest concern.  Making a wrong move in this situation could -- it could be a life threatening situation.  And I don't want that to happen.

(Le Blanc Tr. at 4437)  So while certain correctional practices may appear harsh, such practices have been accepted by Courts as within the sound discretion of the officials charged with protecting the public.  Utilizing practices for the safety of the public, staff and other offenders negates subjective intent.

377.   The wealth of evidence shows that the Defendants the Defendants are not being deliberately indifferent to the Plaintiffs' serious mental health needs.

### IV.  PROPOSED CONCLUSIONS OF LAW RE: EIGHT AMENDMENT

**Defendants are not deliberately indifferent to South Compound Offenders' serious mental health needs and have not violated the Eighth Amendment as a matter of law.**

378.    "Prison officials [may] violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs . . . ." *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009) (citing *Wilson v. Seiter,* 501 U.S. 294, 297 (1991)).

379.    "Deliberate indifference is an 'extremely high' standard to meet." *Id.* at 770; *see also Domino v. Tex. Dep't of Crim. Just.,* 239 F.3d 752, 756 (5th Cir. 2001); *Cadena v. El Paso Cty.*, 946 F.3d 717, 728 (5th Cir. 2020); *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020), *application to vacate stay denied*, 140 S. Ct. 1598 (2020) (mem.).

380.    "Deliberate indifference 'is a stringent standard of fault, requiring proof that a municipal [or state] actor disregarded a known or obvious consequence of his action.'" *Shadrick v. Hopkins Cty., Ky.,* 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 410 (1997)).

381.    Only "unnecessary and wanton infliction of pain" is proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citing *Gregg v. Ga.,* 428 U.S. 153, 173 (1976)).

382.    "In a constitutional claim alleging deliberate indifference to the conditions of a prisoner's confinement, the plaintiff must satisfy both the 'subjective and objective requirements' of the Eighth Amendment inquiry." *Valentine*, 956 F.3d at 801 (citing *Farmer v. Brennan*, 511 U.S. 825, 846 (1994)).

383.    The Fifth Circuit in *Valentine* explained that to satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." *Id.* at 801 (citing *Farmer*, 511 U.S. at 846) To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1)

68

was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (citing *Farmer*, 511 U.S. at 837).

384.    The Supreme Court has also held that in cases in which inmates seek injunctive relief to prevent substantial risks of serious injury from ripening into actual harm, the Eighth Amendment deliberate indifference standard "should be determined in light of the prison authorities' current attitudes and conduct," i.e. "their attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 827.   Further, an offender seeking injunctive relief on the grounds that there is "a contemporary violation of a nature likely to continue," must show both the existence of a violation and produce evidence "from which it can be inferred that the [prison]-officials were at the time suit was filed . . . knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . during the remainder of the litigation and into the future." *Id.* at 845-46.

385.    As regards this showing, inmates "may rely on developments that postdate the pleadings and pretrial motions, as prison officials may rely on such developments to show that the prisoner is not entitled to an injunction." *Id.* at 827.

386.    As the Fifth Circuit and a sister court in this circuit have noted, "[t]he Constitution . . . 'does not require that prisoners, as individuals or groups, be provided with any amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.'" *Dockery v. Hall*, 443 F. Supp. 3d 726, 748 (S.D. Miss. 2019), *aff'd sub nom. Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021) (citing *Newman v. St. of Ala.*, 559 F.2d 283, 291 (5th Cir. 1977)).

387.    Only "extreme deprivation" of one or more of the "minimal civilized measures of life's necessities" arise to a violation of the Eighth Amendment. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (quoting *Wilson*, 501 U.S. at 304).

388.    The *Dockery* court expressly held that expert opinions that offenders should "be given different types of mental health care and different types of medication, and that the security and mental health staff should interact with them in a different manner" do not arise to the level necessary to violate the Eighth Amendment. 443 F. Supp. 3d at 743.

389.    Solitary confinement serves a legitimate purpose in the prison community as a deterrent and a punitive force. *Novak v. Beto*, 453 F.2d 661, 670 (5th Cir. 1971). The Eighth Amendment imposes a duty upon prison officials to protect offenders from violence at the hand of other offenders. *Farmer*, 511 U.S. at 832-33; *see also Rhodes v. Chapman*, 452 U.S. 337, 347-48 (1981).

390.    The Fifth Circuit also recognized the paramount concern of security in corrections, stating: "It is beyond dispute . . . that order must be maintained in the prisons. And when a prisoner continues to break prison rules even after losing such privileges as going to the movies and being assigned extra work, the authorities must have some harsher measure to induce compliance with prison regulations." *Novak*, 453 F.2d at 670.

391.    "[P]rison officials are accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order." *Tasby v. Cain*, No. 16-277, 2017 WL 4295441, at *7 (M.D. La. Sept. 12, 2017), *report and recommendation adopted,* 2017 WL 4322413 (M.D. La. Sept. 28, 2017) (citing *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999)).

392.     The classification of inmates is a matter left to the broad general discretion of prison officials, and a failure to refer an inmate for additional treatment, diagnostic testing, or evaluation is a matter of professional medical judgment that the courts will not normally second-guess in the context of a claim of deliberate medical indifference. *Id.* at *9; *Cuellar v. Livingston*, 321 F. App'x 373, 374-75 (5th Cir. 2009) (upholding the dismissal of an inmate's claim as frivolous where he complained of a failure to refer him to a specialist, noting that "the question whether 'additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.'").

393.     The Supreme Court has repeatedly warned that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" *Woodford v. Ngo*, 548 U.S. 81, 94 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973)); *see also Missouri v. Jenkins*, 495 U.S. 33, 51 (1990).

