UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself and all other similarly situated prisoners at David Wade Correctional Center, | * * * * * | CIVIL ACTION NO.: 5:18-CV-00541-EEF-MLH |
| and | * * | |
| The ADVOCACY CENTER, | * * | JUDGE ELIZABETH E. FOOTE |
| PLAINTIFFS, | * * | MAGISTRATE JUDGE HORNSBY |
| VS. | * * | CLASS ACTION |
| JAMES M. LEBLANC, *et al.*, | * * | |
| DEFENDANTS. | * | |

**PLAINTIFFS FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I.   THE NATURE OF THE ACTION.................................................................6

II.  CLASS MEMBERS..........................................................................6

III. DEFENDANTS ............................................................................7

IV.  OVERVIEW OF DAVID WADE CORRECTIONAL CENTER (DWCC)..........................8

VI.  THE PARTIES EXPERTS....................................................................14

  A.  Secretary Dan Pacholke................................................................14

  A.  Dr. Craig Haney .......................................................................15

  B.  Dr. Kathryn Burns.....................................................................17

VII. DEFENDANTS VIOLATE THE EIGHTH AMENDMENT TO THE CONSTITUTION BY SUBJECTING THE CLASS AND SUBCLASS TO A SUBSTANTIAL RISK OF HARM 18

  A.  Defendants' failure to provide adequate mental health care creates a substantial risk of harm.............................................................................21

    i.   Defendants do not appropriately identify or diagnose mental illness, creating a substantial risk of serious harm.......................................................21

ii. Defendants do not provide adequate mental health care even when they have identified patients with mental illness...................................................................................27

iii. There is no programming available for prisoners housed in extended lockdown ..........42

iii.  The Defendants intentionally discontinued the only program that provided psychotherapy, increasing the risk of harm for the men at DWCC. ....................................46

iv. Defendants' medication policies are extremely dangerous, creating a substantial risk of serious harm....................................................................................................49

v. Defendants' failure to monitor prisoners taking mental health medications in high heat conditions creates a substantial risk of serious harm ..........................................62

v. DWCC does not respond to decompensation or mental health crisis, creating a substantial risk of serious harm and resulting in actual harm ................................64

vi. DWCC's suicide prevention policies create a substantial risk of serious harm .............66

vii. Inadequate Record Keeping at DWCC Creates a substantial risk of serious      harm ...86

vii. Defendants' Offender Posted Policy #34 - Strip Cell Status - creates a substantial risk of serious harm....................................................................................................89

viii. Specific Practices Contributing to a Substantial Risk of Serious Harm .......................94

ix. Inadequate supervision of staff creates a substantial risk of serious harm......................99

x. Lack of supervision of the men held in Extended Lockdown creates a risk of harm .....104

xii. Severe Isolation Creates a Substantial Risk of Serious Harm ....................................111

xiii.  Research shows that long term isolation creates a substantial risk of serious harm and does not comport with the evolving standards of decency.................................116

xv. Dr. John Thompson's Opinions Have Inadequate Basis in Fact and Do Not Address the Most Critical Harms for Class Members...............................................................128

VIII.DEFENDANTS DELIBERATE INDIFFERENCE TO THE RISK OF SERIOUS HARM AT DWCC VIOLATES THE EIGHTH AMENDMENT TO THE CONSTITUTION.............131

A.   Defendants' Policies and practices demonstrate Defendants' knowledge of the risk of harm to class and subclass members..........................................................................131

B.   Defendants Received Explicit Complaints from Class Members ..................................133

C.   Defendants Authorized the Specific Policies that Create a Substantial Risk of Serious Harm....................................................................................................................138

IX.   DEFENDANTS VIOLATE THE AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT BY DISCRIMINATING AGAINST CLASS AND SUB CLASS MEMBERS...........................................................................................................140

A.   The subclass consists of qualified individuals with disabilities...................................142

B.   Defendants Have Violated the Affirmative Duties Imposed Under the Americans with Disabilities Act and Rehabilitation Act........................................................................143

i.      Defendants violate the ADA and RA's affirmative duty to evaluate and accommodate people with disabilities .......................................................................145

ii.    The defendants fail to individually identify people with disabilities ......................... 146

iii.    Defendants' definition of serious mental illness is under inclusive ...................... 147

iv.    Defendants exclude people with chronic mental illness from the definition of serious mental illness ................................................................................................................. 148

v.    Defendants provide no affirmative modifications even for people identified as having serious mental illness................................................................................................. 149

vi. Defendants violate the ADA by setting an overly restrictive criteria for reasonable accommodation ................................................................................................................ 150

vii.    Defendants violate the ADA by ignoring open and obvious disabilities............... 151

viii.    DWCC Fails to Provide a Process for Requesting Reasonable Accommodations . 152

ix.    DWCC Uses Brutal Methods of Discipline Against People with Mental Illness for Behaviors Related to Their Disability................................................................................ 154

x.    Defendants Discriminate Against People with Known Disabilities by Disregarding Appropriate Housing Assignments ................................................................................ 160

X.    DEFENDANTS' CONDUCT VIOLATES THE FIRST AMENDMENT TO THE CONSTITUTION. ................................................................................................................ 163

A.    Protecting the sanctity of legal mail is of particular significance in this case. ............... 163

B.    The First Amendment legal framework........................................................................ 166

C.    Defendants systematically interfered with mail sent by prisoners to their counsel in violation of the First Amendment to the Constitution (Outgoing Mail). .............................. 168

D. Defendants interfered with Plaintiffs' First Amendment rights by systematically censoring mail sent by attorneys to prisoners at DWCC. (Incoming Mail)........................................... 173

D.    Defendants otherwise attempted to interfere with communication with counsel. .......... 178

## <u>TABLE OF AUTHORITIES</u>

Cases

*Alexander v. Choate*, 469 U.S. 287, 301 (1985)..............................................................140

*Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 933106, at *3 (N.D. Cal. Mar. 11, 2021) ..........................................................................................................................................154

*Badalamenti v. Louisiana Dep't of Wildlife & Fisheries*, 439 F. Supp. 3d 801, 808 (E.D. La. 2020) ...................................................................................................................................144

*Ball v. LeBlanc,* 792 F.3d 584, 596 n.9 (5th Cir. 2015)......................................................142

*Braggs v. Dunn,* 257 F. Supp. 3d 1171, 1192 (M.D. Ala. 2017)...........................................21

*Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir. 1993) ................................................ 166, 167

*Brooklyn Cntr for Independence of the Disabled v. Bloomberg*, 980F. Supp.2d 588, 640 (S.D.N.Y. 2013)....................................................................................................................143

*Burt v. Carlson*, 752 F. Supp. 346, 348 (C.D.Cal. 1990).....................................................166

*Burton v. Foltz*, 599 F.Supp. 114, 117 (E.D.Mich. 1984).....................................................166

*Cadena v. El Paso Cnty.*, 946 F.3d at 723 (5th Cir. 2020) ..........................................139, 142

*Calhoun v. DeTella,* 319 F.3d 936, 940 (7th Cir. 2003) .........................................................18

*Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) ..................................................18

*Davidson v. Scully*, 694 F.2d 50, 53 (2d Cir. 1982)..............................................................167

*Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)...............................................................166

*Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000) ..........................................................166

*Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016), modified sub nom. *Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020). .............................140, 145

*Evans v. Vare*, 402 F.Supp.2d 1188, 1194-96 (D.Nev. 2005), *affirmed in part, reversed in part, and remanded on other grounds*, 203 Fed.Appx. 95 (9th Cir. 2006). ..................................165

*Farmer v. Brennan,* 511 U.S. 825, 834 (1995)......................................................................18

*Faulkner v. McLocklin*, 727 F. Supp. 486, 489–92 (N.D.Ind. 1989).....................................166

*Gates v. Cook*, 376 F.3d 323, 343 (2004) ...............................................................18, 19, 20

*Guyer v. Beard*, 907 F.2d 1424, 1428–29 (3d Cir. 1990).....................................................166

*Hayes v. Idaho Correctional Center*, 849 F.3d 1204, 1213 (9th Cir. 2017) .............................172

*Helling v. McKinney,* 509 U.S. 25, 33 (1993)........................................................................18

*Hinderliter v. Hungerford*, 814 F. Supp. 66, 68 (D.Kan. 1993)...........................................166

*Hudson v. McMillian*, 503 U.S. 1, 4 (1992)..........................................................................20

*Hutto v. Finney,* 437 U.S. 678, 686–872 (1978) ...................................................................20

*Johnson v. California*, 543 U.S. 499, 513–15 (2005) ...........................................................176

*Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 131 (1977) ..................................176

*Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002).........................................................172

*Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010)....................................................141, 148

*Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000)....................................20

*Lemon v. Dugger*, 931 F.2d 1465, 1467–68 (11th Cir. 1991)..............................................165

*Levy v. Louisiana Dep't of Pub. Safety & Corr.,* 371 F. Supp. 3d 274, 285 (M.D. La. 2019)...143, 148

*Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *55 (M.D. La. Mar. 31, 2021) ..........153

*Madrid v. Gomez,* 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995).............................................21

*Mawby v. Ambroyer*, 568 F.Supp. 245, 249–50 (E.D.Mich. 1983).........................................167

*McChriston v. Duckworth*, 610 F. Supp. 791, 795–96 (N.D.Ind. 1985)...................................166

*Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir. 1987)................................18, 20
*Merriweather v. Zamora*, 569 F.3d 307, 316–17 (6th Cir. 2009) .............................166
*Mitchell v. Peoples*, 10 F.4th 1226, 1241 (11th Cir. 2021).............................164, 166, 167, 172
*Partridge v. Two Unknown Police Officers,* 791 F.2d 1182, 1187 (1986) .................18
*Pell v. Procunier*, 417 U.S. 817, 828 (1974).....................................................176
*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998)....................142, 145
*Pierce v. District of Columbia*, 128 F.Supp.3d 250, 272 (D.D.C. 2015)..................... 143, 150
*Presta v. Peninsula Corridor Joint Powers Bd*., 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998). 144
*Proudfoot v. Williams*, 803 F.Supp. 1048, 1052 (E.D.Pa. 1992)..............................165
*Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted)........................20
*Reneer v. Sewell*, 975 F.2d 258, 260 (6th Cir. 1992) .........................................165
*Rhodes v. Chapman,* 452 U.S. 337, 347 (1981) ..............................................18
*Royse v. Superior Court of State of Washington*, 779 F.2d 573, 574–75 (9th Cir. 1985)... 166, 167
*Ruiz v. Johnson*, 37 F.Supp.2d 855, 914 (S.D.Tex.1999), *rev'd on other grounds,* 243 F.3d 941 (5th Cir.2001) ..........................................................................19
*Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003).......................................166
*Smith v. Shimp*, 562 F.2d 423, 424 (7th Cir. 1977) .........................................167
*Smith v. Sullivan*, \ 611 F.2d 1039, 1043-44 (5th Cir. 1980) ...............................45
*Stone-El v. Fairman*, 785 F. Supp. 711, 715 (N.D.Ill. 1991) ................................166
*Thornburgh v. Abbott*, 490 U.S. 401, 416 (1989)............................................175
*Turner v. Safley*, 482 U.S. 78, 90 (1987) ...................................................176
*U.S. v. DeFonte*, 441 F.3d 92, 95–96 (2d Cir. 2006)........................................165
*United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926) .................................175
*Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007).........................19, 20
*Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977) .........................20, 45
*Williams v. Price*, 25 F. Supp. 2d 623, 629 – 30 (W.D.Pa. 1998)...........................166
*Wilson v. Blankenship*, 163 F.3d 1284, 1290–91 (11th Cir. 1998)............................167
*Wilson v. Seiter*, 501 U.S. 294, 305 (1991)...................................................20
*Witherow v. Paff*, 52 F.3d 264, 265–66 (7th Cir. 1995)....................................167
*Wolff v. McDonnell*, 418 U.S. 539, 577 (1974)......................................... 166, 173
*Young v. Keohane*, 809 F.Supp. 1185, 1197 (M.D.Pa. 1992) ...............................166

Statutes
29 U.S.C. § 794....................................................................... 7, 141, 142
42 U.S.C. § 12101(b)(1)...............................................................140
42 U.S.C. § 12101(b)(2).................................................................140
42 U.S.C. § 12131........................................................................7
42 U.S.C. §1983..........................................................................6

Regulations
28 C.F.R. § 35.106.....................................................................152
28 C.F.R. § 35.130(b)(3)..........................................................141, 146
28 C.F.R. § 35.152(b)(2)................................................................145
28 C.F.R. § 35.163.....................................................................152

<u>BACKGROUND</u>

## I.      THE NATURE OF THE ACTION

1.      This is an action for injunctive and declaratory relief to remedy the constitutionally inadequate conditions of confinement and mental health care at David Wade Correctional Center in Homer, Louisiana as well as unconstitutional interference with legal communications.

## II.     CLASS MEMBERS

2.      Plaintiff ADVOCACY CENTER is a private, federally-funded, non-profit corporation, designated by Louisiana to serve as the State's protection and advocacy system for persons with mental illness;

3.      Plaintiff BRUCE CHARLES was a prisoner housed in extended lockdown at DWCC at the time of filing;

4.      Plaintiff CARLTON TURNER was a prisoner housed in extended lockdown at DWCC at the time of filing;

5.      Plaintiff LARRY JONES was a prisoner housed in extended lockdown at DWCC at the time of filing;

6.      Plaintiff RONALD BROOKS was a prisoner housed in extended lockdown at DWCC at the time of filing;

7.      Plaintiffs bring this action under 42 U.S.C. §1983, for violations of the First and Eighth Amendments to the United States Constitution on behalf of all prisoners currently held, or who will in the future be held, in extended lockdown at DWCC in the N-1, N-2, N-3, and N-4 buildings;

8.      Plaintiffs also bring this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*.; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.

9.      In its September 20, 2021 ruling the Court certified a class consisting of both a class and a subclass. "The Court certifies a class of all prisoners who are or will be subjected to extended lockdown at David Wade Correctional Center and a subclass consisting of all individuals on extended lockdown at David Wade Correctional Center who have or are perceived as having a qualifying disability related to mental health, as defined within the Americans with Disabilities Act."[1]

## III.     DEFENDANTS

10.      Defendant James LeBlanc in his official capacity as the Secretary of the Louisiana Department of Public Safety and Corrections ("DPS&C"); and,

11.      Defendant Jerry Goodwin in his official capacity as the Warden over David Wade Correctional Center; and,

12.      Defendant Lonnie Nail in his official capacity as a Colonel overseeing the South Compound at DWCC; and,

13.      Defendant Doctor Gregory Seal, M.D. in his official capacity as a contract psychiatrist at DWCC; and,

14.      Defendant Assistant Warden Deborah Dauzat in her official capacity as the Mental Health Director at DWCC; and,

---

[1] R. Doc 462, Memorandum Ruling on Class Certification at pp. 27-28.

15.     Defendant Steve Hayden in his official capacity as a Corrections Program Manager at DWCC; and,

16.     Defendant Aerial Robinson in her official capacity as a Social Services Counselor at DWCC; and,

17.     Defendant Johnie Adkins in his capacity as a Social Services Counselor at DWCC; and,

18.     The Department of Public Safety and Corrections ("DPS&C") pursuant to the ADA and Section 504 of the Rehabilitation Act only.

### IV.     OVERVIEW OF DAVID WADE CORRECTIONAL CENTER (DWCC)

19.     David Wade Correctional Center ("DWCC") is a maximum custody facility.[2]

20.     Prisoners sentenced to the DPS&C are typically initially assessed at Elayn Hunt Correctional Center ("EHCC") at the Hunt Reception and Diagnostic Center ("HRDC") before being assigned to a specific DPS&C facility for housing.[3]

21.     EHCC has reception and diagnostic capacities, has a psychiatrist on staff, and has a special housing unit for prisoners with severe mental health needs.[4]

22.     EHCC provides in-person programming and regularly scheduled mental health counseling to prisoners with mental health needs who are classified as in maximum security custody.[5]

23.     EHCC conducts an extensive screening process that assigns a DSM-5 diagnosis, where appropriate, and a level of care designation for prisoners.[6]

---

[2] R. Doc. 524 at 2, Joint Record Stipulation
[3] R. Doc. 524 at p. 8, Joint Record Stipulation.
[4] R. Doc. 524 at p. 8, Joint Record Stipulation.
[5] R. Doc. 524 at p. 8, Joint Record Stipulation.
[6] R. Doc. 524 at p. 8, Joint Record Stipulation.

24.     The EHCC assessment consists of personality testing, IQ testing, interviews and results in a DSM-5 diagnosis of prisoners with mental illness.  The findings are detailed in an Assessment & Intervention Report for each prisoner.[7]

25.     Upon transfer to DWCC, an intra-system screen is generally performed, usually by Mr. Hayden.[8]

26.     All people who are transferred to DWCC are housed in lockdown for a period of time prior to being moved into general population.[9]

27.     The placement in segregation on arrival to DWCC was affirmatively reported to Defendants' expert, Dr. John Thompson, by 26 of the 42 people he collected information from.[10]

28.     The South Compound at DWCC includes the four buildings, N1-4.[11]

29.     The N1, N2, N3, and N4 buildings are not climate controlled.[12]

30.     Prisoners on extended lockdown spend 23-24 hours per day in their cells.[13]

---

[7] R. Doc. 524 at p. 8, Joint Record Stipulation.
[8] R. Doc. 524 at p. 8, Joint Record Stipulation.
[9] Turner Tr., 45:22 - 46:4 (Mr. Turner was assigned to segregated housing upon arrival to DWCCC);  Brumfield Tr., 153:13-17 (Mr. Brumfield was housed in segregated housing upon his arrival to DWCC, he spent 3-4 years there in total and a little over 2 years continuously); Moran Tr., 197:6-8 (Mr. Moran was assigned to segregated housing upon his arrival to DWCC); *Id.* at 197:11-14 (Mr. Moran spent about a year in segregation total); Dillon Tr., 259:2-11 (Mr. Dillon was housed in segregation upon his arrival to DWCC. During his time there he was exclusively housed in Extended Lockdown); Adams Tr., 960:2-6 (Mr. Adams was housed in Extended Lockdown the entire time he was at DWCC); Exh. P-BBBB-1 - Deposition of Cody Docuet, 24:11-16 (housed in extended on arrival); *Id*, 31:1-3 (only housed in extended lockdown on N2, N3, and N4); Exh. P-YYY-1 - Deposition of Thomas, 13:18-23 (placed on extended lockdown on arrival); Exh. P-YYY-4 - Deposition of Brooks, 44:3-5 (placed in N4 on arrival to DWCC).
[10] Thompson Tr., Thompson Tr., 4131:16-21.
[11] R. Doc. 524 at p. 2 paragraph 28.
[12] Baird Tr., 1070:10-21 (tiers have fans and heaters but no AC);  Dauzat Tr., 3437:13 - 3439:10 (The only buildings without air conditioning are housing units).
[13] Brumfield Tr., 159:22-25 (most days 23 hours 45 minutes in cell); Moran Tr., 198:1-6 (Prisoners spend 23-24 hours a day); Dillon Tr., 259:18-21 (In cell 23 hrs 45 mins, only out for shower); Solomon Tr., 597:2-13 (prisoners spend 23 hours 45  mins in cell everyday); Adams Tr., 962:24 - 963:5 (23 hours 45 mins, sometimes 24 hours if no shower); Exh. P-YYY-1 - Deposition of Thomas, 14:22 (Extended lockdown is 23 hours inside your cell); Exh. P-YYY-4 - Deposition of Ronald Brooks, 10:8.

31.     Prisoners held in extended lockdown are only allowed outside for recreation for 55 minutes five days a week, unless their yard privileges have been restricted which results in the reduction of recreation time to 55 minutes on either Saturday or Sunday.[14]

32.     Prisoners on yard restriction are sometimes not taken out for recreation time at all on the weekend.[15]

33.     Recreation time for prisoners in extended lockdown is conducted in a small cage on concrete. There are no weights or other recreational equipment in the cages. There is no shade in the cages.[16]

34.     Prisoners are only allowed one 10-minute phone call per month. This call is not at a scheduled time and can be taken away for any reason.[17]

35.     Prison policy states that prisoners are to be brought for a shower every day, but prisoners report that they are not brought for a shower every day and the guards barter with prisoners in an attempt to convince them not to shower every day.[18]

---

[14] Turner Tr., 110:12-23 (Mr. Turner testified that regular yard consisted of 50 minutes per day Monday-Friday. If a prisoner is on yard restriction the only recreation time is on the weekend. Sometimes you wouldn't go at all if staff busy); Brumfield Tr., 160:3-12 (Mr. Brumfield testified that recreation time should be an hour, but prisoners do not always get an hour; usually they only go outside for 20 minutes); Solomon Tr., 597:4-8 (Mr. Solomon spent extensive time on yard restriction and reports being allowed outside for one hour a week on a Friday, Saturday, or Sunday); *See* Exh. J-17 - 2017-7-24 - OPP 035 - Maximum Custody Housing_Privileges and Restrictions at p.4.
[15] Turner Tr., 110:12-23.
[16] Turner Tr., 111:5-10 (The recreation area is a 9x9 cage on concrete); McDowell Tr., 1013:17 - 1014:3 (Recreation is in little dog cages on concrete slab in the middle of the field, you just sit out there and it's so hot).
[17] Turner Tr., 50:6-11 (one personal phone call a month for 10 minutes); *Id.* 50:13-20 (you submit a request for a call, they get to you whenever they have time. You don't have a particular time); *Id* 78:7-10 (not able to make confidential call to AC); Dillon Tr. 262:8 - 263:8 (one 10 min call a month; not always allowed to make it, different officers would find reasons not to do calls or trade calls for something else like a shower); Solomon Tr. 598:11-13 (get 1 10-min call a month); Exh. P-YYY-1 - Deposition of Thomas, 14:25 (one 10-minute call a month); Exh. P-YYY-4 - Deposition of Brooks, 12:25; Exh. J-17 - 2017-7-24 - OPP 035 - Maximum Custody Housing_Privileges and Restrictions at p.2.
[18] Turner Tr., 49:23-25 (not taken for shower every day, if you were sleeping, they passed you up); Brumfield Tr., 158:13 - 159:21 (showered every day, but observed other people who did not. Reports that staff would try to get the "mental health" people who are defenseless to not go for a shower, they fear of retaliation if they demand a shower); Solomon Tr., 597:14-19 (Prisoners are supposed to get 15 minutes a day for a shower; sometimes you did not get shower); Adams Tr., 963:6-13; 964:6-11 (Mr. Adams testified that he did not shower every day because of his back and neck injury which made it hard to get restrained); McDowell Tr., 1014:6-14 (guards would offer extra food, extra trays if you want to refuse your shower).

36.     Lockdown units are also used for any prisoner housed in general populations who is on suicide watch.[19]

37.     Buildings N2–N4 house prisoners who are assigned to disciplinary segregation, preventative segregation, investigative segregation, and transitional segregation.[20]

38.     Buildings N2–N4 can house prisoners in protective segregation and who are being watched in connection with a mental health observation or suicide watch.[21]

39.     In restrictive housing, prisoners are allowed outside for fifty minutes per day Monday through Friday, unless they are on "yard restriction."[22]

40.     As of March 2020, prisoners on extended lockdown were allowed one ten-minute phone call per month.[23]

41.     Prisoners in restrictive housing are allowed three books and have no access to television or radio.[24].

42.     N1 has televisions on the tiers and prisoners may have radios on N1.[25]

43.     N2D tier houses a protective custody prisoner in Closed Cell/Restriction status.[26]

44.     Prisoners on N2D have access to television and radios.[27]

---

[19] Hayden Tr., 318:9-12 (people from general population can go on suicide watch to South); *Id*, 472:10 - 473:24 (impeached on this point; people can be housed on South for SSW); *Id*, 475:6-16 (impeached; people go to South Compound for suicide watch).
[20] R. Doc. 524 at p. 6, Joint Record Stipulation.
[21] R. Doc. 524 at p. 6, Joint Record Stipulation.
[22] R. Doc. 524 at p. 7, Joint Record Stipulation.
[23] R. Doc. 524 at p. 7, Joint Record Stipulation.
[24] R. Doc. 524482 at p. 7, Joint Records Stipulation; Turner Tr. 51:10-22 (3 books, no television, no radio); Brumfield Tr. 157:13-16 (can have bible, 2 books, paper, stamps, envelopes, a pen, shower shoes, jumpsuit); Moran Tr. 198:23 - 199:8 (allowed to have very little, not much outside of hygiene, blankets, sheet, clothes you wear); Adams Tr. 960:23-24 (can't have radios, no tv); Adams Tr. 961:14-20 (have limited legal work, 3 books).
[25] R. Doc. 524 at p. 7, Joint Record Stipulation.
[26] R. Doc. 524 at p. 7, Joint Record Stipulation.
[27] R. Doc. 524 at p. 7, Joint Record Stipulation.

45.     Buildings N2–N4 house prisoners who are assigned to disciplinary segregation, preventative segregation, investigative segregation, and transitional segregation.[28]

46.     Buildings N2–N4 can house prisoners in protective segregation and who are being watched in connection with a mental health observation or suicide watch.[29]

47.     In restrictive housing, prisoners are allowed outside for fifty minutes per day Monday through Friday, unless they are on "yard restriction."[30]

48.     As of March 2020, prisoners on extended lockdown were allowed one ten-minute phone call per month.[31]

49.     Prisoners in restrictive housing are allowed three books and have no access to television or radio.[32].

50.     N1 has televisions on the tiers and prisoners may have radios on N1.[33]

51.     N2D tier houses a protective custody prisoner in Closed Cell/Restriction status.[34]

52.     Prisoners on N2D have access to television and radios.[35]

53.     Dr. Thompson, Defendants' expert, concede that N1 is a restrictive housing environment.[36]

54.     DPSC and DWCC use a Level of Care (LOC) system to categorize prisoners by need. Mental health Levels of Care are defined by EPM 03-02-003 III (B).[37]

---

[28] R. Doc. 524 at p. 6, Joint Record Stipulation.
[29] R. Doc. 524 at p. 6, Joint Record Stipulation.
[30] R. Doc. 524 at p. 7, Joint Record Stipulation.
[31] R. Doc. 524 at p. 7, Joint Record Stipulation.
[32] R. Doc. 524482 at p. 7, Joint Records Stipulation; Turner Tr. 51:10-22 (3 books, no television, no radio); Brumfield Tr. 157:13-16 (can have bible, 2 books, paper, stamps, envelopes, a pen, shower shoes, jumpsuit); Moran Tr. 198:23 - 199:8 (allowed to have very little, not much outside of hygiene, blankets, sheet, clothes you wear); Adams Tr. 960:23-24 (can't have radios, no tv); Adams Tr. 961:14-20 (have limited legal work, 3 books).
[33] R. Doc. 524 at p. 7, Joint Record Stipulation.
[34] R. Doc. 524 at p. 7, Joint Record Stipulation.
[35] R. Doc. 524 at p. 7, Joint Record Stipulation.
[36] Thompson Tr., 3967:13-19.
[37] R. Doc 524 at 9, Joint Record Stipulation; Exh. J7 EPM 03-02-003 - DWCC Mental Health Program Policy.

55.     Level of Care designations range from 5 (least severe, indicating no mental illness) to 1 (the most severe, indicating the need for a 24-hour medical and/or mental health presence).[38]

56.     Level of Care 1 means someone who is grossly unable to maintain themselves and needs extreme care that David Wade can't provide.[39]

57.     Level of Care 2 means someone who still needs more care than can be provided at David Wade, possibly forced medication, but they are not stable with their mental illness.[40]

58.     Individuals who have a mental health level of care 2 can be housed at David Wade per policy.[41]

59.     Level of care 3 means an individual who is diagnosed with a severe mental illness.[42]

60.     Level of Care 4 is someone who is diagnosed with a mental illness and taking medications, but not a severe mental illness.[43]

61.     Level of care 5 is someone who does not have a mental health history.[44]

62.     There are modifiers "F" used for all levels of care indicating frequent significant mental health interventions and "H" used only for level of care 5 indicating a history of mental health concerns that can be added to a mental health level of care.[45]

63.     David Wade houses mostly prisoners who are level of care 3-5.[46]

---

[38] R. Doc. 524 at 9, Joint Record Stipulation; Hayden Tr., 330:11-14 (levels of care range from 1 to 5).
[39] Hayden Tr., 330:19-22.
[40] Hayden Tr., 331:1-5.
[41] Exh. J7 - EPM 03-02-003, Mental Health Program Policy at p.5; Dauzat Tr. 719:9-12 (per policy, LOC 2 can be housed at DWCC).
[42] Hayden Tr. 331:9-11.
[43] Hayden Tr.  331:12-16.
[44] Hayden Tr.  331:21-22.
[45] Exh. J7 - EPM 03-02-003, Mental Health Program Policy at p.7; Hayden Tr. 332:12-20 ("H" means at one point there was a history of mental health concerns, it can only be used for LOC 5); Id 332:18 - 333:6 ("F" means frequent significant mental health interventions).
[46] Hayden Tr.  331:17-20 (LOC 3 & 4 primary caseload); Dauzat Tr. 719:22-25 (commonly only house LOC 3, 4, 5).

64.     The individuals who are level of care 3 and 4 comprise the mental health caseload at David Wade, estimated at approximately 120 people.[47]

65.     Mr. Hayden, mental health staff at DWCC, testified that between 28-40% of people in segregation have a mental illness.[48] Dr. Burns, Plaintiffs' expert and Dr. Thompson, Defendants' expert, both concurred in a 40% prevalence rate for mental illness of people in segregation at David Wade.[49]

66.     Dr. Thompson concurred with Dr. Burns' numbers regarding people who have mental illness and opined that this reflected "a high level of mental illness throughout the facility."[50]

67.     Dr. Thompson testified that some people at DWCC had apparent levels of functioning that would put them at a higher level of need than Level of Care 3.[51]

## VI.     THE PARTIES EXPERTS

### A. Secretary Dan Pacholke

68.     Secretary Dan Pacholke is the former Secretary of the Department of Corrections for the state of Washington.[52]

69.     Prior to becoming Secretary, Mr. Pacholke spent 33 years working for the Washington state Department of Corrections.[53]

70.     He has worked at almost every level of the department of corrections, including as the Superintendent (what Louisiana would refer to as a Warden) of prisons.[54]

---

[47] Hayden Tr. 533:19-23 (LOC 3 & LOC 4 primary caseload); *Id* 534:13-16 (120 people on caseload).
[48] Hayden Tr. 526:24 - 527:4 (28-40% people have mental illness on lockdown).
[49]  Burns Tr., 1427:23-1428:1; Thompson Tr., 4070:13-17.
[50] Thompson Tr., 4028:17-22.
[51] Thompson Tr., 4002:21-24.
[52] Pacholke Tr. 2603:14-16.
[53] *Id*. 2601:8-14.
[54] *Id*. 2601:15-18.

71.    Secretary Pacholke is currently running his own business as a consultant on cases involving corrections systems.[55]

72.    As a part of his current work, Secretary Pacholke has extensive experience touring carceral facilities all over the country. In the past approximately five years he has done tours in five prisons with a focus on max custody in Alaska; he's toured at least six prisons -- five prisons in Illinois, once again, with a focus on maximum security; as part of a DOJ team on a CRIPA investigation, toured half a dozen facilities in the state of Massachusetts; he's been to two super max facilities in Virginia, one in Michigan; toured both high security facilities in Nebraska, two facilities in Indiana, one in California, everything in Washington; toured a high security facility in Montana, one in New York, Ohio; and he's been through eight in Florida.[56]

73.    In order to prepare his report Sec. Pacholke visited DWCC. He was there for about two days.[57]

74.    Sec. Pacholke interviewed prisoners who were housed on N1-N4.[58]

75.    Sec. Pacholke also had longer interviews with some of the people from N1-N4.[59]

76.    Sec. Pacholke has used the same methodology he used in this case in other cases where he has been employed as a consultant.[60]

77.    Sec. Pacholke was accepted by this court as an expert in the area of Corrections operations.[61]

### A. Dr. Craig Haney

---

[55] *Id*. 2600:24-2601:2.
[56] *Id*. 2709:1-14.
[57] *Id*. 2614: 13-20
[58] *Id*. 2616:22-25.
[59] *Id*. 2616:8-21.
[60] *Id*. 2619:14-16.
[61] *Id*. 2613:12-17.

78.     Dr. Haney has an undergraduate degree from University of Pennsylvania, he earned master's degree and PhD in psychology. While he was in the PhD program, he became interested in an area of psychology called psychology and law and so he went to and graduated from the Stanford Law School.[62]

79.     Dr. Haney testified that while he was in graduate school, he studied in the social psychology area of the psychology department. He described it by saying, "Social psychology is the study of how people are changed and affected by the settings or the situations or the environments in which they find themselves, and we study a range of different kinds of environments. I've studied environments that are mostly in the legal system."[63]

80.     Dr. Haney specializes in psychology and the law.[64]

81.     Dr. Haney is a professor of psychology at the University of California, Santa Cruz where he has been employed for over 40 years.[65]

82.     Dr. Haney personally visited David Wade while forming his opinion in this case.[66] He visited in August 2019 and October 2019.[67]

83.     While he was there, he toured the housing units, N1-N4 and had an opportunity to see the outdoor recreation areas where prisoners housed in N1-N4 are allowed to recreate one hour per day five days per week.[68]

84.      A photographer accompanied Dr. Haney on at least one of his visits. She took photographs of the things that Dr. Haney and the other people who were with him observed.[69]

---

[62] Haney Tr. 2846:16-2847:3.
[63] *Id*. 2847.2-9.
[64] *Id*. 2847:12-23.
[65] *Id*. 2847:24-2848:7.
[66] Haney Tr. 2859:5-7.
[67] *Id*. 2859:23-25.
[68] *Id*. 2859:8-22.
[69] *Id*. 2860:10-24.

85.     On both of Dr. Haney's visits he was able to observe the living conditions of the people incarcerated there as well as speak with them both at the cell front and in individual interviews.[70]

86.     Interviewees for confidential interviews were chosen in three different ways, the attorney's chose some of them in advance, a few of them were selected by Dr. Haney himself when during his cell front interviews, he spoke to someone who seemed like they had more information to give but would rather do it in a more confidential setting, and some were chosen from a randomized roster of the people living on N1-N4.[71]

87.     Dr. Haney uses a standard format that he typically uses when he does individual confidential interviews with people who are in solitary confinement or restricted housing units. He has been using this procedure since the 1990's and used it in this instance as well.[72]

88.     The standardized list of questions that Dr. Haney used while interviewing with people incarcerated at David Wade is a list of questions that he almost always uses when he can.[73]

89.     Dr. Haney was qualified as an expert in the area of social psychology and solitary confinement in this case.[74]

### B. Dr. Kathryn Burns

90.     Dr. Burns is the former chief psychiatrist for the Ohio Department of Corrections.[75]

91.     She has extensive experience in providing mental health care in correctional settings, as well as setting policies for the delivery of mental health care.[76]

92.     Dr. Burns' report was based on her personal observations of DWCC.[77]

---

[70] *Id*. 2860:25-2861:11.
[71] *Id*. 2861:12-2862:1.
[72] *Id*. 2862:5-12.
[73] *Id*. 2864:12-18.
[74] *Id*. 2851:14-16 and 2853:24-2854:3.
[75] Burns Tr., 1239:23-25
[76] *Id*. 1240:1-1246:9.
[77] *Id*. 1254:21-1255:3

93.     Those observations included interviews conducted with people who were housed on the south compound.[78]

94.     In her report and opinion, she applied the standard of care as that of a reasonable practitioner in a similar correctional environment, as well as benchmark standards from the ACA and NCCHC.[79]

95.     Dr. Burns' report examines screening, treatment, adequate staffing, safeguards around medication, record keeping and the suicide prevention program.[80]

96.     Dr. Burns was accepted by the Court as an expert in clinical psychiatry in correctional systems.[81]

## VII.   DEFENDANTS VIOLATE THE EIGHTH AMENDMENT TO THE CONSTITUTION BY SUBJECTING THE CLASS AND SUBCLASS TO A SUBSTANTIAL RISK OF HARM

97.     To determine if prison conditions satisfy the Eighth Amendment's objective component "[t]he deprivation alleged must be, objectively, sufficiently serious.... [T]he inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 834 (1995) (internal quotation marks and citations omitted).

98.     Additionally, the Eighth Amendment requires that "inmates be furnished with the basic human needs, one of which is reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 33 (1993) (quotation marks omitted).

99.     Courts ask whether the conditions are contrary to "the evolving standards of decency that mark the progress of a maturing society," *Farmer,* 511 U.S. at 833–34, or whether the incarcerated

---

[78] *Id*. 1255:14-17; 1256:24-1257:4.
[79] Burns Tr., 1263:16-1264:14
[80] Burns Tr., 1262:8-24
[81] Burns Tr. 1259:18-1260:6

person has been denied "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981).

100.    These standards are not static. *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).

101.    The Eighth Amendment not only protects against risk of harm to prisoners' physical health, but also protects mental health care as a basic human need of which incarcerated people cannot be deprived. *See, e.g., Calhoun v. DeTella,* 319 F.3d 936, 940 (7th Cir. 2003); *Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir. 1987); *Gates v. Cook,* 376 F.3d 323, 343 (2004), *citing Partridge v. Two Unknown Police Officers,* 791 F.2d 1182, 1187 (1986).

102.    "The same standards that protect against physical torture prohibit mental torture as well— including the mental torture of excessive deprivation." *Ruiz v. Johnson,* 37 F.Supp.2d 855, 914 (S.D.Tex.1999), *rev'd on other grounds,* 243 F.3d 941 (5th Cir.2001), *adhered to on remand,* 154 F. Supp. 2d 975 (S.D. Tex. 2001).

103.    The *Ruiz* court, finding that prisoners had been subjected to "a systemic pattern of extreme social isolation and reduced environmental stimulation," described the evolving standards of decency recognizing psychological pain as follows:

> In the past, courts faced with horrendous conditions of confinement have focused on the basic components of physical sustenance—food, shelter, and medical care. *See Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). More recently, in light of the maturation of our society's understanding of the very real psychological needs of human beings, courts have recognized the inhumanity of institutionally-imposed psychological pain and suffering. As the Third Circuit stated, "[t]he touchstone is the health of the inmate. While the prison administration may punish, it may not do so in a manner that threatens the physical and *mental health* of prisoners." *Young,* 960 F.2d at 364 (emphasis added).
>
> *Ruiz*, 37 F. Supp. 2d at 914.

104.    Like mental health care, social interaction and environmental stimulation are basic human needs. *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 678 (M.D. La. 2007); *citing Ruiz,* 37 F. Supp. 2d at 855, *Rhodes,* 452 U.S. at 346.

105.    "Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need . . . .". *Gates*, 376 F.3d at 333.

106.    Although certain conditions standing alone might not rise to the level of a constitutional violation, a combination of conditions having a "mutually enforcing effect that produces the deprivation of a single identifiable human need such as food, warmth or exercise—for example, a low cell temperature at night combined with a failure to issue blankets," may state a claim under the Eighth Amendment. *Wilkerson,* 639 F. Supp. 2d at 679; *citing Wilson v. Seiter*, 501 U.S. 294, 305 (1991).

107.    Both the Supreme Court and the Fifth Circuit have recognized that certain conditions that would pass constitutional scrutiny if imposed for a short period of time may be rendered unconstitutional if imposed for an extended period of time. *Wilkerson*, 639 F. Supp. 2d at 679, *citing Gates,* 376 F.3d at 333, *Hutto v. Finney,* 437 U.S. 678, 686–872 (1978), *see also Meriwether,* 821 F.2d at 416 ("[T]he duration of a prisoner's confinement in administrative segregation or under lockdown restrictions is certainly an important factor in evaluating whether the totality of the conditions of confinement constitute cruel and unusual punishment.").

108.    In class actions challenging systemic health care deficiencies, a risk of harm to people's health needs may be shown by proving "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff," or by proving there are such "systemic and gross

deficiencies in staffing, facilities, equipment, or procedures" such that the inmate population is effectively denied access to adequate medical care. *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted); *Williams v. Edwards*, 547 F.2d 1206, 1215-16 (5th Cir. 1977); *Lawson v. Dallas Cnty.*, 112 F. Supp. 2d 616, 635 (N.D. Tex. 2000).

109.    The test is whether a cognizable risk of harm exists, not whether the consequences of that risk have manifested as harm; the goal of the courts is to prevent harm where such a risk exists. *See Gates*, 376 F.3d at 341 (emphasis added) (holding that an Eighth Amendment plaintiff did not have to prove that he was actually injured by exposure to raw sewage, only that such exposure posed a serious health risk), *Hudson v. McMillian*, 503 U.S. 1, 4 (1992) (holding that excessive physical force against a prisoner can constitute cruel and unusual punishment even if the prisoner does not suffer serious injury).

110.    The risk associated with placing people in lockdown conditions of the severity of those implemented at David Wade has been widely recognized as unconstitutional by courts. *Madrid v. Gomez,* 889 F. Supp. 1146, 1265–66 (N.D. Cal. 1995) (internal citations omitted), *Braggs v. Dunn,* 257 F. Supp. 3d 1171, 1192 (M.D. Ala. 2017) (finding mental health programs offered in restrictive housing by the Alabama Department of Corrections unconstitutional under the Eighth Amendment).

### A.    *Defendants' failure to provide adequate mental health care creates a substantial risk of harm*

#### i.    *Defendants do not appropriately identify or diagnose mental illness, creating a substantial risk of serious harm*

111.    Mental health screenings must be conducted at intake, and a failure to do so adequately raises a substantial risk of serious harm to incarcerated people.[82] Screening individuals for mental illness is important in prisons and commonly done in isolation units.[83]

112.    The intake screenings performed by the Defendants are inadequate, and are not reviewed by a licensed mental health care professional.[84] Dr. Haney testified that David Wade does not have an adequate mental health screening system. He said, "I didn't see any evidence of anybody being screened before they went into segregation. It's my understanding that before they're placed in extended lockdown there's no determination made. There's no special mental health screening which they have to be subjected to before they get placed in extended lockdown. David Wade does not prohibit mentally ill prisoners from being placed in lockdown."[85] There are also not periodic screenings to assess whether or not a person is deteriorating in this environment where their mental health condition might be getting worse.[86]

113.    Mr. Hayden is responsible for completing the majority of the intake screenings at David Wade, despite his lack of credentials.[87]

114.    Mr. Hayden stated that he relies on the battery of mental health testing completed at EHCC, although he also stated that he does not have the individual's records at the time he completes the intake screening, which means the information on the intake screening is primarily derived from the self-reporting of the prisoner.[88]

---

[82] Burns Tr., 1299:8-1300:3
[83] Haney Tr. 2970:3-7.
[84] Burns Tr., 1297:17-1300:3
[85] Haney Tr. 2973:1-10.
[86] Haney Tr. 2973:14-25.
[87] Hayden Tr., 347:3-5 (he does the majority of the intake screens at DWCC); R. Doc. 524 at 8, Joint Record Stipulation.
[88] Hayden Tr., 350:15 - 351:5 (relies on battery of tests from EHCC and interview with individual); Id, 367:12-22 (does not have assessments from EHCC at time of intake, does not consider them when doing intake screen).

115.     Defendants fail to appropriately connect people with mental illness to necessary services and follow-up during intake screenings.[89]

116.     Defendants fail to follow-up on contradictions or inconsistency in diagnoses from previous institutions.[90] This failure exposes patients to the risk of serious harm and undermines later care.[91]

117.     In reviewing an intake screening, Mr. Hayden confirmed that the information typed at the top of the form is retrieved from CAJUN and the remainder of the form that his handwritten is completed with the individual during the interview.[92]

118.     Mr. Hayden does not verify any of the information self-reported at intake, and he does not review the individual's records for accuracy or completeness.[93]

119.     The medications an individual is taking, as reported on the intake form, are self-reported and not verified by Mr. Hayden.[94]

120.     Mr. Hayden indicated that individuals with a diagnosis of psychosis are referred to see Dr. Seal on the intake form.[95]

121.     Despite Mr. Hayden's assertion that individuals who have a mental health diagnosis and are taking psychotropic medications are referred to see Dr. Seal on intake, Brian Covington was not referred– even though he met the criteria for referral.[96]

---

[89] Burns Tr., 1299:10-1300:3
[90] Burns Tr., 1300:4-1301:8.
[91] Burns Tr., 1301:9-1302:18
[92] See Exh. P-DD-1 - Intake screening for Covington; Hayden Tr., 353:2-7 (everything in handwriting is self-reported); Id, 353:8-25 (all info at the top of the paper can be found in CAJUN); Id, 347:6 - 348:2 (relies on the assessments, relies on the codes that are entered into CAJUN, specifies what he relies on).
[93] Hayden Tr., 355:22 - 356:3 (all info is self-reported, he does not verify any of it for accuracy); Id, 358:14-24 (does not verify any of the self-reported info).
[94] Hayden Tr., 367:24-25 (meds self-reported); Id., 368:1-17 (is not verifying the meds at intake; meds arrive with person and go to medical); Id., 368:18-23 (meds are all self-reported on intake form).
[95] Exh. P-O-30 - Intake screening for Adams; Hayden Tr., 376:5-13 (because Adams is a person diagnosed with psychosis, he is referred to Seal).
[96] Hayden Tr., 376:14-24 (referring to Exh. P-DD-1, says AXP and PMP but not referred to Seal on form, cannot say why); Id, 377:6-17 (means based on diagnoses and medications, if they see Seal and what the LOC is determines how frequently MH staff see the person)

122.    Mr. Hayden was also unable to explain where he obtained information, or what information he obtained, that led him to change Mr. Adams level of care from 4 to 3 on intake.[97]

123.    These dangerous deficiencies in the intakes conducted by DWCC for Mr. Adams and Mr. Covington are consistent with DWCC's practices for conducting intakes.[98]

124.    In another instance, Mr. Solomon reported that he had informed staff on intake that he had a history of mental illness, which was not recorded on his intake form.[99]

125.    Warden Dauzat signs supervisory approval on all intake screenings without verifying the accuracy of the information.[100]

126.    In some instances, Warden Dauzat is signing the intake form as reviewed days, weeks, or a month after it has been completed by Mr. Hayden.[101]

127.    Mr. Hayden testified that he writes "WNL", or "within normal limits," on everyone's intake form for intelligence because he assumes that EHCC would not send anyone to David Wade who has a developmental disability.[102]

128.    This practice fundamentally misunderstands the distinction between a developmental disability and intelligence. It also undermines the intake process by not accurately reporting individualized intelligence.

129.    When asked to define developmental disability, Mr. Hayden incorrectly stated it means a cognitive impairment, usually MR or a delay.[103]

---

[97] Hayden Tr., 380:12-23 (reference Exh. P-O-30, changed LOC to 3F, diagnosed SMI, says he recovered facts that showed he had SMI from prior institution; but doesn't know where that came from).
[98] Burns Tr., 1299:22-1300:3.
[99] Solomon Tr., 644:22 - 645:1 (told DWCC at intake he had history of mental illness); Exh. D69 at p.8 (Intake form).
[100] Dauzat Tr., 749:18-23 (reviewed by means she reviewed the form, not that she was present for the screening); *Id*, 749:24 - 750:3 (Dauzat: will sign off on intake screen even if not present).
[101] Hayden Tr., 410:12-23 (he signed 3/3/15, Dauzat signed 4/27/15).
[102] Hayden Tr., 366:14-22 (marks everyone WNL for intelligence because assumption that nobody has DD).
[103] Hayden Tr., 370:16-21 (asked to define DD, he says cognitive impairments, usually MR or delay that makes person potential target for predators).

130.    Mr. Hayden also incorrectly defined developmental disability as having an IQ of 75 or below and a 6th grade reading level.[104]

131.    Some of the men held on extended lockdown at David Wade have an IQ of less than 75 and many read below a 6th grade reading level.[105]

132.    Mr. Hayden was unable to state if autism is a developmental disability, despite the fact that it is widely recognized as such by the medical community.[106]

133.    Per department regulation, developmental disability is defined as an IQ of 70 or below and lacking the functional skills necessary to adjust to correctional settings.[107]

134.    Mr. Hayden's lack of understanding regarding signs and symptoms of mental illness, including the definition of a developmental disability, renders him incapable of identifying whether an individual has a disability and undermines the appropriateness of an intake screening he may complete that includes a determination of intelligence or disability.[108]

135.    Screening and rescreening for signs and symptoms of mental illness benefits prison operations because it can identify where resources need to be allocated, or it could lead to a person being transferred to a different facility.[109] It is also important because behaviors associated with uncontrolled or untreated mental illness are difficult for staff and can be traumatic for other prisoners.[110]

---

[104] Hayden Tr., 366:2-13 (intelligence and DD are different; defines DD as IQ 75 or less and 6th grade reading level; says they aren't sent anyone with DD from EHCC).
[105] Hayden Tr., 3773:12-14
[106] Hayden Tr., 373:9-23 (cannot tell me if autism is a developmental disability).
[107] Hayden Tr., 372:5-12 (says per policy DD means 70 or below, lacks functional skills to adjust to corrections setting).
[108] Burns Tr., 1300:15-20.
[109] Haney Tr. 2972:10-21.
[110] Haney Tr. 2971:25-2972:25.

136.    It is also important to re-screen individuals with mental illness because their mental health conditions can change, especially if someone is in an environment where they are subjected to severe psychological stressors such as isolation.[111]

137.    Defendants' failure to identify people with serious mental illness and consistent understatement of the severity of mental illness where it is identified creates a substantial risk of serious harm. There are people at David Wade with underlying mental health conditions who are placed in isolation, and there are people who might have an unidentified mental condition that is exacerbated by isolation.[112]

138.    Defendants' mental health intake screenings are inadequate to detect major changes, especially when the person's HRDC intake screening is old. Dr. Haney testified that whatever a person's mental health status is when they arrive it is subject to change, saying, "So it is important to periodically screen them or assess them in a systematic way for the existence of mental illness or the worsening of already existing mental illness or perhaps the incipient or undiagnosed mental illness beginning to manifest itself while somebody is in isolation."[113]

139.    The standard of care requires that people be screened for mental illness upon transfer into restrictive housing.[114]

140.    Defendants fail to screen for mental illness when a person transfers to extended lockdown, they are only screened for medical purposes.[115]

---

[111] Haney Tr. 2970:8-13.
[112] Haney Tr. 2970:18-24.
[113] Haney Tr. 2970:25-2971:8.
[114] Burns Tr., 1435:18-1436:6
[115] Burns Tr., 1414:13-18 (standard of care requires screening upon placement in restrictive housing); Dauzat Tr. 3320:1-6 (people are screened by medical before being placed in segregation); *Id*, 3321:14-18 (mental health is required to complete a screen only when a person remains in segregation for more than 30 days).

141.     During the time that Johnie Adkins worked with the mental health department, he completed intake screening even though he admittedly did not possess the qualifications to make clinical judgments about mental health and was not a qualified mental health provider.[116]

142.     The fact that Defendants had a completely unqualified (albeit seemingly well-intentioned) chaplain responsible for providing mental health care to men held in solitary confinement for years illustrates the negligible attention and priority afforded to mental health care at the facility generally. It was not until after this lawsuit was filed that Mr. Adkins was removed from the role of providing mental health care, despite his having been in that role for years with the support of Wardens Goodwin and Dauzat.

143.     Defendants' failure to identify people with serious mental illness through adequate screening or monitoring exposes people to significant risks of mental and physical harm and deprives people of the opportunity to receive needed treatment.[117]

> *ii. Defendants do not provide adequate mental health care even when they have identified patients with mental illness.*

144.     The mental health care at DWCC is almost non-existent and insufficient, except for medications, and even the process for providing medications fails to adequately provide the medications and document compliance.[118]

145.     Initial intake screenings fail to triage people with serious mental illnesses to ensure that they are seen in a timely manner by mental health staff.[119]

146.     Mental health staff at DWCC are inadequately trained to recognize the signs and symptoms of mental illness, leading to delays in referrals for needed mental health care.[120]

---

[116] Exh. P-YYY-3 - Deposition Adkins, 27:7-16 (completed mental health intake screening).
[117] Burns Tr., 1449:5-1450:8.
[118] Burns Tr., 1148:24-1149:2
[119] Burns Tr., 1149:5-11
[120] Burns Tr., 1149:12-22

147.    Mental health staff do not provide adequate counseling or other therapy, due in part to the lack of training and qualified staff.[121]

148.    Dr. Haney testified that during both his cell front interviews and confidential interviews with incarcerated people they expressed significant concerns regarding the mental health staff at DWCC.[122] They reported widespread concerns and complaints about a lack of mental health care.[123]

149.    First, the common theme of their complaint was that there is not sufficient mental health care at DWCC. There are no individual therapy sessions, and no groups. The only thing that the prison offers is medication with a 90-day review.[124]

150.    Second, the prisoners perceived mental health staff, particularly Mr. Hayden, as unsympathetic and uncaring. He is not responsive to the needs or concerns expressed by prisoners. Dr. Haney testified, "A number of them told me that they simply had lost faith or confidence in the mental health staff, that the mental health staff wasn't caring and they didn't talk to them. In what they perceived to be the few instances in which Mr. Hayden or other mental health staff were in the unit, they wouldn't seek them out. They didn't have confidence in them, didn't trust them, and didn't -oftentimes simply wouldn't talk to them about something even if they were having a problem."[125]

151.    Third, prisoners have inadequate contact with mental health staff at the cell front because of the lack of confidentiality. Prisoners have difficulty sharing personal information because what they say could be heard by correctional officers or other prisoners. This is problematic because

---

[121] Burns Tr., 1340:21-1341:7
[122] Haney Tr. 2903:21-24.
[123] Haney Tr. 2904:4-6.
[124] Haney Tr. 2904:6-11.
[125] Haney Tr. 2904:12-25.

cell front conversations are the primary, if not exclusive, way that mental health staff communicates with the incarcerated men.[126]

152.    Fourth, the 90-day medication reviews are pro-forma or superficial, and last no more than approximately 5 minutes. The meetings are exclusively about medication, and Dr. Seal does not do any psychotherapy. Prisoners also said that despite the fact that they were taken out of cell for their meetings with Dr. Seal, those meetings were not private; Mr. Hayden would be there as well as a correctional officer within earshot of the conversation, creating a circumstance in which they did not have a setting to have psychotherapy or a sympathetic ear for the problems they are experiencing.[127]

153.    Dr. Haney testified that all of these concerns create a substantial risk of harm.[128] He explained that when people feel as though they can't get adequate mental health care, they feel even more desperate in environments like the one at DWCC. Many of the people on the south compound at DWCC already have mental health diagnosis, meaning that the institution either diagnosed them with or recognized a mental illness and they were still not getting what they feel like is appropriate mental health care.[129] This is in addition to the added stress and psychological risk that being in a cell for 23 hours a day would produce.[130]

154.    People known to the Defendants to have serious mental illnesses (SMI), including extensive histories of suicidal ideation and behavior, are routinely placed on extended lockdown at DWCC.[131]

---

[126] Haney Tr. 2905:1-15.
[127] Haney Tr. 2905:16-2906:7.
[128] Haney Tr. 2905:7-10.
[129] Haney Tr. 2906:8-2907:18.
[130] Haney Tr. 2907:9-14.
[131] Turner Tr., 83:11-20 (diagnosed with mental illness, anxiety, depression, bipolar, schizoaffective); Solomon Tr., 593:5-13 (diagnosed ADHD and PTSD; counseling and medications before prison; Depakote, Concerta, Ritalin, and others); Adams Tr., 958:1-13 (in and out of MH hospitals; was diagnosed with mental illness before jail, unsure what); *Id*, 958:22 - 959:18 (treated for antisocial personality disorder, PTSD, psychosis, bipolar, schizophrenia, paranoia,

155.    The absence of observation and monitoring of individuals on extended lockdown means that psychiatric decompensation goes unnoticed, as does the onset of new symptoms.[132]

156.    The standard of care for monitoring requires weekly rounds and periodic out-of-cell assessments.[133]

157.    There is no evidence from individual mental health files that regular rounds are taking place.[134]

158.    Without appropriate rounds, patients are seen only according to policy minimums rather than actual clinical need.[135]

159.    In addition to rounds, mental health staff need to conduct periodic assessments out-of-cell to evaluate each person's mental health condition in detail.[136] DWCC does not properly document these assessments.[137] The substance of each periodic assessment is essentially identical for each person.[138] Patients at DWCC reported that they were unaware that these evaluations had even taken place.[139]

160.    DWCC's failure to adequately perform periodic assessments exposes people to the risk of harm, including suicides and acts of self-harm related to mental illness.[140]

161.    Lacking both rounds and periodic assessments, signs and symptoms of serious mental illness remain unidentified or untreated and people experiencing crisis manifestations of mental

---

MDD); McDowell Tr., 1030:12-17 (diagnosed with depression at EHCC and given meds); Exh. P-BBBB-1 - Deposition of Doucet, 34:12-17 (diagnosed with Bipolar Schizophrenia); *Id*, 35:18-22 (received same diagnoses at EHCC); Exh. P-YYY-1 - Deposition of Da'Marcus Thomas, 7:6-8 (been diagnosed with mental illness); *Id*, 8:12-15 (paranoid schizophrenia, depression and anxiety).
[132] Burns Tr., 1449:3-1451:1
[133] Burns Tr., 1304:6-1305:2.
[134] Burns Tr., 1312:13-1314:7
[135] Burns Tr., 1314:14-20
[136] Burns Tr., 1315:14-1317:6.
[137] Burns Tr., 1318:2-1319:25.
[138] Burns Tr., 1320:18-1321:9; 1326:20-1327:16; 1327:25-1328:6.
[139] Burns Tr., 1328:9-14.
[140] Burns Tr., 1329:1-1330:6.

illness are not detected before the person is a significant risk to himself or others. This creates a substantial risk of serious harm in violation of the Eighth Amendment to the constitution.

162.    In order to provide constitutionally adequate care, in addition to offering medication and medication management, a mental health program must also contain treatment options such as group counseling, individual counseling, and programming to assist patients in managing the symptoms of mental illness.[141] Psychotherapy is an essential part of providing constitutionally adequate mental health care.[142]

163.    The failure to supplement medication management with other forms of mental health care creates a substantial risk of harm to patients.[143]

164.    The only individuals actually licensed by the State of Louisiana to provide mental health "treatment" per se at David Wade are Dr. Seal[144] (the contract psychiatrist), Warden Dauzat (a licensed clinical social worker and the Assistant Warden over Mental Health)[145], and James Burgos, a licensed professional counselor.[146]

165.    Warden Dauzat does not herself provide direct treatment. Her job description includes overseeing and supervising the mental health department, serving as the Prison Rape Elimination Act coordinator, supervising Warden Kayla Sherman and monitoring the functions of the Classification and Education Department.[147]

---

[141] *See Ruiz*, 37 F.Supp.2d 855 (S.D.Tex.1999).
[142] Seal Tr., 1174:20-22; Burns Tr., 1341:15-1342:19.
[143] Burns Tr., 1342:1-1343:23
[144] Seal Tr., 1105:25-1106:2
[145] Dauzat Tr., 717:23 - 718:2 (licensed clinical social worker); Robinson Tr., 668:7-21 (Robinson became a licensed master social worker after the fact cut off date of March 2020).
[146] Burgos Tr., 3778:11-24 (Masters degree in guidance and counseling and licensed professional counselor).
[147] Dauzat Tr., 3334:20 - 3335:3 (Sherman took over Dauzat's responsibilities for Classification in 2014 because Dauzat tied up with PREA stuff); *Id*, 3306:10-14 (still oversees operations of mental health, supervises Warden Sherman, Chaplaincy department, business administration office and has oversight overall these departments).

166.    There are staffing shortages in the mental health staff at DWCC such that it creates a substantial risk of serious harm.[148]

167.    The risk of harm manifested as actual serious harm to class members at DWCC.[149]

168.    Because there is no diversion of people with mental illness from lockdown, DWCC will have a greater than normal need for mental health services on the south compound.[150]

169.    Such diversion programs exist in other states.[151]

170.    Despite the greater need for qualified mental health staff due to a larger population of prisoners with mental illness, DWCC has put unqualified mental health staff in the role of direct patient care such as Chaplain Johnie Adkins.[152]

171.    When Mr. Adkins was first brought on full time, he was working in the mental health department even though he was not qualified to make any clinical decisions.[153]

172.    Each mental health staff person should have a caseload of no more than 60 people.[154]

173.    Mental health staff at DWCC are not clear as to who is on each clinician's caseload.[155]

174.    The danger of understaffing is in delays to psychiatric visits and an increased number of disciplinary reports, decompensation, use of force, and physical harm to self or others.[156]

175.    Burns observed negative consequences from understaffing at DWCC.[157]

---

[148] Burns Tr., 1424:13-1425:9.
[149] Burns Tr., 1425:12-1426:8.
[150] Burns Tr., 1420:7-23
[151] Burns Tr., 1414:23-1415:23
[152] Exh. P-YYY-3 - Deposition of Johnie Adkins, 6:15-24 (earned degrees in divinity, theology and ministry).
[153] Exh. P-YYY-3 - Deposition Adkins, 12:5-24 (work was not clinical); *Id*, 13:10-17 (it was under the umbrella of the mental health department).
[154] Burns Tr., 1422:4-1423:1
[155] Burns Tr., 1423:12-1424:1
[156] Burns Tr., 1424:13-1425:9
[157] Burns Tr., 1425:12-1426:8

176.    Mental illness drives behavioral problems for many people in restrictive housing at DWCC.[158]

177.    Burns conservatively estimates that 40% of the people on lockdown at DWCC have mental illness.[159] Defendants' expert Dr. Thompson agreed with her finding of a conservative estimate at 40%.[160]

178.    Mr. Hayden and Mr. Burgos are the primary persons responsible for delivering services to all individuals housed on the South Compound which includes obligations to screen everyone to identify new or worsening signs of mental illness, conducting segregation interviews every 90 days to monitor new or worsening signs of mental illness, providing care to individuals who engage in self harm or threaten self-harm by placing them on suicide watches, amongst a litany of other duties.[161]

179.    A risk of harm is created because Steve Hayden, the primary mental health staff providing services for incarcerated people in extended lockdown, does not have a clinical license. Dr. Haney testified that there is a risk because when someone who is not qualified and licensed to provide care is performing that service then the required or necessary services are not being provided.[162]

180.    Dr. Seal, the prison's psychologist, visits the prison every two weeks.[163]

181.    Dr. Seal typically sees people every 90 days, but he can set a follow up appointment for whenever he wants to.[164]

---

[158] Burns Tr., 1426:15-1427:19
[159] Burns Tr., 1427:23-1428:1
[160] Thompson Tr., 4070:13-17
[161] Dauzat Tr., 3354:12-16 (2 staff members for South, Hayden and Burgos. Burgos had N1 & N2, Hayden had N3 & N4); Hayden Tr., 313:5 - 314:7 (responsible for the MH care for South Compound); *Id* 314:18-23; 315:17-19 (Hayden conducts reentry classes); *Id* 316:18-21 (Hayden works on both North and South compounds).
[162] Haney Tr. 2898:20-2899:3.
[163] Seal Tr., 1194:2-4
[164] Hayden Tr., 551:21 - 552:6 (Seal typically sees people every 90 days, but can set a follow up for whenever he wants).

182.    During each visit he is on-site for approximately 5 hours.[165]

183.    Each visit, he sees 25-40 patients.[166]

184.    His time is divided between the North Compound and the South Compound.[167]

185.    On the South Compound, Dr. Seal meets with patients in the courtroom in each building for N1 - N4.[168]

186.    During these visits, a mental health staff person is present as well as security staff, which means none of the visits are confidential and people do not feel comfortable openly discussing issues and concerns with Dr. Seal.[169]

187.    The onus is on individual patients to request that security leave the room.[170]

188.    Dr. Seal never prescribes counseling, group therapy, or any intervention whatsoever, other than medication even when people specifically request an intervention other than medication.[171]

---

[165] Seal Tr., 1112:12-16; 1110:5-20 (travel time counts against his total hours under contract)

[166] Seal Tr., 1109:11-14

[167] Seal Tr., 1112:12-16

[168] Seal Tr., 1116:8-10; Turner Tr., 92:11-15 (meet in courtroom); Solomon Tr., 611:2-3 (you meet in a room like a little box, same size as cells); Adams Tr., 986:12-14 (meet with Seal in courtroom).

[169] Turner Tr., 92:6-9 (security in the room every time meet with Seal); Id, 92:24 - 93:17 (security always there, no confidentiality, asked for security to leave and denied, told security needed to be present); Moran Tr., 207:20-25 (met with Seal in courtroom with security and Robinson); Dillon Tr., 271:7-16 (security in the room with Seal, was told that's how things are done at DWCC); Solomon Tr., 611:3-16 (Hayden and Coleman in room; can't talk to Seal with Coleman there, he told Solomon to ram his head into the bars and sprayed him); Adams Tr., 986:15-20 (usually Hayden in room and always a rank in security, always); Id, 986:21 - 987:11 (would make him really uncomfortable in room with security, they use info against them, so you have to watch what you say); Moran Tr., 208:1-20 (it was embarrassing to talk to Seal in front of security, can't be open and honest. You don't want to be truthful about what you're going through when correctional officer present, you're vulnerable and it's embarrassing); Dauzat Tr., 3371:16-20 (the court noted not hearing any testimony that anyone sees Seal without security; Dauzat disagrees); Seal Tr. 1117:23-25.

[170] Seal Tr. 1118:9-25

[171] Dillon Tr., 268:13 - 269:3 (met with Seal; Seal only wanted to give him meds, he wanted someone to talk to); Solomon Tr., 602:20 - 603:8 (Seal put him on Risperdal because  he asked for something to help him sleep and calm his anxiety. Solomon knew there were side effects, but tried it anyhow); Id, 603:9-17 (did not like Risperdal, had side effects like easily annoyed and aggravated; did not want breasts); Id, 603:18-24 (wanted program, counseling, therapy, anything other than meds); Adams Tr., 979:15-18 (requested individual or group therapy, only ever got medications); Dillon Tr., 270:12-25 (requested individual counseling and was denied. Seal would only give him pills); Exh. P-YYY-1 - Deposition of Thomas, 22:2-24 (he asked for help, but all he got was prescribed Buspar); Exh. P-YYY-4 - Deposition of Brooks, 23:23 - 25:11 (told Seal he was having nightmares, wanted therapy or programming, Seal only gave him medications and Brooks did not think it was going to help).

189.    Dr. Seal never encountered a patient in restrictive housing who had psychotherapy on their treatment plan.[172]

190.    Dr. Seal identified patients on the south compound who need psychotherapy, but he only makes verbal recommendations to mental health staff when he identifies this need.[173]

191.    He never creates a written record or formal recommendation for treatment.[174]

192.    At best, on each visit he sees approximately 32-36 people for approximately 3-5 minutes each.[175]

193.    Plaintiff's expert, Dr. Burns, who has worked as a prison psychiatrist stated that psychiatric visits should take 10-15 minutes for follow-ups, initial appointments should be closer to 45 minutes to 1 hour.[176]

194.    The purpose of his visit is to evaluate medication needs and adjust medication.[177]

195.    Dr. Seal does not provide psychotherapy, which is necessary for the treatment of some people with mental illness.[178]

196.    The practical limitations of the structure of Dr. Seal's visits there means that he has 10 hours a month to see everyone on the mental health caseload at DWCC, a prison with a population of roughly 1,200 which falls below the standard of care for the amount of psychiatric treatment time for a facility of that size.[179]

197.    Dr. Seal's default intermission between visits for each of his patients is three months.[180]

---

[172] Seal Tr. 1175:6-9
[173] Seal Tr. 1174:20-25
[174] Seal Tr. 1175:1-5
[175] Burns Tr., 1123:22 - 1124:2 (New patients are closer to 10 minutes); Burns Tr., 1124:3-8
[176] Burns Tr., 1411:25-1412:12
[177] Hayden Tr., 549:5-8 (Seal sees people for medication management); Id, 554:19 - 555:1 (Seal provides med management; important he has complete and accurate information for each person he sees).
[178] Seal Tr., 1216:14-17; 1216:18-24.
[179] Burns Tr. 1418:12-1420:2
[180] Seal Tr., 1142:11-16

198.    Mental health staff are responsible for rescheduling missed appointments with Dr. Seal.[181]

199.    Mental health staff fail to reschedule these appointments even for people with serious symptoms or new medications.[182]

200.    Dr. Seal does not independently evaluate each individual nor does he check to make sure each individual is receiving medications he has prescribed,[183] instead relying upon Mr. Hayden and Mr. Burgos to provide him all the information he needs.

201.    The psychiatrist needs to review documentation on interim functioning of the patient to prepare ahead of that meeting with the patient.[184]

202.    Dr. Seal reviews progress notes but not unusual occurrence reports,[185] and he does not have access to information on uses of force.[186]

203.    Dr. Seal only occasionally reviews the interviews with segregated inmates, the periodic assessment of patients.[187]

204.    Psychiatrists must perform comprehensive assessments, make recommendations for treatment, help with treatment planning, and participate in treatment team meetings, not just medication management.[188]

205.    Psychiatrists must document review of important incidents such as suicide watches and disciplinary incidents.[189]

---

[181] Seal Tr., 1160:1:10
[182] Seal Tr., 1160-1166 (progress notes showing no-shows); *Id*, 1168-1171 (Huber no-shows without immediate follow-up).
[183] Burns Tr. 1400:19-1402:2
[184] Burns Tr. 1416:2-1418:2
[185] Seal Tr., 1121:3-23
[186] Seal Tr., 1123:15-21.
[187] Seal Tr., 1121:3-23
[188] Burns Tr. 1407:13-1409:13.
[189] Burns Tr. 1410:15-1411:4.

206.    Seal never made a written recommendation for any treatment apartment except medication.[190]

207.    Dr. Seal lacks necessary access to the current medication compliance information about his patients.[191]

208.    Dr. Seal cannot appropriately provide a course of treatment without accurate medication administration records.

209.    Dr. Seal lacks basic knowledge of the conditions of confinement in the south compound, including what "extended lockdown" means,[192] what a mental health "level of care" is,[193] the definition of the DPS&C term "serious mental illness", [194] or what a "mental health management order" refers to.[195]

210.    Dr. Seal does not routinely document recent suicide watches in his notes. Failure to do this is dangerous and deprives the person of the assistance of the most qualified mental health practitioner in dealing with self-harm.[196]

211.    Mental health staff at David Wade are responsible for compiling a list of people for Dr. Seal to see during his visit as well as pulling the records for the individuals on that list.[197]

212.    He relies upon the mental health staff member in the room with him at the time to provide medication orders to medical staff and to file the notes into the individual records.[198]

---

[190] Burns Tr. 1409:16-1410:10.
[191] Burns Tr. 1400:19-1402:2.
[192] Seal Tr., 1226:25-1227:4.
[193] Seal Tr., 1233:20-1234:1.
[194] Seal Tr., 1229:13-18.
[195] Seal Tr., 1231:10-19.
[196] Burns Tr. 1367:25-1369:9 (example of Corey Adams).
[197] Hayden Tr., 550:18-25 (they pull a list of people that Seal previously said he wanted to see again, MH staff put the list together); Id, 551:14-20 (MH staff pull records for Seal's visits).
[198] Seal Tr., 1142:17-25.

213.    The mental health staff also create a mental health progress note during the visits with Dr. Seal, the content of which should be similar or the same as the information contained in Dr. Seal's note.[199]

214.    However, a comparison of Dr. Seal's note and Mr. Hayden's note from the same day for Torre Huber showed different diagnoses and different timelines to follow up with Dr. Seal again in addition to Mr. Hayden's failure to document that Mr. Huber had been experiencing hallucinations.[200]

215.    The drastic differences in documentation among people who were in the same room for the same visit demonstrate inadequacies in the provision of mental health care at David Wade.

216.    Accurate record-keeping is essential to the provision of constitutional care. If Dr. Seal is providing the only course of treatment available at Wade (medication) his orders have to be premised on accurate documents, and then also have to be accurately implemented.[201]

217.    At points, Dr. Seal could not read his own handwriting, and neither could others.[202]

218.    An inability for staff to read and implement his orders causes delays in care. For example, Seal ordered bloodwork to evaluate Carlton Turner's wellbeing due to his being on lithium. Despite the passage of several months the tests were not done by Defendants, so Dr. Seal had to order them again. This type of delay in care in evaluating medication toxicity poses a serious risk of significant harm.

---

[199] Hayden Tr., 558:24 - 559:5 (progress note should be similar information to Seal's note).
[200] Exh. P-LL-245 - psychiatric clinic progress note-Huber, Torre; Hayden Tr., 559:14 - 561:1 (reviewing the psych clinic prog note; diagnosis MDD and RTC 4-6 mos); Exh. P-LL-244 - Seal progress note-Huber, Torre; Hayden Tr., 561:7 - 562:9 (review of Seal's note for same day; diagnosis different); Id, 563:25 - 564:12 (his note does not reflect hallucinations, Seal's note does).
[201] See, *Ruiz*, 37 F.Supp.2d 855.
[202] 562:20-25 (Hayden: unable to read Seal's note, see P-LL-244) 563:8-16 (Hayden: it's his job to provide MH treatment to people, should be able to read Seal's note).

219.    Policy promulgated by both the Louisiana Department of Public Safety & Corrections (LDPSC) and DWCC require that mental health treatment plans be individualized for all individuals with a level of care 1, 2, 3, or 4.[203]

220.    As of March 2020, all mental health treatment plans provided for prisoners in restrictive housing at DWCC have the same short term treatment goals and the same long term treatment goals.[204]

221.    The short-term objectives in the mental health treatment plans are: "Comply with medications prescribed and advise staff of any adverse effect, identify stressors that create behaviors warranting segregation, consistently display appropriate behavior in accordance to institutional regulations."[205]

222.    The long-term treatment goals in the mental health treatment plans are: "1. Maintain compliance with all institutional rules and regulations. 2. Maintain appropriate level of functioning. 3. Increase insight in order to be moved to a less restrictive environment. Date Met: on-going."[206]

223.    The treatment plans for the people held on the South Compound do not meet the standard of care for mental-health treatment either inside or outside of prison.[207]

224.    Even when an individual with mental illness is identified, every person receives an identical treatment plan that calls for nothing except medication management.[208]

---

[203] Exh. J-7 - 2019-2-13 - EPM 03-02-003 - Mental Health Program at p.7-9.
[204] R. Doc. 524 at 12, Joint Record Stipulation; Hayden Tr., 585:16-21 (at the time, all short and long term goals were the same on all treatment plans).
[205] R. Doc. 524 at 12, Joint Record Stipulation.
[206] R. Doc. 524 at 12, Joint Record Stipulation.
[207] Seal Tr., 1172:12-14; Burns Tr., 1330:22-1334:12.
[208] Dauzat Tr., 769:7-11 (all treatment plans identical); Burns Tr., 1333:10-15.

225.    These treatment plans do not change over time, regardless of changes or deterioration in the individual's condition.[209]

226.    The lack of individualized treatment plans inhibits the delivery of necessary mental health treatment at DWCC.[210]

227.    Treatment plans are a part of the standard of care, whether in the community or a restrictive housing correctional setting.[211]

228.    Treatment plans should be substantive, containing the patients' strengths, weaknesses, symptoms, the frequency of symptoms, the treatment, who is providing the treatment, the frequency for the treatment, and document progress towards written goals.[212]

229.    General, non-individualized treatment plans have no value.[213]

230.    The lack of individualized treatment plans exposes the members of the class to the risk of serious harm.[214]

231.    David Wade offers no mental health treatment to individuals housed in solitary confinement other than medication management.[215]

232.    There is no programming and there is no individual counseling.[216]

---

[209] Burns Tr., 1334:13-21.
[210] Burns Tr. 1331:5-12 (importance of the plans for communicating expectations to patients and clinicians); 1332:1-1333:9 (importance of the plans for planning and resource allocation).
[211] Burns Tr. 1330:22-1331:4; 1331:15-22.
[212] Burns Tr. 1330:9-21.
[213] Burns Tr. 1333:18-1334:12; 1334:22-1335:17.
[214] Burns Tr., 1438:20-1439:1, 1439:18-21, 1451:4-11; Seal Tr., 1127:18 (Non-individualized treatment plans are not correct, there are risks); Seal Tr., 1217:7-17 (Treatment plans are important and should document a person's actual course of treatment).
[215] Burns Tr., 1448:21-1451:1; Turner Tr., 108:9-15 (only MH tx rec'd was medication or being put on suicide watch); Moran Tr., 209:11-24 (only treatment was meds, no individual counseling; only got to see Seal once every 6 months, those meetings last 5 mins tops).
[216] Hayden Tr., 569:20 - 570:4 (people have to request materials. request for materials would be in progress note. Does not know how many people asked for them); Dauzat Tr. 774:3-9 (any materials requested should be in progress note, and any materials provided might be in progress note); Dillon Tr. 290:14-19 (had asked Robinson for individual counseling and was denied); Turner Tr. 94:7-9 (never received individual counseling); Thompson Tr., 4132:6-11 (Defendants' expert Dr. Thomspn agreed that programming is generally unavailable in restrictive housing at DWCC), *Id*, 4039:15-24 (The only exception is a program available on N-1 for those preparing to re-enter the community).

233.    There aren't even religious programs available for people on the South Compound with the exception of people housed in N1 who are also eligible for reentry classes.[217]

234.    Defendants' expert Dr. John Thompson found that 14 of the 42 people he collected information from reported there was no programming available to them and they would have wanted access to.[218]

235.    The minimum standard of care for counseling requires that the visit take place in a confidential setting with a trained and credentialed provider.[219]

236.    Documentation of counseling must include a treatment plan, a progress note documenting the subject of the counseling and an update on their condition, any follow-up steps like homework or journaling, and include documentation of progress toward the goal.[220]

237.    Dr. Burns encountered no progress notes documenting counseling for patients on the south compound except for those specific to the TTP.[221]

238.    Dr. Burns encountered patients who were in need of counseling in N1-N4 at DWCC.[222]

239.    The lack of counseling at DWCC has negative outcomes, including higher frequency/intensity of self-harm.[223]

240.    Lack of counseling results in people receiving write-ups due to lack of anger management coping mechanisms. This results in unnecessary danger to staff and prisoners, as well as unnecessary uses of force.[224]

---

[217] P-YYY-3 - Deposition of Adkins, 17:5-25 (religious programs not available for South Compound; individuals from churches provide services to people on the tiers only for N1).
[218] Thompson Tr. 4132:6-11.
[219] Burns Tr., 1337:2-19.
[220] Burns Tr., 1337:23-1338:20.
[221] Burns Tr., 1338:21-1339:2; 1340:2-1341:13.
[222] Burns Tr., 1341:15-1342:19;
[223] Burns Tr., 1342:20-1343:17
[224] Burns Tr., 1345:24-1347:3

241.     Yelling and cursing can be symptoms of mental illness,[225] counseling can help people to control their noise level.[226]

242.     The lack of mental health care harms the men held on extended lockdown at DWCC. Dr. Haney testified that there was a "remarkable consistency" in what the incarcerated men had to tell him. They complained about the lack of programs, the harshness of the environment, what they perceived as the lack of mental health care, or lack of responsiveness from mental health staff. Dr. Haney also said that the men he spoke to also complained about mistreatment at the hands of correctional staff. They spoke specifically about the use of chemical spray either on themselves or with some frequency in the unit. Some of them said that even when they had declared a psychological emergency or said they were feeling suicidal they were subjected to chemical agent.[227]

243.     Dr. Haney testified that during interviews with incarcerated people they told him that they had pre-existing mental health conditions, they were suffering from the symptoms of their mental health conditions, had difficulties getting mental health help, and they felt like the solitary confinement they were being subjected to was making their mental health conditions worse.[228]

> iii. There is no programming available for prisoners housed in extended lockdown

244.     Individuals housed on the South Compound are not eligible to participate in group therapy programming.[229]

---

[225] Seal Tr., 1186:20-1187:22
[226] Seal Tr., 1188:9-12
[227] Haney Tr. 2895:19-2896:14.
[228] Haney Tr. 2894:11-18.
[229] Robinson Tr., 676:22 - 677:5 (There is group therapy for the North compound, not available for N1-N4); Dauzat Tr., 772: 11-18 (There is no group therapy for N2-N4; it is not provided for anyone on Extended Lockdown); Adams Tr., 979:7-18 (Mr. Adams requested group and individual therapy in ARPs, never got either one); Exh. P-YYY-1 - Deposition of Thomas 17:7 - 18:1 (programs such as church, mental health programs, school, rehabilitation, substance abuse…not available. Nothing to help you rehabilitate yourself).

245.    Dr. Haney testified that during his visit prisoners told him that there was no programming available to them and that they didn't have anything to do. Dr. Haney said that he understood there was the possibility of correspondence courses, but he saw no evidence of that in the records that he reviewed.[230]

246.    The only exception to the lack of programming is a re-entry course that is only offered to people who are housed on N1 6 months before their release.[231]

247.    Purportedly, individuals can request materials and curriculum for programming that is provided as group therapy available for individuals not in segregation.[232]

248.    One packet of materials, titled "Understanding and Reducing Angry Feelings" was identified by Warden Dauzat as an item that can be provided to an individual upon request.[233]

249.    This packet of materials is provided to individuals despite the fact that it states on the cover page that it is "a collection of materials for leading counseling sessions that encourage new ways of thinking about and responding to anger" and is not self-help materials. [234]

250.    These written materials are inappropriate for anybody but the course instructor, and not consistent with people's reading level.[235]

251.    Packets are not as effective as group therapy.[236]

252.    Individual and group therapy are available at other maximum-security institutions.[237]

---

[230] Haney Tr. 2965:1-13.
[231] Haney Tr. 2965:14-22; Thompson Tr. 4132:6-11, 4039:15-24.
[232] Dauzat Tr., 775:7-10 (materials and curriculum can be sent to people in segregation per request).
[233] Exh. D39 - Understanding and Reducing Angry Feelings materials; Dauzat Tr., 776:3-11 (this is what can be sent to men in segregation).
[234] Exh. D39; Dauzat Tr., 776:20 - 777:6 (materials intended for person leading counseling sessions, not self help).
[235] Burns Tr., 1284:7-24
[236] Burns Tr., 1345:15-23
[237] Burns Tr., 1339:3-25

253.    Warden Dauzat went on to admit that she does not know how many individuals are unable to read or write, which would render this packet entirely ineffective even for the improper use it is provided.[238]

254.    Dr. Burns testified that the deficiencies in the mental health care available at DWCC work together to create a serious risk of significant harm.[239]

255.    These deficiencies and the risks flowing from them should be obvious to anyone with clinical mental health training.[240]

256.    DWCC is not providing any programming outside of the cell, which is not in line with the national consensus around providing programming to people who are in restrictive housing.[241]

257.    The Department of Public Safety and Corrections is familiar with and makes the necessary equipment to provide congregate treatment to prisoners in a maximum-security environment.[242]

258.    Sec Pacholke testified that like other forms of programming, educational programming should be offered to people on extended lockdown to meet the national standard in correctional practices. This recommendation comes from the ASCA guidelines, and the DOJ policy brief.  At DWCC people on extended lockdown are not offered any programming except for correspondence courses,[243] which are not meaningful or even truly accessible because of the reading comprehension limitations of many of the men on extended lockdown.[244]

259.    The incarcerated people Sec. Pacholke spoke with when he visited the prison said that they were not engaged in the coursework offered to them through in cell programming. They reported that it did not have a lot of meaning or purpose. Sec. Pacholke noted in his testimony that

---

[238] Dauzat Tr., 777:7-13 (does not know how many people are unable to read and write).
[239] Burns Tr., 1451:2-19
[240] Burns Tr., 1451:20-6
[241] Pacholke Tr. 2689:6-10.
[242] Smith Tr., 2538:25-2539:7.
[243] Pacholke Tr. 2712:11-2713:4.
[244] *Supra* note 227 & 228.

completing coursework is not a part of the classification review process and therefore does not provide some type of positive denotation on your classification documents, which could provide motivation.[245]

260.    The ACA recommends step down programs which would also incorporate in-cell learning but most importantly out-of-cell learning and group activities in order to further group interaction and prepare people for return to more general population setting and also to reduce the social isolation.[246]

261.  The ASCA guidelines recommend programming for people in isolation in order to provide some congregate activities and to reduce that possibility or likelihood of additional harm based on isolation.[247]

262.  Defendants' regular and disruptive objections to Secretary Pacholke's testimony pertaining to correctional practices interfacing with mental health care illustrates well the problematic and dangerous disconnect at David Wade. At trial, Defendants took the position Secretary Pacholke could not testify about anything pertaining to the provision of mental health services because he is a corrections expert. But the point is precisely that security policies and mental health policies must operate hand in glove. Security staff must know how to respond to mental health concerns, and mental health staff must be involved in security-side decisions. And the Secretary (such as Pacholke) must understand both systems, to provide constitutional mental health care and safe conditions of confinement. The two systems cannot operate in silos. At David Wade, security is divorced from mental health care, and the longstanding failure to implement coordination between the two creates a dangerous environment for the men housed there.[248]

---

[245] Pacholke Tr. 2713:5-16.
[246] Pacholke Tr. 2688:11-20.
[247] Pacholke Tr. 2687:13-2688:1.
[248] See, e.g., Pacholke Tr., 2691:4-6; *Id.* 2692:25-2693:4.

263.    Congregate programs are often seen as a necessity in current corrections practice. First, they reduce misconduct by providing classes or coursework that are geared toward reducing misconduct. Second, it gives prison staff an objective criteria to look at when staff is deciding during a classification review as to whether or not to retain or release somebody.[249]

264.    Mr. Smith testified that group programming could safely be provided at David Wade. There is nothing inherently dangerous or different about the men at Wade that they cannot be provided programming and mental health counseling. The only obstacles to the provision of programming at Wade are physical space and resources.[250]

265.    The Fifth Circuit has repeatedly held that a lack of resources cannot be used as a defense for unconstitutional conditions.   Under *Smith v. Sullivan*, "it is well established that inadequate funding will not excuse the perpetuation of unconstitutional conditions of confinement." 611 F.2d 1039, 1043-44 (5th Cir. 1980) (ordering the El Paso County Jail to submit reports of compliance to initiate certain remedial programs, bring the jail up to standards, and provide an outdoor area/rehabilitative program); *Williams v. Edwards*, 547 F.2d 1206, 1212-13 (5th Cir. 1977) (when appellants challenged the authority of the District Judge to require increased inmate safety measures and enhanced medical facilities at Angola, the Fifth Cir. held "lack of funds or authority over funds does not justify operating a prison in an unconstitutional matter.").

*iii.  The Defendants intentionally discontinued the only program that provided psychotherapy, increasing the risk of harm for the men at DWCC.*

266.    The Defendants discontinued the only program that made psychotherapy available to those on extended lockdown.[251]

---

[249] Pacholke Tr. 2649:18-2650:3
[250] Smith Tr. 2544:19-2545:4.
[251] Robinson Tr., 679:3-4 (cannot recall when TTP ended); Dauzat Tr., 731:2-3 (cannot recall when TTP ended); *Id*,730:19 - 731:1 (says no formal decision to terminate TTP, she would have been part of it).

267.    The purpose of the transition treatment program (TTP) was to provide individual treatment to people in segregation with the goal of improving their behavior so they could leave segregation.[252]

268.    The referrals for TTP came from the classification department or directly from Warden Goodwin.[253]

269.    Warden Kayla Sherman who oversees the classification department at DWCC even acknowledged that people just need someone to talk to.[254]

270.    Cody Doucet testified that he reported to Warden Sherman the issues with receiving mental health treatment and how staff were forcing him to eat his own feces, but nothing ever improved.[255]

271.    The people in TTP were to receive individual counseling and correspondence courses.[256]

272.    The individual counseling with TTP was provided by Ariel Robinson and Steve Hayden and all interactions were documented on a mental health progress note.[257]

273.    Individuals were also supposed to receive individualized treatment plans in this program, although that did not happen.[258]

---

[252] Robinson Tr., 677:18 - 678:9 (purpose to provide treatment to people in segregation); *Id*, 678:10-14 (goal to improve individual's behavior so they could leave segregation); Exh. P-UUU-02; Dauzat Tr., 723:19 - 724:7 (purpose of TTP was pilot project to try and help people change behavior to leave segregation).

[253] Dauzat Tr., 720:10-13 (intended to get referrals from classification); Exh. P-UUU-1; Dauzat Tr., 720:22 - 721:15 (P-UUU-1 is an email from Dauzat to Nail, Sherman, Goodwin in 2016; TTP active in 2016); Testimony of Dauzat 721:23 - 722:3 (does not recall anyone sending the assessment attached to the email, but she got names referred for TTP from classification); *Id*, 722:16-19 (also got referrals from Goodwin); Exh. P-UUU-02; Dauzat Tr., 722:20 - 723:18 (P-UUU-02 is an email to Sherman and Nail from Dauzat; email notifying Goodwin referred people to TTP); Exh. P-UUU-05; Dauzat Tr., 727:25 - 728:5 (P-UUU-05 is an email from Hunter to Dauzat, Nail, Sherman, Jimmerson; list of ppl referred into TTP).

[254] Exh. P-UUU-03; Dauzat Tr., 746:25 - 747:16 (P-UUU-03 email from Sherman "I think the most important thing is that they will just have a reasonable person to listen and give them some perspective. Many of them think no one cares or believes they can behave or be decent and that will be a big deal to them. So just showing up consistently and talking to them will be enough in many cases."; Dauzat agrees with Sherman)

[255] Exh. P-BBBB-1 - Deposition of Cody Doucet, 14:18 - 15:8 (verbally reported to Sherman he wasn't receiving mental health care and staff forcing him to eat his own s***).

[256] Exh. P-UUU-4; Dauzat Tr., 726:4-12 (review of P-UUU-04, ppl supposed to receive individual counseling and correspondence courses).

[257] Robinson Tr., 678:15-17 (meet with people & provide treatment); *Id*, 678:20-23 (Hayden also provided TTP, nobody else).

[258] Dauzat Tr., 727:5-11 (ppl in TTP supposed to receive individual treatment plans; they were not created).

274.     While the initial testimony was that TTP ended due to staffing shortages, it was later stated that the program ended due to a lack of participation.[259]

275.     This was despite a review of 18 progress notes for people between 2016 and 2018 showing active participation in the program.[260]

276.     Psychotherapy has not been provided to the Plaintiff Class, even after they have requested individual counseling.[261]

277.     Mental health staff insist if individual counseling is provided, that fact would be documented in a mental health progress note.[262]

278.     However, when presented with the lack of documentation that individual counseling actually occurs, staff attempted to explain that it may only say "follow up" rather than any note indicating that individual counseling occurred.[263]

---

[259] Robinson Tr., 680:1-13 (deposition testimony from February 20, 2019 was that "manpower maybe, not having enough time, things of that nature" were why TTP ended).

[260] Exh. P-T-31 - Mental health progress note; Dauzat Tr. 731:14 - 732:17 (note says participated in TTP); Exh. P-TT-239 - Mental health progress note; Dauzat Tr. 732:19 - 733:14 (note says participated in TTP); Exh. P-TT-63 - Mental health progress note; Dauzat Tr. 733:23 - 734:14 (note says participated in TTP); Exh. P-TT-69 - Mental health progress note; Dauzat Tr. 734:16 - 735:5 (note says participated in TTP); Exh. P-TT-71 - Mental health progress note; Dauzat Tr. 735:7-22 (note says participated in TTP); Exh. P-OO-33 - Mental health progress note; Dauzat Tr. 736:1-17 (note says participated in TTP); Exh. P-MM-28 - Mental health progress note; Dauzat Tr. 736:24 - 737:12 (note says participated in TTP); Exh. P-MM-29 - Mental helath progress note; Dauzat Tr. 737:15 - 738:4 (note says participated in TTP); Exh. P-MM-33 - Mental health progress note; Dauzat Tr. 738:7-19 (note says participated in TTP); Exh. P-MM-50 - Mental health progress note; Dauzat Tr. 738:22 - 739:9 (note says participated in TTP); Exh. P-DD-17 - Mental health progress note; Dauzat Tr. 739:14 - 741:1 (note says participated in TTP); Exh. P-DD-21 - Mental health progress note; Dauzat Tr. 741:316 (note says participated in TTP); Exh. P-DD-23 - Mental health progress note; Dauzat Tr. 741:18 - 742:9 (note says participated in TTP); Exh. P-DD-24 - Mental health progress note; Dauzat Tr. 742:12-25 (note says participated in TTP); Exh. P-DD-28 - Mental health progress note; Dauzat Tr. 743:2-17 (note says participated in TTP); Exh. P-AA-122 - Mental health progress note; Dauzat Tr. 743:21 - 744: 17 (note says participated in TTP); Exh. P-AA-143 - Mental health progress note; Dauzat Tr. 744:19 - 745:7 (note says participated in TTP); Exh. P-AA-148 - Mental health progress note; Dauzat Tr. 745:9-22 (note says participated in TTP); Exh. P-AA-158 - Mental health progress note; Dauzat Tr. 745:24 - 746:13 (note says participated in TTP).

[261] Burns Tr., 1340:4-1341:7; Dillon Tr. 290:14-19 (had asked Robinson for individual counseling and was denied); Turner Tr. 94:7-9 (never received individual counseling); Moran Tr. 209:11-24 (no individual counseling)..

[262] Hayden Tr. 570:13-16 (if individual counseling provided, it would be in a progress note); Robinson Tr. 714:3-6 (any individual counseling would be in progress note); Dauzat Tr. 773:24 - 774:2 (any request for individual counseling should be in progress note).

[263] Dauzat Tr. 3335:6-16 (individual counseling happens, just won't say it on the progress note; may just say "follow up").

279.    The mental health staff at David Wade also have a liberal idea of what individual counseling entails, asserting that "talk therapy" can include any casual conversation that may allow a person to vent a concern.[264]

280.    Considering this liberal perspective on what individual counseling can include, Warden Dauzat does not believe that confidentiality is a necessary component.[265]

281.    Plaintiffs' expert, after evaluating the mental illness on extended lockdown, determined that there is no treatment at David Wade other than medication.[266]

> *iv. Defendants' medication policies are extremely dangerous, creating a substantial risk of serious harm*

282.    "The control, prescription, dispensation, and administration of medications are important aspects of any medical care delivery system." *Ruiz*, 503 F. Supp. at 1324.

283.    "[P]rescription and administration of behavior-altering medications in dangerous amounts, by dangerous methods, or without appropriate supervision and periodic evaluation, is an unacceptable method of treatment." *Id.* at 1339

284.    Medication is the primary form of treatment for mental disorders of prisoners located in restrictive housing.[267]

285.    Medications are often interrupted when prisoners are transferred to DWCC.[268]

---

[264] Dauzat Tr. 770:20-23 (defines as any casual conversation); Id 770:24 - 771:2 (allowing person to vent concerns and issues).
[265] Dauzat Tr. 771:3-6 (does not consider confidentiality to be a necessary component).
[266] Exh. P-F-07, Burns Report at p.3.
[267] R. Doc. 524 at 12, Joint Record Stipulation.
[268]   Exh. P-BBBB-1 - Deposition of Doucet 36:20 - 37:13 (Cody Doucet testified that he did not receive his medications for approximately two or three months at DWCC); Id, 35:25 - 36:3 (EHCC continued to prescribe medications taken pre-incarceration of Depakote, Trazodone, Keppra, and Celexa); Exh. P-YYY-1 - Deposition of Thomas, 8:23 - 9:6 (arrival at DWCC nurse looked at chart and took him off mental health medication); Id, 10:11-23 (arrived with about a week of medication, discontinued when that ran out because DWCC said they didn't give that here).

286.    Interruptions in medication can have negative consequences on mental health such as increased instances of self-harm or worsening of symptoms.[269]

287.    Dr. Fuller does not prescribe mental health medications for mental health reasons.[270]

288.    He also would never discontinue a medication that had been prescribed by Dr. Seal.[271]

289.    Daily medication is administered by pill call officers throughout the extended lockdown buildings at David Wade with the exception of injections.[272]

290.    Nursing staff is responsible for providing injections, they are not responsible for passing pill medications to anyone on the South Compound.[273]

291.    The security staff in each building keeps a log of who enters and exits tiers A&B and C&D, which equates to an approximate 20 pill pass entries per building each day.[274]

292.    Pill pass is supposed to take place 3 times a day, every day, by the pill pass officers.[275]

293.    The pill pass times are morning around 6:00 a.m., noon, and evening around 4:30 - 5:00 p.m..[276]

294.    Sgt. Pitts stated it takes approximately 20-30 minutes to complete pill pass per building for each of the 4 buildings on the South Compound and the one H-building.[277]

295.    This means it takes approximately 7 hours a day to complete 3 pill passes for the South Compound.[278]

---

[269] Exh. P-BBBB-1 - Deposition of Doucet, 39:19 - 40:1 (during few months without medications, went on suicide watch a couple times for cutting his wrists); Turner Tr., 90:19 - 20:2 (more depressed without medications).
[270] Exh. P-YYY-2 - Deposition of Fuller, 75:18-22.
[271] Exh. P-YYY-2 - Deposition of Fuller, 77:1-4.
[272] R. Doc. 524 at 12, Joint Record Stipulation.
[273] Norris Tr., 845:8-15 (nurses responsible for injections; nurses not responsible for distributing pills).
[274] Pitts Tr., 889:23 - 890:8 (person on tier keeps log; writes he enters for pill pass; log for A&B and C&D); *Id*, 890:9-13 (should be 20 entries a day across all tier logs).
[275] Norris Tr. 825:2-8 (meds distributed by pill call officers; 2 officers for South side); Id 827:7-9 (3 a day in each of the 4 buildings on the South Compound).
[276] Norris Tr. 827:13-15 (occurs at 6am, noon, 4pm); Id 827:16-19 (no particular order for distribution); Pitts Tr. 874:25 - 875:11 (6am, noon, 4:30-5).
[277] Pitts Tr. 893:25 - 894:4 (20-30 mins to complete pill call per building).
[278] Pitts Tr. 894:9-16 (about 7 hours of pill pass a day).

296.     Prior to March 2020, the pill pass officers worked a rotating schedule of 7 12-hour days with only one officer on duty for the South Compound at a time.[279]

297.     The pill call officer post order outlines the steps that are to be taken in conducting each pill pass which includes verifying the identity of the right individual, verifying the right medication and dose, and conducting a visual inspection to make sure that the individual has swallowed the medication.[280]

298.     The pill pass officers testified that they follow the policy and they have not been disciplined for not following the policy.[281]

299.     The David Wade policy EPM# 04-1-029 is applicable to all staff and states "it is important that offenders who have a history of unstable behavior receive their medication on a regular and continual basis."[282]

300.     Pill pass officers receive training on pill pass policies, procedures, and practices for passing out medications on the South Compound, which includes a PowerPoint presentation.[283]

301.     The PowerPoint presentation includes specific information on the importance of accurate and complete documentation, the importance of medication compliance and the importance of making sure people receive their medications regularly.[284]

---

[279] Norris Tr. 826:24 - 827:2 (prior to March 2020, pill officers worked 7 on 7 off 12 hour shifts); Pitts Tr. 866:6-18 (was pill call officer; 2017, 2018, 2019 pill pass on South Compound only, N1-N4); Id 875:12-18 (7 on, 7 off; days on he is the pill officer for South); Id 876:1-6 (also responsible for an H building morning and noon); Id 876:12-14 (when he was on duty, nobody else had pill call duty); Id 893:10-12 (12 hour shift from 5am - 5pm); Id 934:7-9 (someone else supposed to fill in if he's out); Exh. P-BBBB-2 - Depo Scriber, 38:2-8 (worked 7 on 7 off, alternating with Paul Pitts).

[280] Exh. J-13, 2017-5-25 - Post Orders - Pill-Call Officers; Norris Tr. 828:16-19 (post order that describes pill officer duties); Id 829:23 - 830:2 (post order describes step by step process pill officer supposed to follow).

[281] Pitts Tr. 883:12-14 (followed this policy); Exh. P-BBBB-2 - Deposition in Lieu of Live testimony Erik Scriber 10:23 - 11:6 (never been told broke policy, no discipline other than being late).

[282] Exh. J-9, 2019-3-18 - EPM 04-01-029 - Pharmaceuticals_Non-Prescription Meds and Pill Call Procedures; Norris Tr. 834:3-12 (reviewing Exh. J9, applicable to all staff).

[283] Pitts Tr. 868:21 - 869:1 (1-2 days of training for pill pass); Id 869:6 (went over the policy about pill pass); Id 869:12-17 (other than policy, hands on training); Id  869:23 - 870:1 (training went through powerpoint).

[284] Exh. P-QQQ-3 - Medication Handling powerpoint; Pitts Tr. 871:2 - 874:11 (walks through several slides and bullet points; importance of documentation, med compliance); Id  877:2 - 878:7 (continued review of slides; eMAR

302.    The Louisiana DPSC lesson plan for Medication Handling encompasses the training provided to the pill pass officers and provides information regarding medication compliance, specifically stating that people with a mental illness are often likely to be non-compliant with medication which can result in deterioration of their mental status and present officers many avoidable challenges.[285]

303.    Sgt. Pitts agrees with the information presented in the lesson plan.[286]

304.    Medications come to David Wade from Elayn Hunt Correctional Center; David Wade does not have its own pharmacy.[287]

305.    When individuals arrive at David Wade with medications, they are taken by medical and placed onto the pill cart in the building where the individual is going to be housed.[288]

306.    The medications on the pill carts are in blister packs of either a 30 or 60 day supply for each medication.[289]

307.    There is one pill cart for each building and each tier has a separate drawer, in which medications are sorted by individual.[290]

308.    The only responsibility that medical staff or nursing staff has regarding the pill cart is to conduct daily inventory checks of the blister packs on the carts to determine when they need to be

---

documentation, discontinued meds, blister packs); Id 879:24 - 882:8 (continued review of slides; verify meds taken; important to make sure meds are taken; record on eMAR); P-BBBB-2 - Depo Scriber, 33:16-24 (received pill pass training on importance of documentation in eMAR).

[285] Exh. P-QQQ-2 - LDPSC Lesson Plan for Medication Handling; Pitts Tr. 898:16-18 (same info here as powerpoint); *Id*, 900:7-22 (paragraph read into record, issues resulting from med noncompliance).

[286] Pitts Tr. 902:7-10 (agrees with paragraph).

[287] Norris Tr. 824:18-20 (DWCC does not have own pharmacy).

[288] Norris Tr. 824:7-13 (medication on intake put on cart for building; stored there until delivered to prisoners); *Id*, 827:22-25 (all mental health medications distributed are kept on pill carts); *Id*, 823:12-15 (meds arrive in same van as prisoner arriving); *Id*, 823:20-24 (nurse would handle intake of medication).

[289] Norris Tr. 828:1-4 (blister packs w/30 or 60 day supply).

[290] Norris Tr. 831:5-6 (pill cart on each building, separate cart for each tier on each building); Pitts Tr. 884:9-15 (cart has 5 drawers, one for each tier, all blister packs for all people in there); Id 884:20 - 885:8 (each drawer is a tier).

reordered and to verify that the medications on the cart are for the people on the particular tiers of each building.[291]

309. Nurses are responsible for checking the blister pack to determine if a medication needs to be refilled, the visual inspection of the blister pack is the only way to determine when a medication needs to be refilled.[292]

310. Nurses or medical staff do not have any responsibility in monitoring or supervising pill pass on the South Compound.[293]

311. Pill pass officers are supervised and overseen by the Colonel of the South Compound, a security officer with no medical training or background.[294]

312. Col. Nail never personally watched pill pass taking place for supervisory purposes.[295] In fact, Nail did not believe he was responsible for pill pass, instead identifying medical as the department responsible.[296]

313. The security colonel or the captain is responsible for making sure the pill pass officers comply with policies pertaining to passing medications.[297]

---

[291] Norris Tr. 830:18-20 (nurses place meds on cart and sort meds for each tier); Id 830:23-25 (if person moves from C to D, pill officer moves the med to different place on cart, but nurse at night verify that is where it goes).
[292] Norris Tr., 844:21-24 (nurses refill med if see blister pack getting low); Id, 844:25 - 845:7 (only way to determine need for refill is visual inspection of blister pack; no other process for tracking medication); Id, 853:14-19 (blister pack helps keep track of meds, know when to reorder).
[293] Norris Tr., 845:16-23 (Nursing not responsible for monitoring or supervising pill call officers); P-BBBB-2 - Depo Scriber 15:16-19 (no nursing staff ever followed up to make sure pill pass correct).
[294] Norris Tr., 859:6-15 (each pill call officer supervised by colonel in security, not medical); P-BBBB-2 - Depo Scriber 11:20 - 12:5 (immediately supervised by Col. Nail, other supervisors lieutenants, captains, or majors).
[295] Nail Tr., 1835:10-15
[296] Nail Tr., 1833:4-7
[297] Norris Tr., 859:16-20 (security responsible for making sure pill officers comply with policies); Pitts Tr., 895:20-23 (Captain made sure he was in block at certain time); Id, 895:24 - 896:2 (nobody else supervised); Id, 945:5-9 (captains supervised that he was doing pill call).

314.     The only oversight the pill pass officers receive is for someone to call them on their radios and make sure they are in a building at a particular time or a check of the tier logs to make sure they were on a tier.[298]

315.     There is nobody who goes behind the pill pass officers to make sure entries in the eMAR are correct or that people are actually receiving their medications.[299]

316.     The pill pass policies outline the importance of accurate, complete, and timely documentation and Paul Pitts and Erik Scriber testified that they follow the policies and document everything.[300]

317.     Sgt. Pitts testified that he received a list of everyone receiving medications from medical and documented on a notepad who did not take the medications.[301]

318.     If an individual is not given their medication, regardless whether is marked as refused or not requested, the medication remains in the blister pack.[302]

319.     The pill pass officers do not have a list of people considered to be medication hoarders and they do not treat people taking medications with abuse potential any differently than people taking other medications.[303]

320.     Sgt. Pitts stated he would enter the pill pass information into the eMAR and then throw the notebook paper away.[304]

---

[298] Pitts Tr., 945:10-13 (they call on radio and ask if he's in a location); *Id*, 945:14-21 (supervisors check tier logs to make sure he's doing his job).
[299] Norris Tr., 846:7-12 (nobody goes behind pill officer to make sure eMAR is correct).
[300] Pitts Tr. 886:4-10 (policy says document everything, says he does); P-BBBB-2 - Depo Scriber 18:16-18 (training says important to keep good records).
[301] Pitts Tr. 886:16-20 (had list of each person that gets meds); *Id*, 887:5-13 (list came from medical; he would write down who took meds on notebook); *Id*, 887:22 - 888:3 (would create own list of ppl not taking meds); Exh. P-BBBB-2 - Depo Scriber, 49:19-22 (does not carry a list or anything with him for pill pass).
[302] Pitts Tr. 929:8-17 (medication remains in blister pack if not taken).
[303] Exh. P-BBBB-2 - Depo Scriber, 50:1-11.
[304] Pitts Tr. 891:6-9 (enter all morning pill call for N1-N4); Id 891:12-18 (same process for noon and evening; entering data into eMAR 3 times a day); Id 892:9-11 (tears paper up and throws away); Id 892:15-21 (does not keep because info in eMAR).

321.    Sgt. Scriber testified that he would simply remember who took their medication and who did not, without the benefit of making notes as he went through his medication rounds or a list, and would record that information in the eMAR later on.[305]

322.    The electronic medication administration record, or eMAR, contains the result of each pill pass for each individual and indicates if the person took the medication or not and is completed by the pill pass officer.[306]

323.    If the pill pass officer's initials appear on the eMAR, it means the person was provided and took that medication during that pill pass.[307]

324.    An entry into the eMAR is not automatic, it requires the pill pass officer to affirmatively make an entry.[308]

325.    In addition to the eMAR, pill pass officers also enter medication refusals into a medication refusal database.[309]

326.    There is no documentation created for pill pass other than the eMAR or the refusal database.[310]

327.    The pill pass officers who enter information into the eMAR and refusal database are given a unique login and password which tracks who is entering data.[311]

---

[305] Exh. P-BBBB-2 - Depo Scriber, 23:1 - 24:2 (relied on memory).
[306] Norris Tr. 840:11-14 (eMAR created); Id 841:13-17 (pill officer responsible for entering into eMAR); Pitts Tr. 890:18-21 (tracks who is or isn't taking meds in eMAR).
[307] Pitts Tr., 895:1-4 (initials mean person took pills).
[308] Pitts Tr., 892:24 - 893:3 (eMAR is not automatic, have to enter something); Norris Tr., 837:5-10 (required to complete MAR).
[309] Norris Tr. 840:15-18 (eMAR is in addition to refusal database); Exh. P-BBBB-2 - Depo Scriber, 53:4-15 (enters a refusal for a mental health medication into the refusal database).
[310] Norris Tr. 840:19-24 (the only place documentation goes is eMAR or refusal database)
[311] Norris Tr. 841:19 - 842:2 (access to eMAR and refusal database are pill officers, nurses, some wardens-doesn't know which wardens); Id 842:10-19 (access using unique password); Pitts Tr. 891:19-24 (has unique login and pass code; nobody else has it); Id 891:25 - 892:3 (when it logs his name, that was his entry); Exh. P-BBBB-2 - Depo Scriber, 26:9-15 (everyone has a user name and password, he has not shared his password).

328. There is nobody at David Wade responsible for verifying the accuracy of the eMAR or the refusal database completed by pill pass officers.[312]

329. The pill pass officers are required to document when a person refuses or does not otherwise take a medication.[313]

330. Once the pill pass officer enters "R" for refusal into the eMAR and the refusal database, there are no further responsibilities for reporting.[314]

331. Sgt. Pitts, nurse Norris, and Sgt. Scriber testified that if someone stated to him "I do not want to take that medication" he would document it as "R" for refusal.[315]

332. Once the pill pass officer enters "N" for not requested into the eMAR, there are no further responsibilities for reporting.[316]

333. Staff testified to a variety of passive behaviors that would result in "N" being entered, such as being asleep at pill call, person not coming to the bars but not actively refusing, or the person simply does not respond.[317]

334. The pill pass officers assert that they are correctly documenting pill pass, particularly when someone has not taken a medication.[318]

335. Sgt. Pitts testified that the vast majority of the time, he entered "N".[319]

---

[312] Norris Tr. 859:21 - 860:8 (nobody responsible for verifying eMAR is correct; she said she's responsible for making sure nurses do it right; she trains nurses, not pill call officers); Id 861:8 - 862:3 (impeachment with her deposition there is nobody responsible for making sure information is reported accurately).

[313] Norris Tr., 836:15-18 (required to record refusal); *Id*, 836:19-22 (required to document "not requested").

[314] Pitts Tr. 896:4-7 (no further responsibilities after enter "R" into eMAR); Norris Tr., 837:11-14 (refusal is "R").

[315] Pitts Tr., 895:5-8 (says I don't want med, "R"); Norris Tr., 835:7-10 (person says not taking med, that is refusal); Exh. P-BBBB-2 - Depo Scriber, 38:19-20 (they say they don't want it, that is refusal).

[316] Pitts Tr. 896:8-10 (no further responsibility after "N" in eMAR); Norris Tr., 837:15-18 (not requested is "N"); Exh. P-BBBB-2 - Depo Scriber, 54:5-23 (does not report to mental health an "N").

[317] Norris Tr., 835:11-20 (asleep at pill call, not requested); Id, 835:22 - 836:1 (person not come to bars, not requested); Id, 836:2-7 (prisoner does not respond, not requested); Pitts Tr., 895:10-12 (doesn't get out of bed or acknowledge, "N"); Exh. P-BBBB-2 - Depo Scriber, 38:21-23 ("N" would be no-show, maybe asleep); *Id*, 41:12 - 42:3 (Scriber would only mark "N" if person asleep, otherwise always "R" or they took it).

[318] Pitts Tr. 874:15-19 (documents no meds taken correctly).

[319] Pitts Tr., 895:17-19 (vast majority of time entered "N").

336.    The frequency of entering "N" is apparent among all pill pass officers when you look at the MARs for people across all of the South Compound.[320]

337.    Even more concerning than the frequency that "N" is entered are the patterns that emerge when viewing the MARs for various people across different buildings.[321]

338.    The documents themselves suggest that nobody is requesting medications on the same days from different buildings.[322]

339.    The documents themselves even show medications not being provided for individuals who testified that they actually did receive their medications.[323]

340.    Dr. Burns observed a pattern of missed doses of psychotropic medications at DWCC.[324]

341.    Not receiving medications in this pattern renders the medications ineffective.[325]

342.    The documents also show prisoners receiving their medications when they were not even present in the prison.[326]

343.    Dr. Seal noted in his review of progress reports that prisoners were not receiving their medication.[327]

344.    Regardless of the reason for entering "N", the bottom line is it means the prisoner did not take a medication.[328]

---

[320] *See* Exh. P-ZZZ-1 - Demonstrative MARs for 2017, 2018, 2019 (summaries of MARs); *See also* Exhs. P-L for individual MARs that provide information for Exh. P-ZZZ-1.
[321] *Id*.
[322] *Id*.
[323] Turner Tr., 89:21-25 (received medications twice a day as he was supposed to); Exh. P-ZZZ-1 (summary of MARs showing Turner frequently marked as "N").
[324] Burns Tr., 1394:22-1395:1.
[325] Burns Tr., 1395:4-1396:7.
[326] *See* P-ZZZ-1, January 2017 (MAR shows Carlton Turner received medications even though he was hospitalized).
[327] Seal Tr., 3907:9-10 (note states that Mr Jones is doing "good, when I get my meds" indicating that he is not receiving his medications rather than outright refusing them.).
[328] Pitts Tr., 937:3-4 (when says "N" means they did not take a pill); Exh. P-YYY-2 - Deposition of Bruce Fuller, 20:11-21 ("N" means prisoner probably didn't get his medication).

345.   There are no staff at David Wade who are responsible for following up or tracking when individuals are not taking their medication after the data is entered into the eMAR or refusal database.[329]

346.   There is nobody on mental health staff at David Wade who checks the medication administration records to ensure that medications are being provided and taken by the men on their caseloads.[330]

347.   Mental health staff stated they only check the medication refusal database.[331]

348.   Dr. Seal does not monitor his patients for medication compliance and does not know who does.[332]

349.   The information in the medication refusal database is entered by the pill pass officers and the mental health staff rely on these entries without verifying the accuracy of the data.[333]

350.   "There is essentially no mental health treatment provided except psychotropic medication which is not consistently, or property administered, rendering it ineffective."[334]

351.   Even when medication is effective to treat an individual's symptoms, the addition of significant stressors render medications alone ineffective, as reported by Mr. Moran who testified that his medications were effective except when an incident such as officers beating someone to death occurs which render his medications ineffective.[335]

---

[329] Norris Tr. 843:8-17 (no further responsibility); Id 843:21-24 (nobody checks to see if refusals occurred days prior to entry); Id 844:5-13 (would have to print MAR to see if refused day(s) before; not common practice, not printed daily); Pitts Tr. 896:11-14 (once data entered, duties done); Id 896:17 - 897:5 (someone needs to look at eMAR for refusals; guesses someone checks eMAR every day, maybe medical, doesn't know).
[330] Hayden Tr. 555:7-10 (does not review MAR).
[331] Hayden Tr. 555:11-23 (he reviews medication refusal database only).
[332] Seal Tr., 1200:22-24; 1201:10-13.
[333] Hayden Tr. 555:24 - 556:3 (doesn't know if he can edit the info, he's never tried); Id 556:4-11 (thinks the people passing meds enter info, but not certain); Id 557:4-6 (relies on the info in the database to be correct); Id 557:18-20 (has confidence that the info in there is correct).
[334] Exh. P-F-07, Report of Dr. Burns at p. 3; Burns Tr. 1335:21-23 (Burns states that medication management is the only intervention available at DWCC).
[335] Moran Tr. 233:21-234:5; 234:21 - 235:3 (medication effective unless additional stressors such as someone beaten to death by officers; stresses like that make medication not effective).

352.    Medication noncompliance should be addressed by mental health staff including the psychiatrist.[336]

353.    Mental health staff need a system for identifying when people are non-compliant. Systems exist to do this at other facilities.[337]

354.    DWCC does not document regular intervention when people are not receiving their medications.[338]

355.    Medication counseling should take place soon after the medication interruptions/ non-compliance begins to address the problem.[339]

356.    The way that medication is delivered in a prison can be a matter of life or death.[340]

357.    Dr. Bruce Fuller testified that having an accurate record of whether a person has taken or not taken their medication would be important for the safety of the individual as well as important for making treatment decisions.[341]

358.    Despite the glaring inaccuracies in the medication administration records, Dr. Fuller testified that he has never had a specific reason to believe that a medication administration record was inaccurate.[342]

---

[336] Burns Tr., 1396:8-22.
[337] Burns Tr., 1397:2-1398:4.
[338] Burns Tr., 1398:10-17.
[339] Burns Tr., 1398:21-1399:12.
[340] Burns Tr., 1399:16-1400:4; Exh. P-QQQ-3 - Medication Handling powerpoint (Risks include seizures, fights, coma, rapes, and death); Exh. P-F-07, Burns Report at p. 25; Exh. P-BBBB-2 - Depo Scriber, 34:8-13 (accurate pill call records can be a matter of life or death).
[341] Exh. P-YYY-2 - Deposition Fuller, 24:13-25 (medication compliance important for treatment decisions; having an accurate record important for safety).
[342] Exh. P-YYY-2 - Deposition Fuller 28:21-24.

359.    Nurse Norris testified that prisoners have access to staff when they are on the tiers or by submitting a sick call to report that there is an issue with their medication or they have not received it.[343]

360.    She testified that nursing has received reports that people have not received their medications, but the investigation only goes as far as to make sure the medication is reordered if it has run out and does not investigate whether the individual has received the medication.[344]

361.    In fact, the only safeguard in place to ensure that people receive their medications puts the onus of responsibility onto the individual to report to staff that they have not received it.[345]

362.    Even the required ACA audit of medical charts only looks to make sure the printed MAR is placed into the chart and does not audit the accuracy of the record or provide any level of quality assurance.[346]

363.    Sec. Pacholke testified that DWCC's medication administration deviates from the nationally accepted standard because they use security officers to distribute medication and they are not making contemporaneous notes of when they distribute medication. Instead pill call officers are distributing medication, not marking down at the time whether the person took their medication or if they refused it, then going back to the health services area and recording who took their medicine based on their recollection.[347]

---

[343] Norris Tr., 852:21 - 853:11 (nurses make round daily, prisoner can report to nurse. Sick calls can report med issues. Security makes rounds, can report problem to security).
[344] Norris Tr., 856:1-9 (nursing staff have gotten sick calls for no meds; they research it; make sure med is on cart, make sure it is reordered, will talk to prisoner).
[345] Norris Tr., 857:4-7 (up to the prisoner to notify staff they have not gotten medication); *Id*, 857:13-15 (the safeguard in place is that staff present on tier).
[346] Norris Tr., 821:25 - 822:3 (ACA requires 10 charts pulled and reviewed every 3 months); Id, 822:4-6 (10 charts pulled at random); Id, 822:7-10 (no distinction whether those charts were North or South Compound); Id, 822:13-24 (chart check was only to make sure MAR present in chart, no quality assurance).
[347] Pacholke Tr. 2764:7-19

364.    These national standards, based on his decades of experience and observation of maximum-security units nationwide, include a member of the nursing staff distributing medication, and contemporaneous recordation of whether or not someone has received their medication or not.[348]

365.    A proper medication administration system is important in a correctional setting because people need to receive the medical care they have been prescribed, a failure to keep track of medications can lead to pill hoarding and abuse of medication as well as decompensation if a person is not receiving the medication they are prescribed.[349]

366.    Perhaps most alarming is that the system existed this way for countless years prior to this litigation. Even after filing litigation, no changes were made to the way medication was administered or to the staff administering medication right up through the close of discovery in March 2020. This is an important point. Defendants argued in closing those once deficiencies with the medication administration system were brought to their attention, the staff administering the medication program was changed. This is flatly wrong. Not only was there no change in the medication administration practices during the years long discovery period of this case, but Mr. Pitts testified that he was never disciplined or even counseled to do his job differently.[350] Likewise, mental health staff testified that they have never been disciplined.[351] This gross misrepresentation undercuts Defendants' baseless arguments that the Court should trust them to fix conditions without intervening. Defendants had years to remedy conditions– including two full years from

---

[348] Pacholke Tr. 2763:18-2764:6.
[349] Pacholke Tr. 2763:6-17.
[350] *Supra* note 275: The pill pass officers testified that they follow the policy and they have not been disciplined for not following the policy. (Pitts Tr. 883:12-14 (followed this policy); Exh. P-BBBB-2 - Deposition in Lieu of Live testimony Erik Scriber 10:23 - 11:6 (never been told broke policy, no discipline other than being late).
[351] Hayden Tr., 322:1-7 (never been disciplined); Robinson Tr.,  674:5-8 (never been disciplined because of progress note); *Id*,  677:11-17 (never received a negative performance review or disciplinary action).

the filing of a very detailed complaint to the close of discovery in this matter– and failed to do so.[352]

> *v. Defendants' failure to monitor prisoners taking mental health medications in high heat conditions creates a substantial risk of serious harm*

367.    During high heat, circumstances such as access to water, high fever, and hallucinations are important information, with potentially fatal consequences[353] for individuals taking certain antipsychotic medications that make people sensitive to heat.[354]

368.    Dr. Seal is aware of heat pathology statuses, but is not responsible for assigning them.[355]

369.    Contrary to Dr. Seal's testimony, Warden Huff testified that only Dr. Seal may assign a heat pathology status.[356]

370.    Mental health staff, not Dr. Seal, notify patients of how to take heat precautions.[357]

371.    Seal does not know how mental health staff records or reviews heat duty status.[358]

372.    People in crisis while on medications may not be able to understand the situation and self-advocate.[359]

373.    Mr. Hayden testified that it is the responsibility of all DWCC staff to identify signs and symptoms of heat pathology and asserts that all staff receive training on it.[360]

---

[352] This same point applies to multiple flatly and patently unconstitutional conditions in this case: the absence of treatment plans, the abysmal record-keeping, the lack of counseling (or any mental health services other than scattershot medication), the failure to document rounds, failure to hold meaningful mental health interactions, and so on and so on. Defendants had years between suit filing and close of discovery to make changes. For Defendants now to bemoan that the Court's closure of discovery in this proceeding somehow deprives them of an ability to show good faith changes is disingenuous. A Court finding of liability is necessary and warranted.
[353] Seal Tr., 1199:9-23; 1200:16-18.
[354] Seal Tr., 1194:24-1195:9.
[355] Seal Tr., 1196:3-18.
[356] Huff Tr., 2024:7-12..
[357] Seal Tr., 1196:15-21.
[358] Seal Tr., 1197:2-18.
[359] Seal Tr., 1199:1-4.
[360] Hayden Tr., 566:11-18 (it's all staff's role to identify signs, all staff are trained on it).

374.    Department regulation outlines heat pathology and the need for a mechanism to be in place to identify people who are vulnerable to heat due to certain medications and enforce provisions to reduce heat pathology.[361]

375.    Michelle Norris testified that nursing staff will give out the duty status that will say heat pathology, but they do not otherwise provide any information to prisoners regarding heat pathology because that is supposed to be done by mental health staff.[362]

376.    Mr. Hayden testified that a duty status is when the heat reaches a certain temperature it should trigger actions because medications can be dangerous in the heat for some people.[363]

377.    Mr. Hayden testified that Dr. Seal is responsible for designating a person to be on heat duty status, in opposition to Dr. Seal's testimony that he is not responsible for it.[364]

378.    David Wade's policy adopts the department regulation and requires people to be educated about heat pathology and issue a heat alert when the outside temperature exceeds 88 degrees.[365]

379.    Testimony from security staff was that the temperature on the tier is monitored by a handheld thermometer and recorded in the log book.[366]

---

[361] Exh. J-11 - 2018-7-10 - RFP 4 - HC-45 IS-D-2-HCP8 - Heat Pathology; Norris Tr., 847:1-3 (DPSC heat pathology policy); *Id*, 847:10-16 (5th para, need mechanism to identify people vulnerable to heat and enforce provisions to reduce heat pathology); *Id*, 847:20-24 (purpose of policy is to protect).

[362] Norris Tr., 858:13-19 (nursing will give out the duty status that will say heat pathology); *Id*, 859:3-5 (That is all the education nursing provides); *Id*, 855:18-22 (nursing does not train prisoners on heat pathology, that would be mental health).

[363] Hayden Tr., 564:21 - 565:1 (duty status is when heat reaches certain temperature); *Id*, 565:5-11 (duty status for certain meds because dangerous).

[364] Hayden Tr., 565:2-4 (says Seal designates person to be on); Seal Tr., 1196:15-2.

[365] Exh. J-8 - 2019-3-15 - EPM 04-01-039 - Psychotropic Medication and Heath Pathology Sunlight Sensitivity; Norris Tr., 848:21-24 (requires individuals be educated about heat pathology); *Id*, 849:1-5 (heat alert when temp exceeds 88); Baird Tr., 1070:22 - 1071:3 (temp on tiers monitored with thermometers, overall temp monitored by control center; can issue heat alert if average temp outside is 88 degrees).

[366] Baird Tr., 1071:15-18 (temp on tier monitored by handheld thermometer and one on wall in lobby); *Id*, 1072:10-12 (temp on tier recorded in log book).

380.    The precautions for heat pathology should include increasing fluids, providing ice, allowing additional showers or providing cold wet towels and increasing ventilation.[367]

381.    The heat alert is announced over the speakers, the staff on the units should document the heat alert and the steps taken in the off.[368]

382.    During the summer of 2018, these safety precautions were not followed and the result was the death of Torre Huber.[369]

383.    During the summer of 2018, plumbing problems on the tier resulted in cool water not even being available from the sink inside the cells and only steaming hot water accessible from the sink.[370]

> *v. DWCC does not respond to decompensation or mental health crisis, creating a substantial risk of serious harm and resulting in actual harm*

384.    When the inadequate treatment causes an individual to decompensate, the only intervention Defendants employ to stabilize a patient is to place the individual on suicide watch.[371]

385.    The conditions and practices regarding suicide watch work together to deter people from reporting mental health emergencies and deprive people of basic necessities.[372]

---

[367] Norris Tr., 849:6-22 (when heat alert, should take steps like increase fluids and ice, additional showers or cold wet towels, ventilation increased; all steps taken should be documented).

[368] Norris Tr., 852:11-16 (heat alert announced over loud speaker); Baird Tr., 1072:18 - 1073:9 (heat duty status should be triggered by heat alert. Prisoners are supposed to get ice, water, brown towels for wetting selves; extra showers for north only); Id, 1073:10-12 (when these things provided, documented in log book).

[369] McDowell Tr., 1015:6-9 (had a cellmate summer 2018, Torre Huber, he died 7/22/2018).

[370] McDowell Tr., 1014:15 - 1015:5 (issues with plumbing summer 2018, hot water stayed stuck on and sink would fill with steaming hot water. Couldn't touch it much less drink it. Water in sink and toilet was brown. Staff would turn the water off on the tier because working on pipes, but when turned back on sink still broken).

[371] Solomon Tr., 612:19 - 613:9 (first came to extended lockdown still working out and trying to keep mind focused; over time, got worse and worse. Went from ambitious to not wanting to live anymore); Id, 618:10 - 619:12 (response to cutting self in July was suicide watch; "throw him in a cell and hopefully he will get over it". A phone call or something, anything, could have helped; to call grandmother to pray. There was nothing. He wasn't strong enough to get through it on his own, there was no help); Exh. P-BBBB-1 - Deposition of Doucet, 40:25 - 41:20 (on suicide watch at least 5 times because not receiving mental health treatment, only seen Seal 2 times since arrival at DWCC, interruption in medication for 2 months).

[372] Exh. P-YYY-4 - Deposition of Brooks, 22:1-20 (would tell mental health he was ok when he wasn't because he did not want to be put on suicide watch under those conditions).

386.     Mental health interventions, other than medication management and suicide watch, were not reflected in the records Dr. Haney reviewed, or in the interviews he conducted. There is no group therapy provided in these units.[373]

387.     Individual treatment plans are not updated following a sick call or any other decision that could change the treatment options for an individual, including crisis intervention.[374]

388.     Dr. Seal does not review an individual's treatment plan when they go onto suicide watch, he does not make any changes to it as a result of being on suicide watch.[375]

389.     DWCC does not review treatment plans and not implement any additional or more intensive interventions, including any specific individual safety plans, when a person goes on suicide watch.[376]

390.     The treatment plans (which should be the guiding document coordinating care between all staff) fail to reflect or adapt when an individual experiences a mental health crisis or has a suicide attempt that may result in the necessity for additional or different mental health treatment.[377]

391.     Failure to follow up on a patient's history of self-harm is dangerous. Past attempts and behaviors are predictors for completing a suicide.[378]

392.     Sec. Pacholke testified that suicide prevention is a top priority for any segregation unit and any prison system, so it would be a priority to make sure staff can identify the signs and symptoms of someone who was in decompensation. Referrals to mental health are to get a professional to

---

[373] Haney Tr. 2942:11-21.
[374] Burns Tr., 1334:13-21.
[375] Seal Tr. 1217:21-24 (Dr. Seal reviews the treatment plans); *Id.* 1217:25 - 1218:8 (He doesn't remember any that offered actual psychotherapy); *Id.* 1218:9-13 (Dr. Seal doesn't recommend changes in writing); *Id.* 1218:14-21(Dr. Seal never tried to change a treatment plan to add therapy 1218:14-21)
[376] Burns Tr., 1363:21-1365:10; *Id*, 1365:24-1366:19.
[377] Burns Tr., 1364:11-21
[378] Burns Tr., 1292:12-23

check to see if that person is getting the right medication and/or therapies; it is a professional validation of the signs and symptoms seen by security staff.

393.    Sec. Pacholke testified that the academic articles he turned to educate himself on the psychological effects of restrictive housing said that people with underlying mental health issues can get caught up in a cycle of moving in and out of restrictive housing and decompensated over time. The academic literature Sec. Pacholke reviewed on this topic was consistent.[379]

*vi. DWCC's suicide prevention policies create a substantial risk of serious harm*

394.    The accepted standard of care for suicidal patients uses constant and close observation as the two modes, rather than standard and extreme. Constant observation requires constant eye-to-eye observation of the individual, typically at cell front.[380] Close observation requires periodic observations at close, random intervals.[381]

395.    That constant observation can be supplemented by– but not replaced with– video observation.[382]

396.    David Wade falls below this accepted standard of care. Despite having a large number of mental health patients housed in stark and isolated conditions of confinement, Defendants do not provide constant observation of those individuals when they are on suicide watch.

397.    Instead, they provide intermittent video observation, with in-person visual checks every 15 minutes.[383]

398.    Also in lieu of constant observation, Defendants rely upon brutal and punishing conditions of confinement for people who are suicidal, resorting to stripping the individual of all clothing and

---

[379] Pacholke Tr. 2691:2-19.
[380] Burns Tr., 1348:16-21
[381] Burns Tr., 1348:22-1349:15.
[382] Burns Tr., 1357:23-1358:8.
[383] Hayden Tr. 390:7-10.

property, and sometimes even utilizing mechanical restrains while the person is virtually naked in-cell. Such callous and harmful conditions would not be necessary if Defendants provided constant observation– a constantly watched individual could keep their clothes, mattress and some other non-dangerous pieces of property, because staff would be present to intervene should the person attempt suicide. Instead, Defendants' resort to stark conditions of confinement that serve to exacerbate a person's mental illness.

399.    Plaintiff's expert Sec. Pacholke testified that it is important for someone who is working in corrections and who is responsible for the management of the behavior of people who are incarcerated to be familiar with the mental health policies and how to manage people who might have a mental illness.[384]

400.    DWCC has two categories of suicide watch, standard and extreme.[385]

401.    DWCC also has a mental health observation status for prisoners with acute mental health concerns.[386]

402.    Mr. Hayden describes mental health observation ("MHO") used when a person needs to be evaluated because they do not know what's going on with him.[387]

403.    The difference between suicide watch and MHO is that people get to keep their property with MHO, but it has the same observation by security staff at 15 mins and at random.[388]

---

[384] Haney Tr. 2743:6-11.
[385] R. Doc. 524 p. 9, Joint Record Stipulation; *See also* Hayden Tr. 429:16-18; Dauzat Tr. 3387:22-24
[386] R. Doc. 524 p. 10, Joint Record Stipulation.
[387] Hayden Tr., 413:9-18 (describes it as person needs to be evaluated because don't know what's going on with him).
[388] Hayden Tr., 413:19-21 (MHO and SSW different because MHO keeps property); *Id*, 414:5-7 (MHO same 15 mins and random observation); Exh. J-4 - EPM 03-02-008 - Mental Health Observation dated 3.4.2013; Dauzat Tr., 3394:3-15 (review policy; describing what MHO is and how it is used); *Id*, 3394:17-24 (observation is 30 mins per policy, but they still write 15 mins on management order; same monitoring used for MHO, SSW and ESW).

404.     However, it does not appear that Mr. Hayden utilizes MHO for diagnostic or treatment planning purposes, such as the period of time when Torre Huber was on MHO after engaging in bizarre behavior, oriented only x1, and being unable to communicate.[389]

405.     After spending several days on MHO, and showing no signs of improvement in his condition, orientation, or ability to communicate, Mr. Hayden took Mr. Huber off MHO without addressing the underlying cause and without a plan to address the bizarre behavior.[390]

406.     Even though she reviewed the notes and met with Mr. Huber herself, Warden Dauzat did not find fault with Mr. Hayden taking Mr. Huber off of MHO despite his lack of improvement or identifying the underlying cause of his bizarre behavior, orientation to only x1, and inability to communicate.[391]

407.     Dr. Haney testified that based on prisoner accounts and the records he reviewed that when people express a mental health need while on extended lockdown, they are taken to suicide watch. This involves being taken to a cell, stripped of all property, and placed in a paper gown. They may or may not have their mattress taken from them, depending on how they present at the time, and then they are left there. When they are placed on watch they are under observation, but they do not get any additional mental health treatment.[392]

---

[389] Exh. P-LL-260; Hayden Tr., 404:11-20 (Huber seen due to bizarre behavior, reported by security due to inability to respond to simple commands or answer questions); *Id*, 405:6-14 (lacked orientation to surroundings, unable to converse, put on MHO).

[390] Exh. P-LL-269 - MH Prog Note; Hayden Tr., 411:8 - 413:8 (review of progress note; Hayden describes oriented to 1 as being able to only answer 1 question); *Id*, 415:14-18 (Huber oriented x1 and unable to communicate); Exh. P-LL-272 - prog note; Hayden Tr., 416:3-19 (oriented x1, same note); Exh. P-LL-275; Hayden Tr., 417:2-11 (same text in note); Exh. P-LL-278; Hayden Tr., 417:22 - 419:10 (review of note); Exh. P-LL-287; Hayden Tr., 420:13 - 421:13 (review of note); Exh. P-LL-292; Hayden Tr., 421:23 - 423:5 (review of note); Exh. P-LL-293; Hayden Tr., 423:21 - 425:14 (review of note); Exh. P-LL-288; Hayden Tr., 427:1-12 (review of mgmt order taking Huber off MHO).

[391] Exh. P-LL-284; Dauzat Tr., 751:12 - 753:25 (review of note; Huber had difficulties answering questions; Dauzat w/Robinson at time of visit); Exh. P-LL-287; Dauzat Tr., 754:4 - 755:19 (review note; Huber oriented x1, Dauzat explained what that means-not what Hayden said); Exh. P-LL-289; Dauzat Tr., 756:6 - 7577 (review note; lacked orientation, unable to converse, removed from MHO. She approves Hayden's judgment).

[392] Haney Tr. 2940:20-2941:8.

408.    Subject to a clinical determination by mental health staff, prisoners on standard suicide watch have no access to any property, including mattresses, letters, or books.[393]

409.    Subject to a clinical determination by mental health staff, prisoners on standard suicide watch are clothed only in a paper gown.[394]

410.    The mental health management order containing the specifications is signed by a member of the mental health staff.[395]

411.    Security staff cannot change a management order and it is expected that they will follow the order.[396]

412.    People who are placed on suicide watch are not given any type of formal suicide assessment. There was no suicide assessment instrument that was present in the records Dr. Haney reviewed. Dr. Haney did not see any evidence that prisoners placed on suicide watch are seen by a psychologist or psychiatrist, nor that Dr. Seal gets a call to see someone who is placed on suicide watch. People on suicide watch are there until they convincingly assert that they are no longer suicidal. After they go back to their cell, they are seen for a follow-up one week later, but there is no special psychiatric contact, only the regular medication follow-up with Dr. Seal at the predetermined intervals.[397]

413.    The mental health staff uses deprivation of suicidal patient's property as punishment for perceived manipulation. Mr. Hayden testified that if he thinks a patient is manipulating the staff, he will write the mental health management order to make sure that the patient is not allowed to have anything in their cell except for a paper gown.[398]

---

[393] R. Doc. 524 p. 9, Joint Record Stipulation.
[394] R. Doc. 524 p. 9, Joint Record Stipulation.
[395] Hayden Tr. 389:18-20 and 435:25 - 436:14.
[396] Hayden Tr. 390:4-6 and 389:21-23.
[397] Haney Tr. 2940:20-2942:10.
[398] Hayden Tr.  432:22 - 433:20 (if they think people are manipulating, they won't give them anything other than paper gown).

414. Despite the prison's policy providing for clinical discretion regarding the property prisoners are allowed to have, all of the prisoners who testified at trial describe the conditions of suicide watch the same way: alone in a cell with no property, clothed only in a paper gown.[399]

415. Ariel Robinson, a member of the mental health staff at David Wade, confirmed that those are the conditions for suicide watch.[400]

416. Widely accepted correctional practices consider access to a blanket a right, not a privilege, even for people who are currently on suicide watch. Tear resistant blankets that are more difficult to rip or to tie off for the purposes of self-harm are available at ACA conferences.[401]

417. It is generally accepted in the corrections community that prisoners should be given the basic minimum property such as bedding, linen, a mattress, and clothing in all circumstances, including on suicide watch.[402]

418. At Wade, patients on suicide watch are observed by one of the security staff every 15 minutes and at random.[403]

419. Those observations are conducted by security staff, not mental health staff; suicidal patients see mental health staff every 24 hours.[404]

420. Security staff document suicide watch observations on a suicide watch log, which is not reviewed by mental health staff or relied up on for treatment purposes.[405]

---

[399] Turner Tr. 102:20 - 103:7 (SSW in "naked cell" wearing paper gown with zero property); *Id.* 106:21-24 (only ever given paper gown); Solomon Tr.  613:15-23 (no property, no clothes, paper gown. Just like policy 34 but you never get a mattress); Adams Tr.  987:19 - 988:7 (paper gown, nothing in cell, no socks or sweaters, only the gown; can't have legal work or books, no mattress); Exh. P-YYY-1 - Deposition of Thomas, 34:9-16 (paper gown, nothing in cell, no mattress, sleeping on concrete with nobody watching over you).
[400] Robinson Tr. 712:25 - 713:5 (SSW means paper gown, no property).
[401] Pacholke Tr. 2731:2-14.
[402] Pacholke Tr. 2732:13-17.
[403] Hayden Tr. 390:7-10.
[404] Dauzat Tr. 3390:23-3391:19.
[405] Hayden Tr., 397:3-4 (security creates suicide watch logs); Id 397:12-14 (only sometimes reviews the watch logs); *Id*, 397:17-24 (watch logs not always valid tool, doesn't necessarily look at them); *Id*,  414:23 - 415:4 (reviews the logs for MHO but not for SSW).

421.    The key room officer is expected to continuously monitor people in suicide watch cells in addition to all other duties of that position, even when there is more than one person in a suicide watch cell.[406]

422.    Despite these procedural requirements for the observation of suicidal patients, incarcerated witnesses described suicide watch observation sometimes happening at intervals between 30 minutes and a couple of hours.[407]

423.    Plaintiffs' expert, Dr. Burns, personally observed broken suicide watch cameras and the poor placement of suicide watch cameras in the suicide watch cells when she was at DWCC.[408]

424.    She also personally observed the difficulty in pulling up those feeds to monitor the inside of the suicide watch cells.[409]

425.    It is not humanly possible for the key officer to conduct constant observation suicide watch in addition to all of her other duties. She necessarily will be unable to watch suicidal patients at all times, resulting in a substantial risk of harm to the men on suicide watch, and deviating from the constant observation standard of care explained by Dr. Burns.

426.    Johnie Adkins, who was not qualified to make any clinical judgment pertaining to mental health, had the authority to put people onto suicide watch, to take people off of suicide watch, and to evaluate people while they were on suicide watch.[410]

---

[406] Hayden Tr., 391:18-19 (1 person in key); *Id*, 391:23 - 392:9 (key responsible for opening doors to building and tiers); Id 393:9-11 (key has to make a log); *Id*, 396:17-21 (Hayden: key officer has to watch multiple screens if multiple people on SSW). Goodwin Tr. 2227:12-15.
[407] Adams Tr. 989:6-20.
[408] Burns Tr. 1359:6-15
[409] Burns Tr. 1359:16-25.
[410] Exh. P-YYY-3 - Deposition Adkins, 32:21 - 24 (part of the job was to visit people on suicide watch); 33:5 - 34:5 (put people onto suicide watch, extreme suicide watch; says he must have gotten direction from someone else but it isn't documented anywhere); 34:14 - 35:6 (signed paperwork taking people off suicide watch; says must have gotten direction but it isn't documented anywhere); 35:17-18 ("I was just not clinically trained and not really able to take that responsibility").

427.    Subject to a clinical determination by mental health staff, prisoners on extreme suicide watch are clothed in a paper gown.[411]

428.    Subject to a clinical determination by mental health staff and approval from medical staff, prisoners on extreme suicide watch are placed in restraints while in a cell alone.[412]

429.    Subject to a clinical determination by mental health staff, prisoners on extreme suicide watch have no access to any property, including mattresses, letters, or books.[413]

430.    David Wade uses restraints on people in their cells during extreme suicide watch. Restraints used on extreme suicide watch may be: (1) four-point restraints, which consist of both hands being cuffed with the chain for the cuffs connected to a box at the mid-section, designed to prevent movement or tampering, a belly chain connected to the handcuff chain, and shackles on the ankles, (2) placing a prisoner in a restraint chair, which attaches each limb to the chair, or (3) the placing of the prisoner in a restraint chair, as above, with a helmet to prevent spitting and head banging.[414]

431.    Mental health staff, including Steve Hayden, can put someone onto extreme suicide watch with the concurrence of a medical physician.[415]

432.    Dr. Bruce Fuller, a medical physician at David Wade, fills the role of concurring with mental health staff to place people onto extreme suicide watch.[416]

433.    In this role, Dr. Fuller is simply concurring with the assessment of mental health staff whether to place someone on extreme suicide watch.[417]

---

[411] R. Doc. 524 p. 10, Joint Record Stipulation.
[412] R. Doc. 524 p. 10, Joint Record Stipulation.
[413] R. Doc. 524 p. 10, Joint Record Stipulation.
[414] R. Doc. 524 p. 10, Joint Record Stipulation.
[415] Hayden Tr., 444:14-17 (He can put someone on ESW with doctor concurrence).
[416] Exh. P-YYY-2 - Deposition of Bruce Fuller, 36:12-21 (mental health calls him for concurrence for ESW).
[417] Exh. P-YYY-2 - Deposition of Fuller, 36:22 - 37:6.

434.    He makes this concurrence based solely on the information provided to him, he does not speak with the prisoner, evaluate the prisoner, or ever go to evaluate the situation for himself before providing a concurrence over the phone.[418]

435.    In his 11 years in his role at David Wade, he has also never withheld concurrence for extreme suicide watch.[419]

436.    Dr. Fuller has also never had an obligation to perform a physical examination for anyone on extreme suicide watch.[420]

437.    In fact, he has never gone to the cell blocks on the South Compound to conduct an examination of anyone[421] nor has he conducted a review of an individual's chart to determine if there are any medical concerns for use of a particular form of restraints.[422]

438.    Dr. Fuller is not familiar with the policies and limitations around the use of restraints and he does not have any responsibility in making sure that the use of suicide watch conforms to David Wade policy or Departmental regulations.[423]

439.    Although he does recognize that the prolonged use of restraints or the restraint chair could pose dangers, such as injuries resulting from the restraints themselves.[424]

440.    However, he is not familiar with what the different restraints are that can be used for extreme suicide watch.[425]

441.    Dr. Fuller has no role in determining when someone should be released from extreme suicide watch and he has no role whatsoever in standard suicide watch.[426]

---

[418] Exh. P-YYY-2 - Deposition of Fuller, 37:7-13.
[419] Exh. P-YYY-2 - Deposition of Fuller, 37:14-17.
[420] Exh. P-YYY-2 - Deposition of Fuller, 38:2-10.
[421] Exh. P-YYY-2 - Deposition of Fuller, 38:11-16.
[422] Exh. P-YYY-2 - Deposition of Fuller, 39:14-17.
[423] Exh. P-YYY-2 - Deposition of Fuller, 39:18-25.
[424] Exh. P-YYY-2 - Deposition of Fuller, 40:1-16.
[425] Exh. P-YYY-2 - Deposition of Fuller, 41:16-19.
[426] Exh. P-YYY-2 - Deposition of Fuller, 45:11-19.

442.    Despite Mr. Hayden testifying that David Wade uses extreme suicide watch as an intervention to eliminate further threat of harm to the patient,[427] Mr. Adams continued to harm himself such that he spent time on extreme suicide watch at least every two weeks. [428]

443.    Extreme suicide watch requires an evaluation of the patient and renewal, if necessary, every twelve hours.[429]

444.    Christopher Solomon who has spent time on extreme suicide watch, testified that the experience made his desire to kill himself worse,[430] that death would be a way to get him out of his misery.[431]

445.    Noel Dean was able to remove his leg shackles and attempt to kill himself by hanging while on extreme suicide watch.[432]

446.    Extreme suicide watch is hurtful, sad, and aggravating.[433]

447.    As of March 2020, DWCC's Employee Policy Memorandum #02-01-030 provides for use of the restraint chair.[434]

448.    DWCC has a restraint chair.[435]

449.    DWCC policy permits mental health staff to authorize the use of the restraint chair for up to 12 hours per authorization.[436]

---

[427] Hayden Tr. 443:8-12.
[428] Adams Tr. 989:1-5.
[429] Dauzat Tr. 3393:2-3; Exh. P-YYY-2 - Deposition of Fuller, 38:25 - 39:3.
[430] Solomon Tr. 615:2-12.
[431] *Id.*
[432] Exh. P-WWW-17 - Body Camera Video - Noel Dean 309740 20180402235327_0001.MP4.
[433] Solomon Tr. 615:2-12.
[434] R. Doc. 524 p. 10, Joint Record Stipulation.
[435] R. Doc. 524 p. 10, Joint Record Stipulation.
[436] R. Doc. 524 p. 10, Joint Record Stipulation.

450.    At a minimum, after each 12-hour interval, the policy states mental health staff must assess the medical and mental health status of the prisoner to determine if modification or discontinuation of restraint is appropriate for medical or mental health reasons.[437]

451.    DWCC policy requires that a prisoner restrained in a restraint chair be released at a minimum every two hours for toilet, sanitation, and nourishment functions.[438]

452.    DWCC policy states that if after five two-hour cycles in the restraint chair, the person cannot be released from restraint, then he must be released from the chair and be alternatively restrained for a minimum of two hours before he is placed back in the chair.[439]

453.    The Departmental level policy prohibits the use of the restraint chair for more than two hours in any 24-hour period.[440]

454.    Despite the aforementioned policies, prisoners spend much more time in the restraint chair than allowed by policy. The time spent in the restraint chair, with or without breaks creates a substantial risk of harm.[441]

455.    The harsh conditions on suicide watch have a deterrent effect on people self-reporting suicidal ideation, heightening the risk of an act of self-harm or completed suicide.[442]

456.    The combination of harsh suicide watch policies and the lack of treatment trigger psychological decompensation and deterioration.[443] People become trapped in a a cycle of suicidal thoughts and self-harm, and new behavioral incidents caused by untreated mental illness. This results in additional discipline, prevents people from ever regaining their mental stability or ever leaving the disciplinary unit at the prison.

---

[437] R. Doc. 524 p. 10, Joint Record Stipulation.
[438] R. Doc. 524 p. 11, Joint Record Stipulation.
[439] R. Doc. 524 p. 11, Joint Record Stipulation.
[440] Huff Tr., 1950:14-17.
[441] Burns Tr., 1372:18-1373:7.
[442] Burns Tr., 1432:22-1433:11.
[443] Burns Tr., 1448:21-1451:19.

457.    DWCC staff sometimes restrain individuals in the restraint chair used for extreme suicide watch for days at a time, and often use the chair rather than providing actual mental health care. Carlton Turner testified that after he spent nearly 50 hours in the restraint chair and did not receive any mental health counseling or other help for his mental health it changed his relationship with mental health. He realized that they did not care about him.[444]

458.    Dr. Burns, despite her familiarity with prison systems across the country, has never seen the use of restraints as a part of a suicide prevention system.[445]

459.    She says that leaving people restrained in the cells alone is dangerous and has clinical mental health risks.[446]

460.    Sec. Pacholke also described leaving people in mechanical restraints in a cell creates an increased danger for that person and does not comport with the nationally accepted practices in the field of corrections.  He said that the restriction on a person's ability to move creates a risk if the person falls, they might not be able to catch themselves; their ability to clean themselves after they use the restroom is limited; they could be harmed if they fall or jump off of the bunk. While he was preparing for his report, he watched a video[447] in which a prisoner was able to remove his leg restraints and attempt to hang himself with them. It is a danger to give someone in a cell steel

---

[444] Turner Tr. 103:8-19; *see also* Exh. P-BBB-64; Hayden Tr., 571:11 - 573:19 (review of note; on ESW and cont); Exh. P-BBB-106; Hayden Tr., 574:1 - 575:15 (review of note; cont restraint chair, add helmet); Exh. P-BBB-103; Hayden Tr., 575:21 - 576:12 (review of note); Exh. P-BBB-102; Hayden Tr., 576:18 - 577:20 (review of note); Exh. P-BBB-100; Hayden Tr., 578:1-19 (review of note); Exh. P-BBB-117; Hayden Tr., 579:5-13; 580:13 - 581:22 (review of note); Exh. P-BBB-118; Hayden Tr., 582:3-23 (review of note); Exh. P-BBB-59; Hayden Tr., 778:11 - 779:14 (review doc); Exh. P-BBB-62; Dauzat Tr., 779:18 - 780:13 (review doc; 11 hours in chair); Exh. P-BBB-77; Dauzat Tr., 780:17 - 781:5 (review doc; back into chair); Exh. P-BBB-75; Dauzat Tr., 781:12 - 782:16 (review doc; 11 hours in chair); Exh. P-BBB-86; Dauzat Tr., 783:20 - 784:11 (review doc; back into chair); Exh. P-BBB-103; Dauzat Tr., 784:14 - 785:5 (review doc; continue chair, add helmet); Exh. P-BBB-102; Dauzat Tr., 785:8 - 786:1 (review doc; out of chair after 28 hours); *Id*, 786:2-15 (disagrees he was in chair continuously for 28 hours); *Id*, 787:6-8 (was not continuously in chair, was let up for breaks); *Id*, 788:18-23 (otherwise agrees he went into chair and came out 28 hours later).
[445] Burns Tr. 1372:19-1372:1.
[446] Burns Tr. 1372:2-17.
[447] *See* P-WWW-17 - Noel Dean 309740 20180402235327_0001.MP4.

devices. Sec. Pacholke also testified that the rationale around allowing someone to be in mechanical restraints inside of the cell does not make sense because the same staff would use force to get a pair of handcuffs back from a prisoner who had gotten them in their cell.[448]

461.    Despite Noel Dean being allowed to attempt suicide in his cell using his own restraints– with no staff intervention for many minutes– no David Wade staff member was disciplined. Not the key room office, not the tier officer, and not any supervisory officers.[449] Neither was any evidence of retraining or corrective action presented. This is the pattern at David Wade.

462.    Additionally, reducing the use of restraints has not been shown to increase the danger of completed suicides or incidences of self-harm.[450]

463.    Sec. Pacholke testified that in cell restraints in a camera cell is a practice that is unheard of nationally. [451]

464.    Mechanical restraints are not used in the cell in segregation units and when restraints are used for suicide watch that would typically involve therapeutic restrains in a health care setting.[452]

465.    There may be therapeutic restraints that might be used in a health care setting or close observation unit. In the Secretary's tours of other jurisdictions, he doesn't ever see mechanical restraints used in cell. If the prison is going to use restraints, it's typically therapeutic and they're typically used in the context of a health care setting.[453]

466.    Despite using suicide watch as a primary method of mental health treatment for people on extended lockdown the defendants' cell front visits with people on suicide watch are purely to determine whether the individual remains a threat to himself.[454]

---

[448] Pacholke Tr. 2752:2-2753:4.
[449]  Goodwin Tr. 2202:3-2204:5.
[450] Burns Tr. 1375:4-25.
[451] Pacholke Tr. 2750:11-18.
[452] Pacholke Tr. 2751:17-24.
[453] Pacholke Tr. 2751:3-16.
[454] Hayden Tr., 447:22-24 (sees people for SSW at cell front).

467.    Conversations are short and do not include any attempt to ascertain whether the individual is suffering from worsening mental illness or is experiencing a crisis manifestation of chronic mental illness.[455]

468.    Decisions about when a person should be either downgraded from extreme suicide watch to standard suicide watch or taken off of suicide watch are made without providing counseling or treatment of any kind. Steve Hayden testified that he puts people on suicide watch when they say they are suicidal and takes them off when they say they are not suicidal anymore.[456]

469.    He also down grades people from extreme suicide watch to standard suicide watch when they say they are ready.[457]

470.    Dr. Seal, the only licensed psychiatrist employed by DWCC, relies completely on the other mental health staff for information on suicide watches.[458]

471.    Dr. Seal is in fact not generally involved in placing people on suicide watch. He only recommends suicide watch if it is based on events that happen during a clinic session with a patient.[459]

472.    This is despite his acknowledgement that suicide attempts are a clinically significant factor in the care that a person receives.[460]

473.    When Mr. Turner spent over 50 hours in the restraint chair notes were omitted from that time and Dr. Seal was not privy to the information about his patient's care.[461]

---

[455] Moran Tr., 210:2-8 (would see Hayden here and there, was never his case mgr, never discussed mental health with him); Dillon Tr., 293:7-12 (talking about Hayden; saw him a second time, said he didn't want to talk to Hayden because he failed to listen to him before).
[456] Hayden Tr. 429:6-8, 12-15.
[457] Hayden Tr. 447:14-18.
[458] Seal Tr. 1124:12-16; Hayden Tr., 545:24 - 546:2 (Seal is contract psychiatrist at DWCC).
[459] Seal Tr. 1224:19-1225:24.
[460] Seal Tr. 1223:17-19.
[461] Seal Tr. 1131:18-24.

474.    Dr. Seal does not know or determine the conditions of suicide watch, he is also unaware of who determines the conditions on suicide watch.[462]

475.    He also does not know what the terms standard and extreme suicide watch mean in the context of David Wade's care for his patients.[463]

476.    Plaintiffs' Expert, Dr. Burns, testified that the standard of care for suicide watch in a carceral setting involves the constant and close observation of people on suicide watch.[464]

477.    Dr. Burns explained that the standard for placing people on suicide watch should be low, but a risk assessment should soon follow to determine the level of risk for a person and what property they should be allowed to keep.[465]

478.    After her review of information in this case Dr. Burns testified that Steve Hayden could be trained to evaluate people for when it is appropriate to take them off of suicide watch, including the proper procedure for doing so.[466]

479.    Dr. Burns also explained how daily suicide watch check ins should be conducted in order to comply with the standard of care and that daily suicide watch check in should be confidential.[467]

480.    The daily checks should include risk assessments and mental health status check-ins.[468]

481.    Suicide watch precautions should reflect an individualized inquiry into how to prevent the person from engaging in self-injurious behavior.[469]

482.    David Wade does not individualize suicide watch precautions and instead applies the same draconian precautions for everybody.[470]

---

[462] Seal Tr. 1225:25-1226:7.
[463] Seal tr. 1226:17-21.
[464] Burns Tr. 1348:16-1350:10.
[465] Burns Tr. 1350:11-1354:21.
[466] Burns Tr. 1352:12-1354:21.
[467] Burns Tr. 1355:23-1356:11.
[468] Burns Tr. 1356:4-11.
[469] Burns Tr. 1357:1-1358:8.
[470] *Id.*

483.    Sec. Pacholke testified that the generally accepted practices around suicide watch in a correctional setting is to treat it like a mental health issue that would benefit from mental health treatment. Generally, you don't want to change the conditions of the person on suicide watch to make them more depressing than they were.[471]

484.    Dr. Haney testified that from his review or records and interviews with prisoners it is his understanding that people who are on suicide watch are not allowed calls or visits. He explained that because there is no provision that they are going to be seen by a qualified mental health staff while they are suicide watch it is not clear what the mechanism would be for those prisoners to receive a phone call or a visit. He did not see any evidence in the records that he reviewed of people getting phone calls or visits while on suicide watch.[472]

485.    Dr. Burns also opined on the way in which the mental health staff at DWCC make their decisions as to whether or not to put a person on suicide watch. She noted that Hayden's testimony regarding how he decides when to use suicide watch precautions is not a clinical measure, but rather seems to be based on security concerns.[473]

486.    Men report that staff antagonize and ridicule when they are on suicide watch such that they feel they are being punished for having mental health concerns and being on suicide watch.[474]

487.    Men testify that staff routinely open the windows during the winter when people are in paper gowns for the purpose of punishing them, a practice that men have named "bluesing."[475]

---

[471] Pacholke Tr. 2743:15-23.
[472] Haney tr. 2943:23-2944:15.
[473] Burns Tr. 1358:9-25.
[474] Solomon Tr. 619:13 - 620:8 (while on SSW, Coleman antagonizing him, told him to run his head into the bars, so he did. Then he got sprayed with mace); Adams Tr. 991:14 - 992:17 (got punished by Hayden on SSW; was in camera cell, tried to cut artery in wrist. Hayden told him he should have killed himself, was mad to deal with Adams, moved him to last cell on tier which would make it hard to get help at back of tier. no window, no fan, only looking at wall; conditions upset him more).
[475] Turner Tr. 107:11-15 (staff open windows in winter when ppl on SSW, call it bluesing); Brumfield Tr. 174:14 - 175:22 (described bluesing, staff did it to RaRa all the time, they'd punish the whole tier by opening the windows in the winter. Especially after they brought RaRa back from a shower, he was always in a paper gown and he'd be wet

488.    Defendants' own expert, Dr. John Thompson, encountered reports of bluesing in his interviews finding that 13 of the 42 people he collected data from reported staff opening the windows in the winter for the purpose of punishing people.[476]

489.    Dr. Haney said that bluesing is a term that was explained to him as being a situation in which someone is put in a cell, particularly a suicide watch cell and the windows are opened as a way of punishing them.[477]

490.    The practice of bluesing, in which the windows are opened on the tier while there are people on the tier who are clothed only in paper gowns, is one that inflicts pain and suffering.[478] Sec. Pacholke evaluates this type of thing as the inflection of torture. He also notes that corporal punishment is not sanctioned by any correctional organization and is certainly not contemplated as a practice within nationally accepted standards or practices.[479]

491.    The harshness of the conditions on suicide watch do not permit activities that could help people recover such as phone calls and recreation time.[480]

492.    This contributes to conditions that Dr. Burns described as appearing to be punitive, which she says discourages reporting.[481]

---

and they'd open the windows); Id 175:23 - 176:12 (saw other people get blues, named Larry; he got so bad he was vomiting blood and they took him to EA Conway, he suffered so much he almost died. That's what MH is like there, they do nothing); Adams Tr. 989:21 - 991:6 (bluesing is to make a person suffer; no mattress on suicide watch, they'd turn off heat in winter when freezing cold, turn the fans on. Floors already cold, they'd open windows to make you freeze); McDowell Tr. 1011:8-20 (opened windows in winter a lot of times, especially when people were bugging out; sometimes they stayed open 2-3 days before somebody willing to close them); Id 1011:23 - 1012:3 (get so cold your body hurts, you ache); Exh. P-YYY-1 - Deposition of Thomas, 25:6-14 (Hayden tells staff to open windows when you're on suicide watch in the winter and turn on the fans, freeze you out); Exh. P-YYY-4 - Deposition of Brooks, 16:4-17 (guards would open windows in winter and freeze guys out in retaliation).

[476] Thompson Tr., 4131:22-4132:5.
[477] Haney Tr. 2946:8-13.
[478] Pacholke Tr. 2738:25-2739:8.
[479] Pacholke Tr. 2741:24-2742:5.
[480] Burns Tr. 1360:1-20; Turner Tr. 107:24 - 108:3 (no calls or visits when on suicide watch); Solomon Tr. 613:24 - 614:2 (no calls or visits on suicide watch); Id 614:3-9 (nobody on suicide watch gets visitor, no outside; you stay in cell with paper gown); Exh. P-YYY-1 - Deposition of Thomas, 34:22 - 35:2 (no phone calls or visitors on suicide watch).
[481] Burns Tr. 1360:1-20.

493.     Although the facility possesses suicide resistant mattresses, those mattresses are often not given to people on suicide watch, who must stand and sleep on the concrete.[482]

494.     Mr. Hayden confirmed that the only property provided is what the mental health management orders specifically state, which commonly reflect those mattresses are not provided.[483]

495.     On the rare occasion that a suicide resistant mattress is provided, it does not offer comfort to the men on suicide watch because it is extremely thin and reeks of body odor and urine.[484]

496.     Mental health staff report that they see people on suicide watch every day, with the exception of weekends when there is no mental health staff and prisoners are instead seen by medical.[485]

497.     Mental health staff, including Mr. Hayden, testified that a mental health progress note is completed for each mental health related interaction, including each day that a person is seen while on suicide watch and that it is important for those notes to be complete and accurate.[486]

498.     However, Mr. Hayden is not reviewing mental health progress notes completed by other staff prior to when he is seeing a person for the day.[487]

---

[482] Exh. P-O-62; Hayden Tr. 477:3 - 478:18 (no mattress, no property); Exh. P-T-40; Hayden Tr. 480:7 - 481:2 (no mattress); Exh. P-T-90; Hayden Tr. 481:13 - 482:1 (no mattress); Exh. P-Z-228; Hayden Tr. 482:12-24 (no mattress); Exh. P-YY-171; Hayden Tr. 485:23 - 486:19 (no mattress, no property); Exh. P-YYY-1 - Deposition of Thomas, 26:1-5 (asked Hayden for suicide mat becuase he was sleeping on concrete, Hayden denied).
[483] Hayden Tr. 486:20-24 (only things listed on mgmt order will be given; if no mattress or property listed, it's not provided).
[484] Turner Tr. 106:25 - 107:10 (occasionally given a suicide mat; same as reg mattress but a lot thinner, smells like urine and body odor and feces, not given every time on SSW); Robinson Tr. 713:6-9 (mattresses given on case by case basis).
[485] Hayden Tr., 321:16-19 (no mental health staff on weekends); *Id*, 448:23 - 449:1 (no mental health staff on weekend, people on SSW seen by medical); Robinson Tr., 713:12-17 (work schedule Mon-Fri 8-4:30; no MH staff on weekends); *Id*, 713:18-21 (people on suicide watch or MHO not seen by MH on weekends).
[486] Hayden Tr., 449:3-8 (completes note every visit; important to be complete and accurate).
[487] Hayden Tr., 449:9-13 (does not review prior notes done by other staff).

499.    The consequence of this practice is that Mr. Hayden is not considering all the information when seeing a patient on suicide watch and misses clinically significant information such as when Mr. Dotson was eating glass and hitting his head against a wall.[488]

500.    Matthew Carroll, a prisoner on extended lockdown at David Wade at the time, was able to hoard pills sufficient for self-harm and take them in front of security staff declaring that he was suicidal.[489]

501.    Suicide watch should trigger a review of a treatment plan or a new treatment plan if the person did not yet have one.[490]

502.    People on suicide watch should generally receive some assessment to determine if additional interventions are necessary, including in consultation with the psychiatrist.[491]

503.    Correctional facilities should evaluate people on suicide watch to see if they should be transferred, especially if the facility can provide only outpatient level of care like DWCC.[492]

504.    Secretary Pacholke testified that he has experience creating and implementing policies for people who are on suicide watch in a correctional institution.[493]

505.    As a part of his role as the superintendent/warden of several institutions in Washington State it was his job to create these policies. As a result, he consulted with Lindsay Hays, an expert in suicidal behavior and prevention in prisons and academics at the University of Washington.[494]

506.    The result of that consultation and Sec. Pacholke's experience as a correctional professional Secretary Pacholke described different aspects of suicide watch policies and practices

---

[488] Exh. P-FF-19; Hayden Tr., 449:23 - 451:5 (review of note by Robinson, states he hit his head against the wall and ate glass, put on SSW); Exh. P-FF-21; Hayden Tr., 452:6 - 454:19 (his note does not reflect the behaviors from Robinson's note); Exh. P-FF-24; Hayden Tr., 455:19 - 457:3 (seen for follow up, does not reference behavior).
[489] Exhibit P-VVV-32
[490] Burns Tr., 1365:14-23
[491] Burns Tr., 1366:20-1367:24
[492] Burns Tr., 1361:9-1362:20
[493] Pacholke Tr. 2743:24 – 2744:2.
[494] Pacholke Tr. 2744:3-8.

that comport with nationally accepted practices in the field of corrections. First, he testified that the restrictions that are placed on the person experiencing suicidality should be tailored to the person's history of self-harm or suicide attempts. He gave the example of not having to remove bedding from the cell of a person who uses cutting as a form of self-harm. Next Secretary Pacholke described how after a person is out of crisis, they should be offered the chance to do things that might make them feel better, such has a shower or the opportunity to call a loved one. He stated that one of the goals is to maintain them in an environment that is a more therapeutic environment. The person should be in a place where they can have more of an ongoing interaction with mental health and medical staff.[495]

507.    Sec. Pacholke also testified that it is important for people to be able to maintain the privileges that they had before they went on suicide watch because it is important to not punish people for having a mental health breakdown.[496]

508.    Part of the way to do that is to put in the treatment plan that a person can have a phone call, a shower, access to a day room if there is one. This is to get at the underlying mental health issue and not treat suicide watch as an act of discipline.[497]

509.    David Wade's suicide watch practices deviated from the nationally accepted standards in that the conditions of confinement for standard suicide watch look much like the conditions of confinement for the punitive status of Offender Posted Policy #34. Aside from the cells for suicide watch having a camera in them it is difficult to tell the difference between what it looks like when someone in on the punitive status of policy #34 strip cell. Extreme suicide watch goes even further and adds either four-point restraints or four-point restraints and a black box.[498]

---

[495] Pacholke Tr. 2743:24-2748:20.
[496] Pacholke Tr. 2748:22-2749:3.
[497] Pacholke Tr. 2748:22-2749:9.
[498] Pacholke Tr. 2749:23-2750:10.

510.    Secretary Pacholke testified that in his opinion suicide and self-harm are treated like a disciplinary issue at DWCC. People are placed on statuses that look exactly like a disciplinary status, and extreme suicide watch is even more limiting than strip cell status. [499]

511.    Dr. Haney testified that if someone expresses suicidality, but refuses to be placed on suicide watch they are placed in the same conditions but on the status of disciplinary detention. This means that they are put under the same circumstances but as punishment, rather than a response to their suicidality.[500]

512.    Dr. Haney testified that suicide watches by definition times when people are placed in environments where they don't have much so they cannot harm themselves. But, in his experience, that deprivation is usually accompanied by additional mental health care and mental health attention. He said, "So in exchange for putting somebody in an environment where they can't harm themselves, they also get specialized mental health attention because they've expressed a desire to take their own life, perhaps the most severe of all manifestations of mental illness."[501] At David Wade the deprivation occurs but the corresponding mental health attention and treatment does not occur, this makes the risk of harm greater.[502]

513.    Dr. Haney testified that in his opinion, when someone is feeling so desperate and depressed that they are contemplating killing themselves for any reason, but possibly because of the deprivation of solitary confinement, and they are then moved to a place that is even more depraved where they are kept under even worse conditions there is no possible reason that he can think of why one would expect their mental health to get better, to have their mental health improve in that

---

[499] Pacholke Tr. 2750:19-2.
[500] Haney Tr. 2942:24-2943:8.
[501] Haney Tr. 2944:21-2945:6.
[502] Haney Tr. 2945:6-9.

kind of environment.[503] That person might say anything they need to, including that they are no longer feeling suicidal, in order to get out of those conditions; but, that is different than their mental health improving because of the suicide watch conditions.[504]

514.   Dr. Haney did not find any evidence that people were provided with any other mental health intervention besides suicide watch. There is no individual psychotherapy aside from medication reviews.[505]

> *vii. Inadequate Record Keeping at DWCC Creates a substantial risk of serious harm*

515.   The C-05 reports are an important way the department tracks the conditions at David Wade.[506] It is a thorough report of the monthly activities at David Wade.[507] The department depends on each of the facilities to accurately report their numbers for the report.[508]

516.   Defendant Warden Goodwin is responsible for the C-05 reports that are sent from DWCC to DPSC headquarters.

517.   Steve Hayden is responsible for compiling the numbers pertaining to the mental health department for the C-05 reports every month including the numbers of standard suicide watch, extreme suicide watch, and mental health observation.[509]

518.   A suicidal gesture is an act which injures the person but would not result in death or serious injury.[510]

---

[503] Haney Tr. 2945:10-19.
[504] Haney Tr. 2945:19-25.
[505] Haney Tr. 2942:11-16.
[506] Goodwin Tr. 2385:11-13.
[507] Goodwin Tr. 2385:14-16.
[508] Goodwin Tr. 2385:17-19.
[509] Hayden Tr., 314:8-17 (compiles mental health data); Dauzat Tr., 3397:22 - 3398:10 (Hayden compiles numbers for mental health department for standard suicide watch, extreme suicide watch, mental health observation).
[510] Burns Tr., 1370:9-16.

519.     A suicide attempt is an act which injures the person and could result in death or serious injury if untreated.[511]

520.     Matthew Carroll attempted to kill himself by taking pills he had hoarded while he was incarcerated at DWCC on extended lockdown. That incident was categorized as a use of force on the UOR by the officers who were on the scene. As such, no suicide attempt was reported on that month's C-05 report.[512]

521.     Damien Clark wrote on the walls of his cell in his own blood while he was housed in a camera cell. He was finally put on extreme suicide watch. On the UOR for the incident the officers at the scene did not categorize the incident as a suicide attempt, therefore it was not reported as such on that month's C-05 report.[513]

522.     The UOR, which Warden Goodwin Reviews, clearly states that Damien Clark attempted to kill himself during this incident.[514]

523.     The failure of the staff to keep track of incidents as serious and potentially deadly as suicide attempts creates a risk of harm for the men housed in Extended Lockdown at DWCC, one borne from ignorance – intentional or not – of important events at the prison and the staff's response to those events.

524.     The Warden's office makes the determination as to whether something is a Category A, B, or C incident.[515]

---

[511] Burns Tr., 1369:20 - 1370:6.
[512] Goodwin Tr. 2370:2-2371:7; Exh. P-VVV-32.
[513] Goodwin Tr. 2372:7- 2383:4; Exh. P-VVV-16.
[514] Goodwin Ter. 2381:16-2832:17; Exh. P-VVV-16.
[515] Goodwin Tr. 2382:19-2383:4.

525.    Mental health staff testified to the importance of keeping accurate and complete records because colleagues rely on the records, supervisors rely on the records, and the records are necessary for treatment.[516]

526.    Security staff recognize the importance of keeping accurate records.[517]

527.    Records that are not accurate and complete could lead to mistakes in care.[518]

528.    The necessity for accurate and complete records is also to track changes in mental health over time, provide comprehensive care, and identify patterns.[519]

529.    Pill pass officers recognize the importance of keeping detailed, accurate and complete records as well regarding both medication administration records and tier logs that document all activities on the tiers.[520]

530.    During the time that Warden Baird was Assistant Warden over security, he would require the people he supervised to keep accurate records, although he would not check those records for accuracy and instead relied upon the people he supervised to ensure the documentation was accurate.[521]

531.    Yet despite all of the staff at David Wade recognizing and understanding the importance of keeping detailed, accurate and complete records, the testimony and evidence is replete with records that are incorrect, incomplete, contradictory, or absent.

---

[516] Robinson Tr., 669:2-4 (it's important to keep accurate and detailed records for treatment purposes); Id, 669:12-15 (important to have accurate records of mental status); Id, 669:16-19 (supervisors rely on records being accurate); Id, 669:20-23 (colleagues rely on records being accurate).
[517] Baird Tr., 1052:23 - 1053:2 (important that records are accurate).
[518] Robinson Tr., 669:24 - 670:2 (inaccurate records could lead to mistakes in care); Dauzat Tr., 765:7-17 (important to complete accurate and complete records, important for overall care, could negatively impact patient care if not accurate and complete); Id, 766:5-8 (inaccurate and incomplete records could negatively impact safety).
[519] Robinson Tr., 670:3-6 (accurate records to identify changes over time); Dauzat Tr., 767:8-15 (having comprehensive documented history is necessary for patient care and identifying patterns).
[520] Pitts Tr., 868:2-13 (important to keep accurate tier logs; important for documentation to be accurate and correct; important to write everything down that happens on tier).
[521] Barid Tr., 1046:6-22 (require people to keep accurate records; does not check for accuracy, delegated people to do that, Cols and shift major).

532.   The Assistant Warden over security is responsible for reviewing the daily security paperwork, which includes all UORs created for that day.[522]

533.   The colonels responsible for the North and South Compounds report to the Assistant Warden over security, which for a period of time was Jacob Baird, and whose primary responsibility is staff and prisoner safety.[523]

534.   During that time, Asst. Warden Barid would make rounds on the South Compound to make sure staff were doing their jobs.[524]

535.   Security staff at David Wade have an obligation to complete daily paperwork, including an unusual occurrence report for any activity that is outside the daily normal.[525]

536.   Unusual occurrence reports, or "UORs", are generated for activities including an unplanned use of force, a planned use of force, someplace put on suicide watch, or put into alternative restraints.[526]

537.   The Assistant Warden is notified every time a person is placed in alternative restraints which restrain a person with handcuffs, a belly chain, and leg shackles.[527]

538.   Warden Goodwin also receives the daily paperwork for the South Compound, including all UORs.[528]

> *vii. Defendants' Offender Posted Policy #34 - Strip Cell Status - creates a substantial risk of serious harm*

---

[522] Baird Tr., 1040:25 - 1041:8 (reviewed all daily paperwork, included UORs); Id, 1047:15-19 (Col daily records for accuracy include UORs).
[523] Baird Tr., 1039:13-16 (from Dec to March 2020, was Asst Warden over security); Id, 1040:13-19 (As Asst Warden, primary responsibility is staff and inmate safety; Colonels reported to him).
[524] Baird Tr., 1041:10-14 (made rounds on South); Id, 1041:15-18 (on rounds, making sure staff doing their job).
[525] Baird Tr., 1049:19-23 (criteria for UOR is anything outside scope of daily activity).
[526] Baird Tr., 1050:5 - 1052:17 (describing all things that will generate a UOR).
[527] Baird Tr., 1074:24 - 1075:1 (alternative restraints means handcuffs, belly chain, leg shackles); Id, 1076:1-12 (would be notified if someone put in alternative restraints).
[528] Baird Tr., 1041:22-25 (Goodwin also receives daily paperwork).

539.    David Wade maintains an institution-specific disciplinary policy called "Offender Posted Policy 34" ("OPP 34 or strip cell status").[529]

540.    Strip cell status is strictly punitive.[530]

541.    Prisoners can be placed on strip cell status for up to 30 days ostensibly for a documented pattern of certain enumerated behaviors.[531]

542.    The policy provides that an individual may be subjected to solitary confinement with no clothing other than a paper gown, and no property, recreation, mattress or bedding for a period of up to thirty (30) days for certain enumerated offenses.[532]

543.    Those behaviors include: throwing human waste anywhere in any manner; throwing or hurling of any bodily fluid or substance (including spitting); storing weapons. human feces or urine in any form inside of his cell in a container; throwing any item from their cell at any person walking down the tier; throwing item(s) on the tier that might cause a safety hazard, (soap, water, etc.); using belongings as a barricade or shield to prevent security from properly performing their duties; making threats of violence against another while in immediate possession of any personal belonging that might be used as a weapon such as a cup, bar of soap, pen, pencil, etc; flooding cells; committing an act of violence on another person; participation in a major disturbance.[533]

544.    However, in practice people are placed on strip cell status for actions that do not present an immediate threat to the safety and security of the prison, such as throwing a cup on the tier[534]or refusal to pass out a lunch tray;[535]

---

[529] Exh. P-JJJ-13 - 2013-11-8 - Offender Posted Policy #34.
[530] Solomon Tr., 608:11-12 (on 34 because of a disciplinary action).
[531] Solomon Tr., 608:7-10 (on strip cell for 20-30 days)
[532] Id.
[533] Exh. P-JJJ-13 Offender Posted Policy #34.
[534] Exh. P-S-4 2017-9-26 - Decision Form Offender Posted Policy #34 - Batiste, Jacoby.
[535] Exh. P-S-53 2018-6-29 - Decision Form Offender Posted Policy #34 - Batiste, Jacoby.pdf

545.    Strip cell status can be renewed for additional periods of time. If an individual receives a disciplinary infraction while on strip cell status, they may be given a break of no defined length, and then placed back on strip cell status.[536]

546.    Mental health staff are not consulted prior to an individual being placed on this status.[537]

547.    On strip cell status, people are not allowed a mattress outside of the hours of 9 p.m. to 5 a.m.[538]

548.    Although strip cell status calls for mattresses to be returned at 9 p.m., they are frequently not returned timely or at all[539] and men complain of the physical pain that results from sleeping on the concrete bunk or metal rack.[540]

549.    People will be housed on strip cell status for thirty days or more, at the whim of the ranking correctional officers.

550.    People with severe mental illness are placed on OPP 34 strip cell status: there are no restrictions in the policy or in practice that limit its application to people with mental illness, and the mental health staff is not even consulted prior to imposition of the Policy.

551.    Men describe OPP 34 strip cell and standard suicide watch to be the same conditions, meaning all property is removed from the cell, all clothing is taken, and the men are given paper gowns.[541]

---

[536] Nail Tr., 1814:13-21.
[537] Hayden Tr., 387:4-6 (says he's not familiar with it); *Id*, 387:7-13 (Mental health has nothing to do with OPP 34).
[538] Exh. P-JJJ-13 - 2013-11-8 - Offender Posted Policy #34.
[539] Solomon Tr., 607:2-21 (mattress supposed to be returned, most days it isn't).
[540] Solomon Tr., 607:22 - 608:5 (really painful to sleep on concrete. It bruises you. horrible); Brumfield Tr., 179:25 - 180:3 (would sleep on metal rack, no mattress or blanket); Solomon Tr., 606:21 - 607:1 (34 takes everything, gives paper gown. no difference to SSW. Supposed to get mattress back, but they don't do it).
[541] Brumfield Tr., 179:19-24 (strip cell is nothing in the cell, you're naked); Id 180:4-6 (strip cell and suicide watch no different); Solomon Tr., 609:8-17 (34 and SSW no different, except supposed to get mattress with 34); Exh. P-YYY-1 - Deposition of Thomas, 46:20 - 47:7 (strip is just like suicide watch).

552.    Men who have been held on strip cell status describe the impact the conditions have on their mental health, including increased feelings of depression, sadness, hurt, and describing the conditions as inhumane.[542]

553.    Col. Nail testified that people on strip cell status would refuse to take their mattresses back, evincing either a lack of candor on the availability of the mattresses or that the choice to take a mattress or not is made under heavy duress.[543]

554.    Warden Huff signed off on uses of strip cell status in her capacity as duty officer.[544]

555.    Huff did not review any behavior of people on strip every 4 hours. It was her testimony that reviews should be documented in the logbook.[545]

556.    There was no evidence of the review of the behavior of people on strip cell status in any of the hundreds of pages of tier logs produced in this matter: Defendants produced no evidence of the same at trial.

557.    Huff would approve the use of strip cell status after asking security what the person did, whether the person has a pattern of behavioral problems, and how long since the last behavior.[546]

558.    Huff was not responsible for investigating the incident prior to approving use of strip cell status.[547]

559.    Huff never investigated any incident prior to imposing strip cell status.[548]

---

[542] Solomon Tr. 608:16 - 609:7 (feels horrible; plethora of emotions-mad, sad, hurt, depressed-feel all at same time); Brumfield Tr. 180:7-14 (feels inhumane, no purpose, you're naked with nothing, no shoes and no socks, how does it help? what's the purpose?); Solomon Tr. 605:1-13 (wrote sick calls asking mental health to help because he was on 34, it was affecting him mentally).
[543] Nail Tr., 1706:14-19
[544] Huff Tr., 1939:1-9
[545] Huff Tr., 1946:11-24
[546] Huff Tr., 1947:22-1948:1
[547] Huff Tr., 1947:6-18
[548] Huff Tr., 1947:19-22

560.    Strip cell status is imposed outside of the scope of any regular disciplinary process.[549] It is imposed without a hearing and is not reviewed by the disciplinary board. It is imposed fully at the discretion of staff.[550] This practice deviates from nationally accepted standards regarding informal discipline.[551]

561.    OPP 34 was approved by Seth Smith and Secretary LeBlanc on behalf of the Department of Public Safety and Corrections.[552] The Department is aware that the strip cell practice is being imposed upon people with severe mental illness without limitations and without any consultation by mental health staff.

562.    Because OPP 34 occurs outside of the disciplinary process it is untouched by the Defendants' imposition of a new disciplinary and classification system in December 2019.

563.    Sec. Pacholke testified that based on his 30 years of experience in corrections, touring a number of prisons throughout his career and his understanding of the ACA standards. The generally accepted standard regarding the provision of clothing for people in restrictive housing is that it is required. Clothing is considered a right, not a privilege.[553] Strip cell status contravenes this generally accepted standard.

564.    The conditions at DWCC under strip cell status deviates from the national standard regarding giving clothing to prisoners in that no clothing or personal property is allotted except for a paper gown. This gown is open in the back and would be tied shut. There is also no clothing, no underwear, no socks, no jacket, no bedding, no linen, no blankets. And it is both humiliating and to a certain degree creates a sense of vulnerability when you have someone for the most part naked

---

[549] Coleman Tr., 1626:19-23; Nail Tr., 1812:11-24
[550] Nail Tr., 1816:9-24
[551] Goodwin Tr. 2728:10-18.
[552] LeBlanc Tr. 2596:9-16.
[553] Pacholke Tr. 2729:10-2730:3.

in a cell other than this kind of paper garment. So, a sense of humiliation and vulnerability, no protection from the elements.[554]

565.    Defendants' expert Mr. Upchurch stated that the fact that strip cell status can be used in 30-day increments in his professional opinion is inconsistent with corrections practice today.[555]

566.    He believes that there should be a meaningful review no longer than 72 hours after a person is placed on strip cell status.[556]

567.    Mr. Upchurch also believes that there should be an assessment done by a mental health professional within 24 hours of implementing strip cell status[557] for someone with mental illness so as to determine if the person's behaviors are as a result of their mental illness or an act of aggression.[558]

568.    Strip cell status delegitimizes the formal discipline system, he does not believe that there is a fairness component to it, it makes people angry and upset, it acknowledges torture as being an acceptable practice, which is not legitimate in any way.[559]

*viii. Specific Practices Contributing to a Substantial Risk of Serious Harm*

569.    Identifying and responding to signs and symptoms of mental illness are crucial components of keeping people safe in prison.[560]

---

[554] Pacholke Tr. 2730:4-16.
[555] Upchurch Tr. 3256:5-9.
[556] Upchurch Tr. 3256:24-3257:2.
[557] Upchurch Tr. 3259:11-20.
[558] Upchurch Tr. 3258:6-16.
[559] Pacholke Tr. 2735:8-16.
[560] Exh. P-F-07, Burns Report at p.30 (under treated and untreated symptoms of mental illness also result in increased instances of discipline which prolongs the time prisoners are held in extended lockdown); Exh. P-K-03, Haney Report at p.78-79 (placing people with SMI in solitary is harmful to everyone, not just the individuals, including staff); Exh. P-FFF-1, Pacholke Report at p.13-14 (practices at DWCC are inconsistent with industry standards for institutional safety).

570.    The intake screening that is provided to prisoners who are transferred from another facility in the DPSC is completed by Steve Hayden, who is not a licensed mental health care provider.[561]

571.    Mr. Hayden does not have credentials to diagnose mental illness, to prescribe medication or generally make decisions regarding medication.[562]

572.    The only person at David Wade able to diagnose someone with a mental illness is Dr. Gregory Seal.[563]

573.    The intra-institutional intake screening that is provided to prisoners who are transferred from another facility in the Department of Public Safety and Corrections is reviewed by Warden Dauzat, not a psychiatrist.[564]

574.    Intake upon transfer to DWCC should be looking for changes, recent trauma, degree of stability, and monitoring for certain disorders.[565]

575.    Relying on previous institutional intakes is not the clinical standard for intra-institutional screening because people change with time.[566]

576.    DWCC staff's testimony to the contrary, Dr. Burns encountered people at DWCC who had abnormal levels of intellectual functioning who were not excluded by the intake process.[567]

---

[561] Hayden Tr. 315:20-22 (he has a Masters in industrial psychology); *Id,* 316:5-8 (he does not have a license to provide mental health care, his degree is not a clinical degree).
[562] Hayden Tr. 316:9-11 (no credentials to diagnose); *Id*, 316:12-14 (no credentials to prescribe medications); Id 316:15-17 (no credentials to make decisions about meds).
[563] Dauzat Tr., 750:10-13 (correct).
[564] Dauzat Tr. 749:9-13 (ask questions for info on intake form); *Id*, 749:18-23 (reviewed by means she reviewed the form, not that she was present for the screening); *Id*, 749:24 - 750:3 (will sign off on intake screen even if not present).
[565] Burns Tr., 1276:7-1277:8
[566] Burns Tr., 1277:9-17
[567] Burns Tr., 1287:5-7

577.     When people arrive at DWCC with a history of suicidal behavior, the standard of care requires a more in-depth follow-up regarding that person's history and triggers for such behavior.[568] This also holds true for conditions such as schizophrenia.[569]

578.     DWCC makes no effort to resolve contradictions in reports of suicidal behavior.[570]

579.     DWCC didn't mark a person with schizophrenia for follow-up with mental health.[571]

580.     "Follow-up per policy" is not an adequate plan for people with mental illness.[572]

581.     Corey Adams received the default "follow-up per policy" intake screening plan, despite a diagnosis of psychosis and history of self-harm,[573] and Adams' pattern of self-harm continued.[574]

582.     Brian Covington was also sent to extended lockdown despite Defendants' knowledge and documentation of his diagnosis of schizophrenia.[575]

583.     The risks for Adams and Covington are consistent with the risks posed to the rest of the class by inadequate screening.[576]

584.     A person conducting intake needs to be able to ask questions, make observations, and know about psychiatric illness - how they manifest, understand symptoms, and understand how to document them.[577]

585.     Hayden does not do the initial intake assessments with the same psychological testing as EHCC.[578]

---

[568] Burns Tr., 1290:7-17
[569] Burns Tr., 1290:18-24
[570] Burns Tr., 1291:2-12
[571] Burns Tr., 1291:21-1292:8
[572] Burns Tr., 1292:24-1293:19
[573] Burns Tr., 1295:6-21
[574] Burns Tr., 1296:2-4,
[575] Burns Tr., 128913-20
[576] Burns Tr., 1297:18-1298:3
[577] Burns Tr., 1275:1-11
[578] Burns Tr., 1278:2-6

586.    Hayden is not able to perform the same type of intake assessment as EHCC.[579]

587.    Not everyone who arrives at DWCC has received an intake assessment from EHCC.[580] In that case, DWCC performs the intake assessment.[581]

588.    Hayden does not have the minimum requisite skills or training to recognize the signs and symptoms of mental illness, so he is not appropriate to perform intra-system intake.[582]

589.    Dauzat's follow-on after intake is not helpful.[583]

590.    Failure to conduct adequate screening at facility intake creates risks and further problems for later treatment.[584]

591.    When there is a mismatch in intake information regarding a person's diagnosis or needs, staff should follow-up and document their specific steps[585] and differences in diagnosis must be reconciled.[586]

592.    The training provided to security staff at DWCC does not include how to recognize the signs and symptoms of mental illness.[587]

593.    There is no other training provided to security staff for how to work with people with mental illness or people exposed to prolonged segregation.[588]

594.    The findings of Plaintiffs' expert, Sec. Pacholke, note that the annual mental health training is not adequate.[589]

---

[579] Burns Tr., 1285:24-1286:2
[580] Huff Tr., 1933:24-1934:3
[581] Huff Tr., 1934:11-16
[582] Burns Tr., 1298:15-20
[583] Burns Tr., 1298:24-1299:7
[584] Burns Tr., 1299:11-1300:3
[585] Burns Tr., 1300:7-1301:8
[586] Burns Tr., 1301:9-1302:6
[587] Baird Tr. 1055:13 - 1056:6 (use of force and MH training, but not how to identify signs and symptoms of mental illness; trained to refer people to mental health if they request it).
[588] Baird Tr., 1073:13-22 (no other training for security how to work with people with mental illness or people exposed to prolonged segregation).
[589] Exh. P-FFF-1, Pacholke Report at p.39.

595.    Inadequate communication between mental health staff and security staff creates a substantial risk of serious harm. Sec. Pacholke testified that as far back as the 1990's there was a recognition that the number of people with mental health diagnosis in prison is really high. Training regarding recognizing signs and symptoms of mental health disorders, and training in when security staff needs to refer to mental health practitioners is important. Correctional officers are spending 24 hours a day with incarcerated people while the clinicians have a very limited time with the incarcerated population. Understanding the kinds of behaviors that need to be referred to mental health becomes very important because they spend so much time around this population. It is especially important in a setting like extended lockdown where in his experience, a majority of suicide attempts and self-harm occur in restricted housing environments. The correctional officers are the first line of defense for ensuring that someone who needs a referral to a mental health professional gets one.[590]

596.    When asked if the security staff not being able to specifically identify the signs and symptoms of mental illness such that they would be prompted to call mental health staff was a reflection of adequate training he responded that it was a reflection of inadequate training.[591]

597.    Sec. Pacholke testified that Identifying signs and symptoms of mental illness so that security staff – at a minimum- can inform mental health staff that they're needed on the tier, would have been an expectation of his staff. He noted that this was an especially important aspect of training for the staff that worked in segregation units because it is the area in the prison where the most frequent acts of self-harm and/or suicide attempts happen. ACA standards contemplate that there is a need for specialized training in these units.[592]

---

[590] Pacholke Tr., 2754:19-2755:18.
[591] Pacholke Tr., 2758:19-2759:1.
[592] Pacholke Tr., 2759:2-2759:20.

598.    Prisoners report the guards attempt to have prisoners give up their yard time.[593]

599.    Dr. Haney testified that one of the consistent complaints from prisoners was that the meetings with Dr. Seal were not only infrequent and did not involve mental health treatment aside from medication management, but they were also non confidential.[594]

600.    Prisoners told Dr. Haney that it would typically be Dr. Seal, Steve Hayden, and a correctional officer in the room when they were conducting a medication review.[595]

601.    This meeting would be the time for a prisoner to express concerns they were having regarding their medication or other things and they did not feel comfortable doing that in front of a correctional officer.[596]

*ix. Inadequate supervision of staff creates a substantial risk of serious harm.*

602.    There is simply no effort at meaningful staff or supervisor oversight at David Wade– at either the facility or the Department levels– which contributed substantially to the need for this litigation and Court intervention.

603.    Warden Huff never gave Warden Dauzat a negative performance review.[597] This is despite despite the fact that all treatment plans at David Wade were absolutely identical for years and contained no plans for treatment; despite there being no medication oversight or accounting for thousands of pills; despite the employment of a completely unqualified person to provide services (Mr. Adkins); and despite regular prisoner complaints about levels of care, *inter alia*.

---

[593] McDowell Tr., 1013:17-1014:3 (A lot of the time the guards tried to get you to sell your yard).
[594] Haney Tr. 2967:25-2968:11.
[595] Haney Tr. 2969:15-18.
[596] Haney Tr. 2969:18-2970:1
[597] Huff Tr., 1956:4-6

604.    Warden Dauzat's performance managing the mental health services at DWCC was only reviewed by DPS&C as part of the C-05 audit.[598] These audits took place annually.[599]

605.    The C-05 audits of DWCC's mental health program never turned up any results that were out of the ordinary.[600]

606.    These audits were conducted by social workers and counselors from other DPS&C institutions.[601] There were no evaluators from outside of the DPS&C.[602]

607.    Warden Huff used the cursory DPSC audits to determine Dauzat's performance.[603]

608.    Huff didn't prepare documents for the internal review of mental health, only Dauzat did.[604]

609.    The only performance metric Warden Huff used to supervise Dr. Seal's performance under his contract was that he came to the facility twice per month.[605]

610.    Despite being Warden Dauzat's supervisor, Warden Huff had no idea that everyone on the south compound received an identical mental health treatment plan.[606]

611.    Even following the filing of this lawsuit, Huff took no steps to evaluate whether each patient received an individualized treatment plan.[607]

612.    Warden Huff does not believe that giving every person an identical treatment plan would violate policy.[608] Yet she agrees that DPSC and DWCC policy require that plans be

---

[598] Huff Tr., 1957:21-1958:10
[599] Huff Tr., 1958:11-15
[600] Huff Tr., 1958:6-10
[601] Huff Tr., 1958:16-24
[602] Huff Tr., 1958:25-1959:8
[603] Huff Tr., 1959:16-21
[604] Huff Tr., 1959:22-1960:4
[605] Huff Tr., 1966:10-14
[606] Huff Tr., 1967:2-5
[607] Huff Tr., 1969:10-23
[608] Huff Tr., 1968:3-14

individualized[609] and she was the individual responsible at the facility level for supervising the mental health program.

613.    Secretary LeBlanc testified that David Wade cannot house people categorized as Level of Care 2, defined as people who are not considered clinically stable. He is incorrect, as DPSC policy provides that a LOC 2 may be housed at a DPSC facility.[610] In fact, the Department's own review form showed a LOC 2F at DWCC.[611] This distinction matters, because LOC 2 individuals need intensive care. The Secretary needs to know how many specialized beds he needs to provide appropriate services and care throughout the Department, and to properly allocate resources.

614.    Similarly, Secretary LeBlanc testified that it is Seth Smith's responsibility to review the annual mental health reviews conducted of DPSC facilities.[612]

615.    Supervisors of both the mental health staff and the security staff see no issue with the paperwork produced by their supervisees, despite glaring deficiencies, discrepancies, inaccurate and inadequate information.

616.    Despite the glaring lack of detail or individualization in her progress notes, Warden Dauzat testified her opinion is that these notes are all in compliance with policy and she does not see an issue with them.[613]

617.    In fact, many of Steve Hayden's progress notes had a recurring typographical error. Mr. Hayden testified that his "notes" section did not auto-fill, but the typo showed up repeatedly in batches of certain months.[614]

---

[609] Huff Tr., 1966:15-23
[610] Exh. J-7, LOC 2 "All DOC facilities."
[611] *See* Exh. P-J-4.
[612] LeBlanc Tr. 2588:23-2589:8.
[613] Dauzat Tr., 3321:23 - 3322:9 (said she was present for this testimony and these exhibits, her opinion that this is all done in compliance with the policy; *see* Exh. D12).
[614] Exh. D73, pg. 21-22; Hayden Tr., 3759:23 - 3761:3 (same typo in assessment line eliminating space between "in" and "minimal"); Exh. D74, pg. 39; Hayden Tr., 3761:16-24 (same typo); Exh. D74, pg. 46; Hayden Tr., 3762:-15 (same typo, Hayden tries to call it a trend in writing); Exh. P-WW-26; Hayden Tr., 3762:24 - 3763:10 (same typo).

618.     This indicates that Mr. Hayden was copy-pasting his notes between patients rather than providing individualized evaluation.[615]

619.     There is no indication that this rote recitation was even noticed by the supervisors that are supposed to be monitoring the care provided by Hayden, who is an unlicensed case worker.

620.     These forms are the only documents in an individual's case file that track a prisoner's mental health, the lack of detail about the actual mental health status of and individual prevents the handoff of information on which Dr. Seal, any supervisor, the Department of Corrections or any other healthcare provider can ascertain a proper course of care.[616]

621.     Correctional supervision is not appropriate for pill pass officers, they should be under nursing and accountable if patients are not receiving their medications.[617]

622.     DWCC's supervisory systems for tracking medication inventory are inadequate, it should detect a mismatch and that the person is not getting their meds.[618]

623.     DWCC does not adequately supervise its security staff to prevent disproportionate or avoidable uses of force against people with mental illness. For instance, Col. Coleman did not have access to any list of people with serious mental illness and mistakenly believed that the heat duty status roster was the list of all people with serious mental illness.[619]

624.     Col. Coleman was also unable to define the term "serious mental illness" in the context of his job duties.[620]

---

[615] Hayden Tr., 3763:11-24 (Hayden then admits that he does copy and paste notes for the assessment line for different prisoners).
[616] Burns Tr., 1318:15-24
[617] Burns Tr., 1403:5-1404:2
[618] Burns Tr., 1405:1-23
[619] Coleman Tr., 1649:15-1650:13
[620] Coleman Tr., 1632:19-25

625.    Col. Coleman never once investigated a use of strip cell status.[621]

626.    Col. Coleman did not know what the phrase "in crisis" meant in relation to mental health.[622]

627.    Col. Coleman was unable to recall a single use of force against a person with mental illness.[623] This is despite the fact that all unusual occurrence reports for the south compound are supposed to run up the chain of command to him.[624] And despite the fact that 40% of the people on the south compound have a mental illness.[625]

628.    Col. Coleman was unable to answer whether the lieutenants, captains, and majors he supervises were all supposed to review the log books as part of their duties.[626]

629.    It is unclear how supervisors ascertain whether staff are making rounds on the tiers.

630.    While there is a swipe card system on the tiers designed to keep track of the staff that come on and off of the tiers, staff do not consistently utilize this system.[627]

631.    Staff entry onto and off of tiers is required by policy to be entered in the log books.[628]

632.    Defendants' expert Dr. Thompson concurred that in order to evaluate whether rounds are occurring in a facility, one consults the logbooks. He noted presence on the tier as important to relationship building.[629]

---

[621] Coleman Tr., 1630:14-16
[622] Coleman Tr., 1619:13-1620:20.
[623] Coleman Tr., 1613:19-22.
[624] Coleman Tr., 1566:24 - 1567:22; Nail Tr., 1782:8-25.
[625] Burns Tr., 1427:23-1428:1; Thompson Tr., 4070:13-17
[626] Coleman Tr., 1560:19-24
[627] Nail Tr., 1768:17-19 (security officers do not often use the swipe card system); Hayden Tr. 530:1-7 (has badge, does not swipe card on tiers); *Id* 532:21-24 (prior to March 2020, didn't really use much at all); Dauzat Tr. 760:13-20 (could check card swipe for rounds, but does not).
[628] Coleman Tr., 1562:11-13; Nail Tr., 1742:12-1744:21; Exh. P-JJJ-23 Post Orders - Lockdown Cellblock Key Control Officer.
[629] Thompson Tr., 4046:7-15.

633.    Col. Nail testified that the way that one ascertains whether rounds are made is by consulting the logs. At trial, once it was made obvious that the tier logs did not illustrate the presence of the pill pass officers on the tier, the testimony from DWCC staff persons was that the presence of officers on the tiers is documented in the key logbook.[630]

>        *x. Lack of supervision of the men held in Extended Lockdown creates a risk of harm*

634.    Prisoners housed on extended lockdown are only regularly evaluated for mental health needs every 90 days. Those evaluations are called "interviews with a segregated inmate." [631]

635.    Mental Health staff do not otherwise conduct regular or effective "rounds" on the tiers to check on people held in extended lockdown, creating a substantial risk of serious harm. [632]

636.    In a correctional setting, regular rounds are a means of monitoring people for mental illness and should take place weekly.[633]

637.    The purpose of rounds is to evaluate mental health needs. As Dr. Burns testified, rounds are a means of surveillance– not treatment.[634]

638.    Rounds should involve a staff person walking through each tier, once per week, stopping at each cell, making verbal contact, looking at the condition of the person and the cell, and making note of the contact.[635]

---

[630] Nail Tr., 1765:13-1767:14
[631] Exh. J7 - 2019-2-13 - EPM 03-02-003 - Mental Health Program at p.8-9; Hayden Tr. 324:16-20 (segregation interviews every 90 days); *Id*, 487:5-10 (segregation interview done every 90 days for everyone in segregation); *Id*, 487:14 - 488:13 (says 90 days from when they're put in, not the March, June, Sept, Dec schedule; computer says when people ready); Robinson Tr. 671:24 - 672:4 (does segregation interviews and completes form); *Id*, 689:9-16 (completes every 90 days, Mar, Jun, Sept, Dec schedule); *Id*, 689:17-24 (segregation interview completed for everyone in N1-N4 regardless of custody status).
[632] Exh. P-BBBB-1 - Deposition of Doucet, 43:11-24 (mental health staff don't come check on people enough, they're barely there, it means there is no mental health treatment); *Id*, 44:2-7 (the only time mental health is on the tier is to check on people who are on suicide watch); Exh. P-YYY-1 - Deposition Thomas, 18:11-17 (did not see mental health staff on extended lockdown).
[633] Burns Tr., 1304:10-18
[634] Burns Tr, 1310:8-9; Dauzat Tr., 3355:11 - 3356:3 (purpose of rounds is not for treatment it's for access).
[635] Burns Tr. 1310:9-17

639.    The purpose of rounds is to look for signs of difficulty due to stresses of restrictive housing to intervene sooner than later.[636]

640.    If a person requests services from mental health staff on rounds, it must be documented and followed up on.[637]

641.    Rounds must be documented to be complete, there are many reasonable ways to create this documentation.[638] DWCC does not use any of these methods of documenting rounds.[639]

642.    Defense expert Dr. Thompson opined that rounds should be checked by supervisors by consulting a tier log.[640]

643.    Dr. Burns' review of progress notes did not indicate regular rounds are occurring at DWCC.[641]

644.    No other documentation unique to rounds exists in records from DWCC.[642]

645.    No other evidence of rounds existed in the records of individual patients at DWCC.[643]

646.    People housed in N1-N4 did not report regular rounds.[644]

647.    MH staff doing rounds need to be able to recognize signs and symptoms of mental illness.[645]

648.    Failure to properly conduct rounds poses a serious risk that problems will be identified late and that mental health staff will only discover a problem exists after an act of self-harm.[646]

---

[636] Burns Tr., 1310:24-1311:5
[637] Burns Tr., 1310:18-22
[638] Burns Tr., 1311:7-1312:8
[639] Burns Tr., 1312:9-12
[640] Thompson Tr., 4047:10-16.
[641] Burns Tr., 1312:17-19
[642] Burns Tr., 1313:6-10
[643] Burns Tr., 1313:22-1314:1
[644] Burns Tr., 1314:1-7
[645] Burns Tr., 1313:14-21
[646] Burns Tr., 1314:14-1315:4

649.    Rounds need to be supplemented by periodic assessments, which go beyond brief contact and go into detail in a structured way, in a confidential setting.[647]

650.    DWCC staff conduct the "interviews with segregated inmates" at cell-front and people don't even know that the interaction is any form of assessment.[648]

651.    Interviews must be documented in writing;[649] DWCC does not properly document the interviews.[650]

652.    These periodic assessment interviews should take 10-15 minutes.[651]

653.    These notes near-universally indicate that everything is within normal limits and that the person engaged in minimal conversation, even for people with serious illnesses.[652]

654.    Lack of periodic screening means that people who need care don't get it, and they worsen, receive write-ups, or experience suicidal behavior while left untreated.[653]

655.    The interview note for Mr. Huber doesn't provide any information about his condition or treatment.[654]

656.    Huber's note includes many things that can only be assessed through conversation but indicates that he refused conversation.[655]

657.    Huber's progress note with Dr. Seal from the same day indicates active hallucinations.[656]

658.    Hayden was not aware of basic conventions regarding assessment of orientation.[657]

---

[647] Burns Tr., 1315:14-1317:6
[648] Burns Tr., 1317:10-20
[649] Burns Tr., 1318:4-11
[650] Burns Tr.,  1318:15-1319:25
[651] Burns Tr., 1320:1-6
[652] Burns Tr., 1326:20-1327:7; 1327:25-1328:6
[653] Burns Tr., 1329:3-1330:6
[654] Burns Tr., 1322:11-15
[655] Burns Tr., 1322:19-1323:8
[656] Burns Tr., 1325:18-24
[657] Burns Tr., 1323:13-1324:6

659.    Mr. Hayden only sees patients four days a week, Monday through Thursday between 7:00 am and 5:30 pm.[658]

660.    Mr. Hayden does not document rounds.[659]

661.    There are no documents created by mental health staff documenting that they have made rounds unless there is substantial contact with an individual that causes a progress note to be completed.[660]

662.    Mr. Hayden is primarily responsible for receiving and responding to all referrals originating from the South Compound, and those referrals are not tracked or reviewed to ensure the individuals needing mental health intervention are seen and their issues addressed.[661]

663.    Plaintiffs report that they do not regularly see mental health staff on the tiers other than for the purpose of evaluating individuals who are on "suicide watch," or that staff presence on tiers is cursory.[662]

664.    Interactions during rounds lack privacy because they occur at cell front, and prisoners have no way to communicate confidentially with mental health staff.[663]

665.    Defendant Hayden is ineffective and alienating; people either feel unheard, or, if they do speak to him, find him not responsive to their needs.[664]

---

[658] Hayden Tr. 321:8-11 (work schedule is Mon-Thurs 7-5:30).

[659] Hayden Tr. 323:25 - 324-1 (not documenting these weekly rounds anywhere).

[660] Hayden Tr. 324:5-10 (says may create mental health progress note, but does not document that rounds were completed).

[661] Hayden Tr., 527:12-18 (receives all mental health  referrals; approx 2 a week); Id, 528:16-19 (refreshing recollection); Dauzat Tr., 763:6-13 (does not keep track of MH referrals or how many times clinician is contacted).

[662] Exh. P-BBBB-1 - Deposition of Cody Doucet 44:3-4 ("The only time they come to see people is when people are on suicide watch."); Exh. P-YYY-4 - Deposition of Brooks, 36:15-24 (only saw mental health on tier every day talking to people on suicide watch; he was never on suicide watch so they didn't talk to him).

[663] Hayden Tr. 528:20-23 (typically meet with people at cellfront); Turner Tr., 68:9-15 (made requests for confidential visit with mental health, never had one); Id, 91:8 - 92:1 (Hayden & Robinson on tier, never confidential visit, sees cellfront); Moran Tr., 207:2-14 (flagged Robinson down to ask her for mental health help, conversation took place cellfront).

[664] Dillon Tr. 263:12 - 265:24 (when arrived in 2017, tried to talk to Hayden; Hayden was disrespectful to him, made him not want to speak to Hayden. Hayden treated the interaction like a joke, didn't take Dillon seriously); Moran Tr. 206:1-22 (challenging to reach out to ask for mental health help, made it harder; a lot of sadness, feeling like nobody

666.    If people request confidential visits with mental health, they are denied.[665]

667.    Mental health staff use the information shared with them during rounds or other cell front visits to mock prisoners, rendering rounds an ineffective and unavailable means of accessing mental health services, at great risk of harm to the men housed at DWCC.[666]

668.    The forms used to document mental health contact with prisoners, "Interview with a Segregated Inmate" and "Mental Health Progress notes," are completed with virtually no level of detail.[667]

669.    The segregation interviews occur at cell font by mental health staff.[668]

670.    The purpose of the segregation interviews is for assessment and access, not treatment.[669]

671.    The purpose of the segregation interviews is to evaluate each individual's level of functioning who remains housed in segregation.[670]

672.    However, staff are not reviewing prior segregation interview notes before completing the next round of 90 day notes.[671]

---

understands what he's going through, fear of talking to someone because who wants to hear it); Adams Tr. 970:7 - 971:2 (didn't get help; he'd be ridiculed for trying to get help by Hayden; he'd be told to kill himself and get it over with); *Id*, 971:3-8 (Hayden's ridicule made him feel discouraged, hopeless, helpless; wanted to kill himself to get it over with).

[665] Turner Tr. 108:4-8 (all the times he asked for confidential setting, never happened); Solomon Tr. 610:3-24 (if mental health do respond to sick call, they only talk to you cell front which isn't confidential; uncomfortable talking in front of security and other prisoners).

[666] Solomon Tr. 610:3-24 (does not feel comfortable talking to mental health because they only come cellfront, whole tier and guard listening, majority of problems are with those people. "how am I supposed to talk whenever everybody is listening"); *Id* 612:6-18 (Hayden telling people he was a crack baby made him not want to talk to Hayden, no confidentiality); *Id* 611:17 - 612:5 (Hayden told the tier he was a crack baby).

[667] Robinson Tr., 682:25 - 683:6 (completes prog note or seg interview form every MH interaction with a person); *Id*, 684:3-6 (makes notes on notepad with person, transfers to prog note later).

[668] Robinson Tr., 692:3-5 (segregation interviews are at cellfront).

[669] Dauzat Tr. 3357:5-8 (seg interviews are for assessment and access); *Id*, 3357:18-19 (it is not treatment).

[670] Hayden Tr., 488:15-24 (purpose is to evaluate individual level of functioning; problematic when someone loses it).

[671] Hayden Tr., 488:25 - 489:9 (says it depends on individual, sometimes reviews records before seg interview); *Id*, 490:6-23 (Impeached prior statement; does not review); Robinson Tr., 691:3-10 (does not review prior seg interviews before completing new ones. MH database does not include seg interview info).

673.    The segregation interview notes are not completed contemporaneously with the visit, but are instead completed all at once after the fact.[672]

674.    Despite this, virtually all segregation interview notes are universally marked "WNL", or within normal limits, for all people in all areas and all assessment notes at the end are the same.[673]

675.    Even in instances where a mental health progress note was completed by Mr. Hayden due to an individual's segregation exceeding 30 days, the note offers no detail and no insight as to what the individual's issue was or what the individual was experiencing to warrant a mental health contact note.[674]

676.    In fact, Mr. Hayden's understanding of when the initial segregation interview should take place differs from both policy and other mental health staff understanding that it should be after an individual has been in segregation for 30 days, not when an individual is sentenced to be in segregation for 30 days.[675]

>    *xi.  Security practices at DWCC violate the generally accepted practices in the correctional field, creating a substantial risk of serious harm.*

677.    Sec. Dan Pacholke, testified that DWCC's policy of removing the mattresses of people who are on Strip Cell status from 9:00pm to 5:00am does not comport with generally accepted

---

[672] Robinson Tr., 691:15 - 692:2 (makes notes at time, completes form later; sometimes completes them next day b/c alot of forms); Hayden Tr., 490:24 - 491:3 (does not complete form contemporaneously); *Id*, 491:4-6 (makes notes on a notepad).

[673] Exh. P-OOO-20 - 43 - Review of 23 notes, all WNL, all same note; Hayden Tr., 491:7 - 512:17 (walked through all 23 notes); Exh. P-OOO-47 - 66 - Segregation Interview Notes; Robinson Tr., 696:17 - 711:24 (walked through all seg interviews; all WNL, all exact same note).

[674] Exh. P-RR-7 - mental health progress note; Hayden Tr., 514:14-22 (review of P-RR-7); *Id*, 516:6-22 (review of P-RR-7; cannot tell what issue was); Exh. P-PP-51-52 - mental health progress note; Hayden Tr., 517:10 - 519:6 (review of note, cannot determine issue); Exh. P-AAA-70 - mental health progress note; Hayden Tr., 520:1-12 (review of note, cannot determine issue); Exh. P-W-18 - mental health progress note; Hayden Tr., 521:4-16 (review of note, cannot determine issue); Exh. P-DD-11 - mental health progress note; Hayden Tr., 522:2-14 (review of note, cannot determine issue).

[675] Hayden Tr., 514:23 - 516:5 (says the note is not b/c someone been in segregation for 30 days, but seen b/c sentenced to a time that will be 30 days or more); Robinson Tr., 690:5-8 (states that Hayden completes after the first 30 days a person has been in segregation).

correctional practices. In fact, Sec. Pacholke said that there is nothing he could think of in his experience that would make this a legitimate correctional practice.[676]

678.   Sec. Pacholke testified that based on the ACA standards, and his extensive experience touring prisons with a focus on maximum custody housing the generally accepted practice around mattresses and bedding for prisoners in restrictive housing is that that they have, bedding and blankets consistent with the general population and there are no time caveats or restrictions placed on that other than perhaps if you're on suicide watch and you may have to deviate from standard issue mattresses and blankets to ones that are designed to be destruction resistant but still provide you a mat to lay on and a blanket to use.[677]

679.   Rules like those at DWCC, in Sec. Pacholke's opinion, serve no penological purpose except to punish the prisoner.[678]

680.   The only exception to the generally accepted practice that the removal of bedding for most of the day is when a prisoner is on suicide watch. If that were the case in the prisons he oversaw, Sec. Pacholke would give them more of a specially designed mattress and blanket and clothing that was designed to be tear resistant and designed not to be able to be used as a device to hang yourself.[679]

681.   The accepted practice around conditions of confinement in disciplinary detention should mirror those in general population as much as possible.[680]

682.   The ACA's guidance around the conditions of confinement for people who are held in disciplinary detention would include things like meals of same quality as the general population.

---

[676] Pacholke Tr. 2639:1-5.
[677] Pacholke Tr. 2708:9-2709:21.
[678] Pacholke Tr. 2709:19-21.
[679] Pacholke Tr. 2709:14-19.
[680] Pacholke Tr. 2706:13-18.

They're going to have access to a climate-controlled cell that provides appropriate heat or cooling depending on the outside temperature. There's a certain square foot allotment that they're going to have. They have, you know, a right to a mattress and linens and clothing in order to provide protection from the elements and, also, garments that are not humiliating in their nature. They're going to provide access to outdoor recreation, access to medications, access to showering on a routine basis, and certainly access to all forms of health care and mental health services.[681]

683.    Sec. Pacholke testified that based on his experience touring prisons in 13 states that it's a widely accepted practice to keep prisoners connected to their family. One of the ways the prison can keep a prisoner connected with their family is to provide access to the phone.

684.    Sec. Pacholke testified that the generally accepted correctional practice regarding access to the phone is that people have daily access because of the importance of having a support system, someone that wants to see them successful. It's proven to be very effective in re-entry in the sense of having family contact and certainly in an extended lockdown unit. I mean, here is a family member or loved one that is going to want you to be successful so they're going, to a certain degree, advocate. So, telephone access is usually daily, five days a week.[682]

*xii. Severe Isolation Creates a Substantial Risk of Serious Harm*

685.    Dr. Haney testified that there are several negative effects of solitary confinement. The complaints and the harmful effects cluster in certain areas of a person's functioning. There are effects on the emotional well-being of a person, the behavioral health of a person, cognitive and intellectual functioning of a person, it can be destabilizing to the identity of a person, and can

---

[681] Pacholke Tr. 2706:13-2707:11.
[682] Pacholke Tr. 2710:4-21.

create long term distance between the person and others – even after they are released from solitary confinement.[683]

686.    Possibly the most common is the effects on a person's emotional well-being. Solitary confinement often leads to depression, to feelings of hopelessness, and meaninglessness. Sometimes it can lead to mood swings where people lose control of their emotional register; but most of the time, even in those cycles, people tend to set along the sadness part of the cycle such that people report feeling sad a lot. Depression is a widespread phenomenon and it's a widely reported symptom of people who are in solitary confinement.[684]

687.    Dr. Haney testified that the other area that is sometimes affected by solitary confinement is behavioral. He said, "People report being irritable, finding it difficult to control themselves, to control their anger. Sometimes they strike out over some little thing or get angry at someone over some little thing, could be at an officer, could be at another prisoner, and then in retrospect realize it was something insignificant and something that they ordinarily wouldn't react to. But the stress and the pressure and the deprivation of being in solitary confinement affects them, affects them behaviorally."[685]

688.    There can also be cognitive and intellectual changes that can take place as a result of solitary confinement. Many people report having a hard time remembering things, or even more frequently they report having a difficult time concentrating. He also described a related cognitive process, "sometimes called ruminations, somebody not being able to stop thinking about something. So, on the one hand sometimes they find it difficult to concentrate on things they want to concentrate on, but at the same time they may find it impossible not to think about something

---

[683] Haney Tr. 2874:18-2878:10.
[684] Haney Tr. 2874:18-2875:9.
[685] Haney Tr. 2875:12-20.

that they don't want to think about; and this kind of rumination can also become kind of an obsession and they find themselves not able to think about or function except inside of this thought or inside of these thoughts that they're having."[686]

689.    Solitary confinement can be destabilizing to a person's sense of identity and who they are in the world. Because there are very few opportunities for meaningful social interaction to take place, the conditions become destabilizing to people; especially for people who have pre-existing mental health conditions. Dr. Haney explained, "[p]eople who have a relatively tenuous grasp of reality may find that they have an even less solid grasp of that reality because they've lost their anchoring, they've lost their connection to other people which they knew how to rely on to keep them stabilized." He also testified that in the case of people who are already mentally ill, decompensation can lead to a more serious deterioration of their mental state, and may result in the reactivation of people's symptoms that were previously in remission.[687]

690.    One of the negative effects of long-term solitary confinement is the creation of more distance between people. He explained by saying, "People who live in solitary confinement are forced to become accustomed to living in an environment where they don't have normal, meaningful social interactions with others. And sometimes over time what happens is the contact with other people becomes anxiety arousing because they have so little of it, and they're made anxious in the presence of other people. I experience this sometimes myself when I'm interviewing people in solitary confinement. They're anxious about talking to someone. They're anxious about coming out of their cells and sitting down across from someone at a table because it's something they've not done for a long period of time. And if they're in solitary confinement for a long period of time, then when they're ultimately released from solitary confinement that social anxiety can,

---

[686] Haney Tr. 2875:21-2876:14.
[687] Haney Tr. 2876:15-2877:14.

in extreme cases, become a form of social phobia. So they find themselves self-isolating because they're no longer comfortable around people, they've been denied the opportunity to be around people for so long."[688]

691.    There is a substantial risk of harm in housing people in solitary confinement.[689]

692.    People with mental illnesses are more vulnerable to the negative consequences of solitary confinement.[690]

693.    Dr. Haney explained that "Solitary confinement is a potentially very dangerous place to put people because of the psychological consequences that it can have on them."[691]

694.    Acknowledging the risk to prisoners with a mental health condition Sec. Pacholke testified that the inclusion of mental health input is a necessary component of classification reviews, certainly in long term lock down units.[692]

695.    Suicide and self-harm are much more likely to occur in solitary confinement units than anywhere else in the prison.[693]

696.    Dr. Haney testified that all of the ways in which people can and many do deteriorate in solitary confinement are harmful to them and to their well-being. This deterioration may carry over to their attempts to function in a world outside of solitary confinement, whether a general prison population or outside of prison even. In extreme cases it can lead people to engage in self-harm or, in fact, to take their own lives.[694]

697.    He explained that the increased suicidality and acts of self-harm are in part because people in solitary confinement have the opportunity to do things that they would not have an opportunity

---

[688] Haney Tr. 2877:15-2878:10.
[689] Haney Tr. 2879:21-23.
[690] Haney Tr. 2879:18-20.
[691] Haney Tr. 2880:1-3.
[692] Pacholke Tr. 2702:2-5.
[693] Haney Tr. 2880:11-13.
[694] Haney Tr. 2880:4-10.

to do to themselves if they were around other people. There is also a consensus among researchers that study this phenomenon that people who are in solitary confinement are under much greater stress than those who are not. Sometimes stress and hopelessness become overwhelming and out of desperation people take their own lives; and they do so more often in solitary confinement than they do elsewhere.[695]

698.    Dr. Haney explained that researchers have found that social isolation is even more dangerous than previously understood to someone's mental well-being and physical health than they previously thought because many of the people who are isolated do not talk about it and do not recognize the medical changes that are taking place in them as a result of their social isolation. This reaction to isolation is amplified in a prison setting because prisoners are reluctant to express vulnerability and acknowledge weakness. Prisoners oftentimes are not eager to share with you what it is they are going through or what they are experiencing.[696]

699.    Defense expert Mr. Upchurch believes that prisoners who are placed in solitary confinement should be assessed in terms of the potential harm that is believed to exist for prisoners housed there, especially for mentally ill prisoners.[697]

700.    Solitary confinement can have negative effects on a person's mental health from a clinical perspective.[698]

701.    Dr. Burns' opinion to this effect is supported by the American Correctional Association,[699] as well as the APA, HCCHC, CLA, and ASCA.[700]

---

[695] Haney Tr. 2880:13-24.
[696] Haney Tr. 2878:11-2879:17.
[697] Upchurch Tr. 3212:13-20.
[698] Burns Tr., 1265:20-1266:19
[699] Burns Tr., 1266:20-1267:19.
[700] Burns Tr., 1267:23-1268:18.

702. There is consensus that people with mental illness should not be held in restrictive housing.[701]

703. Mr. Upchurch, the Defendants' security expert believes that there is a consensus that solitary confinement can be harmful for those with a pre-existing significant mental illness.[702]

704. This conclusion is consistent with Dr. Burns' professional experience from Ohio.[703]

705. Isolation, enforced idleness, lack of control over intense stimuli, strict security measures, and duration affect the impact of restrictive housing on mental health.[704]

> *xiii. Research shows that long term isolation creates a substantial risk of serious harm and does not comport with the evolving standards of decency.*

706. Dr. Haney testified that the National Academy of Sciences in a 2014 report talked about how the overwhelming majority of studies document the painful, potentially damaging nature of long-term prison isolation. They also made a number of statements about the inappropriateness of putting vulnerable populations, including those with a mental illness in solitary confinement. Their report concluded that lengthy periods of isolation or administrative segregation can place prisoners at risk of significant psychological harm.[705]

707. The American Psychiatric Association issued a position statement in 2012 in which they advise against ever keeping a person who is suffering from serious mental illness in solitary confinement for a period of longer than four weeks.[706]

708. Dr. Haney testified that the National Commission on Correctional Health Care, an organization of professional health care administrators who work in correctional settings, issued a

---

[701] Burns Tr., 1268:19-1270:12.
[702] Upchurch Tr. 3272:24-3274:8.
[703] Burns Tr., 1270:13-1271:5.
[704] Burns Tr., 1271:9-19.
[705] Haney Tr. 2888:1-13.
[706] Haney Tr. 2889:7-17.

position paper in 2016 outlining all of the problems that the researcher identified, the negative consequences or harmful effects of solitary confinement. This paper recommended that no one be kept in solitary confinement, as they defined it, for longer than 15 days and that a person who was seriously mentally ill should never be placed in solitary confinement because of the heightened risk of harm that vulnerable populations like the mentally ill experience in solitary confinement.[707]

709.    Dr. Haney articulated that there is what he called, "a remarkable unanimity about the harmfulness of solitary confinement." He testified that in their entirety, the organizations that he cited in his report as well as additional ones that he did not cite, have in the last 10 or 15 years reached almost identical conclusions about solitary confinement being a harmful practice; a practice whose use should be minimized, used only when absolutely necessary and restricted in time.[708]

710.    Dr. Haney explained that some of the organizations that condemn the use of solitary confinement would put a time limit on its use. The United Nations says it should only be used for 15 days. The National Commission on Correctional Health Care (NCCHC) also said that solitary confinement should not be used for more than 15 days. He said, "Some organizations have not put any particular time limit on it but have suggested that it should be done for the absolute minimum amount of time, again, because of the widespread recognized, scientifically documented harms of solitary confinement."[709]

711.    Dr. Haney testified that he would expect these statements from researchers to have a significant effect on the way prisons operate. He explained that in many instances they have, giving the example of the ACA, which has begun to modify its position on restrictive housing. Many

---

[707] Haney Tr. 2889:18-2890:10.
[708] Haney Tr. 2890:11-2891:2.
[709] Haney Tr. 2891:3-10.

prison systems across the country, including the federal government, have initiated the process of evaluating their use of restrictive housing or solitary confinement to reduce the extent to which they use it.[710]

712.     There are even a few states that have ceased using solitary confinement.[711]

713.     Dr. Haney testified that there is a consensus that solitary confinement or isolation is harmful.[712]

714.     He said that there has been research on the issue of solitary confinement that goes back a century and a half, that documents the negative or harmful effects of putting people in solitary confinement. For a period of time this research was one of the reasons the United States stopped using long-term solitary confinement, which used to be commonplace in American prisons. In the 1970's and 1980's it began to be used with more frequency, this resulted in people once again researching the effects of solitary confinement again.[713]

715.     Dr. Haney also testified that there is another body of research that relates directly to and works in conjunction with the body of research about the effects of solitary confinement. The study of the negative psychological effects of social isolation has grown in significance over the last three decades. These researchers, because they do not have to do their work within the confines of the prison system, have extensively documented the effects of social isolation to be not just painful but can also have very serious negative effects, damage, sometimes even damage which is permanent despite the fact that the social isolation is nowhere near as complete or severe or depriving as it exists in solitary confinement.[714]

---

[710]  Haney Tr. 2891:18-2892:5.
[711]  Haney Tr. 2893:4-6.
[712]  Haney Tr. 2872:17-21. Defendants challenge this position of Dr. Haney using the "Colorado Study." It should be noted that even Defendants' expert agreed that David Wade does not have as much programming as Colorado provided in their system during the study. Thompson Tr., 4059:21-4060:1, 4062:16-25.
[713]  Haney Tr. 2872:21-2873:15.
[714]  Haney Tr. 2873:16-2874:17.

716.    People are kept on extended lockdown long beyond the time when they are a threat to anyone else or to the security of the facility; men languish months and years on extended lockdown, despite known and obvious disabilities.

717.    The continuous confinement reports detail the people who have been in restrictive housing for longer than 30 days.[715]

718.    Warden Goodwin reviews the continuous confinement reports every month to approve them for correctness.[716]

719.    For the purposes of the report "confinement" means a prisoner has been in restrictive housing for 30 days or longer.[717]

720.    Damion Williams and Jackie Sampson were housed on extended lockdown continuously for almost 5 years.[718]

721.    Fredrick Shepard was confined on extended lockdown for 10 months without a write up.[719]

722.    Matthew Carrol was on extended lockdown from August of 2015 to October 2018. He did not have a write up between January 2018 and October 2018.[720]

723.    Terran Johnson moved onto extended lockdown starting on November 13, 2017. He has not had a writeup since he has been on extended lockdown.[721]

724.    Bryant Wilson went to extended lockdown on October 3, 2017 and had his last write up on May 9, 2017. He was still on extended lockdown in October 2018.[722]

---

[715] Goodwin Tr. 2268:13-16.
[716] Goodwin Tr. 2270:13-2271:5.
[717] Goodwin Tr. 2272:8-10.
[718] Goodwin Tr. 2274:8-16; *Id.* 2283:23-2284:7; 2287:7-16; Exh. P-I-01 Continuous Confinement Report for October 2018; Exh. P-I-04 Continuous Confinement Report for January 2017.
[719] Goodwin Tr. 2275:7-19; Exh. P-I-01 Continuous Confinement Report for October 2018.
[720] Goodwin Tr. 2275:20-2276:4; Exh. P-I-01 Continuous Confinement Report for October 2018.
[721] Goodwin Tr. 2277:24-2278:9; Exh. P-I-01 Continuous Confinement Report for October 2018.
[722] Goodwin Tr. 2279:3-12.

725.    Jerry Jones was on extended lockdown from December 2017 to October 2018 because Warden Goodwin reassigned him there. There was no rule violation listed on the continuous confinement report.[723]

726.    Tyler Blanchard was on extended lockdown for just short of 3 years.[724]

>           *xiv. The conditions of confinement on N1-N4 keep prisoners in a state of severe isolation creating a substantial risk of harm*

727.    Dr. Haney testified that all four housing units at issue in this case meet his definition of solitary confinement.[725]

728.    Dr. Haney testified that he defines solitary confinement as "generally understood to be an environment in which prisoners are kept in their cell upwards of 22 or more hours a day kept away from or not allowed to participate in the normal day-to-day routines that prisoners in general population participate in. That would be work programs, educational, vocational training. Instead of participating in those things, they spend virtually all of their time in their cells. Particularly, there are also other kinds of deprivations to which they are subjected. So usually in solitary confinement there are material deprivations. They have a limited amount of property, more limited than prisoners in general population. They may be limited in terms of the kinds of electronic devices that they have access to. So, in some prisons they're allowed to have a radio or a tablet but not a television. In other solitary confinement units, they're allowed to have all three of those things. In places like David Wade, they're not allowed to have any of those things."[726]

729.    Defendants' expert Dr. John Thompson agreed with Dr. Haney in defining restrictive housing as 22+ hours per day in cell.[727] Curiously, and despite having rendered an opinion in this

---

[723] Goodwin Tr. 2280:4-20
[724] Goodwin Tr. 2288:15-2289:5.
[725] Haney Tr. 2871:9-11.
[726] Haney Tr. 2867:15-2868:16; Exh. P-I-01 Continuous Confinement Report for October 2018.
[727] Thompson Tr., 3973:18-23.

matter, Dr. Thompson could not answer questions about how many hours per day individuals spend in cell.[728] Dr. Thompson encouraged the Court to add it up, and opined simply that if people were out of cell more than 14 hours per week it does not meet the definition of restrictive housing.[729]

730.   The one 10-minute phone call per month for individuals on extended lockdown is not at a regularly scheduled time and thus there is no way to plan for a family member to be available for the phone call.[730]

731.   Interactions between individuals are forbidden by the written policy of DWCC, and they may receive a disciplinary write-up for attempting to communicate with one another.[731]

732.   People on extended lockdown, especially those in solitary confinement, are allowed very little human contact.[732]

733.   Dr. Haney testified that the real issue lies in how much of the human contact is meaningful. He said that the real source of psychological distress and long-term damage is the lack of meaningful human contact, because "notwithstanding the sometimes-frequent number of incidental contact[s], visual contact with another human being, very rarely are those contacts meaningful, substantive. They don't, therefore, make up for the deprivation of human -- meaningful human social contact that we've learned over the last many years is psychologically harmful."[733]

---

[728] Thompson Tr., 4040:5-10
[729] Thompson Tr., 4041:11-19.
[730] Turner Tr. 50:13-20 (you submit a request for a call, they get to you whenever they have time. You don't have a particular time).
[731] *See* Exh. P-JJJ-13 Offender Posted Policy #34, Sec. L.
[732] Exh. P-W-24, 2019-4-3-Request For Medical Treatment - Brooks, Ronald; Exh. P-II-69, ARP DWCC-2017-0618 - Francis, Shawn; Moran Tr., 198:7-9 (very little human contact); Solomon Tr., 598:9-25 (no contact with outside world, other than 1 10 min call a month, this led to No outside connection and a feeling of being cut off).
[733] Haney Tr. 2870:24-2871:8.

734.    Most of the individuals serving disciplinary time on the lockdown units have been diagnosed with one or more mental illnesses.[734]

735.    Quinten Moran testified that reaching out for mental health help was difficult for him which made staying in extended lockdown harder. He experienced significant amounts of sadness and the feeling that no one understood what he was going through. He feared speaking to someone about his experience because he felt as though no one at the prison wanted to hear about it.[735]

736.    Christopher Solomon's mental health was affected by the time he spent in extended lockdown. He said that being in a cell for that long caused him to go from being a strong person, with ambitions to someone who gave up on everything. He lost hope, lost faith and did not care about anything, including his family.[736]

737.    Christopher Solomon described his time in extended lockdown as the worst part of his life; that it broke him mentally.[737]

738.    Mr. Solomon described his time in extended lockdown as changing him; he used to be outgoing then he deteriorated to a point that he wanted to die and did not have purpose to exist.[738]

739.    Mr. Willie Dillon testified that he attempted to speak with Mr. Steve Hayden about his mental health but Mr. Hayden was disrespectful to him. This encounter made Mr. Dillon not want to speak to Mr. Hayden. Mr. Hayden joked about the incident.[739]

---

[734] Turner Tr., 83:11-20 (Diagnosed with the following mental illness, anxiety, depression, bipolar, schizoaffective); Brumfield Tr. 154:6-10 (Mr. Brumfield has never been diagnosed with a mental illness but describes his mental health as being rocky while he was at DWCC); Solomon Tr., 593:5-13 (Mr. Solomon was diagnosed with ADHD and PTSD; he had counseling and medicine before prison; Depakote, Concerta, Ritalin, and others); Adams Tr. 958:1-13 (in and out of MH hospitals; was diagnosed with mental illness before jail, unsure what); *Id* 958:22 - 959:18 (treated for antisocial personality disorder, PTST, psychosis, bipolar, schizophrenia, paranoia, MDD); McDowell Tr., 1030:12-17 (diagnosed with depression and EHCC and given medications); Exh. P-YYY-4 - Deposition of Brooks, 19:1-2 (diagnosed with post traumatic stress disorder).
[735] Moran Tr., 206:1-22.
[736] Solomon Tr., 597:20 - 598:8.
[737] Solomon Tr. 599:1-14
[738] Solomon Tr. 599:15 - 600:8
[739] Dillon Tr., 263:12 - 265:24.

740.   Mr. Dillon's mental health suffered while he was housed in extended lockdown causing instability.[740]

741.   Mr. Corey Adams suffers from a Traumatic Brain Injury (TBI) that was the result of an attack. He finds it difficult to remember things, focus, and concentrate. His TBI interrupts his speech and affects his communication.[741]

742.   Mr. Adams has been treated for antisocial personality disorder and Post Traumatic Stress Disorder (PTSD), psychosis, bipolar disorder, schizophrenia, paranoia, and major depressive disorder (MDD). He spent time in and out of mental health hospitals before he arrived at DWCC.[742]

743.   Cody Doucet testified that he was housed in extended lockdown for "misbehaving" because he doesn't "have it all there" and would "rub doo-doo" on himself among other mental health related behaviors.[743]

744.   Da'Marcus Thomas testified that the conditions on lockdown felt cold and dark, he felt like he was all by himself and alone, and he felt like giving up and killing himself because he felt hopeless like he had nothing to look forward to.[744]

745.   Mr. Thomas says the conditions on extended lockdown to the changes in his mental health because being in the cell for 23 hours a day, with nothing to occupy his mind and the loss of contact with his family, caused him to be depressed and anxious.[745]

746.   Dr. Haney testified about the effect of the conditions of confinement on incarcerated people's mental health saying:

[740] *Id*, 278:7-16 (mental state was a rollercoaster, up and down, unstable, uncertain, b/c you never know what's going to happen).
[741] Adams Tr., 955:5-11 (has TBI because he was attacked); *Id*, 956:7-13 (hard to remember, focus, concentrate, interrupts speech and communication).
[742] Adams Tr., 958:22 - 959:18 (Adams: treated for antisocial personality diagnosed with, PTSD, psychosis, bipolar, schizophrenia, paranoia, MDD)
[743] Exh. P-BBBB-1 - Deposition of Doucet, 24:15-25.
[744] Exh. P-YYY-1 - Deposition of Thomas, 18:24 - 19:7.
[745] Exh. P-YYY-1 - Deposition of Thomas, 21:6 - 22:1.

> [T]he conditions in the N1 through 4 units in the south compound are very severe and harsh. They constitute what is commonly understood to be solitary confinement or restrictive housing. The prisoners in those units are manifesting the signs and the symptoms that are consistent with exactly what the literature shows about the harmful effects of solitary confinement. They report suffering.
> They appear to be suffering. They report not just suffering in general but they identify a number of the dimensions of suffering and the dimensions of the harm that they're experiencing, again, consistent with what the literature tells us, my own research, and the research of other people happens to people when they're in severe conditions of solitary confinement.[746]

747.    Men incarcerated at DWCC testified about the general conditions of the south compound.

748.    Men testified at trial that the general conditions on the South Compound are unsanitary and filthy, with the reek of urine and feces, and so loud that it feels like a zoo.[747]

749.    Da'Marcus Thomas testified that "extended lockdown is a place where it's darkness because you don't see no other inmate inside your cell" and you can only see the brick wall out the window.[748]

750.     Damion Brumfield testified that he can see out the window and can see people in the cells two to three cells down the tier on the right side of his cell if they are standing right in front of their cell at the bars.[749]

751.    Corey Adams testified that from his cell he could not see the sky, only a brick wall.[750]

752.    Prisoners can see the wall across from their cells and depending on the cell they are assigned they might only be able to see the exterior wall of the neighboring housing building outside.[751]

---

[746] Haney Tr. 2866:1-18.
[747] Brumfield Tr. 155:1-4 (Extended lockdown at DWCC unsanitary, filthy; Smells and reeks of urine and feces, very loud, kind of like a zoo).
[748] Exh. P-YYY-1 - Deposition of Thomas, 15:1-3.
[749] Brumfield Tr. 155:8-17.
[750] Adams Tr.  961:4-13.
[751] Dillon Tr, 262:2-7.

753.     Several prisoners testified that the cells are stark, containing only a concrete bunk, possibly a metal bunk attached to the wall on top of that, a steel sink and toilet, a mirror, and a metal foot locker for storing items.[752]

754.     Prisoners can hear other prisoners talking to themselves, screaming, and making noises.[753]

755.     Mr. Thomas described "the only thing you have to listen to is the other inmates that's going crazy inside their cell,"[754] people crying because nobody is there to help them, and people banging their heads on the wall.[755]

756.     The tiers smell of urine and feces.[756]

757.     In the winter the tiers are extremely cold.[757]

---

[752] Turner Tr.  47:8-11 (The front of the bars was chicken wire. Inside the cell there was about two bunks, a toilet with a sink attached to it, and that was it.); Brumfield Tr., 157:10-12 (concrete rack, steel stool, steel toilet, mirror); Dillon Tr., 261:21-25 (6x9, toilet with connected sink, top bunk, bottom bunk, mattress when you can have one); Solomon Tr., 595:18-25 (cell is a box; sink attached to toilet, small green box for possessions, concrete bunk); *Id*. at 596:2-9 (Solomon: cells in N4C do not have the green box, he had been housed there); Adams Tr. 960:7 - 961:13; Exh. P-YYY-1 - Deposition of Thomas, 15:18-24 (have a connected toilet and sink, a locker box, a top rack and a concrete slab, a mirror and a light).

[753] Turner, Tr. 47:12-17 (Silence. The only thing you would hear is silence out of the pipe shims at the most. Silence coming from down the tier, the doors opening and guys in their cell talking or making noises or just talking to themselves, rapping, singing, stuff like that.);  Brumfield Tr., 155:18 - 156:14 (you can hear everything on the tier, like in a can, echoes. a lot of screaming, everyone's conversation if they're loud enough; can hear tier behind through the vent on the wall); *Id*. at 170:3 - 171:3 (He could hear people hollering and screaming, all the people deemed MH people); Dillon Tr.,  261:14-20 (Loud, people talking, a lot of guys talk to themselves); Testimony of Christopher Solomon, 596:10-16 (It's Like the Amazon; a lot of screaming and hollering, no peace at all. Very loud; no peace of mind, no getting thoughts together, it's a rambling concert); Testimony of Corey Adams,  961:21 - 962:9 (Mostly quiet b/c if made noise then excessive force or punished; hear complaining about what other guys going through. It's sad, misery, pain); Exh. P-YYY-4 - Deposition of Brooks 12:8-18 (loud noises, people screaming).

[754] Exh. P-YYY-1 - Deposition of Thomas, 15:4-5.

[755] Exh. P-YYY-1 - Deposition of Thomas, 16:23 - 17:6.

[756] Turner Tr.  47:18 - 48:2 ("If you get moved around there is different smells, but if get more up close to a sewage trap you always smell feces, sewers. If you were in one of the parts of the tier where you have these smells coming out of the pipes, depending on if you are closer to the sink that is backed up or the drain is cold or whatever, you know, you could get these smells of urine, feces, different smells coming out of the pipes that is like a rank order and stuff like that."); Brumfield Tr., 156:23 - 157:7 (The usual, feces, body odor, urine; smelled like that b/c MH patients playing in it, MH people cells full of urine and feces); Dillon Tr., 261:9-13 (Smells like urine, feces, mace); \Solomon Tr., 596:17-24 (Smells like feces and urine, mace. Horrible); Adams Tr.,  960:25 - 961:1 (Offensive cells, stink like lint, dirt, and trash); *Id*. at 962:10-11 (Stale, old, musty, like feces and urine).

[757] Moran Tr., 199:9-19 (extremely cold; most of the time, windows open because they are broken so cannot keep cold air from coming in); *Id*. at 236:21-24 (if there were heaters, it was unknown to me); *Id*. at 236:25 - 237:5 (staff sit in the cold too, but they get to wear jackets, gloves and hats. They're bundled); McDowell Tr., 1010:22 - 1011:7 (describing winter as inhumane because it's cold enough to see your breath and not allowed blankets until after 4:00pm).

758.   In the summer the tiers are incredibly hot.[758]

759.   Prisoners will receive a write up if they remove the top half of their jumpsuits in the summer, no matter the temperature.[759]

760.   Additional write ups lead to additional time on extended lockdown.[760]

761.   Prisoners are not allowed contact visits with their family members while they are on extended lockdown, further minimizing the physical touch experienced by prisoners while they are on extended lockdown.[761]

762.   Men testified at trial that the conditions on the South Compound were extremely stressful due to the lack of contact with people, the lack of contact with family, and the lack of recreation and the boredom combines to make some men feel like giving up and breeding thoughts of self-harm or suicide.[762]

763.   Dr. Haney testified that when he conducted individual interviews with incarcerated people the conditions they spoke about at cell front interviews were even more evident. During the individual interviews Dr. Haney asked the interviewees about various kinds of symptoms or reactions to solitary confinement that people sometimes have and sometimes don't. A very high

---

[758] Turner Tr., 48:8-12 (It's excruciatingly hot, no air conditioning, no ice nothing given to help with the heat); Moran Tr., 199:20 - 200:12 (The prisoners have to get staff to pry the windows open that they fixed closed in the winter, extremely hot, no airflow); *Id.* at 239:8-24 (describes fans on tiers; round ones on walls, large box fans at ends of tier.); *Id.* at 240:1-11 (only given ice at lunch and dinner in summertime; not allowed to keep containers outside meal time, so nobody gets ice between meals; you use the water in the sink if it works); Adams Tr., 966:16 - 967:4 (heat, constantly sweating; fans on walls rotate back and forth, some cells get no air, they only blow hot air around); McDowell Tr. 1012:18 - 1013:11 (McDowell: so hot, sometimes got in boxers and put water on the floor to lay on it to try and cool; can't feel the fans, blowing hot air around making it hotter. Constant sweat, tried to get ice and couldn't); Exh. P-YYY-1 - Deposition of Thomas, 37:1-12 (tiers are very hot in the summer, hard to breathe hve to lay on the floor to try and get cool. People have died in the cells from heat stroke); Exh. P-YYY-4 - Deposition of Brooks, 14:1-25 (it was hot, only had ice with meals; would stick his feet in the toilet to cool down).

[759] Moran Tr., 200:6-12 (have to keep jumpsuits on all day, completely) ; Solomon Tr., 661:22 - 662:11; 662:17-20 (Would not wear jumpsuit in October 2019 b/c it was too hot)

[760] Turner Tr., 48:19 - 49:6 (thick material, have to wear it pulled all the way up, will get write up if not)

[761] Turner Tr., 109:110:10 [exhibit for OPP #35 which has the rule for

[762] Moran Tr. 200:13 - 201:10 (extremely stressful; lack of contact, lack of recreation, lack of contact with family); Solomon Tr. 594:18 - 595:1 (complete change from North side, worst thing ever experienced; you go from wanting to do everything to better self to giving up); Adams Tr. 962:15-23 (miserable, boring, nothing to do; pace the floor wanting to hurt/kill self; rather be dead); Id 966:6 - 967:4 (describing what it felt like to be in cells; miserable).

number of them, some of them who reported to Dr. Haney that they were on the mental health caseload and some of whom weren't, reported suffering very high numbers of symptoms. They reported that in many instances they were experiencing frequently, or intensely. Dr. Haney testified that the interviewees acknowledged the symptoms and added comments about what it was like for them and what the despair that they were feeling and the desperation that they felt.[763]

764.    Mr. Thomas testified "it's very lonely without no programs, no one trying to help you rehabilitate yourself. They strip everything from you in extended lockdown. It's basically just 23 hours inside of your cell every day, each day, Monday through Sunday, without no one coming to talk to you. And that plays a big part in everything."[764]

765.    Defendants' lack of monitoring the tiers and cells creates a substantial risk of serious harm.

766.    They key room officers who are the staff people responsible for monitoring who comes and goes from the tier, have several other duties in addition to monitoring the cameras.[765] The key room officer is responsible for monitoring all of the audio from all four tiers in the building.[766]

767.    The key officers do not watch the tier video, but claim to watch the footage from the cells that have cameras in them.[767] Those cameras are only activated when someone is in the cell on suicide watch.[768]

768.    It is not humanly possible for the key room officers to conduct all of the duties to which they are assigned and to monitor patients on suicide watch. As Dr. Burns testified the standard of care for someone who is at high risk of suicide is *constant observation*. Constant observation can be supplemented with – but cannot consist of– video cameras. Noel Dean's suicide attempt

---

[763] Haney Tr. 2894:19-2895:6.
[764] Exh. P-YYY-1 - Deposition of Thomas, 15:6-12.
[765] Nail Tr. 1696:8-1698:15
[766] Goodwin Tr. 2229:2-11 and Exh. P-JJJ-23
[767] Goodwin Tr. 2226:23 - 2227:11.
[768] *Id*.

illustrates this point– the key room officer cannot monitor suicidal prisoners, and the administration of suicide watch at David Wade poses a substantial risk of harm.

769.    Dr. Haney testified that some individuals were so distressed that they could not communicate with him as he toured the prison.[769]

> *xv. Dr. John Thompson's Opinions Have Inadequate Basis in Fact and Do Not Address the Most Critical Harms for Class Members*

770.    Dr. Thompson's report and testimony misused the basic terminology of restrictive housing at DWCC, calling all restrictive housing on N1-N4 "administrative segregation."[770]

771.    Dr. Thompson only interviewed people who were housed on the north compound, which added to the confusion and difficulty caused by his lack of first-hand familiarity with the terms in use at DWCC.[771]

772.    Dr. Thompson claimed to have reviewed policies, but was unable to discuss any of the specific policies he reviewed in any detail.[772]

773.    Dr. Thompson also did not review any master prison records, relying instead on characterizations of those records made by Warden Dauzat.[773]

774.    Dr. Thompson conflated the needs for intake at jails and prisons,[774] which have very different requirements.[775]

775.    Dr. Thompson opined that the alarming conditions at DWCC were not problematic because "people can accommodate to a lot of situations.  People in prison camps live forever in a prison camp environment where they actually are being tortured, because they accommodate to that

---

[769] Haney Tr. 2895:9-14.
[770] Thompson Tr., 3966:20-3969:21, 4017:13-4027:25, 4029:21-4034:13
[771] Thompson Tr., 3969:22-1970:2.
[772] Thompson Tr., 3977:3-24
[773] Thompson Tr,. 4117:21-4118:3.
[774] Thompson Tr., 4010:20-22.
[775] Burns Tr., 4451:13-4452:24.

environment and they can survive in it."[776] This statement is utterly inconsistent with both natural human morality and the standards of decency in an evolving society.

776.     Importantly, Dr. Thompson agreed with the central point that people with mental illness in restrictive housing need access to different programs and resources than others.[777]

777.     Of prisoners interviewed by Dr. Thompson and his agents, 25% of the population at DWCC reported that the windows were being opened in the winter to punish people through extremes of cold.[778] Of that same population, nearly one out of three reported that there is no form of mental health programming available there.[779] Those same interviewees also widely reported a fear of punishment if they spoke to mental health requesting treatment.[780] Dr. Thompson called his own credibility and candor into question by omitting all of this highly relevant information, collected himself, from his report.[781]

778.     Dr. Thompson testified that patients at DWCC sometimes have a higher level of functional need than is reflected in their categorization as level of care 3.[782]

779.     Dr. Thompson concurred that individual mental health needs must be balanced against security concerns in restrictive housing.[783]

780.     Dr. Thompson concurred with Burns' assessment of the prevalence of mental illness at DWCC and opined that "there was a high level of mental illness throughout the facility."[784]

---

[776] Thompson Tr., 4159:10-4160:9.
[777] Thompson Tr., 4126:25-4128:1.
[778] Thompson Tr., 4131:22-4132:5.
[779] Thompson Tr., 4132:12-16.
[780] Thompson Tr., 4133:21-4134:11.
[781] Thompson Tr., 4134:12-4136:19
[782] Thompson Tr., 4002:21-24.
[783] Thompson Tr., 4119:24-4120:5.
[784] Thompson Tr., 4028:1-22.

781.    Dr. Thompson agreed that mental health staff should be involved in any decision to place a person on strip cell status.[785]

782.    Dr. Thompson relied heavily on the Colorado study, despite distinguishing factors such as the increased availability of programming in that penal system.[786]

783.    Dr. Thompson opined that DWCC under-utilizes tools like mental health observation that are less restrictive and more pro-active than suicide watch.[787]

784.    Dr. Thompson concurred that the facility does not have adequate psychiatrist-level staffing.[788]

785.    Dr. Thompson opined that medication administration was adequately supervised based on an incorrect assumption that the process is supervised by the nursing staff rather than security.[789] Even so, he agreed that documentation of pill pass needs improvement.[790]

786.    Dr. Thompson did not observe any individual counseling taking place at DWCC.[791]

787.    Dr. Thompson alleges that rounds were taking place but admits that he didn't actually review any tier log books to verify this fact.[792]

788.    Dr. Thompson also opined that restraints should only be used for behavioral control in a medical setting.[793]

789.    Dr. Thompson opined that treatment plans should be improved and individualized.[794]

---

[785] Thompson Tr., 4057:19-4058:1.
[786] Thompson Tr., 4059:21-4060:1, 4062:16-25.
[787] Thompson Tr., 4049:21-4050:1, 4055:7-10.
[788] Thompson Tr., 4078:17-4079:12.
[789] Thompson Tr., 4087:9-17.
[790] Thompson Tr., 4087:18-20.
[791] Thompson Tr., 4114:21-24.
[792] Thompson Tr., 4047:6-16.
[793] Thompson Tr., 4089:5-14.
[794] Thompson Tr., 4089:15-16.

790.    Dr. Thompson criticized the legibility of Dr. Seal's notes,[795] and opined that documentation was an area in which DWCC had fared "really poorly."[796]

### VIII.    DEFENDANTS DELIBERATE INDIFFERENCE TO THE RISK OF SERIOUS HARM AT DWCC VIOLATES THE EIGHTH AMENDMENT TO THE CONSTITUTION

#### A.    *Defendants' Policies and practices demonstrate Defendants' knowledge of the risk of harm to class and subclass members.*

791.    Secretary James LeBlanc is responsible for establishing policy and practices related to mental health care services provided to prisoners in the custody of the Louisiana Department of Public Safety and Corrections.[797]

792.    Warden Goodwin is responsible for establishing policy and practices at David Wade Correctional Center that are consistent with Department policies.[798]

793.    The policies that implement department regulations are reflected in employee policy memorandums, employee post orders, offender posted policies, and all other policies at the institution.[799]

794.    Post orders are job duty requirements for specific jobs; Warden Goodwin is responsible for implementing those policies.[800]

795.    Warden Goodwin provides his six direct supervisees with annual evaluations. He has never provided them with negative feedback[801]

---

[795] Thompson Tr., 3994:24-25.
[796] Thompson Tr., 4133:12-20
[797] R. Doc. 524 at 13, Joint Record Stipulation.
[798] R. Doc. 524 at 14, Joint Record Stipulation; Goodwin Tr. 2208:17-20.
[799] Goodwin Tr. 2208:21-2209:2.
[800] Goodwin Tr. 2209:19-25.
[801] Goodwin Tr. 2208:1-11.

796.    Warden Goodwin knows that the policies in effect at DWCC must comply with Louisiana State Statute, federal law and the constitution.[802]

797.    Employee and inmate rules are part of the tools that are used to make sure that the conditions of confinement at state prison facilities are constitutional.[803]

798.    The Department regulations are controlling over the prison's policies.[804]

799.    Mr. Goodwin, as the Warden of the institution, expects the staff to have a "working knowledge of the post orders that govern the jobs that they do."[805]

800.    The secretary also uses the information on the C-05 reports to make sure that the conditions of confinement at state prison facilities are constitutional.[806]

801.    Sec. LeBlanc is responsible for the review and approval of department level policies.[807]

802.    Warden Goodwin is responsible for ensuring that institutional policies for DWCC are compliant with department level policies.[808]

803.    Part of making sure that the institution is compliant with federal law is through the supervision of staff. Warden Goodwin is responsible for supervising the staff that report directly to him to make sure that they are properly enforcing policy so that it is compliant with state and federal law and the constitution.[809]

804.    Use of Force incidents at DWCC are reviewed by the Unit Manager.[810]

805.    The unit manager is the colonel who oversees the South Compound.[811]

---

[802] Goodwin Tr. 2211:1-12
[803] LeBlanc Tr. 2562:3-8.
[804] Goodwin Tr. 2212:18-25.
[805] Goodwin Tr. 2214:4-7.
[806] LeBlanc Tr. 2562:3-11.
[807] LeBlanc Tr. 2562:12-14
[808] Goodwin Tr. 2208:17-20.
[809] Goodwin Tr. 2211:19-24.
[810] R. Doc. 524 at 11, Joint Record Stipulation.
[811] R. Doc. 524 at 11, Joint Record Stipulation.

806.    Either Col. Lonnie Nail or Col. Tyrone Mays were the unit managers for the South Compound at all times relevant to this trial.[812]

807.    Use of Force incidents are required to be reported by DWCC to DPS&C in the monthly C-05 report.[813]

808.    Warden Dauzat, the individual responsible for overseeing David Wade's mental health program, did not think the plans were in any way deficient, but also agreed that a mental health treatment plan "should be individualized to be effective."[814]

809.    Warden Dauzat signs off on all treatment plans without meeting with the individual.[815]

810.    None of the identical treatment plans created for the people on the South Compound include group therapy or individual counseling.[816]

811.    Warden Goodwin reports all category A and B incidents, to Chief of Operations Seth Smith.[817]

812.    Despite these and numerous other incidents and violations of policy identified at trial, not a single David Wade staff member was disciplined in the calendar year 2018.[818]

### B. Defendants Received Explicit Complaints from Class Members

813.    David Wade has an Administrative Remedy Procedure (ARP), the purpose of which is to allow incarcerated individuals to file a grievance about their treatment at the prison.[819]

---

[812] R. Doc. 524 at 11, Joint Record Stipulation.
[813] R. Doc. 524 at 11, Joint Record Stipulation.
[814] Dauzat Tr. 768:6-25 (policy requires tx plans be individualized; must be individualized to be effective; signed off on all tx plans even though they have the same long and short term goals).
[815] Dauzat Tr. 767:19-21 (signs off on all treatment plans); Id 767:25 - 768:5 (signs off on treatment plans without having met with the individual).
[816] Dauzat Tr., 773:11-14 (not aware that any tx plan states group therapy); Id, 773:21-23 (not aware that any tx plan says individual counseling).
[817] Goodwin Tr. 2194:11-22.
[818] Goodwin Tr. 2202:3-2204:5.
[819] Leblanc Tr., 12-15 (ARP system is an opportunity for prisoners to file a complaint if they feel they haven't been treated appropriately).

814.    Prisoners are familiar with the ARP purpose as well stating the process may be used to complain about an officer not following policy, or his actions, lost property, lack of medical or mental health treatment, or anything else that needs to be brought to the attention of the prison to be fixed or addressed and request a remedy for it.[820]

815.    The ARP process has two steps, the first step is handled at the institutional level by the Warden, and the second step is handled at DPSC headquarters by the Chief of Operations, Seth Smith's designees.[821]

816.    Angie Huff received around 100 ARPs per month, around 30-40 were answered with a First Step Response each month.[822]

817.    Around 90% of the first step ARPs are accepted for review by David Wade, however, only 4-5 ARPs are reportedly granted a year.[823]

818.    Incarcerated witnesses say that even though they have the ability to file an ARP and make a complaint they have never had any relief from the process.[824]

819.    Despite having not seen any relief from filing an ARP, incarcerated witnesses filed ARPs advising David Wade and DPSC officials of conditions at the prison which sometimes included many issues such as conditions of confinement, lack of mental health care, prevented from having hard time, and other actions that individuals feel are unconstitutional.[825]

---

[820] Turner Tr., 52:4-15 (can file an ARP to complain about officer not following policy or his actions; lost property; lack of medical tx; complain about anything going wrong that needs to be fixed); *Id*, 52:18-21 (topics - conditions of confinement, acts of retaliation, mistreatment from officers); Adams Tr., 971:17-22 (ARP is grievance request to notify officials of a problem or cond'n and request remedy).

[821] Smith Tr., 2520:24 - 2521:5 (First step of ARP handled at institutional level; section step sent to headquarters).

[822] Huff Tr., 1983:1-5.

[823] Huff Tr., 1984:12-18 (Around 90% of ARPs are accepted); *Id*, 1986:1-3 (Only 4-5 ARPs per year are granted).

[824] Turner Tr., 68:19-69:7; Adams Tr., 986:3-7 (ARPs always get rejected).

[825] Exh. P-E-6; Turner Tr., 66:5-15 (filed ARP to address conditions of confinement, cruel and unusual confinement, lack of MH tx, not able to go to yard, everything he felt was unconstitutional).

820.    Many ARPs that are filed are rejected because they contain multiple issues and the response received is that they can only include one issue in an ARP at a time, which causes prisoners to then refile multiple ARPs to address the individual issues.[826]

821.    Mr. Turner filed ARPs pertaining to mental health issues, such as feeling that mental health visits were not confidential, and his ARPs were denied.[827]

822.    Corey Adams also filed ARPs to address issues with mental health, including complaints about how Steve Hayden treats him and how Mr. Adams feels ridiculed, also highlighting that prior to filing the ARP he filed sick calls to address the same concerns but did not receive an adequate remedy to either.[828]

823.    Mr. Adams also filed an ARP regarding the conditions of his confinement and how they make him feel more claustrophobic, asking for help to change his situation and provide him relief.[829]

824.    The ARP system at David Wade is profoundly broken.

825.    At the institutional level, ARPs are answered by Warden Angie Huff or her staff.[830]

826.    Warden Dauzat testified that she investigates ARPs alleging that mental health care is adequate and she has never admitted in response to an ARP that all the treatment plans are identical.[831]

---

[826] Exh. P-E-123; Adams Tr., 980:9-15 (short ARP he wrote b/c they get rejected for multiple complaints; shortened version of other ARPs).

[827] Exh. P-E-13; Turner Tr., 55:10-16 (ARP for failure to provide him anger mgmt and Dauzat interfering w/tx); Exh. P-E-6; Turner Tr., 66:16 - 68:8 (explained what the ARP was addressing concerning MH issues, primarily that the MH visits are not confidential).

[828] Adams Tr., 971:9-16 (complained about Hayden's ridicule and mistreatment in ARPs, complained about it in sick calls).

[829] Exh. P-E-113; Adams Tr., 976:21 - 977:19 (describes what claustrophobia means to him, he wrote about it in the ARP).

[830] Huff Tr., 1976:18-21.

[831] Dauzat Tr., 769:22-25 (investigates ARPs alleging MH care inadequate); *Id*, 770:9-19 (never admitted in response to ARP that all tx plans are identical).

827.    Warden Huff admitted that she did not investigate ARPs filed by Mr. Turner complaining that solitary confinement causes mental illness because the ARP was rejected for containing multiple complaints.[832]

828.    She similarly did not investigate Mr. Turner's complaint that people are kept in their cells 23 hours a day with no programming.[833]

829.    Nor did she investigate Mr. Turner's complaint that the temperature on the tiers can reach triple digits in the summer.[834]

830.    Mr. Adams filed ARPs because his medication that he was taking prior to his arrival at DWCC was discontinued when he arrived and another ARP for continuing issues with receiving his medications at DWCC.[835]

831.    Mr. Turner also testified that he filed ARPs following instances of excessive force, particularly following an incident when Col. Mays pushed him against a wall in his office and had spoken to Mr. Turner's mother to try and convince Mr. Turner to do something Col. Mays wanted him to do.[836]

832.    Mr. Turner explained that this incident with Col. Mays made him feel distressed, angry and frustrated and made him feel like the staff were capable of anything which really cemented his lack of trust with the security staff.[837]

833.    Mr. Adams had also filed an ARP about excessive force with the use of chemical agents.[838]

---

[832] Huff Tr., 1997:2-21.
[833] Huff Tr., 1998:1-9.
[834] Huff Tr., 1998:17-1999:8.
[835] Exh. P-E-132; Adams Tr., 982:4-11 (wrote ARP on return from EHCC because stopped Wellbutrin); Exh. P-E-143; Adams Tr., 985:5-19 (ARP about medication issues).
[836] Exh. P-E-52; Turner Tr., 56:19-21 (attacked by Col Mays in his office); *Id*, 57:11-14 (speaking out against unnecessary use of force); *Id*, 57:25 - 58:24 (description of incident that led to ARP); *Id*, 59:9-18 (explained Col Mays contacting mom).
[837] Turner Tr., 59:21 - 60:9 (interaction made him feel distressed, angry, frustrated. Made him think staff capable of anything, lack of trust).
[838] Adams Tr., 977:20 - 979:6 (wrote about chemical agents in ARP, discussing what he wrote about).

834.    Mr. Turner also filed an ARP after he went many months without a write up and was still denied the classification board, despite the fact that he was told he could get the board if he went more than 90 days without a writeup and he felt he was being treated unfairly because other people received the board who were in similar situations.[839]

835.    Mr. Turner's ARP was denied on the grounds that the document denying him the board identified one of the enumerated reasons for denial as well as stating that an ARP is not the proper process to challenge a classification board decision.[840]

836.    There is no other appeal process available for a classification board decision even though the denial of Mr. Turner's ARP was denied because an ARP is not the proper process.[841]

837.    In her 25 years as a warden at DWCC, Warden Huff could not recall ever granting a request for a reasonable accommodation filed as an ARP by a prisoner.[842]

838.    Warden Huff testified that Noel Dean's ARP regarding self- harm was "not necessarily" an emergency despite his statement that he was "only been constantly crying and thinking of ways to harm myself".[843]

839.    That portion of Dean's ARP had been highlighted to indicate that staff saw it as the primary point of his ARP.[844]

840.    Huff took no steps to determine whether the mental health care Mr. Dean was receiving was adequate.[845]

---

[839] Exh. P-E-4; Turner Tr., 62:17-24 (no writeups for long time, denied board, filed ARP to complain b/c unfair); *Id*, 63:9-23 (been 90 days without a write up, other people got board, he didn't, was not fair).
[840] Turner Tr., 63:24 - 64:5 (no appeal process for board decision; ARP was denied stated not proper process, *see* P-E-4).
[841] *Id*.
[842] Huff Tr., 1990:11-14.
[843] Huff Tr., 2008:8-11
[844] Huff Tr., 2008:15-18
[845] Huff Tr., 2009:2-18

841.    In responding to ARPs relating to mental health, Huff deferred to the judgment of Col Nail, who lacks any mental health background.[846] Col. Nail does not document any consultation with mental health staff regarding the ARP.[847]

842.    To Huff's knowledge, no staff from DPS&C headquarters ever independently investigated any of the ARPs from DWCC.[848]

### C.  *Defendants Authorized the Specific Policies that Create a Substantial Risk of Serious Harm*

843.    Despite being responsible for ensuring that the way that DWCC operates is compliant with federal law and constitutionally adequate, no staff has been disciplined for excessive use of force during Warden Goodwin's entire tenure as warden.[849]

844.    Warden Goodwin ultimately supervises all of the staff at DWCC.[850]

845.    Warden Goodwin provides his direct supervisees with feedback about their performance in the form of performance evaluations.[851]

846.    The policies that govern the job duties of employees are named Employee Policy Memorandums. These documents are all approved by Warden Goodwin.[852]

847.    Offender posted policies are the policies that the population of incarcerated people are governed by and these policies must be approved by DPSC Chief of Operations Seth Smith.[853]

---

[846] Huff Tr., 2026:18-2027:16
[847] Huff Tr., 2028:16-2029:11
[848] Huff Tr., 1990:22-24.
[849] Goodwin Tr. 2204:10-2205:12.
[850] Goodwin Tr. 2211:19-24.
[851] Goodwin Tr. 2208:1-11.
[852] Goodwin Tr. 2208:17-2201:3.
[853] Goodwin Tr. 2210:4-17.

848.     Prison specific policies must comply with Department level policies. When the department issues a policy there has never been a time in which the policy had a timeline associated with its implementation.[854]

849.     When a new policy is implemented at DWCC there is training on the new policy provided for every staff member.[855]

850.     All staff at David wade are responsible for having a working knowledge of all applicable employee policy memoranda.[856]

851.     Offender Posted Policy 34, strip cell status, is a policy that has been approved by Warden Goodwin, Chief of operations Seth Smith,[857] and Secretary LeBlanc.[858]

852.     Secretary Dan Pacholke, Plaintiffs' expert, testified that the conditions of confinement under Offender Posted Policy #34, strip cell status, are akin to torture. He said that when a person is stripped of all of their belongings, including their clothing, and left with nothing but a paper gown it sets up the conditions for sleep deprivation.[859]

853.     The DPSC has reviewed the policies and practices at David Wade and has never offered any recommendations for changes.[860]

854.     The authorization of Policy 34, review of its use at David Wade through annual reviews and failure to even recommend change to the institution makes them deliberately indifferent to conditions that create a substantial risk of serious harm.

---

[854] Goodwin Tr. 2212:13-2213:14.
[855] Goodwin Tr. 2213:15-22.
[856] Goodwin Tr. 2213:19-22.
[857] Goodwin Tr. 2210:4-17.
[858] LeBlanc Tr. 2596:9-16
[859] Pacholke Tr. 2640:21-2641:20
[860] Goodwin Tr. 2244:20-2247:15.

855.    Nail signed off on all instances of strip cell status during his tenure as colonel over the south compound.[861]

856.    Warden Dauzat is responsible for the overall administration and supervision of the provision of mental health at David Wade, she is the person to whom all other mental health staff ultimately report.[862]

857.    She not only approved of identical treatment plans for every individual regardless of diagnosis, she thought that *was* individualized treatment.

### IX.    DEFENDANTS VIOLATE THE AMERICANS WITH DISABILITIES ACT AND REHABILITATION ACT BY DISCRIMINATING AGAINST CLASS AND SUB CLASS MEMBERS

858.    The purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1) (2012), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2).

859.    The prima facie case under Title II and the Rehabilitation Act require that the plaintiff show: (1) That he is a qualified individual withing the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *Cadena v. El Paso Cnty.*, 946 F.3d at 723 (5th Cir. 2020).

---

[861] Nail Tr., 1812:19-24.
[862] Dauzat Tr., 759:13-21 (oversees Mental Health Department; directly supervises Hayden, Hayden supervises Robinson and Burgos); Hayden Tr., 318:17-18 (Dauzat is supervisor); *Id*, 318:22 - 319:4 (supervises Robinson and Burgos).

860.   The ADA makes it unlawful for a public entity to "directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3).

861.   "[E]mploying no system or an inadequate system for identifying and tracking prisoners with disabilities" is a viable class-wide claim for an unlawful method of administration. *Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016), modified sub nom. *Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020).

862.   Public entities must make "reasonable accommodations" to enable people with disabilities to participate in activities and receive services, such that they have "meaningful access." *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

863.   The ADA requires an entity to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

864.   Title II of the Americans with Disabilities Act, 42 U.S.C. §12182, and Section 504 of the Rehabilitation Act, 29 U.S.C. §794, both outlaw discrimination against people with disabilities by public entities.

865.   Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing in its affirmative duty to identify people with disabilities and failing to make any reasonable modifications or accommodations for people with mental illness.

866.    Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to track and act upon requests for reasonable accommodation made by people held on extended lockdown.

867.    Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by failing to make any reasonable accommodations to the disciplinary use of force practices as they are applied to people with disabilities.

868.    Defendants have violated Title II of the ADA and Section 504 of the Rehabilitation Act by disregarding recommendations from its own mental health staff that individuals with mental illness be placed in general population.

869.    The RA states that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of his disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

870.    "[T]he ADA applies only to public entities, including private employers, whereas the RA prohibits discrimination in federally funded programs and activities. The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010).

871.    The RA has the same elements as a claim under the ADA, except that the second element queries whether the program in question receives Federal financial assistance. *See Kemp*, 610 F.3d at 234.

872.    There is a high incidence of mental illness amongst the class members.[863]

### A.  *The subclass consists of qualified individuals with disabilities*

---

[863] *See supra* fn 47-51.

873.    Individuals housed on extended lockdown at DWCC have disabilities due to mental illness, which interfere with their major life activities as defined by the Americans with Disabilities Act.[864]

874.    People with a record of serious mental illness in remission remain people with disabilities within the definition of the ADA. 42 U.S.C. § 12102(1)(B).

875.    "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures" 42 U.S.C.A. § 12102(4)(E)(i). Mitigating measures include "medication" and "learned behavioral or adaptive neurological modifications." 42 U.S.C.A. § 12102(4)(E)(i).

### B.    *Defendants Have Violated the Affirmative Duties Imposed Under the Americans with Disabilities Act and Rehabilitation Act*

876.    Prisons are public entities and as such may not exclude individuals with disabilities from participation in or deny them the benefits of their services, programs, or activities. *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

877.    "The remedies, procedures, and rights available under the Rehabilitation Act parallel those available under the ADA. Thus, jurisprudence interpreting either section is applicable to both." *Cadena.*, 946 F.3d at 723 (internal citations and quotations omitted).

878.    "In addition to their respective prohibitions of disability-based discrimination, both the ADA and the Rehabilitation Act impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Id., citing Ball v. LeBlanc,* 792 F.3d 584, 596 n.9 (5th Cir. 2015).

---

[864] 42 U.S.C. §12102 - Americans with Disabilities Act defines disability.

879.    "[I]t is axiomatic that the ADA and RA do not require a plaintiff to specifically request a certain accommodation in order to prevail on a claim of disability discrimination." *Levy v. Louisiana Dep't of Pub. Safety & Corr.,* 371 F. Supp. 3d 274, 285 (M.D. La. 2019).

880.    "For this type of claim, a plaintiff must show that the entity knew of the disability and its consequential limitations, either because the plaintiff requested an accommodation or because the nature of the limitation was open and obvious." *Id.*

881.    "The ADA seeks to prevent not only intentional discrimination against people with disabilities but also – indeed primarily – discrimination that results from 'thoughtlessness and indifference,' that is, from 'benign neglect.'" *Brooklyn Cntr for Independence of the Disabled v. Bloomberg*, 980F. Supp.2d 588, 640 (S.D.N.Y. 2013) (quoting, H.R.Rep. No. 101–485(II), at 29 (1990)).

882.    "[P]rison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody and to provide the accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation and without relying solely on the assumptions of prison officials regarding that individual's needs." *Pierce v. District of Columbia*, 128 F.Supp.3d 250, 272 (D.D.C. 2015).

883.    The ADA does not permit an institution to ignore the open and obvious needs of a person with a disability simply because they have not requested a reasonable accommodation. *Pierce*, 128 F.Supp.3d at 272.

884.    DWCC undertakes no such assessments of the needs of people with mental illness to be able to participate in the programs and services available in the DPS&C.

885.    People at DWCC in extreme, obvious, and well-documented need for mental health services and therapeutic settings are unable to access those services, even as they are available to others in DPS&C custody.

> *i.Defendants violate the ADA and RA's affirmative duty to evaluate and accommodate people with disabilities*

886.    Defendants make no individualized determination as to whether the individual is safe in those conditions. Despite the strong evidence and consensus that those conditions are not merely intrinsically dangerous[865] but especially so for people with disabilities.[866]

887.    Defendants make no alterations to their usual conditions of confinement that prohibit individual participation in group therapy and all other out of cell programming, that deprive prisoners of their access to yard and recreation, and that maintain quiet through the use of chemical spray.

888.    Under the ADA, "[p]ublic entities shall ensure that inmates or detainees with disabilities are housed in the most integrated setting appropriate to the needs of the individuals." 28 C.F.R. § 35.152(b)(2).

889.    Treating people the same regardless of disability is a violation of the ADA. *Badalamenti v. Louisiana Dep't of Wildlife & Fisheries*, 439 F. Supp. 3d 801, 808 (E.D. La. 2020) *citing McGary v. City of Portland,* 386 F.3d 1259, 1267 (9th Cir. 2004).

890.    "[A] person with a disability may be the victim of discrimination precisely because she did not receive disparate treatment when she needed accommodation." *Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998).

---

[865] Exh P-K-3, Final Declaration of Dr. Haney, pp. 10 - 32, Section IV. The Adverse Psychological Effects of Social Isolation and Solitary Confinement
[866] Exh, P-K-3, Final Declaration Dr. Haney, pp. 32 - 38, Section V. The Exacerbating Effects of Isolation on Mental Illness

891.    The determination of whether a specific prison facility is an appropriate setting for an individual should be based on the treatment needs of that individual; this includes, but is not limited to proper medication and medical treatment. Department of Justice Commentary to 28 C.F.R. § 35.152.

892.    The Supreme Court recognizes a broad interpretation of the ADA's coverage, "Modern prisons provide inmates with many recreational "activities," medical "services," and educational and vocational "programs," all of which at least theoretically "benefit" the prisoners (and any of which disabled prisoners could be "excluded from participation in")." *Yeskey*, 524 U.S. at 210.

893.    David Wade deploys the setting of extended lockdown without any regard to whether it is "the most integrated setting appropriate to needs of the individual" as evidence by everyone's automatic placement in extended lockdown / segregation on arrival[867] and the below standard screenings on intake.[868]

### ii. The defendants fail to individually identify people with disabilities

894.    The ADA makes it unlawful for a public entity to "directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3).

895.    "[E]mploying no system or an inadequate system for identifying and tracking prisoners with disabilities" is a viable class-wide claim for an unlawful method of administration. *Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020).

---

[867] *Supra* note 9.
[868] *Supra* see section *viii. Specific Practices Contributing to a Substantial Risk of Serious Harm*

*iii.Defendants' definition of serious mental illness is under inclusive*

896.    The ADA requires an individualized inquiry into the person's functional limitations. *Pierce*, 128 F.Supp.3d at 272.

897.    The DPSC tracks people with mental illness based only on its internal level of care system and an internal definition of "serious mental illness" or "SMI," which is based only on diagnosis rather than functional impairment.[869]

898.    The six enumerated conditions defined as SMI at DWCC are: major depressive disorder, schizophrenia, schizoaffective disorder, bipolar disorder, unspecified schizophrenia spectrum, and severe anxiety disorder.[870]

899.    By limiting the definition of SMI to only a list of six specific diagnoses and failing to independently track disability, Defendants under-identify people with disabilities by excluding people with mental illness whose symptoms cause a functional impairment but whose diagnosis is not included on the limited list of six SMI diagnoses.[871]

900.    Dr. Burns testified that diagnoses other than the six enumerated diagnoses can reach the level of a disability based on functional impairment.[872] The ACA recognizes and requires institutions to track both disabilities from the enumerated diagnoses and those arising from a functional impairment.

901.    Dr. Thompson concurred, testifying that people could have a disability from a mental health diagnosis other than the six enumerated by the DPS&C's definition of SMI.[873] The

---

[869] Exh. P-JJJ-25 - HC-38 - Department Mental Health Program (defines SMI as 6 diagnoses); Hayden Tr., 335:19 - 336:2 (6 SMI diagnosis); *Id*, 337:18-23 (tries to qualify what SMI means, concedes that the policy does not contemplate functional limitations).
[870] Exh. P-JJJ-25 - HC-38 - Department Mental Health Program at p.2.
[871] Burns Tr., 1271:22-1273:13
[872] Burns Tr., 1272:11-1273:5.
[873] Thompson Tr., 4113:2-12.

functional impairment arising from the person's mental health condition is the determining factor in whether the person has a disability.[874]

902.    People with mental health disabilities will need access to a psychiatrist and counselors when they arrive at a new facility.[875]

903.    Dr. Seal, the person best equipped to gauge the impact of a mental health condition on a person's level of function, is not involved with assigning people the "serious mental illness" designation used by the DPS&C to track people with mental health disabilities.[876]

904.    Dr. Seal undertakes no inquiry into whether his patients can be safely housed in extended lockdown upon arrival.[877]

905.    Even people with severe disorders such as psychosis and schizophrenia, who arrive at DWCC already flagged as seriously mentally ill by the DPS&C, receive the exact same plan of "follow-up per policy" as any other new arrival.[878]

906.    By adopting an unlawfully narrow definition of disability, Defendants have failed to administer DWCC in compliance with the federal law.

> iv. *Defendants exclude people with chronic mental illness from the definition of serious mental illness*

907.    People with a record of serious mental illness in remission remain people with disabilities within the definition of the ADA. 42 U.S.C. § 12102(1)(B).

908.    "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures" 42 U.S.C.A. § 12102(4)(E)(i).

---

[874] Thompson Tr., 4113:13-25.
[875] Burns Tr., 1291:25-1292:8.
[876] Seal Tr., 1229:13-18
[877] Seal Tr., 1223:18-22
[878] Burns Tr., 1291:23-1292:8; 1295:3-21.

909.    Mitigating measures include "medication" and "learned behavioral or adaptive neurological modifications." 42 U.S.C.A. § 12102(4)(E)(i); *Kemp*, 610 F.3d at 236.

910.    Pursuant to Defendants' policy, people whose symptoms are stable and managed with medication are categorized under the level of care system as 5H and lose the SMI designation.[879]

911.    When a person has a mental illness that rises to the level of disability, even managed by medication or a level of behavioral adaptation, that mental illness remains a disability.[880]

912.    The risk to people with a record of mental health disabilities remain at risk, even if the condition is temporarily controlled by medication.

> *v.Defendants provide no affirmative modifications even for people identified as having serious mental illness*

913.    "[I]t is axiomatic that the ADA and RA do not require a plaintiff to specifically request a certain accommodation in order to prevail on a claim of disability discrimination." *Levy*, 371 F. Supp. 3d at 285.

914.    Both Dr. Burns and Defendants' own expert estimates that 40% of the population on extended lockdown meets the Defendants' under-inclusive definition of SMI limited only to enumerated diagnoses.[881] Though many prisoners require special care and accommodation, no modifications are made for people with serious mental illness on extended lockdown.[882]

915.    Prisoners who Defendants document as having SMI are subject to the same harmful conditions of confinement as every other prisoner on extended lockdown at DWCC, even though they might be particularly vulnerable to harm.[883]

---

[879] Exh. P-AA-201, 2018-11-2 - Mental Health Service Codes and Level of Care Review - Charles, Bruce (Plaintiff Bruce Charles was categorized as "Bipolar in Remission" and lost his designation as SMI even though he remained at a level of care 3); *See also* Exh. P-JJJ-25 - HC-38 - Department Mental Health Program.
[880] Burns Tr., 1271:22-1272:10; Thompson Tr., 4158:2-17 (SMI symptoms are chronic, waxing and waning)
[881] Burns Tr., 1427:23-1428:1; Thompson Tr., 4070:13-17
[882] Nail Tr., 1837:3-19; 1837:21-23; 1837:24-1838:2
[883] Exh. P-K-03, Report of Dr. Haney, pp. 32-38, Section V. The Exacerbating Effects of Isolation on Mental Illness.

916.     Psychotherapy, programming, and a higher level of care necessary for individuals with a mental health disability who are maximum security are unavailable at DWCC.[884]

917.     The DPSC and practices at DWCC render inmates with mental health disabilities on extended lockdown unable to access needed mental health care for which they are qualified recipients.

*vi. Defendants violate the ADA by setting an overly restrictive criteria for reasonable accommodation*

918. Dr. Seal recommends people for transfer out of DWCC, albeit rarely, but only if they meet a three-part test: the individual must "have a mental illness, usually a psychotic mental illness, and they are showing dangerous behavior to themselves or others, which might be alleviated by treatment by they are refusing said treatment."[885]

918.     On the rare occasion Dr. Seal recommends someone for transfer to another facility, that recommendation is made verbally to mental health staff at DWCC and is not documented in writing.[886]

919.     These recommendations made by Dr. Seal are only based on the 3-5 minutes he may spend speaking with an individual once every 6 months and whatever reports come from mental health staff.[887]

920.     Although, it was confirmed by Warden Dauzat that while they would like to have Dr. Seal's input when seeking transfer for an individual, his recommendation is not required and he does not need to approve a transfer.[888]

---

[884] Exh. P-F-07, Report of Dr. Burns at p. 3.
[885] Seal Tr., 1189:25-1191:7; *Id*, 1192:17-1193:8.
[886] Seal Tr., 1194:7-14.
[887] Seal Tr., 1193:9-16.
[888] Dauzat Tr., 3310:24 - 3315:17 (Dauzat: reviewing portions of the policy; purpose is to make sure that continuous care; intra-institutional intake; don't necessarily need Seal's approval to transfer for mental health).

921.     EHCC is capable of providing mental health care to patients classified as maximum security.[889]

922.     The patient's inability to access care is due to their symptom cluster not meeting the requirements for reassignment from DWCC imposed by Dr. Seal, as opposed to an evaluation of any specific mental health needs, or individualized evaluation of security concerns.

923.     Defendants also fail to limit the duration of confinement on extended lockdown for individuals who have been documented as having SMI, or people with functional impairment.[890]

924.     Defendants do not modify any existing mental health programming or counseling services to allow people with mental health disabilities on extended lockdown to participate despite these modifications being available in a correctional setting.

925.     DWCC regularly documents the mental health conditions of people, classifies them as seriously mentally ill, and then fails to take any steps whatsoever to accommodate those individuals' need for services or accommodation.

### vii.     Defendants violate the ADA by ignoring open and obvious disabilities

926.     The ADA does not permit an institution to ignore the open and obvious needs of a person with a disability simply because they have not requested a reasonable accommodation. *Pierce*, 128 F.Supp.3d at 272.

927.     Just as the ADA requires prisons to affirmatively provide modifications to people who have visual, hearing, or mobility disabilities, it also requires that the prison affirmatively intervene to provide reasonable modifications to its program for people with known functional limitations arising from known mental health disabilities such as autism, dementia, and hallucinations.

---

[889] Dauzat Tr., 3338:22-25 (people in crisis at DWCC are transferred to EHCC for care).
[890]

*viii.    DWCC Fails to Provide a Process for Requesting Reasonable Accommodations*

928.    "[E]mploying no system or an inadequate system for prisoners to request accommodations and submit grievances regarding non-accommodation" is an unlawful method of administration under the ADA. *Dunn*, 318 F.R.D. at 665.

929.    Public entities are required to maintain a process for requesting reasonable accommodations. 28 C.F.R. § 35.163; *see also* 28 C.F.R. § 35.106.

930.    DWCC has failed to satisfy its affirmative obligation under the ADA to implement a process for allowing individuals to affirmatively request reasonable accommodations.

931.    Due to the failure of DWCC's record-keeping and ADA compliance, DWCC has not knowingly received a documented request for a reasonable accommodation based on a mental health disability.

932.    The lack of a documented request for a mental health accommodation over a five-year period evidence that prisoners at DWCC are not able to use the reasonable accommodation process, that such requests are not tracked, or that no such process exists.

933.    As ADA coordinator, Huff was responsible for handling requests for reasonable accommodations.[891] These requests would come to Huff as ARPs.[892]

934.    When Assistant Warden Huff testified that any time a person requests a reasonable accommodation, she is required to interview that person.[893] ADA interviews have a specific form and are to be documented in the ARP file itself.[894]

---

[891] Huff Tr, 1976:18-21
[892] Huff Tr., 1976:25-1977:2
[893] Huff Tr., 1986:9-12
[894] Huff Tr., 1986:25-1987:2

935.    DWCC's ADA coordinator, Assistant Warden Angie Huff, could not remember granting a single request for reasonable accommodations based on a mental health disability in her 32 years of employment at David Wade, 15 of which have been in her current position as Deputy Warden.[895]

936.    Huff could not recall a single request for accommodations based on mental illness in the past five years.[896]

937.    Col. Nail did not know the process for a person to request a reasonable accommodation.[897]

938.    Nail also never received a request for reasonable accommodation related to a permanent disability.[898]

939.    Nail is unaware of anybody requesting an accommodation based on mental illness.[899]

940.    Additionally, at David Wade, a request for accommodation must be accompanied by magic language; directly contrary to federal law.[900]

941.    Corey Adams filed a request for reasonable accommodations under the ADA, explicitly marked as such.[901] Nothing in the response to Corey Adams' request for accommodation indicates it was handled as a request for reasonable accommodations.[902]

942.    While the ADA coordinator at DWCC identified necessary records that are supposed to be kept when a person requests a reasonable accommodation, those records are non-existent at the facility.

943.    Cody Doucet testified that he filed an ARP with respect to the lack of mental health treatment and "Nikki McCoy rejected [it] for no reason."[903]

---

[895] Huff Tr., 1990:11-14
[896] Huff Tr., 1990:15-18; 2115:24-2117:8
[897] Nail Tr., 1837:24-1838:2
[898] Nail Tr., 1837:3-19
[899] Nail Tr., 1837:21-23
[900] Huff Tr., 1989:22-10
[901] Huff Tr., 2067:21-25
[902] Huff Tr., 2070:15-21
[903] Exh. P-BBBB-1 - Deposition of Doucet, 44:10-25.

944.    Bruce Charles filed an ARP requesting accommodations for his ADHD bipolar disorder in the form of being allowed to participate in mental health programs and classes or transfer to a facility capable of meeting his needs for treatment.[904]

945.    Corey Adams requested the following: "ADA request(s) for accommodations: 1) adequate medical care for chronic arthritis and severe pain in my neck, back, and hip, 2) adequate mental health care therapy and one on one counseling for my serious mental illnesses and chronic claustrophobia with extreme panic attacks (frequent)."[905]

946.    Noel Dean also filed an emergency request for reasonable accommodations for his mental illness while on suicide watch.[906]

947.    Colonel Lonnie Nail, the longtime unit manager for the extended lockdown unit at DWCC, did not know if there was a process for requesting a reasonable accommodation.[907]

ix.    *DWCC Uses Brutal Methods of Discipline Against People with Mental Illness for Behaviors Related to Their Disability*

948.     The obligation to provide accommodations applies to the discipline of disabled inmates, as well: "A failure to provide a reasonable accommodation can occur where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person. A failure to provide a reasonable accommodation, or discrimination by reason of disability, constitutes a violation of the ADA[.]'" *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *55 (M.D. La. Mar. 31, 2021).

949.    "When applied in the prison context, it follows that the second element of a § 12132 claim can be satisfied where a correctional officer could have used less force or no force during the

---

[904] Huff Tr., 2063:5-14
[905] Huff Tr., 2067:21-25
[906] Huff Tr., 2008:8-11
[907] Nail Tr., 1837:21-23.

performance of his or her penological duties with respect to a disabled person." *Id.* citing *Armstrong v. Newsom*, No. 94-cv-02307 CW, 2021 WL 933106, at *3 (N.D. Cal. Mar. 11, 2021).

950.     David Wade has a use of force policy that all security staff are to be trained on and familiar with that outlines the circumstances when force may be used and the process and procedure for using force.[908]

951.     Security staff uses chemical agents on prisoners at David Wade and they purportedly receive training on the use of chemical agents.[909]

952.     David Wade also has capture shields that deliver a muscular disruption "shock" to the individual, which is commonly used when an individual needs to be removed from the cell and is refusing to leave.[910]

953.     Security staff claims to always give prisoners at least 4 orders before chemical agent is used, although testimony by prisoners and body camera footage do not corroborate that claim.[911]

954.     The chemical agents for the South Compound are kept in the armory and in a footlocker in the courtroom in N4.[912]

955.     There is an armory log kept for the cans of chemical agent, or mace, and the weight of each can is documented at the beginning and end of each shift as well as after each use of the can.[913]

---

[908] Exh. J1 - 2019-6-12 - EPM 02-01-005 - Use of Force; Baird Tr., 1079:3-6 (responsible for understanding this policy); Id, 1079:13-17 (responsible for supervisees to follow policy).

[909] Baird Tr., 1079:21 - 1080:2 (security team uses chemical agents on prisoners); Id, 1080:6-14 (received training on use of force and chemical agents).

[910] Baird Tr., 1081:1-2 (DWCC uses capture shields); Id, 1081:12-23 (electronic one is at DWCC, delivers a muscular disruption).

[911] Baird Tr., 1082:23 - 1083:20 (planned use of force is non-emergency; walks through process); Id, 1084:2-11 (given several opportunities to follow orders; promises more than 4 orders given); Id, 1084:23-25 (minimum of 4 orders, more than that is officer discretion); Id, 1085:7-9 (body cameras on).

[912] Baird Tr., 1082:3-21 (chemical agent kept in armory; kept in foot locker in N4; log completed by staff for weight of cans at beginning of shift, end of shift and after each use).

[913] Baird Tr., 1082:3-21 (chemical agent kept in armory; kept in foot locker in N4; log completed by staff for weight of cans at beginning of shift, end of shift and after each use).

956.    Not all security staff are trained and authorized to use chemical agents, the only security staff who are trained to use the chemical agents are lieutenants, majors, captains, lieutenant colonels and colonels.[914]

957.    Warden Baird testified that people are not sprayed with chemical agent for self harm unless they have a weapon, such as a razor, and only the minimal amount of force is used.[915]

958.    Warden Baird specifically testified that an individual with a sheet tied around his neck is not a weapon and therefore spray is not used.[916]

959.    However, Da'Marcus Thomas testified that he was sprayed with mace when he was attempting to hang himself with a sheet, and he sought help from Steve Hayden because his throat hurt but he did not receive any care.[917]

960.    However, staff routinely use chemical agents on individuals as they display clear signs of mental illness, such as eating their own feces.[918]

961.    Despite this high prevalence of acute mental health conditions, the security staff at DWCC have repeatedly stated that the use of chemical agents is justified against people simply for making too much noise.[919]

---

[914] Baird Tr., 1086:5-8 (only lieutenants, captains, majors, Lt Cols, and Cols trained for chemical agents).
[915] Baird Tr., 1085:10-15 (force if harm w/weapon); *Id*, 1089:17 - 1090:6 (if someone has razor, that's a weapon; min force needed used)..
[916] Baird Tr., 1085:16-20; 23-25 (sheet around neck is not a weapon, no spray for that).
[917] Exh. P-YYY-1 - Deposition of Thomas, 26:3-16 (tried to tell Hayden his throat was swollen and hurt after he hung himself and was sprayed with mace); *Id*, 32:18 - 33:9 (tied sheet to bars and hung himself, Capt Malcolm sprayed him in the face and mouth with mace).
[918] Solomon Tr., 625:25 - 628:19 (recounts instance he saw Cody Doucet get sprayed. Cody eating his own feces and throwing his feces and urinating; sprayed him, before they provided medical, they made him mop the urine off the floor. They didn't take him to shower until after, he whole face was swollen); Brumfield Tr., 176:13 - 177:2 (saw RaRa get sprayed 2-3 times a week; people get sprayed constantly, staff hold the trigger longer than is needed, it's like they enjoy it).
[919] Nail Tr., 1784:8-16; Dillon Tr., 277:1-24 (he has smelled mace 30 times in a 7 day period. Staff come down the tier and mess with people then spray them for saying something. "he might be yelling and there's something going on in his head and you are just going to sneak up on the bars and (makes a noise)").

962.    Col. Nail stated that making too much noise would justify an immediate use of mace to quiet the tier without first contacting mental health.[920]

963.    The armory logs reflect that more than one pound and one ounce of spray were used on Mr. Travis McKee over the course fo a week while we was on suicide watch.[921]

964.    At the time of these uses of force, Mr. McKee was on extreme suicide watch, attempting to hang himself and beating his head against the walls.[922]

965.    Nobody was reprimanded or disciplined for the excessive use of force against Mr. McKee.[923]

966.    Nail specifically approved these uses of force as proportional and consistent with policy.[924]

967.    Joshua Musser was sprayed for refusing to comply with orders to stop banging his head against the walls and door of his cell.[925]

968.    Mr. Musser was in full restraints on extreme suicide watch at the time.[926]

969.    Mental health was not contacted prior to this use of force.[927]

970.    Mr. Clark cut himself and wrote on his walls in blood, was placed on extreme suicide watch in full restraints, continued to self-harm, and was taken to the lobby where security staff sprayed him.[928] Mr. Clark was written up for the incident.[929] Mr. Clark was sprayed before mental health staff were called.[930]

---

[920] Nail Tr., 1785:2-14
[921] Nail Tr., 1857:11-1866:3
[922] Nail Tr., 1869:1-1870:6; 1873:4-10; 1872:7-16
[923] Nail Tr., 1866:7-10
[924] Nail Tr., 1866:17-1867:13
[925] Nail Tr., 1923:10-24
[926] Nail Tr., 1924:4-6
[927] Nail Tr., 1923:25-:1924:3
[928] Nail Tr., 1915:24-1916:23
[929] Nail Tr., 1916:24-1917:1
[930] Nail Tr., 1917:7-9

971.    Mr. Ball was sprayed by security staff shortly after attempting to hang himself because he was making too much noise.[931] Mr. Ball was written up for this incident.[932]

972.    When people engage in behaviors linked to mental illness such as flooding their own cell or throwing their own feces, the staff are able to take away that person's clothing, mattress, and property for a month without a hearing or appeal.[933]

973.    Based upon his review of body camera footage, Sec. Dan Pacholke concluded "there are no attempts to de-escalate, just supervisors ordering prisoners to comply, additional supervisors giving an order to comply, and then the deployment of force."[934]

974.    Defendants use force against individuals requesting mental health help.[935]

975.    The use of extreme force against people with mental illness during crisis is commonplace at DWCC: "[They] put me in a cell with a camera, in a gown. I was upset. They sprayed me, left, went to get another can of spray, and emptied it on me. I said, 'I'm on suicide watch.' The officer who was spraying me said, 'oh, you wanted to die?' and then he sprayed the other whole cannister on me [while] I'm in a suicide gown."[936]

976.    The use of force and chemical agents on the South Compound is a frequent occurrence and impacts not only the individual targeted with spray, but actually impacts the entire tier.[937]

977.    The men who are sprayed directly describe horrifying experiences, such as Mr. Turner describing it as "it is like your body is on fire…it is excruciating pain…your skin is constantly burning."[938]

---

[931] Nail Tr., 1919:15-1920:11
[932] Nail Tr., 1920:15-16
[933] Exh. P-FFF-1, Report of Sec. Pacholke at pp. 31-35.
[934] Exh. P-FFF-1, Report of Sec. Pacholke at p. 43.
[935] Exh. P-FFF-1, Report of Sec. Pacholke at p. 44.
[936] Exh P-K-03, Report of Haney at pp. 55-56.
[937] Moran Tr., 198:10-22 (people get sprayed daily, When someone gets sprayed, it affects the whole building).
[938] Turner Tr., 82:6 - 83:7 (observed other people getting sprayed, been sprayed himself, "It is like your body is on fire...it is excruciating pain...your skin is constantly burning").

978.    Mr. Solomon, who was sprayed after ramming his head into the bars while on suicide watch, compared it to jumping into a volcano and described the use of mace by staff made him feel more suicidal.[939]

979.    Mental health staff at David Wade have never been consulted by classification about the decisions whether to keep a person on extended lockdown based on mental illness, resulting in an unconstitutional hands-off approach to discipline.[940]

980.    Col. Nail, unit manager for the South Compound during most of this litigation, and who now is head of investigations, testified that he did not know whether or not there were any people with serious mental illness on extended lockdown at DWCC.[941]

981.    Col. Nail does not have access to a list of people with mental illness, only a list for heat pathology.[942]

982.    Col Nail testified that he does not know who is on the mental health caseload[943] but also testified that he is on and off the tiers constantly talking to people (an assertion belied by the key log admitted into evidence.) As unit manager, Nail also sat on the disciplinary board and classification board for years,[944] making his testimony that he is unaware of whether any person on the South Compound has a mental illness extremely dangerous, and means that de facto a person's mental illness is not taken into account in classification decisions or in meting out punishment for rule violations.

---

[939] Solomon Tr., 620:9 - 621:19 (sprayed while on SSW after ramming head into bars; it's very bad, it burns everywhere, like jumping into volcano. You're on suicide watch, thinking about killing self, in paper gown and instead of security trying to talk and help, they tell you run head into bars and spray you. Mace makes you hate the person, turns you into a monster. "it really puts hate in your heart").
[940] Dauzat Tr., 750:20 - 751:3 (no role in housing or classification); *Id*, 757:21-24 (MH has no role in classification decisions); *Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988, at *55 (M.D. La. Mar. 31, 2021). ("A failure to provide a reasonable accommodation, or discrimination by reason of disability, constitutes a violation of the ADA[.]").
[941] Nail Tr., 1823:7-13
[942] Nail Tr. 1820:8-14
[943] Nail Tr., 1822:8-17
[944] Nail Tr., 1847:19-22

983.   Col. Coleman could not define the term serious mental illness as it is used at DWCC.[945] At trial, Col. Coleman mistakenly stated that the heat pathology list was actually a list of every person with mental illness.[946] He cannot therefore administer the use of force policy in a way that protects people with mental illness from unnecessary uses of force.

984.   Staff receive between ten to thirty minutes of de-escalation training every February.[947] The academy training on deescalation is only delivered once and lasts 30 minutes.[948]

985.   Col. Nail testified that he never once involved mental health staff in the disciplinary board's decision to impose a sanction based on a write-up.[949]

986.   Sanctions such as the loss of yard and phone restriction can be counter-productive:

> Prisoners are punished, sometimes by retaliatory staff, for relatively minor infractions, and at no time is the root cause of negative behaviors addressed. Under current practice, sanctioning includes long terms of privilege removal, taking away things like telephone, recreation, and visits that help prisoners cope. Prisoners in extended lockdown have few privileges to begin with, so by taking away what they do have for extended periods of time, prisoners are left with nothing to occupy their time and their minds, which in my experience leads to more unwanted behavior.[950]

x.    *Defendants Discriminate Against People with Known Disabilities by Disregarding Appropriate Housing Assignments*

987.   People who Defendants subjectively know to have mental health-related disabilities are placed in restrictive housing upon arrival at DWCC for prolonged periods of time, even where counter-indicated by the person's mental health intake assessment in violation of the ADA. *See*, *Pierce*, 128 F.Supp.3d at 272.

---

[945] Coleman Tr., 1649:15-1650:13
[946] Coleman Tr., 1649:15-1650:13
[947] Nail Tr., 3131:4-3132:15.
[948] Nail Tr., 3175:4-7.
[949] .
[950] Exh. P-FFF-1, Report of Sec. Pacholke at p. 25

988.    In December 2019, David Wade began to implement the new classification policy, B-02-019, which changed the terms used for segregated housing away from "extended lockdown" but did not otherwise alter the practices in place.[951]

989.    According to Seth Smith, the facilities were expected to be fully implementing the Policy– no parts of it were "excepted."[952] The purpose of a pilot is to fully implement something, to see what works and what modifications are needed.[953]

990.    Under the new B-02-019, when individuals are brought to lockdown they go through investigative segregation, followed by disciplinary segregation, followed by preventative segregation and then transitional segregation.[954]

991.    With the new classification policy, a new disciplinary matrix was adopted. Disciplinary sanctions were determined based on the new matrix as of December 2019.[955]

992.    The new disciplinary matrix purports to remove disciplinary board discretion in imposing disciplinary sanctions: they are required to follow what the matrix says.[956]

993.    The staff at David Wade received training on the new matrix and the new classification policy with Sec. LeBlanc and Seth Smith.[957]

994.    Secretary LeBlanc and Chief of Operations Seth Smith testified with certainty that the disciplinary matrix went out to the DPS&C facilities with the new classification policy, B-02-

---

[951] Exh. P-JJJ-42 - B-02-019 Classification, Sentencing, and Service Policy; Baird Tr., 1057:17-24 (version of the policy piloted at DWCC, later DOC adopted broader); Id, 1059:10-11 (changed terms of housing, no longer use extended lockdown).
[952] Smith Tr. 2505:11-15; 2505:6-10..
[953] Smith Tr. 2503:4-10.
[954] Baird Tr., 1065:19 - 1066:11 (impeached w/depo that order is investigative, then disciplinary, then preventative, then transitional).
[955] Baird Tr., 1061:15 - 1062:8 (disciplinary board determines sanctions based on new matrix); Exh. D2 - Disciplinary Matrix; Baird Tr., 1063:21-25 (yes, this is matrix).
[956] Baird Tr., 1064:6-9 (disciplinary board no discretion).
[957] Baird Tr., 1070:3-8 (trained on new matrix with Smith and Leblanc).

019.[958] However, Col. Mays, unit manager over the South Compound, testified that he did not receive the disciplinary matrix with the new classification policy.  In fact, Col. Mays testified that the disciplinary matrix was not in effect *until 2021*.[959] Mays himself also contradicted that testimony, stating that this disciplinary matrix was put into effect in January of 2020.[960] This level of confusion at two of the highest levels of prison administration can leave no doubt that regardless of what written policy says, what is actually being administered at DWCC may be something entirely different.

995.    Pursuant to B-02-019, investigative segregation is typically a short period of time, it may be up to 72 hours while someone waits to go before the disciplinary board or it may be an individual who is on suicide watch.[961]

996.    When an individual's classification status changes from disciplinary to preventative, there is no change in housing assignment and the same cells house both classification designations.[962]

997.    There is no maximum period of time that an individual may be held in preventative segregation, which means it could be indefinite.[963]

998.    There also are no limitations or processes for how long an individual can be held on Offender Posted Policy 34/ strip cell status, and therefore those individuals can be held in segregated housing for an indefinite period of time.[964]

999.    Individuals housed as transitional segregation are either awaiting transfer or waiting on a bed becoming available in a medium custody unit.[965]

---

[958] Smith Tr. 2503:11-16; LeBlanc Tr.  2592:19-2593:2; 2594:20-22.
[959] Mays Tr., 2141:9-2142:2
[960] Mays Tr., 1245:11-12.
[961] Baird Tr., 1059:13-19 (investigative segregation, no longer than 72 hours).
[962] Baird Tr., 1066:18-21 (disciplinary to preventative is same cells).
[963] Baird Tr., 1069:10-13 (no maximum for preventative segregation).
[965] J-17 – OPP #34.
[965] Baird Tr., 1069:14-25 (transitional segregation waiting for bed or transfer, med custody).

1000.  People held on extended lockdown have documented mental illness that rises to the Department's own definition of SMI.[966]

1001.  People with disabilities are denied this benefit due to Defendants' failure to provide the reasonable accommodation of housing the person in either the recommended general population or treatment setting.

1002.  These people with disabilities are denied the benefit of the housing assignment recommended by staff in general population where counseling and group therapy are available.

1003.  Extended lockdown is uniquely harmful for people with pre-existing mental illness.[967]

1004.  This practice is commonplace at DWCC.

## X.  DEFENDANTS' CONDUCT VIOLATES THE FIRST AMENDMENT TO THE CONSTITUTION.

1005.  Prisoners in the United States have a long-recognized and well-established right to unobstructed and confidential communication with courts and attorneys. *Ex parte Hull*, 312 U.S. 546, 549 (1941).

1006.  Unfettered communication between lawyers and their clients is indispensable to the fair operation of our system of justice. *Upjohn Company v. United States*, 449 U.S. 383, 389 (1981).

### A.  *Protecting the sanctity of legal mail is of particular significance in this case.*

---

[966] Turner Tr., 83:11-20 (diagnosed with mental illness, anxiety, depression, bipolar, schizoaffective); Solomon Tr., 593:5-13 (diagnosed with ADHD and PTSD; counseling and meds before prison; Depakote, Concerta, Ritalin, and others); Adams Tr., 955:5-11 (has TBI because attacked); Id, 956:7-13 (hard to remember, focus, concentrate, interrupts speech and communication); Id, 958:1-13 (in and out of MH hospitals; was diagnosed with mental illness before jail, unsure what); Id, 958:22 - 959:18 (treated for antisocial personality disorder, PTST, psychosis, bipolar, schizophrenia, paranoia, MDD); McDowell Tr., 1030:12-17 (diagnosed with depression at EHCC and given meds).
[967] Exh. P-K-03, Report of Dr. Haney at p. 33. (Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the benign and socially supportive atmosphere that mental health clinicians seek to create within therapeutic environments. Not surprisingly, mentally ill prisoners generally deteriorate and decompensate when they are placed in isolation units.)

1007.   Undersigned counsel were retained to challenge the conditions of confinement at David Wade Correctional Center (DWCC), a maximum-security prison situated in a national forest in rural Louisiana.[968]

1008.   There are unique challenges to litigation such as this. Unlike any other type of litigation, all plaintiff class members, and every facet of their daily lives, are within the full physical control of the Defendants. Defendants control if and when plaintiffs are kept in solitary confinement, how often they are allowed out of cell, how often they are allowed phone calls,[969] property,[970] recreation,[971] etc. Likewise, all physical evidence in this proceeding is within the exclusive control of the Defendants; Defendants have exclusive physical access to every piece of documentary evidence that exists in the case.

1009.   Due to the prison's remote location, prisoners wishing to communicate with attorneys largely rely on written correspondence, i.e. "legal mail."

1010.   Although the unauthorized intrusion into any prisoner's mail is a serious constitutional problem, the unique facts of this case raise a particularly odious specter of interference with the conduct of the litigation. Prison administrators, Defendants in this very case, surveilled plaintiff correspondence with counsel engaged to sue over for conditions at the prison.[972]

1011.   Prison litigation is unique in that the plaintiffs are in a singularly vulnerable position vis a vis the defendants. The degree of influence Defendant prison administrators have over even the

---

[968] Rec. Doc. 1.
[969] Brumfield Tr., 159:22-25; Dillon Tr., 259:18-21; Solomon Tr., 597:2-13; Adams Tr., 962:24 - 963:5.
[970] Exh. P-JJJ-13 - 2013-11-8 - Offender Posted Policy #34.
[971] Turner Tr., 110:12-23; Brumfield Tr., 160:3-12; Solomon Tr., 597:4-8.
[972] Moran Tr., 216:4-12 (Quinten Moran testified that he lost confidence in the confidentiality of the legal mail process at David Wade after being alerted by an officer in the mailroom that his legal mail was being censored because of his involvement in the lawsuit), *Id*, 214:8-15 (He writes "sealed, not taped" on the back of his legal mail because of the known history of David Wade censoring legal mail if someone gets an outside entity involved in the business of the facility); Exh. P-A-23, Christopher Walker ARP, at p.3 (Christopher Walker filed a complaint that since the Plaintiffs filed their lawsuit against David Wade, the censorship of legal mail only became worse).

most quotidian aspects of Plaintiffs' lives cannot be overstated. What they eat, where they eat, when they bathe, when and for how long they are allowed outside, even the temperature of a prisoner's cell—all of these are, to varying degrees, subject to the whim of DWCC staff.[973]

1012.   If prisoners know their correspondence with counsel about prison conditions is being monitored or read, it deters many prisoners from writing to counsel at all, for fear that they will incur the ire of prison staff, resulting in fewer privileges or more punishment. *Mitchell v. Peoples*, 10 F.4th 1226, 1241 (11th Cir. 2021). It forces writers to self-censor or limit disclosures, also for fear of retaliation.

1013.   It also allows the named Defendants in the proceeding to know which class members are communicating with counsel, when, and about what, obviating the privilege.

1014.   Because of the nature of incarceration, Defendants have the ability to exert all manner of influence—directly and indirectly—over the members of the class. Individual class members were retaliated against because of communication with counsel in this matter.[974]

1015.   Plaintiffs expected their correspondence with counsel to remain confidential.[975] Phone calls between prisoners and attorneys were not confidential—they were recorded.[976] So, having no other

---

[973] Nail Tr., 1838:25 - 1844:21 (DWCC staff monitoring and responding to temperature conditions on the tier); *Id*, 1818:12 - 1819:2 (DWCC "Policy 23" regarding "food loaf"); *Id*, 1717:2-7 (Prisoners eat and drink in their cells); *Id*, 1717:8-11 (Prisoners are allowed to have one hour of recreation time Monday-Friday); *Id*, 1718:15 - 1719:15 (Defines prisoner shower policy at DWCC); Exh. J-17, 2017-7-24-OPP 035-Maximum Custody Housing_Privileges and Restrictions (Chart includes various rules that govern why, when and for how long prisoners are allowed out of their cells).

[974] Exh. J-17, 2017-7-24 - OPP 035 - Maximum Custody Housing_Privileges and Restrictions; Turner Tr., 80:11 - 81:22 (Carlton Turner testified that Colonel Nail denied him for the board (re-classification) in retaliation for his participation in the lawsuit); Brumfield Tr., 169:3-23 (Prison staff harassed him with questions regarding the lawsuit - questions they were not privy to know); Dillon Tr., 274:16-275:2 ("I was threatened. I was made fun of. I was intimidated. I was retaliated against because I was reaching out trying to seek help for the things that were being done to me."); *Id*, 275:3-16 (Prison staff threatened to take more than just Mr. Dillon's property if he continued working with the Advocacy Center).

[975] Turner Tr., 77:16-18; Brumfield Tr., 164:12-14; Moran Tr., 216:13-25 (Quinten Moran testified that he even asked an officer to personally take the mail outside the gate and mail it from the post office, to maintain the letter's confidential contents).

[976] Nail Tr., 1723:1-3 (Phone calls between prisoners and attorneys take place on a recorded line).

way to communicate in confidence with counsel, they continued to write despite the broken legal mail system, desperate as they were to seek relief in the courts.[977]

1016.   The routine and widespread interference with legal mail at DWCC made conducting this litigation extraordinarily onerous, resulting in multiple class members being intimidated into withdrawing from the case, and exponentially compounding the burden on class members, counsel, and the Court.[978]

1017.   For the reasons previously stated, the identities of the parties and subject matter of this case militate toward a most rigorous scrutiny of interference with legal mail.

### B.   The First Amendment legal framework.

1018.   Prisoners have a right of privacy in their legal communications. This right applies to prison visits, telephone calls, and mail correspondence with legal counsel.

1019.   "Privileged" mail is entitled to greater confidentiality and freedom from censorship than general correspondence. *Evans v. Vare*, 402 F.Supp.2d 1188, 1194-96 (D.Nev. 2005), *affirmed in part, reversed in part, and remanded on other grounds*, 203 Fed.Appx. 95 (9th Cir. 2006).

1020.   Privileged mail may not be read in the ordinary course of a prison's routine or practice, except in the case of an emergency. *Reneer v. Sewell*, 975 F.2d 258, 260 (6th Cir. 1992); *Lemon v. Dugger*, 931 F.2d 1465, 1467–68 (11th Cir. 1991); *Proudfoot v. Williams*, 803 F.Supp. 1048, 1052 (E.D.Pa. 1992); *U.S. v. DeFonte*, 441 F.3d 92, 95–96 (2d Cir. 2006).  Instead, prison officials

---

[977] Turner Tr., 78:7-10 (Carlton Turner testified the only alternative to communicating with Disability Rights via the mail system was through phone calls; however, calls were not confidential); Brumfield Tr., 168:6-8 (Dameion Brumfield denied any other alternative to get confidential information to lawyers other than the mail).

[978] Nail Tr., 1900:5 - 1904:14 (Regarding correspondence from prisoner Damonte Henry concerning an agreement between Nail and Henry, and Henry's subsequent decision to drop from the case); Exh. P-KK-123, 2019-5-1 - Letter to Nail from Henry (Referencing a previous agreement between Henry and Col. Nail); Exh. P-KK-124, 2019-5-2 - Letter to Nail from Henry (Informing Col. Nail that he, Henry, had cut off communications with the Advocacy Center); Nail Tr., 1887:16 - 1888:1 (Anthony Tellis removed himself from the case and was subsequently moved by Col. Nail to housing in CCR); Nail Tr., 1703:5-7 ("[Prisoners in CCR] have more privileges and more property than offenders in extended lockdown. Pretty much get the same property and privileges as people on general population.").

must obtain a warrant to inspect privileged mail. *Burton v. Foltz*, 599 F.Supp. 114, 117 (E.D.Mich. 1984).

1021.    Most courts have held that privileged legal correspondence may not be opened by prison officials outside the prisoner's presence. *Wolff v. McDonnell*, 418 U.S. 539, 577 (1974); *Merriweather v. Zamora*, 569 F.3d 307, 316–17 (6th Cir. 2009); *Mitchell v. Peoples*, 10 F.4th 1226, 1230–31 (11th Cir. 2021); *Sallier v. Brooks*, 343 F.3d 868, 874 (6th Cir. 2003); *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003); *Royse v. Superior Court of State of Washington*, 779 F.2d 573, 574–75 (9th Cir. 1985); *Hinderliter v. Hungerford*, 814 F. Supp. 66, 68 (D.Kan. 1993); *Young v. Keohane*, 809 F.Supp. 1185, 1197 (M.D.Pa. 1992); *Burt v. Carlson*, 752 F. Supp. 346, 348 (C.D.Cal. 1990); *Faulkner v. McLocklin*, 727 F. Supp. 486, 489–92 (N.D.Ind. 1989); *McChriston v. Duckworth*, 610 F. Supp. 791, 795–96 (N.D.Ind. 1985); *Guyer v. Beard*, 907 F.2d 1424, 1428–29 (3d Cir. 1990); *Stone-El v. Fairman*, 785 F. Supp. 711, 715 (N.D.Ill. 1991).

1022.    The interference with or invasion of privacy of legal mail potentially violates two rights – a prisoner's First Amendment right to free speech and the right of access to the courts. *Brewer v. Wilkinson*, 3 F.3d 816, 825 (5th Cir. 1993).

1023.    Plaintiffs herein did not bring an access-to-courts claim, because, though Defendants' actions created significant burden and delay, Plaintiffs were ultimately able to pursue this litigation.

1024.    Rather, Plaintiffs brought a First Amendment claim based upon the right to communicate with lawyers.  *Denius v. Dunlap*, 209 F.3d 944, 954 (7th Cir. 2000); *Williams v. Price*, 25 F. Supp. 2d 623, 629 – 30 (W.D.Pa. 1998).

1025.  "Protection of an inmate's freedom to engage in protected communications is a constitutional end in itself." *Mitchell*, 10 F.4th at 1230; *quoting Wilson v. Blankenship*, 163 F.3d 1284, 1290–91 (11th Cir. 1998).

1026.  A free speech claim protects the right to be free from unjustified governmental interference with communication. *Brewer*, 3 F.3d at 820.

1027.  Both the Supreme Court and the Fifth Circuit have recognized this right. "Prisoners retain free speech rights consistent 'with the legitimate penological objectives of the corrections system,' and restrictions on those rights cannot be greater than necessary to protect the correctional interests involved." *Brewer*, 3 F.3d at 821–22.

### C.  *Defendants systematically interfered with mail sent by prisoners to their counsel in violation of the First Amendment to the Constitution (Outgoing Mail).*

1028.  The First Amendment protects outgoing legal mail from surveillance. *Davidson v. Scully*, 694 F.2d 50, 53 (2d Cir. 1982); *Smith v. Shimp*, 562 F.2d 423, 424 (7th Cir. 1977); *Mawby v. Ambroyer*, 568 F.Supp. 245, 249–50 (E.D.Mich. 1983); *Witherow v. Paff*, 52 F.3d 264, 265–66 (7th Cir. 1995); *Royse*, 779 F.2d at 574–75.

1029.  Department of Public Safety's policies and staff acknowledge that outgoing privileged mail should be sent unopened and protected from prison staff surveillance.[979]

1030.  Defendants' staff testified that mail marked "confidential," "legal mail" or otherwise addressed to a known attorney would not be opened by staff absent a specific concern of a threat

---

[979] Exh. P-BBBB-4 - Exhibits for Mathews, at p.8 (The Department of Public Safety and Corrections Offender Mail and Publications policy states, "outgoing privileged correspondence may be posted sealed, and will not be opened and inspected without express authorization from the Warden or Deputy Warden."); Exh. P-BBBB-4, at p.21 (The Mail Room Post Order states, "all offender mail, including packages, *except that mail defined in Department of Corrections Regulation #C-02-009 as "Privileged Mail,"* will be opened." (emphasis added)); Exh. P-BBBB-3, Deposition of Angela Mathews 74:24 - 75:12 (If a piece of mail needed to be read, the officers in the mailroom were the only authorized persons to do so; the officers who delivered the mail were never permitted to read legal mail).

authorized by the warden.[980] Staff could not remember ever opening and reading a piece of legal mail for this reason.[981]

1031.   At David Wade Correctional Center, prisoners typically label outgoing legal mail as such by writing "legal mail" or "confidential" on the envelope, and often include the date of sending.[982]

1032.   When sending legal mail, each prisoner seals his own letter, before handing it to a staff member to be mailed.[983]

1033.   Because of the nature of extended lockdown, plaintiffs cannot themselves put their mail into a mailbox for sending. They necessarily hand it to a staff member, and do not have any further control over the envelope from the time it is handed to staff.[984]

---

[980] Exh. P-BBBB-3, Deposition of Angela Mathews 45:16-22 (Major Angela Mathews testified that an individual sending out legal mail is required to either write "legal mail," "privileged correspondence," or something to let the mailroom know it's legal mail), 51:4-11 (Even if a prisoner fails to write "legal mail" or "confidential" on the envelope, it is still treated as legal mail if the sender is known as a legal entity); *Id*, 50:20 51:3 (Legal addresses like 8325 Oak Street is a known legal entity); Exhs. P-B-05, P-B-06, P-B-14, P-B-17, P-B-18, P-B-20, P-B-23, P-B-26, P-B-28, P-B-32, P-C-01, P-C-05, P-C-07, P-C-11, P-C-21, P-C-23, P-C-27 + 28, P-C-30, P-C-35 + 36, P-C-37, P-C-39, P-C-43, P-C-44 + 45, P-C-46 + 47, P-C-52 + 53, P-C-56 + 57, P-C-64, P-C-68, P-C-70, P-C-75, P-C-80, P-C-82, P-C-88 + 89, P-C-94, P-C-96 + 97, P-C-98 + 99, P-C-102, P-C-108 + 109, P-C-116, P-C-118, P-C-132 + 133, P-C-134 + 135, P-C-136+137, P-C-138, P-C-142 + 143, P-C-148, P-C-150, P-C-152, P-C-154, P-C-158 + 159, P-C-160, P-C-162 + 163, P-C-164, P-C-170 + 171, P-C-172, P-C-174 + 175, P-C-176 + 177, P-C-180, P-C-186 + 187, P-C-192, P-C-194 + 195, P-C-198, P-C-200, P-C-203, P-C-205, P-C-208, P-C-210, P-C-216 + 217, P-C-218, P-C-220, P-C-222, P-C-226 + 227, P-C-230, P-C-232 + 233, P-C-234, P-C-237, P-C-238, P-C-240 + 241, P-C-244 + 245, P-C-246 + 247, P-C-248, P-C-250 + 251, P-C-252, P-C-256 + 257, P-C-264, P-C-266 + 267, P-C-270, P-C-272, P-C-276, P-C-278, P-C-286, P-C-288, P-C-290, P-C-292, P-C-294, P-C-306, P-C-308 + 309, P-C-318 + 319, P-C-322 + 323, P-C-324 + 325, P-C-328, P-C-330, P-C-334, P-C-336, P-C-338, P-C-341, P-C-342 + 343, P-C-356, P-C-357, P-C-362 + 363, P-C-364, P-C-372.

[981] Exh. P-BBBB-3, Deposition of Angela Mathews 51:12 - 52:23 (Unless there was a concern of a threat, there is no other circumstance in which a sealed, outgoing legal letter would be opened); *Id*, 54:8-12 (Major Angela Mathews testified that she does not recall ever opening and reading a piece of legal mail for this reason before it was sent).

[982] Turner Tr., 69:21 - 70:6 ("I would write legal mail either on the front of the envelope or on the back of the envelope and I would write the date that I was sending the letter out"); Brumfield Tr., 163:9-13 (Dameion Brumfield puts the letter in an envelope, writes "legal mail" on it, includes the date, and then labels the address to where it is going); Moran Tr., 212:19-25 (He would always write either "legal mail," "confidential," or privileged mail" on the front side of the envelope); Dillon Tr., 273:17-25 (Mr. Dillon wrote "legal mail" on his envelope because he didn't want anyone to open it - the letter was confidential).

[983] Turner Tr., 69:21 - 70:6 (Carlton Turner testified that he would seal his envelope shut, would give his legal mail to the "free man" to put in the mailbox, and then it would go to the mailroom.); Brumfield Tr., 164:9-11 (He personally gave his letters to the staff for mailing, after he sealed it); Moran Tr., 210:17 - 211:18 (Quinten Moran testified that he would seal his letter and then give it to the deputy or the officer); Exh. P-BBBB-3, Deposition of Angela Mathews 46:18-19 (Major Angela Mathews testified that prisoners seal their own privileged mail).

[984] *Id.*; Exh. P-BBBB-3, Deposition of Angela Mathews 48:10-13 (Major Angela Mathews testified that the staff on the tiers are supposed to directly handle the outgoing legal mail, but is unsure if they actually do).

1034.   Defendants opened Plaintiffs' outgoing legal mail to counsel.

1035.   Sometimes, Plaintiffs' legal mail was not received by Disability Rights Louisiana (DRLA). DRLA maintained a policy of responding to each letter received from David Wade, and clients were informed of this policy.[985] Thus, when a prisoner received no response he would know to try to resend the correspondence, or to ask other people to write for him.[986]

1036.   Other times, Plaintiffs' legal mail was received by Plaintiffs' counsel having been torn open and taped closed, indicating that it had been read by DWCC staff.[987]

1037.   Disability Rights Louisiana staff Chelsea Ormon and Leah O'Brien, were, at different times during the litigation, the first to receive and open correspondence to DRLA attorneys from Louisiana prison facilities. One of those facilities was DWCC.[988]

1038.   Ormon and O'Brien both implemented a systematic process to preserve the condition of each envelope from DWCC.[989] Orman and O'Brien never placed tape on or otherwise manipulated any envelope, other than to open the envelope and remove the letter.[990]

---

[985] Chelsea Ormon Stipulated Testimony 2:7 (Entered in lieu of testimony) ("I developed and implemented the mail handling policies and procedures for Disability Rights Louisiana."), 4:39 ("I was responsible for drafting reply correspondence, at the direction of the attorneys working on the matter."); Leah O'Brien Stipulated Testimony (Entered in lieu of testimony) 2:7 ("I abide by the following mail policies and procedures for Disability Rights."), 2:17 ("I am also responsible for drafting reply correspondence, at the direction of the attorneys working on the matter.").

[986] Brumfield Tr., 166:20 - 167:3 (Describing every time he wrote to DRLA, they would respond back to him. One letter went weeks without a response, so Mr. Brumfield sent a second follow-up letter); Chelsea Ormon Stipulated Testimony 4:40 - 5:42 ("In January 2018, I was assigned to provide Bruce Charles with a list of all letters that Disability Rights Louisiana received from him from September 2017, through December 2017. I reviewed our files and identified responsive correspondence. I sent a letter to Mr. Charles identifying the correspondence, which was a list of the dates of all letters received by Disability Rights from him during the requested time period.").

[987] Exhs. P-B-01 - P-B-32 - Envelope(s); Exhs. P-C-01 - P-C-373 - Envelope(s); Chelsea Ormon Stipulated Testimony 2:18 ("Despite being marked "legal mail," some of the envelopes I received had clearly been ripped open"); Leah O'Brien Stipulated Testimony 3:21("Despite being marked "legal mail," many of the envelopes I receive have been clearly marked open. Many of the envelopes I received have been taped for closure.").

[988] Chelsea Ormon Stipulated Testimony 1:4 - 2:6; Stipulated Testimony of Leah O'Brien 1:4 - 2-6.

[989] Chelsea Ormon Stipulated Testimony 2:13-14 ("Upon receipt of legal mail, I would carefully open the envelope. I often used a letter opener to open mail."); Leah O'Brien Stipulated Testimony 2:13 ("Upon receipt of legal mail, I scan the envelope, and then carefully open it. I use a letter opener to make a clear cut along the side of the envelope, starting at the stamp, in order to maintain its condition.")

[990] Chelsea Ormon Stipulated Testimony 3:24; Leah O'Brien Stipulated Testimony 3:24.

1039.   Major Angela Mathews, in her deposition, testified that the mail room had received some envelopes with tape on them. She was unaware of where the tape originated, but didn't take the time to investigate it.[991]

1040.   Prisoners in extended lockdown at DWCC do not have access to tape.[992] Tape is not among the items available for purchase in the prison commissary,[993] nor is it among the tightly controlled list of items allowed in an extended lockdown cell.[994] Prisoners are strictly prohibited at all times from being in possession of tape.[995] And yet Disability Rights staff testified that as much as 10% of the hundreds of letters the organization received from prisoners at DWCC arrived resealed with tape.[996]

1041.   During their respective periods of employment at Disability Rights Louisiana, neither Orman nor O'Brien recalls *ever* receiving a taped or otherwise modified envelope from any Louisiana prison facility other than David Wade.[997] The opening and reading of legal mail is a David Wade- specific practice, probably because it is known to be unlawful and also violates policy.

1042.   Unlike incoming mail, outgoing mail does not pose a potential threat to prison order and security. The Supreme Court has acknowledged that "the implications of outgoing correspondence

---

[991] Exh. P-BBBB-3, Deposition of Angela Mathews 47:14-19; 76:21 - 77:3.

[992] Turner Tr., 72:8-12 (Mr. Turner does not have access to tape on the South Compound); Brumfield Tr., 167:10-16 (A prisoner does not have access to tape, it is not sold in the canteen either); Moran Tr., 215:1-4 (Prisoners don't have access to tape in the cell block); Dillon Tr., 272:15-19 (Tape is considered contraband for the offenders housed in the cell); Adams Tr. 984:4-20 (Staff members don't give prisoners tape, they do not have access to it).

[993] Exh. P-H-2, Canteen Order Form.

[994] Exh. J-17, 2017-7-24 - OPP 035 - Maximum Custody Housing_Privileges and Restrictions.

[995] Nail Tr., 1710:12-14 (Prisoners are not supposed to be in possession of tape); *Id*, 1710:17-20 (Prisoners are prohibited from having tape in their cells, and were tape found in a cell, it would be removed by prison staff.); Exh. J-17 (OPP 35 cataloging list of items prisoners are allowed to have, does not include tape); Exh. P-H-2 (canteen order form, does not include tape).

[996] Chelsea Ormon Stipulated Testimony 3:22 ("I would estimate that 5-10% of the envelopes I received from David Wade had tape applied   to the envelope.").

[997] Chelsea Ormon Stipulated Testimony 3:21 ("I do not recall ever receiving a taped or otherwise modified envelope from any prison facility other than David Wade."); Leah O'Brien Stipulated Testimony 3:25 ("I have never received envelopes from other Department of Corrections facilities that were taped.").

for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh v. Abbott*, 490 U.S. 401, 411–13 (1989).

1043.   To hold otherwise would threaten lawyers' ability to competently represent people who are incarcerated.

1044.   There is no substantial or legitimate penological or government interest served by opening clearly marked legal mail addressed to the office of lawyers that prison officials know to be representing plaintiff prisoners in a lawsuit against them.

1045.   The lack of government interest is evidenced by the DPS&C and DWCC's own policies, which provide that outgoing privileged correspondence will not be inspected, unless express authorization is given by the Warden or Deputy Warden.[998]

1046.   If any government interest does exist in opening outgoing legal mail, Defendants' opening of Plaintiffs' legal mail in this matter clearly addressed to counsel does not further any such interest. Major Mathews—the DWCC staff member in charge of the mailroom—testified that she does not recall any security threat in outgoing mail.[999] This proves that the mail received taped at DWCC was not opened and inspected pursuant to any security concern.

1047.   The USPS Administrative Support Manual provides that the United States Postal Service does not open and inspect first class mail.[1000]

---

[998] Exh. P-BBBB-4 - Exhibits for Mathews, at p.8 (The Department of Public Safety and Corrections Offender Mail and Publications policy states, "outgoing privileged correspondence may be posted sealed, and will not be opened and inspected without express authorization from the Warden or Deputy Warden."); Exh. P-BBBB-4, at p.21 (The Mail Room Post Order states, "all offender mail, including packages, except that mail defined in Department of Corrections Regulation #C-02-009 as "Privileged Mail," will be opened.").

[999] Exh. P-BBBB-3, Deposition of Angela Mathews 5 1:12-20 (Testifying that outgoing legal mail would need to be opened and inspected if it there was suspicion that it contained a threat); *Id*, 54:4-12 (Testifying that she does not recall ever having intentionally opened a piece of sealed legal mail)

[1000] PPursuant to Federal Rule of Evidence 201(b)(2), permitting judicial notice of facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned," Plaintiffs ask the Court to take judicial notice of the United States Postal Service's "Domestic Mail Manual" (DMM) and Administrative Support Manual (ASM), documents that are both easily accessible to the public. The Fifth Circuit affirms that "it is clearly proper to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 (5th Cir. 2007). The DMM and ASM both establish that it is the firm official policy of the USPS not to open first-class mail

1048.   Every prisoner witness who testified confirmed that mail is sealed and not taped before it is handed off to staff to be sent to counsel, consistent with DPSC policy. The prisoners could not tape mail even if they wanted to. The mailroom does not tape envelopes closed. The United States Postal Service does not open and tape mail closed. The uncontroverted testimony of two different DRLA staff members—who worked for DRLA months apart from one another-- was that they received hundreds of opened and taped envelopes from clients at DWCC. Importantly, neither remembered ever receiving taped mail from any other DPSC facility. The inescapable conclusion is that staff at DWCC is opening, reading, and taping mail closed.

> ### D. Defendants interfered with Plaintiffs' First Amendment rights by systematically censoring mail sent by attorneys to prisoners at DWCC. (Incoming Mail).

1049.   Censorship's effect on free speech "need not be great in order to be actionable." *Keenan v. Tejeda*, 290 F.3d 252, 259 (5th Cir. 2002). But the effect of prison officials intruding upon the sacrosanct relationship between an inmate and his attorney is great indeed.

1050.   "When a prisoner receives confidential legal mail that has been opened and resealed, he may understandably be wary of engaging in future communication about privileged matters." *Hayes v. Idaho Correctional Center*, 849 F.3d 1204, 1213 (9th Cir. 2017).

1051.   Such censorship "sufficiently chills, inhibits, or interferes with [the inmate's] ability to speak, protest, and complain openly to his attorney so as to infringe his right to free speech." *Mitchell*, 10 F.4th at 1241.

---

absent a warrant; Domestic Mail Manual Vol. 1 p.400 ("First-Class Mail is sealed against postal inspection."); Administrative Support Manual 13 Section 274.21 ("No person may open mail sealed against inspection; or search, inspect, read, or disclose information obtained from the mail or its contents…."). The DMM is available on the USPS website at https://pe.usps.com/text/dmm300/233.htm#ep1087944 and the ASM can be obtained from the USPS Law Department by calling 314-345-5820.

The relevant portion of Administrative Support Manual 13 Section 274.21 states, "No person may open mail sealed against inspection; or search, inspect, read, or disclose information obtained from the mail or its contents….". The purpose of the ASM is to establish that it is the firm official policy of the USPS not to open first-class mail absent a warrant.

1052.   Thus, prison officials may not open clearly-marked legal mail. *Wolff*, 418 U.S. at 574–77.

1053.   Defendants in this matter have routinely and flagrantly interfered with prisoners' incoming legal mail at DWCC.[1001]

1054.   At DWCC, all mail distributed to prisoners in restrictive housing is brought by a prison official to the tier and hand delivered to their cells.[1002]

1055.   In order to receive his mail, each prisoner has to sign a form acknowledging that they received their mail sealed and unopened.[1003]

1056.   If he does not sign for his mail—acknowledging that it has been delivered unopened, whether it was in fact unopened or not— he does not receive it. Men therefore sign forms saying they received mail sealed, even when they receive the mail opened, so that they can receive their mail.[1004]

1057.   If the prisoner is not in his cell—taking a shower, for instance, or visiting the doctor—the tier officer keeps the letter in his possession until the prisoner returns, a segment of time in the custodial life of the letter that goes entirely undocumented.[1005]

1058.   Defendants' opening of incoming legal mail is subject to heightened legal scrutiny.

1059.   To hold otherwise would threaten lawyers' ability to competently represent incarcerated people.

---

[1001] Turner Tr., 78:11-19 (Mr. Turner testified that on at least one occasion he received his legal mail with nothing inside, it was merely an empty envelope); Brumfield Tr., 168:25 - 169:2 (Dameion Brumfield testified that sometimes contents of his legal mail are missing, which verified that someone has previously opened it).
[1002] Exh. P-BBBB-3, Deposition of Angela Mathews 37:11-24 (The officer or the supervisor passes out the mail); Turner Tr., 70:7-11 (The officer would come on the tier and give the prisoner a form to sign. When they signed the form, the officer would open the mail and then hand it over).
[1003] Brumfield Tr., 168:9-24 (A form must be signed that says the legal mail was sealed and closed when the prisoner received it, and it wasn't tampered with); Exh. P-BBBB-3 Deposition of Angela Mathews 37:25 - 38:3 (individuals must sign a receipt saying they received their legal mail).
[1004] Brumfield Tr., 168:9-24 ("But that was a way they tried to, you know, scheme on going into your legal mail and if it turns on them they can't get in trouble because they will say, hey, you signed this saying it was sealed. But that is what we got to do before we are able to get that. We have to sign it. And they know that. So they will give it to us open and everything."); Exh. P-BBBB-3, Deposition of Angela Mathews 61:19-22.
[1005] Exh. P-BBBB-3, Deposition of Angela Mathews 60:11-22.

1060. There is no substantial or legitimate penological or government interest served by opening incoming legal mail outside of the presence of the recipient.

1061. DWCC and Department of Public Safety & Corrections (DPS&C) mail-handling policies state that officers delivering legal mail are never permitted to open it, except in the presence of the inmate recipient under certain circumstances.[1006]

1062. Regulations state that if legal mail is opened outside the presence of the recipient (accidentally, for example), "the officer will report all unusual occurrences to the supervisor immediately and file an Unusual Occurrence Report (UOR) prior to leaving the institution."[1007]

1063. Whereas witnesses inside DWCC testified to numerous instances of legal mail arriving already open, and witnesses on the outside testified to hundreds of envelopes showing signs of having been tampered with after leaving prisoner possession, both precisely the kind of events that regulations contemplate triggering a UOR, Defendants did not produce in discovery a single UOR related to improper opening of legal mail.

1064. At trial, Defendants asserted that "[n]o evidence regarding the chain of custody has been adduced that would exclude any one other than the defendants for being responsible for the condition of those envelopes."[1008] That is false. Owing to the unique circumstances of this case, the list of possible custodians for the letters in question is easily determined and extremely short: the sender, the prison, the United States Postal Service (USPS), and the recipient. Letters arrived having been opened to recipients at both ends—prisoners and their lawyers—leaving only DWCC

---

[1006] Exh. P-BBBB-3, Deposition of Angela Mathews 39:1-6 (Legal mail is not opened until it reaches the prisoner), 75:7-12 (Officers are never permitted to be reading mail); Exh. P-BBBB-4 - Exhibits for Mathews, at p.23 (The Mail Room Post Order states, "the officer will not read or allow anyone to read offender mail prior to the mail being delivered to the offender to whom it was addressed.").
[1007] Exh. P-BBBB-4 - Exhibits for Mathews, at p.23; Exh. P-BBBB-4, at p.9 ("If privileged correspondence is opened accidentally, outside the presence of the offender, the envelope shall be immediately stapled or taped closed and the envelope marked "Accidentally Opened" along with the date and employee's initials. An Unusual Occurrence Report shall be completed.").
[1008] Representation of attorney Keith Fernandez 3109:4-7.

and the USPS as possible culprits. It is the plainly stated policy of the USPS that, absent a warrant, first-class mail is not to be opened, full stop.[1009] "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." *United States v. Chem. Found.*, 272 U.S. 1, 14–15 (1926). There being no evidence, clear or otherwise, that the USPS is responsible for routinely unlawfully opening the legal mail to and from a single prison in northern Louisiana, the evidence excludes everyone other than the Defendants for being responsible for the condition of those envelopes.

1065.   Established legitimate penological interests include "security, good order, or discipline of the institution." *Thornburgh v. Abbott*, 490 U.S. 401, 416 (1989).

1066.   There is no substantial or legitimate penological or governmental interest served by prison officials opening clearly-marked legal mail from the office of lawyers that prison officials know to be suing them, much less doing so outside of the presence of the intended recipients, as required by prison regulations and the law.

1067.   While inspecting incoming mail for safety reasons—such as checking for contraband—is a valid penological interest, that interest can be served, in cases where a piece of legal mail is suspect, by opening the item in the presence of the inmate, in accordance with prison regulations. DWCC's practice of opening legal mail outside of the presence of the recipient violates prisoners' First Amendment rights and the facility's own official policy.[1010]

---

[1009] Pursuant to Federal Rule of Evidence 201(b)(2), Plaintiff's again ask the court to take judicial notice of Administrative Support Manual 13 Section 274.21 ("No person may open mail sealed against inspection; or search, inspect, read, or disclose information obtained from the mail or its contents….").

[1010] Exh. P-BBBB-4 Exhibits for Mathews, at p.23 (The Mail Room Post Order states, "the officer will not read or allow anyone to read offender mail prior to the mail being delivered to the offender to whom it was addressed.").

1068.  Any regulation restricting prisoner's First Amendment rights must be neutral in its enforcement, not discriminatory to the content of the expression. *Turner v. Safley*, 482 U.S. 78, 90 (1987); *citing Pell v. Procunier*, 417 U.S. 817, 828 (1974).

1069.  Considering the identities of sender and recipient (prisoners and their lawyers) the nature of these proceedings (prisoners suing the prison over the conditions of their confinement), the testimony of Plaintiffs and other witnesses (that legal mail arrived to attorneys taped closed, and to prisoners already open, or never arrived at all), and the fact that improperly opening legal mail represents a non-trivial violation of Defendants' own policy, it takes no special skills of deduction to conclude that Plaintiffs' mail was targeted for surveillance by Defendants because of the content of their speech and their involvement in this litigation.

1070.  Such content-based regulation of First Amendment activity triggers strict scrutiny analysis—a standard under which Defendants' actions do not pass muster. *Johnson v. California*, 543 U.S. 499, 513–15 (2005).

1071.  When prisons restrict expression through a valid and justified speech restriction (which Plaintiffs' dispute is present here), they must retain other avenues for prisoner expression. *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 131 (1977), *Turner*, 482 U.S. at 89. No such avenues at DWCC exist.[1011]

1072.  Multiple men filed ARPs putting the DWCC on notice of their claims of mail tampering.[1012]

---

[1011] Turner Tr., 78:7-10 (Carlton Turner testified the only alternative to communicating with Disability Rights via the mail system was through phone calls; however, he never had the opportunity to make a confidential call during his time at David Wade); Brumfield Tr., 168:6-8 (Dameion Brumfield denied any other alternative to get information to lawyers other than the mail).

[1012] Exh. P-A-24, Errol Cutno ARP, at p.11 (Errol Cutno filed a complaint that Captain Heard gave his legal mail to him already opened); Exh. P-A-25, Ryan Jaufre ARP, at p.9 (Ryan Jaufre filed a complaint that his legal mail was left on his trey hatch already opened, and he never signed for it); Adams Tr., 984:4-20; Exh. P-E-140, Corey Adams ARP, at p.2; Exh. P-A-23, Christopher Walker ARP.

1073.   Despite the ARPs being filed, no legitimate investigation was done into their claims.[1013] Nor were the responses timely.[1014] Instead, the ARPs were summarily rejected on shallow and at times outright nonsensical grounds.[1015] The highest levels of staff at DWCC were on notice of the alleged mail violations and did not even bother to investigate the claims.

### D. Defendants otherwise attempted to interfere with communication with counsel.

1074.   Prisoners were punished for bringing documents to attorney-client visits.[1016]

1075.   Staff seized counsel's contact information from Plaintiffs and otherwise interfered with and refused counsel the ability to provide written materials to prisoners in violation of the First Amendment of the Constitution.[1017]

### CONCLUSION

---

[1013] Huff Tr., 2081:14-18 (In response to Christopher Walker's ARP complaining that he was not receiving withdrawal slips for his legal mail, Huff dismissed the claim because there was no record of withdrawal slips for his legal mail–which actually proved the exact point about which he was complaining); Exh. P-A-23, Christopher Walker ARP, at p. 1; Huff Tr., 2089:10-17 (Despite the fact that Errol Cutno provided a specific date, time, and location to review camera footage he said would have supported his claim, Huff did not review any camera footage in investigating his ARP); *Id*, 2093:12 - 2094:7 (In response to Ryan Jaufre's ARP complaining that his mail was delivered already opened, Huff's entire investigation consisted of a brief statement from the supervising officer—no statement was taken from the DWCC security officer Jaufre accused by name); Exh. P-A-25, Ryan Jaufre ARP, p. 4 (The supervising officer's three-sentence note denying Jaufre's allegation, comprising the entirety of Huff's investigation into the matter).

[1014] Exh. P-A-23, Christopher Walker ARP, at p.13 (Response to Christopher Walker's August 10, 2017 ARP by Unit Head Angie Huff was dated January 29, 2019); Exh. P-A-25, Ryan Jaufre ARP, at p.2 (Response to Ryan Jaufre's August 8, 2017 ARP by Unit Head Angie Huff was dated January 31, 2019); Turner Tr., 79:7 - 80:10 (Carlton Turner testified that when he received an empty envelope that should have contained legal mail, everybody he contacted said "they ha[d] no idea or no knowledge of anything that I was talking about.").

[1015] *Id*. at fn. 1014), *see also* Exh. P-A-24, Errol Cutno ARP, at p. 5 (In reply to Errol Cutno's ARP complaining that his legal mail arrived already opened, Col. Nail wrote a response, signed off on by Deputy Warden Angie Huff, that emphatically rejected Cutno's complaint, stating he had "not provided a shred of evidence to substantiate [his] claims" that his mail had been opened before it was delivered to him. In the same paragraph, Nail noted that no contraband had been found when Cutno's mail was inspected, implying unequivocally that it had been, in fact, opened. Huff did no independent investigation of the ARPs and deferred entirely to the representation of Nail, which is problematic as Nail is both a named Defendant in this action and the supervisor over the buildings challenged in this litigation.)

[1016] P-A-8 - Chase Courville Confiscation and Disposition of Contraband, at p.1 (Prisoner written up because, while properly outside of his cell, he was found holding an envelope containing ten pieces of paper, "legal material of another offender." He was sanctioned not for possessing them without the owner's permission, but for possessing them at all—an envelope on such a low spectrum of contraband that it wouldn't even be contraband in the hands of its owner, and yet it warranted a full write up.)

[1017] Nail Tr., 1924:18-24 (Col. Nail did not deny taking Melanie Bray's card from Plaintiff Bruce Charles after a visit; he, instead, does not recall doing so).

In consideration of these findings of fact and conclusions of law, Plaintiffs respectfully request that this Court find Defendants have violated the Eighth Amendment of the Constitution in their failure to provide an adequate mental health treatment program at David Wade Correctional Center and for the conditions of confinement that they house men in segregation. Additionally, we request that this Court find Defendants have violated the Americans with Disabilities Act and the Rehabilitation Act for their failure to identify people with disabilities and their failure to provide reasonable accommodations. Lastly, we request this Court find Defendants in violation of the First Amendment of the Constitution for their interference with legal mail coming into and out of David Wade Correctional Center.

Respectfully submitted this 14th day of March, 2022,

/s/ Emma Lee Douglas
Melanie Bray, La. Bar No. 37049
Jonathan C. Trunnell, La. Bar No. 36956, T.A.
Ronald K. Lospennato, La. Bar No. 32191
Emma Lee Douglas, La. Bar No. 39076
Disability Rights Louisiana
Formerly known as The Advocacy Center
8325 Oak Street
New Orleans, LA 70118
504-708-1460
504-507-1956 (fax)
mbray@disabilityrightsla.org

/s/ Katie M. Schwartzmann
Katie M. Schwartzmann, La. Bar No. 30295
Cooperating Counsel for ACLU-F LA
Tulane Law School
6329 Freret Street
New Orleans, La 70115
(504) 496-8566
kschwartzmann@tulane.edu