# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| ANTHONY TELLIS, ET AL. | CIVIL ACTION NO. 18-541 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| JAMES M. LEBLANC, ET AL. | MAGISTRATE JUDGE HORNSBY |

## OPINION

### Table of Contents

I.    **Introduction** ...................................................................................................3

II.   **Procedural Background** ................................................................................5

III.  **Background Facts** .........................................................................................7

    A.    **Restrictive Housing and Extended Lockdown Defined** ..............................8

    B.    **DWCC Overview** ........................................................................................8

        1.    N-2A, N-2B, N-2C, N-3, and N-4 .....................................................10

        2.    N-1 .....................................................................................................10

        3.    N-2D ...................................................................................................11

    C.    **Restrictive Housing at DWCC** .................................................................11

    D.    **Level of Care** ............................................................................................14

    E.    **Corrections Officials** ...............................................................................18

    F.    **Expert Witnesses** .....................................................................................24

        1.    Dan Pacholke .....................................................................................24

        2.    Dr. Craig Haney .................................................................................25

        3.    Dr. Kathryn Burns ..............................................................................27

        4.    Dr. John Thompson .............................................................................29

        5.    James Upchurch ..................................................................................32

IV.  **Eighth Amendment Claims** .......................................................................34

    A.    **Background** ................................................................................................34

    B.    **Eighth Amendment Standard** ...................................................................35

    C.    **Conditions of Confinement** ......................................................................37

        1.    Substantial Risk of Serious Harm .......................................................37

            (a)    Psychological Harms of Solitary Confinement ..........................38

            (b)    Conditions on the South Compound ...........................................43

            (c)    Manifestation of Harm at DWCC ...............................................57

2.      Deliberate Indifference ................................................................58

3.      Conclusion as to the Conditions of Confinement ......................................60

**D.    Delivery of Mental Health Services** ........................................61

1.      Systemic Deficiencies...................................................................62

(a)    Screening and Evaluation ............................................63

(b)    Mental Health Treatment ..............................................86

(c)    Staffing of the Mental Health Department...............................94

(d)    Safeguards for Psychotropic Medication ...............................98

(e)    Lack of Accurate and Adequate Medical Records .............................105

(f)    Suicide Prevention Program ...........................................107

2.      Deliberate Indifference ...............................................................118

(a)    Failure to Comply with Policy .......................................119

(b)    Wanton Disregard for Inmate Health and Safety...........................121

3.      Conclusion as to the Delivery of Mental Health Services............................124

**E.    Conclusion** ...............................................................124

**V.    ADA and RA Claims** ........................................................126

**A.    Background** ...............................................................126

**B.    ADA and RA Standard** .....................................................127

1.      Qualified Individuals ................................................................128

2.      Failure to Accommodate ...............................................................130

(a)    Affirmative Modifications ...........................................130

(b)    Discipline ...........................................................134

(c)    Housing .............................................................137

3.      Methods of Administration.............................................................137

(a)    Whether the DOC's definition of serious mental illness is under-inclusive..........139

(b)    Whether DWCC excludes people with chronic mental illness from the definition of serious mental illness ...............................................141

(c)    Whether Defendants provide an adequate process for requesting reasonable accommodations ......................................................142

**C.    Conclusion** ...............................................................144

**VI.   First Amendment Claims** ...................................................145

**A.    Background** ...............................................................145

**B.    Legal Mail** ...............................................................146

1.      Incoming Legal Mail ..................................................................147

2.      Outgoing Legal Mail .................................................................151

**C.    Retaliation** ..............................................................159

    **D.**    **Conclusion as to the Plaintiffs' First Amendment Claims** ......................................163

**VII.**  **Conclusion** ......................................................................................................163

## I.   <u>Introduction</u>

This class action suit for injunctive and declaratory relief, filed by inmates at David Wade Correctional Center ("DWCC"), challenges the conditions of confinement for inmates on extended lockdown at DWCC, the mental health care provided to inmates on extended lockdown, DWCC's treatment of inmates with mental illness on extended lockdown, and the opening and reading of prisoner legal mail. Plaintiffs allege that multiple policies and practices in place at DWCC violate the First and Eighth Amendments to the United States Constitution,[1] Title II of the Americans with Disabilities Act ("ADA"),[2] and section 504 of the Rehabilitation Act of 1973 ("RA").[3]

This matter came before the Court for a seventeen-day bench trial from January 10, 2022, to February 3, 2022.[4] In total, the Court heard testimony from thirty-eight witnesses[5]—including correction officials and staff, inmates, and expert witnesses—who testified about the conditions on extended lockdown at DWCC. After the trial, the Court

---

[1] The First Amendment and Eighth Amendment claims are brought pursuant to 42 U.S.C. § 1983. Section 1983 provides a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States against any person acting under color of state law. 42 U.S.C. § 1983. Qualified immunity is not at issue in this case because Plaintiffs only seek prospective equitable relief—i.e., injunctive and declaratory relief and not monetary relief—and because Plaintiffs have sued Defendants only in their official capacities. *Singleton v. Cannizzaro*, 956 F.3d 773, 778 n.3 (5th Cir. 2020).

[2] 42 U.S.C. § 12131, *et seq.*

[3] 29 U.S.C. § 794.

[4] Due to the COVID-19 pandemic, the trial was held by Zoom video conference.

[5] This number includes deposition testimony and stipulated testimony.

permitted the parties to submit simultaneous post-trial briefs after which the Court took the matter under advisement.

For the reasons below, after considering the stipulations of the parties, the credible testimony and evidence at trial, and the pre- and post-trial briefs, the Court finds that Plaintiffs have failed to carry their burden of proving that Defendants have been interfering with or censoring the legal mail coming in and out of DWCC or otherwise retaliating against inmates for exercising their free speech rights in violation of the First Amendment. However, the Court finds that Plaintiffs have satisfied their burden of proving by a preponderance of the evidence 1) that Defendants[6] have been deliberately indifferent by a) housing inmates, including the mentally ill, in inhumane conditions while on extended lockdown and b) failing to provide those inmates adequate mental health care in violation of the Eighth Amendment and 2) that Defendants have been violating the

_____

[6] The Court has not parsed out liability to individual Defendants as to each cause of action for which the Court has found liability. This is for several reasons. First, Plaintiffs' briefs do not discuss individual liability. *See generally* Record Document 316. Nor do Defendants argue that the Court should so parse liability. Additionally, the Court notes that all individual Defendants are sued in their official capacities and that injunctive relief is the only type of relief sought; thus, individual liability is not significant. Lastly, the causes of action on which Plaintiffs have prevailed are for the collective failings of a system to which all Defendants contributed to some degree. The Court's decision to not parse out liability to individual Defendants is also keeping in practice with other district courts that have addressed similar issues. *See, e.g., See Lewis v. Cain*, No. 3:15-CV-318, 2021 WL 1219988 (M.D. La. Mar. 31, 2021); *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1180 (M.D. Ala. 2017); *Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980). The Court does note that the Louisiana Department of Public Safety and Corrections is named only as to the ADA and RA claims. Record Document 316 at ¶ 17. Therefore, the liability of that Defendant is limited to the ADA and RA claims for which the Court has found liability. Additionally, Colonel Lonnie Nail was terminated as a Defendant in this matter and Colonel Vincent Coleman was substituted in his place, in his official capacity. *See* Record Document 532 at 2.

ADA and RA by a) failing to make reasonable accommodations for inmates with mental disabilities and b) employing unlawful methods of administration.

## II.    <u>Procedural Background</u>

Plaintiffs in this action are an advocacy center, Disability Rights Louisiana ("Disability Rights") f/k/a Advocacy Center of Louisiana, and several inmate representatives who were housed in extended lockdown at DWCC at the time suit was filed (collectively, "Plaintiffs"). *See* Record Document 316. These inmates are Bruce Charles, Carlton Turner, Larry Jones, and Ronald Brooks (collectively, the "Named Plaintiffs").[7] *See id.*

In February 2018, Plaintiffs filed suit against James LeBlanc, in his official capacity as the Secretary of the Louisiana Department of Public Safety and Corrections; Jerry Goodwin, in his official capacity as the Warden of DWCC; Lonnie Nail, in his official capacity as the Colonel overseeing the South Compound at DWCC;[8] Gregory Seal, M.D., in his official capacity as the contract psychiatrist at DWCC; Deborah Dauzat, in her official capacity as the Deputy Warden at DWCC; Steve Hayden, in his official capacity as a Corrections Program Manager at DWCC; Aerial Robinson, in her official capacity as a Social Services Counselor at DWCC; Johnie Adkins, in his official capacity

---

[7] Anthony Tellis was a Plaintiff at the outset of litigation, but he has since withdrawn from the case. *See* Record Documents 1, 174. At one point, Plaintiffs also sought to add Damonte Henry as a Named Plaintiff, but he requested to withdraw before the Court considered the merits of the request to add him. *See* Record Documents 196, 197.

[8] During the course of this litigation, multiple people served as the Unit Manager over the South Compound. Vincent Coleman is the current Colonel over the South Compound and therefore has been substituted in Colonel Nail's place, in his official capacity. *See* Record Document 532 at 2.

as a Social Services Counselor at DWCC; and the Louisiana Department of Public Safety and Corrections[9] (collectively, "Defendants"). Plaintiffs seek a declaration that Defendants are violating the Eighth Amendment, First Amendment, ADA, and RA and an injunction to cure the violations; Plaintiffs do not seek monetary relief.[10]

Previously, the Court granted Plaintiffs' motion for class certification and certified a class of all prisoners who are or will be subjected to extended lockdown at DWCC that will pursue the First Amendment and Eighth Amendment claims (the "Class") and a subclass consisting of all individuals on extended lockdown at DWCC who have or are perceived as having a qualifying disability related to mental health, as defined within the ADA, that will pursue the ADA and RA claims (the "Subclass"). Record Document 462. The Class and the Subclass are represented by the Named Plaintiffs.[11]

Because of the nature of this case, the Court bifurcated this matter into two phases: a liability phase and a remedy phase. The Court held the aforementioned bench trial only on the liability phase. The issues before the Court during the liability phase were whether, as of the discovery cutoff date of March 15, 2020, Defendants are violating the Class's First Amendment and Eighth Amendment rights and the Subclass's rights under the ADA and RA.[12]

---

[9] As previously mentioned, the Louisiana Department of Public Safety and Corrections is named as a Defendant only as to the ADA and RA claims. Record Document 316 ¶ 17.

[10] Plaintiffs do, however, seek attorney's fees and litigation expenses pursuant to 42 U.S.C. § 1988 and other applicable law.

[11] Bruce Charles and Larry Jones, however, did not testify at trial.

[12] The Court exercised its discretion to limit the liability determination to the discovery period. At a motion hearing on August 26, 2021, the Court detailed its reasoning for declining to consider conditions after March 15, 2020. *See* Record Document 459; *see*

As stated above, the Court finds in favor of Plaintiffs in substantial part as to the Eighth Amendment, ADA, and RA claims. These claims, as detailed below, will proceed to the remedy phase. The Court, however, finds in favor of Defendants as to Plaintiffs' First Amendment claim; Defendants are entitled to dismissal of this claim.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court sets out its findings of fact and conclusions of law herein. If a fact was controverted, the Court weighed the evidence.

## III.  Background Facts

Before turning to the specific claims, the Court will detail the relevant background facts. First, the Court will define important terms that will appear throughout this opinion, such as restrictive housing and extended lockdown. Second, the Court will give a general overview of DWCC—more specifically, the South Compound at DWCC. Third, the Court will provide an overview of restrictive housing at DWCC. Fourth, the Court will describe the level of care system utilized by the Louisiana Department of Public Safety and Corrections (the "DOC"). Fifth, the Court will introduce correctional officials and explain their role with the DOC or DWCC. Lastly, the Court will introduce the parties' expert witnesses upon whose expertise the Court relied in understanding correctional practices and scientific principles.

---

*also* Record Document 378. In short, conditions after the discovery cutoff date would not be probative of liability. For one thing, the discovery cutoff date coincided with the onslaught of the Covid-19 virus in Louisiana. *See* Record Document 378 at 2. Temporary changes in housing arrangements were made at the prison to help prevent the spread of the virus, but said changes were irrelevant to this litigation. Additionally, evidence concerning conditions at DWCC in March 2020 was the most up-to-date information available to Plaintiffs. Changes after the discovery cutoff date will be considered at the remedy phase.

### A.    Restrictive Housing and Extended Lockdown Defined

Placing inmates in restrictive housing is a commonly used practice in prisons throughout the country. Record Document 524 ¶ 73. The parties stipulate that restrictive housing refers to housing prisoners separately from the general population of a correctional institution and imposing restrictions on their movement, behavior, and privileges. *Id.* ¶ 21. Extended lockdown is a subset of restrictive housing. *Id.* Extended lockdown refers to housing prisoners separately from the general population for twenty-two or more hours per day in a cell. *Id.* ¶ 22.

The terminology, however, is not consistent throughout the prison industry. Often, restrictive housing, segregation, extended lockdown, and solitary confinement are used interchangeably. The Court will generally use the terms consistent with the parties' stipulations and the experts' use of the terminology. The Court treats solitary confinement as a synonym for extended lockdown and segregation as a synonym for restrictive housing.

### B.    DWCC Overview

DWCC is a maximum-security prison in Claiborne Parish, Louisiana. Record Document 524 ¶ 26. As of the discovery cutoff date, DWCC was an American Correctional Association ("ACA") accredited institution. Burns Trial Tr. vol. VI at 1466:16-18 [Record Document 540]. It houses over 1,200 inmates in the custody of the DOC.[13] The facility is divided into two compounds—the North Compound and the South

---

[13] The exact number was 1,207 as of March 2020. Ex. J-21 at 9 [Record Document 565-49].

8

Compound. Record Document 524 ¶ 28. The South Compound houses inmates on extended lockdown, whereas the North Compound houses inmates in general population. Solomon Trial Tr. vol. III at 594:7-14 [Record Document 536]. The South Compound has five buildings—N-1 through N-5, though only buildings N-1 through N-4 are at issue in this case. Record Document 524 ¶ 28.

Each South Compound building has four linear tiers: A, B, C, and D; the tiers each have sixteen cells.[14] *Id.* ¶ 29. All cells on the South Compound generally hold two people, except for cells reserved for camera observations on each tier, N-2D, and all cells in the N-4 building, which usually are single-bunked cells. *Id.* ¶ 31-33. Of the sixteen cells on each tier in buildings N-2 through N-4, the first two cells are camera cells for prisoners who are on suicide watch. *Id.* ¶ 30. There is a camera in each of those cells, as well as in all cells on the N-4C tier. *Id.* These cameras are live feed only; that is, they do not record. *Id.* ¶ 44. There is a building lobby that contains the key room—the room in which the Key Officer is stationed to monitor and control traffic in and out of each building and tier. Goodwin Trial Tr. vol. X at 2226:22-2228:4 [Record Document 544].

Buildings N-1 through N-4 were extended lockdown units at the outset of this litigation. Burns Trial Tr. vol. V at 1256:4-6 [Record Document 539]. In January 2017, DWCC housed 344 inmates on extended lockdown. Ex. J-21 at 1 [Record Document 565-49]. During this litigation, DWCC began implementing changes to certain buildings and tiers on the South Compound, which resulted in a reduction of the number of inmates on

---

[14] The buildings are in the shape of an "H" with the legs and arms of the "H" being the tiers and the middle being the connecting lobby area.

extended lockdown. The Court will now detail the specific characteristics of the different buildings and tiers as of March 2020.

    1.    <u>N-2A, N-2B, N-2C, N-3, and N-4</u>

Tiers A, B, and C of building N-2 and every tier in buildings N-3 and N-4 (the "extended lockdown tiers") house maximum custody inmates. Record Document 524 ¶ 32. These inmates have been assigned to these units for disciplinary reasons or as an initial classification decision. In essence, these are the inmates on extended lockdown. The evidence established that inmates on the extended lockdown tiers spend twenty-three to twenty-four hours per day in their cell. As of March 2020, DWCC housed 228 inmates on the extended lockdown tiers.[15] Ex. J-21 at 9 [Record Document 565-49].

    2.    <u>N-1</u>

At some point in 2018, DWCC converted building N-1 into a transitional unit. Goodwin Trial Tr. vol. XVIII at 4271:1-12 [Record Document 562]. In other words, inmates housed in N-1 are in the process of transitioning to general population on the North Compound or society outside the prison. It is also used as an overflow or backlog unit—that is, for inmates waiting for a bed to open on the North Compound. *Id.* Inmates in N-1 are classified as medium custody. Record Document 524 ¶ 34. As of March 2020, N-1 was at capacity with 128 inmates housed on the different tiers. Ex. J-21 at 9 [Record Document 565-49]. Although N-1 is no longer used for disciplinary housing, as detailed below, it is still a restrictive housing setting.

---

[15] The Court notes that this number fluctuated. For example, in January 2019, DWCC housed 246 inmates on the extended lockdown tiers. Ex. J-21 at 6-8 [Record Document 565-49].

3.     <u>N-2D</u>

Like N-1, inmates housed in N-2D are not there for disciplinary reasons. Instead, N-2D houses inmates on closed cell restriction ("CCR"). Record Document 524 ¶ 33. At DWCC, CCR is a protective custody status. Inmates, however, are still classified as maximum custody, Ex. J-3 at 8 [Record Document 564-285], and single bunked. Goodwin Trial Tr. vol. XVIII at 4213:24-4214:13 [Record Document 562]. The purpose of protective custody is to separate an inmate from other inmates for reasons of health or safety; it is nonpunitive. Ex. J-3 at 8 [Record Document 564-285].

By way of example, protective housing may be appropriate for an inmate because of his former profession, such as being a police officer. *Id.* Another example is an inmate who cannot live in general population because he is a threat to institutional security based on prior conduct but has shown improved conduct on extended lockdown and therefore deserves more privileges. Goodwin Trial Tr. vol. XVIII at 4213:24-4214:13 [Record Document 562].

Plaintiffs do not challenge DWCC's use of protective custody. They do, however, challenge the overall conditions on the South Compound and the policies in place for inmates held in a restrictive housing setting. And as the evidence demonstrated, inmates in N-2D remain in their cell for greater than twenty-two hours per day.

**C.     Restrictive Housing at DWCC**

At DWCC, extended lockdown is primarily used to house inmates who have committed a rule infraction or who jeopardize the stability of the prison. Upchurch Trial Tr. vol. XIV at 3201:22-3202:15 [Record Document 555]. Some form of restrictive

housing is necessary to ensure the safe operations of a prison. *Id.*; Pacholke Trial Tr. vol. XII at 2787:7-11 [Record Document 553].

In December 2019, DWCC began to implement a new DOC classification policy, B-02-019. Ex. P-JJJ-42 [Record Document 564-205]. The policy, however, was not in full effect as of March 2020. Indeed, the policy underwent multiple changes before being finalized in 2021. At the close of discovery, the only change in effect was that DWCC altered certain restrictive housing terminology. Goodwin Trial Tr. vol. XVIII at 4392:4-19 [Record Document 562]. Instead of extended lockdown or isolation status,[16] DWCC started to use the terms 1) investigative segregation, 2) disciplinary segregation, 3) preventative segregation, and 4) transitional segregation. Record Document 524 ¶ 243. *See also* Baird Trial Tr. vol. XIV at 1059:8-11 [Record Document 555].[17] In other words, "disciplinary detention isolation" morphed into "disciplinary segregation" and "disciplinary extended lockdown" became "preventative segregation." Goodwin Trial Tr. vol. XVIII at 4392:4-19 [Record Document 562]. Regardless of status, inmates were housed on the extended lockdown tiers under the same conditions. Record Document 524 ¶ 244. Significantly, DWCC's use of strip cell status, as discussed in more detail below, was not affected by this new classification system policy.

---

[16] Inmates could be placed on disciplinary detention isolation status as a sanction from the prison's disciplinary board. Goodwin Trial Tr. vol. XVIII at 4229:16-4230:2 [Record Document 562]. Isolation status involves greater restrictions than extended lockdown status. *Id.* For example, an inmate loses his bedding during the day. *Id.* at 4328:6-13. As of March 2020, isolation status was a viable disciplinary sanction. *Id.* at 4217:21-24.
[17] Jacob Baird is DWCC's Deputy Warden of Security.

Pursuant to the new policy, inmates on investigative, disciplinary, and preventative segregation are housed on the extended lockdown tiers. Inmates on investigative segregation are those being investigated for a rule infraction, and they are housed on this status typically for a short period of time, usually no more than seventy-two hours, while the inmate waits to go before the disciplinary board. Baird Trial Tr. vol. XIV at 1059:13-19 [Record Document 555]. Inmates found guilty of a rule infraction could be sentenced to disciplinary segregation for a determinate period based on the new disciplinary matrix, which accompanied the new classification policy. However, there was conflicting testimony as to whether the disciplinary matrix was even in place as of March 2020. Regardless, after an inmate completes his disciplinary sentence, he remains on extended lockdown for an indefinite period under the status of preventative segregation. Baird Trial Tr. vol. XIV at 1065:19-1066:11 [Record Document 555]; Goodwin Trial Tr. vol. XVIII at 4415:14-20 [Record Document 562]. The inmate remains in the same cell and receives the same privileges whether on preventative or disciplinary segregation.[18] Record Document 524 ¶ 244.

As of March 2020, B-02-019 had no effect on the classification review board process. Goodwin Trial Tr. vol. XVIII at 4392:16-19, 4414:16-4415:8 [Record Document 562]. The board reviewed the status of inmates on preventative segregation every ninety

---

[18] An inmate immediately placed on extended lockdown as an initial classification decision would be considered in preventative segregation. In effect, preventative segregation also encompasses what was formally called administrative segregation at DWCC. *Compare* Ex. J-3 at 5 [Record Document 564-285] (describing administrative segregation), *with* Ex. P-JJJ-42 at 4 [Record Document 564-205] (describing preventive segregation). It appears parts of administrative segregation were partitioned into the new terms investigative, transitional, and preventative segregation.

days. Ex. P-JJJ-42 [Record Document 564-205]. The inmate did not attend the classification review, and mental health played no role in the classification review process. Mays Trial Tr. vol. IX at 2158:8-17 [Record Document 543]. Eventually, if the board determined that an inmate met the requirements to be moved to general population, he could be transferred to transitional segregation on N-1 before returning to general population.[19] Goodwin Trial Tr. vol. XVIII at 4415:14-20 [Record Document 562]. In short, despite the lack of clarity as to what components of this policy were in place before the March 15, 2020 discovery cut-off date, it still provides important context regarding the language and processes used in segregated and restricted housing at the time.

### D.     Level of Care

Before being assigned to DWCC, inmates in DOC custody typically receive an initial assessment at Elayn Hunt Correctional Center ("EHCC"). Record Document 524 ¶ 86. EHCC has reception and diagnostic capacities; it has a psychiatrist on staff and has a special housing unit for prisoners with a serious mental illness.[20] *Id.* ¶ 87. EHCC provides

---

[19] As stated above, N-1 now serves as a transitional unit.

[20] As discussed in detail below, the DOC's definition of serious mental illness is based on diagnosis and includes six enumerated conditions: major depressive disorder (MDD), schizophrenia, schizoaffective disorder, bipolar disorder, unspecified schizophrenia spectrum, and severe anxiety disorder. Ex. P-JJJ-25 at 2 [Record Document 564-204]; *see also* Ex. P-JJJ-42 at 5 [Record Document 564-205]. Separate from the DOC's definition, serious mental illness is also a term of art in the psychiatric field. The definition of serious mental illness, as used by psychiatrists, includes the above enumerated conditions but also includes a person with a diagnosed mental illness other than the categorical mental illnesses but whose symptoms cause such a functional impairment that the mental illness is recognized as serious based on the "duration . . . and the degree of disability that it is caused by." Burns Trial Tr. vol. V at 1271:22-1273:13 [Record Document 539]; *accord* Thompson Trial Tr. vol. XVII at 4113:2-25 [Record Document 561]. Experts for both Plaintiffs and Defendants agree that the DOC's list is underinclusive. Burns Trial Tr. vol.

in-person programming and regularly scheduled mental health counseling to prisoners with mental health needs who are classified as maximum-security custody. *Id.* ¶ 88.

The EHCC assessment consists of personality testing, IQ testing, and interviews, and results in a DSM-5 diagnosis of prisoners with mental illness; the findings are detailed in an "Assessment & Intervention Report" unique to each prisoner. *Id.* ¶¶ 89-90. The initial assessment also assigns an inmate a Level of Care ("LOC") designation for mental health. *Id.* ¶ 90. The LOC designations range from 5 (no mental illness) to 1 (most severe). *Id.* ¶ 94.

Inmates designated LOC-1 have a significant disability primarily due to their mental health condition. Ex. J-7 at 1 [Record Document 565-13]; *see also* Ex. D-14 at 6-7 [Record Document 565-12]. These inmates must be housed in a special mental health housing unit with constant monitoring by mental health staff. Ex. J-7 at 5-6 [Record Document 565-13]; *see also* Ex. D-14 at 6-7 [Record Document 565-12]. DWCC does not have the capabilities to house inmates classified as LOC-1. *See* Record Document 524 ¶ 95; Ex. J-7 at 5 [Record Document 565-13]; Ex. D-14 at 7 [Record Document 565-12].

Inmates classified as LOC-2 have been diagnosed with a serious mental illness and are presently unstable—that is, inmates with a diagnosed serious mental illness who have been in remission for less than six months or have displayed a pattern of instability. Ex. J-7 at 6 [Record Document 565-13]; Ex. D-14 at 7 [Record Document 565-12]. One example is an inmate on forced medication. Hayden Trial Tr. vol. II at 331:1-5 [Record

---

V at 1271:22-1273:13 [Record Document 539]; *see also* Thompson Trial Tr. vol. XVII at 4112:9-4113:25 [Record Document 561].

Document 534]. Although LOC-2s can be housed at DWCC per policy, the DOC avoids assigning LOC-2s to DWCC because DWCC lacks the necessary resources to safely care for those inmates. *See* Dauzat Trial Tr. vol. XV at 719:9-25 [Record Document 556]; *accord* Hayden Trial Tr. vol. II at 331:1-5 [Record Document 534].

Inmates who have been designated as LOC-3 have a diagnosed serious mental illness but have been in remission or stable for at least six months. Ex. J-7 at 6 [Record Document 565-13]; Ex. D-14 at 7 [Record Document 565-12]; Burns Trial Tr. vol. VI at 1477:6-9 [Record Document 540]. Stable means "there are not symptoms that are disrupting your functioning at that point in time." Burns Trial Tr. vol. VI at 1477:16-19 [Record Document 540]. In other words, the inmate can function despite having some symptoms—potentially by developing coping skills. *Id.* at 1477:16-1478:2. Dr. Gregory Seal ("Dr. Seal"), DWCC's contract psychiatrist, described stable as meaning "unchanging," which indicates that the treatment is working. Seal Trial Tr. vol. XVII at 3858:5-8 [Record Document 561].

LOC-4 is assigned to inmates who are diagnosed with mental illness and may be taking medication but are not diagnosed with a serious mental illness. Burns Trial Tr. vol. VI at 1476:9-12 [Record Document 540]; *accord* Hayden Trial Tr. vol. II at 331:12-16 [Record Document 534]; Ex. J-7 at 6 [Record Document 565-13]; Ex. D-14 at 8 [Record Document 565-12].

DOC Health Care Policy No. HC-36 states LOC-5 "shall be assigned to inmates who are not prescribed any psychotropic medication <u>and</u> who have had no mental health interventions for more than one year." Ex. D-14 at 8 [Record Document 565-12]

16

(emphasis in original). DWCC Employee Policy Memorandum #3-02-003 states that LOC-5 "shall be assigned to offenders not prescribed any psychotropic medication *or* current mental health intervention for more than one year." Ex. J-7 at 7 [Record Document 565-13] (emphasis added). Despite the slight difference in wording, LOC-5 simply means the inmate does not have mental health issues. Burns Trial Tr. vol. VI at 1476:13-15 [Record Document 540].

Inmates can be assigned two modifiers to their LOC designation: "F" and "H." Ex. J-7 at 7 [Record Document 565-13]. The modifier "F" means frequent mental health interventions; this modifier can be added to any LOC designation. *Id.* The modifier "H" may only be assigned to LOC-5s; it means there is a history of mental health issues. *Id.*

DWCC typically only houses inmates designated as LOC-3, -4, or -5. Dauzat Trial Tr. vol. III at 719:22-25 [Record Document 536]. LOC-3s and -4s comprise most of the mental health caseload at DWCC. Hayden Trial Tr. vol. II at 533:19-534:16 [Record Document 534]. About forty to forty-five percent of the inmates in restrictive housing at DWCC are diagnosed with a mental illness. Burns Trial Tr. vol. V at 1427:23-1428:1 [Record Document 539].

DWCC provides prisoners with an orientation, which informs them of the various options available to address mental health concerns. Record Document 524 ¶ 99. New intake prisoners with a mental health diagnosis are scheduled to see Dr. Seal at the next available time. *Id.* ¶ 100. However, there is no mental health treatment unit at DWCC. Hayden Trial Tr. vol. II at 318:13-16 [Record Document 534].

After arrival, the classification board interviews the inmate and assigns the inmate to a housing unit. DWCC often holds new inmates in segregation pending the initial classification decision. Ex. J-3 at 2 [Record Document 564-285]; Thompson Trial Tr. vol. XVII at 4131:16-21 [Record Document 561]. And even if an inmate qualifies for general population, he may sometimes remain in segregation on "backlog" until a bed becomes available in general population. Ex. J-3 at 2, 5 [Record Document 564-285]. The initial classification determination also could result in the inmate being placed immediately on extended lockdown on the South Compound. *See, e.g.*, Turner Trial Tr. vol. I at 45:22-46:4 [Record Document 533]; *accord* Moran Trial Tr. vol. I at 197:6-8 [Record Document 533]; Adams Trial Tr. vol. IV at 960:2-6 [Record Document 538]. DWCC's mental health department is not involved in an inmate's housing assignment. *See* Dauzat Trial Tr. vol. III at 750:20-751:3, 757:21-759:12 [Record Document 536] (stating that the mental health department plays no role in the classification of inmates with mental illness); Mays Trial Tr. vol. IX 2158:6-17, 2159:7-15 [Record Document 543] (stating that while serving as the Unit Manager of the South Compound and sitting on the classification board, mental health was not part of the classification decision).

## E.    Corrections Officials

James LeBlanc ("Secretary LeBlanc") is the Secretary of the DOC. LeBlanc Trial Tr. vol. XI at 2559:17 [Record Document 545]. As the Secretary, he is responsible for establishing policies and practices related to the mental health care services provided to prisoners in the DOC's custody. Record Document 524 ¶ 144. Secretary LeBlanc is the

final policymaker for the DOC, though he has delegated authority to other officials, such as Seth Smith. *See* LeBlanc Trial Tr. vol. XI at 2562:18-22 [Record Document 545].

Seth Smith ("Chief Smith") is the DOC's Chief of Operations. Smith Trial Tr. vol. XI at 2482:23 [Record Document 545]. He reports directly to Secretary LeBlanc. LeBlanc Trial Tr. vol. XI at 2259:18-19 [Record Document 545]. Chief Smith's responsibilities include oversight of the Office of Adult Offenders, local level housing of prisoners, transitional work programs, broad oversight over the adult institutions and state facilities, pre-classification functions, and review of Administrative Remedy Procedure ("ARP") complaints. Smith Trial Tr. vol. XI at 2483:2-7 [Record Document 545]. Chief Smith has oversight over DWCC, and he is the direct supervisor to regional wardens, including Jerry Goodwin. *Id.* at 2484:6-2485:15.

Jerry Goodwin ("Warden Goodwin") is a Regional Warden and the Warden of DWCC. Goodwin Trial Tr. vol. X at 2191:22-24 [Record Document 544]. As the Warden, he is responsible for establishing the policies and practices at DWCC and ensuring that DWCC's policies are consistent with DOC policies. Record Document 524 ¶ 145. Warden Goodwin also has direct supervisory responsibilities over certain personnel, such as Deputy Wardens, Assistant Wardens, and others. *See* Goodwin Trial Tr. vol. X at 2197:10-2198:11 [Record Document 544].

