UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANTHONY TELLIS and BRUCE CHARLES | * | JUDGE ELIZABETH E. FOOTE |
| on behalf of themselves and all others similarly | * | USMJ MARK L. HORNSBY |
| situated | * | |
| | * | |
| VERSUS | * | |
| | * | |
| JAMES M. LEBLANC, Secretary | * | |
| of the Louisiana Department of Public Safety | * | |
| and Corrections, JERRY GOODWIN, | * | |
| Warden of David Wade Correction Center | * | CIVIL ACTION |
| COL. VINCENT COLEMAN; | * | |
| DOCTOR GREGORY SEAL; DEPUTY | * | NO.: 5:18-CV-00541-EEF-MLH |
| WARDEN DEBORAH DAUZAT; | * | |
| STEVE HAYDEN; AERIAL ROBINSON; | * | |
| JOHNIE ADKINS; and THE | * | |
| LOUISIANADEPARTMENT OF | * | |
| PUBLIC SAFETYAND CORRECTIONS | * | |

## DEFENDANTS' PHASE II PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

NOW INTO COURT, through undersigned counsel, come Defendants, the Louisiana

Department of Public Safety and Corrections; James M. Leblanc, in his official capacity as

Secretary of the Louisiana Department of Public Safety and Corrections; Jerry Goodwin, in his

official capacity as Warden of David Wade Correctional Center; Deborah Dauzat, in her official

capacity as Assistant Warden of David Wade Correctional Center; and Lonnie Nail, Dr. Gregory

Seal, Steve Hayden, Aerial Robinson, and Johnie Adkins (all in their official capacities as

employees of the David Wade Correctional Center) (collectively the "Defendants"), who

respectfully submit Proposed Findings of Fact and Conclusions of Law as follows:

## I.   NATURE OF THE ACTION

This is a class action brought by Plaintiffs under 42 U.S.C. §1983, for violations of the

First and Eighth Amendments to the United States Constitution on behalf of all prisoners currently

held, or who will in the future be held, in extended lockdown at DWCC in the N-1, N-2, N-3, and N-4 buildings. This action also includes claims by Plaintiffs pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*.; Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.

## II.   **PARTIES**

Plaintiffs in this action are 1) Disability Rights Louisiana ("DRLA") is a private, federally-funded, non-profit corporation. DRLA purports to exercise representational standing in this case, despite not having a membership. 2) Plaintiffs' class representatives include Bruce Charles, Carlton Turner, Larry Jones and Ronald Brooks, all prisoners at David Wade Correctional Center ("DWCC") at the time of filing or at the time of a pertinent amendment to the complaint. None of the class representatives are currently housed at DWCC.

Defendants are James LeBlanc in his official capacity as the Secretary of the Louisiana Department of Public Safety and Corrections; Jerry Goodwin in his official capacity as the Warden over DWCC; Col. Vincent Coleman in his official capacity as a Colonel overseeing the South Compound at DWCC; Doctor Gregory Seal, M.D. in his official capacity as a contract psychiatrist at DWCC; Deputy Warden Deborah Dauzat in her official capacity as the Mental Health Director at DWCC; Steve Hayden in his official capacity as a Corrections Program Manager at DWCC; Aerial Robinson in her official capacity as a Social Services Counselor at DWCC; Johnie Adkins in his capacity as a Social Services Counselor at DWCC; and the Louisiana Department of Public Safety and Corrections ("DPS&C") pursuant to the ADA and Section 504 of the Rehabilitation Act only.

III.   **DEFENDANTS' PROPOSED FINDINGS OF FACT**

A.   **Description of DWCC facilities at issue in this case**

DWCC is a maximum custody facility accredited by the American Correctional Association under their Fifth Edition Standards in August of 2022.

DWCC is divided into two compounds: The North Compound and the South Compound. Five buildings, N-1 through N-5, comprise the South Compound, although only buildings N1-N4 are at issue for this case.

N1, N2, N3, and N4 have the same plant configuration, that is, each building has four linear tiers, A, B, C, and D. Each tier has 16 cells.

Of the 16 cells on each tier in N-2 through N-4, the first two cells are camera cells for offenders who are on either a mental health or suicide watch. There is a camera in each of those cells, as well as in all cells on the N4 C tier.

In the field of corrections, the term "Restrictive Housing" refers to housing where offenders are segregated from general population and confined to a cell for greater than or equal to 22 hours. Housing at DWCC that was referred to during the Phase I trial as "extended lockdown," "disciplinary segregation," or "preventative segregation" would (both then and now) be categorized as "Restrictive Housing."

Going back to at least 2015, the DPS&C began ambitious work related to its statewide usage of Restrictive Housing.

DPS&C began a two-pronged approach to this issue as follows: 1) seeking to reduce its usage of Restrictive Housing through the reduction (where possible) of Restrictive Housing ("Restrictive Housing reduction"); and 2) changing completely how DPS&C operates the

Restrictive Housing areas it must maintain for stability and security of its staff members, offender populations, and the public ("Restrictive Housing procedural changes").

In 2017, DWCC began its preparation to achieve these significant operational goals by converting N1 from a Restrictive Housing area to a medium custody housing area. This change resulted in the reduction of 128 Restrictive Housing beds.

Since the Phase I trial, DWCC has made significant achievements toward the Department of Corrections' goals of Restrictive Housing reduction and Restrictive Housing procedural changes.

Since the Phase I trial, all the cells in N3 and N4 are now single bunked. This change was the result of a request for a reduction of capacity made by DWCC on October 6, 2021 to work toward DPS&C's Restrictive Housing reduction goal. The Department granted the request on November 18, 2021. These cells are no longer used as double-man cells. DWCC achieved this operational reduction by mid-December 2021. This reduction eliminated 128 Restrictive Housing Beds at DWCC.

In furtherance of working toward DPS&C's Restrictive Housing reduction goal, on March 31, 2021, DWCC (in conjunction with DPS&C) instituted a Working Segregation classification for offenders housed in N2C. While still a maximum-security housing area, the change in the conditions of N2C resulted in the conversion of 32 Restrictive Housing beds to 32 non-Restrictive Housing beds.

Since the Phase I trial, DWCC has implemented 32 Working Segregation beds in N2C. [DWCC EPM 03-01-003 dated 3/31/2021.]

Offenders in Working Segregation are assigned that status for a determinate period of time, usually 45 to 90 days with a classification review at least every 90 days.

Offenders in Working Segregation have access to group programming held in the North Compound chapel.

Offenders in Working Segregation are provided a minimum of two hours of exercise time outside of their cells on the yard seven days per week.

Offenders in Working Segregation are provided a minimum of 2 fifteen-minute phone calls per week. [DWCC USOPP 35.]

Offenders in Working Segregation eat in the Chow Hall as opposed to in their cells.

Offenders in Working Segregation are allowed to spend a maximum of $40 per week in the canteen.

Offenders in Working Segregation are evaluated monthly by a multidisciplinary board consisting of the Unit Manager, a classification officer, and the mental health director or his designee to determine an offender's compliance with program requirements.

In furtherance of working toward DPS&C's Restrictive Housing reduction goal, DWCC has also received DPS&C approval to eliminate 64 Restrictive Housing beds in N2A and B. This reduction will be achieved once DWCC is able to return medium custody bed space in N1A and B to regular usage. As of August of 2022, DWCC maintained all the cells in N1A and B for usage in quarantine efforts to fight the COVID-19 pandemic as required by DPS&C's pandemic mitigation plan.

Offenders housed in tiers A, B, and C of N2 and in buildings N3-N4 are classified as maximum custody.

Offenders housed in N2D tier are in a status known as closed cell restriction ("CCR").

Offenders housed in N1 are classified as medium custody.

**B.  Use of Restrictive Housing in General**

DWCC is a clean, well-run, well-maintained, and organized prison.

Restrictive Housing is primarily used to house offenders who have committed multiple violent offenses outside and/or inside of prison.

Restrictive Housing serves the same incapacitation purpose in a prison that prisons provide society at large. That is, offenders who prey on other offenders or staff, will not follow prison rules, or are risks to escape are placed in Restrictive Housing to prevent them from engaging in this type of behavior.

The use of Restrictive Housing is a necessary and appropriate prison practice to ensure the safety of the public, staff, and other offenders.

Prisons throughout the country utilize Restrictive Housing.

DWCC uses Restrictive Housing for the same purposes as and to the same extent as other prisons throughout the country.

