UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself | * | CIVIL ACTION NO.: |
| and all other similarly situated prisoners | * | 5:18-CV-00541-EEF-MLH |
| at David Wade Correctional Center, | * | |
| | * | JUDGE ELIZABETH E. FOOTE |
| | * | |
| and | * | |
| The ADVOCACY CENTER, | * | |
| | * | USMJ MARK L. HORNSBY |
| PLAINTIFFS, | * | |
| | * | |
| VS. | * | CLASS ACTION |
| | * | |
| JAMES M. LEBLANC, *et al.*, | * | |
| | * | |
| DEFENDANTS. | * | |

**PLAINTIFFS' PRE-REMEDY PHASE TRIAL
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## **Table of Contents**

A.    The Nature of the Action ............................................................................................1

B.    The Parties   ..............................................................................................................1

C.    Background Facts........................................................................................................2

D.    Classification...............................................................................................................6

E.    Level of Care ..............................................................................................................8

F.    Corrections Personnel .................................................................................................9

G.    Eighth Amendment Claims .........................................................................................9

H.    Conditions on the South Compound .........................................................................12

I.    Deficiencies in Delivery of Mental Health Services:  Screening and Evaluation .............................18

J.    Deficiencies in Delivery of Mental Health Services:  Mental Health Rounds ...................................19

K.    Deficiencies in Delivery of Mental Health Services: Mandatory Mental Health Evaluations ...........20

L.    Deficiencies in Delivery of Mental Health Services:  Treatment .......................................................21

M.      Suicide Prevention.................................................................................................27

N.    Americans with Disabilities Act and Rehabilitation Act Claims..............................30

O.    Remedy ......................................................................................................................32

## Table of Authorities

**Cases**

*Armstrong v. Brown*, 857 F. Supp. 2d 919 (N.D. Cal. 2012) ................................................30

*Ball v. LeBlanc*, 792 F.3d 584 (5th Cir. 2015) ....................................................................33

*Brown v. Plata*, 563 U.S. 493 (2011) ..................................................................................11

*Dockery v. Cain,* 7 F.4th 375 (5th Cir. 2021) ......................................................................12

*Dunn v. Dunn*, 318 F.R.D. 652 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020) ........................................................30

*Estelle v. Gamble*, 429 U.S. 97 (1976) .................................................................................10

*Farmer v. Brennan*, 511 U.S. 825 (1994).............................................................9, 10, 11, 12

*Frame v. City of Arlington*, 657 F.3d 215 (5th Cir. 2011).....................................................30

*Gates v. Collier*, 501 F. 2d 1291 (5th Cir. 1974) ..................................................................11

*Gates v. Cook*, 376 F.3d 323 (5th Cir. 2004).......................................................................10

*Helling v. McKinney,* 509 U.S. 25 (1993) .......................................................................10, 11

*Hinojosa v. Livingston*, 807 F.3d 657 (5th Cir. 2015) ..........................................................11

*Hudson v. Palmer*, 468 U.S. 517 (1984)................................................................................9

*Jackson v. Johnson*, 475 F.3d 261 (5th Cir. 2007) ................................................................1

*Lewis v. Cain*, No. 15-318-SDD-RLB, slip op. at 7 (M.D. La. Dec. 7, 2022) ......................12

*N. Alamo Water Supply Corp. v. City of San Juan, Tex*., 90 F.3d 910 (5th Cir.1996) .............33

*Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182 (5th Cir. 1986) ...........10

*Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998).................................................30

*Rhodes v. Chapman*, 452 U.S. 337 (1981) ............................................................................10

*Ruiz v. Johnson*, 37 F. Supp. 2d 855 (S.D. Tex. 1999), *rev'd on other grounds,* 243 F.3d 941 (5th Cir. 2001), *adhered to on remand,* 154 F. Supp. 2d 975 (S.D. Tex. 2001) ................................................11

*Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242 (5th Cir. 2014) ........................33

*VRC LLC v. City of Dallas*, 460 F.3d 607 (5th Cir. 2006) .....................................................32

**Statutes**

29 U.S.C. § 794....................................................................................................................2

42 U.S.C. § 12131 *et seq* .......................................................................................................2

42 U.S.C. § 1997e(h) .............................................................................................................1

42 U.S.C. §1983.....................................................................................................................2

## PLAINTIFFS' PRE-REMEDY PHASE TRIAL
## <u>PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

In accordance with the Court's Scheduling Order (Rec. Doc. 640), Plaintiffs submit the following proposed findings of fact and conclusions of law in preparation for the Remedy Phase trial:

### A.  The Nature of the Action

1.      This is an action for injunctive and declaratory relief to remedy the constitutionally inadequate conditions of confinement and mental health care at David Wade Correctional Center in Homer, Louisiana as well as unconstitutional interference with legal communications.

### B.      The Parties

2.      Plaintiff Disability Rights Louisiana ("DRLA"), formerly known as the Advocacy Center, is a private, federally-funded, non-profit corporation, designated by Louisiana to serve as the State's protection and advocacy system for persons with mental illness.

3.      DRLA is not bound to remedies that are available under the Prison Litigation Reform Act (the "PLRA"). The PLRA defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h); *Jackson v. Johnson*, 475 F.3d 261, 265 (5th Cir. 2007).  Thus, under the plain language of the PLRA, Disability Rights Louisiana is not a "prisoner" and is thus not bound by the limitations that the PLRA places on actions by prisoners or remedies available to them.

4.      Plaintiffs Bruce Charles, Carlton Turner, Larry Jones, and Ronald Brooks were prisoners housed in "extended lockdown" at DWCC at the time that Plaintiffs filed their complaint.

1

5.      Plaintiffs brought this action under 42 U.S.C. §1983, for violations of the First and Eighth Amendments to the United States Constitution on behalf of all prisoners currently held, or who will in the future be held, in extended lockdown at DWCC in the N-1, N-2, N-3, and N-4 buildings.  Plaintiffs also brought this action pursuant to Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq*. and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794.  Following the Remedy Phase trial, the Court entered an order determining that Plaintiffs had demonstrated violations of the Eighth Amendment, Title II of the ADA, and Section 504, but they had not demonstrated a violation of the First Amendment.

6.      Defendant James LeBlanc is sued in his official capacity as the Secretary of the Louisiana Department of Public Safety and Corrections ("DPS&C").  Defendant Jerry Goodwin is sued in his official capacity as the Warden over David Wade Correctional Center.  Defendant Tyrone Mays is sued in his official capacity as a Colonel overseeing the South Compound at DWCC.  Defendant Doctor Gregory Seal, M.D. is sued in his official capacity as a contract psychiatrist at DWCC.  Defendant Assistant Warden Deborah Dauzat is sued in her official capacity as the Mental Health Director at DWCC.  Defendant Steve Hayden is sued in his official capacity as a Corrections Program Manager at DWCC.  Defendant Aerial Robinson in her official capacity as a Social Services Counselor at DWCC. Defendant Johnie Adkins in his capacity as a Social Services Counselor at DWCC.  The Louisiana Department of Public Safety and Corrections ("DPS&C") is named as Defendant pursuant to Plaintiffs' claims arising under the ADA and Section 504 of the Rehabilitation Act only.

