UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself and all other similarly situated prisoners at David Wade Correctional Center, | * * * * | CIVIL ACTION NO.: 5:18-CV-00541-EEF-MLH |
| and | * * | JUDGE ELIZABETH E. FOOTE |
| The ADVOCACY CENTER, | * * | MAGISTRATE MARK L. HORNSBY |
| PLAINTIFFS, | * * | CLASS ACTION |
| VS. | * * | |
| JAMES M. LEBLANC, *et al.*, | * * | |
| DEFENDANTS. | * | |

## STIPULATED FACTS

The following facts are stipulated by the parties:

**Preliminary**

1. The parties stipulate as to the authenticity of all documents with a bates number beginning with "DWCC" or "DWCC-R." The parties stipulate as to the authenticity of the body camera videos that were produced by Defendants to Plaintiffs in Remedy Phase discovery.

2. Current conditions at DWCC are being evaluated in this phase of the litigation within the limitations set by the Court. If a practice changed at DWCC from March 15, 2020 through August 31, 2022, the most recent practice represents current conditions.

3. The term "segregated housing" refers to housing prisoners separately from the general population of a correctional institution. Not all Segregated Housing is Restrictive Housing, and Restrictive Housing is a specific type of Segregated Housing.

4. DWCC has prisoners in Disciplinary Segregation, Investigative Segregation, and Preventative Segregation, and Protective Segregation. DWCC now has a Working Segregation status housed in N2C.

5. DPS&C promulgated Department Regulation No. IS-B-4 on March 7, 2021, which replaced former Regulation No. B-02-019. DWCC was required to comply with the provisions of Department Regulation No. IS-B-4 on March 7, 2021 going forward. DPS&C revised Department Regulation No. IS-B-4 on August 29, 2021 and again on July 24, 2022.

**General Conditions of the South Compound**

6. DWCC continues to be divided into two compounds, the North Compound and the South Compound. Five buildings, N1 through N5, comprise the South Compound, but only buildings N1 through N4 are at issue in this case. Each of N1 through N4 has four linear tiers, A through D, each with 16 cells. It remains true that the first two cells on each tier in buildings N2, N3, and N4 are camera cells for use in connection with prisoners who are on suicide watch. There is a camera in those cells as well as in all cells on the N4C tier. The cells in N1, N2 (tiers A, B, and C), and N3 have the capability to be used as double-man cells. Cells in N4 are designated for single-person use. Prisoners housed in N2, N3, and N4 are classified as maximum custody. Prisoners in N1 are classified as medium custody.

7. Prisoners who are assigned to the classifications of investigative segregation, preventative segregation, disciplinary segregation, or protective segregation 1 (non-CCR) may be assigned to Tier N2A, N2B, or any tier in N3 or N4. Prisoners who are assigned to working segregation are assigned to Tier N2C. Prisoners who are assigned to protective segregation 2 (CCR) are assigned to Tier N2D.

8. The size or physical conditions of the housing areas has not changed since the Liability Phase Trial.

9. Prisoners on N2A, N2B, and buildings N3 and N4 are regularly confined to their cells for 23 hours per day, Monday through Friday, and 24 hours on the weekend. Offender Posted Policy #35 governs the privileges and restrictions for prisoners in Units N2A, N2B, N3 and N4. (DWCC-R 036685). The policy provides that yard recreation is available to prisoners on those tiers for one hour per day, five days per week. (DWCC-R 036686). These prisoners are not permitted television sets, radios, or hobby crafts. (Id.) They are not permitted to attend religious services. (Id.) These prisoners are permitted to visit the canteen once time per week and spend a maximum of $10. Prisoners on these tiers eat all meals in their cells.

10. DWCC has reduced the census by 128 beds through single-bunking prisoners in N3 and N4.

11. DWCC has converted 32 beds in N2C to a Working Segregation status.

12. DWCC maintains 16 beds in N2D for usage in Level 2 Protective Custody ("CCR").

13. DWCC maintains 64 beds in N1 for medium custody as of August 30, 2022.

14. Due to the COVID-19 pandemic, DWCC has had to maintain the beds in N1 A and B for quarantining prisoners who are suspected to have or have tested positive for COVID-19.

