UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| BRUCE CHARLES, on behalf of himself | * | CIVIL ACTION NO. |
| and all other similarly situated prisoners | * | 5:18-CV-00541-EEF-MLH |
| at David Wade Correctional Center, | * | |
| | * | JUDGE ELIZABETH E. FOOTE |
| and | * | |
| | * | MAGISTRATE MARK L. |
| The ADVOCACY CENTER, | * | HORNSBY |
| | * | |
| PLAINTIFFS, | * | CLASS ACTION |
| | * | |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, et al., | * | |
| | * | |
| DEFENDANTS. | * | |

**PLAINTIFFS' BRIEF FOLLOWING THE REMEDY PHASE TRIAL**

# Table of Contents

I.    Remedy Phase Expert Witnesses ........................................................................................ 1

   A.   Plaintiffs' Experts ...................................................................................................... 1

   B.   Defendants' Experts .................................................................................................. 2

II.   Background Facts ............................................................................................................... 3

III.  Conditions of Confinement and Discipline ...................................................................... 6

   A.   Duration of Confinement in Restrictive Housing ..................................................... 6

   B.   Segregation Review Boards ....................................................................................... 7

   C.   Conditions in N2A, N2B, N3, and N4 ...................................................................... 9

   D.   Working Segregation ............................................................................................... 13

   E.   N1 Medium Custody Tier ........................................................................................ 13

   F.   Prevalence of Mental Illness ................................................................................... 14

   G.   Continued Use of Strip Cell .................................................................................... 14

   H.   Psychological Harms of Solitary Confinement ....................................................... 17

   I.   ACA Accreditation .................................................................................................. 19

   J.   Proposed Injunction Regarding Conditions of Confinement and Discipline ................. 20

IV.   Mental Health Screening and Evaluation ....................................................................... 24

   A.   Intake Screening ...................................................................................................... 24

      1.   *The DWCC Mental Health Director Is Still Unqualified.* ............................ 24

      2.   *Information Regarding Mental Health Disabilities Is Not Considered at Intake.* ........ 26

   B.   Inadequate Screening on Reassignment from Other Parts of DWCC ............................. 27

   C.   Lack of Effective Rounds ........................................................................................ 28

   D.   Underinclusive Definition of Serious Mental Illness .............................................. 29

   E.   Other Evidence Regarding Inadequate Identification and Screening for Mental Illness .. 31

   F.   Proposed Injunction Regarding Mental Health Screening and Evaluation ..................... 32

V.    Mental Health Treatment ................................................................................34

      A.   Continuing Complaints by Class Members regarding DWCC Mental Health Treatment 34

      B.   Understaffing ..............................................................................................35

      C.   Creation of Mental Health Treatment Plans ...........................................37

      D.   Psychiatric Treatment .................................................................................39

      E.   Timed Assessments .....................................................................................43

      F.   Self-Help Materials......................................................................................45

      G.   Treatment Segregation ...............................................................................46

      H.   Medication Administration.........................................................................47

      I.    Psychoeducational Courses for Working Segregation .........................49

      J.    Proposed Injunction Regarding Mental Health Treatment.................50

VI.   Suicide Prevention ...........................................................................................52

      A.   DWCC Suicide Prevention Policies and Procedures...........................52

      B.   Completed Suicides .....................................................................................53

      C.   The Tier Walker Program ...........................................................................55

      D.   Proposed Injunction Language Regarding Suicide Prevention .........56

VII.  Use of Force and Restraints............................................................................58

      A.   Use of Force..................................................................................................58

      B.   Improper Use of Restraints .......................................................................59

      C.   Proposed Injunction Regarding Use of Force and Restraints...........60

VIII. Americans with Disabilities Act and Rehabilitation Act Claims .......................62

IX.   Monitoring ........................................................................................................65

X.    Conclusion ........................................................................................................70

iii

## Table of Authorities

Cases

*Brown v. Plata*, 563 U.S. 493, 511 (2011) ....................................................................65

*Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982), *amended in part, vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982) ........................................................................66


Rules

Federal Rule of Evidence 1006 ......................................................................................7

Federal Rule of Civil Procedure 53 .........................................................................65, 66

1.      Plaintiffs submit this post-trial brief following the Remedy Phase trial, which was held over fourteen days from January 17 to February 6, 2023. The evidence showed that Defendants have not remedied the conditions, practices, and policies at David Wade Correctional Center ("DWCC") that the Court ruled violated the Eighth Amendment. Prisoners housed on the South Compound continue to face cruel punishment and serious risk of harm. Current conditions include inadequate screening for identification of inmates with mental illness, leaving men with serious mental illnesses to be channeled into solitary confinement; confinement conditions that pose substantial risk of psychological damage, including enforced idleness and uses of force applied to mentally ill inmates, of which Defendants are aware but have not remedied; deficient or absent psychiatric and mental health care treatments; a classification process that leaves inmates trapped in solitary confinement with no way to get out; and inadequate suicide screening and prevention. DWCC officials also continue to disregard their obligations under the Americans with Disabilities Act. Louisiana Department of Corrections officials are aware of the deficiencies at DWCC, but adequate changes have still not been implemented. The Court should enter a final judgment granting declaratory relief and issuing a decree to require Defendants to remedy the deficiencies.[1]

### I.  Remedy Phase Expert Witnesses

#### A.  Plaintiffs' Experts

2.      Secretary Dan Pacholke is the former Secretary for the Department of Corrections for the State of Washington. He previously worked for 33 years in the Washington Department of Corrections. Rec. Doc. 641 at 1. Secretary Pacholke was accepted as an expert in corrections operations. *See* Trial Tr. vol. II at 449:9-19 [Rec. Doc. 705]. In connection with the Remedy Phase,

---

[1] Plaintiffs' pretrial proposed findings of fact and conclusions of law recited the legal standards and applicable case law for Plaintiffs' Eighth Amendment claims, for their ADA/RA claims, and for the granting of injunctive relief. [Rec. Doc. 665 at pp. 9-15, 30-33.] Plaintiffs respectfully incorporate that prior briefing herein.

and expanding on his prior visit made during the Liability Phase, Secretary Pacholke conducted another site visit for three days in late June 2022. Pacholke Trial Tr., vol. II at 455:14-18 [Rec. Doc. 705]. Pacholke toured the visiting area, the infirmary, the recreation areas, and certain tiers in each of the Units (N1, N2, N3, and N4). *Id.* at 455:19-456:6. Pacholke also conducted interviews of identified prisoners from all pertinent housing areas. *Id.* at 456:11-15.

3.      Dr. Kathy Burns is the former chief psychiatrist for the Ohio Department of Corrections. The Court accepted Dr. Burns as an expert in clinical psychiatry and corrections systems. Trial Tr., vol. VII at 1521:18-24 [Rec. Doc. 710]. As the Court noted in its Liability Phase Opinion, Dr. Burns has extensive expertise providing mental health care in correctional settings and designing and setting policies for the delivery of mental health care. [Rec. Doc. 641 at 27.] Dr. Burns visited DWCC again on June 28 and 29, 2022. *Id*. at 1525:25-1526:1. During her site visit, she conducted cell-front interviews, met with prisoners in a private setting, and reviewed inmate records. *Id.* at 1526:24-1527:1, 1529:18-21, and 1530:18-1531:6.

4.      Dr. Craig Haney is a Ph.D. psychologist, and he holds a law degree from Stanford. He has worked as a professor of psychology at the University of California, Santa Cruz for over forty years, and he specializes in social psychology and its interaction with the legal system. The Court accepted him as an expert in social psychology and solitary confinement. Trial Tr., vol. X at 2172:14-2173:7 [Rec. Doc. 713]. Dr. Haney visited DWCC again on June 28 and 29, 2022. *Id*. at 2179:3-4. During the site visit, he toured the housing units where South Compound prisoners are housed, toured the visiting area and the infirmary, spoke to 34 prisoners at cell front, and spoke to other prisoners individually in a private setting.

### B.  Defendants' Experts

5.      Mr. James Upchurch has experience working at various levels in different state correctional systems, and the Court qualified him as an expert in prison operations and security. The

methodology that Mr. Upchurch undertook to derive his opinions, however, lacked rigor. For example, he did not interview any inmates. Upchurch Trial Tr. vol. XII at 2786:23-25 [Rec. Doc. 719]. Nor did he conduct a sit-down interview with any staff. *Id.* at 2787:1-4. Mr. Upchurch opined that since DWCC was accredited by the ACA, DWCC necessarily complies with commonly accepted correctional practices. *Id.* at 2785:23-25. However, he did not read the draft or final ACA audit reports for DWCC. *Id.* at 2808:6-24. He therefore did not identify any errors in those reports. Instead, he relied on Warden Goodwin's statement that DWCC complied with ACA standards, without confirmation, because "he had no reason to think he would lie to me." *Id.* at 2809:9-10.

6.      Dr. John Thompson is board-certified in general psychiatry with added qualifications in forensic psychiatry and addiction psychiatry. He is affiliated with Tulane University Hospital and East Louisiana Mental Health System ("ELMHS"), the state hospital in Jackson, Louisiana.  He was accepted as an expert forensic psychiatrist. Thompson Trial Tr. vol. XIII at 2827:2-9 [Rec. Doc. 720]. As the Court noted in its Liability Phase opinion, Dr. Thompson does not have direct experience preparing policies and procedures for provision of mental health services in a prison setting, unlike Dr. Burns. Dr. Thompson has also never published academic literature on the effects of solitary confinement or socialization on mental health, unlike Dr. Haney.

## II.  Background Facts

7.      Much at DWCC has remained the same since the Liability Phase. The physical layout of the buildings on the South Compound has not changed. Haney Trial Tr. vol. X at 2188:21-25 [Rec. Doc. 713]*;* Stip. Facts ¶ 8, Ex. JR-60 at 3 [Rec. Doc 715-54]*.* Each of Buildings N1 through N4 still has four linear tiers, A through D, each with 16 cells. Stip. Facts ¶ 6, Ex. JR-60 at 2 [Rec. Doc 715-54]*.* Prisoners who are assigned to the classifications of investigative segregation, preventative segregation, disciplinary segregation, or protective segregation 1 (non-CCR) at DWCC are considered maximum custody and may be assigned to housing in Tiers N2A, N2B, or any tier in

N3 or N4. Ex. JR-25 (Offender Posted Policy #35) at 2 [Rec. Doc. 715-20]; Stip. Facts ¶ 7; Ex. JR-60 at 2 [Rec. Doc 715-54].

8.    Each classification category is defined by DWCC's updated classification policy, Employee Policy Memo. #03-01-001. Ex. JR-11 at 8-12 [Rec. Doc. 715-11] (describing maximum custody classifications).

9.    "Investigative segregation" is "a temporary holding area, preferably a cell, where an offender is held pending the outcome of a disciplinary hearing, pending a Classification Review Board, or pending a transfer to an appropriate housing unit." *Id.* at 9. It may be used when an inmate is under investigation for a rule violation. *Id.* These inmates may be housed in Tiers N2A or N2B or any tier in Units N3 or N4. Ex. JR-25 at 6 (Row A) [Rec. Doc. 715-20].

10.    "Disciplinary segregation" is imposed by the prison's Disciplinary Board as a sanction for a rule violation, in accordance with the Disciplinary/Sanctioning Matrix. *Id.* at 10. Although disciplinary segregation is described by policy as "a rehabilitative tool to assist facility staff to redirect an offender's behavior through discipline, motivation, and therapeutic programming," *Id.,* there is in fact no "therapeutic programming" in disciplinary segregation, as discussed below. These inmates may be housed in Tiers N2A or N2B. Ex. JR-25 at 6 (Row A) [Rec. Doc. 715-20].

11.    "Preventative segregation" is assigned when an inmate's continued presence in general population is "a danger to the good order and discipline of the facility and/or whose presence poses a danger to himself, other offenders, staff, or the general public." Ex. JR-11 at 10-11 [Rec. Doc. 715-11]. There is no maximum duration that a prisoner may be held in preventative segregation. Kimball Trial Tr. vol. I at 226:12-15 [Rec. Doc. 704]. These inmates may be housed in Tiers N2A or N2B or any tier in Units N3 or N4. Ex. JR-25 at 6 (Row A) [Rec. Doc. 715-20].

12.    "Protective segregation" is "a maximum custody form of separation from the general

4

population for offenders requesting or requiring protection from other offenders for reasons of health or safety." Ex. JR-11 at 11 [Rec. Doc. 715-11]. There are three tiers of protective segregation. Inmates are assigned to Level 1 protective segregation at their own request or by staff, *Id.,* and they are housed under the same conditions as disciplinary or preventative segregation, *see, e.g.,* Ex. JR-25 at 6 (listing privileges and restrictions) [Rec. Doc. 715-20]. These inmates may be housed in Tiers N2A or N2B or any tier in Units N3 or N4. *Id.* Level 2 protective segregation ("close custody restriction") is assigned based on the nature of the inmate's "crime, prior employment history (for example: former law enforcement, politician, etc.), age, or other significant protection concerns." Ex. JR-11 at 11 [Rec. Doc. 715-11]. The inmate may be a candidate for general population in the future. *Id.* These inmates are housed on tier N2D, which is also referred to as the "CCR Unit." *Id.* Level 3 protective segregation is for inmates, such as former law enforcement or correctional officers, who will never be a candidate for the general population. *Id.* These inmates are housed in Unit N5, *Id.* at 11-12, which is not a part of this litigation.

13.     Prisoners may now be transitioned to "working segregation," a new classification that DWCC implemented in 2021. Per policy, working segregation is "distinguished by access to work and other programs consistent with security restrictions and facility procedures." *Id.* at 12. However, in fact they do not have jobs (rendering "working" segregation a misnomer). Coleman Trial Tr. vol. I at 24:16-20 [Rec. Doc. 704]. Working segregation inmates are housed in Tier N2C. Stip. Facts ¶ 4; Ex. JR-60 at 2 [Rec. Doc 715-54].

14.     All cells in Buildings N2, N3, and N4 are maximum-custody, restrictive housing. As the parties earlier stipulated, "restrictive housing" refers to housing prisoners separately from the general population and imposing restrictions on their movement, behavior, and privileges. Rec. Doc. 524 at 1, ¶ 21. "Segregated housing" refers to housing prisoners separately from the general

population. Stip. Facts ¶ 3, Ex. JR-60 at 1 [Rec. Doc. 715-54].

15.     Some tiers in Unit N1 were used as quarantine cells for inmates affected by COVID-19 until October or November 2022. Goodwin Trial Tr. vol. XI at 2579:8-14 [Rec. Doc. 717]. Cells in N1 are otherwise considered medium custody housing for inmates pending reassignment to general population. Coleman Trial Tr. vol. I at 76:1-3 [Rec. Doc. 704].

16.     Housing on all tiers on the South Compound, including in Unit N1, satisfies the definitions of "restrictive housing" and "segregated housing." Even though N1 is considered a medium-custody unit, restrictions on those inmates' movement, behavior, and privileges remain, and they are housed separately from the general population.

### III.   Conditions of Confinement and Discipline

#### A.  Duration of Confinement in Restrictive Housing

17.     Defendants continue to house prisoners in solitary confinement conditions for months and, sometimes, years. During his testimony, Classification Officer Ryan Kimball testified that he continues to prepare monthly "continuous confinement"[2] reports that list prisoners who have been in continuous confinement for more than 30 days. Kimball Trial Tr. vol. I at 235:2-5 [Rec. Doc. 704]; Exs. PR-L-1 through PR-L-28 (monthly reports) [Rec. Docs. 716-97 to 716-124]. The most recent continuous confinement report admitted at trial showed that as of June 6, 2022, inmate John Booth had been in solitary confinement since December 19, 2016. Ex. PR-L-28 at 5 [Rec. Doc. 716-124]. Thirty-five others had been in solitary confinement for more than a year. *Id.* at 4-5. Well over 100 inmates had been in solitary confinement for more than 30 days. *Id.* at 4-5.

18.     Men may remain in solitary confinement without a write-up for a disciplinary violation for months. Examples from the continuous confinement report dated June 6, 2022, of inmates who

---

[2] The Court discussed the continuous confinement reports at page 49 of its Liability Phase decision.

had gone more than six months without a write-up include Raymond LeBlanc, entry 11/21/17, last RVR 2/24/20 (but noting he refused a TB test), *id.* at 5; Carey Varner, entry 11/20/20, last RVR 10/12/21, *id.* at 4; Shawn Shelton, entry 4/9/20, last RVR 4/8/21, *id.*; Camari Bookter, entry 9/1/21, last RVR 9/1/21, *id.*; Joey Banks, entry 9/15/21, last RVR 9/15/21, *id.* at 3; Kendrick McCall, entry 10/1/21, last RVR 10/1/21, *id.*, and others.

### B.  Segregation Review Boards

19.     Segregation Review Boards (formerly called Multi-Disciplinary Review Boards) are conducted for prisoners in segregated housing who may be moved to less restrictive housing. Stip. Facts ¶ 25, Ex. JR-60 at 5-6 [Rec. Doc. 715-54]. A mental health provider now sits on the board, in addition to a classification officer and the Unit Manager, which is a change. *Id.* ¶ 25 at 6. Another change is that a prisoner now attends his Board in person. *Id.* The boards are held at periodic intervals ranging from 30 to 90 days depending on the classification. *Id.* The meetings of the board are not recorded. Kimball Trial Tr. vol. I at 224:5-7 [Rec. Doc. 704].

