UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANTHONY TELLIS and BRUCE CHARLES | * | JUDGE ELIZABETH E. FOOTE |
| on behalf of themselves and all others similarly | * | USMJ MARK L. HORNSBY |
| situated | * | |
| | * | |
| VERSUS | * | |
| | * | |
| JAMES M. LEBLANC, Secretary | * | |
| of the Louisiana Department of Public Safety | * | |
| and Corrections, JERRY GOODWIN, | * | |
| Warden of David Wade Correction Center | * | CIVIL ACTION |
| COL. VINCENT COLEMAN; | * | |
| DOCTOR GREGORY SEAL; DEPUTY | * | NO.: 5:18-CV-00541-EEF-MLH |
| WARDEN DEBORAH DAUZAT; | * | |
| STEVE HAYDEN; AERIAL ROBINSON; | * | |
| JOHNIE ADKINS; and THE | * | |
| LOUISIANADEPARTMENT OF | * | |
| PUBLIC SAFETYAND CORRECTIONS | * | |

**<u>DEFENDANTS' PHASE II POST-TRIAL BRIEF</u>**

Defendants, the Louisiana Department of Public Safety and Corrections (sometimes "DPS&C or the "Department'); James M. Leblanc, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; Jerry Goodwin, in his official capacity as Warden of David Wade Correctional Center; Deborah Dauzat, in her official capacity as Assistant Warden of David Wade Correctional Center; and Vincent Coleman, Dr. Gregory Seal, Steve Hayden, Aerial Robinson, and Johnie Adkins (all in their official capacities as employees of the David Wade Correctional Center) (collectively the "Defendants"), respectfully submit their brief after conclusion of the Phase II trial as follows:

## **INDEX**

I.    This Case Is Limited to Offenders in Restrictive Housing .................................................1

    A.  Restrictive Housing Is Where an Offender is Confined to a Cell for 22 or more hours per day.........................................................................................................................1

    B.  DPS&C and DWCC Have Reduced Reliance Upon Restrictive Housing ...................2

II.   There Is No Eighth Amendment Violation Because There Is a Genuine Debate within the Scientific Community as to Whether Restrictive Housing Causes Harm............................7

III.  There is No Violation of the Eighth Amendment Because the Use of Restrictive Housing Is Not Unusual ...............................................................................................................11

IV.  Law of the PLRA ...........................................................................................................12

V.   Response to Plaintiffs' Brief and Proposed Remedies ...................................................13

    A.  Conditions of Confinement and Discipline.................................................................13

    B.  Mental Health Screening and Evaluation ..................................................................22

        1.  Intake Screening.................................................................................................22
        2.  Screening on Reassignment from Other Parts of DWCC...................................26
        3.  Weekly Mental Health Rounds...........................................................................27
        4.  Definition of Serious Mental Illness ..................................................................29
        5.  Plaintiffs Presented No Evidence of Inadequate Identification and Screening for Mental Illness ...................................................................................................30
        6.  Response to Proposed Remedies on Mental Health Screening and Evaluation ....31

    C.  Mental Health Treatment ...........................................................................................32

        1.  Plaintiffs Did Not Show Timely Complaints regarding DWCC's Mental Health Treatment .........................................................................................................32
        2.  Mental Health Staffing at DWCC........................................................................34
        3.  Mental Health Treatment Plans ...........................................................................37
        4.  Psychiatric Treatment ..........................................................................................39
        5.  Timed Assessments..............................................................................................41
        6.  Self-Help Materials..............................................................................................43
        7.  Treatment Segregation ........................................................................................44
        8.  Medication Administration ..................................................................................45
        9.  Psychoeducational Courses for Working Segregation.........................................47
       10. Response to Proposed Remedies on Mental Health Treatment ...........................47

D. Suicide Prevention ................................................................................50

  1. DWCC Suicide Prevention Policies and Procedures ...........................50
  2. Completed Suicides .............................................................................53
  3. The Tier Walker Program ...................................................................54
  4. Response to Plaintiffs' Proposed Remedies on Suicide Prevention ...................55

E. Use of Force and Restraints .....................................................................59

  1. Evidence on Use of Force and Restraints ............................................59
  2. Response to Proposed Remedies on Use of Force and Restraints ........................61

F. Americans with Disabilities Act and Rehabilitation Act Claims................................62

G. Monitoring ..............................................................................................66

VI.   Plaintiffs Have Failed to Show Any Systematic Constitutional Deficiencies at DWCC ..68

VI.   Conclusion .............................................................................................70

## **TABLE OF AUTHORITIES**

**Cases**

*A. Duda & Sons Coop. Ass'n v. U.S.*, 504 F.2d 970, 975 (5th Cir. 1974).......................................3

*Amos v. Hall*, No. 20-7, 2020 WL 6791516, at *1 (N.D. Miss. Jan. 24, 2020)...........................67

*Anderson v. Dallas Cty. Tex.*, 286 F. App'x 850, 862 (5th Cir. 2008). .......................... 54, 55, 56

*Atkins v. Cty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003)..................................... 62

*Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015)..................................................................... 13

*Barbee v. Collier*, No. 22-70011, 2022 WL 16860944, at *3 (5th Cir. Nov. 11, 2022),
    *cert. denied*, 143 S. Ct. 440 (2022). ................................................................................... 13

*Bell v. Wolfish*, 441 U.S. 520, 562, 99 S. Ct. 1861, 1886, 60 L. Ed. 2d 447 (1979). .................. 13

*Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999)..................................................................... 61

*Brown v. Plata*, 563 U.S. 493, 531, 131 S. Ct. 1910, 1939-40 (2011). ...................................... 13

*Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). ............................................................... 62

*Center v. Lampert*, 726 Fed. App'x 672, 676 (10th Cir. 2018). .................................................. 67

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
    561 U.S. 661, 676-78, 130 S. Ct. 2971, 2983 (2010) .......................................................... 3

*Clark v. LeBlanc et al.*, No. 19-512, 2023 WL 2655725 (M.D. La. Mar. 27, 2023)..................... 8

*Dockery v. Hall*, 443 F. Supp. 3d 726 (S.D. Miss. 2019), *aff'd sub nom*,
    *Dockery v.* Cain, 7 F.4th 375 (5th Cir. 2022) ........................................................... passim

*Elmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019). .................................................................... 8

*Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004)....................................................................... 13

*Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019)............................................. 7, 8, 10, 11, 12

*Imbraguglio v. LeBlanc*, No. 22-18, 2023 WL 2601909 (M.D. La. Mar. 22, 2023)................... 11

*Jemison v. Falcon Drilling Co.,* 140 F.3d 1038 (5th Cir. 1998)..................................................... 3

*June Med. Servs. LLC v. Kliebert*, 158 F. Supp. 3d 473, 512 (M.D. La. 2016). .......................... 37

*Maccharulo v. N.Y. St. Dep't of Corr. Servs.*, No. 08-301, 2010 WL 2899751, at *3
(S.D.N.Y. July 21, 2010). ................................................................. 62

*Mobil Expl. & Producing U.S., Inc. v. N.L.R.B.*, 200 F.3d 230, 234 (5th Cir. 1999). .................... 3

*Robichaux v. Tanner*, 995 F.2d 223 (5th Cir. 1993). ..................................................... 37

*Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010) ......................... 62

*Smith v. Harris Cty., Tex.*, 956 F.3d 311, 318 n.1 (5th Cir. 2020)................................ 62

*Tasby v. Cain*, No. 16-277, 2017 WL 4295441, at *7 (M.D. La. Sept. 12, 2017), *report and
recommendation adopted,* 2017 WL 4322413 (M.D. La. Sept. 28, 2017). ...................... 61

*Taylor v. Barkes*, 575 U.S. 822, 826, 135 S. Ct. 2042, 2044 (2015). ...........................................55

*U.S. v. Hinds County*, No. 16-489, 2022 WL 1112223, at *42-45
(S.D. Miss. Apr. 13, 2022)........................................................25, 32, 48, 49, 58

*Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003). ................................................. 66, 67

*Woodford v. Ngo*, 548 U.S. 81, 94, 126 S.Ct. 2378 (2006). ................................................. 21, 22

**Statutes**

18 U.S.C. § 3626..............................................................................................12, 66, 67

**MAY IT PLEASE THE COURT:**

**I.      THIS CASE IS LIMITED TO OFFENDERS IN RESTRICTIVE HOUSING**

The narrow focus of this case must be acknowledged.

**A.      Restrictive Housing Is Where an Offender Is Confined to a Cell for 22 or more hours per day.**

This case is about Restrictive Housing, previously referred to as "extended lockdown," where offenders are confined to a cell for 22 or more hours per day. Any housing that does not conform to that definition is not within the scope of this litigation.

Paragraph 24 of the original complaint, paragraph 34 of Amended Complaint, and paragraph 36 of the Second Amended Complaint all state that:

> For the purposes of the litigation, extended lockdown refers to the confinement in a cell for 23 to 24 hours per day. Solitary confinement refers to the subset of extended lockdown in which a single prisoner is confined alone in a cell with no regular social interaction for 23 to 24 hours per day.

[R. Doc. 1 at 8, ¶24; R. Doc. 154 at 11, ¶34; R. Doc. 316 at 12, ¶36] On September 20, 2021, the Court certified a class of all prisoners who are or will be subject to extended lockdown at DWCC. [R. Doc. 462 at 27-28] The Court's Opinion after the Phase I trial found that extended lockdown refers to housing prisoners separately from the general population for twenty-two or more hours per day in a cell. [R. Doc. 641 at 8]

With the adoption of IS-B-4, the term "extended lockdown" was changed to "Restrictive Housing." [Ex. JR-1, at 6(U)] Specifically, IS-B-4 defines "Restrictive Housing" as:

> A placement that requires an offender to be confined to a cell at least 22 hours per day for the safe and secure operation of the facility.

This definition is the same definition promulgated by the ACA. [Burns Trial 2 Tr. vol. VII at 1608:24 - 1609:1] To her credit, Dr. Burns continues to use the same definition tied to offenders being confined to a cell at least 22 hours per day. [*Id.*] Dr. Burns agreed that an offender who is

out of his cell more than two hours a day is no longer in Restrictive Housing. [Burns Trial 2 Tr. vol. VII at 1609:2-8] Dr. Haney testified in his deposition prior to the Phase I trial that Restrictive Housing was defined as being confined to a cell for 22 to 23 hours a day. [Haney Trial 2 Tr. vol. X at 2282:23 - 2283:11] In his expert report for the Phase I trial, Dr. Haney defined Restrictive Housing as the placement of an individual in a cell for at least 22 hours per day. [Haney Trial 2 Tr. vol. X at 2284:11-23]

In the field of corrections, the term "Restrictive Housing" refers to housing where offenders are segregated from general population and confined to a cell for greater than or equal to 22 hours. Housing at DWCC that was referred to during the Phase I trial as "extended lockdown," "disciplinary segregation," or "preventative segregation" would (both then and now) be categorized as "Restrictive Housing." [Upchurch Trial 2 Tr. vol. XII at 2703:8-11; Burns Trial 2 Tr. vol. VII at 1608:20 - 1609:1; Haney Trial 2 Tr. vol. X at 2282:3 - 2287:6; Pacholke Trial 2 Tr. vol. III, 572:24 - 573:4; Goodwin Trial 2 Tr. vol. XI at 2502:11-16; JR-1 at 6] The use of Restrictive Housing allows for the freedoms, opportunities, and activities that inmates in general population are able to experience. [Upchurch Trial 2 Tr. vol. XII at 2784:5 - 2785:6]

Any attempt by Plaintiffs to enlarge this case beyond Restrictive Housing must be rejected.

### B.    DPS&C and DWCC Have Reduced Reliance Upon Restrictive Housing

Going back to at least 2016, DPS&C began ambitious work related to its statewide usage of Restrictive Housing. [Goodwin Trial 2 Tr. vol. XI at 2502:17- 2503:2] DPS&C began a two-pronged approach to this issue as follows: 1) seeking to reduce its usage of Restrictive Housing through the reduction (where possible) of Restrictive Housing ("Restrictive Housing reduction"); [J. Le Blanc Trial 2 Tr. vol. X at 2136:24 - 2137:3; Goodwin Trial 2 Tr. vol. XI at 2502:17- 2503:2; Thompson Trial 2 Tr. vol. XIII at 3003:4 - 3004:2] and 2) changing completely how DPS&C operates the Restrictive Housing areas it must maintain for stability and security of its staff

members, offender populations, and the public ("Restrictive Housing procedural changes"). [J. Le Blanc Trial 2 Tr. vol. X at 2140:17 - 2141:2; Goodwin Trial 2 Tr. vol. XI at 2517:1-18, 2524:9-25, 2539:15 - 2540:12, 2541:6 - 2549:1]

Certain areas are no longer at issue in this case. In 2018, DWCC began its Restrictive Housing reduction efforts by converting N1 from a Restrictive Housing area to a medium custody housing area. When this case started, N1 was considered to be extended lockdown, i.e., Restrictive Housing. Now, it is stipulated[1] that offenders in N1 are medium custody and are out of their cells more than two hours a day. [Ex. JR-60, R. Doc. 669, at 4, ¶16; JR-24 at 1(A); Burns Trial 2 Tr. vol. VII at 1611:2-3; Coleman Trial 2 Tr. vol. I at 76:1-3; Kimball Tr. vol. I at 205:25 - 206:13] This change resulted in the reduction of 112 Restrictive Housing beds. [Goodwin Trial 2 Tr. vol. XI at 2507:15 - 2508:6; Burns Trial 2 Tr. vol. VII at 1611:15-19; J. Le Blanc Trial 2 Tr. vol. X at 2159:9-17; Upchurch Trial 2 Tr. vol. XII at 2714:11-24; Thompson Trial 2 Tr. vol. XIII at 2862:5-12] A consequence of this change was that CCR was moved from N1D to N2D, eliminating 32 more restrictive housing beds previously in N2D.[2] [Goodwin Trial 2 Tr. vol. XI at 2508:7-16]

Offenders in N1 have televisions on the tier and are allowed possession of tablets. Offenders in N1 have access to tablets which can be used to complete phone calls. [JR-60, R. Doc. 669 at 4-5, ¶¶16, 22]

Offenders in N1 are allowed the personal possessions allowed to prisoners in medium custody. Offenders in N1 have access to group programming. Offenders in N1 eat in the dining hall and are allowed to exercise two hours day on the yard (not in the secured recreation areas).

---

[1] Stipulations are binding and conclusive. *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 676-78, 130 S. Ct. 2971, 2983 (2010). Stipulations of fact fairly entered into are controlling and conclusive, and courts are bound to enforce them. *A. Duda & Sons Coop. Ass'n v. U.S.*, 504 F.2d 970, 975 (5th Cir. 1974); *Mobil Expl. & Producing U.S., Inc. v. N.L.R.B.*, 200 F.3d 230, 234 (5th Cir. 1999); *Jemison v. Falcon Drilling Co.*, 140 F.3d 1038 (5th Cir. 1998).
[2] CCR is further discussed *infra* at 5.

[JR-60, R. Doc. 669 at 4, ¶16] Offenders in N1 also have access to a wide variety of programming. [Goodwin Trial 2 Tr. vol. XI at 2558:3 - 2563:7]

In furtherance of working toward DPS&C's Restrictive Housing reduction goal, on March 31, 2021, DWCC created a Working Segregation classification for offenders to be housed in N2C. That unit began running in April 2022. [Goodwin Trial 2 Tr. vol. XI at 2567:8-12] While still a maximum-security housing area, the change in the conditions of N2C resulted in the conversion of 32 Restrictive Housing beds to 32 non-Restrictive Housing beds. [JR-60, R. Doc. 669, at 2-3, ¶¶4, 11; Upchurch Trial 2 Tr. vol. XII at 2718:9 - 2719:13, 2720:10-13; Goodwin Trial 2 Tr. vol. XI at 2550:18 - 2555:16, 2566:20 - 2567:7; JR-12, DWCC EPM 03-01-003 dated 3/31/2021; Pacholke Trial 2 Tr. vol. III at 593:10-14; Burns Trial 2 Tr. vol. VII at 1613:13-16; Thompson Trial 2 Tr. vol. XIII at 2862:13-23] It is further stipulated that offenders in working segregation, N2C, are out of their cells more than two hours a day. [Ex. JR-60, R. Doc. 669, at 3-4, ¶15]

Offenders in Working Segregation are assigned that status for a determinate period of time, usually 45 to 90 days with a classification review at least every 90 days. [JR-60, R. Doc. 669 at 3-4, ¶15; JR-1 at 6(6)(W)(7); JR-12 at 1; Kimball Tr. vol. I at 208:9-19; Thompson Trial 2 Tr. vol. XIII at 2862:24 -2863:1]

Offenders in Working Segregation have access to group programming held in the North Compound chapel. [JR-60, R. Doc. 669 at 3-4, ¶15; Sherman Trial 2 Tr. vol. II at 392:16-22; Pacholke Trial 2 Tr. vol. III at 593:15-19; Goodwin Trial 2 Tr. vol. XI at 2566:3-8]

Offenders in Working Segregation are provided a minimum of two hours of exercise time outside of their cells on the yard seven days per week. [JR-60, R. Doc. 669 at 3-4, ¶15; Goodwin Trial 2 Tr. vol. XI at 2565:22- 2566:2] Offenders in Working Segregation are provided a minimum of 2 fifteen-minute phone calls per week. [JR-60, R. Doc. 669 at 5, ¶22; Goodwin Trial 2 Tr. vol. XII at 2637:3-6] Offenders in Working Segregation eat in the Chow Hall as opposed to in their

4

cells. [JR-60, R. Doc. 669 at 3-4, ¶15; Goodwin Trial 2 Tr. vol. XI at 2565:19-21] Offenders in Working Segregation are allowed to spend a maximum of $40 per week in the canteen. [JR-60, R. Doc. 669 at 3-4, ¶15]

Offenders in Working Segregation are evaluated monthly by a multidisciplinary board consisting of the Unit Manager, a classification officer, and the mental health director or his designee to determine an offender's compliance with program requirements. [JR-12 at 2(G); Kimball Tr. vol. II at 277:8 - 278:4; Pacholke Trial 2 Tr. vol. III at 580:14-18, 591:7 - 593:9]

Since Phase I, offenders on N1 and N2C (Working Segregation) are allowed to use the yard for recreation and eat in a cafeteria setting. [JR-60, R. Doc. 669 at 3-4, ¶¶15, 16]

In furtherance of DWCC's Restrictive Housing reduction efforts, offenders housed in N2D tier are in a status known as closed cell restriction ("CCR"). [JR-60, R. Doc. 669 at 3, ¶12] CCR is in N2D and consists of 16 beds. [*Id.*] CCR is not Restrictive Housing. [Pacholke Trial 2 Tr. vol. III at 594:25 - 595:3; Goodwin Trial 2 Tr. vol. XI at 2587:21-23; Upchurch Trial 2 Tr. vol. XII at 2733:5-16, 2736:10-23] CCR offenders have their classification reviewed every 90 days. [Goodwin Trial 2 Tr. vol. XI at 2594:19-23; JR-1 at 16(C)(4)(b); JR-11 at 11(VI)(4)(b)] Offenders in CCR have access to contact visitation. [R. Doc. 669 at 5-6, ¶25; Belton Tr. vol. II at 443:21 - 445:12] Offenders CCR get three 30-minute phone calls a week. [JR-60, R. Doc. 669 at 5, ¶22; Goodwin Trial 2 Tr. vol. XII at 2637:7-13]

Offenders in N1, N2C, and N2D have access to televisions and radios. [R. Doc. 669 at 3-4, 5, ¶¶15, 16; JR-26 at 9, Goodwin Trial 2 Tr. vol. XI at 2566:17, 2587:18 - 2588:2]

Thus, offenders in N1, N2C, working segregation, and N2D, CCR, are no longer being held in Restrictive Housing.

