UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ANTHONY TELLIS and BRUCE CHARLES | * | JUDGE ELIZABETH E. FOOTE |
| on behalf of themselves and all others similarly | * | USMJ MARK L. HORNSBY |
| situated | * | |
| | * | |
| VERSUS | * | |
| | * | CIVIL ACTION |
| JAMES M. LEBLANC, Secretary | * | |
| of the Louisiana Department of Public Safety | * | NO.: 5:18-CV-00541-EEF-MLJ |
| and Corrections, et al. | * | |

**<u>MEMORANDUM IN SUPPORT OF MOTION TO STAY REMEDIAL ORDER
AND JUDGMENT PENDING APPEAL AND FOR EXPEDITED CONSIDERATION</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION .......................................................................................................... 1

HISTORY OF THE PRISON LITIGATION REFORM ACT (PLRA) ....................... 1

PROCEDURAL BACKGROUND ................................................................................. 3

ARGUMENT ................................................................................................................. 7

    I.      The State Is Likely to Succeed on the Merits. ....................................... 7

            A.      The Injunction Is Impermissibly Vague and Overbroad ............................ 8

            B.      The Remedial Order Violates the Requirements of the PLRA ................. 10

                    1.      The Remedy Order fails to conduct the needs-narrowness-intrusiveness test. ........................................................... 10

                    2.      The Remedial Opinion and the Remedial Order fail to give substantial weight to public safety and security. .......................... 11

                    3.      Appointing three special masters violates the PLRA. ................. 13

                    4.      The Remedy Opinion fails to consider current conditions at DWCC ............................................................................................. 14

    II.     The State Will Be Irreparably Injured Absent a Stay. .......................... 18

    III.    A Stay Will Not Substantially Injure the Plaintiffs. ............................. 21

    IV.    A Stay Benefits the Public Interest. ...................................................... 21

CONCLUSION ............................................................................................................. 22

CERTIFICATE OF SERVICE .................................................................................... 22

# TABLE OF AUTHORITIES

*Page(s)*

### *Cases*

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013) ............................................................................................................ 14

*Amos v. Hall*,
2020 WL 6791516 (N.D. Miss. Jan. 24, 2020) ......................................................... 11

*Bell v. Wolfish*,
441 U.S. 520 (1979) .......................................................................................................... 1

*Berry v. Brady*,
192 F.3d 504 (5th Cir. 1999) ......................................................................................... 2

*Brown v. Plata*,
563 U.S. 493 (2011) .......................................................................................................... 2

*Center v. Lampert*,
726 F. App'x 672 (10th Cir. 2018) .............................................................................. 11

*Chisom v. Louisiana ex rel. Landry*,
85 F.4th 288 (5th Cir. 2023) ........................................................................................... 9

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1982) ........................................................................................................... 14

*Dierlam v. Trump*,
977 F.3d 471 (5th Cir. 2020) ....................................................................................... 17

*Dockery v. Cain*,
7 F.4th 375 (5th Cir. 2021) .................................................................................... 14, 15

*Farmer v. Brennan*,
511 U.S. 825 (1994) ....................................................................................................... 14

*Fed. Trade Comm'n v. Southwest Sunsites, Inc.*,
665 F.2d 711 (5th Cir. 1982) .......................................................................................... 8

*Ga. Adv. Off. v. Jackson*,
4 F.4th 1200 (11th Cir. 2021) ...................................................................................... 15

*Hilton v. Braunskill*,
481 U.S. 770 (1987) .......................................................................................................... 7

*Horne v. Flores,*
    557 U.S. 433 (2009) .......................................................................... 3, 10

*Int'l Rectifier Corp. v. IXYS Corp.,*
    383 F.3d 1312 (Fed. Cir. 2004) .................................................................. 9

*Lewis v. Casey,*
    518 U.S. 343 (1996) .......................................................................... 1, 2

*Morales v. Turman,*
    562 F.2d 993 (5th Cir. 1977) ..................................................................... 2

*N.L.R.B. v. Express Pub. Co.,*
    312 U.S. 426 (1941) ............................................................................... 9

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................................... 7

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) ..................................................................... 9

*Preiser v. Rodriguez,*
    411 U.S. 475 (1973) ............................................................................... 2

*Procunier v. Martinez,*
    416 U.S. 396 (1974) ............................................................................... 2

*Ramirez v. U.S. Immigr. & Customs,*
    *Enf't,* 568 F. Supp. 3d 10 (D.D.C. 2021) ...................................................... 3

*Restaurant Law Center v. U.S. Dep't of Labor,*
    66 F.4th 593 (5th Cir. 2023) .................................................................... 19

*Rhodes v. Chapman,*
    452 U.S. 337 (1981) ............................................................................... 2

*Schmidt v. Lessard,*
    414 U.S. 473 (1974) ............................................................................... 8

*Seattle-First Nat. Bank v. Manges,*
    900 F.2d 795 (5th Cir. 1990) ................................................................... 8, 9

*Shaw v. Murphy,*
    532 U.S. 223 (2001) ............................................................................... 2

*Tasby v. Cain,* No.,
    16-277, 2017 WL 4295441 (M.D. La. Sept. 12, 2017) ........................................ 1

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016)................................................................................ 19

*Valentine v. Collier,*
    993 F.3d 270 (5th Cir. 2021)................................................... 3, 10, 14, 15, 18

*Waite v. Macy,*
    246 U.S. 606 (1918) ......................................................................................... 9

*Webb v. Goord,*
    340 F.3d 105 (2d Cir. 2003) ........................................................................ 10, 11

