UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| ANTHONY TELLIS and BRUCE CHARLES, on behalf of themselves and all other similarly situated prisoners at David Wade Correctional Center, | * * * * | CIVIL ACTION NO.: 5:18-CV-00541-EEF-ML |
| | * | JUDGE ELIZABETH E. FOOTE |
| and | * * | MAGISTRATE MARK L. HORNSBY |
| The ADVOCACY CENTER, | * * | CLASS ACTION |
| PLAINTIFFS, | * * | |
| VS. | * * | |
| JAMES M. LEBLANC, *et al.*, | * * | |
| DEFENDANTS. | * | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO STAY REMEDIAL ORDER AND JUDGMENT PENDING APPEAL AND IN SUPPORT OF CROSS-MOTION IN THE ALTERNATIVE FOR ENTRY OF ADDITIONAL FINDINGS UNDER RULE 52(B) OR TO AMEND, CLARIFY, OR RECONSIDER THE REMEDIAL ORDER UNDER RULE 59(E)**

## <u>TABLE OF CONTENTS</u>

I.     Introduction ........................................................................................................................1

II.    Procedural Background ......................................................................................................3

III.   Legal Standard ...................................................................................................................5

IV.    Defendants Are Not Entitled To A Stay.............................................................................5
      A.     Defendants' Appeal Lacks Merit.............................................................................5
             1.     The Remedial Order Is Not Too Vague or Overbroad .............................5
             2.     The Court's Remedial Order Does Not Violate the Requirements
                   of the PLRA...................................................................................................7
                  a.     The Remedial Order Does Not Violate the Needs-
                          Narrowness-Intrusiveness Test or the "Public Safety
                          Requirement.".................................................................................7
                  b.     The Special Masters Are Not Quasi-Judicial Officers
                          Subject to the PLRA. ...................................................................10
                  c.     The Court Has Instructed Its Experts to Consider Current
                          Conditions in Developing the Remedial Plan..............................13
      B.     Every Minute's Delay in Remediation Injures Class Members, Who Are
            Currently Subjected to Conditions That Are Literally Torture. ...........................14
      C.     The State Will Not Be Injured by the Remedial Order's Preliminary
            Scoping Exercises.................................................................................................16
      D.     The Remedial Order Carefully Does Not Impinge on Public Safety
            Concerns and the Public Has a Strong Interest in Stopping the State's
            Torture of Its Citizens..........................................................................................17

V.     If the Court Believes Defendants' Arguments Have Any Merit, the Court Should
      Amend or Correct Its Decisions Rather Than Staying a Remedy. ....................................18

VI.    Conclusion ........................................................................................................................22

## **TABLE OF AUTHORITIES**

### Cases

*Al-Marri v. Bush*, No. Civ.A. 04-2035(GK), 2005 WL 774843 (D.D.C. Apr. 4, 2005) ..............15

*Atl. States Found., Inc. v. Karg Bros., Inc.*, 841 F. Supp. 51 (N.D.N.Y. 1993) ............................19

*Benjamin v. Fraser*, 343 F.3d 35 (2d Cir. 2003) .........................................................................12

*Brown v. Plata*, 563 U.S. 493 (2011) .........................................................................................13

*Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009)........................................................................12

*Charles v. LeBlanc*, No. 24-30484 (5th Cir.) .........................................................................4, 6

*Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451 (5th Cir. 2016) .........................................18

*Devitri v. Cronen*, 289 F. Supp. 3d 287 (D. Mass. 2018)............................................................15

*Dockery v. Cain,* 7 F.4th 375 (5th Cir. 2021).............................................................................14

*Doe v. Qi*, 349 F. Supp. 2d 1258 (N.D. Cal. 2004) ....................................................................19

*Doe v. Veneman*, 380 F.3d 807 (5th Cir. 2004)............................................................................6

*Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500 (5th Cir. 1980)............................20

*Fields v. Pool Offshore, Inc.*, 1998 WL 43217............................................................................20

*Gary W. v. State of La., Dep't of Health & Hum. Res.*, 861 F.2d 1366 (5th Cir. 1988) ...............12

*Gates v. Cook*, 376 F.3d 323 n. 8 (5th Cir. 2004)..........................................................................7

*Handberry v. Thompson*, 446 F.3d 335 (2d Cir. 2006) ...............................................................12

*Hertz Corp. v. Alamo Rent-a-Car, Inc.*, 16 F.3d 1126 (11th Cir. 1994) ......................................20

*Hilton v. Braunskill*, 481 U.S. 770 (1987).....................................................................................5

*Jackson v. Los Lunas Ctr. for Persons with Developmental Disabilities*, No. CV 87-0839
      JP/KBM, 2012 WL 13076262 (D.N.M. Oct. 12, 2012) ......................................................12

*Louisiana v. Biden*, 45 F.4th 841 (5th Cir. 2022).........................................................................5

*Moore v. Tangipahoa Parish Sch. Bd.*, 864 F.3d 401 (5th Cir. 2017) ........................................20

*Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Env't Conservation*, 831 F. Supp. 57 (N.D.N.Y.
      1993)........................................................................................................................................20

*Nken v. Holder*, 556 U.S. 418 (2009) .............................................................................5, 16, 18

*Parker v. Hooper*, No. 23-30825 .................................................................................................21

*Plata v. Schwarzenegger*, 603 F.3d 1088 (9th Cir. 2010) ..........................................................12

*Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982) ......................................................................11, 13

*Scott v. Schedler*, 826 F.3d 207 (5th Cir. 2016) .......................................................................5, 6

*Sied v. Nielsen*, No. 17-cv-06785-LB, 2018 WL 1142202 (N.D. Cal. 2018)...............................15

*Templet v. HydroChem Inc.*, 367 F.3d 473 (5th Cir. 2004).........................................................19

*Turner v. Cnty. of San Bernardino*, No. 16-00355, 2018 WL 6617638 (C.D. Cal. Dec. 14, 2018)
      ................................................................................................................................................13