394.     The Fifth Circuit has also held that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference," nor does an offender's disagreement with the medical treatment, absent exceptional circumstances. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

395.     The Fifth Circuit has held that solitary confinement or restrictive housing is not *per se* cruel and unusual punishment. *Novak*, 453 F.2d at 665; *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974); *LaVergne v. McDonald*, No. 19-709, 2020 WL 7090064, at *13 (M.D. La. Nov. 23, 2020), *report and recommendation adopted*, 2020 WL 7081598 (M.D. La. Dec. 3, 2020).  As far back as 1971, the Fifth Circuit has deferentially endorsed the use of solitary confinement or restrictive housing.  In *Novak*, the Fifth Circuit stated and warned that:

> In view of recent tragic incidents in this Nation's prisons and of the frequent assertions of the inadequacy of our penal systems, the burden of judging weighs upon us more than usual as we turn to appellants' contention that solitary confinement as administered by the TDC is cruel and unusual punishment. Just as our dissenting brother, we are deeply troubled by the lightless cell, the limited bedding, and the minimal food provided prisoners in solitary confinement in Texas. Nevertheless, we do not find that the imposition of these conditions constitutes cruel and unusual punishment as forbidden by the Eighth Amendment. As judges, we must look to the extant law and the general practices of our society. Otherwise, we run the risk of imposing our own personal moral code on a perhaps unready society.

453 F.2d at 664-65.

396.    The Fifth Circuit has held that denial of outdoor and out-of-cell exercise for thirteen months while in a 5 x 9-foot cell was not cruel and unusual because there is no record evidence that the offender was ever placed at "substantial risk of serious harm." *Hernandez v. Velasquez*, 522 F.3d 556, 560-61 (5th Cir. 2008).  Further, a District Court in Louisiana recently held that "[c]onfinement to a cell for 23 hours per day does not rise to the level of a constitutional violation." *LaVergne*, 2020 WL 7090064, at *13; *see also Milton v. Gusman*, No. 10-3309, 2010 WL 5376117, at *1 (E.D. La. Dec. 20, 2010).

397.    The Court is directed to a remarkably factually similar case of *Dockery v. Hall*, 443 F. Supp. 3d at 740.  The salient facts in *Dockery* are essentially the same as the facts before this Court.

398.    *Dockery* assessed conditions in the East Mississippi Correctional Facility ("EMCF").  Plaintiffs alleged numerous allegations, the following of which are most pertinent to this case:

- With regard to "solitary confinement," plaintiffs alleged that:

  o offenders who are placed in solitary confinement were not permitted one hour of out-of-cell time per day to shower or have yard time and that they would often go days, and sometimes weeks, without being permitted any out-of-cell time; and (*Id.* at 733)

72

- o and that the length of time some offenders are held in solitary confinement violates their Eighth Amendment rights.  (*Id.* at 743)

- With regard to "mental health care," plaintiffs alleged, among other things, that:

  - o mental health care was deficient and/or inadequate because they were provided infrequent or inappropriate access to mental health providers and were provided insufficient access to other structured mental health treatment programs such as group therapy and mental health activities and the symptoms of their mental diseases were exacerbated by the conditions under which they are housed; (*Id.* at 734, 742)

  - o EMCF's intake and screening process was inadequate because it allegedly failed to promptly and reliably detect mental health needs and/or failed to insure the continuity of mental health treatment; (*Id.* at 742)

  - o they did not receive prescribed medications as ordered and that the MARs were poor; and (*Id.* at 740)

  - o treatment plans for mentally ill offenders at EMCF were inadequate because they lacked specificity.  (*Id.* at 742)

- With regard to "abuse and excessive force by staff," plaintiffs alleged that security officers often "use excessive force with impunity and with no oversight" and that staff "frequently use chemical agents and physical force without warning and in the absence of immediate threat of danger or resistance from the prisoners . . . ." (*Id.* at 734)

399.    The District Court in *Dockery* assessed the claims and found no constitutional violations, and the Fifth Circuit readily affirmed.

400.    As to the periods of time out of cell, the District Court in *Dockery* held that:

Although Plaintiffs complain that they often do not get the five-hours-per-week recreation time, or the three showers-per-week as prescribed by EMCF policy, longer periods of continuous cell time have been found constitutional. *See e.g. Hernandez v. Velasquez*, 522 F.3d 556, 561-62 (5th Cir. 2008) (finding that the denial of recreation time for a thirteen-month period had not violated the prisoner's constitutional rights).

*Id.* at 743.  In this case, the evidence is that the plaintiffs in fact did get time out of cell.

401.    As to the length of solitary confinement, several plaintiffs in *Dockery* testified that they had been held in solitary confinement for extended periods of time.  One plaintiff had been

in solitary confinement for four years (2014 through 2018), and another was in solitary confinement for two and a half years. *Id.* As here, plaintiffs' expert argued that placing an offender in solitary confinement can result in his experiencing, inter alia, anxiety, depression, irrational anger, confused thinking, and increase the risk of suicide and that periods of solitary confinement should not exceed fifteen days, an opinion mirrored by the National Commission on Correctional Health Care. *Id.* In response, the District Court held that:

> The Court finds [the expert] testimony/opinion that a prisoner should not be held in solitary confinement for more than fifteen days does not create a benchmark for determining whether any constitutional rights have been violated. *See Rhodes*, 452 U.S. at 348, 101 S.Ct. 2392 (explaining that expert opinions regarding desirable prison conditions do not "suffice to establish contemporary standards of decency."). In addition, Plaintiffs have not shown that their being placed in solitary confinement was not justified, or that the conditions under which they are being confined are inhumane.