Deputy Warden Angie Huff ("Deputy Warden Huff") worked at DWCC for approximately thirty-two years until her retirement in January 2020. Huff Trial Tr. vol. IX at 1931:11-1931:20 [Record Document 543]. From 2004 until her retirement, she served as the Deputy Warden over Administration. *Id.* at 1932:17. She was responsible for human

resources, the business office, information technology, supervising assistant wardens, and disciplinary appeals, among other responsibilities. *Id.* at 1932:17-20. She was also the ADA coordinator. *Id.* at 1935:17-19. Deputy Warden Huff also served as a duty officer— i.e., the administrative officer responsible at the prison on the weekends and after hours. *Id.* at 1935:20-1936:1. As duty officer, she could approve status changes, such as approving a disciplinary action against an inmate on extended lockdown. *Id.* at 1941:24-1942:3.

Colonel Lonnie Nail ("Colonel Nail") served as the Unit Manager over the South Compound for approximately fifteen years before his retirement in June 2019; he subsequently returned to DWCC as a lieutenant colonel over investigations. Nail Trial Tr. vol. VII at 1656:14-19 [Record Document 541]. As Unit Manager, Colonel Nail's responsibilities included enforcement of the South Compound's rules and regulations. *Id.* at 1662:6-9. Colonel Nail also served on the classification board. *Id.* at 1663:4-15. After Colonel Nail retired, Tyrone Mays became the Unit Manager over the South Compound before his promotion to Assistant Warden over Security in March 2020. Mays Trial Tr. vol. IX at 2125:22-2126:4 [Record Document 543]. The current unit manager is Colonel Vincent Coleman ("Coleman"). Coleman Trial Tr. vol. VII at 1539:13-18 [Record Document 541].

Deputy Warden[21] Deborah Michelle Dauzat ("Deputy Warden Dauzat") is responsible for overseeing and supervising the mental health program and mental health staff at DWCC. Record Document 524 ¶ 54. She has a master's degree in social work and is a board approved Licensed Clinical Social Worker. *Id.* ¶ 47. She has been in the mental health field for over twenty-one years and has worked at DWCC since January 6, 2003. *Id.* ¶ 54. Deputy Warden Dauzat's specific responsibilities include supervising the mental health staff's creation of treatment plans, supervising the rounds made by the mental health staff, and supervising the mental health staff's creation of mental health management orders and intake assessments. *Id.* ¶¶ 55-58.

Steve Hayden ("Hayden") has worked at DWCC since January 3, 2005, and his current job title is Corrections Program Manager II. Hayden Trial Tr. vol. II at 312:7 [Record Document 534]; Record Document 524 ¶ 48. Hayden possesses a master's degree in industrial class organizational psychology, but he is not a licensed social worker. Record Document 524 ¶ 48; Hayden Trial Tr. vol. II at 315:20-316:8 [Record Document 534]. Part of his job responsibilities include providing direct mental health care to inmates on the South Compound. *See* Hayden Trial Tr. vol. II at 313:5-8 [Record Document 534]. Hayden is primarily responsible for providing mental health services to inmates housed in buildings N-3 and N-4 on the South Compound, but he also has responsibilities on the North Compound, including conducting anger management classes and reentry courses. Dauzat Trial Tr. vol. XV at 3354:14-21 [Record Document 556]; Hayden Trial Tr. vol. II

---

[21] In January 2020, Dauzat was promoted to Deputy Warden. Her previous title was Assistant Warden over Treatment. As Deputy Warden, she maintained her supervisory responsibilities over mental health care at DWCC in addition to her new duties.

21

at 314:18-315:19 [Record Document 534]. He reports directly to Deputy Warden Dauzat, and he directly supervises the only other mental health workers, Aerial Robinson and James Burgos. Hayden Trial Tr. vol. II at 318:17-319:4 [Record Document 534]. Hayden was not a credible witness; in fact, the Court would label Hayden as a recalcitrant witness. There were instances when Hayden's testimony contradicted his prior testimony or deposition.[22] Furthermore, the Court had to admonish Hayden on occasion for failing to answer and evading the questions asked of him,[23] using a disrespectful tone when responding to questions,[24] and arguing with counsel.[25]

Aerial Robinson ("Robinson") has a master's degree in social work, and as of March 2020, she was working towards obtaining her certification as a Licensed Master Social Worker.[26] Record Document 524 ¶ 49; Robinson Trial Tr. vol. XV at 3451:7-3454:8 [Record Document 556]. She was originally hired as a Social Service Counselor on September 20, 2016, and she was promoted to her current position as a Social Service

---

[22] The Court finds at least six instances in which Hayden contradicted his previous trial testimony or his deposition testimony. *See* Hayden Trial Tr. vol. II at 475:14-17, 524:10-525:12 [Record Document 534]; *see also* Hayden Trial Tr. vol. XVI at 3623:22-3624:4, 3729:4-3730:2, 3768:7-3769:20, 3774:19-3775:21 [Record Document 560].

[23] The Court finds at least eleven instances in which Hayden refused to respond to a question asked of him. *See* Hayden Trial Tr. vol. II at 429:19-430:2, 431:16-432:8. 432:22-434:3, 440:9-13, 441:8-11, 444:23-445:1, 464:15-18, 466:12-16, 534:19-536:20 [Record Document 534]; *see also* Hayden Trial Tr. vol. III at 566:19-567:18, 587:8-10 [Record Document 536].

[24] For a few examples of this, *see, e.g.,* Hayden Trial Tr. vol. II at 465:13-18, 534:19-535:13 [Record Document 534]; see *also, e.g.,* Hayden Trial Tr. vol. III at 564:13-14, 566:15-568:15 [Record Document 536].

[25] For a few examples of this, *see, e.g.,* Hayden Trial Tr. vol. II at 464:23-467:8, 534: 19-535:13 [Record Document 534]; *see also, e.g.,* Hayden Trial Tr. vol. III at 566:1-569:15 [Record Document 536].

[26] The Court notes that she obtained her license in January 2021. Robinson Trial Tr. vol. XV at 3452:2-3 [Record Document 556].

Counselor II on October 12, 2017. Record Document 524 ¶ 49. Although her primary caseload consists of inmates on the North Compound, she has provided—and still does provide some—mental health services to inmates on the South Compound. *See* Robinson Trial Tr. vol. XV at 3455:4-3456:5 [Record Document 556].

James Burgos ("Burgos") obtained his master's degree in industrial organizational psychology in 2006 and a master's degree in counseling in 2017; he is a Licensed Professional Counselor through the Louisiana Board of Licensed Professional Counselors. Record Document 524 ¶ 50. Burgos began working at DWCC in January or February 2019. Burgos Trial Tr. vol. XVI at 3779:24-3780:2 [Record Document 560]. He is primarily responsible for providing mental health care to inmates in buildings N-1 and N-2 on the South Compound and dormitories H-1 and H-2 on the North Compound. *Id.* at 3782:13-15.

Johnie Adkins ("Adkins") is the prison chaplain and holds a Master of Divinity, Master of Religious Education, Master of Theology, and Doctor of Theology. Record Document 524 ¶¶ 62-63.  Before becoming the prison chaplain in 2016, he served as a social service counselor and pastor. *Id.* ¶ 51; Adkins Dep., Ex. P-YYY-3 at 9:7-13 [Record Document 564-258].[27] In other words, he did not provide clinical assessments of inmates. *See id.* He now provides mental health services from the pastoral background. *Id.* at 11:23-12:24. At times, however, Adkins has conducted the initial intake screening and

---

[27] Adkins testified via deposition in lieu of live testimony. Adkins's testimony is located at Ex. P-YYY-3 [Record Document 564-258].

evaluated inmates on suicide watch despite his obvious lack of qualifications to do so. Adkins Dep., Ex. P-YYY-3 at 27:7-16 [Record Document 564-258].

Dr. Seal is the contract psychiatrist at DWCC. Record Document 524 ¶ 52. Dr. Seal is not an employee of the DOC. *Id.* ¶ 66. As of March 2020, Dr. Seal's contract is to provide treatment at DWCC for eighteen hours per month, which includes his travel time from Shreveport to Homer, Louisiana. *Id.* ¶¶ 69-70. Dr. Seal is generally on-site at DWCC every two weeks. *Id.* ¶ 68. Dr. Seal is the only psychiatrist providing treatment at DWCC. *Id.* ¶ 64.

### F.    Expert Witnesses

The Court was aided by the testimony of five expert witnesses[28] in the areas of correctional operations and security, psychiatry, and psychology.

#### 1.    Dan Pacholke

Dan Pacholke ("Secretary Pacholke") one of Plaintiffs' experts, is the former Secretary of the Department of Corrections for the State of Washington. Pacholke Trial Tr. vol. XI at 2603:14-16 [Record Document 545]. Prior to serving as Secretary, he spent over thirty-three years working at various levels for the Washington Department of Corrections, including as the Superintendent (Warden) of Prisons. *Id.* at 2601:15-19. Secretary Pacholke now runs his own business as a consultant on cases involving corrections system. *Id.* at 2600:2-2601:2.

---

[28] Dr. Seal, a party to this litigation, was permitted to testify as a "treating physician." Seal Trial Tr. vol. XVII at 3851:16-20 [Record Document 561].

As part of his work, Secretary Pacholke has extensive experience touring carceral facilities all over the country with a focus on maximum custody. Pacholke Trial Tr. vol. XII at 2709:1-12 [Record Document 553]. For example, he has toured numerous prisons in Alaska, Illinois, Massachusetts, and Florida, and all the prisons in Washington; he has also toured a handful of prisons in other states, including Virginia, Michigan, Nebraska, Indiana, California, Montana, New York, and Ohio. *Id.*

In this case, Secretary Pacholke toured DWCC for two days in October 2019 and interviewed a number of prisoners who were housed in buildings N-1 through N-4. Pacholke Trial Tr. vol. XI at 2614:13-2615:15 [Record Document 545]. He was accepted by the Court as an expert in corrections operations. *Id.* at 2613:12-17. Secretary Pacholke credibly found that the conditions and practices on the South Compound are extremely harsh compared to other prisons around the country and inconsistent with modern correctional practices regarding restrictive housing.

### 2. Dr. Craig Haney

Craig Haney, Ph.D., J.D. ("Dr. Haney"), was another expert for Plaintiffs. He has a Ph.D. in psychology; he also graduated from Stanford Law School. Haney Trial Tr. vol. XII at 2846:16-2847:3 [Record Document 553]. Dr. Haney has been employed as a professor of psychology at the University of California, Santa Cruz for over forty years. *Id.* at 2847:24-2848:7. Dr. Haney specializes in social psychology and its interaction with the legal system. *Id.* at 2846:21-2847:9. Dr. Haney testified, "Social psychology is the study of how people are changed and affected by the settings or the situations or the environments in which they find themselves, and we study a range of different kinds of

environments." *Id.* at 2847:5-8. Dr. Haney was accepted as an expert in social psychology and solitary confinement. *Id.* at 2853:24-2854:3.

Dr. Haney is not a clinical psychiatrist and does not diagnose. *Id.* at 2851:25-2852:4. Dr. Haney's job in this case was to provide a description of the current state of knowledge on the effects of solitary confinement, that is, how people are affected by and sometimes harmed by the experience of solitary confinement, to evaluate the conditions of confinement in certain areas of DWCC with respect to whether or not they meet the definition of solitary confinement or restrictive housing, and to evaluate whether or not the inmates are suffering any adverse consequences from solitary confinement as defined in the literature. *Id.* at 2854:13-2855:13. Furthermore, he was asked the narrower question of whether and how people with mental illnesses suffer more and might be more vulnerable to the negative or harmful effects of solitary confinement. *Id.*

Dr. Haney visited DWCC on two separate occasions: in August 2018 and in October 2019. *Id.* at 2859:23-25. While he was there, he toured buildings N-1 through N-4 and the outdoor recreation cages. *Id.* at 2859:14-19. A photographer accompanied Dr. Haney on at least one of his visits and photographed certain things that Dr. Haney observed. *Id.* at 2860:10-24.

Additionally, Dr. Haney conducted cell-front and individual interviews of inmates on extended lockdown. *Id.* at 2168:8-11. Interviewees for confidential interviews were chosen in three ways: 1) by Plaintiffs' attorneys, 2) by personal selection after cell-front interviews, and 3) by a randomized roster of inmates on extended lockdown. *Id.* at 2861:14-2862:1. During the interviews, Dr. Haney utilized individual questions in a

structured interview format that he has perfected over the course of his career. *Id.* at 2862:7-12. Essentially, he inquired about their social backgrounds, their mental health history, and their involvement in the prison system. *Id.* at 2862:15-2864:11. He asked them questions about things that people experience in solitary confinement and whether these things have bothered them. *Id.* He also reviewed the medical records of those interviewed individuals, and he reviewed DWCC and DOC policies. *Id.* at 2865:11-20.

As will be detailed below, Dr. Haney credibly established that prolonged solitary confinement could produce numerous negative psychological effects that can harm inmates mentally and physically and that many inmates on the South Compound are exposed to these stressors and reported high levels of suffering from the effects of solitary confinement.

### 3.   Dr. Kathryn Burns

Kathryn Burns, M.D. ("Dr. Burns"), the former chief psychiatrist for the Ohio Department of Corrections, appeared as an expert witness for Plaintiffs. She was accepted by the Court as an expert in the field of clinical psychiatry and corrections systems. Burns Trial Tr. vol. V at 1260:2-6 [Record Document 539]. She has extensive experience in providing mental health care in correctional settings, as well as designing and setting policies for the delivery of mental health care. *See id.* at 1236:15-1251:10. Indeed, much of her professional career has been dedicated to the delivery of mental health services to incarcerated individuals. *Id.* Dr. Burns has served as an expert witness in many cases, and she has even been selected as a "special master" in multiple prison litigation suits, where she became the "jointly agreed upon expert for monitoring the results" and "the

implementation of [the] agreement." Burns Trial Tr. vol. V at 1250:11-1251:10 [Record Document 539].

Dr. Burns has a Bachelor of Science from Cleveland State University and a medical degree from Case Western Reserve University; she completed her psychiatric residency at University Hospitals in Cleveland and completed a forensic fellowship. *Id.* at 1248:1-6. She has earned a master's degree in public health from Ohio State University. *Id.* at 1248:6-8. She is certified by the American Board of Psychology and Neurology in general psychiatry and forensic psychiatry. *Id.* at 1248:13-20.

Dr. Burns served two terms as the chief psychiatrist for the Ohio Department of Rehabilitation and Corrections from 1995 to 1999 and then again from 2013 to 2018. *Id.* at 1240:1-10. On both occasions she was responsible for overseeing the delivery of mental health services to the inmates. *Id.* at 1240:12-14. She was responsible for policy development and the development of additional levels of care within the department of corrections. *Id.* at 1240:21-1241:2. She also developed policies on residential care, inpatient care, outpatient care, involuntary medication administration, and the transfer of a patient from a correctional facility into a psychiatric hospital. *Id.* Additionally, she was charged with recruiting and retaining psychiatric staff for the Ohio Department of Rehabilitation and Corrections. *Id.* at 1241:3-5. Under her leadership, the department created crisis stabilization units and suicide prevention policies. *Id.* at 1241:5-7

In between stints for the Ohio Department of Corrections, she served as Chief of Forensics Services at the state hospital in Columbus. *Id.* at 1244:17-21. She supervised psychiatrists and continued to perform competency and sanity evaluations. *Id.* at 1244:21-

1245:1. She also provided direct psychiatric care to inmates at the Franklin County jail facilities in Columbus, Ohio. *Id.* at 1245:1-6.

As part of this case, Dr. Burns visited DWCC twice—once in August 2018 and once in October 2019. *Id.* at 1254:21, 1256:2-3. Her focus was to assess the mental health care provided to inmates on extended lockdown at DWCC. *Id.* at 1255:14-17, 1256:24-1257:4. Dr. Burns's methodology was to review the policies and procedures of the DOC and DWCC. Dr. Burns also conducted cell-front and individual interviews with the inmates on extended lockdown at DWCC and examined standards and physician statements from professional organizations. Based on her training, experience, and education, Dr. Burns credibly established that DWCC fails to deliver adequate mental health care to inmates on extended lockdown at DWCC and that these inadequacies harm inmates housed there, particularly the mentally ill.

### 4. Dr. John Thompson

John Thompson, M.D. ("Dr. Thompson"), appeared as an expert for Defendants. Dr. Thompson has a medical degree from the University of Texas at San Antonio and did his residency training at the University of Florida. Thompson Trial Tr. vol. XVII at 3943:13-21 [Record Document 561]. He also completed a forensic fellowship in the fourth year of his training. *Id.* at 3943:21-23. His residency was in psychiatry and forensic psychiatry. *Id.* at 3943:25. He defined forensic psychiatry as the point at which psychiatry interfaces with the law and can include commenting on rules and regulations to legislators, correctional psychiatry, inpatient state hospital psychiatric care, or medical malpractice. *Id.* at 3944:1-13.

Dr. Thompson is board certified in general psychiatry with added qualifications in forensic psychiatry and addiction psychiatry. *Id.* at 3944:14-17. He is licensed in Louisiana, Alabama, and Colorado. *Id.* at 3945:3-6. He is affiliated primarily with Tulane University Hospital systems and East Louisiana Mental Health System ("ELMHS"), the state hospital in Jackson, Louisiana. *Id.* at 3945:8-13. Dr. Thompson is Chief of Staff at ELMHS and the chairman of the Department of Psychiatry at Tulane. *Id.* at 3945:14-3946:25. He has been involved in developing a forensic fellowship program at Tulane. *Id.* at 3947:3-3948:6. Dr. Thompson testified that he has consulted before to evaluate correctional systems and has consulted to establish treatment programs within correctional systems over the years but has never testified in a similar case. *Id.* at 3948:24-3949:4. Part of his consulting experience involved supervising three doctors who provided treatment at EHCC and the Louisiana Correctional Institute for Women for about three years. *Id.* at 3949:16-3950:12. He also supervises a doctor who provides care at the New Orleans Justice Center. *Id.* at 3950:13-17.

Dr. Thompson and two of his direct reports, Dr. Herman Soong and Dr. Sankep Vyas, have evaluated different prison systems in the past, including the Bridgewater State Hospital in Massachusetts[29] (where they reviewed restraint data) and the Tutwiler Prison in Alabama (an all-female prison where they were tasked with assisting the prison in meeting the National Commission on Correctional Health Care's standards). *Id.* at 3951:3-

---

[29] It is important to note that Bridgewater State Hospital is not a prison or correctional facility. It is a state hospital. Specifically, Dr. Thompson calls it a "forensic hospital." Thompson Trial Tr. vol. XVII at 4104:19-4105:1 [Record Document 561]. Though important, Dr. Thompson's experience at the state hospital cannot be equated to experience in the correctional setting.

3953:25, 3963:23-3964:20. For his report, Dr. Thompson, Dr. Soong, and Dr. Vyas visited DWCC twice; the first visit being April 29-30, 2019, and the second on January 8, 2020. *Id.* at 3964:19-22. The three doctors interviewed a total of fifty-one inmates at DWCC, most of whom were assigned to restricted housing units. *Id.* at 3965:24-3966:12. Neither Dr. Soong nor Dr. Vyas testified.

The Court finds that Dr. Burns's experience in developing policies and procedures for prisons as well as her knowledge of treatment of the mentally ill at prisons overshadows that of Dr. Thompson. Currently, Dr. Thompson does not provide services in a prison setting. *Id.* at 3958:19-21. Additionally, Dr. Thompson has never published anything about the effects of solitary confinement on mental health or the effects of socialization on mental health. *Id.* at 3961:10-17.

It is important to note that, while there may be some similarities between the treatment of patients at a hospital like ELMHS, it is a medical setting and not a prison setting. There are key differences between state hospitals for the mentally ill and prisons; these differences include the resources and treatment available to the patient, the use of disciplinary practices (including the use of force), and the overall purpose for institutionalizing these individuals (the emphasis of treatment in a mental health setting versus the punitive nature of the prison), to name a few. These differences make Dr. Burns's testimony more reliable and credible than Dr. Thompson's.

The Court declined to qualify Dr. Thompson as an expert psychiatrist in the provision of mental health care in correctional systems. Instead, the Court qualified him as

a forensic psychiatrist, which Dr. Thompson admitted is his typical tender. *See id.* at 3961:1-3962:7.

        5.    <u>James Upchurch</u>

James R. Upchurch ("Upchurch") appeared as an expert for the Defendants. Upchurch has a master's degree in interdisciplinary sciences, which include the study of biology, chemistry, and mathematics. Upchurch Trial Tr. vol. XIV at 3178:12-18 [Record Document 555]. He also has received other certifications in public administration and management through Arizona State University, the National Institute of Corrections ("NIC"), and the University of Southern California. *Id.* at 3178:19-23. Upchurch was accepted by this Court as an expert in prison operations and security. *See id.* at 3191:3-3192:3. The Court declined to certify Upchurch as an expert in segregated housing because, although he has some experience in the area, it does not rise to the level of making him independently qualified as an expert in that area. *Id.* at 3192:3-10.

Upchurch has approximately forty-five years of experience working at various levels and capacities within corrections facilities across Mississippi, Arizona, and Florida. *Id.* at 3179:5-3183:24. Over the course of his career, Upchurch has held thirteen different job titles, with varying levels of supervisory, management, and decision-making responsibilities, including deputy warden for operations at the Mississippi State Penitentiary, unit warden for the Arizona State Prison Complex special management unit, the Chief of Bureau Security Operations for the Florida Department of Corrections, and the Director of Operations and Support Deputy Assistant Secretary for the Florida Department of Corrections. *Id.*

In 1997, the NIC asked Upchurch to begin consulting on security auditing and the establishment of security standards. *Id.* at 3186:13-19. As part of his consulting work with the NIC, Upchurch conducted on-site security audits and assessments on facility operations at correctional institutions across thirty-eight states. *Id.* at 3186:16-3187:5. Upchurch also created the staffing analysis program at the NIC. *Id.* at 3187:19-30. After his retirement from his role as Assistant Secretary for Institutions with the Florida Department of Corrections in 2015, Upchurch began his own consulting business, Upchurch Consulting. *Id.* at 3183:20-24.

As part of this case, Upchurch conducted an on-site visit to DWCC on January 27 and 28, 2020. *Id.* at 3251:5-6. During his visit, Upchurch visited parts of the North Compound, though most of his time was spent touring sections of N1, N2, N3, and N4 on the South Compound. *Id.* at 3227:6-18. He also was able to observe inmate interactions, speak with DWCC staff, visit the "key room" where inmates placed on suicide watch are observed on camera, and converse with Warden Goodwin. *See id.* at 3278:17-3280:10. As part of his methodology, Upchurch reviewed the prison files of three DWCC inmates: Larry Jones, Ronald Brooks, and Bruce Charles for the purpose of comparing their watch status to their medical records. *Id.* at 3244:29-3245:5. In his testimony, Upchurch stated that he evaluated various DWCC internal policies, but specific reference was only made to Policy 34, *e.g., id.* at 3253:12-25,[30] as well as the American Correctional Association's 2019 accreditation audit. *Id.* at 3213:10-11. Upchurch's testimony provided contextual

---

[30] During his testimony, other policies are referenced more generally. *See, e.g.,* Upchurch Trial Tr. vol. XIV at 3260:10 [Record Document 555] ("the use of force policy"), or *e.g., id.* at 3221:9 ("You're referring to the draft policy?").

information on the operation of correctional facilities. He also provided his expert opinion on the extent to which DWCC's policies and operations were consistent with other correctional facilities he has observed, *see, e.g., id.* at 3240:8-25, as well as the standards outlined in the fourth and fifth editions of the American Correctional Association's requirements for accreditation. *E.g., id.* at 3190:22-25.

## IV.   Eighth Amendment Claims

### A.   Background

"Central to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979) (cleaned up). Prison officials are afforded wide discretion "in the application of policies and practices designed to maintain security and preserve internal order." *McCord v. Maggio*, 910 F.2d 1248, 1251 (5th Cir. 1990). This includes separating inmates from other inmates, imposing discipline, and using reasonable force. *See id.*; *see also Turner v. Lynaugh*, 40 F.3d 385, 1994 WL 652587, at *4 (5th Cir. 1994) (per curiam).

At the same time, the Eighth Amendment grants all persons the right to be free from "cruel and unusual punishments." U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."). Although the Eighth Amendment "does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), "[p]rison officials must provide humane conditions of confinement; they must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measure to ensure the safety of the inmates," *Gates v. Cook*, 376 F.3d 323, 332 (5th Cir. 2004). "Mental health needs are no less serious

than physical needs." *Id.* "While the prison administration may punish, it may not do so in a manner that threatens the physical and *mental health* of prisoners." *Young v. Quinlan*, 960 F.2d 351, 364 (3d Cir. 1992) (cleaned up) (emphasis added).

Plaintiffs contend that DWCC violates the Eighth Amendment because the conditions on the South Compound at DWCC constitute mental torture. Plaintiffs allege that DWCC houses inmates, many of whom suffer from mental illness, in inhumane conditions for months (sometimes years) with minimal property and little to no meaningful social interaction and environmental stimulation. Along with the inhumane conditions, Plaintiffs maintain that DWCC fails to provide inmates adequate mental health care while on the South Compound. It is the inhumane conditions and the failure to deliver adequate mental health services that, Plaintiffs argue, cause inmates to undergo decompensation and expose them to a substantial risk of serious harm.

### B.     Eighth Amendment Standard

As stated above, the Eighth Amendment mandates inmates be housed in humane conditions, though not necessarily comfortable ones. *Rhodes*, 452 U.S. at 349; *Cook*, 376 F.3d at 332. In determining whether prison officials have violated the Eighth Amendment, courts must apply a two-part test. The first part is an objective test; courts must consider whether the alleged constitutional deprivation is of a "sufficiently serious" nature. *See Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (summarizing the objective component as asking whether the deprivation was "sufficiently serious"). To be sufficiently serious, the alleged deprivation must result in the denial of the "minimal civilized measure of life's necessities," *Rhodes*, 452 U.S. at 347, or result in inmates being housed under conditions

that pose a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 834 (1995); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993). The United States Supreme Court has made clear that these standards are not static but should be based on "the evolving standards of decency that mark the progress of a maturing society." *Farmer*, 511 U.S. at 833-34; *Rhodes*, 452 U.S. at 346.

The second part of the test is subjective; the fact finder must determine whether the defendants were deliberately indifferent to an inmate's health and safety. "A prison official displays deliberate indifference only if he (1) 'knows that inmates face a substantial risk of serious bodily harm' and (2) 'disregards that risk by failing to take reasonable measures to abate it.'" *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)). An obvious risk could be sufficient to allow a fact finder to conclude that prison officials knew of the risk. *Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015) (citing *Cook*, 376 F.3d at 340); *see Farmer*, 511 U.S. at 842; *Harris v. Hegmann*, 198 F.3d 153, 159 (5th Cir. 1999). Willful blindness is not a defense. *See Farmer*, 511 U.S. at 843 n.8 (stating a defendant "would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist"). "The long duration of a cruel punishment condition may make it easier to establish knowledge and hence some form of intent." *Wilson*, 501 U.S. at 300.

The Court will first address Plaintiffs' claim that the conditions on the South Compound are inhumane before moving to their claim regarding the systemic deficiencies in the delivery of mental health services to inmates in extended lockdown.

### C.     Conditions of Confinement

Plaintiffs attack the conditions of confinement on the South Compound at DWCC. The evidence at trial showed that inmates on the South Compound are exposed to a substantial risk of psychological harm by policies causing or related to social isolation, enforced idleness, and indefinite exposure to conditions on extended lockdown. As detailed below, Plaintiffs' evidence credibly established that the conditions, policies, and practices in place on the South Compound subject inmates to a significant risk of severe psychological pain by depriving them of meaningful human contact, personal property, and mental stimulation for an indefinite period. Furthermore, in spite of their awareness of these unlawful conditions, Defendants have been deliberately indifferent by failing to take reasonable steps to alleviate those conditions.

### 1.     Substantial Risk of Serious Harm

Although the need for segregation is within Defendants' sound discretion, "there is a line where [its] conditions [can] become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment." *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974). "[A] remedy for unsafe conditions need not await a tragic event." *Helling*, 509 U.S. at 33. "Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable

human need." *Cook*, 376 F.3d at 333 (citation omitted). "It goes without question that an incarceration that inflicts daily, permanently damaging, physical injury and pain is unconstitutional . . . [T]he same standards that protect against physical torture prohibit mental torture as well—including the mental torture of excessive deprivation." *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 914 (S.D. Tex. 1999). "Mental health, just as much as physical health, is a mainstay of life. Indeed, it is beyond any serious dispute that mental health is a need as essential to a meaningful human existence as other basic physical demands our bodies may make for shelter, warmth or sanitation." *Madrid v. Gomez*, 889 F. Supp. 1146, 1261 (N.D. Cal. 1995). If "the particular conditions of segregation being challenged are such that they inflict a serious mental illness, greatly exacerbate mental illness, or deprive inmates of their sanity, then [D]efendants have deprived inmates of a basic necessity of human existence—indeed, they have crossed into the realm of psychological torture." *Id.* at 1264.

   (a) *Psychological Harms of Solitary Confinement*

  Solitary confinement[31] is "an environment in which prisoners are kept in their cell upwards of [twenty-two] or more hours a day" and are "kept away from or not allowed to participate in the normal day-to-day routines that prisoners in general population participate in," such as vocational training, work programs, and educational courses. Haney Trial Tr. vol. XII at 2867:22-2868:2 [Record Document 553]. Additionally, there

---

[31] As stated above, DWCC refers to solitary confinement as extended lockdown.

are various levels of material deprivations.[32] *Id.* at 2868:6-16. The restricted housing units are designed to decrease social interactions and environmental stimulations and enforce idleness.

There is a consensus in the correctional field and scientific literature that long-term segregation in solitary confinement poses a significant risk of harm to the mental health of all inmates and is especially harmful for inmates with mental illness. *See id.* at 2872:17-21; *accord* Thompson Trial Tr. vol. XVII at 4105:16-4107:3 [Record Document 561]. Dr. Haney, who has spent over forty years studying the psychological effects of solitary confinement, *see generally* Ex. P-K-05 [Record Document 564-63], testified that there has been research on the issue of solitary confinement that goes back a century and a half. Haney Trial Tr. vol. XII at 2872:25-2873:3 [Record Document 553]. Related to this body of research is the study of the negative psychological and medical effects of social isolation in the world at large. *Id.* at 2873:22-2874:1. In summarizing the literature regarding solitary confinement, and social isolation generally, and the effect on mental health, Dr. Haney unequivocally testified that the absence of meaningful human contact and social interaction, along with enforced idleness for prolonged periods of time, produces negative psychological effects that expose inmates to psychological and, sometimes, physical harm. *Id.* at 2873:16-2874:17.

---

[32] Some solitary confinement units around the country allow inmates to have access to televisions, radios, or a tablet. Haney Trial Tr. vol. XII at 2868:6-16 [Record Document 553]. As detailed below, at DWCC, however, virtually all property is taken away, except for limited reading material.

The harm can be severe and lead to permanent dysfunction. Dr. Haney testified that the harmful effects "cluster in certain areas of a person's functioning." *Id.* at 2874:18-23. Solitary confinement can take a toll on an individual's emotional well-being, behavioral health, and cognitive and intellectual functioning. *Id.* at 2874:23-2876:14. It can also destabilize one's identity and create long-term distance between the person and others, even after he is released from solitary confinement. *Id.* at 2874:23-2878:10. Specifically, inmates are placed at risk of experiencing disturbances, severe anxiety, a sense of impending emotional breakdown, hypersensitivity to stimuli, irritability, aggression, rage, loss of control, ruminations, paranoia, perceptual distortions, cognitive dysfunction, hallucinations, depression, self-mutilation, suicidal ideation and behavior, and social withdrawal. *See id.* at 2877:15-2880:24, 2962:8-2964:25.