DWCC's Restrictive Housing terms are consistent with other prisons around the country.

DPS&C has decreased its reliance on Restrictive Housing over the last several years.

DPS&C voluntarily agreed to good faith to participate in a program offered by the Vera Institute to reduce reliance on restrictive housing.

Secretary Le Blanc continues in good faith to work to improve Louisiana's prison system while maintaining public safety.

The number of offenders in Restrictive Housing on the South Compound has been reduced from 355 as of January of 2018, to 266 as of February 8, 2021, to 192 as of August of 2022.

Offenders regularly progress from Restrictive Housing on the South Compound to the general population housing on the North Compound at DWCC.

**C.  Use of Restrictive Housing at DWCC**

Offenders assigned to Restrictive Housing and/or maximum custody due to disciplinary issues are housed only in N2 A and B tiers, and N3–N4.

DWCC uses three types of Restrictive Housing: 1) investigative segregation; 2) disciplinary segregation; and 3) preventative segregation.

Investigative Segregation is "[a] maximum custody temporary holding area, preferably a cell, where an offender is held pending the outcome of a disciplinary hearing, pending a Classification Review Board review, or pending a transfer to an appropriate housing unit." [Dept. Reg. No. IS-B-4 at 6.] Investigative Segregation rarely lasts longer than a couple of days. Plaintiffs do not challenge DWCC's usage of Investigative Segregation.

Offenders found guilty of major rules violations can be assigned to a restrictive housing status known as "disciplinary segregation."

Disciplinary Segregation is "[a] maximum custody housing area, typically a cell, where an offender is housed for a definitive period of time as a result of a sanction from a disciplinary hearing." [Dept. Reg. No. IS-B-4 at 6.] Disciplinary Segregation at DWCC is Restrictive Housing.

Disciplinary Segregation has a specific duration and can only be imposed after an offender is found guilty of a rule violation pursuant to the DPS&C's disciplinary sanction matrix (the "Disciplinary Matrix"). To be clear, a particular rule violation must be severe enough such that the Disciplinary Matrix allows for the imposition of Disciplinary Segregation in the first instance. Plaintiffs largely do not challenge this practice and DRLA has specifically testified that the disciplinary matrix is not part of its claims.

After an offender serves his defined period of Disciplinary Segregation because of his rule violation, if an offender's "continued presence in general population is a danger to the

good order and discipline of the facility and/or whose presence poses a danger to himself, other offenders, staff, or the general public," he may be assigned to "Preventative Segregation" until the offender modifies his behavior.

Offenders are assigned to Preventative Segregation until the Segregation Review Board concludes the offender can be housed safely in a less restrictive setting. [Dept. Reg. No. IS-B-4 at 17.] Plaintiffs' mainly challenge DWCC's usage of Preventative Segregation.

The key to progressing out of a restrictive housing status is demonstrating that the offender is less of a threat to other offenders, the staff, and the public. The Segregation Review Board makes this determination after a review of the offender's records at a live review hearing where the offender is allowed to be heard on the issue.

The Segregation Review Board considers many factors, among them are: 1) if the offender received additional rule violations during his confinement to Restrictive Housing; 2) if the offenders institutional records reveal that the offender has a pattern in engaging in certain behavior when moved from Restrictive Housing (e.g., an offender engages in violent fights when in a less restrictive environment, resulting in multiple Disciplinary Segregation sanctions); 3) the seriousness of an offender's offense (e.g., an offender severely injured or killed another inmate).

Offenders housed in Preventative Segregation may remain there for varying lengths of time depending on the individual circumstances of each offender. DWCC relies on its three-member Segregation Review Board to assess these offenders and determine when an offender can be safely moved to a less restrictive environment. [Dept. Reg. No. IS-B-4 at 3.]

DWCC's Segregation Review Board is "[a] multidisciplinary team comprised of a classification officer, mental health provider, and a security officer (Major or above) to consider

and make recommendations as to whether or not an offender in Protective Segregation, Preventative Segregation, or restrictive housing may be moved to a less restrictive setting or remain in restrictive housing." [Dept. Reg. No. IS-B-4 at 3.]

The duration of each offender's stay in the South Compound is highly variable and depends on the nature of the disciplinary issue and/or the overall risk the offender presents to offenders housed in the general population, staff, and the public.

An offender in preventative segregation is reviewed every 60-days by a multi-disciplinary review board that includes a mental health clinician.

When an offender is placed in Restrictive Housing, he is afforded a phone call within 24-hours of that placement.

Offenders undergo a mental health appraisal within 7-days of assignment to Restrictive Housing.

Offenders in Restrictive Housing have access to non-contact visitation by loved ones.

No offender in Restrictive Housing has been denied visitation because of his classification, a lack of space, or a backlog of any sort.

Offenders in Restrictive Housing exercise in secured recreation areas an hour per day Monday through Friday. If inclement weather prevents offenders from exercising on any scheduled day, the exercise period is made up on the weekend.

Since the Phase I trial, DWCC has installed phone carts that can be brought down the tiers to facilitate an increase in phone calls for offenders in N2–N4.

Since Phase I, offenders in Restrictive Housing are now allowed a minimum of four (4) fifteen-minute phone call per month plus attorney phone calls. Previously, offenders were allowed only one ten-minute phone call. [DWCC USOPP #35 dated 9/30/2022.]

Offenders in Restrictive Housing are allowed three books as well as additional religious and educational materials. [DWCC USOPP #36 dated 8/25/2021.]

Offenders in N1, N2C, and N2D have access to televisions and radios.

Offenders in N1 and N2D (CCR) have access to tablets which can be used to complete phone calls.

Offenders in Disciplinary and Preventative Segregation are not permitted access to radios or other music or sound producing devices. [DWCC USOPP #36 dated 8/25/2021.]

DWCC's cells used for Restrictive Housing have open-front cell doors that face concrete a wall with windows which open to the outdoors.

Since Phase I, offenders on N1 and N2C (Working Segregation) are allowed to use the yard for recreation and eat in a cafeteria setting.

A typical day for an offender in Restrictive Housing is approximately as follows in part:

> 0500–0515 sick call slips
> 0600 Pill call
> 0600 Breakfast is delivered
> 1030 Lunch is delivered
> 1115 major count/Begin Feeding/Pill call
> Afternoon recreation time
> 1600 Major count
> 1600 Pill call
> 1700 Dinner
> 1800 Shift change
> Shower
> 2230 Lights out

Offenders have regular and constant contact with others.

Offenders can speak to offenders in adjacent cells in conversational tones.

Showers are offered daily. Indeed, offenders are required to take a shower at least every other day at DWCC. [DWCC USOPP #35.] The shower requirement mirrors what is required of general population offenders.

Offenders are also permitted to interact with staff if they wish during their presence on the tiers.

Thirty-minute security checks are required by security staff in N1–N4; 15 minutes rounds are preferred.

In addition to all the routine items listed above, there is clothing exchange, mail call, offender tutoring, rounds by the inmate chaplain, and library book exchange.

Medical staff make daily rounds.

Mental health staff make weekly rounds.

The classification officer makes weekly rounds.

Managers and supervisors visit the tiers on a regular basis.

Haircuts are available in the common area on a regular basis.

Calls to attorneys are not limited in number or duration.

Offenders serving a Disciplinary Segregation sanction are reviewed at the end of their sanction by the Segregation Review Board to determine if they can be returned to quarters, stepped-down to Working Segregation or N1, or placed in Preventative Segregation.

The Segregation Review Board reviews the custody status of each offender in Preventative Segregation at least every 60 days. [Dept. Reg. IS-B-4 at 17.]

> D.  **Mental Health Screening**

Offenders sentenced to the DPS&C are typically initially assessed at Elayn Hunt Correctional Center ("EHCC") at the Hunt Reception and Diagnostic Center ("HRDC") before being assigned to a specific DPS&C facility for housing.

The EHCC assessment is extensive and consists of personality testing, IQ testing, interviews, and results in a DSM-5 diagnosis of offenders with mental illness. The findings are detailed in an Assessment & Intervention Report for each prisoner.

EHCC conducts an extensive screening process that assigns a DSM-5 diagnosis, where appropriate, and a level of care designation for offenders.

The assessment process at EHCC assigns offenders a mental health Level of Care designation as defined by EPM 03-02-003 III(B) of 5 (least severe indicating no mental illness) to 1 (the most severe indicating the need for a 24-hour medical and/or mental health presence).