C.      **Background Facts**

7.      As stipulated by the parties, "restrictive housing" refers to housing prisoners separately from the general population of a correctional institution and imposing restrictions on their movement, behavior, and privileges.  Rec. Doc. 524 ¶ 21.  "Extended lockdown" refers to

2

housing prisoners separately from the general population for twenty-two or more hours per day in a cell.  *Id.* ¶ 22.  Since the Remedy Phase trial, DWCC has begun to use the phrase "segregated housing." in place of "extended lockdown."  The parties have stipulated that the term "segregated housing" refers to housing prisoners separately from the general population of a correctional institution.  Joint Pre-Trial Order, Rec. Doc. 659 p. 9.  The parties have further stipulated that not all segregated housing is restrictive housing, and restrictive housing is a specific type of segregated housing.  *Id.*

8.     DWCC remains a maximum-security prison in Claiborne Parish, Louisiana. DWCC continues to be divided into two compounds, the North Compound and the South Compound.  Joint Pre-Trial Order, Rec. Doc. 659 p. 5. Five buildings, N1 through N5, comprise the South Compound, but only buildings N1 through N4 are at issue in this case.  *Id.*  The physical layout of the buildings has not changed since the Remedy Phase trial.  *Id.* Thus, the cells remain stark and extremely small—approximately fifty-six square feet.  The cells continue to have either a single or double built-in bunk, a toilet-sink unit, a mirror, and a metal foot locker for storing items. Prisoners who are double-bunked continue to be required to share this space with another prisoner.

9.     Each of N1 through N4 has four linear tiers, A through D, each with 16 cells.  *Id.* It remains true that the first two cells on each tier in buildings N2, N3, and N4 are camera cells for use in connection with prisoners who are on suicide watch.  *Id.* There is a camera in those cells as well as in all cells on the N4C tier.  *Id.* The cells in N1, N2 (tiers A, B, and C), and N3 have the capability to be used as double-man cells.  Cells in N4 are designated for single-person use.  *Id.* Prisoners housed in N2, N3, and N4 are classified as maximum custody.  *Id.* Prisoners in N1 are classified as medium custody, and DWCC maintained 64 beds in N1 as of August 30, 2022.  *Id.*

10.     The South Compound continues to be primarily used to house prisoners who have purportedly committed a rule infraction or who purportedly jeopardize the stability of the prison. Prisoners who are assigned to the classifications of investigative segregation, preventative segregation, disciplinary segregation, or protective segregation 1 (non-CCR) may be assigned to Tier N2A, N2B, or any tier in N3 or N4. *Id.* Prisoners who are assigned to "working segregation," a new classification that DWCC has created since the Remedy Phase trial, are assigned to Tier N2C. *Id.* Prisoners who are assigned to protective segregation 2 (CCR) are assigned to one of the 16 beds in Tier N2D. *Id.* CCR remains a protective custody status as described at page 11 of the Court's Liability Phase opinion. *See* Rec. Doc. 641.

11.     N1 has been converted to a medium custody tier, with 64 beds as of August 30, 2022. Joint Pre-Trial Order, Rec. Doc. 659 at 6. Prisoners in N1 have televisions on the tier and are allowed possession of tablets if they can purchase them. *See id.* Prisoners in N1 are allowed the personal possessions allowed to prisoners in medium custody. *Id.* Prisoners in N1 have access to group programming in the afternoons. *Id.* Prisoners in N1 eat in the dining hall and are allowed to exercise two hours per day on the yard (not in the secured recreation areas). *Id.*

12.     The parties have stipulated to some of the conditions on the working segregation tier, N2C. Working Segregation has an operational capacity of 32 prisoners. *Id.* at 6. There are televisions on the tier, and prisoners are allowed to possess radio/tape/CD players or a combination. *Id.* Prisoners who wish to hear the television must purchase a receiver. *Id.* Prisoners in Working Segregation eat meals in the dining hall and can exercise outside in the yard (not in the secured recreation area) for two hours per day, seven days a week. *Id.* Prisoners in Working Segregation can attend group programming on Monday, Wednesday, and Friday from 8:00 am to 10:45 am in the North Compound Chapel and are allowed to attend religious services. *Id.* Prisoners

in Working Segregation have an increased canteen spending limit of $40 per week. *Id.* Assignment to Working Segregation is generally for a determinant period from 45 to 90 days. *Id.*

13.     Conditions in tiers N2A, N2B, N3, and N4 have undergone more limited changes since the Remedy Phase trial. The parties have stipulated that prisoners on N2A, N2B, and buildings N3 and N4 are regularly confined to their cells for 23 hours per day, Monday through Friday, and 24 hours on the weekend. *Id.* Offender Posted Policy #35 governs the privileges and restrictions for prisoners in N2A, N2B, N3 and N4. *Id.* The policy provides that yard recreation is available to prisoners on those tiers for one hour per day, five days per week. *Id.* These prisoners are not permitted television sets, radios, or hobby crafts. *Id.* They are not permitted to attend religious services. *Id.* These prisoners are permitted to visit the canteen once per week and spend a maximum of $10. *Id.* Prisoners on these tiers eat all meals in their cells. *Id.* Since the Remedy Phase trial, DWCC has reduced the number of prisoners in N3 and N4 by 128 beds through single-bunking prisoners on those tiers. *Id.*

14.     The telephone policy for prisoners on the South Compound has changed since the Remedy Phase trial. *Id.* at 7. The amended phone policy has increased the maximum duration of calls to 15 minutes, and calls should be offered a minimum of four times a month. *Id.* Phones are now located on carts that are rolled to cell front on Tiers N2, N3, and N4. *Id.* Prisoners in DWCC's Working Segregation classification (N2C) are allowed a minimum of two calls a week. N1 prisoners (as medium custody prisoners) have access to tablets to make phone calls, though if they must use DWCC equipment (the prisoner does not have a tablet) for phone calls, they are now allowed a minimum of 16 calls per month. CCR prisoners are allowed 3 calls per week with a maximum duration of 30 minutes. CCR prisoners have access to tablets to make phone calls, subject to the same conditions as N1. *Id.*

### D.    Classification

15.    DWCC's classification policy is provided by EPM #03-01-001. *Id.* at p. 9. According to the policy, assignment to segregated housing "shall be limited to those circumstances which pose a direct threat to the safety of people or a clear threat to the safe and secure operations of the facility." *Id.*  The policy also provides that prisoners with serious mental illness shall not be placed in segregated housing other than treatment segregation unless they have been cleared by an appropriate mental health professional and reviewed by a psychiatrist/psychologist; are "not actively psychotic"; and "less restrictive measures cannot assure safety/security of the unit."  *Id.* DWCC personnel define "actively psychotic" as a "current state of psychosis" in which a prisoner may be "hallucinating or delusional."  Thus, according to the prison's policy as interpreted by its staff, prisoners with mental illnesses that do not involve hallucinations or delusions may continue to be placed in segregated housing.

16.    DWCC maintains a "Multidisciplinary Review Board" (recently re-termed as a "Segregation Review Board") whose purpose is to consider and make recommendations as to whether a prisoner housed in protective segregation, preventative segregation, or other restrictive housing may be moved to a less restrictive setting.  *Id.* at p. 8. These categories remain as was described by the Court on page 12 of the Liability Phase opinion.  *See* Rec. Doc. 641 p. 12. The board's classification recommendations are subject to review and modification by the Warden.  *Id.* Segregation Review Board Boards ("Board" or "Boards") are conducted for prisoners in preventative segregation at least every 60 days. *Id.* Boards are held every 7 days from those in Level 1 protective segregation (non-CCR) for the first 60 days, then every thirty days.  Boards are held for prisoners on the CCR tier (N2D) every 90 days.  *Id.* The results of the review board are delivered to prisoners via the prison mail. *Id.*  A mental health provider now sits on the Board, in addition to a classification officer, and the Unit Manager.  *Id.*  A prisoner can attend his Board in

person.  *Id.*  DWCC's use of strip cell status is not affected by the classification or board system. Despite the addition of the mental health officer, the Boards continue to maintain prisoners in the segregated housing tiers with little to no explanation.  The Boards continue to use a form that does not provide any individualized reasons why a prisoner is not being moved to a less restrictive form of housing.  After appearing before the Board, the prisoner will often receive a documentation stating he is not being moved due to "serious nature of past offense", without specification of when the offense occurred or why the offense warrants continued placement in preventative segregation following the term imposed by the disciplinary matrix.  There is no explanation provided for why some prisoners remain in preventative segregation for long periods of time without a disciplinary write-up, while others are not so held.