15. Working Segregation has an operational capacity of 32 prisoners. Working Segregation has televisions on the tier, and prisoners are allowed to possess radio/tape/CD players or a combination. Prisoners who wish to hear the television must purchase a receiver. Prisoners in Working Segregation eat meals in the dining hall and can exercise outside in the yard (not in the secured recreation area) for two hours per day, seven days a week. Prisoners in Working

Segregation can attend group programming on Monday, Wednesday and Friday from 8:00 am to 10:45 am in the North Compound Chapel and are allowed to attend religious services. Prisoners in Working Segregation have an increased canteen spending limit of $40 per week. Assignment to Working Segregation is generally for a determinant period from 45 to 90 days.

16. N1 is medium custody housing. Prisoners in N1 have televisions on the tier and are allowed possession of tablets. Prisoners in N1 are allowed the personal possessions allowed to prisoners in medium custody. Prisoners in N1 have access to group programming in the afternoons. Prisoners in N1 eat in the dining hall and are allowed to exercise two hours day on the yard (not in the secured recreation areas).

17. DWCC allows prisoners on the South Compound to talk in "low, conversational tones." (Offender Posted Policy #34, DWCCR-036679).

18. Offender Posted Policy #36 governs the number of possession that prisoners are permitted to have in their cells. The policy expressly prohibits possession of radios, radio cassettes, CD players, or AM/FM tuners in N2A, N2B, N3, or N4. Prisoners in investigative segregation may have one book or magazine, plus a Bible and religious publication. Prisoners in preventative, disciplinary, or protective segregation 1 are permitted to have up to three books or magazines, plus a Bible and religious publication. These policies have not changed since the Liability Phase trial.

19. The availability and procedures for visitation have not significantly changed since the Liability Phase Trial. Prisoners in buildings N2 through N4 are only permitted weekend non-contact visits, with two exceptions. Prisoners who are assigned to CCR (N2D) are permitted one contact visit per month if he has been to CCR for longer than three months. (DWCC-R 036685). Prisoners assigned to Working Segregation are permitted two contact visits per month.

4

20. The prison has changed its phone policy for prisoners on the South Compound since the Liability Phase trial. The amended phone policy has increased the maximum duration of calls to 15 minutes, and calls should be offered a minimum of four times a month. (Defendants' Disclosure.) Phones are now located on carts that are rolled to cell front.

21. On September 6, 2022, DWCC promulgated DWCC USOPP #20 "Use of Offender Telephones Monitoring and Recording of Phone Calls" which outlines current phone usage allowed in buildings N1-N4. DWCC has installed telephone carts for usage in N2-N4.

22. Telephone calls for prisoners at DWCC in Disciplinary and Preventative Segregation have increased in duration to a maximum of 15 minutes. Prisoners in N2A, N2B, N3 and N4 are allowed one 15-minute call a week. Prisoners in DWCC's Working Segregation classification (N2C) are allowed a minimum of 2 calls a week. N1 prisoners (as medium custody prisoners) have access to tablets to make phone calls, though if they must use DWCC equipment (the prisoner does not have a tablet) for phone calls, they are now allowed a minimum of 16 calls per month. CCR prisoners are allowed 3 calls per week with a maximum duration of 30 minutes. CCR prisoners have access to tablets to make phone calls, subject to the same conditions as N1.

23. Since at least the implementation of Department Regulation IS-B-4 on March 7, 2021, prisoners who are assigned to Segregated Housing are allowed a phone call within 24 hours of said placement.