20.     When a prisoner is moved or maintained in preventative segregation—beyond when the prisoner would otherwise be confined to disciplinary segregation for a rule violation per the matrix—the prison should provide documented reasons, according to policy. Ex. JR-11 at 6. [Rec. Doc. 715-11.] Mr. Kimball testified that the documented reason is recorded on the segregation review board form.  Kimball Trial Tr. vol. I at 223:15-19 [Rec. Doc. 704]. The form is a one-page document with a pre-printed list of potential reasons such as "poor attitude", "serious nature of past offenses", and others, and space for the board to provide comments regarding reassignment. *See, e.g.,* Ex. PR-G-2 at 2616 [Rec. Doc. 716-83].

21.     Plaintiffs offered a summary exhibit, in accordance with Rule 1006 of the Federal Rules of Evidence, documenting classification review board documentation that was produced in discovery during the Remedy Phase. Ex. PR-G-1 [Rec. Doc. 716-82]. The exhibit showed that for more than

more than half of the boards, inmates received a paper form in the mail that informed them that they were to remain in restrictive housing due to "serious nature of past offenses." *See id.* at 1.

22.     Jeremy Coleman is one of the individuals whose classification review board Mr. Upchurch had viewed during his site visit. Upchurch Trial Tr. vol. XII at 2798:17-19 [Rec. Doc. 719]. Mr. Coleman had not received any write-ups as of June 6, 2022, yet he was not released from solitary confinement by the board. Rather, Mr. Coleman was provided written notice that he had to remain in solitary confinement due to "serious nature of past offense." *See* Ex. PR-G-1 [Rec. Doc. 716-82] at 61 (reflecting board of Jeremy Coleman on 6/21/21). Indeed, ten inmates whose boards Mr. Upchurch observed received the same notice from the multi-disciplinary review board that they had to remain in preventative segregation for the same reason, "serious nature of past offense." Upchurch Trial Tr. vol. XII at 2794:13-2796:17 [Rec. Doc. 719].

23.     Secretary Pacholke testified to a lack of information regarding these boards. Pacholke Trial Tr. vol. III at 537:24-540:20 [Rec. Doc. 706]. Pacholke opined that there should be documentation that the board considered the inmate's risk profile. *Id.* at 538:15-17. He noted that a risk profile will speak to why the inmate remains in segregation, e.g., aggression or criminal associations, and to what programming or intervention he may need. *Id.* at 538:18-22. The profile may also have information regarding a mental health diagnosis or mental health episodes, including suicidal behaviors. *Id.* at 538:22-25.[3] It could also document how long that inmate had been in lockdown, information about the inmate's behaviors, and reasons why the inmate may remain a threat to the safety of others or the operation of the facility. *Id. at* 539:2-540:5. DWCC's system, instead, "feels like a checklist, and there is no informational probing." *Id.* at 540:10-11. He also noted that

---

[3] Even though DWCC had added a mental health staff person to the board, Pacholke found "no evidence whatsoever that would indicate that they affected the working nature of that board." Pacholke Trial Tr. vol. III at 543:2-3. [Rec. Doc. 706] He found no notations on any documentation showing that the mental health staff had input into the decision of the board.

DWCC's process does not give inmates a path forward, *Id.* at 540:15, and it is not clear why inmates are assigned to preventative segregation or to working segregation. *Id.* at 541:17-542:3. In his opinion, checking a box on a form next to the line "serious nature of past offense" is not only not an accepted method of communicating board decisions, but it is cruel. *Id.* at 542:4-15.

24.     Pacholke also testified that it is unclear why certain individuals are assigned to preventative segregation and others are not. There is no documentation of the "serious nature of past offense," so there is no explanation of why retaining an inmate in solitary confinement is necessary due to that offense. *Id.* at 544:24-545:15. "It just seems like it is completely discretionary and without really any – any rationale. There is no documented rationale." *Id.* at 545:13-15.

### C.  Conditions in N2A, N2B, N3, and N4

25.     In its Liability Phase ruling, the Court identified lack of social interaction and enforced idleness as increasing the risk of substantial harm to prisoners. That problem persists. Prisoners on N2A, N2B, and buildings N3 and N4 are regularly confined to their cells for 23 hours per day, Monday through Friday, and 24 hours per day on Saturday and Sunday. Stip. Facts ¶ 9, Ex. JR-60 at 3 [Rec. Doc. 715-54]. CCR/N2D inmates are generally in their cells 22 hours per day, *see* Ex. JR-25 at 7 (Row V) [Rec. Doc. 715-20] (providing 2 hours for recreation per day), except for a class once per week, Coleman Trial Tr. vol. I at 21:19-21 [Rec. Doc. 704].

26.     Inmate privileges and restrictions are governed by Offender Posted Policy #35. Coleman Trial Tr. vol. I at 16:16-19 [Rec. Doc. 704]. Exhibit JR-25 [Rec. Doc. 715-20] is the version of the policy in effect as of April 13, 2022, *Id.* at 17:13-17, which is used by security personnel to determine the privileges available to an inmate on the South Compound, *Id.* at 18:12-15. DWCC policy still mandates idleness; inmates in the maximum custody tiers are not permitted to possess radios or hobby crafts and are not permitted to watch television. Ex. JR-25 at 7; JR-26 at 9 [Rec. Doc. 715-21]. They eat meals in their cells. Nail Trial Tr. vol. I at 148:14-17 [Rec. Doc. 704].

They are not permitted to have tablets. Dempster Trial Tr. vol. VII at 1493:22-24 [Rec. Doc. 710]. They may have one hour of recreation five days per week. Ex. JR-25 at 7. Such recreation occurs in the exercise cages. Haney Trial Tr. vol. X at 2217:11-2218:5 [Rec. Doc. 713]; Ex. JR-24 at 2 [Rec. Doc. 715-19]. The condition of those cages has not changed since the Liability Phase trial. *Id.* at 2217:14-17.

27.     Communication with other inmates remains restricted; the prison's policy that inmates may only communicate with others in "low, conversational tones" remains the same. Ex. JR-24 at 2 [Rec. Doc. 715-19]; Coleman Trial Tr. vol. I at 27:19-22 [Rec. Doc. 704]. They may not leave their cells to attend classes. *Id.* at 21:13-18. Prisoners in investigative segregation are permitted to possess one book or magazine and one religious publication; prisoners in preventative or disciplinary segregation may have up to three books or magazines and a religious publication. Ex. JR-26 at 6-7 [Rec. Doc. 715-21]. Prisoners with these classifications are also permitted to possess up to 10 photographs and may display one. Ex. JR-26 at 9-10. They may spend a maximum of $10 per week at the prison canteen. Ex. JR-15 at 6 [Rec. Doc. 715-15].

28.     Policies regarding prisoners' possessions have not significantly changed since the Liability Phase trial. Offender Posted Policy #36 governs the number of possessions that prisoners are permitted to have in their cells. [Rec. Doc. 715-21.] The policy expressly prohibits possession of radios, radio cassettes, CD players, or AM/FM tuners in N2A, N2B, N3, or N4.

29.     DWCC has installed four additional oscillating fans on each of the tiers, in addition to the four fans that were previously there. There have been no other changes to temperature control systems on the tiers. *See* Nail Trial Tr. vol. I at 148:11-13 [Rec. Doc. 704] (still no air conditioning). Defendants offered no evidence that the additional fans on the tiers have reduced the high temperature on the tiers during the summer. Conversely, there is no evidence that

Defendants have taken any action to address the Court's findings regarding cold temperatures on the tiers in the winter [Rec. Doc. 641 at p. 46].

30.     Prisoners continue to not receive meaningful opportunities to exercise. Prisoners housed in investigative segregation, disciplinary segregation, or preventative segregation (N2A, N2B, N3, or N4) continue to be permitted to exercise alone in individual cages. The size of the exercise cages has not changed since the Liability Phase trial. There is still no recreational equipment in the cages and no shade or covering to provide protection from the elements. A positive change is that DWCC has revised its disciplinary policy so that removal of yard is no longer an available punishment. *Id*. at 7. Of course, this change does not address the underlying problems with the conditions of the cages themselves.

31.     Secretary Pacholke observed that conditions have not sufficiently changed to resolve the issues identified in the Court's Phase 1 opinion regarding prisoner idleness. Among other observations, he could not discern any differences in conditions between investigative, preventative, and disciplinary segregation, Pacholke Trial Tr. vol. II at 460:13-18 and 463:3-10 [Rec. Doc. 705], and there continued to be no classes, programs, or job assignments for prisoners with those classifications. *Id.* at 459:5-13 and 461:3-6. There were also no items such as TV's, tablets, or radios, which might incentivize good behavior, provide activity, and permit inmates to connect with family. *Id.* at 463:11-465:15.

32.     Prisoners continue to have very little opportunity, if any, for meaningful interactions with others.[4] Prisoners housed in investigative, disciplinary, or preventative segregation continue to be

_____

[4] Since July 2022, DWCC has installed four additional oscillating fans on each of the tiers, in addition to the four fans that were previously there. Except for the installation of the additional fans, there have been no other changes to temperature control systems on the tiers. *See* Nail Trial Tr. vol. I at 148:11-13 [Rec. Doc. 704] (still no air conditioning). Defendants have offered no evidence that the additional fans on the tiers have reduced the high temperature on the tiers during the summer. Conversely, there is no evidence that Defendants have taken any action

permitted only non-contact visitation through a glass window. They still eat every meal in their cells. They continue to be denied any rehabilitative programming or out-of-cell classes.

33.     The prison has changed its phone policy for prisoners on the South Compound since the Liability Phase trial. The amended phone policy has increased the maximum duration of calls to 15 minutes, and calls should be offered a minimum of four times a month. Stip. Facts ¶ 20, Ex. JR-60 at 5; Dempster Trial Tr. vol. VII at 1492:7-17 [Rec. Doc. 710]. Phones are now located on carts that are rolled to cell front. Stip. Facts, ¶ 20, Ex. JR-60 at 5. Mr. Dempster testified that having a phone rolled to cell-front means that inmates do not have to be shackled to use it, but inmates on either side of the cell are able to overhear the conversation. Dempster Trial Tr. vol. VII at 1493:17-21 [Rec. Doc. 710]. Thus, while DWCC has increased the number of calls that an inmate is permitted to make, the new policy does not permit an inmate to make a call that inmates housed nearby are unable to overhear.

34.     Visitation continues to be limited to noncontact visits for inmates in N2, N3, and N4, except for CCR tier. Coleman Trial Tr. vol. I at 21:2-22 [Rec. Doc. 704.] Dr. Haney testified that limiting visitation can have negative effects and recommended that all inmates on the South Compound have an opportunity to have one contact visit per month, as is done now for some prisoners in CCR. Haney Trial Tr. vol. X at 2232:11 [Rec. Doc. 713]. He also raised privacy concerns regarding the current visitation space. *Id.* at 2233:4-15. Dr. Haney further testified that concerns for safety must be considered and that people need to experience consequences for misbehavior, but "the cost of the consequence should not be counterproductive in such a way that it increases the likelihood that someone will deteriorate psychologically and they may be a greater problem in the

---

since the Liability Phase trial to address the Court's findings regarding cold temperatures on the tiers in the winter. (Rec. Doc. 641 at p. 46).

future than they would otherwise be if they were treated differently." *Id.* at 2235:16-20.

### D.  Working Segregation

35.     DWCC opened the working segregation tier in 2021. Coleman Trial Tr. vol. I at 23:10-19 [Rec. Doc. 704]. Working segregation has an operational capacity of 32 prisoners. Ex. JR-60 at 6. There are televisions on the tier, and prisoners are allowed to possess radio/tape/CD players or a combination. *Id*. Prisoners who wish to hear the television must purchase a receiver. *Id.* Prisoners in working segregation eat meals in the dining hall and can exercise outside in the yard (not in the secured recreation area) for two hours per day, seven days a week. *Id.* They may attend group programming on Monday, Wednesday, and Friday from 8:00 am to 10:45 am in the North Compound Chapel. Ex. JR-60 at 6. They are allowed to attend religious services. *Id*. Prisoners in Working Segregation have an increased canteen spending limit of $40 per week. *Id.* Assignment to working segregation is generally for a determinant period from 45 to 90 days. *Id.* Although inmates housed in Working Segregation have more privileges than those in N2A, N2B, N3, or N4, they have fewer privileges than inmates who are housed in N2D, the CCR tier. Belton Trial Tr. vol. II at 441:6-23 [Rec. Doc. 705]. When not in the yard, dining hall, or in class, prisoners in Working Segregation are locked in their cells. *See* Haney Trial Tr. vol. X at 2195:17-21 [Rec. Doc. 713].

### E.  N1 Medium Custody Tier

36.     Prisoners in N1 are now classified as medium custody inmates who are pending reassignment to the general population. Coleman Trial Tr. vol. I at 76:1-3; Kimball Trial Tr. vol. I at 204:14-16 [Rec. Doc. 704]. There are televisions on the tier and possession of tablets is permitted. Ex. JR-60 at 4. Prisoners housed in N1 eat meals in the dining hall and are permitted to exercise two hours per day in the yard, not the secured recreation areas. *Id.* There was some testimony by Defendants at trial that prisoners in N1 have the same privileges as prisoners who

are housed in the general population. Kimball Trial Tr. vol. I at 205:25-206:13 [Rec. Doc. 704]. However, differences remain between N1 and general population. Inmates in N1 do not have jobs, while other medium custody inmates do. Goodwin Trial Tr. vol. XII, 2686:22-2688:2 [Rec. Doc. 719]. N1 housing may also be considered part of a step-down process. *Id.* at 2680:8-12. N1 inmates may be eligible to attend groups available to general population inmates, but they may be placed on a waiting list for these groups so that they do not in fact attend them. Dauzat Trial Tr. vol. VI at 1237:19-22 [Rec. Doc. 709]; Robinson Trial Tr. vol. IX at 2102:14-19 [Rec. Doc. 712].

### F.  Prevalence of Mental Illness

37.     It is still true that many prisoners on the South Compound suffer from mental illness. There is no evidence that the prevalence rate for prisoners with mental illness has changed since the Liability Phase. Rather, the evidence at the Remedy Phase trial showed that DWCC's security staff continues to treat manifestations of mental illnesses as disobedience as opposed to symptoms, resulting in those inmates receiving discipline and extended stays on the South Compound. *See, e.g.,* Ex. PR-D-33 (sealed video showing use of force); Ex. PR-C at 305-306 [Rec. Doc. 716-40] (UOR showing inmate assigned to strip cell status following completion of suicide watch); Dempster Trial Tr. vol. VII at 1496:25-1497:4, 1497:25-1498:3 (witness had received 17 write-ups since May 2022 and was on mood stabilizer medication) [Rec. Doc. 710]. Indeed, Warden Goodwin testified that DWCC has "several offenders in maximum custody for disciplinary reasons" for behavior similar to that of an inmate on the mental health caseload who was documented throwing feces, spitting, and throwing his food tray, among other behaviors.  Goodwin Trial Tr. vol. XII at 2624:5-2628:21 [Rec. Doc. 710.]

### G.  Continued Use of Strip Cell

38.     DWCC policy continues to permit use of "strip cell status." Coleman Trial Tr. vol. I at 71:24-72:1 [Rec. Doc. 704]. On August 5, 2021, DWCC promulgated a revised version of DWCC

USOPP #34 "Maximum Custody Housing – General." Ex. JR-24 [Rec. Doc. 715-19]. In accordance with the revised policy, strip cell may be imposed on prisoners who throw human waste; throw or hurl any bodily fluid or substance (including spitting); store weapons, human feces or urine in any form inside of his cell in a container; throw any item from their cell at any person walking down the tier; throw items on the tier that might cause a safety hazard (soap, water, etc.); use belongings as a barricade or shield to prevent security from properly performing their duties; make threats of violence against another while in immediate possession of any personal belonging that might be used as a weapon such as a cup, bar of soap, pen, pencil, etc.; intentionally flood the cell; commit an act of violence on another person; or participate in a major disturbance. Stip. Facts, ¶ 33, Ex. JR-60 at 7 [Rec. Doc 715-54].  When asked to identify changes to the policy since March 2020, Col. Coleman identified that strip cell could last for 30 days under the old policy, but that provision was reduced to seven days, and prisoners now get to keep their mattresses in strip cell. Coleman Trial Tr. vol. I at 74:2-5 [Rec. Doc. 704]. The Department's Chief of Operations, Seth Smith, approved the revised policy in August 2021. Ex. JR-24 [Rec. Doc. 715-19.]