DWCC also achieved its Restrictive Housing reduction goals by reducing the census in N3 and N4 by 128 through single bunking these buildings. [Ex. JR-60, R. Doc. 669, at 3, ¶10; Nail

5

Trial 2 Tr. vol. I at 147:24 - 148:3; Pacholke Trial 2 Tr. vol. III at 610:8-17; Burns Trial 2 Tr. vol. VII at 1609:9 - 1610:2, 1621:13-17; Haney Trial 2 Tr. vol. X at 2289:1-4; Thompson Trial 2 Tr. vol. XIII at 2863:5-10] This change was the result of a request for a reduction of capacity made by DWCC in October 2021. The Department granted the request in November 2021. DWCC achieved this operational reduction by no later than April 2022. This resulted in the elimination of 128 Restrictive Housing Beds at DWCC. [JR-60, R. Doc. 669 at 3, ¶10; Goodwin Trial 2 Tr. vol. XI at 2569:7 - 2571:19]

DWCC also made further Restrictive Housing reduction efforts by receiving DPS&C approval to eliminate 64 Restrictive Housing beds in N2A and B. [Burns Trial 2 Tr. vol. VII at 1621:18-19 (N2A is single bunked)]. This reduction will be achieved once DWCC is able to return medium custody bed space in N1A and B to regular usage, which occurred after the Court's fact cutoff date. As of August of 2022, DWCC maintained all the cells in N1A and B for usage in quarantine efforts to fight the COVID-19 pandemic as required by DPS&C's pandemic mitigation plan. [(quarantine fact) JR-60, R. Doc. 669 at 3, ¶14; Goodwin Trial 2 Tr. vol. XI at 2578:12-19] As of February 1, 2023, N2A is completely single bunked and N2B had only four cells remaining double bunked. [Goodwin Trial 2 Tr. vol. XI at 2571:1 - 2572:8 (response given to questioning by the Court)]

Since March 2020, DWCC has made significant achievements toward the Department of Corrections' goals of Restrictive Housing reduction and Restrictive Housing procedural changes. [Goodwin Trial 2 Tr. vol. XI at 2541:6 - 2549:1 vol. XII, 2632:23 - 2633:8; Upchurch Trial 2 Tr. vol. XII at 2785:7-10; J. LeBlanc vol. X at 2147:23-25, 2149:4-20.; Burns Trial 2 Tr. vol. VIII at 1719:15-17]

The net effect of all of these changes is that the number of offenders in Restrictive Housing at DWCC has decreased from 344 to 168. [Thompson Trial 2 Tr. vol. XIII at 2863:24 - 2864:4]

Vera reported that Louisiana had the largest reduction in its use of Restrictive Housing of any single jurisdiction that reported. [PR-Z-5 at 4] This case is now about the 168 offenders in Restrictive Housing. The other housing areas that do not meet the definition of Restrictive Housing are no longer at issue.

## II.   THERE IS NO EIGHTH AMENDMENT VIOLATION BECAUSE THERE IS A GENUINE DEBATE WITHIN THE SCIENTIFIC COMMUNITY AS TO WHETHER RESTRICTIVE HOUSING CAUSES HARM

To state an Eighth Amendment claim, a plaintiff must demonstrate "universal acceptance by the medical community." *Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019). Universal acceptance is not present when there is robust and substantial good faith disagreement dividing respected members of the expert medical community. *Id.* Where a genuine debate exists within the scientific community as to an issue, a deliberate indifference claim fails. *Id.*

In *Gibson*, the plaintiff claimed that the policy of the Texas Department of Criminal Justice ("TDCJ") violated the Eighth Amendment because the policy refused to consider the possibility of sex reassignment surgery. The Fifth Circuit affirmed summary judgment in favor of the TDCJ that the policy was not cruel and unusual under the Eight Amendment and denied plaintiff's request for issuance of an injunction. The Fifth Circuit noted the difference of opinion within the medical community as to whether sex reassignment surgery was necessary and effective. Much of the medical opinion cited by the Fifth Circuit was not in the record of the case. *Id.* at 221-222. Indeed, the only evidence in the record was the standards of care issued by the World Professional Association for Transgender Health which provide that for many transgender people sex reassignment surgery is essential and necessary. *Id.* at 218. That provision was not enough to establish a standard of care or medical consensus where others dispute the necessity and effectiveness of sex reassignment surgery. *Id.* at 222-223.

Recently, a similar issue arose in Louisiana. A transgender plaintiff argued that it was a violation of the Eighth Amendment to deny her electrolysis and effeminate commissary products to express her femineity through gender grooming, clothing, and pronoun use. The Defendants filed a motion for summary judgment. On March 27, 2023, Judge Brian Jackson of the Middle District of Louisiana granted summary judgment dismissing the plaintiff's claims, relying in part on *Gibson*. *Clark v. LeBlanc et al.*, No. 19-512, 2023 WL 2655725 (M.D. La. Mar. 27, 2023). Following *Gibson*, the district court noted that the court may take notice of the divergent medical opinions outside the record. *Id.* at \*10. The District Court concluded that there was a genuine debate as to the medical necessity of surgery; thus, Plaintiff's deliberate indifference claims failed. *Id.* at \*11.[3]

Applying the precedent of the Fifth Circuit in *Gibson* and relied on in *Clark*, there is no violation of the Eighth Amendment here because the issue of whether Restrictive Housing causes harm or increases mental illness is not settled and is subject to genuine scientific debate.

It has not been proven that Restrictive Housing causes mental illness. [Thompson Trial 2 Tr. vol. XIV at 3080:24 - 3081:1] As one studies Restrictive Housing longitudinally using standardized psychological instruments and comparison groups, the alleged effects of Restrictive Housing become less and less clear. [Thompson Trial 2 Tr. vol. XIV at 3081:22 - 3082:8] The more controlled scientifically designed studies show that prisoners adapt to the Restrictive Housing environment over time. [Thompson Trial 2 Tr. vol. XIV at 3083:4-17] At best, the most that can be said is that the scientific literature on whether Restrictive Housing causes harm is inconclusive. [Thompson Trial 2 vol. XIV at 3080:17-23]

---

[3] *Gibson* remains the law of the Fifth Circuit even though the Ninth Circuit came to a different conclusion in *Elmo v. Corizon, Inc.*, 935 F.3d 757 (9th Cir. 2019).

The Colorado study examined Restrictive Housing over a year and found that inmates accommodated to that environment. [Thompson Trial 1 Tr. vol. XVII at 4060:3-12] The Colorado study is a valid study. [Thompson Trial 2 Tr. vol. XIV at 3084:6-16] Even Dr. Burns agreed that the Colorado study is authoritative. [Burns Trial 1 Tr. Vol. VI at 1460:16-18]

The meta-analysis undertaken by Morgan in 2016 found that the Colorado study met the scientific rigor to be included within the meta-analysis. [Thompson Trial 2 Tr. vol. XIV at 3084:16-18] The meta-analysis looking at all the valid studies in the area of Restrictive Housing found that the more control groups and more standardized instruments used showed that mentally ill do not worsen while in Restrictive Housing. [Thompson Trial 1 Tr. vol. XVII at 4061:1-20]

The National Institute of Justice issued a report in 2016 called Restrictive Housing in the U.S., Issues, Challenges, and Future Directions. [Burns Trial 1 Tr. vol. VI at 1463:16-25] The NIJ paper concluded that there are two points of view and no consensus on whether Restrictive Housing causes mental illness or harm. [Burns Trial 1 vol. VI at 1464:1-4] The NIJ paper concluded by calling for additional studies. [Burns Trial 1 vol. VI at 1464:4-5]

The Chadick study published in 2018 stated that the magnitude of harm caused by Restrictive Housing had become a hotly contested issue. [Haney Trial 2 Tr. vol. X at 2309:19-21] The Chadick study cited the Colorado study which the Chadick authors called the most sophisticated study to date. [Haney Trial 2 Tr. vol. X at 2310:1-21] The Chadick study also stated that controlled studies looking at longer periods of segregation have found no adverse effects on individuals. [Haney Trial 2 Tr. vol. X at 2309:22-25] The Chadick study concluded that some offenders in Restrictive Housing showed improvement compared to the general population. [Haney Trial 2 Tr. vol. X at 2310:16-21] The Chadick study found that some inmates with mental illness showed improvement with regard to their psychological functioning while in Restrictive Housing. [Thompson Trial 2 Tr. vol. XIV at 3088:21-24; Haney Trial 2 Tr. vol. X at 2310:16-21]

9

The Chadick study further stated that Restrictive Housing did not appear to produce debilitating effects as argued by some. [Haney Trial 2 Tr. vol. X at 2313:8-10] Dr. Haney agreed that the Chadick study is authoritative. [Haney Trial 2 Tr. vol. X at 2313:16-18] The conclusions of the Chadick study are consistent with the conclusions of the Colorado study.

In 2018, Walters published a paper called, Checking the Math, which took a different look at the data from the Colorado study. [Thompson Trial 2 Tr. vol. XIV at 3089:15-24] Walters concluded that inmates with mental illness were just as likely to experience severe psychological deterioration in general population as they were in Restrictive Housing.[4] [Thompson Trial 2 Tr. vol. XIV at 3089:25 - 3090:4] Walters' results indicated that psychological deterioration in mentally ill inmates had less to do with Restrictive Housing, as opposed to the overall incarceration process. [Thompson Trial 2 Tr. vol. XIV at 3090:4-7]

Finally, the Court should consider the Siennick study out of Florida published in November of 2022.[5] That study studied 843 inmates between 2007 and 2015 using mental health professional assessments of SMI and psychological functioning. Just like the Colorado study and the Chadick study, the Siennick study also found no evidence that Restrictive Housing (referring to as ESC, extended solitary confinement) had a more harmful impact on the mental health of inmates with SMI; to the contrary, there was in fact evidence of beneficial changes in mental health functioning and service during Restrictive Housing.

These authorities which run from the Colorado study to the very recent Siennick study all refute the suggestion that Restrictive Housing causes harm. At a minimum, there is an open issue

---

[4] This finding is consistent with the evidence presented as to offender DQ, discussed below. DQ experienced psychological decompensation while in general population. He was admitted into treatment segregation and stabilized. DQ is consistent with the science as related by Dr. Thompson.

[5] The Fifth Circuit in *Gibson* looked at scientific evidence outside the record to make its decision. For this reason, Defendants respectfully suggest that the Court can and should consider the Siennick study offered as Defendants' Proffer 10.

which is subject to genuine debate. In light of the debate over the science, Defendants cannot be found deliberately indifferent under the Eighth Amendment.

The recent case of *Imbraguglio v. LeBlanc*, No. 22-18, 2023 WL 2601909 (M.D. La. Mar. 22, 2023) further supports the conclusion Defendants cannot be found deliberately indifferent as to the use of Restrictive Housing. Imbraguglio complained that he had been held in solitary confinement for seven years, including time at DWCC,[6] and that his excessive prolonged exposure to solitary confinement caused him extreme mental health disabilities for which he was prescribed various medications. While at LSP, he alleges he was only allowed to leave his cell for fifteen minutes a day. The Court held that "long-term solitary confinement is not per se cruel and unusual," and that "confinement to a cell for 23 hours per day does not rise to the level of a constitutional violation." *Id.* at *8, 10. Courts in the Fifth Circuit have denied constitutional claims where offenders were held in solitary confinement for nineteen years or longer. *Id.* at *11. The Court found that the defendants were not deliberately indifferent to Imbraguglio because he was actively being treated for the injuries (mental health disabilities) of which he complained. *Id.* at *12.

Defendants cannot be found deliberately indifferent because the issue is subject to genuine debate within the scientific community, the long-term use of Restrictive Housing has been allowed by legal precedent, and Defendants treat offenders with mental illnesses.

## III.   THERE IS NO VIOLATION OF THE EIGHTH AMENDMENT BECAUSE THE USE OF RESTRICTIVE HOUSING IS NOT UNUSUAL

The Fifth Circuit in *Gibson* noted that a prison violates the Eighth Amendment only if it inflicts punishment that is both cruel and unusual. *Gibson*, 920 F.3d at 226. The Court then stated

---

[6] Warden Goodwin was a named defendant in the suit.

that under a plain meaning of the term unusual, a prison policy cannot be unusual if it is widely practiced in prisons across the country. *Id.*

It is undisputed that Restrictive Housing is widely practiced in prisons across the country. [Burns Trial 2 Tr. vol. VIII at 1718:14-16; Haney Trial 2 Tr. vol. X at 2302:19-21] Florida utilizes a form of Restrictive Housing that looks very much like that at DWCC. [Burns Trial 2 Tr. vol. VIII at 1731:15-17; DR-11][7] The conditions addressed by the Fifth Circuit in the *Dockery* case look very much like those at DWCC. Again, the claims in *Dockery* were dismissed in favor of the defendants with no finding of liability. *Dockery v. Hall*, 443 F. Supp. 3d 726 (S.D. Miss. 2019), *aff'd sub nom*, *Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2022). Nationally, 3.8% of all prisoners are housed in Restrictive Housing, based upon 39 reporting jurisdictions. [Haney Trial 2 Tr. vol. X at 2298:19-25]

Since the vast majority of prisons throughout the country use Restrictive Housing, Defendants' use of restrictive housing cannot be found to be cruel *and unusual* in violation of the Eighth Amendment.

## IV.   LAW OF THE PLRA

Before addressing Plaintiffs' proposed remedies, the limitations of the Prison Litigation Reform Act (the "PLRA") must be considered.

Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. 18 U.S.C. § 3626(a)(1)(A). A court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the

---

[7] Of course, the suit against Florida was dismissed with no finding of liability. Burns Trial 2 Tr. vol. VIII at 1731:1-3.

violation of the Federal right. *Id.* A court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief. *Id.*

Narrow tailoring requires a fit between the remedy's ends and the means chosen to accomplish those ends. The scope of the remedy must be proportional to the scope of the violation, and the order must extend no further than necessary to remedy the violation. The United States Supreme Court has rejected remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution. *Brown v. Plata*, 563 U.S. 493, 531, 131 S. Ct. 1910, 1939-40 (2011). While federal courts can certainly enter injunctions to prevent Eighth Amendment violations, they are not to micromanage state prisons. *Barbee v. Collier*, No. 22-70011, 2022 WL 16860944, at *3 (5th Cir. Nov. 11, 2022), *cert. denied*, 143 S. Ct. 440 (2022); *Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004); *see also Bell v. Wolfish*, 441 U.S. 520, 562, 99 S. Ct. 1861, 1886, 60 L. Ed. 2d 447 (1979). Under the PLRA, "plaintiffs are not entitled to the most effective available remedy; they are entitled to a remedy that eliminates the constitutional injury." *Ball v. LeBlanc*, 792 F.3d 584, 599 (5th Cir. 2015).

## V.   SPECIFIC RESPONSE TO PLAINTIFFS' BRIEF AND PROPOSED REMEDIES

Defendants now address each section of Plaintiffs' brief and the proposed remedies.

### A.   Conditions of Confinement and Discipline

At DWCC, assignment of offenders to segregated housing, of which Restrictive Housing is a subset, is limited to those circumstances which pose a direct threat to the safety of people or a clear threat to the safe and secure operations of the facility. [JR-1 at 8(7)(A)(1); JR-11 at 4(V)(A)(1)] DWCC considers the following nonexclusive situations: a) The relationship between the threat the offender poses and the behaviors articulated during an incident giving rise for the need for segregated housing; b) The impact segregated housing may have on the medical and mental health conditions exhibited by the offender and the

possible alternatives which may be available to compensate for such conditions; or c) A defined list of alternatives which may be available to deal safely with the threat posed by the offender other than segregated housing. [*Id.;* Thompson Trial 2 Tr. vol. XIII at 2897:8 - 2898:1]

Offenders assigned to Restrictive Housing and/or maximum custody due to disciplinary issues are housed only in N2 A and B tiers, and N3–N4. [JR-60, R. Doc. 669 at 2, ¶6]

When an offender is placed in Restrictive Housing, he is afforded a phone call within 24-hours of that placement. [JR-60, R. Doc. 669 at 5, ¶23.; Pacholke Trial 2 Tr. vol. III at 579:5-13; JR-1 at 12(7)(D)(9); JR-11 at 8 (9); Burns Trial 2 Tr. vol. VII at 1637:23 - 1638:7; Thompson Trial 2 Tr. vol. XIII at 2898:9-14]

Offenders undergo a mental health appraisal within 7-days of assignment to Restrictive Housing. [JR-1 at 10(7)(B)(5); JR-11 at 5(V)(B)(5); Burgos Trial 2 Tr. vol. IV at 726:3 - 727:23; Hayden Trial 2 Tr. vol. V at 1083:24 - 1084:8; Dauzat Tr. vol. VI at 1244:16-22; Burns Trial 2 Tr. vol. VII at 1533:23-24, 1638:8-18; Robinson Trial 2 Tr. vol. IX at 2094:2-6]

Offenders found guilty of major rules violations can be assigned to a restrictive housing status known as "disciplinary segregation." [JR-1 at 6(W)(1); JR-11 at 10(2)] Disciplinary Segregation is "[a] maximum custody housing area, typically a cell, where an offender is housed for a definitive period of time as a result of a sanction from a disciplinary hearing." [*Id.*] Disciplinary Segregation at DWCC is Restrictive Housing as defined in the field of corrections.

Disciplinary Segregation has a specific duration and can only be imposed after an offender is found guilty of a rule violation pursuant to DPS&C's disciplinary sanction matrix (the "Disciplinary Matrix"). [JR-1 at 6; JR-11 at 10; JR-2, Disciplinary Sanction Matrix; Upchurch Trial 2 Tr. vol. XII at 2737:3-17] To be clear, a particular rule violation must be severe enough

14

such that the Disciplinary Matrix allows for the imposition of Disciplinary Segregation in the first instance. [J. Le Blanc Trial 2 Tr. vol. X at 2139:12 - 2140:16] Plaintiffs largely do not challenge this practice.