*Wilkerson v. Goodwin,*
    774 F.3d 845 (5th Cir. 2014) ........................................................................... 1

**Statutes**

18 U.S.C. § 3626 ................................................................................................... 7

18 U.S.C. § 3626(a)(1) ..................................................................................... 10, 12

18 U.S.C. § 3626(f)(1) ........................................................................................... 12

18 U.S.C. § 3626(f)(1)(A) ...................................................................................... 13

18 U.S.C. § 3626(f)(2) ........................................................................................... 13

18 U.S.C. § 3626(f)(4) ........................................................................................... 14

18 U.S.C. § 3626(g)(8) .......................................................................................... 13

42 U.S.C. §1983 ..................................................................................................... 3

**Rules**

Fed. R. Civ. P. 53 .................................................................................................. 13

Fed. R. Civ. P. 65(d)(1) ...................................................................................... 8, 9

Fef. R. Civ. P. 65(d) ........................................................................................... 7, 8

## INTRODUCTION

Defendants (hereinafter the "State") move to stay the Remedial Order (R.Doc. 755) and Judgment (R.Doc. 756) pending the resolution of the State's appeal to the United States Court of Appeals for the Fifth Circuit and for Expedited Consideration of this Motion. That Order and Judgment immediately enjoin the State from violating the Constitution and two federal statutes and require the State to open itself to three special masters who will then formulate the particulars of those injunctions. The special-master process has already begun, and they will be appointed as soon as thirty days from the date of the Judgment, which is fifteen (15) days from today. The State meets the standards for immediate relief from those requirements while it litigates the appeal. The State therefore respectfully requests that the Court rule on this Motion by Wednesday, **August 7, 2024 at 5:00 p.m.** so that, if the Court denies this Motion, the State can seek a stay from the Fifth Circuit before the special masters are appointed.

## HISTORY OF THE PRISON LITIGATION REFORM ACT (PLRA)

States have broad discretion to make the difficult judgments concerning institutional operations of their prisons. *Lewis v. Casey*, 518 U.S. 343, 361-63 (1996). "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). This Court agreed that "the Fifth Circuit has found that a 'prisoner has no liberty interest in his custodial classification' and that 'prison officials should be accorded the widest possible deference in classifying prisoners' custodial status as necessary to maintain security and preserve internal order.'" (R. Doc. 754 at 52-53);[1] s*ee Wilkerson v. Goodwin*, 774 F.3d 845, 852 (5th Cir. 2014); *Tasby v. Cain*, No. 16-277,

---

[1] Pinpoint citations to record documents are to internal pagination of the document rather than the page numbers assigned by the ECF system.

2017 WL 4295441, at *7 (M.D. La. Sept. 12, 2017), *report and recommendation adopted*, 2017 WL 4322413 (M.D. La. Sept. 28, 2017) (citing *Berry v. Brady*, 192 F.3d 504, 508 (5th Cir. 1999)).

Federalism concerns are particularly acute in the context of prison management. *See Shaw v. Murphy*, 532 U.S. 223, 228-30 (2001); *Lewis*, 518 U.S. at 386 (Thomas, J., concurring); *see also Procunier v. Martinez*, 416 U.S. 396, 405 (1974) (emphasizing that federal courts are "ill equipped to deal with the increasingly urgent problems of prison administration"), overruled on other grounds by *Thornburgh v. Abbott*, 490 U.S. 401, 413-14 (1989). The Supreme Court observed that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Preiser v. Rodriguez*, 411 U.S. 475, 491-92 (1973).

Federal judges are ill-equipped to manage state prisons. As Justice Scalia stated in his dissenting opinion in *Brown v. Plata*, "[t]hree years of law school and familiarity with pertinent Supreme Court precedents give no insight whatsoever into the management of social institutions." *Brown v. Plata*, 563 U.S. 493, 558 (2011) (Scalia, J., dissenting). Justice Scalia opined that such injunctions over state prison operations invite district court judges to "indulge incompetent policy preferences." *Id.* (emphasis omitted); *see also Shaw*, 532 U.S. at 228-30; *Lewis*, 518 U.S. at 388 (Thomas, J., concurring); *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981) ("these considerations properly are weighed by the legislature and prison administration rather than a court"). As long recognized in the Fifth Circuit, courts are not in "a position to monitor day-by-day changes that affect rehabilitation programs." *Morales v. Turman*, 562 F.2d 993, 999 (5th Cir. 1977). Intervention on this issue is "a significant federal intrusion into a state's affairs," where "[s]tate governments have wide discretion." *Id.* at 996.

2

Notwithstanding these principles, prior to enactment of the PLRA, federal courts routinely entered structural injunctions[2] against prison systems. *Valentine v. Collier*, 993 F.3d 270, 292 (5th Cir. 2021) (J. Oldham, concurring). These structural injunctions imposed massive federalism costs on the states who were required to pay the costs imposed by the injunctions. *Id* at 293. Judge Oldham in his concurring opinion in *Valentine* explained the environment in which federal courts routinely entered structural injunctions against state prisons. *Id*. Incredibly, in 1984, 24% of the nation's state prisons were subject to structural injections. *Id*. The practice of routine issuance of structural injunctions created a significant backlash in both Congress and the courts and led to the passage of the PLRA in 1996. *Id*.