*United States v. Texas*, No. 1:24-CV-8-DAE, 2024 WL 861526 (W.D. Tex. 2024) ...................18

*US v. Burr*, 25 F. Cas. 30 (C.C.D.Va. 1807) ................................................................................5

*Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021)......................................................................14

*Villanueva-Bustillos v. Marin*, 370 F. Supp. 3d 1083 (C.D. Cal. 2018)......................................15

*Waltman v. Int'l Paper Co.*, 875 F.2d 468 (5th Cir. 1989)...........................................................19

*Williams v. Edwards,* 87 F.3d 126 (5th Cir. 1996)....................................................................7, 8

**Statutes**

18 U.S.C. § 3626(a)(1) ...................................................................................................7

18 U.S.C. § 3626(g)(8) .................................................................................................11

28 U.S.C. § 3626(a)(1) .................................................................................................10

**Rules**

Federal Rule of Civil Procedure 52(b) ..................................................................passim

Federal Rule of Civil Procedure 53 .........................................................................11, 12, 13

Federal Rule of Civil Procedure 54 ...............................................................................3

Federal Rule of Civil Procedure 59(e)..................................................................passim

Federal Rule of Civil Procedure 60 ...............................................................................3

Federal Rule of Evidence 706 .........................................................................................13

## I.     INTRODUCTION

After more than six years of litigation and two trials examining in depth the inhumane and unlawful conditions of confinement at David Wade Correctional Center, this Court carefully documented its considered opinion that Defendants' violations of the Constitution and laws of the United States continue to this day and will continue in the future. Accordingly, the Court issued a Remedial Order to *begin* the process of alleviating conditions it found constitute mental and physical "torture."

Having finally been held to account for their inhumane treatment of Plaintiffs and class members, Defendants now seek to delay even further any *hint* of action to remedy the conditions of confinement at DWCC. They claim not only that they will prevail on appeal, but that they will be *irreparably harmed* if they are forced to allow Court-appointed experts to *begin* developing a remedial plan. Unconscionably, they claim that Plaintiffs and class members who have been confined in inhumane conditions, sometimes for years, will *not* suffer irreparable harm from months or years of further delay.

Most of Defendants' arguments are cosmetic. Though it is obvious that the Court considered the "needs-narrowness-intrusiveness" criteria that are required of injunctive relief under the Prison Litigation Reform Act (PLRA)—indeed, so much so that the Remedial Order sets out only a *framework* for remedial action, not remedy itself—Defendants nonetheless complain that the Court did not identify these considerations explicitly. But even if the preliminary process outlined in the Court's Remedial Order were *not* crafted with the needs-narrowness-intrusiveness considerations in mind, findings on those issues are not required until the Court orders *substantive* remedial actions. Defendants also complain that the experts the Court intends to appoint to help assess current conditions at DWCC and plan needed remedies are named "Special Masters,"

1

subject to special procedures under the PLRA, though it is clear that the individuals contemplated by the order are not "quasi-judicial officers" to whom the PLRA provisions apply. They complain that the Court's Remedial Order is too vague because it enjoins the violations the Court found in its Remedial Opinion, rather than issuing declaratory relief on those points and phrasing the specific relief that follows as *justified by* those violations. They appear to complain that the Remedial Order refers to "reasons previously enunciated by the Court" because the Fifth Circuit has forbidden incorporation by reference.

These are trivial and non-substantive grounds for appeal. To the extent any of them has merit, however, the Court should not stay its Remedial Order and wait for the Court of Appeals to instruct how to check these procedural boxes more precisely. Rather, if it believes any of Defendants' arguments have even the slightest chance of triggering another year of procedural wrangling, the Court can and should enter additional findings based on the existing evidentiary record or amend, clarify, or reconsider its opinion, judgment and Remedial Order to perfect any errors and ensure any appeal is taken on substantive grounds.

Rule 52(b) permits a Court to enter additional findings and amend the judgment accordingly if warranted, and Rule 59(e) provides a mechanism for urging the Court to alter or amend its judgment. It may also amend injunctions on motion or its own recognizance. Defendants have not moved for the Court to correct any of the "errors" they identified; they know such a motion would only make the Court's opinion stronger on appeal. To ensure the Court may have the flexibility to address any of Defendants' arguments it thinks have merit, Plaintiffs cross-move for entry of additional facts or to alter or amend the judgment, the Remedial Opinion, and/or the

Remedial Order under Federal Rules of Civil Procedure 52(b), 59(e), and/or the Court's inherent power to amend injunctions as needed.[1]

Whether or not the Court wishes to address any of the alleged defects in its decisions, the Court should deny the requested stay. Each of the considerations governing a stay motion—Defendants' chances on the merits, the relative harms of granting or not granting the stay, and the public interest—weigh strongly in favor of proceeding with the remedy ordered by this Court as quickly as possible.

## II.    PROCEDURAL BACKGROUND

Plaintiffs filed this lawsuit in February 2018, seeking to remedy Defendants' violations of the Eighth Amendment to the U.S. Constitution and the Americans with Disability and Rehabilitation Acts at David Wade Correctional Center ("DWCC") in Claiborne Parish, Louisiana. Complaint, Rec. Doc. No. 1. Despite intimate knowledge of the actual conditions at DWCC, Defendants resisted Plaintiffs' suit at every turn for more than six years. *See generally* Docket. The Court certified the suit as a class action in September 2021. Mem. Ruling, Rec. Doc. No. 462. After a full bench trial on liability in January 2022, the Court held that Defendants had violated Plaintiffs' Eighth Amendment, ADA, and RA rights. Liability Op., Rec. Doc. No. 641. The Court's fact-findings laid out in excruciating detail the conscience-shocking conditions at DWCC. Examples include (but are not limited to) the prison's policy of placing class members on "strip cell" status as punishment, which means placing them in a cell and stripping them of all belongings, all clothing (but a paper gown), and their mattress for most of the day—a policy that the Court

---

[1] To the extent Rules 60 or 54 apply instead, Plaintiffs add these as potential bases for their cross-motion, though Plaintiffs believe Rules 52, 59, and the Court's inherent power provide more than enough authority for the Court to correct any errors it believes Defendants have identified.

deemed "mental and physical torture" (*id.* at 52-57); housing men with serious mental illness in solitary confinement conditions for years at a time (*id.* at 49-51), while simultaneously failing to provide adequate mental health treatment (*id.* at 86-93); inadequate monitoring of inmates on suicide watch, a lack of treatment for suicidal inmates, and improper use of restraints (*id.* at 107-118); and deploying mace on inmates in restraints on suicide watch for acts of self-harm before attempting de-escalating tactics or contacting the mental health department (*id.* at 136).