*Id.* In this case, plaintiffs' experts did not opine that DWCC is keeping offenders in restrictive housing for too long a period of time. (Burns Tr. at 1456-1458; Haney Tr. at 3025-3027) As in *Dockery*, there is no merit to any such claim otherwise.

402.    Plaintiffs in *Dockery* further argued that the mental health care was deficient and/or inadequate because they were provided infrequent or inappropriate access to mental health providers and are provided insufficient access to other structured mental health treatment programs such as group therapy and mental health activities. Plaintiffs also argued that the mental health staff at EMCF did not adequately respond to offenders who are in mental health crises including transferring such offenders to outside medical facilities. *Id.* at 742. The District Court rejected plaintiffs' claims of deficient and/or inadequate mental health care holding that:

> Although Plaintiffs, through [their expert], argue that the mental care they are receiving is inadequate and that they would likely respond better if different treatment was provided, they have not shown that they are being denied treatment, that their mental illnesses or disorders are being ignored, or that they are intentionally being mistreated. In other words, Plaintiffs' arguments that they

> should be screened differently, have different types of treatment plans, and be
> provided different forms of mental health treatment do not establish a constitutional
> violation. The record also shows that Defendants have not acted with deliberate
> indifference with respect to the mental health needs [of] prisoners at EMCF.

*Id.* The District Court's opinion in *Dockery* precisely captures the situation in this case. DWCC

does not ignore claims of mental illness or disorders; instead, the record shows that every offender

who requested mental health was seen by a mental health professional. Plaintiffs are arguing that

they should be provided different forms of mental health treatment. As found in *Dockery*, such

claims do not rise to a constitutional violation.

403. The District Court in *Dockery* rejected the plaintiffs' complaints with regard to

medication administration and the MARs holding that:

> To the extent the missed doses or untimely administration of medications evidenced
> on the MARs reflect human error or poor record keeping, they do not amount to
> constitutional violations. *See e.g. Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662,
> 88 L.Ed.2d 662 (1986) (holding that negligent conduct does not rise to the level of
> constitutional violations). In addition, there is insufficient evidence that Plaintiffs,
> as a class, suffered substantial harm as a result of the missed doses or delays as is
> required to maintain a Section 1983 claim. *See e.g. Mendoza v. Lynaugh*, 989 F.2d
> 191, 193 (5th Cir. 1993).

*Id.* at 740. Here, the exact same ruling should result. While plaintiffs have evidence that the

MARs were subject to human error or poor record keeping, such negligence is insufficient to

establish a constitutional violation. The evidence in this case was that the offenders are in fact

receiving appropriate medications prescribed by Dr. Seal. Such evidence negates any claim that

negligent completion of the MARs is a constitutional violation.

404. As to screening and treatment plans, the District Court in *Dockery* held that

"Plaintiffs' arguments that they should be screened differently, have different types of treatment

plans, and be provided different forms of mental health treatment do not establish a constitutional

violation." *Id.* at 742. Here, in this case, the evidence shows that the defendants are in fact

screening appropriately, both at EHCC and at DWCC.  While the defendants acknowledge that treatment plans need to be individualized, this is not a constitutional violation as found in *Dockery*.

405.    As to plaintiffs' claims that EMCF used excessive force by using chemical spay on offenders, the District Court in *Dockery* held that the use of chemical spray on offenders who refused to comply (refused to allow staff to secure the food tray slots) was appropriate.  *Id.* at 745. Here, the credible evidence supports DWCC use of chemical spray as an appropriate means to secure compliance, not an unconstitutional practice.

406.    On appeal to the Fifth Circuit, the plaintiffs (presumably recognizing the weakness of their position) argued that the District Court erred by considering the challenged conditions in isolation instead of in combination.  The Fifth Circuit soundly rejected any argument that the challenged conditions should be evaluated together as being foreclosed by *Wilson v. Seiter*. 501 U.S. 294.  The Supreme Court in *Wilson* explained that "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id*. at 305;  *Dockery*, 7 F.4th at 378.

407.    The Fifth Circuit further concluded that plaintiffs' experts' opinions and views about specific conditions did not determine Eighth Amendment's standards of what conditions are cruel and unusual.  *Dockery*, 7 F.4th at 380.

408.    Respectfully, *Dockery* should be determinative and requires that plaintiffs' claims be rejected in this case.

409.    The Court in *Williamson v. Larpenter*, No. 19-254, 2019 WL 3719761 (E.D. La. July 15, 2019), *report and recommendation adopted*, 2019 WL 3718135 (E.D. La. Aug. 7, 2019) addressed conditions while on suicide watch.  Williamson testified that:

> when placed on suicide watch, his possessions were taken away, he was dressed in a green smock and placed in a holding cell with four other inmates in what should

be a one-man cell. He stated that he was kept there for "two or three days," until he saw Dr. Lo, and he would have been kept there if he had not told Dr. Lo that he was okay and no longer feeling that he would hurt himself or others. He testified that the conditions in the holding cell were "dirty, with food trays all around," overcrowded and cold. He said the cell was about ten-by-ten feet with a toilet and sink and one slab where a mattress was supposed to be located, but there was no mattress. He testified that he saw no medical personnel during those two or three days until he told Dr. Lo he was no longer suicidal and was returned to general population.

*Id.* at *3. The Court concluded that Williamson was appropriately monitored and addressed by medical personnel while on suicide watch. *Id.* at *7. In this case, the evidence further establishes that DWCC does not overuse suicide watch, that the length of time on suicide watch is consistent with the national average, and that DWCC does not have too many completed suicides. Plaintiffs' claims based upon suicide watch fail factually and legally.