There is also widespread agreement that restrictive housing and solitary confinement pose an even greater risk of harm to inmates with mental illness. *See* Burns Trial Tr. vol. V at 1266:20-1273:13 [Record Document 539]; *accord* Haney Trial Tr. vol. XII at 2879:18-20 [Record Document 553]; Thompson Trial Tr. vol. XVII at 4105:16-4107:3 [Record Document 561]. Dr. Burns, testifying from a clinical perspective, stated that there is agreement among the literature and experts in the field that inmates with serious mental illness have a particularly difficult time with the conditions in restrictive housing,[33] which include the absence of meaningful social interactions, enforced idleness,

---

[33] Dr. Burns clarified her use of the terms restrictive housing, segregated housing, extended lockdown, administrative segregation, and disciplinary segregation, and solitary confinement. She explained that currently in the field of corrections being locked down for more than twenty-two hours a day is referred to as "restrictive housing." But she

sensory deprivations, and the restrictive and oppressive security measures. Burns Trial Tr. vol. V at 1265:21-1266:19 [Record Document 539]. Furthermore, inmates with mental illness are at a greater risk of decompensating in a restrictive housing setting. Restrictive housing can exacerbate a preexisting mental illness or cause the activation of symptoms that were previously in remission. As a result, many professional organizations have condemned the long-term use of solitary confinement for inmates with mental illness.

The American Psychiatric Association issued a position statement in 2012 in which it advised against ever keeping a person who is suffering from serious mental illness in solitary confinement for a period of longer than four weeks. Haney Trial Tr. vol. XII at 2889:7-17 [Record Document 553]. Dr. Haney articulated that the National Commission on Correctional Health Care, an organization of professional health care administrators who work in correctional settings, issued a position paper in 2016 in which it argued that nobody should be housed in solitary confinement for more than fifteen days and that a person with a serious mental illness should never be placed in solitary confinement because of the heightened risk of harm that vulnerable populations like the mentally ill experience in solitary confinement. *Id.* at 2889:18-2890:10.

Defendants challenged Dr. Haney's conclusions by citing the "Colorado Study." Dr. Thompson testified that the Colorado Study was a longitudinal study of the entire Colorado prison system to prove that restrictive housing causes or aggravates mental

---

explained that the other terms are "subsets" within restrictive housing. She testified that all of the inmates on the South Compound are in restrictive housing, with the exception of some individuals on N-1 who are being prepared for release to the community. Burns Trial Tr. vol. V at 1264:15-1265:20 [Record Document 539].

illness. Thompson Trial Tr. vol. XVII at 4059:11-4060:18 [Record Document 561]. After the one-year study concluded, the researchers found that restrictive housing did not cause or worsen mental illness because people acclimate to the environment. *Id.* at 4060:11-18.

The Court, however, finds Dr. Haney's testimony credible in that the Colorado Study is an outlier study and is flawed. Haney Trial Tr. vol. XII at 2881:23-2882:7 [Record Document 553]. Indeed, Colorado abolished long-term solitary confinement notwithstanding this study. *Id.* at 2893:4-16. Additionally, Dr. Thompson acknowledged that the results run counter to what many psychiatrists in the field think. *See generally* Thompson Trial Tr. vol. XVII at 4061:13-25 [Record Document 561]. More germane, Dr. Thompson acknowledged that the inmates in Colorado received greater privileges (such as programming) than inmates at DWCC, and were single celled, so the results could differ at DWCC. *Id.* at 4059:21-4060:3. The Court finds that the factual differences as to the conditions of confinement in the Colorado Study and those at DWCC limit the Colorado Study's relevance to this litigation. Dr. Thompson bases his opinion that restrictive housing does not have an adverse effect on inmates' mental health solely on the basis of reciting to the Court what he read in the Colorado Study, as opposed to his own research or observation. Finally, the Court finds that Defendants' contention that extended stays in segregated housing has no adverse effects on mental health is belied by its own policy that segregated inmates must have an evaluation every thirty and ninety days. The segregated inmate interviews will be discussed in further depth in a later section.

Accordingly, the Court finds that the severity of the conditions and length of the stay in restrictive housing or extended lockdown work in tandem to create a serious risk of

harm. *See* Burns Trial Tr. vol. V at 1269:5-1271:5 [Record Document 539]. And, at DWCC, the conditions on the South Compound are stark.

(b)    *Conditions on the South Compound*

Buildings N-1 through N-4 serve as restrictive housing units at DWCC. As of March 2020, 366 inmates resided in buildings N-1 through N-4. Ex. J-21 at 9 [Record Document 565-49]. Inmates on the South Compound are stripped of virtually all personal belongings and deprived of meaningful human contact and mental stimulation for indefinite, but often lengthy, periods through policies and practices in place at DWCC. The near total deprivation, however, starts with the physical design and composition of the tiers on the South Compound.

i.    Physical Composition and Environment

The evidence showed that the physical composition of the tiers on the South Compound was designed to reduce activity and positive stimulation. The cells in buildings N-1 through N-4 are stark and extremely small—approximately fifty-six square feet, which is non-compliant with the American Correctional Association standards for cell size and substantially smaller than other isolation units throughout the country. Haney Trial Tr. vol. XIII at 2982:17-2983:3 [Record Document 554]; Upchurch Trial Tr. vol. XIV at 3213:13-3214:10 [Record Document 555]; *see Madrid*, 889 F. Supp. at 1228 (describing cells that were eighty square feet). The cells have either a single or a double built-in bunk, a toilet-sink unit, a mirror, and a metal footlocker for storing items.[34] *See, e.g.,* Ex. P-

---

[34] In connection with Dr. Haney's testimony, Plaintiffs admitted multiple photographs as Exhibit P-GGG, including photographs of the cells. *See, e.g.*, Exs. P-GGG-27 [Record

GGG-27 [Record Document 564-185]. Inmates who are double-bunked must share this small space with other inmates.[35]

The tiers also provide no visual stimulation. All cells on the South Compound are open front cells that face concrete walls and the outer windows; the cell doors are made of perforated metal, which significantly blocks vision out of the cell.[36] *See* Record Document 524 ¶ 43. Willie Dillon, a testifying inmate, stated that, at times, he could see outside the tier windows but could only view the exterior wall of the neighboring housing building. *See* Dillon Trial Tr. vol. I at 262:1-7 [Record Document 533]. Most of the time, however, only white concrete walls are within the inmates' visibility. Adams Trial Tr. vol. IV at 961:4-13 [Record Document 538].

The noise level on the tiers fluctuates between complete silence and loud chaos. Carlton Turner and Corey Adams, testifying inmates, described how the tiers were

_____

Document 564-185], P-GGG-33 [Record Document 564-186], P-GGG-34 [Record Document 564-187], P-GGG-124 [Record Document 564-195], P-GGG-147 [Record Document 564-198], P-GGG-149 [Record Document 564-199]. Some of the photographs were sealed for institutional security.

[35] Dr. Haney credibly explained that confining two people in this tight space for a prolonged period is not meaningful social interaction and can even be more deleterious to the mental health of those inmates, exposing them to a greater risk of harm. Dr. Haney testified, "Even though you are with someone, you are alone in a way. I've sometimes said that people who are in these double-celled conditions are both overcrowded and isolated. They're crowded too close together for too long a period of time." Haney Trial Tr. vol. XIII at 2988:13-17 [Record Document 553]. He further stated that the "unavoidably close contact is potentially very dangerous in a different way because of the possibility that conflict will arise between people who are housed under those conditions with virtually nothing to do and virtually no opportunity to get away from one another." *Id.* at 2989:1-5. The existence of a cellmate in such close quarters thus does not provide for meaningful social contact.

[36] *See* Exs. P-GGG-35 [Record Document 564-188], P-GGG-36 [Record Document 564-189], P-GGG-145 [Record Document 564-196], P-GGG-146 [Record Document 564-197], P-GGG-149 [Record Document 564-199].

sometimes miserably "quiet." *Id.* at 961:21-962:9; *accord* Turner Trial Tr. vol. I at 47:12-17 [Record Document 533]. Per policy, inmates are not permitted to communicate with inmates outside of their cell, but if they have a cellmate, they can converse with each other in low conversational tones. *See* Ex. P-JJJ-24 at 2 [Record Document 564-203]. Other inmates, however, testified consistently that the tiers would get "very loud" and that there was "a lot of screaming and hollering." Solomon Trial Tr. vol. III at 596:10-16 [Record Document 534]. Damion Brumfield testified that extended lockdown was loud and filthy like a "zoo" and that every sound "echoes" down the tier.[37] Brumfield Trial Tr. vol. I at 155:1-22 [Record Document 533].

Additionally, inmates have no control over the climate on the tiers. The buildings on the South Compound have fans and heaters but do not have air conditioning. Baird Trial Tr. vol. IV at 1070:18-21 [Record Document 538]. At DWCC, the inmate housing units are the only buildings without air conditioning. Dauzat Trial Tr. vol. XV at 3437:13-3439:10 [Record Document 556]. This causes the tiers to become "excruciatingly hot" during the summer. Turner Trial Tr. vol. I at 48:8-10 [Record Document 533]. Inmates consistently testified that the oscillating fans provide no relief from the heat. *See, e.g.,* Moran Trial Tr. vol. I at 237:6-22 [Record Document 533]. DWCC only provides inmates with ice at mealtime and damp clothes or paper towels to counter the heat. *Id.* at 240:1-11. And so, inmates often have to take extreme measures to cool off. One inmate, Ronald Brooks, testified that he stuck his feet in the toilet to cool down. Da'marcus Thomas and

---

[37] Dr. Burns testified that a harmful effect of solitary confinement at DWCC is the "den of noise" that inmates have no control over and can find "difficult to tolerate." Burns Trial Tr. vol. V at 1265:23-1266:14, 1271:9-18 [Record Document 539].

Joshua McDowell testified that they laid on the floor to cool off, and in McDowell's particular case, he removed his jumpsuit and poured water on the floor to lay in it. Thomas Dep. vol. I at 37:1-12 [Record Document 533]; McDowell Trial Tr. vol. IV at 1012:18-1013:11 [Record Document 538].

Conversely, in the winter, the tiers become "extremely cold." Quentin Moran, an inmate, testified that the tier windows are left open because some are broken, so the cold air fills the tier. Moran Trial Tr. vol. I at 199:9-19 [Record Document 533]. McDowell testified that, at times, he could see his own breath and that security did not provide blankets until after 4:00 p.m. McDowell Trial Tr. vol. IV at 1010:22-1011:7 [Record Document 538].

ii.    Social Isolation and Enforced Idleness

Moving to the policies and practices in place on the South Compound, inmates on the South Compound are deprived of nearly all meaningful human contact and receive little to no mental stimulation.[38] The evidence showed that inmates on the extended lockdown tiers and N-2D are regularly confined to their cell for twenty-three hours per day, Monday through Friday (with one hour for recreation and shower)[39] and twenty-four

---

[38] Dr. Haney contrasted meaningful or substantive social contact with incidental or superficial contact, which does not promote social connectivity. Incidental contact includes when staff passes out food trays, when staff conducts pill or sick call, and fleeting "visual contact with another human being." Haney Trial Tr. vol. XII at 2869:6-2871:8 [Record Document 553]. Dr. Haney described meaningful contact to be contact unimpeded by bars or walls; it is contact that permits inmates the possibility of forming a relationship or bond under circumstances unencumbered by the stress of solitary confinement and is considered more than simple routine contact. Haney Trial Tr. vol. XII at 2907-10 [Record Document 553].

[39] Record Document Ex. J-3 at 7 [Record Document 564-285].

hours on the weekend; that inmates exercise alone in individual cages; that those on "yard restriction" are confined to their cell for nearly twenty-four hours per day, except for fifty minutes of "yard time" in the recreation cages on Saturday or Sunday;[40] that inmates eat every meal in their cell; that inmates are denied all rehabilitative programming or out-of-cell classes;[41] that inmates are only allowed noncontact visitation by telephone through a glass window;[42] and that personal phone calls are limited to one ten-minute call per month at irregular intervals.[43] The Courts also finds that, during the limited times inmates are allowed outside, they are confined to empty cages that are too small to allow for meaningful physical activity.[44] There is no recreational equipment in the cages, and there is no shade or covering in the cages to protect inmates from the elements. *See* Turner Trial

---

[40] Record Document 524 ¶ 36.

[41] While on extended lockdown, inmates cannot partake in any programming, except for in-cell correspondence courses. Dauzat Trial Tr. vol. III at 775:7-10 [Record Document 536]. One packet of materials, "Understanding and Reducing Angry Feelings," was identified by Deputy Warden Dauzat as an item that can be provided to an individual upon request. *Id.* at 776:3-11; Ex. D-39 [Record Document 564-281]. This was the only packet of materials that was admitted into evidence. The cover page states that it is "a collection of materials for leading counseling sessions." These written materials are inappropriate for anybody but the course instructor and are not consistent with many inmates' reading levels on extended lockdown. Burns Trial Tr. vol. V at 1284:7-24 [Record Document 539].

[42] Dr. Haney described the visitation room as having no privacy. Haney Trial Tr. vol. XII at 2912-13 [Record Document 553]. The picture of the visitation room shows three phones on the wall. There are no partitions between the chairs or phones.  As such, whatever is being said can be heard by others. *Id.*; *see* Ex. P-GGG-227 [Record Document 564-201].

[43] *See* Record Document 524 ¶ 37. Dr. Haney explained that the barriers to meaningful human contact on the tiers make the importance for maintaining family contact greater. DWCC, however, places additional barriers to family contact, such as only allowing one, ten-minute phone call per month. Haney Trial Tr. vol. XII at 2910-12 [Record Document 553].

[44] As part of Dr. Haney's testimony, he described several photographs of the outside recreation cages. *See* Exs. P-GGG-02 [Record Document 564-183], P-GGG-73 [Record Document 564-190], P-GGG-74 [Record Document 564-191].

Tr. vol. I at 111:5-10 [Record Document 533]; McDowell Trial Tr. vol. IV at 1013:17-1014:3 [Record Document 538] (stating that he often skipped recreation because it was too hot); Record Document 524 ¶ 46 (stipulating that recreation typically occurs after lunch).

At DWCC, inmates on the extended lockdown tiers are allowed minimal personal belongings to occupy their minds. Inmates are allowed one religious book, three other books or magazines, and some legal work for mental stimulation. Inmates also have very limited access to the canteen—otherwise known as the commissary—for personal care items, paper, flex pens, envelopes, and stamps. Record Document 524 ¶ 41. There are no televisions, radios, or crafts on the extended lockdown tiers.[45] *Id.* ¶ 78.

To DWCC's credit, at some point in this litigation, it stopped using N-1 for disciplinary and preventative segregation.[46] Inmates on N-1 are now afforded more out-of-cell time and social contact. Inmates in N-1 eat in the common chow hall for each meal; this equates to about twenty minutes of out-of-cell time three times per day. Goodwin Trial Tr. vol. XVIII at 4207:21-24 [Record Document 562]. Additionally, inmates housed in N-1 are allowed to use the recreation yard and the gymnasium rather than the small recreation cages, and they are provided a phone call on a weekly basis. Record Document 524 ¶ 45. Warden Goodwin also established through his testimony that inmates housed in

---

[45] Inmates on N-1 and N-2D have access to a television and radios. Record Document 524 ¶ 38. Inmates do not have access to the television's audio unless they are able to purchase a radio from the commissary. *Id.* ¶ 40.

[46] It is important to note that at the time of the discovery cutoff date, these changes were informal; they differ from the written policies submitted as evidence. At the remedy phase, the Court looks forward to hearing testimony about the formal changes implemented and the effect of these changes.

N-1 typically receive two hours of "yard time" Monday through Friday instead of the fifty minutes of yard time provided to inmates on the extended lockdown units. Goodwin Trial Tr. vol. XVIII at 4207:10-16 [Record Document 562]. Further, inmates approaching the end of their sentence may partake in reentry courses and other programming. *Id.* at 4207:17-4210:21. Although N-1 is no longer used for disciplinary housing, it is still a restrictive housing setting because inmates are segregated from general population and have their privileges greatly reduced; inmates who do not receive "yard time" are regularly confined in their cell for twenty-three hours per day. Additionally, inmates who are not approaching the end of their sentence cannot partake in courses.

In sum, the conditions on N-1 through N-4 expose inmates to a substantial risk of harm by policies causing or related to social isolation, reduced environmental stimulation, and enforced idleness. Inmates on the extended lockdown tiers are isolated in extremely small cells for twenty-three to twenty-four hours per day in stark conditions with little to no positive stimulation. And inmates remain in these stark conditions indefinitely.

### iii.    Length of Time on Extended Lockdown

As stated above, per policy, inmates remain in extended lockdown for an indefinite period, subject to a ninety-day review by the classification review board. DWCC creates continuous confinement reports detailing inmates who have been in extended lockdown housing for longer than thirty days. Goodwin Trial Tr. vol. X at 2268:13-16 [Record Document 544]. Warden Goodwin reviews these reports every month. *Id.* at 2270:13-2271:5.

In reviewing the September 2019 report, DWCC had over 200 inmates in extended lockdown for over thirty days. *See* Ex. P-I-04 at 12-19 [Record Document 564-59]. When reviewing the various reports, there were many inmates who had spent years continuously in extended lockdown. *See generally* Ex. P-I-01 [Record Document 564-57], Ex. P-I-02 [Record Document 564-58], Ex. P-I-04 [Record Document 564-59]. Several examples should suffice.

Damion Williams, Jackie Sampson, and Theron Nelson were housed in extended lockdown continuously for almost five years. Goodwin Trial Tr. vol. X at 2274:8-16, 2287:1-6 [Record Document 544]. Matthew Carrol was in extended lockdown for over three years. *Id.* at 2275:10-2276:4. Tyler Blanchard and Carlton Turner spent just short of three years in extended lockdown. *Id.* at 2288:19-2289:3, 2298:21-2299:6. These examples are representative of the Class and show that many inmates spend months and, sometimes, years continuously in extended lockdown at DWCC.

### iv.    Mentally Ill on the South Compound

Many inmates in extended lockdown suffer from a mental illness. Hayden testified that about twenty-eight to forty percent of the inmates on extended lockdown had a mental illness. Hayden Trial Tr. vol. II at 527:3-5 [Record Document 534]. Dr. Burns, Plaintiffs' expert, and Dr. Thompson, Defendants' expert, both concurred in a forty percent prevalence rate for mental illness in restrictive housing at DWCC. Burns Trial Tr. vol. VI at 1427:23-1428:1 [Record Document 540]; *see also* Thompson Trial Tr. vol. XVII at 4070:13-17 [Record Document 561]. Plaintiffs introduced evidence of many inmates with mental illnesses and serious mental illnesses, such as bipolar disorder, major depressive

disorder, schizophrenia, and psychosis. *See, e.g.*, Turner Trial Tr. vol. I   at 46:2-21 [Record Document 533]; Moran Trial Tr. vol. I at 197:1, 209:13-14 [Record Document 533]; Solomon Trial Tr. vol. III at 593:7-595:17 [Record Document 536]; Adams Trial Tr. vol. IV at 951:24, 952:12, 957:9-960:6 [Record Document 538]; McDowell Trial Tr. vol. IV at 1012:12-13, 1030:14 [Record Document 538]; Doucet Dep. at 34:17, 35:22, 36:3-8, 24:20-26:6, 30:22 [Record Document 563-5].

Dr. Burns credibly established that DWCC's mental health patients "were overrepresented" on the South Compound and remained in restrictive housing for long periods of time. Burns Trial Tr. vol. VI at 1427:14-19 [Record Document 540]. Additionally, inmates with mental illness find it extremely difficult to graduate out of extended lockdown because the severe conditions can lead to the activation or worsening of their symptoms. *Id.* at 1451; Haney Trial Tr. vol. XIII at 2947:14-2948:10 [Record Document 554]. DWCC's security staff typically treats the manifestations of these symptoms as disobedience as opposed to symptoms of mental illness. As a result, inmates with mental illness remain on extended lockdown for months and, sometimes, years and return cyclically when their symptoms recur.

Accordingly, based on the concerning statistics and findings above, the Court must unfortunately conclude that DWCC utilizes extended lockdown as a depository for the mentally ill. And the conditions, as detailed above, only cause those inmates even more pain and suffering, including the worsening of their mental illness.

v.      Discipline

As stated above, inmates could be placed on extended lockdown as an initial classification decision upon arrival at DWCC or as a sanction handed down by the disciplinary board for a rule infraction. Goodwin Trial Tr. vol. XVIII at 4230:6-7 [Record Document 562]; Thompson Trial Tr. vol. XVII at 4131:16-21 [Record Document 561]. Inmates sentenced to isolation status must relinquish their mattress between 5:00 a.m. and 9:00 p.m. As will be discussed in further detail below, the length of time an inmate spends on extended lockdown is indefinite and subject to a ninety-day review by the classification review board, which consists of the unit manager (security) and a classification officer. The mental health department plays no role in either the classification or disciplinary process for inmates with mental illness.

DWCC also has an institutional practice of informally disciplining prisoners on extended lockdown. DWCC maintains an institution-specific policy, "Offender Posted Policy 34," which includes "strip cell status." *See* Ex. P-JJJ-13 [Record Document 565-47]. The policy provides that an individual may be subjected to solitary confinement with no clothing other than a paper gown. *Id.* at 4. Additionally, an inmate on strip cell status is not allowed any property or recreation time. *Id.* Per policy, inmates with a documented pattern of behavior are not allowed a mattress outside of the hours of 9 p.m. to 5 a.m. (similar to isolation status). *Id.* at 5. Mattresses, however, are frequently not returned timely, which results in inmates sleeping on the concrete bunk or metal rack. Solomon Trial Tr. vol. III at 607:2-608:5 [Record Document 536]; Brumfield Trial Tr. vol. I at

179:25-180:3 [Record Document 533]. In essence, an inmate is naked in a cell—typically a single cell—with nothing to do. Strip cell status is strictly punitive.

Inmates with a documented pattern of behavior can be placed on strip cell status for an indefinite period with a review scheduled for every thirty days. Ex. P-JJJ-13 at 6 [Record Document 565-47]. Those behaviors include throwing human waste; throwing or hurling any bodily fluid or substance (including spitting); storing weapons, human feces, or urine in any form inside of his cell in a container; throwing any item from the cell at any person walking down the tier; throwing item(s) on the tier that might cause a safety hazard (soap, water, etc.); using belongings as a barricade or shield to prevent security from properly performing their duties; making threats of violence against another while in immediate possession of any personal belonging that might be used as a weapon such as a cup, bar of soap, pen, pencil, etc.; flooding cells; committing an act of violence on another person; and participating in a major disturbance. *Id.* at 3-4. The policy provides, "[s]trip cell status should be used as a last resort to protect lives and property." *Id.* at 3. In reality, inmates are placed on strip cell status for actions that do not present an immediate threat to the safety and security of the prison, such as merely throwing a cup on the tier. *See* Ex. P-S-04 [Record Document 564-75].

Additionally, strip cell status can be renewed for additional periods of time; if an individual receives a disciplinary infraction while on strip cell status, he could be given a break of no defined length and then placed back on strip cell. Nail Trial Tr. vol. VIII at 1814:13-21 [Record Document 542]. Strip cell status is deployed against inmates with mental illness without any consultation with the mental health department. In fact, Hayden

testified that he is not familiar with Policy 34 or strip cell status. Hayden Trial Tr. vol. II at 387:4-6 [Record Document 534]. Although he has heard about the policy, he stated that it has nothing to do with the mental health department. *Id.* at 387:11-13. As such, he is not familiar with the conditions of strip cell status, that is, whether a person has a mattress, because he has not "reviewed the policy since it is not pertinent to [mental health]." *Id.* at 387:14-20. The Court finds Hayden's testimony incredible in this regard in that the strip cells are located on the tiers to which Hayden testified he makes at least weekly rounds. Hayden's "blind eye" to the conditions of strip cell status defines deliberate indifference.

Only the Unit Manager of the South Compound, the duty officer, or a warden can approve putting an inmate on strip cell status. Nail Trial Tr. vol. VIII at 1813:3-4 [Record Document 542]. Before her retirement, Deputy Warden Huff, in her capacity as duty officer, signed off on uses of strip cell status. Huff Trial Tr. vol. IX at 1939:1-9 [Record Document 543]. Deputy Warden Huff would approve the use of strip cell status after asking security what the person did, whether the person has a pattern of behavioral problems, and how long it had been since the last behavioral issue. *Id.* at 1947:22-1948:1. Deputy Warden Huff asserted that during her entire tenure as assistant warden, she was not responsible for investigating an incident prior to approving the use of strip cell status, nor did she ever investigate any incident prior to imposing strip cell status. *Id.* at 1947:6-18. Instead, she relied on the representations of the notifying officer. *See id.* at 1948:6-22. If the Deputy Warden was not responsible for investigating incidents and her only function was to rubberstamp the officer's representations, the Court questions why DWCC

policy required her approval. Deputy Warden Huff's "hands off" attitude as to strip cell status further illustrates the deliberate indifference of the institution.

Strip cell status is imposed outside of the scope of any regular disciplinary process. Coleman Trial Tr. vol. VII at 1626:19-23 [Record Document 541]; Nail Trial Tr. vol. XIII at 1812:11-24 [Record Document 554]. It is imposed without a hearing and is not reviewed by the disciplinary board; it is imposed fully at the discretion of staff. Nail Trial Tr. vol. XIII at 1816:9-24 [Record Document 554]. This practice deviates from nationally accepted standards regarding informal discipline. Pacholke Trial Tr. vol. XII at 2728:10-18 [Record Document 553].

Policy 34 was approved by Chief Smith as a delegation of authority from Secretary LeBlanc on behalf of the DOC. LeBlanc Trial Tr. vol. XI at 2596:9-16 [Record Document 545]. Because Policy 34 occurs outside of the disciplinary process, it is untouched by the Defendants' imposition of a new disciplinary and classification system in December 2019 and remains in place.

Inmates testified that strip cell status had a profound impact on their mental state, leading to increased feelings of depression and sadness. Solomon Trial Tr. vol. III at 608:16-609:7 [Record Document 536]; *see* Brumfield Trial Tr. vol. I at 180:7-14 [Record Document 533]. Christopher Solomon, who had been placed on strip cell status multiple times, testified that the experience left him uncomfortable and bruised from sleeping on concrete for twenty to thirty days. Solomon Trial Tr. vol. III at 605:1-13 [Record Document 536].

Secretary Pacholke testified that based on his thirty years of experience in corrections, touring many prisons throughout his career and his understanding of the American Correctional Association standards, the generally accepted standard regarding the provision of clothing for people in restrictive housing is that it is a right, not a privilege. Pacholke Trial Tr. vol. XII at 2729:10-2730:3 [Record Document 553]. The conditions under strip cell status deviate from the national standard regarding giving clothing to prisoners in that no clothing or personal property is permitted, except for a paper gown. *Id.* at 2730:4-16.

Upchurch, Defendants' own expert, stated that in his professional opinion, the fact that strip cell status can be used in thirty-day increments is inconsistent with corrections practices today. Upchurch Trial Tr. vol. XIV at 3256:5-9 [Record Document 555]. He believes that there should be a meaningful review no longer than seventy-two hours after a person is placed on strip cell status. *Id.* at 3256:12-3257:2. Upchurch also believes that, for an inmate with mental illness, there should be an assessment done by a mental health professional within twenty-four hours of implementing strip cell status to determine if the person's behaviors are because of mental illness, or rather, an act of aggression. *See id.* at 3257:10-3259:20. Dr. Thompson, Defendants' other expert, concurred that the mental health department should be involved in any decision to deploy strip cell status. Thompson Trial Tr. vol. XVII at 4057:19-4058:1 [Record Document 561].

In sum, all experts agree that DWCC's use of strip cell status violates modern correctional practices and minimum standards and recommend that DWCC substantially reform or eliminate the practice. Indeed, the Court finds that DWCC's use of strip cell

status—without any involvement by the mental health department and in thirty-day increments without a formal review—serves to inflict mental and physical torture. As implemented at DWCC, inmates are deprived of all property and clothed in a mere paper gown, which in the wintertime, leaves them exposed to extremely cold conditions.[47] Additionally, inmates suffer physical harm, such as bruising, from sleeping on concrete for prolonged periods. Although Defendants cite to other courts that have found that strip cell status for shorter periods, such as twenty-four hours, did not violate constitutional standards,[48] the Court concludes that DWCC's particular use of strip cell status is distinguishable. Here, the length of time an inmate is placed on strip cell status, the lack of any possessions, the lack of clothing, the lack of bedding, and the failure of the mental health staff to conduct periodic inmate reviews—constitutes cruel and unusual punishment.

(c)    *Manifestation of Harm at DWCC*

The harm suffered by inmates in solitary confinement is not merely theoretical. During his inmate interviews, Dr. Haney observed that inmates were manifesting signs and symptoms consistent with the harms associated with prolonged periods in solitary confinement. Dr. Haney summarized his findings as follows:

---

[47] According to multiple inmates, DWCC security engages in a form of corporal punishment called "bluesing." Bluesing refers to placing an inmate in a paper gown in the winter (for suicide watch or strip cell) and then opening the tier windows to expose inmates to freezing temperatures. The Court, however, finds that Plaintiffs have failed to prove a widespread practice of intentional bluesing.

[48] *See James v. LeBlanc*, No. 09-CV-1592, 2011 WL 6842516, *7-8 (W.D. La. Nov. 16, 2011), *report and recommendation adopted*, No. 09-CV-1592, 2011 WL 6842512 (W.D. La. Dec. 29, 2011) (citing various cases).

> The prisoners [on the South Compound] are manifesting the signs and the symptoms that are consistent with exactly what the literature shows about the harmful effects of solitary confinement. They report suffering. They appear to be suffering. They report not just suffering in general but they identify a number of the dimensions of suffering and the dimensions of the harm that they're experiencing, again, consistent with what the literature tells us, my own research, and the research of other people happens to people when they're in severe conditions of solitary confinement.

Haney Trial Tr. vol. XII at 2866:8-18 [Record Document 553]. Specifically, he observed that some inmates were unable to communicate with him at all and were exhibiting obvious states of distress, such as shaking. *Id.* at 2895:9-18. Dr. Haney described one inmate on suicide watch who could not even tell Dr. Haney his name. *Id.* at 2993:25-2996:5. Dr. Haney testified that inmates, with and without diagnosed mental illnesses, overwhelmingly reported experiencing severe depression, desperation, anxiety, hallucinations, cognitive impairments, ruminations, and feelings of impending breakdown. *Id.* at 2962:8-2964:25. Defendants could not contradict this testimony.

### 2.   Deliberate Indifference

As stated above, in addition to proving that officials' actions put inmates at substantial risk of serious harm, Plaintiffs must also demonstrate that correction officials had a subjectively culpable state of mind—that is, they were deliberately indifferent. Plaintiffs can carry that burden by showing that Defendants had subjective knowledge of the risk of harm and then failed to take reasonable steps to abate such harm. Additionally, the mere fact that a risk was obvious is sufficient to infer deliberate indifference. *Cook*, 376 F.3d at 340. Deliberate indifference can be established if evidence is presented that proves that the substantial risk of a particular action was "longstanding, pervasive, well-

documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." *Farmer,* 511 U.S. at 842-43 (internal quotation marks and citations omitted).

The Court finds, based on the evidence detailed above, that correctional officials are aware of the harsh conditions on the South Compound and the resulting psychological pain experienced by inmates. In fact, Secretary LeBlanc testified that, "Chief Smith and I had a goal of being out of the restrictive housing business by the middle of this year. But that has been . . . put aside because of COVID, hurricanes." LeBlanc Trial Tr. vol. XVIII at 4437:24-4438:3 [Record Document 562]. Clearly, the DOC is aware of the harm caused by restricted housing. Nevertheless, DWCC and the DOC continue to house inmates for twenty-three or more hours per day in their cell with very little meaningful social contact or mental stimulation. The composition of the tiers on the South Compound was designed to cause social isolation, environmental deprivations, and enforced idleness. The policies and practices in place were approved by Warden Goodwin, Chief Smith, and/or Secretary LeBlanc, which includes Policy 34 and strip cell status. Additionally, the record is replete with examples of inmates submitting ARP grievances regarding the stark conditions of confinement and the resulting psychological harm it is causing them. Huff Trial Tr. vol. IX at 1997:22-1999:8 [Record Document 543]; Adams Trial Tr. vol. IV at 976:21-977:19 [Record Document 538]; Turner Trial Tr. vol. I at 66:2-68:8 [Record Document 533]. Despite this knowledge, neither DWCC officials nor DOC officials made any effort to investigate the conditions or determine whether the conditions were, in fact, causing

inmates to experience psychological pain. And, in some instances, DWCC officials and staff displayed willful blindness to the very conditions confronting them on a daily or weekly basis. The callous disregard for the inmates' mental well-being constitutes deliberate indifference. *See Johnson*, 37 F. Supp. 2d at 913-15.