Offenders with a designation of Level of Care 1 and Level of Care 2 are not housed at DWCC.

If an offender is placed by DPS&C at DWCC, DWCC staff then perform an intra-system mental health screening on intake at DWCC.

The DWCC intra-system mental health intake screening is designed to be a more limited assessment than that performed at the HRDC.

The intra-system mental health screening at DWCC is typically performed by Steve Hayden. DWCC mental health staff who conduct this screening receive training on properly conducting this screening.

The "intra-system" screening includes:

a. Inquiry into whether the offender:
Has a present suicidal ideation;
Has a history of suicidal behavior;
Is presently prescribed psychotropic medication;
Has a current mental health complaint;
Is being treated for mental health problems;
Has a history of inpatient and/or outpatient psychiatric treatment;
Has a history of treatment for substance use; and/or
Has a detoxification need.

    b.      Observation of:
              General behavior;
              General appearance;
              Evidence of abuse and/or trauma; and/or
              Current symptoms of psychosis, depression, anxiety and/or aggression.[1]

DWCC provides offenders with an orientation which informs offenders of the various options available to address mental health concerns.

New intake offenders with a mental health diagnosis or who are otherwise flagged during a screening at DWCC are scheduled to see DWCC's psychiatrist, Dr. Seal, at the next available time. Since the Phase I trial, Dr. Seal now sees referrals within seven days rather than the previous 14 days.

In the rare circumstance that an offender does not receive testing at EHCC prior to arrival and prior to housing being assigned by the initial classification board, the same battery of tests the offender would receive at EHCC are administered at DWCC and are reviewed by a psychologist or psychiatrist at EHCC.

### E.  Mental Health Staff at DWCC

Warden Michelle Dauzat has a Master's Degree in social work and is a board approved Licensed Clinical Social Worker. Warden Dauzat has been in the mental health field for over 21 years and has worked at DWCC since January 6, 2003. Warden Michelle Dauzat is responsible for overseeing and supervising the mental health program and mental health staff at DWCC.

Steve Hayden possesses a Masters Degree in Industrial Class Organizational Psychology and has been employed at DWCC since January 3, 2005.

Since the Phase I trial, Aerial Robinson progressed from a Licensed Master Social Worker to a Licensed Clinical Social Worker.

---

[1] Ex. 22, Health Care Policy No. HCP37, §7(A)(3).

James Burgos obtained a Master of Industrial Organizational Psychology in 2006 and a Master of Counseling in 2017. Mr. Burgos is a Licensed Professional Counselor, through the Louisiana Board of Licensed Professional Counselors.

Since the Phase I trial, DWCC has added two individuals to its mental health staff, Lisa Wells and Julia Spivey.

Julia Spivey began working at DWCC on June 13, 2022 in a Social Worker 4, Position # 50615799. Ms. Spivey's job duties are: a) to provide mental health services to offenders housed in H3 and H4; b) to run Anger Management and Parenting Groups for the North Compound; c) to run re-entry programming; d) to provide counseling on non-compliance for offenders in H3 and H4; and e) to participate in Mental Health Clinic with Dr. Seal for offenders on her caseload. The addition of Ms. Spivey allows Messrs. Hayden and Burgos to focus on their patients in buildings N1–N4.

Lisa Wells is employed at DWCC as Social Service Counselor 3, Position #50319752, since November 18, 2021. Her duties include: Groups- Thinking for a Change and Victim Awareness, Instructor for Working Segregation programming, ID Processing, MH Discharge upon release, PREA Vulnerability Reassessment, Social Security Applications, Group Waiting List, Wellness Community Team Lead, Multi-Disciplinary Re-Entry Services Team, AA/NA. Ms. Wells is working toward becoming a licensed social worker. The addition of Ms. Wells similarly allows Messrs. Hayden and Burgos to focus on their patients in buildings N1–N4.

Johnie Adkins remains the chaplain for DWCC. Johnie Adkins, is the holder of a Master's of Divinity; Master's of Religious Education; Master's of Theology; and Doctorate of Theology.

Gregory Seal, M.D. is contracted as a Psychiatrist at DWCC. His contract start date was July 1, 2009. Dr. Seal received his medical degree from LSU Medical Shreveport in 1988 and is

board certified. Dr. Seal is not an employee of the Department of Public Safety and Corrections. Dr. Seal provides services for offenders held at DWCC both in general population and Restrictive Housing. Since the Phase I trial, Dr. Seal's contract to provide services at DWCC has increased to 32 hours a month, and he generally provides services to DWCC on Wednesday and Thursday mornings.

The medical staff at DWCC assists with mental health needs when appropriate. During weekends, when presented with an emergent situation or in response to a threat of suicide, the medical staff will assist the mental health staff.

### F. Mental Health Care and Treatment is Provided to Offenders in Restrictive Housing

Based on demographic data across the country, it is a fact that a certain percentage of offenders in Restrictive Housing will have a history of mental illness.

Offenders with serious mental illness are not placed in segregated housing unless (a) cleared by appropriate Mental Health staff and reviewed by a psychiatrist/psychologist at earliest possible date, (b) not actively psychotic, and (c) less restrictive measures cannot assure safety/security of the unit. [Dept. Reg. IS-B-4 at 8.]

The ratio of mental health staff to offenders on the South Compound at DWCC is appropriate as of March 15, 2020 and has been enhanced with the additions of Mses. Spivey and Wells.

Dr. Seal regularly sees offenders housed on the South Compound during his scheduled visits to DWCC.

Dr. Seal sees every offender on the mental health case load at least every 180 days. Dr. Seal determines the need and frequency of follow-up visits at each scheduled appointment.

If an offender presents with a need for intervention prior to the scheduled appointment, Dr. Seal will see him at his next available date.

Dr. Seal sees all the patients scheduled when he holds clinic on Wednesdays and Thursdays.

Dr. Seal's diagnoses of the offenders are appropriate and accurate.

Medication is the primary form of treatment for mental disorders of offenders located in Restrictive Housing.

Dr. Seal performs the traditional role of a prison psychiatrist and the management of medications.

Dr. Seal's conduct in his role of management of medication is appropriate.

There has never been a mental health backlog at DWCC from 2017 through August 2022.

Once identified and seen by Dr. Seal, offenders with mental illness are followed by a dedicated mental health staff that includes a master's level psychologist, two licensed social workers, and licensed counselor.

An individualized treatment plan is created for each offender. Since the Phase I trial, DWCC has completely reworked offender treatment plans, making the plans individualized and improving their quality.

Mental Health staff at DWCC perform weekly rounds on the South Compound and counsel mental health offenders during those rounds.

An offender can request mental health through the sick call process.

An offender can obtain mental health assistance through declaring an emergency.

Any correctional officer or other employee DWCC can request mental health assistance for an offender.

Group Programming is available to offenders on N1 and N2C (Working Segregation and N2D (CCR).

Although group therapy is not afforded in Restrictive Housing areas due to security concerns, mental health staff provide individual counseling to Restrictive Housing offenders.

Additionally, written materials relating to mental health programming are disseminated to Restrictive Housing offenders where appropriate. DWCC's mental health staff follows up with Restrictive Housing offenders as they work through any written materials on an individual basis.

Mental health progress notes and segregation interviews are completed using standardized forms containing checkboxes for various aspects of a mental status examination.

Since the Phase I trial, DWCC mental health staff use the revised Interview of Segregated Inmate form to document all clinically significant contacts with offenders in Restrictive Housing. The form contains a drop-down menu to indicate the type of contact. Mental Health staff are also creating more robust notes through the usage of the SOAP method.

DWCC transfers offenders in need of a higher level of mental health care to EHCC.

As in the Phase I trial, Plaintiffs' expert witnesses did not opine that the level of care designation of the offenders is incorrect.

All DWCC staff are required to participate in annual training which includes mental health training. Part of that annual training is the Mental Health First Aid curriculum and suicide prevention training.

All DWCC staff with the responsibility for offender supervision are trained on an annual basis in the implementation of suicide prevention and intervention. [DWCC EPM 03-02-001 at 12.]

### G.  **Medication**

If an offender is on medication upon arrival at DWCC, the medications come with the offender, and medications are continued by the general medical doctor unless there is an indication that these medications may be harmful to the offender.

Dr. Seal prescribes appropriate psychotropic medications in appropriate dosages. Plaintiffs' experts have not opined to the contrary in either phase of this case.