17.     Ryan Kimball is the classification officer who is primarily assigned to the South Compound. *Id.* Mr. Kimball prepares monthly continuous confinement reports that are sent to Warden Goodwin and that identify prisoners who have been in segregated housing for more than 30 days, how long each prisoner has been in segregated housing, and the date of the prisoner's last disciplinary write-up ("RVR"). *Id.* According to the continuous confinement report that Kimball prepared for June 2022, 143 prisoners were housed in extended lockdown for more than 30 days. *Id.* Thirty-seven prisoners had been held in continuous confinement for more than a year.  *Id.* Eleven prisoners had been held for more than two years.  *Id.*

18.     It remains true that prisoners who are found guilty of a rule infraction may be sentenced to disciplinary segregation for a determinate period of time in accordance with the Department's disciplinary matrix.  The disciplinary matrix was used at DWCC during the fact period for the Remedy Phase.  It also remains true that after a prisoner completes his disciplinary sentence, he may remain on Tiers N2C, N2D, N3, or N4 for an indefinite period under the status

of preventative segregation.  The prisoner continues to remain in the same cell and receive the same privileges whether on disciplinary or preventative segregation.

19.     On arrival at DWCC each prisoner is interviewed by an "Initial Classification Board," which recommends the prisoner's custody level.  The Initial Classification Board consists of a classification specialist and a security officer. Per policy, a prisoner may be assigned to segregated housing at an initial classification based on lack of bed space, medical/mental health, or other special needs.  All initial classifications at DWCC (classification of an offender done at intake into the facility) include a mental health screening.  *Id.* at 26. A mental health professional does not sit on the Initial Classification Board but may make a recommendation to the board members.  It remains true that on intake at DWCC, prisoners with a mental health diagnosis are scheduled to see the prison psychiatrist, Dr. Seal, at the next available time.  DWCC has created a purported mental health treatment unit called "treatment segregation" since the Liability Phase trial.  Prisoners assigned to "treatment segregation" are housed in one of two rooms in the North Compound infirmary.  *Id.* at p. 16. Treatment segregation has been utilized on two separate occasions for 2 separate individuals in the time it has been an available option at DWCC. *Id.*  A mental health staff person, Mr. Burgos or Ms. Robinson, will see the individual in treatment segregation at least daily.  *Id.*  There were no instances during the fact period where a prisoner was assigned to treatment segregation during intake.

### E.     Level of Care

20.     The Court's findings of fact at pages 14-18 of its Liability Phase opinion remain accurate.  The Department's Level of Care system has not changed since the Liability Phase trial. The Department continues to use the LOC-1 through 5 designations as the Court described in the Liability Phase opinion. Plaintiffs expect testimony confirming that there have been no changes to the mental health level of care system as well.

### F.    Corrections Personnel

21.    There have been few changes to the personnel and staff that are described on pages 18-24 of the Court's Liability Phase opinion.  Warden Dauzat remains the deputy warden over mental health. *Id.* at p. 11. DWCC now has five mental health staff to provide services to the facility: Steve Hayden, James Burgos, Aerial Robinson, Lisa Wells and Julia Spivey. *Id.* Steve Hayden remains the mental health director for the South Compound.  *Id.* DWCC has hired two new social workers, Lisa Wells and Julia Spivey.  Lisa Wells and Julia Spivey provide direct care to prisoners on the North Compound and run groups on the North Compound. *Id.*  Aerial Robinson also primarily provides services on the North Compound. *Id.* James Burgos and Steve Hayden focus on the South Compound.

22.    Dr. Gregory Seal, a board-certified psychiatrist, is the contract psychiatrist providing psychiatry at DWCC.  *Id.* Dr. Seal's contract has increased his time from eight hours every two weeks to eight hours per week. Id. Instead of providing services to DWCC every other Thursday, Dr. Seal now sees prisoners for four hours on Wednesday and four hours on Thursday. *Id.* Since approximately January 2020, Dr. Seal has provided services to prisoners by telehealth instead of in person. *Id.* Dr. Seal's primary role remains to provide medication management to all prisoners housed at DWCC, both the North and South Compounds. *Id.*

### G.    Eighth Amendment Claims

23.    The Eighth Amendment imposes duties on prison officials to provide humane conditions of confinement; to ensure that prisoners receive adequate food, clothing, shelter and medical care; and to "take reasonable measures to guarantee the safety of the prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). An Eighth Amendment claim based on deliberate indifference must satisfy both an objective and a subjective component test.  *Id*. at 834.  A prison official cannot be found liable under the Eighth

Amendment for denying a prisoner humane conditions of confinement unless the official "knows of and disregards an excessive risk to prisoner health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

24.     To determine if prison conditions satisfy the Eighth Amendment's objective component, "[t]he deprivation alleged must be, objectively, sufficiently serious.... [T]he prisoner must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer* 511 U.S. at 834.   Additionally, the Eighth Amendment requires that "prisoners be furnished with the basic human needs, one of which is reasonable safety." *Helling v. McKinney,* 509 U.S. 25, 33 (1993). Courts ask whether the conditions are contrary to "the evolving standards of decency that mark the progress of a maturing society," *Farmer,* 511 U.S. at 833–34, or whether the incarcerated person has been denied "the minimal civilized measure of life's necessities." *Rhodes v. Chapman,* 452 U.S. 337, 347 (1981).  These standards are not static: "The Supreme Court has made clear that the standards against which a court measures prison conditions are 'the evolving standards of decency that mark the progress of a maturing society' and not the standards in effect during the time of the drafting of the Eighth Amendment." *Gates v. Cook*, 376 F.3d 323, 332–33 (5th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (internal quotation omitted)).

25.     The Eighth Amendment not only protects against risk of harm to prisoners' physical health, but also protects mental health care as a basic human need of which incarcerated people cannot be deprived. *Gates v. Cook*, 376 F.3d at 343 (*citing Partridge v. Two Unknown Police Officers of Houston,* 791 F.2d 1182, 1187 (5th Cir. 1986)). "The same standards that protect against physical torture prohibit mental torture as well—including the mental torture of excessive

deprivation." *Ruiz v. Johnson,* 37 F. Supp. 2d 855, 914 (S.D. Tex. 1999), *rev'd on other grounds,* 243 F.3d 941 (5th Cir. 2001), *adhered to on remand,* 154 F. Supp. 2d 975 (S.D. Tex. 2001). As the Court held in its Liability Phase opinion, "Although the need for segregation is within Defendants' sound discretion, 'there is a line where [its] conditions [can] become so severe that its use is converted from a viable prisoner disciplinary tool to cruel and unusual punishment.'" Rec. Doc. 641 p. 37 (*quoting Gates v. Collier*, 501 F. 2d 1291, 1304 (5th Cir. 1974)). The Court "need not await a tragic event" to provide redress for such conditions. Rec. Doc. 641 p. 37 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)).