24. There are prisoners housed at DWCC who are not ready to be housed in general population and may never be.

**Classification**

25. DWCC maintains a "Multidisciplinary Review Board" (recently re-termed as a "Segregation Review Board") whose purpose is to consider and make recommendations as to

whether a prisoner housed in protective segregation, preventative segregation, or other restrictive housing may be moved to a less restrictive setting. (DWCC-R 053981.) The board's classification recommendations are subject to review and modification by the Warden. (DWCC-R 053982.)

26. Segregation Review Board Boards ("Board" or "Boards") are conducted for prisoners in preventative segregation at least every 60 days, (DWCC-R 053991). Boards are held every 7 days from those in Level 1 protective segregation (non-CCR) for the first 60 days, then every thirty days. Boards are held for prisoners on the CCR tier (N2D) every 90 days. (*Id.*) The final results of the review board are delivered to prisoners via the prison mail. A mental health provider now sits on the Board, in addition to a classification officer, and the Unit Manager. (DWCC-R 053981.) A prisoner attends his Board in person.

27. Prisoners receive a mental health restrictive housing appraisal within 7 days of placement in Segregated Housing.

28. Ryan Kimball is the classification officer who is primarily assigned to the South Compound. Mr. Kimball prepares monthly continuous confinement reports that are sent to Warden Goodwin and that identify prisoners who have been in segregated housing for more than 30 days, how long each prisoner has been in segregated housing, and the date of the prisoner's last disciplinary write-up ("RVR"). According to the continuous confinement report that Kimball prepared for June 2022, 143 prisoners were housed in extended lockdown for more than 30 days. (DWCC-R 039756). Thirty-seven prisoners had been held in continuous confinement for more than a year. (*Id.*) Eleven prisoners had been held for more than two years. (*Id.*)

29. DWCC's classification policy is provided by EPM #03-01-001. According to the policy, assignment to segregated housing "shall be limited to those circumstances which pose a direct threat to the safety of people or a clear threat to the safe and secure operations of the facility."

(DWCC-R 053984). The policy also provides that prisoners with serious mental illness shall not be placed in segregated housing other than treatment segregation unless they have been cleared by an appropriate mental health professional and reviewed by a psychiatrist/psychologist; are "not actively psychotic"; and "less restrictive measures cannot assure safety/security of the unit."

**Disciplinary Sanctions**

30. DWCC has instituted a disciplinary/sanctioning matrix to "govern the time an offender may be in segregated housing for rule violations, except to the extent documented reasons and due process review result in the need for continued preventative segregation due to a threat exhibited by an offender to self, other offenders, or staff." (DWCC-R 053986).

31. DWCC has revised its disciplinary policy so that removal of yard is no longer an available punishment.

**Strip Cell**

32. On August 5, 2021, DWCC promulgated a revised version of DWCC USOPP #34 "Maximum Custody Housing – General."

33. In accordance with DWCC USOPP #34(R), prisoners who engage in the following behavior: a) Throwing human waste anywhere in any manner; b) Throwing or hurling of any bodily fluid or substance (including spitting); c) Storing weapons, human feces or urine in any form inside of his cell in a container; d) Throwing any item from their cell at any person walking down the tier; e) Throwing item(s) on the tier that might cause a safety hazard, (soap, water, etc.); f) Using belongings as a barricade or shield to prevent security from properly performing their duties; g) Making threats of violence against another while in immediate possession of any personal belonging that might be used as a weapon such as a cup, bar of soap, pen, pencil, etc.; h)

7

Intentional Flooding of the cell; i) Committing an act of violence on another person; or j) Participation in a major disturbance may be placed on strip cell status.

34. The Shift Supervisor personally reviews every prisoner on strip cell status at least every 4 hours to ascertain if the prisoner's strip cell status is to be discontinued or not. (DWCC-R 036682).

35. Prisoners are permitted by policy to retain a mattress "unless the offender attempts to use it as a shield or a barricade." Whenever a prisoner is placed on strip cell, the Shift Supervisor is to conduct a review at least every four hours "to determine if the offender's behavior has improved enough to allow the return of the mattress." If a mattress remains out of cell for more than 8 hours or past shift change, the Shift Supervisor must receive concurrence from the Unit Manager or a higher rank.