39.     It remains true that while on strip status, a prisoner has no clothing or personal property; they are given a paper gown and allowed to keep their mattress unless it is used as a shield or barricade, per the policy. Coleman Trial Tr. vol. I at 76:13-77:1 [Rec. Doc. 704]. Under the revised policy, the shift supervisor personally reviews every prisoner on strip cell status at least every four hours to ascertain if the prisoner's strip cell status is to be discontinued or not. *Id*. at 77:3-10. If a mattress remains out of cell for more than eight hours or past shift change, the shift supervisor must receive concurrence from the unit manager (Colonel Coleman) or a higher rank. *Id*. at 77:15-20. If a prisoner remains on strip cell status for more than 24 hours, the unit manager must authorize continuation of this status and document the decision on a UOR. Ex. JR-24 at 11. Prisoners who

continue to violate a rule that permits for the implementation of strip cell status or "who have a documented pattern of this type violent behavior" may remain on strip cell based on recommendation of the warden, deputy warden, or duty officer. *Id*. Prisoners are reviewed for release from strip cell status at least once every seven days by a review board that consists of the unit manager and a classification officer. *Id*. The policy does not state a maximum time. Coleman Trial Tr. vol. I at 79:1-4 [Rec. Doc. 704].  Plaintiffs introduced evidence of one inmate who remained on strip cell status for 21 or 22 days in December 2022. Ex. PR-Q-1 at 550-604 [Rec. Doc. 716-131]. Security staff still do not consult mental health before placing an inmate on strip cell. Ex. PR-BB-4, Mays Dep. at 11:11-16 [Rec. Doc. 714-4]. It continues to be imposed outside of regular disciplinary processes and without a hearing. Nail Trial Tr. vol. I at 151:6-8 [Rec. Doc. 704].

40.     Secretary Pacholke testified that strip cell status is not a practice that is the norm for modern correctional institutions and that even with the changes to the policy, the practice remains inconsistent with generally accepted penological practice, stating, "I think it is cruel and it is torture, and I can't imagine any one of us sitting here today that would be in a concrete bunker with a steel bunk with nothing on but a paper gown, be asked to stand there with nothing." Pacholke Trial Tr. vol. III at 548:5-9 [Rec. Doc. 706]. He further noted that there was no therapeutic aspect to this practice and that it potentially compromises the safety of staff and the prisoner population. *Id.* at 548:19-21. When asked why strip cell is not an appropriate way to address the behaviors listed in OPP #34, Pacholke testified that the practice was "dehumanizing." *Id.* at 550:13-23. In other jurisdictions, to address these behaviors, prisons may remove the inmate from the cell, clean the cell and clothe the inmate in an untearable smock, and provide an untearable blanket and mattress. *Id.* at 551:5-11. Pacholke also testified about the availability of tall Plexiglas shields that

are portable and can be used to prevent the throwing of objects from the cell. *Id.* at 551:12-15. He also noted that throwing urine and feces is often a sign of decompensation. *Id.* at 552:2-3. In response to Mr. Upchurch's opinion that strip cell was being used only as reasonably necessary, Secretary Pacholke noted that there is no publication or recommended practice to suggest that strip status is a technique corrections officials should employ. *Id.* at 553:7-10.

41.     Warden Goodwin testified that DWCC discussed eliminating strip cell in 2021, at the time that the policy was revised to bring it into compliance with Department policy; but there is no current plan to end the strip cell policy. Goodwin Trial Tr. vol. IX at 1922:13-1923:5 [Rec. Doc. 712]. Chief Smith testified that the use of strip cell in Louisiana is unique to DWCC. Smith Trial Tr. vol. VII at 1447:19-23 [Rec. Doc. 710].

### H.  Psychological Harms of Solitary Confinement

42.     Dr. Craig Haney testified that the scientific literature regarding the harmful effects of solitary confinement and segregated housing has not changed since the Liability phase trial. As Dr. Haney included in his recent report, there is a robust body of scientific literature that establishes the adverse psychological effects of solitary confinement and the severe risk of serious harm it poses for all prisoners who are subjected to it. In fact, Dr. Haney provided a summary and explanation of 46 different scientific studies and scientific literature that have been published on this topic just between 2018, when this case was originally filed, and the summer of 2022. Haney Trial Tr. vol. X at 2261:19-2263:22 [Rec. Doc. 713] and Ex. PR-AA-2 at 188-253 (Exhibit 3 to Haney Report) [Rec. Doc. 716-159]. He testified, "[T]here is little scientific doubt that solitary confinement or social isolation or restrictive housing . . . is an experience which places people at significant risk of serious harm." Haney Trial Tr. vol. X at 2263:7-11 [Rec. Doc. 713].

43.     Dr. Haney opined that the living conditions for men on the South Compound has not significantly changed.  Dr. Haney noted changes, including that prisoners in some tiers are given

modest amounts of additional out-of-cell time, that some are now able to attend psychoeducational groups, the creation of the working segregation unit, that men in working segregation receive some congregate recreation time, and that prisoners who are housed in N3 and N4 are now single-celled. *Id.* at 2186:7-2188:20. Dr. Haney did not observe anything that suggested that there is a greater level of awareness among staff as to the harmful effects of solitary confinement. *Id.* at 2189:4-21.

44.     Dr. Haney testified that working segregation remains restrictive housing because of the significant amount of time that prisoners spend in their cell, despite the other activities that they are allowed to participate in. *Id.* at 2195:13-19. "They spend upwards of 80 percent of any given week locked in their cells, and the activities which they are permitted to engage in, although not meaningless, are not necessarily a substitute for other forms of meaningful social contact and meaningful activity. . . It was out of cell time, which they appreciated, but it was not much more than that." *Id.* at 2195:19-2196:9. He also characterized CCR (N2D) as restrictive housing. *Id.* at 2198:21-24. This was because of the overall amount of time that people in CCR are in their cells—they receive one hour a week for class, and they go out for yard, but otherwise are locked in their cells. *Id.* at 2198:25-2199:6.

45.     Chief of Operations Smith testified regarding other Louisiana facilities that have permitted more congregate activities and reduced restrictive housing. For example, inmates on death row, even though they are maximum custody, are permitted to play basketball and are no longer required to be restrained every time they leave their cells. Smith Trial Tr. vol. VII at 1454:23-1455:21 [Rec. Doc. 710]. He also explained that other Department facilities can offer group programming or therapy to maximum custody prisoners because programming chairs are available that permit inmates to be restrained while participating in a group setting. *Id.* at 1457:15-1458:15. These have been deployed at Angola and at Elayn Hunt. *Id.* at 1458:18-20. This has permitted the Department

to reduce restrictive housing, which is one of the Department's goals. *Id.* at 1459:18-23.

46.    Chief Smith testified that there is a lot of literature supporting the idea that long-term restrictive housing has a negative effect on the mental health of the individual and that he shares that opinion. *Id.* at 1463:10-1464:2. The Department had previously worked with the Vera Institute to reduce its solitary confinement population. *See* J. LeBlanc Trial Tr.  vol. X at 2146:20-23 [Rec. Doc. 713]. However, Secretary LeBlanc pointedly denied that long-term solitary confinement is harmful and stated that the Department has no policy on that issue. *Id.* at 2169:16-2170:8.

### I.   ACA Accreditation

47.    That DWCC has received accreditation from the American Correctional Association does not necessarily mean that the prison satisfies constitutional and statutory requirements.  Secretary Pacholke provided the Court with an example of a facility, Walnut Grove, that was accredited by the ACA and then found to be housing residents in unconstitutional conditions. Pacholke Trial Tr. vol. III at 534:14-535:6 [Rec. Doc. 706]. Secretary Pacholke also discussed that the ACA has in the past lowered its standards without explanation.  *See id.* at 528:2-530:18.

48.    The audit report shows that the auditors relied at least in part on inaccurate information when assessing the facility. Mr. Upchurch agreed that it was important for facilities to provide accurate information to auditors. Upchurch Trial Tr. vol. XII at 2807:20-24 [Rec. Doc. 719]. Yet the ACA Audit report states that Warden Goodwin reported that there were no class action lawsuits against DWCC. Ex. DR-4 at 4 (DWCC-R 052184) [Rec. Doc. 718-1]; *id.* at 14 ("Over the last three years, the facility had no class action lawsuits."). Warden Goodwin asserted that contrary to the text of the audit report, he did report this lawsuit to the auditors, but the audit chair responded that since there had been no judgment in this case, the audit team did not need to consider it. Goodwin Trial Tr. vol. IX at 1936:18-1937:10 [Rec. Doc. 712]. Warden Goodwin said that he did not correct the written report after it incorrectly stated that the Warden had not reported a lawsuit.

*Id.* at 1938:3-7. A second inaccuracy occurs at page 11, where the audit report states that psychiatry was on-site at DWCC two days each month. Ex. DR-4 at 11. Yet, DWCC has only offered psychiatry services via tele-psych since March 2020. Goodwin Trial Tr. vol. IX at 1939:16-1940:1 [Rec. Doc. 712].

### J.   Proposed Injunction Regarding Conditions of Confinement and Discipline

49.   Plaintiffs respectfully suggest the following language for the Court's consideration as a potential injunction to remedy the constitutional violations:

*A.   The Court finds that inmates on the South Compound are exposed to a substantial risk of psychological harm and that Defendants are in violation of the Eighth Amendment due to policies causing or relating to social isolation, enforced idleness, and indefinite exposure to current conditions. Defendants shall implement policies, practices, and procedures to remediate the violation, which shall include the following provisions.*

*B.   Before issuing a disciplinary rule violation report ("RVR") to a person with mental illness (LOC 3 or LOC 4), a correctional officer must consult with the supervising psychologist or psychiatrist as to whether informal resolution is possible. If staff determines to proceed with the formal RVR, the psychiatrist or psychologist will conduct an out-of-cell interview with the person and will include in the RVR whether the person's mental health condition contributed to the behavior. If the person's mental health condition contributed to the behavior, then the psychologist or psychiatrist will note in writing whatever other findings he or she deems relevant for the disciplinary board and will recommend alternative interventions to the standard prison sanctions. The members of the disciplinary board will consider the psychologist or psychiatrist's findings and recommendations in determining whether and how to sanction an individual for an alleged rule violation.*

*C.   Before imposing punishment on an individual, the Chief of Security or Unit Manager will*

*consult with the supervising psychologist or psychiatrist. Any individual in segregated housing receiving two rule violations in a 15-day period shall trigger a review by the supervising psychologist or psychiatrist to ascertain whether the person's mental health is contributing to the disciplinary violations. Any individual receiving two rule violations in a 15-day period shall be interviewed by a mental health staff member for further evaluation.*

*D.      Individuals incarcerated at DWCC will not be subjected to use of force, additional time in segregation, loss of recreation, or loss of phone access due to talking too loudly, kicking the bars or "racking" the bars. Individuals at DWCC will not be punished for seeking medical or mental health care even if staff determines that the request was frivolous. Self-harm will no longer be a punishable rule violation at DWCC. Individuals at DWCC will not be punished for cutting or injuring themselves, or otherwise mutilating their bodies.*

*E.      Individuals at DWCC will not be punished for destruction of property where the act forming the basis of the rule violation was self-harm or self-injurious behavior. Individuals attempting to hang themselves using torn jumpsuits or sheets will not be charged with destruction of property or any other rule violation. Individuals who cut or mutilate their person will not be charged with destruction of property or any other rule violation. Individuals at DWCC will not be punished for possession of contraband where the act forming the basis of the rule violation was self-harm or self-injurious behavior. Individuals attempting self-harm by possession of a razor or a large number of pills will not be charged with possession of contraband or any other rule violation.*

*F.      Rule 34/"strip cell" will no longer be employed at DWCC.  Food loaf will no longer be utilized at DWCC.*[5]

---

[5] "Food loaf" is a "baked, non-seasoned, loaf-shaped meal preparation, which consists of items listed on a facility's

G.      DWCC will place people in segregated housing only for those rule violations and durations outlined in the Disciplinary Matrix.

H.      All people who are held in segregated housing will be provided with a minimum of twenty hours of out of cell time every week, and more as the person's security classification allows. Ten of the hours provided out of cell will be spent in structured programming. Ten of the hours provided out of cell will be spent in unstructured time. DWCC also will provide people housed in segregated units with library books, tablets, GED and religious services, individual psychotherapy, group therapy and special programs. DWCC will make reasonable accommodations to ensure that people with disabilities can access these programs and services. Individuals may also be permitted additional out of cell time if mental health staff advise that such time would be beneficial, and that request is approved by security staff. Any additional out of cell time will be documented and reflected in that individual's electronic medical record.

I.      All staff working in specialized or segregated housing units, including mental health, security, and medical staff, will be provided with specialized training on working with people with mental illness, recognizing the signs and symptoms of mental illness, de-escalation tactics, collaborating with medical staff, the basics of creating and maintaining reports, identifying prisoner behavior that requires staff to engage him or her in a more extensive treatment planning process, and other matters of particular concern to staff working in restrictive housing. This training will reflect the protocols and the resources available at DWCC.

J.      The classification board will eliminate the current rubric for evaluating suitability for return to the general population, including criteria such as "poor attitude" and "serious nature

---

master menu combined together, which meal preparation shall meet all nutritional standards and shall meet all caloric requirements." Ex. JR-1 at 5 (Policy IS-B-4) [Rec. Doc. 715-1]. Food loaf continues to be used at DWCC. Coleman Trial Tr. vol. I at 93:3-7 [Rec. Doc. 704] (inmate placed on food loaf); *see also* Ex. JR-1 at 12 [Rec. Doc. 715-1] (authorizing use of food loaf).

*of past offenses" as acceptable justifications for the use of segregation. DWCC will draft policies and procedures for the classification board which operate from a presumption that the person will be returned to general population, with the only exception being a new disciplinary infraction punishable by segregation under the disciplinary matrix.*

*K.      Within 180 days of the date that the injunction is issued, DWCC will transfer people out of segregation and into general population or an appropriate treatment setting in accordance with the criteria above. Individuals who are both within twelve months of release from custody and have a mental illness or qualifying disability will be the Priority Level One for such transfer or reclassification. Individuals who are either within twelve months of release from custody or have a mental illness or qualifying disability will have Priority Level Two. All other individuals eligible for transfer out of segregation will be Priority Level 3.*

*L.      Within 14 days after the injunction is effective, DWCC will provide a list of the individuals at each priority level and the status of their removal from segregation. On each Monday after the list is provided, DWCC shall provide an updated list indicating: the listing of every person housed in N1 through N4, their housing assignment, the basis for their being in segregated housing, the date they were placed in segregated housing, and the identity of everyone removed from segregation the preceding week and where the person has been transferred. If an individual is not transferred according to priority, the list will include a brief explanation of why and what steps are being taken.*

*M.      Within 180 days of the effective date, DWCC will draft policies and procedures reflecting the above limitations on the use of segregation. Those policies will establish new classification and security procedures for moving individuals from segregation into general population or treatment settings. Those policies will establish step down units and transfer programs for all*

23

*individuals.*

## IV. Mental Health Screening and Evaluation

50.     The trial evidence demonstrated that inmates with serious mental illnesses are assigned to the South Compound without proper screening or evaluation for whether subjecting those inmates to the conditions in those units will subject them to serious psychological harm or mental torture. Through expert and other testimony, documentary exhibits, and video evidence, Plaintiffs demonstrated that inmates assigned to the South Compound are not properly evaluated to see if their mental state can withstand the rigors of the conditions. *See, e.g.,* Burns Trial Tr. vol. VII at 1550:13-1552:5 [Rec. Doc. 710] (discussion of inmate Belton reporting active hallucinations); *id.* at 1631:23-25 ("[P]eople that I observed there had active hallucinations and were not being excluded or removed from segregation."); Haney Trial Tr. vol. X at 2243:20-2244:18 [Rec. Doc. 713] (unable to speak with an inmate because he was "agitated, rambling, incoherent" and "in distress"); *id.* at 2245:19-2246:19 (inmate experiencing grandiose delusions and incoherent); Ex. PR-D-33 (sealed video showing inmate experiencing psychotic episode) [Rec. Doc. 716-48]; Ex. PR-D-37 (video showing inmate engaging in self-cutting behavior) [Rec. Doc. 716-48].

### A. Intake Screening

#### 1. The DWCC Mental Health Director Is Still Unqualified.

51.     The problems with DWCC's screening practices and procedures start at intake. For one, Steve Hayden is still the primary person completing the intake screenings for individuals who arrive at DWCC from other facilities. Hayden Trial Tr. vol. V at 993:14-17 [Rec. Doc. 708]. Hayden testified that the process for completing a mental health intake screening at DWCC is unchanged from prior to March 2020, other than that diagnostic reports now typically arrive when or before inmates arrive at DWCC. *Id.* at 993:18-994:19. Other staff testified similarly. James Burgos, Burgos Trial Tr. vol. III at 698:7-10 [Rec. Doc. 706]; Michele Dauzat, Dauzat Trial Tr.

vol. VI at 1196:2-4 [Rec. Doc. 709]; and Ariel Robinson, Robinson Trial Tr. vol. IX at 2103:8-12 [Rec. Doc. 712].