Loss of yard is no longer being imposed as a sanction at DWCC. [Pacholke Trial 2 Tr. vol. III at 578:21-24; Haney Trial 2 Tr. vol. X at 2219:14-20] Plaintiffs do not dispute that offenders in Disciplinary and Preventative Segregation are receiving their yard time. [Pacholke Trial 2 Tr. vol. III at 578:25 - 579:4]

Offenders serving a Disciplinary Segregation sanction are reviewed at the end of their sanction by the Segregation Review Board to determine if they can be returned to quarters, stepped-down to Working Segregation or N1, or placed in Preventative Segregation. [JR-1 at 15(8)(B)(4); JR-11 at 10(2)(d); Belton Trial 2 Tr. vol. II at 440:14-19] As part of DWCC's new Restrictive Housing procedures, it has implemented a step-down system (using Working Segregation and/or N1 where appropriate) to assist offenders moving to a less restrictive environment, [Goodwin Trial 2 Tr. vol. XI at 2513:7-15, vol. XII 2680:2-12; Upchurch Trial 2 Tr. vol. XII at 2721:10 - 2722:3; JR-1 at 15(8)(B)(4); Burns Trial 2 Tr. vol. VII at 1618:6-9 (acknowledgment of three-step step-down process at DWCC)]

An offender is placed in Preventative Segregation if the offender's "continued presence in general population is a danger to the good order and discipline of the facility and/or whose presence poses a danger to himself, other offenders, staff, or the general public" until the offender modifies his behavior. [JR-1 at 6(W)(3); JR-11 at 10-11(3); Coleman Trial 2 Tr. vol. I at 71:12-15; Upchurch Trial 2 Tr. vol. XII at 2737:17 - 2738:6]

The key to progressing out of a Restrictive Housing status is demonstrating that the offender is less of a threat to other offenders, the staff, and the public. [Kimball Trial 2 Tr. vol. I at 243:2-6; Coleman Trial 2 Tr. vol. I at 124:14 - 126:11; Goodwin Trial 2 Tr. vol. XI at

15

2532:22 - 2536:25; Upchurch Trial 2 Tr. vol. XII at 2723:14 - 2724:8; JR-1 at 17(D)(1); JR-11 at 10-11(3); DR-20 (exemplars of LOC 3 and 4 individuals progressing out of Restrictive Housing)] The Segregation Review Board (also referred to as the "Multidisciplinary Review Board")[8] makes this determination after a review of the offender's records at a live review hearing where the offender is allowed to be heard on the issue. [JR-1 at 3(B)(4); JR-11 at 1(I)(C); Coleman Trial 2 Tr. vol. I at 125:8-13; Kimball Tr. vol. II at 290:1-17; Goodwin Trial 2 Tr. vol. XI at 2538:5-13; Upchurch Trial 2 Tr. vol. XII at 2753:25 - 2759:2; Thompson Trial 2 Tr. vol. XIII at 2999:9 - 3000:9 (offenders understand how to progress)] The Segregation Review Board then explains its rationale to the offender at the hearing. [Upchurch Trial 2 Tr. vol. XII at 2759:10 - 2760:14]

DWCC's Segregation Review Board is "[a] multidisciplinary team comprised of a classification officer, mental health provider, and a security officer (Major or above) to consider and make recommendations as to whether or not an offender in Protective Segregation, Preventative Segregation, or restrictive housing may be moved to a less restrictive setting or remain in restrictive housing." [JR-1 at 3(B)4); JR-11 at 1(I)(C); Coleman Trial 2 Tr. vol. I at 44:17-21; Thompson Trial 2 Tr. vol. XIII at 2994:19-22] The addition of a mental health provider is a change from previous practice.

An offender in Preventative Segregation is reviewed by the Segregation Review Board at a minimum of every 60-days. [JR-1 at 17(D)(3); JR-11 at 10-11(3)(b); Kimball Tr. vol. I at 224:2-4; Goodwin Trial 2 Tr. vol. XI at 2538:14-19] The Segregation Review Board considers many factors, among them are: 1) if the offender received additional rule violations during his confinement to Restrictive Housing; 2) if the offenders' institutional records reveal that the

---

[8] This brief will use the terminology in JR-1, "Segregation Review Board" for consistency.

16

offender has a pattern in engaging in certain behavior when moved from Restrictive Housing (e.g., an offender engages in violent fights when in a less restrictive environment, resulting in multiple Disciplinary Segregation sanctions); 3) the seriousness of an offender's offense (e.g., an offender severely injured or killed another inmate). [Upchurch Trial 2 Tr. vol. XII at 2754:8 - 2755:6; Kimball Tr. vol. II at 294:3-21, 295:21 - 296:9; Coleman Trial 2 Tr. vol. I at 125:18 - 126:11] As such, the determination is individualized and an offender's time in Restrictive Housing is highly variable. [Kimball Tr. vol. I at 244:5-7, vol. II 272:5 – 273:2; Upchurch Trial 2 Tr. vol. XII at 2748:5-17; Goodwin Trial 2 Tr. vol. XI at 2555:2 - 2556:18]

Despite claiming that classification reviews at DWCC are not "meaningful", Plaintiffs' experts have never witnessed a classification review board at DWCC in either phase of the litigation. [Pacholke Trial 2 Tr. vol. III at 579:14 - 580:3, 595:11 - 599:16] The evidence shows that offenders regularly progress from Restrictive Housing on the South Compound to the general population housing on the North Compound at DWCC. [Thompson Trial 2 Tr. vol. XIII at 2976:3-7, 2998:25 - 2999:8; DR-18 & 19; Burns Trial 2 Tr. vol. VII at 1610:3-21] Plaintiffs' security expert, Mr. Pacholke did not conduct an independent review of individual records to determine if he disagreed with the classification decisions of the Segregation Review Board. [Pacholke Trial 2 Tr. vol. III at 600:2-16]

In 2022, DWCC installed phone carts that can be brought down the tiers to facilitate an increase in phone calls for offenders in N2–N4. [JR-60, R. Doc. 669 at 5, ¶20; Belton Tr. vol. II at 424:2-10; Goodwin Trial 2 Tr. vol. XII at 2635:15-19; Thompson Trial 2 Tr. vol. XIII at 2947:21 - 2948:6] Offenders in Restrictive Housing are allowed a minimum of four (4) fifteen-minute phone call per month plus attorney phone calls. Previously, offenders were allowed only one ten-minute phone call. [JR-60, R. Doc. 669 at 5, ¶22; Goodwin Trial 2 Tr. vol. XII at 2636:15 - 2637:2] If an offender asks for access to the phone cart, DWCC staff bring it to the offender whether it is

in the morning or late at night. [Belton Tr. vol. II at 425:21-25] Calls to attorneys are not limited in number or duration as long as they are reasonable. [JR-25 at 2(F)]

Offenders in Restrictive Housing are allowed three books and additional religious and educational materials. [JR-60, R. Doc. 669 at 4, ¶18; JR-26, DWCC USOPP #36 dated 8/25/2021 at 8-11] Each tier in N1, N2, N3, and N4 now have eight (8) fans as opposed to the previous four (4) that help when the temperature is warm. [Belton Tr. vol. II at 426:24 - 427:7, 428:3-5; Dempster Tr. vol. VII at 1500:7-9] Haircuts and shaves in the lobby area are available to all offenders on Monday, Wednesday, and Saturday. [JR-1 at 12(4); JR-25 at 6 of 15] The privileges allowed in Investigative Segregation, Disciplinary Segregation, and Preventative Segregation at DWCC comply with the 5th Edition ACA Standards. [Pacholke Trial 2 Tr. vol. III at 577:16 - 578:5]

Staff make regular rounds in Restrictive Housing to ensure those offenders have access to their services. Medical staff make daily rounds. [JR-1 at 9(B)(3); Thompson Trial 2 Tr. vol. XIII at 2903:4-11] The classification officer makes weekly rounds. [JR-11 at 1(I)(D); Kimball Tr. vol. 1 at 191:12-14] Mental health staff make weekly rounds which are more fully addressed in section V.B.3 *infra.*

In late June or early July of 2022, DWCC installed the BadgePass System that tracks staff movement through the facility through the scanning of uniquely identifiable badge credentials issued to each DWCC staff member. [Nail Trial 2 Tr. vol. I at 170:15 - 172:15; Goodwin Trial 2 Tr. vol. XII at 2633:9-18] BadgePass is used to ensure the staff rounds are taking place in the proper timeframes in addition to the logbooks kept by security staff. [Goodwin Trial 2 Tr. vol. XII at 2634:3-14] The use of BadgePass and logs is sufficient to monitor staff rounds. [Thompson Trial 2 Tr. vol. XIII at 3019:5-12]

In August 2021, DWCC made changes to USOPP 34 to further DPS&C's Restrictive Housing procedural changes. Offenders who throw items on the tier, at staff members, or at other

18

offenders can be placed on "Policy 34," which restricts their property to prevent recurrence of these types of incidents. [JR-24, DWCC USOPP #34 approved by DPS&C on 8/5/2021] Mr. Pacholke agrees that the behaviors prohibited by Policy 34 are behaviors that a prison has a legitimate interest in interdicting. [Pacholke Trial 2 Tr. vol. III at 603:24 - 605:18]

An offender who engages in behavior prohibited by Policy 34 can be placed on that status for up to 24 hours the first time he engages in that behavior. The policy now requires that the shift supervisor review an offender every four hours to determine if the status can be discontinued. [JR-24 at 5(R)(2)(e); Coleman Trial 2 Tr. vol. I at 121:23 - 122:10, 123:6-12] The review every 4 hours determines if the situation with the offender has been de-escalated such that Policy 34 can be discontinued. [Coleman Trial 2 Tr. vol. I at 122:15-21; Pacholke Trial 2 Tr. vol. III at 603:9-19; Goodwin Trial 2 Tr. vol. IX at 1923:6-25 vol. XI at 2595:17-23]

Now, an offender on Policy 34 retains his mattress unless it is being used as a shield or barricade. [JR-24 at 4(R)(2)(c); Coleman Trial 2 Tr. vol. I at 76:21 - 77:2] If the mattress is removed, a review is conducted at least every 4 hours by the shift supervisor to determine whether it can be returned. If the mattress remains out of the cell for more than 8 hours or is recommended to continue past shift change, the shift supervisor must receive concurrence from the unit manager or higher rank. Since this change in August of 2021, no mattresses have been taken away. [Coleman Trial 2 Tr. vol. I at 123:2-5 Pacholke Trial 2 Tr. vol. III at 603:20-23]

Now, an offender who engaged in a pattern of behavior prohibited by Policy 34 may be placed on that status for a longer duration subject to the following conditions. An offender with a documented pattern is still reviewed by the shift supervisor or higher rank every four hours for release from Policy 34. [JR-24 at 5(R)(2)(e)] Should the status continue beyond 24 hours, the Unit Manager or above must authorize the continuation of the status, documenting the justification on a UOR. [JR-24at 5(R)(2)(f); Coleman Trial 2 Tr. vol. I at 77:25 - 78:6] Should the status continue

for 7 days; the offender must be reviewed every 7 days by a review board consisting of the Unit Manager and a classification officer. [JR-24 at 5(S)(1); Coleman Trial 2 Tr. vol. I at 123:17-20]

Since August of 2021 through August of 2022, no offender has been on Policy 34 status for longer than 7 days. [Coleman Trial 2 Tr. vol. I at 123:21-23] Since August of 2021 through August of 2022, the vast majority of offenders only remain on Policy 34 status for 4 hours. [Coleman Trial 2 Tr. vol. I at 124:11-13; Burns Trial 2 Tr. vol. VII at 1532:7-10, 1599:24 - 1600:2; vol. VIII at 1676:6-11; Goodwin Trial 2 Tr. vol. IX at 1923:22-25] Mr. Pacholke made no attempt to determine the average length of time an offender on Policy 34 spends on that status. [Pacholke Trial 2 Tr. vol. III at 605:19-22] Plaintiffs point to one offender they claim was on Policy 34 for 21 days in 2021,[9] but the full evidence showed that JB was not on strip cell consecutively and was placed on it during that time period for multiple violations. [PR-C pp. 846-847 (Dec. 23), 850-851 (Dec. 9), & 865 (Dec. 17)] Plaintiffs make no claim that the policy was not followed as to these incidents.

Mr. Upchurch, who previously was critical of Policy 34, concludes that the changes made to Policy 34 satisfy his concerns. [Upchurch Trial 2 Tr. vol. XII at 2763:16 - 2766:14] From May through August of 2022, Policy 34 status was used 16 times. Thirteen of those usages lasted four hours or less. Three of them lasted 24 hours. [Upchurch Trial 2 Tr. vol. XII at 2764:22 - 2766:14 (noting the Court excluded consideration of the data post-June 2022, and Defendants proffered that data)]

Mr. Upchurch is familiar with other jurisdictions that use a procedure similar to Policy 34—contrary to the testimony of Mr. Pacholke—including Washington State, where Mr. Pacholke spent his career. [Upchurch Trial 2 Tr. vol. XII at 2768:14 - 2772:3] Since August of 2021, strip

---

[9] Mistakenly represented by Plaintiffs to have occurred in December 2022.

cell is rarely used at DWCC. [Burns Trial 2 Tr. vol. VIII at 1676:1-2; Haney Trial 2 Tr. vol. X at 2302:15-18]

Restrictive Housing at DWCC is being managed in a way that is consistent with generally accepted correctional practice. [Upchurch Trial 2 Tr. vol. XII at 2785:14 - 2786:3]

As to remedies 49(B) and (C) [Pls. Br., R. Doc. 732, at 20-21], there is no support in the record for creating a standard where a correctional officer must consult with a psychologist or psychiatrist prior to issuing a rule violation to an offender with a mental health diagnosis or that the Chief of Security or Unit Manager must similarly consult prior to the imposition of discipline. This suggestion fails both for a lack of proof and a failure to consider the adverse impact on public safety.

As to remedies 49(D) and (E) [Pls. Br., R. Doc. 732, at 21], these paragraphs detail suggestions that are already in place, such as DWCC no longer takes yard, does not punish offenders for malingering, does not punish acts of self-harm, and does not punish property destruction related to one's mental illness. Plaintiffs put no evidence on that these things are taking place. The suggestions of enjoining punishment for possessing weapons or "a large number of pills" would threaten the safety of DWCC.

As to remedy 49(F) [Pls. Br., R. Doc. 732, at 21], the evidence shows that the behaviors sought to be managed by Policy 34 are legitimate correctional concerns and the status is used no longer than necessary to de-escalate the situation. The practice has also been found to be acceptable by courts in this jurisdiction [*see* Defs. Pretrial Br., R. Doc. 664, at 36-37.] Plaintiffs introduced no evidence related to food loaf, so this request fails for a lack of proof.

As to remedies 49(G)-(M) [Pls. Br., R. Doc. 732, at 22-24], these suggestions have no basis in the record and are not narrowly tailored. The detail of how time in Restrictive Housing is structured is delegated to state authority. *Woodford v. Ngo*, 548 U.S. 81, 94, 126 S.Ct. 2378 (2006)

21

("it is 'difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons.'"). The suggestions in 49(H) are not narrowly tailored. The suggestions also include items which are already in place. For instance, DWCC only places people in Restrictive Housing for rule violations pursuant to the Disciplinary Matrix and already trains people who work in segregated housing [JR-1 at 13(E)]. There is no evidence that using an offender's past behavior in making classification decisions [49(J)] is not acceptable correctional practice (in fact, the evidence was to the opposite), and enjoining this practice jeopardizes public safety. There is no evidence that DWCC's classification of offenders is improper, thus ordering transfers of maximum custody offenders out of Restrictive Housing and creating reporting requirements for doing so [49(K) & (L)] are not narrowly targeted to correct a violation of a federal right. As these remedies fail for lack of proof, and, in some cases, because they are already in place, there is no need to redraft policies as indicated in 49(M).

### B. **Mental Health Screening and Evaluation**

#### 1. **Intake Screening**

The evidence shows that every offender who arrives at DWCC receives an intake screening after he gets off the bus. [Thompson Trial 2 Tr. vol. XIII at 2874:6-11; Burns Trial 2 Tr. vol. VII at 1625:6-9] Plaintiffs argue that the screening is not adequate because Hayden is not qualified, and they find fault with manner in which the screening is conducted.

Dr. Thompson testified that Hayden is qualified to perform the intra-system intake screening because:

> He has extensive experience working in the Department of Corrections and evaluating individuals on a day-to-day basis with reference to mental health. He has -- he has degrees that, you know, give him some additional training in these areas. He goes through David Wade trainings, and he appeared to be performing the training well when I watched him do trainings. And then he also is supervised

by Warden Dauzat, who is licensed and can supervise him. So my understanding, and the way I have seen screening evaluations done in prisons and jails over the years, is that many times they are done by officers that are trained, then there is a person that supervises them or goes back and looks at the training. So I felt he was clearly able to perform those screening evaluations based on personally watching him.