The PLRA severely circumscribed the availability of a judicial forum for prisoner complaints and stripped courts of authority to retain jurisdiction over prisons through consent decrees. *Id*. Today, courts generally recognize that structural injunctions raise "sensitive federalism concerns" by usurping state sovereignty. *Id*. at 294 (citing *Horne v. Flores*, 557 U.S. 433, 448 (2009)). One of the aims of the PLRA is to protect states from massive federalism costs brought on by unwarranted intrusions into state affairs. *Id*. at 293.

## PROCEDURAL BACKGROUND

On February 20, 2018, Plaintiffs brought two class action claims: (i) under 42 U.S.C. §1983, for violations of the First and Eighth Amendments to the United States Constitution on behalf of all prisoners currently held, or who will in the future be held, in extended lockdown at David Wade Correctional Center ("DWCC") in the N-1, N-2, N-3, and N-4 buildings (the "South

---

[2] The term "structural injunction" is defined as an "injunction seeking to effect the reform of a social institution." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 23 (D.D.C. 2021), appeal dismissed sub nom. *Ramirez v. Immigr. & Customs Enf't*, 2022 WL 4280690 (D.C. Cir. Sept. 13, 2022). Judge Oldham explained that the purpose of a structural injunction "is to alter broad social conditions by reforming the internal structural relationships of government agencies or public institutions." *Valentine*, 993 F.3d at 292.

Compound") and (ii) under the Americans with Disabilities Act (the "ADA") and Section 504 of the Rehabilitation Act (the "RA") on behalf of a sub-class consisting of all individuals on extended lockdown at DWCC who have or are perceived as having a qualifying disability related to mental health, as defined within the ADA and the RA. (R.Doc. 1 at 7-8).

In January of 2022, the liability phase of the trial was held, and on November 1, 2022, the Court found the State in violation of the Eighth Amendment rights of the Class and the ADA and RA rights of the Subclass. (R.Doc. 641 at 163) (the "Liability Opinion"). Broadly speaking, the Court held that (i) the conditions of confinement in restrictive housing on the South Compound at DWCC exposed inmates on the South Compound to a substantial risk of psychological harm by policies causing or related to social isolation, enforced idleness, and indefinite exposure to conditions on extended lockdown (R.Doc. 641 at 37-61); (ii) delivery of mental health services on the South Compound violated the Eight Amendment (R.Doc. 641 at 61-125); and (iii) defendants violated the ADA and RA rights of the subclass (R.Doc. 641 at 126-145). The issues before the Court during the liability concerned whether the State was violating Plaintiffs' rights as of the discovery cutoff date of March 15, 2020—approximately one (1) year and nine (9) months prior to the trial date. (R.Doc. 641 at 6).

This Court conducted a "remedy phase" trial in January of 2023 which considered conditions at DWCC from March 15, 2020 (the cut-off date for prison conditions at the liability phase of trial), through August 30, 2022. (R.Doc. 754 at 5, referencing R.Docs. 447, 645, 738, and 745). On July 18, 2024, this Court entered its Remedy Opinion, Remedial Order, and Judgment— two (2) years and six (6) months after the liability phase and 17 months after the close of the remedy phase. (R.Docs. 754, 755, 756).

The Remedy Opinion was based upon conditions more than 23 months prior thereto. This

Court has declined throughout the case to consider actual current conditions at DWCC prior to either the Liability Opinion or the Remedy Opinion. (R.Doc. 447, 645, 738, 745). Instead, the Court continues to criticize—and rule upon—conditions at DWCC that no longer exist or that have significantly changed.

On June 14, 2023, the State filed a Motion to Supplement the Record and Admit Certain Specific Evidence of Current Evidence of Conditions seeking to present evidence that after conclusion of the trial in January of 2023 DWCC had implemented electronic healthcare records ("EHR"). (R.Doc. 738). The State's implementation of EHR allowed Dr. Seal to type his notes directly into the EHR instead of his prior practice of making handwritten notes. This critical change addressed one of the Court's primary criticisms, namely, that Dr. Seal's handwritten notes were illegible causing an unconstitutional failure to provide appropriate mental health care at DWCC. On October 23, 2023, the Court denied the motion without even considering this important change in conditions at DWCC (R.Doc. 744).

On March 13, 2024, the State filed a second Motion to Supplement the Record and Consider Evidence of Current Conditions. (R.Doc. 745). The State again attempted to present evidence of the implementation and effectiveness of the EHR which had been in use at DWCC for almost a full year. (R.Doc. 745-1 at 8). The State also sought to present evidence of important and significant personnel changes. The State's changes included the fact that DWCC had hired a new warden to oversee its operations. On July 10, 2023, Michele Dauzat, the prior Deputy Warden over Administration and a licensed mental health profession replaced Jerry Goodwin as Warden at DWCC.  (R.Doc. 745-1 at 8). Warden Dauzat's status as a licensed mental health professional represents an important change in conditions that should have been considered by the Court. The motion further set forth changes in operational and security functions at DWCC and major changes

5

in staffing in the mental health department at DWCC. (R.Doc. 745-1 at 8-9). The State sought to present evidence of the South Compound restructuring which resulted in a decrease in the number of inmates in restrictive housing and other changes implemented in response to the Court's Liability Opinion. (R.Doc. 745-1 at 10-15). On May 24, 2024, the State filed a third motion seeking to present evidence of additional major changes that were completed after the March 13, 2024 motion was filed. (R.Doc. 751). On July 2, 2024, the Court denied the State's motion and refused to consider any evidence of changes and conditions existing at DWCC after August 30, 2022. (R.Doc. 753).