After additional discovery extending to August 30, 2022, the Court held a second trial to consider remedies for Defendants' violations beginning January 17, 2023. On July 18, 2024, the Court issued a 170-page opinion finding that Defendants' violations had continued through trial and would continue into the future. Op., Rec. Doc. No. 754 ("Rem. Op."). It issued a Remedial Order detailing a process by which the Court would appoint expert advisers to assess current conditions at DWCC and *propose* a remedial plan to address the violations found by the Court. Remedial Order, Rec. Doc. No. 755 ("RO"). The parties will have an opportunity to object to the proposed remedial plan and submit proposed amendments and the *Court* will resolve any disputes and enter a *separate order* effectuating the remedial plan reflecting its judgments on any disputes. *Id.* at 16-17. The Court also issued a final judgment in favor of the Plaintiffs and retained jurisdiction over the procedures set forth in the RO. J., Rec. Doc. No. 756.

Defendants filed a notice of appeal on August 2, 2024. Defs.' Notice Appeal, Rec. Doc. No. 757. The same day, they filed the instant motion to stay the Judgment and RO. Defs.' Mem., Rec. Doc. No. 759. On August 12, without waiting on the Court to decide their motion, Defendants filed a Motion to Stay with the Fifth Circuit Court of Appeal. Motion for Administrative Stay & for Stay of the District Court's Orders Pending Appeal, Charles v. LeBlanc, No. 24-30484 (5th Cir.), Rec. Doc. No. 16.

## III.     LEGAL STANDARD

Courts issue stays in their discretion, but "[a] motion to [a court's] discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles." *Nken v. Holder*, 556 U.S. 418, 434 (2009) (quoting *US v. Burr*, 25 F. Cas. 30, 35 (C.C.D.Va. 1807).

> [T]hose legal principles have been distilled into consideration of four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*Id.* (cleaned up) (citing *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

## IV.     DEFENDANTS ARE NOT ENTITLED TO A STAY.

### A.     Defendants' Appeal Lacks Merit.

The first consideration—whether Defendants are likely to succeed—weighs against a stay. Defendants' first argument is that the Court's injunction "is impermissibly vague and overbroad," when in truth the Court's injunction is narrowly tailored to address the constitutional and statutory violations that the Court has twice identified in detailed opinions. Defendants' remaining arguments regarding the Prison Litigation Reform Act are also unlikely to succeed.

### 1.     The Remedial Order Is Not Too Vague or Overbroad

A district court "may not issue an injunction that references other documents or is written in terms too vague to be readily understood." *Scott v. Schedler*, 826 F.3d 207, 213 (5th Cir. 2016). The purpose of the rule is to "prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022). "The drafting standard has been described so that an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed." *Scott*, 826 F. 3d at 211 (internal

citations omitted). An injunction is overbroad if it is not "narrowly tailored to remedy the specific action which gives rise to the order." *Id.* (quoting *Doe v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)).

Defendants argue that the Remedial Order violates these rules because, they purport, it fails to notify the State of what conduct is prohibited. Defs.' Mem. at 14, Rec. Doc. No. 759. But the Court's Remedial Order is clear, specific, and specifically tailored to addressing the issues that the Court has identified. The Remedial Order provides that Defendants must submit candidates for special master, produce evidence to the Special Masters of their remediation of any deficiencies within 14 days following their appointment, provide access to the Special Masters within 30 days, and consider a proposed remedial plan within 120 days. RO at 3, 15-16, Rec. Doc. No. 755. Defendants know exactly what is expected of them because they just complained to the Fifth Circuit about these same deadlines. Mot. for Administrative Stay at 3, Charles v. LeBlanc, No. 24-30484 (5th Cir.), Rec. Doc. No. 16 ("Defendants' deadlines for turning over evidence (14 days), giving access (30 days), and receiving the proposed remedial plan (120 days) start ticking as soon as the district court appoints masters . . . The district court's devotion to the *Parker* playbook has forced Defendants . . . to seek [emergency] relief"). On the one hand, the Defendants identify exactly what is expected of them, yet on the other hand they aver faux confusion. In truth, it is hard to imagine how the Court could have devised a clearer or more narrowly tailored process to remedy Defendants' constitutional and statutory violations.

Defendants' argument that the Remedial Order "does no more than command the State to stop violating the law" (Defs.' Mem. at 15, Rec. Doc. No. 759.) is incorrect on its face. The Remedial Order lays out in painstaking detail the process that the Court will employ to develop the Remedial Plan and identifies each of the issues that the plan should address. It specifically

contemplates that any remedial actions required as part of that plan will be the subject of a further Court order. There is no uncertainty or confusion, nor are Defendants at any current risk of a contempt citation for failing to take particular remedial actions since no Remedial Plan has yet been entered. Defendants are thus unlikely to prevail on appeal on this ground.