410.    Defendants further refer the Court to the very recent Seventh Circuit case of *Rasho v. Jeffreys*, 22 F. 4th 703 (7th Cir. 2022), another case challenging mental health care in a prison. After a settlement agreement was reached, the monitor noted the shortcomings within the Illinois Department of Corrections ("IDOC") as follows:

Among IDOC's challenges is the grossly insufficient and extremely poor quality of psychiatric services. This overwhelming shortage and lack of standards undermines all of the efforts of IDOC to meet the first-year requirements of the Settlement. These psychiatric services deficiencies include but are not limited to problems with the proper continuation of medications for offenders entering IDOC, lack of timely follow-up for offenders prescribed psychotropic medication, dangerous practices related to the use of psychotropic medications including those offenders on forced medication, lack of following standard protocols for ascertaining side effects, extreme delays in obtaining psychiatric evaluations, nonparticipation of psychiatrists in the treatment planning process, lack of timely psychiatric follow up for offenders assigned to crisis beds, and problems related to those offenders designated as requiring inpatient level of psychiatric services. Of note, the overall quality of the psychiatric services provided to the mentally ill offenders of IDOC is exceedingly poor and often times dangerous. IDOC leadership is well aware of the problems related to the insufficient amount of psychiatric services and has taken decisive action to address this issue, but this has not yet been effective. At the time of the submission of this report, however, the lack and quality of psychiatric

services negatively impacts all aspects of the Settlement and contributes to IDOC being non-compliant in the vast majority of areas of the Settlement.

*Id.* at 715.  The District Court entered an injunction directing the IDOC to undertake specific steps and hire a specific number of staff.  On January 12, 2022, the Seventh Circuit reversed finding that the IDOC responded reasonably, even though the IDOC did not comply with the terms of the Settlement.  Even though IDOC fell short of complying with the terms of the Settlement, IDOC was not deliberately indifferent.  *Id.* at 706.

411.    Considering the breadth and depth of the jurisprudence on point and the facts established at trial, it cannot be reasonably concluded that the Defendants were deliberately indifferent to the Plaintiffs' serious medical needs as of March of 2020.

412.    As to Offender Posted Policy 34, in *Peterson v. Michael*, 42,315, p. 7 (La. App. 2 Cir. 6/20/07), 960 So. 2d 1260, 1264, the court held:

> Furthermore, like the trial court, we conclude that Peterson failed to establish any constitutional violation or illegality as to the posted policy. At the time of the hearing, Peterson was no longer on strip cell tier, and counsel for the defendants agreed that he could not be placed back on it without a new infraction. There was no basis for the granting of injunctive relief in Peterson's favor and consequently we reverse and vacate the injunction.

413.    In *James v. LeBlanc*, No. 09-1592, 2011 WL 6842516, at *8 (W.D. La. Nov. 16, 2011), *report and recommendation adopted,* 2011 WL 6842512 (W.D. La. Dec. 29, 2011), the court held:

> Courts have rejected similar claims that confinement to a strip cell generated due process claims. *See e.g., Duncan v. Levenhagen,* 2000 WL 557009, *2 (7th Cir.2000) (placement in strip cell without food for 10 to 12 hours did not impose an atypical and significant hardship); *Seltzer-Bey v. Delo,* 66 F.3d 961 (8th Cir.1995) (strip cell for two days without clothing, bedding, or running water, with a concrete floor, a concrete slab for a bed, and cold air blowing; procedural due process claim dismissed); *Bone v. Walker,* 2010 WL 375320 (C.D.Ill.2010) (strip cell for eight days, without a mattress or clothing for 24 hours, was not atypical or a significant hardship); *Demerson v. Woodford,* 2009 WL 498199

(E.D.Cal.2009) (three days in strip cell did not give rise to due process claim); *Dunkley v. Tate,* 2007 WL 2900169 (W.D.Va.2007) (three days in strip cell without clothing or personal property, with only a smock and mattress, did not present due process claim); and *Lloyd v. Briley,* 2007 WL 917385 (M.D.Ill.2007) (strip cell with no sheets, toilet paper, or personal property for 13 days did not give rise to procedural due process claim). Plaintiff's procedural due process claim should be dismissed.

414.    In this case, the Plaintiffs offered no evidence that anyone was improperly placed on Policy 34.

415.    With regard to Alternate Meal Service (referred to colloquially as "food loaf"), in *Dufrene v. Tuner,* No. 05-2066, 2006 WL 2620091, at *2 (W.D. La. Aug. 14, 2006), the Magistrate Judge assigned to this case found as follows:

> Plaintiff complains that on July 31, 2005, he was deprived of his morning meal. Plaintiff also complains that for seven days he was forced to eat food loaf for every meal. After considering the duration and the totality of the specific circumstances that constituted the conditions of Plaintiff's confinement, this Court finds that the facts alleged do not support a finding that Defendants' conduct was sufficiently harmful enough to deprive him of life's basic necessities. *See Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324. Thus, Plaintiff's claim has failed to satisfy the first requirement of an Eighth Amendment claim.

416.    As to custody status and classification, in *LaVergne,* 2020 WL 7090064, at *8, the court held:

> In order for any due process concern to arise, a protected liberty interest be implicated. The custody status change imposed upon Plaintiff dues not implicate any constitutionally protected liberty interest. Plaintiff also has no constitutionally protected liberty interest in attending college, being allowed access to the hobby shop, attending rodeo, or in his job assignment. Plaintiff's final allegation regarding his quarters change consists of a conclusory allegation that he was "moved to the most violent part of the prison." Plaintiff has not alleged any facts in support of this contention, and thus, it should be dismissed.