### 3.   Conclusion as to the Conditions of Confinement

The Court finds that Plaintiffs have satisfied both the objective and subjective components of the Eighth Amendment inquiry. Plaintiffs proved that the conditions, policies, and practices in place on the South Compound constitute cruel and unusual punishment and that Defendants have been deliberately indifferent in housing inmates under such conditions without taking any reasonable steps to alleviate the conditions in violation of the Eighth Amendment. The evidence shows that inmates are deprived of basic psychological needs through policies and practices related to social isolation, enforced idleness, severe mental deprivation, and indefinite exposure to such conditions.

The Court finds that the conditions, as detailed above, have the mutually enforcing effect of depriving individuals of basic mental health needs and exposing them to mental torture.[49] *See Cook*, 376 F.3d at 333 (citation omitted). Specifically, the Court finds that DWCC's practice of housing inmates continuously for months and years in extremely small cells for twenty-three to twenty-four hours per day with little to no meaningful human contact, mental stimulation, and exercise, combined with DWCC's use of strip cell

---

[49] Although certain conditions and practices may individually constitute cruel and unusual punishment, the Court need not make such determination at this time because it finds that the conditions and practices, as detailed above, have the mutually enforcing effect of depriving inmates of a single, identifiable human need: mental health. *See Alberti v. Klevenhagen*, 790 F.2d 1220, 1225 (5th Cir. 1986).

status in thirty-day increments (or longer), cause extreme psychological pain and suffering. Furthermore, the Court finds that DWCC unconstitutionally utilizes extended lockdown to house the mentally ill for indefinite periods, which only serves to worsen their mental illness and exposes those inmates to even greater pain and suffering. Defendants have shown a wanton disregard for the mental health of the inmates on the South Compound. Accordingly, Plaintiffs are entitled to further relief to alleviate the unlawful conditions.

### D.    Delivery of Mental Health Services

Plaintiffs also claim that DWCC fails to deliver adequate mental health services to inmates on the South Compound. In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983" because it "constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." 429 U.S. 97, 104-05 (1976) (internal quotation marks and citation omitted). The inquiry is whether Defendants were "deliberately indifferen[t] to serious medical needs." *Id.* at 104.

 "Medical treatment that is merely unsuccessful or negligent does not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances." *Arenas*, 922 F.3d at 620 (internal quotation marks and citations omitted). "Rather, an inmate must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* at 620-21 (internal quotation marks and citations omitted).

Systemic deficiencies in a prison's mental healthcare system could support a finding of deliberate indifference at the institutional level. *See Cook*, 376 F.3d at 333 ("Conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." (citation omitted)). Plaintiffs can meet their burden by showing "repeated examples of negligent acts which disclose a pattern of conduct by the prison medical staff . . . or by proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) (citations omitted).

1.   Systemic Deficiencies

"The components of a minimally adequate mental health treatment program may be ascertained by resort to judicial precedent in previous prison cases, by consideration of the expert testimony in the instant case, and by applying the basic principles of minimally adequate care to the specific problem of mental health care." *Ruiz v. Estelle*, 503 F. Supp. 1265, 1339 (S.D. Tex. 1980). *Ruiz* identified the minimum criteria required for mental health care as: systematic screening and evaluation; treatment that is more than mere seclusion or close supervision; participation by trained mental health professionals in appropriate numbers; safeguards against psychotropic medications that are prescribed in dangerous amounts, without adequate supervision or otherwise inappropriately administered; accurate, complete and confidential records; and a suicide prevention program. *Id.*

Dr. Burns testified to these basic principles of minimally adequate care in the context of mental health programs in correctional facilities. When speaking to DWCC's compliance with these industry standards, Dr. Burns relied on a variety of sources, including:

> . . . [P]hysician statements in the World Health Organization, the Association of State Correctional Administrators. That was in 2013. The Department of Justice who issued a report about restrictive housing in the United States. That was in 2016. The World Health Organization talking about solitary confinement as a prison health issue is from 2014. The National Commission on Correctional Health Care Statement was adopted in April of 2016. The American Psychiatric Association was in 2012, policy position statement. And then the American Correctional Association as standards for the delivery of mental health care in correctional settings, those standards were adopted in August of 2018 with an effective date, actually, of October 1st, 2020, but when they were adopted and the effective date there were no changes.

Burns Trial Tr. vol. V at 1261:11-1262:2 [Record Document 539]. Dr. Burns's extensive experience in providing mental health care in the prison context and her consulting work, impressive academic and professional background, and ability to clearly and succinctly explain her reasoning and understanding of mental health care treatment made her a credible and reliable expert witness. The Court will rely on Dr. Burns's explanation of the minimum standard of care within the industry when relevant.

As detailed below, DWCC fails each category, which results in a systemic failure to deliver adequate mental health care to inmates on the South Compound.

(a)     *Screening and Evaluation*

The Court finds that the evidence at trial showcased systemic deficiencies in DWCC's screening and evaluation of inmates. Screening and evaluating inmates for

mental illness is one aspect of providing sufficient mental health care. At DWCC, there are three opportunities to screen an inmate: 1) during intake; 2) during mental health rounds; and 3) during periodic evaluations. The Court will address each in turn.

i.    Screening and Evaluation During Intake

Inmates that arrive at DWCC are either inter-system or intra-system transfer inmates. *See* Hayden Trial Tr. vol. XVI at 3555:3-7 [Record Document 560]. Inter-system transfer inmates are those that are new intakes into the prison system. *See id.* at 3555:11-12. These are rarer, as DWCC is not designated to act as a reception center. *See* Ex. J-5 at 1 [Record Document 565-15]. Intra-system transfers are inmates who are being transferred from one facility to another. *See* Hayden Trial Tr. vol. XVI at 3555:11-12 [Record Document 560]. Most inmates that arrive at DWCC are intra-system transfers from EHCC. *See id.* at 3555:14-24. Both inter-system and intra-system transfers require some level of mental health screening upon arrival to DWCC, per policy. *See* Ex. J-5 at 7 [Record Document 565-15]. This is because an individual's mental health status can change between screenings, even if one was recently performed at an institution like EHCC. Burns Trial Tr. vol. V at 1276:5-1277:8 [Record Document 539].[50] For both intra-system and inter-system transfers, initial mental health screening is typically conducted by mental health staff immediately upon an individual's arrival to the facility. *See* Ex. J-5 at 7

---

[50] In her testimony, Dr. Burns explains the different reasons why an individual's mental health might change between intake screenings. Those include, but are not limited to, the receipt of bad news from home, difficulty coping with extended restrictive housing, feelings of social isolation from friends and family, the presence of a new mental illness (such as schizophrenia) which will manifest at a certain age, and inconsistencies with the consumption of medication. *See* Burns Trial Tr. vol. V at 1276:5-1277:8 [Record Document 539].

[Record Document 565-15]. However, if intake occurs on a weekend or outside of the mental health department's normal business hours, DWCC policy states that a "qualified health care provider completing the medical screen will also complete the mental health screen . . . and forward to Mental Health." *Id.* at 2-3.

Intra-system transfers go through a different process. DWCC has a policy that specifically enumerates the three overarching goals an intra-system mental health screening is meant to accomplish: ask the inmate a list of questions, document a series of observations about the inmate, and assign the inmate a disposition. *Id.* at 7. The following list enumerates the exact questions each mental health screening should include, per DWCC policy:

1. If the offender is being treated for mental health problems[.]
2. If the offender is presently prescribed psychotropic medication.
3. If the offender has a current mental health complaint.
4. If the offender has present suicide [*sic*] ideation[.]
5. If the offender has a history of suicidal behavior[.]
6. If the offender has a history of inpatient and outpatient psychiatric treatment[.]
7. If the offender has a history of substance abuse.

*Id.* Mental health staff must also document any observations they make pertaining to "1) general appearance and behavior, 2) evidence of abuse and/or trauma, 3) current symptoms of psychosis, depression, anxiety, and/or aggression." *Id.* Finally, the mental health staff will determine whether the inmate is sent to general population (with or without referral for follow-up with mental health) or referred for emergency mental health treatment. *Id.* at 7.

Hayden walked the Court through the steps he takes when completing an intra-system mental health screening. The process begins with Hayden observing the inmates as they get off the bus that transported them to DWCC. Hayden Trial Tr. vol. XVI at 3557:7-17 [Record Document 560]. Intra-system transfers arrive at the facility with their records, which are directly loaded into "medical." *Id.* at 3563:20-23. Hayden then individually observes each inmate as they make it through the security process. *Id.* at 3557:18-20. At the top of an intra-system inmate's mental health screening form is a series of pre-populated background information from the CAJUN database, including the "Mental Health Code Upon Arrival." *Id.* at 3559:3-12; *see also, e.g.,* Ex. D-59 at 1 [Record Document 565-27]. Those codes are "SH" or suicidal history, "DD" or developmental disability, "SA" or substance abuse, "SX" or designation as an adjudicated sex offender, "AX" or Axis I diagnosis (which means a diagnosis of a mental health condition that may be treated by medication), "PM" or current prescription of psychotropic medications, and "LOC" to designate which Level of Care this individual was identified as requiring. Hayden Trial Tr. vol. II at 354:5-355:21 [Record Document 534]. There is also a label after those codes to indicate their applicability to the inmate. "P" stands for present, indicating that the individual has that classification, "d" stands for dependency, and "x" stands for "none indicated." *See id.* at 354:8-13. Hayden testified that he then notes any observations regarding behavior and intelligence and will conduct a "verbal interview," where he asks questions about past and present suicidal ideation/behavior and current mental health symptoms. *See* Hayden Trial Tr. vol. XVI at 3564:8-3565:12 [Record Document 560]; *see also, e.g.,* Ex. D-59 at 1 [Record Document 565-27]. The answers to

those specific questions are self-reported, and there is no way for Hayden to verify the information for accuracy. Hayden Trial Tr. vol. II at 356:1-3 [Record Document 534]. Hayden then testified that he will only refer an inmate to Dr. Seal for further consultation if he finds that there are "red flags," like a present mental health diagnosis or prescription of psychotropic medications. Hayden Trial Tr. vol. XVI at 3569:11-3570:16 [Record Document 560]. Hayden generally refers all patients to general population, regardless of their level of care, Hayden Trial Tr. vol. II at 385:7-13 [Record Document 534]; however, it is the classification review board, a group with no mental health staff involvement, that ultimately decides where an inmate is housed. *See* Dauzat Trial Tr. vol. III at 757:25-758:24 [Record Document 536].

There are several issues with the intra-system intake screening and evaluation processes at DWCC. First, Hayden is not qualified to conduct the intra-system mental health intake screenings because he does not have the education or training required to conduct IQ testing or psychological examinations. Burns Trial Tr., vol. V at 1285:24-1286:2 [Record Document 539].[51] In order for Hayden to be qualified to conduct the intra-system intake assessments, he needs additional training; mentorship; and regular, thorough, and timely reviews of his intake screenings by Deputy Warden Dauzat. *See* Burns Trial Tr. vol. V at 1298:21-1299:5 [Record Document 539]. As previously mentioned, Hayden's degree is in industrial psychology, which he describes as a "science

---

[51] Though Dr. Thompson disagrees that Hayden is unqualified to perform these screenings, he did concede that "[h]e does not have an LCSW or a license, and you know, you would prefer to have that, if you could have it." Thompson Trial Tr. vol. XVII at 3985:19-23 [Record Document 561].

and research-based degree" that "appl[ies] . . . psychological principles into work and group settings." Hayden Trial Tr. vol. II at 315:20-316:4 [Record Document 534]. His degree is not clinical, nor is it specific to the prison context. Though it is a psychology degree, the type of psychology is irrelevant to his job. Without the proper education, and without audit or regular oversight from a qualified professional, it is inappropriate for Hayden to be conducting these intra-system health screenings.

There are two examples that demonstrate how Hayden's lack of proper education and training affects his ability to treat inmates. The first example was when Hayden changed an inmate diagnosis by Dr. Seal. On an "Offender Progress Notes" page for inmate T.H.[52] dated February 4, 2016, Dr. Seal noted that the patient had schizoaffective disorder.  Ex. P-LL-244 [Record Document 564-129]; *accord* Hayden Trial Tr. vol. III at 561:16-19 [Record Document 536]. That same day, Hayden filled out a "Psychiatric Clinical Assessment Form" and listed the inmate's diagnosis as "MDD" or major depressive disorder. Ex. P-LL-245 [Record Document 564-130]; *accord* Hayden Trial Tr. vol. III at 560:19-23 [Record Document 536]. When confronted with the discrepancies between these two forms, Hayden argued with counsel, stating that it is difficult to read Dr. Seal's notes. *Id.* at 564:9-12. However, even though some of the note is illegible, the Court was able to identify a diagnosis of schizoaffective disorder, along with the medications the inmate was prescribed. Illegibility is not an excuse for misdiagnosis. As Dr. Burns explained, this "is a problem when the people who are responsible for providing

---

[52] This is inmate T.H. Out of respect to the sensitive nature of this discussion and the information it reveals therein, the inmate's name will not be disclosed here.

treatment don't understand psychiatric symptoms, psychiatric diagnoses, and what sorts of treatment interventions that might be indicated." Burns Trial Tr. vol. V at 1304:1-5 [Record Document 539].

Hayden's lack of credentials was also visible in Ex. P-LL-287 [Record Document 564-137], which is a mental health progress note. The mental health progress note indicates that the inmate was "[o]riented to: xX1" and the clinical note states, "when seen he lacked orientation to his surroundings and was unable to converse gainfully with clinician. Discontinue M[ental] H[ealth] O[bservation]." *Id.* During his testimony, Hayden confirmed the information on the exhibit; he did note that the inmate was "oriented to times one" and that he removed the inmate from mental health observation. Hayden Trial Tr. vol. II at 420:20-421:8 [Record Document 534]. Hayden stated that "oriented times one" means that an inmate is "only able to correctly answer one of my questions . . . do you know what today's date is, do you know the month, and do you know who is president." *Id.* at 412:12-20. He further testified that an individual being "oriented x one" does not necessarily mean that an individual is "grossly disoriented."[53] *Id.* at 418:10-19. Deputy Warden Dauzat described "oriented times one" as meaning that the inmate was "oriented to one of the factors that is used to assess his orientation . . . basically person, place, surroundings, the environment." Dauzat Trial Tr. vol. III at 755:3-7 [Record Document 536].

---

[53] Hayden described "grossly disoriented" to be "if they are not able to even recognize their surroundings whatsoever, if . . . they can't even sit on their bed . . . they are starting to lose all levels of functioning." Hayden Trial Tr. vol. II at 418:10-15 [Record Document 534].

Dr. Burns was present for Hayden's testimony discussing the "oriented x" designations on various mental health assessments and progress forms. Burns Trial Tr. vol. V at 1323:9-12 [Record Document 539]. Dr. Burns opined that Hayden's testimony was demonstrative of a lack of familiarity with medical convention. *Id.* at 1323:24-1324:6. This is because Hayden's understanding of "oriented times one" is inconsistent with medical convention, which defines this as a person who remembers only his name, but not the date, time, or where they are. *Id.* at 1323:16-23. Dr. Burns stated that an inmate being able to remember only his name is concerning because "it is the first thing you learn and it is the last thing that you forget." *Id.* at 1323:22-23. According to Dr. Burns, failing to make a note of which questions an inmate was unable to answer is problematic and indicative of Hayden's incomprehension of the purpose of the line of questioning in general. *Id.* at 1324:3-6.

Additionally, the actual intra-system screenings and corresponding documentation are wholly inadequate. During her testimony, Dr. Burns walked the court through two different intra-system transfer records, *id.* at 1289:11-13, 1294:9-11, which illustrated the deficiencies in the general intake process at DWCC. Burns Trial Tr. vol. V at 1297:18-21 [Record Document 539]. Her criticism included the form used; the way the form was filled out; the inadequacy of the screening's questioning process; the lack of meaningful review by a qualified individual; and the lack of meaningful and prompt follow-up.

She first examined Ex. P-DD-01 [Record Document 564-108].[54] *Id.* at 1289:8-10. This inmate's mental health intake screening showed a diagnosis of schizophrenia and the prescription of the psychotropic medications Haldol and Depakote. *Id.* at 1289:14-20; *see also* Ex. P-DD-01 [Record Document 564-108]. The prepopulated CAJUN information also indicated that there was a present indication of a history of suicide, substance abuse "dependency," a present Axis I diagnosis, a present prescription of psychotropic medication, and a "LOC-3" designation. *See* Burns Trial Tr. vol. V at 1290:25-1291:8 [Record Document 539]; *accord* Ex. P-DD-01 [Record Document 564-108]. However, Hayden's assessment showed the inmate to be completely within normal limits ("WNL"). *See* Burns Trial Tr. vol. V at 1290:13-17 [Record Document 539]; *accord* Ex. P-DD-01 [Record Document 564-108]. Dr. Burns also highlighted the inconsistency that, upon arrival, the inmate is listed as having a history of suicidal behavior, whereas the form indicates that he has no current presence or history of suicidal ideation. *See* Burns Trial Tr. vol. V at 1290:3-1291:12 [Record Document 539]; s*ee also* Ex. P-DD-01 [Record Document 564-108]. Furthermore, the form does not reflect that any follow-up questions were asked or that there was any attempt in the assessment to resolve this disparity. *See* Burns Trial Tr. vol. V at 1291:12 [Record Document 539]; s*ee also* Ex. P-DD-01 [Record Document 564-108]. For example, with regard to the inconsistency in the history of suicide, Dr. Burns indicated that it would have been necessary to have asked "some

---

[54] This is inmate B.C. This individual submitted a waiver to allow his medical and mental health records to be admitted into evidence and utilized during this case. However, out of respect to the sensitive nature of this discussion and the information it reveals therein, the inmate's name will not be disclosed here.

questions about what happened in the past, what helped, what hurt, how were you feeling now, are there plans for the future," in order to have a more comprehensive understanding of the inmate's current mental state. *See* Burns Trial Tr. vol. V at 1290:11-13 [Record Document 539]. Dr. Burns also noted that the mental health referral box was unchecked. *Id.* at 1291:21-22. Instead, there was a simple statement by Deputy Warden Dauzat to "follow-up per policy." *Id.* at 1291:23-25.

Dr. Burns stated that this is not an adequate plan and that the lack of follow-up is of concern. *Id.* She noted that "schizophrenia itself has [a] mortality rate for suicide of about ten percent, and so it is a high-risk disorder . . . you would want some additional information about the past attempts, how many, how serious, did it require treatment and also, some assessment of [current] risk factors." *See* Burns Trial Tr. vol. V at 1292:17-23 [Record Document 539]. The failure of adequate screening poses a serious risk of harm to the inmate, including risk of suicide, self-harm, assault, behavioral issues, and the noncompliance with medication (and subsequent destabilization). *See id.* at 1293:7-19.

Dr. Burns then examined Ex. P-O-30 [Record Document 564-70].[55] The inmate's prepopulated CAJUN information indicated that there was a present indication of a history of suicide, substance abuse "dependency," a present Axis I diagnosis, a present prescription of psychotropic medication, and a "LOC-4f" designation. *See* Ex. P-O-30 [Record Document 564-70]. Dr. Burns noted that at the time, the inmate's diagnosis was

---

[55] This is inmate C.A. This individual submitted a waiver to allow his medical and mental health records to be admitted into evidence and utilized during this case. However, out of respect to the sensitive nature of this discussion and the information it reveals therein, the inmate's name will not be disclosed here.

listed as a "psychotic disorder not otherwise specified." *See* Burns Trial Tr. vol. V at 1294:6-11 [Record Document 539]; *see also* Ex. P-O-30 [Record Document 564-70]. Additionally, the record indicated a history of multiple suicide attempts, a history of the inmate cutting himself, the prescription of three psychotropic medications (Wellbutrin, Zyprexa, and Haldol), and a change in the inmate's LOC to LOC-3 upon arrival at DWCC. *See* Burns Trial Tr. vol. V at 1295:3-16 [Record Document 539]; *see also* Ex. P-O-30 [Record Document 564-70]. Other than the change in LOC and the record of the self-reported history of suicidal ideation and behavior, Hayden found the patient to be completely WNL.

Given the discrepancies in information and the severity of the inmate's mental health history, Dr. Burns felt that the inmate should have been evaluated more often than the standard ninety-day interval.[56] Burns Trial Tr. vol. V at 1295:3-16, 1299:8-21 [Record Document 539]. Instead, it took Deputy Warden Dauzat a week to complete her review of the inmate's initial screening, and all she wrote on the form was "[f]ollow up per policy," just as the other inmate's record indicated. *See* Ex. P-O-30 [Record Document 564-70]; s*ee also* Ex. P-DD-1 [Record Document 564-108]. Witnesses on both sides testified that Deputy Warden Dauzat's review of these intake forms regularly stated only "follow up per policy." *See* Burns Trial Tr. vol. V at 1291:21-1292:8 [Record Document 539]; *accord* Robinson Trial Tr. vol. III at 697:22-24 [Record Document 536]; Hayden Trial Tr. vol. II at 376:25-377:17 [Record Document 534]. Specifically, Hayden stated that all of the intake forms would have a note from Deputy Warden Dauzat stating "follow up per

---

[56] The ninety-day evaluation will be discussed at greater length below.

policy" unless "there is an error." *Id.* at 409:25-410:3. The Court also notes that every intake form it has independently reviewed stated only "follow up per policy" by Deputy Warden Dauzat. In light of the gross inadequacies and inaccuracies highlighted by Dr. Burns in these completed forms, the review by the licensed and qualified Deputy Warden Dauzat appears meaningless.

In addition to reviewing this inmate's medical records, Dr. Burns testified that she had interviewed this inmate. Burns Trial Tr. vol. V at 1295:22-25 [Record Document 539]. Those interviews revealed that he continued to self-harm and that he had been placed on both standard and extreme suicide watches, which was illustrative of the risk of harm posed by an inadequate initial assessment, the lack of timeliness or specificity in Deputy Warden Dauzat's review, the failure to be seen by mental health more frequently, and the lack of an individual treatment plan. *Id.* at 1296:1-4, 1299:8-1300:3.

The Court found Dr. Burns's testimony to be compelling. Accordingly, the Court finds that the evidence presented at trial demonstrated severe systemic deficiencies in the intake screening and evaluations conducted at DWCC. This is evident from 1) Hayden's lack of education, training, and certification, 2) Deputy Warden Dauzat's failure to conduct routine, thorough, and timely audits of Hayden's intake screenings, 3) an inadequate amount of discussion or investigation into the discrepancies between EHCC records and information self-reported by inmates, 4) a seemingly inconsistent system of referrals to the psychiatrist, Dr. Seal, and 5) the mental health department's failure to address an inmate's individual needs at intake that may possibly be exacerbated without proper attention.

74

ii.      Evaluation During Rounds

The Court also found systemic deficiencies in the evaluation process that occurs during weekly rounds. In her testimony, Dr. Burns noted the importance of a correctional facility, like DWCC, conducting weekly rounds. According to Dr. Burns, weekly rounds are an important way for the mental health department to monitor inmates with mental illness who are placed in restrictive housing. Burns Trial Tr. vol. V at 1304:6-14 [Record Document 539]. Specifically, Dr. Burns testified that

> Rounds are a means of surveillance. It is not treatment per se, but a mental health staff person would walk through a housing unit, restrictive housing unit once a week, announce their presence and stop briefly at every cell containing an inmate and inquire as to how they are doing, make verbal contact, but also look at the condition of the cell, how the person is taking care of themselves, ask if they are doing okay, if they need mental health of any sort, and make a note of that in their chart. But they would also, if a person requested services, then schedule a later time to come back and have a more extensive conversation privately in a confidential setting, with that person about what the issue was.

*Id.* at 1310:8-22. Rounds should be done as a proactive measure with the overarching purpose of serving as an additional mechanism for screening or surveillance. *See id.* at 1310:24-1311:5, 1314:21-23. The failure to conduct rounds could result in the escalation of current health issues and a lack of clinical care. *Id.* at 1314:14-20.

Mental health staff at DWCC are required to complete weekly rounds. Dauzat Trial Tr. vol. XV at 3354:22-3355:4 [Record Document 556]. However, depending on an inmate's level of care, some inmates should be seen on rounds more frequently than on a weekly basis. Specifically, DWCC's internal policy requires that LOC-2 designees be visited at least three times per week. Ex. J-7 at 6 [Record Document 565-13]. The purpose

of rounds is to check-in with inmates. Dauzat Trial Tr. vol. XV at 3355:17-18 [Record Document 556]. Mental health staff do not review the individual inmate records prior to the completion of rounds. Hayden Trial Tr. vol. II at 323:3-15 [Record Document 534]. During the process of making rounds, mental health staff are supposed to conduct a cell-front visit with every inmate in each tier. Dauzat Trial Tr. vol. XV at 3355:13-18 [Record Document 556]. During that visit, an inmate can request additional time with mental health staff; similarly, mental health staff can decide to pursue additional intervention based on the interaction. *Id.* at 3355:18-24. Mental health notes, known at DWCC as mental health progress notes, are only made if there is a "specific request or interaction that warranted it." *Id.* at 3356:7-13; *see also* Burgos Trial Tr. vol. XVI at 3786:24-3787:11 [Record Document 553]. Generally, the purpose of keeping a mental health progress note is to track an inmate's care. Robinson Trial Tr. vol. III at 682:19-22 [Record Document 536]. The mental health professional takes notes on a notepad during the interaction and will fill out the form with that information upon return to his/her desk. *Id.* at 683:24-684:14.

According to Dr. Burns, there is no indication that these rounds are conducted at DWCC at all. Burns Trial Tr. vol. V at 1312:9-12 [Record Document 539]. First, she testified that the mental health records she reviewed did not demonstrate that rounds were regularly occurring, nor did she see any evidence that "indicated these people had been seen on rounds." *Id.* at 1312:17-1313:10. According to Dr. Burns, there are several different ways that rounds can be adequately documented. *Id.* at 1311:6-8. Some facilities place a card outside of each cell that is initialed and dated every time a mental health

76

professional visits the cell-front; others have a guest book that documents each visitor to a tier and the duration of their stay. *Id.* at 1311:7-17. Other facilities have an officer that tracks the visits themselves; some correctional facilities keep a list with the name of every inmate in a housing unit and require subsequent documentation to correspond with that list. *Id.* at 1311:18-1312:8.[57] DWCC does not implement or require any of these practices. Dr. Burns also testified that none of the inmates she interviewed reported the occurrence of regular rounds, only that "they would sometimes see people walk through, but mostly when it was predictable was when someone was on a watch, and then the mental health person would come through to talk to the person on the [suicide] watch, but not . . . to stop at every cell and speak with everybody." *Id.* at 1314:1-7.

The Court notes that nothing in the testimony of Defendants' witnesses contradicted Dr. Burns's findings and conclusions. Hayden testified that he conducted weekly walk-throughs, but that only some inmates would speak with him. Hayden Trial Tr. vol. II at 323:3-324:10 [Record Document 534]. Furthermore, he testified that he only made note of a conversation with an inmate if it pertained to a mental health need. *Id.* at 324:7-15. In fact, when Hayden was asked whether he documented if he completed rounds on a tier, generally, he testified that "I don't document that anywhere." *Id.* at 324:7-10. Robinson and Steve Burgos described similar processes. Dauzat Trial Tr. vol. XV at 3356:5-13 [Record Document 556]; *see also* Robinson Trial Tr. vol. III at 680:21-681:3 [Record Document 536]; Burgos Trial Tr. vol. XVI at 3607:8-17 [Record Document 560].

---

[57] Some facilities may even utilize a combination of these strategies. Burns Trial Tr. vol. V at 1314:1-7 [Record Document 539].

The Court finds that there is no evidence in the record that would demonstrate DWCC's adherence to its own internal policies pertaining to rounds. Specifically, there is no indication that individuals with a LOC-2 designation were visited three times per week. There is also no indication that inmates with a LOC-3 or LOC-4 designation were visited weekly during rounds.[58] Additionally, Hayden admitted that he did not meet with every inmate during rounds. The existence of a policy—on which the mental health staff was trained—which mandates these rounds demonstrates knowledge of the importance of these rounds to mental health care. The failure to conduct these rounds as per policy, combined with the inadequate processes for documenting the rounds, generally, only further demonstrate the extent of systemic deficiencies at DWCC pertaining to screening and evaluation.

### iii.    Mandatory Mental Health Evaluations

The Court also finds that DWCC does not conduct mandatory mental health evaluations for LOC-2, LOC-3, and LOC-4 inmates. As previously noted, though DWCC is not a LOC-2 facility, it will occasionally accept inmates that have been given a LOC-2 designation at EHCC. Dr. Thompson also noted that some inmates at DWCC "might look a little bit more than three." Thompson Trial Tr. vol. XVII at 4002:21-24 [Record Document 561]. Employee Policy Memorandum #03-02-003 outlines the evaluation requirements for each level of care. Ex. J-7 at 6 [Record Document 565-13]. According to

---

[58] *Employee Policy Memorandum #03-02-003* does not require that inmates with a LOC-3 or LOC-4 designation are visited during rounds as it does for inmates with a LOC-2 designation. *See* Ex. J-7 [Record Document 565-13] However, Deputy Warden Dauzat testified that mental health staff at DWCC are required to complete weekly rounds on every tier. Dauzat Trial Tr. vol. XV at 3354:22-3355:4 [Record Document 556].

DWCC policy, inmates assigned a LOC-4 designation should have "individualized contact" with mental health staff every 180 days; LOC-3 and LOC-2 should meet with mental health staff every ninety and thirty days, respectively. *Id.*

The Court found no indication that these "individualized contacts" take place. There was no testimony, expert or otherwise, that indicated that these mental health evaluations occur, nor is there any evidence in the record that would reveal otherwise.[59] There are segregated interviews that occur every thirty and ninety days. But these interviews are for all inmates in segregated housing, and, as discussed below, are inadequate evaluations of mental health status in both design and execution. Additionally, not all LOC-2, LOC-3, and LOC-4 inmates are in the segregated housing. Some of these inmates are housed in general population.[60] Additionally, there is no list or roster of inmates on the mental health caseload. Without such a list, it would be nearly impossible to keep track of where each inmate on the mental health caseload resides, when the last point of contact was, and when the next appointment should be scheduled. This is a clear violation of internal DWCC policy and further indication of the systemic deficiencies in the mental health program.

---

[59] Dr. Burns testified regarding a thirty-day evaluation policy, but that policy is outside of the March 2020 discovery deadline for the Liability Phase of this trial. *See* Burns Trial Tr. vol. V at 1306:20-22 [Record Document 539].

[60] The Court recognizes that general population is not within the scope of this case. However, it is relevant to note that LOC-3 or LOC-4 inmates may be assigned to general population with no record that they require additional follow-up to check their mental health status, per DOC and DWCC policy. Again, there is no list that outlines the mental health caseload.

iv.     Mandatory Segregated Housing Evaluations

Finally, the Court finds there to be systemic deficiencies in the periodic evaluations of individuals housed on extended lockdown conducted at DWCC. DWCC policy states that "[a] qualified mental health staff person . . . shall interview and prepare a written report of the findings on any inmate remaining in [extended lockdown] for more than 30 days. If segregation or detention continues for more than 30 [*sic*] days, further assessments shall be made every three months (90 [*sic*] days)." Ex. J-7 at 8-9 [Record Document 565-13]. When a person is first admitted to segregated housing, they receive an evaluation within thirty days; if an individual stays in "segregation" longer than that, he is reevaluated every ninety days. Hayden Trial Tr. vol. II at 487:23-488:6 [Record Document 534]. These evaluations are meant to differ from rounds in that these interactions are a more detailed, structured, documented means of assessing how an inmate is doing. Burns Trial Tr. vol. V at 1315:14-23 [Record Document 539]. Specifically, the purpose of these segregated interviews "is to identify people who are in need of mental health treatment and so that they get it, so that they are scheduled for mental health treatment or potentially transferred to a higher level of care, if that is what they need." *Id.* at 1329:3-8. A failure to properly conduct these assessments can result in harm to the individual and those around him, further disciplinary issues, or a decline in mental health. *Id.* at 1329:16-1330:1.