Medications are distributed using "blister packs" which are specifically numbered and are monitored by nursing staff at DWCC.

All mental health medications are monitored and distributed using blister packs.

Medications are administered by pill call officers. DWCC has two new pill call officers, Sgts. Burns and Rimmer.

Pill call officers are provided specific training on administering medications.

When psychotropic medications are received, a sticker is placed on the pill card indicating that the medication is psychotropic. This process ensures continuity in medication administration.

Since the Phase I trial, DPS&C has worked with technology vendor Fusion Health to enhance its electronic medication administration records.

DWCC now has the sMARt system to document medication administration and otherwise manage its psychotropic medications.

### H.  **Mental Health Observation and Suicide Watch**

Mental health observations ("MHO") are utilized to follow an individual offender more closely who is experiencing an acute exacerbation of symptoms which is considered temporary by medical professionals. MHO is appropriate for offenders who are psychotic, in acute distress,

noncompliant with psychotropic medication, or otherwise psychologically impaired to a significant degree, but not considered a high risk for suicidal behavior.

An offender on MHO is seen daily by mental health or medical staff.

DWCC has two categories of suicide watch, standard and extreme. The mental health staff at DWCC places an offender on suicide watch if there is a question of suicide because it is better to err on the side of caution and institute a suicide watch when in doubt as opposed to taking no action and allowing an offender to commit suicide.

Mental health staff completes a mental health management order ("MHMO") on each new suicide watch. With the clinical judgment of the mental health staff, the MHMO describes the techniques to be used, which property items are permitted, and which property is prohibited.

Removing am offender's property while on suicide watch is an appropriate procedure designed to reduce the risk of completed suicide while an offender is on suicide watch.

Since the Phase I trial, the default is that an offender on suicide watch is allowed to have a mattress unless there is a reason for taking it.

Placing an offender in a room with a camera for monitoring is an appropriate procedure to reduce the risk of suicide while a prisoner is on suicide watch.

An offender on suicide watch is seen and evaluated daily; mental health staff sees offenders on suicide watch daily on Monday through Friday; nursing staff sees offenders on the weekends.

Offenders on standard suicide watch receive in-person observation every thirty minutes and randomly between intervals.

The standard in-person observation for extreme suicide watch is every fifteen minutes and randomly between intervals.

Extreme suicide watches can only be utilized by DWCC's mental health staff with the concurrence of a medical doctor.

Offenders on suicide watch are also monitored by the key room officer using the in-cell cameras.

Since the Phase I trial, DWCC now stations trained tier walkers outside of the cell of an ongoing watch to supplement correctional staff rounds (done according to the MHMO) and staff monitoring of the camera in the cell. [DWCC EPM 03-02-010 dated 10/7/2021.] Tier walkers provide continuous direct observation of individuals on mental health watches.

Since the Phase I trial, DWCC has purchased a humane restraint bed and leather restraints to use on extreme suicide watches when authorized by appropriate medical and mental health staff. The humane restraint bed has replaced the restraint chair.

Since the Phase I trial, DWCC has purchased new suicide mattresses and new protective helmets.

 The use of the restraint bed is infrequent and limited to only the time deemed necessary by the mental health and medical staff.

The mental health staff at DWCC decides when to end a suicide watch.

Upon termination of suicide watch, mental health staff contacts and evaluates the offender within seven days.

DWCC does not overuse suicide watch, i.e., the number of suicide watches is appropriate for the offenders at DWCC.

DWCC does not keep offenders on suicide watch for too long.

DWCC does not have a problem with too many completed suicides.

DWCC does not initiate suicide watches as punishment.

Offenders on extreme suicide watch may only be placed in restraints after a clinical determination by mental health staff and approval from medical director. [DWCC EPM 03-02-001 at 8.]

Suicide watches, suicide attempts, suicidal gestures, and completed suicides must be reported by DWCC to the Department of Corrections in a monthly report called a C-05 report.

Since the Phase I trial, changes have been made to the way in which mental health related incidents are identified and classified for reporting purposes. Specifically, Mental Health reviews the cases of all extreme suicide watches, and, in conjunction with the medical department are classifying incidents as "suicide attempts," "gestures," or "non-suicidal self-injurious behavior." This previous process of this information was that the Executive Staff Officer in conjunction with his support staff reviewed all the facility UORs and flagged such incidents. This change addressed situations where this behavior was being captured in critical incident reporting but sometimes not added to the facility's UOR reporting to help ensure these reports are internally consistent in the C-05 report. [Dept. Reg. AM-I-4; and HCP 30.]

**I.  Use of Force**

Correctional officers on the South Compound can use chemical spray to obtain compliance from offenders who refuse to comply with the officers' commands.

Correctional officers turn on their body cameras when the use of chemical spray or other use of force is anticipated. The body camera videos show that the correctional officers repeatedly advise the offenders that chemical spray will be used if the offender persists in not complying with orders.

Use of Force incidents at DWCC are reviewed by the Unit Manager.

The unit manager is the colonel who oversees the South Compound.

Col. Vincent Coleman was the unit manager for the South Compound at all times relevant to the Phase II trial.

Use of Force incidents are required to be reported by DWCC to DPS&C in the monthly C-05 report.

Since the Phase I trial, every Monday, buildings N1-N4 are provided lists of offenders with serious mental illness in their housing locations (the "SMI List"). The SMI List is consulted by correctional officers prior to planned uses of force. An individual on the SMI List is accommodated by having mental health staff respond to incidents prior to a planned use of force when time allows.

Since the Phase I trial, DWCC has made changes in USOPP 34 to further the DPS&C's goal of Restrictive Housing procedural changes. Offenders who throw items on the tier, at staff members, or at other offenders can be placed on "Policy 34," which restricts their property to prevent recurrence of these types of incidents. [DWCC USOPP #34 approved by DPS&C on 8/5/2021.]

An offender who engages in behavior prohibited by Policy 34 can be placed on that status for 24 hours the first time he engages in that behavior. The policy now requires that the shift supervisor review an offender every four hours to determine if the status can be discontinued.

Since the Phase I trial, an offender on Policy 34 status retains his mattress unless it is being used as a shield or barricade. [DWCC USOPP #34(R)(2)(c).] If the mattress is removed, a review is conducted at least every 4 hours by the shift supervisor to determine whether it can be returned. If the mattress remains out of the cell for more than 8 hours or is recommended to continue past shift change, the shift supervisor must receive concurrence from the unit manager or higher rank.

Since the implementation of revised Policy 34 in August of 2021, no mattresses have had to be taken away.

Since the Phase I trial, an offender who engaged in a pattern of behavior prohibited by Policy 34 may be placed on that status for a longer duration subject to the following conditions. An offender with a documented pattern is still reviewed by the shift supervisor or higher rank every four hours for release from Policy 34. [DWCC USOPP #34(R)(2)(e).] Should the status continue beyond 24 hours, the Unit Manager or above must authorize the continuation of the status, documenting the justification on a UOR. [DWCC USOPP #34(R)(2)(f).] Should the status continue for 7 days, the offender must be reviewed every 7 days by a review board consisting of the Unit Manager and a classification officer. [DWCC USOPP #34(S)(1).]

From May through August of 2022, Policy 34 status was used 16 times total. Thirteen of those usages lasted four hours or less. Three of them lasted 24 hours.

Correctional officers do not barter with offenders for privileges such as showers.

## J. **Subjective Intent**

None of the defendants are being subjectively indifferent to prisoners' serious mental health needs.

Sectary Le Blanc has worked with the Vera Institute in good faith to address alleged concerns regarding Restrictive Housing and has led the Department in its goals of Restrictive Housing reduction and Restrictive Housing procedural changes.

Secretary Le Blanc has led DPS&C into compliance with the new ACA 5th Edition performance-based standards that represent drastic changes in the usage of Restrictive Housing and special management.

The ACA 5th Edition Foreword notes that "an ad hoc committee developed expected practices for mental health and special populations" and states that these first-time practices "will

serve to reform all aspects of restrictive housing practice from initial placement through final release." [ACA Adult Correctional Institutions, Fifth Ed. at xvii.]

At DWCC, the administration there has significantly reduced how many offenders are in Restrictive Housing, implemented completely new Restrictive Housing procedures, implemented step-down levels to assist offenders moving to a less restrictive environment, implemented DPS&C's new disciplinary system to reduce reliance on Restrictive Housing, and changed existing statuses to allow for more out of cell time and group programming.