26.     The fact finder must also resolve the subjective test: whether the defendants were deliberately indifferent to a prisoners' health and safety. Rec. Doc. 641 at p. 36. As the Court previously determined, "An obvious risk could be sufficient to allow a fact finder to conclude that prison officials knew of the risk." *Id.* (*quoting Hinojosa v. Livingston*, 807 F.3d 657, 667 (5th Cir. 2015)). "Willful blindness is not a defense." *Id.* (*citing Farmer,* 511 U.S. at 843 n. 8.). The Court previously entered a finding of deliberate indifference in its Liability Phase opinion. Rec. Doc. 641 at pp. 121 *et seq.* Because deliberate indifference has already been established, Plaintiffs do not need to re-prove the existence of deliberate indifference during the Remedy Phase trial. Rather, the burden rests with the Defendants to demonstrate that "that they [are] no longer unreasonably disregarding an objectively intolerable risk of harm and that they [will] not revert to their obduracy upon cessation of the litigation." *Farmer*, 511 U.S. at 846 n. 9.

27.     Finally, while considering whether to implement a remedy for violations of the Eighth Amendment, the Court may implement a reasonable fact cutoff and is not required to hold open evidence created or obtained up until to the moment of trial. The Supreme Court recognized in *Brown v. Plata,* 563 U.S. 493, 523 (2011), that it is appropriate in a prison conditions lawsuit

11

for the trial court to set a cutoff date for fact discovery that is reasonably close to the trial date. Whether to permit such evidence remains in the district court's discretion. *Farmer*, 511 U.S. at 846; *Dockery v. Cain,* 7 F.4th 375, 379 (5th Cir. 2021); *Lewis v. Cain*, No. 15-318-SDD-RLB, slip op. at 7 (M.D. La. Dec. 7, 2022).

28.     While it has been established that Secretary James LeBlanc has undertaken efforts to reduce restrictive housing in Louisiana, it has also been established that those changes have not reached DWCC. During the liability trial, evidence and testimony were presented to show that LDPSC was working closely with the Vera Institute to review the prison system in Louisiana and provide recommendations for changes to reduce restrictive housing and address a number of other concerns, including the provision of mental health treatment to individuals in segregated housing. However, as Secretary LeBlanc himself stated at the liability phase trial, "when I think about Wade and the responsibility that Warden Goodwin has, we had -- Wade and the penitentiary were two of the most challenging areas to convert to the new way of doing things. So they were kind of the last on the list to get where we want to be." Liability Tr., 2/3/2022, 4436-4437. Evidence and testimony will once again show that while efforts for change have been undertaken at facilities throughout Louisiana, they have not reached DWCC specifically.

        **H.     Conditions on the South Compound**

29.     Conditions on the South Compound continue to violate the Eighth Amendment.

30.     Prisoners' ability to converse with each other remains very limited.  Per policy, DWCC purports to allow prisoners on the South Compound to talk in "low, conversational tones." Joint Pretrial Order, Rec. Doc. 659 p. 6. The noise levels on the tiers continue to fluctuate, however. How loud a conversation may be before it is deemed to violate prison policy (OPP #34, DWCC R-036679), remains left to the discretion of security staff.  Since July 2022, David Wade has installed four additional oscillating fans on each of the tiers, in addition to the four fans that were

previously there.  When operating, these additional fans effectively double the fan noise, making it harder for prisoners to communicate in the required low, conversational tones.

31.     Except for the installation of the additional fans, there have been no other changes to temperature control systems on the tiers.  The tiers are not air conditioned, and DWCC has no current plans to install air conditioning on the South Compound.  Defendants have offered no evidence that the additional fans on the tiers have reduced the high temperature on the tiers during the summer.  Conversely, there is no evidence that Defendants have taken any action since the Liability Phase trial to address the Court's findings regarding cold temperatures on the tiers in the winter. Rec. Doc. 641 at p. 46.

32.     Policies regarding prisoners' possessions have not significantly changed since the Liability Phase trial. Offender Posted Policy #36 governs the number of possessions that prisoners are permitted to have in their cells.  The policy expressly prohibits possession of radios, radio cassettes, CD players, or AM/FM tuners in N2A, N2B, N3, or N4.  Prisoners in investigative segregation may have one book or magazine, plus a Bible and religious publication.  Prisoners in preventative, disciplinary, or protective segregation 1 are permitted to have up to three books or magazines, plus a Bible and religious publication.  *Id.* at pp. 6-7.

33.     Prisoners continue to not receive meaningful opportunities to exercise.  Prisoners housed in investigative segregation, disciplinary segregation, or preventative segregation (N2A, N2B, N3, or N4) continue to be permitted to exercise alone in individual cages. The size of the exercise cages has not changed since the Liability Phase trial.  There is still no recreational equipment in the cages and no shade or covering provide protection from the elements. DWCC has revised its disciplinary policy so that removal of yard is no longer an available punishment. *Id.* at p. 9.

13

34.     Prisoners continue to have very little opportunity, if any, for meaningful interactions with others.  Prisoners housed in investigative segregation, disciplinary segregation, or preventative segregation also continue to be permitted only non-contact visitation through a glass window.  They still eat every meal in their cells.  They continue to be denied any rehabilitative programming or out-of-cell classes.

35.     The duration of prisoners' confinement remains problematic. Prisoners continue to be housed for extremely long periods of time in solitary confinement on the South Compound. The most recent continuous confinement report produced prior to the discovery cutoff is dated June 6, 2022.  This is a report prepared by Ryan Kimball monthly and delivered to Warden Goodwin that lists the prisoners who have been confined continuously on the South Compound for greater than 30 days.  The report does not include prisoners housed in N1, N2C (working segregation), or N2D (CCR). According to that report, John Booth #623973, had been confined on the South Compound since December 19, 2016—over five years and 5 months as of the date of that report.  Raymond LeBlanc #99403 had been confined there since November 21, 2017—over four years and six months.  Four other prisoners had been confined on the South Compound since some point in 2019 and twelve others since some point in 2020.  According to the report, 85 prisoners had been confined on the South Compound for longer than six months.

36.     The South Compound continues to be a depository for the mentally ill.  It is still true that many prisoners on the South Compound suffer from mental illness.  There is no evidence that the prevalence rate for prisoners with mental illness has changed since the Liability Phase. Rather, the evidence at the Remedy Phase trial will show that DWCC's security staff continues to treat manifestations of mental illnesses as disobedience as opposed to symptoms of mental illness.

37.     DWCC's new treatment segregation classification is used sparingly, at best, and prisoners continue to receive disciplinary infractions that are a manifestation of mental illness. Plaintiffs expect Steve Hayden to testify that on one occasion when the prison moved a prisoner to treatment segregation, that prisoner had accumulated multiple disciplinary write-ups in N4. However, once the prisoner was moved to treatment segregation, prison staff made a determination that the prisoner's mental condition was such that the prisoner was not aware of what he was doing. There is no explanation for why DWCC officials determined that in this one instance that the prisoner's behavior was a manifestation of his disability, as opposed to the many other individuals housed on the South Compound with mental illness.