36. If a prisoner remains on strip cell status for more than 24 hours, the Unit Manager must authorize continuation of this status and document the decision on a UOR.

37. Prisoners who continue to violate a rule that permits for the implementation of strip cell status or "who have a documented pattern of this type violent behavior" may remain on strip cell based on recommendation of the warden, deputy warden, or duty officer. Prisoners are reviewed for release from strip cell status at least once every 7 days by a review board that consists of the unit manager and a classification officer.

**Mental Health Department**

38. Warden Dauzat is the deputy warden over mental health. DWCC now has five mental health staff to provide services to the facility: Steve Hayden, James Burgos, Aerial Robinson, Lisa Wells and Julia Spivey. Steve Hayden remains the mental health director for the South Compound. DWCC has hired two new social workers, Lisa Wells and Julia Spivey. Lisa

Wells and Julia Spivey provide direct care to prisoners on the North Compound and run groups on the North Compound. Aerial Robinson primarily provides services on the North Compound. James Burgos and Steve Hayden focus on the South Compound.

39. Dr. Gregory Seal, a board certified psychiatrist, is the contract psychiatrist providing psychiatry at DWCC. Dr. Seal's contract has increased his time from eight hours every two weeks to eight hours per week. Instead of providing services to DWCC every other Thursday, Dr. Seal now sees prisoners for four hours on Wednesday and four hours on Thursday. Since approximately January 2020, Dr. Seal has provided services to prisoners by telehealth. Dr. Seal's primary role remains to provide medication management to all prisoners housed at DWCC, both the North and South Compounds.

40. Dr. Seal determines when he needs to see a prisoner and informs DWCC mental health staff. In addition, DWCC mental health staff can have Dr. Seal see a prisoner sooner if necessary. DWCC mental health staff determine who Dr. Seal who is to see (based upon Dr. Seal's prior order or mental health staff determination) and sends those files electronically to Dr. Seal via Google Drive on Mondays for the individuals he will see that week. Mental health staff also sends a pile of blank progress notes via the regular mail so Dr. Seal can complete a progress note for each person he sees. Dr. Seal scans the completed progress notes and medication orders and emails them back to mental health staff at DWCC, who then put those documents into each individual's file. Dr. Seal then shreds the original progress note and medication order.

41. Dr. Seal does not maintain any records at his remote location. He relies upon the staff at DWCC to maintain the records and to keep track of who he needs to see each week. The outside limit of time between each visit with an individual is 6 months because his medication orders are only valid for 6 months at a time.

42. Dr. Seal generally determines medication compliance by speaking with the prisoner and the DWCC mental health staff. Dr. Seal reviews records that he deems necessary, typically his prior medication orders and any medication orders completed by any other physician. He will also review relevant labs that pertain to psychotropic medication management, such as Lithium levels. DWCC mental health staff can place a prisoner into Treatment Segregation without Dr. Seal's involvement.

43. The plaintiffs have not alleged that any prisoners were prescribed an improper mental health medicine or mental health medicines for their diagnosis.

44. Sometime in September 2022, Mr. Burgos and Mr. Hayden switched their areas of responsibility and Mr. Burgos is now purportedly responsible for N3 and N4 and Mr. Hayden is now purportedly responsible for N1 and N2.

**Diagnoses and Classifications**

45. The plaintiffs do not challenge the diagnoses assigned to prisoners by either EHCC or Dr. Seal.

46. No prisoner assigned a mental health LOC 1 or LOC 2 are sent to DWCC, and the plaintiffs have not identified any prisoner who has been assigned a mental health LOC 2 at DWCC.

47. The plaintiffs have not challenged the LOC classifications assigned to prisoners by either EHCC or DWCC.

48. All DWCC prisoners on the mental health caseload have a mental health client face sheet.

49. The mental health client face sheet tracks a prisoners location, level of care designation, diagnosis, psychotropic medication, prescription expiration date, date of last suicide watch, date of most recent act of self-harm, date of last psychiatric visit, date of the next scheduled

psychiatric visit, date of the most recent treatment plan, date the prisoner was last seen by mental health staff, date the prisoner was last visited in segregation, and the next scheduled visit date in segregation.