52.     The Court previously determined that Steve Hayden is unqualified to conduct the duties of a mental health staff member providing direct care. Rec. Doc. 641, p. 74. That remains true. He has not received any additional licensure or otherwise enhanced his qualifications. Hayden Trial Tr., vol. V at 960:20-25 [Rec. Doc. 708]. Despite having mental health staff at DWCC who are licensed and qualified to complete the mental health intake screening, such as Julia Spivey, Ms. Robinson, or Mr. Burgos, Mr. Hayden remains primarily responsible for completing them. He also continues to supervise the licensed mental health staff at DWCC, including Mr. Burgos and Ms. Robinson, though he does not routinely review documentation they create. *Id.* at 959:24-960:1. Yet Mr. Hayden lacks the prerequisite qualifications to supervise Mr. Burgos and Ms. Robinson, as who are licensed clinicians. As Dr. Burns testified, "[H]e doesn't have the licensure, the credential, or the education and training to be able to do what he is charged [with] doing, according to every definition of what a mental health professional is." Burns Trial Tr. vol. VII at 1627:2-5 [Rec. Doc. 710].

53.     The Court expressly asked Blake LeBlanc, the Mental Health Director for the Department (B. LeBlanc Trial Tr. vol. VI at 1311:7-12 [Rec. Doc. 709]), about Mr. Hayden's lack of qualifications. He testified, "[W]hen I have conversations with Steve about correctional matters, he seems really knowledgeable about these things. And, you know, it – it hasn't concerned me, Judge, not –  no, it hasn't. . . . You know, whether or not the letter of this is -- is up to what ya'll's interpretation is, I can't speak to that." *Id*. at 1381:8-17.

54.     Under the Department's own policies, Hayden is not qualified to perform a mental health screening. The Department's classification policy, No. IS-B-4, requires that mental health

25

screening be conducted by a "qualified mental health professional or mental health care trained professional." Ex. JR-1 at 5. [6] Although Hayden does not meet this standard, since he is not a qualified or trained mental health professional, Deputy Warden Dauzat maintained that Hayden is competent and qualified to perform the duties of his position. Dauzat Trial Tr. vol. XI at 2365:15-18 [Rec. Doc. 717]. Dauzat's disregard of the need for properly trained and qualified staff to conduct screening—especially considering that the South Compound has experienced two completed suicides since March 2020—is further evidence of DWCC officials' continuing deliberate indifference to the lack of proper mental health treatment at DWCC.

55.     The defense suggested that Mr. Hayden need not be licensed to conduct intake because most inmates arriving at DWCC were already screened at Elayn Hunt Correctional Center and because Warden Dauzat reviews his work. Dr. Burns explained that individuals' mental health status is not static and that effective intake screening is necessary to identify inmates with mental illness and connect them with needed services. Burns Trial Tr. vol. VII at p. 1626:1-17 [Rec. Doc. 710]. Blake LeBlanc acknowledged that not every decision by Mr. Hayden is overseen by Warden Dauzat. B. LeBlanc Trial Tr. vol. VI at 1381:3-4 [Rec. Doc. 709].

### 2. Information Regarding Mental Health Disabilities Is Not Considered at Intake.

56.     Information from the intake screening is also not effectively communicated to staff who are making the classification decision. The documentation prepared by the mental health staff person includes a space for a recommendation as to that inmate's placement. Ex. PR-B-16 at 235. The staff making the classification decision do not see the mental health intake form prepared by

---

[6] Despite remaining as the Mental Health Director for DWCC, Hayden is still not a "mental health care practitioner/provider/professional" within the meaning of Policy No. IS-B-4. Ex. JR-1 at 5 [Rec. Doc. 715-1]. The policy defines a "mental health care practitioner/provider/professional" as one "qualified to diagnose and treat patients with mental illness, . . . in accordance with each health care professional's scope of training and applicable licensing, registration, certification, and regulatory requirements." *Id.*

the mental health staff. Kimball Trial Tr. vol. I at 252:2-15 [Rec. Doc. 704]. Classification Officer Kimball testified that the board would take an individual's mental health needs into consideration if the mental health professional identified the individual as actively psychotic, but that had never happened at a board he participated in. *Id*. at 221:2-7. Assistant Warden Kayla Sherman, who oversees the classification department, confirmed that classification does not have access to the mental health screening form and no one from mental health participates in the initial classification decision. Sherman Trial Tr. vol. II at 349:12-23 [Rec. Doc. 705]. Kimball testified that the mental health staff person who completes the mental health intake would need to convey any information verbally to the initial classification board. Kimball Trial Tr. vol. I at 221:2-7 [Rec. Doc. 704]. Indeed, if an inmate is on medication for a serious mental illness, the initial classification board is not informed. *Id.* at 222:18-23. Assistant Warden Sherman testified that she does not believe that the classification recommendation on the mental health screen relates to the inmate's housing. *Id.* at 351:3-12.

### B.  Inadequate Screening on Reassignment from Other Parts of DWCC

57.     Screening deficiencies do not exist solely at intake; the screenings that should occur when an individual is re-assigned to the South Compound from another part of the prison for a rule violation are also inadequate. Policy, and actual practice as confirmed by James Burgos, require that when a prisoner is transferred to the South Compound, a mental health appraisal must be conducted within seven days of placement using Form IS-B-4-a ("Mental Health Restrictive Housing Appraisal"). Ex. JR-11 at 5; Burgos Trial Tr. vol. IV at 731:11-734:16 [Rec. Doc. 707]; Ex. PR-P-1 *in globo* (exemplar forms). The form is designed to capture an inmate's affect, attitude, coherent speech, and other mental evaluation factors. Burgos Trial Tr. vol. IV at 733:4-7 [Rec. Doc. 707]. Yet Mr. Hayden primarily conducted these screenings during the relevant period. *Id.* at

27

742:4-6. As discussed previously, Mr. Hayden was not qualified to do so. Mr. Hayden testified that if an inmate reports concerns, they are often not identified on the form. Hayden Trial Tr. vol. V at 1086:2-1087:24 [Rec. Doc. 708]. He agreed, however, that completing the form is like conducting a mental status exam. *Id.* at 1085:18-23. Deputy Warden Dauzat testified that the purpose of these screenings (the IS-B-4-a form) was to comply with new regulations from the Fifth Edition ACA Standards, but she did not believe that it was designed to evaluate the appropriateness of placement into segregation. Dauzat Trial Tr. vol. VI at 1245:14-1246:11 [Rec. Doc. 709].

58.     The completed forms themselves also show that staff appear to continue to be copying information from one form to another rather than performing an individualized analysis for each screening. Burgos Trial Tr. vol. III at 738:1-740:17 [Rec. Doc. 706] (agreeing that the narratives on the forms that are discussed are all substantially the same). Dr. Burns reviewed some of these appraisals and did not find them sufficient substantively. Burns. Trial Tr. vol. VIII at 1733:3-20 [Rec. Doc. 711]. She observed examples where inmates acknowledged hallucinating or were described as psychotic, but they were not removed from restrictive housing. *Id.* at 1733:13-20.

### C.  Lack of Effective Rounds

59.     Once in the South Compound, men can destabilize. After men are assigned to segregated housing, per policy they should receive a weekly visit from a mental health staff person. Ex. JR-15 at 9. In fact, the mental health rounds are not conducted on a weekly basis on all tiers in all buildings on the South Compound. Moreover, the rounds that are conducted are cursory and are not documented by any mental health staff. The Court received testimony and evidence that rounds performed by Mr. Hayden on a tier lasted as long as only two to five minutes. Hayden Trial Tr. vol. VI at 1075:11-1076:23 [Rec. Doc. 709]; Sherman Trial Tr. vol. II at 370:1-17 [Rec. Doc. 705]; Ex. PR-X-5 (tier logbook excerpt). It would be impossible to visit effectively with each inmate on a tier in that short amount of time. Burns Trial Tr. vol. VII at 1545:23-1546:6 [Rec. Doc. 710].

Mental health staff do not keep a record otherwise of mental health rounds being completed. *Id.* at 1542:6-1543:21. Class member Azarias Heard testified that he only observed a mental health staff person on the tier if someone made a mental health emergency. Heard Trial Tr. vol. VII at 1504:7-9 [Rec. Doc. 710]. Heard testified that he tried to stop Steve Hayden on the tier to get assistance for another inmate, but Hayden would not stop. *Id.* at 1504:13-18. Dr. Burns also reviewed the prior testimony of mental health staff and noted it was a problem that staff did not stop at every cell to check in on each inmate. Burns Trial Tr. vol. VII at 1544:5-15. As Dr. Burns testified, when people with a serious mental illness are decompensating, there may be signs, such as the person taking less care about personal appearance or hygiene or other symptoms of social withdrawal. *Id.* at 1544:16-1545:16.

60.     Staff are purportedly utilizing an improved "Badge Pass" system that was implemented in April 2022. Nail Trial Tr. vol. I at 181:5-182:24 [Rec. Doc. 704]. Dr. Burns testified that she understood that the Badge Pass system was installed in June 2022, based on Defendants' interrogatory responses. Burns Trial Tr. vol. VII at 1543:11-15 [Rec. Doc. 710]. However, this new badge tracking system does not document the adequacy of rounds. The pass system only indicates whether staff, including mental health staff, were on and off a tier; it does not indicate whether they spoke with anyone nor whether they conducted rounds. *Id.* at 1542:19-1543:20.

### D.  Underinclusive Definition of Serious Mental Illness

61.     Another continuing issue with the identification of inmates with mental illness is that even if an inmate is identified by staff for signs of mental illness, they may not receive sufficient treatment, because the Department's definition of "serious mental illness" has not changed since March 2020 and remains underinclusive. *Id*. at 1539:9-15. The definition is provided by the Department's mental health program policy, HCP27. Ex. JR-3 at 2. An SMI is limited to six specified diagnoses; inmates who have other disorders, no matter how debilitating, will not have

an SMI per policy.[7] As Dr. Burns testified, "[T]he definition in use fails to acknowledge the functional component of mental illness, which is recognized in other places . . . including the American Correctional Association, who does include a functional component to their definition of mental illness." *Id.* at 1541:20-1542:1.

62.     Moreover, the testimony revealed problems with the Department's definitions for various Levels of Care. The Levels of Care still range from 1 to 5 and are provided by the Department's mental health program policy, HCP27. Ex. JR-3. DWCC continues to only receive inmates who are a Level of Care 3 or higher. Per policy, Level of Care 3 is "assigned to offenders who have a SMI and who have been in remission or have been stable for at least six months." JR-3 at 7. A Level of Care 3 inmate "is stable, functional and has no major problems with compliance." *Id.* Mental health staff must have an individualized contact with these inmates at least once every 90 days (without regard to where they are housed). *Id.* A Level of Care 4 inmate is an inmate "with any diagnostic impression, excluding SMI, addiction disorder diagnosis, or those requiring mental health interventions within the previous 12 months." *Id.* at 8. These inmates are to receive an individualized contact at least once every 180 days. *Id.* Thus, per policy, only individuals with an SMI may be a Level of Care 3.

63.     Mr. Blake LeBlanc testified that the Department's policy does not state an accurate definition of the Levels of Care, stating, "That is what it says, but I would still say that, even if you are not an SMI, you can be level of care 3, 2, or 1." B. LeBlanc Trial Tr. vol. VI at 1330:20-21 [Rec. Doc. 709]. In response to a question from the Court, Mr. LeBlanc further testified that "it is not exactly clear." *Id.* at 1333:10-11. He testified that anyone who is having significant functional

---

[7]     The diagnoses are major depressive disorder, schizophrenia, schizoaffective disorder, bipolar disorder, unspecified schizophrenia spectrum, or severe anxiety disorder. Ex. JR-3 at 2 [Rec. Doc. 715-3].

problems may receive a lower level of care (meaning greater treatment and monitoring), but that "[p]erhaps we should spell that out a little bit better in policy, though." *Id.* at 1333:12-20. Considering that DWCC security staff receive a list of inmates who are Level of Care 3, so that mental health may be called before a use of force is made against a seriously mentally ill inmate,[8] the Court asked Mr. LeBlanc whether that SMI list would be underinclusive of people who are appropriately Level of Care 3. Mr. LeBlanc responded that he did not know the answer, and that even though within the Department it is his responsibility to make sure that DWCC applies level of care evaluations in a proper manner, "this is a nuance of the policy that, quite frankly, I did not anticipate." *Id.* at 1334:9-1335:22. Dr. Burns noted that an inmate's functioning should be a part of the inmate's level of care assessment, based on how often they need to be seen or their degree of stability. Burns Trial Tr. vol. VII at 1548:14-23 [Rec. Doc. 710].

64.     Mr. LeBlanc's testimony reveals that the Department's Level of Care policy fails to include in fact a functional component for mental illness. As a result, men housed on the South Compound are not properly identified for proper care, receive inadequate treatment and mental health contacts, and are potentially subject to uses of force without any potential intervention by mental health staff.

### E.     Other Evidence Regarding Inadequate Identification and Screening for Mental Illness

65.     The inadequacy of DWCC's screening process was on first-hand display during the incident captured on video and shown on the first day of trial, in which officers used chemical spray on an inmate who was having a psychotic episode. Ex. PR-D-33. In that case, after the

---

[8] The most recent version of DWCC's use of force policy provides that when time permits, mental health must be notified before a use of force is applied to an inmate who is Level of Care 3. Coleman, vol. I at 28:18-299 [Rec. Doc. 704]; Ex. JR-9 [Rec. Doc. 715-9]. A list of inmates who are Level of Care 3 is generated by Aerial Robinson and distributed to security staff so that it may be consulted before a use of force is applied. Robinson Trial Tr. vol. IX at 2031:11-18 [Rec. Doc. 712].

officers applied chemical spray to the inmate, Steve Hayden was called to speak to the inmate. Hayden had an opportunity to intervene but did not, presumably because he failed to correctly identify the inmate as having active psychosis. As discussed below, inmates who are actively psychotic are to be transferred immediately to treatment segregation per policy. Hayden later testified that he was not sure, but that he believed the individual in the video was in fact actively psychotic. Hayden Trial Tr. vol. V at 1108 [Rec. Doc. 708]. Dr. Burns testified that based on her observations of the video, Hayden did not intervene appropriately with an inmate experiencing a great deal of mental distress. Burns Trial Tr. vol. VII at 1538:19-21 [Rec. Doc. 710].

### F.  Proposed Injunction Regarding Mental Health Screening and Evaluation

66.    The Court's decree should address the plain lack of effective screening at DWCC, which results in the continuing placement of inmates with serious mental illness in housing conditions that subject them to risk of significant harm from mental distress. Plaintiffs respectfully recommend the following language for the Court's consideration in issuing its decree:

*Defendants shall institute procedures to ensure that inmates who are suffering from serious mental illness are timely identified. Defendants shall:*

*A.     Implement and maintain comprehensive policies and procedures, in accordance with generally accepted correctional standards, relating to the timing and content of mental health screenings. These policies should include definitions of emergent, urgent, and routine mental health needs and time frames for provision of services in each category.*

*B.     Develop and implement an appropriate screening instrument that identifies mental health needs and ensures timely access to a mental health professional when presenting symptoms that require such care. The screening instrument will be validated by a mental health professional*

*identified by the Monitor[9] and reviewed annually until the injunction otherwise terminates. Within 90 days, the parties will convene with their experts to create screening protocols and standardized forms for documenting encounters consistent with these terms. Each of these screenings and assessments is to take place out of cell in a confidential setting. A confidential setting is one that does not include security personnel.*

*C.      Ensure that a qualified mental health professional screens all inmates arriving at DWCC no later than eight hours after arrival for signs of mental illness and risk of suicide or self-injury.*

*D.      Ensure that no person is held in isolation or restrictive housing more than eight hours before they are screened by a qualified mental health professional, whether transferred from another facility or from the general population at DWCC.*

*E.      Ensure that a qualified mental health professional assesses inmates after the first 24 and the first 48 hours in restrictive housing.*

*F.      Conduct follow-up screenings by a qualified mental health professional after seven days in restrictive housing and every seven days thereafter.*

*G.      Ensure that qualified mental health staff make daily visits to the segregated housing units, walk through each tier, and speak with any inmates who would like to speak with them. Rounds will be memorialized on a Round Sheet form that identifies, at a minimum: tiers visited, time of entry onto and time of exit from the tier, people spoken with, cell locations, and any observations. Staff will offer out-of-cell individual visits to anyone housed there. Round sheets will be submitted to the mental health director at the end of each shift and will be entered into an electronic medical record database for supervisory review and access for coordination of care with other providers. Rounds include, at a minimum: a review of duty post logs/tier logs and segregation unit record*

---

[9] As discussed below, Plaintiffs recommend that the Court exercise its discretion under Rule 53 of the Federal Rules of Civil Procedure to appoint a Special Master/Monitor to oversee post-trial proceedings to ensure compliance.