[Thompson Trial 2 Tr. vol. XIII at 2889:25 - 2890:14] Dr. Thompson concluded that Hayden's intra-system intake screening was well done and appropriate. [Thompson Trial 2 Tr. vol. XIII at 2876:16-18 & 2879:22-25]

Further, Dr. Thompson actually observed Hayden perform the intra-system intake screening. [Thompson Trial 2 Tr. vol. XIII at 2828:17-23] After establishing rapport with the individual, Hayden asked appropriate questions about mental health, discussed confidentiality to address potential drug withdrawal concerns, asked about medical conditions, asked typical mental health screening questions about past psychiatric history and suicide attempts, asked whether the individual had suicidal ideations, and performed a typical mental health status examination. [Thompson Trial 2 Tr. vol. XIII at 2875:5 - 2876:14] Dr. Thompson then confirmed that Hayden identified the individuals (three out of nine) that needed to be referred to Dr. Seal. [Thompson Trial 2 Tr. vol. XIII at 2877:1-25] Indeed, Hayden referred one individual to Dr. Seal out of an abundance of caution even though the individual was resistant to seeing Dr. Seal. [Thompson Trial 2 Tr. vol. XIII at 2880:9-12] Dr. Burns, on the other hand, did not observe Hayden perform the intra-system intake screening. [Burn Trial 2 Tr. vol. VII at 1627:6-8]

In the Court's Ruling after the Phase I trial, the Court found that "Hayden is not qualified to conduct the intra-system mental health intake screenings because he does not have the education or training required to conduct IQ testing or psychological examinations." [R. Doc. 641 at 67] Respectfully, the record does not support such a finding. Prior to coming to DWCC, Hayden administered psychological testing with the Department of Health and Hospitals. [Hayden Trial 1

23

Tr. vol. XVI at 3547:9-17] He has also worked for Dr. Arien Ward doing psychometric testing and psychological evaluations in order to secure Title 19 compliance for any institutions that are housing people with intellectual disabilities. [Hayden Trial 1 Tr. vol. XVI at 3549:22 - 3550:3] Consistent with his training and experience, Hayden is in fact the person who administers the IQ testing or psychological examinations in the rare instances where an individual does not have an A&I report completed at EHCC prior to coming to DWCC. [Dauzat Trial 1 Tr. vol. XV at 3346:23 - 3349:10] The results of the testing are then sent to a psychologist or psychiatrist to interpret and sign. [Dauzat Trial 1 Tr. vol. XV at 3349:3-10] Further, the intra-system intake screen does not require the screener to conduct IQ examinations or psychological examinations as found by the Court, that "mental health appraisal" is done at EHCC. [*see* JR-4 at 3-4 ("mental health screening" versus "mental health appraisal"]

Dr. Burns testified that the individual that does the intra-system screening does not have to have a license or be qualified to diagnose. [Burns Trial 2 Tr. vol. VII at 1625:10-13] Indeed, Dr. Burns agreed in both trials that the intake screening could be conducted by a corrections officer with training and supervision. [Burns Trial 2 Tr. vol. VII at 1625:19-21] Thus, Hayden possesses the qualifications and training to perform the intake screening at DWCC.

Upon screening, Hayden refers offenders to Dr. Seal if a "red flag" is presented, if the offender arrives with a prescription for psychotropic medications, or if the offender has a SMI diagnosis as defined in DPS&C policy. [JR-60, R. Doc., 669, at 11, ¶53] Warden Dauzat signs off on all mental health intake forms completed by Hayden. [JR-60, R. Doc., 669, at 11, ¶54]

In the Phase II trial, Dr. Burns did not identify a single individual who needed to see Dr. Seal or who needed to be on suicide watch and was not identified as such during the initial intra-system screening.[10] [Burns Trial 2 Tr. vol. VII at 1627:24 - 1628:7]

The plaintiffs in *Dockery* challenged the screening process for prisoners upon intake. Plaintiffs argued that the screening was inadequate because the staff did not consistently review medical records as part of the intake process and that assessments reviewed by plaintiffs' expert contained erroneous information. *Dockery*, 443 F.Supp.3d at 742. As here, the evidence in *Dockery* clearly showed the screening was taking place. *Id*. The District Court rejected the plaintiffs' arguments that the screening should be different than that being performed. *Id*. at 742-743. The Fifth Circuit affirmed. *Dockery*, 7 Fed.4th 375. As in *Dockery*, Plaintiffs' arguments that screening should be performed differently than is being performed does not violate the Constitution. *See also U.S. v. Hinds County*, No. 16-489, 2022 WL 1112223, at *42-45 (S.D. Miss. Apr. 13, 2022) which struck a provision requiring that within 24 hours of placement in segregation, all prisoners on the mental health caseload must be screened by a qualified mental health professional to determine whether the prisoner has serious mental illness, and whether there are any acute mental health contraindications to segregation. The Court found the provision overly broad and not the least restrictive means.

Plaintiffs argue that the intake screening form is deficient in some unspecified manner. Dr. Burns' direct examination did not criticize the screening form at all. [Burns Trial 2 Tr. vol. VII at 1532:11- 1533:13] On cross examination, Dr. Burns testified that the form that DWCC was using was an intra-system screening form. [Burns Trial 2 Tr. vol. VII at 1628:8-21] She wanted a "few

---

[10] Defendants submit that it would be exceedingly rare for an offender to report to DWCC with mental health issues that would disqualify them for Restrictive Housing because, as Warden Sherman testified:

> Hopefully Hunt would not put them on the bus if they were actively psychotic, they would just keep them there.

Sherman Trial 2 Tr. vol. II at 355:13-15.

questions about suicide risk" added to the form; however, she admitted that the form did in fact include questions about suicide risk. [Burns Trial 2 Tr. vol. VII at 1628:14-21]

Defendants contend that the record shows that the intra-system intake screening generally performed by Hayden is not constitutionally deficient.

## 2.   <u>Screening on Reassignment from Other Parts of DWCC</u>

In a change from March 2020, offenders with serious mental illness are not placed in Restrictive Housing, other than treatment segregation, unless cleared by appropriate mental health professional. [JR-1, IS-B-4, at 8] Offenders who come to DWCC from elsewhere are cleared for restrictive housing through the intra-system screening explained above. Offenders who move from general population at DWCC into Restrictive Housing are screened by a mental health professional prior to placement. [Robinson Trial 2 Tr. vol. IX at 2092:18 - 2093:21; Dauzat Trial 2 Tr. vol XI at 2469:9-13; Goodwin Trial 2 Tr. vol. XI at 2541:9-22]

Another change since March 2020 is that upon being assigned to Restrictive Housing, a mental health appraisal is completed within seven days of placement utilizing Form IS-B-4-a, "Mental Health Restrictive Housing Appraisal." [Ex. JR-11 at 5] Plaintiffs admitted the completed forms into evidence. [Ex. PR-P-1] The seven-day assessment is required by the ACA. [Burns Trial 2 Tr. vol. VII at 1638:14-15] It is stipulated that offenders receive a mental health appraisal within seven days of placement into Restrictive Housing. [Ex. JR-60, R. Doc. 669, at 6, ¶27] There is no dispute that DWCC is actually doing the assessment within seven days of an offender being admitted into Restrictive Housing. [Burns Trial 2 Tr. vol. VII at 1638:8-11] Dr. Burns did not identify anyone who went into Restrictive Housing that did not get the assessment within seven days after the process was put in place. [Burns Trial 2 Tr. vol. VII at 1639:17-21]

26

### 3.  **Weekly Mental Health Rounds**

Previously, the Court found that:

> there was no evidence in the record that would demonstrate DWCC's adherence to its own internal policies pertaining to rounds. Specifically, there is no indication that individuals with a LOC-2 designation were visited three times per week. There is also no indication that inmates with a LOC-3 or LOC-4 designation were visited weekly during rounds.

[R. Doc. 641 at 78]

As to the Court's comment on LOC 2 designations, DWCC does not house any offenders designated as LOC 2. [Burns Trial 2 Tr. vol. VII at 1624:13-18] No offenders who are assigned a mental health LOC 1 or LOC 2 are sent to DWCC. [Ex. JR-60, R. Doc. 669, at 10, ¶46] Plaintiffs have not identified any offender who has been assigned a mental health LOC 2 at DWCC. [Ex. JR-60, R. Doc. 669, ¶46] Dr. Burns did not identify even a single offender who arrived at DWCC who was below LOC 3 and made no determination that anyone at DWCC was an LOC 2. [Burns Trial 2 Tr. vol. VII at 1624:16-18 & 1626:18-20] Indeed, Plaintiffs do not challenge the LOC classifications assigned by EHCC or DWCC. [Ex. JR-60, R. Doc. 669, at 10, ¶46]

Dr. Burns testified that performing weekly rounds is sufficient and is the standard. [Burns Trial 2 Tr. vol. VII at 1641:2-4] The evidence establishes that weekly rounds are in fact taking place. [JR-1 at 9; Burgos Trial 2 Tr. vol. V at 918:11-13 - 919:2-4; Haney Trial 2 Tr. vol. X at 2291:9-17; Dauzat Tr. vol. XI at 2375:16-19; Thompson Trial 2 Tr. vol. XIII at 2903:15 - 2904:8, 3018:23 - 3019:4] Plaintiffs in fact *stipulated* that weekly rounds are taking place. [Ex. JR-60, R. Doc. 669, at 12, ¶56]

The substance of the weekly rounds is at issue. Policy requires that mental health make announced weekly rounds with every LOC 3 and LOC 4 offender on a weekly basis. [JR-1 at 9]

27

Policy does not require a face-to-face encounter.[11] The mental health staff member is announced on the tier and walks down the tier to be available for any offender. This practice complies with the policy on weekly rounds. Warden Dauzat explained that the weekly rounds are to provide access and availability of mental health to the offenders on the tiers. [Dauzat Trial 2 Tr. vol. XI at 2375:23 – 2376:4] There is no expectation or requirement that the mental health staff will stop and engage with every offender at every cell while making rounds. [Dauzat Trial 2 Tr. vol. XI at 2376:5-14]

The Court directly asked Dr. Thompson if it was acceptable for the mental health professional to announce his presence and walk through the tier without actually speaking with every offender. Dr. Thompson responded directly to the Court's question stating:

> Yes, ma'am, in my opinion it is. I realize other experts, you know, there's -- this has been a -- kind of an ongoing debate amongst experts and monitors as to what you should do or what you shouldn't do with reference to, do you stop at every cell, do you ask the same questions, put a little cart out and sign your initials to it? And, you know, I don't know that I have seen any data or studies that show that that improved the overall quality of mental health care on the units.
>
> I mean, I think the main thing is that announcing that the mental health person is on the unit, and then, obviously, that mental health person is going to stop by periodically to talk to people that are there for their 30-day reviews, so they have options for that. And then the guards are going, as I said before, multiple times a day where they have options to -- to talk to the guards about whether they need to see mental health professionals. So, you know, I think there is a difference of opinion among experts. I don't really see the benefit of checking a cart off every day at every single cell or asking the same questions. I think a lot of times that would be boring and a waste of time.
>
> Dr. Burns talked about different kinds of things that she thought were a waste of time. I think if they're – if they know the person is on the unit and they are going, then they've got ample opportunity to flag a mental health professional down and say, hey, I need to talk with you or have a one-on-one session.

---

[11] HCP39, Section 6(C) explains as to medical rounds that offenders in Restrictive Housing are to receive a daily screening. Ex. JR-7 at 9. Nurses round the tiers after they are announced. There is no suggestion that the nurse must stop at every cell and perform a physical evaluation of the offender. The mental health rounds are the same. Indeed, Dr. Burns testified that weekly mental health rounds are sufficient and are the standard in part because nurses are on the tiers every day. The nurse can call mental health staff if more care is needed. Burns Trial 2 Tr. vol. VII at 1641:4-6.

[Thompson Trial 2 Tr. vol. XIII at 2904:19 - 2905:21] In response to the Court's concern that an individual has to have enough insight to know that he needs mental health, Dr. Thompson explained that such a concern is "overstated" and that someone being so impaired they could not ask for help "would be pretty rare". [Thompson Trial 2 Tr. vol. XIII at 2905:24 - 2906:6] Indeed, there is evidence that individuals do stop the mental health staff during rounds leading to encounters. [Hayden Trial 2 Tr. vol. VI at 1175:8 - 1179:18; Ex. PR-S-1 at 555-556, 559-560, & 609-610]

Defendants further show that they are performing 30-day assessments and respectfully refer the Court to section V.C.5 *infra*.

### 4. <u>Definition of Serious Mental Illness</u>

Plaintiffs argue that the definition of serious mental illness contained in HCP27 is underinclusive because it does not include a functional component in the definition. Plaintiffs did not identify a single offender who they contend has SMI but was not an LOC 3.

Dr. Thompson addressed this criticism directly upon questioning from the Court. Dr. Thompson explained that it is difficult to have a policy that works perfectly with mental health because there is a lot of judgment that goes into determining who has a serious mental illness. [Thompson Trial 2 Tr. vol. XIII at 2910:17-22] Diagnosing a person with a condition other than the six listed in HCP27 requires a very skilled person, and then it is still difficult. [Thompson Trial 2 Tr. vol XIII at 2910:4-7] Dr. Thompson stated that it would be rare for an offender with mental illness to not be handled appropriately. [Thompson Trial 2 Tr. vol. XIII at 2910:8-11] Dr. Thompson's comment on suicide assessments was that "this is not lawyering" that the mental health staff is doing. [Thompson Trial 2 Tr. vol. XIII at 2965:5-9] Blake LeBlanc's testimony is consistent with Dr. Thompson's opinions. B. LeBlanc testified that an offender who was having

29

functional problems would be referred to mental health. [B. LeBlanc Trial 2 Tr. vol. VI at 1332:18 - 1333:18] Ultimately, the system relies upon the professional judgment of the mental health staff.

Dr. Thompson further pointed out that the screening that takes place in Restrictive Housing is important to ensure that no one is missed. [Thompson Trial 2 Tr. vol. XIII at 2893:4-6] Every offender in Restrictive Housing is assessed within seven days of placement into Restrictive Housing. Adequate safeguards are in place. DSPC's definition of SMI does not violate the Constitutional.

### 5. Plaintiffs Presented No Evidence of Inadequate Identification and Screening for Mental Illness

As "evidence" of the alleged failure to screen, Plaintiffs point to one video of JG on March 15, 2022. [Ex. PR-D-33] On the video, JG is not responding to officers. Hayden is seen at JG's cell side. Officers had to extract JG from his cell.

Plaintiffs presented nothing else about JG. There was no evidence of his mental health condition, his actual screening, or what occurred prior thereto. This lack of showing results in a failure of proof.[12]

On the other hand, Defendants showed that prior to extracting JG, officers called mental health with an emergency security request. [Ex. DR-12 at 1-2] It was pursuant to this request that Hayden was at JG's cell side. Hayden placed JG on standard suicide watch until he could be seen by Dr. Seal. [Ex. DR-12 at 2] Two days later, on March 17, 2022, Dr. Seal saw JG. JG was continuing to refuse his medications. [Dr. Seal Trial 2 Tr. vol. IX at 1993:14; Ex. DR-12 at 3] Dr. Seal noted that the staff was attempting to transfer JG to EHCC, but JG needed treatment for safety

---

[12] While it may not be pleasant to watch the recording of security officers extracting JG, lesser methods would not have been prudent. JG could be dangerous. Based on the contemporaneous knowledge at the time of the video, he could have been intoxicated and could have had a weapon such as a shank or a razor blade. Blake LeBlanc testified about psychosis secondary to substance use, referring specifically to the use of Mojo. Offenders on Mojo are going to be very difficult to manage in the short term. B. LeBlanc Trial 2 Tr. vol. VI at 1373:11-21. JG's situation fits this description, though his actual condition is unknown.

reasons prior to transfer. [Dr. Seal Trial 2 Tr. vol. IX at 1993:15-17; Ex. DR-12 at 3] Dr. Seal changed JG's diagnosis to schizophrenia and prescribed Haldol injections and Cogentin. [Dr. Seal Trial 2 Tr. vol. IX at 1993:21-24; Ex. DR-12 at 3] On March 18, 2022, the very next day, DWCC completed a Medical Record Transfer Summary for JG. [Ex. DR-12 at 4]

6. **Response to Proposed Remedies on Mental Health Screening and Evaluation**

The Defendants address the proposed remedies of paragraphs 66(A-C) [Pls. Br., R. Doc. 732, at 32-33] together. Defendants contend that they have comprehensive policies and procedures pertaining to mental health screenings. Thus, under the PLRA, no injunction should issue. Every offender admitted to DWCC receives an intra-system screening as the offenders gets off the bus using an appropriate screening form. Thus, there is no need for an injunction that requires DWCC to screen offenders within eight hours after arrival. Every offender with SMI admitted to Restrictive Housing is cleared by mental health prior to admission. Every offender is assessed within seven days of being admitted into Restrictive Housing. Every offender with serious mental illness in Restrictive Housing receives a mental health assessment every thirty days. There is no evidence that these assessments do not meet the minimum constitutional standard. Plaintiffs' arguments that the assessments should be done differently does not establish a constitutional violation. *Dockery*, 443 F. Supp. 3d at 742, *aff'd*, 7 Fed. 4th 375.

Defendants address the proposed remedies of paragraph 66(D-F) [Pls. Br., R. Doc. 732, at 33] together. These items fail for lack of proof. Dr. Burns did not testify that offenders could not be held in Restrictive Housing for more than eight hours without an assessment. Dr Burns similarly did not testify that offenders needed to be assessed after the first 24 and the first 48 hours in Restrictive Housing. As to paragraph F, if that is referring to weekly rounds, then the weekly rounds are being conducted. If paragraph F is referring to something other than weekly rounds, Plaintiffs offered no evidence to support the need for paragraph F.

31

As to the proposed remedy in paragraph 66(G) [Pls. Br., R. Doc. 732, at 33-34], Plaintiffs offered no evidence that mental health staff is required to make **daily** visits to the Restrictive Housing units. To the contrary, Dr. Burns testified that weekly mental health rounds are sufficient and are the standard in part because the nurse who is on the tier daily can call mental health staff if more care is needed. [Burns Trial 2 Tr. vol. VII at 1641:4-6]

As to the documentation of weekly rounds, Dr. Burns testified about ways to document weekly mental health rounds. DWCC documents weekly rounds in the logbooks and with the BadgePass system. Regardless, the weekly rounds are occurring, which is the constitutional minimum. Plaintiffs' proposed level of documentation is not the least restrictive or the most narrowly tailored remedy. This level of detail is not required by the Constitution and would violate the PLRA. *See Hinds County*, 2022 WL 1112223 (where the Court found all the subsections with explicit details throughout the consent decree were not required by the Constitution and violated the PLRA).

As to the proposed remedy in paragraph 66(H) [Pls. Br., R. Doc. 732, at 34], Plaintiffs offered no evidence of the alleged need for a crisis screening within 24 hours of these events. Therefore, this item fails for lack of proof. Again, Dr. Burns' testimony regarding the sufficiency of weekly mental health rounds combined with daily nurse visits establishes the constitutional minimum.

C. **Mental Health Treatment**

1. **Plaintiffs Did Not Show Timely Complaints Regarding DWCC's Mental Health Treatment**

Plaintiffs allege that class members are continuing to complain about mental health treatment at DWCC. Four of the five ARPs were prior to the promulgation of IS-B-4 on March 7, 2021. [JR-60, R. Doc. 669, at 2 ¶5] One ARP was based upon an event two weeks after IS-B-4

32

was promulgated. Plaintiffs offered no evidence of any ARPs complaining of mental health care between April 26, 2021 and August 31, 2022. Considering that the case is being decided on conditions as of August 31, 2022, Defendants contend that Plaintiff had not proven that class members are continuing to complain of mental health care through August of 2022.