On July 18, 2024, the Court issued the Remedy Opinion (R.Doc. 754), Remedial Order (R.Doc. 755), and entered a Judgment (R.Doc. 756). The Court enjoined the State from "1) continuing to violate the Eighth Amendment rights of all inmates in extended lockdown—the Class—through the unconstitutional conditions of confinement and provision of deficient mental health services; and 2) continuing to violate the ADA and RA rights of inmates with a qualifying mental illness—the Subclass . . . ." (R.Doc. 754 at 172; R.Doc. 756 at 1).

Despite engaging in a fourteen-day trial to determine appropriate relief, the Remedial Order issued by the Court does not identify any actual remedies to the alleged violations. (R.Doc. 755). Instead, it requires the appointment of three "special masters" (the "Special Masters") who will develop remedial plans addressing all aspects of policy and procedure pertaining to the conditions of confinement, delivery of health care, and ADA and RA compliance. (R.Doc. 755 at 3-14). The State is ordered to provide access and cooperate with the Special Masters. (R.Doc. 755 at 15). The Special Masters will thereafter monitor and report on compliance. (R.Doc. 755 at 16-17). All fees of the Special Masters are to be paid by the State, and the Plaintiffs were directed to file a motion for an award of attorneys' fees. (R.Doc. 755 at 17). The Court then entered judgment in favor of

Plaintiffs and against the State dismissing the case. (R.Doc. 756).

The Court's injunction violates the requirements of Federal Rule of Civil Procedure 65(d) and is impermissibly vague and overbroad. The Remedy Opinion and Remedial Order were issued in violation of and without consideration of the requirements of the Prison Litigation Reform Act (18 U.S.C. § 3626, the "PLRA"). The Court did not consider whether any relief was needed, whether the relief is narrowly drawn to address the alleged violation, and whether the relief was the least intrusive as required by the PLRA. Further, the procedure to appoint three special masters violates the terms of the PRLA. Finally, the Remedy Opinion and the Remedial Order are based upon conditions that are two years old.

## ARGUMENT

The "traditional" stay factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder,* 556 U.S. 418, 425–26 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

## I.   THE STATE IS LIKELY TO SUCCEED ON THE MERITS.

The State is likely to succeed on the merits because: (1) the Remedial Order violates principles of federalism; (2) the Remedial Order is impermissibly vague and overbroad in violation of Federal Rule of Civil Procedure 65(d); (3) the Remedial Order violates the requirements of the PLRA in multiple ways; and (4) the Remedy Opinion and Remedial Order are not based upon current conditions at DWCC and current attitudes of the named officials.

The Court's Remedial Order follows very closely the Remedial Order entered in *Lewis v. Cain*.[3] *Compare* R.Doc. 755 *with Lewis v. Cain*, No. 3:15-cv-00318-SDD-RLB, (M.D. La. Nov. 6. 2023). The Fifth Circuit stayed the remedial order in *Lewis* on December 6, 2023, and that stay remains in place today. *Parker v. Hooper*, No. 23-30825, 5th Cir. Dec. 6, 2023 (R.Docs. 44-1, 156-1). The Court should enter a stay pending appeal as its Remedial Order is almost identical to the *Lewis* remedial order that the Fifth Circuit stayed.

### A.  The Injunction Is Impermissibly Vague and Overbroad.

"Every order granting an injunction and every restraining order must": (a) "state the reasons why it issued," (b) "state its terms specifically," and (c) "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. Pro. 65(d). "[T]he specificity provisions of Rule 65(d) are no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Instead, Rule 65(d) is designed to prevent uncertainty and confusion on the part of those faced with injunctive orders and to avoid the possible founding of a contempt citation on a decree too vague to be understood. *Id.* Since an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed. *Id.*

The Fifth Circuit has strictly construed Rule 65(d)(1) to require the parties to be able to interpret the injunction from the four corners of the order. *Seattle-First Nat. Bank v. Manges*, 900 F.2d 795, 800 (5th Cir. 1990); *Fed. Trade Comm'n v. Southwest Sunsites, Inc.,* 665 F.2d 711, 724 (5th Cir. 1982). Further, the Fifth Circuit is clear that an injunction cannot reference another document. In *Manges*, the injunction order referenced the findings and recommendations of the magistrate judge and the TRO previously issued by the district court. The Fifth Circuit found that

---

[3] On appeal to the Fifth Circuit *sub nom Parker v. Hooper*.

the injunction order failed to comply with Rule 65(d)(1) notwithstanding the fact that the reference to the magistrate's findings and recommendation and to the TRO clearly gave the defendants specific guidance as to the prohibited behavior. *Manges*, 900 F.2d at 800.

The injunction against the State in this case fails as both vague and overbroad. The injunction fails as vague because it does not put the State on notice of the prohibited conduct. The injunction merely recites that the State is enjoined from continuing to violate the Eighth Amendment and from violating the rights of the Subclass as to the ADA and the RA without any additional specificity.

Further, the injunction "enjoin[s] the State from ever violating the law again," which is "an invalid and overbroad form of injunctive relief." *Chisom v. Louisiana ex rel. Landry*, 85 F.4th 288, 315 (5th Cir. 2023) (Engelhardt, J., dissenting), *reh'g granted and opinion vacated on other grounds*, No. 22-30320, 2024 WL 323496 (5th Cir. Jan. 29, 2024). Courts "consistently" so hold. *Id.* at n.19; *accord Waite v. Macy*, 246 U.S. 606, 609 (1918) ("Courts will not issue injunctions against administrative officers on the mere apprehension that they will not do their duty or will not follow the law."); *N.L.R.B. v. Express Pub. Co.*, 312 U.S. 426, 435 (1941) ("But the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute."); *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) (explaining that "the Supreme Court has denounced broad injunctions that merely instruct the enjoined party not to violate a statute"); *Parsons v. Ryan*, 754 F.3d 657, 689 n.35 (9th Cir. 2014) (requiring more specificity "than a bare injunction to follow the law").