2. <u>The Court's Remedial Order Does Not Violate the Requirements of the PLRA.</u>

Defendants further argue that the Court erred in failing to consider the Prison Litigation Reform Act. They are also unlikely to prevail on this ground because the PLRA is not triggered until the Remedial Plan is entered.

a. *The Remedial Order Does Not Violate the Needs-Narrowness-Intrusiveness Test or the "Public Safety Requirement."*

The PLRA requires that in cases involving prison conditions, injunctive relief must be narrowly drawn, minimally intrusive, and necessary to correct a federal rights violation. 18 U.S.C. § 3626(a)(1). This portion of the statute merely codified pre-existing Fifth Circuit law regarding the granting of injunctive relief in prison reform cases. *Williams v. Edwards,* 87 F.3d 126, 133 (5th Cir. 1996). When granting prospective relief, a district court is not required to enter particularized findings, on a provision-by-provision basis, as to each component of the injunction. *Gates v. Cook*, 376 F.3d 323, 336 n. 8 (5th Cir. 2004).

Defendants argue that the Court needed to explicitly enter factual findings as to the needs-narrowness-intrusiveness test before entering the Remedial Order. This argument contravenes Fifth Circuit precent holding that until a district court fashions specific prospective relief, the PLRA is not implicated. In *Williams v. Edwards*, a case involving a then-long-running consent decree as to the Louisiana prison system, the state defendants appealed after the district court entered an order vacating a prior order terminating its supervision; the order thus brought state prisons back within the jurisdiction of the court. 87 F.3d at 127-29. The defendants argued that the

order violated the PLRA due to a purported failure to conduct the needs-narrowness-intrusiveness inquiry. *Id.* at 133. The Fifth Circuit disagreed, holding that the mere fact that a district court enters an order contemplating the issuance of a *future* remedy does not fall subject to the PLRA. Because the "district court ha[d] fashioned no prospective relief," "the provisions of the Act have yet to be triggered." *Id.* The appellate court advised the district court that "[i]n the future . . . any remedy it might fashion must conform to the standards set forth in the Act." *Id.* "But for now," the court of appeals added, "the Act does not affect this case." *Id. Williams* remains the law of the Fifth Circuit, and until this Court enters its Remedial Plan, the needs-narrowness-intrusiveness inquiry of the PLRA is not implicated.

This is also common sense, because until the Court enters its Remedial Plan, there is not yet a firm plan to consider. But also, it is clear that even if the needs-narrowness-intrusiveness test applied, the Court's current Remedial Order satisfies those criteria. Rather than directly ordering specific relief actions, the RO provides a framework process for assessing up-to-the-minute conditions at DWCC, developing a remedial plan with assistance from penological and mental health experts, and weighing objections, concerns, and alternative proposals from DWCC. This process, in other words, is specifically tailored to ensure any future orders for remedial action that are needed to remedy Defendants' violations, as narrowly tailored as possible, and as solicitous of Defendants' legitimate penological functions as is consistent with the Constitution and laws of the United States.

The only specific actions Defendants are currently ordered to undertake are those which are necessary to allow the Court's experts to develop a proposed remedial plan. Obviously, the Court believes this cooperation is needed to develop effective, PLRA-compliant relief. No

8

narrower or less intrusive method of assessing current conditions and crafting appropriately tailored relief is evident.

Nevertheless, if the Court is persuaded by Defendants' argument that a needs-narrowness-intrusiveness inquiry was required before entry of the Remedial Order, or even that a "belt and suspenders" approach is prudent to achieve the fastest possible relief for Plaintiffs and the class, the Court has discretion to do so expressly now through entry of additional findings of fact, in accordance with Rule 52(b), and/or revision of the Remedial Order to clarify its NNI assessment (under Rule 59(e) or the Court's inherent power to modify injunctive orders). The Court's Remedy Phase Opinion is replete with findings of fact that detail the evidentiary basis for the Court's conclusion that Defendants continue to exhibit deliberate indifference toward the unconstitutional conditions on the South Compound. *See* Rem. Op. at pp. 66-68, 76-77, 107, 113, 116, 144-151, Rec. Doc. No. 754. Considering these factual findings regarding Defendants' ongoing deliberate indifference, the Court's Remedial Order—which currently only requires the appointment of experts and provision of information to develop a plan—is narrowly drawn, minimally intrusive, and necessary to remedy the federal rights violations.

Defendants also argue that the Remedial Order grants the special masters the power to impose "best or preferred practices" rather than focusing on remedy. That argument is incorrect on its face. The Remedial Order merely identifies areas needing remedies and defers the adoption of specific steps or practices. The special masters also do not have the authority, absent a further order of the Court, to impose any specific remedy on Defendants. When a Remedial Plan is entered, the Court may at that time ensure any proposed plan is the narrowest and least intrusive. Until substantive remedial plans are ordered, Defendants have no basis to assert the purported lack of a needs-narrowness-intrusiveness inquiry.

Defendants next argue that the Court failed to consider public safety as required by 28 U.S.C. § 3626(a)(1) in developing its remedial order, but the Court may reject this argument for the same reason. The trial record contained sufficient evidence to prove that Defendants' current practices put inmates and staff in unnecessary jeopardy of harm. *See e.g.,* Test. Dan Pacholke, Remedy Trial Vol. III at 512-13, Jan. 19, 2023 (testifying that DWCC's use of solitary confinement and the lack of stimulation, particularly for inmates with mental illness, increases risk of self-harm and violent behavior); *id.* at 548:17-21 (DWCC's use of strip cell status "compromises the safety of your staff as well as the offender population"). But in any event, until the Remedial Plan is developed, there are no specific remedial actions yet for the Court to evaluate for public safety purposes. The cooperation with Court experts required by the Remedial Order obviously has no impact whatsoever on public safety or the legitimate functions of DWCC; even if the Court were to credit Defendants' histrionic claims of burden from having to grant access to records and allow experts access to DWCC to assess conditions; and even if the Court were to give those burdens extraordinary, unwarranted weight; those concerns would be easily outweighed by the persistence of unconstitutionally and unlawfully torturous conditions at DWCC. The Court will, of course, consider public safety concerns in consideration of the Remedial Plan, and craft remedial actions that give those concerns due weight. Defendants' argument here is also premature.