(footnotes omitted).

417.    Incarcerated offenders do not retain any absolute rights of physical association. The Fifth Circuit has held "that for convicted offenders '[v]isitation privileges are a matter subject to the discretion of prison officials.'" *Id.* at *8; *Thorne v. Jones*, 765 F.2d 1270, 1273 (5th Cir. 1985).

418.    Confinement to a cell for 23 hours per day does not rise to the level of a constitutional violation. *Milton*, 2010 WL 5376117 at *1 (citing *Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (holding that confinement for 23-hours per day, Monday through Friday, is not unconstitutional because it does not impose an atypical and significant hardship) and *Hill v. Pugh*, 75 F. App'x 715, 721 (10th Cir. 2003) (holding that confinement for 23-hours per day five days a week and 24-hours per day on the remaining two days is not unconstitutional because it shows neither an "unquestioned and serious deprivation of basic human needs" nor intolerable or shocking conditions)).

419.    Offenders have no absolute constitutional right to outdoor recreation, so long as some form of exercise is permitted, or, the conditions of confinement, when viewed as a whole, are not violative of the Eighth Amendment. *See Callicutt v. Panola Cty. Jail*, 200 F.3d 816, 816 (5th Cir. 1999) (unpublished) (citing *Jones v. Diamond*, 594 F.2d 997, 1012-13 (5th Cir.1979)); *Scott v. Gusman*, No. 10-2706, 2011 WL 666851, at *3 (E.D. La. Feb. 14, 2011) (even if an offender is allowed outside for only 45 minutes twice per week, that "is not an atypical, significant deprivation in a prison setting, and it does not rise to the level of a constitutional violation."); *Argue*, 80 F. App'x at 430; *Hill*, 75 F. App'x at 721; *Figueroa v. Dinitto*, 52 F. App'x 522, 523 (1st Cir. 2002) (unpublished); *Smith v. Romer*, No. 96-1211, 1997 WL 57093, at *2 (10th Cir. Feb. 11, 1997); *Smith v. Beatty*, No. 95-1493, 1996 WL 166270, at *1 (7th Cir. Apr. 5, 1996).

420.    Even severe restrictions on or complete denials of outdoor recreation are not prohibited by the Constitution. *See, e.g., Chavis v. Fairman*, No. 92-7490, 1994 WL 55719, at *5

(N.D.Ill. Feb. 22, 1994), *aff'd*, 51 F.3d 275 (7th Cir. 1995) ("Generally, even dramatic restrictions on outdoor exercise do not violate the Eighth Amendment (or due process, where pretrial detainees are at issue) so long as offenders have ample opportunity to enjoy indoor activity."); *Rue v. Gusman*, No. 09-6480, 2010 WL 1930936, at *9 (E.D.La. May 11, 2010); *Broussard v. Phelps*, No. 86-2126, 1987 WL 18153, at *1, 3 (E.D.La. Oct. 6, 1987) (no constitutional deprivation shown where offender was allowed outdoor recreation only twice in a seventeen month period in light of the fact that he was allowed to leave his cell for an hour each day and cell was large enough for indoor exercise).

## V.  FINDINGS OF FACT RE: ADA/RA CLAIMS

421.    Prior to March 2020, Deputy Warden Angie Huff was the ADA liaison at DWCC. (Huff Tr. at 1935)

422.    Heat precaution duty statuses for offenders on certain psychotropic medication are ordered by medical or mental health staff. (Huff Tr. at 2024-2025)

423.    Most ADA accommodations at DWCC are handled informally based on staff observation or offender's inquiry without the offender having to file a request for accommodation. (Huff Tr. at 2108-2109)

424.    Disciplinary action taken as a result of misconduct is not discrimination based upon a mental health disability.

425.    Discipline against offenders with mental illness is allowed in a prison setting.

426.    Disciplinary segregation is necessary and appropriate for offenders with mental illness if they pose a danger to prison officials and/or other offenders.

427.    Group therapy and/or group programs are not available to any offenders in disciplinary segregation at DWCC, including offenders with or without a disability. (Huff Tr. at 2106-2107)

428.    Offenders in disciplinary segregation, both with or without a disability, have access to programs through written materials and individual counseling. (Huff Tr. at 2107)

429.    Defendants identify offenders with mental illness through the screening and intake process described above in detail.

430.    Plaintiffs' ADA claims are a re-packaging of their Eighth Amendment claims. (Court's denial of Defendants' Motion for Summary Judgment, R. Doc. 516 at 16)

431.    The Plaintiffs adduced no expert testimony on the ADA claims.

432.    The Plaintiffs failed to demonstrate evidence of a qualifying disability for any class member.

433.    The Plaintiffs failed to demonstrate discrimination by reason of disability.

434.    The Plaintiffs failed to demonstrate reasonable accommodations were being denied to offenders who were assigned to restrictive housing as a result of violating institutional rules.

435.    Dr. Haney believes restrictive housing "harms" offenders with or without mental illness. (Haney Tr. at 2888, 2890-2891)

436.    All offenders in disciplinary segregation are treated the same with regard to the types of mental health treatment available to them. (Huff Tr. at 2106-2107)

437.    Defendants' mitigation measures and accommodations for offenders with a mental health diagnosis include the following: screening and testing offenders for mental illness; providing medication; providing counseling through the hiring and assigning of social workers to the restrictive housing areas; refraining from disciplining offenders who violate institutional rules

as a result of their mental health issues; declaring heat alerts; providing offenders heat duty statuses; and promulgating policies prohibiting placing the actively psychotic in restrictive housing.