Hayden and Robinson generally conduct the thirty- and ninety-day assessments on the South Compound, and each testified as to the process of completing an inmate evaluation. Generally, an inmate's individual records and prior segregation interviews are

not reviewed in preparation for the next interview. Robinson Trial Tr. vol. III at 691:7-10 [Record Document 536]; *see also* Hayden Trial Tr. vol. II at 489:10-490:23 [Record Document 534]. The assessments are generally conducted cell-front. Robinson Trial Tr. vol. III at 692:3-5 [Record Document 536]. The mental health staff member conducting the evaluation will carry around a notepad to document the assessment and will then complete a DWCC Mental Health Department Interview of Segregated Inmate form back in the office. Hayden Trial Tr. vol. II at 490:24-491:6 [Record Document 534]; *see, e.g.,* Ex. P-OOO-20 [Record Document 564-227]. Robinson completes all her ninety-day reviews every March, June, September, and December. Robinson Trial Tr. vol. III at 689:13-16 [Record Document 536]. Hayden testified that he completes his assessments ninety days from each inmate's initial thirty-day order. Hayden Trial Tr. vol. II. at 487:8-488:1 [Record Document 534].[61]

Again, the Court found Dr. Burns's analysis of the periodic evaluations to be informative and persuasive. Dr. Burns testified that these periodic interviews of inmates on segregation at DWCC are inadequate for several reasons. First, Dr. Burns raised the issue that Hayden is not qualified to conduct these interviews. As previously discussed, Hayden lacks the education, training, and certification required to properly diagnose and understand mental health issues. Additionally, there is a lack of meaningful oversight and

---

[61] When asked by the Court whether he conducts his interviews ninety days from an inmate's initial evaluation or on the March, June, September, December schedule Robinson outlined, Hayden responded, "I don't have a March whatever schedule." Hayden Trial Tr. vol. II at 487:14-18 [Record Document 534].

audit by somebody who is qualified to conduct these interviews, like Deputy Warden Dauzat.

Second, Dr. Burns testified about the nature of the periodic interviews conducted. Specifically, Dr. Burns articulated her reasons for believing that the cell-front interviews should instead be conducted in a confidential area, away from the other inmates and security staff. Burns Trial Tr. vol. V at 1315:24-25 [Record Document 539]. This is because, without confidentiality, there is a risk that an inmate suffering from serious mental health issues will choose not to confide in the mental health professional about the state of his mental health for fear that another inmate would learn deeply personal and sensitive information and use it in retaliation. *See id.* at 1315:24-1316:6. A failure to disclose information could mean that the inmate may not receive the level of care or attention that his current mental state requires.

Dr. Burns testified that requiring these interviews be conducted cell-front is not the only means of ensuring the mental health staff's security. *Id.* at 1316:13-1317:6. Instead of the cell-front interviews, Dr. Burns stated that inmates could be taken to a secure location where the security staff may have visualization of what is happening, such as access to view the conversation through a window, but where the inmate would be assured confidentiality in his conversation with staff. *Id.* at 1316:17-19. Alternatively, DWCC could procure high-security furniture and talking booths to be utilized during these interactions. *Id.* at 1316:19-1317:6. Dr. Burns testified that these would be reasonable accommodations for security and safety and could assist in ensuring that mental health

staff are safe during the evaluations, while still offering inmates a confidential and private way to discuss their mental health. *See id.* 1315:24-1317:6.

The Court found Dr. Burns's analysis to be very compelling here. Specifically, Dr. Burns's testimony outlining the risks posed by non-confidential cell-front interviews—including the risks to an inmate's safety and the potential barriers they create to mental health treatment—was convincing. Dr. Burns also testified that many of the inmates with whom she spoke did not know about the ninety day assessment because of the cell-front, non-confidential nature of the evaluation. Burns Trial Tr. vol. V at 1317:10-20 [Record Document 539]. This is plausible because there does not seem to be much differentiation in the duration, location, and nature of questions asked between the mental health rounds and the more extensive thirty- and ninety-day assessments.

Third, Dr. Burns testified about the inadequacy of the assessments and their documentation. Dr. Burns argued that there was no documented evidence of a mental health evaluation or true mental status examination conducted during the thirty- and ninety-day segregated housing interviews; instead, the documentation consisted of a one-page checklist with "all of the elements of the mental health status exam." *See id*. 1318:12-18. Dr. Burns noted that many of the records she examined had the "within normal limits" box checked in every category, with no additional details that would indicate differentiations in mental status between the inmates. *Id.* at 1318:15-24. Dr. Burns also concluded that the checklists made it apparent that the people doing the assessments were doing sixteen to twenty per day. *Id.* at 1319:1-2. Dr. Burns discussed the impossibility of thoroughly, accurately, and confidentially conducting that many

evaluations per day. *Id.* at 1319:2-7. In fact, to be a useful record and productive conversation, Dr. Burns testified that she would expect each evaluation to take between ten to fifteen minutes, not including the time it took to find an officer available to escort the inmate to a confidential setting. *Id.* at 1320:1-6.

Dr. Burns's analysis of two evaluations of inmate "H," who was housed on segregated housing at the time, further highlights the deficiencies in reporting.[62] These evaluations were conducted on the same day, but one was by Hayden and the other by Dr. Seal. *See* Burns Trial Tr. vol. V at 1321:13-1325:24 [Record Document 539]. In reviewing Hayden's report, Dr. Burns testified that the document "doesn't tell me anything about his treatment. It is just that he is going to be followed per policy. It doesn't say what his condition is. It doesn't say what his diagnosis is. And so, it really doesn't tell me anything." *Id.* at 1322:11-15. Additionally, the assessment notes the inmate "refused further conversation." *Id.* at 1323:7-8. Dr. Burns stated that the refusal of conversation fails to explain the responses listed in the rest of the report because many of the items on the assessment are only answerable through meaningful conversation to evaluate things like mood and orientation. *Id.* at 1322:20-1323:23. Dr. Burns stated that Hayden's report is inconsistent with Dr. Seal's report. *Id.* at 1325:16-18. According to Dr. Burns, Dr. Seal's evaluation notes indicate that the inmate was speaking with dead relatives and that there were some auditory and visual hallucinations. *Id.* at 1325:19-22. It was clear to Dr. Burns that the inmate was not WNL as Hayden had noted. *Id.* at 1325:22-24.

---

[62] The Court cannot independently review these two documents, Exs. P-LL-87 and P-LL-188, because they were not offered into evidence.

Dr. Burns also examined Exs. P-OOO-47-66 [Record Document 564-228].[63] This group of exhibits is comprised of twenty periodic assessments of segregated inmates performed by Robinson on June 13, 2018. *Id.* Dr. Burns commented,

> [I]t was surprising to see how many could be done in a single day. That was an indication that they were just done at the South Compound as opposed to in a confidential setting [and] lots of the assessment [were] the same. They were within normal limits check off over and over and that the person either would not speak or [refused] to answer questions or had no complaints, and they were just going to . . . follow up per policy.

Burns Trial Tr. vol. V at 1326:23-1327:7 [Record Document 539]. The Court conducted its own examination of these twenty documents and confirmed that they are all identical except for the inmate's name and inmate number. Indeed, when held up to the light, all the lines purportedly filled in individually by Robinson overlap precisely. That is, they appear to be exact copies. The most telling sign was the "[c]ontinue to follow-up per policy" note that is multiple spaces away from the beginning of the line. Exs. P-OOO-47-66 [Record Document 564-228]. The Court can only conclude that each of these documents was created and replicated through the "save as" feature on a computer. Hayden does the same; the Court reviewed twenty-four segregation interviews that are all "WNL" and have the same assessment listed. *See, e.g.,* Exs. P-OOO-20-43 [Record Document 564-227]; *see also* Hayden Trial Tr. vol. II at 496:2-512:15 [Record Document 534]. Additionally, all twenty-four of Hayden's segregation interviews contain the same date. *Id.*

---

[63] The trial transcript states that these are Exs. P-OOO-47-67. However, the records lists the range as Exs. P-OOO-47-66 [Record Document 564-228]. The Court interprets this as an error.

The Court evaluated the three different types of inmate evaluations completed at DWCC—the initial intake screening and evaluation, weekly rounds, and the periodic segregated housing thirty- and ninety-day evaluations—and found there to be several systemic deficiencies present in them all. Additionally, no evidence was presented at trial that a mandatory fourth type of evaluation, the periodic mental health evaluation, occurs at all. Accordingly, this Court finds that these deficiencies rise to the level of an Eighth Amendment violation.

(b)     *Mental Health Treatment*

The Court finds that the evidence at trial also demonstrated systemic deficiencies in DWCC's mental health treatment. As previously mentioned, an inmate's mental health treatment is imperative to inmate stability and health, as well as preventing overall behavioral issues and maintaining safety for the inmate, other inmates, and prison staff. However, there are several aspects of mental health treatment at DWCC that rise to the level of a constitutional violation, including the failure to individualize treatment plans, the reliance on the prescription of psychotropic medication as the sole treatment, and the provision of inappropriate and inadequate therapeutic materials. The Court will address each topic individually below.

i.     The Failure to Individualize Treatment

First, the Court found there to be systemic deficiencies in DWCC's inmate treatment plans. According to Dr. Burns:

> A treatment plan is . . . the roadmap of what the person's condition is, what their strengths are, what their weaknesses are, and what their symptoms are, and how frequently they occur, who is going to provide treatment, what

> kind of treatment is going to be provided and at what frequency for the person, and then measure at subsequent team meetings their attainment towards written goals on the plan. So, it contains interventions, the objectives, the goals, and then you measure how they are doing and adjust things accordingly if they are not moving toward goal attainment.

Burns Trial Tr. vol. V at 1330:8-21 [Record Document 539]. The creation of a meaningful treatment plan, with input from all parties who interact with the inmate, is part of the minimum standard of care. *Id.* at 1330:25-1331:4. Individual treatment plans are specifically tailored to address the inmate's needs and medical history. The implementation of an individualized treatment plan has become a standard industry practice across the corrections and mental health fields because it helps keep all parties involved—inmates and staff—aware of all expected services and anticipated outcomes. *See id.* at 1331:5-17. Experts for both Plaintiffs and Defendants agreed that an individualized treatment plan, as opposed to a standard plan that all individuals follow, would be their professional recommendation. *See* Thompson Trial Tr. vol. XVII at 4125:22-4126:10 [Record Document 561]; *accord* Burns Trial Tr. vol. V at 1330:8-1331:22 [Record Document 539]. Dr. Thompson commented, "[it] is not an uncommon problem at any system we evaluate, that treatment plans end up being cookie cutter. These were particularly cookie cutter . . . it would be nice if they had . . . better goals and objectives." Thompson Trial Tr. vol. XVII at 4126:3-10 [Record Document 561].

In fact, DWCC's own policy requires individualized treatment plans. The post order titled, *Employee Policy Memorandum #03-02-003*, contains a section called

"Treatment Planning" that outlines the requirements for inmate treatment plans at DWCC. Ex. J-7 at 9 [Record Document 565-13].[64] The order states:

> All offenders who are designated as requiring a mental health LOC of 1, 2, 3, 4 shall be provided an *individualized*, written mental health treatment plan . . . The treatment plan should include the long-term goals, short term objectives, housing assignments, methods of treatment, identification of the mental health and other personnel involved in the care and supervision of the offender, and directions to the mental health staff and other personnel regarding their roles in the care [and] supervision of the offender.

*Id.* (emphasis added). Deputy Warden Dauzat agreed that DWCC policy requires the implementation of an individualized treatment plan, and in fact, as Deputy Warden, she is tasked with assuring compliance. Dauzat Trial Tr. vol. III at 768:6-13 [Record Document 536].

However, witnesses for both Plaintiffs and Defendants have agreed that DWCC has only adopted a standard treatment plan. Hayden testified that the "short-term objectives" and "long-term goals" were the same on all treatment plans. Hayden Trial Tr. vol. III at 585:16-21 [Record Document 536]. Deputy Warden Dauzat testified that on the South Compound "[t]he treatment plans goals were identical . . . Given the population over there, the goals were pretty much the same." Dauzat Trial Tr. vol. III at 769:7-13 [Record Document 536]. She further testified that the treatment plans she approved contained identical short-term and long-term goals. *Id.* at 768:18-769:1. During her review of inmate mental health records, Dr. Burns also observed that the treatment plans were not individualized, stating that "[the treatment plan] is the exact same form each and every

---

[64] In Hayden Trial Tr. vol. II at 329:14 [Record Document 534], this is referred to as "J-22." However, it was filed into the record as J-7 [Record Document 565-13].

time." Burns Trial Tr. vol. V at 1334:8-21 [Record Document 539]. Further, the standard plans are not tailored to address changes in mental health status as they arise. Burns Trial Tr. vol. V at 1334:8-21 [Record Document 539]. Considering the information presented regarding the necessity of an individualized treatment plan and given that individual treatment plans are required by DWCC policy, the Court finds that the failure to tailor each plan to the individual inmate is just another example of the widespread systemic deficiencies at DWCC.

ii.      Prescription Medication as Sole Treatment

The Court also finds that DWCC's reliance on the prescription of psychotropic medication as the only type of mental health treatment in place at the facility further evidences systemic deficiencies. DWCC's post order regarding the Mental Health Program states that "mental health services provided at DWCC on an outpatient basis *shall* include detection, diagnosis, and treatment of mental illness. These services *shall* be provided by qualified mental health professionals and may include comprehensive evaluation, individual counseling, psychiatric consultation, group therapy, or any combination of the aforementioned." Ex. J-7 at 1 [Record Document 565-13] (emphasis added). Additionally, special programs must be made available for inmates with a history of substance abuse or sexual offenses. *Id.* at 2. The post order identifies three routes available for an inmate to take advantage of any mental health program: self-referral, referral by staff, or referral by another inmate. *Id.* at 8. All referrals must be answered within fourteen days. *Id.* These services are required offerings.

89

Though DWCC guarantees the availability of these mental health programs, the only mental health treatment provided to inmates on the South Compound is psychotropic medication prescription and management. *See* Dauzat Trial Tr. vol. III at 772:19-773:10 [Record Document 536]. Previously, DWCC had implemented a pilot transitional treatment program ("TTP") with ten inmates that targeted the underlying causes perpetuating behavior issues, but that program has since been discontinued. Deputy Warden Dauzat stated that TTP was discontinued for "lack of participation." *Id.* at 726:13-731:7. While Robinson also testified that the program was terminated for lack of participation, she had previously indicated in a deposition that lack of manpower and time were causes for the discontinuation of the program. Robinson Trial Tr. vol. III at 679:5-680:10 [Record Document 536]. There is also no in-cell or out-of-cell programming available to inmates in restricted housing. *See* Dauzat Trial Tr. vol. III at 772:11-15 [Record Document 536]. Other correctional systems provide individuals counseling as part of their mental health program. *Id.* at 1339:3-6. The fact that DWCC fails to do so is a deviation from the minimum standard of mental health care. Unfortunately, the use of medication is the only treatment upon which individuals on the South Compound can rely.

According to Dr. Burns, DWCC's failure to provide counseling or programming, which are considered proactive forms of treatment, leaves an inmate at greater risk of self-harm. *See generally* Burns Trial Tr. vol. V at 1343:9-13 [Record Document 539]. This is because behavioral issues and suicidal ideations that could be mitigated or addressed through therapy are instead allowed to worsen. *Id.* at 1343:13-1344:23. Deputy Warden Dauzat testified that any inmate on the segregated housing unit that requested individual

counseling would receive it. Dauzat Trial Tr. vol. III at 791:18-24 [Record Document 536]. However, Dr. Burns testified that in the hundreds of restricted housing interviews she reviewed, she saw no evidence that counseling sessions had taken place, despite having seen places in the record where inmates had requested counseling. *See generally* Burns Trial Tr. vol. V at 1337:25-1340:20 [Record Document 539].

Dr. Burns testified that either individual or group therapy—ideally both—should be offered to an inmate and conducted in a private space by a licensed and trained professional. *Id*. at 1337:2-9. An inmate should be assigned homework to ensure he is grasping and engaging with the information learned between sessions. *Id*. at 1338:8-11. The treatment plan and medical records should document the session's logistics, the subject covered in the session, a discussion of counseling's logistics, any relevant homework, and a progress note documenting the inmate's overall mental health status. *Id*. at 1337:20-1388:7. None of this occurs at DWCC, despite an obvious need for counseling and despite inmates' affirmative requests for counseling.

Accordingly, the Court finds there to be systemic deficiencies in the treatment options available to inmates at DWCC.

### iii.    Appointments with Dr. Seal

The way in which Dr. Seal conducts his appointments also prevents inmates from receiving adequate treatment and care while at DWCC. On the South Compound, Dr. Seal would meet with inmates in one of the disciplinary courtrooms. Seal Trial Tr. vol. V at 1116:8-10 [Record Document 539]. The Court reviewed the photo of this courtroom that was admitted into evidence. The courtroom is small, with a raised platform in the corner

of the room. Ex. P-GGG-207 [Record Document 564-200]. A basic wooden desk sits on top of the platform. *Id.* In the photo, Dr. Haney sits at the desk. Despite being seated, the raised platform makes it appear as though that he is angled slightly above the photographer. *Id.* That is where Dr. Seal would sit for his evaluations. Seal Trial Tr. vol. V at 1117:10-12 [Record Document 539]. A member of mental health staff stays in the room with Dr. Seal, and almost always, so does security staff, unless the inmate specifically requests that they leave. *Id.* at 1117:15-1118:23.[65] The inmate would typically be in restraints. *Id.* at 1118:1-3According to Dr. Seal, Hayden would provide him a file, which Dr. Seal would review for a minute or two before an inmate is brought into the courtroom. *Id.* at 1120:5-22. During the review period, Dr. Seal would look at his prior notes about diagnosis, medication, symptoms, and prior behaviors. *Id.* at 1120:23-1122:1. He would not review any disciplinary documentation, relying instead on verbal reports from mental health staff regarding any behavioral issues. *Id.* at 1122:3-12.

This entire interaction seems to create an environment that is the antithesis of what proper therapy and treatment require. First, it is inappropriate for these appointments to be held in the courtroom. The very purpose of the room is for disciplinary hearings, which is clear from the layout of the room itself. Dr. Seal sits on a pedestal towering over the inmates. Second, there is a lack of confidentiality. The brief appointment is not just between doctor and patient; the room also has a member of security staff and a member of the mental health staff. As previously mentioned, the fact that an inmate can ask for the

---

[65] Though this is allegedly an option for inmates, there was no testimony to explain what security measures would be in place should an inmate request that the officer leave the room.

security guard to leave does not minimize the confidentiality issues; instead, it serves to further highlight the deficiencies in the system because there is no way for inmates to know they may request to do so. The environment is intimidating and does not promote the vulnerability and trust required in these sensitive appointments to ensure effective treatment.

iv.    Inadequate Therapeutic Materials

Finally, the Court finds that while internal policy recognizes that psychiatric treatment must include therapy, current treatment solely relies on medication management. This is further demonstrated by DWCC's failure to provide inmates meaningful and helpful therapeutic materials. DWCC purports to provide self-help materials to inmates struggling with their mental illness. Dauzat Trial Tr. vol. III at 774:23-775:2 [Record Document 536]. Deputy Warden Dauzat testified that DWCC's therapeutic materials address "stress management, anger management, substance abuse, AA/NA, something relative to grief counseling." *Id.* at 775:2-6. However, Plaintiffs' counsel contends that only a single document was produced during discovery that can support Deputy Warden Dauzat's testimony. They are correct; Ex. D-39 [Record Document 564-281], which is a counselor's model for a course called "Understanding and Reducing Angry Feelings," was the sole document produced by Defendants. In other words, no other materials were adduced at trial that can support Deputy Warden Dauzat's claim. This manual was created by the Texas Institute of Behavioral Research at Texas Christian University and was "derived from cognitive behavioral models designed particularly for counselors." *Id*. It introduces a topic, offers a relevant activity, provides

93

some information on how to analyze the activity, and gives a "tying up" synopsis at the end of the subject.

These materials are clearly inadequate and inappropriate for inmate use. First, the manual is designed for an individual with education and experience teaching in this area. The manual specifically states that it is to be used by "counselors and group facilitators." *Id*. at 2.  This means that these materials will be inappropriate and of little worth to most inmates unless an inmate has an educational background or extensive experience working in a mental health setting. As Dr. Burns highlighted in her testimony, inmates—especially those with intellectual disabilities—would have difficulty reading and processing these materials. Burns Trial Tr. vol. V at 1287:8-12 [Record Document 539]. Therefore, although Deputy Warden Dauzat stated that DWCC provides therapeutic materials, the evidence adduced at trial clearly indicated that no meaningful mental health materials are made available to inmates.

The inappropriate training manuals, the failure to create individualized treatment plans, the intimidating and non-confidential appointments with Dr. Seal, and the inability to provide adequate treatment through therapy or programming all rise to the level of an Eighth Amendment violation.

(c)     *Staffing of the Mental Health Department*

The Court also finds that DWCC's mental health department is understaffed, which contributes to DWCC's failure to provide adequate mental health care to inmates. As previously mentioned, Dr. Seal is the only psychiatrist providing care at DWCC, and his contract is to provide eighteen hours of service per month. Record Document 24 ¶¶ 64-66.

This time includes his travel time from Shreveport to Homer, Louisiana. *Id.* Dr. Seal visits the prison every two weeks, Seal Trial Tr. vol. XVII at 3857:4-7 [Record Document 561], and he is onsite for about five hours each visit after deducting travel time. Seal Trial Tr. vol. V at 1110:9-1111:16 [Record Document 539]. Dr. Seal estimated that twenty-five percent of the DWCC population suffered from some type of mental illness. *Id.* at 1109:15-20. These individuals would be considered his patients. During a visit, Dr. Seal sees about thirty-two patients on both the North and South Compound. *Id.* at 1115:8-13. Medication checks can take about three to five minutes, while an interview with a new patient takes an average of ten minutes. *Id.* at 1123:23-1124:8.

First, the amount of time that Dr. Seal is contracted to spend at DWCC is wholly inadequate.[66] According to Dr. Burns's testimony, the American Psychiatric Association's guidelines recommend that there be one full-time psychiatrist (or equivalent) employed to serve every 150-200 inmates, which is less than the estimated number of inmates at DWCC with mental illness. Burns Trial Tr. vol. VI at 1418:9-21 [Record Document 540]. Dr. Burns stated that because inmates on the South Compound require greater care and security measures, she would recommend one full-time psychiatrist for every 150 people. *Id.* at 1418:12-1420:2. Dr. Thompson concurred, testifying that "a little more Dr. Seal would [go] a long way," and suggested increasing Dr. Seal's contractual hours to half or

---

[66] This is not a criticism of Dr. Seal as a psychiatrist, but a criticism of the terms of his contract. He admitted that he was only contracted for eighteen hours per month for the purpose of prescribing medication. At the same time, as a psychiatrist, he should know that inmates would have benefitted from counseling and of the inadequacy of the treatment provided to them. Yet, there is no indication in the record of him expressing these concerns to DWCC.

three-quarters time. Thompson Trial Tr. vol. XVII at 4078:17-4079:12 [Record Document 561].

It is also worth noting that Dr. Seal is unaware of the conditions of strip cell status, standard suicide watch, or extreme suicide watch. Dr. Seal testified that he is not able to make decisions about the conditions of suicide watch. Seal Trial Tr. vol. V at 1226:5-7 [Record Document 539]. More concerning, however, is Dr. Seal's testimony that he does not even know the conditions of standard or extreme suicide watch. *Id.* at 1226:17-21. He also stated that he does not know what circumstances would lead to somebody being placed in a paper gown versus a jumpsuit. *Id.* at 1227:24-1228:2. Not knowing the conditions of strip cell status, standard suicide watch, and extreme suicide watch prevent Dr. Seal from asking targeted questions to better understand an inmate's current mental state, mental status, and mood, generally. This further highlights the inadequacies of treatment available to inmates at DWCC.

Additionally, Dr. Seal does not spend sufficient time with each inmate. Dr. Burns, who has extensive experience working as a prison psychiatrist, stated that inmates requiring a simple medication check and not exhibiting any worrisome behaviors or indications of a change in their mental health status mental illness only require a psychiatric visit of about ten to fifteen minutes. Burns Trial Tr. vol. VI 1411:23-1412:3 [Record Document 540]. However, initial appointments at intake, even those intra-system transfers from EHCC, should take closer to forty-five minutes to one hour because the psychiatrist should thoroughly review the inmate's prison and medical records and complete a comprehensive mental health evaluation. *Id.* at 1412:3-12. Her testimony

makes it clear that the three to ten minutes Dr. Seal spends with his patients are barely even adequate for a standard medication check-in. Additionally, Dr. Seal is not able to see all inmates on a regular basis, and it can take a few weeks to a few months to be able to schedule an appointment with him. *Id.* at 1424:11-24. Dr. Burns described the risks associated with a patient having to wait so long for an appointment with Dr. Seal:

> People are going to have symptoms. They are going to decompensate . . . they are going to have behavioral problems. They are going to receive disciplinary reports. They are going to stay in restrictive housing longer as a consequence of receiving those reports. They are at risk of harming themselves or harming other people, and then become at risk of having . . . force used against them and hurting someone else.

*Id.* at 1424:25-1425:9. Accordingly, the Court concludes that the psychiatric staffing is plainly inadequate, which results in delays in treatment and the inability to provide other treatment besides medication management.

The Court also finds that there are adequacy issues with the mental health department in general. Dr. Burns was unable to determine exactly how many inmates were on the mental health caseload due to poor tracking and record keeping. *Id.* at 1423:21-23. Based on the estimated numbers, Dr. Burns testified that she would recommend staffing one mental health professional for a caseload of sixty inmates. *Id.* at 1422:1-6. This would allow the mental health staff to perform individual and group interventions, conduct the thirty- and ninety-day evaluations on every segregated inmate, complete rounds, and be available for suicide watches. Similarly, Dr. Thompson recommended two full-time mental health professionals for the DWCC caseload. Thompson Trial Tr. vol. XVII at

4071:13-16 [Record Document 561]. DWCC's mental health department falls far short of these recommendations.

As previously stated, Hayden, who is not licensed, and Burgos, a Licensed Professional Counselor, are the primary workers responsible for delivering services to inmates on the South Compound. The same issues previously discussed with regards to Hayden's training, education, and credentials continue to be of issue here, as he lacks the ability to diagnose or counsel inmates diagnosed with mental illness. Burns Trial Tr. vol. VI at 1425:23-1426:8 [Record Document 540]. Regardless, the evidence shows that Hayden and Burgos are unable to provide full-time services to the inmates on the South Compound because they are also tasked with substantial responsibilities on the North Compound. *Id.* at 1425:14-22. Simply put, it is not possible for Hayden and Burgos to provide adequate services splitting time between the North and South Compounds.

The evidence presented at trial by both Plaintiffs and Defendants demonstrates that DWCC's mental health staffing is severely inadequate given the facility's population size. This is both with respect to psychiatric services as well as the mental health department more broadly. The Court's findings here serve to further demonstrate the systemic deficiencies visible at DWCC.

(d)     *Safeguards for Psychotropic Medication*

As noted in the "Mental Health Treatment" subsection, the prescription of medication is the only type of treatment available to inmates at DWCC. Despite being the only treatment offered at DWCC, the Court nonetheless finds there to be systemic

deficiencies in the administration of these psychotropic medications for the reasons outlined below.

Sgt. Paul Pitts ("Sgt. Pitts") was employed as a Pill Call Officer on the South Compound from approximately 2017-2019. Pitts Trial Tr. vol. IV at 866:6-20 [Record Document 538]. Sgt. Pitts testified as to the process of administering psychotropic medication to the inmates. Prior to beginning the role, Sgt. Pitts received one to two days of training from a DWCC nurse, where he received hands-on training and the "Pill Pass Policy." *Id.* at 869:2-15. The "Pill Pass Policy" or as the PowerPoint Presentation is titled, the "Medication Handling Pill Call Training for Correctional Employees," is a thirty-one page document that discusses medication safety, the process of distributing and reporting medication, and areas of dangers of which the pill call officer must be aware. Ex. P-QQQ-03 [Record Document 564-233].

A pill call officer will work seven days, during which he is tasked with distributing medication during all three rounds; the individual is then off duty for seven days, and another pill call officer will work his shifts. Pitts Trial Tr. vol. IV at 875:12-22 [Record Document 538]. There are three pill call rounds per day (during which all buildings will be visited): morning (which begins around 6:00 a.m.), noon, and evening (which begins around 4:30-5:00 p.m.). *Id.* at 874:25-876:1. The nurses provide a list with the names of each inmate to receive medication that day. *Id.* at 887:3-5. The pill call officer pushes the pill cart with the inmates' prescription medications. *Id.* at 879:5-9. He walks through each tier, stopping at the appropriate cells, where he will verify the inmate's name, DOC number, and ID card before giving medication to the inmate. *Id.* at 884:12-885:18. The

99

pills will arrive in a blister package, which requires the pill call officer to "pop the medicine out of the blister pack" before administering it to the inmate. *Id.* at 878:25-880:2. The pill call officer then asks the inmate to verify that he has swallowed the medication by asking him to open his mouth, lift his tongue, pull on his gums, lips, and cheeks, and show his palms. *Id.* at 878:24-880:25. The pill call officer will then maintain a list of inmates who refused to take their medications for later documentation in the Electronic Medication Administration Records ("E-MAR") system. *Id.* at 887:22-888:10. Once the pill call officer has completed his rounds for the day, the pill cart is locked up in the key room in each building. *Id.* at 889:1-13. The pill call officer records an inmate's consumption of medicine (or lack thereof) in the E-MAR system three times per day, after each round. *Id.* 890:22-891:18. Sgt. Pitts stated that during training, he was taught to report medical noncompliance by inputting "N" for "not requested" or "R" for refusal in the E-MAR system. *Id.* at 911:18-25. Medications may only be discontinued if there is a "stop order" in place. *Id.* at 877:17-22.

Given that psychotropic medication is an inmate's only form of mental health treatment, it is critical that its administration is done correctly. However, Dr. Burns testified that the medication administration program at DWCC fell below the minimum standard of care. *See generally* Burns Trial Tr. vol. VI at 1395:8-1407:10 [Record Document 540]. The Court agrees with this for several different reasons. First, there are insufficient mechanisms for reporting a missed dose of medication. The extent of Sgt. Pitts's medicine noncompliance reporting was to input the information into the E-MAR system. Pitts Trial Tr. vol. IV at 896:16-20 [Record Document 538]. Sgt. Pitts would not

report the information to anybody personally. *Id.* at 896:21-25. He also did not know who, if anyone at all, would check the information he input for follow-up, testifying only that "I'm guessing medical did." *Id.* at 897:1-5. In fact, Dr. Burns recalled that a nurse "who does the audits, just checks to see that the MAR is actually filed in the chart and [does] not look at what it says." Burns Trial Tr. vol. VI at 1403:20-1404:2 [Record Document 540].

Many inmates at DWCC frequently refuse their medication, as Dr. Burns observed during the review of the medical administration records that are filled out by the pill call officers. *Id.* at 1394:17-22. Dr. Burns testified that many of these records indicated that the medications were "refused" or "not requested." *Id.* at 1394:21-24. As Dr. Seal explained, though it is common for inmates to refuse medication, a missed dose could be cause for concern that the medication would not work.[67] Seal Trial Tr. vol. V at 1203:25-1204:13 [Record Document 539]. The harms associated with medication noncompliance are highlighted in the training manual itself; however, the policy stops short of ensuring that there are provisions or requirements to alleviate that harm. As illustrated by the testimony of Sgt. Pitts and Dr. Seal outlined below, DWCC has a policy in place that recognizes the importance of regular and consistent medication and administration and has a method of recording medication administration but has no process by which an inmate's

---

[67] Dr. Burns agreed with Dr. Seal, noting that "these medications are designed so that they . . . be given once a day, and that is important because you want to have a steady state of medication in your bloodstream so that it has the intended effect. If you don't receive all of the doses of medicine, and there were large blocks of time when people didn't receive the medicine, it can't have the intended effect." Burns Trial Tr. vol. VI at 1395:2-12 [Record Document 540].

regular or inconsistent medication administration is reported to someone who can address the problem.