Warden Goodwin has relied upon the advice and counsel of mental health professionals as to the appropriate means to provide mental health care to offenders on the South Compound.

Colonel Coleman has overseen security of the South Compound while complying with directives from superiors and relying upon mental health professionals as to the appropriate means to provide mental health care to offenders on the South Compound.

Dr. Seal has provided treatment and appropriate medication management to offenders on the South Compound.

Warden Dauzat has supervised and overseen mental health care to offenders following the guidance from superiors and Dr. Seal.

Messrs. Hayden and Burgos and Ms. Robinson have provided mental health care to offenders in compliance with policies directed by superiors and under the guidance of Dr. Seal.

Defendant Adkins no longer provides mental health care at DWCC.

Mental health documentation has been strengthened by having typed notes of the substance of the psychiatric clinic with Dr. Seal, the usage of a unified form for mental health contacts in N1-N4, and utilization of the SOAP method in mental health staff notes.

K. **ADA**

DWCC staff receive training on the ADA which includes how to identify and meet offender needs related to their disabilities.

Most ADA accommodations at DWCC are handled without the need for a written offender request based on an offender's classification, staff observation, or an offender's inquiry.

DWCC's medical, mental health, classification, and security staff actively review offenders at the facility to determine individual needs and appropriate accommodations.

Should an offender feel that he is not provided with an accommodation he needs, the offender can request a review by making a request for accommodation or by filing an ARP grievance.

Since the Phase I trial, Assistant Warden Brenda Acklin is the ADA liaison at DWCC.

DWCC maintains files on requests for accommodation that include the request, documentation of the interview with the offender, documentation related to the investigation such as a response from medical or mental health, and the documented decision and rationale.

Heat precaution duty statuses for offenders on certain psychotropic medication are ordered by medical or mental health staff.

Offenders with serious mental illness are identified by a list posted in the key rooms of N1-N4. To accommodate offenders with serious mental illness, mental health is contacted prior to uses of force on these offenders if circumstances allow.

Offenders with mental illness in Restrictive Housing are provided individual counseling with mental health clinicians since they cannot attend group programming.

Offenders with mental illness in Restrictive Housing are provided written program materials to work on individually and discuss with their clinicians.

Offenders with mental illness in Restrictive Housing are provided with inmate tutors to assist them in their educational and mental health work.

Disciplinary action taken because of misconduct is not discrimination based upon a mental health disability.

Since the Phase I trial, DWCC disciplinary boards are now made up of three members, a security staff member, a classification officer, and a third member from a department other than security or classification.

Disciplinary Boards can refer cases to mental health rather than prosecute rules violations after review of the nature of the incident or, if indicated, in response to the initial contact with the offender at the Board. In addition to the Disciplinary Board's power to refer the case to Mental Health, Mental Health staff can also intervene in disciplinary cases as appropriate. The Mental Health Department's intervention in a disciplinary matter can occur from personal knowledge in the incident; responding to a security request for mental health prior to a use of force (use of chemical agents, cell extraction, security intervention in general population incidents, etc.); response to the results of the examination of an offender prior to that offender being placed in a restrictive housing environment; results from the follow-up mental health examination that takes place within 7 days of an offender's placement in Restrictive Housing; or the request of an offender or other staff.

Mental health staff, medical staff, and security work together to prevent rule violations that are determined to be the result of mental health difficulties from resulting in discipline. This can be done by not giving an offender a rule violation in the first instance, not processing a rule violation to go before a disciplinary board, deferring a disciplinary board hearing pending mental

health evaluation, and dismissing a rule violation found to be the result of mental health difficulties.

In determining whether a deferral or dismissal of a rule violation is warranted, disciplinary board members will consider the appearance and communications of the offender when he appears before the Board; statements of the offender to other staff, the documents describing the incident; consultation with mental health; whether the offender was already being followed by mental health in general or acutely (such as a watch); the offender's known normal behavior as compared to the behavior demonstrated during the incident in question; the offender's behavior and general disposition in temporal proximity to the incident in question, recommendations from any medical staff familiar with the incident or who may have responded to the incident; video and audio of the incident; security staff concerns for the offender; and any other piece of information that may be available to determine such an issue.

The disciplinary board will consult with mental health and the medical doctor on the appropriateness of proceeding if there is a question as to whether the disciplinary process is inappropriate in any given situation.

Discipline against offenders with mental illness is allowed in a prison setting.

## IV.  **DEFENDANTS' PROPOSED CONCLUSIONS OF LAW**

### A.  **Defendants are not deliberately indifferent to South Compound Offenders' serious mental health needs and have not violated the Eighth Amendment**

"Prison officials [may] violate the Eighth Amendment when they demonstrate deliberate indifference to a prisoner's serious medical needs." *Brewster v. Dretke*, 587 F.3d 764, 769 (5th Cir. 2009) (citing *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S. Ct. 2321, 2323 (1991)).

"Deliberate indifference is an 'extremely high' standard to meet." *Id.* at 770; *see also Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). *Cadena v. El Paso*

*Cty.*, 946 F.3d 717, 728 (5th Cir. 2020); *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020), *cert. denied*, 2020 WL 2497541 (5/14/20).

"Deliberate indifference 'is a stringent standard of fault, requiring proof that a municipal [or state] actor disregarded a known or obvious consequence of his [, her or its] action.'" *Shadrick v. Hopkins Cnty.,* 805 F.3d 724, 737 (6th Cir. 2015) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382 (1997)).

Only "unnecessary and wanton infliction of pain" is proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 290 (1976).

The Fifth Circuit in *Valentine* explained that: To satisfy the objective requirement, the plaintiff must show an "objectively intolerable risk of harm." [*Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970 (1994).] To satisfy the subjective requirement, the plaintiff must show that the defendant: "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk." *Cleveland v. Bell*, 938 F.3d 672, 676 (5th Cir. 2019) (quoting *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970).

The Supreme Court has also held that in cases in which inmates seek injunctive relief to prevent substantial risks of serious injury from ripening into actual harm, the Eighth Amendment deliberate indifference standard "should be determined in light of the prison authorities current attitudes and conduct," i.e. "their attitudes and conduct at the time suit is brought and persisting thereafter." *Farmer*, 511 U.S. at 827.

Further, a prisoner seeking injunctive relief on the grounds that there is "a contemporary violation of a nature likely to continue," must show both the existence of a violation and produce evidence "from which it can be inferred that the [prison] officials were at the time suit was filed .

. . knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so . . . during the remainder of the litigation and into the future." *Id.*

As regards this showing, "inmates may rely on developments that postdate the pleadings and pretrial motions, [and] defendants may rely on such developments to establish that the inmate is not entitled to an injunction." *Id.*

As the Fifth Circuit and a sister court in this circuit have noted, "[t]he Constitution . . . 'does not require that prisoners, as individuals or groups, be provided with any amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.'" *Dockery v. Hall*, 443 F. Supp. 3d 726, 748 (S.D. Miss. 2019) *affirmed sub nom Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021) (*citing Newman v. State of Al.*, 559 F.2d 283, 291 (5th Cir. 1977)).

The evaluation of multiple complained of conditions together to prove "cruel and unusual conditions" is foreclosed by *Wilson v. Seiter*, 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). As that decision explained, "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305, 111 S.Ct. 2321. *Dockery v. Cain*, 7 F.4th 375, 378 (5th Cir. 2021).

Only "extreme deprivation" of one or more of the "minimal civilized measures of life's necessities" arise to a violation of the Eighth Amendment. *Davis v. Scott*, 157 F.3d 1003, 1006 (5th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S. Ct. 2321, 2327 (1991)).

The *Dockery* court expressly held that expert opinions that offenders should "be given different types of mental health care and different types of medication, and that the security and mental health staff should interact with them in a different manner . . ." do not arise to the level necessary to violate the Eighth Amendment. *Dockery*, 443 F. Supp. 3d at 743.

The Fifth Circuit has held that solitary confinement/restrictive housing is not *per se* cruel and unusual punishment. *Novak v. Beto*, 453 F.2d 661, 665 (5th Cir. 1971); *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974); *LaVergne v. McDonald*, No. 19-709, 2020 WL 7090064 at *13 (M.D. La. 3/23/20).