38.     DWCC policy continues to permit use of "strip cell status."  On August 5, 2021, DWCC promulgated a revised version of DWCC USOPP #34 "Maximum Custody Housing – General."  In accordance with DWCC USOPP #34(R), prisoners who engage in the following behavior—a) Throwing human waste anywhere in any manner; b) Throwing or hurling of any bodily fluid or substance (including spitting); c) Storing weapons, human feces or urine in any form inside of his cell in a container; d) Throwing any item from their cell at any person walking down the tier; e) Throwing item(s) on the tier that might cause a safety hazard, (soap, water, etc.); f) Using belongings as a barricade or shield to prevent security from properly performing their duties; g) Making threats of violence against another while in immediate possession of any personal belonging that might be used as a weapon such as a cup, bar of soap, pen, pencil, etc.; h) Intentional Flooding of the cell; i) Committing an act of violence on another person; or j) Participation in a major disturbance—may be placed on strip cell status.  Joint Pretrial Order p. 10. The revised policy was approved by the Department's Chief of Operations, Seth Smith, in August 2021.

39.     It remains true that while on strip status, a prisoner has no clothing or personal property.  They are given a paper gown and allowed to keep their mattress unless it is used as a shield or barricade, per the policy.  Under the revised policy, the Shift Supervisor personally reviews every prisoner on strip cell status at least every 4 hours to ascertain if the prisoner's strip cell status is to be discontinued or not. *Id.* Prisoners are permitted by policy to retain a mattress "unless the offender attempts to use it as a shield or a barricade." *Id.* Whenever a prisoner is placed on strip cell, the Shift Supervisor is to conduct a review at least every four hours "to determine if the offender's behavior has improved enough to allow the return of the mattress." *Id.* If a mattress remains out of cell for more than 8 hours or past shift change, the Shift Supervisor must receive concurrence from the Unit Manager or a higher rank.  *Id.*

40.     If a prisoner remains on strip cell status for more than 24 hours, the Unit Manager must authorize continuation of this status and document the decision on a UOR. *Id.* at p. 11. Prisoners who continue to violate a rule that permits for the implementation of strip cell status or "who have a documented pattern of this type violent behavior" may remain on strip cell based on recommendation of the warden, deputy warden, or duty officer. *Id.* Prisoners are reviewed for release from strip cell status at least once every 7 days by a review board that consists of the unit manager and a classification officer. *Id.*  Under the policy, it remains possible for a prisoner to remain on strip cell status for an indefinite period.

41.     The evidence that Plaintiffs will demonstrate at trial will show that it remains true that prisoners are placed on strip cell status for actions that do not constitute an immediate threat to the safety and security of the prison.  It also remains true that prisoners may be placed on strip cell status without consultation with the mental health department.  (Mays Dep. 11:11-16.) DWCC's policy also does not require any additional checks or consultations with mental health

16

staff while a prisoner is on strip cell status. Strip cell continues to be imposed outside of the regular disciplinary process and without a hearing.  Secretary Pacholke will testify that strip cell status is not a practice that is the norm for modern correctional institutions.

42.     Secretary Pacholke will also testify that based on his three-day site visit, conditions on the South Compound remain, more generally, inconsistent with generally accepted penological practice.  He observed that conditions have not sufficiently changed to resolve the issues identified in the Court's Phase 1 opinion.  He noted continuing significant concerns regarding prisoner idleness. Among other observations, he could not discern any differences in conditions between investigative, preventative, and disciplinary segregation, and there continued to be no classes, programs, or job assignments for prisoners with those classifications. There were also no TV's, tablets, or radios for them. All movement for those prisoners outside the cell was in restraints. There was no attempt to provide these men skills so that they could be successful in general population or in the community following release. Secretary Pacholke will also testify that working segregation is not a true step-down program because programming and activities were insufficient.

43.     Plaintiffs also expect Secretary Pacholke to opine that the fact that DWCC has been awarded ACA accreditation does not necessarily mean that conditions satisfy constitutional standards.  He has noted that the ACA lowered its standards regarding segregation with it issued a new edition of the standards in March 2020, and in his expert opinion, the association has not offered sufficient explanation for why these standards were lowered.

44.     Dr. Craig Haney will testify that the scientific literature regarding the harmful effects of solitary confinement and segregated housing has not changed since the liability phase trial. As Dr. Haney included in his recent report, there is a robust body of scientific literature that establishes the adverse psychological effects of solitary confinement and the severe risk of serious

harm it poses for all prisoners who are subjected to it. Haney Report, pg. 90. In fact, Dr. Haney provided a summary and explanation of 46 different scientific studies and scientific literature that have been published on this topic since 2018 when this case was originally filed. Haney Report, pg. 18-23 and Exhibit 3 to Haney Report.

45.     Dr. Craig Haney will once again testify that the conditions on the South Compound are still exactly the type of conditions that are commonly described as "solitary confinement" in the scientific literature. Haney Report, pg. 7. He will once again opine that these conditions of confinement place all prisoners at significant risk of serious harm, regardless of their pre-existing mental health status. Haney Report, pg. 8. Dr. Haney will also testify that although there have been some changes at DWCC, even if they have been implemented as they are described in writing, those changes would not substantially alter the harmful nature of the conditions to which prisoners are subjected. The living conditions remain extremely harsh and dangerous and are the kinds of conditions known to undermine the psychological health and well-being of prisoners exposed to them. Haney Report, pg. 8.

**I.     Deficiencies in Delivery of Mental Health Services:  Screening and Evaluation**

46.     Plaintiffs anticipate Steve Hayden to testify that he is still the primary person completing the intake screening for individuals who arrive at DWCC. The process for completing a mental health intake screening at DWCC is unchanged from the process prior to March 2020.

47.     It remains true that Steve Hayden is unqualified to conduct the duties of a mental health staff member providing direct care. Court's Opinion, Doc. 641, p 74 last pp, p 85-86, p 121 pp 2. Steve Hayden has not received any licensure, additional education, additional training, or taken any action to enhance his qualifications. Mr. Hayden remains unqualified to provide direct mental health care services. Mr. Hayden continues to supervise licensed mental health staff at

DWCC, including Mr. Burgos and Ms. Robinson, both of whom are far more qualified to perform the duties of the job. Mr. Hayden lacks the prerequisite qualifications to supervise Mr. Burgos and Ms. Robinson as they both hold licensure as a professional counselor and social worker, respectively, and as part of their licensure need to be supervised by someone with a higher level license.

48.     There continues to be a high percentage of mentally ill prisoners housed on the South Compound at DWCC. Haney Report, pg. 8. As Dr. Haney opined in his original report and testified during the liability trial, the risk of serious psychological harm is significantly heightened for individuals with mental illness. The staff at DWCC still do not receive any training regarding isolation-related stressors and traumas that the prisoners housed on the South Compound may be facing, including becoming familiar with the wide body of literature on the topic. Haney Report, pg. 9.

49.     Individuals with serious mental illness continue to be placed in restrictive housing and are not screened out, as policy suggests they should be. Dr. Haney continues to recommend that more robust screening be implemented to screen individuals with serious mental illness out of placement in segregation because they are more vulnerable to a risk of serious psychological harm. Haney Report, pg. 90. Dr. Haney's recommendation to exclude individuals with serious mental illness from segregated housing is in line with other widely recognized entities. Haney Report, pg. 90-91.

J.      **Deficiencies in Delivery of Mental Health Services:  Mental Health Rounds**

50.     Mental health rounds are not conducted on a weekly basis on all tiers in all buildings on the South Compound. The rounds that are conducted are cursory and not documented by any mental health staff. There is no record created of mental health rounds being completed.