**Mental Health Screening**

50. The mental health intake screening, the intra-system intake screening, conducted at DWCC is the same intake screening that was conducted prior to March 2020. Steve Hayden is still the primary person responsible for conducting the mental health intake screening and he is using the same intake form that he was using prior to March 2020. Since the liability phase, the records for individuals arriving at DWCC now come before the individual arrives and are available to staff at DWCC shortly prior to the arrival of the prisoner.

51. Mental Health staff at DWCC, primarily Mr. Hayden, asks the same questions, makes the same observations, and documents the same categories of information as prior to March 2020. A referral is made on the intake form regarding an initial placement, although the classification department remains responsible for the actual housing location.

52. Mental Health staff all testified in depositions in August 2022 that the intake process is unchanged, the documentation is unchanged, the information collected is unchanged, and there is no change in the mental health intake process.

53. Mr. Hayden will refer an individual to see Dr. Seal if a "red flag" is presented, or if the prisoner arrives with a prescription for psychotropic medications, or the prisoner has a serious mental illness diagnosis as defined in LDPSC policy.

54. Warden Dauzat signs off on all mental health intake forms completed by Steve Hayden, even though she does not attend them. Steve Hayden, as the mental health director, signs off on all mental health intake forms completed by James Burgos or Aerial Robinson.

**Mental Health Rounds and Access to Mental Health**

55. DWCC prisoners may seek access to mental health services through routine sick call, emergency sick call, during a mental health staff person's rounds on the tier, or by referral by any DWCC staff or another prisoner.

56. By policy, DWCC conducts mental health rounds weekly on all tiers in all buildings on the South Compound. The rounds are conducted cell front. No record of the cell front interview is created unless the encounter calls for a further contact.

**Treatment Plans**

57. DWCC has now created individualized mental health treatment plans.

**Medication Administration and Pill Pass**

58. Austin Burns has been a pill call officer for the South Compound since at least March 2020. Cody Rimmer has been a pill call officer for the South Compound since October 2020. Both officers received training on the pill call policy prior to conducting pill call. The pill pass policy is EPM #04-01-029, Pharmaceuticals/Non-Prescription Medication and Pill Call Procedures, dated July 14, 2020, and is the policy that guides how the officers conduct their duties.

59. Both officers Burns and Rimmer received an in-class training that included a PowerPoint presentation and trained them how to conduct pill call, including documentation. They were also provided hands on training by medical staff including how to verify which prisoner gets which medication, verifying what time each prisoner receives each medication, and how the medications are dispensed. The hands on training was provided prior to the officers conducting any pill call and was not repeated once they started. They receive a refresher course every February on the pill call policy, which is presented in a PowerPoint presentation.

60. In June of 2022, DWCC upgraded its EMAR system to the Correctional and Inpatient Pharmacy Software (CIPS), the medication administration module which is known as sMARt, offered by technology vendor Fusion Health.

61. Both officers were trained in the use of the new sMARt system which began to be implemented at DWCC in late June of 2022. Both officers document each pill call following completion of each time including morning, afternoon, and evening.

62. Pill call officers are directly supervised by security staff. Pill call officers document refusals to take psychotropic medications in the medication refusal database.

63. Pill call officers no longer use the designation "Not Requested" in reporting medication administration, unless the prisoner has a medication that is only provided on request and the prisoner does not request it. Generally, the medication is only designated as provided or refused, with the caveat for when the prisoner is on a trip to court or a medical visit at the time of pill call.

64. As confirmed by Dr. Burns, documentation of medication administration is better and more consistent than before March of 2020.

**Segregation Interviews**

65. Following IS-B-4, segregation interviews are conducted every 30 days for individuals who are assigned a LOC 3 classification. For all other individuals, segregation interviews are conducted every 90 days.