*sheets for information about prisoner participation in recreation, showers, meal consumption and sleep patterns; discussion with the post officer(s) as to whether they have noticed any behavior changes of any person; walking through the segregated housing unit, stopping at every cell and making visual contact with the people inside the cell; verbal communication with the prisoners including a brief inquiry into how the prisoner is doing, whether he/she needs to talk to mental health privately or has any other mental health need; and documenting the condition of the prisoner's hygiene, behavior, affect, physical condition, and the condition of the cell.*

*H.      Provide any individual in segregation who is placed on suicide watch, makes a suicide attempt, makes any expression of suicide ideation, makes a suicidal gesture, engages in any aggression to self that results in injury, refuses to maintain hygiene for seven days, has a significant change in mental status and/or behavioral functioning, is referred by security staff, suffers a traumatic event, is reported by others on the tier to be in crisis, or self-reports to be in mental health crisis with a crisis screening within 24 hours.*

## V.   Mental Health Treatment

67.      The trial evidence showed that even if inmates are identified as having a serious mental illness, they still receive inadequate treatment. Defendants have not remedied the deficiencies in psychiatric and mental health treatment that the Court identified in its Liability Phase opinion.

### A. Continuing Complaints by Class Members regarding DWCC Mental Health Treatment

68.      At the outset, the evidence demonstrated that DWCC continues to receive requests from class and subclass members requesting improved treatment for mental illness, but all such ARPs have been denied by DWCC. Steve Hayden testified that all ARPs for mental health related issues would come for him for a response. Hayden Trial Tr. vol. V at 1111:5-9 [Rec. Doc. 708]. However, he testified that he does not recall receiving any ARPs with complaints about mental

health since March of 2020. *Id.* at 1111:10-13. By contrast, Warden Goodwin identified several ARPs during his testimony which DWCC considered to be a complaint regarding the denial of adequate mental health care. Goodwin Trial Tr. vol. VIII at 1859:22-1860:2 [Rec. Doc. 711](confirming that an inmate alleged that correctional staff interfered with mental health treatment), 1861:21-1862:8 (confirming that an ARP is related to mental health), 1867:5-10 (similar), 1869:9-1870:10 (similar); *see also* Ex. PR-M-1 at 92-113, 179-191, and 236-278.

## B. Understaffing

69.     Following the liability phase, this Court determined that DWCC suffered from inadequate staffing levels and psychiatric time and that the prison psychiatrist was not providing meaningful information to staff, especially regarding suicide watch and strip cell status. Rec. Doc. 641 at 122. While DWCC has increased the number of mental health staff positions, the prison remains understaffed; the concerns raised by the Court have not been addressed; and indeed, some of the problems have grown worse.

70.     Dr. Seal remains the only psychiatrist. Seal Trial Tr. vol. III at 617:18-24 [Rec. Doc. 706]. In July 2021, Dr. Seal moved to Texas. *Id.* at 617:25-618:4. There is therefore no direct psychiatric service at the prison. Dr. Seal only sees patients at DWCC via Zoom telemed. *Id.* at 618:17-18. His hours have increased. Because he is no longer traveling to the prison, he does not include travel time in his contract hours. *Id.* at 619:6-620:23. His employment remains part-time; as of August 2022, he was now available to see patients for four hours twice a week, for a total of eight hours a week. *Id.* at 621:13-14. The increase in Dr. Seal's hours does not resolve the adequacy of psychiatric care, especially since he may only see patients with severe mental illness now on Zoom. Moreover, the evidence showed that there are weeks during which Dr. Seal does appear at all or appears only one day in a week. Ex. PR-T-2 (summary calendar exhibit) [Rec. Doc. 716-136].

71.     Dr. Julia Woods is a psychologist who was employed at DWCC for a few months at the

end of 2021. Burgos Trial Tr. vol. IV at 804:12-17 [Rec. Doc. 707]. Dr. Woods provided clinical services to inmates on the South Compound. *Id.* at 804:20-22. She would write clinical notes regarding her encounters that were significantly more robust than notes prepared by other clinicians at DWCC. *See* Ex. PR-U-1. She resigned because the environment at DWCC was "not right for her." Hayden Trial Tr. vol. V at 976:16-18 [Rec. Doc. 708]. Since Dr. Wood left, her position has remained vacant. Goodwin Trial Tr. vol. XII at 2681:5-7 [Rec. Doc. 719]. DWCC has advertised the position, gone to job fairs, and asked by word of mouth, to no avail. *Id.* at 2637:14-2638:4. DWCC personnel have not studied why new candidates have not been able to be attracted or identified. *Id.* at 2681:11-15.

72.     Since March 2020, DWCC added an additional new mental health staff member, Julia Spivey. Robinson Trial Tr. vol. IX at 2027:16-19 [Rec. Doc. 712]. Ms. Spivey works solely on the North Compound, which has freed Mr. Burgos and Mr. Hayden to work primarily on the South Compound. *Id.* at 2027:20-25. However, since Steve Hayden is now primarily assigned clinical duties for Buildings N1 and N2, inmates in those housing units do not regularly receive mental health contacts with a qualified clinician. *See, e.g.,* Burns Trial Tr. vol. VII at 1603:17-24 [Rec. Doc. 710] ("Mr. Hayden can't do independent work, based on what his education is, which is not clinical, much less supervise people that are higher credentialed than him."). At the time of trial, two other mental health positions were unfilled at the prison. Goodwin Trial Tr. vol. XII at 2638:5-9 [Rec. Doc. 719]. Warden Goodwin has made no inquiry as to why these vacancies persist other than discussing it with HR at DWCC and asking whether anyone applied. *Id.* at 2682:5-16.

73.     Dr. Burns maintained her recommendation from the Liability Phase that a staffing plan analysis be performed to determine the number of staff that are necessary. Burns Trial Tr. vol. VII at 1601:3-1602:1 [Rec. Doc. 710]. The plan should accommodate the participation of the prison

psychiatrist in treatment team meetings, to see people in treatment segregation, to see people on suicide watch, and to provide additional education about medication to inmates. *Id.* at 1601:13-21. Dr. Burns also testified that it would be beneficial to hire another psychologist at DWCC because psychologists can independently diagnose and provide individual and group treatment. *Id.* at 1607:19-1608:3. The staffing analysis would allow a calculation of the appropriate staffing ratio based on the current census on the South Compound and what services are offered, including the ability to provide some group treatment and activities. *Id.* at 1657:11-1658:10.

### C.  Creation of Mental Health Treatment Plans

74.     In its Liability Phase opinion, the Court identified deficiencies in Defendants' failure to individualize treatment plans, which is part of the minimum standard of care. Rec. Doc. 641 at 86-89. DWCC has changed the forms that it uses for the plans, but these plans remain a problem.

75.     Per the Department-level policy governing its mental health program, a treatment plan is "a written assessment of individualized needs, required services and intervention, including short-term and long-term goals, measurable outcome, and the roles of health care/non health care personnel for the purpose of providing necessary treatment and services in accordance with the patient's identified needs and problem areas." B. LeBlanc Trial Tr. vol. VI at 1325:13-22 [Rec. Doc. 709]; Ex. JR-3 at 2 [Rec. Doc. 715-3]. All individuals identified as a Level of Care 3 or 4 receive a treatment plan. Burgos Trial Tr. vol. III at 698:23-699:1 [Rec. Doc. 706]. Per policy treatment plans are to be reviewed at least annually and may be reviewed more frequently if clinically indicated. Ex. JR-3 at 9.

76.     DWCC began using a new form sometime in mid-2021 to document treatment plans because the prior forms were very general and not individualized. Burgos Trial Tr. vol. III at 700:7-17 [Rec. Doc. 706]. The new forms were implemented following discussions between Blake LeBlanc and Warden Dauzat, and the forms were approved by Warden Goodwin. Goodwin Trial

Tr. vol. IX at 1913:6-1914:7 [Rec. Doc. 712]. The new forms provide a space for mental health staff to document an individual's diagnosis and treatment goals. Ex. PR-B-1 at 74 (exemplar form). The new forms also contain sections for identification of need areas, action plans, and the staff responsible for assisting the inmate with achieving the goals/action plan. *Id.* Individuals with the same diagnosis may have the same goals. Burgos Trial Tr. vol. III at 699:24-700:1 [Rec. Doc. 706]. Medication compliance is also common to most treatment plans. *Id.* at 700:2-6.

77.     Despite the roll out of these new forms, problems remain. The forms are still not individualized and there is no evidence that they are guiding care. This may be because staff were not properly trained to use them. DWCC staff did not receive any written guidance on how to complete the forms. *Id.* at 701:2-4. Staff also did not receive any formal training on the forms. Dauzat Trial Tr. vol. VI at 1199:9-13 [Rec. Doc. 709]. Staff are unclear on protocols. For example, Mr. Hayden testified at trial that the plans would not be updated based on a change in housing, but he testified at deposition that a change in housing would necessitate an update to the plan. Hayden Trial Tr. vol. V at 1009:9-1010:15 [Rec. Doc. 708].

78.     Dr. Burns testified that while the new treatment plan format is an improvement, because unlike before all prisoners do not have the same treatment plan, Burns Trial Tr. vol. VII at 1581:6-25 [Rec. Doc. 710], the new forms still do not address the reasons why a treatment plan is created. The purpose of a treatment plan is to "show what the problems are, what the interventions will be, . . . what frequency they'll be given, what the objectives are, and measure progress toward goal attainment." *Id.* at 1581:11-15. Dr. Burns noted that her recommendations were not to make the plans perfect, but only up to the Department's own standards. *Id.* at 1582:23-1583:3. Dr. Burns' review of plans created by DWCC mental health staff revealed no evidence that later care was guided by the plans. Dr. Burns testified that Dr. Seal does not use the plans and that based on her

review of notes created by mental health staff, "the notes don't relate back to the plan." *Id.* at 1582:7-22. Moreover, not everyone involved in the inmate's care participates, or is even aware of, the treatment plan. *Id.* at 1581:16-25. Moreover, the treatment plans often consist of generic statements without including measurable goals, and they do not provide for individual or group counseling. *Id.* at 1583:16-1585:5.

79.     In addition, Dr. Seal affirmed in his testimony that he continues to have no direct input into the creation of the treatment plans. As Dr. Seal testified, "Whether part of the treatment plan had been initiated before I see them, I don't know. I just know that I've known that the staff can add my part to the treatment plan at the time I am seeing the inmate." Seal Trial Tr. vol. III at 670:2-5 [Rec. Doc. 706]. Moreover, the trial testimony was that Dr. Seal does not consistently receive the treatment plans for review. Dr. Seal testified that sometimes he receives a treatment plan, sometimes not, *id.* at 670:16-18. Ms. Robinson testified that she does not send them for his review when preparing the documents to send to him ahead of psychiatric clinics. Robinson Trial Tr. vol. IX at 2036:24-2037:2 [Rec. Doc. 712]. Dr. Seal is still not participating in treatment team meetings, he is still not apprised or consulted when prisoners are placed on suicide watch, put into clinical restraints, placed on strip cell, or moved to treatment segregation. Ex. PR-AA-1 at 15 (Burns Report) [Rec. Doc. 716-155].

80.     In short, the process for the creation of treatment plans to care for inmates with mental illness has not been adequately remedied. Even to the extent that the new treatment plan forms are an improvement, there is no evidence that Dr. Seal uses the plan to prescribe actual treatment or that staff are providing other therapies to address goals and items identified in the treatment plan.

### D. Psychiatric Treatment

81.     Prescription of psychotropic medications remains the primary form of psychiatric treatment at DWCC. Dr. Seal testified that he does not prescribe group or individual therapy for

inmates. Seal Trial Tr. vol. III at 670:25-671:4 [Rec. Doc. 706]. Dr. Burns testified that she noted some groups are being offered for prisoners in working segregation. Burns. Trial Tr. vol. VII at 1568:2-4 [Rec. Doc. 710]. Group treatments remain unavailable, however, to inmates in N2C, N2D, N3, or N4. *Id.* at 1568:4-6. Dr. Burns also testified that she did not see much improvement in provision of counseling or individual therapy. *Id.* at vol. VIII, 1735:22-1736:5 [Rec. Doc. 711].

82.     That Dr. Seal is now available to see patients only via Zoom is also a problem. If an inmate refuses to leave his cell or has been placed on suicide watch, for example, Dr. Seal has no way to see him. Seal Trial Tr. vol. III at 630:5-8 [Rec. Doc. 706]. Especially considering that there have been two completed suicides at DWCC since March 2020, the inability of DWCC to provide direct psychiatric services is problematic. Dr. Seal does not have an understanding of the conditions of extreme suicide watch. *Id.* at 685:3-5. As Dr. Burns testified, a clinician should know the conditions of suicide watch, the conditions of the housing units, and be able to observe clinicians for whom the psychiatrist has some supervisory authority as the chief psychiatrist for the prison. Burns Trial Tr. vol. VII at 1568:21-1569:8 [Rec. Doc. 710]. Indeed, Dr. Burns contrasted Dr. Seal's lack of direct observations of conditions at DWCC unfavorably to the actions of Blake LeBlanc, who performs a direct, in person review of a facility when he conducts a suicide review. *Id.* at 1569:9-18.

83.     Zoom visits with Dr. Seal's patients on the South Compound are now held in the N4 "courtroom." Burgos Trial Tr. vol. III at 798:21-799:6 [Rec. Doc. 706]. Prior to Dr. Seal's clinics each week, Aerial Robinson compiles records for inmates with upcoming appointments on a Google Drive and sends them to Dr. Seal. Robinson Trial Tr. vol. IX at 2036:8-15 [Rec. Doc. 712]; Seal Trial Tr. vol. III at 624:19-25 [Rec. Doc. 706]. The materials that Robinson gathers include Dr. Seal's prior notes and mental health records from prior prisons or physicians' notes about

current treatment. *Id.* at 625:9-13. Dr. Seal does not, however, review patients' medication compliance records. *Id.* at 625:22-25. He also receives from DWCC, via the U.S.P.S, a weekly packet of progress notes and order sheets that are preprinted with prisoner names and DOC numbers, to write his notes on. *Id.* at 625:4-8. Dr. Seal does not keep any records himself, nor does he keep track independently of whom he needs to see or the frequency of appointments. *Id.* at 629:7-12. He handwrites his notes regarding a patient, scans them, and electronically sends them back to Ms. Robinson. *Id.* at 629:23-25. He then shreds the original records. *Id.* at 630:3-4.

84.     Dr. Seal's handwritten notes are illegible to the DWCC staff. Staff repeatedly testified as to this. "I don't typically review his notes because I am [un]able to decipher his notes." Burgos Trial Tr. vol. V at 940:22-23 [Rec. Doc. 708]. "I can't read any of his handwriting. And I have testified to that before." Hayden Trial Tr. vol. V at 973:7-8 [Rec. Doc. 708]. *See also* Robinson Trial Tr. vol. IX at 2047:15-22 [Rec. Doc. 712] (testifying that she does not know why Dr. Seal doesn't type his notes). Warden Goodwin also could not read Dr. Seal's handwriting. Goodwin Trial Tr. vol. XII at 2657:19-20 [Rec. Doc. 719]("I can't be sure what it says, Your Honor."). When Dr. Seal was asked why he does not type his notes, he responded, "I don't have an answer for that question." Seal Trial Tr. vol. III at 630:16-20 [Rec. Doc. 706].

85.     To gather information from Dr. Seal in the absence of legible written notes, mental health staff must sit in on Dr. Seal's clinics and take their own notes. *See* Hayden Trial Tr. vol. V at 1008:20-24 [Rec. Doc. 708]. Dr. Burns recommended that Dr. Seal type or dictate his notes. Burns Trial Tr. vol. VII at 1571:1-14 [Rec. Doc. 710]. She opined that it is important that the mental health staff, who might be covering a suicide watch, be able to read what the doctor said about the inmate, or for the prison's physicians and nurses. *Id.* "If it was not important, it would not have to be written down. It is important for continuity of care and to communicate across shifts, days, and

people." *Id.* at 1571:11-14.

86.     Beyond the fact that prison staff have difficulty continuing care for mentally ill inmates in the absence of legible records from the prison's chief psychiatrist, Dr. Seal knows practically nothing about the new treatment segregation at DWCC. He does not know where it is located. Seal Trial Tr. vol. V at 674:6-8 [Rec. Doc. 708]. He has never recommended that anyone be placed in treatment segregation and does not know the criteria to place someone there. *Id.* at 674:9-14. He has never been asked by mental health staff to opine as to whether an inmate should be in treatment segregation and does not know which or how many inmates have been placed in treatment segregation. *Id.* at 674:15-675:1. He does not know what services are available in treatment segregation. *Id.* Dr. Seal testified that on "several" occasions he was told by DWCC staff that the person he was seeing by video was in treatment segregation, though he could not recall any names. *Id.* at 675:10-676:3. Yet Warden Dauzat testified that treatment segregation had only been used on two occasions. Dauzat Trial Tr. vol. VI at 1251:13-15 [Rec. Doc. 709]. Dr. Seal agreed that it would be relevant information for him to know whether someone was in treatment segregation at the time of their appointment. Seal Trial Tr. vol. V at 677:7-10 [Rec. Doc. 708].

87.     DWCC mental health staff, primarily Mr. Burgos or Mr. Hayden (sometimes both), continue to be present during the appointments with Dr. Seal and create a second progress note for the same encounter. Dr. Burns identified concerns with this practice. First, no one ensures that the mental health worker is writing the same thing that Dr. Seal wrote, and they cannot read his handwriting so they cannot double-check. Burns Trial Tr. vol. VII at 1570:6-10 [Rec. Doc. 710]. They also cannot write their notes during the appointment because they do not have a computer with them, so their notes are not contemporaneous. *Id.* at 1570:10-14. Further, that Mr. Burgos and Mr. Hayden both sit in on Dr. Seal's appointments 40 to 65 percent of the time is a waste of staff

time, when they could be addressing unmet needs, such as working on treatment plans, having an individual session, or doing rounds. *See Id.* at 1570:15-23.