None of the other ARPs have merit in any event. TD's ARP pertained to the use of chemical spray on March 22, 2021 while he was in N1. As stated at the beginning. N1 is not a Restrictive Housing unit that is part of this litigation. Further, this Court did not find that Defendants use of chemical spray was inappropriate in its prior Ruling. Finally, correctional officers used chemical spray to stop TD from harming himself. [PR-M-1 at 33] The action was appropriate. *See* section V.E.1 *infra*. BG alleged that on January 31, 2021, he was not allowed to see mental health after a death in his family. The record, however, shows that a nurse saw him (January 31, 2021 was a Sunday) and that he was placed on suicide watch after speaking with Robinson. [PR-M-1 at 95-104] LJ alleged on December 4, 2020 that he had not seen mental health as per policy. The record, however, shows that mental health did in fact see him as per policy. [PR-M-1 at 183-186] BH alleged a violation of the ADA when he was given a paper gown after endorsing suicidal thoughts on May 20, 2020. The record showed that BH was placed on suicide watch after claiming to be suicidal and beginning a hunger strike due having received what he claimed to be a false write up. [PR-M-1 at 131-132] No expert testified that DWCC's response was inappropriate. Finally, CP filed an ARP seeking to be prescribed Wellbutrin. DWCC responded explaining that Wellbutrin was a non-formulary drug proven to be widely abused within correctional institutions; Dr. Seal offered him a substitute (Effexor) in the same class of drugs. [PR-M-1 at 239-242] None of these ARPs have merit.

More importantly, Plaintiffs' allegation that class members have continued to complain of mental health services based upon current conditions that existed in Restrictive Housing as of

August 31, 2022 is not true as Plaintiffs offered no evidence of APRs after April 21, 2021, a full sixteen months before the fact discovery cutoff date and the date for "current conditions" in this case.

### 2. Mental Health Staffing at DWCC

Psychiatrist hours and number of visits have significantly increased. Dr. Seal was working eight hours on every other Thursday. Now, Dr. Seal time has been doubled, to eight hours per week, four hours every Wednesday and four hours every Thursday. [Ex. JR-60, R. Doc. 669, at 9, ¶39] Dr. Seal's increased time is for approximately 50% less offenders housed in Restrictive Housing. [Thompson Trial 2 Tr. vol. XIII at 2929:8-15; Burns Trial 2 Tr. vol. VII at 1656:15-18] Dr. Seal's time has increased while the number of offenders that he needs to see on the South Compound has decreased. [Thompson Trial 2 Tr. vol. XIV at 3048:3-5] No one has identified an instance when an offender was unable to see Dr. Seal timely. [Burns Trial 2 Tr. vol. VII at 1646:16-24] Dr. Seal's staffing level is adequate for DWCC.

In the later part of 2021, DWCC hired Dr. Julia Wood as a contract psychologist for about five months, August through December. [Dauzat Trial 2 Tr. vol. XI at 2376:15-25] Dr. Wood worked one day a week for seven hours at DWCC. [Dauzat Trial 2 Tr. vol. VI at 1195:1-8] Since Dr. Wood left DWCC, DWCC wants to fill that position but has been unable to do so. [Burgos Trial 2 Tr. vol. IV at 809:12-21; Dauzat Trial 2 Tr. vol. VI at 1192:10 - 1193:11 vol. XI, 2377:3 - 2379:14; Goodwin Trial 2 Tr. vol. XII at 2637:14 - 2638:4] Warden Dauzat explained that DWCC has reached out to colleges that have psychology programs, DWCC's HR team has attended eight job fairs within the year, and DWCC has advertised. [Dauzat Trial 2 Tr. vol. XI at 2377:6-22; Goodwin Trial 2 Tr. vol. XII at 2637:14-25] The combination of a correctional setting and the rural location make hiring a professional at DWCC very difficult. [Dauzat Trial 2 Tr. vol. XI at 2380:5-15] Dr. Thompson agreed that it is very difficult to hire a psychologist. [Thompson Trial 2 Tr. vol. XIII at

34

2932:23-24] Specifically, he explained the difficulty in hiring a psychologist even at ELMS forensic hospital and concluded that ELMS has had open positions for psychologist for literally years. [Thompson Trial 2 Tr. vol. XIII at 2930:6-19] DWCC has not been able to fill the position despite its good faith strong effort to do so. [Goodwin Trial 2 Tr. vol. XII at 2637:24 - 2638:4]

DWCC is also trying to fill an employed psychologist position (different than the contract position previously held by Dr. Wood) that would split time at DWCC and the Steve Hoyle facility. [Dauzat Tr. vol. VI at 1192:18 - 1193:4 vol. XI, 2377:3 - 2379:14] DWCC is also trying to fill two vacant mental health staff positions, one social worker and one social service counselor. [Goodwin Trial 2 Tr. vol. XII at 2638:4-9; PR-K-8 at 2; PR-K-11 at 2]

Even with these openings, staffing for mental health is clearly within constitutional minimum standards. Dr. Burns at the first trial opined that DWCC needed one mental health staff member for every 65 individuals on the case load. [Burns Trial 2 Tr. vol. VII at 1656:22-25] Since March 2020, DWCC hired two additional mental health staff members, Mses. Spivey and Wells. [Burns Trial 2 Tr. vol. VII at 1658:20-24] These two new staff members have taken on duties to allow Burgos and Hayden to focus upon the South Compound. [JR-60, R. Doc. 669 at 8-9, ¶38; Robinson Trial 2 Tr. vol. IX at 2027:20-25; Thompson Trial 2 Tr. vol. XIII at 2929:16-22] Dr. Burns admits that DWCC is now clearly within the 1 to 65 staff ratio that she originally proposed for the South Compound. [Burns Trial 2 Tr. vol. VII at 1657:11-14]

Realizing that DWCC's staffing is now within the criteria she previously set as the standard, Dr. Burns wants to change the criteria. She now recommends that a staffing plan analysis be undertaken. Plaintiffs argue that Dr. Burns "maintained" her recommendation from the Liability Phase that a staffing plan analysis be performed. [Pls. Br., R. Doc. 732 at 36, ¶73] Dr. Burns *never* opined in her first report or in her testimony during the first trial that a staffing plan analysis needed

to be undertaken. The Court's Ruling also did not mention a staffing plan analysis because there was no evidence of same. As DWCC is properly staffed, a staffing plan analysis is not needed.

It is necessary to address Steve Hayden at this point. Hayden is not a licensed social worker, but that does not mean that he is not qualified to perform his duties. IS-B-4 defines a "health care professional" as:

> Staff who perform clinical duties, such as health care practitioners/providers, nurses, licensed professional counselors, social workers, and emergency medical technicians, *all in accordance with their respective scope of training and applicable licensing, registration, certification, and regulatory requirements*.

[Ex. JR-1, IS-B-4, at 5] The key is that the staff member performs duties in accordance with his scope of training and applicable licensing, registration, certification, and regulatory requirements. This policy is consistent with the ACA definitions. [Ex. PR-Z-4 at 1]

Hayden holds a master's degree in psychology and has worked in the position for fifteen years. [Hayden Trial 2 Tr. vol. V at 961:1-3; Ex. PR-F-5] He clearly has the training to perform his job. He does not diagnose or perform other duties that would require a licensure. Blake LeBlanc, the state mental health director, testified about Hayden:

> I have worked with Steve now for about three years, and when I have conversations with Steve about correctional matters, he seems really knowledgeable about these things. And, you know, it – it hasn't concerned me, Judge, not -- no, it hasn't. I mean, I think that Steve is -- is knowledgeable in his profession, and whenever I read his documentation it seems on point. My conversations with him have gone well. He has consulted me when he needs to.

[B. Leblanc Trial 2 Tr. vol. VI at 1381:7-15] Mr. Leblanc had no concerns with Hayden having to decide whether or not an offender is having a psychotic episode in his everyday duties. [B. LeBlanc Trial 2 Tr. vol. VI at 1381:18-23] Dr. Thompson similarly testified that Hayden could do his job:

> I felt that he has certainly enough training to be able to do the screening and I observed him do the screening, and he has enough years in corrections with the supervision of Ms. Dauzat to be able to provide the kinds of therapy that need to be provided. And I had seen, I think, sometimes he even refers folks to other social

workers if they are -- if it looks like they are a more appropriate person or they might identify better with the individual…in my opinion he can do his job.

[Thompson Trial 2 Tr. vol. XIV at 3049:18 - 3050:4] He is qualified and can develop treatment plans with information provided by Dr. Seal. [Thompson Trial 2 Tr. vol. XIV at 3051:7-9] Hayden can assess offenders who go on and come off of suicide watch, and he refers offenders to Dr. Seal for further treatment. [Thompson Trial 2 Tr. vol. XIV at 3052:7-11] He is qualified to provide individual counseling because he has been doing it for years. [Thompson Trial 2 vol. XIV at 3052:24 - 3053:5] He can provide supportive therapy. [Thompson Trial 2 vol. XIV at 3053:11-23] Hayden is qualified to perform a level of care assessment on an offender. [Thompson Trial 2 vol. XIV at 3056:9-14]

Defendants' interpretation of its policies as to Hayden's qualifications to do his job is entitled to deference. The Fifth Circuit in *Robichaux v. Tanner*, 995 F.2d 223 (5th Cir. 1993) held that prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices. *See also June Med. Servs. LLC v. Kliebert*, 158 F. Supp. 3d 473, 512 (M.D. La. 2016) ("Like their federal counterparts, Louisiana state agencies are 'entitled to deference regarding ... interpretation and construction of the rules and regulations that ... [they] promulgate[ ].'") Thus, DOC's interpretation of its regulation that Hayden is able to perform duties consistent with his training is entitled to deference.

### 3. Mental Health Treatment Plans

This issue of the similarity of DWCC's treatment plans has been remedied – it is stipulated that "DWCC now has individualized mental health treatment plans." [Ex. JR-60, R. Doc. 699, at 12, ¶57] Plaintiffs are foreclosed from arguing that the treatment plans are not individualized. Dr. Thompson called the treatment plans "massively improved" from before. [Thompson Trial Tr. 2 Tr. vol. XIII at 2918:4-16; Thompson Trial 2 Tr. vol. XIV at 3061:14-23]

The mental health staff, Burgos and Hayden, complete the treatment plans for the offenders on their caseload. [Burgos Trial 2 Tr. vol. III at 698:16-22] Dr. Seal's input is added to the treatment plans as a result of his visit with the offender. [Dr. Seal Trial 2 Tr. vol. III at 669:16 - 670:12] Treatment plans identify an offender's diagnosis and goals. [Burgos Trial 2 Tr. vol. III at 699 at 21-23] The mental health staff will then meet with the offender to discuss goals and need areas. [Burgos Trial 2 Tr. vol. III at 701:9-11] The offender signs the treatment plan after it is prepared, and the mental health staff goes over each and every column with the offender. [Burgos Trial 2 Tr. vol. III at 705:19-25 & 713:9-22]

Treatment plans are reviewed at least annually and may be reviewed more frequently if clinically indicated. [Burgos Trial 2 Tr. vol. V at 932:24 - 933:14; Ex. JR-3 at 9] Treatment plans are updated or revised if a diagnosis changes. [Burgos Trial 2 Tr. vol. III at 716:5-10] Evidence shows that the treatment plans are in fact updated no less than annually and often sooner. Plaintiffs showed Burgos a treatment plan for BA dated May 20, 2021. [Ex. PR-B-1 at 74] Even though the annual date for the next treatment plan was May 20, 2022, BA's treatment plan was updated on December 16, 2021 when his diagnosis changed. [Burgos Trial 2 Tr. vol. V at 935:1-24; Ex. PR-B-1 at 165] This is an example of a treatment plan that was changed before the annual review date. [Burgos Trial 2 Tr. vol. V at 937:19-21]

Plaintiffs' attempt to impeach Hayden as to treatment plans rings hollow. Hayden testified that he would update a treatment plan if there was a change in medication or a change in custody status, but not for a change in house. [Hayden Trial 2 Tr. vol. V at 1009:17-23] A change of cell within a cell block would not matter, but a change in custody status would.

Dr. Burns' testimony revealed that what she desires for the treatment plans is, "ideal," a telling description. [Burns Trial 2 Tr. vol. VII at 1581:11] Plaintiffs' desires for "ideal" treatment

plans do not establish a constitutional violation. *Dockery*, 443 F. Supp. 3d at 742, *aff'd* 7 F.4th 375.

### 4.  Psychiatric Treatment

Plaintiffs do not challenge the diagnoses assigned to offenders by either Dr. Seal or EHCC. [Ex. JR-60, R. Doc. 669, at 10, ¶45] Dr. Seal's diagnoses assigned to offenders at DWCC are correct. [Burns Trial 2 Tr. vol. VII at 1646:4-7] Dr. Seal performs the traditional role of a psychiatrist and does medication management. [Burn Trial 2 Tr. vol. VII at 1643:7-14] Prescription of psychotropic medications are the most important type of treatment for many mental health conditions. [Burns Trial 2 Tr. vol. VII at 1649:7-10] In fact, psychotropic medications in some instances are the only treatment for individuals with serious mental illness.[13] [Burns Trial 2 Tr. vol. VII at 1649:12-15] As before, Dr. Burns offered no criticisms of the medications prescribed by Dr. Seal.

Dr. Seal's visits are now by telemed. After COVID, the rules changed, and telemed visits are acceptable. [Burns Trial 2 Tr. vol. VII at 1569:9-12] With telemed, security is no longer present when Dr. Seal sees the offenders. [Burn Trial 2 Tr. vol. VII at 1643:18-20] Plaintiffs argue without support that Dr. Seal seeing offenders only by zoom is a problem. There was no expert testimony that visits via telehealth are unacceptable.

The mental health staff attends the session with Dr. Seal and the offender. [Burns Trial 2 Tr. vol. VII at 1643:24 - 1644:1] Dr. Burns tried to create an issue that both Mr. Hayden and Mr. Burgos are in attendance for psychiatric clinics with Dr. Seal. She was apparently unaware that this occurs because Dr. Seal sees all of his South Compound patients on the same day and the duties for patients on the South Compound are split between Messrs. Hayden and Burgos. Thus,

---

[13] This testimony was elicited through impeaching Dr. Burns with her prior deposition testimony.

if patients from N1 and N2 are scheduled with patients from N3 and N4, one would expect that both clinicians would be present for the clinic of the patients on their caseload. [Dauzat Tr. vol. XI at 2374:1 - 2275:14; Thompson Trial 2 Tr. vol. XIII at 2980:5 - 2981:1, 3022:16 - 3023:3 (opining that this practice is a good)]

The process of having the mental health staff sit in on the visits between Dr. Seal and the offenders ensures that the mental health staff is informed and that everyone is on the same page. [Burns Trial 2 Tr. vol. VII at 1644:2-5] The presence of both on each visit also helps because Burgos and Hayden do in fact work both units. [Dauzat Trial 2 Tr. vol. XI at 2375:4-5] Both are able to provide information and feedback on the offender during the visit as well [Dauzat Trial 2 Tr. vol. XI at 2375:1-8] Finally, both being present in the treatment room makes the logistics of escorting the offenders to the visits easier. [Dauzat Trial 2 Tr. vol. XI at 2374:3-25]

Psychiatric clinic documentation has been strengthened by having the clinicians type notes of the substance of the psychiatric clinic with Dr. Seal utilizing the SOAP method. [Hayden Trial 2 Tr. vol. V at 965:14-20; Dauzat Tr. vol. XI at 2424:1-23; Thompson Trial 2 Tr. vol. XIII at 2980:8 - 2981:1, 3023:4-8] This practice is to assist with clinicians' difficulty reading Dr. Seal's handwritten notes.

Dr. Seal determines when he wants to see an offender for follow up. [Ex. JR-60, R. Doc. 669, at 9, ¶40] DWCC mental health staff can have an offender see Dr. Seal sooner if necessary. [Ex. JR-60, R. Doc. 669, at 9, ¶40] There is no evidence that Dr. Seal's psychiatric visits are deficient in any manner.

Plaintiffs continue to complain that offenders in Restrictive Housing do not have access to group programming. The plaintiffs in *Dockery* argued that they were "provided insufficient access to other structured mental health treatment programs such as group therapy and mental health activities." The Court found that the plaintiffs' arguments that they wanted different mental health

40

treatment did not establish a constitutional violation. *Dockery*, 443 F. Supp. 3d at 742, *aff'd* 7 F.4th 375.

The medical staff at DWCC assists with mental health needs when appropriate. During weekends, when presented with an emergent situation or in response to a threat of suicide, the medical staff will assist the mental health staff. [Coleman Trial 2 Tr. vol. I at 132:13 - 134:10; Dauzat Tr. vol. VI at 1188:9 - 1189:4]

### 5. **Timed Assessments**

Although this section is labeled "timed assessments," Plaintiffs only address the thirty-day assessments for offenders with SMI or ninety-day assessments for offenders without SMI. There are numerous other timed or regular assessments. An offender who is placed into Restrictive Housing is assessed within seven days of placement. [JR-11, EPM #03-01-001, at 5; Ex. PR-P-1] The level of care designation is reviewed every ninety days, and a more thorough level of care assessment is performed at least annually. [Burgos Trial 2 Tr. vol. IV at 887:7 - 888:2] Offenders see Dr. Seal at least once every six months. [Dr. Seal Trial 2 Tr. vol. III at 628:24 - 629:2] The treatment plan is updated at least once a year. [Burgos Trial 2 Tr. vol. V at 932:24 - 933:14; Ex. JR-3 at 9] Of course, in addition to all of the above, offenders at DWCC may seek access to mental health services through routine sick call, emergency sick call, during a mental health round on the tier, or by referral by any DWCC staff or another prisoner. [Ex. JR-60, R. Doc. 669, at 12, ¶55] *See* the discussion of screening and evaluation in section V.B *supra*.

After the Phase I trial, the Court found that these mandatory mental health evaluations were not occurring. [R. Doc. 641 at 78-79] The evidence now shows that evaluations are in fact taking place and the interval between evaluations is shorter.