In short, the injunction against the State is hopelessly vague, giving no guidance or specification at all as to what exactly the State must do or stop doing. The injunction is overbroad

because it does no more than command the State to stop violating the law. And it makes no attempt to narrowly tailor or limit its scope to the Court's liability findings.

### B.    The Remedial Order Violates the Requirements of the PLRA.

The PLRA severely circumscribed the availability of a judicial forum for prisoner complaints and stripped courts of authority to retain jurisdiction over prisons through consent decrees. *Valentine*, 993 F.3d at 293. Today, courts generally recognize such structural injunctions raise "sensitive federalism concerns" by usurping state sovereignty. *Horne v. Flores*, 557 U.S. 433, 448 (2009). Incredibly and inexplicably, neither the Remedy Opinion nor the Remedial Order addressed the requirements of the PLRA. The Court's failure to consider the requirements of the PLRA resulted in clear legal error.

#### 1.    The Remedy Order fails to conduct the needs-narrowness-intrusiveness test.

The PLRA specifically requires that "[t]he court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."4 18 U.S.C. § 3626(a)(1). Further, the Court must "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

"The PLRA has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions, specifically in order to ensure compliance with the Eighth Amendment." *Webb v. Goord*, 340 F.3d 105, 111 (2d Cir. 2003). "That statute provides that a federal court may not grant any prospective relief at all—let alone appoint a special master to administer a state prison system—unless [doing so meets the needs-narrowness-instrusiveness

---

4 This provision of the PLRA is referred to as the "needs-narrowness-intrusiveness test."

test].” *Id.* In *Webb*, the Second Circuit reversed a district court's similar attempt to appoint a special master to develop a remedy plan. *Id.*[5]

Here, the Court's decision to appoint Special Masters fails the PLRA's needs-narrowness-intrusiveness test. The Court did not narrowly limit the powers of the Special Masters—to the contrary, the Special Masters have wide-ranging power and dominion over all aspects of the South Compound at DWCC. The Remedial Order grants the Special Masters unlimited freedom to recommend best or preferred practices, rather than limiting the inquiry to only remedies needed to correct any perceived violation as mandated by the PLRA. The Court made no attempt whatsoever to make the Remedial Order or the powers of the Special Masters the least intrusive necessary to correct the perceived violation. Arguably, the Court's appointment of Special Masters represents the broadest and most intrusive possible relief that the Court could enter. Granting Special Masters a mandate to "remedy" every operational aspect of a maximum-security prison such as DWCC cannot be fairly described as narrow. The Court provides neither guidance nor limit to the Special Masters as they take over all aspects of the security, conditions of confinement, and delivery of mental health care at the South Compound (a prohibited structural injunction) with no regard for governmental intrusion or taxpayer expense.[6]

> 2.   *The Remedial Opinion and the Remedial Order fail to give substantial weight to public safety and security.*

---

[5] *See also Center v. Lampert*, 726 F. App'x 672, 676 (10th Cir. 2018) (The PLRA "has substantially limited the capacity of federal courts to appoint special masters to oversee prison conditions"). The court for the Northern District of Mississippi, citing *Webb* and *Lampert*, acknowledged that the PLRA "has substantially limited the capacity of federal courts to appoint special masters to oversee special prison conditions, specifically in order to ensure compliance with the Eighth Amendment." *Amos v. Hall*, No. 20-7, 2020 WL 6791516, at *1 (N.D. Miss. Jan. 24, 2020). As such, the Court's appointment of Special Masters without undertaking the needs-narrowness-intrusiveness test violates the PLRA.

[6] In fact, the Court envisions further remedy proceedings to "resolve any disputes as to the Special Masters' report on improvements and the proposed remedial plan." (R.Doc. 755 at 17). Such additional proceedings further highlight the lack of consideration of the PLRA in the remedy proceeding and the efficacy of the remedy phase.

The PLRA provides that the court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief. 18 U.S.C. § 3626(a)(1). The PLRA similarly directs that properly appointed special masters to give due regard to the public safety. 18 U.S.C. § 3626(f)(1). Neither the Remedy Opinion nor the Remedial Order address the impact upon public safety or the operation of the criminal justice system.

DWCC is a maximum-security prison. (R.Doc. 754 at 9). Inmates housed in the South Compound include those who are under investigation for a prison infraction and those who have been found guilty and sentenced to restrictive housing. (R.Doc. 754 at 10). The operation of the South Compound implicates the highest public safety concerns.

The Court's Remedial Order clearly fails to consider public safety and operation of the criminal justice system. Instead, the Court gives the Special Masters *carte blanche* to develop standards and procedures pertaining to the following:

- the physical composition of the cell, including but not limited to the size of the cell[7];
- the practice of double bunking;
- the lack of visual stimulation;
- the fluctuating noise levels;
- the lack of adequate climate controls during hot and cold months[8];
- cure the social isolation experienced by inmates in extended lockdown, including but not limited to meaningful and increased recreational time;
- utilizing communal spaces for mealtime;
- out-of-cell religious services, classes, and group programming;
- additional and/or contact visitation;
- additional and confidential telephone privileges;
- cure the enforced idleness in extended lockdown, including but not limited to the ability of inmates to keep possessions with them in segregated housing;
- the provision of wireless internet services for inmates that are permitted a tablet;
- access to any other in-cell activities that are deemed necessary;
- cure the practices that keep inmates on extended lockdown for an indefinite length of time, including but not limited to reform and/or reconstruction of the decision-making board (the multi-disciplinary review board) to include specific, objective decision-making criteria;

---

[7] Is the Court suggesting that the State must build a new prison with larger cells?
[8] Is the Court suggesting that the State must install air conditioning on the South Compound?