> b.      *The Special Masters Are Not Quasi-Judicial Officers Subject to the PLRA.*

Defendants argue that the Court violated the PLRA by appointing special masters without following the procedures of the PLRA. However, under the Remedial Order the "Special Masters" that the Court will appoint will not carry quasi-judicial powers, and therefore they do not fall within the ambit of the PLRA. The "Special Masters" label is perhaps a misnomer, but it is the *functions* of these Court-appointed experts that matter, not the label.

The Fifth Circuit has long recognized that district courts have inherent power to appoint experts to assist them in enforcing their order.  District courts retain "inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy." *Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982), amended in part, vacated in part, 688 F.2d 266 (5th Cir. 1982). "Such court-appointed agents have been identified by a confusing plethora of titles: receiver, Master, Special Master, master hearing officer, monitor, human rights committee, Ombudsman, and others. The function is clear, whatever the title." *Id.* (internal quotation marks and citations omitted).

A "special master" as defined by the PLRA is "any person appointed by a Federal court *pursuant to Rule 53 of the Federal Rules of Civil Procedure or pursuant to any inherent power of the court to exercise the powers of a master*, regardless of the title or description given by the court." 18 U.S.C. § 3626(g)(8) (emphasis added). When determining whether a court-appointed expert or agent is a special master who falls within the ambit of the PLRA, federal courts examine whether the function of the appointee is equivalent to those of a special master under Rule 53. Thus, for example, a federal appellate court determined that a compliance consultant was not a special master because the duties of the consultant were different than the quasi-judicial function of a special master outlined in Rule 53:

> The powers of special masters, who are quasi-judicial officers, are set forth generally in Federal Rule of Civil Procedure 53. They include the ability to convene and to regulate hearings, to rule on the admissibility of evidence, to subpoena and swear witnesses, and to hold non-cooperating witnesses in contempt. The master's responsibilities typically culminate in a report. If the report includes findings of fact, they are binding in non-jury actions unless clearly erroneous.

*Benjamin v. Fraser*, 343 F.3d 35, 45 (2d Cir. 2003) (citations omitted), overruled in part on other grounds by *Caiozzo v. Koreman*, 581 F.3d 63 (2d Cir. 2009). The consultant was not a special

master because the consultant "was not appointed to hold hearings, subpoena witnesses, take testimony, or rule upon evidence." *Id.* The consultant also did not "prepare reports to assist in the court's determination of discrete issues of law or fact, and its factual findings [we]re not legally entitled to deference." *Id.* The consultant did not exercise "quasi-judicial power" and was therefore not a special master. *Id.* at 47;  *see also Plata v. Schwarzenegger,* 603 F.3d 1088, 1095 (9th Cir. 2010) (holding that a receiver was not a special master under the PLRA because the receiver had *greater* powers over day-to-day prison management than a special master under Rule 53); *Handberry v. Thompson*, 446 F.3d 335, 352 (2d Cir. 2006) (examining a prison monitor's functions to conclude that the monitor was not a special master under the PLRA). Beyond the context of the PLRA, federal courts have also looked at an expert's functions to determine whether the expert was a Rule 53 special master. *See Gary W. v. State of La., Dep't of Health & Hum. Res*., 861 F.2d 1366, 1369 (5th Cir. 1988) (former special master previously appointed under Rule 53 was still serving "a quasi-judicial function" when she submitted a formal recommendation to the court and thus could not be deposed); *Jackson v. Los Lunas Ctr. for Persons with Developmental Disabilities*, No. CV 87-0839 JP/KBM, 2012 WL 13076262, at *91 (D.N.M. Oct. 12, 2012) (comparing a compliance administrator's function to those listed under Rule 53 to determine he was not a special master).

The experts appointed pursuant to the Remedial Order have different functions from those of a Rule 53 special master. They are not empowered to hold hearings, subpoena witnesses, take testimony, rule upon evidence, or enter factual findings that are subject to deference. They merely develop recommendations for the Court, which the Court may accept or decline. Nor does the Order indicate that the three experts are limited in their ability to communicate *ex parte*. To the contrary, the Court has authorized them to have access to the prison outside Plaintiffs' presence,

12

which is a benefit to Defendants. Holding no quasi-judicial powers, it is clear that they are not "special masters" but rather court-appointed experts appointed either under the inherent authority of the Court or Federal Rule of Evidence 706. *See, e.g., Ruiz,* 679 F.2d at 1161 (holding that courts have inherent power to appoint people to assist in administering a remedy); *Turner v. Cnty. of San Bernardino*, No. 16-00355, 2018 WL 6617638, at *7 (C.D. Cal. Dec. 14, 2018) (in consent decree, appointing experts to ensure compliance pursuant to Rule 706);

As the Court did not intend to give the experts the quasi-judicial powers of a special master as provided under Rule 53, the provisions of Section 3626(f) governing special masters do not apply.

  c. *The Court Has Instructed Its Experts to Consider Current Conditions in Developing the Remedial Plan.*

Defendants complain that the Court did not let them introduce purported evidence of "current conditions" after the discovery cutoff or after trial as evidence of whether the Defendants remain liable. The parties have already briefed this issue numerous times. Mot. Present Evid., Rec. Doc. No. 459; Defs.' Mot. in Lim., Rec. Doc. No. 656; Mot. Suppl. R., Rec. Doc. No. 738; Order, Rec. Doc. No. 753. The Supreme Court expressly approved a district court's imposition of discovery and cut-off deadlines in prison conditions litigation as part of orderly trial management in *Brown v. Plata*, 563 U.S. 493, 523 (2011) ("It is true that the three-judge court established a cutoff date for discovery a few months before trial . . . and that evidence of 'changed prison conditions' after that date would not be admitted. . . . Both rulings were within the sound discretion of the three-judge court."). Defendants cite no Supreme Court case overruling this aspect of *Brown* and indeed, they fail to even mention this controlling precedent.