438.   Defendants do not discipline offenders who violate institutional rules during a psychotic episode as demonstrated by the particular case of Frederick Gray. (Hayden Tr. at 3612-3614; Ex. D-62)

439.   Plaintiffs failed to provide any evidence that the Defendants' definition of disability is underinclusive by way of not taking into account functional impairment.

440.   Plaintiffs failed to demonstrate that any class member lost his SMI designation as a result of being in remission.

441.   Defendants provide offenders a process for requesting reasonable accommodations and educate the offenders on how to utilize that system. (Huff Tr. at 2098-2103; Ex. D-36)

442.   Defendants provide inmate counsel substitutes to assist offenders in accessing both the ARP and ADA reasonable accommodation procedures. (Huff Tr. at 2107)

## VI.   CONCLUSIONS OF LAW RE: ADA/RA CLAIMS

443.   A plaintiff states a claim for relief under Title II of the ADA if he alleges: (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.  *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

444.   The purpose of the ADA as specifically stated by Congress is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . ." 42 U.S.C. § 12101(b)(1).

445.    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

446.    The RA is interpreted the same as the ADA with certain exceptions not applicable here. *See Smith v. Harris Cty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020).

447.    The ADA is not meant to be an "end run" around Eighth Amendment cases.  *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

448.    The ADA proscribes discrimination against disabled individuals.  The Eastern District of Louisiana in *Williamson v. Larpenter*, 2019 WL 3719761, at *14, held that the ADA is a discrimination statute. "The fact that a person has a qualifying disability is <u>not</u> alone sufficient to state a cognizable ADA claim. Instead, the person with a disability must also establish causation, <u>i.e.,</u> that he was discriminated against in the provision of benefits, services or programs <u>by reason of his disability</u>."  *Id.; see also Kokinda v. Pa. Dep't of Corr.*, 779 F. App'x 944, 950 (3d Cir. 2019) (claim was dismissed because plaintiff failed to "assert that he was excluded from a program or service on account of or because of his disability as required."); *Goodman v. Johnson*, 524 F. App'x 887, 890 (4th Cir. 2013) (unpublished) (ADA claim dismissed because plaintiff "failed to allege facts indicating that, due to his disability, he has been deprived of benefits for which he was otherwise qualified."); *Bryant*, 84 F.3d at 249 (failure to attend to a disabled person's needs is not a violation of the ADA where no discrimination is alleged and the disabled person is not treated worse because he is disabled); *Maccharulo v. N.Y. St. Dep't of Corr. Servs.*, No. 08-301, 2010 WL 2899751, at *3 (S.D.N.Y. July 21, 2010) ("Therefore, when there is no allegation of 'disparate treatment,' . . . between disabled and non-disabled individuals, the plaintiff has not stated a claim

under the ADA or the Rehabilitation Act."); *Lee v. St., Dep't of Corr. Servs.*, No. 97-7112, 1999 WL 673339, at *14 (S.D.N.Y. Aug. 30, 1999) (plaintiff's allegations suffered from a fundamental defect in that they failed to state that the offender was excluded from any prison service or program because of his disability)

449.    Neither the ADA nor the RA applies to claims regarding the quality of mental health services. *See Smith v. Harris Cty.*, 956 F.3d at 318 n.1 ("the ADA does not typically provide a remedy for negligent medical treatment."); *Atkins v. Cty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003); *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *Bryant*, 84 F.3d at 249 (the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners" where no discrimination is alleged).

450.    Similarly, a claim that challenges the adequacy or the substance of services that are provided to a disabled individual is not a valid claim under either the ADA or the RA. *Maccharulo*, 2010 WL 2899751, at *3; *Atkins*, 251 F. Supp. 2d at 1232.

451.    Disciplinary action taken as a result of misconduct is not discrimination based upon a disability as to mental health. *See O'Guinn v. Nev. Dep't of Corr.*, 468 F. App'x 651, 654 (9th Cir. 2012) (claim rejected because plaintiff failed to produce evidence showing that his disciplinary action was on account of his disability rather than on account of his misconduct).

452.    "[H]arsh conditions [of administrative segregation] may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners." *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).

453.    If the entity does not provide the program, service, or activity as a general matter, the entity has no duty under Title II to provide an accommodation for disabled persons. This

makes sense because the goal of the ADA is to provide equal access to individuals with disabilities to opportunities and benefits, not to provide privileges withheld from everyone else. *Williamson*, 2019 WL 3719761, at *15 (quoting *Irby v. Sumnicht*, 683 F. Supp. 2d 913, 917 (W.D. Wis. 2010)). In *Williamson v. Larpenter*, the offender asserted that the "defendants discriminated against him by denying him access to therapy, group programs and regular trips to a mental health facility." *Id.* at *14. The court addressed the ADA claims specifically by noting that the jail did not provide any of the services to any of the inmates at the jail. *Id.* The court then noted that the plaintiff "was not treated differently from other inmates." *Id.* at *15.

454.    The mere fact that conditions may be harsh is not an allegation of discrimination. *See Wilkinson*, 545 U.S. at 224. "[R]outine discomfort is part of the penalty that convicted prisoners pay for having committed crimes." *Williamson*, 2019 WL 3719761, at *11.

455.    Because Plaintiffs did not show that individuals requested accommodations which were denied, the ADA/RA claim is merely as re-packaging or end run around the Eighth Amendment claims and should be denied as such.