Indeed, Sgt. Pitt's testimony confirmed this. During his testimony, Sgt. Pitts reviewed Ex. P-L-124 [Record Document 564-67 at 35], Ex. P-L-122 [Record Document 564-67 at 33], Ex. P-L-14 [Record Document 564-66 at 14], and Ex. P-L-15 [Record Document 564-66 at 15]. *Id.* at 920:15-932:11. Ex. P-L-124 [Record Document 564-67 at 35] is a copy of inmate R.R.'s medication administration records during October 2017. Sgt. Pitts was questioned regarding R.R.'s Remeron prescription. During the month of October, R.R. only took seven of thirty-one prescribed doses of Remeron. *Id.* at 1; *see also* Pitts Trial Tr. vol. IV at 921:16-21 [Record Document 538]. Sgt. Pitts testified that he had been tasked with administering doses that month between October 24, 2017, and October 29, 2017. Of those six doses, inmate R.R. only took one dose of Remeron. *See* Ex. P-L-124 [Record Document 564-67 at 35]; *see also* Pitts Trial Tr. vol. IV at 921:16-21 [Record Document 538]. Sgt. Pitts testified that he followed his training by documenting those five missing doses, which is visible in the "N" reported on those given days. Pitts Trial Tr. vol. IV at 922:4-17 [Record Document 538]. Inmate T.T.'s October 2017 medication administration record provides similar information; T.T. only took his Remeron once during Sgt. Pitt's six shifts, and eight out of thirty-one doses prescribed for the month. *See* Ex. P-L-122 [Record Document 564-67 at 33]; *see also* Pitts Trial Tr. vol. IV at 923:1-924:1 [Record Document 538]. Inmate T.H. took fourteen of sixty-two and fifteen of sixty-two prescribed Prolixin and Cogentin doses, respectively, in October 2017. *See* Exs. P-L-14, P-L-15 [Record Document 564-66 at 14, 15]; *see also* Pitts Trial Tr. vol. IV at

926:23-928:25 [Record Document 538]. Sgt. Pitts documented the noncompliance with an "N" or "R" in the E-MAR system. *See* Exs. P-L-14, P-L-15 [Record Document 564-66 at 14, 15]; *see also* Pitts Trial Tr. vol. IV at 929:1-6 [Record Document 538].

Sgt. Pitts indicated in his testimony that he relied on his training to properly record medicine noncompliance. Pitts Trial Tr. vol. IV at 922:4-17 [Record Document 538]. However, the Louisiana Department of Correction's training materials for medication administration does not provide pill call officers any real guidance in how they should treat medicine noncompliance. The exact language of the policy, titled "Medication Handling Pill Call Training for Correctional Employees," states that "appropriate documentation is to be entered on MAR/E-MAR for all refused medications." Ex. P-QQQ-03 at 6 [Record Document 564-233]. On the next page, it states "Psyciatric [*sic*] Medication Non-compliance: 3 consecutive missed doses; and/or an obvious pattern of missed doses. Example: offender misses every other day or evening dose." *Id.* at 7. The policy neither outlines what the pill call officer should do with information on medicine noncompliance, nor does it provide a system for reporting this information (e.g., to whom the information should be reported, when should the information be reported, how the information should be reported, etc.). Thus, the information that pill call officers receive during their training fails to provide adequate instructions on what to do in these situations.

Dr. Burns explained that she would typically expect that mental health staff or nurses would review inmate records to detect a missed dose of medication. Burns Trial Tr. vol. VI at 1395:8-1397:12 [Record Document 540]. The psychiatrist would then be

informed after a certain amount of missed doses so that an appointment could be scheduled to address medication noncompliance. *Id.* at 1396:8-1397:18. Generally, intervention should occur as soon as possible, though the exact timing would vary depending on the type of medication. *Id.* at 1398:18-24. Clearly, this did not occur at DWCC; in fact, DWCC's practices were in derogation of the overall rules governing the medical administration.[68] The risk of harm becomes obvious in that not only is there harm to the patient who could experience a recurrence or worsening of symptoms, but it can also lead him to be written up or disciplined. *See* Burns Trial Tr. vol. VI at 1399:13-23 [Record Document 540]. This is because "their behavior, which can be symptomatic of untreated mental illness, is being perceived as negative and receiving writeups." *Id.* at 1399:21-26. This also poses a risk to the staff and others at DWCC.

Not only was there no follow-up for medical noncompliance, but Dr. Seal did not even have access to E-MAR and did not know whether a printed copy of the MAR was in every relevant inmate chart. Seal Trial Tr. vol. V at 1201:14-1202:11 [Record Document 539]. Instead, he had access to older records printed off at the end of each prior month. He also did not know what the "N" and "R" in the E-MAR printouts indicated. *Id.* at 1202:23-1203:4. This concerned Dr. Burns, and she noted that a failure to understand these notations would make it impossible to interpret the records. Burns Trial Tr. vol. VI at 1402:10-15 [Record Document 540]. Dr. Burns opined that it should be the

---

[68] Hayden testified that he reviews the printed E-MAR every morning "to see who is taking their medicine and who is not. And if they are not taking their medicine then that is something that Dr. Seal is made aware of." Hayden Trial Tr. vol. III at 555:11-18 [Record Document 536]. However, neither Dr. Seal's testimony, nor the record corroborates this statement.

responsibility of the mental health staff to develop some sort of system that coordinates with medical and pharmacy to ensure that the prescriber, that is Dr. Seal, has access to this information. *Id.* at 1402:16-23.

Finally, it is evident that the pill call officer is not adequately supervised. Sgt. Pitts is not supervised by a nurse or anyone on the mental health staff, but instead, by the security captains. *See* Pitts Trial Tr. vol. IV at 945:5-9 [Record Document 538]. The captains are the individuals ensuring that Sgt. Pitts is conducting the rounds, filling out the tier logs, and is on time to all distributions. *Id.* at 945:10-21. These individuals are not competent to oversee medication management. Burns Trial Tr. vol. VI at 1403:5-15 [Record Document 540]. The individuals that would be qualified, that is, the nurses or mental health department, simply check to ensure that the MAR is filled out. Thus, there is no audit of Sgt. Pitt's record keeping or his work.

The Court finds that the systemic deficiencies visible in the administration of psychotropic medications—the lack of adequate guidance through training and relevant materials, the absence of any systems of reporting or subsequent follow-up for medicine noncompliance, a failure to audit or provide quality assurance of the pill call officers' job performance or records, and the fact that Dr. Seal does not have access to the E-MAR system—rise to the level of a constitutional violation.

(e)     *Lack of Accurate and Adequate Medical Records*

The Court has already noted several issues with respect to the accuracy of medical records. These include concerns of duplicating records, the reporting of information in the medical records and medicinal administration records (and lack thereof), inconsistencies

105

between records on the same day, and illegible writing within those records. However, the broader topic of Dr. Seal's own record keeping, and what it indicates, should be addressed in further depth. Dr. Burns opined, and this Court agrees, that Dr. Seal does not maintain the requisite quality and quantity of record keeping that his role requires. Patient records are missing medical consent forms and documentation outlining the benefits and risks in taking a psychotropic medication.   Burns Trial Tr. vol. VI at 1406:14-21 [Record Document 540]. Additionally, there is no documentation that otherwise reflects Dr. Seal's participation in any treatment team meetings or intervention development, which would be the typical responsibilities of a prison psychiatrist. *Id.* at 1407:22-1408:4. Dr. Burns testified that this is imperative because "the psychiatrist, again, is the person that has the most education and credential and training to do mental health care. And it is important that the person with that be available and mentor other people in that process. They can also make recommendations to improve processes." *Id.* at 1408:16-1409:2. Dr. Burns stated that she did not see any of Dr. Seal's recommendations documented in writing. *Id.* at 1409:14-24. Comparing inmate records to a story, the lack of appropriate documentation leaves a record riddled with plot holes and inconsistencies. *Id.* at 1409:23-1410:10. Given that Dr. Seal is the only individual qualified to diagnose and prescribe medication, the only type of treatment at DWCC, meticulous documentation is required so that mental health staff can carry out his directives. The failure to accurately and appropriately complete inmate records, in conjunction with the aforementioned record keeping issues, rise to the level of a constitutional violation.

(f)     *Suicide Prevention Program*

Courts have held that prisons must have adequate suicide prevention policies to provide constitutional care. *Ruiz*, 503 F. Supp. at 1339; *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1219 (M.D. Ala. 2017); *Madrid*, 889 F. Supp. at 1258. "The identification, treatment, and supervision of inmates with suicidal tendencies is a necessary component of any mental health treatment program." *Ruiz*, 503 F. Supp. at 1339. The suicide prevention policies at DWCC fail to meet any of these objectives; both Dr. Haney and Dr. Burns credibly established that inmates are exposed to cruel conditions on the South Compound. Haney Trial Tr. vol. XII at 2735:2-4 [Record Document 553]; *see also* Burns Trial Tr. vol. VI at 1450:9-13 [Record Document 540]. The Court agrees, as evidence shows that DWCC's suicide prevention policies and practices are constitutionally inadequate.

i.     The Punitive Nature of the Suicide Prevention Program

At DWCC, there are two forms of suicide watch: standard and extreme. Ex. J-10 at 6 [Record Document 565-17]. Standard suicide watch is for "the management of offenders who are at risk for suicide but do not present a clear and continual risk of self-injurious behavior(s)." *Id.* at 4. Extreme suicide watch is "for the management of offenders who present a clear and continual risk of self-injurious behavior." *Id.* DWCC's post order requires mental health staff to utilize the "least restrictive" means necessary to preventing an inmate's injury, and it also requires consultation with mental health staff before modifying suicide watch status. *Id.* at 7-8. Mental health staff are also tasked with "determin[ing] the appropriate security garment(s) that, to the extent possible, promote the

107

offender's safety in way that is designed to prevent humiliation and degradation." Ex. J-10 at 4 [Record Document 565-17]. The Court finds the nature of the suicide prevention program at DWCC to be punitive, as opposed to a realistic and practical form of treatment. Among the reasons, the rest of which are discussed below, is the identical nature of the conditions of suicide watch and strip cell status.

Standard suicide watch subjects inmates to the same conditions as strip cell status—meaning all property is removed from the cell, including mattresses and clothing; all inmates are given paper gowns. Hayden Trial Tr. vol. II at 430:14-431:25 [Record Document 534]; *accord* Burns Trial Tr. vol. VI at 1357:6-20 [Record Document 540]. This is especially the case for those inmates on "manipulation suicide watch," which is when "the offender is looking for a cell move or if they are aggravated with staff . . . and if they won't tell us why they have actually moved and why they have done this, we don't know exactly what to expect of them." *Id.* at 432:9-21. Hayden did not elaborate on the methods of evaluation or assessment tools used by the mental health staff to determine whether an inmate is being manipulative or is legitimately suicidal, which is alarming. According to Hayden, if it is determined that an inmate should be placed on "manipulative suicide watch," his property is taken from him; however, if an inmate is determined to be legitimately suicidal, some property will be given to him. *Id.* at 432:9-433:20. This makes no logical sense and clearly demonstrates that the allowance or removal of property is not an individualized determination based on personal security, but instead, is another disciplinary tactic used to punish inmates, further highlighting the punitive nature of suicide watch.

Dr. Haney testified that the removal of the inmate's clothing was "cruel," ineffective, and "delegitimizes the formal disciplinary system." Haney Trial Tr. vol. XII at 2735:2-9 [Record Document 553]. Dr. Burns testified that the conditions of standard suicide watch mirror that of strip cell status such that one cannot tell the status of the inmate by merely looking at him, signaling to inmates that suicide watch is a punitive setting and dissuades inmates from accurately reporting suicidal ideation. Burns Trial Tr. vol. VI at 1360:1-20 [Record Document 540].

On extreme suicide watch, inmates are clothed in a paper gown and have no access to any property, including mattresses, letters, or books. Record Document 524 ¶ 107. Additionally, prisoners on extreme suicide watch may be placed in restraints while in a cell alone. *See id.* at ¶¶ 108, 110. Restraints used on extreme suicide watch include:

> (1) four-point restraints, which consist of both hands being cuffed with the chain for the cuffs connected to a box at the mid-section, designed to prevent movement or tampering, a belly chain connected to the handcuff chain, and shackles on the ankles; (2) placing a prisoner in a restraint chair, which attaches each limb to the chair; or (3) the placing of the prisoner in a restraint chair, as above, with a helmet to prevent spitting and head banging.

Record Document 524 ¶ 108.  The restraint chair may be used for up to twelve hours if approved through the adequate channels. *Id.* at ¶ 113. During that twelve-hour window, an inmate must be released every two hours "for toilet, sanitation, and nourishment functions." *Id.* at ¶ 115. After twelve hours, mental health staff must conduct a medical and mental health assessment to determine whether the restraint chair must continue to be used, modified in its use, or terminated. *Id.* at ¶114. If an inmate cannot safely be released

from the restraint chair after five, two-hour cycles, the policy requires that he be restrained in a different way before returning him back to the chair. *Id.* at ¶ 116.

DWCC's extreme suicide practices plainly deviate from its own internal policies. Record Document 524 ¶¶ 111-16. By way of example, inmate C.T. testified as to his experience on extreme suicide watch, describing a three-day cycle where he was restrained in the chair, he was taken off the chair and put into his cell alone in restraints, and then he attempted suicide. Turner Trial Transcript vol. I at 94:16-101:12 [Record Document 533]. During that time, C.T. testified that he spent "no less than 24 hours, no more than 30 hours" in the restraint chair. *Id.* at 100:11-16.  C.T.'s experience in the restraint chair ran afoul of internal policy.

Not only do DWCC's extreme suicide watch practices deviate from its own policies, but they also do not meet the minimum standard of mental health care. First, DWCC's practice of taking away all property and bedding is not a widely used or accepted process; the failure to tailor decisions regarding clothing, property, and bedding to each inmate is a deviation from basic principles of mental health care. *See generally* Burns Trial Tr. vol. V at 1349:16-1350:10 [Record Document 539]; *accord* Pacholke Trial Tr. vol. XII at 2731:5-17 [Record Document 553].[69] Second, Dr. Burns testified that the use of steel security restraints for suicide watch is foreign to any suicide watch that she has observed. Burns Trial Tr. vol. V at 1376:4-11 [Record Document 539]. Dr. Burns further testified that if an inmate's risk to himself was so severe that he required restraint,

---

[69] Secretary Pacholke relied on both "ACA standards and certainly my tours of, you know, over 13 different jurisdictions in the last few years" to make this assertion. Pacholke Trial Tr. vol. XII at 2731:15-17 [Record Document 553].

then he should be placed in a health care setting with therapeutic restraints, such as leather, because he needs to be monitored by a medical professional. *See id.* at 1371:14-1372:17; *accord* Pacholke Trial Tr. vol. XII at 2750:11-2751:16 [Record Document 553]. Dr. Thompson agreed, stating that he would recommend that leather restraints be utilized instead of the current restraint mechanisms, including the chair. Thompson Trial Tr. vol. XVII at 4053:17-19 [Record Document 561]. Additionally, Dr. Thompson testified that the use of the restraint chair was neither a "best practice" nor a "common practice." *Id.* at 4052:14-4053:10. Dr. Burns also highlighted the potential harm in using a restraint chair, stating that "people get blood clots and there have been deaths in restraint chairs in other correctional settings." Burns Trial Tr. vol. V at 1372:18-21 [Record Document 539]. These suicide watch practices are so egregious and cruel that they rise to the level of an Eighth Amendment violation.

### ii.    Lack of Meaningful Treatment

The Court also finds that the evidence presented at trial demonstrated a lack of meaningful treatment plans for those on standard suicide and extreme suicide watch. Additionally, the Court finds that there is no initial assessment before placing an inmate on suicide watch, no treatment for inmates while on suicide watch, and there is no assessment or treatment before the inmate is removed from suicide watch.

First, DWCC violates acceptable prison practices by failing to conduct a suicide risk assessment. Dr. Burns explained what she believed was an appropriate process for putting an inmate on suicide watch. Burns Trial Tr. vol. V at 1350:11-1351:1 [Record Document 539]. There should be a low threshold for placing an inmate on suicide watch

because it is better to be overly cautious than risk an inmate taking his own life. *Id.* at 1350:13-16. Mental health staff should then follow up with a more comprehensive assessment to determine "the level of risk [the inmate] presents . . . what level of watch and property can be provided." *Id.* at 1350:16-1351:1.[70] These assessments should be confidential so that the risk of disclosing highly personal information around other inmates is mitigated. *Id.* at 1355:23-1356:3. The assessment should then be documented in the inmate's chart, including "all of the items that the person is assessing risk about, whether there are static factor or dynamic factors that can be addressed and treated." *Id.* at 1355:5-7.

The evidence shows that mental health staff fail to conduct a proper, standard suicide risk assessment. First, Dr. Burns testified that Hayden is currently not qualified to conduct the suicide risk assessments, though he could be if he were adequately trained by a licensed professional who would be consulted when removing an individual from suicide watch. *See generally id.* at 1354:12-21. Second, Dr. Burns testified that there was no evidence that a standard suicide risk assessment is conducted at DWCC because the only documentation in the records she reviewed were progress notes, and even those did not indicate an evaluation occurred. *Id.* at 1355:3-18. There was no indication that Hayden conducted an evaluation based on the inmate's individual needs and mental health history, *id.* at 1357:10-11, despite DWCC's policy requiring officials to employ the least restrictive means necessary to prevent inmate injury. An individualized approach to a

---

[70] An adequate assessment would include questions such as whether an inmate is partaking in harmful behaviors and whether there is opportunity to self-harm. Burns Trial Tr. vol. V at 1356:14-1357:5 [Record Document 539].

suicide assessment would reveal it is safe for an inmate to possess a mattress or a mat. *Id.* at 1357:10-13.

Additionally, there is no treatment available to people on suicide watch. As previously mentioned, there is no other type of treatment available to inmates at DWCC other than the administration of psychotropic medication. Inmates on suicide watch do not receive individual or group therapy, nor are they allowed to partake in in-cell or out-of-cell programming. Dr. Seal's testimony revealed that he did not make any decisions regarding the conditions on suicide watch, did not decide when an inmate should be removed from suicide watch, and did not know the differences between standard and extreme suicide watch. Seal Trial Tr. vol. For example, an individualized approach to a suicide assessment would reveal whether an individual can have a mattress or a mat. *Id.* at 1357:10-13.  at 1226:5-21. Tellingly, while being asked about suicide watch, Dr. Seal stated that "my job is to diagnose and to provide medication." *Id.* at 1227:9-10. The Court concludes that the harm to the patient is obvious in that the patient is not receiving the appropriate treatment. The Court is convinced that Dr. Seal is the only person who has the credentials to make diagnosis and treatment recommendations, and yet, the record showed very little evidence demonstrating Dr. Seal's role or impact in the suicide prevention program at DWCC. Further, treatment and the use of restraints at DWCC, Dr. Burns aptly noted that "[n]o one feels better because they have been tied down in a restraint chair or placed into steel handcuffs and leg irons. So it is more suffering . . . It is not helpful in terms of addressing the underlying issue that is making the person suicidal." Burns Trial Tr. vol. V at 1373:11-17 [Record Document 539].

The damaging effects of DWCC's suicide prevention program are highlighted by inmate T.M.'s three weeks on suicide watch. Dr. Galvin, a board-certified internal medicine doctor, testified about the changes he witnessed in inmate T.M.'s behavior after being placed on suicide watch. Galvin Trial Tr. vol. XII at 2834:17-18 [Record Document 553].[71] Dr. Galvin was incarcerated at DWCC from approximately January to May 2016. *Id.* at 2835:4-7. Dr. Galvin met inmate T.M. at EHCC before they were transferred to DWCC.[72] Dr. Galvin explained the personality changes he noticed in T.M. as their time at DWCC progressed. Specifically, Dr. Galvin stated that T.M. "became increasingly agitated, restless, was unable to sleep . . . [a]nd he knew something was wrong because he was . . . getting into some disagreements and couldn't control his speech and was . . . verbally aggressive . . . blurting things out, couldn't be patient." *Id.* at 2836:19-2837:1. Dr. Galvin states that the "pivotal event" was a time where T.M. was speaking very loudly:

> [P]eople got tired of hearing him . . . it escalated to the point that somebody said "well he's spitting on people." And they had basically what people call a shakedown and it was a little bit of a violent shakedown where they came in, several of the guards, and took his possessions away and whisked him away for about a week or so.

*Id.* at 2837:5-23. Although Dr. Galvin did not know where the guards took T.M., he said that he was told that T.M. was taken to the restraint chair. *Id.* at 2837:25-2838:3. Witness testimony and records maintained by DWCC corroborate Dr. Galvin's testimony. There is

---

[71] Dr. Gavin was housed in N-5, which is outside of the scope of consideration in this matter. Nevertheless, the information that was provided during Dr. Gavin's testimony is relevant to the issues in this litigation.

[72] Inmate T.M. submitted a waiver to allow his medical and mental health records to be admitted into evidence and utilized during this case. However, out of respect to the sensitive nature of this discussion and the information it reveals therein, the inmate's name will not be disclosed here.

evidence of T.M. being placed on suicide watch during the time of Dr. Galvin's incarceration at DWCC. During those three weeks, records indicate that inmate T.M. was placed in the restraint chair. *Id.* at 1869:1-20. There are also multiple documented instances of chemical spray being used on him. Nail Trial Tr. vol. VIII at 1857:16-1866:2 [Record Document 542] (describing all the documented instances where chemical spray was used on T.M., including testimony as to how many ounces were sprayed each time); *see also* Ex. P-D-2 [Record Document 564-6].

Dr. Galvin testified that T.M. was "profoundly and irrevocably changed" when T.M. returned to the unit. Galvin Trial Tr. vol. XII at 2838:8-9 [Record Document 553]. He described the first time he saw T.M. on his way to the showers:

> He was standing up on, you know, the one foot or so elevation concrete bed with a paper gown on with his entire backside exposed, with his buttocks exposed. His nose was in the corner of the cinderblock wall, and he was only making guttural sounds. He wasn't speaking anymore. It was a profound and dramatic change. Something clearly happened.

*Id.* at 2838:11-17. The Court found Dr. Galvin's observations to be credible and compelling for several reasons. First, Dr. Galvin's testimony that T.M. was "taken away" aligns with his short period of incarceration at DWCC, testimony by officials at DWCC, and documents produced at trial. Dr. Galvin's observations are also consistent with the damaging effects of utilizing disciplinary measures on inmates with mental health issues without prior consultation of mental health staff, as well as the harm caused by DWCC's suicide prevention program. The Court finds Dr. Galvin's testimony to be further evidence of the systemic deficiencies in DWCC's suicide prevention program.

Finally, DWCC has no assessment or method of evaluation to remove an inmate from standard suicide watch. Hayden testified that if an inmate indicates that he no longer wants to remain on suicide watch, he will be removed. *See* Hayden Trial Tr. vol. III at 581:6-18 [Record Document 536]. When asked about the changes that took place to prompt inmate C.T.'s removal from suicide watch, Hayden simply stated that "he no longer wanted to be on standard suicide watch." *Id.* at 581:15-18. If an inmate is suicidal, he should not be removed from suicide watch simply because he no longer wants to be there; indeed, this is completely counterintuitive and contrary to the goal of suicide watch, which is to prevent an inmate from committing suicide. This just further highlights the lack of treatment or care available to inmates at DWCC.

Accordingly, the Court finds that the complete lack of standard suicide assessment and failure to create an individualized treatment plans—specifically, the lack of initial assessment before placement on suicide watch, the lack of treatment available to inmates while on suicide watch, and the failure to evaluate inmates before they are removed from suicide watch—are indicative of the widespread systemic deficiencies in the suicide prevention program at DWCC.

### iii. Failures in Observing Inmates on Suicide Watch

Finally, the Court finds that there are failures in the observation of inmates on suicide watch that rise to the level of a constitutional violation. First, DWCC's camera monitoring processes are not currently aligned with basic practices across correctional institutions. According to a DWCC post order on suicide prevention and management, "frequency of observation shall be included in the management instructions and shall vary

from continual observation to intervals of [fifteen] minutes or less. Within the prescribed interval, irregular additional observations shall be made on an occasional, random basis to frustrate the planning of self-injurious acts." Ex. J-10 at 6 [Record Document 565-17]. At DWCC, individuals on suicide watch are supposedly either observed continuously through cameras by the tier sergeant or in-person every fifteen minutes by a tier officer. *See* Hayden Trial Tr. vol. II at 390:7-10 [Record Document 534]. The individual monitoring the cameras on each tier has various other tasks, including letting individuals in and out of the tiers and recording tier visitors in the logbooks. *Id.* at 392:6-393:11. The tier officer will also fill out the suicide watch logbooks. *Id.* at 397:3-11. Mental health staff do not observe the inmates personally but will sometimes review the logbooks. *Id.* at 390:17-20, 397:12-14.

In her testimony, Dr. Burns stated that DWCC's level of observation violates acceptable practices for observation of inmates on suicide watch. Her reasoning is compelling. First, Dr. Burns personally observed that the cameras at DWCC do not always work. She testified that "[n]ot all the cameras were in working order and . . . there were some places within the cell that are not visible on the camera, just blind spots based upon where the camera is located in the cell itself." Burns Trial Tr. vol. V at 1359:9-15 [Record Document 539]. Furthermore, while observing the same cells from the camera feed, Dr. Burns noticed that it was difficult finding the correct cell and camera to get a good view in a specific cell. *Id.* at 1359:16-25. Even if the cameras did work, Dr. Burns stated that it is generally recommended that camera monitoring be used in addition to "face to face assessments." *Id.* at 1357:21-1358:1. This is because an inmate should be well aware that

117

he is constantly being watched, which will help prevent suicide attempts. *Id.* at 1358:1-8. The lack of working cameras and a clear view of each monitored cell is imperative for camera monitoring to work successfully. Without routine face-to-face monitoring, the reliance on cameras puts these inmates at risk. The inadequacy of the systems for monitoring inmates, along with the lack of treatment for inmates on suicide watch and the improper use of restraints, are sufficient evidence for this Court to find an Eighth Amendment violation.

2.  Deliberate Indifference

Having found that there are substantial, systemic deficiencies in all six aspects of mental health care at DWCC—screening and evaluations, effective and individualized treatment, adequate staffing, safeguards to the prescription and distribution of psychotropic medications, accurate record keeping, and the creation and maintenance of a suicide prevention program—the Court will now address the deliberate indifference prong of the Eighth Amendment inquiry. Using the same deliberate indifference standard previously articulated, the Court finds that the evidence demonstrates the existence of deliberate indifference in all six of the *Ruiz* categories. The evidence presented at trial highlights common themes throughout these six categories. First, throughout this section, the Court has noted the failure of the mental health staff to follow its own policies. The existence of an institution-wide policy is proof of knowledge of a specific, substantial risk of harm. The Court finds that the staff at DWCC have made a conscious, informed decision not to comply with DOC and DWCC internal policy, despite firsthand knowledge, education, and training that their actions would result in a substantial risk of

118

harm. Second, Defendants' actions clearly evince a wanton disregard of inmates' serious
mental health needs. The Court will briefly address DWCC's failure to comply with
internal policy and instances of wanton disregard below.

(a)    *Failure to Comply with Policy*

The Court found evidence that DWCC staff consciously decided to not comply
with its policies. First, DWCC mental health staff do not comply with *Employee Policy
Memorandum #03-02-003* which requires that DWCC conduct walking rounds at a
minimum of three times per week in units housing LOC-2 inmates. Ex. J-7 at 6 [Record
Document 565-13]. No evidence was produced at trial that demonstrated compliance with
this policy. *Employee Policy Memorandum #03-02-003* also requires that LOC-2, LOC-3,
and LOC-4 inmates receive an individual mental health evaluation every 30, 90, and 180
days, respectively. *Id.* at 6-7. Again, no evidence was produced at trial that would indicate
that these evaluations occur. This policy also requires mental health staff to create an
"individualized, written mental health treatment plan" that, at minimum, is reviewed
annually for each inmate with a LOC-2, LOC-3, and LOC-4 designation. *Id.* at 9. The
Court did not review a single individualized treatment plan, and in fact, witnesses on both
sides testified that DWCC creates no such treatment plans. Finally, *Employee Policy
Memorandum #03-02-003* states that mental health services are available to inmates upon
request, *id.* at 8, and yet, only psychotropic medications are provided. The Court finds that
DWCC does not comply with any of the four provisions required by *Employee Policy
Memorandum #03-02-003.*

119

Furthermore, DWCC mental health staff do not comply with policies governing suicide watch. *Employee Policy Memorandum #03-02-001* requires that mental health staff "utilize[e] the least restrictive management necessary to prevent an inmate's self-harm." Ex. J-10 at 7, 8 [Record Document 565-17]. However, DWCC implements a generalized approach to suicide prevention; there are no individualized assessments to determine what "least restrictive" means are required for a particular inmate on suicide watch. Mental health staff also violate DWCC policy by forcing inmates to sit in the restraint chair for longer than permitted and without the requisite breaks. Finally, security staff at DWCC do not observe inmates as required by *Employee Policy Memorandum #03-02-001*. *Employee Policy Memorandum #03-02-001* requires "continuous observation of the offender" at frequencies that vary between "continual observation to intervals of [fifteen] minutes or less." Ex. J-10 at 6 [Record Document 565-17]. As was previously mentioned, some cameras in the cells used for suicide watch are inoperable, making it impossible for DWCC to comply with this policy. The purpose of *Employee Policy Memorandum #03-02-001* is to offer procedures and mechanisms for protecting DWCC's most at-risk inmates and preventing inmate injury and death.[73] DWCC's failure to comply

---

[73] Specifically, the purpose of *Employee Policy Memorandum #03-02-00* is "[t]o establish a formal policy and a written suicide prevention plan for DWCC to manage inmates who display suicidal tendencies or behavior and to establish a formal procedure for staff and offender critical incident debriefing that covers the management of suicidal incidents. To provide guidelines at DWCC under which restraints are employed on offenders in an authorized and safe manner as part of a health care regimen." Ex. J-10 at 1 [Record document 565-17]. The policy goes on to stating that "It is *critical that staff understand* that the use of restraints [*sic*] mental health purposes is designed to control destructive and/or dangerously aggressive behaviors." *Id.* (emphasis added).

with one of its most important policies further demonstrates its indifference towards inmate health and safety.

DWCC officials also disregard the risks and harms outlined in its training for medication administration, specifically, the *Pill Call Training for Correctional Employees.* The *Pill Call Training for Correctional Employees* outlines, at length, the risks associated with inmate medication noncompliance. Ex. P-QQQ-03 [Record Document 564-233]. The policy acknowledges those risks and cautions employees of medication noncompliance, and yet, the policy itself shows that there is no procedure or process in place to further avoid or to mitigate these harms. This serves as further evidence of DWCC's deliberate indifference toward inmate mental health.

(b)     *Wanton Disregard for Inmate Health and Safety*

The Court finds evidence of DWCC mental health staff's wanton disregard for inmates' health and safety in each of the six *Ruiz* categories.

As to the screening and intake process, the Court's finding of wanton disregard of inmate health and safety is supported by: 1) Hayden's lack of qualifications to conduct the initial assessments required by the intake process; 2) the inadequacy of the initial intake forms; 3) the failure to ask meaningful questions during intake evaluations; 4) the lack of meaningful review of intake evaluations by a qualified mental health professional; 5) the lack of timely and meaningful follow-up of intake evaluations by mental health staff; 6) the failure of mental health staff to address an inmate's individual needs at intake; 7) the

failure of the mental health staff to conduct weekly rounds;[74] 8) Hayden's lack of qualifications to conduct the thirty- and ninety-day segregated housing interviews; 9) the cell-front, non-confidential nature of the segregated housing interviews; 10) the inadequate evaluation of mental health status during segregated housing interviews; and 11) the untimely execution of the segregated housing interviews.

As to mental health treatment, the Court's finding of wanton disregard of inmate health and safety is supported by 1) the location of the psychiatric appointments with Dr. Seal; 2) the lack of confidentiality during psychiatric appointments; 3) the inadequate amount of time spent on psychiatric appointments; and 4) the inadequate and inappropriate therapeutic materials provided to inmates at DWCC.