Solitary confinement serves a legitimate purpose in the prison community as a deterrent and a punitive force. *Novak*, at 453 F.2d at 670. The Eighth Amendment imposes a duty upon prison officials to protect prisoners from violence at the hand of other prisoners. *Farmer*, 511 U.S. at 831-32; *see also Wilson*, 501 U.S. at 300, 303; *see also Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981).

The Fifth Circuit also recognized the paramount concern of security in corrections, stating: "It is beyond dispute, of course, that order must be maintained in the prisons. And when a prisoner continues to break prison rules even after losing such privileges as going to the movies and being assigned extra work, the authorities must have some harsher measure to induce compliance with prison regulations." *Novak*, 453 F.2d at 670.

"[P]rison officials are accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order. *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999); *Tasby v. Cain*, No. 16-277, 2017 WL 4295441, at *7 (M.D. La. Sept. 12, 2017), *report and recommendation adopted,* 2017 WL 4322413 (M.D. La. Sept. 28, 2017).

The classification of inmates is a matter left to the broad general discretion of prison officials, and a failure to refer an inmate plaintiff for additional treatment, diagnostic testing or evaluation is a matter of professional medical judgment that the courts will not normally second-guess in the context of a claim of deliberate medical indifference. *Tasby v. Cain*, 2017 WL 4295441 at *9 (M.D. La. 9/12/17), *report and recommendation adopted* 2017 WL 4322413 (M.D.

La. 9/28/17); *Cuellar v. Livingston*, 321 Fed. Appx. 373, 374 (5th Cir. 2009) (upholding the dismissal of an inmate's claim as frivolous where he complained of a failure to refer him to a specialist, noting that "the question whether 'additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.'").

The Supreme Court has repeatedly warned that "it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'" *Woodford v. Ngo*, 548 U.S. 81, 94, 126 S.Ct. 2378 (2006) (quoting *Preiser v. Rodriguez*, 411 U.S. 475, 491–92, 93 S.Ct. 1827 (1973)); *see also Missouri v. Jenkins*, 495 U.S. 33, 51, 110 S.Ct. 1651 (1990).

The Fifth Circuit has also held that "[u]nsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

The Fifth Circuit has held that solitary confinement or restrictive housing is not *per se* cruel and unusual punishment. *Novak*, 453 F.2d at 665; *Gates v. Collier*, 501 F.2d 1291, 1304 (5th Cir. 1974); *LaVergne v. McDonald*, No. 19-709, 2020 WL 7090064, at *13 (M.D. La. Nov. 23, 2020), *report and recommendation adopted*, 2020 WL 7081598 (M.D. La. Dec. 3, 2020). As far back as 1971, the Fifth Circuit has deferentially endorsed the use of solitary confinement or restrictive housing. In *Novak*, the Fifth Circuit stated and warned that:

> In view of recent tragic incidents in this Nation's prisons and of the frequent assertions of the inadequacy of our penal systems, the burden of judging weighs upon us more than usual as we turn to appellants' contention that solitary confinement as administered by the TDC is cruel and unusual punishment. Just as our dissenting brother, we are deeply troubled by the lightless cell, the limited bedding, and the minimal food provided prisoners in solitary confinement in Texas. Nevertheless, we do not find that the imposition of these conditions constitutes cruel and unusual punishment as forbidden by the Eighth Amendment. As judges,

we must look to the extant law and the general practices of our society. Otherwise, we run the risk of imposing our own personal moral code on a perhaps unready society.

453 F.2d at 664–65.

The Fifth Circuit has held that denial of outdoor and out-of-cell exercise for thirteen months while in a 5 x 9-foot cell was not cruel and unusual because there is no record evidence that the offender was ever placed at "substantial risk of serious harm." *Hernandez v. Velasquez*, 522 F.3d 556, 560-61 (5th Cir. 2008). Further, a District Court in Louisiana recently held that "[c]onfinement to a cell for 23 hours per day does not rise to the level of a constitutional violation." *LaVergne*, 2020 WL 7090064, at *13; *see also Milton v. Gusman*, No. 10-3309, 2010 WL 5376117, at *1 (E.D. La. Dec. 20, 2010).

*Dockery v. Hall*, 443 F. Supp. 3d at 740 is remarkably similar to this case. The salient facts in *Dockery* are essentially the same as the facts before this Court.

*Dockery* assessed conditions in the East Mississippi Correctional Facility ("EMCF"). Plaintiffs alleged numerous allegations, the following of which are most pertinent to this case:

- With regard to "solitary confinement," plaintiffs alleged that:

  o offenders who are placed in solitary confinement were not permitted one hour of out-of-cell time per day to shower or have yard time and that they would often go days, and sometimes weeks, without being permitted any out-of-cell time; and (*Id.* at 733)

  o and that the length of time some offenders are held in solitary confinement violates their Eighth Amendment rights. (*Id.* at 743)

- With regard to "mental health care," plaintiffs alleged, among other things, that:

  o mental health care was deficient and/or inadequate because they were provided infrequent or inappropriate access to mental health providers and were provided insufficient access to other structured mental health treatment programs such as group therapy and mental health activities and the symptoms of their mental diseases were exacerbated by the conditions under which they are housed; (*Id.* at 734, 742)

- o   EMCF's intake and screening process was inadequate because it allegedly failed to promptly and reliably detect mental health needs and/or failed to insure the continuity of mental health treatment; (*Id.* at 742)

- o   they did not receive prescribed medications as ordered and that the MARs were poor; and (*Id.* at 740)

- o   treatment plans for mentally ill offenders at EMCF were inadequate because they lacked specificity. (*Id.* at 742)

- With regard to "abuse and excessive force by staff," plaintiffs alleged that security officers often "use excessive force with impunity and with no oversight" and that staff "frequently use chemical agents and physical force without warning and in the absence of immediate threat of danger or resistance from the prisoners . . . ." (*Id.* at 734)

The District Court in *Dockery* assessed the claims and found no constitutional violations, and the Fifth Circuit readily affirmed.

As to the periods of time out of cell, the District Court in *Dockery* held that:

Although Plaintiffs complain that they often do not get the five-hours-per-week recreation time, or the three showers-per-week as prescribed by EMCF policy, longer periods of continuous cell time have been found constitutional. *See e.g. Hernandez v. Velasquez*, 522 F.3d 556, 561-62 (5th Cir. 2008) (finding that the denial of recreation time for a thirteen-month period had not violated the prisoner's constitutional rights).

*Id.* at 743.

As to the length of restrictive housing, several plaintiffs in *Dockery* testified that they had been held in restrictive housing for extended periods of time. One plaintiff had been in restrictive housing for four years (2014 through 2018), and another was in restrictive housing for two and a half years. *Id.* As here, plaintiffs' expert argued that placing an offender in restrictive housing can result in his experiencing, inter alia, anxiety, depression, irrational anger, confused thinking, and increase the risk of suicide and that periods of solitary confinement should not exceed fifteen days, an opinion mirrored by the National Commission on Correctional Health Care. *Id.* In response, the District Court held that:

The Court finds [the expert] testimony/opinion that a prisoner should not be held in solitary confinement for more than fifteen days does not create a benchmark for determining whether any constitutional rights have been violated. *See Rhodes*, 452 U.S. at 348, 101 S.Ct. 2392 (explaining that expert opinions regarding desirable prison conditions do not "suffice to establish contemporary standards of decency."). In addition, Plaintiffs have not shown that their being placed in solitary confinement was not justified, or that the conditions under which they are being confined are inhumane.

*Id.*

Plaintiffs in *Dockery* further argued that the mental health care was deficient and/or inadequate because they were provided infrequent or inappropriate access to mental health providers and are provided insufficient access to other structured mental health treatment programs such as group therapy and mental health activities. Plaintiffs also argued that the mental health staff at EMCF did not adequately respond to offenders who are in mental health crises including transferring such offenders to outside medical facilities. *Id.* at 742. The District Court rejected plaintiffs' claims of deficient and/or inadequate mental health care holding that:

Although Plaintiffs, through [their expert], argue that the mental care they are receiving is inadequate and that they would likely respond better if different treatment was provided, they have not shown that they are being denied treatment, that their mental illnesses or disorders are being ignored, or that they are intentionally being mistreated. In other words, Plaintiffs' arguments that they should be screened differently, have different types of treatment plans, and be provided different forms of mental health treatment do not establish a constitutional violation. The record also shows that Defendants have not acted with deliberate indifference with respect to the mental health needs [of] prisoners at EMCF.