19

51.     The mental health rounds on the South Compound continue to be inconsistent and undocumented. While prisoners report seeing mental health staff more frequently, they are not reporting that they are on the tiers weekly nor that they are speaking with everyone on the tier. In the instances where mental health will pause to speak with a prisoner, that interaction continues to be at cellfront, lacking confidentiality or an environment that encourages open sharing by prisoners.

52.     Staff are purportedly utilizing a new and improved "Badge Pass" system when they come onto and off of the tiers. However, this badge tracking system only indicates whether staff, including mental health staff, were on and off a tier, it does not indicate whether they spoke with anyone nor whether they conducted rounds. Further, as noted by Dr. Burns, a similar badge swipe system was in place previously during the liability phase but it was not routinely used by staff. Burns Report, p. 6.

**K.     Deficiencies in Delivery of Mental Health Services: Mandatory Mental Health Evaluations**

53.     Prior to September 2022, Mr. Burgos was responsible for conducting the 90-day segregation interviews for N1 and N2, Ms. Robinson conducted the 30-day segregation interviews for prisoners who are LOC 3 in N1 and N2, and Mr. Hayden conducted all segregation interviews for N3 and N4.  Segregation interviews are sometimes conducted outside the cell in the courtroom of each building, although not all mental health staff consistently take people out of their cells. Mr. Hayden primarily conducts segregation interviews at cell front unless a prisoner specifically asks to be taken out of their cells.

54.     Mr. Burgos and Ms. Robinson reported that they most often conduct these interviews off the tier in the courtroom, which is a more private setting. However, the interviews they reported on were for individuals housed in N1 and N2.

55.     Mental health staff have transitioned to only using the "Interview with a Segregated Inmate" form to document all contact with individuals in segregated housing rather than using the Mental Health Progress Note formats for all contacts other than the 30- or 90-day segregation interviews. While it is purported that this change was done to improve tracking, Dr. Burns finds that by only using the one form for all contacts actually obscures the type of interaction. Burns Report, pg. 14. Dr. Burns further states that periodic mental health assessments do not constitute clinical interventions. Burns Report, pg. 14.

**L.      Deficiencies in Delivery of Mental Health Services:  Treatment**

56.     Dr. Burns has found that while the treatment plan format has been revised so that the plans are not identical, the plans still fail to identify patient strengths, weaknesses, the frequency and types of interventions to be provided, objectives, and progress toward goal attainment. Burns Report pg. 12.

57.     Prescription of psychotropic medications remains the only type of mental health treatment in place at the facility.

58.     Dr. Burns will state that for prisoners on the mental health caseload, individualized treatment plans should be relevant, meaningful, and accurately reflect the prisoner's condition and the services he will receive. Burns Report pg. 13. The plans shall include all clinically appropriate assessments and tests necessary for determining the prisoner's mental health treatment needs, shall be implemented fully, and have measurable goals that target behaviors and symptoms resulting from their illness. Burns Report, pg. 13. The plan shall list all services the patient shall receive (including individual and group therapy), the duration and frequency of all services, and the staff position/discipline responsible for providing such services. Burns Report pg. 13. Dr. Burns also continues to recommend that treatment plans should be updated at regular intervals including changes in level of care or whenever there is a significant change in the patient's condition to

accurately reflect the clinical condition and treatment needs of the patient, interventions, and progress toward goal attainment. Burns Report, pg. 13.

59.     Dr. Burns recommends that the frequency of assessments of prisoners with mental illness by mental health staff or the psychiatrist must be driven by the clinical need of the patient and treatment interventions (including initiation or changes in medication prescriptions, laboratory testing results, and group and individual therapy) being provided – not simply in response to policy minima for their assigned level of care. Burns Report, pg. 13-14.

60.     Dr. Burns has stated that considering the lack of detail in the treatment plans as well as the consolidated use of only the "Interview with a Segregated Inmate" note format, it appears that the only treatment provided is psychotropic medications. Burns Report, pg. 14.

61.     Dr. Gregory Seal has been the only contract psychiatrist providing psychiatry at DWCC since prior to March 2020. Dr. Seal has been providing only telehealth visits since approximately January 2020. In mid-2021, Dr. Seal relocated to Texas, and since that time has no longer been available to be on site at DWCC. Dr. Seal does not review the records of whether someone is taking their medications or not. Those records are not usually provided to him via Google Drive with the other records. Dr. Seal does not provide input into who should be transferred into treatment segregation. Dr. Seal is not aware whether he has seen anyone in treatment segregation and agrees that it may be pertinent information for him to have at the time he is seeing someone. He does not know what criteria needs to be met in order for someone to be transferred into treatment segregation. He has not received any requests from mental health staff at DWCC to opine as to whether an individual should be placed into treatment segregation. Dr. Seal does not know what services are available in treatment segregation or what the conditions of confinement in treatment segregation are.

62.     Dr. Burns finds that psychiatric appointments with Dr. Seal continue to be held in the courtroom, which was previously found to be a space that is intimidating and non-confidential. Burns Report, pg. 10.  The appointments are now solely via telemed and do now appear to exclude security staff from the actual courtroom. The prisoner still stands for the brief duration of the appointment and must wear restraints.

63.     DWCC mental health staff, primarily Mr. Burgos or Mr. Hayden, continue to be present during the appointments with Dr. Seal and continue to create a second progress note for the same encounter. Dr. Burns finds that this implies two different types of interventions have occurred when, in fact, it is simply but one brief appointment that is primarily focused on medication management. Burns Report, pg. 10. Mental health staff do not have to sit in on psychiatric appointments but should meet with both the inmate and the psychiatrist about the treatment plan, progress toward goal attainment and level of care reviews. Burns Report, pg. 17. There is no need for a second note memorializing the psychiatric appointment. Burns Report, pg. 17.

64.     The psychiatrist should be the treatment team leader and provide clinical guidance to other members of the treatment team, not a passive participant only writing prescriptions. Burns Report, pg. 17.

65.     In response to a request for production of all materials provided to prisoners, a 742-page PDF was provided including multiple documents, many of which appear to be self-help documents - some related to substance abuse disorders, others related to mental health symptoms, and somewhat related general topics such as anger management, parenting, problem-solving, mindfulness, and decision-making. Burns Report, pg. 12. None of these materials are referenced in any of the treatment plans reviewed by Dr. Burns. Burns Report, pg. 12. As such, Dr. Burns

finds it is not possible to determine why, when, or whether any of these materials are provided to prisoners on the South Compound. Burns Report, pg. 12.

66.     DWCC has created and begun using "treatment segregation" which means that if an individual meets criterion for transfer into treatment segregation, they are placed in one of 2 rooms in the North Compound infirmary. As Dr. Burns has opined, if a person needs to be transferred into an infirmary, he should immediately be removed from segregation and be transferred to Elayn Hunt Correctional Center ("EHCC") for treatment. Burns Report, pg. 13. She further opined that all prisoners must have timely access to clinically indicated mental health care - including transfer to EHCC rather than transferring from segregation on the South Compound to segregation in the infirmary on the North Compound. Burns Report, pg. 13.

67.     Dr. Burns continues to find that with the exception of rounds, all clinical contacts with mental health staff should be in an area outside of their cells that affords sound privacy, unless custody and mental health staff each document a legitimate safety, security, or treatment rationale why the prisoner cannot be seen outside his cell. Burns Report, pg. 14. It shall be the exception rather than the rule that Mental Health Staff and Providers see prisoners cell side for assessments. Burns Report, pg. 14. Inmates that custody and mental health staff agree cannot be safely assessed in an area outside of their cells shall be assessed to determine whether they require additional treatment or should be transferred to EHCC for more intensive treatment. Burns Report, pg. 14.