66. Segregation interviews are recorded on the "Interview of a Segregated Inmate" form, Form 350. Since June 2022, mental health staff on the South Compound are no longer using the mental health progress notes to document contacts with prisoners and are instead documenting all contacts on the "Interview of a Segregated Inmate" form. The new "Interview of a Segregated

13

Inmate" form contains a drop-down menu that allows the mental health staff person to select the purpose of the record.

**Treatment Segregation**

67.     DWCC has created a "treatment segregation" which consists of 2 rooms in the North Compound infirmary. Treatment segregation has been utilized on 2 separate occasions for 2 separate individuals in the time it has been an available option at DWCC. A mental health staff person, Mr. Burgos or Ms. Robinson, will see the individual in treatment segregation at least daily.

**Suicide Watch**

68.     DWCC has in the keyrooms of N1, N2, N3, and N4 suicide kits containing the following items: 1) an Airway protection device; 2) Non-sterile protective gloves; 3) Pocket masks for rescue breathing; 4) Large Paramedic shears; 5) Bandage scissors; 6) Blood stopper compression bandages; and 7) a Hoffman Medical Rescue tool.

69.     DWCC conducts training annually to all staff with the responsibility of offender supervision in the implementation of suicide prevention and intervention.

70.     DWCC utilizes standard suicide watch and extreme suicide watch. The mental health staff determines what property is kept by a prisoner on suicide watch.

71.     DWCC has purchased and acquired a restraint bed which uses leather restraints.

72.     DWCC began utilizing tier walkers when individuals are on suicide watch sometime after October 2021. The tier walkers are prisoners that are recommended for the position, cleared by mental health as not having a serious mental illness, cleared by classification as not having an active disciplinary history, and approved to be a tier walker. A tier walker is utilized 24 hours a day for the duration of time an individual is on suicide watch on the South Compound. The tier walker receives training from mental health and reports all activities and observations to

security staff during their shift. The relevant policy is EPM #03-02-010, Tier Walkers, dated October 7, 2021.

73. Prisoners at DWCC on standard suicide watch are evaluated by mental health (or other treatment staff in the absence of mental health professionals) at a minimum of every 24 hours.

74. Prisoners at DWCC on extreme suicide watch are assessed at the initiation of the extreme suicide watch. Prisoners at DWCC on extreme suicide watch are assessed at least every 12 hours by a medical or mental health professional. Prisoners at DWCC on an extreme suicide watch are stepped down to a standard suicide watch for observation and evaluation prior to the final discontinuation of the suicide watch.

75. Mental health staff determine when to take a prisoner off of suicide watch.

76. Prisoners at DWCC who are discontinued from a suicide watch have a follow-up contact with mental health within 7 days of the discontinuation.

77. DWCC does not utilize suicide watch more often than it should. DWCC does not keep prisoners on suicide watch for longer than it should.

APPROVED AS TO FORM AND CONTENT:

COUNSEL FOR PLAINTIFFS:

Respectfully submitted,

*/s/ Melanie A. Bray*
Melanie A. Bray, La. Bar No. 37049
J. Dalton Courson, La. Bar No. 28542
Ronald K. Lospennato, La. Bar No. 32191
Disability Rights Louisiana
*formerly known as the Advocacy Center*
8325 Oak Street
New Orleans, LA 70118
504-208-4151

15

504-272-2531 (fax)
mbray@disabilityrightsla.org
dcourson@disabilityrightsla.org


COUNSEL FOR DEFENDANTS:

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By: /s/ Randal J. Robert
    Randal J. Robert (#21840), TA
    Connell L. Archey (#20086)
    Keith J. Fernandez (#33124)
    Madaline King (#38301)
    *Special Assistant Attorneys General*
    Email: Randy.Robert@butlersnow.com
           Connell.Archey@butlersnow.com
           Keith.Fernandez@butlersnow.com
           Madaline.Rabalais@butlersnow.com