### E. Timed Assessments

88.     In its Liability Phase opinion, the Court found systematic deficiencies in the periodic evaluations of individuals housed on the South Compound, which could result in harm to the individual and those around him, further disciplinary issues, or a decline in mental health. Rec. Doc. 641 at 80. Following revisions to the classification policy, now numbered IS-B-4, segregation interviews are conducted every 30 days for individuals who are assigned a LOC 3 classification. Ex. JR-1 at 10. The policy expressly requires that for inmates with a behavioral health disorder, a mental health care practitioner/provider shall complete a behavioral health assessment at least every 30 days and more often if clinically indicated. JR-1 at 10. For all other individuals, segregation interviews are conducted every 90 days. Stip. Facts ¶ 65, JR-60 at 13.[10]

89.     Dr. Burns testified that it is an improvement that interviews with segregated inmates are apparently being done with greater frequency. Burns Trial Tr. vol. VII at 1571:19-21 [Rec. Doc. 710]. However, Dr. Burns further opined that these interviews remain ineffective. The purpose of these interviews is to ensure that inmates are adequately coping with being in segregated housing. *Id.* at 1572:2-12. In her review of the records produced, Dr. Burns did not identify any interview sheets noting that mental health staff contacted security about moving an inmate. *Id.* at 1572:13-17.

90.     DWCC staff now use a single computerized form, Form 350, for multiple purposes, including segregated inmate interviews. The new form contains a drop-down menu that allows

---

[10]   The parties stipulated that inmates who have a Level of Care 4 are interviewed every 90 days. Stip. Facts ¶ 65, JR-60 at 13.  However, at trial Mr. Hayden testified that LOC 4 inmates are now interviewed every 30 days. Hayden Trial Tr. vol. V at 1048:2-5 [Rec. Doc. 708].  This was a change from 90-day interviews for both LOC 3 and LOC 4 inmates during the period at issue in the Remedy Phase trial. *Id.* at 1049:7-18.

mental health staff to select the purpose of the record. Stip. Facts, ¶ 66, Ex. JR-60 at 14 [Rec. Doc 715-54]. Exhibit PR-S-1 shows examples of the new form. Mr. Burgos testified that he takes handwritten notes on a clipboard during his interviews and enters the data later. Burgos Trial Tr. vol. IV at 795:12-22 [Rec. Doc. 707].

91.     Dr. Burns testified that the use of a single form for multiple purposes is problematic because the reasons why a person may be seen vary, but the form is asking only a single set of questions that is not tailored to the situation or purpose presented. Burns Trial Tr. vol. VII at 1546:7-1547:13 [Rec. Doc. 710]. She also noted that the check-off boxes at the top of the form are not consistently used by staff and that the topics overlap, which means that you cannot understand the purpose of the mental health contact without reading the narrative section of the document, which defeats the purpose of having it in a database. *Id.* at 1547:14-21. Dr. Burns testified that information that would be included in a sufficient database would include the scheduling of segregated inmate interviews, all types of intervention and reasons for appointments (intake, placement in segregation, periodic interviews, suicide watch), the number of visits, and when treatment plan updates are due. *Id.* at 1606:17-1607:6. *See also* Dauzat Trial Tr. vol. VI at 1228:15-1229:10 [Rec. Doc. 709] (admitting that there is no policy as to how to document contacts and further admitting "we might need to tweak [the form] a little bit to make it a little bit more user friendly when someone is reviewing documentation.")

92.     As the Court noted in its Liability Phase opinion, Steve Hayden does not meet the definition of a mental health practitioner/professional under Policy IS-B-4 because he is not licensed. Yet, he continues to perform the segregation interviews/behavioral health assessments required under IS-B-4 despite his lack of qualifications. Burgos Trial Tr. vol. IV at 780:5-17 [Rec. Doc. 707]; Hayden Trial Tr. vol. V at 1047:5-9 [Rec. Doc. 708]; Ex. PR-S-1 at 392-444 (sealed exhibit). Dr.

Burns further opined that individuals who experience delusions are not able to self-report their psychosis because a delusion is by definition a firmly held belief that is not widely shared by others; the clinician necessarily has to make the determination that a patient is delusional. Burns Trial Tr. vol. VIII at 1734:6-13 [Rec. Doc. 711].

93.     Steve Hayden testified that he now gives inmates who are a Level of Care 3 the option to be seen in the courtroom, but otherwise he conducts these interviews at cell front. Hayden Trial Tr. vol. V at 1050:10-14 [Rec. Doc. 708]. The Court previously determined in its Liability Phase ruling that failing to hold these interviews in a confidential setting creates a risk that an inmate suffering serious mental health issues will not disclose information to the mental health professional for fear that another inmate will overhear the conversation and use it for retaliation. Rec. Doc. 641 at 82. Dr. Burns recommends that if the decision is made to proceed with an interview at cell-front instead of in a confidential setting, then a rationale should be given. Burns Trial Tr. vol. VII at 1549:13-1550:4 [Rec. Doc. 710].

94.     During Mr. Burgos' testimony, Plaintiffs' counsel walked through several of the forms that were completed following segregation interviews and showed examples of notes and assessments which were largely the same from inmate to inmate. Burgos Trial Tr. vol. IV at 899:17-904:5 [Rec. Doc. 707]; Ex. PR-S-1 at 392-444 (Burgos segregated inmate interview forms); *see also* Ex. PR-S-1 at 32, 155, 233, 381, 535-536, 593-594, and 625-626 (Hayden segregated inmate interview forms). Thus, Defendants have not resolved the issues raised in the Liability Phase opinion regarding the lack of individualized contacts. *See* Rec. Doc. 641 at 85.

## F.  Self-Help Materials

95.     Defendants offered into evidence self-help materials that are provided to prisoners. Exs. JR-28 through JR-58, *in globo.* None of these materials are referenced in any treatment plans reviewed by Dr. Burns. Burns Trial Tr. vol. VII at 1568:6-20 [Rec. Doc. 710]. As such, Dr. Burns

finds it is not possible to determine why, when, or whether any of these materials are provided to prisoners on the South Compound. *Id.* Some of the materials were created to be used in a classroom setting, not by an individual. *Id.* at 1568:6-20. Moreover, self-help materials may be inappropriate for general use as treatment of individuals with mental health disorders because, as Dr. Haney noted, "[T]hose are the kinds of things . . . which are difficult for people to work through without therapeutic assistance, which why we provide therapy to people with mental health problems." Haney Trial Tr. vol. X at 2207:16-19 [Rec. Doc. 713]. Moreover, distribution of the materials presumes the literacy of the men to whom the materials are given, and it presumes that individuals will be able to work through sensitive mental health or therapeutic issues on their own through a workbook. *Id.* at 2208:4-10. Nor are inmates routinely informed about the availability of self-help materials; the education section of the Offender Orientation Manual does not disclose them, only correspondence courses. Ex. PR-N-4 at 25-26 [Rec. Doc. 716-128].

### G.  Treatment Segregation

96.     DWCC has begun using "treatment segregation." Per the most recent classification policy, treatment segregation is defined as housing for inmates "who have a mental health disorder with symptoms that are severe and persistent to the point of interfering with the offender's ability to behaviorally and cognitively live in a less structured environment." Ex. JR-11 at 12. If an individual meets the criterion for transfer into treatment segregation, they are placed in one of two rooms in the North Compound infirmary. Stip. Facts, Ex. JR-60 at 67. Treatment segregation had been utilized on two occasions as of August 2022. Burgos Trial Tr. vol. IV at 876:13-16 [Rec. Doc. 707]. There has not been an instance where a prisoner was transferred to treatment segregation on intake. Kimball Trial Tr. vol. I at 203:12-15 [Rec. Doc. 704]. Whether to transfer an inmate to treatment segregation is a decision made by mental health or a physician; classification personnel do not transfer inmates to treatment segregation. *Id.* at 203:16-20.

97.     In treatment segregation, an inmate is under 24-hour nursing care in the infirmary. Robinson Trial Tr. vol. IX at 2095:2-6 [Rec. Doc. 712]. Mental health staff perform a round to the infirmary typically twice per day. *Id.* at 2095:9-10. On the two instances where treatment segregation has been used, staff scheduled the prisoner to be seen by Dr. Seal at an upcoming available clinic. *Id.* at 2096:2-19. As Dr. Burns has opined, if a person needs to be transferred into an infirmary, he should immediately be removed from segregation and be transferred to Elayn Hunt Correctional Center for in-patient psychiatric treatment. Burns Trial Tr. vol. VII at 1576:17-1577:14 [Rec. Doc. 710]. As Dr. Burns noted, one of the men stayed in the infirmary for several weeks, and the other stayed for at least a week; the standard practice for such treatment is that the inmate would remain in the infirmary only for a few days before being moved to a facility that can provide a higher level of psychiatric care. *Id.* at 1577:8-14.

98.     If treatment segregation is intended to provide treatment for prisoners who are "actively psychotic", it is grossly underutilized. The Court heard testimony regarding an inmate who was placed on suicide watch by Steve Hayden, following a use of force, after that inmate charged a security officer. Coleman Trial Tr. vol. I at 113:16-116:18 [Rec. Doc. 704]. When Dr. Haney encountered this same individual during his walk-through in June 2022, his opinion was that the individual had severe problems and was incapable of communicating at a basic level. Haney Trial Tr. vol. X at 2233:4-19 [Rec. Doc. 713]. When this individual was removed from suicide watch, rather than being transferred to treatment segregation or otherwise receiving intensive psychiatric treatment, he was placed on strip cell status. Coleman Trial Tr. vol. I at 116:15-18 [Rec. Doc. 704]; Ex. PR-C at 303-316.

## H.  Medication Administration

99.     Since the Liability trial, DWCC has put new pill call officers in place for the South Compound, Austin Burns and Cody Rimmer. Stip. Facts ¶ 58, Ex. JR-60 at 12 [Rec. Doc. 715-54].

The process that the pill officers use to pass out medication has not changed since March 2020. Ex. PR-BB-5, Norris Dep. Tr. at 15:10-16:3 [Rec. Doc. 714-5]. The new officers appear to be better at, or at least more consistent in, documentation and tracking of medication administration. Burns Trial Tr. vol. VII at 1558:11-17 [Rec. Doc. 710]. The prior issue of overutilizing the "Not Requested" option appears to have been resolved with the change in staff. However, the pill call officers remain supervised and overseen by security staff, not medical. A. Burns Dep. Tr., Ex. PR-BB-2 at 8:23-25 [Rec. Doc. 714-2]; Rimmer Dep. Tr., Ex. PR-BB-3 at 8:13-14 [Rec. Doc. 714-3].

100.    DWCC has plans to improve medication administration through use of a new "sMart" medication system, but the system has glitches that have not been resolved and prevent its functioning. Burgos Trial Tr. vol. IV at 814:20-817:7 [Rec. Doc. 707]; Hayden Trial Tr. vol. V at 1109:13-1110:5 [Rec. Doc. 708]; Dauzat Trial Tr. vol. VI at 1264:19-1265:16 [Rec. Doc. 709]. Dr. Burns testified that the new system, if implemented, would be an improvement. The new system would show medication administration, recorded contemporaneously; and scanning of the drug at the same time would ensure that it is given to the right person. Burns Trial Test, vol. VII at 1564:3-13 [Rec. Doc. 710]. The sMart system may also be able to improve reporting of medication noncompliance. *Id.* at 1564:20-1565:2.

101.    Dr. Burns still recommends that nursing staff, not security staff, be responsible for administering medications on the South Compound. *Id*. at 1561:25-1562:23. Nurses are responsible for administering medications on the North Compound. *Id.* at 1562:3-5. Dr. Burns points out that nurses have the requisite training and knowledge required to identify efficacy of medication and recognize adverse reactions and side effects, as well as counsel individuals on medication compliance. *Id.* at 1561:21-1562:23. The Court previously held that security staff are not qualified to oversee medication management. Rec. Doc. 641 at 105.

102.     In addition, trial revealed an issue with the timing of medication administration. The pill calls at DWCC are posted in the policy as being at 6:00 AM, noon, and 4:00 PM. *Id.* at 1559:15-17. The pill call officers testified, however, that pill call occurs at 5:00 AM, noon, and 2:00 PM. A. Burns Dep. Tr., Ex. PR-BB-2 at 19:2-21; Rimmer Dep. Tr., Ex. PR-BB-3 at 20:22-21:1. Dr. Burns testified that administration of a bedtime medication should not be before 8 PM. Burns Trial Tr. vol. VII at 1559:10-14 [Rec. Doc. 710]. Thus, when Dr. Seal prescribes a medication to be given "at the hour of sleep", it is given at 2:00 in the afternoon and will have no effect later in the evening, unless the prisoner waits to take the medication in violation of prison rules regarding medication hoarding. *Id.* at 1559:17-1560:21.

103.     Further, Dr. Burns recommends a policy revision to set forth some parameters with respect to reporting medication noncompliance back to the prescribing psychiatrist such that a follow up is scheduled. *Id.* at 1558:22-1559:1 Prisoners prescribed psychotropic medications should otherwise be seen at intervals based on clinical need.

### I.   Psychoeducational Courses for Working Segregation

104.     Warden Dauzat described the classes that are available in working segregation as psychoeducational programming that teaches tools to deal with difficult situations, rather than therapeutic programming. Dauzat Trial Tr., vol. VI at 1231:3-1232:9 [Rec. Doc. 709]. Individuals who are in working segregation thus do not have access to groups that permit them to have any kind of meaningful social interaction. Haney Trial Tr. vol. X at 2193:16-24 [Rec. Doc. 713].

105.     Dr. Haney opined that the out-of-cell programming that is available to prisoners on N1 should be made available to prisoners on all tiers. "Prisoner after prisoner in N3 and N4 voiced concern and pain over the fact that there was virtually nothing for them to do." Haney Trial Tr., vol. X at 2211:8-10 [Rec. Doc. 713].

49

### J.   Proposed Injunction Regarding Mental Health Treatment

106.   Plaintiffs respectfully propose the following language to address the deficiencies in psychiatric and mental health care discussed above:

*Proposed Remedy: Defendants shall provide adequate mental health treatment and monitoring to ensure the reasonable safety of people in DWCC custody. Defendants shall take all reasonable measures to ensure that mental health needs are timely identified and addressed. Defendants will do the following:*

*A.   Review, revise, and supplement existing policies to implement a policy for the delivery of mental health services that includes a continuum of care, provides for necessary and appropriate mental health professionals, includes a treatment plan for people with mental illness, and collects data and contains mechanisms sufficient to measure whether care is being provided in a manner consistent with constitutional standards.*

*B.   Requirements for clinical encounters: People held in segregated housing at DWCC will have regularly scheduled, face-to-face out of cell meetings with a qualified mental health professional at a frequency based on the individual's needs as determined by their treatment plan and level of care. Security staff must be removed enough that they cannot overhear the discussion. Those meetings will be memorialized in encounter notes. The notes will include the time that the meeting commenced and the time that it ended. The notes will be placed into the individual's record and a notation of the encounter will be entered into an electronic medical record.*

*C.   Defendants will provide group or individual therapy services by an appropriately licensed provider for prisoners with mental health needs.*

*D.   Defendants will ensure that mental health evaluations that are done as part of the disciplinary process include recommendations based on the person's mental health status.*

*E.   Within 60 days of the effective date of the injunction, DWCC and the Plaintiffs, in*

*consultation with their experts, will agree on the number of individuals at DWCC requiring specialized mental health housing. Within 180 days of the effective date, DWCC will create policies and procedures for the location, staffing and programming of specialized mental health housing units. Those units may include specialized mental health dorm housing units, as well as units to house the acute and sub-acute populations. Those plans will be submitted to all Parties and the Monitor for approval.*

F.      *Within 120 days of the effective date, DWCC will produce a staffing analysis regarding its mental health program. Within 60 days thereafter, the Parties, in consultation with their experts, will confer and arrive at the number of mental health professionals necessary to provide mental health care at DWCC. If the Parties are unable to reach agreement, the matter may be brought to the Monitor for resolution. If the Monitor is unable to resolve the dispute, the staffing levels may be brought to the Court for resolution.*

G.      *All notes, documents and treatment plans referenced herein will be filed into an electronic medical record system to allow for supervisory review and coordination of care among providers.*

H.      *Within 180 days of the effective date, the Parties, in consultation with their experts, will confer and develop clinical thresholds governing transfer from general population or segregated housing into specialized treatment settings. This process will include a review of the continuum of mental health care currently available in Specialized Mental Health Housing at other Department of Corrections facilities as well as the sub-acute care unit described below. If the Parties identify gaps in the available continuum of care or insufficient bed-count to accommodate the treatment needs of class members, and are unable to resolve the issue, the matter may be referred to the Monitor. If the Monitor is unable to resolve the dispute, then the adequacy of the available specialized mental health housing may be brought before the Court.*

I.      *Within 180 days of the Effective Date, Defendants will create a policy requiring quality assurance and supervisory review of the provision of mental health care at DWCC. That policy will be submitted to the Plaintiffs' counsel and the Monitor for review and approval.*

J.      *Medication will be administered by nursing staff and at the appropriate time of day (e.g., 8:00 PM administration for medication to be taken before bed). Medication administration and medication refusals will be documented in the EMAR system.*

## VI.  Suicide Prevention

### A.  DWCC Suicide Prevention Policies and Procedures

107.    As the Court noted in its Liability Phase opinions, prisons must have adequate suicide prevention policies to provide constitutional care. Rec. Doc. 641 at 107. At the Liability Phase trial, the Court determined that DWCC's suicide prevention program was constitutionally inadequate because it failed to deal with the necessary objectives of identification, treatment, and supervision. DWCC has not implemented significant new changes to its suicide policy beyond the creation of a tier walker program, which Plaintiffs' expert opined is a positive but is not sufficient. Since 2020, two prisoners on the South Compound have completed suicide. Suicide prevention thus is an area that DWCC has left the Court to remedy.