Previously, offenders designated as LOC 3 received a mental health evaluation every ninety days. [Ex. J-15 at 6, EPM #03-02-003] Now, offenders with a diagnosed behavioral health

41

disorder (LOCs 3 and 4) receive a behavioral mental health assessment every thirty days. [Dauzat Trial 2 Tr. vol. XI at 2372:22-25; Ex. JR-1, IS-B-4, at 10] The thirty-day assessment is consistent with the ACA standards. [Burns Trial 2 Tr. vol. VII at 1571:23-25] Plaintiffs stipulated that the thirty-day segregation interviews are occurring.[14] [JR-60, R.Doc. 669 at 13, ¶65]

Moreover, these assessments are more often conducted in a private setting. Burgos generally conducts the assessments in a private setting, and Hayden gives the offender the choice of conducting the assessment cell side or in a private setting. [Burns Trial 2 Tr. vol. VII at 1651:1 - 1652:7] The practice of conducting the interviews is a private setting is much improved since the Phase 1 trial. [Burns Trial 2 Tr. vol. VII at 1651:25 - 1652:2]

In the Phase 1 ruling, the Court found that "there is no list or roster of inmates on the mental health caseload. Without such a list, it would be nearly impossible to keep track of where each inmate on the mental health caseload resides, when the last point of contact was, and when the next appointment should be scheduled." [R.Doc. 641 at 79] DWCC now has a database which produces a face sheet for each offender. [Ex. JR-60, R. Do. 669, at 10, ¶48] The mental health face sheet created from the database allows DWCC to track important information on each offender, including LOC, suicide history, date of most recent suicide watch, heat pathology/duty status, diagnosis, diagnosis date, psychotropic medications, last psychiatric visit, date of next psychiatrist visit, medication expiration date, date of information consent, date of confidentiality form, date last seen, next clinician visit, with space for comments. [Dauzat Trial 2 Tr. vol. XI at 2368:11-24,

---

[14] Dr. Thompson undertook the exercise of looking at every mental health contact for LOC 3 offenders in Restrictive Housing in June of 2022. He found that every LOC 3 offender was seen for the thirty-day interview within the month of June of 2022. Thompson Trial 2 Tr. vol. XIII at 2911:21-24. Dr. Burns conceded that DWCC does perform thirty-day and ninety-day assessments on offenders in Restrictive Housing. Burns Trial 2 Tr. vol. VII at 1533:14-17; 1649:21-25 & 1650:13. In fact, Dr. Burns is not aware of a single individual with SMI who did not receive the thirty-day interview. Burns Trial 2 Tr. vol. VII at 1650:17-19.

1271:12-18; Ex. JR-60, R. Doc. 669, at 10-11, ¶49; Ex. PR-J] DWCC mental health staff review this database daily. [Hayden Trial 2 Tr. vol. V at 1108:4-8]

In the Phase 1 ruling, the Court criticized the content of the assessments. The documentation of the assessments is more robust than before utilizing the SOAP method. [Dauzat Trial 2 Tr. vol. VI at 1225:20 - 1226:8, vol. XI at 2366:22 - 2267:13;] Dr. Burns had no criticism of Burgos and found that his notes were more detailed. [Burns Trial 2 Tr. vol. VII at 1647:9-11] Plaintiffs presented no evidence that the current documentation is deficient.

The thirty-day mental health assessments are occurring and are above the constitutional minimum. Again, as the District Court in *Dockery* held, there is no constitutional violation where the plaintiffs are not being denied treatment and their mental health illnesses are not being ignored; plaintiffs' arguments that they should be provided different treatment do not establish a constitutional violation. *Dockery*, 443 F. Supp. 3d at 742, *aff'd* 7 F.4th 375.

**6. Self-Help Materials**

DWCC has self-help materials available and provided to offenders in Restrictive Housing. [Exs. JR-28 - JR-58 (written materials)] Materials provided to offenders on the South Compound include anger management, victim awareness, substance abuse, parenting and thinking for a change. [Burgos Trial 2 Tr. vol. III at 707:25 - 708:8; Burgos Trial 2 Tr. vol. IV at 833:2-11; Hayden Trial 2 Tr. vol. V at 1111:14-20] Burgos also provides information related to veterans' affairs to offenders on the South Compound. [Burgos Trial 2 Tr. vol. IV at 834:13-14] Burgos has given out materials to 66 offenders, though he does not know how many of those have SMI. [Burgos Trial 2 Tr. vol. III at 709:20-24] Hayden has given out materials to 55 offenders since March of 2020. [Hayden Trial 2 Tr. vol. V at 1111:23 - 1112:2] Written materials to work toward a high school diploma can be provided to offenders on the South Compound. [Goodwin Trial 2 Tr.

vol. XI at 2564:3-16] DWCC has certified offender tutors to assist offenders with courses. [Goodwin Trial 2 Tr. vol. XI at 2564:21 - 2565:2]

Further, offenders in Restrictive Housing have access to correspondence work and homework with mental health staff for self-help programs. [Sherman Trial 2 Tr. vol. II at 382:8 - 383:14, 406: 20 - 408:1; Pacholke Trial 2 Tr. vol. III at 575:20 - 576:5 (self-help materials are programming); Hayden Trial 2 Tr. vol. V at 1111:14-20; Robinson Trial 2 Tr. vol. IX at 2053:6-14; Thompson Trial 2 Tr. vol. XIII at 2975:15-23 (records review indicated anger management materials were given out to two individuals in June of 2022), 2984:12-16 (offender who was interviewed reported the availability of such materials), 3027:25 - 3028:11]

### 7. **Treatment Segregation**

Since the phase I trial, DWCC began using treatment segregation. [Ex. JR-60, R. Doc. 669, at 14, ¶67] There are two beds in the north infirmary designated as treatment segregation. [Burgos Trial 2 Tr. vol. IV at 873:11-14] An individual who begins to display systems of active psychosis and is not performing day-to-day functions is eligible for placement into treatment segregation.[15] [Burgos Trial 2 Tr. vol. IV at 873: 24 - 874:2] Treatment segregation has been used for two offenders. [Ex. JR-60, R. Doc. 669, at 14, ¶67]

On May 21, 2021, DQ walked into the north infirmary from his housing in general population on the North Compound. [Dr. Seal Trial 2 Tr. vol. IX at 1976:19-22; Ex. PR-B-27 at 181] He was having displaced thought patterns. [*Id.*] Dr. Seal gave a verbal order by telephone to the nurse to administer Haldol and Cogentin injections three times a day for two weeks or until seen by a mental health doctor. [Dr. Seal Trial 2 Tr. vol. IX at 1974:14-20] This injection of Haldol is a quick-acting version of Haldol that is meant to have an immediate effect to control psychosis.

---

[15] Treatment segregation can also be used for offenders with medical issues. JR-1 at 6; JR-11 at 12(VI)(A)(6).

[Dr. Seal Trial 2 Tr. vol. IX at 1975:11-14] The quick-acting Haldol requires close observation by a nursing staff. [Dr. Seal Trial 2 Tr. vol. IX at 1977:1-5] DQ was placed into treatment segregation in a hospital room in the infirmary. [Burgos Trial 2 Tr. vol. IV at 876:13-21, 879:25 - 880:1] The nursing staff monitored DQ thereafter until June 2, 2021. [Dr. Seal Trial 2 Tr. vol. IX at 1977:6-15; Ex. PR-B-27 at 173-187] On June 2, 2021, Dr. Seal saw DQ. [Ex. PR-B-27 at 202] Dr. Seal noted that he had issued the verbal order for DQ to be started on Haldol injectable and that the staff reported that DQ was less irritable and volatile as of June 2, 2021. [Dr. Seal Trial 2 Tr. vol. IX at 1979:20-25; Ex. PR-B-27 at 202] Dr. Seal changed the Haldol injectable to the long-lasting once a month Haldol injection at that time. [Dr. Seal Trial 2 Tr. vol. IX at 1980:10-15; Ex. PR-B-27 at 202] Dr. Seal obtained a successful result for DQ as a result of his stay in treatment segregation. [Dr. Seal Trial 2 Tr. vol. IX at 1981:1-7] Burgos confirmed that DQ got better. [Burgos Trail 2 Tr. vol. IV at 880:12-13] DQ's stayed in treatment segregation for twelve days (May 21 through June 2). The situation with DQ, who was housed in the general population, shows that treatment segregation at DWCC works.

Plaintiffs have failed to show that treatment segregation is constitutionally deficient. To the contrary, the evidence as to DQ, who came from general population, showed a successful use of treatment segregation to stabilize a patient with acute psychiatric symptoms.

### 8.  Medication Administration

The deficiencies that the Court found in medication administration in the Phase I trial have been remedied. Plaintiffs stipulated that DWCC has new pill call officers for the South Compound. [JR-60, R. Doc. 669, at 12, ¶58] Pill call officers are trained via in-class and hands on training by medical staff on how to conduct pill call, including documentation. [JR-60, R. Doc. 669, at 12, ¶59] The officers receive a refresher course on the pill call policy every February. [*Id*] It is stipulated that the documentation of medication administration is better and more consistent that

45

before March of 2020. [JR-60, R. Doc. 669, at 13, ¶64; Thompson Trial 2 Tr. vol. XIV at 3061:8-11] The prior over utilization of the "not requested" option on the MARs has been resolved. [JR-60, R. Doc. 669, at 13, ¶63] Further, DWCC monitors the medication noncompliance more aggressively than before. [Burgos Trial 2 Tr. vol. IV at 814:9-17; Hayden Trial 2 Tr. vol. V at 1109:5-8]]

DWCC has acquired a new electronic medication program called "sMARt" from technology vendor Fusion Health. [JR-60, R. Doc. 669, at 13, ¶60] Unfortunately, the sMARt system has glitches and does not yet work at intended. [Dauzat Trial 2 Tr. vol. VI at 1265:8-16] When working as designed, the pill call officer will have a scanner which will scan the medication and document the MAR. [Thompson Trial 2 Tr. vol. XIII at 2936:23-25] The feature of the sMARt system that would notify mental health of missed medication doses would be an improvement. [Thompson Trial 2 Tr. vol. XIII at 2937:20-25] The Department's acquisition of the sMARt system is a good thing. [Burns Trial 2 Tr. vol. VII at 1662:15-18]

Plaintiffs still assert that pill call should be conducted by nurses, not correctional officers. Dr. Thompson testified that a pill call officer who is not a nurse can administer medications. [Thompson Trial 2 vol. XIV at 3061:4-7] Dr. Burns admitted that it is not uncommon for correctional officers to administer medications. [Burns Trial 2 Tr. vol. VII at 1659:25 - 1660:2] Plaintiffs presented no evidence of harm from pill call officers administering medications at DWCC.

As to evening pill call, Dr. Thompson testified that it is hard to get medications delivered at nighttime in most correctional institutions. [Thompson Trial 2 Tr. vol. XIII at 2938:21-22] Ideally, evening medications should be delivered between 6 and 8 pm. [Thompson Trial 2 Tr. vol. XIII at 2939:4-6] Sleep medications need to be taken a couple of hours before bedtime to reach peak dosage. [Thompson Trial 2 Tr. vol. XIII at 2939:6-13] Dr. Thompson further pointed out that

46

DWCC's day begins early and that considering that offender wake up at 5:00, sleep medications between 4 and 6 pm might not be a bad time. [Thompson Trial 2 Tr. vol. XIII at 2939:21-25] The risk of giving sleeping medications too early is only that the offender will be sleeping earlier and waking up earlier. [Thompson Trial 2 Tr. vol. XIII at 2940:14 - 2941:1]

Plaintiffs have not alleged that any offenders were prescribed improper mental health medications. [Ex. JR-60, R. doc. 669, at 10, ¶43] The bottom line is that offenders are receiving the medications that are prescribed. [Thompson Trial 2 Tr. vol. XIII at 2943:1-5]

### 9.  Psychoeducational Courses for Working Segregation

Plaintiffs complain that offenders in working segregation attend psychoeducational courses rather than therapeutic programming. To begin with, working segregation is no longer Restrictive Housing because offenders in working segregation are out of their cells for more than two hours a day. Even if Working Segregation was Restrictive Housing, this is nothing more than the Plaintiffs wanting treatment different than they are receiving. This complaint does not raise a constitutional issue.

### 10. Response to Proposed Remedies on Mental Health Treatment

As to the proposed remedy in paragraph 106(A) [Pls. Br., R. Doc. 732, at 50] (with the exception of group programming which is addressed below), Defendants' policies are more than sufficient. Plaintiffs' experts provided no explicit criticisms of DWCC's policies. Plaintiffs have failed to prove that DWCC's policies are below the constitutional minimum.

As to the proposed remedy in paragraph 106(B) [Pls. Br., R. Doc. 732, at 50], the evidence shows that offenders in Restrictive Housing at DWCC already have face-to-face meetings with mental health staff on a regular basis. All offenders with a behavioral health diagnosis are seen at least once every 30 days, and more frequently if necessary. For instance, when Dr. Thompson reviewed all mental health contacts for LOC 3 offenders in Restrictive Housing in June of 2022,

47

he found that the 31 LOC 3 offenders in restrictive housing had 68 mental health contacts during the month, not including psychiatric time. [Thompson Trial 2 Tr. vol. XIV at 3042:1-7]

There is no requirement that security staff be removed when mental health staff are counseling offenders. DWCC is a maximum-security prison which means that security staff may need to be present on occasion to protect the mental health staff. Imposing such a requirement risks tragedy and makes the hiring and retention of staff more difficult.

The proposal that the Court order that a mental health clinical encounter be documented is unnecessary as DWCC already documents mental health clinical encounters. Plaintiffs offered no testimony that the note must include the time that meeting commenced and ended. This suggestion is not the least restrictive or narrowly tailored. *See Hinds County*, 2022 WL 1112223 (in performing a PLRA analysis, the court struck provisions providing detail as to how mental health staff must document interactions with offenders as not required by the Constitution).

As to the proposed remedy in paragraph 106(C) [Pls. Br., R. Doc. 732, at 50], DWCC does provide individual therapy to offenders. The Constitution does not require group therapy. As here, the plaintiffs in *Dockery* argued that they received little if any group **or** individual therapy. The district court rejected the claim because the plaintiffs did not show that they were being denied treatment, that their mental health illnesses were being ignored, or that they were being intentionally mistreated. Plaintiffs' arguments that they should receive different treatment do not establish a constitutional violation. *Dockery*, 443 F. Supp. 3d at 742, *aff'd*, 7 F.4th 375.

As to the proposed remedy in paragraph 106(D) [Pls. Br., R. Doc. 732, at 50], Plaintiffs presented no evidence that a mental health evaluation needed to be done as part of the disciplinary process. Likely for that reason, Plaintiff presented no argument regarding same in this section. Suffice to say that there is no requirement for a mental health evaluation to be completed as part

of the disciplinary process in every instance. DWCC's accommodations as to discipline are further discussed in Defendants' treatment of the ADA *infra* in section V.F.

As to the proposed remedies in paragraph 106(E) and (H) [Pls. Br., R. Doc. 732, at 50-51], Plaintiffs presented no evidence that DWCC needs to establish specialized mental health housing. To the contrary, the evidence is that DWCC will send individuals who decompensate to EHCC, the facility that provides specialized mental health housing to offenders. [Dauzat Tr. vol. VI at 1263:12-25; Burns Trial 2 Tr. vol. VII at 1625:1-3; see the discussion regarding JG section V.B.5 *supra*.] This provision is not narrowly tailored or the least restrictive remedy as required by the PLRA. The lack of specialized mental health housing does not violate the Constitution.

As to the proposed remedy in paragraph 106(F) [Pls. Br., R. Doc. 732, at 51], DWCC's mental health staffing is above constitutional minimum levels. *See* the discussion of staffing section V.C.2 *supra*.

As to the proposed remedy in paragraph 106(G) [Pls. Br., R. Doc. 732, at 51], Plaintiffs offered no evidence that DWCC was required to maintain electronic medical records. This proposal violates the PLRA as it is not narrowly drawn and the least restrictive. The Constitution does not require that DWCC maintain electronic medical records.

As to the proposed remedy in paragraph 106(I) [Pls. Br., R. Doc. 732, at 52], Plaintiffs offered no evidence regarding the need for a quality assurance program at DWCC beyond that currently in place as DWCC. Further, the Court in *Hinds County* held that the quality assurance provisions:

> while helpful, go beyond the minimum standards required by the Constitution. That is, although these sections were designed to aid the County in complying with its basic obligations, they exceed the Constitutional "floor"…

2022 WL 11112223, at *55.

49

As to the proposed remedy in paragraph 106(J) [Pls. Br., R. Doc. 732, at 52], Dr. Thompson explained that there was no harm from the earlier distribution of medications. This remedy is not necessary as there is no risk of serious harm.

### D. Suicide Prevention

It is stipulated that DWCC does not overuse suicide watch, i.e., the number of suicide watches is appropriate for the offenders at DWCC. [Ex. JR-60, R. Doc. 669, at 15, ¶77; Burns Trial 2 Tr. vol. VIII at 1677:23 - 1678:1] It is also stipulated that DWCC does not keep offenders on suicide watch for too long. [Ex. JR-60, R. Doc. 669, at 15, ¶77] The length of time that DWCC keeps individuals on suicide watch is consistent with the national average. [Burns Trial 2 Tr. vol. VIII at 1678:2-4] DWCC does not have a problem with too many completed suicides. [Thompson Trial 2 Tr. vol. XIV at 3064:12-22; Burns Trial 2 Tr. vol. VIII at 1678:25 - 1679:6] DWCC's suicide prevention policy works as there are no instances of completed suicide while an offender was on suicide watch.[16]

### 1. DWCC Suicide Prevention Policies and Procedures

If there is a question of suicide, it is better to err on the side of caution and institute a suicide watch than taking no action and allowing an offender to commit suicide. [Thompson Trial 2 Tr. vol. XIII at 2961:20-21; Burns Trial 2 Tr. vol. VIII at 1677:13-20] It is stipulated that DWCC conducts training annually to all staff with the responsibility of offender supervision in the implementation of suicide prevention and intervention. [Ex. JR-60, R. Doc. 669, at 14, ¶69]

---

[16] Mental health observations ("MHO") are utilized to follow an individual offender more closely who is experiencing an acute exacerbation of symptoms which is considered temporary by medical professionals. Ex. JR-14 at 6. MHO is appropriate whenever an individual requires additional observation based on behaviors or expressed stressor which can include medication side effect, concerns over receiving disturbing information from family members or an individual just needs to be alone for a period of time. Burgos Trial 2 Tr. vol. IV at 760:1-18. Plaintiffs do not complain about MHO in their brief.