- the participation and input of mental health providers in the decision-making process for housing assignments;
- the provision to inmates of specific reasoning for assignment to preventative segregation;
- the provision to inmates of written guidance explaining the steps required for them to matriculate out of extended lockdown; and
- eliminate the use of strip cell status.

In short, the Special Masters are charged with overseeing every aspect of public safety and operation of the South Compound. Such a broad mandate to three special masters without consideration of public safety and operation is a *per se* violation of the PLRA.

> 3.    *Appointing three special masters violates the PLRA.*

The PLRA circumscribes the district court's ability to appoint a special master. 18 U.S.C. § 3626(f)(1)(A). The PLRA defines the term "special master" to mean any person appointed by a Federal Court pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master, regardless of the title or description given by the court. 18 U.S.C. § 3626(g)(8). Thus, the PLRA clearly encompasses all appointments of a special master by a district court in prison litigation.

The PLRA provides a specific process for selecting a special master. The defendant institution and the plaintiff each submit a list of not more than five (5) persons to serve as a special master. Then, each party shall have the opportunity to remove up to three (3) persons from the opposing party's list. The court shall select the master from the persons remaining on the list. 18 U.S.C. § 3626(f)(2). The Remedial Order simply calls for each side to submit three proposed names for each position should the parties be unable to agree. (R.Doc. 755 at 2).

Further, the PLRA authorizes the appointment of "*a special master*," 18 U.S.C. § 3626(f)(1)(A) (emphasis added)—singular—not three special masters. A properly appointed special master is to conduct a hearing on the record, not engage in *ex parte* communications as called for by the Remedial Order. (*see, e.g.*, R.Doc. 755 at 15). Moreover, under the PLRA, the

special master is to be paid from funds appropriated to the Judiciary at a set rate. 18 U.S.C. § 3626(f)(4). The Remedial Order requires the State to pay the fees of the Special Masters with no reference to any limitation as required by the PLRA. (R.Doc. 755 at 18).

      4.     *The Remedy Opinion fails to consider current conditions at DWCC.*

In determining whether a case or controversy exists in an action seeking prospective relief for allegedly unconstitutional practices, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1982) (emphasis added). An actual controversy "must exist not only at the time the complaint is filed, but through all stages of the litigation." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90–91 (2013) (internal quotation marks omitted).

In the prison context, a court must consider current conditions up to the time it issues the injunction because those conditions determine not only the scope of the remedy, but also *whether the defendant remains liable*:

> When there is a possible constitutional violation that is likely to continue over time as in a prison injunction case, we consider the evidence from the time suit is filed *to the judgment*. Deliberate indifference is determined based on prison officials' current attitudes and conduct. The evidence must show over the course of the timeline that officials knowingly and unreasonably disregarded an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future.

*Valentine*, 993 F.3d at 282 (emphasis added) (internal quotations and citations omitted); *accord Farmer v. Brennan*, 511 U.S. 825 (1994).

The Fifth Circuit reaffirmed its *Valentine* decision in *Dockery v. Cain*, 7 F.4th 375 (5th Cir. 2021). There, the district court specifically considered current conditions at the prison at the time of trial and *after* trial. *Id.* The district court ordered briefing and considered evidence of

current conditions after the trial, prior to ruling. *Id.* at 377. In affirming the district court ruling, the Fifth Circuit considered current conditions and found them to be constitutional—*i.e.*, there was no more liability—noting that the conditions had "changed dramatically" since the beginning of the case. *Id.*

    *Valentine* and *Dockery* definitively establish that conditions at a prison must be considered at trial not to determine whether constitutional violations have occurred, but whether they continue to occur in a manner such that injunctive relief is appropriate. The Eleventh Circuit recently took the same approach. *See Ga. Adv. Off. v. Jackson*, 4 F.4th 1200, 1208-09 (11th Cir. 2021), *vacated as moot due to settlement before mandate issued*, 33 F.4th 1325 (11th Cir. 2022). There, the Eleventh Circuit considered whether the needs-narrowness-intrusiveness test must be applied when a district court converts a preliminary injunction to a permanent injunction. The Eleventh Circuit describes how the PLRA interacts with a district court's traditional equity powers, noting that "[t]he PLRA only adds to the preexisting limits on injunctive relief; it does not subtract from them." *Id.* at 1208. The PLRA "supercharges" the requirements of "narrow tailoring" and "public interest considerations." *Id.* at 1209. As to the consideration of current conditions, the Eleventh Circuit held that "[b]ecause circumstances may change during the 90-day period in which the preliminary injunction is in place[,]" a district court must make a second set of needs-narrowness-intrusiveness findings when converting a preliminary injunction into a permanent injunction. *Id.*

    Here, the Court cited throughout its Remedy Opinion its criticisms of DWCC's recordkeeping and found DWCC lacked adequate medical records management. (*See, e.g.*, R.Doc. 754 at 101, 116-17). While the State does not concede that DWCC maintained inadequate mental health records, on April 24, 2023, DWCC implemented electronic health records and brought that fact to the Court to consider prior to ruling, but the Court declined to consider it. (R. Docs. 738,

744, 745, 753). When the Court issued its Remedy Opinion on July 18, 2024, the State had maintained an EHR system at DWCC for 15 months. (R.Doc. 738-3, ¶ 3).