*Valentine v. Collier*, 993 F.3d 270 (5th Cir. 2021), also does not support Defendant's late attempt to supplement the record outside of discovery. *Valentine* involves a prison's response to

13

the fast-moving COVID pandemic. The *Valentine* complaint was filed in March 2020, the trial as

held in July 2020, and judgment was entered in September 2020. *Id.* at 278-79. The district court

exercised discretion to permit Defendants to offer post-trial reports of changes to their COVID

testing regime, which this Court considered.  *See id*. at 286.   *See id.* at 284-288. Nothing in

*Valentine* speaks to Defendants' extraordinary request here: that district courts lack discretion and

upend orderly case administration each time a prison administrator requests permission to

unilaterally offer new post-trial evidence, *without* any opportunity for discovery or cross-

examination by the plaintiff. *Dockery v. Cain,* 7 F.4th 375 (5th Cir. 2021) also does not contravene

*Brown*: indeed, *Dockery* speaks of the "broad discretion" and "ample discretion *Farmer* affords

district courts" in their administration of prison litigation. *Id.* at 380. In *Dockery*, while the district

court, *in its discretion*, permitted post-trial discovery, nothing in *Dockery* states that post-trial

discovery was *required*. And nothing in *Dockery* suggests Defendants' proposition here: that the

Court was simply required to accept unilateral introduction their purported post-trial evidence or

alternatively, engage in a never-ending cycle of trials.

  The Court has crafted a Remedial Order that will permit the Defendants to offer, and permit

the Court to consider, evidence of current conditions as of the time that a Remedial Plan is entered.

This Remedial Order falls within the "ample discretion" afforded to district courts in their

administration of prison cases. *Dockery*, 7 F. 4th at 380.

  B. <u>Every Minute's Delay in Remediation Injures Class Members, Who Are Currently Subjected to Conditions That Are Literally Torture.</u>

  As this Court held, "the evidence presented at trial—including DWCC's own policies and

expert testimony—demonstrated that the unconstitutional conditions of confinement that are

imposed upon inmates on extended lockdown continue to subject inmates to physical and mental

torture and will continue to subject inmates to physical and mental torture into the future." Rem.

Op. at 66, Rec. Doc. No. 754. At least two individuals' suicides can be directly traced to Defendants' violations. *See id.* at 136-44. "Torture and death are irreparable harm." *Sied v. Nielsen*, No. 17-cv-06785-LB, 2018 WL 1142202, at *27 (N.D. Cal. 2018); *see also Villanueva-Bustillos v. Marin*, 370 F. Supp. 3d 1083, 1090 (C.D. Cal. 2018) (same); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 296-97 (D. Mass. 2018) (staying removal order because of *threat* of torture); *Al-Marri v. Bush*, No. Civ.A. 04-2035(GK), 2005 WL 774843, at *4 (D.D.C. Apr. 4, 2005) ("[The Petitioner] faces the possibility of transfer to a country where he might be tortured or indefinitely confined, which undeniably would constitute irreparable harm.").

Defendants argue Plaintiffs and class members will suffer no harm from a stay for two reasons. First, they argue, "the changes that the State has made to the South Compound at DWCC make current conditions there more than constitutional." Defs.' Mem. at 21, Rec. Doc. No. 759. The Court has found otherwise. Moreover, to the extent any of Defendants' post-close-of-discovery alleged changes *have* brought conditions up to constitutional muster, they may so demonstrate *through the mechanism set out for doing so in the Remedial Order*, which specifically provides for consideration of current conditions without playing an Achilles-and-the-tortoise game of unending new trials. *See* RO at 2-3, Rec. Doc. No. 755.

Second, Defendants argue that, because it has taken six years of litigation to issue a Remedial Order in the face of Defendants' tooth-and-nail battle to avoid the reforms needed for even minimal compliance with the Constitution and laws of the United States, Plaintiffs and the class will not be further irreparably harmed by months or years more of torturous, inhumane, and unlawful conditions of confinement. *See* Defs.' Mem. at 21, Rec. Doc. No. 759. This argument is morally abhorrent on its face.[2]

---

[2] It is also logically fallacious.

C.      The State Will Not Be Injured by the Remedial Order's Preliminary Scoping Exercises.

Defendants are not imprisoned in inhumane and unlawful conditions of confinement, so almost definitionally the harm to Plaintiffs and class members from staying a remedy outweighs any harm to Defendants from allowing a remedy to proceed. *See Nken* 556 U.S. at 425-26 (cited by Defs.' Mem. at 7, Rec. Doc. No. 759); *see id.* at 422-23 (noting grant by the Supreme Court of a stay where applicant for asylum claimed he would be persecuted if removal order were carried out). The implicit calculus at the heart of Defendants' motion is jaw-dropping: it suggests that the harm Defendants will bear from *cooperating with the development of a remedial plan* outweighs the harm to Plaintiffs and the class of remaining in conditions of confinement the Court has found to be inhumane to the point of torture. Defendants' continued resistance toward even *developing a plan* for compliance with the law further demonstrates their to-the-minute willful indifference to the unlawful and inhumane conditions to which Plaintiffs and class members are subjected.

Defendants' claims of irreparable harm would be comic if their consequences were less dire. Putting the lie to Defendants' hyperbolic claims, the Court's Remedial Order takes a cautious, sensible approach to improving conditions at DWCC that imposes almost *no* burden on Defendants whatsoever. Defendants' duties under the Remedial Order constitute only a handful of administrative, legal, and cooperative efforts to assist the Court's experts in crafting a remedial plan. Defendants fail to articulate why giving the Court's appointed experts "*carte blanche* to develop standards and procedures" is an irreparable harm. Defs.' Mem. at 12, Rec. Doc. No. 759; *see also id.* at 18 (appearing to argue that experts' authority to "develop plans" presents an irreparable injury).