## VII.  FINDINGS OF FACT RE: FIRST AMENDMENT CLAIMS

456.    Plaintiffs allege that Defendants have interfered with counsel's investigation of conditions at DWCC by systematically interfering with mail sent by prisoners to their counsel in violation of the First Amendment of the Constitution.  Plaintiffs' First Amendment claims suffer from a fatal failure of proof.

457.    Major Angela Mathews has been responsible for the DWCC mail room since approximately 2013.  (Ex. P-BBBB-3 at 8-9)

458.    DWCC has policies for operation of its mail room. The mail room personnel are trained and follow the policies.  (Ex. P-BBBB-3 at 14, 55)

86

459.    An offender who sends legal mail from DWCC is required to write "legal mail" or "privileged correspondence" on the envelope.  (Ex. P-BBBB-3 at 45)  Even if the mail is not noted as legal mail or privileged correspondence, the mail room treats the mail as legal mail anyway if it is identified as such.  (Ex. P-BBBB-3 at 51)

460.    Dep. Reg. No. C-02-009 provides that all outgoing privileged correspondence may be posted sealed and will not be opened and inspected without express authorization from the Warden or Deputy Warden as specified in the policy.  (Ex. P-BBBB-4 at 8)

461.    On the South Compound, a locked mail box is passed down the tier for each offender to personally place mail into a locked mailbox.  (Ex. P-BBBB-3 at 47-48; Ex. P-BBBB-4 at 28)  Mail room personnel are the only persons who have a key to the locked mailbox.  (Ex. P-BBBB-3 at 12, 56; Ex. P-BBBB-4 at 28)

462.    An officer from the mail room goes to each cell block on the South Compound and retrieves the mail box.  The officer from the mail room unlocks the mail box, gets the mail, and places the mail in a plastic bag.  No staff from the tiers are supposed to handle the mail at all.  (Ex. P-BBBB-3 at 47-48)

463.    Major Mathews has received legal mail from the South Compound with tape on it.  (Ex. P-BBBB-3 at 49-50, 76)

464.    Colonel Nail has received mail from offenders in restrictive housing that was "taped." (Nail Tr. at 3155-3156)

465.    Personnel in the mail room will tape mail that is not sealed to keep the contents from falling out.  (Ex. P-BBBB-3 at 50)

466.    Mail room personnel take outgoing mail to the Homer Post Office to be handled by the United States Post Office thereafter.  (Ex. P-BBBB-3 at 87)  DWCC mail room personnel

87

obviously have no way of knowing what happens to mail after it is in the custody of the United States Postal Service.  (Ex. P-BBBB-3 at 90)

467.    Some of the envelops complained of appear as if they were opened and taped shut after DWCC mail room stamped the envelopes with the notation, "Not responsible for contents." (Ex. P-BBBB-3 at 96)

468.    Major Mathews in charge of the mail room testified that the suggestion that personnel in the mail room opened outgoing mail and then taped it shut before sending it was "crazy."  (Ex. P-BBBB-3 at 86)

469.    Chelsea Ormon, an administrative assistant with Disability Rights, estimated that only 5-10% of the envelopes received from DWCC had tape applied to the envelope.

470.    As to incoming mail, the DWCC mail room receives 300-500 pieces of mail a day. (Ex. P-BBBB-3 at 33-34)

471.    When the mail room receives incoming legal mail, the mail is logged into a computer and then placed into the box for the night shift supervisor.  (Ex. P-BBBB-3 at 37)

472.    An officer with the rank of Captain or higher delivers legal mail directly to the offender.  (Ex. P-BBBB-3 at 59; Ex. P-BBBB-4 at 30)  The delivering officer secures the signature of the offender/recipient on a legal mail receipt. (Ex. P-BBBB-3 at 61; Ex. P-BBBB-4 at 30)

473.    Mathews has received mail from the United States Post Office that was torn and had been taped.  (Ex. P-BBBB-3 at 91)

474.    If legal mail is accidentally opened, the mail is not read. (Ex. P-BBBB-3 at 59)

475.    Plaintiffs did not identify any employee or agent of DWCC as having tampered with the mail.

476.    Plaintiffs claim that DWCC is responsible for damage to envelopes, ignoring the fact that the United States Postal Service handled and delivered the mail. No evidence of the multiple post offices that handle and transport the mail after it leaves DWCC was offered.

477.    Plaintiffs further allege that Defendants have punished and retaliated against class members in violation of their First Amendment.  Again, Plaintiffs offered no credible evidence as of any such actions to support the claim.

478.    Plaintiffs offered a series of letters from Damonte Henry from which they argue that Henry withdrew from the lawsuit as a plaintiff after being transferred to EHCC.  This argument fails for lack of proof because Henry himself states in a handwritten letter that:

> . . . I am writing to clarify and dissolve the implications about anything being offer to me as a deal from you or any other employee at David Wade Correctional Center. That was not the case. I don't know if things has got misconstrued or what, but I just want to let you know that nothing has been offered to me. You told me give you good behavior and you would see about me making the board. Nothing more, no promises, guarantee's.

(Ex. P-KK-125) Henry did not testify to say anything contrary.  Consistent with the letter, Colonel Nail testified that he spoke with Henry about his conduct and how to get off of extended lockdown, not about the Advocacy Center  (Nail Tr. at 1901)  Colonel Nail specifically denied speaking with Henry about the lawsuit and affirmatively stated that he did not make a deal with Henry.  (Nail Tr. at 3156-3157)  That testimony stands unrefuted.