As to mental health staffing, the Court's finding of wanton disregard of inmate health and safety is supported by 1) the failure to contract with a psychiatrist for the number of hours necessary to fulfill the demand of DWCC's mental health caseload; 2) the failure to adequately staff the mental health department; and 3) the failure to provide Dr. Seal with the information needed for meaningful psychiatric appointments, especially information relating to suicide watch and strip cell status.

As to the administration of psychotropic medications, the Court's finding of wanton disregard of inmate health and safety is supported by 1) the lack of processes by which an inmate's missed medication administration can be addressed or remedied,

---

[74] Deputy Warden Dauzat testified that mental health staff at DWCC are required to complete weekly rounds on every tier. Dauzat Trial Tr. vol. XV at 3354:22-3355:4 [Record Document 556]. However, the Court could not independently verify this with the written policies admitted into evidence.

despite written materials that warn of the dangers; 2) the failure to provide Dr. Seal with accurate, up-to-date printed MARs for psychiatric appointments; and 3) Dr. Seal's lack of training and access to the E-MAR system.

As to DWCC's maintenance of adequate and accurate patient records, the Court's finding of wanton disregard of inmate health and safety is supported by 1) the instances of inmate record duplication; 2) Dr. Seal's illegible notes; 3) inaccuracies in various inmate forms and mental health evaluations; and 4) the failure to maintain a list of inmates on the mental health caseload.

As to the suicide prevention program, the Court's finding of wanton disregard of inmate health and safety is supported by 1) the punitive nature of suicide watch; 2) the conditions of extreme suicide watch, specifically the use of restraints; 3) the failure to develop a treatment plan for inmates specifically on suicide watch; 4) the lack of mental health assessment immediately after an inmate is placed on suicide watch; 5) the lack of treatment during an inmate's stay on suicide watch; and 6) the lack of assessment by a qualified mental health provider when someone is taken off suicide watch.

Despite their education, training, and knowledge, the Court finds that DWCC and DOC have exhibited deliberate indifference to inmate mental health care and treatment at DWCC, satisfying the second prong of the Eighth Amendment analysis. This widespread, cruel indifference towards the mental health care and treatment of inmates at DWCC by mental health professionals, combined with the gross systemic deficiencies previously discussed, rises to the level of a constitutional violation.

3.     Conclusion as to the Delivery of Mental Health Services

It cannot be genuinely disputed that there is a serious need for mental health services for inmates on the South Compound at DWCC. As detailed above, inmates with mental illness comprise a substantial portion of the inmates on extended lockdown. DWCC, however, fails to provide those inmates with constitutionally adequate mental health services. This failure is systemic.

The Court identified six areas in the delivery of mental health services that contribute to the systemic failure to provide adequate mental health services to inmates clearly in need of such services: 1) the failure to properly screen and evaluate inmates for mental illness; 2) the failure to provide treatment beyond medication management; 3) the failure to provide adequately trained mental health professionals in sufficient numbers; 4) the failure to have safeguards around the administration of psychotropic medication; 5) the failure to maintain accurate, complete, and confidential records; and 6) the failure to have an adequate suicide prevention program.

For the reasons stated previously, the Court finds that a constitutional violation has been demonstrated, the two-pronged Eighth Amendment violation having been satisfied. Accordingly, Plaintiffs are entitled to further relief.

**E.     Conclusion**

The Court concludes this section by noting that it has great respect for the people who have dedicated their lives to the carceral field. It appreciates Secretary LeBlanc for candidly expressing his vision to move Louisiana away from its current restrictive housing practices to reflect the national norm. LeBlanc Trial Tr. vol. XVIII at 4436:17-4438:4

[Record Document at 562]. The Court also acknowledges that the DOC voluntarily partnered with the Vera Institute to review its segregated housing practices. With that said, the Court cannot "shrink" from its "obligation to enforce the constitutional rights of all persons, including prisoners." *Brown v. Plata*, 563 U.S. 493, 511 (2011) (internal quotation marks and citation omitted). As it currently stands, DWCC is violating the Eighth Amendment rights of its prisoners, many of whom suffer from mental illness, by housing them in inhumane conditions on extended lockdown and by failing to deliver those inmates adequate mental health care. Plaintiffs are entitled to further relief to alleviate the following violations:

(1) The current conditions of confinement on the South Compound, as detailed above, have the mutually enforcing effect of exposing inmates on the South Compound to a substantial risk of severe psychological pain and suffering and depriving those inmates of their sanity in violation of the Eighth Amendment.

(2) DWCC's systemic failure to deliver adequate mental health services to inmates on the South Compound, as detailed above, constitutes cruel and unusual punishment.

(3) Separately from above, a subgroup of the Class, inmates with mental illness,[75] has its Eighth Amendment rights violated because the conditions of confinement on restricted housing expose inmates with mental illness to a substantial likelihood of even more psychological pain and suffering, including the exacerbation of their already diagnosed mental illness.

---

[75] The Class includes all inmates on extended lockdown, which includes inmates with mental illness.

## V.   ADA and RA Claims

### A.   Background

The Court will now turn to Plaintiffs' ADA and RA claims.[76] As stated above, there is a high incidence of mental illness among inmates housed on the South Compound. Dr. Burns and Dr. Thompson concurred that there is a forty to forty-five percent prevalence rate for mental illness for inmates in segregation at DWCC. Burns Trial Tr. vol. V at 1427:23-1428:1 [Record Document 539]; Thompson Trial Tr. vol. XVII at 4070:13-17 [Record Document 561]. Dr. Thompson opined that this reflected "a high level of mental illness throughout the facility." Thompson Trial Tr. vol. XVII at 4028:1-22 [Record Document 561]. By definition, LOC-3s and -4s have a mental illness, and LOC-3s have a serious mental illness.

Despite the high rate of mental illness throughout DWCC, the evidence shows that DWCC fails in its affirmative duty to identify inmates with mental illness and fails to provide any accommodations or modifications to existing policies or practices for inmates with mental illness on the South Compound. Additionally, the evidence shows that the DOC and DWCC employ unlawful methods of administration by under-identifying inmates with serious mental illness and maintaining an inadequate process for inmates with mental illness to request reasonable accommodations. As will be shown below, this results in inmates with mental illness being excluded from services, benefits, and activities, such as group programming and individual counseling, in violation of the ADA and RA.

---

[76] The Court adopts the factual findings from above and incorporates the facts throughout.

126

## B.     ADA and RA Standard

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. It defines a person with a disability as one who has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.105. This includes individuals with historical, but not present, impairments and those who are regarded as having an impairment regardless of actual disability. 42 U.S.C. § 12102(1)(B)-(C). The RA states that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of his disability . . . be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). It defines disability in the same way as the ADA. *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010). "The RA and the ADA are judged under the same legal standards, and the same remedies are available under both Acts." *Id.* (citations omitted).

To prevail on an ADA claim, a plaintiff must prove "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). The elements of a claim under the RA are the same, except

that the public entity in question must be one which receives federal financial assistance.[77] *See Kemp*, 610 F.3d at 234. Plaintiffs have established, and Defendants do not dispute, that the ADA and RA apply to DWCC.

A defendant's failure to make reasonable modifications for the unique needs of disabled inmates can qualify as intentional discrimination. *See, e.g., Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004); *Garrett*, 560 F. App'x at 382. Mental health services have been recognized as "services" that "benefit" prisoners. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded from participation in')."); *Hernandez v. Cnty. of Monterey*, 110 F. Supp. 3d 929, 935-36 (N.D. Cal. 2015) (listing mental health services).

### 1.    Qualified Individuals

It cannot be genuinely disputed that members of the Subclass are qualified individuals with disabilities that substantially limit one or more major life activities, as defined by the ADA. For one thing, Plaintiffs successfully certified the Subclass by submitting evidence that some of the Named Plaintiffs had a mental illness and showed how these diagnoses interfered with major life activities. In addition, Plaintiffs presented evidence that inmates housed in extended lockdown at DWCC have disabilities due to mental illness that interfere with major life activities, such as brain function. Take Bruce

---

[77] The RA has certain exceptions that are not applicable to the present case.

Charles for example; he was diagnosed with bipolar disorder. *See* Ex. D-63 at 119 [Record Document 565-24]. Bipolar disorder is a qualifying disability even if symptoms are in remission, i.e., not active, and it limits a major life activity—brain function. 42 U.S.C. § 12102; 29 C.F.R. § 1630.2(j); *Weed v. Sidewinder Drilling, Inc.*, 245 F. Supp. 3d 826, 834 (S.D. Tex. 2017). Charles's case is representative of the Subclass. *See, e.g.*, Turner Trial Tr. vol. I at 83:11-20 [Record Document 533]; Ex. P-O-30 [Record Document 564-70]. Indeed, Defendants' expert, Dr. Thompson, agreed with Dr. Burns that about forty percent of the inmates housed in extended lockdown had a mental illness. Thompson Trial Tr. vol. XVII at 4070:13-17 [Record Document 561]. And, by the very nature of the mental illnesses, brain function is limited.

Accordingly, Plaintiffs have satisfied the first element of their claim by presenting evidence that the Subclass consists of qualified individuals under the ADA and RA; thus, the Court must determine whether Plaintiffs proved that "members of the Subclass are being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of their disabilities." *Lewis*, 2021 WL 1219988, at *44. "Plaintiffs' burden is to demonstrate a systemic failure; they are not required to demonstrate a failure of policies applied to each class member individually." *Id.*

Plaintiffs' claims under the ADA and RA can be grouped into two broad categories. Plaintiffs contend that DWCC violates the ADA and RA 1) by failing to accommodate inmates with mental illness and 2) by employing methods of administration that discriminate against inmates with mental illness. The Court will address each category in turn.

2.    Failure to Accommodate

Plaintiffs argue that DWCC fails in its affirmative duty to accommodate inmates

with known disabilities. "In addition to their respective prohibitions of disability-based

discrimination, both the ADA and the [RA] impose upon public entities an affirmative

obligation to make reasonable accommodations for disabled individuals." *Cadena v. El

Paso Cnty.*, 946 F.3d 717, 723 (5th Cir. 2020) (citations omitted); *Smith v. Harris Cnty.*,

956 F.3d 311, 317 (5th Cir. 2020) (internal quotations marks and citations omitted).

Although the ADA "does not require prisons to provide new services or programs for

disabled prisoners," prisons "do have an affirmative obligation to make reasonable

modifications . . . so that a disabled prisoner can have meaningful access to existing public

services or programs." *Borum v. Swisher Cnty.*, No. 2:14-CV-127-J, 2015 WL 327508, at

*9 (N.D. Tex. Jan. 26, 2015).

Plaintiffs assert three specific claims: 1) where DWCC identifies an inmate with a

mental illness, DWCC does not make any reasonable modifications or accommodations

for that inmate; 2) DWCC fails to make any reasonable accommodations to the

disciplinary or use of force practices as they are applied to inmates with mental illness;

and 3) DWCC disregards recommendations from its own mental health staff that inmates

with a serious mental illness be placed in general population instead of extended

lockdown. The Court will address each specific claim in turn.

(a)    *Affirmative Modifications*

The evidence shows that inmates with mental illness at DWCC are subjected to the

same conditions as all other inmates on the South Compound without any individualized

assessment by a qualified person as to the appropriateness of housing those individuals in such harsh conditions. *See* Dauzat Trial Tr. vol. III at 750:20-751:3, 757:21-759:12 [Record Document 536] (stating that mental health plays no role in the classification of inmates with mental illness); Seal Trial Tr. vol. V at 1223:18-1227:11 [Record Document 539] (establishing that DWCC does not utilize Dr. Seal, the only psychiatrist at DWCC, to undertake any inquiry into whether his patients can be safely housed in extended lockdown and that Dr. Seal is unfamiliar with the conditions of confinement on the South Compound). As detailed above, DWCC plainly fails to individually assess inmates with mental illness. Instead, all inmates receive the same treatment plan with three generic goals listed.

Defendants also do not make any alterations to the conditions of confinement that prohibit individual participation in group therapy and all other out-of-cell programming; that deprive prisoners of their property, access to a common eating area, the recreation yard, the gymnasium, and contact visitation; and that result in social isolation and enforced idleness for twenty-three to twenty-four hours per day. Defendants concede that inmates with mental illness do not receive accommodations on the South Compound even when accommodations are requested by inmates that DWCC knows to have serious mental illnesses. *See* Huff Trial Tr. vol. IX at 2067:21-2071:3, 2106:21-2107:6 [Record Document 543]; Ex. P-E-133 at 1, 28-29 [Record Document 564-26].

As Drs. Haney and Burns credibly established, as stated above, extended lockdown poses a substantial risk to the mental health of inmates; even more so for inmates with mental illness whose symptoms often worsen while on extended lockdown, which then

131

leads to worse behavior. And so, inmates with mental illness often are unable to conform their behavior to meet the requirements to return to general population and thus serve a prolonged stay on extended lockdown and, if eventually released, return cyclically when their symptoms reappear.[78] *See* Burns Trial Tr. vol. V at 1451:4-11 [Record Document 539]; Haney Trial Tr. vol. XIII at 2947:18-2948:10 [Record Document 554]; Goodwin Trial Tr. vol. X at 2268:13-2280:20, 2283:23-2284:7, 2287:7-2289:5 [Record Document 544] (describing the continuous confinement reports). Inmates with mental illness thus are often excluded from the services, programs, and activities available to inmates in general population, such as group therapy and other out-of-cell programming, though inmates with mental illness are often the ones most in need of such services, activities, and programs. Even if some inmates' active mental illness prohibits them from being safely integrated into general population, DWCC's policies and practices of failing to treat those inmates in a way that accommodates their mental illness have the effect of excluding those inmates from many services, activities, and programs.

In the Court's view, this violates the ADA and RA. 28 C.F.R. § 35.152(b)(2) ("Public entities shall ensure that inmates or detainees with disabilities are housed in the

---

[78] As stated above, inmates with mental illness represent about forty to forty-five percent of the inmates on extended lockdown at DWCC. Burns Trial Tr. vol. V at 1427:23-1428:1 [Record Document 539]; Thompson Trial Tr. vol. XVII at 4070:13-17 [Record Document 561]. Many testifying inmates reported having mental illnesses and being housed in extended lockdown for over a year or returning cyclically. *See, e.g.*, Turner Trial Tr. vol. I at 46:2-21 [Record Document 533]; Moran Trial Tr. vol. I at 197:14, 209:13-14 [Record Document 533]; Solomon Trial Tr. vol. III at 593:7-595:17 [Record Document 536]; Adams Trial Tr. vol. IV at 951:24, 952:12, 957:9-960:6 [Record Document 538]; McDowell Trial Tr. vol. IV at 1012:12-13, 1030:14 [Record Document 538]; Doucet Dep. at 34:17, 35:22, 36:3-8, 24:20-26:6, 30:22 [Record Document 563-5].

most integrated setting appropriate to the needs of the individuals."); 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587, 597 (1999) (holding that the unjustified isolation of a disabled individual constitutes discrimination).

Defendants counter that Plaintiffs' claims must fail because they have not produced evidence that inmates are being discriminated against *because of* their disabilities. In other words, the fact that DWCC treats all inmates on extended lockdown the same regardless of mental illness, Defendants contend, defeats any ADA and RA claim. The Court disagrees.

It is DWCC's failure to individually consider each inmate's mental illness or accommodation needs before placing inmates in extended lockdown for twenty-three to twenty-four hours per day for months and, sometimes, years at a time and then DWCC's failure to provide any modifications to alleviate the severe harm extended isolation poses to those inmates that is discriminatory. In fact, the "failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *McCoy v. Tex. Dep't of Crim. Justice*, No. C-05-370, 2006 WL 2331055, at *7 (S.D. Tex. Aug. 9, 2006). "[A] person with a disability may be the victim of discrimination precisely because she

133

did not receive disparate treatment when she needed accommodation." *Presta v. Peninsula Corridor Joint Powers Bd.*, 16 F. Supp. 2d 1134, 1136 (N.D. Cal. 1998) (citation omitted). "[T]he purpose of the ADA's reasonable accommodation requirement is to guard against the facade of 'equal treatment' when particular accommodations are necessary to level the playing field." *Badalamenti v. Louisiana Dep't of Wildlife & Fisheries*, 439 F. Supp. 3d 801, 808 (E.D. La. 2020) (quoting *McGary v. City of Portland*, 386 F.3d 1259, 1267 (9th Cir. 2004)). United States Supreme Court Justice Jackson, while a district court judge, stated:

> [P]rison officials have an affirmative duty to assess the potential accommodation needs of inmates with known disabilities who are taken into custody and to provide the accommodations that are necessary for those inmates to access the prison's programs and services, without regard to whether or not the disabled individual has made a specific request for accommodation and without relying solely on the assumptions of prison officials regarding that individual's needs.

*Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 272 (D.D.C. 2015). So too with the decision to exclude inmates from various services, activities, and programs by placing inmates on extended lockdown—whether prison officials do so as an initial classification decision or for disciplinary reasons. On that basis, Defendants plainly fail, which potentially exposes individuals with mental illness to greater harm and suffering. DWCC's failure to treat inmates with mental illness in a way that accommodates the mental illness violates the ADA and RA.

(b)     *Discipline*

Plaintiffs maintain that DWCC violates the ADA and RA by failing to consider an inmate's mental illness before using force or imposing discipline against inmates who

pose no immediate threat to safety. Although the maintenance of prison security is typically left to the sound discretion of prison staff, as stated above, prison officials have an affirmative obligation to examine the needs of inmates with mental illness and provide them with necessary accommodations to ensure access to prison services. *See Pierce*, 128 F. Supp. 3d at 271-72. Other courts have held that the "obligation to provide accommodations applies to the discipline of disabled inmates, as well." *Lewis*, 2021 WL 1219988, at *55 (citation omitted). In the prison context, the ADA and RA are violated "where a correctional officer could have used less force or no force during the performance of his or her penological duties with respect to a disabled person." *Id.* at *56 (quoting *Armstrong v. Newsom*, No. 94-CV-02307 CW, 2021 WL 933106, at *25 (N.D. Cal. Mar. 11, 2021)). A "lack of medical oversight in disciplinary decisions for disabled inmates" could support a failure-to-accommodate claim under the ADA and RA. *Id.*

Here, the evidence shows a concerning disconnect between security and the mental health department. *See* Nail Trial Tr. vol. VIII 1823:7-24 [Record Document 542] (testifying that he did not actually know whether DWCC housed inmates with mental illness on the South Compound and that he never met with Deputy Warden Dauzat about individual prisoners); Coleman Trial Tr. vol. VII at 1632:21-25, 1649:20 [Record Document 541] (consistently testifying that mental health related things are not part of his "job duties" as a security officer). Security deploys force and discipline without considering an inmate's mental illness. *See, e.g.*, Coleman Trial Tr. vol. VII at 1631:23 [Record Document 541] (testifying that he never consulted the mental health department before imposing strip cell status). DWCC has in place a policy that mental health must be

called before chemical agents can be used on an inmate "on the mental health list . . . if time warrants it and it doesn't put any of the other inmates or staff at risk." *See* Nail Trial Tr. vol. VIII at 1784:19-1785:1 [Record Document 542].[79] But this limitation on when mental health staff must be called is interpreted by the staff to include instances in which an inmate is making too much noise, kicking a cell door, or slamming the footlocker box. *Id.* at 1785:2-14. What is more is that security will deploy mace on inmates in restraints on suicide watch for acts of self-harm before attempting de-escalating tactics or contacting the mental health department. *See id.* at 1923:4-1924:17 (describing the use of chemical spray against an inmate in full restraints on extreme suicide for hitting his head and body against the cell door).

The mental health department plays no role in the decision to place inmates with mental illness in segregation, and the mental health staff is not consulted before the implementation of sanctions or greater discipline, such as strip cell status, yard restriction, etc. *See, e.g.*, Dauzat Trial Tr. vol. III at 750:20-751:3 [Record Document 536] (stating that the mental health department plays no actual role in the placement of inmates on extended lockdown); Mays Trial Tr. vol. IX at 2158:8-17 [Record Document 543] (testifying that the mental health department was not consulted regarding classification); Hayden Trial Tr. vol. II at 387:4-13 [Record Document 534] (stating that he is unfamiliar with strip cell status).

---

[79] The Court reiterates that DWCC does not make a list of inmates on the mental health caseload available to security officers. Colonel Nail testified that he relied on the heat pathology list and that he could "surmise" which inmates were on the mental health caseload "by face" based on "who'd come and see the mental health people." Nail Trial Tr. vol. VIII at 1820:8-1821:14 [Record Document 542].

The bottom line is this: based on the evidence, the Court finds that the mental health staff employs "a completely 'hands off' approach to discipline" as it relates to the discipline of inmates with mental illness. *Lewis*, 2021 WL 1219988, at *56. This violates the ADA and RA because inmates with mental illness run the risk of being disciplined in the same way as inmates without mental illness even though the discipline could expose inmates with mental illness to greater harm. *See McCoy*, 2006 WL 2331055, at *7.

(c)   <em>Housing</em>

The Court finds that the evidence, as presented at trial, does not support an ADA or RA claim regarding security officials disregarding recommendations from the mental health staff that inmates with mental illness be placed in general population instead of extended lockdown. Although Plaintiffs showed several instances of Hayden checking the general population box on the recommended housing section of the intake screening form, this is just a preliminary observation at the time inmates arrive at DWCC. Most of the time, Hayden makes this observation without the benefit of the inmates' records. Hayden Trial Tr. vol. II at 385:7-386:5 [Record Document 534]. The Court does not view this as an official recommendation from the mental health staff. The salient point is that the mental health department plays no actual role in the housing decision for inmates with mental illness. Dauzat Trial Tr. vol. III at 750:20-751:3, 757:21-759:12 [Record Document 536].

3.   <u>Methods of Administration</u>

Plaintiffs assert that Defendants violate the ADA by utilizing methods of administration that have the effect of discriminating against disabled inmates. Particularly

137

relevant to this case, the ADA also recognizes a "methods of administration" claim that prohibits public entities from using "criteria or methods of administration . . . [that] have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(3); *see Dunn v. Dunn*, 318 F.R.D. 652, 664 (M.D. Ala. 2016).

> A public entity may not . . . utilize criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability . . . [or] [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities.

28 C.F.R. § 35.130(b)(3)(i) & (ii). "In other words, a public entity cannot actively undercut the ability of a public program to benefit those with disabilities." *Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 752 (N.D. Tex. 2014). "[A]n omission as well as a commission can be an actionable method of administration." *Dunn*, 318 F.R.D. at 665. "The methods-of-administration regulation makes clear that a know-nothing, do-nothing policy of non-administration is a privately actionable violation of the ADA, at least when plaintiffs can show that it has the effect of discriminating." *Id.* at 665 n.12. Under the ADA, prisons must be "proactive." *Id.*

With respect to the methods of administration, Plaintiffs allege three specific violations: 1) that DWCC fails to individually identify inmates with disabilities; 2) that DWCC excludes individuals with chronic mental illness from the definition of serious mental illness; and 3) that DWCC has an inadequate system for processing requests for reasonable accommodations and fails to track such requests.

138

(a)    *Whether the DOC's definition of serious mental illness is under-inclusive*

Plaintiffs claim that the DOC's definition of serious mental illness is under-inclusive and fails to identify and track prisoners with serious mental illness by way of functional impairment. An unlawful method of administration can occur when a public entity "employ[s] no system or an inadequate system for identifying and tracking prisoners with disabilities." *Id.* at 665.

The DOC tracks inmates with mental illness based only on its internal level of care system and an internal definition of serious mental illness, which is based solely on diagnosis rather than functional impairment. Ex. P-JJJ-25 [Record Document 564-204]. As previously mentioned, the DOC's definition of serious mental illness only includes six enumerated conditions: major depressive disorder, schizophrenia, schizoaffective disorder, bipolar disorder, unspecified schizophrenia spectrum, and severe anxiety disorder. *Id.* at 2. By limiting the definition of serious mental illness to only a list of six specific diagnoses and failing to independently track disability, Defendants under-identify inmates with disabilities by excluding those with mental illness whose symptoms cause a functional impairment but whose diagnosis is not included on the limited list of six serious mental illness diagnoses. Burns Trial Tr. vol. V at 1271:22-1273:13 [Record Document 539]. This is something on which both Plaintiffs and Defendants agree. *See id.*; *see also* Thompson Trial Tr. vol. XVII at 4112:9-4113:25 [Record Document 561].

Dr. Burns testified that diagnoses other than the six enumerated diagnoses can reach the level of a disability based on functional impairment. The American Correctional

Association recognizes and requires prisons to track both disabilities from the enumerated diagnoses and those arising from a functional impairment. Dr. Burns attested that a serious mental illness by way of functional impairment is a mental illness that disrupts a person's ability to interact with others; it is considered serious based on the degree of impaired functioning it causes. Burns Trial Tr. vol. V at 1271:22-1273:13 [Record Document 539].

Dr. Thompson concurred with Dr. Burns. He testified that people could have a disability from a mental health diagnosis other than the six enumerated by the DOC's definition of serious mental illness. The functional impairment arising from the person's mental health condition is the determining factor in whether the person has a serious mental illness by way of functional impairment. Thompson Trial Tr. vol. XVII at 4113:2-25 [Record Document 561]. Dr. Thompson further testified that, periodically, some inmates at DWCC appear to have levels of functioning that would put them at a higher level of need than LOC-3. *Id.* at 4002:21-24

Inmates with serious mental illness need access to a psychiatrist and counselors when they arrive at a new facility. Burns Trial Tr. vol. V at 1291:25-1292:8 [Record Document 539]. Dr. Seal, the person best equipped to gauge the impact of a mental health condition on a person's level of function, is wholly uninvolved in assigning the serious mental illness designation used by the DOC to track inmates with mental health disabilities. Seal Trial Tr. vol. V at 1229:13-18 [Record Document 539]. DWCC does not utilize Dr. Seal, the only psychiatrist it employs, to inquire into whether patients can be safely housed in extended lockdown. Seal Trial Tr. vol. V at 1223:18-22 [Record Document 539]. Even people with severe disorders such as psychosis and schizophrenia,

who arrive at DWCC already flagged by the DOC as seriously mentally ill, receive the exact same plan of "follow-up per policy" as any other new arrival, despite being more in need of immediate attention. Burns Trial Tr. vol. V at 1291:23-1292:8, 1295:3-21 [Record Document 539].

Here, the evidence showed that the DOC uses an under-inclusive definition of disability by excluding inmates with debilitating mental illnesses by way of functional impairment from the definition of serious mental illness. This method of administration results in a substantial likelihood that inmates with serious mental illnesses by way of functional impairment will fall through the cracks and will not be treated accordingly. This poses a substantial likelihood that those inmates will not be tracked and provided the appropriate level of mental health care or offered the appropriate affirmative accommodations. And it makes it even more likely that those inmates will be disciplined without consideration for their unidentified serious mental illness. Defendants have thus violated the ADA in this regard.

> (b)    *Whether DWCC excludes people with chronic mental illness from the definition of serious mental illness*

Next, Plaintiffs aver that even DWCC inmates with a diagnosed serious mental illness based on the under-inclusive definition lose their serious mental designation if they are in a period of remission. Plaintiffs argue that this policy violates the ADA because "[t]he determination of whether an impairment substantially limits a major life activity [must] be made without regard to the ameliorative effects of mitigating measures such as medication." 42 U.S.C. § 12102(4)(E)(i)(I); *Kemp,* 610 F.3d at 236. In support, Plaintiffs

cite to the example of Bruce Charles, an inmate diagnosed with bipolar disorder, who lost his serious mental illness designation because he was in a period of remission. Ex. D-63 at 119 [Record Document 564-24]. This one incident, however, does not show a systemic deficiency in this regard. Although Charles's ADA rights may have been violated in this one instance, Plaintiffs have failed to prove a widespread failure in identifying and tracking inmates with a serious mental illness in remission. Accordingly, Plaintiffs have failed to prove that DWCC systemically excludes inmates with chronic mental illness from the under-inclusive definition of serious mental illness.[80]

(c)    *Whether Defendants provide an adequate process for requesting reasonable accommodations*

Plaintiffs contend that DWCC's failure to process and track requests for reasonable accommodations related to mental illness is part of DWCC's systemic failure to comply with the ADA. Under the ADA, "employing no system or an inadequate system for prisoners to request accommodations and submit grievances regarding non-accommodation" can be an unlawful method of administration. *Dunn*, 318 F.R.D. at 665; *see Lewis*, 2021 WL 1219988, at *48-50, 52; *Armstrong v. Brown*, 857 F. Supp. 2d 919, 933 (N.D. Cal. 2012) (finding a violation of the ADA because the county jail lacked "functional and timely grievance procedures . . . to request and obtain disability accommodations").

Prior to March 2020, Deputy Warden Huff, who has a background in accounting, was the ADA liaison at DWCC. Record Document 524 ¶ 137. As ADA coordinator,

---

[80] Nevertheless, this evidence is probative of the overall failure of DWCC to comply with the ADA when the evidence is viewed in totality.

Deputy Warden Huff was responsible for handling requests for reasonable accommodations. The majority of, if not all, accommodation requests come through the ARP process, as directed by policy.[81] Deputy Warden Huff testified that when an inmate requests a reasonable accommodation, she is required to interview that inmate; ADA interviews have a specific form and should be documented in the ARP file itself. Huff Trial Tr. vol. IX at 1989:8-1990:10 [Record Document 543]; *see also* Ex. D-3 [Record Document 565-3] (DOC ADA policy). These forms, however, are nonexistent in DWCC's records.

Additionally, for a request to be considered as a request for an accommodation, Deputy Warden Huff required inmates to title requests as an "ADA complaint" or specifically write that they were making an accommodation request. Huff Trial Tr. vol. IX at 1990:3-8 [Record Document 543]. In her thirty-two years of employment at DWCC, fifteen of which had been in her current position, Deputy Warden Huff could not remember granting a single request for reasonable accommodations based on a mental health disability. *Id.* at 1990:6-24. Deputy Warden Huff also could not recall a single request for accommodations based on mental illness in the past five years. *Id.* at 1990:19-21. Colonel Nail, the long-time Unit Manager of the South Compound, was unaware of the process for a person to request a reasonable accommodation or if there even was a process.

---

[81] Huff did testify that some ADA requests were handled informally before an inmate filed a formal request. Huff Trial Tr. vol. IX at 2103:13-17 [Record Document 543].

DWCC's current process leads to many ADA requests being ignored, unnoticed, and unaddressed. Take Corey Adams's ADA request, for example. He filed it through the ARP process, but nothing in DWCC's response to Adams's request for mental health accommodation indicates it was handled as a request for a reasonable accommodation. *See Id.* at 1270:15-21 [Record Document 543]. There was no evidence that Adams was interviewed by Deputy Warden Huff, nor was there any evidence in the ARP file that she filled out an ADA-specific interview form. Furthermore, Adams's ARP was backlogged and went unaddressed for almost three months.

The trial evidence shows that there are systemic deficiencies in the ways that DWCC identifies, screens, and tracks ADA requests. ADA requests have been subsumed by the ARP process. Deputy Warden Huff's testimony demonstrated that she and her staff fail to recognize when mental health requests trigger the ADA.

Based on the evidence, DWCC is violating the Subclass's ADA rights by failing to provide inmates with "functional and timely grievance procedures . . . to request and obtain disability accommodations." *Brown*, 857 F. Supp. 2d at 933. Regardless of what the policy states, DWCC fails to appropriately process and track accommodation requests, which contributes to DWCC's systemic failure to comply with the ADA. *See Lewis*, 2021 WL 1219988, at *52 (finding a systemic failure in Louisiana State Penitentiary's tracking and processing of ADA accommodation requests).

## C.    Conclusion

To summarize, DWCC's widespread neglect of mental illness results in violations of the ADA and RA. Plaintiffs have proven that there is a systemic failure to comply with

the ADA and RA. Specifically, Plaintiffs proved that DWCC fails to consider an inmate's mental illness before placing him on extended lockdown for an indefinite period of time or before deploying discipline. Further, Defendants provide no modifications to existing policies or practices for the mentally ill on the South Compound, despite the mentally ill being susceptible to harm while on extended lockdown, which has the effect of excluding them from various programs, activities, and services. Additionally, DWCC violates the ADA by using an under-inclusive definition of serious mental illness and by failing to maintain an adequate system for inmates to request and obtain reasonable accommodations regarding mental illness. Plaintiffs are entitled to further relief to cure the deficiencies.