*Id.*

The District Court in *Dockery* rejected the plaintiffs' complaints with regard to medication administration and the MARs holding that:

To the extent the missed doses or untimely administration of medications evidenced on the MARs reflect human error or poor record keeping, they do not amount to constitutional violations. *See e.g. Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (holding that negligent conduct does not rise to the level of constitutional violations). In addition, there is insufficient evidence that Plaintiffs,

as a class, suffered substantial harm as a result of the missed doses or delays as is required to maintain a Section 1983 claim. *See e.g. Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).

*Id.* at 740.

As to screening and treatment plans, the District Court in *Dockery* held that "Plaintiffs' arguments that they should be screened differently, have different types of treatment plans, and be provided different forms of mental health treatment do not establish a constitutional violation." *Id.* at 742. Here, in this case, the evidence shows that the defendants are in fact screening appropriately, both at EHCC and at DWCC. While the defendants acknowledge that treatment plans need to be individualized, this is not a constitutional violation as found in *Dockery*.

As to plaintiffs' claims that EMCF used excessive force by using chemical spay on offenders, the District Court in *Dockery* held that the use of chemical spray on offenders who refused to comply (refused to allow staff to secure the food tray slots) was appropriate. *Id.* at 745.

The Fifth Circuit further concluded that plaintiffs' experts' opinions and views about specific conditions did not determine Eighth Amendment's standards of what conditions are cruel and unusual. *Dockery*, 7 F.4th at 380.

The Court in *Williamson v. Larpenter*, No. 19-254, 2019 WL 3719761 (E.D. La. July 15, 2019), *report and recommendation adopted*, 2019 WL 3718135 (E.D. La. Aug. 7, 2019) addressed conditions while on suicide watch. Williamson testified that:

> when placed on suicide watch, his possessions were taken away, he was dressed in a green smock and placed in a holding cell with four other inmates in what should be a one-man cell. He stated that he was kept there for "two or three days," until he saw Dr. Lo, and he would have been kept there if he had not told Dr. Lo that he was okay and no longer feeling that he would hurt himself or others. He testified that the conditions in the holding cell were "dirty, with food trays all around," overcrowded and cold. He said the cell was about ten-by-ten feet with a toilet and sink and one slab where a mattress was supposed to be located, but there was no mattress. He testified that he saw no medical personnel during those two or three

days until he told Dr. Lo he was no longer suicidal and was returned to general population.

*Id.* at *3. The Court concluded that Williamson was appropriately monitored and addressed by medical personnel while on suicide watch. *Id.* at *7.

In *Rasho v. Jeffreys*, 22 F. 4th 703 (7th Cir. 2022), another case challenging mental health care in a prison, after a settlement agreement was reached, the monitor noted the shortcomings within the Illinois Department of Corrections ("IDOC") as follows:

> Among IDOC's challenges is the grossly insufficient and extremely poor quality of psychiatric services. This overwhelming shortage and lack of standards undermines all of the efforts of IDOC to meet the first-year requirements of the Settlement. These psychiatric services deficiencies include but are not limited to problems with the proper continuation of medications for offenders entering IDOC, lack of timely follow-up for offenders prescribed psychotropic medication, dangerous practices related to the use of psychotropic medications including those offenders on forced medication, lack of following standard protocols for ascertaining side effects, extreme delays in obtaining psychiatric evaluations, nonparticipation of psychiatrists in the treatment planning process, lack of timely psychiatric follow up for offenders assigned to crisis beds, and problems related to those offenders designated as requiring inpatient level of psychiatric services. Of note, the overall quality of the psychiatric services provided to the mentally ill offenders of IDOC is exceedingly poor and often times dangerous. IDOC leadership is well aware of the problems related to the insufficient amount of psychiatric services and has taken decisive action to address this issue, but this has not yet been effective. At the time of the submission of this report, however, the lack and quality of psychiatric services negatively impacts all aspects of the Settlement and contributes to IDOC being non-compliant in the vast majority of areas of the Settlement.

*Id.* at 715. The District Court entered an injunction directing the IDOC to undertake specific steps and hire a specific number of staff. On January 12, 2022, the Seventh Circuit reversed finding that the IDOC responded reasonably, even though the IDOC did not comply with the terms of the Settlement. Even though IDOC fell short of complying with the terms of the Settlement, IDOC was not deliberately indifferent. *Id.* at 706.

As to Offender Posted Policy 34, in *Peterson v. Michael*, 42,315, p. 7 (La. App. 2 Cir. 6/20/07), 960 So. 2d 1260, 1264, the court held:

Furthermore, like the trial court, we conclude that Peterson failed to establish any constitutional violation or illegality as to the posted policy. At the time of the hearing, Peterson was no longer on strip cell tier, and counsel for the defendants agreed that he could not be placed back on it without a new infraction. There was no basis for the granting of injunctive relief in Peterson's favor and consequently we reverse and vacate the injunction.

In *James v. LeBlanc*, No. 09-1592, 2011 WL 6842516, at *8 (W.D. La. Nov. 16, 2011), *report and recommendation adopted,* 2011 WL 6842512 (W.D. La. Dec. 29, 2011), the court held:

> Courts have rejected similar claims that confinement to a strip cell generated due process claims. *See e.g., Duncan v. Levenhagen,* 2000 WL 557009, *2 (7th Cir.2000) (placement in strip cell without food for 10 to 12 hours did not impose an atypical and significant hardship); *Seltzer-Bey v. Delo,* 66 F.3d 961 (8th Cir.1995) (strip cell for two days without clothing, bedding, or running water, with a concrete floor, a concrete slab for a bed, and cold air blowing; procedural due process claim dismissed); *Bone v. Walker,* 2010 WL 375320 (C.D.Ill.2010) (strip cell for eight days, without a mattress or clothing for 24 hours, was not atypical or a significant hardship); *Demerson v. Woodford,* 2009 WL 498199 (E.D.Cal.2009) (three days in strip cell did not give rise to due process claim); *Dunkley v. Tate,* 2007 WL 2900169 (W.D.Va.2007) (three days in strip cell without clothing or personal property, with only a smock and mattress, did not present due process claim); and *Lloyd v. Briley,* 2007 WL 917385 (M.D.Ill.2007) (strip cell with no sheets, toilet paper, or personal property for 13 days did not give rise to procedural due process claim). Plaintiff's procedural due process claim should be dismissed.

With regard to Alternate Meal Service (referred to colloquially as "food loaf"), in *Dufrene v. Tuner*, No. 05-2066, 2006 WL 2620091, at *2 (W.D. La. Aug. 14, 2006), the Magistrate Judge assigned to this case found as follows:

> Plaintiff complains that on July 31, 2005, he was deprived of his morning meal. Plaintiff also complains that for seven days he was forced to eat food loaf for every meal. After considering the duration and the totality of the specific circumstances that constituted the conditions of Plaintiff's confinement, this Court finds that the facts alleged do not support a finding that Defendants' conduct was sufficiently harmful enough to deprive him of life's basic necessities. *See Wilson*, 501 U.S. at 298, 111 S.Ct. at 2324. Thus, Plaintiff's claim has failed to satisfy the first requirement of an Eighth Amendment claim.

As to custody status and classification, in *LaVergne*, 2020 WL 7090064, at *8, the court held:

> In order for any due process concern to arise, a protected liberty interest be implicated. The custody status change imposed upon Plaintiff dues not implicate any constitutionally protected liberty interest. Plaintiff also has no constitutionally protected liberty interest in attending college, being allowed access to the hobby shop, attending rodeo, or in his job assignment. Plaintiff's final allegation regarding his quarters change consists of a conclusory allegation that he was "moved to the most violent part of the prison." Plaintiff has not alleged any facts in support of this contention, and thus, it should be dismissed.

(footnotes omitted).

Incarcerated offenders do not retain any absolute rights of physical association. The Fifth Circuit has held "that for convicted offenders '[v]isitation privileges are a matter subject to the discretion of prison officials.'" *Id.* at *8; *Thorne v. Jones*, 765 F.2d 1270, 1273 (5th Cir. 1985).

Confinement to a cell for 23 hours per day does not rise to the level of a constitutional violation. *Milton*, 2010 WL 5376117 at *1 (citing *Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (holding that confinement for 23-hours per day, Monday through Friday, is not unconstitutional because it does not impose an atypical and significant hardship) and *Hill v. Pugh*, 75 F. App'x 715, 721 (10th Cir. 2003) (holding that confinement for 23-hours per day five days a week and 24-hours per day on the remaining two days is not unconstitutional because it shows neither an "unquestioned and serious deprivation of basic human needs" nor intolerable or shocking conditions)).