68.     Following the liability phase, DWCC was found to have inadequate staffing levels, inadequate psychiatric time, and the psychiatrist was not provided meaningful information, especially regarding suicide watch and strip cell status. Rec. Doc.  641, p.122.

69.     Dr. Burns finds that while Dr. Seal has increased his number of weekly hours from 8 hours every 2 weeks to 8 hours a week, he is now exclusively seeing patients via telemed. Burns

Report, pg. 15. Dr. Seal is still not participating in treatment team meetings, he is still not apprised or consulted when prisoners are placed on suicide watch, put into clinical restraints, placed on strip cell, or moved to "treatment segregation". Burns Report, pg. 15.

70.     Despite having mental health staff at DWCC who are licensed and qualified to complete the mental health intake screening, such as Julia Spivey, Ms. Robinson, or Mr. Burgos, Mr. Hayden remains primarily responsible for completing them.

71.     Dr. Burns noted that the psychologist that was offered at the liability trial resigned from her position at DWCC in December 2021, before the liability trial even began, and has not been replaced. Burns Report, pg. 16.

72.     Dr. Burns recommends that DWCC should conduct a mental health staffing analysis to determine the adequacy of the current staffing level. Burns Report, pg. 16. She explains that such an analysis must consider the prisoner population, security classifications, prevalence of mental illness, levels of mental health care to be provided, interventions and services to be provided for each level of care, and provisions for individual and group therapy. Burns Report, pg. 16. The staffing needs on the South Compound must consider tasks required such as time to conduct rounds, periodic assessments, treatment planning, clinical interventions, and treatment team meetings. Burns Report, pg. 16. From this analysis, a mental health staffing plan must be developed, and any mental health staff hired as a result must be clinically trained, licensed and credentialed as permitted by law to evaluate and care for the needs of patients - whether in the community or inside the prison. Burns Report, pg. 16.

73.     Dr. Burns recommends that if not already in place, develop and utilize a tracking system of caseload numbers on both sides of the compound with a tickler system for scheduling the various types of appointments (intake, placement in segregation, periodic segregation

assessments, suicide watch reviews and follow-up after watch discontinuation, psychiatric appointments, counseling appointments, treatment plan updates, etc.). Burns Report, pg. 17-18.

74.     Since the liability trial, DWCC has put new pill call officers in place for the South Compound, Austin Burns and Cody Rimmer. The new officers appear to be better, or at least more consistent, documentation and tracking of medication administration. The prior issue of overutilizing the "Not Requested" option appears to have been resolved with the change in staff. However, the pill call officers remain supervised and overseen by security staff not medical.

75.     Dr. Burns recommends that nursing staff, not security staff, be responsible for administering medications on the South Compound. Burns Report, pg. 20. Nurses are responsible for administering medications on the North Compound where prisoners go to the nursing staff to obtain their medications. DWCC employs nurses that are primarily assigned to the NOrth Compound and that are primarily assigned to the South Compound. Dr. Burns points out that nurses have the requisite training and knowledge required to identify efficacy of medication and recognize adverse reactions and side effects. Burns Report, pg. 20.

76.     Further, Dr. Burns recommends a policy revision to set forth some parameters with respect to referral of noncompliance back to the prescribing psychiatrist such that a follow up is scheduled. Burns Report, pg. 20. Prisoners prescribed psychotropic medications should otherwise seen at intervals based on clinical need, including but not limited to whenever mediations are started, dosages changed or discontinued, when there is a negative change in condition, the prisoner is suffering from side effects or adverse effects or if medication is ineffective after reaching a therapeutic dose, level or duration of treatment. Burns Report, pg. 21.

77.     Generally, documentation in the medical record continues to need improvement. Dr. Seal's notes continue to be largely illegible handwriting, which could easily be addressed

simply by Dr. Seal typing his notes.  Dr. Burns states that the additional time required to ensure legibility is well worth the effort and easily accomplished with adequate psychiatric time as addressed in her prior report and staffing section of the current report. Burns Report, pg. 24.

78.     Dr. Burns points out that Defendants must develop appropriate forms that clarify the purpose of the interaction/contact or intervention and contain the elements of documentation required for that purpose. Burns Report, pg. 23. The form should follow the PURPOSE of the encounter --- treatment – individual counseling, referral response, response to self-referral, required contact for level of care determination, treatment plan contact, various types of assessments such as periodic segregation assessment interviews, suicide risk assessments (initial, subsequent to watch placement and follow-up), etc. Burns Report, pg. 23.

79.     A necessary component of the implementation of new or revised documentation should be staff training to ensure that all staff understand the purpose of appropriately documenting the type of clinical contact and to clarify the purpose of the various types of interactions with prisoners in restrictive housing.

    **M.    Suicide Prevention**

80.     Since the Liability Phase trial, there have been 2 completed suicides at DWCC, both individuals were housed on the South Compound and both died by hanging. The first death was in October 2020 and the second was January 2022. This is contrasted with the 5 years prior to the liability phase trial where there were zero completed suicides. Based on this information alone, the effectiveness of the suicide prevention program at DWCC is questionable.

81.     A restraint bed was purchased for DWCC in September 2021 for use on the South Compound. In conjunction with the restraint bed, soft leather restraints were also acquired and utilized for use with the restraint bed. When the restraint bed is in use, it is brought into the

prisoner's cell. The prisoner is strapped to the bed using the soft leather restraints with locks. The cell door is then closed and locked, leaving the restrained prisoner on the bed inside.

82. Despite the purchase of the restraint bed, and the continued assertions that the restraint chair hasn't been used for years, the restraint chair remains at DWCC as an option for extreme suicide watch and has, in fact, been used since the liability trial. The use of standard restraints for extreme suicide watch remains an option that has also been utilized since the liability trial.

83. One change that DWCC has implemented has been the creation of the tier walker program since October 2021. Tier walkers are prisoners who meet criteria laid out in policy which includes they are not on the mental health caseload themselves, they do not have an extensive disciplinary history within the prison, and they are recommended by staff. The tier walkers sit outside the cell of a prisoner on suicide watch 24 hours a day for the duration of time a prisoner is on suicide watch. The tier walkers are to report all observations to security staff to be documented. The presence of tier walkers is not supposed to relieve security staff of their obligation to conduct checks as indicated on the mental health management order.

84. DWCC reports to have purchased suicide mattresses to be utilized when individuals are on watch. However, the practice remains that unless it is documented on the mental health management order that a suicide mattress is to be provided, security staff will not provide one. That practice remains the same for all other property as well - security staff will only provide property specifically indicated on the management order. The standard clothing on suicide watch is still the paper gowns.

85. The conditions on suicide watch still remain punitive in nature. The lack of dignified clothing, the infrequency of suicide mattresses being provided, and the lack of alternative

interventions such as counseling or phone calls to family members contributes to the punitive nature. Additionally, the conditions on standard suicide watch remain the same as the conditions for Policy 34 strip cell.

86.     As Dr. Burns testified during the liability trial, she continues to recommend changes to the suicide prevention policy and practices at DWCC. Dr. Burns recommends the use of "close watch" and "constant watch", neither of which automatically result in the prisoner being restrained. Burns Report, pg. 27. The use of restraints for suicide watch should be reserved who are actively engaging in self-injurious behavior and/or threaten suicide with a specific plan. Burns Report, pg. 27. The recommendations Dr. Burns makes regarding suicide prevention are in line with the National Commission on Correctional Health Care - Standards for Health Services in Prisons. Burns Report, pg. 26-27.