108.    DWCC's prevention and post suicide management policy is EPM #03-02-001. Ex. JR-14 [Rec. Doc. 715-14]. The policy provides that inmates must be screened for suicide risk at the time of an inter- and infra-system transfer or if an inmate is moved to segregated housing, and officers also have a duty to report if the officer believes that a prisoner is a potential suicide risk. *Id.* A prisoner may be assigned to suicide watch or extreme suicide watch. *Id.* at 6-7. Extreme suicide watch involves the use of restraints and is to be used only when an individual presents a "clear and continual risk of self-injurious behavior(s)." *Id.* at 1.

109.    The conditions of suicide watch and extreme suicide watch have not changed, except that

the restraint bed may be used to restrain prisoners. Dr. Burns has maintained her opinion that putting people in restraints for suicide watch is extreme and is not related to watch. Burns Trial Tr. vol. VII at 1586:25-1587:22 [Rec. Doc. 710]. According to Dr. Burns, the National Commission on Correctional Health Care and other organizations discuss "close watch" for people with suicidal thoughts and "constant watch" for people who are acting or have recently acted on suicidal impulses. *Id.* Neither category requires the use of restraints. *Id.* Constant watch requires one-on-one constant observation of the person on watch. *Id.*

110. Dr. Burns also noted that there is no documentation of a risk assessment being performed in connection with placing inmates on suicide watch, and DWCC's follow-up assessment also does not include a risk assessment. *Id.* at 1588:1-13.

111. There continues to be no difference in conditions between suicide watch and strip cell, so suicide watch is viewed as punitive. Haney Trial Tr. vol. X at 2238:8-10 [Rec. Doc. 713]. The Court also received testimony regarding an inmate being placed on suicide watch and strip cell for the same behavior. Coleman Trial Tr. vol. I at 116:9-18 [Rec. Doc. 704]. Dr. Haney reported that his interviewees talked about the harshness of suicide watch, that suicide ideation is treated punitively rather than therapeutically, and the lack of meaningful follow-up after suicide watch. Haney Trial Tr. vol. X at 2238:5-16 [Rec. Doc. 713].

### B. Completed Suicides

112. Since March 2020, two inmates have committed suicide on the South Compound at DWCC. The first was James Doyle, during October 2022. Ex. PR-H-1 (Doyle death report, sealed exhibit). He was housed in Tier N4D. Coleman Trial Tr. vol. I at 97:21 [Rec. Doc. 704]. The second was Jonathan Bray, who completed suicide in January 2022. Ex. PR-H-2.[11] Bray was

---

[11] Even though he remains Mental Health Director, Mr. Hayden was unsure where the men who completed suicide

housed in N4C. *Id.* at 972:5-98:1. Both died of strangulation.

113.    Per the DWCC suicide policy, the first officer on the scene is to call for help and get the victim down if hanging. Ex. JR-14 at 11. The policy expressly states, "IMMEDIATE ACTION IS REQUIRED! SECONDS MAY SAVE A LIFE!!" *Id.* Despite this language in the policy, the evidence indicated that DWCC security staff are not trained to respond within seconds to a suicide incident. Plaintiffs offered a video exhibit of the recording taken by security staff at the time that Mr. Bray's body was discovered. Ex. PR-D-5 (sealed). The video revealed delay in opening the cell on the discovery of Mr. Bray and additional delay in removal of the object around Mr. Bray's neck and commencement of CPR. Coleman Trial Tr. vol. I at 118:17-119:8 [Rec. Doc. 704]. Approximately three minutes went by before a radio signal is heard on the video. *Id.* at 119:13-21.

114.    Neither DWCC nor the Department has taken any steps to remedy deficiencies following these suicides. Colonel Lonnie Nail investigated Mr. Bray's suicide and determined that a security officer was a few minutes late making his rounds. Nail Trial Tr. vol. I at 153:23-25 [Rec. Doc. 704]. His investigation did not identify any other deficiencies. *Id.* at 154:1-4. Notably, Colonel Nail testified that even though one of his responsibilities is to investigate suicides, he was not familiar with DWCC's suicide policy. *Id.* at 156:14-16. There were no changes to any DWCC policies after either suicide. Goodwin Trial Tr. vol. IX at 1917:8-10 [Rec. Doc. 712]. Blake LeBlanc leads the Department's suicide review committee and investigated the suicides, but he could not remember if he had recommended changes at DWCC. B. LeBlanc Trial Tr. vol. VI at 1365:11-1366:16 [Rec. Doc. 709].

115.    Trial testimony revealed that several months before his suicide, Mr. Doyle was seen by Mr.

---

were housed.  "I think one was in N3, maybe one was in N4. Maybe. I don't know." Hayden Trial Tr. vol. V at 1045:14-15 [Rec. Doc. 708]. Mr. Hayden bore primary responsibility for the mental health care of inmates in Buildings N3 and N4 at the time that these suicides occurred, in addition to his role as Mental Health Director.

Burgos at the request of staff. Burgos Trial Tr. vol. IV at 768:4-22 [Rec. Doc. 707]. Mr. Doyle had been observed with bedsheets torn into strips, and he complained regarding his medication. *Id.* Mr. Burgos could not remember details in response to questions regarding his encounter with Mr. Doyle. *Id.* at 768:23-769:2. Mr. Burgos has not made any changes to how he does his job because of the completed suicides. *Id.* at 766:1-9.

### C.  The Tier Walker Program

116.    On or about October 2021, DWCC began a "tier walker" program to assist with suicide watch. Sherman Trial Tr. vol. II at 400:24-401:16 [Rec. Doc. 705]. Tier walkers are prisoners that have been selected and screened to watch prisoners on suicide watch. Kimball Trial Tr. vol. II at 310:1-10 [Rec. Doc. 705]. The program is governed by a new policy memorandum, EPM #03-02-010. Sherman Trial Tr. vol. II at 397:8-13 [Rec. Doc. 705]; Ex. JR-18. Prison staff may recommend candidates to be a tier walker, and Warden Sherman will review their records and interview appropriate candidates. *Id*. at 397:8-13. Tier walkers are a tool of security to provide additional observation on suicide watch. *Id.* at 399:4-17. Per the policy, tier walkers should observe the prisoner on suicide watch and report any self-injurious or unusual activity. Ex. JR-18 at 3.

117.    Tier walkers receive no formal training. They receive training from mental health on things to watch for, and then Warden Sherman talks with them about situations that they may encounter. *Id.* at 399:19-400:2. Warden Sherman does not have a training manual for them, but she believes that the Mental Health Department has documentation that they use to teach the prisoners. *Id.* at 400:3-9. That documentation appears to be attached to the tier walker policy. Ex. JR-18 at 5, 6. Dr. Burns testified that, with appropriate training, it may be helpful to have someone next to the cell; but tier walkers should be considered a supplemental tool that does not replace staff supervision of the individual on watch. Burns Trial Tr. at vol. VII, 1595:7-15 [Rec. Doc. 710].

### D.  Proposed Injunction Language Regarding Suicide Prevention

118.   Plaintiffs suggest the following language for an injunction relating to suicide prevention.

*Defendants shall institute procedures to ensure that inmates who are suicidal or who may engage in self-injurious behavior receive timely observation. Defendants shall do the following:*

*A.       DWCC will end the practice of extreme suicide watch.*

*B.       Any staff who observes an individual experiencing a mental health crisis or who has concerns for the individual's risk for self-harm shall begin continuous observation until the individual may be evaluated by mental health staff or a psychiatrist to determine appropriateness for placement on suicide watch.*

*C.       People will only be ordered held on suicide watch precautions on order of a psychiatrist or other M.D. Persons held on suicide watch will be held in the least restrictive environment required for their safety. This means that they will be clothed, able to use the telephone, and able to access writings unless any of those conditions would be a risk to the person's safety.*

*D.       Constant Observation Suicide Watch: If a person is held on constant observation suicide watch, a security or mental health staff member must be physically present on the tier with that individual, with 1:1 direct observation of that individual, always. If staff orders a person to be held on constant observation suicide watch precautions, that person shall be seen by a qualified mental health professional as soon as possible, but no later than within two hours of the order, including nights and weekends.*

*E.       Close Observation Suicide Watch: If a person is held on close observation suicide watch, a security or mental health staff member must be physically present on the tier with that individual, with periodic direct observation of that individual, at least every 15 minutes.*

*F.       Cameras may be used to augment these checks but may not serve as a substitute.*

*G.       No individual will be held on constant observation suicide watch longer than 72 hours. If*

*after 72 hours an individual is not stabilized, the treatment team will convene to review the patient's treatment plan and determine whether any modifications to care may stabilize the person, or if transfer to a more acute placement is appropriate. This meeting will be documented in writing.*

H. *When removal of clothing is necessary to ensure someone's safety, DWCC will provide a "turtle suit" with which to clothe suicidal men. DWCC will cease usage of paper gowns. When removal of the mattress is necessary to ensure someone's safety, DWCC will continue to provide a suicide resistant mattress. DWCC will install a suicide-resistant floor covering in its suicide cells so that suicidal individuals will not be held on the bare concrete unless there is no alternative to prevent self-harm. DWCC will conduct suicide watches in a therapeutic setting, such as the infirmary, where possible. People on suicide watch shall be authorized to take a shower after they stabilize. DWCC will retrofit one eighth of its segregated housing cells as "suicide resistant" cells with breakaway hooks and elimination of tie-off points.*

I. *People held on suicide watch will be allowed unimpeded access to the telephone. They will also be allowed access to writing materials, when safe and under staff supervision.*

J. *People held on suicide watch will be seen once per day for one-on-one confidential meetings with a qualified mental health professional. Whenever it can be safely done, those meetings will be conducted out of cell. DWCC will create policies and forms for the memorialization of those meetings and recommended treatment resulting from those meetings. In addition to general treatment, the goal of those meetings will be to form individualized assessments of the triggers of that individual's self-injurious behavior and to work jointly to identify ways to prevent that trigger from causing self-harm.*

K. *Once an individual is ordered removed from "constant observation suicide watch" by a psychiatrist, that individual will be stepped down to close observation suicide watch.*

L.      *When an individual is placed on suicide watch, the treatment team will be notified by email. The treatment team will convene within 48 hours of an individual being placed on suicide watch to identify suicidal ideation triggers, identify other interventions that could prevent the onset of suicidal ideation, and determine whether the person can safely be housed in a segregated setting. This meeting will be memorialized in the electronic medical records system with notes identifying attendees and actions taken. To remove a patient from suicide watch, mental health staff must perform a suicide risk assessment using the assessment criteria and form described above.*

M.      *DWCC mental health staff will follow up with a patient who has been discharged from suicide watch daily for one week. The individual will be provided with a mental health visit including a suicide risk screening, as described above, daily for five days following the watch, and again on the 10th day following the watch.*

## VII.   Use of Force and Restraints

### A.  Use of Force

119.    DWCC's policy regarding use of force has not changed in any significant way since the Liability Phase trial. Coleman Trial Tr. vol. I at 27:23-28:14 [Rec. Doc. 704]; Ex. JR-9 [Rec. Doc. 715-9]. Per policy, "Whenever possible, force shall not be used against mentally ill or mentally retarded offenders before appropriate medical or mental health personnel can be called to the scene." *Id.* at 4. Nevertheless, DWCC continues to use force against mentally ill inmates. Col. Coleman identified a single change in policy or practice—an SMI list that is distributed to security personnel.[12] *See* Coleman Trial Tr. vol. I at 28:9-29:20 [Rec. Doc. 704]; Ex. JR-29 (use of force policy) [Rec. Doc. 715-24]. One of Colonel Nail's responsibilities is to investigate allegations of

---

[12] The most recent version of DWCC's use of force policy provides that when time permits, mental health must be notified before a use of force is applied to an inmate who is Level of Care 3. Coleman Trial Tr. vol. I at 28:18-299 [Rec. Doc. 704]; Ex. JR-9 [Rec. Doc. 715-9]. A list of inmates who are Level of Care 3 is generated by Aerial Robinson and distributed to security staff so that it may be consulted before a use of force is applied. Robinson Trial Tr. vol. IX at 2031:11-18 [Rec. Doc. 712].

excessive uses of force, but he did not remember conducting any such investigations. Nail Trial Tr. vol. I at 144:18-147:18 [Rec. Doc. 704].

120.    The evidence at trial showed multiple examples of the use of force against an inmate experiencing mental illness without staff from the mental health department being called first. Ex. PR-D-33 (sealed video); Coleman Trial Tr. vol. I at 37:10-399 [Rec. Doc. 704] (inmate Curtis Belton sprayed with chemical agent while on extreme suicide watch for banging his head against the wall, without mental health being contacted first); *id.* at 85:17-21 (inmate sprayed with chemical agent while in restraints on extreme suicide watch); Ex. PR-M-1 at 25-38 (UOR for same incident) [Rec. Doc. 716-126]; Coleman Trial Tr. vol. I at 89:11-92:10 [Rec. Doc. 704] (chemical spray applied to an inmate who was purportedly disruptive while complaining about not receiving medication).

### B.  Improper Use of Restraints

121.    Since the Liability Phase, DWCC purchased a restraint bed in addition to the restraint chair. Nail Trial Tr. vol. I at 175:10-12 [Rec. Doc. 704]. The bed was acquired around March 2021. *Id.* at 176:19-22. The bed uses soft leather restraints tied around a prisoner's wrists, torso, legs, and ankles. *Id.* at 176:24-12. It is to be placed inside the inmate's cell with his head toward the bars. *Id.* at 176:10-12. DWCC purchased new suicide helmets but there are no functional differences between the new and old helmets. Burgos Trial Tr. vol. IV at 749:21-750:13 [Rec. Doc. 707]. DWCC updated its restraint policy to reference the new bed. Ex. PR-A-47 [Rec. Doc. 716-10].

122.    The restraint chair is still an available option for use.  *Id.* at 750:22-25. Plaintiffs offered video evidence at trial of improper use of the chair in a cell, with the inmate zip-tied to the cell bars and the chair facing the wrong way. Ex. PR-D-6 [Rec. Doc. 716-48 (sealed manual attachment)]. Dr. Burns testified that the restraint chair should be used for transportation only and that tying an inmate to the cell in that manner is a "recipe for paranoia" because the inmate is

immobilized and cannot see who is approaching the cell or talking to them. Burns Trial Tr. vol. VII at 1593:16-1594:20 [Rec. Doc. 710.]

123. Dr. Burns opined that restraints imposed for the purpose of suicide prevention should be used in a health care setting and not in cells due to associated health risks. *See id.* at 1593:4-15; vol. VIII at 1679:13-19 [Rec. Doc. 722].

### C. Proposed Injunction Regarding Use of Force and Restraints

124. Plaintiffs respectfully suggest the following language for the Court's injunction regarding use of force and use of restraints.

*DWCC will develop, implement, and maintain comprehensive policies and procedures, in accordance with generally accepted correctional standards, relating to the use of force with particular emphasis on permissible and impermissible uses of force.*

*A.  DWCC will provide at least annual training to ensure correctional officers have knowledge of permissible and impermissible uses of force. This training will include specific training on de-escalation tactics and management of prisoners with mental illness to limit the need for force.*

*B.  DWCC will develop and implement a uniform reporting system under a use of force reporting policy, including a system for tracking use of chemical agents and supervisory review. DWCC will annually assess all data collected regarding uses of force and make any needed changes to use of force policies and procedures to ensure that unnecessary force is not used. DWCC will document the review and provide copies to Plaintiffs' counsel and the Monitor.*

*C.  At a minimum, DWCC will adopt policies that provide that use of force is prohibited as a response to verbal insults or threats where there is no immediate threat to the safety or security of the institution, prisoners, staff, or visitors; for failure to follow instructions where there is no immediate threat to the safety or security of the institution, prisoners, staff or visitors; where a person has ceased to offer resistance and is under control; or as punishment or retaliation.*

D.     DWCC's Use of Force policy will prohibit kicking, striking, hitting, or punching a non-combative prisoner. Chemical, electronic, and physical restraints will only be used when necessary to preserve the safety of another person, the staff or institution. The restraint bed or chair will not be used unless there is no lesser intervention that can preserve the safety of the individual being restrained. It will never be used as a substitute for mental health interventions. It will not be used inside the cell. If the restraint bed or chair is used, staff shall record on video the entire interaction, from the time that the person is touched to be placed in the chair until he is removed from observation. Any use of the restraint bed or chair will trigger a full review of the patient's current treatment plan, level of care, and eligibility for segregation.