Mental health staff completes a mental health management order ("MHMO") on each new suicide watch. [Ex. JR-14 at 4] Within the clinical judgment of the mental health staff, the MHMO describes the techniques to be used, which property items are permitted, and which property items are prohibited. [Ex. JR-14 at 4-6; Ex. JR-60, R. Doc. 669, at 14, ¶70] Removing an offender's clothing and property while on suicide watch is an appropriate procedure designed to reduce the risk of completed suicide while an offender is on suicide watch. [Burns Trial 2 Tr. vol. VIII at 1678:5-9] By the later part of 2021, the default is that an offender on suicide watch is allowed to have a mattress unless there is a reason for taking it. [Burgos Trial 2 Tr. vol. IV at 757:20-23; Hayden Trial 2 Tr. vol. V at 1033:17-19] Since the Phase I trial, DWCC has purchased new suicide mattresses [Dauzat Trial 2 Tr. vol. XI at 2428:6] and new protective helmets. [Hayden Trial 2 Tr. vol. V at 1013:25 - 1014:1]

An offender on suicide watch is seen and evaluated daily. Mental health staff sees offenders on suicide watch daily on Monday through Friday; nursing staff sees offenders daily on the weekends. [Ex. JR-60, R. Doc. 669 at 15, ¶73; Ex. JR-14 at 8] Offenders on suicide watch are also monitored by the key room officer using the in-cell cameras. [Ex. JR-60, R. Doc. 669, at 2, ¶6] Offenders on suicide watch receive in-person observation by staff every fifteen minutes and randomly between intervals. [Ex. JR-14 at 6]

DWCC now stations trained tier walkers outside of the cell of an ongoing watch to supplement correctional staff rounds and staff monitoring of the camera in the cell. [Ex. JR-60, R. Doc. 669, at 14-15, ¶72; Ex. JR-18; Sherman Trial 2 Tr. vol. II at 397:2 - 403:22] Tier walkers supplement the staff and are an improvement since the Phase I Trial. [Burns Trial 2 Tr. vol. VIII at 1682:8-13] Dr. Thompson testified that tier walkers were an excellent addition to DWCC's other practices. [Thompson Trial 2 Tr. vol. XIII at 2960:12-21] Tier walkers are trained. [Burns Trial 2

51

Tr. vol. VIII at 1682:4-5] The ACA has provisions that allow for use of tier walkers. [Burns Trial 2 Tr. vol. VIII at 1685:24 - 1686:1]

Offenders on extreme suicide watch may only be placed in restraints after a clinical determination by mental health staff and approval from the medical director. [Ex. JR-14 at 8] Warden Goodwin is notified of every time an offender is placed on extreme suicide watch. [Thompson Trial 2 Tr. vol. XIII at 2961:8-11] The utilization of extreme suicide watch decreased significantly in 2022. [Burns Trial 2 Tr. vol. VIII at 1679:7-10] There were only three instances of extreme suicide watch between January and May of 2022. [Thompson Trial 2 Tr. vol. XIII at 2961:16-22][17]

On or around September 2021, DWCC purchased a humane restraint bed and leather restraints to use on extreme suicide watches when authorized by appropriate medical and mental health staff. [Ex. JR-60, R. Doc. 669, at 14, ¶71; Ex. PR-K-11] The restraint chair has not been used since DWCC acquired the humane restraint bed. [Dauzat Trial 2 Tr. vol. VI at 1204:6-9, vol. XI at 2395:15-17] DWCC did not use the restraint chair at any point in 2022. [Dauzat Trial 2 Tr. vol. XI at 2394:24 - 2395:4; Burns Trial 2 Tr. vol. VIII at 1680:10-13] The restraint bed has been used six times since it was acquired in the fall of 2021. [Dauzat Trial 2 Tr. vol. XI at 2396:1-3] The restraint bed is a good addition. [Thompson Trial 2 Tr. vol. XIII at 2961:12-15]

Offenders on extreme suicide watch are assessed upon initiation of suicide watch and at least every 12 hours thereafter. [Ex. JR-60, R. Doc. 669, at 15, ¶74] Offenders on extreme suicide watch are stepped down to standard suicide watch. [Ex. JR-60, R. Doc. 669, at 15, ¶74] The mental health staff at DWCC decides when to end a suicide watch. [Ex. JR-60, R. Doc. 669, at 15, ¶75] The most important factor in terminating suicide watch is the clinical decision of the mental health

---

[17] *See* Exs. PR-E-23 at 83, PR-E-24 at 88, and PR-E-26 at 61.

staff based upon the report of the offender and knowing the offender. [Thompson Trial 2 Tr. vol. XIII at 2962:17 - 2963:11] The single most important piece of information is whether the offender tells you that he is actively planning on harming himself. [Thompson Trial 2 Tr. vol. XIII at 2963:12-16]

Upon termination of suicide watch, mental health staff evaluates the offender within seven days. [Ex. JR-60, R. Doc. 669, at 15, ¶76] Plaintiffs have not identified a single instance where an individual failed to receive a seven-day follow-up after coming off of suicide watch. [Burns Trial 2 Tr. vol. VIII at 1678:21-24]

Plaintiffs presented evidence of suicidal behavior of a number of offenders over 27 months.[18] Dr. Thompson listened intently to the testimony and took good notes regarding the suicidal behaviors presented by the Plaintiffs. [Thompson Trial 2 Tr. vol. XIII at 2948:7-14] Dr. Thompson testified that the number of suicidal behaviors was reasonable. [Thompson Trial 2 Tr. vol. XIII at 2955:2-9] Dr. Thompson's opinion remains unrefuted.

## 2. **Completed Suicides**

Over the last seven years, DWCC has had two completed suicides. DWCC does not have a problem with too many completed suicides. [Thompson Trial 2 Tr. vol. XIV at 3064:12-22; Burns Trial 2 Tr. vol. VIII at 1678:25 - 1679:6]

Plaintiffs complain of an alleged delay in responding to JB's competed suicide. The Plaintiffs did not demonstrate crucial information about the incident to actually support their complaints. For instance, the officer with the camera was not the first officer at the scene. As such, the camera does not record whether or not the first officer had activated the beeper and radioed for help. One can conclude that he did because the ranking officer (with the camera) and a second

---

[18] As to the Court's concern that these were the only instances of suicidal behavior, it was incumbent on the Plaintiffs to show that there were more, if there were in fact more. The evidence consists solely of these events.

individual (discussed below) respond in under a minute. While DWCC policy permits a single correctional officer to enter a cell in an emergency, it does not require it. [JR-14 at 9] The Plaintiffs also failed to identify the persons in the video and whether any of them was part of the medical response team.[19] The video alone is insufficient as proof of any failure by DWCC.

In *Anderson v. Dallas Cty. Tex.*, 286 F. App'x 850, 862 (5th Cir. 2008), the plaintiffs argued the jail was liable because the first responders did not immediately perform CPR. The Fifth Circuit rejected a theory of deliberate indifference on the basis that the jail's policies related to suicide were "not strictly followed" when CPR was not rendered (the Fifth Circuit assumed *arguendo* that CPR was not performed until paramedics arrived and that the failure to perform CPR contributed to the death). Here, the Plaintiffs acknowledge that DWCC has a policy governing the response to a suicide attempt or completion.[20] The Plaintiffs adduced no expert testimony that DWCC did not comply with its policy. Even if they had such testimony, one instance of an alleged violation of policy (which is denied), does not support a class action claim of deliberate indifference.

### 3.  **The Tier Walker Program**

Defendants addressed the tier walker program in the section above addressing DWCC's suicide policies and procedures. The tier walker program, enacted consistent with the ACA, does not violate the Constitution.

---

[19] Nurse Joel Williams is one of the first to respond on the video, under a minute from the beginning of the video. He is known to the Court having appeared before it to testify in this matter on February 1, 2022. Williams Trial 1 Tr. vol. XVI at 3804-3836.

[20] The parties stipulated that DWCC has in the keyrooms of N1, N2, N3, and N4 suicide kits containing the following items: 1) an Airway protection device; 2) Non-sterile protective gloves; 3) Pocket masks for rescue breathing; 4) Large Paramedic shears; 5) Bandage scissors; 6) Blood stopper compression bandages; and 7) a Hoffman Medical Rescue tool. Ex. JR-60, R. Doc. 669, at 14, ¶68.

**4.   Response to Plaintiffs' Proposed Remedies on Suicide Prevention**

Defendants submit that the evidence of suicidal behavior adduced by the Plaintiffs shows that DWCC staff is appropriately intervening and preventing suicidal behavior. While Defendants provide mental health care to offenders at DWCC, the United States Supreme Court stated that:

> No decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols.

*Taylor v. Barkes*, 575 U.S. 822, 826, 135 S. Ct. 2042, 2044 (2015); see also *Anderson*, 286 F. App'x at 862.

Plaintiffs' simply want a *different* suicide prevention policy, that is, one that Dr. Burns prefers. The Plaintiffs are not entitled to their preferred policy. *Dockery*, 443 F. Supp. 3d at 742, *aff'd*, 7 F.4th 375. The Defendants are not ignoring suicide risk and have policies to address it. To the contrary, the evidence is that DWCC's suicide prevention policy is working. Plaintiffs presented no evidence that DWCC has ever had a completed suicide while an offender was on suicide watch. No evidence supports a finding that DWCC's suicide watch policies are deliberately indifferent. None of Plaintiffs' proposals in paragraph 118 [Pls. Br., R. Doc. 732, at 56-58] are necessary, as there is no constitutional violation.

As to the proposed remedy in paragraph 118(A) [Pls. Br., R. Doc. 734, at 56], there is no need to eliminate extreme suicide watch, as it is necessary in rare instances to prevent harm to an offender. Eliminating extreme suicide watch creates a risk of harm (even death), rather than eliminating a risk of harm.

Plaintiffs' proposed remedy in paragraph 118(B) [Pls. Br., R. Doc. 732, at 56] is contrary to the testimony and would weaken DWCC's suicide prevention practices. Both Dr. Thompson and Dr. Burns testified that one should err on the side of caution and that there is a low bar for placing a person on suicide watch because it is difficult to know when a person is an actual threat

55

to commit suicide. [Thompson Trial 2 Tr. vol. XIII at 2961:20-21; Burns Trial 2 Tr. vol. VIII at 1677:13-20] The proposal that the staff simply observe an offender and that only a psychiatrist or medical doctor can place the offender on suicide watch is contrary to the expert testimony. It is stipulated that the mental health staff evaluate an offender on standard suicide watch at least every 24 hours. [Ex JR-60, R. Doc. 669, at 15, ¶73] Again, Plaintiffs' proposal poses a risk of harm to the offenders represented in this class action.

The proposed remedy in paragraph 118(C) [Pls. Br., R. Doc. 732, at 56] is again contrary to testimony and would weaken DWCC's suicide prevention practices. The professional judgment of the mental health staff as to when to institute suicide watch and the conditions of suicide watch must prevail. Dr. Burns testified that removing clothing during suicide watch is appropriate. [Burns Trial 2 Tr. vol. VII at 1678:5-8] In *Anderson*, 286 F. App'x at 863, the plaintiffs argued the jail was liable because the jail **did not** remove the offender's clothing. While the Fifth Circuit rejected the claim, *Anderson* demonstrates the risk of allowing offenders to keep their clothing.

As to the proposed remedy in paragraph 118(D) [Pls. Br., R. Doc. 732, at 56], there was no testimony that DWCC's use of tier walkers to supplement staff observation was insufficient to comply with the alleged need for constant observation. There was no testimony that a person had to be seen within two hours of being placed on constant observation as being the minimum necessary to comply with the Constitution. Plaintiffs' proposal for constant observation is merely their preferred practice, to which they are not entitled.

As to the proposed remedy in paragraph 118(E) [Pls. Br., R. Doc. 732, at 56], the proposal is not clear whether a staff member must be present at all times or whether direct observation at least every 15 minutes is acceptable. Dr. Burns' testimony is that close watch is "not under continuous observation." [Burns Trial 2 Tr. vol. VII at 1587:14-17] DWCC uses tier walkers and in-cell cameras for continuous observation. Nothing further is required by the Constitution.

56

As to the proposed remedy in paragraph 118(F) [Pls. Br., R. Doc. 732, at 56], there is no evidence that cameras are used as a substitute for observation and periodic checks. Thus, this proposed remedy is not required.

As to the proposed remedy in paragraph 118(G) [Pls. Br., R. Doc. 732, at 56-57], there was no evidence that suicide watch should not last more than 72 hours. To the contrary, Dr. Burns testified many systems allow suicide watch for up to seven days. [Burns Trial 2 Tr. vol. VII at 1592:14-15] The evidence is only that DWCC does not keep offenders on suicide watch for too long a period of time. [Burns Trial 2 Tr. vol. VII at 1678:2-4] The suggestions regarding treatment team meetings and modifications to the treatment plan are Plaintiffs' preferred practices. No remedy is necessary to bring DWCC in compliance with the constitutional minimum standards.

As to the proposed remedy in paragraph 118(H) [Pls. Br., R. Doc. 732, at 57], all of these proposals are Plaintiffs' preferred practices. For instance, Plaintiffs want DWCC to provide a "turtle suit" for suicide watch. However, Dr. Burns testified that an offender on suicide watch is provided a suicide resistant smock or a paper gown. [Burns Trial 2 Tr. vol. VIII at 1678:8-9] Warden Dauzat testified that paper gowns are used because it reduces the opportunity to use the garment to complete a suicide and that the suicide smock makes the offenders too hot. [Dauzat Tr. vol. XI at 2396:13 - 2397:11] The evidence is that DWCC now provides a suicide mattress unless there is a reason not to do so. There is no evidence supporting a Constitutional requirement to install suicide-resistant flooring and create suicide resistant cells. There is no evidence that suicide watches occur in a "therapeutic" setting. These remedies should be rejected because DWCC's suicide watch policies work. No suicides have been completed while an offender was on suicide watch.

The proposed remedy in paragraph 118(I) [Pls. Br., R. Doc. 732, at 57] that offenders on suicide watch should be allowed unimpeded access to the telephone is naïve and

counterproductive. This proposal would incentivize offenders to endorse suicide ideation (which should be honored in an abundance of caution) to obtain unimpeded access to the telephone.[21] This proposal would have negative consequences and is neither narrowly tailored nor the least restrictive to comply with the Constitution.

As to the proposed remedy in paragraph 118(J) [Pls. Br., R. Doc. 732, at 57], mental health staff or nurses on the weekend do in fact meet with offenders on suicide watch daily. [Ex. JR-60, R. Doc. 669, at 15, ¶73] The Constitution requires nothing more.

As to the proposed remedy in paragraph 118(K) [Pls. Br., R. Doc. 732, at 57], DWCC already steps down offenders from extreme suicide watch to standard suicide watch. The Constitution requires nothing more.

As to the proposed remedy in paragraph 118(L) [Pls. Br., R. Doc. 732, at 58], there was no testimony regarding the need for treatment teams in response to suicide ideations. The proposed detail within 48 hours of an offender being placed on suicide watch is not required by the Constitution and is prohibited by the PLRA. *See Hinds County*, 2022 WL 1112223. Plaintiffs' proposal that DWCC must use suicide risk assessment forms is not necessary, i.e., not the least restrictive or narrowly tailored. Dr. Thompson testified that the most important factor in deciding to remove someone from suicide watch is the professional judgment of the mental health staff, relying upon the report of the offender. [Thompson Trial 2 Tr. vol. XIII at 2962:17 - 2963:11] Risk assessments that are so complicated that it can take 45 minutes to complete have not been shown to be effective—the mental health staff still has to rely upon what the offender says and knowing

---

[21] Upchurch offered some testimony to this effect when he testified that there has to be a difference between the privilege levels and the things that are comfortable in general population versus restrictive housing. Upchurch Trial 2 Tr. vol. XII at 2749:4-9. Plaintiffs' proposal would actually create more privileges, i.e., unlimited telephone use, which creates an incentive for offenders to be on watch, making clinical judgment on these watches much more difficult.

the offender well enough to make a good decision. [Thompson Trial 2 Tr. vol. XIII at 2963:7-11] The evidence shows no issue with DWCC's suicide risk assessments.

As to the proposed remedy in paragraph 118(M) [Pls. Br., R. Doc. 732, at 58], there was no testimony that mental health is required to follow up with an offender daily for five days and then on the tenth day following a suicide watch.

Based on the record, suicide watch at DWCC is not constitutionally deficient. Plaintiffs' proposals for suicide prevention are their preferred practices. Even if the policies were found to be deficient, Plaintiffs' proposals are not narrowly tailored or the least restrictive under the PLRA.

### E. Use of Force and Restraints

#### 1. Evidence on Use of Force and Restraints

Use of Force incidents at DWCC are reviewed by the Unit Manager, Col. Vincent Coleman. Use of Force incidents are documented on UORs and are reported by DWCC to DPS&C in the monthly C-05 report. [*see, e.g.*, PR-E-12 at 10] Correctional officers turn on their body cameras when the use of chemical spray or other use of force is anticipated. [JR-9 at 3-4]

Every Monday, buildings N1-N4 are provided lists of offenders with serious mental illness in their housing locations (the "SMI List"). [Coleman Trial 2 Tr. vol. I at 28:18-23; Robinson Trial 2 Tr. vol. IX at 2031:11 - 2032:7; Dauzat Tr. vol. VI at 1279:8 - 1280:3] The SMI List is consulted by correctional officers prior to planned uses of force. An individual on the SMI List is accommodated by having mental health staff (or medical staff if mental health is unavailable) respond to incidents prior to a planned use of force when time allows.

Plaintiffs cite in alleged support that DWCC is not calling medical or mental health staff prior to a use of force [Pls. Br., R. Doc. 732, at 59] an incident with JF that occurred on Sunday, April 10, 2022. [Coleman Trial Tr. vol. I at 37:10-39:7; JR-9 at 6(D)(3)(b)(3)] First, Plaintiffs improperly describe the policy requirements by stating evidence showed uses of force prior to the

59

mental health department being called. The policy actually requires that medical or mental health staff be contacted prior to the use of force "whenever possible." [JR-9 at 6(D)(3)(b)(3)] The Court took judicial notice that this date was a Sunday. [Coleman Trial Tr. vol. I at 132:1-11] Col. Coleman testified that medical staff (a nurse) would be called to intervene with an offender when mental health staff are not at the facility. [Coleman Trial Tr. vol. I at 132:13 - 133:7]

Plaintiffs' evidence starts in the middle of this incident when Major Young responds to Captain Kidd. Plaintiffs did not demonstrate that Captain Kidd failed to contact medical staff prior to using force on JF. Tellingly, the Plaintiffs did not put before the Court the report of the preceding incident with Captain Kidd, that Major Young was responding to in PR-C at 964-965. Plaintiffs failed to do this despite having identified that report as an exhibit in the pretrial order. That context is in evidence at PR-E-26 at 132-133 which shows that JF had an intervention with the nurse prior to any use of force.

Plaintiffs also cite an incident with TD that occurred on March 22, 2021 in N1A, which was a COVID quarantine unit at this time. [JR-60, R. Doc. 669, at 3, ¶14] While in the quarantine unit, DWCC correctional officers had to use force to stop TD from harming himself by banging his head on the wall and top bunk. [PR-M-1 at 33] DWCC's Use of Force Policy allows for the use of chemical agents to prevent serious injury. [JR-9 at 7(G)(2)]

Similarly, DWCC's correctional officers intervened on CB to prevent him from harming himself. Finally, the Plaintiffs cite an incident with JM where chemical agents were not used. Plaintiffs state in their brief that chemical spray was used, despite such a characterization being contrary to the plain language of the exhibit and the testimony. [Coleman Trial Tr. vol. I at 94:15 -95:16; PR-C-1 at 820-821 (chemical agents not checked off as used and not reported as used in the narrative on the following page)] This represents a failure of proof.

Plaintiffs' citation to PR-D-33, an incident with JG, is discussed *supra* at Section V.B.5.