The EHR system serves as a repository for all health records made under the system by DWCC medical and mental health providers. *Id.* Any user with access to the EHR system can access medical and mental health records within the system. *Id.* ¶ 4. DWCC staff scan into the EHR system documents requiring signatures, such as consent to treatment and acknowledgment of confidentiality, which are associated with the electronic record of the appropriate inmate. *Id.* at ¶ 3. DWCC provided Dr. Seal a laptop computer with access to the system and training on using the EHR system. *Id.* ¶ 5. Rather than handwrite notes, Dr. Seal types his notes and orders into the EHR system, and those notes and orders (as appropriate) can be accessed by other treatment staff at DWCC. *Id.* ¶ 6. All facilities within the Louisiana Department of Public Safety and Corrections now have the EHR system, and DWCC is able to and does access the medical and mental health records for transfers to DWCC prior to their arrival. (R.Doc. 745-2 ¶ 8). Thus, the State remedied any alleged defect in the legibility and accessibility of its medical records and is no longer liable (if it ever was).

The State's implementation of the EHR system transformed record keeping at DWCC— and resolved the Court's concerns. Thus, the State's implementation of EHR should have been considered by the Court. The Court's Remedial Order pertaining to alleged inadequate mental health recordkeeping at DWCC no longer responds to an "actual controversy." Despite this change mooting the issue, the Court still purports to enter an injunction requiring its appointed Special Masters to address "maintaining detailed records; ensuring consistency across record-keeping practices; if handwritten, maintaining legible records; ensuring that there are adequate electronic record keeping practices; using consent forms for the prescription of medication and any other

treatment; and ensuring the availability of an inmate's mental health records to all appropriate parties." (R.Doc. 755 at 10). The Court's assurances that the State will be credited for its efforts (R.Doc. 753 at 2) do not suffice to overcome mootness. *See Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020) ("The doctrine of mootness arises from Article III of the Constitution, which provides federal courts with jurisdiction over a matter only if there is a live 'case' or 'controversy.' . . . This case-or-controversy requirement persists 'through all stages of federal judicial proceedings.'") (internal footnotes omitted).

The Court also refused to consider other changes to the South Compound. (R.Doc. 745). For instance, Warden Goodwin retired, and Warden Dauzat received a promotion to the position of DWCC Warden. (R.Doc. 745-2 ¶ 9). Warden Dauzat made changes to facility leadership and implemented a Unit Management Model for security operations. *Id.* at ¶¶ 10-14. Significantly, Warden Dauzat reorganized the mental health department, promoting James Burgos to Assistant Warden over Treatment, overseeing the medical and mental health departments. *Id.* at ¶ 15. Warden Dauzat promoted Aerial Robinson to Mental Health Director, Correctional Program Manager 2, the position formerly held by Steve Hayden. *Id.* at ¶¶ 16. Further, the Court criticized DWCC as understaffed (R.Doc. 754 at 109) yet ignored evidence that DWCC added Edward Lewis to the mental health department. (R.Doc. 745-2 ¶ 16)

The State also significantly changed the operation of the South Compound and its segregated housing such that it no longer functions as the Court found in its Remedy Opinion. For instance, the State implemented a step-down process for inmates on the South Compound. The step-down process proceeds through the following levels: Preventative Segregation 1, Preventative Segregation 2, Working Segregation Level 1, Working Segregation Level 2, and General Population. (R.Doc. 751-2 ¶ 4). Privileges are increased as an inmate steps down from the

segregation levels. *Id.* The State provides inmates in both Working Segregation and Preventative Segregation 2 with additional privileges, and these custody levels no longer qualify as restrictive housing, as inmates in these steps receive additional out of cell time. *Id.* at ¶¶ 9-10. The changes have reduced the number of inmates in restrictive housing. Despite these changes, the Court ordered its Special Masters to include "[s]tandards and procedures . . . including but not limited to meaningful and increased recreational time." (R.Doc. 755 at 3). The State's changes prior to judgment mooted the Court's ordered relief.

The Court failed to consider the State's significant operational changes and described previous usage in its Remedy Opinion. (R.Doc. 754 at 9-13). Consequently, the Court's opinion relies on outdated findings which do not support a conclusion of a current and continuing violation and issued Remedial Order that facially fails the PLRA's needs-narrowness-intrusiveness criteria. The Court's refusal to consider the evidence the State placed before it prior to issuing its Remedy Opinion does not comply with the Fifth Circuit's holding in *Valentine* that "the evidence must be considered from the time suit is filed to the judgment." 993 F.3d at 282. As such, the State remains entitled to a stay of the Court's Remedial Order pending appeal.[9]

## II.    THE STATE WILL BE IRREPARABLY INJURED ABSENT A STAY.

The Court's Remedy Opinion and Remedial Order are reminiscent of the pre-PLRA world. The Court's actions constitute an impermissible intrusion into the operations of the State of Louisiana's correctional system. The Remedy Order calls for the appointment of three special masters who are then to develop plans that address what appears to be all aspects of restrictive housing, the delivery of mental health care and ADA/RA compliance in the South Compound. The

---

[9] The State also intends to press on appeal its arguments that (1) the Eighth Amendment does not extend to prison conditions and (2) the State has not violated the Americans with Disabilities Act or the Rehabilitation Act. While the State does not raise these arguments in this stay motion, the State in no way waives or forfeits those arguments.