Defendants suggest allowing the Court's experts to evaluate conditions and recommend a remedial plan is tantamount to "the complete take-over of all aspects of the operation of the South

16

Compound at DWCC," but this is nonsense. The Court's appointed experts have no authority under the Remedial Order to *impose* a remedial plan on the Defendants; rather, they must submit a "*proposed* remedial plan" for review by the Court. RO at 16-17, Rec. Doc. No. 755. The RO contemplates extensive opportunities for Defendants to present evidence of improvements to conditions at DWCC, to object to any or all elements of the proposed remedial plan, and to propose alternatives of their own devising. *See id.* at 2-3; *id.* at 16-17. Even in the unlikely event that Defendants' most hyperbolic fears are realized and the Court's experts *propose* that they "take over" every aspect of prison administration at DWCC, Defendants will suffer no irreparable harm; Defendants may not presume the Court will accept any proposal that goes beyond what is needed to fix Defendants' violations.

The only irreparable "harm" Defendants would suffer from denial of a stay is the burden of thinking through how to stop violating class members' constitutional and statutory rights. This is a burden they should have undertaken years before this case began, without the impetus of a lawsuit.

> D.   The Remedial Order Carefully Does Not Impinge on Public Safety Concerns and the Public Has a Strong Interest in Stopping the State's Torture of Its Citizens.

The fourth factor for consideration in whether to grant a stay is the public interest. As noted above, the Remedial Order is cautious about the very federalism concerns Defendants insist the Court ignores. Rather than "shooting from the hip" and issuing injunctions demanding specific actions, practices and procedures, the Court identified Defendants' many violations of the Constitution and laws and ordered a process for appointing experts to advise the Court on what specific remedial actions are necessary. Nothing in the Remedial Order presents the slightest imposition on public safety, the functioning of the criminal justice system, or the legitimate penological interests of DWCC as an institution. At best, the Remedial Order sets out a framework

for considering potential changes to DWCC's conditions of confinement that *might* impact the way DWCC operates; the Court's consideration of those potential changes, of course, will weigh their necessity in light of *both* their facility in remedying Defendants' constitutional and statutory violations *and* their potential impacts on other public safety and other dimensions of the penal system. At present, though, merely allowing Court-appointed experts to develop a remedial plan cannot be said to seriously interfere with public safety concerns or the legitimate functions of DWCC. The public has no interest in granting Defendants' proposed stay.

On the other hand, the public has a strong interest in ensuring that conditions in their penal institutions are at least minimally humane. "It is always in the public interest to prevent the violation of a party's constitutional rights." *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 458 (5th Cir. 2016); *cf. Nken*, 556 U.S. at 436 ("Of course there is a public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm."); *United States v. Texas*, No. 1:24-CV-8-DAE, 2024 WL 861526 (W.D. Tex. 2024) (holding it against the public interest to permit application of a law "which strips away an asylum applicant's option to raise credible fears [of] torture or persecution in a state hearing"); *Doe v. Qi*, 349 F. Supp. 2d 1258, 1306 (N.D. Cal. 2004) (holding "it would be difficult to conclude" that "actions allegedly taken in violation of international human rights—*e.g.*, torture, cruel, inhuman or degrading treatment and arbitrary detentions—were 'in the public interest'").

The public interest weighs strongly in favor of proceeding with the remedial process outlined in the Court's Remedial Order.

## V.   IF THE COURT BELIEVES DEFENDANTS' ARGUMENTS HAVE ANY MERIT, THE COURT SHOULD AMEND OR CORRECT ITS DECISIONS RATHER THAN STAYING A REMEDY.

As discussed above, Defendants' merits arguments are wrong and should not prevail on appeal. However, to the extent the Court *does* see merit in Defendants' formalistic procedural

arguments, Defendants suggest no reason why the Court could not dispose of those arguments by amending, clarifying, or reconsidering its rulings, or adding findings of fact. For the avoidance of doubt, Plaintiffs here move in the alternative for the Court to do so. Rather than delaying prisoners' relief by months or years while Defendants' arguments are tested on appeal, the Court may remedy any perceived problems with its decisions now, reducing the likelihood that class members' relief will be delayed on non-substantive grounds.

Under Federal Rule of Civil Procedure 52(b), "On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly." Under Rule 59(e), a party may move to alter or amend a judgment within 28 days of the entry of the judgment. Rule 59(e) is available "to correct manifest errors of law or fact," and the Court has "considerable discretion in deciding" such a motion. *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004) (quoting *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 473 (5th Cir. 1989)); *see also Atl. States Found., Inc. v. Karg Bros., Inc.*, 841 F. Supp. 51, 55 (N.D.N.Y. 1993) ("Reconsideration is warranted where, as here, a party demonstrates that the earlier ruling was premised on a misunderstanding of a relevant regulatory scheme"); *Fields v. Pool Offshore, Inc.*, 1998 WL 43217, at *2 ("reconsideration warranted where court has overlooked matters or controlling decisions that might have materially influenced earlier decision") (citing *Motor Vehicle Mfrs. Ass'n v. N.Y. State Dep't of Env't Conservation*, 831 F. Supp. 57, 60 (N.D.N.Y. 1993)). Though Defendants insist the Court's Remedial Order is "hopelessly vague," Defs.' Mem. at 9 Rec. Doc. No. 759, and that its "inexplicabl[e] failure to invoke magic words in its PLRA analysis is "clear legal error," *id.* at 10, Defendants have not filed a motion to correct these purported errors, seeking instead to delay even tenuous steps toward relief of the shockingly inhumane conditions at DWCC. If Defendants will not file such a motion,

19

Plaintiffs will,[3] in abundance of caution, so that that if the Court is persuaded that the grounds Defendants lay out as reasons they will prevail on appeal have merit, the Court has jurisdiction and discretion to resolve those issues now.[4] If errors of law in the Court's decisions are as manifest as Defendants say, the Court should simply modify its rulings to clarify its meaning.