479.    The remainder of the allegations of retaliation are so vague and baseless as to almost not merit a specific response. For instance, Carlton Turner testified that he felt like he was retaliated against when he received a write up for having his jumpsuit down.  (Turner Tr. at 80-81)  Willie Dillon testified that he was retaliated against because his property was lost.  (Dillon Tr. at 274-275)  Indeed, Plaintiffs' own security expert, Pacholke, was unable to identify any rule violations that were retaliatory.  (Pacholke Tr. at 2814)

89

## VIII.  <u>CONCLUSIONS OF LAW RE: FIRST AMENDMENT CLAIMS</u>

480.    "A prison official's interference with a prisoner's legal mail . . . may violate the prisoner's First Amendment right to free speech—i.e., the right to be free from unjustified governmental interference with communication." *Brewer v. Wilkinson*, 3 F.3d 816, 820, 825-26 (5th Cir. 1993); *Damm v. Cooper*, 288 F. App'x 130, 132 (5th Cir. 2008).

481.    "[P]rison officials may open incoming legal mail to inspect it for contraband." *Jones v. Mail Room Staff*, 74 F. App'x 418, 419 (5th Cir. 2003) (citing *Brewer*, 3 F.3d at 820-21. Similarly, "prisoners do not have a constitutional right to be present when privileged, legal mail is opened and inspected." *Collins v. Foster*, 603 F. App'x 273, 275 (5th Cir. 2015) (citing *Brewer*, 3 F.3d at 825).

482.    Conclusory allegations of interference with legal mail are insufficient to support such claims. *Damm*, 288 F. App'x at 132; *Every v. Jindal*, No. 9-671, 2011 WL 2182047, at *3 (W.D. La. May 13, 2011), *report and recommendation adopted*, 2011 WL 2182721 (W.D. La. June 3, 2011).

483.    Plaintiffs presented no evidence that anyone at DWCC was interfering and/or tampering with their mail.  To the contrary, Defendants offered undisputed testimony as to how the mail service at DWCC operates.  Defendants further presented evidence that offenders do have tape, at least at times, a critical fact that supposedly supports their claims.  Further, Plaintiffs cannot overcome the fact that the mail is processed by the United States Postal Service and that only 5-10% of the mail is questionable.  This claim fails for a complete lack of proof.

484.    The court in *Young v. LeBlanc*, No. 19-13516, 2020 WL 3421132, at *26 (E.D. La. May 7, 2020), *report and recommendation adopted*, 2020 WL 3415800 (E.D. La. June 22, 2020) stated that the law in the Fifth Circuit:

is well established that prison officials may not retaliate against an inmate who exercises his right of access to court. Officials likewise may not retaliate against an inmate for using the grievance system. A plaintiff must allege facts showing that the defendant possessed a retaliatory motive. The inmate must show <u>more than his personal belief that he was the victim of retaliation. Mere conclusory allegations of retaliation are not enough</u>.

(emphasis in original)

485.    Since Plaintiffs offered little more than their own personal beliefs of retaliation, these claims fail as a matter of law.

## IX. <u>CONCLUSION</u>

486.    The salient facts are that DWCC utilizes restrictive housing, a common correctional practice employed in at least 98% of the prisons in the country, to control aberrant behavior. The men assigned to restrictive housing are screened so that the offenders with the most serious mental illness (LOC 1 and LOC 2) are not housed at DWCC. The offenders that are assigned to DWCC are screened on intake and their mental health diagnoses are correct. While at DWCC, the offenders regularly see the psychiatrist consistent with their LOC, and the psychiatrist prescribes appropriate medications. Mental health staff are available and see the offenders regularly. Suicide watch is not overused, and DWCC does not have a problem with too many suicide watches or too many completed suicides. The offenders in restrictive housing regularly progress out of restrictive housing, and there is no evidence that DWCC keeps offenders on restrictive housing for too long a period of time. Further, the evidence shows that DPS&C and DWCC have adopted new policies and have reduced their reliance on the use of restrictive housing. These salient facts are fully supported by the record and are generally undisputed.

487.    The salient, generally undisputed facts supported by the record, negate any suggestion that the Defendants are deliberately indifferent to the Plaintiffs' serious medical needs.

Exactly as expressed by Secretary Le Blanc, while care can be and is being improved, care is beyond the constitutional standard.  (Le Blanc Tr. at 4439)

488.    Plaintiffs' claims regarding ADA/RA should be rejected for failure of proof.  There is no proof that DWCC discriminates against the disabled.  Plaintiffs' claims are essentially an improper attempt to bootstrap what are essentially Eighth Amendment quality of mental health claims under the ADA/RA.  This claim fails as a matter of fact and law.

489.    Plaintiffs' claims regarding alleged First Amendment violations fail for lack of proof

490.    Defendants are remarkable state actors who are performing the difficult and thankless job of securing the most violent offenders in our society in order to maintain the safety of the public, the institution, and the offenders themselves.  The evidence shows that the Defendants account for the offenders' mental health and are not being deliberately indifferent.  Because there are no actions that fall below the constitutional standard of care, this suit for injunctive relief should be dismissed eliminating the need for further proceedings.

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 383-4703
Facsimile: (225) 343-0630

By: /s/ Randal J. Robert
    Randal J. Robert (#21840)
    Connell L. Archey (#20086)
    Keith J. Fernandez (#33124)
    Madaline King (#38301)
    *Special Assistant Attorneys General*
    Email:  Randy.Robert@butlersnow.com
            Connell.Archey@butlersnow.com

Keith.Fernandez@butlersnow.com
Madaline.King@butlersnow.com

Counsel for Defendants

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of March 2022, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

      /s/ Randal J. Robert
      Randal J. Robert