## VI. <u>First Amendment Claims</u>

### A. **Background**

Plaintiffs allege that Defendants have obstructed counsel's investigation of the conditions at DWCC by systematically interfering with prisoner legal mail in violation of the First Amendment. Particularly, Plaintiffs claim that prison officials violate inmates' free speech rights by opening and reading legal mail from inmates to attorneys and from attorneys to inmates without justification and outside the presence of the inmates. According to Plaintiffs, the arbitrary monitoring of legal mail obviates the attorney-client privilege and therefore disrupts counsel's ability to investigate the allegations made against the prison and causes inmates to withdraw from litigation or limit their disclosures to counsel out of fear of retaliation at the hands of the staff against whom the inmates are lodging complaints.

DWCC is situated in a national forest in a remote part of Louisiana, and as such, mail correspondence serves as an important method of communication for inmates and their legal counsel. As of March 2020, DWCC employed two mailroom employees: Major Angela Mathews ("Major Mathews") and Adrianne Judgeware ("Judgeware"). Mathews Dep. at 10 [Record Document 564-265].[82] Major Mathews testified via deposition in lieu of live testimony. She testified that she has been responsible for the DWCC mailroom since approximately 2013 and supervises the only other mailroom employee, Judgeware. *Id.* at 9:1-10:14. Together, the two are responsible for processing the mail, logging the legal mail into a database, checking regular mail for contraband, placing the incoming mail in the night shift supervisor's box for delivery to the inmates, picking up the outgoing mail from the repository in each building, and transporting the outgoing mail to the United States Postal Service in Homer, Louisiana. *Id.* at 10:3-12:6, 35:15-37:24, 87:12-13. They do not, however, open and inspect incoming and outgoing legal mail. *Id.* at 39:1-9.

## B.   Legal Mail

The protections of the First Amendment continue to exist inside prison walls. *See Brewer v. Wilkinson*, 3 F.3d 816, 820-21 (5th Cir. 1993). An inmate's right to be free from unlawful interference with his mail, including incoming and outgoing legal mail, arises from two distinct rights: the right of access to the courts and the right of free speech. *See id.* Plaintiffs, here, do not bring an access to the courts claim; rather, they contend that DWCC's arbitrary interference with legal mail violates inmates' "First Amendment right

---

[82] Major Mathews's trial deposition in lieu of live testimony was accepted into the record as Ex. P-BBBB-3 [Record Document 564-265].

to free speech—i.e., the right to be free from unjustified governmental interference with communication." *Id.* at 820.

Inmates retain free speech rights consistent "with the legitimate penological objectives of the corrections system," and restrictions on those rights cannot be greater than necessary to protect the correctional interests involved. *Id.* The First Amendment thus protects a prisoner from mail censorship that is not "reasonably related to legitimate penological interests." *Id.* at 824 (citation omitted). However, "freedom from censorship . . . is not the equivalent of freedom from inspection or perusal." *Wolff v. McDonnell*, 418 U.S. 539, 576 (1974). As previously mentioned, Plaintiffs allege that DWCC has interfered with both incoming and outgoing legal mail. Because the interference with incoming and outgoing legal mail presents different issues, the Court will address each claim separately.

1.   Incoming Legal Mail

"[P]rison officials may open incoming legal mail to inspect it for contraband." *Jones v. Mail Room Staff*, 74 F. App'x 418, 419 (5th Cir. 2003) (citing *Brewer*, 3 F.3d at 820-21). In the Fifth Circuit, "prisoners do not have a constitutional right to be present when privileged legal mail is opened and inspected." *Collins v. Foster*, 602 F. App'x 273, 275 (5th Cir. 2015) (citing *Brewer*, 3 F.3d at 825). Even "the violation of the prison regulation requiring that a prisoner be present when his incoming legal mail is opened and inspected is not a violation of a prisoner's constitutional rights." *Brewer*, 3 F.3d at 825. Instead, the inmate must show that his mail has been unlawfully censored or seized. *See*

*id.* at 818-26, n.13 (requiring censorship to state a cognizable claim for a violation of opening legal mail).

With respect to incoming legal mail, Major Mathews testified that once an envelope is identified as legal mail,[83] the mail is logged into a computer database and placed in the shift supervisor's box for delivery to the inmate; the legal mail is not opened at this time. Mathews Dep. at 35:17-39:9 [Record Document 564-265]. Instead, an officer with the rank of Captain or higher delivers the legal mail directly to the inmate and opens the legal mail in front of the inmate to check for contraband. *See id.* at 39:1-9, 59:16-23; *accord* Ex. P-BBBB-4 at 30 [Record Document 564-266].

On the contrary, inmates testified that, at times, incoming legal mail was opened outside their presence, which would be a violation of department policy. Carlton Turner, an inmate housed at DWCC during the relevant period, testified that an officer generally "opens the mail and hands it to [the inmate]" after the inmate signs a form, which is consistent with Major Mathews's testimony and DWCC policy. Turner Trial Tr. vol. I at 70:7-11 [Record Document 533]. But, Turner stated, on one occasion he received an opened envelope from Disability Rights without any content inside. *See id.* at 78:11-19. Another DWCC inmate, Dameion Brumfield, testified that sometimes he had "stuff" missing from his legal mail at DWCC, so he knew someone went through it before he received the mail. Brumfield Trial Tr. vol. I at 168:9-169:2 [Record Document 533].

---

[83] The mailroom staff can identify legal mail generally based on the sender being an identifiable attorney or advocacy group. *See* Mathews Dep. at 35:1-14, 50:2-51:16, 106:7-107:15 [Record Document 564-265]. For example, Major Mathews was able to recite the address of Disability Rights from memory. *Id.* at 50:20-51:3. Major Mathews also testified that she could verify attorneys through the Bar Association. *Id.* at 35:4-14.

Turner's and Brumfield's non-specific testimony, however, was not persuasive to the Court in this regard. Turner's description of the alleged incident was vague and lacked signs of reliability. For instance, there is no evidence that Turner filed an administrative grievance regarding this alleged incident so that this incident could have been investigated. Additionally, he did not approximate when this incident took place or specifically identify the security staff whom Turner claims he informally confronted about the missing content so that someone could testify in support or in challenge of his allegations.[84] *See* Turner Trial Tr. vol. I at 78:11-80:10 [Record Document 533]. In short, the Court finds Turner's description of the alleged incident to be too vague to carry enough indicia of reliability.

Likewise, Brumfield testified in generalities and did not detail any specific instances of mail tampering, nor did he describe how he knew "stuff" was missing or what "stuff" was missing. *See* Brumfield Trial Tr. vol. I at 168:9-169:2 [Record Document 533]. There is also no evidence that Brumfield filed a grievance regarding his incoming legal mail being opened outside of his presence and its content being censored. Brumfield's testimony was thus unreliable in this regard. Plaintiffs submitted no otherwise

---

[84] In response to the question about identifying who brought Turner the legal mail, he testified, "Sometimes mostly it would be Captain Solomon, but it would never be the same person. It was always different officers that brought the legal mail." Turner Trial Tr. vol. I at 79:16-18 [Record Document 533]. In effect, Turner answered generally who brought him mail but not specifically who brought him the empty envelope.

credible evidence that proves the disputed fact that DWCC was censoring or interfering with incoming legal mail.[85]

The Court finds that the delivering officer opens and inspects incoming legal mail in front of the inmate. After inspecting the legal mail, the delivering officer requires the receiving inmate to sign a legal mail receipt before relinquishing the legal mail to the inmate; the legal mail receipt signifies that the inmate received his mail.[86] Mathews Dep. at 37-38, 61 [Record Document 564-265]. If the inmate does not sign the mail receipt, he does not receive the mail and the mail is returned to the sender. *Id.* at 61-62.

Here, Plaintiffs' incoming legal mail claim fails for a lack of proof. There is no credible evidence that DWCC has opened or read incoming legal mail outside the presence of the inmate. Even if so, the Fifth Circuit has made clear that such conduct alone does not violate constitutional rights even when prison regulations are violated. *See Brewer*, 3 F.3d at 825 (stating that the inspection of incoming legal mail is a legitimate penological practice). More germane, Plaintiffs failed to produce any credible evidence of widespread censorship of incoming legal mail. As such, Plaintiffs have failed to prove a constitutional violation as to their incoming legal mail claim.

---

[85] Other inmates filed grievances regarding the censoring of incoming legal mail. These grievances, however, were not admitted for the truth of the matter asserted but, instead, to show notice of a potential issue and a duty to investigate. Although Defendants were on notice of complaints about mail tampering, Plaintiffs have failed to prove the truth of any of the complaints.

[86] Plaintiffs also contend that the form acknowledges that the envelope was sealed when received by the inmate. Plaintiffs, however, did not submit an example of a physical receipt into evidence to support this contention. Instead, the Court finds the testimony of Major Mathews credible in this regard as she testified consistent with the policy that the signature signals that the inmate received his mail. *See* Ex. P-BBBB-4 at 30 [Record Document 564-266].

2.    Outgoing Legal Mail

Plaintiffs' outgoing legal mail claim presents a different issue. "[A] distinction still exists between incoming prison mail and outgoing prison mail." *Id.* (citing *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)). "But that distinction revolves around the differing penological concerns with respect to outgoing and incoming mail." *Id.* "The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials." *Thornburgh*, 490 U.S. at 413. The Fifth Circuit has recognized that inmates have a right to be free from "arbitrary censorship" of outgoing mail. *Brewer*, 3 F.3d at 826.

Inmates are allowed flex pens, paper, envelopes, and stamps to send mail, including legal mail. Moran Trial Tr. vol. I at 210:17-211:25 [Record Document 533]. When sending legal mail, each inmate typically seals his own envelope. *See id.* at 211:13-14; Turner Trial Tr. vol. I at 71:7-11 [Record Document 533]; Brumfield Trial Tr. vol. I at 164:6-165:25 [Record Document 533]; Dillon Trial Tr. vol. I at 272:10-11 [Record Document 533]; Mathews Dep. at 46:16-19 [Record Document 564-265]. Per DOC and DWCC policy, legal mail should not be opened and inspected without express authorization from the Warden or Deputy Warden. Dep. Reg. No. C-02-009 section I; Ex. P-BBBB-4 [Record Document 564-266]. In contrast, regular mail is sent to the mailroom unsealed and the staff seals the envelope with tape after inspection. Mathews Dep. at 46:20-24 [Record Document 564-265]. If legal mail arrives to the mailroom unsealed, Major Mathews testified that the mailroom staff would seal the envelope by applying tape. *Id.* at 50:5-10.

151

Along with addressing the envelope to legal counsel, inmates are required to write "legal mail" or "privileged correspondence" on the envelope to clearly identify the mail as legal. *Id.* at 45:16-22. Because inmates on the South Compound do not have access to a mailbox, a prison official carries a locked mailbox down the tier for each inmate to personally place mail into. *Id.* at 47:20-48:13.[87] At times, however, inmates hand their mail directly to prison staff walking on the tiers.[88] Turner Trial Tr. vol. I at 69:21-70:6 [Record Document 533]; Brumfield Trial Tr. vol. I at 164:9-11 [Record Document 533]; Moran Trial Tr. vol. I at 210:17-211:18 [Record Document 533]. Only Major Mathews and Judgeware have keys to the mailboxes. Mathews Dep. at 56:7-12 [Record Document 564-265]. After Major Mathews or Judgeware picks up the mail from the mailboxes, they will take it back to the mailroom to sort it, inspect regular mail, stamp the mail with a stamp that says, "Not Responsible for Contents," and then transport the outgoing mail to the United States Post Office after which DWCC no longer has control over the mail. *Id.* at 46:20-24, 49:19-24, 87:7-22; *see, e.g.*, Exs. P-C-023-024 [Record Document 564].[89]

Plaintiffs do not challenge DWCC's official mailroom policy. Instead, Plaintiffs contend that Defendants violate those policies by opening and reading legal mail outside

---

[87] Major Mathews responded, "Mm-hmm," when asked if the officers take the mailbox down the tier and if the inmate puts the mail in the box. Although unambiguous responses are preferred, the context confirms that she was responding affirmatively to the questions.

[88] Plaintiffs stopped short of conclusively establishing that the mailbox is never passed down the tier. Instead, the testimony of the inmates, which the Court found credible in this regard, shows inmates also hand their mail directly to an officer walking on the tier in lieu of placing it in the mailbox.

[89] Plaintiffs submitted Exhibits P-C as physical letters into evidence, which the Clerk of Court will preserve and maintain for the Fifth Circuit. To maintain the integrity of the physical letters, no party, attorney, or member of the public may view or handle these letters without express authorization and oversight from the Court.

the presence of inmates. In support, Plaintiffs submitted the stipulated testimony of two mail workers at Disability Rights—Chelsea Ormon ("Ormon") and Leah O'Brien ("O'Brien"), the testimony of inmates, and 116 envelopes from inmates at DWCC to Disability Rights with tape applied to the envelopes.

Ormon and O'Brien both worked at Disability Rights and were, at different times during the litigation, the staff responsible for receiving and reviewing written correspondence from inmates at various DOC facilities, including DWCC. Record Documents 615 ¶¶ 1-4, 615-1 ¶¶ 1-4. They both testified that they received hundreds of letters from inmates housed at DWCC. Record Documents 615 ¶¶ 15, 18. And Ormon testified that five to ten percent of the envelopes received from DWCC had tape applied to them. Record Document 615 ¶ 22. Both Ormon and O'Brien testified that they did not recall ever receiving mail from other Louisiana correctional institutions with tape applied to the envelopes. Record Documents 615 ¶ 21, 615-1 ¶ 25. Additionally, they both testified that some of the envelopes Disability Rights received had been ripped open and taped closed despite the correspondence being clearly marked as legal mail. Record Documents 615 ¶¶ 18-19, 615-1 ¶¶ 21-22. The Court, however, finds the testimony that the envelopes were ripped open before arriving at Disability Rights largely overstated based on the physical evidence.

Ormon was responsible for receiving and reviewing the written correspondence from inmates at DWCC from April 2016 to February 2019. Record Document 615 ¶ 2. She received and authenticated the envelopes accepted as the P-C exhibit [Record Document 564]; in total, the P-C exhibit contained 104 envelopes. Record Document 615

153

¶ 26. These envelopes clearly have tape on them, which Ormon did not apply. Record Document 615 ¶ 24. But many of the envelopes are only opened in one place.[90] The Court is thus largely unable to decipher who made what cuts. In other words, because Ormon did not cut open the envelopes in a unique way to preserve any alleged prior rips, the Court is unable to tell whether the adhesive was cut by Ormon based on her practice of opening the envelopes with a letter opener or by somebody else. *See, e.g*, Exs. P-C-134/135, 136/137, 138/139, 286/287 [Record Document 564]. And Ormon's testimony was very broad, as she testified that "some" of the envelopes were ripped open without pinpointing a specific letter as an exemplar and explaining how she was not the one who made the rips on the envelope when opening the letter.[91] What is more is that some of the envelopes are sealed shut notwithstanding the tape—that is, sealed by the envelope's own adhesive, and the only evidence of the envelopes being opened is where someone, presumably Ormon, cut them open to retrieve the content.[92] *See, e.g.*, Exs. P-C-21/22, 142/143 [Record Document

---

[90] In fact, most of the envelopes are inconclusive because it is not clear to the Court who performed the cut.

[91] Ormon photographed many of the envelopes to document the condition in which Disability Rights received them, Record Document 615 ¶ 20, but Plaintiffs failed to place these photographs into evidence. As such, the Court must reach its conclusions from the physical evidence before it.

[92] Plaintiffs have not presented evidence or alleged that DWCC was resealing envelopes by another means, such as by applying glue. Accordingly, the Court deems the following P-C exhibits as unopened except by Ormon to retrieve the content: 21/22, 27/28, 29/30, 43/44/45, 70/71, 102/103, 116/117, 142/143, 152/153, 158/159, 172/173, 210/211, 218/219, 220/221, 222/223, 230/231, 232/233, 236/237, 238/239, 244/245, 250/251, 256/257, 264/265, 290/291, 294/295, 318/319, 322/323, 324/325, and 362/363 [Record Document 564]. The only P-C exhibits that the Court found suspicious were P-C-23/24, 208/209, and 246/247; the remainder, which the Court counted to be seventy-two envelopes, are inconclusive because it is not clear to the Court who performed the cuts.

564]. Accordingly, the Court finds that Plaintiffs have failed in their burden of proving DWCC opened any P-C exhibit, except as discussed below.

Of the 104 envelopes the Court reviewed in the P-C exhibit, the Court did identify three letters that DWCC opened: 23/24, 208/209, and 246/247 [Record Document 564]. These envelopes appear cut open at the top by a machine—that is, a cleaner cut and not ripped open—and then taped closed; they were not cut open along the adhesive. The Court finds it inconceivable that someone would place tape at the top of the envelopes except for the purpose of sealing an opened envelope. The Court also finds it implausible that the United States Postal Service would cut open these letters or that inmates on extended lockdown would have access to a letter opener. Further, the Court finds Ormon's testimony that she did not apply the tape to these envelopes to be credible. Accordingly, the Court finds that Plaintiffs have proven that DWCC cut open these three pieces of legal mail with an opener, which constitutes three violations of department policy.

Regarding O'Brien, most of the envelopes she reviewed while at Disability Rights do not convincingly establish that someone outside her own organization opened the letters. O'Brien was responsible for receiving and reviewing mail from October 2019 to March 2020. Record Document 615-1 ¶¶ 2-3. As part of her testimony, she authenticated twelve envelopes, which were accepted as exhibit P-B.[93] *Id.* ¶ 26. These envelopes clearly

---

[93] Like exhibit P-C, Plaintiffs submitted the physical copies of the letters for exhibit P-B. The same restrictions apply to exhibit P-B—i.e., nobody shall review or handle these letters without express authorization and oversight from the Court. The purpose of this restriction is to preserve the integrity of the physical exhibit for the Fifth Circuit. Exhibit P-B was also submitted in PDF format. *See* Record Document 564-5. The Court, however, found the photographs/scans to be unhelpful and the physical evidence more reliable.

have tape on them, which O'Brien did not apply. *Id.* ¶ 24. Unlike Ormon, O'Brien utilized a unique method of cutting open the envelopes—she largely cut the envelopes on the side starting at the stamp. *Id.* ¶ 14. The physical evidence, however, is inconsistent with her testimony at times.

Eight of the twelve envelopes she reviewed show no signs of being opened other than her cut along the side. These envelopes appear sealed by the adhesive notwithstanding the tape. *See* Exs. P-B-002, 005/006,[94] 017, 018, 028, 023, 026, and 032 [Record Document 564-5 at 3-4, 7-10, 13-16, 23-24, 19-22, 25-26]. Accordingly, the Court finds that Plaintiffs have failed to show that these eight envelopes were opened by someone other than O'Brien.

The envelopes admitted as Exs. P-B-001 and P-B-020 [Record Document 564-5 at 1-2, 17-18] are also unhelpful for Plaintiffs. As to Ex. P-B-001 [Record Document 564-5 at 1-2], the envelope shows no signs of being sealed with the adhesive; the only evidence of it being sealed is by the piece of tape. A part of the envelope, however, has been damaged by the tape indicating the envelope was opened. Unfortunately for Plaintiffs, O'Brien's stipulated testimony is broad and does not identify this specific letter—or any letter—to rule herself out as being responsible for the damage. In sum, there are too many alternative explanations such that the Court cannot conclude DWCC was responsible for opening this envelope.

---

[94] P-B-005 and P-B-006 appear to be duplicates. Plaintiffs provided the Court with a combined hard copy containing only one envelope.

Turning to Ex. P-B-020 [Record Document 564-5 at 17-18], this envelope does not appear ripped open because there are no signs of damage to the adhesive area. Instead, it appears as if the adhesive lost its stick. Simply put, Plaintiffs have failed to convince the Court that DWCC opened this letter.

Exs. P-B-004 and P-B-014 [Record Document 564-5 at 5-6, 11-12], however, were opened by someone at DWCC. First, Ex. P-B-004 [Record Document 564-5 at 5-6] has been cleanly cut open at the top, similar to the envelopes marked as Exs. P-C-23/24, 208/209, and 246/247 [Record Document 564]. Even though O'Brien did not open it from the side like her normal technique, the Court finds her testimony that she did not place the tape on the envelope to be credible. For the same reasons as the Court articulated for the envelopes marked as Exs. P-C-23/24, 208/209, and 246/247 [Record Document 564], the Court concludes that DWCC opened this envelope.

Ex. P-B-014 [Record Document 564-5 at 11-12] is a clear example of an envelope being opened by a DWCC personnel. This envelope has been cleanly opened from the top and then taped closed. Additionally, O'Brien cut the envelope open from the side, consistent with her normal technique, and left the top of the envelope taped closed. In effect, O'Brien retrieved the envelope and preserved the evidence to show that it was taped closed when it arrived in the mail. Like the letters marked as Exs. P-B-004 [Record Document 564-5 at 5-6] and P-C-23/24, 208/209, and 246/247 [Record Document 564], the only logical explanation for the cut at the top of the envelope is that it was caused by a DWCC employee. For the same reasons detailed above, the Court concludes that DWCC opened this envelope.

The Court also heard conflicting testimony as to who applied the tape to the envelopes in the P-B and P-C exhibits. Who applied the tape to the envelopes under the circumstances of this case is not relevant. It is far too large of a logical leap to conclude that the mere presence of tape—even assuming DWCC placed the tape on the envelope—means someone opened the envelopes. Indeed, as shown above, many of the envelopes appeared sealed by the adhesive notwithstanding the tape, and most of the envelopes are inconclusive as to when the adhesive was broken.

In sum, Plaintiffs proved the following relevant facts: 1) from approximately 2016 to 2020, Disability Rights received hundreds of letters from inmates at DWCC; 2) of the hundreds of envelopes received from inmates at DWCC, five to ten percent had tape applied to the envelopes; and 3) of the 116 envelopes submitted as evidence, DWCC opened five pieces of legal mail, which constituted five violations of department policy.

Just as Plaintiffs' incoming legal mail claim failed for lack of proof, so too here. The mere fact that five envelopes were opened does not prove that someone read—let alone censored—outgoing legal mail. There is no evidence that someone opened and removed a piece of outgoing legal mail. *Cf. Brewer*, 3 F.3d at 825-26 (denying a motion for summary judgment based on allegations that officials removed legal material). In short, Plaintiffs' evidence is far too weak and circumstantial to prove censorship of outgoing legal mail.

This is not to say Plaintiffs' concerns and investigation were meritless. But the Court's task is to review the evidence before it. To that end, Plaintiffs have simply failed to carry their burden in showing that Defendants are nefariously opening legal mail and

interfering with or censoring Plaintiffs' free speech rights. Accordingly, Plaintiffs' incoming and outgoing legal mail claims are dismissed.

### C.    Retaliation

Plaintiffs have argued that DWCC officials retaliated against inmates for participating in this lawsuit. It appears Plaintiffs' evidence of retaliation is designed to lend support to their claim that legal mail is being opened for an illegitimate purpose and is not designed to support a class-wide claim of retaliation in violation of the First Amendment. The Court finds that a class-wide claim of retaliation is not before it. Indeed, Plaintiffs did not even brief the retaliation legal standard, and they addressed allegations of retaliation within the legal mail section of their brief. *See* Record Document 573 at 165, n.974. Instead, it appears Plaintiffs offered evidence of alleged retaliation to show the consequences of DWCC opening and reading the legal mail and for the Court to make the inference that DWCC staff read the legal mail and then censored free speech through retaliatory conduct. As the Court stated above, Plaintiffs' evidence is far too weak for the Court to make any such inferences. Although the Court believes no further discussion is warranted, out of an abundance of caution, the Court will briefly explain why Plaintiffs also failed to prove a class-wide retaliation claim.

"It is well established that prison officials may not retaliate against an inmate because that inmate exercised his right of access to the courts." *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998). To prevail on a retaliation claim, a plaintiff must prove: 1) the exercise of a specific constitutional right; 2) the defendants' intent to retaliate for the exercise of that right; 3) a retaliatory adverse act; and 4) causation, which in this context

means that, but for the retaliatory motive, the complained-of incident would not have occurred. *Id.* Courts must "carefully scrutinize" retaliation claims to "assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Id.* (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). The Fifth Circuit "places a significant burden on the inmate," and "conclusory allegations of retaliation" will not suffice. *Id.* (citation omitted).

Inmates testified that they felt DWCC staff retaliated against them for communicating with legal counsel. First, Turner testified that Colonel Nail disciplined him for having his jumpsuit around his waist, which prevented his transfer to general population. Turner Trial Tr. vol. I at 80:11-82:2 [Record Document 533]. Second, Brumfield testified that staff asked him general questions about the suit but never about the specifics. Brumfield Trial Tr. vol. I at 169:3-23 [Record Document 533]. Third, Dillon testified that he felt intimidated and threatened by staff and that at one point, his property went missing.[95] Dillon Trial Tr. vol. I at 274:16-275:16 [Record Document 533].

Plaintiffs also contend that Defendants coerced prisoners into disassociating with this litigation by moving them to a more favorable housing assignment. In other words,

---

[95] The Court found that some of the testimony within the cited-to lines of Brumfield's and Dillon's testimony regarding retaliation was vague and unreliable, and the Court only found the facts specifically stated above were established.

Plaintiffs allege that Defendants used extended lockdown to intimidate prisoners into withdrawing from the lawsuit. In support, Plaintiffs point to the suspicious withdrawals of Anthony Tellis and Damonte Henry from the suit. *See* Record Documents 171, 174, 197.

Anthony Tellis withdrew from the suit in March 2019 and Colonel Nail subsequently moved him to CCR, which afforded Tellis greater privileges than inmates on extended lockdown. *See* Record Documents 171, 174; Nail Trial Tr. vol. VIII at 1703:1-8, 1887:4-1888:20 [Record Document 542]. Plaintiffs, however, failed to establish the date Tellis was moved to CCR. And Colonel Nail testified that Tellis was moved to CCR because he met the requirements for protective custody, such as improved conduct and potentially being a security risk in general population. *See* Nail Trial Tr. vol. VIII at 1887:4-1888:20 [Record Document 542].

Moving to Henry, Plaintiffs cross-examined Colonel Nail about letters he received from Henry. In these letters, Henry referred to "trying to come to an agreement with you concerning the lawsuit the Advocacy is filing," "a previous agreement we talked about," and requested to "speak with you as soon as possible to make sure you keep your word." Exs. P-KK-122 [Record Document 564-123], P-KK-123 [Record Document 564-124]. He also stated that he "gave you 9, almost 10 months without a write up." Record Document 564-123. In another letter to Colonel Nail, Henry reported that he had "cut off all communications with the lawyers at the Advocacy Center" and points out, "I kept my word, so please do the same." Ex. P-KK-124 [Record Document 564-125].

As the Court has previously stated, *see* Record Document 197, there are two possible interpretations to the letters. In one, Henry and Colonel Nail agreed that if Henry

maintained positive behavior record for a period of time, he would be transferred out of extended lockdown—an appropriate exercise of discretion afforded prison officials. On the other hand, these letters may indicate that Colonel Nail and Henry agreed that if Henry refused to continue his involvement with the lawsuit, he then would be transferred out of extended lockdown—an attempt to interfere with the lawsuit and undermine First Amendment rights by exploiting the potentially coercive nature of the carceral environment.

Plaintiffs, however, did not subpoena Henry to testify about the content of the letters. The letters were thus deemed hearsay and were not admitted for the truth of the matter asserted. Nail Trial Tr. vol. VIII at 1898:7-12, 1900:20-23, 1902:11-12 [Record Document 542]. Colonel Nail also denied speaking to Henry about the lawsuit, and he stated that he did not make any deals with Henry regarding the lawsuit. He testified that he only discussed Henry's behavior and getting off extended lockdown. *See id.* at 1901:3-1902:20. Additionally, after being notified that his prior letters were being misconstrued, Henry sent a follow-up letter to Colonel Nail stating that he was "writing to clarify and dissolve the implications about anything being offer [*sic*] to me as a deal from you or any other employee at David Wade Correctional Center" and that Colonel Nail "told me give you [*sic*] good behavior and you would see about me making the board." Ex. P-KK-125 [Record Document 564-126].[96] In short, although the withdrawals of Tellis and Henry

---

[96] Like the other letters, this letter was not accepted for the truth of the statements made within. The Court finds that Henry's interests were no longer aligned with the Class such that the statements cannot qualify as statements of an opposing party. Additionally, Henry

were suspicious, Plaintiffs failed to present persuasive evidence to establish that Colonel Nail's conduct was retaliatory or exploitative as opposed to an appropriate exercise of discretion afforded to prison officials regarding housing assignments.

In summary, the Court finds that Plaintiffs offer no analysis of a standalone retaliation claim in their post-trial brief, so it appears that it has been abandoned. More to the point, Plaintiffs failed to produce any credible evidence of pervasive retaliatory conduct. As to the individual claims of retaliation, the Court finds that they also fail because the testimony was vague, conclusory, and without further evidentiary support aside from the inmates' own subjective beliefs of retaliation. Simply put, Plaintiffs failed to introduce sufficient evidence to support a retaliation claim at the class level.

### D.    Conclusion as to the Plaintiffs' First Amendment Claims

The Court finds that Plaintiffs have failed to prove that DWCC is violating the Class's First Amendment rights by opening and reading incoming and outgoing prisoner legal mail or otherwise retaliating against prisoners for exercising their First Amendment rights. Defendants are entitled to dismissal of these claims. Accordingly, Plaintiffs' First Amendment claims will be dismissed with prejudice at the appropriate time.[97]

### VII.   Conclusion

Based on the foregoing reasons, the Court finds that Defendants, in their official capacities, are violating the Eighth Amendment rights of the Class and the ADA and RA rights of the Subclass. The Court finds that the conditions on the South Compound rise to

---

never became a Named Plaintiff. In short, Defendants have failed to convince the Court that the statements are not hearsay or fall under an exception to the hearsay rule.

[97] At this time, the Court is not certifying any part of the opinion as a final judgment.

the level of an Eighth Amendment violation due to the psychological harms of solitary confinement, the physical composition of the South Compound, the length of time an inmate remains on extended lockdown, the treatment of the mentally ill, and DWCC's disciplinary practices on the unit. Additionally, the Court finds an Eighth Amendment violation in DWCC's delivery of mental health services. Specifically, the Court finds constitutional violations in the screening and evaluation processes, mental health treatment options available to inmates (and the lack thereof), the lack of adequate mental health staffing, the lack of safeguards for the administration of psychotropic medications, the inaccuracy and insufficiency of medical records, and the failures of the suicide prevention program. The evidence at trial also supports Plaintiffs' ADA and RA claims that there are no reasonable accommodations for inmates with mental illness in the extended lockdowns units at DWCC, nor are there reasonable accommodations related to discipline and the use of force on those with mental illness.[98] However, the Court does not find that the evidence presented at trial supports the Plaintiffs' claim that DWCC disregards recommendations from mental health staff about extended lockdown of inmates with mental illness. Instead, the Court holds that mental health is not, but should be, involved in the classification system. Regarding Plaintiffs' First Amendment claims, the Court finds in favor of Defendants; the First Amendment claims will be dismissed with prejudice at the appropriate time.

---

[98] This is the only claim for which Defendant Louisiana Department of Public Safety and Corrections is liable. *See* Record Document 316 ¶ 17.

Plaintiffs are entitled to have these unlawful conditions, practices, and policies remedied through injunctive relief. At the remedy phase, the Court will permit Defendants to prove that they have satisfactorily remedied violations by instituting effective changes after the March 15, 2020 discovery cutoff date through August 30, 2022. Record Document 640 at 3. Following the remedy phase, the Court intends to grant injunctive relief to cure the violations detailed herein to the extent the violations have not been cured. Trial on the remedy phase is scheduled to begin on January 17, 2023. *Id.* at 1. Fifteen days have been allocated for the trial. *Id.*

**THUS DONE AND SIGNED** this 1st day of November, 2022.

**ELIZABETH ERNY FOOTE**
**UNITED STATES DISTRICT JUDGE**