Offenders have no absolute constitutional right to outdoor recreation, so long as some form of exercise is permitted, or, the conditions of confinement, when viewed as a whole, are not violative of the Eighth Amendment. *See Callicutt v. Panola Cty. Jail*, 200 F.3d 816, 816 (5th Cir. 1999) (unpublished) (citing *Jones v. Diamond*, 594 F.2d 997, 1012-13 (5th Cir.1979)); *Scott v. Gusman*, No. 10-2706, 2011 WL 666851, at *3 (E.D. La. Feb. 14, 2011) (even if an offender is

allowed outside for only 45 minutes twice per week, that "is not an atypical, significant deprivation in a prison setting, and it does not rise to the level of a constitutional violation."); *Argue*, 80 F. App'x at 430; *Hill*, 75 F. App'x at 721; *Figueroa v. Dinitto*, 52 F. App'x 522, 523 (1st Cir. 2002) (unpublished); *Smith v. Romer*, No. 96-1211, 1997 WL 57093, at *2 (10th Cir. Feb. 11, 1997); *Smith v. Beatty*, No. 95-1493, 1996 WL 166270, at *1 (7th Cir. Apr. 5, 1996).

Even severe restrictions on or complete denials of outdoor recreation are not prohibited by the Constitution. *See, e.g., Chavis v. Fairman*, No. 92-7490, 1994 WL 55719, at *5 (N.D.Ill. Feb. 22, 1994), *aff'd*, 51 F.3d 275 (7th Cir. 1995) ("Generally, even dramatic restrictions on outdoor exercise do not violate the Eighth Amendment (or due process, where pretrial detainees are at issue) so long as offenders have ample opportunity to enjoy indoor activity."); *Rue v. Gusman*, No. 09-6480, 2010 WL 1930936, at *9 (E.D.La. May 11, 2010); *Broussard v. Phelps*, No. 86-2126, 1987 WL 18153, at *1, 3 (E.D.La. Oct. 6, 1987) (no constitutional deprivation shown where offender was allowed outdoor recreation only twice in a seventeen month period in light of the fact that he was allowed to leave his cell for an hour each day and cell was large enough for indoor exercise).

**B.** **Defendants have not violated the ADA**

A plaintiff states a claim for relief under Title II of the ADA if he alleges: (1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability. *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011).

The purpose of the ADA as specifically stated by Congress is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities . . . ."  42 U.S.C. § 12101(b)(1).

The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

The RA is interpreted the same as the ADA with certain exceptions not applicable here. *See Smith v. Harris Cty., Tex.*, 956 F.3d 311, 317 (5th Cir. 2020).

The ADA is not meant to be an "end run" around Eighth Amendment cases.  *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996).

The ADA proscribes discrimination against disabled individuals.  The Eastern District of Louisiana in *Williamson v. Larpenter*, 2019 WL 3719761, at *14, held that the ADA is a discrimination statute. "The fact that a person has a qualifying disability is not alone sufficient to state a cognizable ADA claim. Instead, the person with a disability must also establish causation, i.e., that he was discriminated against in the provision of benefits, services or programs by reason of his disability." *Id.; see also Kokinda v. Pa. Dep't of Corr.*, 779 F. App'x 944, 950 (3d Cir. 2019) (claim was dismissed because plaintiff failed to "assert that he was excluded from a program or service on account of or because of his disability as required."); *Goodman v. Johnson*, 524 F. App'x 887, 890 (4th Cir. 2013) (unpublished) (ADA claim dismissed because plaintiff "failed to allege facts indicating that, due to his disability, he has been deprived of benefits for which he was otherwise qualified."); *Bryant*, 84 F.3d at 249 (failure to attend to a disabled person's needs is not a violation of the ADA where no discrimination is alleged and the disabled person is not treated

worse because he is disabled); *Maccharulo v. N.Y. St. Dep't of Corr. Servs.*, No. 08-301, 2010 WL 2899751, at *3 (S.D.N.Y. July 21, 2010) ("Therefore, when there is no allegation of 'disparate treatment,' . . . between disabled and non-disabled individuals, the plaintiff has not stated a claim under the ADA or the Rehabilitation Act."); *Lee v. St., Dep't of Corr. Servs.*, No. 97-7112, 1999 WL 673339, at *14 (S.D.N.Y. Aug. 30, 1999) (plaintiff's allegations suffered from a fundamental defect in that they failed to state that the offender was excluded from any prison service or program because of his disability)

Neither the ADA nor the RA applies to claims regarding the quality of mental health services.  *See Smith v. Harris Cty.*, 956 F.3d at 318 n.1 ("the ADA does not typically provide a remedy for negligent medical treatment."); *Atkins v. Cty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003); *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *Bryant*, 84 F.3d at 249 (the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners" where no discrimination is alleged).

Similarly, a claim that challenges the adequacy or the substance of services that are provided to a disabled individual is not a valid claim under either the ADA or the RA.  *Maccharulo*, 2010 WL 2899751, at *3; *Atkins*, 251 F. Supp. 2d at 1232.

Disciplinary action taken as a result of misconduct is not discrimination based upon a disability as to mental health.  *See O'Guinn v. Nev. Dep't of Corr.*, 468 F. App'x 651, 654 (9th Cir. 2012) (claim rejected because plaintiff failed to produce evidence showing that his disciplinary action was on account of his disability rather than on account of his misconduct).

"[H]arsh conditions [of administrative segregation] may well be necessary and appropriate in light of the danger that high-risk inmates pose both to prison officials and to other prisoners." *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005).

If the entity does not provide the program, service, or activity as a general matter, the entity has no duty under Title II to provide an accommodation for disabled persons.  This makes sense because the goal of the ADA is to provide equal access to individuals with disabilities to opportunities and benefits, not to provide privileges withheld from everyone else. *Williamson*, 2019 WL 3719761, at *15 (quoting *Irby v. Sumnicht*, 683 F. Supp. 2d 913, 917 (W.D. Wis. 2010)). In *Williamson v. Larpenter*, the offender asserted that the "defendants discriminated against him by denying him access to therapy, group programs and regular trips to a mental health facility." *Id.* at *14. The court addressed the ADA claims specifically by noting that the jail did not provide any of the services to any of the inmates at the jail.  *Id.* The court then noted that the plaintiff "was not treated differently from other inmates." *Id.* at *15.

The mere fact that conditions may be harsh is not an allegation of discrimination.  *See Wilkinson*, 545 U.S. at 224. "[R]outine discomfort is part of the penalty that convicted prisoners pay for having committed crimes."  *Williamson*, 2019 WL 3719761, at *11.

Because Plaintiffs did not show that individuals requested accommodations which were denied, the ADA/RA claim is merely as re-packaging or end run around the Eighth Amendment claims and should be denied as such.

## C. <u>Prison Litigation Reform Act</u>

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. 18 U.S.C. § 3626(a)(1)(A).

The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. 18 U.S.C. § 3626(a)(1)(A).

The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief. 18 U.S.C. § 3626(a)(1)(A).

Narrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends. The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation. The United States Supreme Court has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution. *Brown v. Plata*, 563 U.S. 493, 531, 131 S. Ct. 1910, 1939–40, 179 L. Ed. 2d 969 (2011).

While federal courts can certainly enter injunctions to prevent Eighth Amendment violations, they are not to micromanage state prisons. *Barbee v. Collier*, No. 22-70011, 2022 WL 16860944, at *3 (5th Cir. Nov. 11, 2022), cert. denied, 143 S. Ct. 440 (2022).

Under the PLRA, plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury. *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015).

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700

Facsimile: (225) 325-8800

By: /s/ Randal J. Robert
       Randal J. Robert (#21840), TA
       Connell L. Archey (#20086)
       Keith J. Fernandez (#33124)
       Madaline King (#38301)
       *Special Assistant Attorneys General*
       Email: Randy.Robert@butlersnow.com
             Connell.Archey@butlersnow.com
             Keith.Fernandez@butlersnow.com
             Madaline.Rabalais@butlersnow.com

Counsel for Defendants

### **CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of January 2023, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Randal J. Robert
Randal J. Robert