87.     Dr. Burns recommends revisions to the policy to include clear definitions of serious suicide attempt and suicide gesture, as well as the reporting processes and types of investigations to be completed for each of them. Burns Report, pg. 27. Dr. Burns continues to recommend that qualified mental health staff conduct a risk assessment to determine the level of watch placement for an individual as well as a re-assessment to determine when it may be appropriate to step down the level of watch or discontinue it. Burns Report, pg. 27. There should also be notification and consultation with the psychiatrist about each prisoner who is placed on suicide watch regarding watch status, risk assessment, treatment interventions, and watch discontinuation. Burns Report, pg. 28.

88.     A gap in the suicide prevention policy and practice at DWCC is the failure of mental health staff to counsel the prisoner to determine the underlying cause for the suicidal gesture, attempt, or ideation to address the problem at the source. While it is appropriate to use caution

when managing individuals expressing suicidal intent, it is more important to venture to uncover, understand and treat the causes for the ideation in the first place. This is not accomplished simply by asking an individual if they continue to feel like harming themselves. There is no treatment available for individuals on suicide watch and checks per policy do not constitute treatment.

### N.    Americans with Disabilities Act and Rehabilitation Act Claims

89.    Courts interpret Title II and the Rehabilitation Act *in pari materia. Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011).  "[T]he plain text of Title II of the ADA unambiguously extends to state prison inmates."  *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998).  "[E]mploying no system or an inadequate system for identifying and tracking prisoners with disabilities" is a viable class-wide claim for an unlawful method of administration. *Dunn v. Dunn*, 318 F.R.D. 652, 665 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020); *see also Armstrong v. Brown*, 857 F. Supp. 2d 919, 933 (N.D. Cal. 2012).

90.    Assistant Warden Brenda Acklin serves as the ADA Coordinator for DWCC. Acklin Dep. 6:25-7:4. She has served as the ADA Coordinator for the past two years.  *Id.* at 7:5-6; 11:2-5.  Before her, Assistant Warden Angie Huff served as the coordinator.  *Id.* at 11:8-9.  She reports to Assistant Warden Kayla Sherman. *Id.* at 11:6-7.  She does not train other David Wade employees regarding the ADA.  *Id.* at 13:9-18.  Warden Acklin is also in charge of the human resources department, and she testified that DWCC employees are informed of ADA requirements on hire but do not receive any training. *Id.*at 13:24-14:4. She is not aware of any current policies or procedures in place to identify prisoners with disabilities.  *Id.* at 14:11-17.  She is not personally in charge of investigating any requests for reasonable accommodations. *Id.* at 19:11-17.  Rather, Warden Acklin refers requests for a reasonable accommodation to the relevant department head for investigation—medical, classification, or mental health. *Id.* at 19:14-17. Requests for an

accommodation relating to mental health would go to Steve Hayden. *Id.* at 19:25-20:2. However, she testified that she had not received any requests that related to mental health. *Id.* at 32:7-23. Warden Acklin has also not provided any training to Mr. Hayden regarding the ADA. *Id.* at 19:3-5.

91.     Once the investigation by the department is completed, the relevant department head and Warden Acklin make a decision whether to approve the request for a reasonable accommodation. *Id.* at 20:6-8. Since March of 2020, there has not been any instance where Warden Acklin approved a prisoner's request for a reasonable accommodation. *Id.* at 21:8-15.  Prisoners have a right to appeal Warden Acklin's denial of their request to Department Headquarter, but Warden Acklin was not aware of any instances where her decision was appealed. *Id.* at 21:16-21, 21:24-22:5.  Warden Acklin is not aware of any plans to change any policies or procedures regarding the investigation or processing of requests for reasonable accommodation.

92.     Warden Acklin does not make an independent determination of whether an inmate's major life activities are implicated for evaluating an ADA claim, and instead she relies on the medical department for that determination.  *Id.* at 26:8-23.  Warden Acklin goes in person to meet with an inmate if an inmate requests to meet with her, but she could not provide any estimate of the number of times that has happened.  *Id.* at 27:8-28:4. When she walks the tiers on the South Compound, she does not make any assessment of whether other prisoners on the tier might qualify for an ADA accommodation.  *Id.* at 27:12-15. She has not interviewed any staff on the tier about compliance with the ADA since March 2020. *Id.* at 27:16-21. When asked if a prisoner needed to have a "serious mental illness" within the meaning of the Department's Classification Policy (IS-B-4) in order to qualify for a reasonable accommodation, she stated that she should not answer that question. *Id.* at 27:22-28:3, 28:8-12.  She had not made a determination

31

regarding the number of prisoners at David Wade with a disability or the percentage of prisoners on the South Compound with a disability. *Id.* at 35:10-21. During her tenure as Assistant Warden, she has never made a recommendation to Warden Goodwin or other staff regarding any changes to policies or procedures regarding treatment of prisoners with disabilities. *Id.* at 38:1-12.

93.     The current process in place at DWCC continues to permit prisoners' requests for accommodation for their disabilities to be ignored.  During the relevant fact period, multiple inmates filed ARP requests relating to a request for treatment or accommodation for their mental health.  None of those ARP requests were granted, and there is no indication that they were even referred to Warden Acklin for consideration as a request for a reasonable accommodation.  There continue to be no individualized assessments conducted to ascertain whether patients with mental illness can safely be housed on the South Compound.  There continue to be no alterations to conditions on the South Compound for men with mental health disabilities under the ADA or Section 504 in order to minimize substantial harm that such housing creates.

**O.     Remedy**

94.     Considering the continuing and ongoing systematic failures at DWCC, the Court should grant declaratory and injunctive relief.  The Court should order that an independent monitor be installed to ensure compliance with the injunction.

95.     "The party seeking a permanent injunction must meet a four-part test. It must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006).

96.     The Fifth Circuit Court of Appeals reviews a district court's permanent injunctions for abuse of discretion. *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, 775 F.3d 242, 254 (5th

Cir. 2014) (citing *N. Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 916–17 (5th Cir.1996)).  "An abuse of discretion occurs when the district court (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction[,] (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief.'" *Ball v. LeBlanc*, 792 F.3d 584, 598 (5th Cir. 2015) (internal citations omitted).

97.    Plaintiffs have satisfied the requirements for a permanent injunction to redress Defendants' constitutional and statutory violations.  The Court previously concluded that Defendants' conduct and prison conditions violated the Eighth Amendment, the ADA, and the RA. Conditions at the prison have not changed so that the Court could conclude that those violations have been resolved.  Plaintiffs have thus demonstrated success on the merits in accordance with the Court's Liability Phase opinion.  Plaintiffs have or will further demonstrate that the Plaintiff Class will suffer irreparable injury if the violations identified by the Court are not remedied; that the damage to the Plaintiff Class outweighs any burdens placed on the Defendants; and that the public interest is served by the issuance of an injunction.

Date:  January 9, 2023                                  Respectfully submitted,

                                                        */s/ Melanie A. Bray*
                                                        Melanie A. Bray, La. Bar No. 37049
                                                        J. Dalton Courson, La. Bar No. 28542
                                                        Ronald K. Lospennato, La. Bar No. 32191
                                                        Disability Rights Louisiana
                                                        *formerly known as the Advocacy Center*
                                                        8325 Oak Street
                                                        New Orleans, LA 70118
                                                        504-208-4151

504-272-2531 (fax)
mbray@disabilityrightsla.org
dcourson@disabilityrightsla.org