E.     Individuals who are housed in segregation for non-serious offenses will not automatically be placed in mechanical restraints ("shackles") during out of cell time. Such an individual will only be shackled if a decision is made, on a case-by-case basis, that the use of shackles is necessary to preserve the safety of other people or the institution. If a decision is made to use restraints against a person who is in segregation for a non-serious offense, that decision and the rationale shall be documented by the staff employing the restraints on a "Use of Restraint Form," which will be completed by the end of shift and provided to the chief of security. The chief of security will review the Use of Restraints forms daily and assess whether the use of restraints was necessary.

F.     All uses of force will be videotaped from the earliest practicable point in the disturbance and prior to deployment of force until medical staff arrives and force is concluded.

G.     Security staff will attempt de-escalation prior to resorting to use of force.

H.     A representative from the mental health department, or any staff member who has been trained as a crisis negotiator, will be contacted and attempt de-escalation before a use of force on a person in segregated housing unless that individual is actively harming himself or someone else.

I.      *If force is used before notice to mental health staff, notice will be given as soon as possible.*

J.      *Making noise, yelling, and verbal disrespect do not rise to the level of security threat allowing officers to make a use of force. Likewise, refusal to obey a direct verbal order to cease such conduct or an order to come to the bars to be restrained does not rise to the level of security threat allowing officers to make a use of force. Failure to report a use of force incident by any staff member engaging in the use of force or witnessing the use of force shall be grounds for discipline, up to and including termination. Defendants will ensure collection of sufficient information on uses of force to assess whether staff members are following policy; whether corrective action is necessary, including any training or discipline; and to evaluate the effectiveness of training and policies. Defendants will provide the Monitor a periodic report detailing uses of force by staff. These periodic reports will be provided within four (4) months of the Effective Date and every six (6) months thereafter until termination of the injunction. Those reports will include, at a minimum, the following information: (1) a brief summary of all uses of force by type; (2) the date force was used; (3) staff members involved in use of force; (4) identity of person against whom force was used; (5) a brief summary of all uses of force resulting in injuries; (6) number of planned and unplanned uses of force identified by type; (7) a listing of serious injuries requiring hospitalization.*

## VIII.   Americans with Disabilities Act and Rehabilitation Act Claims

125.    In its Liability Phase decision, the Court identified three areas under which the Defendants failed to comply with the ADA: (1) failing to make reasonable accommodations or modifications for inmates with mental illness; (2) failing to make a reasonable accommodation to disciplinary or use of force practices for inmates with mental illness, and (3) disregarding recommendations from its own staff that inmates with a serious mental illness be placed in general population instead of solitary confinement. Rec. Doc. 641.

126.    The evidence showed that these problems continue. Assistant Warden Brenda Acklin is the ADA Coordinator for DWCC. Ex. PR-BB-1, Acklin Dep. Test. at 6:25-7:4 [Rec. Doc. 714-1]. She has so served the past two years. *Id.* at 7:5-6; 11:2-5. She does not train other DWCC employees regarding the ADA. *Id.* at 13:9-18. She is also in charge of the human resources department, and she testified that DWCC employees are informed of ADA requirements on hire but do not receive any training. *Id.*at 13:24-14:4. She was not aware of any current policies or procedures in place to identify prisoners with disabilities. *Id.* at 14:11-17. She is not personally in charge of investigating any requests for reasonable accommodations. *Id.* at 19:11-17. Warden Acklin refers requests for a reasonable accommodation to the relevant department for investigation. *Id.* at 19:14-17. Requests for an accommodation relating to mental health go to Steve Hayden. *Id.* at 19:25-20:2. She testified that she had not received any requests for a reasonable accommodation that related to mental health. *Id.* at 32:14-23. Thus, DWCC failed to recognize ARPs submitted by inmates for mental health services as requests for an accommodation under the ADA. Warden Acklin has also not provided any training to Mr. Hayden regarding the ADA. *Id.* at 20:3-5.

127.    Once the investigation by the department is completed, the relevant department head and Warden Acklin decide whether to approve the request for a reasonable accommodation. *Id.* at 20:6-8. Since March 2020, she has never approved a prisoner's request for a reasonable accommodation. *Id.* at 21:8-15. Prisoners have a right to appeal her denial of their request to headquarters, but she was not aware of any instances where her decision was appealed. *Id.* at 21:16-21, 21:24-22:10. She is not aware of any plans to change any policies or procedures regarding the investigation or processing of requests for reasonable accommodation.

128.    Warden Acklin does not make an independent determination of whether an inmate's major life activities are implicated for evaluating an ADA claim, and instead she relies on the medical

department for that determination. *Id.* at 26:8-23. She goes in person to meet with an inmate if an inmate requests to meet with her, but she could not provide any estimate of the number of times that has happened. *Id.* at 27:8-28:4. When she walks the tiers on the South Compound, she does not make any assessment of whether other prisoners on the tier might qualify for an ADA accommodation. *Id.* at 28:12-15. She has not interviewed any staff on the tiers about compliance with the ADA since March 2020. *Id.* at 27:16-21. When asked if a prisoner needed to have a "serious mental illness" within the meaning of the Department's Classification Policy (IS-B-4) to qualify for a reasonable accommodation, she stated that she should not answer that question. *Id.* at 29:4-12.

129.    She has not made any determination regarding the number of prisoners at DWCC with a disability or the percentage of prisoners on the South Compound with a disability. *Id.* at 35:10-21. During her tenure as Assistant Warden, she has never made a recommendation to Warden Goodwin or other staff regarding any changes to policies or procedures regarding treatment of prisoners with disabilities. *Id.* at 38:1-12. Steve Hayden testified that she had never asked him to change any way he has provided treatment in order to accommodate an individual. Hayden Trial Tr. vol. V at 1110:17-20 [Rec. Doc. 708]. Hayden also testified in response to questions regarding conditions of strip cell, "[M]ental health does not have any sort of bearing on what security staff does, as far as their disciplinary process." *Id.,* vol. VI at 1149:4-6 [Rec. Doc. 709].

130.    Plaintiffs respectfully propose the following language for the Court's consideration:

*Within 120 calendar days, Defendants shall submit revised policies, practices, and procedures to Plaintiffs' counsel and the Monitor, for review and approval. The revised policies shall provide for the following regarding compliance with the ADA and Rehabilitation Act:*

*A.     DWCC shall satisfy the requirements of Title II of the ADA, Section 504 of the*

*Rehabilitation Act, and their implementing regulations by ensuring equal opportunities for inmates with disabilities and ensuring that all inmates with disabilities have equal opportunities to benefit from the services, programs, and activities associated with general population inmates.*

*B.      DWCC shall not provide inmates with disabilities with opportunities that are unequal to those afforded to inmates who do not have disabilities. DWCC shall reasonably modify its policies, practices, and procedures where necessary to avoid discrimination based on disability.*

*C.      Inmates must be permitted to make a request for accommodation of all staff, either in writing or verbally. DWCC will create and maintain an effective and comprehensive system for tracking individuals with disabilities and ensure that those individuals are accommodated appropriately in all aspects of their incarceration, including housing, medical care, and discipline. The system will include tracking for individuals whose disabilities develop or change while incarcerated. DWCC will create a database that reliably captures all requests for accommodations (including letters, ARPs, RFAs, and verbal requests) and the status of such requests, their disposition, and supporting documentation.*

*D.      The presence of a disability must be considered throughout the disciplinary process. DWCC will propound a policy that ensures that all disciplinary policies are ADA-compliant.*

*E.      DWCC will ensure that all staff are adequately trained regarding the ADA at least annually. Trainings must be approved by the Monitor for the duration of the injunction.*

## IX.   Monitoring

131.    "Courts faced with the sensitive task of remedying unconstitutional prison conditions must consider a range of available options, including appointment of special masters or receivers and the possibility of consent decrees." *Brown v. Plata*, 563 U.S. 493, 511 (2011). To enforce an injunction, the Court may exercise its discretion under Rule 53 of the Federal Rules of Civil Procedure to appoint a special master or monitor for post-trial proceedings. "The power of a federal

court to appoint an agent to supervise the implementation of its decrees has long been established." *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982), *amended in part, vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982). The Advisory Committee on Civil Rules expressly contemplates that a district court may employ a special master to ensure compliance with complex decrees. Fed. R. Civ. Proc. 53 (advisory committee notes) (2003). Considering the complexity of the proposed relief, and so that matters concerning enforcement may be resolved in a timely and expeditious manner without the need for the district court's direct involvement each time, appointing a special master or monitor to enforce the injunction is appropriate. Plaintiffs' expert witnesses also offered testimony supporting appointment of an external monitor. Pacholke Trial Tr. vol. III at 560:16-25 [Rec. Doc. 706]; Haney Trial Tr. vol. X at 1393:4-9 [Rec. Doc. 713].

132.    The evidence showed that Defendants do not currently maintain reliable data regarding incidents so that changes may be properly tracked. For example, the evidence showed that the monthly reporting of incidents from DWCC to DOC headquarters is unreliable. Ex. PR-E-28 [Rec. Doc. 716-77] is a summary of data from the monthly C-05 report that DWCC prepares and submits to Department headquarters. The reporting did not disclose that any suicide attempts were made at DWCC between March 2020 and May 2022. *Id.* Zero "suicide gestures" were reported for the same period. *Id.*; *see also* Dauzat Trial Tr. vol. IX at 2496:1-8 [Rec. Doc. 712]. However, the evidence at trial showed that there were in fact multiple gestures or attempts during that period. *See* B. LeBlanc Trial Tr. vol. VI at 1357:5-3 [Rec. Doc. 709] (gown fashioned into a rope and tied around neck); Goodwin Trial Tr. vol. VIII at 1799:13-16 [Rec. Doc. 711] (Hoffman tool used); *id.* at 1800:15-22 (sheet around neck); *id.* at 1804:25-1809:11 (sheet tied to bars and neck, inmate cut down and placed on suicide watch); *id.* at 1808:25-1809:11 (string around neck and hitting head on wall); *id.* at 1814:3-7 (string tied around neck, Hoffman tool used); *id.* at 1817:5-17 (sheet tied

around neck); *id.* at 1818:19-1819:16 (gown tied around neck); *id.* at 1822:4-25 (inmate repeatedly jumping off top bunk; spray applied and placed on extreme suicide watch); *id.* at 1825:3-19 (self-cutting); *id.* at 1827:21-1828:14 (self-cutting); *id.* at 1837:8-24 (sheet around neck); *id.* at 1840:4-17 (sheet around neck); *id.* at 1841:18-1842:3 (blanket around neck and air vent).

133.    Secretary James LeBlanc testified that it would be very difficult to track data on the usage of segregated housing at DWCC from March 2020 through the end August 2022. J. LeBlanc Trial Tr. vol. X at 2152:5-2153:11 [Rec. Doc. 713]. He stated that while the Department is working on improving its data collection systems through new technologies and software, those systems are not in place. *Id.* There is also no current timeframe as to when those technologies will be implemented. *Id.* at 2156:2-16. In the meantime, to collect that data someone at DWCC would have to compile the data manually. *Id.* at 2153:12-2154:5.

134.    The Court should appoint a Monitor to collect data and enforce compliance with injunctive relief that the Court may grant. Plaintiffs respectfully suggest the following possible language:

A.      *The Parties will jointly select a Monitor to oversee implementation of the injunction, subject to the Court's approval. If the Parties cannot agree on a Monitor, they will each submit a nominee to the Court. Neither Party, nor any employee or agent of either Party, shall have supervisory authority over the Monitor's activities, reports, findings, or recommendations. Unless authorized by the Parties jointly, the Monitor will make no press or public statements other than those made in open Court or in the reporting process.*

B.      *The Monitor shall file with the Court and provide the Parties with reports describing the steps taken by Defendants to comply with the injunction and evaluating the extent to which Defendants have complied with each substantive provision. The Monitor shall issue an initial report 120 days after assuming his or her position and then every 120 days thereafter. The reports*

will be provided to both Parties in draft form for comment at least fourteen days before issuance. The Monitor will consider each Party's written comments and incorporate changes as appropriate before issuing the report. The Monitor will submit its report to the Court, which will be publicly filed into the record. In the Monitor's report, the Monitor shall evaluate the status of compliance using the following standards: (1) substantial compliance, (2) partial compliance, (3) non-compliance. To assess compliance the Monitor will review pertinent documents, speak with all necessary staff, and interview a representative number of incarcerated people to accurately assess conditions. Each report will describe the steps taken to analyze conditions and assess compliance, including documents reviewed and individuals interviewed and the factual basis for the Monitor's findings. The Monitor is responsible for independently verifying representations from Defendants regarding progress toward compliance and examining supporting documentation. On request, the Monitor will provide supporting documentation to counsel.

C.      The Monitor will take steps to ensure that people who speak with him or her are not retaliated against. If the Monitor suspects that inmates are being subjected to retaliation the Monitor shall notify the Parties and the Court immediately.

D.      The Court will hold a hearing on the record after public notice within a reasonable time after each Report by the Monitor is submitted. The Monitor shall present his or her findings, and the Parties and the Court may ask questions of the Monitor at the hearing.

E.      DWCC is responsible for payment of the Monitor's fees and costs. Neither the Monitor nor any person or entity the Monitor retains may be liable for a claim or suit arising from the Monitor's performance, other than a proceeding relating to contract performance.

F.      The Monitor, and his or her consultants and agents, will have unrestricted access to DWCC, DWCC records, medical and mental health records, staff, and inmates. DWCC will direct

all staff to cooperate with and communicate with the Monitor. The Monitor can initiate and receive ex parte communications with all Parties but not the Court. Within seven days of receipt, the Monitor will distribute all DWCC documents to Plaintiffs' counsel.

G. DWCC will submit periodic compliance reports to the Monitor and Plaintiffs' counsel. These periodic reports will be provided within four months after the effective date and every six months thereafter until termination of the injunction. Each report will describe steps Defendants have taken during the preceding reporting period toward compliance. The report shall summarize audits, improvements, and quality assurance activities and contain findings and recommendations about progress. The report shall capture data tracked and monitored under this injunction.

H. DWCC will advise the Monitor and Plaintiffs' counsel of the death of any prisoner within 24 hours. DWCC will forward to the Monitor and Plaintiffs' counsel the incident reports/UORs; medical and mental health reports related to deaths; autopsies; death summaries; and all final internal investigations by DWCC or the Department that involve deaths in DWCC custody.

I. DWCC will provide a monthly report disclosing each of the following: (a) each use of force incident on the South Compound, including the level of care for the individuals involved, quantity of chemical agent applied, if any, and the presence or absence of mental health staff during the incident; (b) name of inmate placed on suicide watch, how long the suicide watch remained, what clinical interventions were offered or attempted, any injuries suffered by the inmate, and any use of restraints; (c) how many missed doses of medication were documented in segregated housing and identifying any inmates who missed five or more doses in a given month; (d) the number of mental health sick calls and referrals, the response time for mental health staff to meet with the person for each, and what services, if any, were ultimately provided; (e) the name and DOC number of each patient referred to treatment segregation or other sub-acute treatment unit at

69

*DWCC, the name and DOC number of each patient escalated from such unit to a more intensive setting; the name and number of patients stepped down from such unit back into general population or segregated housing and present location; the name and DOC number of patients who are eligible for transfer to treatment segregation but are on a waiting list and identifying the steps being taken toward transfer to an appropriate treatment setting. The Monitor shall redact prisoner names and other identifying information from publicly filed reports but shall distribute unredacted copies to the parties and file an unredacted version under seal with the Clerk of Court.*

*J.      DWCC will maintain sufficient records to document that the requirements of the injunction are being implemented. Defendants shall maintain and provide on request all records or other documents to verify that they have taken the actions described in their compliance reports.*

*K.      On the first day of each month, DWCC will provide the Monitor and Plaintiffs' counsel with a list identifying each individual held in segregated housing, their location, and the reason for such placement. DWCC will advise the Monitor and Plaintiffs' counsel of any person detained in segregation more than 15 days and the reason for the placement. On request, DWCC will provide the full medical and disciplinary file of that individual.*

## X.  Conclusion

Based on the Remedy Trial evidence, the Court should find that the Eighth Amendment and ADA/RA violations persist and should enter an order granting declaratory and injunctive relief to the Plaintiffs.

Respectfully submitted,
/s/ J. Dalton Courson
Melanie A. Bray, La. Bar No. 37049
J. Dalton Courson, La. Bar No. 28542
Ronald K. Lospennato, La. Bar No. 32191
Disability Rights Louisiana
8325 Oak Street, New Orleans, LA 70118
504-522-2337; 504-272-2531 (fax)
dcourson@disabilityrightsla.org