## 2. <u>Response to Proposed Remedies on Use of Force and Restraints</u>

First, Plaintiffs requests as to use of force in general are not properly before this Court as this case is about offenders in Restrictive Housing with mental illness. As to Plaintiffs' proposed relief that is actually related to offenders with mental illness, none of it is supported by the record. Despite having access to all UORs related to uses of force [Pacholke Trial 2 Tr. vol. III at 589:8-11], Mr. Pacholke offered no opinions on specific instances, and Plaintiffs' brief contains no citations to his testimony on these points.

As to the proposed remedies in paragraph 124(A) and (B) [Pls. Br., R. Doc. 732, at 60], Plaintiffs adduced no expert testimony about any use of force at DWCC over the time period in question or the quality of training which is currently provided. As such, there is no basis to order additional training. There is no testimony regarding deficiencies in tracking uses of force, and DWCC already has a uniform reporting system.

As to the proposed remedies in paragraph 124(C) and (F)-(J) [Pls. Br., R. Doc. 732, at 60-62], the Plaintiffs do not define what would be a "use of force" and have no basis to curtail state authority to promote offender, staff, and public safety. Prison officials are accorded the widest possible deference in the application of policies and practices designed to maintain security and preserve internal order. *See Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999); *Tasby v. Cain*, No. 16-277, 2017 WL 4295441, at *7 (M.D. La. Sept. 12, 2017), *report and recommendation adopted,* 2017 WL 4322413 (M.D. La. Sept. 28, 2017). DWCC already uses body cameras to capture planned uses of force, attempts to de-escalate prior to using force, and calls mental health or medical to respond when time permits.

As to the proposed remedies in paragraph 124(E) [Pls. Br., R. Doc. 732, at 61], Dr. Burns' criticisms of restraints do not support a claim of deliberate indifference. Dr. Burns simply gave her opinion and did not point to any national standards on the use of restraints. No systemic issue has

been proven. The Plaintiffs then take two paragraphs of facts they believe they have proved [Pls. Br., R. Doc. 732 at 59-60], and touch wholly new areas, such as whether some maximum custody offenders should not be restrained when leaving their cell. Neither Mr. Pacholke nor Dr. Burns provided testimony that there should be a separate restraint policy for different classes of maximum custody offenders such as what is embraced in this proposal. Plaintiffs have a complete failure of proof on their use of force and restraint proposals.

### F. Americans with Disabilities Act and Rehabilitation Act Claims

The ADA is not meant to be an "end run" around Eighth Amendment cases. *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996). Neither the ADA nor the RA applies to claims regarding the quality of mental health services. *See Smith v. Harris Cty., Tex.*, 956 F.3d 311, 318 n.1 (5th Cir. 2020) ("the ADA does not typically provide a remedy for negligent medical treatment."); *Atkins v. Cty. of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003); *Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1022 (9th Cir. 2010), *overruled on other grounds by Castro v. Cnty. of Los Angeles,* 833 F.3d 1060 (9th Cir. 2016) (en banc) ("The ADA prohibits discrimination because of disability, not inadequate treatment for disability."); *Bryant*, 84 F.3d at 249 (the ADA is not "violated by a prison's simply failing to attend to the medical needs of its disabled prisoners" where no discrimination is alleged). Similarly, a claim that challenges the adequacy or the substance of services that are provided to a disabled individual is not a valid claim under either the ADA or the RA. *Maccharulo v. N.Y. St. Dep't of Corr. Servs.*, No. 08-301, 2010 WL 2899751, at *3 (S.D.N.Y. July 21, 2010); *Atkins*, 251 F. Supp. 2d at 1232.

Prior to the first trial, Defendants filed a motion for summary judgment citing this law and arguing that Plaintiffs' claims were really claims under the Eighth Amendment, not ADA or RA claims. This Court noted that "[i]t is possible that Plaintiffs are merely re-packaging their Eighth Amendment claims and that Plaintiffs have not stated a claim under the ADA or RA in this regard."

[R. Doc. 516 at 16] Defendants suggest that Plaintiffs' three pages of ADA and RA briefing shows that this claim is really subsumed under the Eight Amendment claims.

DWCC screens for ADA issues and accommodates them. For example, since the implementation of IS-B-4, DWCC disciplinary boards are now made up of three members, a security staff member, a classification officer, and a third member from a department other than security or classification. The Disciplinary Board can refer cases to mental health rather than prosecute rules violations after review of the nature of the incident or, if indicated, in response to the initial contact with the offender at the Board. In addition to the Disciplinary Board's power to refer the case to Mental Health, Mental Health staff can also intervene in disciplinary cases as appropriate.[22] [Kimball Tr. vol. II at 304:23 - 305:13, 307:13 – 309:22, 328:13 - 330:14; Hayden Trial 2 Tr. vol. V at 1104:8-13]

Additionally, offenders with serious mental illness are identified by a list posted in the key rooms of N1-N4. To accommodate offenders with serious mental illness, mental health is contacted prior to uses of force on these offenders if circumstances allow. [Coleman Trial 2 Tr. vol. I at 28:18-23; Dauzat Trial 2 Tr. vol. VI at 1279:8 - 1280:3] Also, heat precaution duty statuses for offenders on certain psychotropic medications are ordered by medical or mental health staff and a list of offenders on this status is sent every Monday from May 1 through October 31 to buildings N1-N4. [Ex. JR-21 at 2; Dauzat Trial 2 Tr. vol. VI at 1280:10-20; Robinson Trial 2 Tr. vol. IX at 2029:13-19]

DWCC maintains files on requests for accommodation that include the request, documentation of the interview with the offender, documentation related to the investigation such

---

[22] This can be done by not giving an offender a rule violation in the first instance, not processing a rule violation to go before a disciplinary board, deferring a disciplinary board hearing pending mental health evaluation, and dismissing a rule violation found to be the result of mental health difficulties. Kimball Trial 2 Tr. vol. II at 304:23 - 305:13, 307:13 - 309:22, 328:13 - 330:14.

as a response from medical or mental health, and the documented decision and rationale. [Ex. JR-59] These files demonstrate the detailed review and consideration given to all requests for accommodations submitted to DWCC.

One example of this detailed review is that of SF who submitted a written "Request for Accommodation" in June 2020 seeking special heat accommodations due to his medications. [Ex. JR-59 at 17] DWCC investigated the request and determined that his medications did not call for a heat duty status, and he was informed in writing that his request was denied. [Ex. JR-59 at 16] DWCC fully investigated the matter and completed the six-page assessment form required by DOC headquarters in evaluating requests for accommodations. [Ex. JR-59 at 18-23] Thus, DWCC does have an adequate process in place to identify, review, and dispose of ADA claims.

Moreover, Defendants do not discriminate against individuals with mental illness in the South Compound. Each such offender receives that same treatment options as any other offender located in Restrictive Housing, including: (1) visits with DWCC's contract psychiatrist; (2) individual counseling with mental health clinicians since they cannot attend group programming; (3) written program materials to work on individually and discuss with their clinicians; and (4) inmate tutors to assist them in their educational and mental health work. [Sherman Trial 2 Tr. vol. II at 375:9 - 380:21]

Plaintiffs' remedy proposals in paragraph 130 [Pls. Br., R. Doc. 732, at 64-65] are generic restatements of the law and obligations the law imposes on DWCC under the ADA and RA. Plaintiffs have identified nothing that requires issuance of an injunction.

As to the proposal in paragraph 130(A) [Pls. Br., R. Doc. 732, at 64-65], Plaintiffs seek to require DWCC to make all programs associated with the general population available to offenders with disabilities. No such requirement exists in law. Disciplinary action taken as a result of misconduct is not discrimination based upon a disability as to mental health. Offenders with

disabilities are potentially entitled to accommodations in Restrictive Housing; they are not entitled to enjoy all of the programs available to offenders in general population prior to being housed in general population. This proposal is not required to comply with the ADA or RA.

The proposal in paragraph 130(B) [Pls. Br., R. Doc. 732, at 65] states that DWCC shall not provide offenders with disabilities with opportunities that are unequal to those afforded to inmates who do not have disabilities. DWCC is not discriminating against offenders with disabilities. As set forth above, mental health is considered at every step, from the initial Disciplinary Board, through punishment for rules violations, and classification boards to become eligible for general population. Nothing more is required.

As to the proposal in paragraph 130(C) [Pls. Br., R. Doc. 732, at 65], the evidence is that DWCC has a system in place for offenders to make requests for accommodations, either in writing or verbally, and that DWCC does in fact track and monitor the requests. The evidence presented shows a process for inmates with any qualifying disability to request reasonable accommodations. Offenders may make accommodation requests verbally, by written letter, or by using the well-known ARP process. [Ex. PR-BB-1, Acklin Dep., at 14:18-23, 15:2-7, 38:18 - 39:19] ADA accommodations at DWCC are most often handled without the need for a written offender request based on an offender's classification, staff observation, or an offender's inquiry. [Ex. PR-BB-1, Acklin Dep., at 38:8 - 39:19[23]] DWCC's medical, mental health, classification, and security staff actively review offenders at the facility to determine individual needs and appropriate accommodations. [Ex. JR-11 at 3-4] The ADA requires no more.

---

[23] Edited Deposition Transcripts are cited to the transcript page as opposed to the pdf page.

As to the proposal in paragraph 130(D) [Pls. Br., R. Doc. 732, at 65], DWCC does in fact consider an offender's disability throughout the disciplinary process, as explained in detail above. Nothing more is required.

As to the proposal in paragraph 130(E) [Pls. Br., R. Doc. 732, at 65], DWCC does in fact train its staff. The Court's prior ruling said nothing about inadequate training on the ADA. Nothing more is required.

The evidence demonstrates that DWCC does have an adequate process in place for offenders with mental illness to make requests for accommodations under the ADA/RA. It also shows that DWCC has a well-defined process to investigate requests for accommodations and to provide written notice to the offender of the disposition of the request. Moreover, the offender is allowed to appeal to DPS&C headquarters if he is dissatisfied with the disposition. The evidence also shows that offenders with mental illness are not discriminated against because of their condition. They are afforded the same programs and services that are available to other offenders. Plaintiffs' ADA/RA claims should be denied.

## G. Monitoring

Defendants oppose the appointment of a special master or monitor as unnecessary and contrary to the limitations set out by the PLRA.

Appointment of a special master or monitor in the context of prison litigation is governed by the PLRA. 18 U.S.C. § 3626. The PLRA substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions, specifically to ensure compliance with the Eighth Amendment. *Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003). The PLRA provides that a court may not grant prospective relief at all – "let alone appoint a special master to administer a state prison system" – unless the court finds that such relief meets the standard set out in the statute. *Id.* That means the relief must be narrowly drawn, extend no further than necessary to correct the

violation of the federal right, and be the least intrusive means necessary to correct the violation of the federal right. *Id.*; 18 U.S.C. § 3626(a)(1)(A).

Within the Fifth Circuit, a district court denied a temporary restraining order and preliminary injunction filed by prison inmates that requested a special master be appointed to assume control of day-to-day operations of the prison. *Amos v. Hall*, No. 20-7, 2020 WL 6791516, at *1 (N.D. Miss. Jan. 24, 2020). The district court noted that the PLRA has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions. *Id.* (citing *Webb*, 340 F. 3d at 111). Additionally, the district court stated that it is "incumbent upon a plaintiff to support a request for such relief with relevant authority and argument." *Id.*

The Tenth Circuit followed the Second Circuit's lead in affirming a district court's denial of a prison inmate's preliminary injunction that requested the appointment of a court advocate to oversee prison operations. *Center v. Lampert*, 726 Fed. App'x 672, 676 (10th Cir. 2018) (citing *Webb*, 340 F. 3d at 111). The plaintiff failed to provide support for the court's authority to appoint such an advocate. *Id.*

In support of their request to appoint a monitor, the Plaintiffs point to the alleged problems with the C-05 reports and suicide gestures or attempts. Warden Dauzat explained that DWCC took steps to fix the problem in reporting once the issue came to light at her deposition. [Dauzat Trial 2 Tr. vol. XI at 2409:2 - 2413:11, 2417:9 - 2423:9] Plaintiffs misconstrue Secretary LeBlanc's testimony. Secretary LeBlanc testified that information regarding DWCC's use of Restrictive Housing is available and can be provided. [J. LeBlanc Trial 2 Tr. vol. X at 2153:16 - 2154:1]

The appointment of a special master or monitor as relief in this matter is not narrowly drawn, extends further than necessary to correct the violation of Plaintiffs' federal rights, and is not the least intrusive means necessary to correct such violations, as required by the PLRA.

## VI.   PLAINTIFFS HAVE FAILED TO SHOW ANY SYSTEMATIC CONSTITUTIONAL DEFICIENCIES AT DWCC

Plaintiffs have failed to show a systematic failure to provide mental health care at DWCC. From March 2020 through May 2022 (27 months), the mental health staff at DWCC had 7,923 contacts and 1,727 psychiatric contacts.[24] According to the mental health face sheets, 128 LOC 3 and LOC 4 individuals were assigned to Restrictive Housing at some point between July of 2021 and July of 2022. After requesting records that they chose, Plaintiffs identified trial exhibits for 38 non-randomly selected offenders consisting of 15,246 pages. [PR-B-1 through PR-B-38] Plaintiffs introduced into evidence only 104 pages of the 15,246 pages identified for trial.[25] Defendants contend that there should be an adverse presumption against the Plaintiffs that the remainder of the individual records that they identified over Defendants' objections are adverse to the Plaintiffs and favorable to the Defendants.

Given the dearth of documentary support introduced by the Plaintiffs, a sound sampling methodology is required to extrapolate from a sample to the whole of Restrictive Housing. Neither the Plaintiffs nor their experts employed a valid sampling methodology. Plaintiffs tacitly acknowledge this major flaw in their methodology through the attempt to have their experts characterize their interview selections as "random," when those selections are definitively not "random" for the purposes of sampling. [Pacholke Trial 2 Tr. vol. III at 495:16 - 496:2, 563:6-19; Burns Trial 2 Tr. vol. VII at 1527:2-14; Haney Trial 2 Tr. vol. X. at 2179:24 - 2180:11 (Dr. Haney

---

[24] C-05 Reports from March 2020-May 2022, PR-E-1 at 101; PR-E-2 at 73; PR-E-3 at 203; PR-E-4 at 188; PR-E-5 at 97; PR-E-6 at 148; PR-E-7 at 133; PR-E-8 at 103; PR-E-9 at 86; PR-E-10 at 97; PR-E-11 at 122; PR-E-12 at 115; PR-E-13 at 79; PR-E-14 at 59; PR-E-15 at 114; PR-E-16 at 79; PR-E-17 at 145; PR-E-18 at 188; PR-E-19 at 59; PR-E-20 at 75; PR-E-21 at 63; PR-E-22 at 112; PR-E-23 at 83; PR-E-24 at 88; PR-E-25 at 62; PR-E-26 at 61; PR-E-27 at 164.
[25] Absolutely no records were introduced into evidence on twelve of the offenders. Plaintiffs pointed to a form with no substantive discussion for another five offenders. See for instance the reference to BA to merely identify a screening form. Another seven of the records were identified solely with regard to suicide behavior. There were only five records that received any substantive discussion at all.

uses the word "random" or a variation three times.) at 2317:2-6 (admits not using a statistical method); *compare with* Thompson Trial 2 Tr. Vol. XIII at 3007:2-20, 3008:18 - 3009:4]

Instead of random sampling, Plaintiffs' experts, like the attorneys in discovery, simply identified offenders they thought supported their litigation position, tainting their findings with bias that makes their sample unreliable. Even by solely selecting records to present to the Court that gave a slanted and unreliable view of DWCC, there were very few records upon which the Plaintiffs' attempted to build their case.

The problems with Plaintiffs' experts' methodology extend past the failure to properly sample. Plaintiffs' experts failed to determine crucial objective issues in this case. For instance, Plaintiffs' experts did not do any research to determine how many offenders with serious mental illness were in Restrictive Housing. [Pacholke Trial 2 Tr. vol. III at 532:22 - 533:2; Burns Trial 2 Tr. vol. VIII at 1718:9-13; Haney Trial 2 Tr. vol. X at 2294:19-23] Dr. Haney made no effort to determine the average length of time offenders at DWCC spend in Restrictive Housing. [Haney Trial 2 Tr. vol. X at 2305: 9-15.][26] Dr. Burns made no effort to determine whether two suicides at DWCC over any time period were too high compared to other institutions. [Burns Trial 2 Tr. vol. VIII at 1678:25- 1679:6] Mr. Pacholke's report did not contain a single citation to any individual's records in support of his opinions. [Pacholke Trial 2 Tr. vol. III at 565:14-16] Mr. Pacholke did not review or compile any statistics in support of his opinions. [Pacholke Trial 2 Tr. vol. III at 568:13 - 569:12] Mr. Pacholke did nothing to verify any of the statements he cites in support of his opinion. [Pacholke Trial 2 Tr. vol. III, 569:13-18]

Similar to Dr. Burns changing her opinion on staffing in an attempt to deny DWCC's compliance with her previous opinion (discussed in section V.C.2 *supra*), Mr. Pacholke engaged

---

[26] Mr. Pacholke agreed that the duration someone spends in a Restrictive Housing or segregated environment is a consideration you have to look at. Pacholke Trial 2 Tr. vol. III, 586:5-8.

in a similar tactic with respect to ACA accreditation. Mr. Pacholke had previously used the 5th Edition ACA Standards as a basis to say that DWCC was deficient,[27] and, now that DWCC is compliant with the 5th Edition ACA Standards, Mr. Pacholke attacks the standards and accreditation process themselves. [Phase I Expert Report of Pacholke 1/11/21, P-FFF-1 at 18, 23, 45; Pacholke Trial 2 Tr. vol. III at 601:6-19; Burns Trial 2 Tr. vol. VIII at 1692:23 – 1693:1]

**VII.**   **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully pray that the Court find that no remedy is necessary to address any perceived constitutional deficiencies, considering the limitations of the PLRA.

Respectfully Submitted:

**JEFF LANDRY,**
**ATTORNEY GENERAL**

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By: /s/ Randal J. Robert
        Randal J. Robert (#21840), TA
        Connell L. Archey (#20086)
        Keith J. Fernandez (#33124)
        Madaline King Rabalais (#38301)
        *Special Assistant Attorneys General*
        Email: Randy.Robert@butlersnow.com
                  Connell.Archey@butlersnow.com
                  Keith.Fernandez@butlersnow.com
                  Madaline.Rabalais@butlersnow.com

Counsel for Defendants

---

[27] DWCC was not required to become compliant with the 5th Edition ACA standards at the time of Mr. Pacholke's Phase I report, as its next accreditation was not until 2022.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 14th day of April 2023, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

<u>/s/ Randal J. Robert</u>
Randal J. Robert