Special Masters will then monitor and report on compliance. This massive intrusion, *i.e.*, the complete take-over of all aspects of the operation of the South Compound at DWCC, is contrary to principles of federalism and will impose tremendous costs upon the State. This court, by using "special masters," has decided to personally run an important and vital role which clearly belongs to the State of Louisiana. The Supreme Court and the Fifth Circuit have repeatedly warned against interventions of this nature.

Contrary to the PLRA, the Remedial Order requires the State to pay the fees of the Special Masters with no limitations. (R.Doc. 755 at 18). The fees for the Special Masters to conduct reviews of DWCC and its security, mental health care, and ADA operations, evaluate all necessary records and documents, attend in-person visits at DWCC, develop remedial plans, testify at hearings to resolve any disputes related to the proposed plans, monitor compliance, and draft and submit comprehensive reports every six (6) months will impose a significant burden on the State. Moreover, the State will be responsible for the cost of complying with the proposed remedial plans. Because these expenses cannot be recovered, the astronomical cost of the Special Masters' work as imposed by the Remedial Order constitutes an irreparable harm. *See Restaurant Law Center v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023) ("Even purely economic costs may count as irreparable harm where they cannot be recovered in the ordinary course of litigation." (internal quotations omitted)); *see also Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) ("Indeed complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." (internal quotations omitted)).

Additionally, the Remedial Order provides the Special Masters virtually unfettered access to DWCC facilities, records, documents, staff, and inmates with no consideration given to DWCC's need to ensure safe and secure operations. The Remedial Order requires DWCC to

provide access to the Special Masters to conduct reviews of the facility, as well as its security, mental health care, and ADA operations. (R.Doc. 755 at 15). The Special Masters shall have access to "any and all records and documents appropriate and necessary for their tasks" regardless of privacy and confidentiality concerns or whether state law requires those materials to remain private. (R.Doc. 755 at 15). The State must make available a number of employees, including a DOC employee and a warden and/or deputy warden, mental health clinician, member of the medical staff, and security employee from DWCC, to coordinate with and facilitate the work of the Special Masters. (R.Doc. 755 at 15). These staff members will be pulled away from their critical roles to do so. Last, the Remedial Order mandates that DWCC facilitate visits by the Special Masters with members of the Class and Subclass with only twenty-four-hour notice. (R.Doc. 755 at 15). Again, this directive is made with no limitations concerning public safety, security, or orderly operation.

The Remedial Order requires that the parties submit proposed Special Masters within thirty days, or by August 17, 2024. (R.Doc. 755 at 2). The Remedial Order also provides access to DWCC beginning no later than thirty days after the Special Masters' appointment. (R.Doc. 755 at 15). Thus, the State will begin to incur the significant costs and irreparable harm when the Special Masters are appointed by the Court in less than one month. These fees cannot be recovered, and the harm cannot be reversed, even if the Fifth Circuit ultimately rules in favor of the State.

This massive intrusion, i.e., the complete take-over of all aspects of the operation of the South Compound at DWCC, is contrary to principles of federalism and will impose tremendous costs upon the State. This Court, through use of Special Masters, has decided to personally administer a vital role which clearly belongs to the State. The Supreme Court and the Fifth Circuit have repeatedly warned against such interventions, and the United States Congress, through the

PLRA, has curtailed by law such practices. The State should not be forced to operate its correctional system under the purview of the federal government. This complete usurpation of an important State function causes irreparable injury and massive unrecoverable costs to the State.

## III.     A STAY WILL NOT SUBSTANTIALLY INJURE THE PLAINTIFFS.

A stay will not injure the Plaintiffs for two reasons. *First*, the changes that the State has made to the South Compound at DWCC make current conditions there more than constitutional. *Second*, the procedural history of this case reveals that a stay will not injure the Plaintiffs. This case has been pending for over six years. This Court took approximately ten months to issue its opinion after the liability trial. The Court then took approximately another year and a half to rule after the remedy trial. Surely, the Court would not have kept the case under advisement for a combined two years if the Plaintiffs were being substantially injured.

## IV.     A STAY BENEFITS THE PUBLIC INTEREST.

The public has a vested interest in the operation and security of prisons within the State of Louisiana. The Court's Remedial Order and Judgment will impose substantial costs to be borne by the taxpayers of the State of Louisiana. A stay to allow the Fifth Circuit an opportunity to review the matter is reasonable and will protect the taxpayers from the cost of any remedies that ultimately may be reversed.

## CONCLUSION

For all these reasons, the Court should stay the Remedial Order and Judgment pending appeal.

Respectfully Submitted:

BUTLER SNOW LLP
445 North Boulevard, Suite 300 (70802)
P. O. Box 2997
Baton Rouge, Louisiana 70821-2997
Telephone: (225) 325-8700
Facsimile: (225) 325-8800

By: /s/ Randal J. Robert
      Randal J. Robert (#21840), TA
      Connell L. Archey (#20086)
      Keith J. Fernandez (#33124)
      Madaline King Rabalais (#38301)
      Email: Randy.Robert@butlersnow.com
             Connell.Archey@butlersnow.com
             Keith.Fernandez@butlersnow.com
             Madaline.Rabalais@butlersnow.com

Counsel for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of August 2024, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Randal J. Robert
Randal J. Robert

88927263.v2

22