The district court has inherent equitable authority to modify injunctive relief at any time, by motion or sua sponte, when "the original purposes of the injunction are not being fulfilled in any material respect." *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 503 (5th Cir. 1980) (citation omitted); *see Moore v. Tangipahoa Parish Sch. Bd.*, 864 F.3d 401, 407 (5th Cir. 2017) ("Upon proper notice, the district court may modify the terms of an injunction *sua sponte*."). Defendants suggest the injunctive relief issued by this Court is "impermissibly vague and overbroad," impermissibly incorporates other material, and violates the PLRA by failing to make specific needs-narrowness-intrusiveness findings, Defs.' Mem. at 10-11, Rec. Doc. No. 759, failing to address "any adverse impact on public safety or the operation of [the] criminal justice system," *id.* at 12, and "[a]ppointing three special masters," *id.* at 13. At best, Defendants' arguments highlight formalistic technicalities rather than substantive misapplications of the law or facts, and these arguments would be easily mooted by modification of the Court's Remedial Opinion, Remedial Order, and/or Judgment.

While Plaintiffs believe the District Court's decision is correct in all respects and are eager to defend it on appeal, the Court may think it opportune to explicitly tuck away some of the formal

---

[3] Defendants' strategic delay of relief on procedural grounds is, of course, ongoing evidence of their deliberate indifference to the unconstitutional conditions of confinement at DWCC.

[4] Though a Court may amend a judgment *sua sponte* only within the 28-day time limit of Rule 59(e), Plaintiffs' motion stops the clock and allows the Court some room in which to consider its decision. *See Hertz Corp. v. Alamo Rent-a-Car, Inc.*, 16 F.3d 1126, 1132 (11th Cir. 1994).

bones Defendants pick. As Defendants point out, several of the procedural arguments they cite here are live issues in *Parker v. Hooper*, No. 23-30825, currently pending in the Fifth Circuit. Should the *Parker* Appellants prevail, relief in this case might be substantially delayed for non-substantive reasons, and further delayed on a subsequent appeal. To the extent the Court believes Defendants' arguments have merit, it would be better to address those issues now rather than waiting for the Circuit's decision.

The Court could moot Defendants' key non-substantive arguments by, for example:

- Rephrasing its injunctions against violating the Eight Amendment, the ADA, and the RA to rephrase them as declaratory relief, or clarify that Defendants' violations of these laws are reasons why the specific instructions that follow are required, and that the intent of the injunctive relief is to expeditiously put Defendants on a path toward alleviating their violations, *compare* Defs.' Mem. at 9, Rec. Doc. No. 759 (complaining that the RO "enjoins the State from ever violating the law again");

- Clarifying that the "Special Masters" referred to in the Remedial Order are not special masters as defined by the PLRA, because they are not acting as "quasi-judicial officers," *see Benjamin* 343 F.3d at 45; and that the individuals in question are experts appointed under the Court's inherent authority and/or Federal Rule of Evidence 706 to advise the Court as to complex medical, technical and penological matters involved in remediating Defendants' Constitutional and statutory violations, and to monitor Defendants' compliance. *See id.*; *compare* Defs.' Mem. at 13-14, Rec. Doc. No. 759;

- Explicitly enunciating that the Court's findings that the groundwork scoping relief ordered is "narrowly drawn, extends no further than necessary to correct the violation[s] of the Federal right[s], and is the least intrusive means necessary to correct the violation of the Federal right[s]," including the appointment of each of the three experts with individualized expertise and their authorities to review conditions at DWCC and propose means by which Defendants may remedy their identified violations of the Eighth Amendment, ADA, and RA, *compare id.* at 10;

- Explicitly enunciating that the Court has considered and given substantial weight to the relief's impact on public safety and the operation of the criminal justice system, and found, *e.g.*, that the relief ordered will have almost no impact on either, especially relative to the persistent harms of not granting the ordered relief or of ordering other, lesser relief, *compare id.*;

- Clarifying that the Court's experts should consider legitimate concerns about public safety and the operation of the criminal justice system in formulating their recommendations, *compare id.* at 12;

- Explicitly attaching or incorporating its Remedial Opinion to the Remedial Order to the extent necessary to further elucidate "the reasons why [the injunction] issued," resolving Defendants' complaint that an injunction "cannot reference another document," *id.* at 8; and

- Entering any other additional findings of fact or undertaking any other amendments or clarifications to the Remedial Opinion, Remedial Order, or Judgment as appropriate to render more explicit the Court's consideration of applicable legal principles.

In their desperation to avoid the obligation to bring conditions at DWCC up to a standard of minimal Constitutional and statutory adequacy, Defendants grasp at procedural straws to delay their compliance with the Court's orders. The Court should not let them.

## VI.   CONCLUSION

For the reasons stated above, the Court should deny Defendants' Motion to Stay and, to the extent it believes Defendants have any meritorious arguments, enter additional findings of fact under Rule 52(b) or amend, correct, or reconsider its opinion, judgment, and/or remedial order under Federal Rule of Civil Procedure 59(e) and/or the Court's inherent power to modify its order granting injunctive relief.

Date: August 14, 2024                    Respectfully submitted,

*/s/ J. Dalton Courson*
Melanie A. Bray, La. Bar No. 37049
J. Dalton Courson, La. Bar No. 28542
Disability Rights Louisiana
8325 Oak Street, New Orleans, LA 70118
504-522-2337; 504-272-2531 (fax)
mbray@disabilityrightsla.org
dcourson@disabilityrightsla.org

**CERTIFICATE OF SERVICE**

I hereby certify that on the 14th day of August 2024, I electronically filed the foregoing *Plaintiffs' Memorandum in Opposition to Defendants' Motion to Stay Remedial Order and Judgment Pending Appeal and in Support of Cross-Motion in the Alternative for Entry of Additional Findings Under Rule 52(b) or to Amend, Clarify, or Reconsider the Remedial Order Under Rule 59(e)* with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ J. Dalton Courson*